ORIGINAL



1   STEVEN M. WATT* swatt@aclu.org
    BEN WIZNER (SBN 215724) bwizner@aclu.org
2   JAMEEL JAFFER* jjaffer@aclu.org
    STEVEN R. SHAPIRO* sshapiro@aclu.org
3   AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
4   125 Broad Street, 18th Floor
5   New York, NY, 10004
    Tel. 212.549.2500 / Fax 212.549.2651
6
7   ANN BRICK (SBN 65296) abrick@aclunc.org
    ACLU FOUNDATION OF
8   NORTHERN CALIFORNIA
    39 Drumm Street
9   San Francisco, CA, 94111
    Tel. 415.621.2493 / Fax 415.255.1478
10
11  CLIVE STAFFORD SMITH*† clivess@mac.com
    ZACHARY KATZNELSON† (SBN 209489)
12  Zachary@reprieve.org.uk
    REPRIEVE
13  PO Box 52742
    London EC4P 4WS
14  England
15  Tel. +44 (0)207 353 4640 / Fax +44 (0)207 353 4641

    E-filing

16  Additional Counsel Listed on Next Page

17              IN THE UNITED STATES DISTRICT COURT                    RS
18            FOR THE DISTRICT OF NORTHERN CALIFORNIA
                        Division of San Jose
19

20  BINYAM MOHAMED
    ABOU ELKASSIM BRITEL                    C 07        2798
21  AHMED AGIZA

22          Plaintiffs,

23      v.                                Civil Action No.

24
                                          COMPLAINT
25  JEPPESEN DATAPLAN, INC.
                                          DEMAND FOR JURY TRIAL
26          Defendant.

27

28

                              COMPLAINT

1   PAUL HOFFMAN (SBN 71244) hoffpaul@aol.com
    SCHONBRUN DESIMONE SEPLOW
2   HARRIS & HOFFMAN LLP
3   732 Ocean Front Walk, Suite 100
    Venice, CA, 90291
4   Tel. 310.999.7040, ext. 4 / Fax 310.999.7040

5   HOPE METCALF* hope.metcalf@yale.edu
    NATIONAL LITIGATION PROJECT
6   ALLARD K. LOWENSTEIN INTERNATIONAL
7   HUMAN RIGHTS CLINIC
    YALE LAW SCHOOL
8   127 Wall Street
    New Haven, CT, 06520
9   Tel. 203.432.9404 / Fax 203.432.9128

10   **Attorneys for Plaintiffs BINYAM MOHAMED, ABOU EL KASSIM BRITEL, and**
11   **AHMED AGIZA**
     **\* Pro Hac admission pending**
12   **†Attorneys for and on behalf of Plaintiff BINYAM MOHAMED only**

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

# COMPLAINT

## INTRODUCTION

1.  This case arises from Defendant Jeppesen Dataplan, Inc.'s ("Jeppesen") participation in the forced disappearance, torture, and inhumane treatment of Plaintiffs Binyam Mohamed, Abou Elkassim Britel, and Ahmed Agiza by agents of the United States and other governments.

2.  Since at least 2001, Jeppesen has provided direct and substantial services to the United States for its so-called "extraordinary rendition" program, enabling the clandestine and forcible transportation of terrorism suspects to secret overseas detention facilities where they are placed beyond the reach of the law and subjected to torture and other forms of cruel, inhuman, or degrading treatment. Publicly available records demonstrate that Jeppesen facilitated more than 70 secret rendition flights over a four-year period to countries where it knew or reasonably should have known that detainees are routinely tortured or otherwise abused in contravention of universally accepted legal standards.

3.  On April 10, 2002, Binyam Mohamed, a British resident seeking to return to the United Kingdom from Pakistan, was arrested in Karachi, Pakistan and turned over to agents of the U.S. Federal Bureau of Investigation and the Central Intelligence Agency. After four months of interrogation, during which time he was refused access to a lawyer, CIA agents stripped him and dressed him in overalls, blindfolded him, shackled his hands and feet, strapped him to the seat of a plane, and flew him to Rabat, Morocco.

4.  For the next eighteen months, Mr. Mohamed was secretly detained, interrogated, and tortured by agents of the Moroccan intelligence services. On January 21, 2004, he was once more stripped, blindfolded, and shackled by agents of the CIA and flown to the secret U.S. detention facility known as the "Dark Prison," in Kabul, Afghanistan. There, Mr. Mohamed was subjected to several more months of detention,

1

COMPLAINT

interrogation, and torture by U.S. intelligence agents before being transferred to Bagram airbase outside Kabul. In September 2004, Mr. Mohamed was transferred to the Naval Station at Guantánamo Bay, Cuba where he remains.

5. On March 10, 2002, Abou Elkassim Britel, an Italian citizen, was apprehended by Pakistani police in Lahore, Pakistan. After two months of interrogation, during which time his repeated requests to speak with the Italian consulate were denied, he was turned over to CIA agents who stripped him, dressed him in overalls, blindfolded him, shackled his hands and feet, and flew him to Rabat, Morocco.

6. For more than eight months, Mr. Britel was secretly detained, interrogated, and tortured by agents of the Moroccan intelligence services until he was released without charges in February 2003. In May 2003 he was arrested by Moroccan authorities while attempting to return to Italy. In the same month, following a trial that failed to comport with universally recognized fair trial standards, Mr. Britel was sentenced to fifteen years in prison for his alleged involvement in terrorist-related activities. His sentence was subsequently reduced to nine years on appeal.

7. On December 18, 2001, Ahmed Agiza, an Egyptian citizen seeking asylum in Sweden, was secretly apprehended by Swedish security police, handed over to agents of the CIA, and then stripped, dressed in overalls, chained, shackled, drugged, and flown from Stockholm to Cairo. There, he was turned over to agents of the Egyptian intelligence services who detained, interrogated, and tortured him.

8. For the first five weeks after his arrival in Egypt Mr. Agiza was detained incommunicado. During this time and for some ten weeks thereafter he was repeatedly and severely tortured and denied meaningful access to consular officials, family members, and lawyers. In April 2004, following trial before a military tribunal that failed to comport with universally recognized fair trial standards, Mr. Agiza was convicted and sentenced to twenty-five years in prison for membership in an

2

COMPLAINT

organization banned under Egyptian law. The sentence has since been reduced to fifteen years.

9.   Plaintiffs Mohamed, Britel, and Agiza were victims of an unlawful program, devised and developed by the CIA. Commonly known as "extraordinary rendition," the program involves the clandestine apprehension and transfer of persons suspected of involvement in terrorist activities to secret detention and interrogation facilities in countries outside the United States, utilizing methods impermissible under U.S. and international law. The program has been carried out by the CIA with the assistance of U.S.-based corporations that have provided the aircraft, flight crews, and flight and logistical support necessary for hundreds of international flights.

10.   In return for undisclosed fees, Jeppesen has played a critical role in the successful implementation of the extraordinary rendition program. It has furnished essential flight and logistical support to aircraft used by the CIA to transfer terror suspects to secret detention and interrogation facilities in countries such as Morocco and Egypt where, according to the U.S. Department of State, the use of torture is "routine," as well as to U.S.-run detention facilities overseas, where the United States government maintains that the safeguards of U.S. law do not apply.

11.   Jeppesen provided these services to the CIA in connection with the forced disappearances, torture, and other inhumane treatment of Mr. Mohamed, Mr. Britel, and Mr. Agiza. Among other services provided, Jeppesen prepared pre-departure flight planning services, including itinerary, route weather, and fuel plans for both aircraft involved in their renditions; procured necessary landing and overflight permits for all legs of the rendition flights; and through local agents, arranged fuel and ground handling for the aircraft; filed flight plans with national and inter-governmental air traffic control authorities; paid passenger fees for the crew; and made arrangements to secure the safety of the aircraft and crew on the ground.

3

COMPLAINT

12. In providing its services to the CIA, Jeppesen knew or reasonably should have known that Plaintiffs would be subjected to forced disappearance, detention, and torture in countries where such practices are routine. Indeed, according to published reports, Jeppesen had actual knowledge of the consequences of its activities. A former Jeppesen employee informed The New Yorker magazine that at an internal board meeting, a senior Jeppesen official stated: "We do all of the extraordinary rendition flights – you know, the torture flights. Let's face it, some of these flights end up that way." Jane Mayer, *Outsourced: The C.I.A.'s Travel Agent*, The New Yorker, Oct. 30, 2006.

13. Mr. Mohamed, Mr. Britel, and Mr. Agiza bring this action against Jeppesen because in providing flight and logistical services to the CIA, the company facilitated and profited from Plaintiffs' forced disappearances, torture, and other inhumane treatment.

**JURSIDICTION AND VENUE**

14. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1332 (diversity jurisdiction); and 28 U.S.C. § 1350 (Alien Tort Statute).

15. Venue is proper pursuant to 28 U.S.C. § 1391(b) (1) and (c).

**INTRADISTRICT ASSIGNMENT**

16. This case should be assigned to the San Jose Division of this District because Defendant Jeppesen Dataplan, Inc. has its headquarters in the city of San Jose.

**PARTIES**

17. Plaintiff Binyam Mohamed is an Ethiopian citizen. At the time of his unlawful rendition, Mr. Mohamed was a legal resident of the United Kingdom. Mr. Mohamed is currently imprisoned at Guantánamo.

4

COMPLAINT

18. Plaintiff Abou Elkassim Britel is an Italian citizen. At the time of his unlawful rendition, Mr. Britel was working in Pakistan. Mr. Britel is currently imprisoned at the Ain Bourja prison in Morocco.

19. Plaintiff Ahmed Agiza is an Egyptian citizen. At the time of his unlawful rendition, Mr. Agiza, together with his wife and five young children, was living in Sweden, where the family had applied for political asylum and permanent residence. Mr. Agiza is currently imprisoned in the Tora prison complex in Egypt. His wife and children have since acquired refugee status and permanent residence in Sweden.

20. Defendant Jeppesen Dataplan, Inc. is a corporation with headquarters in San Jose, California. Jeppesen provides an aviation logistical and travel service operating under the trade name Jeppesen International Trip Planning. Jeppesen is a wholly owned subsidiary of Jeppesen Sanderson, a corporation with headquarters in Englewood, Colorado and with branch offices throughout the world. Jeppesen Sanderson, in turn, is a wholly owned subsidiary of the Boeing Company, a publicly traded corporation with world headquarters in Chicago, Illinois.

## LEGAL FRAMEWORK

21. The Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, adopted in 1789, permits aliens to bring suit in United States courts for violations of the law of nations or a treaty of the United States. The ATS recognizes as federal common law those international norms that have definite content and acceptance among civilized nations. *Sosa v. Alvarez Machain,* 542 U.S. 692 (2004).

22. The acts described herein, constituting forced disappearance, torture, and other cruel, inhuman or degrading treatment, are within the body of acts that violate such definite and accepted international norms, as codified in numerous conventions, declarations, and other international instruments, including, *inter alia*:

- United Nations General Assembly, "Declaration on the Protection of All Persons from Enforced Disappearances" (Geneva: United Nations, 1992), A/RES/47/133;

5

COMPLAINT

- Inter-American Convention on Forced Disappearance of Persons, 33 I.L.M. 1429 (1994), entered into force March 28, 1996;
- International Convention for the Protection of All Persons from Enforced Disappearance, E/CN.4/2005/WG.22/WP.1/Rev.4 (2005);
- United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, annex, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984), *entered into force* June 26, 1987;
- Universal Declaration of Human Rights, G.A. res. 217A (III), U.N. Doc. A/810 at 71 (1948);
- International Convention on Civil and Political Rights, G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171, *entered into force* Mar. 23, 1976.

23.  Accordingly, the challenged conduct falls within the body of acts deemed actionable under the federal common law by the United States Supreme Court in *Sosa*. Moreover, since *Sosa,* courts have consistently recognized the existence of complicity liability under the ATS.  *See, e.g., Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157 (11th Cir. 2005); *Bowoto v. Chevron Texaco Corp.*, 2006 WL 2455752 *3 (N.D. Cal. 2006); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 321-324 (S.D.N.Y. 2003).

**FACTUAL ALLEGATIONS**

**General Facts**

**The United States Extraordinary Rendition Program**

24.  On information and belief, beginning in the early 1990s and continuing to this day, the CIA, together with other U.S. government agencies, has developed an intelligence-gathering program involving the apprehension and transfer of foreign nationals suspected of involvement in terrorism to detention and interrogation in

6

COMPLAINT

1    countries where, in the United States' view, federal and international legal safeguards do

2    not apply.

3        25. Suspects are detained at facilities outside U.S. sovereign territory, run by

4    either U.S. or foreign authorities, where they are interrogated by U.S. or foreign

5    intelligence agents. In all instances, detention and interrogation methods that do not

6    comport with federal and internationally recognized standards are employed. The

7    program is commonly known as "extraordinary rendition."

8        26. Testifying before a hearing of the Joint House/Senate Intelligence

9    Committee in October 2002, George J. Tenet, then Director of Central Intelligence,

10    described the rendition program as a key counterterrorism tool, and testified that in an

11    unspecified period before September 11, 2001, the United States had undertaken 70 such

12    renditions.

13        27. On information and belief, since the September 11, 2001 attacks, the

14    primary objective of the rendition program, the transfer of suspects to stand trial, has

15    altered significantly and is now aimed at the clandestine apprehension, transfer,

16    detention, and interrogation of foreign nationals suspected of involvement in terrorism

17    outside the United States.

18        28. On information and belief, the extraordinary rendition program serves two

19    discrete functions: it permits agents of the United States to apprehend and detain foreign

20    nationals whom it considers terrorist suspects outside U.S. sovereign territory; and it

21    permits those agents, either on their own or through counterparts in foreign intelligence

22    agencies, to employ interrogation methods that would be prohibited under federal or

23    international law as a means of obtaining information from suspects.

24        29. Memoranda prepared by the U.S. Department of Justice's Office of Legal

25    Counsel have consistently advanced the position that foreign nationals held at such

26    facilities, outside U.S. sovereign territory, are not protected by the Constitution or by

27    U.S. obligations under international law, and that U.S. officials cannot, therefore, be held

28

7

COMPLAINT

accountable in U.S. courts for actions carried out in relation to such persons.  For example, government lawyers have advanced this argument in habeas corpus proceedings brought on behalf of foreign nationals detained and interrogated at Guantánamo.

30.  Pursuant to the extraordinary rendition program, foreign nationals suspected of involvement in terrorism have been apprehended and transported to detention and interrogation facilities in Morocco, Egypt, Afghanistan, Syria, Jordan, Guantánamo, and elsewhere.  Of the foreign countries involved, Egypt, in particular, has played a leading role in the extraordinary rendition program.  On May 15, 2005, the Egyptian Prime Minister stated publicly that Egypt had assisted the United States in the rendition of 60 to 70 terrorist suspects since the September 11 attacks.

31.  Since at least 2001, the press had begun to report on the existence of the program as well as details of its operation.  For example, on November 20, 2001, the Wall Street Journal published a detailed, front-page investigative story on earlier CIA-orchestrated renditions to torture in Egypt.  The article described the 1998 arrests of several Egyptian terrorism suspects in Albania by local authorities at the behest of the CIA, and the use of unmarked "CIA-chartered plane[s]" to send them to Egypt, where they were detained and interrogated under torture.  Two of the men were hanged in 2000. The article's authors were explicit about the incident's relevance, arguing that it "illuminates some of the tactical and moral questions that lie ahead in the global war on terrorism.  Taking this fight to the enemy will mean teaming up with foreign security services that engage in political repression and pay little heed to human rights."

**Use of Torture by Moroccan Intelligence Services**

32.  The United States Department of State has long documented the prevalence of torture and other forms of inhumane treatment in Morocco, particularly for detainees in the custody of the country's security and intelligence services.  For instance, State

8

COMPLAINT

1    Department reports for 2002 and 2003, spanning the years that Plaintiffs Mohamed and

2    Britel were rendered to detention and interrogation in Morocco, noted that members of

3    the security forces "tortured or otherwise abused detainees," while the failure to

4    prosecute such cases "raised concerns regarding the Government's commitment to

5    resolving the problem." The reports also listed several documented killings of prisoners

6    by security personnel. The 2003 report documented that the use of torture by security

7    personnel became even more commonplace following the passage of a new "anti-

8    terrorist" law in May, and that "[a]ttorneys for some persons convicted under the new

9    anti-terrorism law claimed their clients were convicted on the basis of confessions

10   coerced by torture."

11        33.   U.N. Human Rights bodies and international non-governmental

12   organizations reported similar findings during this period. For example, in a 2002 report,

13   Amnesty International documented that "scores of detainees were tortured or ill-treated

14   in custody in order to extract confessions or to force them to sign statements which they

15   rejected or denied," and that many of the victims were "Islamists held in secret detention

16   and accused of involvement in or planning violent acts." And, mirroring the State

17   Department report, in 2003, the organization reported "an alarming upsurge in the

18   number of allegations of torture and ill-treatment" over the previous two years and stated

19   that many suspects "were reportedly tortured while held in secret and unacknowledged

20   detention by the Directorate for the Surveillance of the Territory (the internal intelligence

21   service)."

22   **Use of Torture by Egyptian Intelligence Services**

23        34.   In Egypt as well, for well over a decade, the United States Department of

24   State has documented that torture and other forms of inhumane treatment are routine.

25   These reports make clear that terrorism suspects in the custody of the intelligence

26   services are particularly vulnerable to such treatment. For example, in its 2001 report,

27

28                                              9

                                          COMPLAINT

the State Department noted that "[i]n combating terrorism, the security forces continued to mistreat and torture prisoners, arbitrarily arrest and detain persons, and hold detainees in prolonged pretrial detention." The report noted that "[t]orture takes place in SSIS [State Security Investigations Services] offices, including its headquarters in Cairo, and at CSF [Central Security Forces] camps. Torture victims usually are taken to an SSIS office, where they are handcuffed, blindfolded, and questioned about their associations, religious beliefs, and political views. Torture is used to extract information, coerce the victims to end their antigovernment activities, and deter others from similar activities."

35. U.N. Human Rights bodies, as well as international and national non-governmental organizations, including Amnesty International, Human Rights Watch, and the Egyptian Organization for Human Rights, have also documented that since at least 1993, the use of torture has become a widespread phenomenon in Egypt and has been especially prevalent among members of the country's intelligence services in cases with national security overtones.

**Use of Torture at U.S. Detention Facilities in Afghanistan**

36. The existence of U.S.-run detention centers in Afghanistan and elsewhere, as well as the use of torture and other inhumane interrogation techniques by U.S. officials, has been widely reported and documented since at least 2002. News reports from this time revealed that individuals apprehended after September 11, 2001, and held by the U.S. at military bases or detention facilities in Afghanistan, were regularly subjected to illegal interrogation methods, physical abuse, and torture at the hands of U.S. personnel. As early as 2002, Amnesty International released a series of reports into the alleged killings and mistreatment of detainees by U.S. forces in Afghanistan. And, in December, 2002 the Washington Post described how "captives are often 'softened up' by MPs and U.S. Army Special Forces troops who beat them up and confine them in tiny rooms."

10

COMPLAINT

The Post also reported that "alleged terrorists are commonly blindfolded and thrown into walls, bound in painful positions, subject to loud noises and deprived of sleep."

37.  In March, 2003, The New York Times also reported extensively on the torture and other inhumane treatment of detainees by U.S. officials, and noted that prisoners at Bagram Air Base were forced to stand naked, hooded, shackled, and immobile for long periods of time and were deprived of sleep for days on end.

38.  These same reports also disclosed that numerous detainees had died in custody.  For example, the New York Times reported in 2003 that two criminal investigations had been launched into the deaths of detainees in Afghanistan.  In one of these cases, the death of an Afghan man in U.S. custody, the Times noted that a U.S. pathologist had ruled the death to be a homicide.  Following the release of the Abu Ghraib prison abuse photographs in the spring of 2004, news outlets in the United States and around the world continued to report on the torture and other mistreatment of detainees in U.S. custody in Afghanistan and elsewhere.

39.  In March 2004, Human Rights Watch released comprehensive findings on the mistreatment of detainees in U.S. detention facilities in Afghanistan and Pakistan between 2003 and 2004, the period during which Plaintiff Mohamed was rendered to detention and interrogation by U.S. forces in Afghanistan.  Specifically, Human Rights Watch found that detainees were severely beaten, doused with cold water and subjected to freezing temperatures, forced to stay awake, or to stand or kneel in painful positions for extended periods.  Since this time, the widespread torture and abuse of detainees in U.S. custody overseas has been widely reported in media outlets around the world and documented in official U.S. government reports and other publicly available documents, as well as in reports by U.N. Human Rights bodies and international non-governmental organizations.

**Corporate Involvement in the Extraordinary Rendition Program**

11

COMPLAINT

40.  U.S.-based corporations and their agents have played an integral role in the implementation of the extraordinary rendition program.  Some of these corporations have furnished aircraft and personnel to transport persons identified by the United States as potential terrorist threats to detention and interrogation facilities overseas.  Other corporations, including Jeppesen, have provided flight and logistical support services to these aircraft and crew.

41.  The services provided by Jeppesen have been crucial to the functioning of the extraordinary rendition program.  Jeppesen operates one of the largest aviation trip-planning services in the world, and, on information and belief, Jeppesen has been one of the main providers of flight and logistical support services to aircraft used in the program.  On information and belief, Jeppesen had two employees who were "specifically designated" to provide services for the program.

42.  Jeppesen has provided a number of services essential to all stages of planning and execution of rendition flights:

    a.  In preparation for these flights, it furnished aircraft crew with comprehensive flight planning services, including itinerary, route, weather, and fuel planning.  It has assumed responsibility for the preparation of flight plans for rendition flights and, where necessary, filed them in advance of departure with appropriate national and inter-governmental air traffic control authorities, smoothing the way for the renditions.  It has established cooperative relationships with virtually every government worldwide, allowing it to procure necessary overflight and landing permits for aircraft involved in the rendition program;

    b.  During flights, Jeppesen has provided en-route, destination, and departure weather forecasting to ensure the safe passage of aircraft; and,

    c.  Once aircraft have landed, Jeppesen, through its worldwide network of local handling agents, has facilitated essential customs clearance in the

12

COMPLAINT

1               countries of operation and made arrangements for ground transportation,

2               catering, and hotel accommodation for aircraft crew, as well as physical

3               security for the aircraft and crew.  Jeppesen also has arranged fuel and

4               refueling services as well as maintenance for the aircraft involved.

5 In short, but for the assistance of Jeppesen and other corporations, the extraordinary

6 rendition program could not have gotten off the ground.

7         43.  Just as important as the provision of these services, Jeppesen's role as

8 coordinator with virtually all public and private third parties has permitted the CIA to

9 conduct its illegal activities below the radar of public scrutiny and beyond the reach of

10 the rule of law.  For example, on information and belief, through its interaction with

11 government officials for procurement of overflight and landing permits for the aircraft,

12 Jeppesen enabled the CIA to sidestep its obligations under the Convention on

13 International Civil Aviation, which requires any aircraft conducting State business to

14 request relevant authorizations from host nations.

15         44.  Flight records obtained by a European Parliamentary inquiry and a parallel

16 investigation by the Council of Europe into CIA activities in Europe, together with other

17 flight records obtained from national civil aviation authorities in Portugal, Spain, the

18 Netherlands, and Italy in the course of criminal and journalistic investigations in those

19 countries, reveal that over a four-year period, beginning on or around December 16,

20 2001, Jeppesen provided flight and logistical support to at least 15 aircraft which made a

21 total of 70 flights.  The European Parliament and the Council of Europe concluded that

22 all of these flights were made in the context of the extraordinary rendition program.

23         45.  Among the 15 aircraft serviced by Jeppesen are a Gulfstream V aircraft

24 formerly registered with the Federal Aviation Administration ("FAA") as N379P, and a

25 Boeing-737 aircraft formerly registered with the FAA as N313P.  On information and

26 belief, Jeppesen provided flight and logistical services for all of the CIA flights for these

27 two aircraft involving the rendition of terror suspects.

28

13

COMPLAINT

46. More specifically, based upon flight logs and other corroborating evidence, both the European Parliament and Council of Europe concluded that these two aircraft were involved in at least six specific rendition flights carried out by the CIA:

- On December 18, 2001, the Gulfstream V aircraft was used to transport Plaintiff Agiza and another Egyptian citizen, Mohammed El-Zery, from Sweden to Egypt.

- On May 24, 2002, the Gulfstream V aircraft was used to transport Plaintiff Abou Elkassim Britel from Islamabad, Pakistan to Rabat, Morocco.

- On July 21, 2002, the Gulfstream V aircraft was used to transport Plaintiff Binyam Mohamed from Islamabad to Rabat.

- On December 9, 2002, the Gulfstream V aircraft was used to transport Bisher Al Rawi, an Iraqi citizen and legal resident of the United Kingdom, and Jamil Al Banna, a Jordanian citizen who had been granted asylum and permission to reside in the United Kingdom, from Banjul, Gambia to Kabul, Afghanistan. Flight logs show that this aircraft departed Banjul at 9:45 p.m. on December 8, 2002, landed in Cairo the next morning at 3:45 a.m., and later that morning at 4:45 a.m. flew from Cairo to Kabul, arriving there at 9:04 a.m. In Afghanistan the men were detained and interrogated under torture by agents of the United States government, first at the notorious "Dark Prison," and then at the Bagram Air Base. In January 2003, both men were flown to Guantánamo. Mr. Al Rawi was returned to the United Kingdom on March 29, 2007, where he was released without charge. Mr. Al Banna remains incarcerated.

- On January 22, 2004, the Boeing-737 aircraft was used to transport Plaintiff Binyam Mohamed from Rabat, Morocco to a U.S. detention facility in Afghanistan.

14

COMPLAINT

- On January 24, 2004, the same Boeing-737 aircraft was used to transport German citizen Khaled El-Masri from Skopje, Macedonia to Kabul, Afghanistan. Flight logs show that this aircraft departed Skopje at 1:30 a.m. on January 24, 2004, landed in Baghdad at 5:53 a.m., and later that morning at 7:15 a.m. flew from Baghdad to Kabul, arriving there at 11:14 a.m. In Afghanistan Mr. El Masri was detained and interrogated under torture at the secret U.S.-run "Salt Pit" detention facility for more than four months before he was released in Albania. The investigation by the Council of Europe found that Mr. El Masri's rendition was part of the same, single-flight circuit as that of Mr. Mohamed.

47.   On information and belief, the originator code on all these flight records reveals that Jeppesen was responsible for filing pre-departure flight plans with appropriate national and inter-governmental air traffic control authorities in each of these renditions. On information and belief, Jeppesen also provided all other flight and logistical support to the aircraft and crew, including, *inter alia*, compilation of itinerary, route, weather, and fuel plans; providing weather forecasting both pre-departure and en-route; procuring over-flight and landing permits; and, through its local ground handling agents, providing customs clearance, ground transportation, catering, and hotel arrangements for air crew and security for both the aircraft and crew.

48.   In coordinating these flights, Jeppesen knew or reasonably should have known that the flights involved the transportation of terror suspects pursuant to the extraordinary rendition program and that the governments of the destination countries routinely subject detainees to torture and other forms of cruel, inhuman, or degrading treatment. Indeed, Jeppesen states on the website for its "International Trip Planning" division that, among other services, the company "monitors political and security situations" and provides "[f]ull background on the political state of affairs in destination countries so you know the lay of the land, before you land."

15

COMPLAINT

**Specific Allegations By Plaintiffs**

**Background Information on Plaintiff Binyam Mohamed**

49.   Plaintiff Binyam Mohamed is a 28 year-old Ethiopian citizen.  In 1994, Mr. Mohamed, who had fled Ethiopia with his family, came to the United Kingdom where he sought political asylum.  While his asylum application was pending, he was granted leave to remain in the country and remained there for seven years.

50.   In the summer of 2001, Mr. Mohamed traveled to Afghanistan to escape from a social life in London where he had suffered a drug problem.  When the U.S.-led coalition invaded Afghanistan, he left that country for Pakistan, planning to return to the United Kingdom.

**Detention, Interrogation and Torture in Pakistan**

51.   On April 10, 2002, Mr. Mohamed, while attempting to leave Pakistan and return to the United Kingdom, was arrested by Pakistani officials at Karachi airport on immigration charges.  He was taken by Pakistani officials to a detention facility where he was interrogated by agents of the FBI and British intelligence.  His numerous requests to speak to a lawyer were denied, and while detained and interrogated he was badly abused by Pakistani security personnel.

52.   During his detention, Mr. Mohamed was repeatedly interrogated about Al Qaeda and his association with that organization.  He was accused of being a high-ranking member of Al Qaeda, although an agent for the FBI would later admit in a sworn affidavit, that he was not a member at all.

53.   On July 19, 2002, escorted by two Pakistani officials, Mr. Mohamed was flown from Karachi to Islamabad.  When the aircraft landed, he was handcuffed and taken by bus to a pick-up truck, and then placed in a cell where he was detained until July 21, 2002.

**Efforts made by Mr. Mohamed's Family to Locate Him**

16

COMPLAINT

54.  In June or July 2002, after Mr. Mohamed's initial detention and interrogation in Pakistan by U.S. and British officials, Mr. Mohamed's brother and sister, both of whom reside in the United States, were visited by FBI officers.

55.  These officers asked them various questions about Mr. Mohamed, but because neither of them had seen or heard from him for some time, they were unable to assist.  Mr. Mohamed's siblings asked the officers if they knew where their brother was, and the officers replied that he might be in the custody of the Pakistani government and that if they wanted to inquire further, they should take matters up with Pakistani consulate in New York.

56.  Mr. Mohamed's siblings inquired with the Pakistani consulate about Mr. Mohamed's whereabouts but to no avail.  His sister also contacted one of the FBI officers who had visited with her to ask if he had any information about Mr. Mohamed's whereabouts.  She called and spoke with him approximately ten times from July 2002 to December 2003, when the officer told her to stop calling him and to call the Pakistani consulate again.

**Rendition to Morocco**

57.  On July 21, 2002, Mr. Mohamed was taken to what appeared to him to be a military airport near Islamabad.  He was left waiting for about two hours before being turned over to the exclusive custody and control of U.S. officials.

58.  At the airport, several Americans dressed in black, wearing masks and work boots, stripped Mr. Mohamed of all his clothes.  He was photographed and subjected to an anal cavity search.  Mr. Mohamed was then dressed in a tracksuit, shackled, blindfolded, and forced to wear earphones.

59.  Mr. Mohamed and two other prisoners were bundled on board an aircraft. For the duration of the eight to ten hour flight that followed, Mr. Mohamed remained unable to move.  Early the next morning, July 22, 2002, the aircraft landed in Rabat, Morocco.

17

COMPLAINT

1    60.  Flight records show that on July 21, 2002, a Gulfstream V aircraft,

2  registered with the FAA as N379P, left Islamabad at 5:35 p.m. and arrived in Rabat,

3  Morocco at 3:42 a.m. the following day.  Upon information and belief, Jeppesen

4  provided the flight and logistical support necessary to secure the aircraft's safe passage

5  from Islamabad to Rabat.

6  **Detention, Interrogation, and Torture in Morocco**

7    61.  Between July 2002 and January 2004, Mr. Mohamed was detained,

8  interrogated, and tortured at a series of detention facilities in Morocco.

9    62.  Mr. Mohamed was subjected to severe physical and psychological torture.

10  He was routinely beaten, suffering broken bones and, on occasion, loss of consciousness

11  due to the beatings.  His clothes were cut off with a scalpel and the same scalpel was

12  then used to make incisions on his body, including his penis.  A hot stinging liquid was

13  then poured into open wounds on his penis where he had been cut.  He was frequently

14  threatened with rape, electrocution, and death.

15    63.  Mr. Mohamed was handcuffed, fitted with earphones, and forced to listen to

16  extremely loud music day and night, sometimes interrupting his sleep for forty-eight

17  hours at a time.  He was placed in a damp, moldy room with open sewage for a month at

18  a time.  He believed his food to be drugged, but when he refused to eat he was forcibly

19  hooked up to two different IVs.  These IVs alternated pumping different substances into

20  his body, the combination of which forced him to undergo painful withdrawal symptoms.

21  In the end, Mr. Mohamed decided to return to eating solid food.

22    64.  Under constant threat of torture, Mr. Mohamed continued to be interrogated

23  about Al Qaeda and suspected Al Qaeda members.  He was told that the U.S. wanted a

24  story from him and that he had to prepare to testify against individuals then in U.S.

25  custody, including Jose Padilla, Khalid Sheikh Mohammed, Abu Zubaydah, and Ibn

26  Shiekh Al Libi.  He was told to repeat, that he was a top Al Qaeda operative, that he had

27

28                                18

1  met with Osama Bin Laden and twenty-five other Al Qaeda leaders on multiple

2  occasions, and that he had told Bin Laden about places that should be attacked.

3  **Rendition to Afghanistan**

4      65.  On January 21, 2004 — approximately eighteen months after he was

5  unlawfully rendered to Morocco — Mr. Mohamed was again handcuffed, blindfolded,

6  placed in a van, and driven for approximately thirty minutes.  He was then placed in a

7  room with two other prisoners.

8      66.  After two hours Mr. Mohamed heard an aircraft and American-accented

9  English.  His blindfold was removed.  Five U.S. agents dressed in black and grey,

10  wearing masks and work boots, entered the room.  Once again, Mr. Mohamed's clothing

11  was cut off and he was photographed.  This time, due to the extent of his injuries, the

12  picture taking process required approximately thirty minutes to complete.  Later, in

13  Afghanistan, additional photographs were taken and Mr. Mohamed was informed that

14  the pictures were necessary "to show Washington" that his wounds were healing.

15      67.  Flight records show that on January 22, 2004, a Boeing-737 aircraft,

16  registered with the FAA as N313P, left Rabat, Morocco at 2:05 a.m. and arrived in

17  Kabul, Afghanistan at 9:58 a.m. that same day.  The Council of Europe concluded, based

18  on these documents and other corroborating evidence, that this same aircraft was used by

19  the CIA in the transportation and rendition of German citizen Khaled El-Masri from

20  Skopje, Macedonia to Kabul, Afghanistan only two days later.  And, on information and

21  belief, Jeppesen provided flight and logistical support services for this itinerary.

22      68.  After the aircraft landed in Kabul, Mr. Mohamed was removed from the

23  aircraft, put in a truck, and driven along a dirt track until he reached the U.S.-run prison,

24  commonly known as the "Dark Prison."

25  **Detention, Interrogation, and Torture in Kabul, Afghanistan**

26      69.  Upon his arrival at the "Dark Prison," Mr. Mohamed's captors repeatedly hit

27  his head against the wall until he began to bleed.  He was then thrown into a tiny cell

28  
19

COMPLAINT

1    measuring barely more than two meters in either direction.  He was chained to the floor,

2    leaving him little room to maneuver.  Despite the extreme cold, he was given only shorts

3    and a thin shirt to wear and a single blanket as thin as a sheet for warmth.

4        70.  At first, Mr. Mohamed was kept in near-permanent darkness.  His cell was

5    pitch black for twenty-three hours a day.  There was a bucket in the corner for his toilet,

6    but it was difficult to use in the dark without spilling the contents all over his only

7    blanket.  During the four months he was held in Kabul, the periods of darkness were

8    gradually reduced to twelve hours a day.

9        71.  On his first day in the "Dark Prison," Mr. Mohamed was hung from a pole

10   in his cell.  On his second day, he was allowed only a few hours sleep and then hung up

11   again.  By the time he was next taken down — two days after that — his legs were

12   swollen and his wrists and hands had gone numb.  Over the following weeks, loud

13   music, the sounds of "ghost laughter," thunder, aircraft taking off, the screams of women

14   and children, and other frightening and irritating sounds were piped into his cell twenty-

15   four hours a day.  To ensure that sleep was difficult, if not impossible, masked guards

16   would visit the cells throughout the night and make loud noises.

17       72.  For the duration of his detention in Afghanistan, Mr. Mohamed was fed raw

18   rice, beans, and bread, sparingly and irregularly.  He was weighed every other day and in

19   four months he lost between forty and sixty pounds.  Initially, Mr. Mohamed was not

20   permitted to shower, and when he eventually was, it was only rarely.  He was seldom

21   given adequate clothing.

22       73.  From the outset, Mr. Mohamed was subjected to intense interrogation at all

23   times of the day and night.  His interrogations took place on almost a daily basis until he

24   left the facility.  As part of the interrogation process he was shown pictures of Afghanis

25   and Pakistanis and was interrogated about the story behind each picture.  Although Mr.

26   Mohamed knew none of the persons pictured, he would invent stories about them so as

27   to avoid further torture.

28

20

COMPLAINT

74.  At one point, a group of American agents dressed from head to toe in black came to him with a story.  He was told that "Washington" wanted him to recount how he had stolen parts for what they called a "dirty bomb" and how he had built it with Jose Padilla in New York.  Mr. Mohamed did not know what a "dirty bomb" was and could not understand what they were talking about.  He tried to repeat the story as he had been instructed.  One time, when he got the details wrong he was chained in a seated position in his cell with his arms suspended over his head for several days.

75.  In May 2004, Mr. Mohamed was allowed outside for five minutes.  It was the first time he had seen the sun in two years.

**Transfer to Bagram Air Base and to Guantánamo**

76.  In late May 2004, Mr. Mohamed was blindfolded and forced to wear earphones.  He was tied together with a group of prisoners and they were thrown into what he sensed was a helicopter.  After a twenty to thirty minute flight he landed at what he eventually learned was Bagram Air Base.

77.  Processing at Bagram lasted for many hours and was not completed until the early hours of the morning.  During this time Mr. Mohamed remained tied, blindfolded, and wearing earphones, and was not allowed to pray or use the bathroom.  He was not given a blanket or mat for two days, after which he was given just a blanket.

78.  At Bagram, Mr. Mohamed was told that he was going to be transferred to Guantánamo and would be tried immediately upon his arrival.  He was forced to write a twenty-page statement that detailed his relationship with Jose Padilla, how they went to Afghanistan together, and how they planned to go to the United States to detonate a dirty bomb.

79.  Sometime in late May or June 2004, Mr. Mohamed met with a representative of the International Committee of the Red Cross (ICRC).

80.  Mr. Mohamed was held at Bagram until he was transferred in September 2004 to Guantánamo, where he was charged under the President's Military Order with

21

COMPLAINT

1  conspiracy.  These charges were subsequently dropped after the military commission

2  system was declared unlawful by the U.S. Supreme Court.  Mr. Mohamed remains

3  incarcerated at Guantánamo.

4        81.   In early 2005, the ICRC notified Mr. Mohamed's siblings that he was

5  detained at Guantánamo.

6  **Background Information on Plaintiff Abou Elkassim Britel**

7        82.   Plaintiff Abou Elkassim Britel is a 40 year-old Italian citizen of Moroccan

8  descent.  Mr. Britel immigrated to Italy from Morocco in 1989 and in October 1995

9  married an Italian woman, Anna Lucia Pighizzini.  In 1999, Mr. Britel was naturalized.

10       83.   After immigrating to Italy, Mr. Britel initially worked at a poultry shop

11  before qualifying as an electrician in January 1996.

12       84.   In 2000, Mr. Britel and his wife began translating Islamic books and texts

13  from Arabic to Italian.  They set up a webpage "Islamiqra," on which they published

14  these translations as well as topical commentaries aimed at supporting the understanding

15  and spread of Islam.

16       85.   On June 17, 2001, Mr. Britel traveled on a visa from his home in Bergamo,

17  Italy to Iran in order to seek financing to support his and his wife's translation work and

18  to conduct further research on Islamic issues.  From there, Mr. Britel traveled to

19  Pakistan, for the same professional reasons.

20  **Detention, Interrogation, and Torture in Pakistan**

21       86.   On March 10, 2002, Mr. Britel was apprehended by agents of the Pakistani

22  police on immigration charges and detained and interrogated by them at a facility in

23  Lahore, Pakistan, known as "Garden Town."  Following his initial apprehension and

24  continuously thereafter, Mr. Britel asserted his Italian citizenship and requested that he

25  be afforded legal representation and assistance from the Italian Embassy.  These requests

26  were denied.

27

28                                    22

                              COMPLAINT

87. Throughout his detention and interrogation in Pakistan, Mr. Britel was physically and psychologically tortured. His interrogators beat him severely, sometimes with a cricket bat, and accused him of being a "terrorist fighter." Mr. Britel's hands and feet were bound and he was hung from the walls or ceiling of his cell for extensive periods of time. He was denied access to a toilet. His interrogators threatened to rape the women in his family and frequently told him that he would be subjected to worse torture and even death.

88. In April, 2002, following fainting spells brought on by continued beatings and extreme sleep deprivation, Mr. Britel eventually succumbed and confessed to what his interrogators had been insisting from the outset, that he was a terrorist. Soon thereafter, Mr. Britel was brought before U.S. officials who fingerprinted and photographed him. They told him his Pakistani interrogators would kill him if he did not cooperate.

89. On May 5, Mr. Britel was brought from the detention facility in Lahore to the headquarters of Pakistani intelligence services in Islamabad. On four separate occasions he was blindfolded and taken from this facility to a house where he was interrogated by agents of U.S. intelligence services. During these interrogations, which focused on Mr. Britel's alleged association with Osama Bin Laden, his repeated requests to contact the Italian Embassy were again denied.

90. At his final interrogation session, Mr. Britel was introduced to a U.S. official by the name of "David Morgan." Mr. Morgan told Mr. Britel that he had been tasked with writing a profile on him for "Washington." Mr. Morgan asked him a number of questions about his life, filling out a form with the answers. Mr. Britel reiterated his request for a meeting with the Italian embassy but once more his request was denied. Instead, Mr. Morgan told him he could meet with the Moroccan ambassador. This meeting never occurred.

23

COMPLAINT

1        91.   Shortly thereafter, Mr. Britel was told by one of his captors that he would

2    soon be released and allowed to return to Italy.

3    **Rendition to Morocco**

4        92.   On the night of May 24, 2002, Mr. Britel was handcuffed, blindfolded, and

5    taken by car to an airport somewhere on the outskirts of the city.  After approximately

6    one half hour, someone grabbed him from behind and held him so tightly around the

7    neck that he thought he would suffocate.  Mr. Britel was escorted to what he later

8    discovered to be a bathroom where his clothes were cut off with a box cutter.  At one

9    point his blindfold was removed and he saw four or five men dressed in black from head

10   to toe, with only their eyes showing.  These men examined and photographed Mr. Britel

11   and then dressed him in a diaper and a torn t-shirt.  Mr. Britel was blindfolded again and

12   placed in a metallic slip which was chained to the shackles that bound his hands and feet.

13       93.   Mr. Britel was dragged on to an aircraft and forced to lie down on his back.

14   Shortly thereafter, he heard another passenger being brought on board.  Mr. Britel was

15   ordered not to move from his position on the floor of the aircraft; when he did move, he

16   was hit or kicked.  During the flight his back began to hurt and he asked permission to

17   turn over, but he was refused.  Tape was placed over his mouth instead.  He was left like

18   this until the plane landed, when his handcuffs were removed and replaced with tight

19   plastic bands.  He was denied permission to go to the bathroom for the entire duration of

20   the flight.

21       94.   Flight records show that on May 23, 2002, a Gulfstream V aircraft,

22   registered with the FAA as N379P, departed from Washington D.C. at 12:45 a.m. and

23   arrived at Frankfurt, Germany at 7:39 a.m. before taking off at 10:08 a.m. that same

24   morning for Dubai, United Arab Emirates, arriving there at 4:10pm.  At 9:05 a.m. on

25   May 24, the same aircraft departed from Islamabad at 9:05 p.m. and arrived in Rabat,

26   Morocco at 7:03 a.m. the following day.  Less than an hour later, at 7:58 a.m., the aircraft

27   departed Rabat for Porto, Portugal, where it remained overnight before departing Porto at

28                                          24

8 a.m. the next morning for Washington D.C., arriving there on May 26, 2002 at 3:09

p.m. Upon information and belief, Jeppesen provided all the flight and logistical support

services necessary to secure the aircraft's safe passage from the United States to

Germany, from Germany to Dubai, Dubai to Pakistan, Pakistan to Morocco, and

Morocco via Portugal to the United States.

95.    Following his arrival in Rabat, U.S. officials transferred Mr. Britel to the

custody of agents of the Moroccan intelligence services who took him to the notorious

Témara prison.

**Detention, Interrogation, and Torture in Morocco: May 2002 – February 2003**

96.    At the Témara prison, Mr. Britel was cut off entirely from the world for

nearly eight and a half months. He was denied access to family, friends, counsel, and the

Italian consulate. Not once was he permitted outside the four walls of the prison. He

was held in total isolation in a tiny cell, deprived of both sleep and adequate food. He

was forced to undergo intensive interrogations about his private life and the people he

associated with in Italy and pressured to act as an informant.

97.    While being interrogated, Mr. Britel was kept handcuffed and blindfolded

and then beaten severely on all parts of his body. He was threatened with worse torture,

including cutting of his genitals and a technique routinely used in Morocco called "bottle

torture," whereby a bottle is forced into the detainee's anus. Threats were also made by

his interrogators against his wife and sisters.

98.    From the moment of his disappearance, Mr. Britel's family had no idea of

his whereabouts. On June 7, 2002 — after Mr. Britel had been unlawfully rendered to

Morocco — Mr. Britel's brother, based in Italy, received a phone call from a man

claiming that he had been detained with Mr. Britel in Islamabad. It was not until January

2003, when a Moroccan official visited Mr. Britel's mother and sister in Morocco, that

any member of his family was made aware of his whereabouts.

COMPLAINT

99.   On February 11, 2003, Mr. Britel was released from the Témara prison —
without any explanation and without any charges brought against him.  He was
blindfolded, driven from the facility to his family's house in Kenitra, Morocco, and
immediately released.

100.   On February 26, 2003, Mrs. Britel arrived in Morocco and saw her
husband for the first time in over eighteen months.  Mr. Britel exhibited both physical
and psychological signs of his torture.  He suffered from dizziness and chronic diarrhea,
and his left eye and ear were permanently damaged.  Mrs. Britel also noticed that large
portions of his skin had turned black and blue and that no hair grew in these areas.

101.   Agents of the Moroccan intelligence services continued to harass Mr.
Britel after his release, insisting that he tell nobody about his imprisonment in the
Témara prison.  An officer would call and meet with him at least once a week, pushing
him to agree to collaborate with Moroccan intelligence upon his return to Italy.  Under
this constant pressure, Mr. Britel remained in a fragile psychological state.

102.   Fearful for the safety of himself and his family, Mr. Britel attempted to
return home immediately to Italy with his wife, but his plans suffered numerous
administrative hurdles and delays.  His Italian passport had been confiscated in Pakistan
and he was unable to freely leave Morocco and enter Italy.

103.   After several months, on May 12, 2003, Mr. Britel finally received travel
documentation from the Italian embassy authorizing him to enter Italy.  The permission
was valid through May 24, 2003.  Fearful of traveling to the airport without an escort
from the embassy, Mr. Britel explained to embassy officials that he would travel to Italy
over-land through Melilla, a town on the border between Morocco and Spain.  Because
Mrs. Britel had already purchased a ticket on a return flight to Italy, Mr. and Mrs. Britel
decided that she would travel by plane as soon she heard that Mr. Britel had safely made
it across the Moroccan border.

COMPLAINT

1    104.    That same day, Mr. Britel left his home and took a bus towards the

2    Moroccan border town of Nador.  Concerned about whether the documentation he had

3    would suffice to allow him to leave Morocco and enter Italy, Mr. Britel called his wife

4    and family multiple times over the course of his journey.  The last time his family heard

5    from him was May 15, 2003.

6    105.    On May 16, Casablanca was bombed in a suspected terrorist attack.

7    When Mr. Britel reached Melilla he was stopped at the border and detained for six hours

8    without any explanation.  He was then handcuffed, forced into a car, and driven to the

9    Témara prison.  On May 17, 2003, the day after the bombing in Casablanca, Mrs. Britel

10    received news that an Italian of Moroccan descent had been arrested in the town of

11    Melilla.

12    106.    This time Mr. Britel was held incommunicado at Témara for four months.

13    He was held in inhumane conditions throughout this time and, eventually, under duress,

14    Mr. Britel signed a confession that he was never permitted to read.

15    107.    On September 16, 2003, Mr. Britel was tried for terrorist activities in

16    Morocco.  Mrs. Britel arrived in Morocco on September 28 and visited him at the Salé

17    prison, near Rabat, where he was now held.  Mr. Britel was extremely thin and Mrs.

18    Britel could see that his wrists bore deep marks from his handcuffs.

19    108.    On October 2, 2003, Mr. Britel was convicted and sentenced to fifteen

20    years for involvement in terrorist activities.  As an observer from the Italian embassy

21    who attended the trial noted, the procedures followed failed to comport with universally

22    accepted fair trial standards.  In particular, the observer noted that in convicting Mr.

23    Britel, the court relied upon the confessions he made while he was interrogated under

24    torture at the Témara prison.  On appeal, Mr. Britel's sentence was reduced to nine years

25    imprisonment.

26    109.    Mr. Britel remains incarcerated at the Ain Bourja prison in Casablanca.

27    Eighty-seven members of the Italian Parliament have petitioned the President of

28                                              27

                                        COMPLAINT

1  Morocco to have Mr. Britel pardoned, released from prison, and immediately returned to

2  Italy.  To date these efforts have been unsuccessful.  Mr. Britel continues to be subjected

3  to harsh treatment and abuse inside the prison.

4      110.   On September 29, 2006, following a six-year criminal investigation in

5  Italy into Mr. Britel's suspected involvement in terrorist activities, the examining judge

6  dismissed the prosecution case, finding a complete lack of any evidence linking Mr.

7  Britel with any criminal, let alone terrorist-related, activity.

8  **Background Information on Plaintiff Ahmed Agiza**

9      111.   Plaintiff Ahmed Hussein Mustafa Kamil Agiza is a 45 year-old Egyptian

10  citizen who is a licensed pharmacist.  Mr. Agiza married his wife, Hanan Attia, in 1986.

11  Together they have five children.

12      112.   In 1982, Mr. Agiza was arrested, detained, and interrogated under torture

13  by Egyptian security police because they suspected that his cousin had been involved in

14  the assassination of President Anwar Sadat.  Following his release, Mr. Agiza was

15  continually threatened and harassed by the security police.

16

17      113.   In 1991, Mr. Agiza filed a damages action against the Egyptian

18  government for the torture he had suffered in 1982.  His lawyers were harassed and

19  arrested for filing the suit.  Fearing for his own safety and that of his family, Mr. Agiza

20  fled the country with his wife and children, first to Saudi Arabia and then to Pakistan,

21  where they remained for a short period.  In an attempt to escape the Middle East and seek

22  asylum in Europe, Mr. Agiza and his family traveled to Syria, and when that plan failed

23  they moved to Iran.  In Iran, Mr. Agiza was granted a scholarship to study pharmacy at

24  the University of Teheran.

25      114.   In 1999, Mr. Agiza was tried and convicted *in absentia* before an

26  Egyptian military tribunal for alleged membership in "Al Gihad," a banned organization.

27

28

In April 1999, he was convicted and sentenced to twenty-five years imprisonment with hard labor and without the possibility of appeal.

115.    Early in 2000, concerned that improving relations between Egypt and Iran might result in his expulsion back to Egypt, Mr. Agiza decided to flee Iran with his family and seek asylum in the United Kingdom. Because he could not get visas to travel to the U.K., he purchased tickets to Canada. On September 23, 2000, during a transit stop through Stockholm, Mr. Agiza and his family decided to seek asylum in Sweden instead.

116.    Mr. Agiza made a joint application for asylum on his own behalf and on behalf of his family. The application was predicated on Mr. Agiza's fear of arbitrary arrest, detention, and torture should he be returned to Egypt, and his desire to keep his family unified.

117.    The Swedish Migration Board considered Mr. Agiza's application for asylum and permanent residence. In its assessment, the Board considered that Mr. Agiza was at risk of torture or other ill-treatment should he be returned to Egypt and that he was therefore in need of protection. However, because of Mr. Agiza's background, and his *in absentia* conviction, the Board referred the matter to the Swedish Security Police for their assessment.

**From Asylum to Rendition**

118.    In its assessment, the Security Police considered secret evidence that Mr. Agiza was given no opportunity to rebut. At the conclusion of their review, the Security Police recommended that Mr. Agiza, together with his family, be denied a permanent residence permit for "security reasons."

119.    Because of this assessment, the Migration Board, while of the view that Mr. Agiza and his family were in need of protection, referred the matter to the Swedish government for determination. Under the statute then in force, the government was

29

COMPLAINT

1   authorized to make a first and final decision whether to grant permanent residence to an

2   applicant if the Migration Board considered the case to be a "security case" regardless of

3   its assessment of the need for protection.

4        120.    On December 18, 2001, the Swedish government determined that

5   although Mr. Agiza had demonstrated a well-founded fear of persecution if returned to

6   Egypt, he should be excluded from refugee status on national security grounds and

7   immediately expelled.  The evidence upon which the government relied in reaching its

8   determination was not disclosed to Mr. Agiza or to his appointed attorney.

9        121.    Earlier that same day, before the expulsion order was executed, an

10  unnamed Swedish police officer met with two U.S. Embassy officials at Bromma Airport

11  on the outskirts of Stockholm to discuss the removal of Mr. Agiza and his family from

12  Sweden to Egypt.  At this time the parties knew that the Swedish government would

13  order Agiza's expulsion.  During this meeting, on information and belief, the

14  arrangements for Mr. Agiza's expulsion were made.  Specifically, it was agreed that

15  Swedish Security Police would be responsible for apprehending Mr. Agiza and turning

16  him over to agents of the United States who, in turn, would secretly transport him to

17  Egypt for detention and interrogation by the Egyptian intelligence service.

18
     122.    On information and belief, prior to the conclusion of this agreement, U.S.
19
    officials had entered into an agreement with Egyptian government officials to detain and
20
    interrogate Mr. Agiza in Egypt.
21

22       123.    Later that same day, the Swedish foreign minister signed an order

23  expelling Mr. Agiza and his family to Egypt.  On information and belief, this was the

24  first occasion upon which a decision to expel an asylum seeker was executed before its

25  terms were communicated to the individual's legal counsel, without affording them an

26  opportunity to challenge the order before international fora, such as the European Court

27  of Human Rights.

28                                    30

                                 COMPLAINT

124.    On May 24, 2005, in the course of a Parliamentary Inquiry into the expulsions, the political director at the Swedish Ministry of Foreign Affairs, Sven-Olof Petersson, revealed that the decision to expel Mr. Agiza was based primarily on intelligence information provided by U.S. officials to the Swedish Security Police and political pressure exerted by the United States on the Swedish government to remove him.

125.    Shortly after the order was signed, without notifying his family, the Swedish Security Police apprehended Mr. Agiza on the streets of his home town, Karlstad.

126.    Mr. Agiza was then driven from Karlstad to the Bromma airport, arriving there at around 8.20 p.m.

127.    Shortly before 8 p.m., a Gulfstream V aircraft, registered number N379P, the same aircraft that transported Plaintiff Mohamed from Pakistan to Morocco, touched down on the runway.  An officer of the Swedish Security Police met the crew of the aircraft.  The crew was comprised of seven or eight men, all U.S. nationals, and two Egyptian officials.  Swedish Security officers accompanied these men to a small police post.

128.    An officer then escorted Mr. Agiza to the same police post and handed him over to the custody and control of the U.S. and Egyptian officials.

129.    All of the men wore dark hoods and were dressed in civilian clothes.  Mr. Agiza was brought into a small room.  There the men conducted a physical search, forcibly sliced off his clothes, including his underwear, inserted suppositories into his rectum, fitted him with a diaper, dressed him in overalls, blindfolded him, and placed a hood over his head.  One of the men photographed the whole process.

130.    Thereafter, Mr. Agiza was handcuffed, shackled, dragged towards the awaiting aircraft, and shoved inside.  The entire process took place in complete silence

31

COMPLAINT

and lasted no more than fifteen minutes.  Once onboard, Mr. Agiza was chained and shackled in an awkward and painful position on the floor of the aircraft for the duration of the five-hour flight to Egypt.

131.    Following the aircraft's arrival in Cairo, Mr. Agiza was handed over to agents of the Egyptian intelligence services and driven to a secret detention facility on the outskirts of Cairo.

**Detention, Interrogation, and Torture by Egyptian Intelligence Agents**

132.    During the first five weeks of his incarceration, neither Swedish government officials nor family members were permitted to meet with Mr. Agiza.  No member of his family knew exactly where in Egypt he was being held or anything about the conditions of his detention.  Throughout this time, Mr. Agiza was tortured physically and psychologically.

133.    From the outset, Mr. Agiza was held in solitary confinement in a squalid cell measuring little more than two square meters, without windows, heat, or light.  He was kept shackled and blindfolded, interrogated repeatedly, and forced into signing false confessions.

134.    Mr. Agiza was beaten and verbally abused.  He was interrogated under torture about his alleged membership in or connection to terrorist organizations and the whereabouts of senior figures in those organizations.

135.    On January 23, 2002, some five weeks after the rendition, the Swedish Ambassador to Egypt arranged a visit with Mr. Agiza.  Before the visit, Mr. Agiza was warned, under threat of torture, not to mention either the conditions under which he was being held or the extent of the torture and ill-treatment to which he had been subjected. The Ambassador was not permitted to meet with Mr. Agiza in private and consequently Mr. Agiza was unable to speak candidly about his torture.  Nevertheless, Mr. Agiza made serious allegations of inhumane treatment, including torture.  A confidential

32

COMPLAINT

memorandum prepared by the Swedish embassy included his account of being brutalized by the rendition team, blindfolded during interrogations in Egypt, placed in very small cells, denied necessary medication, beaten by prison guards on the way to and from interrogations, and threatened by interrogators with retaliation against family members if a confession was not forthcoming.

136.    On the same day, Mr. Agiza was permitted to meet with his mother. Prison officials were present during this meeting also, and Mr. Agiza could not speak freely. His mother noted, however, that he appeared pale, weak, and near breakdown.

137.    Following these meetings, the torture increased in severity. On numerous occasions Mr. Agiza was severely and repeatedly beaten and routinely subjected to electric shock treatment. Mr. Agiza was stripped naked and strapped to a wet mattress. Electrodes were then applied to his ear lobes, nipples, and genitals, so that an extremely strong electric current could be introduced causing his body to rise and fall. A doctor was present throughout to ensure he did not die from torture. When the sessions ended, the same doctor would apply cream to his body where the electrodes had been so as to prevent scarring and to minimize visible signs of the torture. Mr. Agiza was also made to stand under a cold shower to prevent bruising.

138.    After an initial visit, Swedish embassy officials met with Mr. Agiza approximately every five weeks. During one of these meetings, Mr. Agiza described in detail the torture he had endured, including the use of electric shocks. Eventually, Mr. Agiza was permitted to meet with members of his family. During these visits he revealed to them the nature and the extent of the torture to which he was being subjected.

139.    From October 2003, Mr. Agiza was transferred to various detention facilities within the Tora prison complex and, finally, in January 2004, to the maximum security facility, Abu Zabal.

COMPLAINT

140.     On April 27, 2004, after a six-hour military trial which took place between April 10 and 27, Mr. Agiza was sentenced to twenty-five years imprisonment for membership in an Islamic organization banned under Egyptian law.  His requests for a forensic medical examination during his trial to prove his allegations of torture were summarily denied by the court.  Moreover, according to an independent trial monitor, the proceedings failed to comport with internationally recognized due process requirements, a fact later acknowledged by the Swedish government.  In June, 2004, without explanation, Mr. Agiza's prison sentence was reduced to 15 years and he was transferred to the minimum security prison at Tora.

141.     Mr. Agiza remains incarcerated at the Tora prison complex, and since November 2005 has been held at the maximum security facility called Scorpio.  His physical and psychological health continue to deteriorate.  He has requested a trial before a civilian court, but to date this request remains unanswered.  In June 2004, his wife and children were granted asylum on humanitarian grounds by the Swedish government, and a year later they were formally granted refugee status and are currently seeking Swedish citizenship.

**Official Investigations and Proceedings Before International Tribunals**

142.     On June 12, 2006, following a seven-month investigation into alleged secret detentions and unlawful inter-state transfers, including specific investigations into the circumstances surrounding the secret detention, unlawful rendition, and torture of Mr. Mohamed, Mr. Agiza, and others, the Council of Europe issued a report on the "intentional or grossly negligent collusion" of European countries in the CIA rendition program.  Based in part on official information provided by national and international air traffic control authorities, the Council of Europe concluded that the flights transporting Mr. Mohamed and Mr. Agiza to Morocco, Egypt, and Afghanistan, were part of a "spider's web" of unlawful inter-state transfers to secret detention centers across the

34

COMPLAINT

globe.  Specifically in relation to the rendition of Mr. Mohamed, the Council found that

flight records examined by them conclusively proved that the renditions of Mr.

Mohamed and Khaled El-Masri were "carried out by the same CIA-operated aircraft,

within 48 hours of one another, in the course of the same 12-day tour in January 2004."

143.    On January 30, 2007, following a ten-month inquiry, the European

Parliament adopted a final report into the alleged use of European countries by the CIA

for the transportation and illegal detention of prisoners.  In its report, the European

Parliament stated conclusively that between 2001 and 2005, flights involving aircraft

directly or indirectly operated by the CIA were used to carry out the "proven

'extraordinary renditions'" of Mr. Mohamed, Mr. Britel, Mr. Agiza, and others.

According to the report, the publicly available flight data proves "the existence of a

widespread, methodical practice of 'extraordinary rendition,' following precise rules and

carried out by certain U.S. secret services."

144.    At a national level, the Office of the Parliamentary Ombudsman of the

Swedish Government and the Swedish Parliament's Standing Committee on the

Constitution have inquired into the Swedish government's handling of Mr. Agiza's

rendition and the Swedish Security Police's involvement in the process and determined

that the circumstances surrounding the rendition violated relevant Swedish laws.  The

Ombudsman's report concluded that U.S. and Egyptian officials involved in the rendition

had violated Swedish criminal law by subjecting Mr. Agiza to "degrading and

humiliating treatment" and by exercising police powers on Swedish soil.  And the

Standing Committee on the Constitution concluded that Swedish government actions

violated Swedish immigration laws prohibiting the transfer of anyone from Sweden to a

country where there is a substantial likelihood of his being subjected to torture.

145.    In addition, two United Nations Human Rights bodies, the U.N.

Committee Against Torture and the U.N. Human Rights Committee, respectively, found

that the expulsion of Mr. Agiza and Mohammed El-Zery – another Egyptian citizen

35

COMPLAINT

1  rendered from Sweden to Egypt at the same time as Mr. Agiza – violated, *inter alia*,

2  Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading

3  Treatment or Punishment (prohibition against rendition to torture) and Article 7 of the

4  International Covenant on Civil and Political Rights (prohibition against torture).

5  Pursuant to these two findings, Mr. Agiza is seeking remedies for these proven violations

6  from the Swedish government.  To date, however, his demands have not been met.

7  **Defendant Jeppesen's Involvement in Plaintiffs' Extraordinary Rendition**

8         146.    Defendant Jeppesen played an integral role in the forced disappearances

9  and rendition of Mr. Mohamed, Mr. Britel, and  Mr. Agiza to detention and interrogation

10  under torture in Morocco, Egypt, and Afghanistan.

11        147.    On information and belief, Jeppesen entered into an agreement with

12  agents of the CIA and U.S.-based corporations that owned and operated the Gulfstream

13  V jet aircraft and the Boeing-737 business jet aircraft to provide flight and logistical

14  support to the aircraft and crew to transport Mr. Mohamed from Pakistan to detention in

15  Morocco and from Morocco to detention in Afghanistan; Mr. Britel from Pakistan to

16  detention in Morocco; and Mr. Agiza from Sweden to detention in Egypt.

17        148.    Flight records from July 2002 confirm that the Gulfstream V jet aircraft

18  owned and operated by Premier Executive Transportation Services ("PETS") and Aero

19  Contractors Limited ("ACL") departed Islamabad, Pakistan on July 21, 2002 at 5:35 p.m.

20  and arrived in Rabat, Morocco, the next morning, July 22, 2002 at 3:42 a.m. before

21  departing Rabat an hour later, at 4:44 a.m., for Shannon, Ireland, arriving there at 7:21

22  a.m..

23        149.    Flight records from January 2004 confirm that a Boeing 737 business jet

24  aircraft, then owned by PETS and operated by ACL and registered with the FAA as

25  N313P, departed Larnaca, Cyprus, at 6:39 p.m. on January 21, 2004, and arrived in

26

27

28                                    36

                                 COMPLAINT

Rabat, Morocco at 11:48 p.m. that night. The same aircraft departed Rabat the next day, January 22, 2004, at 2:05 a.m. and arrived in Kabul, Afghanistan, at 9:58 a.m..

150.    Documents, including telex instructions from Jeppesen to its local Spanish agent, Mallocair, also confirm that Jeppesen was responsible for arranging "ground handling" services for this aircraft in Spain. The Council of Europe investigation further confirms that within a 48-hour period, this aircraft was involved in the renditions of both Khaled El-Masri and Plaintiff Mohamed.

151.    Flight records from May 2002 confirm that the Gulfstream V jet owned and operated by PETS and ACL departed Islamabad, Pakistan on May 24, 2002, at 9:05 p.m. and arrived in Rabat, Morocco, the next morning, May, 25, 2002 at 7:05 a.m. before departing Rabat less than an hour later at 7:58 a.m. for Porto, Portugal, arriving there at 9:19 a.m.

152.    The originator code on these flight records show that Jeppesen was responsible for filing pre-departure flight plans with appropriate national and inter-governmental air traffic control authorities for this itinerary.

153.    Flight records from December 2001 confirm that a Gulfstream V jet aircraft then owned by PETS and operated by ACL, then registered with the FAA as N379P, departed Johnson County Airport, North Carolina at 12:13 a.m. on December 18, 2001, landed briefly in Washington D.C., then proceeded to Cairo, Egypt, where it arrived at 1:19 p.m.

154.    Flight records for the same itinerary then confirm that the same aircraft left Cairo for Bromma airport in Sweden at 2:43 p.m. and arrived there at 7:43 p.m. The plane departed Bromma for Cairo at 8:48 p.m., arriving there at 1:30 a.m. on December 19, 2001. On December 20, 2001, the aircraft departed Cairo at 6:56 a.m., landed first at Prestwick airport, Scotland, at 12:03 p.m., before finally touching down in Washington at 7:18 p.m.

COMPLAINT

155.    Swedish Civil Aviation Records and a related invoice confirm Jeppesen's involvement in this extraordinary rendition, and, specifically, that Jeppesen was responsible, through its local Swedish agent, Luftfartsverket, for arranging landing and overflight permits for this aircraft, air terminal navigation fees, noise and emission charges, security charges, and passenger fees for a total of nine crew members.

156.    On information and belief, in advance of the departure of both aircraft, Jeppesen was responsible for, *inter alia*, itinerary, route, and fuel planning for the flights from (i) Washington D.C. to Ireland; Ireland to Cyprus; Cyprus to Morocco; Morocco to Kabul; Kabul to Algiers; and Algiers to Spain; (ii) Pakistan to Morocco; Morocco to Portugal; (iii) Pakistan to Morocco; Morocco to Ireland; and (iv) the United States to Egypt; Egypt to Sweden; Sweden to Egypt; Egypt to Scotland; and finally, Scotland to the United States.

157.    On information and belief, services provided by Jeppesen included pre-filing flight plans with relevant national and inter-governmental traffic control authorities, procuring all overflight and landing permits necessary for the itinerary, as well as instructing local ground handling agents in countries including the United States, Pakistan, Morocco, Cyprus, Spain, Portugal, Ireland, Egypt, Sweden, and Scotland and to provide in-country assistance with re-fueling, aircraft maintenance, customs clearance, servicing and re-fueling of aircraft, and aircraft and crew security.

158.    In facilitating the transportation of Mr. Mohamed, Mr. Britel, and Mr. Agiza  to Morocco, Egypt and Afghanistan, Jeppesen knew or reasonably should have known that they would be subject to forced disappearance, held in secret detention in destination countries, interrogated, and subjected to torture and other forms of cruel, inhuman, or degrading treatment there.

//

//

38

COMPLAINT

# CAUSES OF ACTION

## First Claim For Relief

### Alien Tort Statute: Forced Disappearance

159.    Pursuant to the extraordinary rendition program, Plaintiffs were subjected
to forced disappearance by agents of the United States, Morocco, and Egypt.  Customary
international law prohibits the arrest, detention, abduction, or any other form of
deprivation of liberty by agents of the State or by persons or groups of persons acting
with the authorization, support, or acquiescence of the State, and the subsequent refusal
to acknowledge the deprivation of liberty or concealment of the fate or whereabouts of
the disappeared person.  The entire extraordinary rendition program is premised on the
secret detention of suspects without any official acknowledgement of the location or fact
of their detention.  The program has the effect of placing individuals beyond the reach of
legal protections, thereby rendering them particularly vulnerable to torture and other
illegal methods of detention and interrogation.  The prohibition against forced
disappearance is a "specific, universal, and obligatory" norm of customary international
law cognizable under the Alien Tort Statute.

160.    Jeppesen is directly liable for Plaintiffs' forced disappearance.  The very
nature and purpose of the extraordinary rendition program – to forcibly abduct
individuals in secret and to place them beyond the rule of law – constitutes forced
disappearance.  Here, Jeppesen actively participated in numerous aspects of the logistical
planning and implementation of the extraordinary renditions of Plaintiffs, with actual or
constructive knowledge that its involvement would result in the secret apprehension and
detention of Plaintiffs.

161.    In the alternative, Jeppesen is liable for the violation of Plaintiffs' rights
because it conspired with agents of the United States in Plaintiffs' forced disappearance.
Jeppesen entered into an agreement with agents of the United States to unlawfully render

39

COMPLAINT

1    Plaintiffs to secret detention in Morocco, Egypt, and Afghanistan.  Defendant

2    participated in or committed a wrongful act in furtherance of said conspiracy, which

3    resulted in injury to Plaintiffs.

4        162.    Further, or in the alternative, Jeppesen is liable for the forced

5    disappearance of Plaintiffs because it aided and abetted agents of the United States,

6    Morocco, and Egypt in subjecting Plaintiffs to such treatment.  Specifically, Jeppesen

7    knew or reasonably should have known that the flight and logistical support that it

8    provided to the aircraft and crew would be used to transport Plaintiffs to secret detention

9    and interrogation in Morocco, Egypt, and Afghanistan.  In addition, Jeppesen, through its

10   provision of flight and logistical services to aircraft and crew, provided substantial

11   practical assistance to U.S., Moroccan, and Egyptian government officials in subjecting

12   Plaintiffs to forced disappearance.

13       163.    Further, or in the alternative, Jeppesen is liable for the violation of

14   Plaintiffs' rights because it demonstrated a reckless disregard as to whether Plaintiffs

15   would be subjected to forced disappearance through its participation in the extraordinary

16   rendition program and specifically its provision of flight and logistical support services

17   to aircraft and crew that it knew or reasonably should have known would be used to

18   transport them to secret detention and interrogation in Morocco, Egypt, and Afghanistan.

19       164.    Defendant's acts and omissions described herein caused Plaintiffs to

20   suffer damages, including mental and emotional pain and suffering, in an amount to be

21   determined at trial.

22       165.    Defendant's acts or omissions were deliberate, willful, intentional,

23   wanton, malicious, and oppressive, and should be punished by an award of punitive

24   damages in an amount to be determined at trial.

25

26   //

27   //

28                                    40

                                  COMPLAINT

1

**Second Claim For Relief**

2

**Alien Tort Statute: Torture and Other Cruel, Inhuman, or Degrading Treatment**

3          166.    Plaintiffs were subjected to torture and other cruel, inhuman, or degrading

4    treatment by agents of the United States, Morocco, and Egypt.  Customary international

5    law prohibits any act by which severe pain or suffering, whether physical or mental, is

6    intentionally inflicted on a person for such purposes as obtaining from him or a third

7    person information or a confession, punishing him for an act he or a third person has

8    committed or is suspected of having committed, or intimidating or coercing him or a

9    third person, or for any reason based on discrimination of any kind, when such pain or

10   suffering is inflicted by or at the instigation of or with the consent or acquiescence of a

11   public official or other person acting in an official capacity.  This norm incorporates,

12   *inter alia*, the prohibition against removing any person, regardless of status, to a country

13   where there is a substantial likelihood that he will be tortured.  The prohibition against

14   torture and other cruel, inhuman, or degrading treatment is a "specific, universal, and

15   obligatory" norm of customary international law cognizable under the Alien Tort Statute.

16          167.    Plaintiffs were subjected to torture and other cruel, inhuman, or degrading

17   treatment during their transportation to Morocco, Egypt, and Afghanistan; as a

18   consequence of their rendition to these countries; and while detained and interrogated

19   there.

20          168.    Jeppesen is liable for the violation of Plaintiffs' rights because it

21   conspired with agents of the United States in Plaintiffs' torture and other cruel, inhuman,

22   or degrading treatment, including their rendition to Morocco, Egypt, and Afghanistan,

23   when it knew or reasonably should have known that there was a substantial likelihood

24   that they would be subjected to torture and other forms of cruel, inhuman, or degrading

25   treatment there.  Defendant entered into an agreement with agents of the United States to

26   provide flight and logistical support services to aircraft and crew used in the

27   extraordinary rendition program to unlawfully render Plaintiffs to detention and

28                                          41

COMPLAINT

1    interrogation in Morocco, Egypt, and Afghanistan, where they would be subjected to acts

2    of torture and other cruel, inhuman or degrading treatment. Through its provision of

3    these services, Defendant participated in or committed a wrongful act in furtherance of

4    said conspiracy, which resulted in injury to Plaintiffs.

5        169.    In the alternative, Jeppesen is liable for the torture and other cruel,

6    inhuman, or degrading treatment of Plaintiffs because it aided and abetted agents of the

7    United States, Morocco, and Egypt in subjecting Plaintiffs to such treatment.

8    Specifically, Jeppesen knew or reasonably should have known that the aircraft and crew

9    for which it provided flight and logistical support services would be used in the

10   extraordinary rendition program to transport Plaintiffs to detention and interrogation in

11   Morocco, Egypt, and Afghanistan, where they would be subjected to acts of torture and

12   other cruel, inhuman or degrading treatment.  In addition, Jeppesen, through its provision

13   of flight and logistical services to aircraft and crew, provided substantial practical

14   assistance to U.S., Moroccan, and Egyptian government officials in subjecting Plaintiffs

15   to torture and other cruel, inhuman, or degrading treatment in Morocco, Egypt, and

16   Afghanistan.

17       170.    Further, or in the alternative, Jeppesen is liable for the violation of

18   Plaintiffs' rights because it demonstrated a reckless disregard as to whether Plaintiffs

19   would be subjected to torture or other cruel, inhuman, or degrading treatment by

20   providing flight and logistical support to aircraft and crew it knew or reasonably should

21   have known would be used in the extraordinary rendition program to transport them to

22   detention and interrogation in Egypt, Morocco, and Afghanistan, where they would be

23   subjected to torture and other cruel, inhuman, or degrading treatment.

24       171.    Defendant's acts and omissions described herein caused Plaintiffs to

25   suffer damages, including mental and emotional pain and suffering, in an amount to be

26   determined at trial.

27

28                                        42

                                      COMPLAINT

172.    Defendant's acts or omissions were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court grant the following relief:

A.  for compensatory damages in an amount to be proven at trial, but in an amount over $75,000;

B.  for punitive and exemplary damages in an amount to be proven at trial;

C.  for reasonable attorneys' fees and costs of suit; and

D.  for such other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Dated: May 30, 2007

Respectfully submitted,


STEVEN M. WATT
BEN WIZNER, SBN 215724
STEVEN R. SHAPIRO
JAMEEL JAFFER
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel. 212.519.7870
Fax 212.549.2629

43

COMPLAINT

1

2  ANN BRICK, SBN 65296
   American Civil Liberties Union Foundation
3  of Northern California
   39 Drumm Street
4  San Francisco, CA, 94111
   Tel. 415.621.2493
5  Fax 415.255.1478

6

7                          *Ann Brick*
                     By:        Ann Brick

8

9  *CLIVE STAFFORD-SMITH
   *ZACHARY KATZNELSON, SBN 209489
10 Reprieve
   PO Box 52742
11 London EC4P 4WS
   England
12 Tel. +44 (0)207 353 4640
   Fax +44 (0)207 353 4641
13

14
   PAUL HOFFMAN, SBN 71244
15 Schonbrun DeSimone Seplow Harris &
   Hoffman LLP
16 723 Ocean Front Walk, Suite 100
   Venice, CA 90291
17 Tel. 310.396.0731, ext. 4
   Fax 310.399.7040
18

19 HOPE METCALF
   National Litigation Project
20 Allard K. Lowenstein International
   Human Rights Clinic
21 Yale Law School
   127 Wall Street
22 New Haven, CT 06520
   Tel. 203.432.9404
23 Fax 203.432.9128

24

25 * For and on behalf of Plaintiff BINYAM MOHAMED only

26

27

28                          44

                     COMPLAINT