STEVEN M. WATT* swatt@aclu.org
BEN WIZNER (SBN 215724) bwizner@aclu.org
ALEXA KOLBI-MOLINAS* akolbi-molinas@aclu.org
JAMEEL JAFFER* jjaffer@aclu.org
STEVEN R. SHAPIRO* sshapiro@aclu.org
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY, 10004
Tel. 212.549.2500 / Fax 212.549.2651

ANN BRICK (SBN 65296) abrick@aclunc.org
ACLU FOUNDATION OF
NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA, 94111
Tel. 415.621.2493 / Fax 415.255.1478

Additional Counsel Listed on Next Page

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTHERN CALIFORNIA**
**San Jose Division**

| | |
|---|---|
| **BINYAM MOHAMED;**<br>**ABOU ELKASSIM BRITEL;**<br>**AHMED AGIZA;**<br>**MOHAMED FARAG AHMAD**<br>**BASHMILAH;**<br>**BISHER AL-RAWI**<br><br>     **Plaintiffs,**<br><br>     **v.**<br><br><br>**JEPPESEN DATAPLAN, INC.**<br><br>     **Defendant.** | **Civil Action No. 5:07-cv-02798 (JW)**<br><br>**FIRST AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

FIRST AMENDED COMPLAINT

CLIVE STAFFORD SMITH*† clivess@mac.com
ZACHARY KATZNELSON† (SBN 209489)
Zachary@reprieve.org.uk
REPRIEVE
PO Box 52742
London EC4P 4WS
England
Tel. +44 (0)207 353 4640 / Fax +44 (0)207 353 4641

PAUL HOFFMAN (SBN 71244) hoffpaul@aol.com
SCHONBRUN DESIMONE SEPLOW
HARRIS & HOFFMAN LLP
732 Ocean Front Walk, Suite 100
Venice, CA, 90291
Tel. 310.999.7040, ext. 4 / Fax 310.999.7040

HOPE METCALF* hope.metcalf@yale.edu
NATIONAL LITIGATION PROJECT
ALLARD K. LOWENSTEIN INTERNATIONAL
HUMAN RIGHTS CLINIC
YALE LAW SCHOOL
127 Wall Street
New Haven, CT, 06520
Tel. 203.432.9404 / Fax 203.432.9128

MARGARET L. SATTERTHWAITE++ satterth@juris.law.nyu.edu
INTERNATIONAL HUMAN RIGHTS CLINIC
WASHINGTON SQUARE LEGAL SERVICES, INC.
NEW YORK UNIVERSITY SCHOOL OF LAW
245 Sullivan Street
New York, NY 10012
Tel. 212.998.6657 / Fax 212.995.4031

**Attorneys for Plaintiffs BINYAM MOHAMED, ABOU EL KASSIM BRITEL, AHMED AGIZA, MOHAMED FARAG AHMAD BASHMILAH, and BISHER AL-RAWI**
**\*Admitted *Pro Hac Vice***
**†Attorneys for and on behalf of Plaintiff BINYAM MOHAMED only**
**++ Attorney for and on behalf of Plaintiff MOHAMED FARAG AHMAD BASHMILAH only. *Pro Hac Vice* admission pending**

FIRST AMENDED COMPLAINT

## FIRST AMENDED COMPLAINT

## INTRODUCTION

1.   This case arises from Defendant Jeppesen Dataplan, Inc.'s ("Jeppesen") participation in the forced disappearance, torture, and inhumane treatment of Plaintiffs Binyam Mohamed, Abou Elkassim Britel, Ahmed Agiza, Mohamed Farag Ahmad Bashmilah, and Bisher al-Rawi by agents of the United States and other governments.

2.   Since at least 2001, Jeppesen has provided direct and substantial services to the United States for its so-called "extraordinary rendition" program, enabling the clandestine and forcible transportation of terrorism suspects to secret overseas detention facilities where they are placed beyond the reach of the law and subjected to torture and other forms of cruel, inhuman, or degrading treatment.  Publicly available records demonstrate that Jeppesen facilitated more than seventy secret rendition flights over a four-year period to countries where it knew or reasonably should have known that detainees are routinely tortured or otherwise abused in contravention of universally accepted legal standards.

3.   On April 10, 2002, Binyam Mohamed, a British resident seeking to return to the United Kingdom from Pakistan, was arrested in Karachi, Pakistan and turned over to agents of the U.S. Federal Bureau of Investigation and the Central Intelligence Agency.  After four months of interrogation, during which time he was refused access to a lawyer, CIA agents stripped him and dressed him in a track-suit, blindfolded him, shackled his hands and feet, strapped him to the seat of a plane, and flew him to Rabat, Morocco.

4.   For the next eighteen months, Mr. Mohamed was secretly detained, interrogated, and tortured by agents of the Moroccan intelligence services.  On January 21, 2004, he was once more stripped, blindfolded, and shackled by agents of the CIA and flown to the secret U.S. detention facility known as the "Dark Prison," in Kabul, Afghanistan.  There, Mr. Mohamed was subjected to several more months of detention,

1

FIRST AMENDED COMPLAINT

interrogation, and torture by U.S. intelligence agents before being transferred to Bagram Air Base outside Kabul.  In September 2004, Mr. Mohamed was transferred to the Naval Station at Guantánamo Bay, Cuba where he remains.

5.   On March 10, 2002, Abou Elkassim Britel, an Italian citizen, was apprehended by Pakistani police in Lahore, Pakistan.  After two months of interrogation, during which time his repeated requests to speak with the Italian consulate were denied, he was turned over to CIA agents who stripped him, dressed him in overalls, blindfolded him, shackled his hands and feet, and flew him to Rabat, Morocco.

6.   For more than eight months, Mr. Britel was secretly detained, interrogated, and tortured by agents of the Moroccan intelligence services until he was released without charges in February 2003.  In May 2003 he was arrested by Moroccan authorities while attempting to return to Italy.  In the same month, following a trial that failed to comport with universally recognized fair trial standards, Mr. Britel was sentenced to fifteen years in prison for his alleged involvement in terrorist-related activities.  His sentence was subsequently reduced to nine years on appeal.

7.   On December 18, 2001, Ahmed Agiza, an Egyptian citizen seeking asylum in Sweden, was secretly apprehended by Swedish security police, handed over to agents of the CIA, and then stripped, dressed in overalls, chained, shackled, drugged, and flown from Stockholm to Cairo.  There, he was turned over to agents of the Egyptian intelligence services who detained, interrogated, and tortured him.

8.   For the first five weeks after his arrival in Egypt Mr. Agiza was detained incommunicado.  During this time and for some ten weeks thereafter he was repeatedly and severely tortured and denied meaningful access to consular officials, family members, and lawyers.  In April 2004, following trial before a military tribunal that failed to comport with universally recognized fair trial standards, Mr. Agiza was convicted and sentenced to twenty-five years in prison for membership in an

2

FIRST AMENDED COMPLAINT

organization banned under Egyptian law.  The sentence has since been reduced to fifteen years.

9.   On or about October 21, 2003, Mohamed Farag Ahmad Bashmilah, a citizen of Yemen, was taken into custody by the Jordanian General Intelligence Department while he was visiting Jordan to assist his mother in obtaining needed medical care.  After being interrogated under torture for many days, Mr. Bashmilah was handed over, by the Jordanian government, to agents of the CIA, who beat and kicked him before stripping him, dressing him in a diaper, shackling him, blindfolding him, hooding him, and flying him to Kabul, Afghanistan.

10.   For the next nineteen months, Mr. Bashmilah was held incommunicado by the U.S. government.  For about six months, Mr. Bashmilah was secretly detained, interrogated, and tortured by U.S. intelligence agents at Bagram Air Base in Afghanistan. Toward the end of April, 2004, Mr. Bashmilah was again stripped, diapered, shackled, hooded, and transferred to another detention facility in an unknown country.  In this CIA "black site," Mr. Bashmilah was subjected to more than a year of interrogation, torture, and detention.  On May 5, 2005, he was again "prepared" for flight by a CIA team.  This time he was returned to Yemen, where he was detained for about nine months before being released.

11.   On November 8, 2002, Bisher al-Rawi, an Iraqi citizen and long-term British permanent resident, was apprehended by Gambian intelligence agents at the Banjul airport in the Republic of The Gambia, where he had arrived to establish a legitimate business venture.  He was detained and questioned for two weeks by Gambian officials and agents of the CIA, and then stripped, dressed in a diaper and track-suit, chained and shackled, blindfolded, and flown to Kabul, Afghanistan.

12.   In Afghanistan, Mr. al-Rawi was detained for two weeks at the secret U.S.-run detention facility known as the "Dark Prison" before being transferred to the Bagram

3

FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Air Base for two more months of detention and interrogation.  While in U.S. custody, Mr. al-Rawi was physically and psychologically tortured and otherwise abused before he was flown to Guantánamo on February 7, 2003.  On March 30, 2007, Mr. al-Rawi was released from Guantánamo and returned to his home in England, were he currently resides.  No charges have ever been brought against him.

13.  Plaintiffs Mohamed, Britel, Agiza, Bashmilah, and al-Rawi were victims of an unlawful program devised and developed by the CIA.  Commonly known as "extraordinary rendition," the program involves the clandestine apprehension and transfer of persons suspected of involvement in terrorist activities to secret detention and interrogation facilities in countries outside the United States, utilizing methods impermissible under U.S. and international law.  The program has been carried out by the CIA, with the assistance of U.S.-based corporations that have provided the aircraft, flight crews, and the flight and logistical support necessary for hundreds of international flights.

14.  In return for undisclosed fees, Jeppesen has played a critical role in the successful implementation of the extraordinary rendition program.  It has furnished essential flight and logistical support to aircraft used by the CIA to transfer terror suspects to secret detention and interrogation facilities in countries such as Morocco and Egypt where, according to the U.S. Department of State, the use of torture is "routine," as well as to U.S.-run detention facilities overseas, where the United States government maintains that the safeguards of U.S. law do not apply.

15.  Jeppesen provided these services to the CIA in connection with the forced disappearances, torture, and other inhumane treatment of Mr. Mohamed, Mr. Britel, Mr. Agiza, Mr. Bashmilah, and Mr. al-Rawi.  Jeppesen was involved in the planning and execution of each multi-flight rendition.  Among other services provided, Jeppesen prepared pre-departure flight planning services, including itinerary, route, weather, and

4

FIRST AMENDED COMPLAINT

fuel plans for the aircraft involved in their renditions; procured necessary landing and overflight permits for all legs of the rendition flights; and, through local agents, arranged fuel and ground handling for the aircraft; filed flight plans with national and inter-governmental air traffic control authorities; paid passenger fees for the crew; and made arrangements to secure the safety of the aircraft and crew on the ground.

16.  In providing its services to the CIA, Jeppesen knew or reasonably should have known that Plaintiffs would be subjected to forced disappearance, detention, and torture in countries where such practices are routine.  Indeed, according to published reports, Jeppesen had actual knowledge of the consequences of its activities.  A former Jeppesen employee informed The New Yorker magazine that at an internal company meeting, a senior Jeppesen official stated: "We do all of the extraordinary rendition flights – you know, the torture flights.  Let's face it, some of these flights end up that way."  Jane Mayer, *Outsourced: The C.I.A.'s Travel Agent*, The New Yorker, Oct. 30, 2006.

17.  Further evidence of Jeppesen's knowledge of the objectives of the rendition program was recently highlighted in a report by Dick Marty, Rapporteur to the Committee on Legal Affairs and Human Rights of the Parliamentary Assembly of the Council of Europe.  Dick Marty, *Secret Detentions and Illegal Transfers of Detainees Involving Council of Europe Member States:  Second Report* 3 (Jun. 7, 2007), available at http://assembly.coe.int/CommitteeDocs/2007/EMarty_20070608_NoEmbargo.pdf [hereinafter "Marty Report"].  The Report states that Jeppesen falsified flight plans submitted to European air traffic control authorities to avoid public scrutiny of CIA flights.  More specifically, according to the Report's findings, Jeppesen intentionally

5

FIRST AMENDED COMPLAINT

submitted "dummy flights" to various aviation authorities in order to conceal the true

flight paths of the rendition planes.

18.   Mr. Mohamed, Mr. Britel, Mr. Agiza, Mr. Bashmilah, and Mr. al-Rawi

bring this action against Jeppesen because in knowingly providing flight and logistical

services to the CIA for the rendition program, the company facilitated and profited from

Plaintiffs' forced disappearances, torture, and other inhumane treatment.

### JURISDICTION AND VENUE

19.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331

(federal question); 28 U.S.C. § 1332 (diversity jurisdiction); and 28 U.S.C. § 1350 (Alien

Tort Statute).

20.   Venue is proper pursuant to 28 U.S.C. § 1391(b) (1) and (c).

### INTRADISTRICT ASSIGNMENT

21.   This case should be assigned to the San Jose Division of this District

because Defendant Jeppesen Dataplan, Inc. has its headquarters in the city of San Jose.

### PARTIES

22.   Plaintiff Binyam Mohamed is an Ethiopian citizen.  At the time of his

unlawful rendition, Mr. Mohamed was a legal resident of the United Kingdom.  Mr.

Mohamed is currently imprisoned at Guantánamo.

23.   Plaintiff Abou Elkassim Britel is an Italian citizen.  At the time of his

unlawful rendition, Mr. Britel was working in Pakistan.  Mr. Britel is currently

imprisoned at the Ain Bourja prison in Morocco.

24.   Plaintiff Ahmed Agiza is an Egyptian citizen.  At the time of his unlawful

rendition, Mr. Agiza, together with his wife and five young children, was living in

Sweden, where the family had applied for political asylum and permanent residence.  Mr.

Agiza is currently imprisoned in the Tora prison complex in Egypt.  His wife and

children have since acquired refugee status and permanent residence in Sweden.

6

FIRST AMENDED COMPLAINT

25. Plaintiff Mohamed Farag Ahmad Bashmilah is a Yemeni citizen. At the time of his unlawful rendition, Mr. Bashmilah, together with his wife, was visiting Jordan to assist his mother in obtaining medical care. Mr. Bashmilah currently resides in Yemen, following his release from detention in March, 2006.

26. Plaintiff Bisher al-Rawi is an Iraqi citizen and a British permanent resident. At the time of his unlawful rendition, Mr. al-Rawi, together with his elder brother and his business associates, was traveling to the Republic of the Gambia, Africa, to establish a peanut processing business. Mr. al-Rawi currently resides in the United Kingdom, following his release from Guantánamo in March, 2007.

27. Defendant Jeppesen Dataplan, Inc. is a corporation with headquarters in San Jose, California. Jeppesen provides an aviation logistical and travel service operating under the trade name Jeppesen International Trip Planning. Jeppesen is a wholly owned subsidiary of Jeppesen Sanderson, a corporation with headquarters in Englewood, Colorado and with branch offices throughout the world. Jeppesen Sanderson, in turn, is a wholly owned subsidiary of the Boeing Company, a publicly traded corporation with world headquarters in Chicago, Illinois.

## LEGAL FRAMEWORK

28. The Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, adopted in 1789, permits aliens to bring suit in United States courts for violations of the law of nations or a treaty of the United States. The ATS recognizes as federal common law those international norms that have definite content and acceptance among civilized nations. *Sosa v. Alvarez Machain,* 542 U.S. 692 (2004).

29. The acts described herein, constituting forced disappearance, torture, and other cruel, inhuman, or degrading treatment, are within the body of acts that violate such definite and accepted international norms, as codified in numerous conventions, declarations, and other international instruments, including, *inter alia*:

7

FIRST AMENDED COMPLAINT

- United Nations General Assembly, "Declaration on the Protection of All Persons from Enforced Disappearances" (Geneva: United Nations, 1992), A/RES/47/133;

- Inter-American Convention on Forced Disappearance of Persons, 33 I.L.M. 1429 (1994), entered into force March 28, 1996;

- International Convention for the Protection of All Persons from Enforced Disappearance, E/CN.4/2005/WG.22/WP.1/Rev.4 (2005);

- United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, annex, 39 U.N. GAOR Supp. (No. 51), at 197, U.N. Doc. A/39/51 (1984), *entered into force* June 26, 1987;

- Universal Declaration of Human Rights, G.A. res. 217A (III), at 71, U.N. Doc. A/810 (1948);

- International Convention on Civil and Political Rights, G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171, *entered into force* Mar. 23, 1976.

30.    Accordingly, the challenged conduct falls within the body of acts deemed actionable under the federal common law by the United States Supreme Court in *Sosa*. Moreover, since *Sosa*, courts have consistently recognized the existence of complicity liability under the ATS.  *See, e.g., Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157 (11th Cir. 2005); *Bowoto v. Chevron Texaco Corp.*, 2006 WL 2455752 *3 (N.D. Cal. 2006); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 321-324 (S.D.N.Y. 2003).

8

FIRST AMENDED COMPLAINT

**FACTUAL ALLEGATIONS**

**General Facts**

**The United States Extraordinary Rendition Program**

31.   On information and belief, beginning in the early 1990s and continuing to this day, the CIA, together with other U.S. government agencies, has developed an intelligence-gathering program involving the apprehension and transfer of foreign nationals suspected of involvement in terrorism to detention and interrogation in countries where, in the United States' view, federal and international legal safeguards do not apply.

32.   Suspects are detained at facilities outside U.S. sovereign territory, run by either U.S. or foreign authorities, where they are interrogated by U.S. or foreign intelligence agents.  In all instances, detention and interrogation methods that do not comport with federal and internationally recognized standards are employed.  The program is commonly known as "extraordinary rendition."

33.   Testifying before a hearing of the Joint House/Senate Intelligence Committee in October 2002, George J. Tenet, then Director of Central Intelligence, described the rendition program as a key counterterrorism tool, and testified that in an unspecified period before September 11, 2001, the United States had undertaken seventy such renditions.

34.   On information and belief, since the September 11, 2001 attacks, the primary objective of the rendition program, the transfer of suspects to stand trial, has altered significantly and is now aimed at the clandestine apprehension, transfer, detention, and interrogation of foreign nationals suspected of involvement in terrorism outside the United States.

35.   On information and belief, the extraordinary rendition program serves two discrete functions:  it permits agents of the United States to apprehend and detain foreign

9

FIRST AMENDED COMPLAINT

nationals whom it considers terrorist suspects outside U.S. sovereign territory; and it permits those agents, either on their own or through counterparts in foreign intelligence agencies, to employ interrogation methods that would be prohibited under federal or international law as a means of obtaining information from suspects.

36.  Memoranda prepared by the U.S. Department of Justice's Office of Legal Counsel have consistently advanced the position that foreign nationals held at such facilities, outside U.S. sovereign territory, are not protected by the Constitution or by U.S. obligations under international law, and that U.S. officials cannot, therefore, be held accountable in U.S. courts for actions carried out in relation to such persons.  For example, government lawyers have advanced this argument in habeas corpus proceedings brought on behalf of foreign nationals detained and interrogated at Guantánamo.

37.  Pursuant to the extraordinary rendition program, foreign nationals suspected of involvement in terrorism have been apprehended and transported to detention and interrogation facilities in Morocco, Egypt, Afghanistan, Syria, Jordan, Guantánamo, and elsewhere.  Of the foreign countries involved, Egypt, in particular, has played a leading role in the extraordinary rendition program.  On May 15, 2005, the Egyptian Prime Minister stated publicly that Egypt had assisted the United States in the rendition of sixty to seventy terrorist suspects since the September 11 attacks.

38.  Since at least 2001, the press has reported on the existence of the program as well as details of its operation.  For example, on October 28, 2001, the Los Angeles Times reported that Jamil Qasim Saeed Mohammed, a Yemeni citizen, was handed over by Pakistani authorities at Karachi airport to the United States. The transfer took place in the early hours of the morning and, according to witnesses, "involved masked U.S. officers …."  The report also notes that "a private company was used to service the aircraft rather than national airport authorities …."  Two days earlier, a report on the

10

FIRST AMENDED COMPLAINT

same incident in The News International of Pakistan noted that the registration number of the aircraft was N-379P, that it arrived from Amman, Jordan and, after Mohammed was put on board the aircraft by men "wearing masks," departed at 2:40 a.m. for the same destination.

39.    On November 20, 2001, the Wall Street Journal published a detailed, front-page investigative story on earlier CIA-orchestrated renditions to torture in Egypt.  The article described the 1998 arrests of several Egyptian terrorism suspects in Albania by local authorities at the behest of the CIA, and the use of unmarked "CIA-chartered plane[s]" to send them to Egypt, where they were detained and interrogated under torture.  Two of the men were hanged in 2000.  The article's authors were explicit about the incident's relevance, arguing that it "illuminates some of the tactical and moral questions that lie ahead in the global war on terrorism.  Taking this fight to the enemy will mean teaming up with foreign security services that engage in political repression and pay little heed to human rights."

**Use of Torture by Moroccan Intelligence Services**

40.    The United States Department of State has long documented the prevalence of torture and other forms of inhumane treatment in Morocco, particularly for detainees in the custody of the country's security and intelligence services.  For instance, State Department reports for 2002 and 2003, spanning the years that Plaintiffs Mohamed and Britel were rendered to detention and interrogation in Morocco, noted that members of the security forces "tortured or otherwise abused detainees," while the failure to prosecute such cases "raised concerns regarding the Government's commitment to resolving the problem."  The reports also listed several documented killings of prisoners by security personnel.  The 2003 report documented that the use of torture by security personnel became even more commonplace following the passage of a new "anti-terrorist" law in May, and that "[a]ttorneys for some persons convicted under the new

11

FIRST AMENDED COMPLAINT

anti-terrorism law claimed their clients were convicted on the basis of confessions coerced by torture."

41.   U.N. Human Rights bodies and international non-governmental organizations reported similar findings during this period.  For example, in a 2002 report, Amnesty International documented that "scores of detainees were tortured or ill-treated in custody in order to extract confessions or to force them to sign statements which they rejected or denied," and that many of the victims were "Islamists held in secret detention and accused of involvement in or planning violent acts."  And, mirroring the State Department report, in 2003, the organization reported "an alarming upsurge in the number of allegations of torture and ill-treatment" over the previous two years and stated that many suspects "were reportedly tortured while held in secret and unacknowledged detention by the Directorate for the Surveillance of the Territory (the internal intelligence service)."

**Use of Torture by Egyptian Intelligence Services**

42.   In Egypt as well, for well over a decade, the United States Department of State has documented that torture and other forms of inhumane treatment are routine. These reports make clear that terrorism suspects in the custody of the intelligence services are particularly vulnerable to such treatment.  For example, in its 2001 report, the State Department noted that "[i]n combating terrorism, the security forces continued to mistreat and torture prisoners, arbitrarily arrest and detain persons, and hold detainees in prolonged pretrial detention."  The report noted that "[t]orture takes place in SSIS [State Security Investigations Services] offices, including its headquarters in Cairo, and at CSF [Central Security Forces] camps.  Torture victims usually are taken to an SSIS office, where they are handcuffed, blindfolded, and questioned about their associations,

12

FIRST AMENDED COMPLAINT

religious beliefs, and political views.  Torture is used to extract information, coerce the victims to end their antigovernment activities, and deter others from similar activities."

43.  U.N. Human Rights bodies, as well as international and national non-governmental organizations, including Amnesty International, Human Rights Watch, and the Egyptian Organization for Human Rights, have also documented that since at least 1993, the use of torture has become a widespread phenomenon in Egypt and has been especially prevalent among members of the country's intelligence services in cases with national security overtones.

**Use of Torture at U.S. Detention Facilities in Afghanistan**

44.  The existence of U.S.-run detention centers in Afghanistan and elsewhere, as well as the use of torture and other inhumane interrogation techniques by U.S. officials, has been widely reported and documented since at least 2002.  News reports from this time revealed that individuals apprehended after September 11, 2001, and held by the U.S. at military bases or detention facilities in Afghanistan, were regularly subjected to illegal interrogation methods, physical abuse, and torture at the hands of U.S. personnel. As early as 2002, Amnesty International released a series of reports into the alleged killings and mistreatment of detainees by U.S. forces in Afghanistan.  And, in December, 2002 the Washington Post described how "captives are often 'softened up' by MPs and U.S. Army Special Forces troops who beat them up and confine them in tiny rooms." The Post also reported that "alleged terrorists are commonly blindfolded and thrown into walls, bound in painful positions, subject to loud noises and deprived of sleep."

45.  In March, 2003, The New York Times also reported extensively on the torture and other inhumane treatment of detainees by U.S. officials, and noted that prisoners at Bagram Air Base were forced to stand naked, hooded, shackled, and immobile for long periods of time and were deprived of sleep for days on end.

13

FIRST AMENDED COMPLAINT

46.   These same reports also disclosed that numerous detainees had died in custody.  For example, the New York Times reported in 2003 that two criminal investigations had been launched into the deaths of detainees in Afghanistan.  In one of these cases, the death of an Afghan man in U.S. custody, the Times noted that a U.S. pathologist had ruled the death to be a homicide.  Following the release of the Abu Ghraib prison abuse photographs in the spring of 2004, news outlets in the United States and around the world continued to report on the torture and other mistreatment of detainees in U.S. custody in Afghanistan and elsewhere.

47.   In March 2004, Human Rights Watch released comprehensive findings on the mistreatment of detainees in U.S. detention facilities in Afghanistan and Pakistan between 2003 and 2004, the period during which Plaintiffs Mohamed, Bashmilah, and al-Rawi were rendered to detention and interrogation by U.S. forces in Afghanistan.  Specifically, Human Rights Watch found that detainees were severely beaten, doused with cold water and subjected to freezing temperatures, forced to stay awake, or to stand or kneel in painful positions for extended periods.  Since this time, the widespread torture and abuse of detainees in U.S. custody overseas has been widely reported in media outlets around the world and documented in official U.S. government reports and other publicly available documents, as well as in reports by U.N. Human Rights bodies and international non-governmental organizations.

**Corporate Involvement in the Extraordinary Rendition Program**

48.   U.S.-based corporations and their agents have played an integral role in the implementation of the extraordinary rendition program.  Some of these corporations have furnished aircraft and personnel to transport persons identified by the United States as potential terrorist threats to detention and interrogation facilities overseas.  Other

14

FIRST AMENDED COMPLAINT

corporations, including Jeppesen, have provided flight and logistical support services to these aircraft and crew.

49.   The services provided by Jeppesen have been crucial to the functioning of the extraordinary rendition program.  Jeppesen operates one of the largest aviation trip-planning services in the world, and, on information and belief, Jeppesen has been one of the main providers of flight and logistical support services to aircraft used in the program.  On information and belief, Jeppesen had two employees who were "specifically designated" to provide services for the program.

50.   Jeppesen has provided a number of services essential to all stages of planning and execution of rendition flights:

      a.   In preparation for these flights, it furnished aircraft crew with comprehensive flight planning services, including itinerary, route, weather, and fuel planning.  It has assumed responsibility for the preparation of flight plans for rendition flights and, where necessary, filed them in advance of departure with appropriate national and inter-governmental air traffic control authorities, smoothing the way for the renditions.  It has established cooperative relationships with virtually every government worldwide, allowing it to procure necessary overflight and landing permits for aircraft involved in the rendition program;

      b.   In some instances, Jeppesen has filed flight plans with civil aviation authorities for "dummy flights" in order to obscure the actual routes taken by multi-flight renditions;

      c.   During flights,  Jeppesen has provided en-route, destination, and departure weather forecasting to ensure the safe passage of aircraft; and,

      d.   Once aircraft have landed, Jeppesen, through its worldwide network of local handling agents, has facilitated essential customs clearance in the

15

FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

countries of operation and made arrangements for ground transportation, catering, and hotel accommodation for aircraft crew, as well as physical security for the aircraft and crew.  Jeppesen also has arranged fuel and refueling services as well as maintenance for the aircraft involved.

In short, but for the assistance of Jeppesen and other corporations, the extraordinary rendition program could not have gotten off the ground.

51.  Just as important as the provision of these services, Jeppesen's role as coordinator with virtually all public and private third parties has permitted the CIA to conduct its illegal activities below the radar of public scrutiny and beyond the reach of the rule of law.  For example, on information and belief, through its interaction with government officials for procurement of overflight and landing permits for the aircraft, Jeppesen enabled the CIA to sidestep its obligations under the Convention on International Civil Aviation, which requires any aircraft conducting State business to request relevant authorizations from host nations.

52.  Flight records obtained by a European Parliamentary inquiry and a parallel investigation by the Council of Europe into CIA activities in Europe, together with other flight records obtained from national civil aviation authorities in Portugal, Spain, the Netherlands, and Italy in the course of criminal and journalistic investigations in those countries, reveal that over a four-year period, beginning on or around December 16, 2001, Jeppesen provided flight and logistical support to at least fifteen aircraft which made a total of seventy flights.  The European Parliament and the Council of Europe concluded that all of these flights were made in the context of the extraordinary rendition program.

53.  Among the fifteen aircraft serviced by Jeppesen are a Gulfstream V aircraft formerly registered with the Federal Aviation Administration ("FAA") as N379P, and a Boeing-737 aircraft formerly registered with the FAA as N313P.  On information and

16

FIRST AMENDED COMPLAINT

belief, Jeppesen provided flight and logistical services for all of the CIA flights for these two aircraft involving the rendition of terror suspects.

54.  More specifically, based upon flight logs and other corroborating evidence, both the European Parliament and Council of Europe concluded that these two aircraft were involved in at least six specific rendition flights carried out by the CIA:

- On December 18, 2001, the Gulfstream V aircraft was used to transport Plaintiff Agiza and another Egyptian citizen, Mohammed El-Zery, from Sweden to Egypt.

- On May 24, 2002, the Gulfstream V aircraft was used to transport Plaintiff Abou Elkassim Britel from Islamabad, Pakistan to Rabat, Morocco.

- On July 21, 2002, the Gulfstream V aircraft was used to transport Plaintiff Binyam Mohamed from Islamabad to Rabat.

- On December 9, 2002, the Gulfstream V aircraft was used to transport Plaintiff Bisher al-Rawi and Jamil el-Banna, a Jordanian citizen who had been granted asylum and permission to reside in the United Kingdom, from Banjul, Gambia to Kabul, Afghanistan.

- On January 22, 2004, the Boeing-737 aircraft was used to transport Plaintiff Binyam Mohamed from Rabat, Morocco to a U.S. detention facility in Afghanistan.

- On January 24, 2004, the same Boeing-737 aircraft was used to transport German citizen Khaled El-Masri from Skopje, Macedonia to Kabul, Afghanistan.  Flight logs show that this aircraft departed Skopje at 1:30 a.m. on January 24, 2004, landed in Baghdad at 5:53 a.m., and later that morning at 7:15 a.m. flew from Baghdad to Kabul, arriving there at 11:14 a.m.  In Afghanistan Mr. El-Masri was detained and interrogated under

17

FIRST AMENDED COMPLAINT

torture at the secret U.S.-run "Salt Pit" detention facility for more than four months before he was released in Albania. The investigation by the Council of Europe found that Mr. El-Masri's rendition was part of the same, single-flight circuit as that of Mr. Mohamed.

55.  On information and belief, the originator code on all these flight records reveals that Jeppesen was responsible for filing pre-departure flight plans with appropriate national and inter-governmental air traffic control authorities in each of these renditions. On information and belief, Jeppesen also provided all other flight and logistical support to the aircraft and crew, including, *inter alia*, compilation of itinerary, route, weather, and fuel plans; providing weather forecasting both pre-departure and en-route; procuring over-flight and landing permits; and, through its local ground handling agents, providing customs clearance, ground transportation, catering, and hotel arrangements for air crew and security for both the aircraft and crew.

56.  In coordinating these flights, Jeppesen knew or reasonably should have known that the flights involved the transportation of terror suspects pursuant to the extraordinary rendition program and that the governments of the destination countries routinely subject detainees to torture and other forms of cruel, inhuman, or degrading treatment. Indeed, Jeppesen states on the website for its "International Trip Planning" division that, among other services, the company "monitors political and security situations" and provides "[f]ull background on the political state of affairs in destination countries so you know the lay of the land, before you land."

**Specific Allegations By Plaintiffs**

**Background Information on Plaintiff Binyam Mohamed**

57.  Plaintiff Binyam Mohamed is a twenty-eight year-old Ethiopian citizen. In 1994, Mr. Mohamed, who had fled Ethiopia with his family, came to the United

18

FIRST AMENDED COMPLAINT

Kingdom where he sought political asylum.  While his asylum application was pending, he was granted leave to remain in the country and remained there for seven years.

58.   In the summer of 2001, Mr. Mohamed traveled to Afghanistan to escape from a social life in London where he had suffered a drug problem.  When the U.S.-led coalition invaded Afghanistan, he left that country for Pakistan, planning to return to the United Kingdom.

**Detention, Interrogation, and Torture in Pakistan**

59.   On April 10, 2002, Mr. Mohamed, while attempting to leave Pakistan and return to the United Kingdom, was arrested by Pakistani officials at Karachi airport on immigration charges.  He was taken by Pakistani officials to a detention facility where he was interrogated by agents of the FBI and British intelligence.  His numerous requests to speak to a lawyer were denied, and while detained and interrogated he was badly abused by Pakistani security personnel.

60.   During his detention, Mr. Mohamed was repeatedly interrogated about Al Qaeda and his association with that organization.  He was accused of being a high-ranking member of Al Qaeda, although an agent for the FBI would later admit in a sworn affidavit that he was not a member at all.

61.   On July 19, 2002, escorted by two Pakistani officials, Mr. Mohamed was flown from Karachi to Islamabad.  When the aircraft landed, he was handcuffed and taken by bus to a pick-up truck, and then placed in a cell where he was detained until July 21, 2002.

**Efforts made by Mr. Mohamed's Family to Locate Him**

62.   In June or July 2002, after Mr. Mohamed's initial detention and interrogation in Pakistan by U.S. and British officials, Mr. Mohamed's brother and sister, both of whom reside in the United States, were visited by FBI officers.

19

FIRST AMENDED COMPLAINT

63.   These officers asked them various questions about Mr. Mohamed, but because neither of them had seen or heard from him for some time, they were unable to assist.  Mr. Mohamed's siblings asked the officers if they knew where their brother was, and the officers replied that he might be in the custody of the Pakistani government and that if they wanted to inquire further, they should take matters up with the Pakistani consulate in New York.

64.   Mr. Mohamed's siblings inquired with the Pakistani consulate about Mr. Mohamed's whereabouts but to no avail.  His sister also contacted one of the FBI officers who had visited with her to ask if he had any information about Mr. Mohamed's whereabouts.  She called and spoke with him approximately ten times from July 2002 to December 2003, when the officer told her to stop calling him and to call the Pakistani consulate again.

**Rendition to Morocco**

65.   On July 21, 2002, Mr. Mohamed was taken to what appeared to him to be a military airport near Islamabad.  He was left waiting for about two hours before being turned over to the exclusive custody and control of U.S. officials.

66.   At the airport, several Americans dressed in black, wearing masks and work boots, stripped Mr. Mohamed of all his clothes.  He was photographed and subjected to an anal cavity search.  Mr. Mohamed was then dressed in a tracksuit, shackled, blindfolded, and forced to wear earphones.

67.   Mr. Mohamed and two other prisoners were bundled on board an aircraft. For the duration of the eight to ten hour flight that followed, Mr. Mohamed remained unable to move.  Early the next morning, July 22, 2002, the aircraft landed in Rabat, Morocco.

68.   Flight records show that on July 21, 2002, a Gulfstream V aircraft, registered with the FAA as N379P, left Islamabad at 5:35 p.m. and arrived in Rabat,

20

FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Morocco at 3:42 a.m. the following day. Upon information and belief, Jeppesen provided the flight and logistical support necessary to secure the aircraft's safe passage from Islamabad to Rabat.

**Detention, Interrogation, and Torture in Morocco**

69. Between July 2002 and January 2004, Mr. Mohamed was detained, interrogated, and tortured at a series of detention facilities in Morocco.

70. Mr. Mohamed was subjected to severe physical and psychological torture. He was routinely beaten, suffering broken bones and, on occasion, loss of consciousness. His clothes were cut off with a scalpel and the same scalpel was then used to make incisions on his body, including his penis. A hot stinging liquid was then poured into open wounds on his penis where he had been cut. He was frequently threatened with rape, electrocution, and death.

71. Mr. Mohamed was handcuffed, fitted with earphones, and forced to listen to extremely loud music day and night, sometimes interrupting his sleep for forty-eight hours at a time. He was placed in a damp, moldy room with open sewage for a month at a time. He believed his food to be drugged, but when he refused to eat he was forcibly hooked up to two different IVs. These IVs alternated pumping different substances into his body, the combination of which forced him to undergo painful withdrawal symptoms. In the end, Mr. Mohamed decided to return to eating solid food.

72. Under constant threat of torture, Mr. Mohamed continued to be interrogated about Al Qaeda and suspected Al Qaeda members. He was told that the U.S. wanted a story from him and that he had to prepare to testify against individuals then in U.S. custody, including Jose Padilla, Khalid Sheikh Mohammed, Abu Zubaydah, and Ibn Shiekh Al Libi. He was told to repeat that he was a top Al Qaeda operative, that he had met with Osama Bin Laden and twenty-five other Al Qaeda leaders on multiple occasions, and that he had told Bin Laden about places that should be attacked.

21

FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Rendition to Afghanistan**

73.    On January 21, 2004 — approximately eighteen months after he was unlawfully rendered to Morocco — Mr. Mohamed was again handcuffed, blindfolded, placed in a van, and driven for approximately thirty minutes.  He was then placed in a room with two other prisoners.

74.    After two hours Mr. Mohamed heard an aircraft and American-accented English.  His blindfold was removed.  Five U.S. agents dressed in black and grey, wearing masks and work boots, entered the room.  Once again, Mr. Mohamed's clothing was cut off and he was photographed.  This time, due to the extent of his injuries, the picture taking process required approximately thirty minutes to complete.  Later, in Afghanistan, additional photographs were taken and Mr. Mohamed was informed that the pictures were necessary "to show Washington" that his wounds were healing.

75.    Flight records show that on January 22, 2004, a Boeing-737 aircraft, registered with the FAA as N313P, left Rabat, Morocco at 2:05 a.m. and arrived in Kabul, Afghanistan at 9:58 a.m. that same day.  The Council of Europe concluded, based on these documents and other corroborating evidence, that this same aircraft was used by the CIA in the transportation and rendition of German citizen Khaled El-Masri from Skopje, Macedonia to Kabul, Afghanistan only two days later.  And, on information and belief, Jeppesen provided flight and logistical support services for this itinerary.

76.    After the aircraft landed in Kabul, Mr. Mohamed was removed from the aircraft, put in a truck, and driven along a dirt track until he reached the U.S.-run prison, commonly known as the "Dark Prison."

**Detention, Interrogation, and Torture in Kabul, Afghanistan**

77.    Upon his arrival at the "Dark Prison," Mr. Mohamed's captors repeatedly hit his head against the wall until he began to bleed.  He was then thrown into a tiny cell measuring barely more than two meters in either direction.  He was chained to the floor,

22

FIRST AMENDED COMPLAINT

leaving him little room to maneuver.  Despite the extreme cold, he was given only shorts and a thin shirt to wear and a single blanket as thin as a sheet for warmth.

78.   At first, Mr. Mohamed was kept in near-permanent darkness.  His cell was pitch black for twenty-three hours a day.  There was a bucket in the corner for his toilet, but it was difficult to use in the dark without spilling the contents all over his only blanket.  During the four months he was held in Kabul, the periods of darkness were gradually reduced to twelve hours a day.

79.   On his first day in the "Dark Prison," Mr. Mohamed was hung from a pole in his cell.  On his second day, he was allowed only a few hours sleep and then hung up again.  By the time he was next taken down — two days after that — his legs were swollen and his wrists and hands had gone numb.  Over the following weeks, loud music, the sounds of "ghost laughter," thunder, aircraft taking off, the screams of women and children, and other frightening and irritating sounds were piped into his cell twenty-four hours a day.  To ensure that sleep was difficult, if not impossible, masked guards would visit the cells throughout the night and make loud noises.

80.   For the duration of his detention in Afghanistan, Mr. Mohamed was fed raw rice, beans, and bread, sparingly and irregularly.  He was weighed every other day and in four months he lost between forty and sixty pounds.  Initially, Mr. Mohamed was not permitted to shower, and when he eventually was, it was only rarely.  He was seldom given adequate clothing.

81.   From the outset, Mr. Mohamed was subjected to intense interrogation at all times of the day and night.  His interrogations took place on almost a daily basis until he left the facility.  As part of the interrogation process he was shown pictures of Afghanis and Pakistanis and was interrogated about the story behind each picture.  Although Mr. Mohamed knew none of the persons pictured, he would invent stories about them so as to avoid further torture.

23

FIRST AMENDED COMPLAINT

82.   At one point, a group of American agents dressed from head to toe in black came to him with a story.  He was told that "Washington" wanted him to recount how he had stolen parts for what they called a "dirty bomb" and how he had built it with Jose Padilla in New York.  Mr. Mohamed did not know what a "dirty bomb" was and could not understand what they were talking about.  He tried to repeat the story as he had been instructed.  One time, when he got the details wrong he was chained in a seated position in his cell with his arms suspended over his head for several days.

83.   In May 2004, Mr. Mohamed was allowed outside for five minutes.  It was the first time he had seen the sun in two years.

**Transfer to Bagram Air Base and to Guantánamo**

84.   In late May 2004, Mr. Mohamed was blindfolded and forced to wear earphones.  He was tied together with a group of prisoners and they were thrown into what he sensed was a helicopter.  After a twenty to thirty minute flight he landed at what he eventually learned was Bagram Air Base.

85.   Processing at Bagram lasted for many hours and was not completed until the early hours of the morning.  During this time Mr. Mohamed remained tied, blindfolded, and wearing earphones, and was not allowed to pray or use the bathroom.  He was not given a blanket or mat for two days, after which he was given just a blanket.

86.   At Bagram, Mr. Mohamed was told that he was going to be transferred to Guantánamo and would be tried immediately upon his arrival.  He was forced to write a twenty-page statement that detailed his relationship with Jose Padilla, how they went to Afghanistan together, and how they planned to go to the United States to detonate a dirty bomb.

87.   Sometime in late May or June 2004, Mr. Mohamed met with a representative of the International Committee of the Red Cross (ICRC).

24

FIRST AMENDED COMPLAINT

88. Mr. Mohamed was held at Bagram until he was transferred in September 2004 to Guantánamo, where he was charged under the President's Military Order with conspiracy. These charges were subsequently dropped after the military commission system was declared unlawful by the U.S. Supreme Court. Mr. Mohamed remains incarcerated at Guantánamo.

89. In early 2005, the ICRC notified Mr. Mohamed's siblings that he was detained at Guantánamo.

**Background Information on Plaintiff Abou Elkassim Britel**

90. Plaintiff Abou Elkassim Britel is a forty year-old Italian citizen of Moroccan descent. Mr. Britel immigrated to Italy from Morocco in 1989 and in October 1995 married an Italian woman, Anna Lucia Pighizzini. In 1999, Mr. Britel was naturalized.

91. After immigrating to Italy, Mr. Britel initially worked at a poultry shop before qualifying as an electrician in January 1996.

92. In 2000, Mr. Britel and his wife began translating Islamic books and texts from Arabic to Italian. They set up a webpage "Islamiqra," on which they published these translations as well as topical commentaries aimed at supporting the understanding and spread of Islam.

93. On June 17, 2001, Mr. Britel traveled on a visa from his home in Bergamo, Italy to Iran in order to seek financing to support his and his wife's translation work and to conduct further research on Islamic issues. From there, Mr. Britel traveled to Pakistan, for the same professional reasons.

**Detention, Interrogation, and Torture in Pakistan**

94. On March 10, 2002, Mr. Britel was apprehended by agents of the Pakistani police on immigration charges and detained and interrogated by them at a facility in Lahore, Pakistan, known as "Garden Town." Following his initial apprehension and continuously thereafter, Mr. Britel asserted his Italian citizenship and requested that he

FIRST AMENDED COMPLAINT

be afforded legal representation and assistance from the Italian Embassy.  These requests were denied.

95.   Throughout his detention and interrogation in Pakistan, Mr. Britel was physically and psychologically tortured.  His interrogators beat him severely, sometimes with a cricket bat, and accused him of being a "terrorist fighter."  Mr. Britel's hands and feet were bound and he was hung from the walls or ceiling of his cell for extensive periods of time.  He was denied access to a toilet.  His interrogators threatened to rape the women in his family and frequently told him that he would be subjected to worse torture and even death.

96.   In April, 2002, following fainting spells brought on by continued beatings and extreme sleep deprivation, Mr. Britel eventually succumbed and confessed to what his interrogators had been insisting from the outset, that he was a terrorist.  Soon thereafter, Mr. Britel was brought before U.S. officials who fingerprinted and photographed him.  They told him his Pakistani interrogators would kill him if he did not cooperate.

97.   On May 5, Mr. Britel was brought from the detention facility in Lahore to the headquarters of Pakistani intelligence services in Islamabad.  On four separate occasions he was blindfolded and taken from this facility to a house where he was interrogated by agents of U.S. intelligence services.  During these interrogations, which focused on Mr. Britel's alleged association with Osama Bin Laden, his repeated requests to contact the Italian Embassy were again denied.

98.   At his final interrogation session, Mr. Britel was introduced to a U.S. official by the name of "David Morgan."  Mr. Morgan told Mr. Britel that he had been tasked with writing a profile on him for "Washington."  Mr. Morgan asked him a number of questions about his life, filling out a form with the answers.  Mr. Britel reiterated his request for a meeting with the Italian embassy but once more his request was denied.

26

FIRST AMENDED COMPLAINT

Instead, Mr. Morgan told him he could meet with the Moroccan ambassador. This meeting never occurred.

99. Shortly thereafter, Mr. Britel was told by one of his captors that he would soon be released and allowed to return to Italy.

**Rendition to Morocco**

100. On the night of May 24, 2002, Mr. Britel was handcuffed, blindfolded, and taken by car to an airport somewhere on the outskirts of the city. After approximately one half hour, someone grabbed him from behind and held him so tightly around the neck that he thought he would suffocate. Mr. Britel was escorted to what he later discovered to be a bathroom where his clothes were cut off with a box cutter. At one point his blindfold was removed and he saw four or five men dressed in black from head to toe, with only their eyes showing. These men examined and photographed Mr. Britel and then dressed him in a diaper and a torn t-shirt. Mr. Britel was blindfolded again and placed in a metallic slip which was chained to the shackles that bound his hands and feet.

101. Mr. Britel was dragged on to an aircraft and forced to lie down on his back. Shortly thereafter, he heard another passenger being brought on board. Mr. Britel was ordered not to move from his position on the floor of the aircraft; when he did move, he was hit or kicked. During the flight his back began to hurt and he asked permission to turn over, but he was refused. Tape was placed over his mouth instead. He was left like this until the plane landed, when his handcuffs were removed and replaced with tight plastic bands. He was denied permission to go to the bathroom for the entire duration of the flight.

102. Flight records show that on May 23, 2002, a Gulfstream V aircraft, registered with the FAA as N379P, departed from Washington, D.C. at 12:45 a.m. and arrived at Frankfurt, Germany at 7:39 a.m. before taking off at 10:08 a.m. that same

27

FIRST AMENDED COMPLAINT

morning for Dubai, United Arab Emirates, arriving there at 4:10pm. At 9:05 a.m. on May 24, the same aircraft departed from Islamabad and arrived in Rabat, Morocco at 7:03 a.m. the following day. Less than an hour later, at 7:58 a.m., the aircraft departed Rabat for Porto, Portugal, where it remained overnight before departing at 8:00 a.m. for Washington, D.C., arriving there on May 26, 2002 at 3:09 p.m. Upon information and belief, Jeppesen provided all the flight and logistical support services necessary to secure the aircraft's safe passage from the United States to Germany, from Germany to Dubai, Dubai to Pakistan, Pakistan to Morocco, and Morocco via Portugal to the United States.

103.    Following his arrival in Rabat, U.S. officials transferred Mr. Britel to the custody of agents of the Moroccan intelligence services who took him to the notorious Témara prison.

**Detention, Interrogation, and Torture in Morocco: May 2002 – February 2003**

104.    At the Témara prison, Mr. Britel was cut off entirely from the world for nearly eight and a half months. He was denied access to family, friends, counsel, and the Italian consulate. Not once was he permitted outside the four walls of the prison. He was held in total isolation in a tiny cell, deprived of both sleep and adequate food. He was forced to undergo intensive interrogations about his private life and the people he associated with in Italy and pressured to act as an informant.

105.    While being interrogated, Mr. Britel was kept handcuffed and blindfolded and then beaten severely on all parts of his body. He was threatened with worse torture, including cutting of his genitals and a technique routinely used in Morocco called "bottle torture," whereby a bottle is forced into the detainee's anus. Threats were also made by his interrogators against his wife and sisters.

106.    From the moment of his disappearance, Mr. Britel's family had no idea of his whereabouts. On June 7, 2002 — after Mr. Britel had been unlawfully rendered to Morocco — Mr. Britel's brother, based in Italy, received a phone call from a man

28

FIRST AMENDED COMPLAINT

claiming that he had been detained with Mr. Britel in Islamabad.  It was not until January

2003, when a Moroccan official visited Mr. Britel's mother and sister in Morocco, that

any member of his family was made aware of his whereabouts.

107.    On February 11, 2003, Mr. Britel was released from the Témara prison

— without any explanation and without any charges brought against him.  He was

blindfolded, driven from the facility to his family's house in Kenitra, Morocco, and

immediately released.

108.    On February 26, 2003, Mrs. Britel arrived in Morocco and saw her

husband for the first time in over eighteen months.  Mr. Britel exhibited both physical

and psychological signs of his torture.  He suffered from dizziness and chronic diarrhea,

and his left eye and ear were permanently damaged.  Mrs. Britel also noticed that large

portions of his skin had turned black and blue and that no hair grew in these areas.

109.    Agents of the Moroccan intelligence services continued to harass Mr.

Britel after his release, insisting that he tell nobody about his imprisonment in the

Témara prison.  An officer would call and meet with him at least once a week, pushing

him to agree to collaborate with Moroccan intelligence upon his return to Italy.  Under

this constant pressure, Mr. Britel remained in a fragile psychological state.

110.    Fearful for the safety of himself and his family, Mr. Britel attempted to

return home immediately to Italy with his wife, but his plans suffered numerous

administrative hurdles and delays.  His Italian passport had been confiscated in Pakistan

and he was unable to freely leave Morocco and enter Italy.

111.    After several months, on May 12, 2003, Mr. Britel finally received travel

documentation from the Italian embassy authorizing him to enter Italy.  The permission

was valid through May 24, 2003.  Fearful of traveling to the airport without an escort

from the embassy, Mr. Britel explained to embassy officials that he would travel to Italy

over-land through Melilla, a town on the border between Morocco and Spain.  Because

29

FIRST AMENDED COMPLAINT

Mrs. Britel had already purchased a ticket on a return flight to Italy, Mr. and Mrs. Britel decided that she would travel by plane as soon she heard that Mr. Britel had safely made it across the Moroccan border.

112.    That same day, Mr. Britel left his home and took a bus towards the Moroccan border town of Nador.  Concerned about whether the documentation he had would suffice to allow him to leave Morocco and enter Italy, Mr. Britel called his wife and family multiple times over the course of his journey.  The last time his family heard from him was May 15, 2003.

113.    On May 16, Casablanca was bombed in a suspected terrorist attack. When Mr. Britel reached Melilla he was stopped at the border and detained for six hours without any explanation.  He was then handcuffed, forced into a car, and driven to the Témara prison.  On May 17, 2003, the day after the bombing in Casablanca, Mrs. Britel received news that an Italian of Moroccan descent had been arrested in the town of Melilla.

114.    This time Mr. Britel was held incommunicado at Témara for four months. He was held in inhumane conditions throughout this time and, eventually, under duress, Mr. Britel signed a confession that he was never permitted to read.

115.    On September 16, 2003, Mr. Britel was tried for terrorist activities in Morocco.  Mrs. Britel arrived in Morocco on September 28 and visited him at the Salé prison, near Rabat, where he was now held.  Mr. Britel was extremely thin and Mrs. Britel could see that his wrists bore deep marks from his handcuffs.

116.    On October 2, 2003, Mr. Britel was convicted and sentenced to fifteen years for involvement in terrorist activities.  As an observer from the Italian embassy who attended the trial noted, the procedures followed failed to comport with universally accepted fair trial standards.  In particular, the observer noted that in convicting Mr. Britel, the court relied upon the confessions he made while he was interrogated under

30

FIRST AMENDED COMPLAINT

torture at the Témara prison.  On appeal, Mr. Britel's sentence was reduced to nine years imprisonment.

117.    Mr. Britel remains incarcerated at the Ain Bourja prison in Casablanca. Eighty-seven members of the Italian Parliament have petitioned the President of Morocco to have Mr. Britel pardoned, released from prison, and immediately returned to Italy.  To date these efforts have been unsuccessful.  Mr. Britel continues to be subjected to harsh treatment and abuse inside the prison.

118.    On September 29, 2006, following a six-year criminal investigation in Italy into Mr. Britel's suspected involvement in terrorist activities, the examining judge dismissed the prosecution case, finding a complete lack of any evidence linking Mr. Britel with any criminal, let alone terrorist-related, activity.

**Background Information on Plaintiff Ahmed Agiza**

119.    Plaintiff Ahmed Hussein Mustafa Kamil Agiza is a forty-five year-old Egyptian citizen who is a licensed pharmacist.  Mr. Agiza married his wife, Hanan Attia, in 1986.  Together they have five children.

120.    In 1982, Mr. Agiza was arrested, detained, and interrogated under torture by Egyptian security police because they suspected that his cousin had been involved in the assassination of President Anwar Sadat.  Following his release, Mr. Agiza was continually threatened and harassed by the security police.

121.    In 1991, Mr. Agiza filed a damages action against the Egyptian government for the torture he had suffered in 1982.  His lawyers were harassed and arrested for filing the suit.  Fearing for his own safety and that of his family, Mr. Agiza fled the country with his wife and children, first to Saudi Arabia and then to Pakistan, where they remained for a short period.  In an attempt to escape the Middle East and seek asylum in Europe, Mr. Agiza and his family traveled to Syria, and when that plan failed

31

FIRST AMENDED COMPLAINT

they moved to Iran.  In Iran, Mr. Agiza was granted a scholarship to study pharmacy at the University of Teheran.

122.    In 1999, Mr. Agiza was tried and convicted *in absentia* before an Egyptian military tribunal for alleged membership in "Al Gihad," a banned organization. In April 1999, he was convicted and sentenced to twenty-five years imprisonment with hard labor and without the possibility of appeal.

123.    Early in 2000, concerned that improving relations between Egypt and Iran might result in his expulsion back to Egypt, Mr. Agiza decided to flee Iran with his family and seek asylum in the United Kingdom.  Because he could not get visas to travel to the U.K., he purchased tickets to Canada.  On September 23, 2000, during a transit stop through Stockholm, Mr. Agiza and his family decided to seek asylum in Sweden instead.

124.    Mr. Agiza made a joint application for asylum on his own behalf and on behalf of his family.  The application was predicated on Mr. Agiza's fear of arbitrary arrest, detention, and torture should he be returned to Egypt, and his desire to keep his family unified.

125.    The Swedish Migration Board considered Mr. Agiza's application for asylum and permanent residence.  In its assessment, the Board considered that Mr. Agiza was at risk of torture or other ill-treatment should he be returned to Egypt and that he was therefore in need of protection.  However, because of Mr. Agiza's background, and his *in absentia* conviction, the Board referred the matter to the Swedish Security Police for their assessment.

**From Asylum to Rendition**

126.    In its assessment, the Security Police considered secret evidence that Mr. Agiza was given no opportunity to rebut.  At the conclusion of their review, the Security

32

FIRST AMENDED COMPLAINT

Police recommended that Mr. Agiza, together with his family, be denied a permanent residence permit for "security reasons."

127.    Because of this assessment, the Migration Board, while of the view that Mr. Agiza and his family were in need of protection, referred the matter to the Swedish government for determination.  Under the statute then in force, the government was authorized to make a first and final decision whether to grant permanent residence to an applicant if the Migration Board considered the case to be a "security case" regardless of its assessment of the need for protection.

128.    On December 18, 2001, the Swedish government determined that although Mr. Agiza had demonstrated a well-founded fear of persecution if returned to Egypt, he should be excluded from refugee status on national security grounds and immediately expelled.  The evidence upon which the government relied in reaching its determination was not disclosed to Mr. Agiza or to his appointed attorney.

129.    Earlier that same day, before the expulsion order was executed, an unnamed Swedish police officer met with two U.S. Embassy officials at Bromma Airport on the outskirts of Stockholm to discuss the removal of Mr. Agiza and his family from Sweden to Egypt.  At this time the parties knew that the Swedish government would order Agiza's expulsion.  During this meeting, on information and belief, the arrangements for Mr. Agiza's expulsion were made.  Specifically, it was agreed that Swedish Security Police would be responsible for apprehending Mr. Agiza and turning him over to agents of the United States who, in turn, would secretly transport him to Egypt for detention and interrogation by the Egyptian intelligence service.

130.    On information and belief, prior to the conclusion of this agreement, U.S. officials had entered into an agreement with Egyptian government officials to detain and interrogate Mr. Agiza in Egypt.

33

FIRST AMENDED COMPLAINT

131.    Later that same day, the Swedish foreign minister signed an order expelling Mr. Agiza and his family to Egypt.  On information and belief, this was the first occasion upon which a decision to expel an asylum seeker was executed before its terms were communicated to the individual's legal counsel, without affording them an opportunity to challenge the order before international fora, such as the European Court of Human Rights.

132.    On May 24, 2005, in the course of a Parliamentary Inquiry into the expulsions, the political director at the Swedish Ministry of Foreign Affairs, Sven-Olof Petersson, revealed that the decision to expel Mr. Agiza was based primarily on intelligence information provided by U.S. officials to the Swedish Security Police and political pressure exerted by the United States on the Swedish government to remove him.

133.    Shortly after the order was signed, without notifying his family, the Swedish Security Police apprehended Mr. Agiza on the streets of his home town, Karlstad.

134.    Mr. Agiza was then driven from Karlstad to the Bromma airport, arriving there at around 8:20 p.m.

135.    Shortly before 8:00 p.m., a Gulfstream V aircraft, registered number N379P, the same aircraft that transported Plaintiff Mohamed from Pakistan to Morocco, touched down on the runway.  An officer of the Swedish Security Police met the crew of the aircraft.  The crew was comprised of seven or eight men, all U.S. nationals, and two Egyptian officials.  Swedish Security officers accompanied these men to a small police post.

136.    An officer then escorted Mr. Agiza to the same police post and handed him over to the custody and control of the U.S. and Egyptian officials.

34

FIRST AMENDED COMPLAINT

137.    All of the men wore dark hoods and were dressed in civilian clothes.  Mr. Agiza was brought into a small room.  There the men conducted a physical search, forcibly sliced off his clothes, including his underwear, inserted suppositories into his rectum, fitted him with a diaper, dressed him in overalls, blindfolded him, and placed a hood over his head.  One of the men photographed the whole process.

138.    Thereafter, Mr. Agiza was handcuffed, shackled, dragged towards the awaiting aircraft, and shoved inside.  The entire process took place in complete silence and lasted no more than fifteen minutes.  Once onboard, Mr. Agiza was chained and shackled in an awkward and painful position on the floor of the aircraft for the duration of the five-hour flight to Egypt.

139.    Following the aircraft's arrival in Cairo, Mr. Agiza was handed over to agents of the Egyptian intelligence services and driven to a secret detention facility on the outskirts of Cairo.

**Detention, Interrogation, and Torture by Egyptian Intelligence Agents**

140.    During the first five weeks of his incarceration, neither Swedish government officials nor family members were permitted to meet with Mr. Agiza.  No member of his family knew exactly where in Egypt he was being held or anything about the conditions of his detention.  Throughout this time, Mr. Agiza was tortured physically and psychologically.

141.    From the outset, Mr. Agiza was held in solitary confinement in a squalid cell measuring little more than two square meters, without windows, heat, or light.  He was kept shackled and blindfolded, interrogated repeatedly, and forced into signing false confessions.

35

FIRST AMENDED COMPLAINT

142.    Mr. Agiza was beaten and verbally abused.  He was interrogated under torture about his alleged membership in or connection to terrorist organizations and the whereabouts of senior figures in those organizations.

143.    On January 23, 2002, some five weeks after the rendition, the Swedish Ambassador to Egypt arranged a visit with Mr. Agiza.  Before the visit, Mr. Agiza was warned, under threat of torture, not to mention either the conditions under which he was being held or the extent of the torture and ill-treatment to which he had been subjected. The Ambassador was not permitted to meet with Mr. Agiza in private and consequently Mr. Agiza was unable to speak candidly about his torture.  Nevertheless, Mr. Agiza made serious allegations of inhumane treatment, including torture.  A confidential memorandum prepared by the Swedish embassy included his account of being brutalized by the rendition team, blindfolded during interrogations in Egypt, placed in very small cells, denied necessary medication, beaten by prison guards on the way to and from interrogations, and threatened by interrogators with retaliation against family members if a confession was not forthcoming.

144.    On the same day, Mr. Agiza was permitted to meet with his mother. Prison officials were present during this meeting also, and Mr. Agiza could not speak freely.  His mother noted, however, that he appeared pale, weak, and near breakdown.

145.    Following these meetings, the torture increased in severity.  On numerous occasions Mr. Agiza was severely and repeatedly beaten and routinely subjected to electric shock treatment.  Mr. Agiza was stripped naked and strapped to a wet mattress. Electrodes were then applied to his ear lobes, nipples, and genitals, so that an extremely strong electric current could be introduced, causing his body to rise and fall.  A doctor was present throughout to ensure that he did not die from torture.  When the sessions ended, the same doctor would apply cream to his body where the electrodes had been so

36

FIRST AMENDED COMPLAINT

as to prevent scarring and to minimize visible signs of the torture.  Mr. Agiza was also made to stand under a cold shower to prevent bruising.

146.    After an initial visit, Swedish embassy officials met with Mr. Agiza approximately every five weeks.  During one of these meetings, Mr. Agiza described in detail the torture he had endured, including the use of electric shocks.  Eventually, Mr. Agiza was permitted to meet with members of his family.  During these visits he revealed to them the nature and the extent of the torture to which he was being subjected.

147.    From October 2003, Mr. Agiza was transferred to various detention facilities within the Tora prison complex and, finally, in January 2004, to the maximum security facility, Abu Zabal.

148.    On April 27, 2004, after a six-hour military trial which took place between April 10 and 27, Mr. Agiza was sentenced to twenty-five years imprisonment for membership in an Islamic organization banned under Egyptian law.  His requests for a forensic medical examination during his trial to prove his allegations of torture were summarily denied by the court.  Moreover, according to an independent trial monitor, the proceedings failed to comport with internationally recognized due process requirements, a fact later acknowledged by the Swedish government.  In June, 2004, without explanation, Mr. Agiza's prison sentence was reduced to fifteen years and he was transferred to the Tora minimum security prison complex.

149.    Mr. Agiza remains incarcerated at the Tora complex, and since November 2005 has been held at the maximum security facility called Scorpio within that complex. His physical and psychological health continue to deteriorate.  He has requested a trial before a civilian court, but to date this request remains unanswered.  In June 2004, his wife and children were granted asylum on humanitarian grounds by the Swedish

37

FIRST AMENDED COMPLAINT

government, and a year later they were formally granted refugee status and are currently seeking Swedish citizenship.

**Background information on Plaintiff Mohamed Farag Ahmad Bashmilah**

150.    Plaintiff Mohamed Farag Ahmad Bashmilah is a thirty-eight year-old Yemeni citizen.  Until 2000, he ran a business selling clothing in Yemen along with his uncle.  Near the end of 2000, Mr. Bashmilah moved to Indonesia, where he established a small business importing and selling ready-to-wear clothing.

151.    In the latter half of 2003, Mr. Bashmilah was arrested and detained by Indonesian immigration authorities because he had used an Indonesian identity card in his name to marry an Indonesian woman.  He was ordered to leave Indonesia on a flight of his choosing.

152.    Mr. Bashmilah and his wife arranged to leave for Yemen via Jordan, so that Mr. Bashmilah could assist his mother in obtaining needed heart surgery in Jordan.  On September 26, 2003, they departed Indonesia.

**Detention, Interrogation, and Torture in Jordan**

153.    When Mr. Bashmilah arrived in Jordan, Jordanian officials asked him about his passport, which did not reflect his exit from Yemen or his entry into Indonesia.  Mr. Bashmilah explained that he had been given a replacement passport by the Embassy of Yemen in Indonesia after he lost his passport there.  Despite this explanation, Jordanian officials confiscated his passport and told him to report to the General Intelligence Department for return of his passport.

154.    Eager to retrieve his passport, which he needed as proof of identity to arrange for his mother's operation, Mr. Bashmilah visited the GID office several times.  On or about October 21, 2003, he was asked whether he had ever been to Afghanistan.

When he answered yes, GID officials handcuffed Mr. Bashmilah and took him into custody.

155.    After seeking assistance from the Embassy of Yemen, Mr. Bashmilah's mother, Ni'ma Naji Ali Al-Sabri ("Mrs. Ni'ma Al-Sabri") and his wife were allowed to see Mr. Bashmilah for about ten minutes. During this meeting, Mr. Bashmilah requested that his mother seek further assistance from the Embassy to secure his release. After this brief meeting, Mr. Bashmilah did not see his family again until he was returned to Yemen in 2005. Nor was he ever permitted contact with any Yemeni authorities, representatives of humanitarian organizations, or lawyers during this period.

156.    While in GID custody, Mr. Bashmilah was subject to severe physical and psychological abuse. While he was tortured, GID officials demanded that Mr. Bashmilah "confess" to knowing people he did not know. GID officials threatened to hand Mr. Bashmilah over to the U.S and to harm his family if he did not "confess." Through this torture, Mr. Bashmilah was forced to sign papers without knowing what they said.

**Rendition to Afghanistan**

157.    In the early morning hours of October 26, 2003, Mr. Bashmilah was told that he was being released. He was hooded and taken into a hallway. He asked his GID guard where he was being taken; the guard replied that he should "ask the interrogator," and lifted his hood to reveal a tall, heavy-set, balding white man wearing civilian clothes and dark sunglasses.

158.    Mr. Bashmilah was driven to an airstrip, where he was surrounded by a number of men dressed from head to toe in black and wearing black masks. These men violently pushed, beat, and kicked him before rapidly cutting off all of his clothing. One of the men lifted him up from behind while another took photos of him. Mr. Bashmilah

39

FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

was then subjected to a roughly administered anal cavity search; this, combined with the beating, caused him to lose consciousness briefly.

159.    Mr. Bashmilah was diapered, dressed, hooded, shackled, and handcuffed. Headphones were placed over his ears and goggles over his eyes before he was forced to board an airplane, where he was strapped in a prone position across the chest and legs. Mr. Bashmilah was flown to what he later learned was Kabul, Afghanistan.  During the flight, he suffered pain in his head, sides, and knees.

160.    Flight records show that at 4:15 a.m. on October 26, 2003, a Gulfstream V aircraft, registered with the FAA as N379P, departed Amman, Jordan and arrived in Kabul, Afghanistan at 8:25 a.m. the same day.

161.    On November 17, 2003, the Foreign Ministry of Jordan sent a letter to the Embassy of the Republic of Yemen in Amman confirming that Mr. Bashmilah had exited Jordan on October 26, 2003.  On October 10, 2006, the government of Jordan confirmed this date again, informing the U.N. Special Rapporteur on Torture that Mr. Bashmilah had been questioned by the GID before departing from Jordan on October 26, 2003.

162.    In a letter dated March 27, 2006, the Embassy of Yemen in France informed the Council of Europe that on March 11, 2004, the Jordanian General Intelligence Department told the government of Yemen that Mr. Bashmilah had been released from custody and had departed for Iraq.  The Embassy of Yemen in France informed the Council of Europe that instead of releasing Mr. Bashmilah as asserted, "the Jordanians handed over [Mr. Bashmilah] to another agency at one of their airports and he was transported by jet aircraft to an unknown location . . . .  The landing airport is unknown."

**Detention, Interrogation, and Torture in Afghanistan**

40

FIRST AMENDED COMPLAINT

163.    Following his arrival in Kabul, Mr. Bashmilah was forced into a vehicle and driven to a detention facility.  Mr. Bashmilah remained in solitary confinement at this facility from October 26, 2003 until about April 24, 2004.

164.    After an initial medical examination, Mr. Bashmilah was taken to the first of three cells in which he was detained in this facility.  This cell was tiny, old, and had a bucket for a toilet.  In this cell, Mr. Bashmilah was subjected to severe sleep deprivation and shackling in painful positions.  Excruciatingly loud music was played twenty-four hours per day, seven days per week.  Guards deprived him of sleep, routinely waking him every half hour.  Initially, the cell was pitch black, his hands were cuffed together, and his legs were shackled together, severely restricting his movement and causing him pain.  Later, he was chained to a wall and the light in his cell was left on at all times, except for brief moments when the guards came to his cell.

165.    In the second cell, music was still constantly audible, there was a camera, and the light was on all the time, except when the guards came.  Mr. Bashmilah was chained to the wall in this cell, and he was forced to use a bucket for a toilet.

166.    The third cell, a room that had been used for interrogations, contained strong lights, a camera on a tripod that faced in Mr. Bashmilah's direction, and a table that Mr. Bashmilah could not reach since he was chained to the wall.  Again, Mr. Bashmilah was given a bucket for a toilet.

167.    Mr. Bashmilah was deprived of the essential information and materials needed to enable prayer.  He was allowed only brief exposure to sunlight once a week, when he was taken outside under heavy guard to sit on a metal chair facing a wall. During these sessions, the guards would remove his hood and stand behind him to ensure that he did not turn his head away from the wall that stood directly in front of the chair.

41

FIRST AMENDED COMPLAINT

168.    Mr. Bashmilah became so depressed that he tried to kill himself three separate times while at this facility.

169.    Mr. Bashmilah was interrogated frequently, including about specific individuals.  When Mr. Bashmilah tried to tell his interrogators about his treatment and the false confessions he signed in Jordan, he was told to "forget about Jordan."  When Mr. Bashmilah asked to be assured of his family's safety, officials told him they knew nothing.  Mr. Bashmilah was not allowed to contact his family, his government, a lawyer, or any humanitarian organization such as the International Committee of the Red Cross.

170.    On information and belief, Mr. Bashmilah was held by the U.S. government at Bagram Air Base during this period.  His interrogators spoke English with American accents and frequently referred to reports coming from Washington.  Mr. Bashmilah overheard other detainees explaining that they had discovered that the facility was Bagram Air Base.  When he was taken out to sit in the sun, Mr. Bashmilah frequently heard planes taking off and landing, and occasionally he heard children's voices speaking outside the wall in a language Mr. Bashmilah believed was Pashto.

**Rendition to CIA "Black Site" Prison**

171.    On or about April 24, 2004, Mr. Bashmilah was examined by a doctor, who noted Mr. Bashmilah's distinctive marks and injuries on a diagram of the human body.  Mr. Bashmilah was then diapered, dressed, shackled, and hooded, and a pair of headphones was placed over his ears.  He waited in this state for a few hours.  He was then forced into a large vehicle with other detainees and driven to a waiting aircraft.

172.    The aircraft flew for a number of hours.  After landing, Mr. Bashmilah waited on board until he heard helicopters arriving.  He was then taken off the aircraft

and carried onto a helicopter, which flew for several hours.  After landing, Mr.

Bashmilah was taken by vehicle to a CIA "black site."

**Detention, Interrogation, Torture and Other Cruel, Inhuman and Degrading Treatment in the CIA "Black Site"**

173.    Once inside the facility, Mr. Bashmilah was stripped and photographed from all sides.  He saw about ten to fifteen people.  All but the photographer were dressed in black with balaclavas covering their faces.  Mr. Bashmilah was then examined by a doctor who consulted the same diagram that had been marked on before his transfer.

174.    Mr. Bashmilah was taken, completely disoriented, to a new or newly refurbished cell, with a stainless steel toilet and basin, two video cameras on the ceiling and one above the door, and a fixture to which the guards would link Mr. Bashmilah's ankle chain.  The ceilings and walls were a uniform color.  Automatically-controlled double doors led to the cell, which was part of a cluster of three.

175.    An interrogator came into the cell and gave instructions concerning detainee protocol while in the facility: upon hearing the outside door to the cluster opening, Mr. Bashmilah was to go to the corner farthest from the door, place his hands on the wall, and wait as one guard hooded him, one guard cuffed him, and another guard unlinked the ankle chain from the wall.

176.    The guards in this facility wore black outfits and black face masks, and communicated through hand gestures.  Mr. Bashmilah was welcomed to his "permanent home" by his captors; this statement and the newness of the cell made Mr. Bashmilah fear that he might never be released.

177.    Initially, Mr. Bashmilah was given a Casio watch with a date that enabled him to verify the date of his transfer and to use a prayer schedule that his captors

43

FIRST AMENDED COMPLAINT

supplied.  However, the watch was soon taken away and Mr. Bashmilah perceived anomalies in the prayer schedule.

178.    After about five months, Mr. Bashmilah was moved to a run-down cell with a filthy mattress, where he remained until he was transferred to Yemen in May 2005.

179.    Mr. Bashmilah was frequently interrogated about his activities in Afghanistan and Indonesia.  For example, on one occasion, he was accused of accompanying an individual in Indonesia to mail letters to England; Mr. Bashmilah explained that he did not know the person in question or anyone in England.  The interrogator later verified Mr. Bashmilah's explanation.

180.    Mr. Bashmilah suffered sensory manipulation through constant exposure to white noise, alternating with deafeningly loud music, which was blasted into his cell and the area where Mr. Bashmilah was taken to shower once a week.  Cell walls, ceiling, and floor were painted the same drab color, fixtures were a uniform stainless steel, and artificial lights were kept on constantly.  The deprivation of sunlight, the unceasing sameness of the cell and constant lighting, and the monotony of the daily routine all profoundly disoriented Mr. Bashmilah, making him feel "sealed in" and claustrophobic.  Mr. Bashmilah's unceasing isolation fostered a sense of despair, and the continual monitoring by video cameras deprived him of any sense of privacy.

181.    Mr. Bashmilah's psychological torment was such that he used a piece of metal to slash his wrists in an attempt to bleed to death.  He used his own blood to write "I am innocent" and "this is unjust" on the walls of his cell.  On another occasion, Mr. Bashmilah went on hunger strike for ten days.  Prison personnel took him to the interrogation room, strapped him down, and forced a feeding tube up his nose.  Mr.

44

FIRST AMENDED COMPLAINT

Bashmilah's mental state was so poor that a number of psychiatrists were sent to consult him.

182.    Several months before his release, the director of the prison introduced Mr. Bashmilah to a man said to have come from Washington, D.C. to inspect the prison. The man explained that he had come to tell Mr. Bashmilah that he would soon be released since there was no evidence against him. Prison personnel asked Mr. Bashmilah if he wanted to be returned to Yemen or to Indonesia, noting that he would probably be returned to Yemen, since it was the country of his nationality. Mr. Bashmilah was told that he would be held in prison in Yemen for a short period and then released.  He was also told that he would "never be released" if he told anyone about what had happened to him in secret detention.

183.    The encounter with the man from Washington was only one of many facts that demonstrated to Mr. Bashmilah that he was being held by the U.S. government. Interrogators and other prison personnel spoke English with American accents. The different detention facilities appeared to be run as part of a system, with similar procedures used in the two facilities, and some of the same staff present in both.

184.    In a letter dated March 27, 2006, the Embassy of Yemen in France informed the Council of Europe that on March 5, 2005, the United States government, acting through its Liaison Officer in Sana'a, informed the Central Organization for Political Security in Yemen that the United States had Mr. Bashmilah in custody.

185.    According to Amnesty International, on May 4, 2005, senior Yemeni officials were informed by the U.S. Embassy in Sana'a that three men would be flown from U.S. custody to Yemen the next day. The U.S. official instructed the government of Yemen to hold the men until their files had been transferred. In official communications with the United Nations Working Group on Arbitrary Detention,

45

FIRST AMENDED COMPLAINT

Yemen confirmed that Mr. Bashmilah was handed over to Yemen by the U.S. government and that the government of Yemen had expected receipt of information pertaining to Mr. Bashmilah from the U.S. government.

**Transfer to Yemen**

186.    On May 5, 2005, Mr. Bashmilah was bundled onto an aircraft that flew non-stop for about seven hours, arriving in Yemen in the late evening.  Mr. Bashmilah, along with two other Yemeni nationals,  Mohammed Abdullah Saleh al-Asad and Salah Naser Salem Ali Darwish ("Mr. Darwish"), was taken to the office of the Central Organization for Political Security, where he stayed until the early morning hours the next day.  At around 4:00 a.m., Mr. Bashmilah and Mr. Darwish were flown to Aden, where they were placed in detention.

**Detention, Trial, and Release in Yemen**

187.    Mr. Bashmilah was detained by the government of Yemen from May 2005 to March 2006.  Having never received from the U.S. government any documents pertaining to Mr. Bashmilah, the prosecutor of the Special Penal Court in Yemen interviewed Mr. Bashmilah, who admitted to the prosecutor that he had used a false identity document in Indonesia.

188.    On February 13, 2006, Mr. Bashmilah was tried for, and admitted to, forgery.  He was sentenced to two years in prison, but was ordered released because the time he spent in detention—inside and outside of Yemen—exceeded this sentence.  At about midnight on the evening of March 27, 2006, Mr. Bashmilah was freed, never once having faced any charges relating to terrorism.

**Efforts by Mr. Bashmilah's Family to Locate Him**

189.    From the time of Mr. Bashmilah's arrest, his family made repeated attempts to determine his fate and whereabouts.  After he was taken into custody by the

46

FIRST AMENDED COMPLAINT

GID, Mrs. Ni'ma Al-Sabri asked to see her son. At first, Jordanian officials told her that they did not have him. She challenged this, since she had seen GID officers take him into custody. She was ultimately allowed to see Mr. Bashmilah for a very brief visit while he was in GID detention.

190.   Mrs. Ni'ma Al-Sabri sought assistance from the Embassy of Yemen in Jordan, and from the Yemeni Foreign Minister. A letter dated December 3, 2003 and faxed from the Yemeni Foreign Ministry Department of Consular and Expatriate Affairs to the Ambassador of Yemen to Jordan explained that Mrs. Ni'ma Al-Sabri had "filed a complaint stating that her son . . . was detained by Jordanian authorities . . . for no known reasons." The letter asked the Ambassador to "expedite his release and find out the reasons for the detention." The Foreign Ministry again sent an urgent fax dated December 10, 2003 to the Embassy of Yemen in Jordan asking for quick action on behalf of Mr. Bashmilah, since "his family members are very worried about him."

191.   In response, the Ambassador of Yemen to Jordan explained that despite the statements by the Jordanian government that Mr. Bashmilah had left Jordan, the Embassy was "still persistently following up on the matter by raising the matter with the concerned agencies, the Foreign Ministry, Intelligence, and the Ministry of the Interior." In response to this letter, on December 15, 2003, the Foreign Ministry in Yemen responded that "[Mr. Bashmilah's] family members have been called to the office, and they have looked at the memorandum, but they have stated that the aforementioned has not arrived in Yemen. They now want to know to where he has been deported."

192.   Mr. Bashmilah's family was never contacted by the U.S. government or the International Committee of the Red Cross. As a result of this lack of information, combined with the misinformation she received about her son's departure from Jordan, Mrs. Ni'ma Al-Sabri was in anguish. She cried every night and worried about where Mr.

47

FIRST AMENDED COMPLAINT

Bashmilah might be and how he was being treated.  She became ill and was hospitalized for some time.  Mr. Bashmilah's wife was also hospitalized due to stress and anxiety.  During Mr. Bashmilah's time in secret detention, his father died, leaving his mother without financial support.  Eventually, Mrs. Ni'ma Al-Sabri gave up hope, convinced her son had been killed.

**Background Information on Plaintiff Bisher al-Rawi**

193.    Plaintiff Bisher al-Rawi is a thirty-nine year-old Iraqi citizen.  In the early 1980s, his father was detained and tortured by Saddam Hussein's secret police.  In 1984, Mr. al-Rawi left Iraq for the United Kingdom where his brother Wahab al-Rawi already lived.  The following year his father, mother, and sister joined them there.  Mr. Bisher al-Rawi is a permanent British resident with Indefinite Leave to Remain in the United Kingdom.   He currently resides in Surrey, England.

194.    Beginning in 1996, Mr. al-Rawi acted as an interpreter for the British authorities, including MI5, the British intelligence agency, and the Muslim community in London, including a Muslim cleric, Abu Qatada.  Following the September 11th terrorist attacks on the United States, Mr. al-Rawi was approached by MI5 and asked to assist them.  Mr. al-Rawi agreed, hoping his work would help ease the extreme tensions that existed between the Muslim community and the British authorities at that time.

195.    As part of his work with MI5, Mr. al-Rawi served as an intermediary between the agency and Abu Qatada, whom the British suspected was involved with Al Qaeda.  For approximately two to three months during the fall of 2002, Mr. al-Rawi conveyed questions from MI5 to Abu Qatada and passed his answers back to MI5.  Mr. al-Rawi tried hard to bring the two together for a meeting, but was ultimately

48

FIRST AMENDED COMPLAINT

unsuccessful.

196.    In 2002, Mr. al-Rawi, together with his brother, Wahab, his close friend of twelve years, Jamil el-Banna, his friend of ten years, Abdullah El Janoudi, and Omar Omeri, a Gambian citizen with British residency, entered into a joint venture to start a mobile peanut-oil processing factory in The Republic of The Gambia ("Gambia").  Mr. Omeri had come up with the idea for the factory about a year earlier, and in early 2002 Wahab drew up a business plan and began to secure funding, purchase equipment, and obtain the necessary permits for the venture.  Mr. al-Rawi, who was trained as an engineer, was to travel to Gambia for one month in order to help set up operations.  Mr. Omeri's sister-in-law, who worked for a governmental development agency in Gambia, agreed to be the bookkeeper for the business.  Her friend, the First Secretary in Gambia's Ministry of Agriculture, agreed to act as an advisor.  The enterprise was vetted and approved by the Gambian Embassy in the United Kingdom.  The company was registered, and all the necessary permits and licenses had been obtained through a Gambian law firm, prior to the men's intended arrival in the country.

197.    On October 26, 2002, Wahab flew to Gambia in order to retrieve the equipment the men had purchased.  Before boarding the aircraft at the London City Airport, Wahab was stopped by police and questioned for about one hour.  He was asked about the purpose of his trip, how the business was supposed to operate, and, unrelatedly, about Abu Qatada.  Wahab answered their questions and was permitted to board the flight.  On October 31, 2002, security officers went to Mr. el-Banna's house and asked him similar questions.  At the end of the questioning, Mr. el-Banna asked if he would still be able to travel to Gambia.  The officers assured him that he would be.

49

FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

198.    On November 1, 2002, Mr. al-Rawi, Mr. el-Banna, and Mr. El Janoudi attempted to fly to Gambia for the first time.  Before they could depart, they were arrested by police officers at Gatwick Airport, London, because of a "suspect electronic device" they found in Mr. al-Rawi's luggage.  The men were taken to Paddington Police Station and detained and questioned for approximately four days.  During this time their houses were also searched.  British authorities later concluded that the device was in fact a harmless, store-bought battery charger.  On or about November 4, 2002, the men were released from police custody, and the charger was returned to Mr. al-Rawi.

199.    According to documents released to the Council of Europe with the consent of the British government, on the same day that Mr. al-Rawi was arrested, MI5 sent a telegram to the CIA stating falsely that Mr. al-Rawi was an "Islamist extremist" and that a search of his luggage "revealed some form of home-made electronic device.  Preliminary inquiries including X-ray suggest that it may be a timing device or could possibly be used as some part of a car-based Improvised Electronic Device (IED)."  After police authorities had confirmed that the device was actually a harmless battery charger, a second telegram was sent by MI5 to the British Ministry of Foreign Affairs confirming the actual nature of the device.  However, according to a Council of Europe investigation, this exculpatory information was never relayed to the U.S. Central Intelligence Agency.

200.    Although Mr. al-Rawi had never been arrested or charged with any wrongdoing as a result of his relationship with Abu Qatada, MI5 sent several telegrams to the CIA between November 4 and November 8, 2002, concerning his association with the cleric.  The various telegrams refer to other communications between the two

50

FIRST AMENDED COMPLAINT

agencies that were ongoing at the time (e.g., "Further to our telephone conversation"; "our telephone call today"; "we have spoken at length about this operation"; "we will forward further relevant information in due course").

201.    On November 8, 2002, Mr. al-Rawi, Mr. el-Banna, and Mr. El Janoudi flew to Banjul, Gambia, without incident.  A fourth person, Ibrahim Yousif, another friend of Wahab's, had joined them at Gatwick airport intending to fly with them.  However, while the men were waiting in the departures hall, Mr. Yousif was approached by a British official and taken aside.  Upon approaching the aircraft, Mr. Yousif suddenly became distressed, and after boarding requested that he be permitted to de-plane, which he was ultimately allowed to do.  Mr. Yousif never joined the other men.

202.    That same day MI5 forwarded Mr. al-Rawi's flight details to the CIA by telegram.  According to the Council of Europe investigation, unlike all the previous telegrams between MI5 and the CIA concerning Mr. al-Rawi, this telegram failed to specify that the information contained therein "must not be used as the basis of overt, covert or executive action."

**Detention and Interrogation in Gambia**

203.    Immediately upon arrival in Banjul, Mr. al-Rawi, Mr. el-Banna, and Mr. El Januodi, together with Wahab and Mr. Omeri, who had come to the airport to meet them, were detained by Gambian officials.  The men were told their detention was routine.  According to unclassified FBI documents, the men were taken from the airport to the Gambian National Intelligence Agency ("GNIA") headquarters.

204.    For approximately two hours, the men were questioned separately by Gambian officials about their reasons for traveling to the country.  The Gambians

51

FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

suggested they were there to build a terrorist camp, which was entirely untrue.  At around 2:00 a.m. the next morning, two Americans arrived and took over the questioning.  One of the Americans called himself "Mr. Lee" and had each of the men photographed.  Mr. Lee appeared to be in charge and was present at all interrogations throughout their detention in Gambia.

205.    Initially, Mr. al-Rawi was held in the reception area of the NIA where he slept on a foam mattress on the floor.  He was held there, together with the other men, for approximately two days. Thereafter, the men were all transferred to a "safe house."  The men were then separated; Mr. al-Rawi and Mr. El Janoudi were transferred back to the GNIA building, and Wahab and Mr. el-Banna remained in the "safe house."  Finally, all four men were reunited and detained at a second "safe house" where they were all placed in special holding cells.

206.    The cells in the second "safe house" were hot, small, and windowless.

207.    American men controlled all the questioning in the second "safe house." For the most part it remained informal and took place every few days.  At one point, "Mr. Lee" told Mr. al-Rawi that he knew that one of them had worked with MI5, but Mr. al-Rawi did not reveal himself to be this man at the time.  Mr. al-Rawi underwent only one formal interrogation during his detention in which Mr. Lee, along with another American and two Gambian intelligence agents, questioned him rigorously about his relationship with Abu Qatada.

208.    Throughout their detention, Wahab and Mr. El Janoudi (both British citizens) made numerous requests to meet with British consular officials, all of which were denied.  They were repeatedly told that British officials had arranged for their

52

FIRST AMENDED COMPLAINT

arrest.  On information and belief, Mr. el-Banna (who has refugee status in the United

Kingdom) also requested consular assistance but was denied such representation.

**Rendition to Afghanistan**

209.    After twenty-six days in detention, Mr. El Janoudi was released, driven to

the airport in Banjul, and permitted to return to the United Kingdom.  After 27 days in

detention, Wahab was also released, driven to the airport in Banjul, and permitted to

return to the United Kingdom.  Mr. Omeri, a Gambian citizen, had been released from

detention much earlier.

210.    Mr. al-Rawi and Mr. el-Banna—neither of whom had ever obtained

British citizenship—were not released; instead the men were driven back to the airport at

Banjul.  They were taken to a room where they were hooded, their hands were cuffed

behind their backs, and their feet were shackled.  On information and belief, the process

was carried out by the Gambians and supervised by the Americans.

211.    Mr. al-Rawi was placed on a seat between two Gambian officials.

Although unable to see, he could hear the sound of jet engines close by.  Observing that

it was difficult for Mr. al-Rawi to sit comfortably while his hands were bound behind his

back, one of his Gambian escorts attempted to help him find a less painful way to sit.

Then, without speaking, one of his escorts began to gently rub Mr. al-Rawi's feet as they

waited.  The kindness of the gesture took Mr. al-Rawi by surprise and seemed to be

almost apologetic in nature.  Although he could have no idea of what was about to

unfold, it was at this point that Mr. al-Rawi became convinced that something awful was

about to happen.

53

FIRST AMENDED COMPLAINT

212.     After some time, the two Gambian officials stood up and, with Mr. al-Rawi between them, began to walk forward. They released him momentarily but then he was immediately grabbed from behind by two other men and dragged into a small, dark room located somewhere on the perimeter of the airport. In this room, several men and women – hooded and using flashlights to guide them – removed Mr. al-Rawi's handcuffs and shackles, cut off all his clothes, and dressed him in diapers and different clothing. His handcuffs and shackles were replaced with new ones that were part of some sort of restraining harness. Something was then placed in or around his ears that impaired his hearing and both a blindfold and goggles were placed over his eyes.

213.     Mr. al-Rawi was then roughly manhandled on board a waiting aircraft, and once inside was restrained on a stretcher-like platform. For the duration of flight Mr. al-Rawi was unable to move or change position. He was also denied access to food, water, or a toilet. It was all he could do to keep himself from screaming.

214.     The aircraft landed once before reaching its final destination, but Mr. al-Rawi was not taken off the plane at this time. In total, the flight felt like it lasted for around nine hours.

215.     Flight records show that on December 8, 2002, a Gulfstream V aircraft, registered with the FAA as N379P departed Banjul airport at 9:45 p.m. and landed in Cairo, Egypt, at 3:45 a.m. the next morning. The aircraft then left Cairo an hour later at 4:45 a.m. and arrived in Kabul, Afghanistan at 9:04 a.m. that morning.

**Detention, Interrogation, and Torture in Afghanistan**

216.     After the aircraft landed, Mr. al-Rawi was removed from the aircraft and thrown into the back of a van-like vehicle. Mr. el-Banna was also in the vehicle, and the

54

FIRST AMENDED COMPLAINT

two men were driven along a bumpy road to the prison commonly known as the "Dark Prison," in Kabul, Afghanistan.  When the vehicle stopped, Mr. al-Rawi and Mr. el-Banna were dragged to the prison and placed in separate cells, still blindfolded, shackled, and handcuffed.

217.    From the outset, Mr. al-Rawi was held in complete darkness and isolation and kept in leg shackles twenty-four hours a day.  He was given very little water and fed only once every one or two days.  His toilet was a very small bucket, which was difficult to use, especially in the dark.  Despite the extreme cold, he was not given adequate clothing or blankets.  Strange music and loud man-made sounds were played around the clock, which—in addition to the constant screams of his fellow prisoners—made sleeping extremely difficult and very disturbed.  When he did manage to fall asleep he often had nightmares.

218.    During the entire time Mr. al-Rawi was detained at the "Dark Prison," the noise would stop only briefly, for a few seconds, each time the tape reached its end.  In these brief moments of silence, Mr. al-Rawi could just barely make out the sound of Mr. el-Banna calling his name.  Fearing retaliation, Mr. al-Rawi did not respond.  This happened on several occasions, but eventually Mr el-Banna stopped calling out to him.

219.    After approximately two weeks, Mr. al-Rawi was again hooded, shackled, and handcuffed and thrown into the back of a truck.  Despite being fully restrained and unable to resist, Mr. al-Rawi was punched and badly beaten while waiting to be transported.  In the truck, other prisoners were thrown on top of him, suffocating him under their weight.  His injuries were so extensive—he had cuts and bruises all over his body and was unable to see properly for some time—that they were later photographed

55

FIRST AMENDED COMPLAINT

by U.S. soldiers, who told him: "We want to know what we've done and what the

Afghans have done."

220.    Mr. al-Rawi was then driven to a U.S. military helicopter and transferred

to the U.S. Bragram Air Base in Afghanistan.  Fearing that he was going to be thrown to

his death from the helicopter, Mr. al-Rawi was in terror during the entire flight.

**Detention, Torture, and Interrogation at Bagram**

221.    On his first day at Bagram, Mr. al-Rawi was forced to stand for two hours

before a military officer at the base.  Upon viewing the extent of his injuries, the officer

took pity on him and permitted him to sit down.  Mr. al-Rawi later learned that it was

customary for every new prisoner at Bagram to be forced to stand for twenty-four hours

upon arrival.

222.    Conditions worsened the very next day.  For more than two months, Mr.

al-Rawi was subjected to humiliation, degradation, and physical and psychological

torture by U.S. officials at Bagram.  He was beaten and dragged along the floor, deprived

of access to a toilet, shower, or clean clothes, held in a squalid cell, and forced to

undergo prolonged periods of isolation and sleep deprivation.  He was threatened with

death or with transfer to another country to be tortured.  He was frequently interrogated

about Abu Qatada, but this time — unlike at the "Dark Prison" — his captors no longer

wore hoods.

223.    On February 7, 2003, Mr. al-Rawi was transferred to Guantánamo.

Before his transfer, Mr. al-Rawi, together with a number of other prisoners scheduled for

transfer to Guantánamo, was isolated from the rest of the prisoners at the base.  His food

was restricted and his hair and beard were cut.  For around eight hours before the flight,

56

FIRST AMENDED COMPLAINT

Mr. al-Rawi was left shackled and handcuffed in excruciating pain.  He was then moved

to a vehicle and driven to a waiting aircraft.

224.    Forced to wear darkened goggles, a facemask, and earphones, Mr. al-

Rawi was tied — still shackled and handcuffed very painfully with his legs and hands in

front — to a seat on the aircraft.  He was forced to maintain this position for the duration

of the approximately twenty-four hour flight.

225.    Unlike his previous flights to the "Dark Prison" and Bagram, the flight to

Guantánamo was marked by small acts of kindness.  Some hours into the journey, he and

the other prisoners were offered a tablet that they were told would help them "get

through" the flight.  Though Mr. al-Rawi did not feel like he could refuse, he still

appreciated the gesture.  Some time thereafter he was offered a tiny amount of water and

a sandwich.  Not knowing what to expect, Mr. al-Rawi asked for an additional sandwich

and was given one.

226.    Documentation from the International Committee for the Red Cross

("ICRC") confirms that Mr. al-Rawi was held in U.S. custody at Bagram, and that he

was visited there by ICRC delegates on January 4, 2003.  ICRC documentation also

confirms that Mr. al-Rawi was transferred from Bagram to Guantánamo on February 7,

2003.

227.    On March 30, 2007, almost four and half years after he was seized in

Gambia, Mr. al-Rawi was released from Guantánamo without charge.  He was flown

directly from Guantánamo to Britain — accompanied by a number of high ranking

British officials from MI6, the Home Office, and Special Branch — on a luxury Lear Jet.

Upon arrival at Luton Airport outside London, Mr. al-Rawi underwent a routine, almost

57

FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

solicitous, interview with an Immigration Officer.  Mr. al-Rawi has not been charged

with any crime and currently resides freely in the United Kingdom.

**Efforts Made to Locate Mr. al-Rawi**

228.    In early January 2003, Amnesty International received information from

an unnamed source that Mr. al-Rawi had been secretly transferred from Gambia to the

U.S. Air Force Base at Bagram — absent any extradition or deportation process and

despite the fact that a habeas corpus petition, which had been initiated by Mr. al-Rawi's

mother on his behalf, was still pending in a court in Gambia.  Despite requests, U.S.

officials refused to confirm Mr. al-Rawi's whereabouts.  Because Mr. al-Rawi was not a

British national, the British government similarly refused to provide any consular or

diplomatic assistance in locating or seeking his immediate and unconditional release.

Mr. al-Rawi's family only learned officially of Mr. al-Rawi's whereabouts from the

ICRC, when the organization contacted them to advise that he had been transferred to

Guantánamo.

**Official Investigations and Proceedings Before International Tribunals**

229.    On June 12, 2006, following a seven-month investigation into alleged

secret detentions and unlawful inter-state transfers, including specific investigations into

the circumstances surrounding the secret detention, unlawful rendition, and torture of Mr.

Mohamed, Mr. Agiza, Mr. Bashmilah, Mr. al-Rawi, and others, the Council of Europe

issued a report on the "intentional or grossly negligent collusion" of European countries

in the CIA rendition program.  Based in part on official information provided by national

and international air traffic control authorities, the Council of Europe concluded that the

58

FIRST AMENDED COMPLAINT

flights transporting Mr. Mohamed, Mr. Agiza and Mr. al-Rawi to Morocco, Egypt, and Afghanistan, were part of a "spider's web" of unlawful inter-state transfers to secret detention centers across the globe.  Specifically in relation to the rendition of Mr. Mohamed, the Council found that flight records examined by them conclusively proved that the renditions of Mr. Mohamed and Khaled El-Masri were "carried out by the same CIA-operated aircraft, within 48 hours of one another, in the course of the same twelve-day tour in January 2004."

230.    On January 30, 2007, following a ten-month inquiry, the European Parliament adopted a final report into the alleged use of European countries by the CIA for the transportation and illegal detention of prisoners.  In its report, the European Parliament stated conclusively that between 2001 and 2005, flights involving aircraft directly or indirectly operated by the CIA were used to carry out the "proven 'extraordinary renditions'" of Mr. Mohamed, Mr. Britel, Mr. Agiza, Mr. al-Rawi, and others.  According to the report, the publicly available flight data proved "the existence of a widespread, methodical practice of 'extraordinary rendition,' following precise rules and carried out by certain U.S. secret services."

231.    Most recently, on June 7, 2007, based on interviews with U.S. and European intelligence, aviation, and security officials and extensive review of available public and classified documents, the Council of Europe concluded in a supplemental report that "what was previously just a set of allegations is now proven."  This report detailed the rendition program's general parameters, including the forms of mistreatment, including extreme sensory deprivation, stress positions, and sleep deprivation.  This

59

FIRST AMENDED COMPLAINT

report also confirmed Jeppesen's close involvement with the program, specifically in relation to flights in and out of a U.S. run "black site" detention facility in Poland.

232.    At a national level, the Office of the Parliamentary Ombudsman of the Swedish Government and the Swedish Parliament's Standing Committee on the Constitution have inquired into the Swedish government's handling of Mr. Agiza's rendition and the Swedish Security Police's involvement in the process and determined that the circumstances surrounding the rendition violated relevant Swedish laws. The Ombudsman's report concluded that U.S. and Egyptian officials involved in the rendition had violated Swedish criminal law by subjecting Mr. Agiza to "degrading and humiliating treatment" and by exercising police powers on Swedish soil. And the Standing Committee on the Constitution concluded that Swedish government actions violated Swedish immigration laws prohibiting the transfer of anyone from Sweden to a country where there is a substantial likelihood of his being subjected to torture.

233.    In the United Kingdom, on March 28, 2006, an All Party Parliamentary Group on Rendition conducted an inquiry into the rendition program generally, including the collaboration of United States and United Kingdom intelligence agencies and specifically, the cases of Mr. Mohamed, Mr. al-Rawi and other British residents rendered pursuant to the program. On July 25, 2007, the United Kingdom Parliamentary Intelligence and Security Committee published a Report on the findings of this inquiry to be laid before and considered by Parliament. This Report fully corroborates Mr. al-Rawi's version of events.

234.    In addition, two United Nations Human Rights bodies, the U.N. Committee Against Torture and the U.N. Human Rights Committee, respectively, found

60

FIRST AMENDED COMPLAINT

that the expulsion of Mr. Agiza and Mohammed El-Zery – another Egyptian citizen rendered from Sweden to Egypt at the same time as Mr. Agiza – violated, *inter alia*, Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (prohibition against rendition to torture) and Article 7 of the International Covenant on Civil and Political Rights (prohibition against torture). Pursuant to these two findings, Mr. Agiza is seeking remedies for these proven violations from the Swedish government.  To date, however, his demands have not been met.

235.    Three United Nations Human Rights bodies have expressed grave concern about the rendition, torture, and detention of Mr. Bashmilah.  The U.N. Special Rapporteur on Torture and the U.N. Special Rapporteur on the Promotion and Protection of Human Rights and Fundamental Freedoms While Countering Terrorism jointly wrote to the government of the United States on November 17, 2005 expressing concern about the secret detention and ill-treatment to which Mr. Bashmilah had been subjected while in U.S. detention.  The Special Rapporteur on Torture also protested the treatment that Mr. Bashmilah suffered in Jordan.  Finally, the U.N. Working Group on Arbitrary Detention found that Mr. Bashmilah's detention in Yemen following his return by the U.S. government amounted to an arbitrary detention since there was no legal basis for the detention.  The Working Group also noted that the type of secret detention to which Mr. Bashmilah was subject before he was sent to Yemen amounts to a violation of myriad human rights norms.

**Defendant Jeppesen's Involvement in Plaintiffs' Extraordinary Rendition**

236.    Defendant Jeppesen played an integral role in the forced disappearances and rendition of Mr. Mohamed, Mr. Britel, Mr. Agiza, Mr. Bashmilah, and Mr. al-Rawi to detention and interrogation under torture in Morocco, Egypt, and Afghanistan.

**Comment [MSOffice1]:** Making consistent with other references to UN HR bodies.

61

FIRST AMENDED COMPLAINT

237.    On information and belief, Jeppesen entered into an agreement with agents of the CIA and U.S.-based corporations that owned and operated the Gulfstream V jet aircraft and the Boeing-737 business jet aircraft to provide flight and logistical support to the aircraft and crew to transport Mr. Mohamed from Pakistan to detention in Morocco and from Morocco to detention in Afghanistan; Mr. Britel from Pakistan to detention in Morocco; Mr. Agiza from Sweden to detention in Egypt; Mr. Bashmilah from Jordan to detention in Afghanistan; and Mr. al-Rawi from Gambia to detention in Afghanistan.

238.    Flight records from July 2002 confirm that the Gulfstream V jet aircraft owned and operated by Premier Executive Transportation Services ("PETS") and Aero Contractors Limited ("ACL") departed Islamabad, Pakistan on July 21, 2002 at 5:35 p.m. and arrived in Rabat, Morocco, the next morning, July 22, 2002 at 3:42 a.m. before departing Rabat an hour later, at 4:44 a.m., for Shannon, Ireland, arriving there at 7:21 a.m.

239.    Flight records from January 2004 confirm that a Boeing 737 business jet aircraft, then owned by PETS and operated by ACL and registered with the FAA as N313P, departed Larnaca, Cyprus, at 6:39 p.m. on January 21, 2004, and arrived in Rabat, Morocco at 11:48 p.m. that night.  The same aircraft departed Rabat the next day, January 22, 2004, at 2:05 a.m. and arrived in Kabul, Afghanistan, at 9:58 a.m.

240.    Documents, including telex instructions from Jeppesen to its local Spanish agent, Mallocair, also confirm that Jeppesen was responsible for arranging "ground handling" services for this aircraft in Spain.  The Council of Europe

FIRST AMENDED COMPLAINT

investigation further confirms that within a 48-hour period, this aircraft was involved in the renditions of both Khaled El-Masri and Plaintiff Mohamed.

241.    Flight records from May 2002 confirm that the Gulfstream V jet owned and operated by PETS and ACL departed Islamabad, Pakistan on May 24, 2002, at 9:05 p.m. and arrived in Rabat, Morocco, the next morning, May 25, 2002 at 7:05 a.m. before departing Rabat less than an hour later at 7:58 a.m. for Porto, Portugal, arriving there at 9:19 a.m.

242.    The originator code on these flight records shows that Jeppesen was responsible for filing pre-departure flight plans with appropriate national and inter-governmental air traffic control authorities for this itinerary.

243.    Flight records from December 2001 confirm that a Gulfstream V jet aircraft then owned by PETS and operated by ACL, then registered with the FAA as N379P, departed Johnson County Airport, North Carolina at 12:13 a.m. on December 18, 2001, landed briefly in Washington, D.C., then proceeded to Cairo, Egypt, where it arrived at 1:19 p.m.

244.    Flight records for the same itinerary then confirm that the same aircraft left Cairo for Bromma airport in Sweden at 2:43 p.m. and arrived there at 7:43 p.m.  The plane departed Bromma for Cairo at 8:48 p.m., arriving there at 1:30 a.m. on December 19, 2001.  On December 20, 2001, the aircraft departed Cairo at 6:56 a.m., landed first at Prestwick airport, Scotland, at 12:03 p.m., before finally touching down in Washington at 7:18 p.m.

245.    Swedish Civil Aviation Records and a related invoice confirm Jeppesen's involvement in this extraordinary rendition, and, specifically, that Jeppesen was responsible, through its local Swedish agent, Luftfartsverket, for arranging landing and

63

FIRST AMENDED COMPLAINT

overflight permits for this aircraft, air terminal navigation fees, noise and emission charges, security charges, and passenger fees for a total of nine crew members.

246.    Flight records from October 2003, show that on October 24, 2003, a Gulfstream V aircraft, then registered with the FAA as N379P, departed from Washington, D.C., at 6:03 p.m. and arrived at Prague, Czech Republic at 1:46 a.m. on October 25, 2003 before taking off again at 8:48 p.m. that same evening for Bucharest, Romania, arriving there at 10:16 p.m.  Less than an hour later, at 11:12 p.m., the same aircraft departed Bucharest for Amman, Jordan, arriving there on October 26, 2003 at 1:10 a.m. before taking off again at 4:15 a.m. that same morning for Kabul, Afghanistan, arriving there at 8:25 a.m.  At 8:45 a.m. on October 29, 2003 the same aircraft departed from Kabul arriving in Baghdad, Iraq at 12:55 p.m. before taking off again at 1:33 p.m. that same afternoon for Porto, Portugal, arriving there at 8:04 p.m.  At 1:00 p.m. on October 30, 2003 the same aircraft departed Porto for Washington, D.C., arriving there at 7:53 p.m.

247.    The originator code on these flight records shows that Jeppesen was responsible for filing pre-departure flight plans with appropriate national and inter-governmental air traffic control authorities for this itinerary.

248.    Flight records from December 2002 confirm that a Gulfstream V jet aircraft then owned by PETS and operated by ACL, then registered with the FAA as N379P, departed Washington, D.C. at 1:15 p.m. on December 8, 2002, arriving at Banjul, Gambia at 8:10 p.m.  The aircraft departed Banjul at 9:45 p.m. and landed in Cairo, Egypt, at 3:45 a.m. the next morning.  The aircraft then left Cairo an hour later at 4:45 a.m. and arrived in Kabul, Afghanistan at 9:04 a.m. that morning.

64

FIRST AMENDED COMPLAINT

249.    The originator code on these flight records shows that Jeppesen was responsible for filing pre-departure flight plans with appropriate national and inter-governmental air traffic control authorities for this itinerary.

250.    On information and belief, in advance of the departure of both aircraft, Jeppesen was responsible for, *inter alia*, itinerary, route, and fuel planning for the flights from (i) Washington, D.C. to Ireland; Ireland to Cyprus; Cyprus to Morocco; Morocco to Kabul; Kabul to Algiers; and Algiers to Spain; (ii) Pakistan to Morocco; Morocco to Portugal; (iii) Pakistan to Morocco; Morocco to Ireland; and (iv) the United States to Egypt; Egypt to Sweden; Sweden to Egypt; Egypt to Scotland; and finally, Scotland to the United States (v) the United States to Czech Republic, from Czech Republic to Romania, Romania to Jordan, Jordan to Afghanistan, Afghanistan to Iraq, Iraq to Portugal, and Portugal to the United States; and (vi) the United States to Gambia, Gambia to Cairo, and Cairo to Afghanistan.

251.    On information and belief, services provided by Jeppesen included pre-filing flight plans with relevant national and inter-governmental traffic control authorities, procuring all overflight and landing permits necessary for the itinerary, as well as instructing local ground handling agents in countries including the United States, Pakistan, Morocco, Cyprus, Spain, Portugal, Ireland, Egypt, Sweden, Jordan, Gambia, and Scotland and to provide in-country assistance with re-fueling, aircraft maintenance, customs clearance, servicing and re-fueling of aircraft, and aircraft and crew security.

252.    In facilitating the transportation of Mr. Mohamed, Mr. Britel, Mr. Agiza, Mr. Bashmilah, and Mr. al-Rawi  to Morocco, Egypt, and Afghanistan, Jeppesen knew or

65

FIRST AMENDED COMPLAINT

reasonably should have known that they would be subject to forced disappearance, held

in secret detention in destination countries, interrogated, and subjected to torture and

other forms of cruel, inhuman, or degrading treatment there.

//

//

## CAUSES OF ACTION

### First Claim For Relief

### Alien Tort Statute: Forced Disappearance

253.    Pursuant to the extraordinary rendition program, Plaintiffs were subjected

to forced disappearance by agents of the United States, Morocco, and Egypt.  Customary

international law prohibits the arrest, detention, abduction, or any other form of

deprivation of liberty by agents of the State or by persons or groups of persons acting

with the authorization, support, or acquiescence of the State, and the subsequent refusal

to acknowledge the deprivation of liberty or concealment of the fate or whereabouts of

the disappeared person.  The entire extraordinary rendition program is premised on the

secret detention of suspects without any official acknowledgement of the location or fact

of their detention.  The program has the effect of placing individuals beyond the reach of

legal protections, thereby rendering them particularly vulnerable to torture and other

illegal methods of detention and interrogation.  The prohibition against forced

disappearance is a "specific, universal, and obligatory" norm of customary international

law cognizable under the Alien Tort Statute.

254.    Jeppesen is directly liable for Plaintiffs' forced disappearance.  The very

nature and purpose of the extraordinary rendition program – to forcibly abduct

individuals in secret and to place them beyond the rule of law – constitutes forced

disappearance.  Here, Jeppesen actively participated in numerous aspects of the logistical

FIRST AMENDED COMPLAINT

planning and implementation of the extraordinary renditions of Plaintiffs, with actual or constructive knowledge that its involvement would result in the secret apprehension and detention of Plaintiffs.

255.    In the alternative, Jeppesen is liable for the violation of Plaintiffs' rights because it conspired with agents of the United States in Plaintiffs' forced disappearance. Jeppesen entered into an agreement with agents of the United States to unlawfully render Plaintiffs to secret detention in Morocco, Egypt, and Afghanistan.  Defendant participated in or committed a wrongful act in furtherance of said conspiracy, which resulted in injury to Plaintiffs.

256.    Further, or in the alternative, Jeppesen is liable for the forced disappearance of Plaintiffs because it aided and abetted agents of the United States, Morocco, Egypt, and Jordan in subjecting Plaintiffs to such treatment.  Specifically, Jeppesen knew or reasonably should have known that the flight and logistical support that it provided to the aircraft and crew would be used to transport Plaintiffs to secret detention and interrogation in Morocco, Egypt, and Afghanistan.  In addition, Jeppesen, through its provision of flight and logistical services to aircraft and crew, provided substantial practical assistance to U.S., Moroccan, and Egyptian government officials in subjecting Plaintiffs to forced disappearance.

257.    Further, or in the alternative, Jeppesen is liable for the violation of Plaintiffs' rights because it demonstrated a reckless disregard as to whether Plaintiffs would be subjected to forced disappearance through its participation in the extraordinary rendition program and specifically its provision of flight and logistical support services to aircraft and crew that it knew or reasonably should have known would be used to transport them to secret detention and interrogation in Morocco, Egypt, and Afghanistan.

67

FIRST AMENDED COMPLAINT

258.    Defendant's acts and omissions described herein caused Plaintiffs to suffer damages, including mental and emotional pain and suffering, in an amount to be determined at trial.

259.    Defendant's acts or omissions were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

//

//

**Second Claim For Relief**

**Alien Tort Statute: Torture and Other Cruel, Inhuman, or Degrading Treatment**

260.    Plaintiffs were subjected to torture and other cruel, inhuman, or degrading treatment by agents of the United States, Morocco and Egypt.  Customary international law prohibits any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.  This norm incorporates, *inter alia*, the prohibition against removing any person, regardless of status, to a country where there is a substantial likelihood that he will be tortured.  The prohibition against torture and other cruel, inhuman, or degrading treatment is a "specific, universal, and obligatory" norm of customary international law cognizable under the Alien Tort Statute.

261.    Plaintiffs were subjected to torture and other cruel, inhuman, or degrading treatment during their transportation to Morocco, Egypt, and Afghanistan; as a

68

FIRST AMENDED COMPLAINT

consequence of their rendition to these countries; and while detained and interrogated there.

262.    Jeppesen is liable for the violation of Plaintiffs' rights because it conspired with agents of the United States in Plaintiffs' torture and other cruel, inhuman, or degrading treatment, including their rendition to Morocco, Egypt, and Afghanistan, when it knew or reasonably should have known that there was a substantial likelihood that they would be subjected to torture and other forms of cruel, inhuman, or degrading treatment there. Defendant entered into an agreement with agents of the United States to provide flight and logistical support services to aircraft and crew used in the extraordinary rendition program to unlawfully render Plaintiffs to detention and interrogation in Morocco, Egypt, and Afghanistan, where they would be subjected to acts of torture and other cruel, inhuman or degrading treatment. Through its provision of these services, Defendant participated in or committed a wrongful act in furtherance of said conspiracy, which resulted in injury to Plaintiffs.

263.    In the alternative, Jeppesen is liable for the torture and other cruel, inhuman, or degrading treatment of Plaintiffs because it aided and abetted agents of the United States, Morocco and Egypt in subjecting Plaintiffs to such treatment. Specifically, Jeppesen knew or reasonably should have known that the aircraft and crew for which it provided flight and logistical support services would be used in the extraordinary rendition program to transport Plaintiffs to detention and interrogation in Morocco, Egypt, and Afghanistan, where they would be subjected to acts of torture and other cruel, inhuman or degrading treatment. In addition, Jeppesen, through its provision of flight and logistical services to aircraft and crew, provided substantial practical assistance to U.S., Moroccan and Egyptian government officials in subjecting Plaintiffs to torture and other cruel, inhuman, or degrading treatment in Morocco, Egypt, and Afghanistan.

69

FIRST AMENDED COMPLAINT

264.    Further, or in the alternative, Jeppesen is liable for the violation of Plaintiffs' rights because it demonstrated a reckless disregard as to whether Plaintiffs would be subjected to torture or other cruel, inhuman, or degrading treatment by providing flight and logistical support to aircraft and crew it knew or reasonably should have known would be used in the extraordinary rendition program to transport them to detention and interrogation in Egypt, Morocco, and Afghanistan, where they would be subjected to torture and other cruel, inhuman, or degrading treatment.

265.    Defendant's acts and omissions described herein caused Plaintiffs to suffer damages, including mental and emotional pain and suffering, in an amount to be determined at trial.

266.    Defendant's acts or omissions were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court grant the following relief:

A.  for compensatory damages in an amount to be proven at trial, but in an amount over $75,000;

B.  for punitive and exemplary damages in an amount to be proven at trial;

C.  for reasonable attorneys' fees and costs of suit; and

D.  for such other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Dated: August 1, 2007

70

FIRST AMENDED COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,


_____/s/ Ben Wizner_____
BEN WIZNER, SBN 215724
STEVEN M. WATT
ALEXA KOLBI-MOLINAS
JAMEEL JAFFER
STEVEN R. SHAPIRO
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel. 212.519.7870
Fax 212.549.2629

ANN BRICK, SBN 65296
American Civil Liberties Union Foundation
of Northern California
39 Drumm Street
San Francisco, CA, 94111
Tel. 415.621.2493
Fax 415.255.1478

*CLIVE STAFFORD-SMITH
*ZACHARY KATZNELSON, SBN 209489
Reprieve
PO Box 52742
London EC4P 4WS
England
Tel. +44 (0)207 353 4640
Fax +44 (0)207 353 4641

PAUL HOFFMAN, SBN 71244
Schonbrun DeSimone Seplow Harris &
Hoffman LLP
723 Ocean Front Walk, Suite 100
Venice, CA  90291
Tel. 310.396.0731, ext. 4
Fax 310.399.7040

71

FIRST AMENDED COMPLAINT

HOPE METCALF
National Litigation Project
Allard K. Lowenstein International
Human Rights Clinic
Yale Law School
127 Wall Street
New Haven, CT 06520
Tel. 203.432.9404
Fax 203.432.9128

MARGARET L. SATTERTHWAITE++
International Human Rights Clinic
Washington Square Legal Services, Inc.
New York University School of Law
245 Sullivan Street
New York, NY 10012
Tel. 212.998.6657 / Fax 212.995.4031

* For and on behalf of Plaintiff BINYAM MOHAMED only
++ For and on behalf of Plaintiff MOHAMED FARAG AHMAD BASHMILAH only

72

FIRST AMENDED COMPLAINT