UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
San Jose Division

BINYAM MOHAMED;  )
ABOU ELKASSIM BRITEL;  )
AHMED AGIZA;  )
MOHAMED FARAG AHMAD BASHMILAH;  )
BISHER AL-RAWI,  )
  )
          Plaintiffs,  ) Civ. No. 5:07-cv-02798 (JW)
  )
     v.  )
  )
JEPPESEN DATAPLAN, INC.,  )
  )
          Defendant.  )
_____ )

**FORMAL CLAIM OF STATE SECRETS AND STATUTORY PRIVILEGES
BY GENERAL MICHAEL V. HAYDEN, USAF,
<u>DIRECTOR, CENTRAL INTELLIGENCE AGENCY</u>**

<u>Introduction</u>

I, MICHAEL V. HAYDEN, hereby declare and state:

1.  I am the Director of the Central Intelligence Agency (CIA) and have served in this position since 30 May 2006. In my capacity as Director, I lead the CIA and manage the Intelligence Community's human intelligence and open source collection programs on behalf of the Director of National Intelligence (DNI). I have held a number of positions in the Intelligence Community, including Principal Deputy Director of National Intelligence from April 2005 to May 2006; Director, National Security Agency/Chief, Central Security Service (NSA/CSS), Fort George G. Meade, Maryland, from March 1999 to April 2005;

Commander, Air Intelligence Agency, and Director, Joint Command and Control Warfare Center, both headquartered at Kelly Air Force Base, Texas, from January 1996 to September 1997; and Director, Intelligence Directorate, U.S. European Command, Stuttgart, Germany, from May 1993 to October 1995.

2. I am a four-star general in the United States Air Force and have held senior staff positions at the Pentagon, the National Security Council, and the U.S. Embassy in Sofia, Bulgaria, as well as serving as Deputy Chief of Staff for United Nations Command and U.S. Forces Korea. I entered active duty in 1969 as a distinguished graduate of the Reserve Officer Training Corps program.

3. The purpose of this declaration is to formally assert, in my capacity as the Director of the Central Intelligence Agency, the military and state secrets privilege (hereafter "state secrets privilege") and a statutory privilege under section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 403-1(i)(1), in order to protect intelligence activities, sources, and methods that are at risk of disclosure in this case. Disclosure of the information covered by this privilege assertion reasonably could be expected to cause serious--and in some instances, exceptionally grave-- damage to the national security of the United States and, therefore, the information should be excluded from any use in this case. In addition, because highly classified information is central to the allegations and issues in this case, the risk

is great that further litigation will lead to disclosures harmful to U.S. national security and, accordingly, this case should be dismissed.

4. I make the following statements based upon my personal knowledge and upon information made available to me in my official capacity.

### Authorities of the DCIA and CIA

5. The CIA was established by section 104(a) of the National Security Act of 1947 (Act), as amended, 50 U.S.C. § 403-4(a). Pursuant to section 104(b) of the Act, 50 U.S.C. § 403-4(b), the function of the CIA is to assist the Director of the CIA (DCIA) in carrying out his assigned responsibilities. The Act also established the position of DCIA, 50 U.S.C. § 403-4a(a), whose duty is serving as head of the CIA, 50 U.S.C. § 403-4a(c), and whose responsibilities include collecting information through human sources and by other appropriate means, correlating and evaluating intelligence related to the national security and providing appropriate dissemination of such intelligence, providing overall direction for coordination of the collection of national intelligence outside the United States through human sources by elements of the intelligence community authorized to undertake such collection, and performing such other functions and duties related to intelligence affecting the national security as the President, or the Director of National Intelligence (DNI), may

direct. 50 U.S.C. § 403-4a(d). A more particularized statement of the authorities of the DCIA and the CIA is set forth in sections 1.5 and 1.8 of Executive Order 12333.[1]

6. Under the direction of the DNI pursuant to section 102A(i) of the Act, 50 U.S.C. § 403-1(i), and in accordance with section 6 of the Central Intelligence Agency Act of 1949, as amended, 50 U.S.C. § 403g, and sections 1.3(a)(5) and 1.5(h) of Executive Order 12333, I am responsible for protecting CIA sources and methods from unauthorized disclosure.

7. Section 1.3(a) of Executive Order 12958, as amended,[2] provides that the authority to classify information originally may be exercised only by the President and, in the performance of executive duties, the Vice President; agency heads and officials designated by the President in the *Federal Register;* and United States Government officials delegated this authority pursuant to section 1.3(c) of the Order. Section 1.3(c)(2) provides that TOP SECRET original classification authority may be delegated only by the President; in the performance of executive duties, the Vice President; or an agency head or official designated pursuant to section 1.3(a)(2) of the Executive Order. In accordance with section 1.3(a)(2), the President designated the Director of the CIA as an official who

---

[1] Executive Order 12333, as amended, 3 C.F.R. 200 (1981), *reprinted in* 50 U.S.C.A. § 401 note at 22 (West Supp. 2007), and as amended by Executive Order 13284, 68 Fed. Reg. 4,077 (Jan. 23, 2003), and Executive Order 13355, 69 Fed. Reg. 53,593 (Aug. 27, 2004).
[2] Executive Order 12958, as amended, 3 C.F.R. 333 (1995), *reprinted in* 50 U.S.C.A. § 435 note at 187 (West Supp. 2007), and as amended by Executive Order 13292, 68 Fed. Reg. 15,315 (Mar. 25, 2003).

may classify information originally as TOP SECRET.[3]

### Plaintiffs' First Amended Complaint

8. Through the exercise of my official duties, I am familiar with this litigation. I understand that the plaintiffs allege that Defendant Jeppesen Dataplan, Inc., ("Jeppesen") should be held liable for purportedly assisting the United States in the conduct of alleged clandestine intelligence activities. Plaintiffs maintain that Jeppesen violated international law by, among other things, "provid[ing] direct and substantial services to the United States for its so-called 'extraordinary rendition' program." First Amended Compl. ¶ 2. Plaintiffs allege that Jeppesen "is directly liable" under the Alien Tort Statute for allegedly violating Plantiffs' rights, or that, in the alternative, Jeppesen is liable because it "conspired with" and "aided and abetted" agents of the United States, or because it acted "with reckless disregard." First Amended Compl. ¶¶ 254-57, 262-264.

### Privileged Information

9. Plaintiffs contend that Jeppesen assisted the CIA in conducting clandestine intelligence activities abroad. As a general rule, the United States does not--and cannot--confirm or deny allegations of clandestine intelligence activities. Where

---

[3] Order of President, Designation under Executive Order 12958, 70 Fed. Reg. 21,609 (Apr. 21, 2005), *reprinted in* U.S.C.A. § 435 note at 199 (West Supp. 2007).

such allegations are true, the Government cannot confirm them for the simple reason that doing so would reveal the very secret the Government is required to protect. Even where that is not the case, the United States cannot simply deny the existence of such activities where none exist. If that were the policy, the United States' failure to deny such activities in other circumstances would be tantamount to an admission of such clandestine activities in other circumstances. Therefore, the United States must take the consistent position of refusing to confirm or deny allegations relating to unacknowledged intelligence activities.[4]

10. I understand that the United States, the CIA, and its officers and employees are not named as defendants in this action. Rather, I understand that plaintiffs allege that Jeppesen should be held liable for purportedly assisting the United States in the conduct of alleged clandestine intelligence activities. Nevertheless, I understand that in order to proceed with their lawsuit, plaintiffs will have to prove, among other things, that the conduct to which they allegedly were subjected was on behalf of the United States government and various foreign governments, and that these governments assisted in carrying out the alleged acts. See, e.g., First Amended Compl.

---

[4] While the President acknowledged the *existence* of the CIA terrorist detention and interrogation program, the details of the program remain highly classified. Thus, the President's determination to authorize a limited disclosure of the existence of the program, see infra ¶¶ 12-15, does not obviate the need to continue to refuse to confirm or deny the operational details of that program which, if disclosed, reasonably could be expected to cause exceptionally grave damage to the national security.

¶ 1 (alleging plaintiffs were subject to "forced disappearance, torture, and inhumane treatment" at the hands of "agents of the United States and other governments," and that Jeppesen assisted these governments in carrying out the alleged acts).

11. With these considerations in mind, I hereby submit this declaration to formally assert a claim of state secrets privilege. I make this claim of state secrets privilege in my capacity as head of the CIA after personal consideration of the matter. Additionally, in that capacity I also assert a statutory privilege under section 102A(i)(1) of the National Security Act of 1947, 50 U.S.C. § 403-1(i)(1). The allegations in the First Amended Complaint contain detailed descriptions of plaintiffs' purported detention, interrogation, and mistreatment by officials of the United States and other countries, and Jeppesen's purported involvement in, and knowledge of, those activities. See, e.g., First Amended Compl. ¶¶ 2-15, 48-56, 59-86, 94-105, 109, 113-14, 126-47, 153-87, 203-24, 236-52, 253-57, 260-64. Such allegations attempt to probe the CIA's clandestine foreign intelligence interests, authorities, activities, and methods. I have determined that no information can be adduced on the public record to establish or refute such claims, or any defenses thereto, without jeopardizing the national security of the United States. The reasons underlying this decision cannot be fully described on the public record and, accordingly, are included in a separate, classified declaration (which I hereby incorporate by reference) that has

7

been lodged in a secure location and is available for the Court's in camera, ex parte review.[5]

CIA Terrorist Detention and Interrogation Program

12. On 6 September 2006, President Bush delivered a speech that officially acknowledged the existence of a CIA terrorist detention and interrogation program. The President acknowledged that a small number of suspected terrorist leaders and operatives captured during the war on terrorism had been held and questioned outside the United States in a program operated by the CIA. He further acknowledged that the CIA employed an alternative set of interrogation procedures that the Department of Justice (DOJ) had reviewed and determined to be lawful. He announced that fourteen suspected terrorists in CIA custody had been transferred to the United States Naval Base Guantanamo Bay, Cuba. He stated that, due to the transfers, no detainees remained in the CIA program.[6] He also stated that as more suspected high-ranking terrorists are captured, the need to obtain intelligence from such individuals will remain critical, and that having a CIA program for questioning terrorists would continue to be crucial to our ability to obtain life-saving

---

[5] My classified declaration will be delivered to a DOJ Security Officer who will assist in delivery and storage as the Court may require. In this regard, it is my understanding that the Classified Information Procedures Act (CIPA) does not govern this civil proceeding, and the DOJ Security Officer will not perform the additional responsibilities as a Court Security Officer under the Chief Justice's CIPA guidelines.

[6] On 27 April 2007, the Department of Defense acknowledged the transfer to Guantanamo Bay of a fifteenth suspected terrorist who was captured and detained by the CIA after the President's speech.

information.

    13.  In his speech, the President stated:

    In addition to the terrorists held at Guantanamo, a small number of suspected terrorist leaders and operatives captured during the war have been held and questioned outside the United States, in a separate program operated by the Central Intelligence Agency . . . .

    Many specifics of this program, including where these detainees have been held and the details of their confinement, cannot be divulged.  Doing so would provide our enemies with information they could use to take retribution against our allies and harm our country.  I can say that questioning the detainees in this program has given us information that has saved innocent lives by helping us stop new attacks--here in the United States and across the world.

    . . . . And so the CIA used an alternative set of procedures . . . . I cannot describe the specific methods used--I think you understand why--if I did, it would help the terrorists learn how to resist questioning and to keep information from us that we need to prevent new attacks on our country . . . .

    . . . . This program has been and remains one of the most vital tools in our war against the terrorists.  It is invaluable to America and to our allies.  Were it not for this program, our intelligence community believes that Al Qaeda and its allies would have succeeded in launching another attack against the American homeland.  By giving us information about terrorist plans we could not get anywhere else, this program has saved innocent lives.

    . . . . The current transfers mean that there are now no terrorists in the CIA program.  But as more high-ranking terrorists are captured, the need to obtain intelligence from them will remain critical.  And having a CIA program for questioning terrorists will continue to be crucial to getting life-saving information.

    Some may ask:  Why are you acknowledging this program now?  There are two reasons why I'm making these limited disclosures today.  First we have largely completed our questioning of the men, and to start the process for bringing them to trial, we must bring them into the open.  Second, the Supreme Court's recent decision has impaired our ability to prosecute terrorists through military commissions and has put in question the future of the CIA

program . . . .

> So today I'm asking Congress to pass legislation that will clarify the rules for our personnel fighting the war on terror. First, I'm asking Congress to list the specific, recognizable offenses that would be considered crimes under the War Crimes Act so our personnel can know clearly what is prohibited in the handling of terrorist enemies. Second, I'm asking that Congress make explicit that by following the standards of the Detainee Treatment Act, our personnel are fulfilling America's obligations under Common Article Three of the Geneva Conventions. Third, I'm asking that Congress make it clear that captured terrorists cannot use the Geneva Conventions as a basis to sue our personnel in courts--in U.S. courts. The men and women who protect us should not have to fear lawsuits filed by terrorists because they're doing their jobs.

*Remarks on the War on Terror*, 42 Weekly Comp. Pres. Doc. 1569, 1570-1572, 1574-75 (Sep. 6, 2006).

14. In their public statements on the subject of rendition, Secretary of State Condoleezza Rice and my predecessors George J. Tenet and Porter J. Goss acknowledged no more than the fact of the existence of instances of rendition and the approximate numbers of terrorists involved.[7] In my own

---

[7] See, e.g., Secretary of State Condoleezza Rice, *Remarks Upon Her Departure For Europe* (Dec. 5, 2005) ("For decades, the United States and other countries have used 'renditions' to transport terrorist suspects from the country where they were captured to their home country or to other countries where they can be questioned, held, or brought to justice."), *available at* http://www.state.gov/secretary/rm/2005/57602.htm; Director of Central Intelligence George J. Tenet, *Written Statement for the Record of the Director of Central Intelligence Before the Joint Inquiry Committee* (Oct. 17, 2002) ("By 11 September, CIA (in many cases with the FBI) had rendered 70 terrorists to justice around the world."), *available at* https://www.cia.gov/news-information/speeches-testimony/2002/dci_testimony_10172002.html; Director of Central Intelligence George J. Tenet, *Written Statement for the Record of the Director of Central Intelligence Before the National Commission on Terrorist Attacks Upon the United States* (Mar. 24, 2004) ("The [DCI Counterterrorist] Center has racked up many successes, including the rendition of many dozens of terrorists prior to September 11, 2001."), *available at* http://www.9-11commission.gov/hearings/hearing8/tenet_statement.pdf; Director of Central Intelligence Porter J. Goss, *Testimony Before the Senate Armed Services Committee* (Mar. 17, 2005) ("The idea of moving people around, transferring people for criminal or other reasons, by government agencies is not new."), *available at* Lexis, Legislation Library, Federal News Service.

public statements on the subject, I acknowledged only the fact of the existence of instances of rendition and the approximate numbers of terrorists who had been detained or rendered by the CIA.[8]

15. The President emphasized that he was making only limited disclosures and specifically declined to provide any information relating to the details of the CIA terrorist detention and interrogation program, including whether any particular allied governments or private entities assisted the CIA in carrying out the program, the identities of individuals formerly subject to CIA detention and interrogation (other than the individuals he identified for the purposes of bringing them to trial), the locations where such detainees were held, the details of their confinement, or the interrogation methods employed with them.

### Limited Declassification

16. In his speech, the President stated that he officially

---

[8] Director of the CIA Michael V. Hayden, *Statement to Employees by Director of the Central Intelligence Agency, General Michael V. Hayden on the Executive Order on Detentions and Interrogations* (Jul. 20, 2007) ("In the past five years, fewer than 100 hardened terrorists have been placed in the program, and just a fraction of those--well under half--have ever required any sort of enhanced interrogation measures."), *available at* https://www.cia.gov/news-information/press-releases-statements/statement-on-executive-order.html; Director of the CIA Michael V. Hayden, *Transcript of Remarks by Central Intelligence Agency Director Gen. Michael V. Hayden at the Council on Foreign Relations* (Sep. 7, 2007) ("Fewer than 100 people had been detained at CIA's facilities. And I mentioned renditions, the number of renditions--that's moving a terrorist from A to B--apart from that 100 that we've detained, the number of renditions is actually even a smaller number, mid-range two figures."), *available at* https://www.cia.gov/news-information/speeches-testimony/general-haydens-remarks-at-the-council-on-foreign-relations.html.

acknowledged the existence of a CIA terrorist detention and interrogation program for two reasons. First, he stated that the CIA had largely completed its questioning of the fourteen suspected terrorists and that it was time to bring them into the open to start the process for bringing them to trial. *Remarks on the War on Terror*, 42 Weekly Comp. Pres. Doc. 1569, 1574 (Sep. 6, 2006). Second, he stated that the *Hamdan* decision had put into question the future of the CIA program and that legislation was required for it to continue. Id. at 1574-75. The President asked for legislation that: a) specifies the offenses that are considered crimes under the War Crimes Act; b) makes explicit that U.S. personnel who follow the standards of the Detainee Treatment Act fulfill their obligations under Common Article Three of the Geneva Conventions; and c) makes clear that captured terrorists cannot use the Geneva Conventions as a basis to sue U.S. personnel in U.S. courts. Id. On 17 October 2006, legislation addressing all three of the President's concerns was enacted. See Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (to be codified at 50 U.S.C. §§ 948a-950w).

17. Section 3.1(b) of Executive Order 12958 provides that, in some exceptional cases, the need to protect classified information may be outweighed by the public interest in disclosure of the information. For the reasons the President specified in his speech, the Executive Branch determined that a limited amount of information concerning the CIA terrorist

detention and interrogation program could be declassified (specifically, its existence and the identities of a limited number of detainees that the United States intends to prosecute).

18. While the President and the CIA have thus acknowledged the existence of the CIA terrorist detention and interrogation program, neither has disclosed any information relating to the details of that program, including the identities of governments or companies that allegedly assisted the CIA, the locations where detainees were held, the details of their confinement, the interrogation methods employed with them, or the identities of detainees who had been in CIA custody (beyond those already publicly acknowledged because the United States intends to bring them to trial).

19. In addition to the fact that the details of the CIA terrorist detention and interrogation program have never been publicly disclosed, the United States also has not publicly acknowledged whether any of these plaintiffs were ever in CIA custody, or whether Jeppesen ever assisted the CIA in its conduct of clandestine intelligence activities.

Information Subject to Assertions of Privilege

20. The information subject to the state secrets privilege (and separate, statutory privilege) I am asserting includes the following:

13

    A.  Information that may tend to confirm or deny whether Jeppesen or any other private entity assisted the CIA with any alleged clandestine intelligence activities, including the CIA terrorist detention and interrogation program;

    B.  Information that may tend to confirm or deny any alleged cooperation between the CIA and foreign governments regarding clandestine intelligence activities;

    C.  Information concerning the scope and operation of the CIA terrorist detention and interrogation program, such as: the locations where detainees were held; whether or not the CIA cooperated with particular foreign governments or private entities in conducting this program; the interrogation methods used in the program; and the identities of any individuals detained by the CIA that have not already been publicly acknowledged; and

    D.  Any other information concerning CIA clandestine intelligence activities that would tend to reveal any intelligence activities, sources, or methods.

<u>Damage to the National Security</u>

21. As set forth in my classified declaration submitted for the Court's <u>in camera</u>, <u>ex parte</u> review, disclosure of information in the foregoing categories reasonably could be expected to cause serious--and, in some instances, exceptionally grave--damage to the national security. I briefly summarize the damage at issue below to the extent I am able to do so in an unclassified setting.

22. First, this lawsuit puts at issue whether or not Jeppesen assisted the CIA with any of the alleged detention and interrogation described in plaintiffs' First Amended Complaint. Disclosure of information that would tend to confirm or deny whether or not Jeppesen provided such assistance--even if such

14

confirmations or denials come from a private party alleged to have cooperated with the United States and not the United States itself--would cause exceptionally grave damage to the national security by disclosing whether or not the CIA utilizes particular intelligence sources and methods and, thus, revealing to foreign adversaries information about the CIA's intelligence capabilities or lack thereof.  Although the CIA has publicly acknowledged the existence of the CIA terrorist detention and interrogation program, it has not disclosed whether (or, if so, how) Jeppesen, or indeed any private entity, assisted the CIA in conducting the program.  Confirmation of such allegations would reveal the intelligence sources and methods by which the CIA conducts clandestine intelligence activities.  Denial of such allegations in this case would tend to confirm similar allegations in other cases in which the CIA could not deny such allegations.  I note that this is the second lawsuit in which the CIA has been compelled to assert the state secrets privilege to avoid confirming or denying allegations relating to the participation of private entities in the CIA's terrorist detention and interrogation program.  See El-Masri v. Tenet, 437 F. Supp. 2nd 530 (E.D. Va. 2006), aff'd, 479 F.3d 296 (4th Cir. 2007), cert. denied, 76 U.S.L.W. 3021 (U.S. Oct. 9, 2007).

23.  Second, this lawsuit puts at issue whether or not the CIA cooperated with particular foreign governments in the conduct of alleged clandestine intelligence activities. Adducing evidence that would tend to confirm or deny such

15

allegations would result in extremely grave damage to the foreign relations and foreign activities of the United States. When foreign governments cooperate with the CIA in clandestine intelligence activities, they do so under assurances from the CIA that the fact of their cooperation will remain secret. Violating such assurances would damage the relations with foreign governments and severely impact the CIA's foreign activities by making other governments unwilling to cooperate with the United States in the future.

24.  Third, this lawsuit attempts to probe other operational details of the CIA's terrorist detention and interrogation program. Those additional details include the names of individuals subject to detention and interrogation in the CIA's program, the locations at which such detainees may be held, and the methods of interrogation to which they might be subject. None of these operational details, which constitute core sources and methods of CIA intelligence-gathering activities, have been disclosed publicly by the President or the CIA (except for the identities of the fifteen detainees, noted above, that the United States intends to try). Disclosing these types of operational details of the program would degrade the effectiveness of the United States' intelligence gathering activities by, for example, providing terrorists information about interrogation methods that would assist their interrogation resistance programs.

25. In connection with my formal assertion of the state secrets privilege and statutory privilege pursuant to section 102A(i)(1) of the National Security Act of 1947, 50 U.S.C. § 403-1(i)(1), I have considered the extent to which the bases for my assertion could be filed on the public record. After careful consideration, I have determined that no further information regarding the bases for my claim of privilege can be disclosed on the public record without revealing the very information I seek to protect. The full scope of the information protected by the claim of privilege is itself privileged from disclosure. Accordingly, my full description of the scope of information protected by the privileges and the bases for my determination are contained in my classified declaration, which is submitted for this Court's in camera, ex parte review.

26. I have requested DOJ to seek dismissal of this case (or, in the alternative, summary judgment) in view of this claim of state secrets privilege and statutory privilege pursuant to section 102A(i)(1) of the National Security Act of 1947, 50 U.S.C. § 403-1(i)(1). I recognize that dismissal is a harsh result. Nevertheless, after consulting with CIA and DOJ officials, I have determined that the highly classified information over which I am asserting these privileges is central to the allegations and issues in this case such that any further litigation of this case would pose an unacceptable risk of disclosure of information that the nation's security requires

17

not be disclosed. Allowing the parties to attempt to prove or disprove the allegations in the complaint, see supra at ¶ 11 (cataloguing the plaintiffs' factual allegations attempting to probe, inter alia, the United States' intelligence gathering methods and foreign relations)--whether by court filings, discovery, or otherwise--would harm the national security interests summarized above and set forth in greater detail in my classified declaration.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of October, 2007.

_____
General Michael V. Hayden, USAF
Director
Central Intelligence Agency