STEVEN M. WATT* swatt@aclu.org
BEN WIZNER (SBN 215724) bwizner@aclu.org
JAMEEL JAFFER* jjaffer@aclu.org
STEVEN R. SHAPIRO* sshapiro@aclu.org
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY  10004
Tel. 212.549.2500 / Fax 212.549.2651

ANN BRICK (SBN 65296) abrick@aclunc.org
ACLU FOUNDATION OF
NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Tel. 415.621.2493 / Fax 415.255.1478

Additional Counsel Listed on Next Page

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| BINYAM MOHAMED;<br>ABOU ELKASSIM BRITEL;<br>AHMED AGIZA;<br>MOHAMED FARAG AHMAD<br>BASHMILAH;<br>BISHER AL-RAWI,<br><br>            Plaintiffs,<br><br>      v.<br><br>JEPPESEN DATAPLAN, INC.,<br><br>            Defendant. | Civil Action No. 5:07-cv-02798 (JW)<br><br>**MEMORANDUM OF PLAINTIFFS IN OPPOSITION TO THE UNITED STATES' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT** |

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary
Judgment
Case No. C 07-2798-JW

1    CLIVE STAFFORD SMITH*† clivess@mac.com
2    ZACHARY KATZNELSON† (SBN 209489) zachary@reprieve.org.uk
3    REPRIEVE
4    PO Box 52742
5    London EC4P 4WS
6    England
7    Tel. +44 (0)207 353 4640 / Fax +44 (0)207 353 4641
8
9    PAUL HOFFMAN (SBN 71244) hoffpaul@aol.com
10   SCHONBRUN DESIMONE SEPLOW
11   HARRIS & HOFFMAN LLP
12   732 Ocean Front Walk, Suite 100
13   Venice, CA 90291
14   Tel 310.999.7040, ext. 4 / Fax 310.999.7040
15
16   HOPE METCALF* hope.metcalf@yale.edu
17   NATIONAL LITIGATION PROJECT
18   ALLARD K. LOWENSTEIN INTERNATIONAL
19   HUMAN RIGHTS CLINIC
20   YALE LAW SCHOOL
21   127 Wall Street
22   New Haven, CT 06520
23   Tel. 203.432.9404 / Fax 203.432.9128
24
25   MARGARET L. SATTERTHWAITE*++ satterth@juris.law.nyu.edu
26   INTERNATIONAL HUMAN RIGHTS CLINIC
27   WASHINGTON SQUARE LEGAL SERVICES, INC.
28   NEW YORK UNIVERSITY SCHOOL OF LAW
29   245 Sullivan Street
30   New York, NY 10012
31   Tel. 212-998-6657 / Fax 212-995-4031
32
33   **Attorneys for Plaintiffs BINYAM MOHAMED, ABOU ELKASSIM BRITEL, AHMED**
34   **AGIZA, MOHAMED FARAG AHMAD BASHMILAH, and BISHER AL-RAWI**
35   **\* Admitted Pro Hac Vice**
36   **† Attorneys for and on behalf of Plaintiff BINYAM MOHAMED only**
37   **++ Attorney for and on behalf of Plaintiff MOHAMED FARAG AHMAD BASHMILAH**
38   **only**

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................. ii

**INTRODUCTION** ............................................................................................... 1

**BACKGROUND** ................................................................................................ 3

    A. The Plaintiffs ............................................................................................ 3

        i. Ahmed Agiza ................................................................................ 3

        ii. Abou Elkassim Britel ................................................................... 7

        iii. Binyam Mohamed ........................................................................ 9

        iv. Bisher Al-Rawi ........................................................................... 12

        v. Mohamed Farag Ahmad Bashmilah ........................................... 15

    B. Jeppesen's Role in the Rendition Program ............................................. 17

    C. Procedural History .................................................................................. 17

**ARGUMENT** ................................................................................................... 18

    I.   **THE STATE SECRETS PRIVILEGE IS AN EVIDENTIARY
         PRIVILEGE, NOT AN IMMUNITY DOCTRINE** .............................. 19

    II.  **DISMISSAL OF A SUIT PURSUANT TO THE STATE SECRETS
         PRIVILEGE IS PERMISSIBLE ONLY IN EXTREME AND NARROW
         CIRCUMSTANCES NOT APPLICABLE HERE** .............................. 23

        A.  **Under the Controlling Law of this Circuit, the "Very Subject
            Matter" of this Suit Is Not a State Secret** ................................. 25

        B.  **Dismissal of this Action Without Permitting Nonsensitive Discovery
            and Considering Nonprivileged Evidence
            Would Be Improper** .................................................................. 37

    III. **THIS COURT IS COMPETENT TO HEAR THIS CASE WITHOUT
         ENDANGERING NATIONAL SECURITY** ........................................ 42

        A.  **An Independent Judiciary Plays a Vital Role in Reviewing
            the Legality of Executive Action** ............................................ 43

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

i

1
2
3      **B.  Federal Courts Have Wide Experience in Assessing National
4          Security Matters**........................................................................46
5
6      **C.  Robust and Secure Alternatives to Dismissal Are Available** ...48
7
8      **IV. THE GOVERNMENT'S STATUTORY PRIVILEGE ARGUMENT
9          IS MERITLESS** ......................................................................50
10
11     **CONCLUSION** ........................................................................................52
12

13

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

                                    ii

1    <u>**TABLE OF AUTHORITIES**</u>

2    **Cases**

3

4    *ACLU v. Brown*, 619 F.2d 1170 (7th Cir. 1980) ............................................................. 23

5

6    *ACLU v. Dep't of Def.*, 389 F. Supp. 2d 547 (S.D.N.Y. 2005) ................................. 45, 50

7

8    *Afshar v. Dep't of State*, 702 F.2d 1125 (D.C. Cir. 1983) ....................................... 26

9

10   *Air-Sea Forwarders, Inc. v. United States*, 39 Fed. Cl. 434 (Fed. Cl. 1997) ................ 50

11

12   *Al-Haramain v. Bush*, 2007 WL 3407182 (9th Cir., Nov. 16, 2007) .................. passim

13

14   *Att'y Gen. v. The Irish People, Inc.*, 684 F.2d 928 (D.C. Cir. 1982) ..................... 23, 49

15

16   *Bareford v. General Dynamics Corp.*, 973 F.2d 1138 (5th Cir. 1992) ....................... 40

17

18   *Bowles v. United States*, 950 F.2d 154 (4th Cir. 1991) ...................................... 23

19

20   *Capital Cities Media, Inc. v. Toole*, 463 U.S. 1303 (1983) ........................... 36

21

22   *CIA v. Sims*, 471 U.S. 159 (1985) ................................................................. 36

23

24   *Clift v. United States*, 597 F.2d 826 (2d Cir. 1987) ...................................... 23

25

26   *Clinton v. Jones*, 520 U.S. 681 (1997) ....................................................... 43

27

28   *Crater Corp. v. Lucent Technologies, Inc.*, 255 F.3d 1361 (Fed. Cir. 2001) ......... 23, 37

29

30   *Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002) .......................... 45

31

32   *Doe v. Ashcroft*, 334 F. Supp. 2d 471 (S.D.N.Y. 2004) ................................. 45

33

34   *Doe v. Gonzales*, 386 F. Supp. 2d 66 (D. Conn. 2005) ................................... 45

35

36   *Doe v. Gonzales*, 449 F.3d 415 (2d Cir. 2006) ........................................... 45

37

38   *DTM Research, LLC v. AT&T Corp.*, 245 F.3d 327 (4th Cir. 2001) ..................... 23

39

40   *Ellsberg v. Mitchell*, 709 F.2d 51(D.C. Cir. 1983) ........................... 20, 23, 45, 48

41

42   *El-Masri v. Tenet*, 437 F. Supp. 2d 530 (E.D. Va. 2006) ............................... 31

43

44   *El-Masri v. United States*, 479 F.3d 296 (4th Cir. 2007) ......................... 10, 37, 39

45

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

iii

*Fitzgerald v. Penthouse Int'l, Ltd*, 776 F.2d 1236 (4th Cir. 1985) ......................................... 23, 48

*Fitzgibbon v. CIA*, 911 F.2d 755 (D.C. Cir. 1990) ...................................................................... 26

*Halkin v. Helms*, 598 F.2d 1 (D.C. Cir. 1978) ............................................................................. 23

*Halkin v. Helms*, 690 F.2d 977 (D.C. Cir. 1982) ......................................................................... 23

*Halpern v. FBI*, 181 F.3d 279 (2d Cir. 1999) ....................................................................... 46, 50

*Hamdi v. Rumsfeld,* 542 U.S. 507 (2004) ..................................................................................... 44

*Hayden v. NSA*, 608 F.2d 1381 (D.C. Cir. 1979) ........................................................................ 50

*Heine v. Raus*, 399 F.2d 785 (4th Cir. 1968) ............................................................................... 23

*Hepting v. AT & T Corp.*, 439 F. Supp. 2d 974 (N.D. Cal. 2006) ......................................... passim

*Herring v. United States*, 2004 WL 2040272 (E.D.Pa. Sept. 10, 2004) ...................................... 21

*In re Guantanamo Detainee Cases*, 344 F. Supp. 2d 174 (D.D.C. 2004) .................................... 50

*In re Sealed Case,* 494 F.3d 139 (D.C. Cir. 2007).................................................................. passim

*In re under seal*, 945 F.2d 1285 (4th Cir. 1991) .................................................................... 23, 50

*In re United States*, 872 F.2d 472 (D.C. Cir. 1989).............................................................. passim

*Jabara v. Webster*, 691 F.2d 272 (6th Cir. 1982) ........................................................................ 23

*Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246 (2d Cir. 2001) .................................... 38

*Kasza v. Browner*, 133 F.3d 1159 (9th Cir. 1998).......................................................... 26, 37, 38

*Knopf v. Colby*, 509 F.2d 1362 (4th Cir. 1975) ........................................................................... 26

*Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001) ............................................................ 43

*Linder v. Dep't of Defense*, 133 F.3d 17 (D.C. Cir. 1998) .......................................................... 23

*Loral Corp. v. McDonnell Douglas Corp.*, 558 F.2d 1130 (2d Cir. 1977).................................. 49

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803).................................................................... 43

*McGehee v. Casey*, 718 F.2d 1137 (D.C. Cir. 1983) ................................................................... 46

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

iv

*Molerio v. FBI*, 749 F.2d 815 (D.C. Cir. 1984) ................................................ 23, 39, 45

*New York Times Co. v. United States*, 403 U.S. 713 (1971)......................................... 22

*Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395 (D.C. Cir. 1984) ........................ 23

*Patterson v. FBI*, 893 F.2d 595 (3d Cir. 1989) ..................................................... 23

*Rasul v. Bush*, 542 U.S. 466 (2004)................................................................ 44

*Ray v. Turner*, 587 F.2d 1187 (D.C. Cir. 1978)................................................... 45, 46

*Rizzo v. Goode*, 423 U.S. 362 (1976)............................................................... 38

*Snepp v. United States*, 444 U.S. 507 (1980)................................................... 36, 46

*Spock v. United States*, 464 F. Supp. 510 (S.D.N.Y. 1978)........................................ 45

*Tenenbaum v. Simonini*, 372 F.3d 776 (6th Cir. 2004)............................................. 39

*Tenet v. Doe*, 544 U.S. 1 (2005) ............................................................... 21, 24

*Terkel v. AT & T*, 441 F. Supp. 2d 899 (N.D. Ill. 2006) ......................................... 51

*Totten v. United States*, 92 U.S. 105 (1875) ................................................... 21, 24

*United States v. Lockheed Martin Corp.*, 1998 WL 306755 (D.D.C. 1998) ............................ 49

*United States v. Moussaoui*, 365 F.3d 292 (4th Cir. 2004)........................................ 44

*United States v. Musa*, 833 F.Supp. 752 (E.D.Mo.1993) ........................................ 49, 50

*United States v. Pappas*, 94 F.3d 795 (2d Cir. 1996) .......................................... 47, 50

*United States v. Reynolds*, 345 U.S. 1 (1953) ............................................. 20, 21, 45

*United States v. Rezaq*, 899 F. Supp. 697 (D.D.C. 1995) ......................................... 49

*United States v. Sarkissian*, 841 F.2d 959 (9th Cir. 1988)....................................... 47

*United States. v. United States District Court*, 407 U.S. 297 (1972)............................. 42

*Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1983) ................................................ 49

*Virginia Dep't of State Police v. Washington Post*, 386 F.3d 567 (4th Cir. 2004).................. 36

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

v

*Weberman v. NSA*, 490 F. Supp. 9 (S.D.N.Y. 1980) ..................................................... 50

*Zuckerbraun v. General Dynamics Corp.*, 935 F.2d 544 (2d Cir. 1991)...................................... 39

*Zweibon v. Mitchell*, 516 F.2d 594 (D.C. Cir. 1975) ..................................................... 42

## Statutes and Treaties

18 U.S.C. § 2340A ..................................................................................... 44

18 U.S.C. § 2441 ...................................................................................... 44

18 U.S.C. app ..................................................................................... 47, 50

28 U.S.C. § 1350 ...................................................................................... 43

5 U.S.C. § 552(a)(4)(B) & (b)(1) (2002) ................................................................ 46

50 U.S.C. § 1805 (2006) ............................................................................... 47

50 U.S.C. § 1806(f) (2006) ............................................................................ 47

50 U.S.C. § 403-1(i)(1) ............................................................................ 19, 51

Convention Against Torture and Other Cruel, Inhuman or Degrading
Treatment or Punishment, 1465 U.N.T.S. 85, G.A. Res. 39/46, U.N. GAOR, 39th Sess., Supp.
No. 51, at 197, U.N. Doc. A/39/51 (1984)............................................................... 44

## Other Authorities

Edward J. Imwinkelried, THE NEW WIGMORE: EVIDENTIARY PRIVILEGES
§ 8.2 at 1144-45 (2002)................................................................................ 21

Exec.Order. No: 13292  (Mar. 25, 2003) ................................................................ 46

James Madison, THE FEDERALIST NO. 47 (J. Cooke, ed., 1961)............................................. 43

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

vi

1    **INTRODUCTION**

2    The United States has moved to dismiss this action, which raises profoundly substantial

3    allegations of unlawful abduction, forced disappearance, and torture, in order to protect the

4    nation from disclosure of information that the entire world already knows. Government officials

5    at the highest levels have spoken publicly, repeatedly, and in detail about the rendition program.

6    The plaintiffs' specific allegations of forced disappearance and torture are supported by abundant

7    corroborating evidence. And the involvement of Defendant Jeppesen Dataplan, Inc., in the

8    transfer of plaintiffs and other terrorism suspects to countries where they faced brutal torture is a

9    matter of public record, confirmed by documentary evidence and eyewitness testimony,

10   including a sworn declaration by a former Jeppesen employee who was told by a senior company

11   official of the profits derived from the CIA's "torture flights."

12   The government insists that it can neither confirm nor deny any allegations concerning

13   the rendition program without causing harm to national security. In fact, as discussed below,

14   government officials have done both, repeatedly – confirming and even defending the existence

15   of the rendition program and describing its parameters, and denying that the program is an

16   instrument of coercive interrogation. Only in seeking to dismiss victims' suits does the United

17   States insist that it can neither admit the former nor deny the latter. The government made the

18   identical claim in a civil suit brought by Khaled El-Masri, a German citizen of Lebanese descent,

19   who was rendered to torture in a CIA-run prison in Afghanistan. *After* Mr. El-Masri's suit was

20   dismissed with prejudice based on the government's alleged inability to confirm or deny his

21   allegations, former CIA Director George Tenet – the defendant in that case – expressly *denied*

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

1

1    Mr. El-Masri's allegations in a television interview.[1]  This Court should regard the government's

2    present assertions with such past conduct in mind.

3           The common-law state secrets privilege, which the United States has invoked to

4    extinguish altogether plaintiffs' right of redress, is an evidentiary privilege, not an immunity

5    doctrine.  Its purpose is to block disclosure in litigation of information that will damage national

6    security, and it is rare and drastic for invocation of the privilege to result in dismissal of an action.

7    Plaintiffs do not dispute that, during the course of litigation, there may well be relevant evidence

8    that may be properly withheld pursuant to the privilege.  However, dismissal at this stage –

9    before the named defendant has so much as answered the complaint – would be wholly improper.

10   As the Ninth Circuit has made clear, only where the "very subject matter" of a suit is a state

11   secret – a circumstance not remotely applicable here – is dismissal at the pleading stage

12   permissible.

13          Recent events underscore the vital importance of ensuring that the Court – *not* the

14   Director of the CIA – remains the arbiter of what evidence is relevant and necessary for this

15   litigation to proceed.  CIA Director Michael Hayden has submitted two declarations in support of

16   the government's assertion that the plaintiffs cannot prove their case, and Jeppesen cannot

17   defend itself, without recourse to privileged evidence.  General Hayden is well qualified to offer

18   his views on national security, but he is not a federal judge, and he is not entrusted with

19   determining the relevance of particular evidence at trial.  Indeed, the CIA Director is no more

20   qualified to determine what evidence *will* be relevant to a legal proceeding than he is to

21   determine what evidence will *not* be relevant.  *See* Greg Miller, *CIA Says Interrogation Tapes*

22   *Were Destroyed*, L.A. TIMES, Dec. 7, 2007 (noting CIA Director Hayden's comment that

---

[1] *The Situation Room* (CNN television broadcast May 2, 2007), *available at* http://transcripts.cnn.com/TRANSCRIPTS/0705/02/sitroom.02.htm.  Exhibit O to Watt Decl. at ¶ 19

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

2

1   videotaped interrogations of high-level terrorism suspects were destroyed "only after it was

2   determined that they were no longer . . . relevant to any internal, legislative, or judicial

3   inquiries").  That is this Court's role, and it is virtually impossible to accomplish in the absence

4   of actual evidence.

5       The Ninth Circuit's recent decision in *Al-Haramain v. Bush*, 2007 WL 3407182 (9th Cir.,

6   Nov. 16, 2007), provides the legal framework for evaluating the government's motion.  That

7   decision makes clear that where, as here, the government has revealed key details of an

8   intelligence program in a public defense of its legality and efficacy, it cannot thereafter seek

9   dismissal of a suit targeting that program on the ground that its "very subject matter" is a state

10  secret.  That is not to say that the government has waived its right to assert the privilege in this

11  litigation, only that it must do so with respect to particular evidence, during discovery.  Under

12  the controlling law of this circuit, the government's motion must be denied as premature.

13                                      **BACKGROUND**

14  A.    The Plaintiffs

15      Each of the five plaintiffs in this action was forcibly disappeared and transported to

16  torture on flights organized by Defendant Jeppesen Dataplan, Inc. ("Jeppesen") at the behest of

17  the U.S. government for the purpose of avoiding judicial oversight and the protection of the

18  Constitution and American and international law.  The information collected below is hardly

19  secret – rather, it is corroborated by sworn declarations, government documents, flight records,

20  official reports, and other reliable evidence.

21  Ahmed Agiza

22      On December 18, 2001, Plaintiff Ahmed Agiza, a 45-year-old Egyptian father of five,

23  was summarily expelled from Sweden, where he and his family had been seeking asylum.  First

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

3

1   Amended Compl. ¶¶ 126-133.  Swedish authorities seized Mr. Agiza off the streets of his home

2   town, drove him to an airport, and handed him to agents of the U.S. and Egyptian governments.

3   In minutes, Mr. Agiza's clothes were sliced from his body and a suppository forced into his anus.

4   He was then dressed in a diaper and overalls and dragged barefooted, blindfolded, and shackled

5   to an awaiting aircraft where he was strapped to a mattress on the floor.  The flight planning and

6   logistical support for this aircraft -- a Gulfstream V jet, registered with the U.S. Federal Aviation

7   Administration (FAA) as N379P -- and its crew were organized by Jeppesen.  *Id.* at ¶¶ 133-38,

8   243-45.

9        Mr. Agiza was flown to Egypt and transferred to authorities there.  For five weeks, he

10  was held incommunicado in a squalid, windowless, and frigid cell approximately two square

11  meters in size, and interrogated, tortured, and otherwise abused.  *Id.* at ¶¶ 140-142.  Interrogators

12  routinely beat him and strapped him to a wet mattress and subjected him to electric shock

13  through electrodes attached to his ear lobes, nipples, and genitals.  *Id.* at ¶¶ 143-145.  After two

14  and a half years in detention, Mr. Agiza was given a six-hour show trial before a military court

15  that failed to meet minimum international fair trial standards.  He was convicted of membership

16  in a banned Islamic organization and is presently serving a 15-year sentence in an Egyptian

17  prison.  *Id.* at ¶ 148.  On May 16, 2007, the Swedish government, recognizing the illegality of

18  the order that expelled Mr. Agiza from Sweden, repealed that order and reopened his application

19  for a residence permit in Sweden.  The Swedish government also instructed the Office of the

20  Chancellor of Justice to negotiate an agreement with Mr. Agiza on the issue of compensation for

21  the unlawful actions of the government.  Exhibit C to the Declaration of Anna Wigenmark in

22  Support of Plaintiffs' Opposition to United States' Motion to Dismiss, or, in the Alternative, for

23  Summary Judgment ("Wigenmark Decl.") at ¶ 7.

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

4

1       Virtually every aspect of Mr. Agiza's rendition, including his torture in Egypt, has been

2   publicly acknowledged by the Swedish government.  Jeppesen's involvement is also a matter of

3   public record.  The Swedish government's decision to expel Mr. Agiza to Egypt and its

4   subsequent decision to repeal that expulsion are substantiated in government documents.

5   Exhibits A and C to Wigenmark Decl. at ¶2 and ¶ 7.  The decision-making process of the

6   Swedish government leading up to Mr. Agiza's expulsion, as well as its involvement with the

7   U.S. and Egyptian governments, have been exhaustively and publicly investigated by the Chief

8   Parliamentary Ombudsman and the Swedish Parliament's Standing Committee of the

9   Constitution.

10      The Ombudsman's report explicitly discusses contacts between the CIA and the Swedish

11  government over Mr. Agiza's transport to Egypt: "Some time before the expulsion decision was

12  made . . . the Security Police received an offer from the American Central Intelligence Agency

13  (CIA) of the use of a plane that was said to have what was referred to as direct access so that it

14  could fly over Europe without having to touch down."  Exhibit E to the Wigenmark Decl. at ¶ 11.

15  Quoting from a memorandum drawn up by the Swedish security police on February 7, 2002, the

16  Ombudsman also notes: "After some consultation with the staff of the Ministry for Foreign

17  Affairs the Foreign Minister then gave approval of the acceptance by SÄPO/RPS of the help

18  offered by the USA for the transport of A. [Mr. Agiza]."  *Id.*  The Ombudsman further

19  documents the disturbing details of Mr. Agiza's mistreatment and humiliation at Bromma airport.

20  *Id.* at ¶ 14.  The Political Director at the Ministry for Foreign Affairs at the time of Mr. Agiza's

21  rendition, Mr. Sven-Olof Petersson, advised the Standing Committee of the Constitution of the

22  involvement of the U.S. government in initially providing information about Mr. Agiza and in

23  convincing Egypt to accept his return.  Exhibit I to the Wigenmark Decl. at ¶ 20.

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
5

1    The fact of Mr. Agiza's torture and the negotiation between Sweden and Egypt of

2   "diplomatic assurances" for his well-being following his removal to Egypt were reviewed by the

3   United Nations Committee Against Torture (CAT).  The Committee, which based its conclusions

4   in part on documents obtained from the Swedish government, found that Sweden had violated its

5   obligations under international human rights law.  Exhibit B to the Wigenmark Decl. ¶ 6.  The

6   Standing Committee on the Constitution acknowledged that Mr. Agiza may have been tortured

7   and, to comply with the findings of the CAT, the Swedish government has referred Mr. Agiza's

8   request for compensation to the Office of the Chancellor of Justice to attempt to reach an

9   agreement with him on the issue of compensation, including an amount to compensate for his

10  torture.  Exhibits C and G to the Wigenmark Decl. ¶7.

11    Separate inquires by the Council of Europe and the European Parliament identified the

12  aircraft – a Gulfstream V jet, then registered with the FAA, as N379P – used to transport Mr.

13  Agiza to Egypt.  Exhibit J to the Wigenmark Decl. at ¶ 21.  These inquiries, as well as

14  investigations by plaintiffs' attorneys, have also produced three documents confirming that

15  Jeppesen provided flight planning and logistical support to the aircraft and crew used for this

16  rendition flight.  First, the local "data string" for the flight plan filed for this flight contains an

17  originator code, KSFOXLDI, uniquely identifying Jeppesen as the entity having filed the plan

18  with European air traffic control authorities.[2]  Exhibit HH to the Declaration of Steven

19  MacPherson Watt in Support of Plaintiffs' Opposition to United States' Motion to Dismiss, or, in

20  the Alternative, for Summary Judgment ("Watt Decl.") at ¶ 57.   Second, an invoice, numbered

---

[2] "KSFOXLDI" is the originator code assigned to Jeppesen in the Aeronautical Fixed Telecommunication Network (AFTN).  Every flight plan submitted by Jeppesen to air traffic control authorities, including Eurocontrol, includes this originator code, whch indicates the entity responsible for filing the plan.  Eurocontrol's Integrated Initial Flight Plan Processing System, IFPS Users Manual notes that the "AFTN address KSFOXLDI is a collective address for Jeppesen flight planning services in San Francisco."  Watt Decl. at ¶ 51.

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

6

1    19122416, from Luftfartsverket Division, Stockholm to Jeppesen, notes that Jeppesen was billed

2    for noise, landing, terminal navigation, emission, passenger, and security fees for a Gulfstream V

3    aircraft with registration N379P for December 18, 2001.  Exhibit  GG to the Watt Decl. at ¶ 56.

4    Third, the information in the Luftfartsverket invoice is corroborated by a record from the

5    Swedish Civil Aviation Administration, which also notes that the aircraft landed at Bromma

6    airport at 19:54 and departed for Cairo at 20:49 on December 18, 2001 with nine passengers on

7    board.  *Id.*

8    <u>Abou Elkassim Britel</u>

9        On March 10, 2002, Plaintiff Abou Elkassim Britel, a 40-year-old Italian citizen of

10   Moroccan origin, was arrested and detained in Pakistan on immigration charges.  First Amended

11   Compl. at ¶¶ 90, 94.  While detained, Mr. Britel was interrogated by Pakistani and U.S. officials.

12   His Pakistani captors subjected him to torture for weeks, including beating him repeatedly and

13   suspending him from the ceiling of his cell.  His numerous requests to both Pakistani and U.S.

14   officials to meet with the Italian Embassy were refused.  *Id.* at ¶¶ 94-8.  To escape further torture,

15   Mr. Britel confessed falsely to being a "terrorist."

16       On May 24, 2002, Mr. Britel was handed over to the exclusive custody of U.S. officials.

17   After stripping him of his clothing, dressing him in a diaper and overalls, and chaining, shackling,

18   and blindfolding him, U.S. officials transported Mr. Britel on board the same Gulfstream V jet

19   aircraft that had been used five months earlier to transport Mr. Agiza to Egypt.  The flight

20   planning and logistical support for the aircraft and its crew were once again provided by

21   Jeppesen.  *Id.* at ¶¶ 96, 100, 102, 241-42.  Upon arrival in Morocco, Mr. Britel was handed over

22   to agents of the Moroccan security services who detained him incommunicado at the notorious

23   Temara prison.

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
7

1    For eight months, Mr. Britel was interrogated and tortured by his Moroccan captors. He

2    was severely beaten, deprived of sleep and food, and threatened with forms of sexual torture,

3    including being sodomized with a bottle and having his genitals cut off. *Id.* at ¶¶ 104-5. On

4    February 11, 2003, Mr. Britel was released without charge. *Id.* at ¶ 107. With the assistance of

5    his Italian wife and the Italian Embassy, Mr. Britel made arrangements to return to his home in

6    Italy. On the eve of his return, however, Mr. Britel was caught up in a government dragnet in the

7    wake of the May 16, 2003 bombings in Casablanca. He was once again detained

8    incommunicado at the Temara prison, where he was coerced into signing a false confession he

9    was never permitted to read. *Id.* at ¶¶ 111, 113-4. On October 3, 2003, Mr. Britel was convicted

10   of a terrorism-related charge by a Moroccan court and sentenced to 15 years in prison. An

11   observer from the Italian Embassy reported that the trial was fundamentally flawed and failed to

12   meet universally accepted minimum fair trial standards.

13   On September 29, 2006, Italian authorities closed an exhaustive six-year investigation

14   into Mr. Britel's alleged involvement in terrorist activities, citing a complete lack of evidence of

15   any criminal wrongdoing on his part. Exhibit C to the Declaration of Abou Elkassim Britel in

16   Support of Plaintiffs' Opposition to the United States' Motion to Dismiss or, in the Alternative,

17   for Summary Judgment ("Britel Decl.") at ¶ 27. In January 2007, nearly one hundred Italian

18   parliamentarians and members of the European Parliament supported a request calling on

19   Moroccan authorities to pardon Mr. Britel. The Italian government also separately sought a

20   pardon from the King of Morocco, as well as Mr. Britel's immediate release and repatriation to

21   Italy. Mr. Britel remains incarcerated in Ain Bourja prison in Casablanca. Britel Decl. at ¶ 28.

22   Mr. Britel's allegations of forced disappearance and torture in Morocco have been

23   investigated and corroborated by the European Parliament and by the International Federation for

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

8

1    Human Rights (FIDH). Britel Decl.; Watt Decl. at ¶ 33. The European Parliament has identified

2    the aircraft used to transport Mr. Britel from Pakistan to Morocco as a Gulfstream V jet aircraft,

3    then registered with the FAA as N379P. Flight records examined by the European Parliament

4    also confirm that on May 24, 2004, this aircraft flew from Pakistan to Rabat and then on to Porto,

5    Portugal. Exhibit A to Britel Decl. at ¶ 14. Jeppesen's involvement in providing the flight

6    planning and logistical support to the aircraft and crew is also substantiated by flight records.

7    The local "data string" for the flight plan filed with European air traffic control authorities for

8    this flight contains an originator code, KSFOXLDI, uniquely identifying Jeppesen as the entity

9    having filed the flight plan. Exhibit B to the Britel Decl. at ¶ 15; Exhibit A to the Britel Decl. at

10    ¶ 14.

11    <u>Binyam Mohamed</u>

12        On April 10, 2002, Plaintiff Binyam Mohamed, a 28-year-old Ethiopian citizen and legal

13    resident of the United Kingdom, was arrested at the airport in Karachi, Pakistan on immigration

14    charges. For more than three months, Mr. Mohamed was held in secret detention, interrogated,

15    and subjected to torture by his Pakistani captors. During this time, he was also interrogated by

16    agents of the U.S. and British governments. First Amended Compl. at ¶¶ 59-60. On July 21,

17    2002, Mr. Mohamed was handed over to the exclusive custody of U.S. officials, who stripped,

18    shackled, blindfolded, and dressed him in a tracksuit before dragging him on board a Gulfstream

19    V jet aircraft, then registered with the FAA as N379P – the same aircraft used to render plaintiffs

20    Agiza and Britel to Egypt and Morocco just several months before – and flying him to Morocco.

21    On information and belief, Jeppesen provided the flight and logistical support for this aircraft

22    and its crew. *Id.* at ¶¶ 65-8, 238.

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

9

1    In Morocco, Mr. Mohamed was handed over to agents of the Moroccan security services,

2    who for the next 18 months detained, interrogated, and tortured him.  Mr. Mohamed was

3    routinely beaten to the point of losing consciousness, and a scalpel was used to make incisions

4    all over his body, including his penis, after which a hot stinging liquid was poured into his open

5    wounds.  *Id.* at ¶¶ 69-71.  On January 22, 2004, Mr. Mohamed was returned to the custody of

6    U.S. officials.  These officials photographed him, stripped him, dressed him in overalls,

7    handcuffed, shackled, and blindfolded him, and thereafter put him on board an aircraft and flew

8    him to Afghanistan.  The flight planning and logistical support to the aircraft -- a Boeing 737

9    business jet, then registered with the FAA as N313P -- and its crew were provided by Jeppesen.

10    Two days after transporting Mr. Mohammed to Afghanistan, the same aircraft was used to

11    transport another rendition victim, German citizen Khaled El-Masri,[3] from Macedonia to

12    Afghanistan.  *Id.* at ¶¶ 73-75, 239-240.

13    Immediately after arriving in Afghanistan, Mr. Mohamed was taken to a CIA-run prison

14    outside Kabul commonly known as the "Dark Prison."  There, for the next four months, Mr.

15    Mohamed was detained, interrogated, tortured, and otherwise abused by his jailers.  He was

16    physically beaten, had his head repeatedly slammed against a wall, and was suspended by his

17    arms from a pole.  He was deprived of sleep by being subjected to excruciatingly loud noises,

18    including the screams of women and children, thunder, and loud rock music 24 hours a day.  *Id.*

19    at ¶¶ 76-80.  Under coercive interrogation, Mr. Mohamed invented stories to please his captors.

20    *Id.* at ¶ 81.  Throughout, Mr. Mohamed was kept in a tiny, pitch-black, cold, damp cell with only

[3] El-Masri, a German citizen of Lebanese origin, was detained in Macedonia on December 31, 2003 and later transferred to secret CIA detention in Afghanistan, where he was subjected to physical and psychological torture. El-Masri was released on May 28, 2004, flown to Albania, and released on a hilltop at night.  He was never charged with a crime.  *See El-Masri v. United States*, 479 F.3d 296 (4th Cir. 2007).

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

10

1    a bucket for a toilet.  Deprived of adequate food, Mr. Mohamed lost between 40 and 60 pounds.

2    He was permitted outside once during this time and then only for five minutes –the first time he

3    had seen the sun in two years.  *Id.* at ¶¶ 78, 80, 83.  In September 2004, Mr. Mohamed was

4    transferred to Guantánamo Bay, where he remains detained without charge.  *Id.* at ¶ 88.

5         Mr. Mohamed's allegations have also been extensively investigated and his account

6    corroborated by the Council of Europe, the European Parliament, and human rights organizations.

7    Inquiries by both the European Parliament and the Council of Europe have, through examination

8    of flight records, identified the aircraft used in both Mr. Mohamed's rendition from Pakistan to

9    Morocco in 2002 and his rendition from Morocco to Afghanistan in 2004, determining that the

10   aircraft – respectively, a Gulfstream V jet, registered N379P and a Boeing Business Jet,

11   registered N313P – had been involved in numerous other rendition flights.  Exhibits C and D to

12   the Stafford-Smith Decl. at ¶¶ 6-7.

13        British and U.S. authorities have disclosed information about the role of both U.K.

14   and U.S. intelligence services in Mr. Mohamed's initial detention in Pakistan.  The European

15   Parliament's report noted the admission of "former U.K. Secretary of State for Foreign and

16   Commonwealth Affairs, Jack Straw, [….] in December 2005 that U.K. intelligence officials met

17   Binyam Mohamed when he was arrested in Pakistan."  Exhibit B to the Stafford-Smith Decl. at ¶

18   7.  A more recent inquiry by the U.K. Parliament's Security and Intelligence Committee found

19   that a "member of the [U.K.] Security Service . . . interview[ed] [Mr. Mohamed] once, for

20   approximately three hours, while he was detained in Karachi in 2002."  Exhibit F to the Stafford-

21   Smith Decl. at ¶ 11.  Moreover, in testimony before the Committee, Dame Eliza Manningham-

22   Buller, the Director General of the U.K. Security Service, confirmed that U.S. authorities were in

23   charge of determining Mr. Mohamed's fate even before he was flown from Pakistan to Morocco

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
11

1     in July 2002: "[A]t the beginning, it was thought [Mr. Mohamed] was [a British national], we

2     were told by [the U.S.] that they were going to move him to Afghanistan."  Exhibit W to the

3     Watt Decl. at ¶ 34 (xiii), p. 104 ¶ 34.

4          Documentation uncovered in a criminal investigation by a Spanish prosecutor concerning

5     the CIA's use of Spanish airports as a "staging post" for unlawful rendition flights and by the

6     Council of Europe's inquiry into the same matter substantiates Jeppesen's role in furnishing the

7     flight planning and logistical support to the aircraft and crew used for Mr. Mohamed's second

8     rendition.  The Spanish prosecutor obtained a telex from Jeppesen to its agent in Mallorca, Spain,

9     Mallorcair, requesting that Mallorcair provide ground handling services and pay airport fees for

10    N313P from January 25-27, 2004.  Exhibit D to the Stafford-Smith Decl. at ¶ 8.  In a statement

11    to Spanish police, Mallorcair confirmed receipt of instructions from Jeppesen.  Exhibit E to the

12    Stafford-Smith Decl. at ¶ 9.  And, in the course of its examination of flight records relative to

13    this aircraft and itinerary, the Council of Europe concluded that N313P was used to transport Mr.

14    Mohamed from Morocco to Afghanistan just two days before landing in Mallorca from Budapest,

15    where it had landed briefly after having been used in the rendition of German citizen Khaled El-

16    Masri from Macedonia to Afghanistan on January 22, 2004.  The Council of Europe concluded

17    that both flights were part of the same extended circuit of rendition flights originating from

18    Washington, D.C. and back from January 16-28, 2004.  Exhibit S(a)  to the Watt Decl. at §3.9 ¶

19    209.

20    <u>Bisher Al-Rawi</u>

21         On November 8, 2002, Plaintiff Bisher Al-Rawi, a 39 year-old Iraqi citizen and legal

22    resident of the United Kingdom, was arrested at the international airport in Banjul, Gambia,

23    where he had traveled with several colleagues to commence a legitimate business venture.  First

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
12

1    Amended Compl. at ¶¶ 193, 203.  On the first day of his detention, U.S. officials, who appeared

2    to be in control of the situation, met with and interrogated Mr. Al-Rawi.  *Id.* at 204.

3        On December 8, 2002, Mr. Al-Rawi was driven to an airport.  There, agents of the U.S.

4    government stripped him, dressed him in a diaper and overalls, chained and shackled him, and

5    dragged him on board an awaiting aircraft.  The flight planning and logistical support for this

6    aircraft -- a Gulfstream V jet, then registered with the FAA as N379P -- and its crew were

7    provided by Jeppesen.  *Id.* at ¶¶ 204, 212, 215, 248-49; *see also* Exhibits F and G to the

8    Declaration of Bisher Al-Rawi in Support of Plaintiffs' Opposition to the United States' Motion

9    to Dismiss or, in the Alternative, for Summary Judgment ("Al-Rawi Decl.") at ¶¶ 43-4.

10        Mr. Al-Rawi was flown to Afghanistan and detained at the CIA-run "Dark Prison" where,

11   for two weeks, he was held in isolation, in a tiny pitch-black cell, chained and shackled the entire

12   time.  Loud noises were blasted into his cell 24 hours a day, making sleep almost impossible.

13   First Amended Compl. at ¶¶ 215-17.  Mr. Al-Rawi was later transferred to the U.S.-run Bagram

14   Air Base, where he was beaten, kept shackled with heavy chains for extended periods, and

15   deprived of adequate sleep, water, and clothing.  *Id.* at ¶¶ 219-22.  In January 2003, Mr. Al-Rawi

16   was transferred to the Guantánamo Bay Naval Station and, on March 20, 2007, after four and a

17   half years in detention without charge, he was released back to his home and family in the United

18   Kingdom.  *Id.* at ¶¶ 223, 227.

19        The British government has made numerous public statements and disclosed multiple

20   documents corroborating Mr. Al-Rawi's allegations.  According to the report published by the

21   U.K. Parliamentary Intelligence and Security Committee on July 25, 2007, the British Security

22   Service "was informed by the U.S. authorities that they intended to conduct . . . a 'Rendition to

23   Detention' operation, to transfer [Mr. Al-Rawi and others] from The Gambia to Bagram Air Base

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
13

1    in Afghanistan.  The Service registered strong concerns, both orally and in writing, at this

2    suggestion and alerted the FCO (U.K. Home, Foreign and Commonwealth Office)."  British

3    diplomats in both Gambia and the United States raised protests with their counterparts at the U.S.

4    State Department and the National Security Council.  Exhibits J and K to the Al-Rawi Decl. ¶¶

5    44-45.

6         The Council of Europe has publicly discussed a number of telegrams sent by the British

7    security services to the CIA about Mr. Al-Rawi in November 2002, prior to his initial detention

8    in Gambia.  Exhibits A-D to the Al-Rawi Decl. ¶¶ 2 - 5.  These telegrams included allegations

9    immediately determined to be false but which nevertheless appeared in Mr. Al-Rawi's

10    Combatant Status Review Tribunal hearings in Guantánamo as "evidence" against him in

11    October 2004.  See Exhibit S(a) to the Watt Decl. at §3.5 ¶ 174.     Documents from the

12    International Committee of the Red Cross (ICRC) confirm that the ICRC visited Mr. Al-Rawi

13    while he was in U.S. custody at Bagram on January 4, 2003 and that he was transferred to

14    Guantánamo on February 7, 2003.  Exhibit L to the Al-Rawi Decl. at ¶ 56.

15         Separate inquires by the Council of Europe and the European Parliament identified the

16    aircraft – a Gulfstream V jet, then registered with the FAA, as N379P – used to transport Mr. Al-

17    Rawi to Afghanistan.  Exhibit H to the Al-Rawi Decl. at ¶ 42.  These flight records also confirm

18    that Jeppesen provided flight planning and logistical support to the aircraft and crew used for this

19    rendition flight.  The local "data string" for the flight plan filed for this flight contains an

20    originator code, KSFOXLDI, uniquely identifying Jeppesen as the entity having filed the flight

21    plan with European air traffic control authorities.  Exhibits H and I to the Al-Rawi Decl. ¶ 42-43.

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
14

1    Mohamed Farag Ahmad Bashmilah

2        On October 21, 2003, Plaintiff Mohamed Farag Bashmilah, a 39-year-old Yemeni citizen

3    and resident of Indonesia, was apprehended by agents of the Jordanian government while he was

4    visiting his ailing mother in Jordan.  First Amended Compl. at ¶ 154.  After several days of

5    detention and interrogation under brutal torture, Mr. Bashmilah was coerced into signing a false

6    confession.  *Id*. at ¶ 156.  The Jordanians thereafter handed him over to agents of the U.S.

7    government, who beat and kicked Mr. Bashmilah, sliced off his clothes, replaced them with a

8    diaper and blue outfit, shackled and blindfolded him, then dragged him on board an awaiting

9    aircraft.  Declaration of Mohamed Farag Ahmad Bashmilah in Support of Plaintiffs' Opposition

10   to the United States' Motion to Dismiss or, in the Alternative, for Summary Judgment

11   ("Bashmilah Decl.") at ¶¶ 36-41.  The flight planning and logistical support for this aircraft – the

12   same Gulfstream V jet that had been used in the transportation of the other four plaintiffs – and

13   its crew were organized by Jeppesen.  First Amended Compl. at ¶¶ 160, 246-7.

14       Mr. Bashmilah was flown to Afghanistan where he spent nearly six months in secret

15   incommunicado detention at a U.S.-run facility.  *Id.* at ¶ 163.  For the first three months, he was

16   held in a windowless six-square-meter cell with a bucket as a toilet; during his first 15 days, he

17   remained shackled and clothed in the same diaper that he had been given in Jordan.  Bashmilah

18   Decl. at ¶¶ 56-64.  Excruciatingly loud music and noises were blasted into his cell 24 hours a day,

19   depriving him of sleep for weeks on end.  *Id.* at ¶ 64.  On three separate occasions during these

20   initial months of detention, Mr. Bashmilah tried to end his life.  *Id.* at ¶ 66.

21       In April 2004, Mr. Bashmilah was "rendered" a second time to a site in an unknown

22   country, where he was subjected to similar physical and psychological torture.  First Amended

23   Compl. ¶¶ 171-72.  At one point during his detention in this facility, Mr. Bashmilah cut himself

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
                                                    15

1    and used his own blood to write "I am innocent" and "this is unjust" on his cell walls.

2    Bashmilah Decl. at ¶ 116.  On May 5, 2005, U.S. authorities transferred Mr. Bashmilah to

3    Yemen, his country of birth, for further detention and investigation.  First Amended Compl. at ¶

4    186.  Yemeni authorities have informed the United Nations that they received files on Mr.

5    Bashmilah from the U.S. government on November 10, 2005.  Bashmilah Decl. ¶ 175, Exh. V.

6    On February 13, 2006 Mr. Bashmilah was tried for the crime of forgery based on his admission

7    that he had used a false identity document while living in Indonesia.  *Id.* at ¶ 178.  On February

8    27, 2006, the Yemeni court sentenced him to time served both inside and outside of Yemen –

9    which included the 18 months he was held and tortured in U.S. detention facilities.  *Id.* at ¶ 181.

10    Even though it had been given files by the U.S. government that allegedly contained information

11    concerning Mr. Bashmilah, the Yemeni government never filed terrorism-related charges against

12    him.  *Id.* at ¶¶ 175, 179.

13        Documents emanating from official sources corroborate Mr. Bashmilah's allegations of

14    forced disappearance and torture and Jeppesen's involvement therein.  On at least three separate

15    occasions, the Government of Jordan has confirmed Mr. Bashmilah's departure from that

16    country on October 26, 2003, in letters to the Embassy of the Republic of Yemen in Amman, the

17    United Nations Special Rapporteur on Torture and other Cruel, Inhuman or Degrading Treatment

18    or Punishment ("U.N. Special Rapporteur on Torture"), and the United Nations Office of the

19    High Commissioner for Human Rights.  Exhibits F, B, and C to the Bashmilah Decl. ¶¶ 44-5.

20        The Yemeni government has made no secret of its cooperation with U.S. authorities in

21    receiving, detaining, and investigating Mr. Bashmilah.  On December 20, 2005, the head of the

22    Central Organization for Political Security in Yemen informed the U.N. Special Rapporteur on

23    Torture and the U.N. Special Rapporteur on the Promotion and Protection of Human Rights and

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
16

1    Fundamental Freedoms while Countering Terrorism that the Yemeni government had received

2    Mr. Bashmilah from the United States government and was continuing to hold him.  Exh. V to

3    the Bashmilah Decl. ¶ 175.  He also stated that Yemen had received files on Mr. Bashmilah from

4    the United States on November 10, 2005.  *Id.*  On March 27, 2006, the Embassy of Yemen in

5    France confirmed in a letter to the Council of Europe that the Jordanians had handed Mr.

6    Bashmilah over to another agency at a Jordanian airport. This letter also states that on March 5,

7    2005, the United States, through the Liaison Officer in Sana'a, informed the Central

8    Organization for Political Security in Yemen that Mr. Bashmilah was in U.S. custody and that on

9    May 5, 2005, Yemeni authorities received Mr. Bashmilah from U.S. authorities.  Exh. G to the

10   Bashmilah Decl. ¶¶ 46, 159, 183.

11       Flight records detail Mr. Bashmilah's rendition flight from Jordan to Afghanistan on

12   October 26, 2003 on board a CIA-owned Gulfstream V jet, registered N379P.  Jeppesen's

13   involvement in providing the flight planning and logistical support to the aircraft and crew is a

14   matter of public record.  The local "data string" for the flight plan filed for this flight contains an

15   originator code, KSFOXLDI, uniquely identifying Jeppesen as the entity having filed this flight

16   plan with European air traffic control authorities.   Exhibit D to the Bashmilah Decl. at ¶ 42.

17   B.    Jeppesen's Role in the Rendition Program

18       Defendant Jeppesen's involvement in the rendition flights described above, as well as

19   many others, is a matter of public record, traceable in flight plans and other documents filed with

20   national and inter-governmental aviation authorities across Europe.  Jeppesen was not only

21   providing crucial flight planning and logistical services to the aircraft and crew -- including filing

22   flight plans, planning itineraries, obtaining landing permits, and arranging for fuel and ground

23   handling – it was also using its legitimacy as a well-known aviation services company to enable

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

17

1    the CIA to disguise the true nature of these flights.  The Council of Europe has also revealed that

2    Jeppesen filed "multiple 'dummy' flight plans" for many of the CIA flights it supported, further

3    contributing to the concealment of the flights' unlawful purposes.  Exhibit S(b) to Watt Decl. at §

4    III (iii) ¶185; *see also* Appendix 1.

5        Jeppesen participated in the rendition program in full knowledge of the horrific

6    consequences of its actions.  As the Declaration of Sean Belcher, a former Jeppesen employee,

7    demonstrates, senior company officials spoke openly about Jeppesen's rendition work and its

8    association with torture.  On August 11, 2006, Belcher attended a meeting for new employees

9    convened by Bob Overby, director of Jeppesen International Trip Planning Service at Jeppesen's

10   San Jose office.  During his presentation, Overby said: "We do all the extraordinary rendition

11   flights."  Apparently believing that only a few people present knew what he was referring to,

12   Overby clarified that these were "torture flights," explaining, "let's face it, some of these flights

13   end up this way," or words to that effect.  He added that the flights paid very well and that the

14   government spared no expense.  He also revealed that two employees, one mentioned by name,

15   handled rendition flights for the company.  Declaration of Sean Belcher in Support of Plaintiffs'

16   Opposition to the United States' Motion to Dismiss or, in the Alternative, for Summary

17   Judgment ("Belcher Decl.") at ¶4.

18   C.    Procedural History

19        This action, which arises under the Alien Tort Claims Act, 28 U.S.C. § 1350, was filed on

20   May 30, 2007; a first amended complaint was filed on August 1, 2007.  Plaintiffs allege that,

21   through its knowing participation in the rendition program, Jeppesen is either directly or

22   indirectly liable for the forced disappearance, torture, and other cruel, inhuman, or degrading

23   treatment to which they were subjected.  First Amended Compl. at ¶¶ 253-66.  On September 6,

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
18

1    the United States filed a Statement of Interest pursuant to 28 U.S.C. § 517, requesting a stay of

2    proceedings while the United States considered whether to intervene and whether to assert the

3    state secrets privilege.  Statement of Interest of the United States ("Statement of Interest"), at 2.

4    On October 19, the government moved to intervene and simultaneously filed a Motion to

5    Dismiss, or, in the Alternative, for Summary Judgment of the United States of America ("Motion

6    to Dismiss").  In support of its motions, the government submitted public and *ex parte*

7    declarations from CIA Director Michael Hayden, formally invoking the state secrets privilege

8    and 50 U.S.C. § 403-1(i)(1) as grounds for immediate dismissal.

9                                                   **ARGUMENT**

10   **I.      THE STATE SECRETS PRIVILEGE IS AN EVIDENTIARY PRIVILEGE, NOT**
11   **        AN IMMUNITY DOCTRINE**
12
13          The government's contention that this suit must be dismissed on the basis of an

14   evidentiary privilege – before there is any evidence at issue – reflects an expansive and

15   overbroad construction of the state secrets privilege that would virtually immunize the most

16   egregious executive misconduct from judicial review.  This sweeping theory of executive power

17   and judicial "deference" – a theory that has been rejected in several recent "state secrets"

18   decisions that the government entirely ignores – constitutes an assault not only on the plaintiffs'

19   right of access to an Article III forum, but to core separation of powers principles.  If endorsed

20   by this Court, it would upset the system of checks and balances necessary to sustain a free

21   society by preventing courts from reviewing executive actions that violate the law and the

22   Constitution, and would transform a narrow evidentiary privilege into a broad immunity doctrine**.**

23   This departure from the evidentiary roots of the privilege, if ratified by this Court, would amount

24   to a de facto rule of immunity for even the gravest violations of human rights.

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
                                                 19

1    The state secrets privilege is a "common-law evidentiary privilege that permits the

2    government to bar the disclosure of information if there is a 'reasonable danger' that disclosure

3    will 'expose military matters which, in the interest of national security, should not be divulged.'"

4    *Al-Haramain*, 2007 WL 3407182, at *5 (quoting *United States v. Reynolds*, 345 U.S. 1, 10

5    (1953)).  The privilege must be narrowly construed and may not be used to "shield any material

6    not strictly necessary to prevent injury to national security."  *Ellsberg v. Mitchell*, 709 F.2d 51,

7    57 (D.C. Cir. 1983).

8    The Supreme Court outlined the proper use of the privilege 50 years ago in *Reynolds,* and

9    has not considered the doctrine in depth since then.  In *Reynolds*, the family members of three

10   civilians who died in the crash of a military plane in Georgia sued for damages.  In response to a

11   discovery request for the flight accident report, the government asserted the state secrets

12   privilege, arguing that the report contained information about secret military equipment that was

13   being tested aboard the aircraft during the fatal flight.  *Reynolds*, 345 U.S. at 3.  The Court first

14   held that the privilege could be invoked only by the government and then only upon "a formal

15   claim of privilege, lodged by the head of the department which has control over the matter, after

16   actual personal consideration by that officer."  *Id*. at 7-8[4]  In evaluating government's invocation

17   of the privilege, the Court explained that the greater the plaintiff's necessity for the allegedly

18   privileged information in presenting the case, the more a "court should probe in satisfying itself

19   that the occasion for invoking the privilege is appropriate."  *Id.* at 11.

---

[4] Plaintiffs do not dispute that the public declaration of CIA Director Hayden satisfies the procedural requirements set forth in *Reynolds*.  However, as discussed more fully below, plaintiffs emphatically contest the propriety of the government's invocation of the privilege with respect to the entire case, before the named defendant has even answered and before any nonsensitive discovery.

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
20

1    The *Reynolds* Court then upheld the claim of privilege over the accident report but did

2 *not* dismiss the suit. Rather, it remanded the case for further proceedings, explaining: "There is

3 nothing to suggest that the electronic equipment, in this case, had any causal connection with the

4 accident. Therefore, it should be possible for respondents to adduce the essential facts as to

5 causation without resort to material touching upon military secrets." *Id.* at 11. Upon remand,

6 plaintiffs' counsel deposed the surviving crewmembers, and the case was ultimately settled.[5]

7    The Court has never departed from its holding that the state secrets privilege is a rule of

8 evidence, not justiciability, and has in fact recently distinguished the "evidentiary state secrets

9 privilege" from the related nonjusticiability rule of *Totten v. United States*, 92 U.S. 105 (1875).[6]

10 *Tenet v. Doe*, 544 U.S. 1 (2005); *see also* note 9, *infra.* Accordingly, except in the narrowest of

11 circumstances not applicable here (*see* Part II.A., *infra*), the privilege must be invoked with

---

[5] Recently disclosed facts regarding the *Reynolds* litigation show that strong judicial oversight in state secrets cases is an absolute necessity. The flight accident report over which the claim of privilege was upheld was finally declassified in 2000, and the survivors of the men who perished on that flight learned the truth: the government had misled the Court. In fact, the accident report contained no information about the sensitive technology aboard the aircraft, but did contain details relevant to the plaintiffs' negligence claims. *See Herring v. United States*, 2004 WL 2040272 at 8 (E.D.Pa. Sept. 10, 2004) (noting that accident report "does not refer…to any newly developed electronic devices or secret electronic equipment" but did reveal that "engine failure caused the crash" and that "had the plane complied with technical order…the accident might have been avoided"). *See also* Barry Siegel, *The Secret of the B-29: How the Death of Judy's Father Made America More Secretive*, L.A. TIMES, (April 18, 2004), at A1. The original accident report is available at: http://www.fas.org/sgp/othergov/reynoldspetapp.pdf.

[6] This reasoning is supported by leading treatises on the subject. 8 WIGMORE ON EVIDENCE § 2378(g) at 796 (referring to state secrets privilege as a common law doctrine); Edward J. Imwinkelried, THE NEW WIGMORE: EVIDENTIARY PRIVILEGES § 8.2 at 1144-45 (2002) (noting that and "it is not at all clear that the Constitution compels the courts to recognize a topical privilege for this type of information in the possession of the executive branch"). Thus, because "[t]he lawful limits of the privilege are extensible beyond any control, if its applicability is left to the determination of the very official whose interest it is to shield his wrongdoing under the privilege. . . [b]oth principle and policy demand that the determination of the privilege shall be for the judge." WIGMORE, § 2376, at 3345.

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
21

1   respect to discrete and specific evidence – not asserted as a sweeping justification for dismissing

2   a suit on its pleadings.  Indeed, *Reynolds*' instruction that courts are to weigh a plaintiff's

3   showing of need for particular evidence in determining how deeply to probe the government's

4   claim of privilege is rendered wholly meaningless where, as here, the privilege is invoked before

5   any request for evidence has even been made.

6       The government pays lip service to the role of the Court in determining whether the

7   privilege has been properly invoked, but the timing and scope of the government's invocation, as

8   well as the deference it demands for the CIA director's predictive judgments, effectively render

9   the judicial role irrelevant and would allow for unilateral termination of unwanted litigation by

10   the Executive Branch.  Indeed, by the standard advocated by the government here, the Supreme

11   Court erred in refusing to enjoin publication of the Pentagon Papers in the face of Executive

12   Branch claims that the papers' release would harm national security.  *See New York Times Co. v.*

13   *United States*, 403 U.S. 713 (1971).[7]

14       The vital role of the courts in independently assessing whether the evidence at issue is

15   genuinely secret; whether disclosure of particular information will reasonably cause harm to

16   national security; and whether, even if state secrets are legitimately implicated, dismissal of an

17   entire suit at the pleading stage is warranted, does not evaporate simply because the Executive

18   contends unilaterally that its actions are too sensitive for judicial review.  As the court of appeals

19   has made clear:  "Simply saying 'military secret,' 'national security' or 'terrorist threat' or

20   invoking an ethereal fear that disclosure will threaten our nation is insufficient to support the

---

[7] *See* Brief for the United States in *New York Times, Co. v. United States*, *available at* 1971 WL 167581 at *18 ("In the present cases high government officials have explained the reasons for their concern; that judgment is enough to support the Executive Branch's conclusion, reflected in the top secret classification of the documents and in the in camera evidence, that disclosure would pose the threat of serious injury tLR15o the national security.").

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
22

1  privilege."  *Al-Haramain*, 2007 WL 3407182 at *12 ; *see also*, *Hepting v. AT & T Corp.*, 439 F.

2  Supp. 2d 974, 995 (N.D. Cal. 2006)("[I]t is important to note that even the state secrets privilege

3  has its limits.  While the court recognizes and respects the executive's constitutional duty to

4  protect the nation from threats, the court also takes seriously its constitutional duty to adjudicate

5  the disputes that come before it.") (citations omitted).

6   **II.    DISMISSAL OF A SUIT PURSUANT TO THE STATE SECRETS PRIVILEGE IS**
7   **PERMISSIBLE ONLY IN EXTREME AND NARROW CIRCUMSTANCES NOT**
8   **APPLICABLE HERE**
9
10          Dismissal of an entire suit on the basis of the state secrets privilege is an extreme and

11  "drastic remedy" that is strongly disfavored.  *Fitzgerald v. Penthouse Int'l, Ltd*, 776 F.2d 1236,

12  1242 (4th Cir. 1985).  That is because dismissal of otherwise worthy claims results in the "denial

13  of the forum provided under the Constitution for the resolution of disputes," *id.*, and, in a case

14  such as this one, forecloses any judicial accountability for grave violations of human rights.  This

15  principle is reflected in the history of the state secrets privilege, which in the overwhelming

16  majority of cases since *Reynolds* has been considered in response to particular discovery requests,

17  rather than in support of a motion to dismiss at the pleadings-stage.[8]  The propriety of evaluating

---

[8] *See, e.g.*, *DTM Research, LLC v. AT&T Corp.*, 245 F.3d 327, 330 (4th Cir. 2001) (privilege
invoked in response to subpoenas issued to federal agencies); *Linder v. Dep't of Defense*, 133
F.3d 17, 21 (D.C. Cir. 1998) (privilege invoked in response to third-party subpoenas); *Clift v.
United States*, 597 F.2d 826, 828 (2d Cir. 1987) (privilege invoked in response to discovery
requests, held to be pre-empted by statute); *Crater Corp. v. Lucent Technologies, Inc.*, 255 F.3d
1361 (Fed. Cir. 2001); *see also Bowles v. United States*, 950 F.2d 154, 156 (4th Cir. 1991); *In re
under seal*, 945 F.2d 1285, 1287 (4th Cir. 1991); *Patterson v. FBI*, 893 F.2d 595, 599 (3d Cir.
1989); *Fitzgerald v. Penthouse Int'l, Ltd.*, 776 F.2d at 1238 (4th Cir. 1985) (privilege invoked
after discovery, on eve of trial); *Molerio v. FBI*, 749 F.2d 815 (D.C. Cir. 1984); *Northrop Corp.
v. McDonnell Douglas Corp.*, 751 F.2d 395, 397 (D.C. Cir. 1984); *Ellsberg v. Mitchell*, 709 F.2d
at 54-55; *Halkin v. Helms*, 690 F.2d 977, 985 (D.C. Cir. 1982) ("*Halkin II*"); *Att'y Gen. v. The
Irish People, Inc.*, 684 F.2d 928 (D.C. Cir. 1982); *Jabara v. Webster*, 691 F.2d 272 (6th Cir.
1982); *ACLU v. Brown*, 619 F.2d 1170 (7th Cir. 1980) (*en banc*); *Halkin v. Helms*, 598 F.2d 1, 4
(D.C. Cir. 1978) ("*Halkin I*"); *Heine v. Raus*, 399 F.2d 785, 787 (4th Cir. 1968).

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
23

1    the privilege "on the battlefield of discovery," *Halkin v. Helms*, 690 F.2d 977, 1009 (D.C. Cir.

2    1982)("*Halkin II*"), rather than at the courthouse door, is even more apparent in a case such as

3    this one, where alleged government contractor complicity in the kidnapping and torture of

4    foreign citizens implicates not only the private interests of the individual plaintiffs, but also the

5    vitally important public interest in ensuring that actions taken in the name of the United States

6    comply with bedrock principles of U.S. and international law.

7         As discussed more fully below, in only two circumstances is dismissal of a suit on state

8    secrets grounds permissible: first, in the extremely narrow category of cases in which the "very

9    subject matter" of a suit is a state secret; and second, when a court determines, *after evaluating*

10   *all nonprivileged evidence*, that one of the parties is unable to prove or validly defend against a

11   claim without relying on privileged evidence.  Because the former situation is inapplicable here,

12   and the latter cannot yet be determined at this stage of the proceedings, the government's

13   premature and overbroad claim of privilege must be rejected.[9]

---

[9] Distinct from both the evidentiary privilege described in *Reynolds* and the de facto nonjusticiability rule that allows pleadings-stage dismissals when the "very subject matter" of a suit is a state secret is a narrower nonjusticiability rule articulated by the Supreme Court in *Totten*, 92 U.S. 105.  In *Totten*, the Supreme Court refused to hear a dispute about an alleged oral contract between a deceased Civil War spy and President Abraham Lincoln.  As the Court recently made clear in a case involving a foreign spy who had been resettled in the United States by the CIA, *Totten* described a "unique and categorical" nonjusticiability doctrine designed to "preclude judicial inquiry" into "secret espionage relationship[s]" between the government and alleged former spies.  *Tenet*, 544 U.S. at 6 n.4, 8.  The *Totten* rule is a "threshold question" that is considered before jurisdiction, *id.* at 6, and can therefore be thought of as a narrower and more categorical subset of the ability of courts to dismiss cases at the pleadings stage if their "very subject matter" is state secret.  *Al-Haramain*, 2007 WL 3407182 at *5-6.  *See also In re Sealed Case,* 494 F.3d 139, 151 (D.C. Cir. 2007) ("[T]he Supreme Court clarified that *Totten*, which eliminates actions that 'depend[] upon the existence of [a] secret espionage relationship,' performs a different function than *Reynolds*, which merely affects the evidence available.").

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

24

A. **Under the Controlling Law of this Circuit, the "Very Subject Matter" of this Suit Is Not a State Secret**

It is axiomatic that the "first step in determining whether a piece of information constitutes a 'state secret' is determining whether that information actually is a 'secret.'" *Hepting*, 439 F. Supp. 2d at 986. In making that assessment, a court should consider public information that possesses "substantial indicia of reliability" but that need not meet the standards required for considering strictly admissible evidence. *Id.* at 990-91 (quoting exemption of preliminary questions regarding the existence of a privilege from normal evidence rules in FRE 104(a)). To be sure, government officials have made a number of public statements that directly contradict the contention that the subject matter of this suit is a closely guarded secret.[10] While such high-level disclosures by themselves provide sufficient grounds to foreclose premature dismissal of this action, they should not be the only information considered by this court in its analysis.

There is a vast amount of reliable public information exhibiting "substantial indicia of reliability" rising far above the level of mere speculation or rumor. *Id.* at 990. This includes results of investigations by allied governments and inter-governmental organizations of *specific cases* of rendition, including of the five plaintiffs' ordeals of forced disappearance and torture.[11] Ironically, much of this information comes directly from U.S. allies such as Egypt, the United

---

[10] CIA Director Hayden contends that he, Secretary of State Condoleezza Rice, and former CIA Director Porter Goss have "acknowledged no more" than the existence of renditions and the approximate numbers of detainees. Hayden Declaration at 10-11. The information summarized below, however, demonstrates that this assertion is palpably false.

[11] These investigations and official documents are more reliable, concrete, and specific than the "publicly-filed pleadings, televised arguments in open court . . . and in the media and the blogosphere" that occurred around the warrantless wiretapping litigation without "disturbing the dark waters of privileged information." *Al-Haramain*, 2007 WL 3407182 at *6.

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
25

1    Kingdom, Sweden, Yemen, and Jeppesen itself – the very parties whose relationships with the

2    CIA the government insists cannot be confirmed or denied in the name of national security.

3    Motion to Dismiss, at 16-18.  Moreover, the U.S. government has itself publicly named

4    governments with which it has cooperated in renditions, including Britain, France, and Jordan.[12]

5    This substantial and growing public record concerning the rendition program, the five plaintiffs'

6    specific experiences of forced disappearance and torture, and the role of Jeppesen, amply

7    demonstrates that the "very subject matter" of this action not only is not secret, but is a national

8    and international scandal.

9        Although the Supreme Court has not directly addressed the application and scope of the

10   state secrets privilege since *Reynolds,* in the intervening years some lower courts, including the

11   Ninth Circuit, have recognized a narrow category of cases in which outright dismissal of a suit

12   pursuant to the privilege is required because the "very subject matter" of the suit is a state

13   secret.[13]  In *Kasza v. Browner*, 133 F.3d 1159 (9th Cir. 1998), the Ninth Circuit upheld the

14   dismissal of a suit on the ground that its very subject matter was a state secret, but that decision

---

[12] The government's contention that this court must avert its eyes from any publicly reliable but once-classified information unless it has been "publicly released through 'an official and documented disclosure'" proposes a near-impossible standard that effectively usurps the court's ability to control the factual record before it.  Motion to Dismiss at 21 (citing *Afshar v. Dep't of State*, 702 F.2d 1125 (D.C. Cir. 1983)).  To support this point, the government inappositely relies on cases discussing when the government must release information that substantially overlaps with or corroborates what is already in the public domain, either in the context of FOIA requests (*Afshar*; *Fitzgibbon v. CIA*, 911 F.2d 755 (D.C. Cir. 1990)) or clearing ex-CIA employees' manuscripts for publication (*Knopf v. Colby*, 509 F.2d 1362 (4th Cir. 1975)).  These cases regulate when the government must give up information to litigants.  They do not empower the government to intervene in cases and remove what is already in the public domain from the court's consideration.

[13] The exceptional nature of this category is underscored by the fact that the Court of Appeals for the District of Columbia Circuit – a court that routinely considers national security-related matters – has *never* upheld the dismissal of a suit on this ground.  *See In re Sealed Case*, 494 F.3d at 158 (Brown, J., dissenting) ("This court has had no occasion to apply the 'very subject matter' ground.").

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
26

1    "provide[d] scant guidance" as to when a case could be dismissed on that ground.  *Al-Haramain,*

2    2007 WL 3407182, at *9.  Only in the recent case of *Al-Haramain* did the court of appeals

3    establish a framework for assessing whether and when the very subject matter of a suit is a state

4    secret.  Under the clear rule of *Al-Haramain,* the subject matter of this suit – the CIA's

5    extraordinary rendition program – is decidedly *not* a state secret.

6            In *Al-Haramain*, the government sought pleading-stage dismissal of a suit alleging that

7    plaintiffs had been unlawfully surveilled by the National Security Agency pursuant to the so-

8    called "Terrorist Surveillance Program" ("TSP").  The government, relying in part on the Fourth

9    Circuit's opinion in *El-Masri v. United States*, argued that the very subject matter of the suit – a

10   classified intelligence program – was a state secret, and therefore that the case must be dismissed

11   at its outset.  2007 WL 3407182, at *3.

12           The court of appeals rejected that argument.  First, the court explained that the question

13   whether the "very subject matter" of a suit is a state secret is a "separate threshold

14   determination" distinct from the question whether the privilege ultimately may deprive plaintiffs

15   or defendants of *evidence* necessary to prosecute or defend a suit.  *Id.* at *10.  In so holding, the

16   court expressly disavowed the Fourth Circuit's approach in *El-Masri*, which – like the

17   government's motion in this case – illogically conflated those two inquiries.  *Id.* ("Because the

18   Fourth Circuit has accorded an expansive meaning to the 'subject matter' of an action, one that

19   we have *not* adopted, *El-Masri* does not support dismissal based on the subject matter of the

20   suit.") (emphasis added).  Next, the court of appeals made clear that when the government has

21   publicly confirmed the existence of an intelligence program – and publicly defended its legality –

22   it cannot thereafter secure dismissal of a suit challenging that program on the ground that its very

23   subject matter is a state secret.  The court explained:  "In light of extensive government

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

27

1    disclosures about the TSP, the government is hard-pressed to sustain its claim that the very

2    subject matter of the litigation is a state secret.  Unlike a truly secret or "black box" program that

3    remains in the shadows of public knowledge, the government has moved affirmatively to engage

4    in public discourse about the TSP."  *Id.* at *2.

5         The government's motion in this case falls squarely within this reasoning, and *Al-*

6    *Haramain* controls its disposition.  Like the TSP, the rendition program – the officially-

7    acknowledged CIA practice of transporting individuals on civilian aircraft to locations overseas

8    for detention and interrogation without judicial oversight and outside the protections of the

9    Constitution and U.S. and international law – can hardly be described as a "black box" program.

10   To the contrary, the President of the United States has publicly confirmed it; the Secretary of

11   State has repeatedly defended it; and the Director of Central Intelligence – whose declarations

12   form the basis for the government's premature motion – has offered numerous details about the

13   program.  All of these officials have vigorously defended the program's legality.

14        CIA Director Michael Hayden has discussed and defended the rendition program in

15   considerable detail on a number of separate occasions.  For example, on September 7, 2007 –

16   several months *after* this litigation was commenced – General Hayden openly discussed the

17   rendition program during a public speech and subsequent question-and-answer session at the

18   Council on Foreign Relations in New York.  General Hayden's speech focused on what he

19   described as the CIA's "rendition, detention and interrogation programs" and the Agency's

20   "close collaboration with allied intelligence services."  Watt Decl. at ¶¶ 21-22.  In his remarks,

21   General Hayden emphasized that the program is "very closely controlled and lawfully

22   conducted," and revealed that "[m]ore than 70 percent of the human intelligence reporting used

23   in [the National Intelligence Estimate] is based on information from detainees."  He discussed

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

28

1    the genesis of the current program, noting that "[i]t began with the capture of Abu Zubaydah in

2    the spring of 2002." *Id.*

3    General Hayden provided detailed statistical data about the program: since its inception,

4    "[f]ewer than 100 people had been detained at CIA's facilities," and "the number of renditions –

5    that's moving a terrorist from A to B – apart from that 100 that [the CIA] has detained . . .is . . .

6    mid-range two figures." *Id.* Regarding the CIA officers involved, General Hayden revealed that

7    the "average age of interrogators is 43. The amount of training for [interrogators] is 240 hours."

8    *Id.* And, in disparaging the European Parliament's finding that "at least 1,245 flights operated by

9    the CIA flew into European airspace and stopped over at European airports between the end of

10   2001 and the end of 2005," General Hayden insisted that the "actual number of rendition flights

11   ever flown by CIA is a tiny fraction of that." *Id.*

12   General Hayden acknowledged that the CIA had detained terrorism suspects itself and

13   turned others over to foreign governments. With respect to the latter, General Hayden was

14   adamant that the CIA did not employ renditions to facilitate the use of unlawful interrogation

15   methods:

16      [W]e do not circumvent any restrictions that we have on ourselves. There is a standard
17      that we have to – have to apply in each and every case. We have to receive assurances
18      and we have to have confidence in the assurances that this individual will be handled in a
19      way that is consistent with international law. And we are required to maintain awareness
20      of how this individual is handled. Now that's not an invasive right to go to an ally with a
21      clip board and see how they're running day-to-day activity with a detainee, but as an
22      intelligence agency we have a broad responsibility that the assurances we receive at the
23      beginning – that we continue to have confidence that we should have in those
24      assurances . . . . We have to believe that it is less rather than more likely that the
25      individual will be tortured.
26

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

29

1    General Hayden explained that this standard was derived from the "legislative history for the

2    Senate working to pass the International Covenant Against Torture."[14]  *Id.*

3            General Hayden's immediate predecessors, former CIA Directors Porter Goss and

4    George Tenet, were similarly willing to defend the rendition program publicly when it was

5    expedient to do so.  For example, Mr. Goss testified to the Senate Armed Services Committee on

6    March 17, 2005 that "[t]he idea of moving people around, transferring people for criminal or

7    other reasons, by government agencies is not new . . . .  We also have liaison partners [i.e., other

8    governments] who make requests of us, and we try to respect not only the sovereign rights of

9    other countries, but all of the conventions and our own laws and, of course, the Constitution."

10   *Threats to U.S. National Security: Hearing of the Senate Armed Services Committee* (Watt Decl.

11   ¶ 20).  In written testimony submitted to the Congressional 9/11 Joint Inquiry Committee, Mr.

12   Tenet revealed that the CIA had worked "with numerous European governments, such as the

13   Italians, Germans, French, and British," and "[by] 11 September, the CIA (in many cases with

14   the FBI) had rendered 70 terrorists to justice around the world."  *Written Statement for the*

15   *Record of the Director of Central Intelligence Before the Joint Inquiry Committee* (Watt Decl. at

16   ¶ 16).

---

[14] General Hayden repeated many of these assertions one month later during an hourlong interview with Charlie Rose on national television.  He confirmed that the number of persons who had been detained by the CIA since September 11 was "fewer than a hundred" and that "enhanced interrogation techniques" were used on "fewer than a third" of those.  General Hayden also confirmed that there is "another group of people …. on whom [the CIA has] conducted renditions.  We have moved them from one country to another."  In specifically denying that the CIA had facilitated the torture of terrorism suspects, General Hayden maintained that the CIA acted in accordance with prescribed standards that were lawful under U.S. and international laws: "There are absolute standards.  Those standards are embodied in our law.  They're in the Military Commissions Act, for example.  They're in how we ratify the Convention Against Torture.  They're in domestic U.S. law (*sic*) that forbid different aspects of torture.  Some things are just absolutely forbidden.  Some things are just wrong.  And they're mentioned very specifically." (Watt Decl. at ¶ 23).

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

30

1   Mr. Tenet went further in a May 2, 2007 interview on CNN, *specifically* denying

2 allegations made by Khaled El-Masri in a lawsuit challenging his rendition to Afghanistan and

3 his torture by the CIA.  Responding to a question about whether Mr. El-Masri's allegations were

4 true, Mr. Tenet stated:  "I don't believe that what he [El-Masri] says is true."  *The Situation*

5 *Room's Interview With Former CIA Director George Tenet* (Watt Decl. at ¶ 19).  Yet in an

6 unclassified declaration asserting the state secrets privilege in that case, former CIA Director

7 Goss had earlier argued that "damage to the national security could result if the defendants in this

8 case were required to admit or deny El-Masri's allegations."  *El-Masri v. Tenet*, 437 F. Supp. 2d

9 530, 537 (E.D. Va. 2006).

10   Secretary of State Condoleezza Rice, too, has publicly described the parameters of the

11 rendition program and defended its legality.  For example, on December 5, 2005, Secretary Rice

12 told reporters that the rendition program was "a vital tool in combating transnational terrorism."

13 *Secretary of State Condoleezza Rice's Remarks Upon Her Departure for Europe* (Watt Decl. at ¶

14 8).  She continued: "For decades, the United States and other countries have used 'renditions' to

15 transport terrorist suspects from the country where they were captured to their home country or

16 to other countries where they can be questioned, held, or brought to justice."  Secretary Rice

17 denied that detainees were abused: "The United States has not transported anyone, and will not

18 transport anyone, to a country when we believe he will be tortured.  Where appropriate, the

19 United States seeks assurances that transferred persons will not be tortured."  She also confirmed

20 that foreign governments "choose to cooperate" in the program in exchange for intelligence

21 information from the United States.  *Id.*

22   Even President Bush has publicly discussed the CIA's rendition program and defended its

23 utility and legality on several occasions.  On September 6, 2006, in a speech announcing the

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
31

1    transfer of 14 "high value detainees" from secret CIA detention overseas to Guantánamo,

2    President Bush described and defended the CIA's program of detention and interrogation.  The

3    President acknowledged that among the "thousands of terrorists" captured by U.S. and allied

4    forces, a "small number" had been "transferred to an environment where they can be held

5    secretly, questioned by experts." *President Discusses Creation of Military Commissions to Try*

6    *Suspected Terrorists*.  (Exhibit A to the Watt Decl. at ¶5).  Those individuals were "held and

7    questioned outside the United States, in a separate program operated by the Central Intelligence

8    Agency."  The President singled out several of them by name – Abu Zubaydah, Khalid Sheikh

9    Mohammed, and Ramzi bin al Shibh – and noted that the information those men and others

10   provided during their interrogation "has given [the U.S. government] information that has saved

11   innocent lives by helping . . . stop new attacks – here in the United States and across the world."

12   *Id.*  He acknowledged that an "alternative set" of interrogation procedures had been employed

13   and that the interrogators had been "carefully chosen and…screened from a pool of experienced

14   CIA officers."  *Id.*  Finally, the President suggested that the CIA rendition program "has been,

15   and remains, one of the most vital tools in our war against the terrorists" and that at all times it

16   operated within a legal framework: "This program has been subject to multiple legal reviews by

17   the Department of Justice and CIA lawyers; they've determined it complied with our laws.  This

18   program has received strict oversight by the CIA's Inspector General."  Regarding the

19   "alternative" interrogation techniques employed, the President insisted: "These procedures were

20   designed to be safe, to comply with our laws, our Constitution, and our treaty obligations."  *Id.*

21          Earlier, in response to specific questions about the rendition program at press conferences

22   in March and April of 2005, President Bush did not refuse to answer questions about the

23   program on the ground that allegations concerning clandestine intelligence operations could be

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

1    neither confirmed nor denied.  To the contrary, he defended the program in strong terms, stating

2    that in a "post-9/11 world, the United States must make sure we protect our people and our

3    friends from attack," and "one way to do so is to arrest people and send them back to their

4    country of origin with the promise that they won't be tortured."  *President's Press Conference*

5    (Watt Decl. at ¶ 7).  The President insisted that the rendition program complies with U.S. law:

6    "We operate within the law and we send people to countries where they say they're not going to

7    torture the people . . . .  [W]e expect the countries where we send somebody to, not to torture, as

8    well.  But you bet, when we find somebody who might do harm to the American people, we will

9    detain them and ask others from their country of origin to detain them . . . .  [W]e've got

10    guidelines.  We've got law.  But you bet . . . we're going to find people before they harm us."  *Id.*

11          Through these public statements, senior government officials have not only confirmed the

12    existence of the rendition program, they have also disclosed a number of crucial details about the

13    practice, including: (1) that the U.S. government sends some individuals to their countries of

14    origin or to other countries for detention and interrogation; (2) that the CIA operates a detention

15    and interrogation program outside the U.S; (3) the names of specific countries that have

16    cooperated in renditions; (4) the legal framework purportedly employed for regulating these

17    practices; (5) details of training and policy guidelines of clandestine personnel involved in

18    operational aspects of the rendition and interrogation programs; (6) numbers of renditions and

19    CIA detentions.  On the basis of these statements alone, there are compelling grounds to

20    conclude that the "very subject matter" of this action cannot be a state secret.[15]

---

[15] Public discussion of the rendition program, however, has not been limited to the Executive
Branch.  On July 26, 2007, the Senate Foreign Relations Committee held a public hearing on
"Rendition, Extraterritorial Detention, and Treatment of Detainees: Restoring Our Moral
Credibility and Strengthening Our Diplomatic Standing."  The House Subcommittee on
International Organizations, Human Rights, and Oversight has held two public hearings on

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
33

1    As in *Al-Haramain,* that the government has "even thought it necessary to explain to the

2    public in an unclassified form" and on repeated occasions the purported legality and necessity of

3    the rendition program "suggests that the government both knew that details of the [rendition]

4    program were in the public sphere and recognized that the program was already the subject of

5    significant public discussion and interest." *Al-Haramain*, 2007 WL 3407182 at *8 (internal

6    citation omitted). The government's selective release of information concerning the rendition

7    program and its participation in the debate about its efficacy and legality "doom[s] the

8    government's assertion that the very subject matter" of the litigation is barred by the privilege.

9    *Id.* at *9. [16]

---

rendition: Extraordinary Rendition in U.S. Counterterrorism Policy: The Impact on Transatlantic Relations" (April 17, 2007) and Rendition to Torture: The Case of Maher Arar (October 18, 2007). (Watt Decl. at ¶ 31). Senator Patrick Leahy, Representative Ed Markey, and Senator Joseph Biden have each introduced legislation either to abolish or regulate the rendition program. (Watt Decl. at ¶ 30). The Congressional Research Service, at the behest of interested members of Congress, has produced a series of reports focused on the rendition program. (Watt Decl. at ¶ 32). And, the initial findings released by the 9/11 Commission Staff included a section under the heading "Renditions," describing the practice as "an important component of U.S. counterterrorism policy throughout the period leading up to 9/11" that is "widely used today." (Watt Decl. at ¶18).

[16] Because the rendition program has been officially acknowledged and publicly defended, the government's assertion that this suit must be dismissed because its allegations cannot be confirmed or denied is, at best, vastly overbroad. *See, e.g., Hepting,* 439 F. Supp. 2d at 996 (because "the government [had] already opened the door for judicial inquiry by publicly confirming and denying information about its monitoring of communication content," confirmation of the existence of a certification would "not reveal any new information that would assist a terrorist and adversely affect national security."). The government's specific concern that any "[i]nformation that may tend to confirm or deny" CIA relationships with foreign governments is a state secret, Motion to Dismiss, at 5, 17, is undermined by the inconvenient fact that many of those governments have openly acknowledged their own roles, as well as the role of the CIA, in the rendition program. For example, during an interview on Meet the Press on May 15, 2005, Egyptian Prime Minister Ahmed Nazif openly acknowledged that his country had assisted the U.S. in the rendition of some 60 to 70 individuals since 2001. (Watt Decl. at ¶ 42). Many similar acknowledgements have been made by other governments. *See* Wigenmark Decl. (noting that the Swedish government has acknowledged its role in the rendition of plaintiff Agiza); Declaration of Clive Stafford-Smith in Support of Plaintiffs'

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

34

1    Indeed, in certain respects, the CIA's rendition program may be even less of a state secret

2    than the "TSP" at issue in *Al-Haramain*.  As the court of appeals observed in *Al-Haramain*,

3    although the "government has acknowledged the existence of the TSP, it has not disclosed the

4    identities of the specific persons or entities surveilled under the program." *Id.* at *3**.**  In contrast,

5    the President *has* publicly disclosed the identities of at least 15 individuals subjected to CIA

6    detention and interrogation, and Director Hayden has provided an estimate of the total number of

7    rendition victims.  Moreover, unlike plaintiffs in surveillance cases, plaintiffs in this action do

8    not require discovery in order to establish what they already know all too well:  that they

9    themselves were victims of the government's rendition program, as their sworn declarations and

10   accompanying documentation attest.  As demonstrated above, the plaintiffs in this action can

11   produce considerably more specific and reliable information about the concrete harm they have

12   suffered as a result of defendant's conduct than could the plaintiffs in *Al-Haramain.*

13   As in *Al-Haramain*, "there are details about the program that the government has not yet

14   disclosed . . . ." *Id.* at *9.  During the course of discovery, proper application of the privilege

15   may very well result in the withholding and removal of otherwise relevant evidence that would

---

Opposition to United States' Motion to Dismiss, or, in the Alternative, for Summary Judgment ("Stafford-Smith Decl."); and Al-Rawi Decl. (noting acknowledged role of the United Kingdom in the rendition of plaintiffs Binyam Mohamed and Bisher Al-Rawi); Exhibit W to the Watt Decl. at ¶34 (xiii); Bashmilah Decl. (noting acknowledged roles of Jordan and Yemen in the detention of Mohamed Farag Ahmad Bashmilah).

Overseas, concern among European allies about complicity in the rendition program through the operation of U.S.-run rendition centers in certain European countries and the use of European airspace and airports for CIA flights has resulted in exhaustive inter-governmental inquiries by the Council of Europe and the European Parliament.  Watt Decl. at ¶ 34 (i) and (ii). There have also been separate criminal investigations and public inquiries in at least 18 countries, including France, Italy, Spain, Sweden, the United Kingdom, Portugal, Germany and Canada.  *Id.* at ¶ 34 (iii)-(xiv).  These official inquiries have included review of thousands of pages of inter- and intra-governmental correspondence, flight records from national and inter-governmental air traffic control authorities, and testimony by high-ranking officials.

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

35

1   support plaintiffs' claims.  But the likelihood that this case, like *Al-Haramain,* "does involve

2   privileged information," *id.* at *10, stands separate and apart from the question whether its "very

3   subject matter" is a state secret.  "[B]ecause of the voluntary disclosures made by various

4   officials" concerning the rendition program, "the nature and purpose of the [rendition program],

5   the 'type' of persons it target[s], and even some of its procedures are not state secrets."  *Id.* at

6   *9.[17]

7          It would defy logic to conclude that the very subject matter of a suit is a state secret when

8   it involves an officially acknowledged program and widely corroborated allegations.  As a matter

9   of law and common sense, the government cannot legitimately keep secret what is already

10   widely known and what has repeatedly been publicly disseminated.[18]  To terminate plaintiffs'

11   right of redress in the name of safeguarding information that is already known to the public

12   would be to sacrifice their rights to a legal fiction.  *Al-Haramain* makes plain that this Court

13   must reject the unsupported assertion that the very nature of this case compels immediate

14   dismissal, and instead require the government to assert the privilege on an item-by-item basis

15   during discovery.

---

[17] Accordingly, the government's invocation of the "mosaic theory," Motion to Dismiss, at 6-7, is inapposite.  This is not a case in which the executive branch has the "whole picture" while the public, and the court, do not.  *See CIA v. Sims*, 471 U.S. 159, 179 (1985).  Rather, the reverse is the case here: the "whole picture" is already sufficiently well-known and the "missing pieces" of undisclosed and genuinely sensitive information remaining are discrete and specific enough for this court to protect in the course of litigation without delegating its authority wholesale to the executive branch at the outset.

[18] *See, e.g.*, *Capital Cities Media, Inc. v. Toole*, 463 U.S. 1303, 1306 (1983) (noting that Court has not "permitted restrictions on the publication of information that would have been available to any member of the public"); *Snepp v. United States*, 444 U.S. 507, 513 n.8 (1980) (suggesting that the government would have no interest in censoring information already "in the public domain"); *Virginia Dep't of State Police v. Washington Post*, 386 F.3d 567, 579 (4th Cir. 2004)(holding that the government had no compelling interest in keeping information sealed where the "information ha[d] already become a matter of public knowledge").

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
36

1   **B.     Dismissal of this Action Without Permitting Nonsensitive Discovery and**
2   **Considering Nonprivileged Evidence Would Be Improper**

3

4          Where, as here, the very subject matter of a suit is a not state secret, a case may not be

5   dismissed on state secrets grounds unless, after all possible nonsensitive discovery and

6   presentation of nonprivileged evidence, a court determines that a plaintiff cannot present a prima

7   facie case or a defendant cannot present a valid defense without resort to privileged evidence.

8   As the Ninth Circuit has explained, "[i]f, *after further proceedings*, the plaintiff cannot prove the

9   *prima facie* elements of her claim with nonprivileged evidence, then the court may dismiss her

10  claim as it would with any plaintiff who cannot prove her case." *Kasza,* 133 F.3d at 1166

11  (emphasis added). "Alternatively, if the privilege deprives the defendant of information that

12  would otherwise give the defendant a *valid* defense to the claim, then the court may grant

13  summary judgment to the defendant." *Id.* (emphasis added) (internal quotation omitted).

14         The wisdom of this traditional practice is manifest. When the government urges

15  dismissal pursuant to the state secrets privilege before an answer has been filed, it is difficult for

16  a court to determine which allegations are relevant, or even in dispute. Attempting to discern the

17  "impact of the government's assertion of the state secrets privilege" before the plaintiff's claims

18  have developed and the relevancy of privileged material has been determined "is akin to putting

19  the cart before the horse." *Crater Corp. v. Lucent Technologies, Inc.,* 423 F.3d at 1268. That is

20  precisely how the Fourth Circuit went astray in *El-Masri*, and why the Ninth Circuit expressly

21  rejected such an approach. To reach its erroneous decision, the Fourth Circuit was compelled to

22  posit a series of hypothetical prima facie cases and defenses; predict which facts might or might

23  not be required to establish them; and then arrive at a decision in the absence of actual evidence

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
37

1    or concrete arguments from the parties.  Such an approach demands a kind of judicial

2    clairvoyance that invariably leads to error.[19]

3         The extensive factual information set forth above – comprised of, *inter alia*, eyewitness

4    testimony, detailed and corroborated sworn statements, intergovernmental investigatory reports,

5    and the numerous public statements of U.S. officials – plainly illustrates why it would be wholly

6    premature and improper to conclude at this preliminary stage of the proceedings that the

7    plaintiffs will be unable to make out a prima facie case.  It would be even more unjust and

8    improper to credit the government's pleading-stage argument that the state secrets privilege will

9    prevent Jeppesen from *defending* against plaintiffs' claims.  As the Ninth Circuit has explained,

10   dismissal on state secrets grounds is not permissible when the privilege may interfere with

11   *possible* defenses, but only when it precludes the assertion of a *valid* defense.  *Kasza,* 133 F.3d at

12   1166.  That is, unless the state secrets privilege results in the elimination of a "meritorious and

13   not merely plausible" defense, a case may not be dismissed on this ground.  *In re Sealed Case,*

---

[19] For example, the Fourth Circuit incorrectly stated that in order to establish the liability of former CIA Director George Tenet, Mr. El-Masri would be "obliged to show in detail how the head of the CIA participates in such operations, and how information concerning their progress is relayed to him."  *El-Masri*, 479 F.3d at 309.  This was quite wrong. Under well-established rules of supervisory liability, Mr. El-Masri could have made out his prima facie case simply by demonstrating that Director Tenet had promulgated the policy that led foreseeably to Mr. El-Masri's injuries, or by various other bases of liability.  *See Rizzo v. Goode*, 423 U.S. 362, 371 (1976) (holding that supervisors may be held liable where plaintiff demonstrates "affirmative link" between constitutional violation and defendant's actions, typically through "the adoption of any plan or policy . . . showing [] authorization or approval"); *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir. 2001) (holding that supervisory liability attaches in any of the following circumstances: "(1) the [official] participated directly in the alleged constitutional violation, (2) the [official], after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the [official] created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the [official] was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the [official] exhibited deliberate indifference to the rights of [others] by failing to act on information indicating that unconstitutional acts were occurring.") (citations omitted).

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
38

1    494 F. 3d at 149.  Therefore, only if Director Hayden's classified affidavit were conclusively to

2    demonstrate that Jeppesen had no involvement in the forced disappearance and torture of any of

3    the five plaintiffs – an assertion that in any event would be directly contradicted by abundant

4    available evidence – could this case be dismissed prior to discovery on the ground that the state

5    secrets privilege would interfere with Jeppesen's defense.  *Cf. Molerio v. FBI*, 749 F.2d at 825

6    (accepting valid defense raised *in camera* on the basis that classified affidavit conclusively

7    established that plaintiff's claim was without merit).

8         The reason for this rule is clear.  As the D.C. Circuit recently explained:

9         Were the valid-defense exception expanded to mandate dismissal of a complaint for any
10        plausible or colorable defense, then virtually every case in which the United States
11        successfully invokes the state secrets privilege would need to be dismissed.  This would
12        mean abandoning the practice of deciding cases on the basis of evidence . . . in favor of a
13        system of conjecture.
14

15   *In re Sealed Case* 494 F. 3d at 150-151.[20]  It was precisely such "conjecture" that formed the

16   basis for the Fourth Circuit's decision in *El-Masri*.  The Fourth Circuit recited a series of

17   admittedly "hypothetical defenses" with which the privilege might interfere – even as the court

18   acknowledged that those defenses might not "represent[] the true state of affairs . . . ."  *El-Masri*,

19   479 F. 3d at 310.  Such a standard requires a court to base its determination on mere speculation,

20   not evidence, and has been rejected by every other circuit to address this issue.  *See Tenenbaum v.*

21   *Simonini*, 372 F.3d 776, 777-78 (6th Cir. 2004); *Zuckerbraun v. General Dynamics Corp.*, 935

---

[20] The court elaborated: "[A]llowing the mere prospect of a privileged defense to thwart a
citizen's efforts to vindicate his or her constitutional rights would run afoul of the Supreme
Court's caution against precluding review of constitutional claims [] and against broadly
interpreting evidentiary privileges, for whatever their origins, … exceptions to the demand for
every man's evidence are not lightly created nor expansively construed, for they are in
derogation of the search for truth."  *In re Sealed Case*, 494 F.3d at 151 (citations omitted).

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
39

1    F.2d 544, 547 (2d Cir. 1991); *Bareford v. General Dynamics Corp.*, 973 F.2d 1138, 1141 (5th

2    Cir. 1992).

3         The government's contention, offered repeatedly in its motion, that litigation of

4    plaintiffs' claims necessarily will reveal intelligence "sources and methods" demonstrates

5    precisely why courts must consider the privilege in light of specific evidence, not broad

6    conjecture.  Motion to Dismiss, at 1, *see also* 16, 18, 20, 21, 22.  The specific manner in which

7    the CIA operates its rendition program is by now widely known and has been publicly aired not

8    only in the media, but in the official reports of foreign governments.[21]  Indeed, it is difficult to

---

[21] For example, the Council of Europe, in a section of its report on rendition and secret detention entitled "CIA methodology – how a detainee is treated during a rendition," distills the testimony of several rendition victims, as well as other eyewitnesses, regarding the CIA's "method" of subduing and transporting rendition targets, and concludes that "[c]ollectively[,] the cases in the report testify as to the existence of an established *modus operandi* of rendition . . . ." Dick Marty, Committee on Legal Affairs and Human Rights, Council of Europe, *Alleged Secret Detentions and Unlawful Inter-State Transfers Involving Council of Europe Member States* § 2.7.1, ¶85 (draft report 2006), Exhibit S (a) to Watt Decl. The report proceeds to describe that *modus operandi*, in part, as follows:

   i.    it generally takes place in a small room (a locker room, a police reception area) at the airport, or at a transit facility nearby.

   ii.   the man is sometimes already blindfolded when the operation begins, or will be blindfolded quickly and remain so throughout most of the operation.

   iii.  four to six CIA agents perform the operation in a highly-disciplined, consistent fashion – they are dressed in black (either civilian clothes or special 'uniforms'), wearing black gloves, with their full faces covered.  Testimonies speak, variously, of "*big people in black balaclavas,*" people "*dressed in black like ninjas,*" or people wearing "*ordinary clothes, but hooded.*"

   iv.  the CIA agents "*don't utter a word when they communicate with one another,*" using only hand signals or simply knowing their roles implicitly.

   v.   some men speak of being punched or shoved by the agents at the beginning of the operation in a rough and brutal fashion; others talked about being gripped firmly from several sides.

   vi.  the man's hands and feet are shackled.

   vii.  the man has all his clothes (including his underwear) cut from his body using knives or scissors in a careful, methodical fashion; an eyewitness described how "*someone was taking these clothes and feeling every part, you know, as if there was something inside the clothes, and then putting them in a bag.*"

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

40

1    conceive how requiring the defendant to answer plaintiffs' complaint could alert our terrorist

2    enemies to anything that they do not already know.  Just as the President's confirmation that 15

3    suspected terrorists had been detained and interrogated by the CIA did not reveal classified

4    "means and methods" that were unknown to the public, it is highly likely plaintiffs would be able

5    to establish defendant's liability without any such revelations.[22]

---

   viii.    the man is subjected to a full-body cavity search, which also entails a close examination of his hair, ears, mouth and lips.

   ix.    the man is photographed with a flash camera, including when he is nearly or totally naked; in some instances, the man's blindfold may be removed for the purpose of a photograph in which his face is also identifiable.

   x.    some accounts speak of a foreign object being forcibly inserted into the man's anus; some accounts speak more specifically of a tranquiliser or a suppository being administered *per rectum . . . .*

   xi.    the man is then dressed in a nappy or incontinence pad and a loose-fitting "*jump-suit*" or set of overalls; "*they put diapers on him and then there is some handling with these handcuffs and foot chains, because first they put them on and then they are supposed to put him in overalls, so then they have to alternately unlock and relock them.*"

   xii.    the man has his ears muffled, sometimes being made to wear a pair of "*headphones.*"

   xiii.    finally a cloth bag is placed over the man's head, with no holes through which to breathe or detect light; they "*put a blindfold on him and after that a hood that apparently reaches far down on his body.*"

   xiv.    the man is typically forced aboard a waiting aeroplane, where he may be "*placed on a stretcher, shackled,*" or strapped to a mattress or seat, or "*laid down on the floor of the plane and they bind him up in a very uncomfortable position that makes him hurt from moving.*"

   xv.    in some cases the man is drugged and experiences little or nothing of the actual rendition flight; in other cases, factors such as the pain of the shackles or the refusal to drink water or use the toilet make the flight unbearable: "*this was the hardest moment in my life.*"

   xvi.    in most cases, the man has no notion of where he is going, nor the fate that awaits him upon arrival.

(citations omitted) (emphasis in original).  *Id.* at § 2.7.1, ¶85

[22] That is not to say that there might not be specific details – such as, for example, the identities of covert operatives – that may be legitimately withheld on state secrets grounds.  But it is precisely the role of the district court to ensure that such "sensitive information . . . [is] disentangled from nonsensitive information to allow for the release of the latter." *Ellsberg v. Mitchell*, 709 F.2d at 57.

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

41

1    The question at this stage is not whether the CIA Director has identified any classified

2    facts in his affidavits; rather, the question is whether it can be determined with certainty at this

3    stage of the litigation that those facts are absolutely *essential* either for plaintiffs to prove their

4    claims or for Jeppesen validly to defend against them.  Such a determination would be

5    premature.[23]  The proper manner in which to assess the effect of the privilege on the evidence

6    available to plaintiffs and defendant is to permit the case to proceed to discovery.  There will be

7    no shortage of opportunities for the government to protect its legitimate interests with respect to

8    specific privileged evidence.  To attempt to do so now, and to deprive plaintiffs of any judicial

9    remedy on the basis of speculation, would be unjust, unnecessary, and improper, and would

10    "sacrifice liberty for no apparent enhancement of security."  *Hepting*, 439 F. Supp. 2d at 995.

11    **III.    THIS COURT IS COMPETENT TO HEAR THIS CASE WITHOUT**
12    **ENDANGERING NATIONAL SECURITY**
13
14    This Court is plainly competent to make an independent assessment of the government's

15    claims of privilege and must determine on its own whether further litigation would reasonably

16    cause danger to national security or simply cause embarrassment to the United States.  The

17    Supreme Court has long made clear that the demand for extreme deference to Executive

18    judgments – and the suggestion that national security matters are "too subtle or complex for

19    judicial evaluation" – is without basis.  *United States. v. United States District Court* (*Keith*), 407

20    U.S. 297, 320 (1972); *see also Zweibon v. Mitchell*, 516 F.2d 594, 641-642 (D.C. Cir. 1975), *cert.*

---

[23] *See Hepting* at 994 (court "declines to decide at this time whether this case should be dismissed on the ground that the government's state secrets assertion will preclude evidence necessary for plaintiffs to establish a *prima facie* case or for AT&T to raise a valid defense to the claims.  Plaintiffs appear to be entitled to at least some discovery.  It would be premature to decide these issues at the present time.") (citations omitted).

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
42

1    *denied,* 425 U.S. 944 (1976) ("[W]e do not believe federal judges will be 'insensitive to or

2    uncomprehending of the issues involved in' foreign security cases . . . .").

3    **A.    An Independent Judiciary Plays a Vital Role in Reviewing the Legality of Executive
4           Action**

5

6           Because the Constitution's Framers feared the prospect of unchecked executive power,[24]

7    the Constitution provides for an independent judiciary as the ultimate arbiter of when the

8    Executive has acted beyond its authority, contrary to its legal obligations, or in violation of

9    individual rights.  *See, e.g., Clinton v. Jones*, 520 U.S. 681, 703 (1997) ("[W]hen the President

10   takes official action, the Court has the authority to determine whether he has acted within the

11   law.").  The question whether the government violated plaintiffs' rights when it abducted,

12   detained, and tortured them – and whether Jeppesen should be held liable for its role in those

13   abuses – remains an inherently judicial one.  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177

14   (1803); *see also Legal Services Corp. v. Velazquez*, 531 U.S. 533, 545 (2001).

15          Vigorous judicial review is especially necessary where, as here, the government seeks to

16   declare nonjusticiable a suit challenging grave executive misconduct in violation of bedrock

17   principles of U.S. and international law.  It is precisely in cases such as this one that judicial

18   scrutiny must be at its apex.  Indeed, Congress, in one of its earliest acts, expressly provided for

19   federal court jurisdiction over civil actions for the violation of the law of nations,[25] and it has

---

[24] *See* James Madison, THE FEDERALIST NO. 47, at 324 (J. Cooke, ed., 1961) ("The accumulation
of all powers legislative, executive and judiciary in the same hands . . . may justly be pronounced
the very definition of tyranny.").

[25] Alien Tort Statute, 28 U.S.C. § 1350 (granting jurisdiction to federal courts over "any civil
action by an alien for a tort only, committed in violation of the law of nations or a treaty of the
United States").

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
43

1    repeatedly enacted laws and ratified treaties that proscribe torture and cruel treatment in

2    unequivocal terms.[26]

3         Courts are plainly competent to review cases implicating even the most sensitive national

4    security issues.  Consistent with the Supreme Court's admonition that "a state of war is not a

5    blank check for the President," *Hamdi v. Rumsfeld,* 542 U.S. 507, 536 (2004), courts have played

6    an active and vital role in evaluating the legality of executive action taken in the name of

7    national security.  In the past five years alone, the Supreme Court has decided whether the

8    President can detain enemy combatants captured on the battlefield in Afghanistan and whether

9    those captured are entitled to due process,[27] whether individuals detained at Guantánamo Bay

10   may challenge their detention,[28] and whether the trial of detainees by military commissions

11   passes constitutional muster.[29]  Courts have required access to the testimony of enemy combatant

12   witnesses;[30] considered the legality of the National Security Agency's warrantless wiretapping of

13   American citizens;[31] decided whether, consistent with the Constitution, the FBI may unilaterally

14   demand that Internet Service Providers turn over customer records related to national security

---

[26] *See, e.g.*, 18 U.S.C. § 2340A (providing for prosecution of a U.S. national or anyone present in the U.S. who, while outside the U.S., commits or attempts to commit torture); 18 U.S.C. § 2441 (making it a criminal offense for U.S. military personnel and U.S. nationals to commit grave breaches of Common Article 3 of the Geneva Convention); and Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, Annex, 39 U.N. GAOR Supp. No. 51, U.N. Doc. A/39/51(1984), entered into force June 26, 1987.

[27] *Hamdi,* 542 U.S. 507.

[28] *Rasul v. Bush*, 542 U.S. 466 (2004).

[29] *Hamdi,* 542 U.S. at 535.

[30] *United States v. Moussaoui*, 365 F.3d 292 (4th Cir. 2004)

[31]*Al-Haramain v. Bush*, 2007 WL 3407182; *Hepting v. AT & T Corp.*, 439 F. Supp. 2d 974.

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
44

1    investigations and gag them forever without judicial review;[32] whether the government may

2    require closure of all post-9/11 deportation hearings for national security reasons;[33] and whether

3    the government must disclose information about the treatment of detainees in Iraq, Afghanistan,

4    and Guantánamo Bay.[34]  Had the government's radical view of judicial deference prevailed in

5    these cases – all of which involve national security issues every bit as sensitive as those

6    presented in this case – important constitutional issues might never have been decided.

7            The Court should assess the government's state secrets claim with these precedents and

8    principles in mind.  Ultimately, only the Court can ensure that plaintiffs are not unnecessarily

9    denied their "constitutional right to have access to the courts to redress violations of [their]

10   constitutional and statutory rights."  *Spock v. United States*, 464 F. Supp. 510, 519 (S.D.N.Y.

11   1978).  The Supreme Court has cautioned that judicial control in a case "cannot be abdicated to

12   the caprice of executive officers."  *Reynolds,* 345 U.S. at 9-10.  "To defer to a blanket assertion

13   of secrecy . . . would be to abdicate that duty . . . ."  *Hepting,* 439 F. Supp. 2d at 995; *see also In*

14   *re United States*, 872 F.2d 472, 475 (D.C. Cir. 1989) ("[A] court must not merely unthinkingly

15   ratify the executive's assertion of absolute privilege, lest it inappropriately abandon its important

16   judicial role."); *Ellsberg*, 709 F.2d at 58 "[T]o ensure that the state secrets privilege is asserted

17   no more frequently and sweepingly than necessary, it is essential that the courts continue

18   critically to examine the instances of its invocation."); *Molerio*, 749 F.2d at 822 ("[T]he validity

19   of the government's assertion must be judicially assessed.").

---

[32] *Doe v. Ashcroft*, 334 F. Supp. 2d 471 (S.D.N.Y. 2004), *vacated, Doe v. Gonzales*, 449 F.3d 415 (2d Cir. 2006); *Doe v. Gonzales*, 386 F. Supp. 2d 66 (D. Conn. 2005), *appeal dismissed as moot*, *Doe v. Gonzales*, 449 F.3d 415 (2d Cir. 2006)

[33] *Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002)

[34] *ACLU v. Dep't of Def.*, 389 F. Supp. 2d 547 (S.D.N.Y. 2005)

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
45

1    **B.    Federal Courts Have Wide Experience in Assessing National Security Matters**

2            Article III courts are routinely charged with making sensitive national security

3    determinations – and the government routinely insists that courts have little or no role in

4    evaluating executive assertions of secrecy.  For example, courts review classification

5    determinations to assess whether the executive has properly shielded information from public

6    disclosure.  Freedom of Information Act (FOIA), 5 U.S.C. § 552(a)(4)(B) & (b)(1) (2002); *see,*

7    *e.g.*, *Ray v. Turner*, 587 F.2d 1187, 1191-95 (D.C. Cir. 1978) (describing *de novo* review

8    procedures required by FOIA).  When it amended FOIA in 1974, Congress "stressed the need for

9    an objective, independent judicial determination, and insisted that judges could be trusted to

10   approach the national security determinations with common sense, and without jeopardy to

11   national security." *Ray*, 587 F.2d at 1194; *McGehee v. Casey*, 718 F.2d 1137, 1148 (D.C. Cir.

12   1983) (requiring *de novo* judicial review of pre-publication classification determinations to

13   ensure that information is properly classified and agency "explanations justify censorship with

14   reasonable specificity, demonstrating a logical connection between the deleted information and

15   the reasons for classification"); *see also Snepp*, 444 U.S. at 513 n. 8 (requiring judicial review of

16   pre-publication classification determinations).  In determining whether information is properly

17   classified, courts must evaluate, inter alia, whether its disclosure could be expected to cause

18   varying levels of harm to the nation's security.  Exec.Order. No: 13292  WL 1618058 (Mar. 25,

19   2003).  Courts make similar determinations when evaluating Exemption 1 claims in FOIA

20   litigation.  *See, e.g., Halpern v. FBI*, 181 F.3d 279 (2d Cir. 1999) (rejecting government's

21   Exemption 1 claim).

22           Similarly, under the Foreign Intelligence Surveillance Act of 1978 (FISA), federal judges

23   must independently review the government's assertion that electronic surveillance is needed for

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

46

1  foreign intelligence purposes. *See* 50 U.S.C. § 1805 (2006).  To obtain a FISA warrant, the

2  executive must disclose sensitive national security information to the FISA court and convince

3  the judges that the requirements for issuing the warrant have been met. *Id.*  Moreover, FISA

4  empowers all federal district courts, not just the special FISA court, to review highly sensitive

5  information *in camera* and *ex parte* to determine whether the surveillance was authorized and

6  conducted in accordance with FISA. *See* 50 U.S.C. § 1806(f) (2006).  "In making this

7  determination, the court may disclose to the aggrieved person, under appropriate security

8  procedures and protective orders, portions of the application, order, or other materials relating to

9  the surveillance . . .  where such disclosure is necessary to make an accurate determination of the

10  legality of the surveillance." *Id.*

11       Finally, the Classified Information Procedures Act (CIPA), 18 U.S.C. app., empowers

12  judges to craft special procedures to determine whether and to what extent classified information

13  may be used at trial. *See generally United States v. Pappas*, 94 F.3d 795, 799 (2d Cir. 1996).

14  Section 4 of CIPA, which allows for defense discovery of classified information, explicitly

15  provides courts with discretion to deny government requests to delete specific data from

16  classified materials or substitute summaries or stipulations of facts.  18 U.S.C. app. § 4.  When

17  section 4 is invoked, a judge must determine the relevance of the information in light of the

18  asserted need for information and any claimed government privilege. *See*, *e.g.*, *United States v.*

19  *Sarkissian*, 841 F.2d 959 (9th Cir. 1988) (holding that in deciding whether to disclose

20  confidential material submitted by the government in criminal prosecution pursuant to CIPA,

21  judge was free to balance defendant's need for documents against national security concerns).[35]

---

[35] Section 6 of CIPA also provides for pretrial hearings on admissibility of classified evidence, *see* 18 U.S.C. app. § 6, during which the judge must determine the relevance of the classified

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

47

1    Here, the United States seeks greater judicial deference to a determination with harsher

2    consequences – outright dismissal of potentially worthy and claims of forced disappearance,

3    torture, and other abuse – than in those situations where the courts routinely make the most

4    sensitive judgments.  Notwithstanding the government's arguments, this Court has the requisite

5    institutional competence to devise procedures that would allow this case to proceed to discovery.

6    **C.    Robust and Secure Alternatives to Dismissal Are Available**

7    Even if this Court determines that litigation of this matter is likely to touch upon

8    privileged evidence, it may not dismiss this action without carefully considering whether

9    alternatives exist that would permit plaintiffs' claims to be adjudicated without exposing secrets

10   of state.  Courts must use "creativity and care" to devise "procedures which would protect the

11   privilege and yet allow the merits of the controversy to be decided in some form."  *Fitzgerald*,

12   776 F.2d at 1238 n.3; *see also In re United States*, 872 F.2d at 478 (discussing measures to

13   protect sensitive information as case proceeds); *Ellsberg*, 709 F.2d at 64 (encouraging

14   "procedural innovation" in addressing state secrets issues).  "Only when no amount of effort and

15   care on the part of the court and the parties will safeguard privileged material is dismissal [on

16   state secrets grounds] warranted."  *Fitzgerald*, 776 F.2d at 1244.

17   A court must use all tools at its disposal, including item-by-item review of purportedly

18   privileged evidence in camera, before considering the final resort of outright dismissal.  *See, e.g.,*

19   *Ellsberg v. Mitchell*, 709 F.2d at 59 n.37 ("When a litigant must lose if the claim is upheld and

20   the government's assertions are dubious in view of the nature of the information requested and

21   the circumstances surrounding the case, careful in camera examination of the material is not only

22   appropriate, but obligatory.") (internal citation omitted); *In re United States*, 872 F.2d at 478.

information, *id.* at § 6(a), and the adequacy of substitutions offered by the government in lieu of
classified documents.  *Id.* at § 6(c).

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
48

1    Moreover, there are ample additional procedures that are available to courts that can protect

2    legitimately sensitive evidence while allowing the merits of a case to be adjudicated.

3         For example, in *In re United States*, the D.C. Circuit discussed several alternatives to

4    dismissal, noting that "the information remains in the Government's custody, and the parties'

5    discovery stipulation has preserved the Government's right to assert the privilege and to support

6    its assertions by submission of representative samples of documents for in camera review."  872

7    F.2d at 478.  Moreover, "the parties have provided for the protection of third party privacy by

8    agreeing to mechanisms limiting the disclosure of certain documents, including redaction of

9    names." *Id*.  Finally, the court noted that a bench trial "w[ould] reduce the threat of unauthorized

10   disclosure of confidential material."  *Id.*

11        Similarly, in *The Irish People, Inc*, the D.C. Circuit upheld the invocation of the privilege

12   but refused to dismiss the case, suggesting that the district court could make representative

13   findings of fact and provide summaries of withheld information.  The court noted that "the

14   district court may properly itself delve more deeply than it might ordinarily into marshalling the

15   evidence on both sides for the selective prosecution claim."  684 F.2d at  955.

16        Most recently, the district court in *Hepting v. AT&T* proposed the appointment of an

17   expert pursuant to FRE 706 "to assist the court in determining whether disclosing particular

18   evidence would create a 'reasonable danger' of harming national security."  *Hepting,* 439 F.

19   Supp. 2d at 1010.  The same function could be performed by the designation of a special master

20   to examine and evaluate invocations of privilege.  *See Vaughn v. Rosen*, 484 F.2d 820, 828 (D.C.

21   Cir. 1983); *Loral Corp. v. McDonnell Douglas Corp.*, 558 F.2d 1130, 1132 (2d Cir. 1977).

22   Other courts have utilized a number of additional tools to safeguard sensitive information in

23   cases involving state secrets, including (1) protective orders, *United States v. Lockheed Martin*

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
49

1    *Corp*., 1998 WL 306755 (D.D.C. 1998); *In re Under Seal*, 945 F.2d at 1287 (noting protective

2    orders issued and allowing depositions to be conducted in secure facilities); *Air-Sea Forwarders,*

3    *Inc. v. United States*, 39 Fed. Cl. 434, 436-37 (Fed. Cl. 1997) (noting that CIA provided

4    discovery under protective order);[36] (2) seals, *In re Under Seal*, 945 F.2d at 1287; (3) bench

5    trials, *In re United States*, 872 F. 2d. at 478; and (4) *in camera* trials, *Halpern*, 258 F.2d at 41.

6        Any or all of those alternatives, or others devised by this Court, could be employed to

7    permit this case to proceed without jeopardizing national security.

8    **IV.    THE GOVERNMENT'S STATUTORY PRIVILEGE ARGUMENT IS**
9    **        MERITLESS**
10
11        Almost by way of afterthought, the government offers the additional argument that a

12    "statutory privilege" under the National Security Act, which is typically invoked to prevent

13    disclosure of particular documents under the FOIA,[37] provides an "independent basis for

14    dismissal of this suit."  Motion to Dismiss at 22.  The government cites to not a single case that

15    supports the use of this statute to dismiss a civil suit at its outset, because none exists.  There is,

16    however, specific authority to the contrary.

17        In the *Hepting* case – which the government has declined even to cite, let alone

---

[36] *See also In re Guantanamo Detainee Cases*, 344 F. Supp. 2d 174 (D.D.C. 2004); *United States v. Rezaq*, 899 F. Supp. 697, 708 (D.D.C. 1995) (issuing protective order tracking provisions of Classified Information on Procedures Act provided "more than adequate procedural protections against public disclosure of classified information"); *United States v. Musa*, 833 F.Supp. 752, 758-61 (E.D.Mo.1993) (imposing protective order to control viewing of classified documents and requiring counsel to sign confidentiality agreement).  In addition, courts routinely protect classified information used in criminal proceedings through protective orders.  Under CIPA, when necessary, protective orders are utilized to prevent the release of classified information beyond the parties to the litigation.  *See, e.g.*, 18 U.S.C. app. III § 3; *Pappas*, 94 F.3d at 797; *Musa*, 833 F. Supp. at 758-61.

[37] *See, e.g., Hayden v. NSA*, 608 F.2d 1381 (D.C. Cir. 1979) (NSA statute invoked to withhold information under the FOIA); *Weberman v. NSA*, 490 F. Supp. 9 (S.D.N.Y. 1980) (same); *ACLU v. Dep't of Defense*, 389 F. Supp. 2d 547 (predecessor to DNI statute invoked to withhold information under FOIA).

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW

50

1    distinguish – the government raised the identical statutory argument, and it was flatly rejected.

2    There, as here, the government maintained that a suit challenging the involvement of a private

3    corporation in allegedly unlawful intelligence operations must be dismissed pursuant to 50

4    U.S.C. § 403-1(i)(1).  *Hepting*, 439 F. Supp. 2d at 979, 998.  Judge Walker disagreed, holding

5    that the statute in question, as well another statute invoked by the government, did not "by their

6    terms require[] the court to dismiss this action and it would be premature for the court to do so at

7    this time." *Id.* at 998.  The court explained that, during the course of discovery, the court would

8    consider whether the statutory privileges barred plaintiffs from obtaining "particular evidence,"

9    but it found no basis for outright dismissal of the suit.  *Id.*

10    Similarly, in *Terkel v. AT&T*, a suit challenging a distinct but related aspect of AT&T's

11    alleged involvement in the Executive Branch's domestic intelligence-gathering, the government

12    invoked the statutory privilege under the National Security Act in support of a motion to dismiss.

13    441 F. Supp. 2d 899 (N.D. Ill. 2006).  The court squarely rejected the argument, holding that the

14    statute did "not by itself bar prosecution in this case." *Id.* at 906.  Moreover, the court explained

15    that the plaintiffs, like the plaintiffs here, had sued only a corporation, and had not sought

16    discovery from the government, rendering the statute inapplicable; accordingly, "the statute, by

17    its terms, applies to this case only in that it instructs the Director of National Intelligence to take

18    measures that are available to prevent disclosure regarding intelligence sources and methods --

19    for example, by asserting the state secrets privilege." *Id.*  This, of course, Director Hayden has

20    already done.

21    As plaintiffs have not sought any discovery at all – let alone discovery from the

22    Executive Branch – the government's invocation of this statutory privilege is inapposite, and

23    cannot be invoked to support dismissal of a civil suit against a third party at the pleading stage.

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
51

1

**CONCLUSION**

2        For the forgoing reasons, this Court should deny the United States' motion to dismiss or

3    for summary judgment, and permit this case to proceed.

4

5                                        Respectfully submitted,

6

7                                        _____/s/  Ben Wizner____
8                                        BEN WIZNER, SBN 215724
9                                        STEVEN M. WATT
10                                       STEVEN R. SHAPIRO
11                                       JAMEEL JAFFER
12                                       American Civil Liberties Union
13                                       Foundation
14                                       125 Broad Street, 18th Floor
15                                       New York, NY 10004
16                                       Tel. 212.519.7870
17                                       Fax 212.549.2629
18
19                                       ANN BRICK, SBN 65296
20                                       American Civil Liberties Union
21                                       Foundation of Northern California
22                                       39 Drumm Street
23                                       San Francisco, CA, 94111
24                                       Tel. 415.621.2493
25                                       Fax 415.255.1478
26

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
52

1  *CLIVE STAFFORD-SMITH
2  *ZACHARY KATZNELSON
3  SBN 209489
4  Reprieve
5  PO Box 52742
6  London EC4P 4WS
7  England
8  Tel. +44 (0)207 353 4640
9  Fax +44 (0)207 353 4641
10
11  PAUL HOFFMAN, SBN 71244
12  Schonbrun DeSimone Seplow Harris &
13  Hoffman LLP
14  723 Ocean Front Walk, Suite 100
15  Venice, CA  90291
16  Tel. 310.396.0731, ext. 4
17  Fax 310.399.7040
18
19  HOPE METCALF
20  National Litigation Project
21  Allard K. Lowenstein International
22  Human Rights Clinic
23  Yale Law School
24  127 Wall Street
25  New Haven, CT 06520
26  Tel. 203.432.9404
27  Fax 203.432.9128
28
29  MARGARET SATTERTHWAITE++
30  International Human Rights Clinic
31  Washington Square Legal Services, Inc.
32  New York University School of Law
33  245 Sullivan Street
34  New York, NY. 10012
35  Tel. 212.298.6657
36  Fax. 212.995.4031
37
38
39
40  * For and on behalf of Plaintiff BINYAM MOHAMED only
41  ++ For and on behalf of Plaintiff MOHAMED FARAG AHMAD BASHMILAH only
42
43  On the Brief:  Darryl Li and Amanda Shanor, student law interns, National Litigation Project of
44  the Allard K. Lowenstein International Human Rights Clinic, Yale Law School
45

Memorandum of Plaintiffs in Opposition to United States'
Motion to Dismiss, or, in the Alternative, for Summary Judgment
Case No. C 07-2798-JW
                                    53