STEVEN M. WATT* swatt@aclu.org
BEN WIZNER (SBN 215724) bwizner@aclu.org
JAMEEL JAFFER* jjaffer@aclu.org
STEVEN R. SHAPIRO* sshapiro@aclu.org
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10014
Tel. 212.549-2500 / Fax 212.549.2651

ANN BRICK (SBN 65296) abrick@aclunc.org
ACLU FOUNDATION OF
NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Tel. 415.621.2493 / Fax 415.255.1478

Additional Counsel Listed on Next Page

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| BINYAM MOHAMED;<br>ABOU ELKASSIM BRITEL;<br>AHMED AGIZA;<br>MOHAMED FARAG AHMAD BASHMILAH;<br>BISHER AL-RAWI,<br><br>Plaintiffs,<br><br>v.<br><br>JEPPESEN DATAPLAN, INC.,<br><br>Defendant. | Civil Action No. 5:07-cv-02798 (JW)<br><br>DECLARATION OF ANNA WIGENMARK IN SUPPORT OF PLAINTIFFS' OPPOSITION TO THE UNITED STATES' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT |

Declaration of Anna Wigenmark - C 07-2798-JW

1  CLIVE STAFFORD SMITH*† clivess@mac.com
   ZACHARY KATZNELSON† (SBN 209489) zachary@reprieve.org.uk
2  REPRIEVE
   PO Box 52742
3  London EC4P 4WS
   England
4  Tel. +44 (0)207 353 4640 / Fax +44 (0)207 353 4641
5
   PAUL HOFFMAN (SBN 71244) hoffpaul@aol.com
6  SCHONBRUN DESIMONE SEPLOW
   HARRIS & HOFFMAN LLP
7  732 Ocean Front Walk, Suite 100
   Venice, CA 90291
8  Tel 310.999.7040, ext. 4 / Fax 310.999.7040
9
   HOPE METCALF* hope.metcalf@yale.edu
10 NATIONAL LITIGATION PROJECT
   ALLARD K. LOWENSTEIN INTERNATIONAL
11 HUMAN RIGHTS CLINIC
   YALE LAW SCHOOL
12 127 Wall Street
   New Haven, CT 06520
13 Tel. 203.432.9404 / Fax 203.432.9128
14
   MARGARET L. SATTERTHWAITE*++ satterth@juris.law.nyu.edu
15 INTERNATIONAL HUMAN RIGHTS CLINIC
   WASHINGTON SQUARE LEGAL SERVICES, INC.
16 NEW YORK UNIVERSITY SCHOOL OF LAW
   245 Sullivan Street
17 New York, NY 10012
   Tel. 212-998-6657 / Fax 212-995-4031
18
19 **Attorneys for Plaintiffs BINYAM MOHAMED, ABOU ELKASSIM BRITEL, AHMED
20 AGIZA, MOHAMED FARAG AHMAD BASHMILAH, and BISHER AL-RAWI**
   * **Admitted Pro Hac Vice**
21 † **Attorneys for and on behalf of Plaintiff BINYAM MOHAMED only**
   ++ **Attorney for and on behalf of Plaintiff MOHAMED FARAG AHMAD
22 BASHMILAH only**

I, **ANNA WIGENMARK**, of Stockholm, Sweden, under penalty of perjury under the laws of the United States of America, declare as follows, pursuant to 28 U.S.C. § 1746:

1. I am a Human Rights Lawyer at the Swedish Helsinki Committee for Human Rights and I am familiar with the factual circumstances surrounding the rendition of Mr. Agiza and another Egyptian citizen, Mohamed El Zery, from Sweden to Egypt on December 18, 2001. I am also well acquainted with international legal proceedings filed on their behalf subsequent to their rendition, as well as the findings of official investigations and inquiries conducted into this matter. I was counsel for Mr. El Zery in his individual application to the U.N. Human Rights Committee. Presently, I am representing both Mr. El Zery and Mr. Agiza in negotiations with the Swedish Chancellor of Justice seeking reparations for their illegal expulsion from Sweden. I have full power of attorney for Mr. Agiza and I make this Declaration on his behalf in opposition to the United States Motion to Dismiss, or in the Alternative, Summary Judgment.

2. That Mr. Agiza was removed by the Swedish government from Sweden to Egypt on December 18, 2001, is not in dispute. Attached hereto as Exhibit A is a true and correct copy of the order expelling Mr. Agiza signed by then Minister for Foreign Affairs, Anna Lindh.

3. The specific facts surrounding Mr. Agiza's rendition from Sweden to Egypt on December 18, 2001, including the involvement of agents of the Central Intelligence Agency ("CIA"), are well known by the Swedish public and indeed by thousands of people worldwide. They are as stated in the complaint filed in this matter and, so far

1

as I am aware, his specific allegations concerning involvement of agents of the U.S., Swedish and Egyptian governments in his rendition have never been refuted.

4. Since Mr. Agiza's rendition, the facts of his case have been the subject of numerous inquiries at the universal, regional and national level. At the universal level, the United Nations Committee Against Torture has considered and issued recommendations concerning Mr. Agiza's case. Regionally, investigations have been carried out into Mr. Agiza's rendition by the European Parliament and the Council of Europe. And, on the national level, the Office of the Parliamentary Ombudsman of the Swedish Government and the Swedish Parliament's Standing Committee on the Constitution, have conducted inquiries in to his rendition during which both institutions confirmed that agents of the Swedish, U.S. and Egyptian governments were implicated.

5. On June 25, 2003, Mr. Agiza filed a petition before the United Nations Committee Against Torture (CAT) against Sweden, challenging Sweden's decision to expel him. In its decision issued on May 20, 2005, the CAT found that the expulsion of Mr. Agiza violated, *inter alia*, Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (prohibition against rendition to torture).

6. The CAT was provided with detailed information deriving from the Swedish Minister for Foreign Affairs, including reports from the Swedish Embassy in Cairo and Swedish government *aide memoires*. In arriving at its decision, the Committee considered this information together with submissions made by the Swedish

government on its liability for the expulsion of Mr. Agiza. In its submission the Swedish government made detailed reference to its discussions with the Egyptian government regarding the decision to expel Mr. Agiza from Sweden to Egypt. In addition, the Committee considered U.S. involvement in the matter. Attached hereto as Exhibit B is a true and correct copy of the findings and recommendations of the CAT Committee, *available at*:

http://sim.law.uu.nl/SIM/CaseLaw/fulltextcat.nsf/160f6e7f0fb318e8c1256d410033e0a1/b38dcf2b03d521cac1257021003d2212?OpenDocument

7. Following the Committee's decision, on May 16, 2007, the Swedish government repealed its earlier decision expelling Mr. Agiza from Sweden and referred his request for a residence permit in Sweden to the Swedish Migration Board for examination under the Aliens Act 2005. The Swedish government also referred Mr. Agiza's request for compensation for the injuries he suffered to the government body responsible, the Office of the Chancellor of Justice, instructing the Office to negotiate an agreement with Mr. Agiza on this matter. Attached hereto as Exhibit C is a true and correct copy of a letter dated May 24, 2007, from the Ministry for Foreign Affairs to the Committee Against Torture setting forth this information.

8. A Temporary Committee of the European Parliament established to inquire into the alleged use of European Countries by the CIA for the transportation and illegal detention of prisoners also conducted an inquiry into Mr. Agiza's rendition and issued a report on its findings in January 2007. In sum, in relation to Mr. Agiza's rendition, the European Parliament found that: "the Swedish authorities accepted an (*sic*) US

offer to place at their disposal an aircraft that benefited from special overflight authorisation in order to transport [Mr. Agiza] to Egypt; and "the Swedish security police lost control over the enforcement of the expulsion of Ahmed Agiza [....] to Egypt, outside the rule of law, by remaining passive during the degrading treatment of the men by US agents at Bromma airport." Attached hereto as Exhibit D is a true and correct copy of the relevant paragraphs of the European Parliament resolution on the alleged use of European countries by the CIA for the transportation and illegal detention of prisoners (2006/2200 (INI)), *available at*:

http://www.europarl.europa.eu/comparl/tempcom/tdip/final_report_en.pdf

9. Mr. Agiza's rendition and subsequent detention in Egypt was the subject of a second inter-governmental inquiry carried out by the Council of Europe into alleged secret detentions and unlawful inter-state transfers of detainees involving Council of Europe Member States. In a report published in 2006, the Council of Europe, based on flight records, and other evidence, concluded that the CIA was involved in Mr. Agiza's removal from Sweden to Egypt. Attached hereto as Exhibit E is a true and correct copy of the report of the Council of Europe relative to Mr. Agiza's rendition, *available at*:

http://assembly.coe.int//Main.asp?link=http://assembly.coe.int/Documents/WorkingDocs/doc06/edoc10957.htm?link=/Documents/WorkingDocs/Doc06/EDOC10957.htm

10. In 2004-2005, the Parliamentary Ombudsman of the Swedish Government conducted an inquiry into the rendition of Mr. Agiza and Mr. Mohamed El-Zery. The inquiry was initiated by the Ombudsman to establish: "what occurred at Bromma airport and

4

the manner in which the expulsion of the two Egyptians was carried out." The Ombudsman's report, published on March 22, 2005, focused on: "the actions of the [Swedish] Security Police in connection with the use of public authority by *foreign officials* on Swedish territory and the use of force and coercive measures." (emphasis added).

11. In the course of his inquiry, the Ombudsman interviewed members of the Swedish security police present at Bromma airport during Mr. Agiza's rendition and examined relevant Swedish security police records as well as documentation from the Swedish Ministry for Foreign Affairs and Ministry of Justice. From his examination of this information, the Ombudsman noted that: "Some time before the expulsion decision was made .... the Security Police received an offer from the American Central Intelligence Agency (CIA) of the use of a plane that was said to have what was referred to as direct access so that it could fly over Europe without having to touch down." [¶ 2.4.1.] Quoting from a memorandum drawn up by the Security Police on February 7, 2002, the Ombudsman also noted: "After some consultation with the staff of the Ministry for Foreign Affairs the Foreign Minister then gave approval of the acceptance by SÄPO/RPS of the help offered by the USA for the transport of A. [Mr. Agiza] and E.Z.[Mr. El Zery]" [¶2.4.2.]

12. Referencing official documentation, the report establishes that on the afternoon of December 18, 2001 a Swedish Security Officer met with American officials at Bromma airport to discuss details of Mr. Agiza's rendition later that day and that: "During the meeting it was also said that the security personnel on the plane might be

wearing hoods and that they wished to conduct a security check of A. [Agiza] and E.Z [Mohamed El Zery] before they boarded the plane." [¶2.4.3.] And: "in addition to its crew, a security team of seven or eight, among them a doctor and two Egyptian officials" would be on board. [*Id.*]

13. Based on interviews and his examination of both classified and unclassified government documentation, the Ombudsman in his report details the whole rendition process from beginning to end, including the fact that the men were subjected to a rigorous "security check" by Americans wearing hoods and that two representatives of the Swedish Security Police were on board the aircraft when it took off for Cairo. The report also describes the conditions of the two men during the flight and that upon arrival in Cairo at about 3 a.m., Mr. Agiza and Mr. El Zery "disembarked and were received by Egyptian officials [and] driven off in a transit bus." [*Id.*]

14. The Ombudsman's report contains a very detailed description of the *modus operandi* of Mr. Agiza's rendition: "[Mr. Agiza and Mr. El-Zery] were [...] subjected to a security check at Bromma airport conducted by American officials. As has already been made clear, these checks comprised at least the following elements: 'A. and E.Z. were subjected to body-searches, their clothes were cut to pieces and placed in bags, their hair was thoroughly examined, as were their oral cavities and ears. In addition they were handcuffed and their ankles fettered, dressed in overalls and photographed. Finally loose hoods without holes for their eyes were placed over their heads. A. and E.Z. were then taken out of the police station in bare feet and conveyed to the aircraft

6

where they were laid on mattresses to which they were strapped. The hoods, handcuffs and fetters were not removed during the flight to Egypt.'" [¶ 3.2.2.]

15. In conclusion, the Ombudsman determined that: "The Swedish Security Police officers remained in the background while the American officials exercised public authority on their own by, for instance, adopting coercive measures such as body-searches, physical examination and some degree of force in the use of fetters and handcuffs." [¶ 3.1.2.] and that: "American security officials did not merely assist the [Swedish] Security Police in their enforcement but that in reality they took over and were in control from the moment of their arrival at Bromma airport." [¶3.1.1.]

16. The Ombudsman concludes that in the circumstances agents of the United States and Swedish governments violated Swedish criminal law by subjecting Mr. Agiza to "degrading and humiliating treatment" and by exercising police powers on Swedish soil without legal authority to do so. Attached hereto as Exhibit F is a true and correct copy of the report of the Office of the Parliamentary Ombudsman of the Swedish Government, *available at*:

http://www.jo.se/Page.aspx?MenuId=106&MainMenuId=106&Language=en&ObjectClass=DynamX_SFS_Decision&Id=1662]

17. The Swedish Parliament's Standing Committee on the Constitution also inquired into the Swedish government's handling of Mr. Agiza's rendition, and in particular, whether the government knew and approved of CIA involvement. In its report on the inquiry, the Standing Committee concluded that Swedish government actions violated Swedish immigration laws, and specifically, the Alien's Act, prohibiting the transfer

7

of anyone from Sweden to a country where there is a substantial likelihood of his being subjected to torture. Attached hereto as Exhibit G is a true and correct copy of an English translation of the summary of the conclusions of the Standing Committee on the Constitution.

18. During the hearing, and as recorded in the official report of the proceedings, the Administrative Director of the Swedish security services, Mr. Arne Andersson, stated that Swedish security police fully informed the then Minister for Foreign Affairs about the CIA-involvement in the rendition. Attached hereto as Exhibit H is a true and correct copy of an unofficial English translation of Mr. Arne Andersson's testimony before the Standing Committee.

19. Members of the Standing Committee also interviewed senior Swedish government officials. In response to questions concerning Egyptian and American government involvement in Mr. Agiza's rendition, the State Secretary at the Ministry for Foreign Affairs, Ms. Gun-Britt Andersson, confirmed that an agreement had been reached between Sweden and the Head of Egyptian security regarding Mr. Agiza's removal to Egypt. The political Director at the Ministry for Foreign Affairs, Mr. Sven-Olof Pettersson was also interviewed by the Committee. He confirmed that U.S. officials had assisted in the process of convincing Egypt to accept return of its citizens from Sweden.

20. Mr. Petersson disclosed also that it was American intelligence agencies that had initially provided the Swedish government with information on Mr. Agiza and Mr. El Zery and in the course of a telephone conversation with Ms. Gillian Milovanovic, an

official from the American Embassy in Stockholm, Ms. Milovanovic had expressed her concern that the two men may not be under constant surveillance by Security Police. Attached hereto as Exhibit I is a true and correct copy of an unofficial English translation of the testimony of Sven-Olof Petersson before the Standing Committee on the Constitution Swedish Parliament.

21. Flight records obtained in the course of the aforementioned inquiries conducted by the European Parliament and Council of Europe confirm CIA involvement in Mr. Agiza's rendition. Both institutions separately identify that a Gulfstream aircraft with the registration number N379P was involved in his transportation to Egypt, and that this aircraft was owned and operated by agents of the CIA. The European Parliament and Council of Europe both also note the same itinerary for this aircraft. Attached hereto as Exhibit J are true and correct copies of the flight records for N379P for December 18, 2001, referenced by the European Parliament and Council of Europe.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 10th day of Dec 2007.

Anna Wigenmark

9

Declaration of Anna Wigenmark - C 07-2798-JW