# EXHIBIT B

| UNITED NATIONS | CAT |
|---|---|

 **Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment**

Distr.

GENERAL

CAT/C/34/D/233/2003
24 May 2005

Original: ENGLISH

Committee Against Torture
Thirty-fourth session
2 - 21 May 2005

Decisions of the Committee Against Torture under article 22 of the

Convention against Torture and Other Cruel,

Inhuman or Degrading Treatment or Punishment

- Thirty-fourth session

**Communication No. 233/2003 ***

Submitted by: Mr. Ahmed Hussein Mustafa Kamil Agiza (represented by counsel, Mr. Bo Johansson, of the Swedish Refugee Advice Centre)

Alleged victim: The complainant

State party: Sweden

Date of complaint: 25 June 2003

The Committee against Torture, established under Article 17 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,

Meeting on 20 May 2005,

Having considered complaint No. 233/2003, submitted to the Committee against Torture by Mr. Ahmed Hussein Mustafa Kamil Agiza, under article 22 of the Convention against Torture and Other

Cruel, Inhuman or Degrading Treatment or Punishment,

Having taken into account all information made available to it by the complainant and the State party,

Adopts the following decision:

### Decision of the Committee under article 22, paragraph 7, of the Convention

1.1 The complainant is Ahmed Hussein Mustafa Kamil Agiza, an Egyptian national born on 8 November 1962, detained in Egypt at the time of submission of the complaint. He claims that his removal by Sweden to Egypt on 18 December 2001 violated article 3 of the Convention. He is represented by counsel, who provides as authority to act a letter of authority issued by the complainant's father. The complainant himself, detained, is allegedly not allowed to sign any documents for external purposes without special permission from the Egyptian State prosecutor, and according to counsel such a permit cannot be expected.

### The facts as presented

2.1 In 1982, the complainant was arrested on account of his family connection to his cousin, who had been arrested for suspected involvement in the assassination of the former Egyptian President, Anwar Sadat. Before his release in March 1983, he was allegedly subjected to torture. The complainant, active at university in the Islamic movement, completed his studies in 1986 and married Ms. Hannan Attia. He avoided various police searches, but encountered difficulties, such as the arrest of his attorney, when he brought a civil claim in 1991 against the Ministry of Home Affairs, for suffering during his time in prison.

2.2 In 1991, the complainant left Egypt for Saudi Arabia on security grounds, and thereafter to Pakistan, where his wife and children joined him. After the Egyptian embassy in Pakistan refused to renew their passports, the family left in July 1995 for Syria under assumed Sudanese identities, in order to continue to Europe. This plan failed and the family moved to Iran, where the complainant was granted a university scholarship.

2.3 In 1998, the complainant was tried in Egypt for terrorist activity directed against the State before a "Superior Court Martial" in absentia, along with over one hundred other accused. He was found guilty of belonging to the terrorist group "Al Gihad", and was sentenced, without possibility of appeal, to 25 years' imprisonment. In 2000, concerned that improving relations between Egypt and Iran would result in his being returned to Egypt, the complainant and his family bought air tickets, under Saudi Arabian identities, to Canada, and claimed asylum during a transit stop in Stockholm, Sweden, on 23 September 2000.

2.4 In his asylum application, the complainant claimed that he had been sentenced to "penal servitude for life" in absentia on account of terrorism linked to Islamic fundamentalism, **(1)** and that, if returned, he would be executed as other accused in the same proceedings allegedly had been. His wife contended that, if returned, she would be detained for many years, as the complainant's wife. On 23 May 2001, the Migration Board sought the opinion of the Swedish Security Police on the case. On 14 September 2001, the Migration Board held a "major enquiry" with the complainant, with a further enquiry following on 3 October 2001. During of the same month, the Security Police questioned the complainant. On 30 October 2001, the Security Police advised the Migration Board that the complainant held a leading position in an organisation guilty of terrorist acts and was responsible for the activities of the organisation. The Migration Board thus forwarded the complainant's case, on 12 November 2001, to the Government for a strength of the

decision under chapter 7, section 11(2)(2), of the Aliens Act. In the Board's view, on the information before it, the complainant could be considered entitled to claim refugee status; however, the Security Police's assessment, which the Board saw no reason to question, pointed in a different direction. The balancing of the complainant's possible need for protection against the Security Police's assessment, thus had to be made by the Government. On 13 November 2001, the Aliens Appeals Board, whose view the Government had sought, shared the Migration Board's assessment of the merits and also considered that the Government should decide the matter. In a statement, the complainant denied belonging to the organisation referred to in the Security Police statement, arguing that one of the designated organisations was not a political organisation but an Arab-language publication. He also claimed that he had criticised Usama Bin Laden and the Afghan Taliban in a letter to a newspaper.

2.5 On 18 December 2001, the Government rejected the asylum applications of the complainant and of his wife. The reasons for these decisions are omitted from the text of this decision at the State party's request and with the agreement of the Committee. Accordingly, it was ordered that the complainant be deported immediately and his wife as soon as possible. On 18 December 2001, the complainant was deported, while his wife went into hiding to avoid police custody.

2.6 On 23 January 2002, the Swedish Ambassador to Egypt met the complainant at Mazraat Tora prison outside Cairo. **(3)** The same day, the complainant's parents visited him for the first time. They allege that they when they met him in the warden's office, he was supported by an officer and near breakdown, hardly able to shake his mother's hand, pale and in shock. His face, particularly the eyes, and his feet were swollen, with his cheeks and bloodied nose seemingly thicker than usual. The complainant allegedly said to his mother that he had been treated brutally upon arrest by the Swedish authorities. During the eight hour flight to Egypt, in Egyptian custody, he allegedly was bound by hands and foot. Upon arrival, he was allegedly subjected to "advanced interrogation methods" at the hand of Egyptian state security officers, who told him the guarantees provided by the Egyptian Government concerning him were useless. The complainant told his mother that a special electric device with electrodes connected to his body was utilized, and that electric shocks were utilized if he did not respond properly to orders.

2.7 On 11 February 2002, a correspondent for Swedish radio visited the complainant in prison. According to him, the complainant walked with difficulty but he could not see any sign of torture. In response to a question by counsel, the correspondent stated that he had explicitly asked the complainant if he had been tortured, and that he had replied that he could not comment. After the initial visit, the Ambassador or other Swedish diplomats were permitted to visit the complainant on a number of occasions. Counsel states that what can be understood from the diplomatic dispatches up to March 2003, is that the complainant had been treated "relatively well", and that he had not been subjected to torture even if the prison conditions were harsh.

2.8 On 16 April 2002, the complainant's parents again visited him. He allegedly told his mother that after the January visit further electric shocks had been applied, and that for the last ten days he had been held in solitary confinement. His hands and legs had been tied, and he had not been allowed to visit a toilet. At a following visit, he told his parents that he was still in solitary confinement but no longer bound. He was allowed to visit a toilet once a day, and the cell was cold and dark. With reference to a security officer, he was said to have asked his mother, "do you know what he does to me during the nights?" He had also been told that his wife would soon be returned to Egypt and that she and his mother would be sexually assaulted in his presence. Thereafter, the complainant's parents visited him once a month until July 2002 and then every fortnight. According to counsel, the information available is that he is held in a two square meter cell, which is artificially cooled, dark and without a mattress to sleep on. His toilet visits are said to be restricted.

2.9 In December 2002, the complainant's Egyptian lawyer, Mr. Hafeez Abu Saada, the head of an Egyptian human rights organization with knowledge of local conditions of detention and interrogation methods, met in Cairo with Mr. Thomas Hammarberg, head of the Olaf Palme

International Centre. Mr. Abu Saada expressed his belief that the complainant had been subjected to torture.

2.10 On 5 March 2003, the Swedish Ambassador met the complainant with a human rights envoy from the Swedish Ministry of Foreign Affairs. The complainant allegedly stated for the first time that he had been subjected to torture. In response to the question as to why he had not mentioned this before, he allegedly responded, "It does no longer matter what I say, I will nevertheless be treated the same way".

**The complaint**

3.1 Counsel claims that the reason that he lodged the complainant over one and a half years after the complainant's removal was that for a long period it was uncertain who was able to represent him. Counsel contends that the original intention had been for lawyer who had represented the complainant in domestic proceedings in Sweden to submit the complaint; "due to the circumstances", that lawyer found himself "unable to fulfill the commission" and transferred the case to present counsel "some months ago". Counsel adds that it had been difficult to obtain the complainant's personal consent to lodge a complaint.

3.2 As to the merits, counsel argues that the complainant's removal to Egypt by Sweden violated his right under article 3 of the Convention. He bases this proposition both on what was known at the time the complainant was expelled, as viewed in the light of subsequent events. He contends that it has been satisfactorily established that the complainant was in fact subjected to torture after his return.

3.3 Counsel argues that torture is a frequently used method of interrogation and punishment in Egypt, particularly in connection with political and security matters, and that accordingly the complainant, accused of serious political acts, was at substantial risk of torture. In counsel's view, the State party must have been aware of this risk and as a result sought to obtain a guarantee that his human rights would be respected. Counsel emphasizes, however, that no arrangements had been made prior to expulsion as to how the guarantees in question would be implemented after the complainant's return to Egypt. Counsel refers to the judgment of the European Court of Human Rights in <u>Chahal v. United Kingdom</u>, **(3)** where the Court found a guarantee provided by the Indian government to be, of its own, insufficient protection against human rights violations.

3.4 Subsequent events are said to bear out this view. Firstly, Amnesty International expressed concerns about the complainant's situation in communiqués dated 19 and 20 December 2001, 10, 22 January, and 1 February 2002. Secondly, the conclusions drawn by the State party as a result of its visits should be discounted because they took place in circumstances which were deficient. In particular, the visits were short, took place in a prison which is not the one where the complainant was actually detained, were not conducted in private and without the presence of any medical practitioners or experts. Thirdly, independent evidence tends to corroborate that torture did occur. Weight should be attached to the complainant's parents' testimony as, although supervised, not every word was recorded as it was with the official visits and there was opportunity for him to share sensitive information, especially when bidding his mother farewell. In the course of these visits, supervision lessened, with persons entering and leaving the room. Counsel argues it would not be in the parents' or the complainant's interests for them to have overrepresented the situation, as this would needlessly put him at risk of prejudicial treatment as well as distress the complainant's family still in Sweden. In addition, the parents, elderly persons without political motivation, would thereby be placing themselves at risk of reprisal.

3.5 Furthermore, the complainant's Egyptian lawyer is well qualified to reach his conclusion, after meeting with the complainant, that he had been tortured. Mr. Hammarberg, for his part, considers this testimony reliable. In advice dated 28 January 2003 provided by Mr. Hammarberg to counsel, the former considered that there was prima facie evidence of torture. He was also of the view that

there were deficiencies in the monitoring arrangements implemented by the Swedish authorities, given that during the first weeks after return there were no meetings, while subsequent meeting were neither in private nor with medical examinations undertaken.

3.6 For counsel, the only independent evidence on the question, that of the radio correspondent's visit, confirms the above conclusions, as the complainant declined to answer a direct question as to whether he had been tortured. He would not have done this had he not feared further reprisals. The complainant also informed the Swedish Ambassador directly on 5 March 2003 that he had been subjected to torture, having by that point allegedly given up any hope that the situation would change.

3.7 Counsel concludes that the complainant's ability to prove torture has been very limited, though he has done his best to inform on his experiences in prison. He has been unable to present a full statement of his experiences or corroborative evidence such as medical reports.

**The State party's submissions on the admissibility and merits of the complaint**

4.1 By submission of 5 December 2003, the State party contests both the admissibility and the merits of the complaint. It regards complaint as inadmissible (i) for the time elapsed since the exhaustion of domestic remedies, (ii) as an abuse of process, and (iii) as manifestly ill-founded.

4.2 While accepting that neither the Convention not the Committee's case law prescribe a definitive timeframe within which a complaint must be submitted, the State party submits that in light of the content of Rule 107(f) of the Committee's rules of procedure, this cannot mean that a complaint could <u>never</u> be time-barred. The State party refers to the six month limit applicable to cases submitted to the European Court of Human Rights, including with respect to expulsion cases arising under article 3 of the European Convention, and the strong rationale of legal certainty for both complainants and States underlying that rule. The State party argues that this principle of legal certainty must be considered as one of the fundamental principles inherent in the international legal order. As the Convention as well as the European Convention are both important parts of international human rights law, it would be natural for one regime to seek guidance from another on an issue on which the former is silent. In view of Rule 107(f) of the Committee's Rules, **(4)** therefore, a six-month limit could arguably serve as a point of departure for the Committee.

4.3 With respect to the present case, the State party argues that no convincing information has been provided for the delay of over one and a half years in submission of the complaint. As counsel derives his authority to act from the complainant's father rather than the complainant himself, there is no reason why this could not have been obtained at an earlier stage. Nor does it appear that any attempt was made shortly after expulsion to obtain authority to act from this or another relative, such as the complainant's wife in Sweden. The State party refers to the complaint submitted by the same counsel on behalf of the complainant's wife in December 2001, **(5)** where it was argued that her situation was so closely linked to that of the present complaint that it was impossible to argue her case without referring to his. The arguments advanced in her case show that counsel was well acquainted with the circumstances presently invoked, and he should not be allowed to argue that the delay was due to his involvement with the family's case until a much later stage. There is, in the State party's view, no reason why the present complainant could not have been included in the first complaint submitted in December 2001. Accordingly, the State party argues that in the interests of legal certainty, the time that has elapsed since exhaustion of domestic remedies is unreasonably prolonged, and the complaint is inadmissible pursuant to article 22, paragraph 2, of the Convention and Rule 107(f).

4.4 The State party also argues that the complaint discloses an abuse of the right of submission, disputing whether the complainant can be considered to have justifiable interest in having his complaint considered by the Committee. The factual basis of the current complaint is the same as that submitted on his wife's behalf in December 2001, **(6)** with the crucial issue in both cases

relating to the guarantees issued by the Egyptian authorities prior to and for the purpose of the expulsion of the complainant and his family. In its decision on that case, after having assessed the value of the guarantees and finding no violation of the Convention, the Committee already dealt with the very issue raised by the present complaint. The issue should accordingly be considered *res judicata*.

4.5 Furthermore, within the framework of the proceedings concerning the complaint by the complainant's wife, the same extensive information has been submitted concerning his past activities, present whereabouts and conditions of detention. As both complaints were submitted by the same counsel, the present complaint places an unnecessary burden both on the Committee and the State party. Accordingly, the complainant does not have a demonstrable interest in having his complaint examined by the Committee. It should thus be regarded as an abuse of the right of submission and inadmissible pursuant to article 22, paragraph 2, of the Convention and Rule 107 (b). **(7)**

4.6 Finally, the State party considers the complaint manifestly unfounded, as the complainant's claims fail to rise to the basic level of substantiation required in light of the arguments on the merits set out below. It should thus be declared inadmissible under article 22, paragraph 2, of the Convention and Rule 107(b).

4.7 On the merits, the State party sets out the particular mechanisms of the Aliens Act 1989 applicable to cases such as the complainant's. While asylum claims are normally dealt with by the Migration Board and, in turn, the Aliens Appeals Board, under certain circumstances either body may refer the case to the Government, while appending its own opinion. This constellation arises if the matter is deemed to be of importance for the security of the State or otherwise for security in general, or for the State's relations with a foreign power (chapter 7, section 11(2)(2), of the Act). If the Migration Board refers a case, it must first be forwarded to the Aliens Appeals Board which provides its own opinion on the case.

4.8 An alien otherwise in need of protection on account of a well-founded fear of persecution at the hand of the authorities of another State on account of a reason listed in the Convention on the Status of Refugees (under chapter 3, section 2, of the Act) may however be denied a residence permit in certain exceptional cases, following an assessment of that alien's previous activities and requirements of the country's security (chapter 3, section 4 of the Act). However, <u>no</u> person at risk of torture may be refused a residence permit (chapter 3, section 3 of the Act). In addition, if a person has been refused a residence permit and has had an expulsion decision issued against him or her, an assessment of the situation at the enforcement stage must be made to avoid that an individual is expelled to face, inter alia, torture or other cruel, inhuman or degrading treatment or punishment.

4.9 The State party recalls UN Security Council Resolution 1373 of 28 September 2001, which enjoins all UN Member States to deny safe haven to those who finance, plan, support or commit terrorist acts, or themselves provide safe haven. The Council called on Member States to take appropriate measures, consistent with international human rights and refugee law, to ensure asylum seekers have not planned, facilitated, or participated in, terrorist acts. It also called upon Member States to ensure, in accordance with international law, that the institution of refugee status is not abused by perpetrators, organizers or facilitators of terrorist acts. In this context, the State party refers to the Committee's statement of 22 November 2001, in which it expressed confidence that responses to threats of international terrorism adopted by States parties would be in conformity with their obligations under the Convention.

4.10 The State party also recalls the interim report **(8)** submitted in July 2002 by the Special Rapporteur of the Commission on Human Rights on the question of torture and other cruel, inhuman or degrading treatment or punishment, submitted in accordance with resolution 56/143 of 19 December 2001. In his report, the Special Rapporteur urged States "to ensure that in all

appropriate circumstances the persons they intend to extradite, under terrorist or other charges, will not be surrendered unless the Government of the receiving country has provided an unequivocal guarantee to the extraditing authorities that the persons concerned will not be subjected to torture or any other forms of ill-treatment upon return, and that a system to monitor the treatment of the persons in question has been put into place with a view to ensuring that they are treated with full respect for their human dignity" (paragraph 35).

4.11 As to the facts of the present case, the State party details the information obtained by its Security Police, which led it to regard the complainant as a serious security threat. At the State party's request, this information, while transmitted to counsel for the complainant in the context of the confidential proceedings under article 22 of the Convention, is not set out in the Committee's public decision on the present complaint.

4.12 The State party observes that on 12 December 2001, after referral of the case from the Migration and Aliens Appeals Boards, a state secretary of its Ministry of Foreign Affairs met with a representative of the Egyptian government in Cairo. At the State party's request and with the Committee's agreement, details of the identity of the interlocutor are deleted from the text of the decision. As the State party was considering to exclude the complainant from protection under the Refugee Convention, the purpose of the visit was to determine the possibility, without violating Sweden's international obligations, including those arising under the Convention, of returning the complainant and his family to Egypt. After careful consideration of the option to obtain assurances from the Egyptian authorities with respect to future treatment, the State party's government concluded it was both possible and meaningful to inquire whether guarantees could be obtained to the effect that the complainant and his family would be treated in accordance with international law upon return to Egypt. Without such guarantees, return to Egypt would not be an alternative. On 13 December 2002, requisite guarantees were provided.

4.13 The State party then sets outs in detail its reasons for refusing, on 18 December 2001, the asylum claims of the complainant and his wife. These reasons are omitted from the text of this decision at the State party's request and with the agreement of the Committee.

4.14 The State party advises that the complainant's current legal status is, according to the Egyptian Ministries of Justice and Interior, that he presently serves a sentence for his conviction, in absentia, by a military court for, among other crimes, murder and terrorist activities. His family provided him with legal representation, and in February 2002, a petition for review of the case was filed with the President. By October 2002, this had been dealt with by the Ministry of Defence and would soon be handed to the President's office for decision. Turning to the monitoring of the complainant's situation after his expulsion, the State party advises that his situation has been monitored by the Swedish embassy in Cairo, mainly by visits approximately once every month. As of the date of submission, there had been seventeen visits. **(9)** On most occasions, visitors have included the Swedish Ambassador, and several on other visits a senior official from the Ministry of Foreign Affairs.

4.15 According to the embassy, these visits have over time developed into routine, taking place in the prison superintendent's office and lasting an average 45 minutes. At no time has the complainant been restrained in any fashion. The atmosphere has been relaxed and friendly, with the visitors and the complainant being offered soft drinks. At the end of the June 2002 visit, embassy staff observed the complainant in seemingly relaxed conversation with several prison guards, awaiting return to detention. At all times he has been dressed in clean civilian clothes, with well-trimmed beard and hair. He appeared to be well-nourished and not to have lost weight between visits. At none of the visits did he show signs of physical abuse or maltreatment, and he was able to move around without difficulty. At the request of the Ambassador, in March 2002, he removed his shirt and undershirt and turned around, disclosing no sign of torture.

4.16 In the embassy's report of the first (January 2002) visit, the complainant did not seem to

hesitate to speak freely, and told the Ambassador that he had no complaints as to his treatment in prison. Asked whether he had been subjected to any kind of systematic abuse, he made no claim to such effect. When asked during the April 2002 visit whether he had been in any way maltreated, he noted that he had not been physically abused or otherwise maltreated. During most visits he had complaints concerning his general health, concerning a bad back, gastric ulcer, kidney infection and thyroid gland, causing inter alia sleeping problems. He had seen a variety of internal and external medical specialists, and had had an MRI spinal examination, physiotherapy for his back and an X-ray thyroid gland examination. The X-ray revealed a small tumour for which he will undergo further tests. In August 2003, he expressed to the Ambassador, as he had done before, his satisfaction with the medical care received. At the November 2003 visit, he advised that a neurologist had recommended a back operation. He has received regular medication for various health problems.

4.17 During the May and November 2002 visits, the complainant remarked adversely about the general conditions of detention. He referred to the absence of beds or toilets in the cell, and that he was being held in a part of the prison for unconvicted persons. According to him, this generally improved after December 2002, when he was no longer kept apart from other prisoners and could walk in the courtyard. In January 2003, he was moved on health grounds to a part of the prison with a hospital ward. In March 2003, in response to a question, he said he was treated neither better nor worse than other prisoners; general prison conditions applied. At no subsequent visits did he make such complaints.

4.18 On 10 February 2002, that is at an early stage of detention, the Swedish national radio reported on a visit by one of its correspondents with the complainant in the office of a senior prison official. He was dressed in dark-blue jacket and trousers, and showed no external signs of recent physical abuse, at least on his hands or face. He did have some problems moving around, which he ascribed to a long-term back problem. He complained about not being allowed to read and about lack of a radio, as well as lack of permission to exercise.

4.19 Further issues that have been brought up regularly between the complainant and embassy staff are visits from family and lawyers. Following the June 2002 visit, a routine of fortnightly family visits appeared to have been established. At the time of submission this routine continued, though visits in May and June 2003 were restricted for security reasons. The complainant remarked that he had only received two visits from his lawyer, in February and March 2002. He had not requested to see his lawyer as he considered it meaningless. This issue was raised in the embassy's follow-up meetings with Egyptian government officials, who affirmed that the complainant's lawyer is free to visit and that no restrictions apply.

4.20 As the complainant on several occasions and in reply to direct questions, stated he had not suffered abuse, the Ambassador concluded after the November 2002 visit that, although the detention was mentally trying, there was no indication that the Egyptian authorities had breached the guarantees provided. The State party details certain allegations subsequently made by the complainant and the actions it took in response thereto. At the request of the State party and with the Committee's agreement, details of these matters are not included in the text of this decision.

4.21 As to the application of the Convention, the State party observes that the present case differs from most article 3 complaints before the Committee in that the expulsion has already taken place. The wording of article 3 of the Convention however implies that the Committee's examination of the case must focus on the point in time when the complainant was returned to his country of origin. Events that have taken place or observations made thereafter may naturally be of interest in establishing whether the guarantees provided have been respected, and this bears on the assessment of the State party's Government that the complainant would not be treated contrary to the Convention was in fact correct. But while such developments are relevant, the State party maintains that the principal question in the current complaint is whether or not its authorities had reason to believe, at the time of the complainant's expulsion on 18 December 2001, that

substantial grounds existed for believing him to be at risk of torture.

4.22 The State party refers to the Committee's constant jurisprudence that an individual must show a foreseeable, real and personal risk of torture. Such a risk must rise beyond mere theory or suspicion, but does not have to be highly probable. In assessing such a risk, a standard which is incorporated into Swedish law, the guarantees issued by the Egyptian government are of great importance. The State party recalls the Committee's decision on the complaint presented by the complainant's wife where the same guarantees were considered effective, **(10)** and refers to relevant decisions of the European organs under the European Convention on Human Rights.

4.23 In <u>Aylor-Davis v. France</u> (judgment of 20 January 1994), it was held that guarantees from the receiving country, the United States, were found to eliminate the risk of the applicant being sentenced to death. The death penalty could only be imposed if it was actually sought by the State prosecutor. By contrast, in <u>Chahal v. United Kingdom</u>, the Court was not persuaded that assurances from the Indian government that a Sikh separatist "would enjoy the same legal protection as any other Indian citizen, and that he would have no reason to expect mistreatment of any kind at the hand of the Indian authorities" would provide an adequate guarantee of safety. While not doubting the Indian government's good faith, it appeared to the Court that despite the efforts *inter alia* of the Indian government and courts to bring about reform, violations of human rights by members of the security forces in Punjab and elsewhere in India remained a recurrent problem. The case law thus suggests that guarantees may be accepted where the authorities of the receiving State can be assumed to have control of the situation.

4.24 Applying this test, the State party argues that the current case is more in line with <u>Aylor-Davis</u>. The guarantees were issued by a senior representative of the Egyptian government. The State party points out that if assurances are to have effect, they must be issued by someone who can be expected to be able to ensure their effectiveness, as, in the State party's view, was presently the case in light of the Egyptian representative's senior position. In addition, during the December 2001 meeting between the Swedish state secretary and the Egyptian official, it was made clear to the latter what was at stake for Sweden: as article 3 of the Convention is of absolute character, the need for effective guarantees was explained at length. The state secretary reaffirmed the importance for Sweden to abide by its international obligations, including the Convention, and that as a result specific conditions would have to be fulfilled in order to make the complainant's expulsion possible. It was thus necessary to obtain written guarantees of fair trial, that he would not be subjected to torture or other inhuman treatment, and that he would not be sentenced to death or executed. The trial would be monitored by the Swedish embassy in Cairo, and it should be possible to visit the complainant, even after conviction. Moreover, his family should not be subjected to any kind of harassment. It was made clear that Sweden found itself in a difficult position, and that Egypt's failure to honour the guarantees would impact strongly on other similar European cases in the future.

4.25 The State party expands on the details of these guarantees. They are omitted from the text of this decision at the request of the State party, and with the consent of the Committee. The State party points out that the guarantees are considerably stronger than those provided in <u>Chahal</u> and are couched much more affirmatively, in positive terms of prohibition. The State party recalls that Egypt is a State party to the Convention, has a constitutional prohibition on torture and acts of, or orders to torture, are serious felonies under Egyptian criminal law.

4.26 For the State party, it is of interest in assessing the complaint whether the guarantees have been and are being respected. It recalls the allegations of ill-treatment made by the complainant's mother, and subsequently by non-governmental organisations, including the mother's description of his physical condition at her first visit on 23 January 2002. The State party's Ambassador's visit the same day immediately followed the mother's visit, and the Ambassador observed no signs of physical abuse. As observed, he seemed to speak freely, made no complaints about torture, and in response to a direct question on systematic abuse in prison, made no claim to that effect. The

State party thus argues the allegation of ill-treatment on that date has been effectively refuted by its Ambassador's observations.

4.27 The State party asserts that judging from the numerous reports provided by the Ambassador, embassy staff and the senior official of its Ministry of Foreign Affairs, the guarantees provided have proved effective vis-à-vis the complainant. Allegations made by him to the contrary have not been substantiated, and on numerous occasions, he confirmed to the Swedish Ambassador that he had not been tortured or ill-treated. The allegations of March 2003 were refuted by the Egyptian authorities. The complainant receives the medical care he requires as a result of his health problems, and legal assistance has been provided to him by his family. That his lawyer so far may not have taken sufficient action to achieve review of sentence is of no relevance to the current complaint. In addition, his family visits him regularly. On the whole, considering the inherent constraints of detention, the complainant appears to be in fairly good health. The State party concludes that as the allegations of torture have not been substantiated, they cannot form the basis of the Committee's assessment of the case. The State party also points out that the case has been widely reported in national media and has received international attention. The Egyptian authorities can be assumed to be aware of this, and are likely to ensure as a result he is not subjected to ill-treatment.

4.28 The State party recalls that in its decision on the complaint of the complainant's wife, **(11)** the Committee appeared to make a prognosis for her in the light of the information about the effectiveness of the guarantees regarding her husband, the present complainant, to whom she had linked her case solely on the basis of her relationship to him. The Committee declared itself "satisfied by the provision of guarantees against abusive treatment" and noted that they were "regularly monitored by the State party's authorities *in situ*." It went on to observe that Egypt "is directly bound properly to treat prisoners within its jurisdiction." In the State party's view, therefore, the Committee's conclusion that she had not made out a breach of article 3 in her complaint is of "essential importance" to the present complaint.

4.29 In conclusion, the State party argues that by obtaining the guarantees in question from the competent Egyptian official, it lived up to its commitments under the Convention while at the same time as fulfilling its obligations under Security Council Resolution 1373. Prior to expelling the complainant, appropriate guarantees were obtained from the official best placed to ensure their effectiveness. The guarantees correspond in content to the requirements of the Special Rapporteur (see paragraph 4.10 above), while a monitoring mechanism was put into place and has been functioning for almost two years. Therefore, the complainant has not substantiated his claims that the guarantees have, in practice, not been respected. Should the Committee come to another conclusion, the crucial question is what the State party's Government had reason to believe at the time of the expulsion. As the complainant has not substantiated his claim under article 3, his removal to his country of origin was not in breach of that provision.

**Counsel's comments on the State party's submissions**

5.1 By letter of 21 January 2004, counsel disputed the State party's submissions both on admissibility and merits. On the State party's arguments concerning timely submission of the complaint, he argues that it was unclear for a long period who was entitled to represent the complainant. Counsel argues that his prior lawyer had been unable to arrange for a power of attorney to be signed prior to the complainant's rapid removal, and that the prior lawyer considered his responsibilities at an end once the complainant had been removed. Counsel argues that once the complainant had been removed and could not be consulted directly, it was necessary to obtain more information about his situation, before carefully evaluating, together with his parents, whether it would be productive to file a complaint on his behalf. Counsel argues that the circumstances in the complaint brought by the complainant's wife were "completely different", as she had remained in Sweden and thus an urgent communication was necessary in order to prevent

removal. In the present case, the complainant had already been expelled, and there was no urgent need to submit the complaint before a careful evaluation of its substance. He also points out that the six-month limit for submission refers only to complaints presented under the European Convention, and that there is no difficulty in the existence of different treaty regimes. In any case, counsel argues that the issue of principle before the Committee in terms of the satisfactory protection afforded by diplomatic assurances is so important that it should consider the case rather than declare it inadmissible.

5.2 Counsel denies that the complaint constitutes an abuse of the right of submission. While conceding that many of the "basic factors" in the cases of the complainant and his wife are the same and that the circumstances "coincide to a considerable degree", the current complainant is the individual at most serious risk of torture. His wife, who by contrast based her claim simply as a close relative to a person sought for terrorist activities, is in a subsidiary position facing a less serious risk than her husband. As a result there are "major differences" between the two cases and the complaint should thus not be declared inadmissible on this ground. Counsel also rejects the characterisation of the case as manifestly ill-founded.

5.3 On the merits, counsel refers, for a general picture of the gross, flagrant and widespread use of torture by Egyptian authorities to reports of several human rights organizations. The human rights report of the Swedish Ministry of Foreign Affairs itself refers to frequent torture by Egyptian police, especially in terrorism-related investigations. Counsel argues that the complainant was not involved in any terrorist activities, and rejects any applicability of Security Council Resolution 1373. In any event, this resolution could not override other international obligations such as the Convention. Counsel denies that the complainant participated in terrorist activities, including through those organisations that the Security Police claimed he was involved in. In any case, allegations of involvement with terrorist organisations would only have served to heighten the existing interest of the Egyptian authorities in the complainant, an individual convicted of terrorist offences, and this aggravating circumstance exacerbating the risk of torture should have been considered by the State party prior to expelling him.

5.4 For counsel, the key issue is not whether a guarantee was given by a government official, but rather whether it can be implemented and, if so, how. The guarantee in question was obtained at short notice, vague in its terms and provided no details on how the guarantees would be given effect with respect to the complainant; nor did the Egyptian government provide, or the Swedish authorities request, any such information. Neither did the Swedish authorities conceive an effective and durable arrangement for monitoring, conducting the first visit over a month after the complainant's removal. This arrangement, coming shortly after the Committee had requested interim measures of protection with respect to the complainant's wife, appeared to be an ad hoc reaction rather than part of a properly conceived monitoring plan. Counsel reiterates his criticisms of the effectiveness of the monitoring arrangements, observing that standard routines in such cases applied by organisations such as the International Committee of the Red Cross had not been met. In addition, the Swedish authorities apparently did not seek to call any medical expertise, particularly after the complainant's direct allegation of torture in March 2003. Counsel contends that differences between the complainant's testimony to his parents on one hand, and to Swedish authorities, unknown to him and accompanied by Egyptian authorities, on the other, are explicable.

5.5 Counsel criticizes the Committee's decision on the complaint presented by the complainant's wife, as the information that her husband had suffered ill-treatment, was based on a variety of sources and could not be dismissed as unfounded. Counsel disputes the State party's interpretation of the jurisprudence of the European organs, viewing the content of the current guarantee and that offered by India in <u>Chahal</u> as "basically the same". He observes that the Court did not doubt the good faith of the Indian government, but regarded the fundamental problem as human rights violations committed at the operational level by the security forces. In the present case, similarly, even assuming the same good will at the political level on the part of Egyptian authorities such as the representative with whom the guarantees were agreed, the reality at the lower operational