levels of the state security services and other authorities with whom the complainant was in contact is that torture is commonplace. The Aylor-Davis case, by contrast, is inapposite as the guarantee there was offered by a State the circumstances of which cannot be compared to those appertaining in Egypt.

5.6 With respect to the State party' statement that the Egyptian authorities rejected the allegations made by the complainant in March 2003, counsel observes that any contrary reaction would have been surprising, and that such refutation does not disprove the complainant's allegation. In counsel's view, the burden of proof to show ill-treatment did not occur rests with the State party, with the most effective capacity to present evidence and conduct appropriate supervision. Counsel submits that the State party has not discharged this burden.

5.7 While accepting that Egypt is a State party to the Convention, counsel observes that this formal act is regrettably no guarantee that a State party will abide by the commitments assumed. As to the prophylactic effect of media publicity, counsel argues that there was some coverage of the cases of the complainant and his wife around the time of the former's removal, but that thereafter interest has been limited. In any case, there is reason to doubt whether media coverage has any such protective effect, and even where coverage is intensive, its positive effect may be doubted.

5.8 Counsel submits that if the Committee were to accept guarantees such as those offered in the present case as sufficient protection against torture, one could not discount that large scale deportations could take place after some standard form of assurance provided by States with poor human rights records. At least in circumstances where there was a limited will and capability on the part of the removing state appropriately to monitor the consequences, the results could readily be wide scope for authorities of the receiving state to engage in and conceal torture and ill-treatment. As a result, counsel invites the Committee to find that there was (i) a violation by the State party of article 3 of the Convention at the time of the complainant's expulsion, in the light both of the information then available and of subsequent events, and (ii) that he has been subjected to torture after removal.

**Supplementary submissions by the parties**

6.1 By letter of 20 April 2004, counsel advised that on 18 February 2004, the complainant met his mother in prison. He informed her that he had been threatened by interrogation officers that he could be killed or tortured, and the same day lodged a complaint that he had been tortured. On 19 February 2004, he was transferred to Abu-Zabaal prison some 50 kilometres from Cairo, against which he protested by hunger strike lasting 17 days. He was allegedly placed in a small punitive isolation cell measuring 1.5 square meters in unhygienic conditions, receiving a bottle of water a day. On 8 March 2004, representatives of the Swedish embassy visited him with unknown results. On 20 March 2004, following unsuccessful attempts by the complainant's mother to visit him, it was announced that no family visits would be permitted outside major holidays due to his status as a security prisoner with special restrictions. On 4 April 2004, he was returned to Masra Torah prison. On 10 April 2004, a retrial began before the 13th superior military court on charges of joining and leading an illegal group or organization and criminal conspiracy, to which the complainant pleaded not guilty. A representative of Human Rights Watch was admitted, but family, journalists and representatives of the Swedish embassy were not. The complainant's lawyer requested an adjournment in order that he could read the 2000 pages of charging material and prepare a defence. As a result, the trial was adjourned for three days, with the lawyer permitted only to make handwritten notes. In counsel's view, this information demonstrates that the complainant had been tortured in the past, has been threatened therewith and faces a considerable risk of further torture. It also shows he has been treated in cruel and inhumane manner as well as denied a fair trial.

6.2 By further letter of 28 April 2004, counsel advised that on 27 April 2004 the complainant had been convicted and sentenced to 25 years' imprisonment. He also contended that the court rejected a request from the complainant for a medical examination as he had been tortured in detention. In counsel's view, the complainant's statement to the court and the court's rejection of his request constitute a further clear indication that he had been subjected to torture.

7.1 By submission of 3 May 2004, the State party responded to counsel's letter of 20 April 2004. The State party advised that since the last (seventeenth) visit reported to the Committee on 5 December 2003, four further visits on 17 December 2003, 28 January 2004, 8 March 2004 and 24 March 2004 had taken place. The State party advised that from December 2003 to January 2004, the complainant's situation remained broadly the same, with him taking up law studies. While complaining that his two cellmates disturbed peace and quiet required for study, he managed to prepare for examinations that took place in the facility in January 2004. The reportedly maximum security Abu-Zabaal facility to which he was transferred was said to be a more customary facility for prisoners sentenced to long terms. At the same time, the prison director advised that the complainant had been ordered to spend 15 days in isolation as a disciplinary sanction for having attempted to instigate a rebellion amongst Masra Torah inmates. The State party had obtained separate corroborating evidence that (i) the complainant had attempted to start a prison riot by "shouting words calling for disobedience against the instructions and regulation of the prison" and that (ii) restrictions had been imposed on correspondence and visiting rights, for a period of three months. The State party observed that the complainant was found guilty of one of the two offences with which he was charged, namely having held a leading position in, and being responsible for, the terrorist organization *Islamic Al-Fath Vanguards*. He was sentenced to life imprisonment, hard labour (abolished in 2003) not being imposed. He is currently in Masra Torah prison awaiting decisions as to future placement.

7.2 The State party maintained its earlier positions with respect to the admissibility of the complaint, as well as to the merits, that is, that the complainant has not substantiated his claims that the Egyptian authorities have not respected the guarantees in practice. It recalled that the crucial question is what the State party had reason to believe, in light of the guarantees given, at the time of the expulsion. The State party thus submitted that it has been in full conformity with its obligations under the Convention.

8.1 By letter of 3 May 2004, counsel argued that he had initially only been supplied with a redacted version of the diplomatic report supplied after the first ambassadorial meeting in 23 January 2002 with the complainant. Counsel contended that the full report had just been provided to him by a lawyer representing a third party deported at the same time as the complainant. Counsel contends that according to this report the complainant informed the Ambassador that he had been tortured (in the form of beating by prison guards) and subjected to cruel and degrading treatment (in the form of blindfolding, solitary confinement in a very small cell, sleep deprivation and refusal of prescribed medication). Counsel argued that the State party had not supplied this information to the Committee. Counsel further provided a report by Human Rights Watch critical of diplomatic assurances in this context, **(12)** as well as a statement dated 27 April 2004 of the Egyptian Organization for Human Rights critical of the complainant's retrial.

8.2 By letter of 4 May 2004, counsel provided his translation of the diplomatic report described. After describing a forced posture during the air transport to Egypt, the complainant is said to have told the Ambassador at the first meeting, in the presence of Egyptian officials, that he had been "forced to be blindfolded during interrogation, kept in too narrow cells, 1.50 x 1.50 metres during the same period, lack of sleep due to supervision in cells, a delay of ten days before [he] once gets access to his anti-gastric drugs (after medical examination), that [he] had been beaten by prison guards during transport to and from interrogation and threats from interrogation offices that it could affect his family if he did not tell everything about his time in Iran". The Ambassador concluded that he could not evaluate the veracity of these statements, but did not understand the claim to be of any form of systematic, physical torture. Counsel viewed this newly-disclosed

information as a clear indication that the complainant had been subjected to torture. Counsel also argued that the real reason that the complainant had been transferred to the Abu-Zaabal facility was because he had lodged a complaint of threatened torture. He also contended that the complainant was denied "real and fair possibilities" to prepare his defence and observed that the State party did not address issues arising from the complainant's trial.

8.3 By a further letter of 4 May 2004, counsel provided a statement of the same day by Human Rights Watch entitled "Suspected Militants Unfair Trial and Torture Claim Implicate Sweden", in which the complainant's retrial as well as the State party's monitoring arrangements were criticized. Counsel also provided a letter to him by a Human Rights Watch researcher purporting to confirm the contents of the unredacted first diplomatic report described above and concluding that there were credible allegations of ill-treatment.

8.4 By submission of 5 May 2004, the State party advised that it considered the Committee to be in a position to take a decision on the admissibility and, if necessary, the merits of the complaint on the basis of the Convention and the information before the Committee. Accordingly, it did not intend to make additional submissions beyond those already made on 3 May 2004. It observed in conclusion that counsel's letter of 4 May 2004 raised, *inter alia*, issues falling outside the scope of the Convention.

**The Committee's admissibility decision:**

9.1 At its 32nd session, the Committee considered the admissibility of the communication. The Committee ascertained, as it was required to do under article 22, paragraph 5 (a), of the Convention, that the same matter had not been and was not being examined under another procedure of international investigation or settlement.

9.2 On the State party's argument that the present complaint was an abuse of process which rendered it inadmissible, the Committee observed that the complaint submitted on behalf of the complainant's wife in order to prevent her removal had necessarily been filed with dispatch, and had concerned, at least at the time of the Committee's decision, the issue of whether at that point the circumstances were such that her removal would be a violation of article 3 of the Convention. In reaching the conclusion that removal of the complainant's wife would not breach article 3, the Committee had considered the chronology of events up to the time of its decision, a necessarily wider enquiry than that at issue in the present case, which was focused upon the situation of the complainant at the time of his expulsion in December 2001. Indeed, the Committee had observed in its decision on the original complaint that it was not being presented with the issue of whether the present complainant's removal itself breached article 3. The two complaints related to different persons, one already removed from the State party's jurisdiction at the time of submission of the complaint and the other still within its jurisdiction pending removal. In the Committee's view, the complaints were thus not of an essentially identical nature, and it did not consider the current complaint to be a simple re-submission of an already decided issue. While submission of the present complaint with greater dispatch would have been preferable, the Committee considered that it would be inappropriate to take so strict a view that would consider the time taken in obtaining authorization from the complainant's father as so excessively delayed as amounting to an abuse of process.

9.3 As to the State party inadmissibility argument grounded on Rule 107(f), the Committee observed that this Rule required the delay in submission to have made consideration of the case "unduly difficult". In the present case, the State party had had ready access to the relevant factual submissions and necessary argumentation, and thus, while the timing of submission of the two complaints may have been inconvenient, consideration of the present complaint could not be said to have been made unduly difficult by the lapse of 18 months from the date of the complainant's expulsion. The Committee thus rejected the State party's argument that the complaint is

inadmissible on this ground.

9.4 The Committee noted that Egypt has not made the declaration provided for under article 22 recognizing the Committee's competence to consider individual complaints against that State party. The Committee observed, however, that a finding, as requested by the complainant, that torture had in fact occurred following the complainant's removal to Egypt (see paragraph 5.8), would amount to a conclusion that Egypt, a State party to the Convention, had breached its obligations under the Convention without it having had an opportunity to present its position. This separate claim against Egypt was thus inadmissible *ratione personae.*

9.5 In terms of the State party's argument that the remaining complaint was insufficiently substantiated, for purposes of admissibility, the Committee considered that the complainant had presented a sufficiently arguable case with respect to Sweden for it to be determined on the merits. In the absence of any further obstacles to the admissibility of the complaint advanced by the State party, the Committee accordingly was ready to proceed with the consideration of the merits.

9.6. Accordingly, the Committee against Torture decided that the complaint was admissible, in part, as set out in paragraphs 9.2 to 9.5 above.

**Supplementary submissions by the parties on the merits of the complaint**

10.1 By letter of 20 August 2004, counsel for the complainant made additional submissions on the merits of the case, providing additional details on the complainant's retrial in April 2004. He stated that the complainant's defence counsel was only provided with copies of parts of the criminal investigation that had been conducted, despite a request to be able to photocopy the investigation records. When the trial was resumed on 13 April, the complainant was only able to speak to his counsel for about 15 minutes. The State called a colonel of the State Security Investigation Sector to testify against the complainant, to the effect that the complainant had had a leading position since 1980 in the Jamaa group, as well as links since 1983 with Ayman al Zawahiri, a central figure of the group. He further testified that the complainant had attended training camps in Pakistan and Afghanistan, and participated in weapons training sessions. Upon cross-examination, the colonel stated that the Jamaa leadership continually changes, that his testimony was based on secret information, that the sources thereof could not be revealed due to risks to their lives and that he (the colonel) had had a supplementary role in the investigation alongside other officers whom he did not know. According to counsel for the complainant, the court in its verdict of 27 April 2004 rejected the complainant's request for a forensic medical examination made during the trial, but referred to a medical examination report by the prison doctor which indicated that the complainant had suffered injuries in prison.

10.2 Counsel refers to a Swedish television broadcast of 10 May 2004 on entitled "Kalla Fakta", examining the circumstances of the expulsion of the complainant and another individual. **(13)** The programme stated that the two men had been handcuffed when brought to a Stockholm airport, that a private jet of the United States of America had landed and that the two men were handed over to a group of special agents by Swedish police. The agents stripped the clothes from the men's bodies, inserted suppositories of an unknown nature, placed diapers upon them and dressed them in black overalls. Their hands and feet were chained to a specially-designed harness, they were blindfolded and hooded as they were brought to the plane. Mr. Hans Dahlgren, State Secretary at the Foreign Ministry, stated in an interview that the Egyptian Government had not complied with the fair trial component of the guarantees provided.

10.3 According to counsel for the complainant, following this programme, the Swedish Foreign Ministry sent two senior representatives to Egypt to discuss with the Egyptian Government how the two deportees had been treated. Results of the meeting are not known apart from an Egyptian

denial of maltreatment and that an investigation under Egyptian leadership, but with international participation and medical expertise, would be involved. Three separate investigations in Sweden have also resulted and are ongoing: (i) a *proprio motu* investigation by the Chief Ombudsman to determine whether the actions taken were lawful, (ii) a criminal investigation by the Stockholm public prosecutor, upon private complaint, on whether Swedish Security Police committed any crime in connection with the deportation, and (iii) an investigation by Parliament's Constitutional Committee into the lawfulness of the Swedish handling of the cases.

10.4 On 15 June 2004, the Aliens Appeals Board granted the complainant's wife and her five children permanent resident status in Sweden on humanitarian grounds. Later in June, the Egyptian Government through prerogative of mercy reduced the complainant's twenty-five year sentence to fifteen years' of imprisonment. According to counsel for the complainant, the complainant last met Swedish representatives in July 2004. For the first time, the meeting was wholly private. After the meeting, he met his mother and told her that prior to the meeting he had been instructed to be careful and to watch his tongue, receiving from an officer the warning "don't think that we don't hear, we have ears and eyes."

10.5 As at 20 August 2004, the date of the submissions, there was no information as to the announced inquiry in Egypt. **(14)** However, that day, the Swedish Minister of Foreign Affairs announced in a radio broadcast the receipt of a Note from the Egyptian government rejecting all allegations of the complainant's torture and considering an international inquiry unnecessary and unacceptable. The Minister of Foreign Affairs also considered there reason to be self-critical concerning the Swedish handling of the case.

10.6 Counsel submits that the retrial fell patently short of international standards, being conducted in a military court with limited time and access available to the defence resulting in a conviction based on weak and insufficient evidence. **(15)** The failure to respect this portion of the guarantee, as conceded by State Secretary Dahlgren, raised of itself serious doubts as to the fulfillment of the remaining commitments. Counsel states that the complainant told his mother that he is irregularly sent to hospital for his back damage, there being no indication that he has been examined by a forensic physician. In counsel's view, the information already made known, coupled with the finding by the prison doctor that the complainant had suffered medical injuries (see paragraph 8.1, *supra*) and the refusal of the Egyptian authorities to allow an international investigation, together show that he has been subjected to torture. The burden to prove the contrary must rest upon the State party, with its commensurately greater resources and influence upon proceedings.

10.7 Reiterating his previous arguments, counsel contends that the complainant faced substantial risks of torture at the time of expulsion irrespective of the guarantees obtained from a country with a record such as Egypt. Counsel refers in this connection to a report on Sweden, dated 8 July 2004, of the Council of Europe, where criticism was expressed on the use of guarantees. **(16)** Alternatively, counsel argues that the steps taken to prevent and monitor the guarantees were insufficient. In addition to the arguments already raised, no detailed plans or programs featuring matters such as special orders on permissible interrogation techniques, confirmation that subordinate personnel were aware and would adhere to the guarantees or a post-expulsion treatment and trial plan were implemented.

11.1 By submission of 21 September 2004, the State party responded, observing that further visits since its last submissions of 3 May 2004 took place on 4 May, 2 June, 14 July and 31 August 2004. Each visit, excepting the most recent, took place in Masra Torah prison where the complainant appears to be serving sentence. The most recent visit took place at the Cairo university hospital. The State party refers to the complainant's improved legal situation, with the reduction to fifteen years' imprisonment subject, according to the complainant, to further reduction in the event of good behaviour. An assessment thereof is conducted automatically by the Egyptian Ministry for Interior Affairs. The complainant's health situation has also improved since May when he fell ill with pneumonia. Upon his return to Masra Torah prison on 4 April 2004, his previous treatments and

medication were resumed. In late August 2004, he underwent surgery at the Cairo university hospital on spinal discs. The neurosurgeon involved informed the embassy on 31 August that the operation had taken five hours, involving microsurgery, but had been successful and without complications. According to the physician, the back problems were of a type which could befall anyone and had no apparent cause.

11.2 Concerning general conditions at Masra Torah prison, the complainant offered embassy staff no particular complaints when asked. Family visits have resumed upon his return to that prison. He was pleased to be informed of the permanent residence granted his wife and children, and has continued with his law studies and exams.

11.3 Following renewed allegations of ill-treatment by the complainant's counsel, his Egyptian lawyer and NGOs, the State party's Government made further investigative efforts. On 18 May 2004, it dispatched Ms. Lena Hjelm-Wallén, former Minister of Foreign Affairs and Deputy Prime Minister, as special envoy to Egypt, accompanied by the Director General for Legal Affairs of the Swedish Ministry for Foreign Affairs. The envoy met with the Egyptian Deputy Minister of Justice and the Minister in charge of the General Intelligence Service (GIS), voicing the State party's concerns over the alleged ill-treatment in the first weeks following the complainant's return to Egypt. She requested an independent and impartial inquiry on the allegations, including international medical expertise. The Egyptian Government dismissed the allegations as unfounded, but agreed to undertake an investigation. Subsequently, on 1 June 2004, the Swedish Minister of Foreign Affairs dispatched a letter to the Egyptian Minister in charge of the GIS, suggesting that in order for the Egyptian investigation to receive the widest possible international acceptance, it should be carried out with or by an independent authority, involving the judiciary and medical expertise, and preferably international expertise with recognized expertise in investigation of torture. She also professed willingness to allow a Swedish official, such as senior police officer or prosecutor, to assist. She added that it was crucial that the fight against terrorism be carried out with full respect for the rule of law and in conformity with international human rights obligations. In his answer of late July 2004, the responsible Egyptian Minister refuted the allegations of ill-treatment as unfounded, referring without detail to Egyptian investigations. While confirming the reduction of the complainant's sentence, he gave no direct answer to the Swedish request for an independent investigation.

11.4 The State party states that its Government is not content with the Egyptian response. In the process of considering possible further action, it is of the utmost importance that the Government receives a confirmation that such action will be in line with the complainant's own wishes, as further measures should not risk affecting his legal interests, safety or welfare adversely in any way. It is also necessary, in the circumstances, for the Egyptian Government to concur and co-operate in any further investigative efforts.

11.5 The State party reiterated its previous submissions based on a deficient retrial are outside the scope of the present case, concerned with whether the complainant's return to Egypt was in breach of the absolute ban on torture. It reiterates that the complainant has not substantiated his claim that he was ill-treated following return, and, thus, that the guarantees provided were not respected. The State party recalls that the crucial issue for decision is what its Government, in view of the guarantees received, had reason to believe at the time of the expulsion. Accordingly, the State party has complied with its obligations under the Convention, including article 3.

11.6 By letter of 16 October 2004, counsel responded to the State party's supplementary submissions, pointing out that the circumstances of the four visits from May to August 2004 described by the State party remained unclear but that it is likely that Egyptian officials were present and it would be difficult to speak freely. The situation may have been different for the hospital visit. Counsel criticises the State party for stating that it appeared that Masra Torah prison was the detention facility for sentence, arguing that as it is well known that the complainant was serving sentence at the Esquebahl Torah prison, the State party appeared to be ill-informed on the

circumstances of his detention.

11.7 Counsel observes argues that the complainant's back condition was already diagnosed, as moderate, in Sweden. These problems deteriorated after his return and in 2003 he was brought to a Cairo hospital for examination, where he was recommended for surgery. Only a year later was "absolutely necessary" surgery actually carried out. He stayed for eleven days in hospital under supervision and received controlled visits from family. Although far from recovered, he was then returned to prison in an ordinary transport vehicle rather than an ambulance. Counsel argues that the State party knew of but neglected to tend to the complainant's medical condition for two and a half years, and in that time exposed him to treatment such as being kept in "very small" cells and with arms being tied behind the back. Apart from itself causing severe pain, such treatment seriously risked exacerbating his medical condition.

11.8 Counsel argues that the reduction in sentence does not affect how the complainant has been treated, is being and will be treated until release. As to law studies, it is not known whether and how the complainant has been able to pass any exams. Counsel rejects that there has been a significant improvement of the complainant's situation during the summer of 2004, conceding only that the situation is an improvement on that just after his return, arguing that as late as March 2004 the complainant was detained in a very small cell without adequate hygiene facilities and proper access to water. There remains a considerable risk the complainant will be subjected to torture or treatment approximating it. In any event, counsel argues that the complainant's present condition does not establish how he was treated in the past.

11.9 Counsel points out that the complainant's Egyptian attorney has lodged a request for review of verdict to the Highest State Security Court, on grounds that the trial Military Court misjudged the evidence, that the preliminary investigation was afflicted with serious shortcomings, that defence rights were violated at trial and that during the investigation the complainant had been subjected to violence and torture. The attorney has also lodged a special complaint with the Egyptian Minister of the Interior, the Chief Public Prosecutor and the Director-General of the Prison Institutions, alleging improper treatment of the complainant during his hospitalisation, including being chained to the bed and rendered immobile on medical grounds, and being returned to prison prior to recuperation.

11.10 Counsel argues that after the publicity generated by the television broadcast referred to in paragraph 10.2, *supra*, the State party shifted its position from a firm denial that torture had taken place to the "more reluctant position" shown by the measures it then took by way of dialogue with Egypt. Counsel points out Egypt's curt dismissal as unfounded of the allegations giving rise to the Swedish requests for an investigation, without so much as supplying any detail of the investigation allegedly conducted. This strongly suggests the complainant was in fact tortured, as Egypt would benefit significantly from being able to demonstrate to other countries, through an independent investigation showing the complainant had not been tortured, that Egypt could safely be entrusted with the return of sensitive prisoners and to abide by assurances given.

11.11 Counsel refers to the State party's apparent unwillingness to further press the Egyptian authorities, with the State party citing possible prejudices to the complainant's legal interests or welfare. This suggests the State party accepts, in contrast to its earlier view, that the complainant is at risk of external pressure in the event of an insistence on an independent investigation. In fact, the complainant, through his relatives, has repeatedly made known his desire for the fullest possible defence of his interests.

11.12 Counsel goes on to refer to relevant case law in national jurisdictions. In the case of Mr. Bilasi-Ashri, the Egyptian government refused to accept a detailed set of assurances, including post-return monitoring, requested by the Austrian Minister of Justice following a decision to that effect by an Austrian court of appeal. In the case of Ahmed Zakaev, a British extradition court found that a real risk of torture was not discounted by assurances given in open court by a Russian

deputy minister overseeing prisons. Counsel argues that a similarly rigorous approach, with effective protection provided by the legal system, ought to have been followed in the complainant's case.

11.13 Counsel expands on the earlier reference to involvement of the United States of America in the complainant's case in paragraph 10.2, *supra,* referring to a book entitled "Chain of Command" by Seymour Hersh. This contended that "the Bromma action" (referring to the airport from which the complainant was removed) was carried out by members of the Special Access Program of the United States Department of Defense who were engaged in returning terrorist suspects to their countries of origin utilising "unconventional methods". It is said that the complainant's removal was one of the first operations carried out under this program and described by an operative involved as "one of the less successful ones". In counsel's view, this third State involvement at the removal stage in an anti-terrorism context should have confirmed what the State party already knew from its knowledge of the common use of torture in Egypt and the complainant's particular vulnerability, that is, that a real risk of torture existed at the time of his removal, in breach of article 3.

11.14 By further letter of 16 November 2004, counsel provided a copy of a Human Rights Watch report to the Committee entitled "Recent Concerns regarding the Growing Use of Diplomatic Assurances as an Alleged Safeguard against Torture". The report surveys recent examples of State practice in the area of diplomatic assurances by Germany, the United States of America, the Netherlands, the United Kingdom and Canada. The report argues that such assurances are increasingly viewed as a way of escaping the absolute character of non-refoulement obligations, and are expanding from the anti-terrorism context into the area of refugee claims. It contends that assurances tend to be sought only from countries where torture is a serious and systematic problem, which thus acknowledges the real risk of torture presented in such cases.

11.15 In the light of national experience, the report concludes that assurances are not an adequate safeguard for a variety of reasons. Human rights protection is not amenable to diplomacy, with its tendency to untransparent process and to place the State to State relationship as the primary consideration. Such assurances amount to trusting a systematic abuser who otherwise cannot be trusted to abide by its international obligations. It also amounts to giving a systematic abuser a "pass" with respect to an individual case when torture is otherwise widespread. Finally, the effectiveness of post-return monitoring is limited by the undetectability of much professionally-inflicted torture, the absence of medical expertise from typical monitoring arrangements, the unwillingness of torture victims to speak out for fear of retribution, and the unwillingness of either the sending State or the receiving State to accept any responsibility for exposing an individual to torture.

11.16 In conclusion, the report refers to the October 2004 report to the General Assembly of the United Nations Special Rapporteur on Torture, who argued that, as a baseline, diplomatic assurances should not be resorted to in circumstances where torture is systematic, and that if a person is a member of a specific group that is routinely targeted and tortured, this factor must be taken into account. In the absence of either of these factors, the Special Rapporteur did not rule out the use of assurances provided that they reflect an unequivocal guarantee that is meaningful and verifiable.

12.1 By letter of 11 March 2005, the State party provided additional submissions on the merits of the complaint. It observed that the Swedish embassy in Cairo had continued to monitor the complainant's situation, with further visits taking place in Toraj prison on 3 October 2004, 21 November 2004, 17 January 2005 and 2 March 2005. The State party notes for the sake of clarity that there are several buildings on the prison grounds, one of which is called Masra and another Estekbal. The complainant has been detained, and visits have taken place, in both parts of the prison compound at different points in time.

12.2 With respect to his legal situation, the complainant stated that he had instructed his Egyptian

lawyer to lodge a petition with the President of Egypt for a new trial in a civil court, invoking Egypt's undertaking prior to his expulsion from Sweden that he was to be given a fair trial. He had not met with the lawyer in person; his mother appeared to be the one giving instructions to the lawyer. According to the complainant, she had subsequently been informed by the lawyer that the petition had been lodged. However, the complainant was not very hopeful with regard to the outcome of such a petition.

12.3 Concerning the health situation, the complainant was recovering according to plan from the back surgery he underwent in August 2004 at the university hospital in central Cairo. Back at the Torah prison, he had spent some time in the prison hospital before returning to a normal cell. He had received physiotherapy treatment and a so-called MRI-examination, where his back had been x-rayed. He complained about the lack of further physiotherapy sessions which, he stated, had to be held at the hospital. This was due to the fact that the necessary equipment was not available in the prison. In order to further strengthen his back, he had been scheduled for special magnetic treatment.

12.4 With regard to the issue of the general conditions of detention, the State party observes that by March 2005 the complainant was placed in a cell of his own. He continued to receive visits from his mother, who brought him books, clothes and extra food. She also appeared to be providing him with information about his family in Sweden on a regular basis. However, he complained that his request to call his wife and children had been denied. Moreover, it was his intention to continue with his law studies. He had managed to pass further exams during the autumn.

12.5 In addition to the measures described in its last submissions to the Committee on 21 September 2004, the State party states that it had made further efforts to bring about an investigation into the ill-treatment allegedly suffered by the complainant at the hands of the Egyptian authorities during the initial stage of the detention. In a new letter of 29 September 2004 to the Egyptian Minister in charge of the GIS, the Swedish Minister of Foreign Affairs, Ms. Laila Freivalds, responded to the answer given by him in July of that year. Ms. Freivalds remarked that the letter she had received in July 2004 contained no information on the type of investigations that had been carried out by the Egyptian authorities and on which the Egyptian Minister's conclusions were based. She concluded, in her turn, that under the circumstances she did not exclude that she would have to revert to him on the same matter at a later stage.

12.6 In the course of the Swedish embassy's visit to the complainant on 3 October 2004, the question of the complainant's position in respect of further inquiries into the allegations of ill-treatment was raised again. When the issue had been raised with him for the first time (during the visit of 14 July 2004), the complainant's prison sentence had recently been reduced to 15 years and he was concerned that new investigations might have a negative impact on the chances of further reductions being made as a consequence of good behaviour on his part. On 3 October 2004, however, the complainant's position had changed. He then declared that he was in favour of an independent inquiry and said that he was willing to contribute to such an inquiry.

12.7 In view of the importance attached by the State party to the complainant's own wishes in this regard, the State party regarded the complainant's new position as making way for further measures on its part. Since the envisaged inquiry would naturally require the additional approval and cooperation of the Egyptian government, the Swedish Ambassador to Egypt was instructed on 26 October 2004 to raise this issue with the Egyptian Foreign Ministry at the highest possible level. The Ambassador consequently met with the Egyptian Minister of Foreign Affairs on 1 November 2004. The Ambassador conveyed the message that the Swedish Government continued to be concerned about the allegations that the complainant had been exposed to torture and other ill-treatment during the initial period following his return to Egypt. The need for a thorough, independent and impartial examination of the allegations, in accordance with the principle of the rule of law and in a manner that was acceptable to the international community, was stressed by the Ambassador. In response, the latter was informed of the Minister's intention to discuss the

matter with the Minister in charge of the GIS. The Egyptian Minister of Foreign Affairs, however, anticipated two problems with regard to an international inquiry. Firstly, there was no tradition in Egypt when it came to inviting representatives of the international community to investigate domestic matters of this character. It would probably be viewed as an unwelcomed interference with internal affairs. Secondly, attempting to prove that ill-treatment had not occurred could pose a problem of a more technical nature, particularly in view of the fact that several years had passed since the ill-treatment allegedly took place.

12.8 As a follow-up to the meeting with the Minister of Foreign Affairs, the State party informs that its Ambassador met with the Undersecretary of State of the GIS on 22 November and 21 December 2004. During the first of these meetings, the undersecretary of state mentioned that Egypt was anxious to comply, as far as possible, with the Swedish Government's request for an inquiry. However, during the second meeting, the Ambassador was handed a letter by the Minister in charge of the GIS containing the Egyptian government's formal answer to the renewed Swedish request for an inquiry. The content of the letter was similar to that of the previous letter from the same Minister in July 2004. Thus, the allegations concerning ill-treatment of the complainant were again refuted as unfounded. Furthermore, no direct answer was provided to the request that an independent inquiry be conducted.

12.9 The matter was again brought up by Ms. Freivalds in connection with a visit to Stockholm on 15 February 2005 by the Egyptian Deputy Minister of Foreign Affairs responsible for multilateral issues. Ms. Freivalds informed the Egyptian Deputy Minister of the complainant's case and the allegations made regarding his ill-treatment. She stressed that it ought to be a common interest for Sweden and Egypt to look into those allegations and asked the Deputy Minister to use his influence with the Egyptian authorities in favour of the Swedish position. The Deputy Minister assured her that he would raise the issue upon his return to Cairo.

12.10 The State party also points out that the issue of an international inquiry was raised with the United Nations High Commissioner for Human Rights, Ms. Louise Arbour, when she visited Stockholm in December 2004. On that occasion, Ms. Freivalds made clear that the Swedish Government would welcome any efforts that might be undertaken by the High Commissioner to investigate the allegations that the complainant had been subjected to torture or other forms of ill-treatment while in detention in Egypt. The State party also observes that the investigation initiated by the Swedish Chief Parliamentary Ombudsman into the circumstances surrounding the execution of the Government's decision to expel the complainant from Sweden has not yet concluded.

12.11 The State party recalls that already in May 2004, counsel for the complainant provided the Committee with a written account of the embassy's report of its first visit on 23 January 2002 to the complainant after his return to Egypt. A copy of the report was submitted by counsel to the Committee in August 2004. In the State party's view, therefore, the Committee had thus been provided with all the information of relevance for its examination of the present case. Prior to explaining the fact that the report was not fully accounted for by the Government in its initial observations of 5 December 2003, the State party provides the following translation of the relevant portion of the Ambassador's report:
"Agiza and [name of another person] had just been transferred to the Torah prison after having been interrogated for thirty days at the security service's facilities in another part of Cairo. Their treatment in the Torah prison was "excellent". However, they had a number of complaints that related to the time period between their apprehension in Sweden and the transfer to the Torah: excessive brutality on the part of the Swedish police when they were apprehended; forced to remain in uncomfortable positions in the airplane during the transport to Egypt; forced to be blindfolded during the interrogation period; detention in too small cells 1.5 x 1.5 meters during the same period; lack of sleep due to surveillance in the cells; a delay of ten days before Agiza, following a medical examination, had access again to his medication for gastric ulcer; blows from guards while transported to and from interrogation; threats from interrogator that there could be consequences for Agiza's family if he did not tell everything about his time in Iran etc. It is not