possible for me to assess the veracity of these claims. However, I am able to note that the two men did not, not even on my direct questions, in any way claim that they had been subjected to any kind of systematic, physical torture and that they consider themselves to be well treated in the Torah prison."

12.12 The State party argues that it has been aware of difficulties experienced by the Committee in the past with regard to upholding respect for the confidentiality of its proceedings. For that reason, the State party formulated its submissions with great care when they involved the unveiling of information that has been classified under the Swedish Secrecy Act. For the State party, it was a question of balancing the need to reveal information in order to provide the Committee with the correct factual basis for the proper administration of justice, on the one hand, and the need to protect the integrity of Sweden's relations with foreign powers, the interests of national security and the security and safety of individuals, on the other.

12.13 The State party argues that its position in this regard should be seen against the background of the experience gained from the proceedings relating to the case of <u>Hanan Attia</u>. **(17)** In the State party's view, it became clear during those proceedings that the concerns in respect of confidentiality, which existed already at that time, were not unfounded. In that case, the Committee offered the State party in September 2002 the opportunity to withdraw its initial observations of 8 March 2002 and to submit a new version in view of the fact that the Committee could not guarantee that "any of the information submitted by the parties to the case would not be disclosed in any of its decisions or views on the merits of the case". Furthermore, in January 2003 counsel for Hanan Attia appended a briefing note from Amnesty International in London to his own observations, from which it was clear that counsel had made the State party's observations of 8 March 2002 available to Amnesty International.

12.14 The State party argues that its concerns with regard to the Committee's ability to uphold respect for the confidentiality of its proceedings were reflected in its repeated requests and comments concerning the confidentiality of the information that was in fact included in the initial observations of 5 December 2003 in the present case. However, in the light of the foregoing, the conclusion was drawn that only part of the classified information found in the Security Police's written opinion of 30 October 2001 to the Migration Board could be revealed. Another conclusion was that the information contained in the embassy's report from its first visit on 23 January 2002 to the complainant in detention should not be fully accounted for either. The reason for the latter conclusion was that it could not be ruled out that the information concerning ill-treatment provided by the complainant during the embassy's first visit would later be found in the public domain and thus become known to the Egyptian authorities.

12.15 The State party concludes that for these reasons not all the information that emerged at the embassy's first visit was revealed to the Committee. If such unconfirmed information had been released at that stage, and with the indirect assistance of the Swedish Government, this could have resulted in reprisals against the complainant. The risk for reprisals was not deemed to be insignificant, irrespective of whether the information was correct or not. If the information regarding the complainant's ill-treatment was correct - although such treatment did not appear to amount to torture within the meaning of the Convention -, this would have meant that the diplomatic assurances had not had the intended effect to protect him against treatment in breach of Sweden's international obligations, including treatment prohibited under article 3 of the European Convention on Human Rights. In such a case, there was an apparent risk that the disclosure of the information would put the complainant at risk of further ill-treatment and maybe even of torture. On the other hand, if the disclosed information was incorrect, this could have had a negative impact on the relations between Sweden and Egypt. In turn, it could have led to problems as far as the embassy's monitoring efforts were concerned. In this situation, when the different risks involved were assessed, the conclusion was reached that the best course of action would be to await the report of the embassy's next visit.

12.16 The State party points out that according to the embassy's report from its second meeting with the complainant in the detention facility, there were at that time no indications of torture or other ill-treatment. However, even prior to the third visit on 14 April 2002, information was circulating to the effect that the complainant's mother had stated publicly that her son had been tortured after his return to Egypt. The embassy's report from the first visit on 23 January 2002 confirmed the information submitted by the complainant's mother, namely that the visit when she had allegedly noticed signs of ill-treatment on her son's body had been interrupted by the Swedish Ambassador's first visit. The fact that the Ambassador had reported that he had not been able to see any signs of physical abuse on that very same day led the State party to doubt the veracity of the claims made by the complainant's mother and affected its assessment of the credibility of the complainant's own information to the Ambassador the same day.

12.17 The State party observes that there was no new information from the complainant regarding ill-treatment during the following year and the view that the information submitted during the embassy's first visit had been incorrect gradually gained in strength. It was essential that the embassy's opportunities to carry out the monitoring on a regular basis were not hampered, which could have been the result if the State party had forwarded unconfirmed or incorrect information to the Committee already during the first months of 2002. Considering the situation in April 2002 when the contents of a letter by the complainant's mother became known, it was therefore, on balance, not deemed appropriate to supplement, at that time, the information already submitted by the State party regarding the embassy's first visit in its observations of 8 March 2002.

12.18 A different assessment was made by the State party when the complainant, on 5 March 2003, repeated his complaints about ill-treatment at the hands of the Egyptian authorities during the initial stages of his detention. The allegations were much more serious this time and included claims that he had been subjected to torture involving the use of electricity. The mere fact that the complainant came back more than a year later to what had allegedly occurred already at the beginning of the detention period contributed to the fact that a different assessment was made in March 2003. The allegations of torture were therefore immediately raised with representatives of the relevant Egyptian authorities, who refuted them categorically. The State party accounted for the information submitted by the complainant, and the Egyptian authorities' reactions to it, in its submissions to the Committee of 26 March 2003. It should be reiterated that the information in issue was considerably more serious than that provided by the complainant a year earlier and that it concerned the same time period.

12.19 The State party further contends that by March 2003 the reasons for confidentiality were not as weighty as before. Even if the information from the embassy's tenth visit on 5 March 2003 would have ended up in the public domain despite the fact that the proceedings before the Committee were confidential according to the applicable provisions in the Convention and the Committee's own rules of procedure, the damaging effects were no longer considered to be as serious as before. Following the State party's initial submissions to the Committee, information had already been in circulation that - if correct - amounted to a breach on the part of Egypt of the diplomatic assurances. Moreover, the issue of torture had already been raised with the Egyptian authorities in March 2003. Furthermore, the monitoring carried out by the embassy had been going on for more than a year by that time and had become routine for both the Egyptian authorities, the embassy and the complainant himself. It was thus no longer likely that there would be a negative impact on the monitoring so that it would be more difficult in the future to ensure the continued effectiveness of the assurances. The State party also stresses that the allegations made by the complainant during the first embassy visit did not amount, in its view, to torture within the meaning of the Convention. It is, however, clear that the ill-treatment complained of at that time would have amounted to inhuman and maybe also cruel treatment, had the allegations been substantiated.

12.20 The State party refers the Committee to the recent decision of the Grand Chamber of the European Court on Human Rights, on 4 February 2005, in the case of <u>Mamatkulov et al. v. Turkey</u>.

This case concerned the applicants' extradition in March 1999 to Uzbekistan under a bilateral treaty with Turkey. Both applicants had been suspected of homicide, causing injuries to others by the explosion of a bomb in Uzbekistan and an attempted terrorist attack on the President of Uzbekistan. Following their extradition, they were found guilty of various offences and sentenced to twenty and eleven years' imprisonment respectively.

12.21 Before the European Court, the applicants claimed that Turkey had violated *inter alia* article 3 of the European Convention. In defence, Turkey invoked assurances concerning the two applicants given by the Uzbek authorities. According to those assurances, which were provided by the public prosecutor of the Republic of Uzbekistan, the applicants would not be subjected to acts of torture or sentenced to capital punishment. The assurances also contained the information that Uzbekistan was a party to the Convention against Torture and accepted and reaffirmed its obligation to comply with the requirements of the provisions of the Convention "as regards both Turkey and the international community as a whole". Officials from the Turkish embassy in Tashkent had visited the applicants in their respective places of detention in October 2001. They were reportedly in good health and had not complained about their prison conditions. Turkey also invoked medical certificates drawn up by military doctors in the prisons where the applicants were held.

12.22 The State party observes that the European Court assessed the existence of the risk primarily with reference to those facts which were known or ought to have been known to the State party at the time of the extradition, with information coming to light subsequent to the extradition potentially being of value in confirming or refuting the appreciation that had been made by the State party of the well-foundedness or otherwise of a complainant's fears. The Court concluded that it had to assess Turkey's responsibility under article 3 by reference to the situation that obtained on the date of the applicants' extradition, i.e. on 27 March 1999. While taking note of reports of international human-rights organisations denouncing an administrative practice of torture and other forms of ill-treatment of political dissidents and the Uzbek regime's repressive policy towards such dissidents, the Court furthermore stated that, although those findings described the general situation in Uzbekistan, they did not support the specific allegations made by the applicants in the case and required corroboration by other evidence. Against the background of the assurances obtained by Turkey and the medical reports from the doctors in the Uzbek prisons in which the applicants were held, the Court found that it was not able to conclude that substantial grounds existed at the relevant date for believing that the applicants faced a real risk of treatment proscribed by article 3 of the European Convention.

12.23 The State party invites the Committee to adopt the same approach. It points out that assurances similar to those in the case before the European Court were indeed obtained by the Swedish Government in the instant case. Although the guarantees given in this case did not refer to Egypt's obligations under the Convention against Torture, this is of no particular consequence since Egypt, like Uzbekistan, is in fact bound by the Convention. It is doubtful whether the value of assurances should be considered to be increased simply because they include a reference to a state's human rights obligations. The important factor must be that the State in issue has actually undertaken to abide by the provisions of a human rights convention by becoming party to it. The fact that Egypt was a party to the Convention against Torture was known to the State party when it obtained the diplomatic assurances in this case and subsequently decided to expel the complainant.

12.24 The State party goes on to argue that the assurances obtained in the present case must be regarded as carrying even more weight than those in the case against Turkey since they were issued by the person in charge of the Egyptian security service. It is difficult to conceive of a person better placed in Egypt to ensure that the diplomatic guarantees would actually have the intended effect, namely to protect the complainant against treatment in breach of Sweden's obligations under several human-rights instruments.

12.25 The State party acknowledges that no medical certificates have been invoked in the present case. However, the medical certificates obtained in the Turkish case had been issued by Uzbek military doctors working in the prisons where the applicants in that case were detained. In the State party's view, such certificates are of limited value in view of the fact that they had not been issued by experts who could be perceived as truly independent in relation to the relevant state authorities. Moreover, in the current case, the absence of corresponding medical certificates must reasonably be compensated by the monitoring mechanism put in place by the Swedish Government. To this date, almost thirty visits to the complainant in detention have been made by its embassy in Cairo. The visits have taken place over a period of time that amounts to over three years. This should be compared to the single visit by two officials from the Turkish embassy in Tashkent more than two and a half years after the extradition of the applicants in the case examined by the European Court.

12.26 By letter of 7 April 2005, counsel for the complainant made further submissions. As to his medical care, counsel argues that treatment following the complainant's surgery in August 2004 was interrupted prior to full recovery, and he was denied medical treatment in the form of micro-electric stimulation that he required.

12.27 Counsel observes that in December 2004 and January 2005, the expulsion of the complainant and a companion case was debated in the Swedish parliament and media. The Prime Minister and the Minister of Immigration stated that the expellees were terrorists and their removal was necessary to prevent further attacks and deny safe haven. According to counsel, these statements were presented to the complainant by Egyptian officials during an interrogation. For counsel, this demonstrates that the Egyptian security services are still interrogating the complainant and seeking to extract information, exposing him to ongoing risk of torture.

12.28 Counsel provides the conclusions (in Swedish with official English summary) dated 22 March 2005 of the investigations of the Parliamentary Ombudsman into the circumstances of deportation from Sweden to Cairo, with an emphasis on the treatment of the expellees at Bromma Airport. According to the Ombudsman's summary, a few days prior to 18 December 2001 the Central Intelligence Agency offered the Swedish Security Police the use of an aircraft for direct expulsion to Egypt. The Security Police, after apparently informing the Minister of Foreign Affairs, accepted. At mid-day December 18, the Security Police was informed that American security personnel would be onboard the aircraft and they wished to perform a security check on the expellees. It was arranged for the check to be conducted in a police station at Bromma airport in Stockholm.

12.29 Immediately after the Government's decision in the afternoon of December 18, the expellees were apprehended by Swedish police and subsequently transported to Bromma airport. The American aircraft landed shortly before 9.00 p.m. A number of American security personnel, wearing masks, conducted the security check, which consisted of at least the following elements. The expellees had their clothes cut up and removed with a pair of scissors, their bodies were searched, their hands and feet were fettered, they were dressed in overalls and their heads were covered with loosely fitted hoods. Finally, they were taken, with bare feet, to the airplane where they were strapped to mattresses. They were kept in this position during the entire flight to Egypt. It had been alleged that the expellees were also given a sedative per rectum, which the Ombudsman was unable to substantiate during the investigation. The Ombudsman found that the Security Police had remained passive throughout the procedure. The Ombudsman considered that, given that the American offer was received only three months after the events of 11 September 2001, the Security Police could have been expected to inquire whether the American offer involved any special arrangements with regard to security. No such inquiry was made, not even when the Security Police had been informed of the fact that American security personnel would be present and wished to perform a security check. When the actual content of the security check became obvious as it was performed at Bromma airport, the attending Swedish police personnel remained passive.

12.30 In the Ombudsman's view, the investigation disclosed that the Swedish Security Police lost control of the situation at the airport and during the transport to Egypt. The American security personnel took charge and were allowed to perform the security check on their own. Such total surrender of power to exercise public authority on Swedish territory was, according to the Ombudsman, clearly contrary to Swedish law. In addition, at least some of the coercive measures taken during the security check were not in conformity with Swedish law. Moreover, the treatment of the expellees, taken as a whole, must be considered to have been inhuman and thus unacceptable and may amount to degrading treatment within the meaning of Article 3 of the European Convention for the Protection of Human Rights and Fundamental Freedoms. The Ombudsman emphasized that the inhuman treatment to which the expellees were subjected could not be tolerated. The Security Police should have decided to discontinue the expulsion proceedings and deserved severe criticism for its handling of the case.

12.31 Counsel observes that the Ombudsman declined to bring charges against any individuals, as it was not possible to hold any individual to account before a court. Counsel contends that, at least, the prolonged hooding amounted to torture, and that what occurred on the aircraft could also be fomally imputed to Sweden. Counsel argues that in the prevailing atmosphere the State party ought to have been sceptical of American motives in offering to transport the expellees to Egypt and been reluctant to accept the Egyptian guarantees provided.

12.32 By letter of 12 April 2005, the State party also provided the summary of the Ombudsman's report, as "background information in full understanding that the execution of the Government's decision to expel the complainant from Sweden is not part of the case now pending before the Committee, which deals with the issue of the diplomatic assurances by Egypt with regard to the complainant."

12.33 By letter of 21 April 2005, counsel for the complainant submitted final remarks. He criticizes the modalities of the State party's most recent visits on the same basis as the earlier visits. As to medical care, the complainant has been re-examined twice at the facility that performed the 2004 surgery and may require further surgery. Concerning the proposed international investigation, counsel argues that the only reason for Egypt's refusal to co-operate lies in its breach of the guarantees provided.

12.34 Counsel rejects the State party's reasons for concealing part of the initial Ambassadorial report from the Committee, arguing that they can only be relevant to protect the complainant from Egyptian reprisals concerning his outspokenness as to the torture suffered. The complainant's statement was made in the presence of the prison warden and other officials, and the Ambassador raised the issue with the Ministry of Foreign Affairs. In any event, having already endured reprisals, there was nothing left for the State party to protect against in withholding information. Mistreatment of the author was already in the public domain through the complainant's mother and Amnesty International shortly after January 2002. Counsel argues that the State party's position also reflects "weak confidence" in the integrity of the Egyptian guarantees. Counsel also questions how national security could be affected by public knowledge of the complainant's allegations. In sum, the only plausible reason to conceal the information was to avoid inconvenience and embarrassment on the part of the State party.

12.35 Concerning his transmittal of information supplied in the context of the article 22 process to non-governmental organisations, counsel argues that at the time he saw no obstacle to doing so, neither the Convention nor the Committee's Rules proscribing, in his view, such a course. He did not intend to disseminate the information to the media or the broader public. Following the Committee's advice that complaint information was confidential, counsel argues his capacity to defend the complainant was significantly reduced, particularly given the disparity of resources available to the State party. In any event, the State party has shared other confidential intelligence information with the Committee, belaying its concerns that sensitive information would be inappropriately disseminated. Counsel argues that the conduct described is, contrary to the

Ambassador's characterisation, torture as understood by the Committee, bearing in mind that the complainant may have been reluctant to disclose the totality of circumstances to the Ambassador and that more severe elements emerged through the testimony of his mother.

12.36 With respect to the European Court's decision in <u>Mamatkulov et al.</u>, counsel seeks to distinguish the instant case. He emphasises however that in both cases the speed with which the removal was undertaken denied an effective exercise of a complaint mechanism, a circumstances that for the European Court disclosed a violation of article 34 of the European Convention. In counsel's view, the <u>Mamatkulov</u> Court was unable to find a violation of article 3 of the European Convention as, in contrast to the present case, there was insufficient evidence before the Court. A further distinction is that the treatment at the point of expulsion clearly pointed, in the current case, to the future risk of torture. Given the prophylactic purpose of article 3, it cannot be correct that an expelling State simply transfers, through the vehicle of diplomatic assurances, responsibility for an expellee's condition to the receiving State.

12.37 Finally, counsel supplies to the Committee a report, dated 15 April 2005, by Human Rights Watch, entitled "Still at Risk : Diplomatic Assurances no Safeguard against Torture", surveying the contemporary case law and experiences of diplomatic assurances and concluding that the latter are not effective instruments of risk mitigation in an article 3 context. Concerning the current case, Human Rights Watch argues that "there is credible, and in some instances overwhelming, evidence that the assurances were breached" (at 59).

**Issues and Proceedings before the Committee**

*Consideration of the merits*

13.1 The Committee has considered the merits of the complaint, in the light of all information presented to it by the parties, pursuant to article 22, paragraph 4, of the Convention. The Committee acknowledges that measures taken to fight terrorism, including denial of safe haven, deriving from binding Security Council Resolutions are both legitimate and important. Their execution, however, must be carried out with full respect to the applicable rules of international law, including the provisions of the Convention, as affirmed repeatedly by the Security Council. **(18)**

*Substantive assessment under article 3*

13.2 The issue before the Committee is whether removal of the complainant to Egypt violated the State party's obligation under article 3 of the Convention not to expel or to return a person to another State where there are substantial grounds for believing that he or she would be in danger of being subjected by the Egyptian authorities to torture. The Committee observes that this issue must be decided in the light of the information that was known, or ought to have been known, to the State party's authorities <u>at the time</u> of the removal. Subsequent events are relevant to the assessment of the State party's knowledge, actual or constructive, at the time of removal.

13.3 The Committee must evaluate whether there were substantial grounds for believing that the complainant would be personally in danger of being subjected to torture upon return to Egypt. The Committee recalls that the aim of the determination is to establish whether the individual concerned was personally at risk of being subjected to torture in the country to which he was returned. It follows that the existence of a consistent pattern of gross, flagrant or mass violations of human rights in a country does not as such constitute a sufficient ground for determining that a particular person was in danger of being subjected to torture upon his return to that country; additional grounds must exist to show that the individual concerned was personally at risk. Similarly, the absence of a consistent pattern of gross violations of human rights does not mean

that a person could not be considered to be in danger of being subjected to torture in his or her specific circumstances.

13.4 The Committee considers at the outset that it was known, or should have been known, to the State party's authorities at the time of the complainant's removal that Egypt resorted to consistent and widespread use of torture against detainees, and that the risk of such treatment was particularly high in the case of detainees held for political and security reasons. **(19)** The State party was also aware that its own security intelligence services regarded the complainant as implicated in terrorist activities and a threat to its national security, and for these reasons its ordinary tribunals referred the case to the Government for a decision at the highest executive level, from which no appeal was possible. The State party was also aware of the interest in the complainant by the intelligence services of two other States: according to the facts submitted by the State party to the Committee, the first foreign State offered through its intelligence service an aircraft to transport the complainant to the second State, Egypt, where to the State party's knowledge, he had been sentenced in absentia and was wanted for alleged involvement in terrorist activities. In the Committee's view, the natural conclusion from these combined elements, that is, that the complainant was at a real risk of torture in Egypt in the event of expulsion, was confirmed when, immediately preceding expulsion, the complainant was subjected on the State party's territory to treatment in breach of, at least, article 16 of the Convention by foreign agents but with the acquiescence of the State party's police. It follows that the State party's expulsion of the complainant was in breach of article 3 of the Convention. The procurement of diplomatic assurances, which, moreover, provided no mechanism for their enforcement, did not suffice to protect against this manifest risk.

13.5 In light of this assessment, the Committee considers it appropriate to observe that its decision in the current case reflects a number of facts which were not available to it when it considered the largely analogous complaint of Hanan Attia, **(20)** where, in particular, it expressed itself satisfied with the assurances provided. The Committee's decision in that case, given that the complainant had not been expelled, took into account the evidence made available to it up to the time the decision in that case was adopted. The Committee observes that it did not have before it the actual report of mistreatment provided by the current complainant to the Ambassador at his first visit and not provided to the Committee by the State party (see paragraph 14.10 below); the mistreatment of the complainant by foreign intelligence agents on the territory of the State party and acquiesced in by the State party's police; the involvement of a foreign intelligence service in offering and procuring the means of expulsion; the progressively wider discovery of information as to the scope of measures undertaken by numerous States to expose individuals suspected of involvement in terrorism to risks of torture abroad; the breach by Egypt of the element of the assurances relating to guarantee of a fair trial, which goes to the weight that can be attached to the assurances as a whole; and the unwillingness of the Egyptian authorities to conduct an independent investigation despite appeals from the State party's authorities at the highest levels. The Committee observes, in addition, that the calculus of risk in the case of the wife of the complainant, whose expulsion would have been some years after the complainants, raised issues differing from to the present case.

**Procedural assessment under article 3**

13.6 The Committee observes that the right to an effective remedy for a breach of the Convention underpins the entire Convention, for otherwise the protections afforded by the Convention would be rendered largely illusory. In some cases, the Convention itself sets out a remedy for particular breaches of the Convention, **(21)** while in other cases the Committee has interpreted a substantive provision to contain within it a remedy for its breach. **(22)** In the Committee's view, in order to reinforce the protection of the norm in question and understanding the Convention consistently, the prohibition on refoulement contained in article 3 should be interpreted the same way to encompass a remedy for its breach, even though it may not contain on its face such a right to

remedy for a breach thereof.

13.7 The Committee observes that in the case of an allegation of torture or cruel, inhuman or degrading treatment having occurred, the right to remedy requires, after the event, an effective, independent and impartial investigation of such allegations. The nature of refoulement is such, however, that an allegation of breach of that article relates to a future expulsion or removal; accordingly, the right to an effective remedy contained in article 3 requires, in this context, an opportunity for effective, independent and impartial review of the decision to expel or remove, once that decision is made, when there is a plausible allegation that article 3 issues arise. The Committee's previous jurisprudence has been consistent with this view of the requirements of article 3, having found an inability to contest an expulsion decision before an independent authority, in that case the courts, to be relevant to a finding of a violation of article 3. **(23)**

13.8 The Committee observes that, in the normal course of events, the State party provides, through the operation of the Migration Board and the Aliens Appeals Board, for review of a decision to expel satisfying the requirements of article 3 of an effective, independent and impartial review of a decision to expel. In the present case, however, due to the presence of national security concerns, these tribunals relinquished the complainant's case to the Government, which took the first and at once final decision to expel him. The Committee emphasizes that there was no possibility for review of any kind of this decision. The Committee recalls that the Convention's protections are absolute, even in the context of national security concerns, and that such considerations emphasise the importance of appropriate review mechanisms. While national security concerns might justify some adjustments to be made to the particular process of review, the mechanism chosen must continue to satisfy article 3's requirements of effective, independent and impartial review. In the present case, therefore, on the strength of the information before it, the Committee concludes that the absence of any avenue of judicial or independent administrative review of the Government's decision to expel the complainant does not meet the procedural obligation to provide for effective, independent and impartial review required by article 3 of the Convention.

**Frustration of right under article 22 to exercise complaint to the Committee**

13.9 The Committee observes, moreover, that by making the declaration under article 22 of the Convention, the State party undertook to confer upon persons within its jurisdiction the right to invoke the complaints jurisdiction of the Committee. That jurisdiction included the power to indicate interim measures, if necessary, to stay the removal and preserve the subject matter of the case pending final decision. In order for this exercise of the right of complaint to be meaningful rather than illusory, however, an individual must have a reasonable period of time before execution of a final decision to consider whether, and if so to in fact, seize the Committee under its article 22 jurisdiction. In the present case, however, the Committee observes that the complainant was arrested and removed by the State party immediately upon the Government's decision of expulsion being taken; indeed, the formal notice of decision was only served upon the complainant's counsel the following day. As a result, it was impossible for the complainant to consider the possibility of invoking article 22, let alone seize the Committee. As a result, the Committee concludes that the State party was in breach of its obligations under article 22 of the Convention to respect the effective right of individual communication conferred thereunder.

**The State party's failure to co-operate fully with the Committee**

13.10 Having addressed the merits of the complaint, the Committee must address the failure of the State party to co-operate fully with the Committee in the resolution of the current complaint. The Committee observes that, by making the declaration provided for in article 22 extending to individual complainants the right to complain to the Committee alleging a breach of a State party's

obligations under the Convention, a State party assumes an obligation to co-operate fully with the Committee, through the procedures set forth in article 22 and in the Committee's Rules of Procedure. In particular, article 22, paragraph 4, requires a State party to make available to the Committee all information relevant and necessary for the Committee appropriately to resolve the complaint presented to it. The Committee observes that its procedures are sufficiently flexible and its powers sufficiently broad to prevent an abuse of process in a particular case. It follows that the State party committed a breach of its obligations under article 22 of the Convention by neither disclosing to the Committee relevant information, nor presenting its concerns to the Committee for an appropriate procedural decision.

14. The Committee against Torture, acting under article 22, paragraph 7, of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, decides that the facts before it constitute breaches by the State party of articles 3 and 22 of the Convention.

15. In pursuance of rule 112, paragraph 5, of its rules of procedure, the Committee requests the State party to inform it, within 90 days from the date of the transmittal of this decision, of the steps it has taken in response to the Views expressed above. The State party is also under an obligation to prevent similar violations in the future.

_____

[Adopted in English, French, Russian and Spanish, the English text being the original version. Subsequently to be issued also in Arabic and Chinese as part of the Committee's annual report to the General Assembly.]

* The text of a separate opinion, dissenting in part, by Committee member Mr. Alexander Yakovlev is appended to the present document.

### Separate Opinion of Committee Member Mr. Alexander Yakovlev

### (dissenting, in part)

I respectfully disagree with the majority's finding on the article 3 issues. The Committee establishes, correctly, the time of removal as the key point in time for its assessment of the appropriateness, from the perspective of article, of the complaint's removal. As is apparent from the Committee's decision, the bulk of the information before it relates to events transpiring after expulsion, which can have little relevance to the situation at the time of expulsion.

It is clear that the State party was aware of its obligations under article 3 of the Convention, including the prohibition on refoulement. Precisely as a result, it sought assurances from the Egyptian government, at a senior level, as to the complainant's proper treatment. No less an authority than the former Special Rapporteur of the Commission on Human Rights on Torture, Mr. van Boven, accepted in his 2002 report to the Commission on Human Rights the use of such assurances in certain circumstances, urging States to procure "an unequivocal guarantee … that the persons concerned will not be subjected to torture or any other forms of ill-treatment upon return" . This, which is precisely what the State party did, is now faulted by the Committee. At the time, the State party was entitled to accept the assurances provided, and indeed since has invested considerable effort in following-up the situation in Egypt. Whatever the situation may be if the situation were to repeat itself today is a question that need not presently be answered. It is abundantly clear however at the time that the State party expelled the complainant, it acted in good faith and consistent with the requirements of article 3 of the Convention. I would thus come to the conclusion, in the instant case, that the complainant's expulsion did not constitute a violation of article 3 of the Convention.

[signed] Alexander Yakovlev

[Adopted in English, French, Russian and Spanish, the English text being the original version. Subsequently to be issued also in Arabic and Chinese as part of the Committee's annual report to the General Assembly.]

## **Notes**

1. Counsel states that the following information concerning the complainant's whereabouts and well-being originates from Swedish diplomatic sources, the complainant's parents, a Swedish radio reporter and the complainant's Egyptian attorney.

2. Counsel states that the following information concerning the complainant's whereabouts and well-being originates from Swedish diplomatic sources, the complainant's parents, a Swedish radio reporter and the complainant's Egyptian attorney.

3. Judgment of 15 November 1996.

4. Rule 107(f) provides: "With a view to reaching a decision on the admissibility of a complaint, the Committee, its Working Group or a rapporteur designated under rules 98 or 106, paragraph 3, shall ascertain: ... (f) That the time elapsed since the exhaustion of domestic remedies is not so unreasonably prolonged as to render consideration of the claims unduly difficult by the Committee or the State party."

5. <u>Hanan Ahmed Fouad Abd El Khalek Attia v. Sweden</u>, Case No 199/2002, Decision adopted on 17 November 2003.

6. Ibid.

7. Rule 107(b) provides: "With a view to reaching a decision on the admissibility of a complaint, the Committee, its Working Group or a rapporteur designated under rules 98 or 106, paragraph 3, shall ascertain: ... (b) That the complaint is not an abuse of the Committee's process or manifestly unfounded."

8. A/57/173, 2 July 2002.

9. These took place on 23 January, 7 March, 14 April, 27 May, 24 June, 22 July, 9 September and 4 November 2002, as well as 19 January, 5 March, 9 April, 14 May, 9 June, 29 July, 25 August, 30 September and 17 November 2003.

10. Ibid.

11. Ibid.

12. Human Rights Watch: "Empty Promises : Diplomatic Assurances No Safeguard against Torture",April 2004, Vol.16 No. 4(D).

13. Counsel has supplied a transcript of the programme.

14. Counsel supplies a public statement by Amnesty International, dated 28 May 2004, entitled "Sweden : Concerns over the treatment of deported Egyptians" calling for an "international, wide-

ranging, independent and impartial investigation " (EUR 42/001/2004), and, to similar effect, a statement by Human Rights Watch, dated 27 May 2004, entitled "Sweden : Torture Inquiry Must Be Under U.N. Auspices".

15. Counsel cites in support a public statement by Human Rights Watch, dated 4 May 2004, entitled "Sweden/Egypt: Suspected Militant's Unfair Trial and Torture Claims Implicate Sweden".

16. Report by Mr. Alvaro Gil-Robles, Commissioner for Human Rights, on his Visit to Sweden (21-23 April 2003), CommDH(2004)13, stating, at paragraph 19: "The second point relates to the use of diplomatic assurances regarding the treatment of deported aliens in the countries to which they are returned. This example, which is not unique to Sweden, clearly illustrates the risks of relying on diplomatic assurances. The weakness inherent in the practice of diplomatic assurances lies in the fact that where there is a need for such assurances, there is clearly an acknowledged risk of torture and ill-treatment. Due to the absolute nature of the prohibition of torture or inhuman or degrading treatment, formal assurances cannot suffice where a risk nonetheless remains. As the UN Special Rapporteur on Torture has noted, such assurances must be unequivocal and a system to monitor such assurances must be in place. When assessing the reliability of diplomatic assurances, an essential criteria must be that the receiving state does not practice or condone torture or ill-treatment, and that it exercises effective control over the acts of non-state agents. In all other circumstances it is highly questionable whether assurances can be regarded as providing indisputable safeguards against torture and ill-treatment."

17. Op.cit.

18. Security Council Resolution 1566 (2004), at preambular paragraphs 3 and 6, Resolution 1456 (2003) at paragraph 6, and Resolution 1373 (2001) at paragraph 3(f).

19. See, among other sources, the Report of the Committee against Torture to the General Assembly (A/51/44), at paragraphs 180 to 222 and the Committee's Conclusions and Recommendations on the fourth periodic report of Egypt (CAT/C/CR/29/4, 23 December 2002).

20. Op.cit.

21. See articles 12 to 14 in relation to an allegation of torture.

22. See <u>Dzemajl v. Yugoslavia</u>, Case No 161/2000, Decision adopted on 21 November 2002, at paragraph 9.6.: "The positive obligations that flow from the first sentence of article 16 of the Convention include an obligation to grant redress and compensate the victims of an act in breach of that provision. The Committee is therefore of the view that the State party has failed to observe its obligations under article 16 of the Convention by failing to enable the complainants to obtain redress and to provide them with fair and adequate compensation."

23. <u>Arkauz Arana v. France</u>, Case No. 63/1997, Decision adopted on 9 November 1999, at paragraphs 11.5 and 12.