# EXHIBIT D

# EUROPEAN PARLIAMENT

*2004*    *2009*

*Session document*

FINAL
**A6-0020/2007**

30.1.2007

# REPORT

on the alleged use of European countries by the CIA for the transportation and illegal detention of prisoners
(2006/2200(INI))

Temporary Committee on the alleged use of European countries by the CIA for the transportation and illegal detention of prisoners

Rapporteur: Giovanni Claudio Fava

**EN**                                         **EN**

PR_INI

## CONTENTS

**Page**

MOTION FOR A EUROPEAN PARLIAMENT RESOLUTION .............................................. 3

EXPLANATORY STATEMENT ......................................................................................... 35

Annex 1: ......................................................................................................................... 37

Annex 2: ......................................................................................................................... 50

Annex 3: ......................................................................................................................... 64

Annex 4: ......................................................................................................................... 70

PROCEDURE ................................................................................................................. 77



## MOTION FOR A EUROPEAN PARLIAMENT RESOLUTION

**on the alleged use of European countries by the CIA for the transportation and illegal detention of prisoners**
**(2006/2200(INI))**

*The European Parliament,*

– having regard to its resolution of 15 December 2005 on the presumed use of European countries for the transportation and illegal detention of prisoners by the CIA[1],

– having regard to its decision of 18 January 2006 setting up a Temporary Committee on the alleged use of European countries by the CIA for the transportation and illegal detention of prisoners[2],

– having regard to its resolution of 6 July 2006 on the alleged use of European countries by the CIA for the transportation and illegal detention of prisoners, adopted midway through the work of the Temporary Committee[3],

– having regard to the delegations which the Temporary Committee sent to the Former Yugoslav Republic of Macedonia, the United States, Germany, the United Kingdom, Romania, Poland and Portugal,

– having regard to the hearings, numbering no fewer than 130, held by the Temporary Committee in the course of its meetings, delegation missions and confidential interviews,

– having regard to all the written contributions received by the Temporary Committee or to which it has had access, particularly the confidential documents forwarded to it (in particular by the European Organisation for the Safety of Air Navigation (Eurocontrol) and the German Government or which it has obtained from various sources,

– having regard to its resolution of 30 November 2006 on the progress made in the EU towards the Area of freedom, security and justice (AFSJ) (Articles 2 and 39 of the EU Treaty)[4], notably its paragraph 3,

– having regard to its resolution of 13 June 2006 on the situation of prisoners at Guantánamo[5],

– having regard to Rule 175 of its Rules of Procedure,

– having regard to the report of the Temporary Committee on the alleged use of European countries by the CIA for the transportation and illegal detention of prisoners (A6-0020/2007),

---

[1]    *Texts Adopted*, P6_TA(2005)0529.
[2]    *Texts Adopted*, P6_TA(2006)0012.
[3]    *Texts Adopted*, P6_TA(2006)0316.
[4]    *Texts Adopted*, P6_TA-PROV(2006)0525.
[5]    *Texts Adopted*, P6_TA(2006)0254.

**EN**

A.  whereas, in its resolution of 6 July 2006, Parliament decided that 'the Temporary Committee would continue its work for the remainder of its established twelve-month term, without prejudice to the provisions of Rule 175 of its Rules of Procedure on the possibility of extending the term',

B.  whereas, in adopting its resolution of 22 November 1990 on the Gladio affair[1], it drew attention, more than 16 years ago, to the existence of clandestine operations involving intelligence services and military organisations without adequate democratic control,

C.  whereas the Member States cannot circumvent the requirements imposed on them by European Community (EC) and international law by allowing other countries' intelligence services, which are subject to less stringent legal provisions, to work on their territory; whereas, in addition, the operations of intelligence services are consistent with fundamental rights only if adequate arrangements exist for monitoring them,

D.  whereas the principle of the inviolability of human dignity is enshrined in international human rights law, notably in the preamble to the Universal Declaration of Human Rights and the preamble to and Article 10 of the International Covenant on Civil and Political Rights, and whereas that principle is guaranteed by the jurisprudence of the European Court of Human Rights; whereas this principle appears in most Member States' constitutions, as well as in Article 1 of the Charter of Fundamental Rights of the European Union[2] and whereas that principle should not be undermined, even for the purposes of security, in times of peace or war,

E.  whereas the principle of inviolability of human dignity underlies every other fundamental right guaranteed by international, European and national human rights instruments, in particular the right to life, the right to freedom from torture and inhuman or degrading treatment or punishment, the right to liberty and security, the right to protection in the event of removal, expulsion or extradition and the right to an effective remedy and to a fair trial,

F.  whereas extraordinary rendition and secret detention involve multiple violations of human rights, in particular violations of the right to liberty and security, the freedom from torture and cruel, inhuman or degrading treatment, the right to an effective remedy, and, in extreme cases, the right to life; whereas, in some cases, where rendition leads to secret detention, it constitutes enforced disappearance,

G.  whereas the prohibition of torture is a peremptory norm of international law (*jus cogens*) from which no derogation is possible and the obligation to protect against, investigate and sanction torture is an obligation owed by all states (*erga omnes*), as provided by Article 5 of the Universal Declaration of Human Rights, Article 7 of the International Covenant on Civil and Political Rights, Article 3 of the European Convention for the Protection of Human Rights and Fundamental Freedoms (ECHR) and the related case law, Article 4 of the Charter of Fundamental Rights, and national constitutions and laws; whereas specific conventions and protocols on torture and monitoring mechanisms adopted at the European and international level demonstrate the importance attached to this inviolable norm by the international community; whereas the use of diplomatic assurances is incompatible with this obligation,

---

[1]    OJ C 324, 24.12.1990, p. 201.
[2]    OJ C 364, 18.12.2000, p. 1.

**EN**

H.   whereas in democracies in which the respect for the rules of law is inherent, the fight against terrorism cannot be won by sacrificing or limiting the very principles that terrorism seeks to destroy, notably, the protection of human rights and fundamental freedoms must never be compromised; whereas terrorism can and must be fought by legal means and must be defeated while respecting international and national law,

I.   whereas the United States (US) administration's strategy to combat terrorism has made use of pervasive instruments to monitor sensitive data relating to European citizens, such as the Passenger Names Record (PNR) agreement, and to monitor bank details through the Society for Worldwide Interbank Financial Telecommunication (Swift) network,

J.   whereas on 6 September 2006, US President George W. Bush confirmed that the Central Intelligence Agency (CIA) was operating a secret detention programme outside the United States,

K.   whereas President George W. Bush said that the vital information derived from the extraordinary rendition and secret detention programme had been shared with other countries and that the programme would continue, which raises the strong possibility that some European countries may have received, knowingly or unknowingly, information obtained under torture,

L.   whereas the Temporary Committee has obtained, from a confidential source, records of the informal transatlantic meeting of European Union (EU) and North Atlantic Treaty Organisation (NATO) foreign ministers, including US Secretary of State Condoleezza Rice, of 7 December 2005, confirming that Member States had knowledge of the programme of extraordinary rendition, while all official interlocutors of the Temporary Committee provided inaccurate information on this matter,

M.   whereas the Temporary Committee has obtained, from a confidential source, records of meetings of the Council's Working Party on Public International Law (COJUR) and Transatlantic Relations Working Party (COTRA) with senior representatives of the US Department of State during the first half of 2006 (notably on 8 February and 3 May 2006), while it was provided by the Council Presidency only with a summarised version of these documents; whereas the documents sent by the Council to Parliament concerning those meetings in answer to Parliament's specific request, were incomplete summaries of the proceedings with essential parts missing,

N.   whereas the information on these meetings was not notified to Parliament and absolute secrecy was maintained in relation to their proceedings,

O.   whereas, in the present resolution, 'European countries' should be understood as meaning Member States and candidate and associate countries, as outlined in the mandate of the Temporary Committee adopted on 18 January 2006,

1.   Recalls that terrorism represents one of the main threats to the security of the European Union and that it must be fought with lawful and coordinated efforts by all European governments, in close collaboration with international partners and notably with the United States, along the lines of the strategy defined at United Nations (UN) level; underlines that the fight against terrorism must be fought on the basis of, and in order to protect, our common values of democracy, the rule of law, human rights and

**EN**

fundamental freedoms; furthermore stresses that all the work carried out by the Temporary Committee is intended to make a contribution towards the development of clear and focused measures in the fight against terrorism, which are commonly accepted and respect national and international law;

2.    Considers that after 11 September 2001, the so-called 'war on terror' -in its excesses- has produced a serious and dangerous erosion of human rights and fundamental freedoms, as noted by the outgoing UN Secretary-General Kofi Annan;

3.    Is convinced that the rights of the individual and full respect for human rights contribute to security; considers it necessary that in the relationship between the need for security and the rights of individuals, human rights must always be fully respected, ensuring that suspected terrorists are tried and sentenced while due process is observed;

4.    Emphasises that the positive obligation to respect, protect and promote human rights is binding, regardless of the legal status of the individual concerned, and that any discrimination among EU nationals, residents of Member States or any other person entitled to protection from, or otherwise under the jurisdiction of, the Member States must be avoided;

5.    Recalls that the purpose of this resolution, based on the report of the Temporary Committee, is to determine responsibilities for the facts that it has been able to examine on the one hand and to consider ways of preventing any repetition of the abuses and violations perpetrated in connection with measures against terrorism on the other;

6.    Notes the statement made by US President George W. Bush on 6 September 2006, according to whom "a small number of suspected terrorist leaders and operatives captured during the war have been held and questioned outside the United States, in a separate programme operated by the CIA" and that many of the persons who had been detained there,  had subsequently been transferred to Guantánamo and it is strongly suspected that other prisoners are still held in secret places of detention; notes the report of the Federal Bureau of Investigation (FBI) of 2 January 2007 mentioning 26 testimonies of mistreatment in Guantánamo since 11 September 2001;

7.    Deplores, in this context, the inability of the Council - due to the opposition of certain Member States - to adopt conclusions in response to that statement at the General Affairs and External Relations Council of 15 September 2006, and requests that the Council adopt them urgently, to dissipate any doubt as to the Member State governments' cooperation with and connivance in the extraordinary rendition and secret prisons programme in the past, present and future;

8.    Calls on the Council and the Member States to issue a clear and forceful declaration calling on the US Administration to put an end to the practice of extraordinary arrests and renditions, in line with the position of Parliament;

9.    Deplores the fact that the governments of European countries did not feel the need to ask the US administration for clarifications regarding the existence of secret prisons outside US territory;

10.    Notes the statements by the legal adviser to the US State Department at a meeting on 3 May 2006 with representatives of the Member States meeting within the Council,

**EN**

according to which, in carrying out the extraordinary rendition programme, whose existence he confirmed, the sovereignty of the countries concerned had always been fully respected; notes that this remark was subsequently confirmed at the meeting with the Temporary Committee delegation which visited Washington;

11.    Thanks the former CIA agents who agreed to cooperate with the Temporary Committee, particularly at certain confidential meetings at which they confirmed that the extraordinary rendition programme had already begun during the 1990s;

12.    Welcomes the announcement by the new majority established by the elections to the US Senate that it will investigate the CIA's extraordinary rendition programme; notes that this is further confirmation of the relevance of the work of the Temporary Committee;

13.    Denounces the lack of cooperation of many Member States, and of the Council of the European Union towards the Temporary Committee; stresses that the behaviour of Member States, and in particular the Council and its Presidencies, has fallen far below the standard that Parliament is entitled to expect;

14.    Believes that the serious lack of concrete answers to the questions raised by victims, non-governmental organisations (NGOs), the media and parliamentarians has only strengthened the validity of already well-documented allegations;

15.    Stresses the serious and rigorous work undertaken by the judicial authorities of Italy, Germany and Spain concerning the allegations which fall within the remit of the Temporary Committee, and invites the judicial authorities in other Member States to act similarly on the basis of the substantial information made available by the Temporary Committee;

16.    Encourages the national parliaments of European countries to continue or launch thorough investigations, in the ways they consider most appropriate and efficient, into these allegations, including by setting up parliamentary committees of inquiry;

17.    Pays tribute to the world press, in particular the US journalists who were the first to disclose the abuses and breaches of human rights related to extraordinary rendition, thus demonstrating the great democratic tradition of the US press; also recognises the efforts and good work undertaken by several NGOs on these matters, in particular Statewatch, Amnesty International and Human Rights Watch;

18.    Recognises that  some information in this report, including the existence of secret CIA prisons, comes from official or unofficial US sources, demonstrating the vitality and self-policing inherent in the US democracy;

19.    Expresses its profound gratitude to all victims who had the courage to share their very traumatic experiences with the Temporary Committee;

20.    Calls on all European countries to refrain from taking any action against officials, former officials, journalists or others who, by providing testimony or other information, either to the Temporary Committee or to other investigating bodies, have helped shed light on the system of extraordinary rendition, illegal detention and the transportation of terrorism suspects;

**EN**

21.   Reiterates its call on the Council, as expressed in its resolution of 6 July 2006, to adopt a common position ruling out the acceptance of mere diplomatic assurances from third countries as a basis for any legal extradition provision, where there are substantial grounds for believing that individuals would be in danger of being subjected to torture or ill-treatment;

### Cooperation with EU institutions and international organisations

22.   Deplores the failure by the Council and its Presidency to comply with their obligations to keep Parliament fully informed of the main aspects and basic choices of the common foreign and security policy (CFSP) and of work carried out in the field of police and judicial cooperation in criminal matters pursuant to Articles 21 and 39 of the Treaty on European Union;

23.   Stresses, in this context, that it is wholly unacceptable that the Council should first have concealed and then, at Parliament's request, only supplied piecemeal information on the regular discussions held with senior officials of the US Administration, asserting that this was the only available version; furthermore denounces the fact that the Council also referred to the request by the government of a third country that the information remain confidential;

24.   Points out that these shortcomings of the Council implicate all Member State governments since they have collective responsibility as members of the Council;

25.   Is outraged by the proposal which was to have been made by the then Council Presidency to set-up a joint "framework" with the US on standards for the rendition of terrorism suspects, as confirmed by those who took part in the meeting of the Council's Working Party on Public International Law (COJUR) and the Transatlantic Relations Working Party (COTRA) with senior representatives of the US Department of State held in Brussels on 3 May 2006;

26.   Calls for the disclosure of the results of the discussions conducted with the United States, according to Gijs de Vries, on the definitions of "rendition" and "extraordinary rendition";

27.   Takes note of the fact that the Secretary-General (and High Representative for the Common Foreign and Security Policy (CFSP)) of the Council of the European Union, Javier Solana, reaffirmed that Member States must ensure that any measures they take to combat terrorism comply with their obligations under international law; expresses its concern about the omissions in the statements made to the Temporary Committee by the Secretary-General, regarding the Council's discussions and knowledge of the methods used by the United States in its campaign against terrorism; deplores the fact that he was unable to supplement the evidence already in the possession of the Temporary Committee; asks him to declare all facts and discussions that are within his knowledge and to promote a European foreign policy and an international anti-terrorism strategy that respect human rights and fundamental freedoms;

28.   Questions the real substance of the post of EU Counter-terrorism Coordinator

**EN**

occupied by Gijs de Vries, since he was unable to give satisfactory answers to the questions raised by the Temporary Committee; is of the opinion that a revision and strengthening of his competences and powers, as well as the increased transparency and monitoring of his activities by Parliament must be undertaken in the near future, so as to enhance the European dimension of the fight against terrorism;

29.    Deplores the refusal by the Director of the European Police Office (Europol), Max-Peter Ratzel, to appear before the Temporary Committee, particularly because it has emerged that liaison officers, in particular for the US intelligence services, were seconded to the Office; requests that he provide Parliament with comprehensive information concerning the role of those liaison officers, their tasks, the data to which they had access and the conditions for such access;

30.    Thanks Commission Vice-President Franco Frattini for his cooperation with the work of the Temporary Committee and encourages the Commission to step up its work in the context of the continuing efforts to ascertain the truth and find ways of preventing any repetition of the facts analysed by the Temporary Committee;

31.    Welcomes, in particular, the commitment shown by Vice-President Frattini to launching a Euro-Atlantic cooperation framework in the fight against international terrorism, with harmonised rules on the protection of human rights and fundamental freedoms;

32.    Thanks Eurocontrol, and notably its Director, for its excellent cooperation and for the very useful information which it shared with the Temporary Committee;

33.    Appreciates the close cooperation which it has maintained with the Council of Europe, particularly its Parliamentary Assembly and its Secretary-General, and encourages the Committee on Legal Affairs and Human Rights - and its Chairman, Senator Dick Marty - to continue its work; endorses the recommendations made to the Committee of Ministers by the Secretary-General, Terry Davis; stresses the convergence of the findings of the two committees to date;

34.    Expresses its deep concern with the refusals of the former and current Secretaries-General of NATO, Lord Robertson and Jaap de Hoop Scheffer, to appear before the Temporary Committee or with that organisation's rejection of its request for access to the decision taken by the North Atlantic Council on 4 October 2001 concerning the implementation of Article 5 of the North Atlantic Treaty following the attacks on the United States on 11 September 2001; reiterates its request to make the document public and at least to provide information on its contents, its past and current implementation, whether it still remains into force and whether CIA flights have operated within its framework;

35.    Thanks the special rapporteurs of the United Nations, Manfred Nowak (on torture) and Martin Scheinin (on the promotion and protection of human rights in connection with counter-terrorism measures) for their contributions to the work of the Temporary Committee, while regretting that it was not possible for the High Commissioner for Human Rights, Louise Arbour, to meet it; thanks the European Network of Experts on Human Rights and notably its Co-ordinator, Olivier De Schutter, for their contribution to the works of the Temporary Committee;

**EN**



*Information analysed by the Temporary Committee*

*Extraordinary rendition and the misuse of airspace and airports*

36.    Recalls that the programme of extraordinary rendition is an extra-judicial practice which contravenes established international human rights standards and whereby an individual suspected of involvement in terrorism is illegally abducted, arrested and/or transferred into the custody of US officials and/or transported to another country for interrogation which, in the majority of cases, involves *incommunicado* detention and torture;

37.    Deplores the fact that the families of the victims are kept in complete ignorance of the fate of their relatives;

38.    Underlines, not withstanding an intended confusion created by some US representatives in private and public speeches, that extraordinary rendition is a wholly different practice from one that has been used by some European countries only in very exceptional circumstances, namely the detention or reception into custody in third countries of individuals formally accused of very serious crimes, in order to transfer them to European soil in order to face criminal charges before a court with all the legal guarantees of a judicial system;

39.    Condemns extraordinary rendition as an illegal instrument used by the United States in the fight against terrorism; condemns, further, the acceptance and concealing of the practice, on several occasions, by the secret services and governmental authorities of certain European countries;

40.    Condemns any participation in the interrogation of individuals who are victims of extraordinary rendition,  because it represents a deplorable legitimisation of that type of illegal procedure, even where those participating in the interrogation do not bear direct responsibility for the kidnapping, detention, torture or ill-treatment of the victims;

41.    Considers that the practice of extraordinary rendition has been shown to be counterproductive in the fight against terrorism and that extraordinary rendition in fact damages and undermines regular police and judicial procedures against terrorism suspects;

42.    Stresses that at least 1 245 flights operated by the CIA flew into European airspace or stopped over at European airports between the end of 2001 and the end of 2005, to which should be added an unspecified number of military flights for the same purpose; recalls that, on one hand, there may have been more CIA flights than those confirmed by the investigations carried out by the Temporary Committee, while, on the other hand, not all those flights have been used for extraordinary rendition;

43.    Regrets that European countries have been relinquishing their control over their airspace and airports by turning a blind eye or admitting flights operated by the CIA which, on some occasions, were being used for extraordinary rendition or the illegal transportation of detainees, and recalls their positive obligations arising out of European Court of Human Rights case law, as reiterated by the European Commission for Democracy through Law (Venice Commission);

**EN**

44.   Is concerned, in particular, that the blanket overflight and stopover clearances granted to CIA-operated aircraft may have been based, inter alia, on the NATO agreement on the implementation of Article 5 of the North Atlantic Treaty, adopted on 4 October 2001;

45.   Recalls that Article 1 of the Convention on International Civil Aviation (the Chicago Convention) sets out the principle that contracting States have complete and exclusive sovereignty over the airspace above its territory, and accordingly does not imply any exclusion from the States' full responsibility for the observance of human rights within their territory, including the airspace above it;

46.   Emphasises that the CIA has been using civil aviation rules to bypass the legal obligations for state aircraft, including those operated by the military and the police, as provided in the Chicago Convention; recalls that Article 4 of the Chicago Convention provides that: "Each contracting State agrees not to use civil aviation for any purpose inconsistent with the aims of this Convention";

47.   Confirms, in view of the additional information received during the second part of the proceedings of the Temporary Committee, that it is unlikely that certain European governments were unaware of the extraordinary rendition activities taking place in their territory;

48.   Stresses that the Temporary Committee's working documents Nos 7 and 8[1] provide strong evidence of the extraordinary renditions analysed by the committee, as well as of the companies linked to the CIA, the aircraft used by the CIA and the European countries in which CIA aircraft made stopovers;

ITALY

49.   Deplores the fact that the representatives of the current and former Italian Governments who are or were responsible for the Italian secret services declined the invitation to appear before the Temporary Committee;

50.   Condemns the extraordinary rendition by the CIA of the Egyptian cleric Abu Omar, who had been granted asylum in Italy and who was abducted in Milan on 17 February 2003, transferred from Milan to the NATO military base of Aviano by car, and then flown, via the NATO military base of Ramstein in Germany, to Egypt, where he has been held *incommunicado* and tortured ever since;

51.   Condemns the active role played by a carabinieri marshal and certain officials of the Italian military security and intelligence services (SISMI) in the abduction of Abu Omar, as shown by the judicial investigation and the evidence collated by Milan's Public Prosecutor Armando Spataro;

52.   Concludes, and deplores the fact, that General Nicolò Pollari, former Director of the SISMI, concealed the truth while appearing before the Temporary Committee on 6 March 2006, when he stated that Italian agents had played no part in any CIA kidnapping and that the Italian intelligence services were not aware of the plan to

---

[1]       Reference numbers: PE 380.593v04-00 and PE 380.984v02-00.

**EN**

kidnap Abu Omar;

53. Considers it very likely, in view of the involvement of its secret services, that the Italian Government of the day was aware of the extraordinary rendition of Abu Omar from within its territory;

54. Thanks Public Prosecutor Spataro for his testimony to the Temporary Committee, applauds the efficient and independent investigations he carried out in order to shed light on the extraordinary rendition of Abu Omar and fully endorses his conclusions and the decision to bring to judgment 26 US nationals, CIA agents, seven senior officials of the SISMI, an ROS carabiniere and the assistant editor of the 'Libero' daily newspaper; welcomes the opening of the proceedings at the Milan Court;

55. Regrets that the abduction of Abu Omar jeopardised Public Prosecutor Spataro's investigation into the terrorist network to which Abu Omar was connected; recalls that had Abu Omar not been illegally seized and transported to another country, he would have faced a regular and fair trial in Italy;

56. Takes note that the testimony provided by General Pollari is inconsistent with a number of documents found on SISMI premises and confiscated by Milan prosecutors; considers that such documents show that the SISMI was regularly informed by the CIA about the detention of Abu Omar in Egypt;

57. Deeply regrets the systematic misleading, among others, of Milan prosecutors by the SISMI board with the aim of jeopardising the investigation into the extraordinary rendition of Abu Omar; is extremely concerned about the fact that the SISMI board appeared to be working to a parallel agenda , and about the lack of appropriate internal and governmental controls; requests the Italian Government to remedy this situation urgently by establishing enhanced parliamentary and governmental controls;

58. Condemns the fact that Italian journalists investigating the extraordinary rendition of Abu Omar were illegally pursued, that their telephone conversations were tapped and their computers were confiscated; stresses that testimonies from those journalists have been of the utmost benefit to the work of the Temporary Committee;

59. Criticises the length of time it took for the Italian Government to decide to remove from office and replace General Pollari;

60. Regrets that a document on US-Italian cooperation in the fight against terrorism, which would have assisted the investigation into the extraordinary rendition of Abu Omar, was classified by the former Italian Government and that the current government has confirmed the classified status of this document;

61. Urges the Italian Minister of Justice to process, as soon as possible, the requests for extradition of the 26 US nationals referred to, for the purpose of standing trial in Italy;

62. Condemns the extraordinary rendition of Italian citizen Abou Elkassim Britel, who was arrested in Pakistan in March 2002 by the Pakistani police and interrogated by US and Pakistani officials, and subsequently rendered to the Moroccan authorities and imprisoned in the detention facility 'Temara', where he remains detained; emphasises that the criminal investigations in Italy against Abou Elkassim Britel were closed

**EN**