without any charges being brought;

63. Regrets that, according to the documentation provided to the Temporary Committee by Abou Elkassim Britel's lawyer, the Italian Ministry of Internal Affairs was at the time in 'constant cooperation' with foreign secret services concerning the case of Abou Elkassim Britel following his arrest in Pakistan;

64. Urges the Italian Government to take concrete steps in order to obtain the immediate release of Abou Elkassim Britel and Abu Omar so that proceedings against the latter can be prosecuted in the Court of Milan;

65. Deeply regrets that Italian territory was used by the CIA to make a stopover during the flight that was used to carry out the extraordinary rendition of Maher Arar, who gave testimony to the Temporary Committee, from the United States to Syria, via Rome;

66. Notes the 46 stopovers made by CIA-operated aircraft at Italian airports and expresses serious concern about the purpose of those flights which came from or were bound for countries linked with extraordinary rendition circuits and the transfer of detainees; deplores the stopovers at Italian airports of aircraft which have been shown to have been used by the CIA on other occasions for the extraordinary rendition of , Bisher Al-Rawi, Jamil El-Banna, Abou Elkassim Britel, Khaled El-Masri, Binyam Mohammed, Abu Omar and Maher Arar and for the expulsion of Ahmed Agiza and Mohammed El Zari;

THE UNITED KINGDOM

67. Deplores the manner in which the UK Government, as represented by its Minister for Europe, cooperated with the Temporary Committee; is extremely surprised at the letter of the Minister sent to Parliament's President,

68. Thanks the All-Party Parliamentary Group on Extraordinary Renditions (APPG), comprising members of the House of Commons and the House of Lords, for its work and for providing the Temporary Committee delegation to London with a number of highly valuable documents;

69. Condemns the extraordinary rendition of Bisher Al-Rawi, an Iraqi citizen and resident of the United Kingdom, and Jamil El-Banna, a Jordanian citizen and resident of the United Kingdom, who were arrested by Gambian authorities in Gambia in November 2002, turned over to US agents, and flown to Afghanistan and then to Guantánamo, where they remain detained without trial or any form of judicial assistance;

70. Points out that the telegrams from the UK security service MI5 to an unspecified foreign government which were released to the Chairman of the APPG, Andrew Tyrie, suggest that the abduction of Bisher Al-Rawi and Jamil El-Banna was facilitated by partly erroneous information supplied by the UK security service;

71. Criticises the unwillingness of the UK Government to provide consular assistance to Bisher Al-Rawi and Jamil El-Banna on the grounds that they are not UK citizens;

72. Condemns the multiple extraordinary rendition of Binyam Mohammed, Ethiopian citizen and resident of the United Kingdom; points out that Binyam Mohammed has been held in at least two secret detention facilities, in addition to military prisons;

73. Is deeply disturbed by the testimony of Binyam Mohammed's lawyer, who gave an account of the most horrific torture endured by his client to the official delegation of the Temporary Committee to the United Kingdom;

74. Emphasises that the former UK Secretary of State for Foreign and Commonwealth Affairs, Jack Straw, conceded in December 2005 that UK intelligence officials met Binyam Mohammed when he was arrested in Pakistan; points out in this respect that some of the questions put by the Moroccan officials to Binyam Mohammed appear to have been inspired by information supplied by the UK;

75. Condemns the extraordinary rendition of UK citizen Martin Mubanga, who met the official delegation of the Temporary Committee to the United Kingdom, and who was arrested in Zambia in March 2002 and subsequently flown to Guantánamo; regrets the fact that Martin Mubanga was interrogated by British officials at Guantánamo, where he was detained and tortured for four years without trial or any form of judicial assistance and then released without charge;

76. Thanks Craig Murray, former UK Ambassador to Uzbekistan, for his very valuable testimony to the Temporary Committee on the exchange of intelligence obtained under torture and for providing a copy of the legal opinion of Michael Wood, former legal advisor to the UK Foreign and Commonwealth Office;

77. Is outraged by Michael Wood's legal opinion, according to which 'receiving or possessing' information extracted under torture, in so far as there is no direct participation in the torture, is not per se prohibited by the UN Convention against Torture and other Cruel, Inhumane or Degrading Treatment or Punishment; expresses its outrage at any attempt to obtain information by means of torture, regardless of who is involved;

78. Expresses serious concern about the 170 stopovers made by CIA-operated aircraft at UK airports, which on many occasions came from or were bound for countries linked with extraordinary rendition circuits and the transfer of detainees; deplores the stopovers at UK airports of aircraft which have been shown to have been used by the CIA, on other occasions, for the extraordinary rendition of Bisher Al-Rawi, Jamil El-Banna, Abou Elkassim Britel, Khaled El-Masri, Binyam Mohammed, Abu Omar and Maher Arar and for the expulsion of Ahmed Agiza and Mohammed El Zari;

GERMANY

79. Acknowledges the good cooperation on the part of the German Government by providing restricted documents to the Chairman and the rapporteur of the Temporary Committee; regrets, on the other hand, that no representative of the German Government was able to appear before the Temporary Committee;

80. Welcomes the excellent work of the German Parliament inquiry committee and expresses its full support for the continuation of that committee's work;

81. Thanks Munich Public Prosecutor Martin Hofmann for his testimony to the Temporary Committee and applauds all ongoing judicial inquiries in Germany;

82. Deplores the fact that German authorities at least had knowledge of the illegal abduction

of German citizen Khaled El-Masri, who gave testimony to the Temporary Committee, and requests the German Parliament inquiry committee to examine further and clarify the role of German agents in this case;

83. Condemns the extraordinary rendition of Turkish citizen and resident of Germany Murat Kurnaz, who gave testimony to the Temporary Committee and who was arrested in Pakistan in November 2001, transferred to the US units across the border in Afghanistan by the Pakistani police on no legal basis and with no judicial assistance, and finally flown to Guantánamo at the end of January 2002, from where he was released on 24 August 2006 without charge, having been tortured in all the locations where he had been held;

84  Points out that, according to confidential institutional information, the German Government did not accept the US offer, made in 2002, to release Murat Kurnaz from Guantánamo; notes that on many occasions since 2002, Murat Kurnaz's lawyer was told by the German Government that it was impossible to open negotiations with the US Government on his release because Murat Kurnaz was a Turkish citizen; notes that all investigations concluded, as early as the end of October 2002, that Murat Kurnaz posed no terrorist threat;

85. Regrets the fact that Murat Kurnaz was interrogated twice, in 2002 and in 2004, by German officials at Guantánamo, where he was detained subject to neither formal charge nor trial and without judicial assistance; regrets the fact that German officials denied him any assistance and were only interested in questioning him;

86. Fully supports the investigation launched by the public prosecutor in Potsdam, transferred to the Public Prosecutor in Tübingen/Karlsruhe on 25 October 2006, into unknown perpetrators in order to establish whether Murat Kurnaz was ill-treated in Afghanistan by German soldiers belonging to the Kommando Spezialkräfte (KSK), the German army's special operational forces, before being sent to Guantánamo;

87. Notes that during his interrogations Murat Kurnaz was confronted with details from his personal life; notes that this gives rise to the suspicion that even before he left the country Murat Kurnaz was the subject of surveillance of a closeness which can normally only be provided by domestic intelligence services;

88. Appreciates the German Government's initiative in January 2006 which led to the release of Murat Kurnaz;

89. Condemns the extraordinary rendition of the German citizen Mohammed Zammar, arrested without formal charge on 8 December 2001 at Casablanca airport in Morocco and detained and tortured in Morocco and Syria;

90. Notes that, according to a confidential institutional source, on 26 November 2001 the German Federal Criminal Police Office provided details of Mohammed Zammar's whereabouts to the US Federal Bureau of Investigation (FBI), and that this facilitated Mohammed Zammar's arrest;

91. Points out that, subsequently to a meeting between the officials of the German Federal Chancellery and Syrian intelligence officials in July 2002, German prosecutors dropped charges against several Syrian citizens in Germany while the Syrian authorities allowed

German officials to meet Mohammed Zammar in the Syrian prison Far' Falastin, as also confirmed by a confidential institutional source; regrets that Mohammed Zammar was interrogated by German agents in that prison;

92. Calls on the German Bundestag's First Committee of Inquiry, in the context of the forthcoming expansion of its remit, to investigate the case which recently came to light involving the illegal rendition of the Egyptian national Abdel-Halim Khafagy, who had long been resident in Germany; Abdel-Halim Khafagy was probably arrested in Bosnia and Herzegovina in September 2001 on suspicion of being a terrorist and abducted to a prison on the US 'Eagle Base' military base in Tuzla, where he was severely mistreated and detained under inhumane conditions;

93. Is deeply concerned at information contained in an unclassified document made available to the Temporary Committee which shows that the illegal rendition of at least six Algerians from Tuzla via Incirlik to Guantánamo was planned at the US European Command (USEUCOM) military base near Stuttgart; calls on the German Bundestag to investigate without delay whether those alleged renditions involved breaches of the Forces Status Agreement or other agreements or treaties concluded with US military forces on German territory, whether further illegal renditions were planned by USEUCOM and whether German liaison officers were involved in any way;

94. Expresses serious concern about the 336 stopovers made by CIA-operated aircraft at German airports that on many occasions came from or were bound for countries linked with extraordinary rendition circuits and the transfer of detainees; deplores the stopovers in Germany of aircraft which have been shown to have been used by the CIA, on other occasions, for the extraordinary renditions of Bisher Al-Rawi, Jamil El-Banna, Abou Elkassim Britel, Khaled El-Masri, Binyam Mohammed, Abu Omar and Maher Arar and for the expulsionof Ahmed Agiza and Mohammed El Zari; is particularly concerned that one of the flights referred to was destined for Guantánamo; strongly encourages the German authorities further to investigate that flight;

95. Notes the allegations concerning the temporary detention and mistreatment of suspected terrorists at the US military prison in Mannheim-Blumenau, welcomes the investigations opened by the Federal Public Prosecutor's Office and hopes that the German Bundestag and/or the competent committee of inquiry will investigate this case more closely;

SWEDEN

96. Takes note of the position of the Swedish Government expressed in the letter transmitted to the Temporary Committee by its Foreign Minister Carl Bildt; regrets that no representative of the government was able to appear before the Temporary Committee in order to hold an exchange of views on its position;

97. Condemns the fact that Sweden's expulsion in December 2001 of Mohammed El-Zari and Ahmed Agiza, Egyptian nationals who were seeking asylum in Sweden, was based solely on diplomatic assurances from the Egyptian Government, which did not provide effective safeguards against torture; also acknowledges that the Swedish government hindered them from exercising their rights in accordance with the European convention, by not informing their lawyers until before they had arrived in Cairo; deplores the fact that the Swedish authorities accepted an US offer to place at their disposal an aircraft

which benefited from special overflight authorisation in order to transport the two men to Egypt;

98. Deplores the fact that the Swedish security police lost control over the enforcement of the expulsion of Ahmed Agiza and Mohammed El-Zari to Egypt, outside the rule of law, by remaining passive during the degrading treatment of the men by US agents at Bromma airport;

99. Underlines that the decision of the expulsion was taken at the highest executive level, from which no appeal was possible;

100. Fully endorses the UN Human Rights Committee's decision of 6 November 2006 in which it found that Sweden had breached the absolute ban on torture; similarly endorses a separate ruling by the UN Committee against Torture of 20 May 2005, which concluded that Sweden had violated the UN Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment and stated that "procurement of diplomatic assurances (from Egypt), which, moreover, provided no mechanism for their enforcement, did not suffice to protect against this manifest risk";

101. Thanks the Swedish Chief Parliamentary Ombudsman, Mats Melin, for his testimony to the Temporary Committee and applauds his investigation which concluded that the Swedish security service and airport police "were remarkably submissive to the American officials" and "lost control of the enforcement", resulting in the ill-treatment of Ahmed Agiza and Mohammed El-Zari, including physical abuse and other humiliation, at the airport immediately before they were transported to Cairo;

AUSTRIA

102. Notes the written explanations given on behalf of the Austrian Government but regrets that the Austrian Government did not consider it appropriate to appear before the Temporary Committee in order to hold an exchange of views about its position;

103. Notes that the persons referred to in the following paragraphs, Masaad Omer Behari and Gamal Menshawi, are individuals who did not and still do not have Austrian citizenship, whose freedom of movement was unrestricted; notes that the two men left Austria voluntarily and without undergoing checks by the Austrian authorities, and that they were arrested by foreign agencies, outside Austrian territory and outside the area of influence of the Austrian authorities, with no Austrian involvement; notes that, accordingly, these are clearly not cases of rendition of persons to foreign authorities;

104. Condemns the fact that Masaad Omer Behari, a Sudanese citizen and resident of Austria since 1989 who gave testimony to the Temporary Committee, was abducted at Amman airport on 12 January 2003 on his way back to Vienna from Sudan;

105. Deplores the fact that Masaad Omer Behari was later illegally secretly detained in a prison close to Amman run by the Jordan General Intelligence Department, without trial or legal assistance, and that he was tortured and ill-treated there until 8 April 2003, when he was released without charge; recalls that a judicial procedure was started by the Austrian authorities against Masaad Omer Behari in September 2001, which was subsequently closed in August 2002, without charge;

106. Deplores the fact that, according to Masaad Omer Behari's statement to the Temporary Committee, there may have been cooperation between the US, Austrian and Jordanian authorities in respect of his case;

107. Condemns the abduction of Egyptian citizen and resident of Austria, Gamal Menshawi, who was arrested on his way to Mecca at Amman airport in February 2003, and later brought to Egypt where he was secretly detained until 2005 without trial or legal rights; recalls that no allegations have ever been made against Gamal Menshawi in Austria;

108. Regrets that, having considered the above paragraphs, neither a special nor a parliamentary inquiry was carried out in Austria into the possible involvement of the Austrian authorities in the two cases referred to; urges the Austrian Parliament to start appropriate inquiries as soon as possible;

SPAIN

109. Welcomes the declaration of good cooperation with the Temporary Committee of the Spanish Government, in particular, the testimony given to the Temporary Committee by its Minister for Foreign Affairs; regrets, nevertheless, that the Spanish Government ultimately did not authorise the Director of the Spanish Intelligence Services to appear before the Temporary Committee, several months after having been requested to do so;

110. Thanks the Chief Prosecutor Javier Zaragoza and Prosecutor Vicente González Mota of the *Audiencia Nacional* for their testimony to the Temporary Committee and applauds their investigations into the use of Spanish airports for the transit of CIA aircraft within the context of the programme of extraordinary rendition; encourages the prosecutors to investigate further the stopovers of the aircraft involved in the extraordinary rendition of Khaled El-Masri;

111. Applauds the investigative journalism of Diario de Mallorca, which played an important role in revealing the transit of CIA aircrafts through the Balearic Island airports and the identification of their crews;

112. Recalls the words of Chief Prosecutor Zaragoza that "there was no obstacle, objection or trouble from the Spanish Government side in the investigations by the *Audiencia Nacional*";

113. Calls on the Spanish authorities to take all necessary steps to allow Spanish citizen Mustafa Setmariam Nasarwho, abducted in Syria in October 2005 and rendered to US agents, to face a fair trial before competent judicial authorities;

114. Expresses serious concern about the 68 stopovers made by CIA-operated aircraft at Spanish airports that on many occasions came from or were bound for countries linked with extraordinary rendition circuits and the transfer of detainees; deplores the stopovers in Spain of aircraft which have been shown to have been used by the CIA in other countries for the extraordinary rendition of Ahmed Agiza, Mohammed El-Zari, Bisher Al-Rawi, Jamil El-Banna, Abou Elkassim Britel, Khaled El-Masri, Binyam Mohammed, Abu Omar and Maher Arar, according to the legal investigations under way in Spain and Italy; is particularly concerned that, of the above flights, three originated from or were destined for Guantánamo; strongly encourages the Spanish Prosecutors further to investigate those flights;

PORTUGAL

115. Welcomes the meeting in Lisbon with the Portuguese Minister of Foreign Affairs and the fact that the Portuguese Government supplied documents and explanations; regrets that the Portuguese authorities were unable or reluctant to answer all the questions raised by the Temporary Committee delegation in Portugal;

116. Asks the Portuguese authorities to investigate the case of Abdurahman Khadr, allegedly carried on board the Gulfstream IV N85VM from Guantánamo to Tuzla in Bosnia and Herzegovina on 6 November 2003, with a stopover in Santa Maria on the Azores Islands on 7 November 2003; calls on the Portuguese authorities to examine this case and those of other possible victims transported via Portugal with a view to determining whether there should be compensation for violations of human rights;

117. Welcomes the establishment of the inter-ministerial working group on 26 September 2006 and the entry into force, on 13 October 2006, of a regulation stipulating that lists of the names of crew members and passengers on private flights must be submitted to the Portuguese frontier authorities;

118. Deplores the fact that the former Minister of Defence, Paulo Portas, and the former Minister of the Interior, António Figueiredo Lopes, declined invitations to meet the delegation of the Temporary Committee;

119. Notes that some of the 91 stopovers made in Portugal enabled the CIA and US military bodies to carry out the extraordinary rendition of Bisher Al-Rawi, Jamil El-Banna, Khaled El-Masri, Binyam Mohammed and Abu Omar and for the expulsion of Ahmed Agiza and Mohammed El Zari; is particularly concerned that of those flights, at least three originated from or were destined for Guantánamo; notes that the aircraft involved in the rendition of Maher Arar and Abou Elkassim Britel made stopovers in Portugal on their return flights;

120. Expresses deep concern at an additional list that the Temporary Committee has obtained, the authenticity of which the Portuguese Government has not denied, which indicates that, in addition to the 91 stopovers made, aircraft from a number of countries, travelling to or from Guantánamo, made 17 stopovers (including three contained in Eurocontrol lists) at the Portuguese airports of Lajes and Santa Maria between 11 January 2002 and 24 June 2006;

IRELAND

121. Welcomes the testimony given to the Temporary Committee by the Irish Minister for Foreign Affairs on behalf of the Irish Government as well as his unequivocal criticism of the process of extraordinary rendition; notes the fact, however, that he failed to answer all the questions in relation to the concerns that Irish airports may have been used by CIA aircraft travelling to or from extraordinary rendition missions (as in the case of Abu Omar);

122. Thanks the Irish Human Rights Commission (IHRC) for its testimony to the Temporary Committee and endorses its view which considers that acceptance by the Irish government of diplomatic assurances do not fulfil Ireland's human rights obligations, which oblige the government actively to seek to prevent any actions that could in any

way facilitate torture or ill-treatment in Ireland or abroad; regrets the decision of the Irish Government not to follow the IHRC's advice on this matter to date; notes that there is continuing dialogue between the IHRC and the Irish Government;

123. Expresses serious concern about the 147 stopovers made by CIA-operated aircraft at Irish airports that on many occasions came from or were bound for countries linked with extraordinary rendition circuits and the transfer of detainees; deplores the stopovers in Ireland of aircraft which have been shown to have been used by the CIA, on other occasions, for the extraordinary rendition of Bisher Al-Rawi, Jamil El-Banna, Abou Elkassim Britel, Khaled El-Masri, Binyam Mohammed, Abu Omar and Maher Arar and for the expulsion of Ahmed Agiza and Mohammed El Zari;

124. Notes the absence of Irish parliamentary scrutiny of either Irish or foreign intelligence services and the potential that this creates for abuse;

125. Considers, that, in the absence of a system of random searches, a ban should be imposed on all CIA-operated aircraft landing in Ireland;

126. Urges the Irish Government, in view of the findings of the Temporary Committee, to agree to launch a parliamentary inquiry into the use of Irish territory as part of the CIA rendition circuit;

GREECE

127. Expresses serious concern about the 64 stopovers made by CIA-operated aircraft at Greek airports that on many occasions came from or were bound for countries linked with extraordinary rendition circuits and the transfer of detainees; deplores the stopovers in Greece of aircraft which have been shown to have been used by the CIA, on other occasions, for the extraordinary rendition of Ahmed Agiza, Mohammed El-Zari, Bisher Al-Rawi, Jamil El-Banna, Abou Elkassim Britel, Khaled El-Masri, Binyam Mohammed and Maher Arar;

CYPRUS

128. Expresses serious concern about the 57 stopovers made by CIA-operated aircraft at Cypriot airports that on many occasions came from or were bound for countries linked with extraordinary rendition circuits and the transfer of detainees; deplores the stopovers in Cyprus of aircraft which have been shown to have been used by the CIA, on other occasions, for the extraordinary rendition of Ahmed Agiza, Mohammed El-Zari, Bisher Al-Rawi, Jamil El-Banna, Abou Elkassim Britel, Khaled El-Masri, Binyam Mohammed and Abu Omar;

DENMARK

129. Welcomes the cooperation received from the Danish authorities, while regretting that no representative of the government considered it appropriate to appear before the Temporary Committee;

BELGIUM

130. Calls on the Belgian Government to disclose the results of all investigations that have

taken place and deplores the fact that Belgium did not conduct a thorough investigation concerning the use of Belgian airports and the Belgian airspace by aircraft clearly involved in the extraordinary rendition programme or the transport of detainees;

131. Notes the statements of the President of the Belgian Senate Anne-Marie Lizin and refers to the conclusions of the report of the Belgian Senate which deplore the lack of cooperation by the Belgian intelligent services and the Belgian authorities;

TURKEY

132. Expresses its serious concern about the failure of the Turkish authorities to extend diplomatic protection to their national Murat Kurnaz and about the absence of any step to secure his release from the prison at Guantánamo;

133. Regrets that, on the contrary, the same authorities used the illegal detention of their national to interrogate him at Guantánamo;

134. Deplores the silence of the Turkish authorities concerning the use of their territory for the stopover of an aircraft which had taken to Guantánamo the six nationals of or residents in Bosnia and Herzogovina, of Algerian origin, who were illegally arrested in Bosnia and Herzegovina;

FORMER YUGOSLAV REPUBLIC OF MACEDONIA

135. Emphasises that a delegation of the Temporary Committee was received in Skopje in April 2006 by the President of the Republic, members of the government and several officials and thanks them for the welcome given to the delegation; notes, however, a lack of thorough investigation into the Khaled El-Masri case by the authorities of the Former Yugoslav Republic of Macedonia;

136. Condemns the extraordinary rendition of the German citizen Khaled El-Masri, abducted at the border-crossing Tabanovce in the Former Yugoslav Republic of Macedonia on 31 December 2003, illegally held in Skopje from 31 December 2003 to 23 January 2004 and then transported to Afghanistan on 23-24 January 2004, where he was held until May 2004 and subjected to degrading and inhuman treatment;

137. Urges the Council and its High Representative for the CFSP to shed full light on the fact that the EU police mission (PROXIMA) was incorporated into the Ministry of Interior of the Former Yugoslav Republic of Macedonia and was involved in the work of the Macedonian Security and Counter-Espionage Service (DBK) at the time when Khaled El-Masri was handed over to the CIA; would like to know if it is true that the Council questioned the EU staff involved in the PROXIMA mission so as to evaluate the level of information in their possession regarding the case of Khaled el Masri; if appropriate, asks the Council to provide Parliament with a full account of the investigation;

138. Fully endorses the preliminary findings of Munich Public Prosecutor Martin Hofmann that there is no evidence on the basis of which to refute Khaled El-Masri's version of events;

139. Deeply regrets the fact that the authorities of the Former Yugoslav Republic of Macedonia failed to follow up the recommendations made by the Temporary

Committee in its interim report of 6 July 2006;

140. Points out again that the Former Yugoslav Republic of Macedonia authorities are expected to carry out investigations; urges the newly elected national parliament of the Former Yugoslav Republic of Macedonia to set up a committee of inquiry as soon as possible to deal with the case of Khaled El-Masri and to cooperate fully with the ongoing inquiry of the German Parliament;

BOSNIA AND HERZEGOVINA

141. Welcomes the fact that the Government of Bosnia and Herzegovina is the only European government that does not deny its participation in the extraordinary rendition of four citizens of and two residents in Bosnia and Herzegovina, all of Algerian origin, and stresses that the Government of Bosnia and Herzegovina is the only European government to have accepted formal responsibility for its illegal actions; regrets, however, that the steps undertaken by the Government of Bosnia and Herzegovina have not yet resulted in the release of the six men from Guantánamo;

142. Condemns the extraordinary rendition of those six men, who were abducted in Sarajevo on 17 January 2002, turned over to US soldiers and then flown to Guantánamo, where they remain detained without trial or legal guarantees;

143. Takes note of the testimony given to the Temporary Committee by Wolfgang Petritsch, former High Representative of the international community in Bosnia and Herzegovina, and by Michèle Picard, former President of the Human Rights Chamber of Bosnia and Herzegovina, which stated that representatives of the international community in Bosnia and Herzegovina were given adequate notice of the imminent handing-over of the men referred to the US forces before events unfolded; condemns in this respect the Member States for their lack of action;

144. Regrets the fact that the international community as represented in Bosnia and Herzegovina turned a blind eye when the decisions of the Supreme Court and the Human Rights Chamber of Bosnia and Herzegovina ordering the release of the men from custody were not implemented;

145. Points out that, according to the information that the Temporary Committee received from the lawyers of the six men, the authorities of Bosnia and Herzegovina were subject to unprecedented pressure from the US Government, which threatened to close its embassy, withdraw all staff and cease diplomatic relations with Bosnia and Herzegovina unless the Government of Bosnia and Herzegovina immediately arrested the six men on terrorism charges;

146. Notes that Wolfgang Petritsch confirmed that the United States put considerable pressure on the authorities of Bosnia and Herzegovina and the international community not to interfere in the renditions and that the commander of the international NATO-led Stabilisation Force in particular rejected any questioning of his activities since he acted in his capacity as US military officer;

OTHER EUROPEAN COUNTRIES

147. Is concerned about the stopovers made by CIA-operated aircraft in other European

countries' airports and expresses serious concern about the purpose of those flights which came from or were bound for countries linked with extraordinary rendition circuits and the transfer of detainees; encourages the authorities of those European countries to launch adequate investigations into this matter;

*Secret detention facilities*

148. Welcomes the investigations carried out into the existence of secret detention facilities in Europe by Human Rights Watch, the Washington Post and American Broadcasting Company News (ABC News);

149. Recalls that some journalists at the Washington Post and ABC News, as they confirmed to the Temporary Committee, were put under pressure not to name the eastern European countries, namely Poland and Romania, where there were said to have been secret detention facilities;

150. Emphasises that the concept of "secret detention facility" includes not only prisons, but also all places where somebody is held *incommunicado*, such as private apartments, police stations or hotel rooms, as in the case of Khaled El-Masri in Skopje;

151. Is deeply concerned that, in some cases, temporary secret detention facilities in European countries may have been located at US military bases;

152. Calls for the appropriate implementation of bilateral agreements, Status of Forces Agreements and military base agreements (between Member States and third countries) to ensure the monitoring of respect for human rights and, where appropriate, for a review and renegotiation of those agreements to this effect; stresses that, according to the Venice Commission, the legal framework of foreign military bases on the territory of Council of Europe's Member States must enable them to exercise sufficient powers to fulfil their human rights obligations;

153. Points out in this regard the allegations concerning the US Coleman Barracks in Mannheim, Germany, and calls on both the judiciary and the German Bundestag's inquiry Committee to investigate this case further;

154. Regrets that there may have been a lack of control over US military bases by host European countries; recalls, however, that the ECHR provides that all State parties are bound to exercise jurisdiction over their whole territory, including foreign military bases;

155. Recalls that the ECHR also provides that every case of detention must be lawful and must be the result of proceedings prescribed by law, whether national or international;

156. Recalls that imposing or executing or allowing directly or indirectly secret and illegal detentions, which are instruments resulting in people's 'disappearance', per se constitute serious violations of human rights and that the active or passive involvement in such secret and illegal detentions by a European country renders that county responsible under the ECHR;

ROMANIA

157. Welcomes the excellent hospitality and good cooperation extended by the Romanian authorities to the Temporary Committee, including meetings with members of the Romanian Government, as well as the establishment of an ad hoc inquiry committee of the Romanian Senate;

158. Notes, however, the reluctance on the part of the Romanian authorities to investigate thoroughly the existence of secret detention facilities on its territory;

159. Regrets that the report issued by the Romanian inquiry committee was entirely secret except for its conclusions, included in Chapter 7, categorically denying the possibility that secret detention facilities could be hosted on Romanian soil; regrets that the Romanian inquiry committee heard no testimony from journalists, NGOs, or officials working in airports, and has not yet provided the Temporary Committee with the report contrary to its commitment to do so; regrets that taking these elements into consideration, the conclusions drawn in the Romanian inquiry committee's report appear premature and superficial; takes note, however, of the intention expressed by the Chairwoman of the inquiry committee to the Temporary Committee delegation to consider the conclusions provisional;

160. Regrets the lack of control of the Gulfstream aircraft with Registration Number N478GS that suffered an accident on 6 December 2004 when landing in Bucharest; recalls that the aircraft took off from Bagram Air Base in Afghanistan, and that its seven passengers disappeared following the accident; appreciates, however, the good cooperation of the Romanian authorities in handing over the report on the accident to the Temporary Committee;

161. Is deeply concerned to see that Romanian authorities did not initiate an official investigation process, as any democratic country should have done, into the case of a passenger on the aircraft Gulfstream N478GS, who was found carrying a Beretta 9 mm Parabellum pistol with ammunition;

162. Expresses serious concern about the 21 stopovers made by CIA-operated aircraft at Romanian airports, which on many occasions came from or were bound for countries linked with extraordinary rendition circuits and the transfer of detainees; deplores the stopovers in Romania of aircraft which have been shown to have been used by the CIA, on other occasions, for the extraordinary rendition of Bisher Al-Rawi, Jamil El-Banna, Abou Elkassim Britel, Khaled El-Masri, Binyam Mohammed and Abu Omar and for the expulsion of Ahmed Agiza and Mohammed El Zari; is particularly concerned that, of the flights referred to, two originated from or were destined for Guantánamo; strongly encourages the Romanian authorities further to investigate those flights;

163. Is extremely concerned that the Romanian authorities may have lacked control over US activities in the military base at Kogalniceanu airport;

164. Cannot exclude, based only on the statements made by Romanian authorities to the Temporary Committee delegation to Romania, the possibility that US secret services operated in Romania on a clandestine basis and that no definitive evidence has been provided to contradict any of the allegations concerning the running of a secret detention facility on Romanian soil;

POLAND

165. Deplores the glaring lack of cooperation by the Polish Government with the Temporary Committee, in particular when receiving the Temporary Committee delegation at an inappropriate level; deeply regrets that all those representatives of the Polish Government and Parliament who were invited to do so, declined to meet the Temporary Committee;

166. Believes that this attitude reflected an overall rejection on the part of the Polish Government of the Temporary Committee and its objective to examine allegations and establish facts;

167. Regrets that no special inquiry committee has been established and that the Polish Parliament has not conducted an independent investigation;

168. Recalls that on 21 December 2005, the Special Services Committee held a private meeting with the Minister Coordinator of Special Services and the heads of both intelligence services; emphasises that the meeting was conducted speedily and in secret, in the absence of any hearing or testimony and subject to no scrutiny; stresses that such an investigation cannot be defined as independent and regrets that the committee released no documentation, save for a single final statement in this regard;

169. Expresses serious concern about the 11 stopovers made by CIA-operated aircraft at Polish airports that on many occasions came from or were bound for countries linked with extraordinary rendition circuits and the transfer of detainees; deplores the stopovers in Poland of aircraft which have been shown to have been used by the CIA, on other occasions, for the extraordinary rendition of Bisher Al-Rawi, Jamil El-Banna, Abou Elkassim Britel, Khaled El-Masri and Binyam Mohammed and for the expulsion of Ahmed Agiza and Mohammed El Zar;

170. Regrets that following the hearings carried out by the Temporary Committee delegation in Poland, there was confusion and contradictory statements were made about the flight logs for those CIA flights, which were first said not to have been retained and then said to have probably been archived at the airport and finally claimed to have been sent by the Polish Government to the Council of Europe; acknowledges that in November 2006, the Szymany Airport's management provided the Temporary Committee with partial information on flight logs;

171. Thanks the former manager of the Szymany airport, for the valuable testimony given before the Temporary Committee; notes the fact that during 2006 he or she was questioned in the framework of a late enquiry concerning the CIA flights, immediately after his or her testimony was made public;

172. Takes note that, according to different sources, several high-value detainees who had been held secretly in Afghanistan in 2003 were transferred out of the country in September and October 2003; underlines with concern that a Boeing 737 with Registration Number N313P, used by the CIA for ascertained renditions, flew from Kabul to Szymany airport on 22 September 2003 and was then directed to Guantánamo;

173. Recalls that, concerning the landing of the aircraft referred to at Szymany airport, seven staff on board were joined by five passengers and that no customs control was carried out on those passengers;

174. Takes note of the declarations made by Szymany airport employees, and notably by its former manager, according to which:

- in 2002, two Gulfstream jets, and in 2003, four Gulfstream jets with civilian registration numbers were parked at the edge of the airport and did not enter customs clearance;

- orders were given directly by the regional border guards about the arrivals of the aircraft referred to, emphasising that the airport authorities should not approach the aircraft and that military staff and services alone were to handle those aircraft and only to complete the technical arrangements after the landing;

- according to a former senior official of the airport, no Polish civilian or military staff were permitted to approach the aircraft;

- excessive landing fees were paid in cash - usually between EUR 2 000 and EUR 4 000;

- one or two vehicles waited for the arrival of the aircraft;

- the vehicles had military registration numbers starting with "H", which are associated with the intelligence training base in nearby Stare Kiejkuty;

- in one case, a medical emergency vehicle belonging either to the police academy or the military base was involved;

- one airport staff member reported following the vehicles on one occasion and seeing them heading towards the intelligence training centre at Stare Kiejkuty;

175. Acknowledges that shortly after, and in accordance with, President George W. Bush's statements on 6 September 2006, a list of the 14 detainees who had been transferred from a secret detention facility to Guantánamo was published; notes that 7 of the 14 detainees had been referred to in a report by ABC News, which was published nine months previously on 5 December 2005 but was withdrawn shortly thereafter from ABC's webpage, listing the names of twelve top Al Qaeda suspects held in Poland;

176. Encourages the Polish Parliament to establish a proper inquiry committee, independent of the Government and capable of carrying out serious and thorough investigations;

177. Regrets that Polish human rights NGOs and investigative journalists have faced a lack of cooperation from the government and refusals to divulge information;

178. Considers that in the light of the above circumstantial evidences, it is not possible to acknowledge that secret detention centres were based in Poland;

179. Notes with concern that the official reply of 10 March 2006 from Under-Secretary of State Witold Waszykowski to Terry Davis indicates the existence of secret cooperation agreements, initialled by the two countries' secret services themselves, which exclude the activities of foreign secret services from the jurisdiction of Polish judicial bodies;

KOSOVO (UNDER UN SECURITY COUNCIL RESOLUTION 1244)

180. Expresses deep concern over the fact that the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment (CPT) obtained access to NATO-run detention facilities in Kosovo only in July 2006;

181. Regrets the refusal of NATO to provide evidence on the allegations of illegal detention of terrorist suspects in the prison run by the NATO-led peacekeeping force in Kosovo (KFOR) at Camp Bondsteel, the only detention facility in Europe where CPT inspectors were not allowed unlimited access until very recently;

182. Points out in this respect that the testimony given to the Temporary Committee by the former Kosovo Ombudsman, Marek Antoni Nowicki, confirmed that from July 1999, inmates were frequently detained at Camp Bondsteel, subject only to a decision by the Commander of KFOR and subject to no judicial decision or any form of other external control; recalls that from 2000 to 2001, a number of people were detained also following administrative decisions of the Special Representative of the UN Secretary-General and that, according to official data available, 23 people were imprisoned at Camp Bondsteel for a short period of time by the KFOR Commander in connection with violent events in Kosovo in spring 2004;

*Other relevant information collected by the Temporary Committee*

183. Points out that the Temporary Committee came across information - including the direct testimony of Murat Kurnaz - about the interrogation of Guantánamo detainees carried out by agents of Member State governments; emphasises that those interrogations were aimed at collecting information from individuals illegally detained, which is clearly in contradiction with the public condemnation of Guantánamo, as expressed at both EU and Member State level on several occasions;

184. Encourages the Member States involved to launch adequate investigations into this matter;

*Recommendations*

*Political recommendations*

185. Considers it necessary that those European countries that have started inquiries and investigations at governmental, parliamentary and/or judicial level on matters within the remit of the Temporary Committee should conduct their work as speedily as possible and make public the results of the investigations;

186. Urges European countries in relation to which serious allegations have been made regarding active or passive cooperation with extraordinary rendition and that have not undertaken governmental, parliamentary and/or judicial investigations to commence such proceedings as soon as possible; recalls that, according to the case law of the European Court of Human Rights, there is a positive obligation on Member States to investigate allegations of and sanction human rights violations in breach of the ECHR;

EN

187. Calls for the closure of Guantánamo and for European countries immediately to seek the return of their citizens and residents who are being held illegally by US authorities;

188. Considers that all European countries that have not done so should initiate independent investigations into all stopovers made by civilian aircraft carried out by the CIA, at least since 2001, including those cases already analysed by the Temporary Committee;

189. Expects to be kept fully informed on all developments concerning all the above-mentioned procedures;

190. Calls on European countries to compensate the innocent victims of extraordinary rendition and to ensure that they have access to effective and speedy compensation, including access to rehabilitation programmes, guarantees that there will be no repetition of what happened as well as appropriate financial compensation;

191. Asks the Commission to undertake an evaluation of all anti-terrorist legislation, in the Member States and of both formal and informal arrangements between Member State and third-country intelligence services, from a human rights perspective, to review legislation where international or European human rights bodies considers that it could lead to breach of human rights and to present proposals for actions in order to avoid any repetition of the matters under the remit of the Temporary Committee;

192. Considers it necessary to review by limiting and restrictively defining the exceptions that flow from the notion of 'State secret', also in the framework of the impending review of Regulation 1049/01[1], as well as the adoption of common principles by the EU institutions as regards the treatment of confidential information, to avoid abuses and deviations that are more and more unacceptable in modern democratic States and that contradict human rights obligations; deems it necessary to establish specific mechanisms to allow for access to secret information by parliaments and judges, as well as for the release of the information after a certain period of time;

193. Notes the recent creation of a High-Level Working Group composed of representatives of the Commission, the Council and US governmental representatives of the Justice Ministry and the Homeland Security, which constitutes the political framework for EU-US dialogue on security matters, including differences in the approach to terrorism as well as the concerns raised by the Temporary Committee; deems it necessary to associate in this High-Level Working Group the European Parliament and the US Congress, as well as to publish its agendas, minutes, documents examined and decisions taken, in order to ensure and increase its democratic legitimacy and transparency;

194. Encourages European countries when they conduct military operations in third countries to:

   – ensure that any detention centre established by their military forces is subject to civilian and judicial supervision and that *incommunicado* detention is not permitted;

---

[1] Regulation (EC) No 1049/2001 of the European Parliament and of the Council of 30 May 2001 regarding public access to European Parliament, Council and Commission documents (OJ L 145, 31.5.2001, p. 43).