# EXHIBIT E

Parliamentary **Assembly**
**Assemblée** parlementaire



Doc. 10957
12 June 2006

# Alleged secret detentions and unlawful inter-state transfers of detainees involving Council of Europe member states

Report
Committee on Legal Affairs and Human Rights
Rapporteur: Mr Dick Marty, Switzerland, Alliance of Liberals and Democrats for Europe

*Summary*

Our analysis of the CIA 'rendition' programme has revealed a network that resembles a 'spider's web' spun across the globe. The analysis is based on official information provided by national and international air traffic control authorities, as well as on other information. This 'web' is composed of several landing points, which we have subdivided into different categories, and which are linked up among themselves by civilian planes used by the CIA or military aircraft.

Analysis of the network's functioning and of ten individual cases allows us to make a number of conclusions both about human rights violations – some of which continue – and about the responsibilities of some Council of Europe Member states, which are bound by the European Convention on Human Rights and the European Convention for the Prevention of Torture.

The United States, an observer state of our Organisation, actually created this reprehensible network, which we criticise in light of the values shared on both sides of the Atlantic. But we also believe having established that it is only through the intentional or grossly negligent collusion of the European partners that this "web" was able to spread also over Europe.

Whilst hard evidence, at least according to the strict meaning of the word, is still not forthcoming, a number of coherent and converging elements indicate that secret detention centres have indeed existed and unlawful inter-state transfers have taken place in Europe. It is not intended to pronounce that the authorities of these countries are 'guilty' for having tolerated secret detention sites, but rather it is to hold them 'responsible' for failing to comply with the positive obligation to diligently investigate any serious allegation of fundamental rights violations.

The draft resolution and recommendation propose different measures so that terrorism can be fought effectively whilst respecting human rights at the same time.

*Doc. 10957*

**A.    Draft resolution**

1.    The Council of Europe is both the point of reference and the guardian for human rights, democracy and respect for the rule of law in Europe. It draws its legal and moral authority from, *inter alia*, the common standards of human rights protection embodied in the European Convention on Human Rights (ECHR) and the European Convention on the Prevention of Torture (ECPT), to which all of its 46 member States subscribe.

2.    The Parliamentary Assembly of the Council of Europe places human rights at the heart of its work. The Assembly must raise the alarm internationally whenever human rights are set aside, or when established standards of their application are undermined.

3.    The Assembly reaffirms its absolute commitment to overcoming the threat of terrorism; but it must equally speak out in the strongest possible terms against the numerous and systematic human rights abuses committed in the pursuit of the so-called "war on terrorism". It considers that such violations play into the hands of the terrorists and ultimately serve to strengthen those who aim to destroy the established political, legal and social order.

4.    The United States of America finds that neither the classic instruments of criminal law and procedure nor the framework of the laws of war (including respect for the Geneva Conventions) have been apt to address the terrorist threat. As a result, it has introduced new legal concepts, such as "enemy combatant" and "rendition", which were previously unheard of in international law and stand contrary to the basic legal principles that prevail on our continent.

5.    Thus, across the world, the United States has progressively woven a clandestine "spider's web" of disappearances, secret detentions and unlawful inter-state transfers, often encompassing countries notorious for their use of torture. Hundreds of persons have become entrapped in this web, in some cases merely suspected of sympathising with a presumed terrorist organisation.

6.    The "spider's web" has been spun out with the collaboration or tolerance of many countries, including several Council of Europe member States. This co-operation, which took place in secret and without any democratic legitimacy, has spawned a system that is utterly incompatible with the fundamental principles of the Council of Europe.

7.    The facts and information gathered to date, along with new factual patterns in the process of being uncovered, indicate that the key elements of this "spider's web" have notably included : a world-wide network of secret detentions on CIA "black sites" and in military or naval installations; the CIA's programme of "renditions", under which terrorist suspects are flown between States on civilian aircraft, outside of the scope of any legal protections, often to be handed over to States who customarily resort to degrading treatment and torture; and the use of military airbases and aircraft to transport detainees as human cargo to Guantanamo Bay in Cuba or to other detention centres.

8.    The Assembly condemns the systematic exclusion of all forms of judicial protection and regrets that, by depriving hundreds of suspects of their basic rights, including the right to a fair trial, the United States has done a disservice to the cause of justice and has tarnished its own hard-won reputation as a beacon of the defence of civil liberties and human rights.

9.    Some Council of Europe member States have knowingly colluded with the United States to carry out these unlawful operations; some others have tolerated them or simply turned a blind eye. They have also gone to great lengths to ensure that such operations remain secret and protected from effective national or international scrutiny.

10.    This collusion with the United States of America by some Council of Europe member States has taken several different forms. Having carried out legal and factual analysis on a range of cases of alleged secret detentions and unlawful inter-state transfers, the Assembly has identified instances in which Council of Europe member States have acted in one or several of the following ways, wilfully or at least recklessly in violation of their international human rights obligations, as explained in the explanatory memorandum[1]:

10.1.    secretly detaining a person on European territory for an indefinite period of time, whilst denying that person's basic human rights and failing to ensure procedural legal guarantees such as *habeas corpus*;

---

[1] See Doc ...

10.2. capturing a person and handing the person over to the United States, in the knowledge that such a person would be unlawfully transferred into a US-administered detention facility;

10.3. permitting the unlawful transportation of detainees on civilian aircraft carrying out "renditions" operations, travelling through European airspace or across European territory;

10.4. passing on information or intelligence to the United States where it was foreseeable that such material would be relied upon directly to carry out a "rendition" operation or to hold a person in secret detention;

10.5. participating directly in interrogations of persons subjected to "rendition", or held in secret detention;

10.6. accepting or making use of information gathered in the course of detainee interrogations, before, during or after which the detainee in question was threatened or subjected to torture or other forms of human rights abuse;

10.7. making available civilian airports or military airfields as "staging points" or platforms for rendition or other unlawful detainee transfer operations, whereby an aircraft prepares for and takes off on its operation from such a point; and

10.8. making available civilian airports or military airfields as "stopover points" for rendition operations, whereby an aircraft lands briefly at such a point on the outward or homeward flight, for example to refuel.

11. Attempts to expose the true nature and extent of these unlawful operations have invariably faced obstruction or dismissal, from the United States and its European partners alike. The authorities of most Council of Europe member States have denied their participation, in many cases without actually having carried out any inquiries or serious investigations.

12. In other instances such attempts have been thwarted on the grounds of national security or state secrecy. The Assembly takes the view that neither national security nor state secrecy can be invoked in such a sweeping, systematic fashion as to shield these unlawful operations from robust parliamentary and judicial scrutiny.

13. The Assembly highlights the widespread breach of the positive obligations of all Council of Europe member States to investigate such allegations in a full and thorough manner. It has now been demonstrated incontestably, by numerous well-documented and convergent facts, that secret detentions and unlawful inter-state transfers involving European countries have taken place, such as to require in-depth inquiries and urgent responses by the executive and legislative branches of all the countries concerned.

14. While the Assembly has been seized in this instance with looking into allegations concerning very specific facts, it cannot ignore other allegations surrounding the existence of other secret detention centres in Europe, apparently also set up in the context of the "war on terrorism". In particular, the Assembly expresses its deep concern at the continued reports of secret detentions in the North Caucasus. The European Committee for the Prevention of Torture issued a Public Statement on this subject in 2003, which was recently supplemented by new, detailed victim testimony and credible allegations from non-governmental organisations. Further serious investigation and analysis of secret detentions in the North Caucasus is clearly required.

15. The Assembly also regrets that detention centres in Kosovo were not accessible, until very recently, to the European Committee for the Prevention of Torture. The lack of access seems all the more unacceptable in light of the fact that the international community intervened in that region with the declared aim of restoring order, peace and the respect for human rights.

16. The Assembly's central objective is to prevent violations of the sort described in this resolution from occurring in the future.

17. The Assembly therefore commends the Secretary General of the Council of Europe for the swift and thorough use of his power of inquiry under Article 52 ECHR.

18. The Assembly calls upon the member States of the Council of Europe to:

18.1. undertake a critical review of the legal framework that regulates the intelligence services, with the dual objective of enhancing their efficiency and strengthening accountability mechanisms against abuse; clear regulations must also govern co-operation with foreign services and the activities of foreign services on national territory;

*Doc. 10957*

18.2.   ensure that the laws governing state secrecy protect persons who disclose illegal activities of state organs (so-called "whistle-blowers") from disciplinary or criminal sanctions;

18.3.   undertake a review of bilateral agreements signed between Council of Europe member States and the United States, particularly those on the status of US forces stationed in Europe and on the use of military and other infrastructures, to ensure that these agreements conform fully to applicable international human rights norms;

18.4.   urge the United States to dismantle its system of secret detentions and unlawful inter-state transfers and to co-operate more closely with the Council of Europe in establishing common means of overcoming the threat of terrorism in line with international human rights standards and respect for the rule of law.

19.   The Assembly also calls on the United States of America, which is an Observer State to the Council of Europe and Europe's long-standing ally in resisting tyranny and defending human rights and the rule of law, to:

19.1.   send a strong message to the world by demonstrating that terrorism can be vanquished by lawful means, thereby proving the superiority of the democratic model founded on respect of human dignity;

19.2.   co-operate more closely in identifying and employing the most effective means with which to prevent and suppress the terrorist threat in conformity with international human rights norms and the rule of law;

19.3.   align its definitions of torture and other cruel, inhuman or degrading treatment with the definition used by the UN Committee Against Torture;

19.4.   prohibit the transfer of persons suspected of involvement in terrorism to countries that practise torture and that fail to guarantee the right to a fair trial;

19.5.   issue official apologies and award compensation to the victims of illegal detentions against whom no formal accusations, nor any court proceedings, have ever been brought; and

19.6.   refrain from prosecuting any officials, former officials or journalists who, by providing testimony or other information, have helped to bring to light the system of unlawful detentions and mistreatment.

20.   The Assembly calls upon its Committee on Legal Affairs and Human Rights urgently to establish an ad hoc Sub-Committee to continue this inquiry into alleged secret detentions and unlawful inter-state transfers involving Council of Europe member States, in view of new facts that are still in the process of being uncovered.

21.   The Assembly further urges its members to call for rigorous inquiries in their respective national parliaments, especially in those States from which no or insufficient information has been forthcoming.

22.   The Assembly recognises, in the context of the present inquiry into secret detentions, that it lacks appropriate investigative powers akin to those provided to parliamentary inquiries in member States, including the powers to subpoena witnesses and compel disclosure of documents, and calls for consideration of this issue.

23.   Finally, the Assembly expresses its appreciation to the relevant European Union institutions (European Commission, European Parliament and EU Satellite Centre), as well as to Eurocontrol, for their invaluable contributions to this inquiry, whilst reiterating the Council of Europe's role as the guardian of human rights throughout Europe.

**B.     Draft recommendation**

1.      The Parliamentary Assembly refers to its Resolution ... (2006) on alleged secret detentions and unlawful inter-state transfers involving Council of Europe member states.

2.      The Assembly also recalls its Resolution 1433 (2005) and its recommendation on the legality of the detention of persons by the United States in Guantanamo Bay.

3.      The Assembly urges the Committee of Ministers to draft a recommendation to Council of Europe member States containing:

3.1.    common measures to guarantee more effectively the human rights of persons suspected of terrorist offences who are captured from, detained in or transported through Council of Europe member States; and

3.2.    a set of minimum requirements for "human rights protection clauses", for inclusion in bilateral and multilateral agreements with third parties, especially those concerning the use of military installations on the territory of Council of Europe member States.

4.      The Assembly urgently requests that:

4.1.    an initiative be launched on an international level, expressly involving the United States, an Observer to the Council of Europe, to develop a common, truly global strategy to address the terrorist threat. The strategy should conform in all its elements with the fundamental principles of our common heritage in terms of democracy, human rights and respect for the rule of law;

4.2.    a proposal be considered, in instances where States are unable or unwilling to prosecute persons accused of terrorist acts, to bring these persons within the jurisdiction of an international court that is competent to try them.  One possibility worth considering would be to vest such a competence in the International Criminal Court, whilst renewing invitations to join the Court to the United States and other countries that have not yet done so.

5.      The Assembly finally recommends that the Committee of Ministers should consider means of improving the Council of Europe's ability to react rapidly and effectively to allegations of systematic human rights abuse involving several member States.

*Doc. 10957*

**C.     Explanatory memorandum**
        by Mr Dick Marty, Rapporteur

Table of Contents:

| | |
|---|---|
| 1.   Are human rights little more than a fairweather option? | 8 |
|     1.1.   11 September 2001 | 8 |
|     1.2.   Guantanamo Bay | 8 |
|     1.3.   Secret CIA prisons in Europe? | 9 |
|     1.4.   The Council of Europe's response | 10 |
|     1.5.   The European Parliament | 10 |
|     1.6.   Rapporteur or investigator? | 11 |
|     1.7.   Is this an Anti-American exercise? | 12 |
|     1.8.   Is there any evidence? | 12 |
| 2.   The global "spider's web" | 13 |
|     2.1.   The evolution of the rendition programme | 13 |
|     2.2.   Components of the spider's web | 15 |
|     2.3.   Compiling a database of aircraft movements | 17 |
|     2.4.   Operations of the spider's web | 17 |
|     2.5.   Successive rendition operations and secret detentions | 18 |
|     2.6.   Detention facilities in Romania and Poland | 18 |
|         2.6.1   The case of Romania | 19 |
|         2.6.2   The case of Poland | 20 |
|     2.7.   The human impact of rendition and secret detention | 21 |
|         2.7.1.   CIA methodology – how a detainee is treated during a rendition | 22 |
|         2.7.2.   The effects of rendition and secret detention on individuals and families | 24 |
| 3.   Individual case studies | 25 |
|     3.1.   Khaled El-Masri | 25 |
|         3.1.1.   The individual account of Khaled El-Masri | 25 |
|         3.1.2.   Elements of corroboration for Mr. El-Masri's account | 26 |
|         3.1.3.   The role of "the former Yugoslav Republic of Macedonia" | 27 |
|             3.1.3.1.   The "official line" of the authorities | 27 |
|             3.1.3.2.   Further elements | 29 |
|     3.2.   "The Algerian Six" | 32 |
|     3.3.   Ahmed Agiza and Mohammed Alzery (El Zari) | 35 |
|     3.4.   Abu Omar | 37 |
|     3.5.   Bisher Al-Rawi and Jamil El-Banna | 38 |
|     3.6.   Maher Arar | 40 |
|     3.7.   Messrs Bashmila and Ali Qaru | 41 |
|     3.8.   Mohammed Zammar | 41 |
|     3.9.   Binyam Mohamed al Habashi | 42 |
| 4.   Secret places of detention | 45 |
|     4.1.   Satellite photographs | 45 |
|     4.2.   Documented aircraft movements | 45 |
|     4.3.   Witness accounts | 45 |
|     4.4.   Evaluation | 46 |
| 5.   Secret detentions in the Chechen Republic | 46 |
|     5.1.   The work of the European Committee for the Prevention of Torture (CPT) | 46 |
|     5.2.   Damning recent accounts by witnesses | 46 |
| 6.   The attitude of governments | 47 |
| 7.   Individual cases: judicial proceedings in progress | 49 |
|     7.1.   A positive example: the Milan public prosecutor's office (Abu Omar case) | 49 |
|     7.2.   A matter requiring further attention: the Munich (El-Masri case) and Zweibrücken (Abu Omar case) public prosecutors' offices | 49 |
|     7.3.   Another matter requiring further attention: the Al Rawi and El Banna case | 49 |
|     7.4.   Sweden: what next in the Agiza and Alzery case? | 49 |
|     7.5.   Spain | 50 |
|     7.6.   Mr El-Masri's complaint in the United States | 50 |
| 8.   Parliamentary investigations | 50 |
|     8.1.   Germany | 50 |
|     8.2   The United Kingdom | 51 |
|     8.3.   Poland: a parliamentary inquiry, carried out in secret | 51 |

|  |  |  |
|---|---|---|
| 8.4. | Romania and "the former Yugoslav Republic of Macedonia": no parliamentary inquiries | 51 |
| 9. | Commitment to combating terrorism | 52 |
| 9.1. | Fight against terrorism: an absolute necessity | 52 |
| 9.2. | The strength of unity and of the law | 52 |
| 10. | Legal perspectives | 54 |
| 10.1. | The United States' legal position | 54 |
| 10.2. | The point of view of the Council of Europe | 56 |
| 10.2.1. | The European Commission for Democracy through Law (Venice Commission) | 56 |
| 10.2.2 | The Secretary General of the Council of Europe (Article 52 ECHR) | 58 |
| 11. | Conclusion | 59 |

*Doc. 10957*

### 1.   Are human rights little more than a fairweather option?

**1.1.   11 September 2001**

1.      The tragedies that took place on 11 September 2001 undoubtedly marked the beginning of an important new chapter in the terrible, never-ending history of terrorism. It is a history of indiscriminate violence, instigated in order to create a climate of insecurity and fear with the intention of attacking the existing political and social system. For the first time, spectacular and extremely lethal acts struck highly symbolic targets at the very heart of the United States of America, the most powerful state in the world. Europe, for its part, already has a long and painful experience of terrorism, involving numerous victims and large-scale attacks, particularly in Italy[2], Germany, Spain, the United Kingdom, France and, more recently, Russia.

2.      While the states of the Old World have dealt with these threats primarily by means of existing institutions and legal systems[3], the United States appears to have made a fundamentally different choice: considering that neither conventional judicial instruments nor those established under the framework of the laws of war could effectively counter the new forms of international terrorism, it decided to develop new legal concepts. The latter are based primarily on the *Military Order on the Detention, Treatment, and Trial of Certain Non-Citizens in the War against Terrorism* signed by President Bush on 13 November 2001[4]. It is significant that, to date, only one person has been summoned before the courts to answer for the 11 September attacks: a person, moreover, who was already in prison on that day, and had been in the hands of the justice system for several months[5]. By contrast, hundreds of other people are still deprived of their liberty, under American authority but outside the national territory, within an unclear normative framework. Their detention is, in any event, altogether contrary to the principles enshrined in all the international legal instruments dealing with respect for fundamental rights, including the domestic law of the United States (which explains the existence of such detention centres outside the country). The following headline appears to be an accurate summary of the current administration's approach: *No Trials for Key Players: Government prefers to interrogate bigger fish in terrorism cases rather than charge them*[6].

3.      This legal approach is utterly alien to the European tradition and sensibility, and is clearly contrary to the European Convention on Human Rights and the Universal Declaration of Human Rights. Cicero's old adage, *inter arma silent leges*, appears to have left its mark even on international bodies supposed to ensure the rule of law and the fair administration of justice. It is frankly alarming to see the UN Security Council sacrificing essential principles pertaining to fundamental rights in the name of the fight against terrorism. The compilation of so-called "black lists" of individuals and companies suspected of maintaining connections with organisations considered terrorist and the application of the associated sanctions clearly breach every principle of the fundamental right to a fair trial: no specific charges, no right to be heard, no right of appeal, no established procedure for removing one's name from the list[7].

**1.2.   Guantanamo Bay**

4.      At Guantanamo Bay, on the island of Cuba, several hundred people are being detained without enjoying any of the guarantees provided for in the criminal procedure of a state governed by the rule of law or by the Geneva Conventions on the law of war. These people have been arrested in unknown circumstances, handed over by foreign authorities without any extradition procedure being followed, or

---

[2] More than 14 500 politically motivated acts of violence were recorded in Italy between 1969 and 1987, causing 419 deaths and 1181 casualties (Interior Ministry figures).
[3] We may recall the words of the former President of Italy, Sandro Pertini (albeit translated in paraphrased form): *"Italy can proudly say that it has defeated terrorism in the law courts, rather than resorting to "stadium justice".*
[4] Regarding the various decisions taken by the American administration following the 11 September attacks, I refer readers to the excellent report by Kevin McNamara, *Lawfulness of Detentions by the United States in Guantanamo Bay*, accompanying the resolution and recommendation adopted by the PACE on 26 April 2005 (Doc 10497).
[5] The person in question is Zacarias Moussaoui, a French citizen of Moroccan descent, sentenced to life imprisonment by a Virginia grand jury on 3 May 2006; the jurors did not impose the death penalty sought by the federal prosecutors (thereby avoiding the trap set by the defendant, who clearly wished to be sentenced to death so as to appear a martyr). According to an American government document, now declassified, six important Al-Qaeda members directly involved in the organisation and funding of the 11 September attacks have apparently been captured by the United States. Although more heavily involved than Moussaoui, they have not been summoned before the American courts to answer for their actions (see also *Le Monde* of 22 April 2006).
[6] *Los Angeles Times* of 4 May 2006.
[7] A motion raising the issue of the UN black lists (Doc 10856) has been referred to the PACE Committee on Legal Affairs and Human Rights, which will submit a report on the subject in the near future.

illegally abducted in various countries by United States special services. They are considered "enemy combatants", according to a new definition introduced by the American administration[8].

5.  The Parliamentary Assembly of the Council of Europe (PACE) has strongly criticised this state of affairs: on 26 April 2005, it unanimously adopted Resolution 1433 (2005) and Recommendation 1699 (2005) in which it urges the United States Government to put a stop to this situation and to ensure respect for the principles of the rule of law and human rights. It also concludes that *"the United States has engaged in the unlawful practice of secret detention"*. In its reply of 17 June 2005 (Doc 10585), the Committee of Ministers expresses *"its full support to all such efforts and to all efforts to obtain a prompt release or fair trial of persons detained at Guantánamo Bay by an independent and impartial court. It urges the United States Government to ensure that the rights of all detainees are ensured and that the principle of the rule of law is fully respected. For its own part, it expresses the determination of the member States to ensure that the rights of persons released and returned to their jurisdiction are fully respected"*. The Committee of Ministers has conveyed a message in these terms to the Government of the United States of America[9]. To our knowledge, no reply has been received to date.

6.  The UN Committee against Torture has also called for the closure of the Guantanamo Bay detention facility in recent times, criticising its secret character and the denial of access to the ICRC[10].

### 1.3. Secret CIA prisons in Europe?

7.  This was the news item circulated in early November 2005 by the American NGO Human Rights Watch (HRW), the Washington Post and the ABC television channel. Whereas the Washington Post did not name specific countries hosting, or allegedly having hosted, such detention centres, simply referring generically to "eastern European democracies", HRW reported that the countries in question are Poland and Romania. On 5 December 2005, ABC News in turn reported the existence of secret detention centres in Poland and Romania, which had apparently been closed following the Washington Post's revelations. According to ABC, 11 suspects detained in these centres had been subjected to the harshest interrogation techniques (so-called "enhanced interrogation techniques') before being transferred to CIA facilities in North Africa.

8.  It is interesting to recall that this ABC report, confirming the use of secret detention camps in Poland and Romania by the CIA, was available on the Internet for only a very short time before being withdrawn following the intervention of lawyers on behalf of the network's owners. The Washington Post subsequently admitted that it had been in possession of the names of the countries, but had refrained from naming them further to an agreement entered into with the authorities. It is thus established that considerable pressure was brought to bear to ensure that these countries were not named. It is unclear what arguments prevailed on the media outlets in question to convince them to comply. What is certain is that these are troubling developments that throw into question the principles of the freedom and independence of the press. In this light, it is worth noting that just before the publication of the original revelations by the reporter Dana Priest in early November 2005, the Executive Editor of the Washington Post was invited for an audience at the White House with President Bush[11].

---

[8] Following an injunction by an American court, based on the provisions of press law, in April 2006 the Pentagon published, for the first time, a list of the names and nationalities of 558 people detained at Guantanamo. However, no details are given for some 140 people previously detained but no longer imprisoned at Guantanamo on that date. Furthermore, no outside body can confirm whether this list is actually comprehensive.
[9] The United States has enjoyed observer status with the Committee of Ministers since 10 January 1996.
[10] See Press Release of the United Nations Office at Geneva, *CAT Concludes Thirty-Sixth* Session, 19 May 2006: "The Committee was concerned by allegations that the State party had established secret detention facilities, which were not accessible to the International Committee of the Red Cross. The Committee recommended that the United States cease to detain any person at Guantánamo Bay and that it close that detention facility, permit access by the detainees to judicial process or release them as soon as possible, ensuring that they were not returned to any State where they could face a real risk of being tortured"; available at:
http://www.unog.ch/unog/website/news_media.nsf/(httpNewsByYear_en)/5FBB9C351B9E70EBC1257173004EB4CE?OpenDocument.
[11] This meeting, along with several similar instances, was reported in a column in the Washington Post at the end of 2005. Leonard Downie, the Executive Editor of the Washington Post, said: *"We met with them on more than one occasion… The meetings were off the record for the purpose of discussing national security issues in [Dana Priest's] story"*. See Howard Kurtz, "Bush Presses Editors on Security", *The Washington Post*, 26 December 2005; available at http://www.washingtonpost.com/wp-dyn/content/article/2005/12/25/AR2005122500665_pf.html.

*Doc. 10957*

### 1.4. The Council of Europe's response

9. The Council of Europe responded straight away. The President of the PACE immediately took a very firm position, and asked the Committee on Legal Affairs and Human Rights to look into the matter without delay. The latter did so at its meeting of 7 November 2005. The Secretary General of the Council, for his part, set in motion the procedure established by Article 52 of the European Convention on Human Rights (ECHR). The Committee on Legal Affairs and Human Rights also requested the Venice Commission to prepare an opinion on the international legal obligations and duties of Council of Europe member States in respect of secret detention facilities and inter-state transport of prisoners. Cooperation was likewise established with the Council of Europe's Human Rights Commissioner.

10. The European Union Commission, via its Vice-President Franco Frattini, expressed its full support for the Council of Europe. The EU Commission's support proved invaluable in obtaining the necessary information from Eurocontrol and the European Union Satellite Centre. The reference to named European countries suddenly aroused huge media interest. Yet these incidents – secret detentions and "renditions" – had already been attracting condemnation for some time, both from the PACE itself, *inter alia* through the aforementioned resolution and recommendation concerning Guantanamo Bay, the re-reading of which I cannot recommend highly enough, and in extremely detailed reports by NGOs, university professors and journalists known for their very painstaking work[12]. These revelations had met with curious indifference from the media, governments and political circles in general.

### 1.5. European Parliament

11. Members of the European Parliament also became alarmed at the mounting evidence that European countries, or at least facilities located on European territory, had been the scene of systematic human rights violations. In early 2006, a 46-member Temporary Committee was set up and instructed to investigate the alleged existence of CIA prisons in Europe in which terrorist suspects had allegedly been detained and tortured[13].

12. I welcomed this initiative in my previous memorandum, considering it wholly consistent with the Council of Europe's desire to ascertain the truth. Co-operation with the Temporary Committee has been extremely satisfactory, both at the level of our respective secretariats and with its Chairman, Carlos Miguel Coelho, and rapporteur, Claudio Fava. I had the opportunity to address members of the European Parliament's committee during one of its first public hearings.

13. On 24 April 2006 the Temporary Committee presented its draft interim report, which confirmed strong indications of illegal actions carried out by the CIA in Europe. In its initial analysis, the report largely supported the observations we made in our own *Information Memorandum II* on 24 January 2006. The TDIP rapporteur Claudio Fava, in presenting his interim report, spoke of *"more than a thousand flights chartered by the CIA [that] have transited through Europe, often in order to carry out extraordinary renditions"*[14]. In a press conference, Mr Fava clarified that, according to information given to him in confidence by an intelligence source, *"30 to 50 people have been rendered by the CIA in Europe"* and that *"the CIA could not*

---

[12] These include the Human Rights Watch Breifing Paper of October 2004 entitled *The United States' 'Disappeared': The CIA's Long-Term Ghost Detainees*; and the Amnesty International report AMR 51/051/2006 of 5 April 2006, entitled *Below the radar: secret flights to torture and "disappearance"*, as well as numerous articles describing in detail the new techniques for fighting terrorism, such as *extraordinary renditions;* for instance, the articles in the *Corriere della Sera* by Paolo Biondani and Guido Olimpio, which the latter has compiled and edited in a well-researched book (*Operazione Hotel California*, Feltrinelli, 2005), along with articles by Stephen Grey (*America's Gulag*, The New Statesman, 17 May 2004; *US Accused of Torture Flights*, The Sunday Times, 14 November 2004; *Les Etats-Unis inventent la délocalisation de la torture*, Le Monde Diplomatique, April 2005); Alfred McCoy (*Cruel Science: CIA Torture and U.S. Foreign Policy*, New England Journal of Public Policy, Boston, 2004, an article subsequently expanded and published in book form, and also published in German under the title *Foltern und foltern lassen*, Zweitauseneins, 2005; *Torture by Proxy: International and Domestic Law Applicable to "Extraordinary Renditions"*, report published in 2004 by the Committee on International Human Rights of the Association of the Bar of the City of New York and the Center for Human Rights and Global Justice, New York University School of Law, the conclusions of which could not be clearer: "*Extraordinary Rendition is an illegal practice under both domestic and international law, and that, consistent with U.S. policy against torture, the U.S. government is duty bound to cease all acts of Extraordinary Rendition, to investigate Extraordinary Renditions that have already taken place, and to prosecute and punish those found to have engaged in acts that amount to crimes in connection with Extraordinary Rendition.*"
[13] Temporary Committee on the Alleged Use of European Countries by the CIA for the Transport and Illegal Detention of Prisoners (TDIP; http://www.europarl.eu.int/comparl/tempcom/tdip/default_en.htm).
[14] See *Le Monde*, 27 April 2006.