*have carried out such renditions without the agreement of European states"*[15]. The Temporary Committee proposes to continue its work[16].

### 1.6. Rapporteur or investigator?

14.     I have often been described as an "investigator", or even a "special investigator". It might be helpful to point out, therefore, that I do not enjoy any specific investigatory powers and, in particular, am not entitled to use coercive methods or to require the release of specific documents. My work has consequently consisted primarily of interviews and analysis. I submitted a set of questions to governments via their national parliamentary delegations, and asked the latter to take the debate to the national level. Parliamentary questions were thereby tabled in many states with a view to obtaining information from the various governments. Special parliamentary commissions of inquiry were set up in some countries. The work undertaken by a number of NGOs has proven invaluable and even, in many cases, more detailed and reliable than the information supplied by governments. A significant contribution was also made by many journalists investigating on the ground, often for months on end. I also received information entrusted to me only on the assurance that I would keep it confidential and protect my sources. The information thus received clearly cannot be presented as evidence; it did, however, point my research in certain more specific directions, and enables me to state with certainty that the search for the truth about what really happened to terrorist suspects in Europe will not end with the present report.

15.     I received considerable assistance in this task from the head of the secretariat of the Committee on Legal Affairs and Human Rights and one of his colleagues – both of whom were already very busy with other tasks connected with the committee's operation and work with other rapporteurs – as well as from another young colleague who, in the end, was temporarily assigned specifically to this investigation (and whose help proved invaluable). I am extremely grateful to them for their outstanding competence and exceptional readiness to assist.

16.     I was formally designated as Rapporteur on 13 December 2005. Within the Council of Europe it was considered that the report should be presented as quickly as possible. Taking into account the breadth and complexity of the subject, as well as the extremely modest means put at my disposal, I have certainly not been able to present a complete overview of the different aspects of what has really occurred. Moreover, we are still far from knowing all the details of "extraordinary renditions" and the conditions in which abducted persons have been detained and interrogated in Europe. It is thus highly likely that the Council of Europe should remain seized on this subject matter. Elements presently in the public domain - which are supplemented with new information as every week goes by - not only justify, but require that member States finally decide to open serious inquiries on the extent to which they were directly or indirectly implicated in such activities.

17.     As I stated in my previous memorandum, serious consideration must be given to whether the Assembly should equip itself with other resources for dealing with such complex matters. Where investigations relate to possible human rights violations that are not confined to individual cases (for which the European Court of Human Rights has jurisdiction) and transcend borders, thereby sidestepping national procedures, one is justified in questioning the effectiveness of existing instruments. Instead of appointing a single member as rapporteur with the support of the normal resources of the Committee's secretariat, which is already overwhelmed by other reports in preparation, we might seriously consider whether setting up a proper commission of inquiry, assisted by experts and enjoying genuine investigatory powers, might not be a better solution for dealing with these new and important challenges.

18.     We have tackled this problem with determination and a constant concern for objectivity, mindful of both the enormity of the task entrusted to me and the frankly derisory resources available and the risk of being manipulated. My aim was by no means to amass evidence for the purpose of condemning or stigmatising. On the contrary, I was guided by a desire to ascertain the truth in order to reaffirm the values the Council of Europe has always striven to uphold, and to guard against the repetition of such incidents.

---

[15] See *Le Monde*, 18 May 2006.
[16] The draft resolution of the European Parliament, produced as an annex to the interim report, can be consulted at: http://www.europarl.europa.eu/comparl/tempcom/tdip/interim_report_en.pdf. I should like to thank the Temporary Committee and its Rapporteur, Mr Fava, for having made it possible for a member of my team to join their visits to Macedonia and the United States.

*Doc. 10957*

### 1.7. Is this an Anti-American exercise?

19. I consider this reproach, made fairly frequently when criticisms are voiced about violations of fundamental rights committed in the context of the fight against terrorism, downright ridiculous and wholly inaccurate. It overlooks the fact that the initial criticisms, relating to the establishment of the detention centre at Guantanamo Bay as well as the use of *extraordinary renditions* and torture, were first forcefully expressed by American journalists, NGOs and politicians, often thanks to detailed information released by sources within the administration, and indeed the intelligence services themselves. The debate has been, and in my view still is, considerably more heated in the United States than in Europe, at least in certain circles and media.

20. Moreover, the United States Supreme Court itself pointed out, in an extraordinary June 2004 judgment, that *"at stake in this case is nothing less than the essence of a free society. (...) For if this Nation is to remain true to the ideals symbolized by its flag, it must not wield the tools of tyrants even to resist an assault by the forces of tyranny"*[17]. This is a sharp reminder of the great democratic tradition of the United States and its exemplary commitment to human rights. The United States is, and remains, a deeply democratic country. Indeed, criticisms of some of the current administration's decisions also reflect a concern that a country which unquestionably serves as an example to the rest of the world is committing what we consider to be mistakes that not only violate fundamental principles, but also constitute a counterproductive anti-terrorism strategy.

### 1.8. Is there any evidence?

21. It is paradoxical to expect bodies without any real investigatory powers – the Council of Europe and the European Parliament – to adduce evidence in the legal sense. Indeed, these European bodies have been prompted to undertake such investigations owing to a lack of willingness and commitment on the part of national institutions that could, and should, have completely clarified these allegations which from the outset did not appear to be totally unfounded.

22. At this stage there is no formal evidence of the existence of secret CIA detention centres in Poland, Romania or other Council of Europe member States, even though serious indications continue to exist and grow stronger. Nevertheless, it is clear that an unspecified number of persons, deemed to be members or accomplices of terrorist movements, were arbitrarily and unlawfully arrested and/or detained and transported under the supervision of services acting in the name, or on behalf, of the American authorities. These incidents took place in airports and in European airspace, and were made possible either by seriously negligent monitoring or by the more or less active participation of one or more government departments of Council of Europe member States.

23. In the light of the silence and obvious reluctance on the part of the bodies that could have provided the necessary information, it is legitimate to assume that there are more such cases than can be proven at present. In effect, the facts as would appear to be established today – and as will be illustrated throughout the report – as well as the total absence of serious inquiries by the national authorities concerned, implies, in my view, the reversal of the burden of proof: in such a situation it is incumbent on the Polish and Romanian authorities to conduct an independent and in-depth inquiry and to make public not only its results but also the method and the different stages of the enquiry[18]. Even if proof, in the classical meaning of the term, is not as yet available, a number of coherent and converging elements indicate that such secret detention centres did indeed exist in Europe. Such an affirmation does not pretend to be a judgment of a criminal court, necessitating "proof beyond reasonable doubt" in the Anglo-Saxon meaning of the term; it rather reflects a conviction based on a careful balance of probabilities, as well as logical deductions from clearly established facts. The intention is not to determine that the authorities of these countries are "guilty" for having tolerated

---

[17] These are the words of Judge Sandra Day O'Connor in the case of José Padilla, judgement of the United States Supreme Court, 28 June 2004.
[18] Reversal of the burden of proof if the authorities concerned do not discharge their positive duty to investigate is not a new idea: Article 39 of the Rules of Procedure of the Inter-American Commission of Human Rights provides that *"The facts alleged in the petition, the pertinent parts of which have been transmitted to the State in question, shall be presumed to be true if the State has not provided responsive information during the maximum period set by the Commission under the provisions of Article 38 of these Rules of Procedure, as long as other evidence does not lead to a different conclusion"*. At the Council of Europe, this idea was applied in the Independent Experts' report to the Secretary General (by Mr Alkema and Mr Trechsel) on political prisoners in Azerbaijan (doc. SG/Inf (2001) 34 Addendum I), in which it was stated that the cases concerned had been submitted to the authorities for comments and observations and that, in the absence of substantive observations by the authorities, the experts had had to base their findings on plausible allegations from other sources (idem, p. 20).

secret detention sites, but rather to hold them "responsible" for failing to comply with the positive obligation to investigate serious allegations.

### 2. The global "spider's web"[19]

24. The system of targeting, apprehending and detaining terrorist suspects, which forms the focus of this report, was not created overnight. Nor has it been built up from scratch in the wake of the terrorist attacks of 11 September 2001.

25. I have chosen to adopt the metaphor of a global "spider's web" as the *leitmotif* for my report. It is a web that has been spun out incrementally over several years, using tactics and techniques that have had to be developed in response to new theatres of war, new terms of engagement and an unpredictable threat.

26. The chief architect of the web, the United States of America, has long possessed the capacity to capture individual targets abroad and carry them to different parts of the world. Through its Central Intelligence Agency (CIA), the United States designed a programme known as "rendition" for this purpose in the mid-1990s. The CIA aimed to take terrorist suspects in foreign countries "off the streets" by transporting them back to other countries, usually their home countries, where they were wanted for trial, or for detention without any form of due process.

#### 2.1. The evolution of the rendition programme

27. During a recent mission to the United States, a member of my team came into contact with several "insider sources" in the US intelligence community. The most prominent such witness was Mr Michael Scheuer, who designed the original rendition programme in the 1990s under the Clinton Administration and remained employed by the CIA until November 2004[20]. Excerpts of Mr Scheuer's testimony are reflected verbatim in this report and, to the extent possible, have been substantiated or corroborated by a range of other source material in the account below[21].

28. The strategic target of the CIA rendition programme has always been, and remains, the global terrorist network known as Al-Qaeda. In the conception of the United States, Al-Qaeda exists as a nebulous collection of "cells" in countries around the world, comprising "operatives" who perform various roles in the preparation of terrorist attacks. When the US National Security Council became alarmed, in 1995, at what appeared to be a serious prospect of Osama bin Laden acquiring weapons of mass destruction, it developed rendition, according to Scheuer and others, as a way of *"breaking down Al-Qaeda"*, *"taking down cells"* and *"incarcerating senior Al-Qaeda people"*.

29. Rendition was designed, at the outset of the programme at least, to fit within the United States' interpretation of its legal obligations[22]. The prerequisites for launching a rendition operation in the pre-9/11 period included:

- an "outstanding legal process" against the suspect, usually connected to terrorist offences in his country of origin;
- a CIA "dossier", or profile of the suspect, based on prior intelligence and in principle reviewed by lawyers;
- a "country willing to help" in the apprehension of the suspect on its territory; and
- "somewhere to take him after he was arrested".

---

[19] This section should be read in conjunction with the graphic map annexed to this explanatory memorandum, entitled: *The global "spider's web" of secret detentions and unlawful inter-state transfers*

[20] Mr Michael Scheuer was Chief of the Bin Laden Unit in the CIA Counter-Terrorism Center for four years, from August 1995 to June 1999. He then served for a further three years, from September 2001 to November 2004, as Special Advisor to the Chief of the Bin Laden Unit. He is recognised as one of the most important authorities on the evolution of rendition. Mr Scheuer graciously granted my representative a three-hour personal interview in Washington, DC in May 2006. Unlike many intelligence sources with whom my team spoke, he agreed to go "on the record", talking extensively about his first-hand operational experience of the rendition programme. A transcript of the interview is on file with the Rapporteur. Excerpts are cited in this report as follows: "Michael Scheuer, former Chief of the Bin Laden Unit in the CIA Counter-Terrorism Center".

[21] I also wish to recognise the valuable work of various non-governmental organisations and academic institutions in researching the evolution of rendition and to thank them for meeting with my team to relay their insights first-hand. In particular, the following groups have produced papers that I have consulted extensively: The Center for Human Rights and Global Justice at New York University School of Law, Human Rights First, Amnesty International, Human Rights Watch and Cage Prisoners.

[22] For further detail on the United States' interpretation of its international legal obligations, see the section below entitled *The point of view of the United States*, at heading 10.1.

30. The receiving countries were, as a matter of policy, only asked to provide diplomatic assurances to the United States that they would "treat the suspects according to their own national laws". After the transfer, the United States made no effort to assess the manner in which the detainees were subsequently treated[23].

31. Intelligence gathering, according to Scheuer, was not considered to be a priority in the pre-9/11 programme:

> "It was never intended to talk to any of these people. Success, at least as the Agency defined it, was to get someone, who was a danger to us or our allies, 'off the street' and, when we got him, to grab whatever documents he had with him. We knew that once he was captured he had been trained to either fabricate or to give us a great deal of information that we would chase for months and it would lead nowhere. So interrogations were always a very minor concern before 9/11."[24]

32. Several current Council of Europe member States are known to have co-operated closely with the United States in the operation of its rendition programme under the Clinton Administration[25]. Indeed, the United Kingdom Government has indicated to the Council of Europe[26] that a system of prior notification existed in the 1990s, whereby even intended stopovers or overflights were reported by the United States in advance of each rendition operation[27].

33. The act of "rendition" may not *per se* constitute a breach of international human rights law. It is worth noting that other States have also asserted their right to apprehend a terrorist suspect on foreign territory in order to bring him to justice if the tool of international judicial assistance or cooperation did not attain the desired result[28].

34. The most prominent legal authorities in the United States, including its Supreme Court, have interpreted the object of the pre-9/11 rendition programme to be within the law[29]. Indeed, several human rights NGOs have assessed the original practice under the rubric of "rendition to justice", conceding that an inter-state transfer could be lawful if its object is to bring a suspect within a recognised judicial process respectful of human rights[30]. This indicator might in fact provide a legal benchmark against which unlawful inter-state transfers can be measured[31].

---

[23] In my *Information Memorandum II* in January, I quoted several former CIA agents who indicate that the United States knew some of the treatment of detainees would flout minimum standards of protection in international law. Mr Scheuer simply told my representative: *"I check my moral qualms at the door".*

[24] Michael Scheuer, former Chief of the Bin Laden Unit in the CIA Counter-Terrorism Center, interview carried out by the Rapporteur's representative, *supra* note 19.

[25] See Jane Mayer, *Outsourcing Torture: The secret history of America's "extraordinary rendition" program*, in The New Yorker, 14 and 21 February 2005. Mayer refers to well-documented cases of rendition in which Croatia (1995) and Albania (1998) collaborated with the United States in apprehending suspects; at pages 109-110. Mr Scheuer gave a further example involving Germany, in which a suspect named Mahmood Salim, alias Abu Hajer, was arrested by Bavarian police.

[26] See Jack Straw, Secretary of State for Foreign and Commonwealth Affairs, *Written Ministerial Statement – Enquiries in respect of rendition allegations*, appended to the Response of the United Kingdom Government to the Request of the Secretary-General for an explanation in accordance with Article 52 ECHR, available at: http://www.coe.int/T/E/Com/Files/Events/2006-cia/United-Kingdom.pdf.

[27] *Ibid*. Mr Straw states: "There were four cases in 1998 where the US requested permission to render one or more detainees through the UK or Overseas Territories. In two of these cases, records show the Government granted the request, and refused two others."

[28] See US Secretary of State Condoleeza Rice, *Remarks upon her departure for Europe*, Andrews Air Force Base, 5 December 2005. Ms Rice refers to France's actions in the case of "Carlos the Jackal": "A rendition by the French government brought him to justice in France, where he is now imprisoned."

[29] See *United States v. Alvarez-Machain*, 504 U.S. 655 (1992), in which the Supreme Court upheld the jurisdiction of a US court to try a man brought to the US from Mexico by means of abduction rather than extradition. Case law on this matter dates back to the 1886 case of *Ker v. Illinois*, 119 U.S. 436 (1886), in which the Supreme Court said: "There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will."

[30] This concept of "rendition to justice" is discussed in greater detail in: Center for Human Rights and Global Justice, NYU School of Law, *Beyond Guantanamo: Transfers to Torture One Year after Rasul v. Bush*, 28 June 2005. I am also grateful to the staff of Human Rights First for their thorough explanations, in meetings, of the contemporary legal dilemmas faced in bringing terrorist suspects to justice.

[31] For a detailed analysis of the legal parameters of inter-state transfers, see Opinion No. 363/2005 of the European Commission for Democracy through Law (Venice Commission), available at: http://www.venice.coe.int/docs/2006/CDL-AD(2006)009-e.asp. See also the section below on the point of view of the Council of Europe, at heading 10.2.1.

35.     However, there has clearly been a critical deviation away from notions of justice in the rendition programme. In the wake of the 9/11 attacks, the United States transformed rendition into one of a range of instruments with which to pursue its so-called "war on terror". The attacks of 9/11 genuinely signalled something of a watershed in the United States approach to overcoming the terrorist threat[32]. This new "war on terrorism" was launched by the military intervention in Afghanistan in October 2001. At the same time new importance was attached to the collection of intelligence on persons suspected of terrorism. The CIA was put under pressure to play a more proactive role in the detention and interrogation of suspects rather than just putting them "behind bars". Without appropriate preparation, a global policy of arresting and detaining "the enemies" of the United States was – still according to Scheuer – improvised hastily. It was up to the lawyers to "legitimise" these operations, whilst the CIA and the American military became the principal supervisors and operators of the system[33].

36.     Rendition operations have escalated in scale and changed in focus. The central effect of the post-9/11 rendition programme has been to place captured terrorist suspects outside the reach of any justice system and keep them there. The absence of human rights guarantees and the introduction of "enhanced interrogation techniques" have led, in several cases examined, as we shall see, to detainees being subjected to torture.

37.     The reasons behind the transformation in the character of rendition are both political and operational. First, it is clear that the United States Government has set out to combat terrorism in an aggressive and urgent fashion. The executive has applied massive political pressure on all its agencies, particularly the CIA, to step up the intensity of their counter-terrorist activities. According to Scheuer, "after 9/11, we had nothing ready to go – the military had no plans, they had no response; so the Agency felt the brunt of the executive branch's desire to show the American people victories"[34].

38.     Second, and more importantly, the key operational change has been the mandate given to the CIA to administer its own detention facilities. When it takes terrorist suspects into its custody, the CIA no longer uses rendition to transport them into the custody of countries where they are wanted. Instead, for the high-level suspects at least, rendition now leads to secret detention at the CIA's so-called "black sites"[35] in unspecified locations around the world. Rather than face any form of justice, suspects become entrapped in the spider's web.

**2.2.    Components of the spider's web**

39.     In addition to CIA "black sites", the spider's web also encompasses a wider network of detention facilities run by other branches of the United States Government. Examples reported in the public domain have included the US Naval Base at Guantanamo Bay and military prisons such as Bagram in Afghanistan and Abu Ghraib in Iraq. Although the existence of such facilities is known, there are many aspects of their operation that remain shrouded in secrecy too.

40.     It should also be noted that "rendition" flights by the CIA are not the only means of transporting detainees between different points on the web. Particularly in the context of transfers to Guantanamo Bay, detainees have been moved extensively on military aircraft[36], including large cargo planes. Accordingly military flights have also fallen within the ambit of my inquiry.

---

[32] See Cofer Black, former Head of the CIA Counter-Terrorism Center, testimony before the House and Senate Intelligence Committees, *Hearings on Pre-9/11 Intelligence Failures*, 26 September 2002: "All you need to know is that there was a 'before 9/11' and an 'after 9/11'. After 9/11, the gloves came off."
[33] General Nicolo Pollari, the Director of the Italian Intelligence and Security Services (SISMI), testified before the European Parliament's TDIP Temporary Committee on 6 March 2003 that "the rules of the game have changed" in terms of international co-operation in the intelligence sector: "many security activities are now carried out on the borderline of legality, albeit within the legal framework".
[34] Michael Scheuer, former Chief of the Bin Laden Unit in the CIA Counter-Terrorism Center, interview carried out by the Rapporteur's representative, *supra* note 19.
[35] For an impressive account of CIA "black sites", see: Center for Human Rights and Global Justice, NYU School of Law, *Fate and Whereabouts Unknown: Detainees in the "War on Terror"*, 17 December 2005. The term "black sites" came into the public debate largely as a result of Dana Priest, *CIA Holds Terror Suspects in Secret Prisons*, Washington Post, 2 November 2005.
[36] See, *inter alia*, US Department of Defense documents released in response to a lawsuit under the *Freedom of Information Act* by Stephen H. Oleskey, Wilmer Hale LLP (copies of all disclosed documents on file with the Rapporteur). These materials shed light on the full extent to which military planes were used to transport detainees to Guantanamo Bay: in five consecutive missions in early January 2002 alone, nearly 150 detainees were transferred there (including out from European countries).

*Doc. 10957*

41.   The graphic included in this report depicts only a small portion of the global spider's web. It consists of two main components.

42.   First it illustrates the flights of both civilian and military aircraft, operated by the United States, which appear to be connected to secret detentions and unlawful inter-state transfers also involving Council of Europe member States. This inquiry is based on seven separate sets of data from Eurocontrol[37], combined with specific information from about twenty national aviation authorities in response to my requests. In this way, we have obtained a hitherto unique database[38].

43.   Second, it distinguishes four categories of aircraft landing points, which indicate the different degrees of collusion on the part of the countries concerned. These landing points have been placed into their respective categories as follows on the basis of the preponderance of evidence gathered[39]:

Category A: "**Stopover points**"
(points at which aircraft land to refuel, mostly on the way home)

>    Prestwick
>    Shannon
>    Roma Ciampino
>    Athens
>    Santa Maria (Azores)
>    Bangor
>    Prague

Category B: "**Staging points**"
(points from which operations are often launched - planes and crews prepare there, or meet in clusters)

>    Washington
>    Frankfurt
>    Adana-Incirlik
>    Ramstein
>    Larnaca
>    Palma de Mallorca
>    Baku

Category C: "**One-off pick-up points**"
(points from which, according to our research, one detainee or one group of detainees was picked up for rendition or unlawful transfer, but not as part of a systematic occurrence)

>    Stockholm-Bromma
>    Banjul
>    Skopje
>    Aviano
>    Tuzla

Category D: "**Detainee transfer / Drop-off points**"
(places visited often, where flights tend to stop for just short periods, mostly far off the obvious route – either their location is close to a site of a known detention facility or a *prima facie* case can be made to indicate a detention facility in their vicinity)

>    Cairo
>    Amman
>    Islamabad
>    Rabat
>    Kabul

---

[37] Eurocontrol is the European Organisation for the Safety of Air Navigation. I am grateful to Eurocontrol's Director General, Mr Victor Aguado, and his staff for responding to my various enquires in such an efficient and collegial manner. See the section below, at heading 2.3
[38] I sent a round of letters to the Heads of National Parliamentary Delegations on 31 March 2006 in which I asked specifically for information from their respective national aviation authorities.
[39] In this regard we have gathered detainee testimonies, exhibits placed before judicial and parliamentary enquiries, information obtained under *Freedom of Information* legislation, interviews with legal representatives and insider sources, the accounts of investigative journalists and research conducted by non-governmental organisations.

Guantanamo Bay
Timisoara / Bucharest
Tashkent
Algiers
Baghdad
Szymany

### 2.3. Compiling a database of aircraft movements

44.   As we began our work in November 2005, various organisations and individuals in the non-governmental sector, especially investigative journalists and NGOs, sent us lists of aircraft suspected either of belonging to the CIA or of being operated on the CIA's behalf by bogus "front companies". The lists contained details such as the type of aircraft, the registered owner and operator, and the "N-number" by which an aircraft is identified. These lists are the result of painstaking efforts to piece together information that is publicly available on certain Internet sites, observations by "planespotters" and testimony from former detainees. We subsequently received from Eurocontrol "flight plans" regarding these planes, at least in so far as the European air space is concerned, for the period between the end of 2001 and early 2005. The Eurocontrol data received in January and February 2006 include, on the one hand, the plans of flights foreseen (which can be changed even during a flight for different reasons) and, on the other hand, information that has been verified following a request for collection of route charges, and flight data obtained from aviation authorities in the United States and elsewhere.

45.   The lists requested from Eurocontrol in our original correspondence were somewhat speculative, but knowingly so. It was important for the inquiry team, in conjunction with external experts and investigators familiar with the topic, to gain a sense of how CIA-related aircraft operate in relation to the thousands of other, non-CIA aircraft that use European airspace. In other words we sought to build a profile of the characteristics of CIA flights. Additionally we hoped that by casting our net widely, we would be able to identify planes never before connected to the CIA.

46.   We subsequently reverted to Eurocontrol on several occasions to obtain additional flight records[40]. As our work has progressed, we have been able to narrow down the number of aircraft movements that are of interest to our work and develop our analysis into a more sophisticated, realistic measure of the extent of illegality in the CIA's clandestine flight operations.

47.   Based on our initial analysis, we sent a series of one-off additional requests to certain national air traffic control bodies in order to obtain records of the flights actually made in their countries; we also asked for data on the movements of military aircraft, which are not covered by Eurocontrol.

48.   I am happy to report that through this channel I received useful information from various state institutions in different Council of Europe member States, including from transport ministries, aeronautic authorities, airport operators and state airlines. In addition, I obtained official records from national parliaments directly, including papers lodged by ministries of defence in response to parliamentary questions[41]. All of these diverse sources have contributed to the database of aircraft movements relied upon in this report.

### 2.4. Operations of the spider's web

49.   We believe that we have made a significant step towards a better comprehension of the system of "renditions" and secret detention centres. One observation must be made. We should not lose our sense of proportion. It would be exaggerated to talk of thousands of flights, let alone hundreds of renditions concerning Europe. On this point I share the views expressed by members of the US Department of State, who recently delivered a first-hand briefing in Washington, DC at which a member of my team was present[42]. We undermine our credibility and limit the possibility for serious discussion if we make allegations that are

---

[40] Notably, in February 2006, I met with the staff of Eurocontrol for a very constructive briefing session.
[41] See, *inter alia*, the letter of the Rt. Hon Adam Ingram, UK Minister of State for the Armed Forces, in response to parliamentary questions in the House of Commons about the use of UK military airfields by US registered aircraft, dated 2 March 2006.
[42] See John Bellinger, Chief Legal Advisor to the US Secretary of State, and Dan Fried, Assistant Secretary of State, Bureau of European and Eurasian Affairs; *Briefing to European Delegation during the visit of the TDIP Temporary Committee of the European Parliament to Washington, DC*, 11 May 2006 (transcript on file with the Rapporteur – hereinafter "Bellinger, *Briefing to European Delegation*" or "Fried, *Briefing to European Delegation*").

Doc. 10957

ambiguous, exaggerated or unsubstantiated[43]. Indeed, it is evident that not all flights of CIA aircraft participate in "renditions". As Mr John Bellinger pointed out:

> "Intelligence flights are a manifestation of the co-operation that happens amongst us. They carry analysts to talk with one another, they carry evidence that has been collected... I'm sure the Director of Intelligence himself was personally on a number of those flights."[44]

Mr Scheuer gave another explanation as to the purposes of such flights:

> "There are lots of reasons other than moving prisoners to have aircrafts. It all depends on what you are doing. If you are in Afghanistan and you're supplying weapons to a commander that is working with Karzai's Government, then it could be a plane load of weapons. It could be food – the CIA is co-located with the US Military in bases around the country, so it could be rations.
>
> Also, we try to take care of our people as well as we can, so it's toiletries, it's magazines, it's video recorders, it's coffee makers. We even take up collections at Christmas, to make sure we can send out hundreds and hundreds of pounds of Starbucks Coffee. So out of a thousand flights, I would bet that 98% of those flights are about logistics!"[45]

In fact it is precisely the remaining 2% that interests us.

50.    In order to understand the notion of a "spider's web", what is important to bear in mind is not the overall numbers of flights[46]; but rather the nature and context of individual flights. Our research has covered ten case studies of alleged unlawful inter-state transfers, involving a total of seventeen individual detainees. In most of these cases it was possible to generate flight logs from the amalgamated official flight database referred to earlier. I have then matched those logs with the times, dates and places of the alleged transfer operations – according to victims themselves, lawyer's notes or other sources. Finally, where possible, I have corroborated this information with factual elements acquired from legal proceedings in Council of Europe member States or in the United States.

51.    In translating these case studies into graphic representations, I resolved to trace each flight route not individually, but as part of a circuit. Each circuit begins and ends, where possible, at the aircraft's "home base" (very often Dulles Airport in Washington, DC) in the United States. Following these flight circuits helps to better understand the different categories of aircraft landings – simple stopovers for refuelling, staging points that host clusters of CIA aircraft or serve to launch operations, and detainee drop-off points. Despite being a fairly simple analytical technique, it has also helped discover some significant new information, which we present in the following sections.

### 2.5.    Successive rendition operations and secret detentions

52.    We believe we are in a position to state that successive CIA rendition operations have taken place in the course of the same, single flight circuit. Two of the rendition case studies examined in this report, both involving Council of Europe member States to differing degrees, belonged to the same clandestine circuit of abductions and renditions at different points of the spider's web. The information at our disposal indicates that the renditions of Binyam Mohamed and Khaled El-Masri were carried out by the same CIA-operated aircraft, within 48 hours of one another, in the course of the same 12-day tour in January 2004. This finding appears significant for a number of reasons. First, since neither man even knows of the other – Mr Mohamed is still detained at Guantanamo Bay and Mr El-Masri has returned to his home community near Ulm in the South of Germany – their respective stories can be used to lend credence to one another. My team has received direct or indirect testimony from each of them independently.

---

[43] *Ibid.* According to Mr Bellinger: "We have been trying, from Secretary Rice down, to engage in a real dialogue with our different partners in Europe, be it the EU, be it the Council of Europe. We know your concerns and we are interested in talking to you directly, but on the basis of fact and not mere hyperbole." According to Mr Fried: "If the charges are absurd, it becomes difficult to deal with the real problems of the legal regime and the legal framework in which we have to conduct this struggle."
[44] Bellinger, *Briefing to European Delegation*, *supra* note 41.
[45] Michael Scheuer, former Chief of the Bin Laden Unit in the CIA Counter-Terrorism Center, interview conducted by the Rapporteur's representative, *supra* note 19.
[46] Bellinger, *Briefing to European Delegation*, *supra* note 41: "There really is not evidence of this. There is not evidence of a thousand detainees; there's not evidence of a hundred detainees; there's not even evidence of ten detainees."

53.     As they both allege having been subjected to CIA rendition, the fact that the same aircraft - operated by a CIA-linked company – carried out two transfers in such quick succession allows us to speak of the existence of a "rendition circuit" within the "spider's web".

54.     It is also possible to develop a hypothesis as to the nature of some other aircraft landings belonging to the same renditions circuit. Thus, for example, the landings which occurred directly before and directly after the El-Masri rendition bear the typical characteristics of rendition operations[47].

55.     Our analysis of the rendition programme in the post-9/11 era allows us to infer that the transfer of other detainees on this rendition circuit must have entailed detainees being transferred out of Kabul to alternative detention facilities in different countries. Thus, drawing upon official flight data, the probable existence of secret detention facilities can be inferred in Algeria and, as we will see, in Romania.

### 2.6.    Detention facilities in Romania and Poland

### 2.6.1    The case of Romania

56.     Romania is thus far the only Council of Europe member State to be located on one of the rendition circuits we believe we have identified and which bears all the characteristics of a detainee transfer or drop-off point. The N313P rendition plane landed in Timisoara at 11.51 pm on 25 January 2004 and departed just 72 minutes later, at 1.03 am on 26 January 2004. I am grateful to the Romanian Civil Aeronautic Authority for confirming these flight movements[48].

57.     It is known that detainee transport flights are customarily night flights, as is the case of the other rendition flights already documented. The only other points on this rendition circuit from which the plane took off at a similar hour of the morning were Rabat, Morocco (departure at 2.05 am) and Skopje, "the former Yugoslav Republic of Macedonia" (hereinafter "Macedonia") (departure at 1.30 am). In both of these cases, we possess sufficient indications to claim that when the plane left its destination, it was carrying a prisoner to a secret detention centre situated in Kabul.

58.     We can likewise affirm that the plane was not carrying prisoners to further detention when it *left* Timisoara. Its next destination, after all, was Palma de Mallorca, a well-established "staging point", also used for recuperation purposes in the midst of rendition circuits.

59.     There is documentation in this instance that the passengers of the N313P plane, using US Government passports[49] and apparently false identities[50], stayed in a hotel in Palma de Mallorca for two nights before returning to the United States. One can deduce that these passengers, in addition to the crew of the plane, comprised a CIA rendition team, the same team performing all renditions on this circuit.

60.     The N313P plane stayed on the runway at Timisoara on the night of 25 January 2004 for barely one hour. Based on analysis of the flight capacity of N313P, a Boeing 737 jet, in line with typical flight behaviours of CIA planes, it is highly unlikely that the purpose of heading to Romania was to refuel. The plane had the capacity to reach Palma de Mallorca, just over 7 hours away, directly from Kabul that night – twice previously on the same circuit, it had already flown longer distances of 7 hours 53 minutes (Rabat to Kabul) and 7 hours 45 minutes (Kabul to Algiers).

---

[47] See *Flight logs related to the successive rendition operations of Binyam Mohamed and Khaled El-Masri in January 2004*, reproduced in this report in the Appendix to the present document. The landings in question are at Algiers (Algeria) and Timisoara (Romania).
[48] See *Information from the records of the Romanian Civil Aeronautic Authority and the Romanian Ministry of National Defence*, contained as Appenices to the letters sent to me by György Frunda, Chairman of the Romanian delegation to PACE, dated 24 February 2006 and 7 April 2006. I wish to thank my colleague Mr Frunda for his outstanding efforts in gathering information from various Romanian authorities on my behalf.
[49] See Andrew Manreas, *La investigación halla en los vuelos de la CIA decenas de ocupantes con estatus diplomatico*, in El Pais, Palma de Mallorca, 15 November 2005.
[50] See Matias Valles, journalist with Diario de Mallorca, *Testimony before theTDIP Temporary Committee of the European Parliament*, 20 April 2006. Valles researched a total of 42 names he had uncovered from the records of a hotel in Mallorca where the passengers of the N313P plane stayed. Many proved to be "false identities", apparently created using the names of characters from Hollywood movies such as *Bladerunner* and *Alien*. Valles confirmed that at least some of the persons who arrived back in Palma de Mallora from Romania after the rendition circuit were the same persons who had stayed in the hotel at a previous point on the circuit – thus indicating that the "rendition team" remained on the plane throughout its trip.

*Doc. 10957*

61. It should be recalled that the rendition team stayed about 30 hours in Kabul after having "rendered" Khaled El-Masri. Then, it flew to Romania on the same plane. Having eliminated other explanations – including that of a simple logistics flight, as the trip is a part of a well-established renditions circuit – the most likely hypothesis is that the purpose of this flight was to transport one or several detainees from Kabul to Romania.

62. We consider that while all these factual elements do not provide definitive evidence of secret detention centres, they do justify on their own a positive obligation to carry out a serious investigation, which the Romanian authorities do not seem to have done to date.

**2.6.2.  The case of Poland**

63. Poland was likewise singled out as a country which had harboured secret detention centres.

64. On the basis of information obtained from different sources we were able to determine that persons suspected of being high level terrorists were transferred out of a secret CIA detention facility in Kabul, Afghanistan in late September and October 2003[51]. During this period, my official database shows that the only arrival of CIA-linked aircraft from Kabul in Europe was at the Polish airport of Szymany. The flights in question, carried out by the well-known "rendition plane" N313P, bear all the hallmarks of a rendition circuit.

65. The plane arrived in Kabul, on 21 September 2003, from Tashkent, Uzbekistan. The axis between Tashkent and Kabul was well known for detainee transfers[52]. Still, according to information received, the most significant detainee movements at this time probably involved transfers *out of* Kabul. The explanation attributed by NGO sources and journalists who have investigated this period[53] is that the CIA required a more isolated, secure, controlled environment in which to hold its high-level detainees, due to the proliferation of both prison facilities and prisoners in Afghanistan arising from the escalating "war on terrorism".

66. Thus, the circuit in question continued on 22 September 2003, when the plane flew from Kabul to Szymany airport in Poland. On the same grounds given above for the case of Romania, one may deduce that this flight was a CIA rendition, culminating in a "detainee drop-off" in Poland.

67. Szymany is described by the Chairman of the Polish delegation to PACE as a "former Defence Ministry airfield", located near the rural town of Szczytno in the North of the country. It is close to a large facility used by the Polish intelligence services, known as the Stare Kiejkuty base. Both the airport and the nearby base were depicted on satellite images I obtained in January 2006[54].

68. It is noteworthy that the Polish authorities have been unable, despite repeated requests, to provide me with information from their own national aviation records to confirm any CIA-connected flights into Poland. In his letter of 9 May 2006, my colleague Karol Karski, the Chairman of the Polish delegation to PACE, explained:

> "I addressed the Polish authorities competent in gathering the air traffic data, related to these aircraft numbers... I was informed that several numbers from your list were still not found in our flight logs'

---

[51] My team has worked closely with Human Rights Watch to corroborate the available evidence of detainee movements out of Afghanistan. For an indication of the earlier analysis of this information, see *Human Rights Watch Statement on US Secret Detention Facilities in Europe*, 7 November 2005, available at: http://hrw.org/english/docs/2005/11/07/usint11995.htm.

[52] See Craig Murray, former United Kingdom Ambassador to Uzbekistan, *Exchange of views with the Committee on Legal Affairs and Human Rights (AS/Jur)*, Strasbourg, 24 January 2006. The minutes reflect that Mr Murray spoke of "evidence of the CIA chartering flights to Uzbekistan, between Kabul and Tashkent, and of the use of torture by Uzbek agents, as well as evidence that the American and British authorities were willing to receive and use information obtained under torture by foreign agencies, the relevant decision having been taken at a high level". See also Don van Natta Jr, *Growing Evidence US Sending Prisoners to Torture Capital: Despite Bad Record on Human Rights, Uzbekistan is Ally*, New York Times, 1 May 2005, available at: www.nytimes.com/2005/05/01/international/01renditions.html?ex=1272600000&en=932280de7e0c1048&ei=5088&partner=rssnyt&emc=rss.

[53] For an excellent account of the motivations for moving detainees to secret locations, see James Risen, *State of War: The Secret History of the CIA and the Bush Administration*, Free Press, New York, 2006, at pages 29 to 31: "The CIA wanted secret locations where it could have complete control over the interrogations and debriefings, free from the prying eyes of the international media, free from monitoring by human rights groups, and, most important, far from the jurisdiction of the American legal system."

[54] See European Union Satellite Centre, information provided to the Rapporteur on 23 January 2006. For further information see the section below at heading 4.1.

*records. Being not aware about the source of your information connecting these flight numbers with Polish airspace, I am not able, [nor are] the Polish air traffic control authorities, to comment on the fact of missing them in our records.*[55]

69. Mr. Karski also made the following statement, which reflects the position of the Polish Government on the question of CIA renditions:

"*According to the information I have been provided with, none of the questioned flights was recorded in the traffic controlled by our competent authorities – in connection with Szymany or any other Polish airport.*"

70. The absence of flight records from a country such as Poland is unusual. A host of neighbouring countries, including Romania, Bulgaria and the Czech Republic have had no such problems in retrieving official data for the period since 2001. Indeed, the submissions of these countries, along with my data from Eurocontrol, confirm numerous flights into and out of Polish airports by the CIA-linked planes that are the subject of this report.

71. In this light, Poland cannot be considered to be outside the rendition circuits simply because it has failed to furnish information corroborating our data from other sources. I have thus presented in my graphic the suspected rendition circuit involving Szymany airport, in which the landing at Szymany is placed in the category of "detainee drop-off" points.

72. According to records in our possession, the N313P plane remained at Szymany airport on 22 September 2003 for just 64 minutes. I can also confirm that the plane then flew from Szymany to Romania, where it landed, after a change of course, at Bucharest Baneasa airport. Here, as in the case of Timisoara above, the aircraft landing in Romania fits the profile of a "detainee drop-off".

73. It is possible that several detainees may have been transported together on the flight out of Kabul, with some being left in Poland and some being left in Romania. This pattern would conform with information from other sources, which indicated the simultaneous existence of secret prisons in these two Council of Europe member States[56].

74. This suspected rendition circuit continued after Romania by landing in Rabat, Morocco, which several elements point to as a location that harbours a detention facility[57]. It is conceivable that this landing may even have constituted a third "detainee drop-off" in succession before the plane returned to the United States, via Guantanamo Bay.

75. As for Romania, I find that there is now a preponderance of indications, not to prove the existence of detention centres, but in any case to open a real in-depth and transparent inquiry. One can add that the sources at the origin of the publications by Human Rights Watch, The Washington Post and ABC News, referring to the existence of such centres in Romania and Poland, are multiple, concordant and particularly well informed, as they belong to the very services that have directed these operations.

### 2.7. The human impact of rendition and secret detention

76. Rendition is a degrading and dehumanising practice; certainly for its victims, but also for those who perform the operations. This simple realisation has become clear to me and my team as we have met with various people whose lives have been indelibly changed by rendition.

77. Therefore, while it is necessary to analyse the global system that rendition has become, we should never lose sight of the human dimension, as this is at the core of the abuses.

78. I have considered the human impact of rendition in two ways: first, the systematic CIA practice of preparing a detainee to be transported on a rendition aircraft; and second, the grave and long-lasting psychological damage that extraordinary rendition inflicts upon its victims.

---

[55] Letter sent to me by Karol Karski, Chairman of the Polish delegation to PACE, dated 9 May 2006.
[56] See, *inter alia*, Brian Ross and Richard Esposito, *Sources Tell ABC News Top Al-Qaeda Figures Held in Secret CIA Prisons: 10 out of 11 Terror Leaders Subjected to "Enhanced Interrogation Techniques"*, ABC News, 5 December 2005, available at: http://abcnews.go.com/WNT/Investigation/story?id=1375123.
[57] See the case study of Binyam Mohamed al Habashi at section 3.9 of this report.