*Doc. 10957*

141.    In the Council of Ministers document cited by the Human Rights Chamber[121], the Government of Bosnia and Herzegovina admitted that the six men had been "handed over" to the American forces by the Bosnian authorities without extradition formalities being observed[122].

142.    On 21 April 2004, the Human Rights Committee of the Parliament of Bosnia and Herzegovina exhorted the Bosnian executive to execute the decision of the Human Rights Chamber and start proceedings with the United States for the repatriation of the detainees. Its report was endorsed by the parliament chamber on 11 May 2004.

143.    On 11 March 2005, the Minister of Justice confirmed that the Bosnian government had sent a letter to the American government requesting the return of the six men.

144.    On 21 June 2005, the Bosnian Prime Minister Mr Adnan Terzic confirmed before the Parliamentary Assembly of the Council of Europe[123] the importance of this case as an indicator of democratic progress in Bosnia, and declared his willingness to identify the best way of ensuring the release of the six Bosnian citizens and former residents from Guantanamo, in accordance with Parliamentary Assembly Resolution 1433 (2005).

145.    Lastly, on 16 September 2005, the Bosnian parliament adopted a resolution inviting the Council of Ministers of Bosnia and Herzegovina to make contact with the American government in order to resolve the problem of the six men as rapidly as possible.

146.    It is all the more surprising that, in spite of all these promising declarations, including that of the Prime Minister to the Parliamentary Assembly of the Council of Europe, there has been no government initiative aimed at the release of the six men.

147.    According to their lawyers[124], the American government has declared on several occasions that it is willing to enter into bilateral discussions with the governments of countries whose citizens are detained at Guantanamo in order to arrange their repatriation, subject to adequate security conditions. In the case of the six men in question, such measures would be unnecessary anyway, since the charges against them have already been investigated by the competent authorities and those investigations have shown that they are innocent. Nonetheless, the Bosnian government has apparently made no credible move to initiate negotiations in that direction[125].

148.    The innocence of the men in question – which is in any event presumed, and is in no sense a condition for treating the suspects in accordance with legal rules – has just been strengthened by a report drawn up by the German military. This report, produced in decidedly unusual circumstances[126], which also

---

[121] Note 115 above.

[122] The Human Rights Chamber, in the above-mentioned Bensayah judgment (note 114), explains in a relevant manner that the "handing over" of the applicant can in no way be deemed to constitute extradition. In particular, the note dated 17 January 2002 from the US embassy cannot be regarded as a request for extradition by the United States. In that note, the US embassy in Sarajevo informs the Government of Bosnia and Herzegovina that it is willing to take charge of the six Algerian citizens in question and offers to arrange for the physical transfer of these persons at a time and place suitable to both parties.

[123] In reply to a question from our former colleague Kevin McNamara, following Resolution 1433 (2005) adopted by the Parliamentary Assembly on 26 April 2005, calling on all Council of Europe member States, including Bosnia and Herzegovina, to protect the rights of their citizens or residents detained at Guantanamo and to have them released and repatriated.

[124] Memorandum of 12 April 2006, addressed to the Temporary Committee of the European Parliament.

[125] See Matthew A. Reynolds, Acting Assistant Secretary, Legislative Affairs, US Department of State, letter to Senator James M. Jeffords, response to a requeset for information (copy on file with the Rapporteur), 15 June 2005: *"Although the Government of Bosnia and Herzegovina has made several inquiries regarding the condition of each detainee and has asked for their release, it has not indicated that it is prepared or willing to accept responsibility for them upon transfer."*

[126] German military personnel posed as journalists in order to conduct an interview with Mr Bensayah's wife, Mrs Anela Kobilica, on 17 June 2003. The report subsequently drawn up by the German military concluded that the grounds on which the six men were arrested and deported were *"highly dubious"* and that documents examined gave rise to the suspicion that at least some of the six had been *"subjected to an injustice"*.

aroused the interest of the German media and parliamentarians[127], concluded *inter alia* that the reasons for arresting the six men were "highly dubious"[128].

149.    In my opinion, the case of the "Bosnian six" is another well documented example of the abduction of European citizens and residents by the American authorities with the active collusion of the authorities of a Council of Europe member state. The government of Bosnia and Herzegovina has the merit of no longer denying the fact that it handed over the six men to the American forces. According to information I have received[129], the Bosnian authorities acted under extraordinary pressure from the American embassy in Sarajevo, but the fact remains that they acted in violation of clear decisions by the Supreme Court and the Human Rights Chamber ordering the release of these men. If the damage to the good human rights reputation of Bosnia and Herzegovina is to be repaired, official recognition of the facts is an important step in the right direction, but it must be followed as swiftly as possible with credible diplomatic intervention vis-à-vis the American government in order to secure the rapid repatriation of these six men, who have now been festering in Guantanamo Bay for over four years.

### 3.3.    Ahmed Agiza and Mohammed Alzery (El Zari)

150.    The case of the two Egyptian asylum-seekers "handed over" by the Swedish authorities to American agents who took them to Egypt, where they were tortured in spite of diplomatic assurances given to Sweden, is another very well documented case. It led to Sweden's being condemned by the United Nations Committee against Torture (UN-CAT)[130]. The Swedish authorities were also criticised for having attempted to conceal the facts from UN-CAT[131].

151.    The affair was brought to public notice mainly by the "Kalla Fakta"[132] television programme, and research by the Swedish investigative journalists blew open the secret system of CIA aircraft transporting clandestine prisoners in the "war against terrorism". The aircraft used for this operation – a Gulfstream, number N379P – has become one of the most notorious "rendition" aircraft[133].

152.    The behaviour of the Swedish secret police (Säpo) gave rise to a detailed investigation by the Swedish parliamentary ombudsman, Mats Melin[134]. The judicial authorities also examined the case and concluded that there were no grounds for a criminal prosecution against either the Swedish agents involved, or the pilot of the aircraft, or other American agents who were part of the team responsible for transporting Mr Agiza and Mr Alzery to Egypt[135].

---

[127] See, for example, http://www.tagesschau.de/aktuell/meldungen/0,1185,OID5072374,00.html. Journalists' associations protested vehemently at methods of investigation that involved intelligence agents masquerading as journalists, as this exposed real journalists to suspicion and possible reprisals.
[128] From a confidential source, I received a copy of this report, which, it was claimed, was deleted from the German military archives and never received by the German embassy in Sarajevo, to which it was said originally to have been addressed. See *Supplementary Intelligence Report*, 16 July 2003 (copy on file with the Rapporteur).
[129] See for example the Wilmer Hale memorandum of 12 April 2006, at page 3, supported by a wealth of documents given to us by Wilmer Hale, copies of which are all on file with the Rapporteur.
[130] United Nations Committee against Torture, decision of 20 May 2005, CAT/C/34/D/233/2003; see also United Nations Committee against Torture, Conclusions and recommendations of the Committee against Torture: Sweden. 06/06/2002, CAT/C/CR/28/6 (Concluding Observations/Comments), and the Swedish reply (Comments by the Government of Sweden on the Concluding Observations of the Human Rights Committee (CCPR/CO/74/SWE) of 14 May 2003. In that reply (para. 16), the Swedish government said that in its opinion, the "assurances" given by Egypt were being and would continue to be fully respected, and that the government had received no information to cast doubt on that conclusion.
[131] See "Kalla Fakta" (note 131 below), page 10 : the Swedish reply to the final observations (note 129 above) seems to be contradicted by the first report of the Swedish Ambassador in Egypt, according to which Mr Agiza had spoken to him about the abuse and violence which he and Mr Alzery had suffered. According to "Kalla Fakta", the Swedish government had filed this information and refused to hand it to the United Nations. In its decision of 20 May 2005 (note 129 above, para. 13.10), UN-CAT notes that Sweden has not fulfilled its obligation to co-operate fully with the Committee, and has not made all the relevant and necessary information for resolving the case available to the Committee.
[132] Translation of the title of the programme: "Cold facts"; a transcript of the broadcast of 22 November 2004 was provided to me by TV4.
[133] Kalla Fakta has given an account of its research into the owner of N379P, Premier Executive Transport Services. Posing as potential clients, journalists satisfied themselves as to the governmental, clandestine nature of this firm (cf. transcript, note 131 above, pages 4-5).
[134] See Mats Melin, Parliamentary Ombudsman (Sweden), *A review of the enforcement by the Security Police of a Government decision to expel two Egyptian citizens*, Adjudication No. 2169-2004, dated 22 March 2005. (Translated copy on file with the Rapporteur.)
[135] *Ibid*, at page 3.

*Doc. 10957*

153.    In short, the facts occurred in the following manner: on 18 December 2001, Mr Agiza and Mr Alzery, Egyptian citizens seeking asylum in Sweden, were the subject of a decision dismissing the asylum application and ordering their deportation on grounds of security, taken in the framework of a special procedure at ministerial level. In order to ensure that this decision could be executed that same day, the Swedish authorities accepted an American offer to place at their disposal an aircraft which enjoyed special overflight authorisations[136]. Following their arrest by the Swedish police, the two men were taken to Bromma airport where they were subjected, with Swedish agreement, to a "security check" by hooded American agents.

154.    The account of this *"check"* is especially interesting, as it corresponds in detail to the account given independently by other victims of "rendition", including Mr El-Masri. The procedure adopted by the American team, described in this case by the Swedish police officers present at the scene[137], was evidently well rehearsed: the agents communicated with each other by gestures, not words. Acting very quickly, the agents cut Agiza's and Alzery's clothes off them using scissors, dressed them in tracksuits, examined every bodily aperture and hair minutely, handcuffed them and shackled their feet, and walked them to the aircraft barefoot.

155.    The ombudsman condemns as degrading the way in which the detainees were treated from the time when they were taken charge of by the American agents until the end of the operation when the two men were handed to the Egyptian authorities. He does not consider that it constitutes torture for the purposes of Article 3 of the European Convention on Human Rights, but asks the question – though he does not answer it – whether the execution of the deportation order nonetheless violates Article 3. In any event, he finds that the operation was carried out in an inhuman and therefore unacceptable manner[138].

156.    According to the ombudsman's findings, the Swedish officers, who were poorly led, lost control of the operation from the start of the American team's intervention. They ought to have intervened to put an end to the degrading treatment of the detainees, which was not justified on security grounds since the Swedish police had already carried out a body search on the detainees at the time of arrest.

157.    Prior to deportation of the two men to Egypt, Sweden sought and obtained "diplomatic assurances" that they would not be subjected to treatment contrary to the anti-torture convention, would have fair trials and would not be subjected to the death penalty. The "assurances" were even backed up by a monitoring mechanism, regular visits by the Swedish Ambassador and participation by Swedish observers at the trial.

158.    Developments in the case show that these "assurances" were not honoured. Mr Alzery's lawyer, Kjell Jonsson[139], states that extremely grave acts of torture took place[140]. Although Mr Alzery was released from prison in October 2003, he is not allowed to leave his village without permission from the authorities. Mr Agiza was sentenced to 25 years imprisonment by a military court in a trial from which the Swedish observers were excluded for the first two days out of a total of four. Despite the fact that Mr Agiza complained of torture during his detention, which lasted over two years after his forced return to Egypt, and despite the fact that the prison doctor's report did record physical injuries sustained in prison, the military court did not act on the defence request for an independent medical examination[141].

159.    The UN-CAT decision shows that the "diplomatic assurances", even with follow-up clauses attached, are not such as to prevent the risk of torture[142]. The deporting state therefore still bears responsibility.

---

[136] An internal Säpo report seems to indicate that the American involvement was approved by the Ministry of Foreign Affairs; persons who attended the meeting with the minister and were questioned by the ombudsman have no recollection that this was mentioned.

[137] Owing to lack of space in the room made available to the Americans, the Swedish police were not able to observe everything. In particular, they did not see that (tranquillising) suppositories were administered and that diapers were affixed, as the detainees maintain, and as was done in other "renditions". See the earlier section of this report on the "Human Impact of Renditions and Secret Detentions".

[138] See the report by Mats Melin, *supra* note 134, page 23.

[139] Mr Jonsson testified before the Temporary Committee of the European Parliament on 23 March 2005; he spoke at great length with a member of my team during his visit to Brussels.

[140] Electric shock torture was used, with electrodes fixed to the most sensitive parts of the body, in the presence of a doctor who assesses what electrical charge the prisoner can survive. In order to prevent marks, the places affected are treated specially at the end of each torture session.

[141] A representative of Human Rights Watch observed the entire trial ; the observed violations of the rights of the defence are listed in a HRW communiqué of 5 May 2005 (Sweden Implicated in Egypt's abuse of Suspected Militant – Egypt violated diplomatic promises of fair trial and no torture for terrorism suspect (http://hrw.org/english/docs/2004/05/05/egypt8530_txt.htm).

[142] Diplomatic assurances are not the focus of my mandate; here, nevertheless, are two very pertinent reports on the subject: Amnesty International, *"Diplomatic Assurances" – no protection against torture or ill-treatment*, report No. ACT

160.    All things considered, the Swedish case of Agiza and Alzery cannot be classed as "abduction" by the CIA. The two men were the subject of a Swedish deportation procedure following dismissal of the asylum application; that procedure was severely criticised by UN-CAT, and rightly so: the immediate execution of the decision deprived the two men of any possibility of appeal, including under the United Nations Convention against Torture – an appeal which moreover would have stood a good chance of success, in view of the risk of torture they faced in Egypt. Other criticisms directed at Sweden are the "slack" implementation of the follow-up clause relating to the assurances obtained prior to extradition[143], and above all the fact that Sweden did not send UN-CAT all the relevant information[144]. On the other hand, with regard to the ill-treatment of the prisoners at Bromma airport and in the aircraft, the reproach is aimed primarily at the United States. I share Mats Melin's view that such degrading and humiliating treatment is unacceptable.

161.    Nonetheless, in my opinion it is for Sweden to clarify further the reasons and responsibilities: how was it that the Swedish officers present on the scene allowed their American counterparts to do as they wished, letting them take control of this operation while still on Swedish soil?

### 3.4.    Abu Omar

162.    At midday on 17 June 2003, Hassam Osama Mustafa Nasr, known as Abu Omar, an Egyptian citizen, was abducted in the middle of Milan. Thanks to an outstanding and tenacious investigation by the Milan judiciary and the DIGOS police services, Abu Omar's is undoubtedly one of the best-known and best-documented cases of "extraordinary rendition"[145]. Via the military airbases at Aviano (Italy) and Ramstein (Germany), Abu Omar was flown to Egypt, where he was tortured before being released and re-arrested. To my knowledge, no proceedings were brought against Abu Omar in Egypt. The Italian judicial investigation established beyond all reasonable doubt that the operation was carried out by the CIA (which has not issued any denials). The Italian investigators likewise established that the presumed leader of the abduction operation – who had also worked as the American consul in Milan – was in Egypt for two weeks immediately after Abu Omar was handed over to the Egyptian authorities. It may safely be inferred that he contributed, in one way or another, to Abu Omar's interrogation. The proceedings instituted in Milan concern 25 American agents, against 22 of whom the Italian judicial authorities have issued arrest warrants. Abu Omar was a political refugee. Suspected of Islamic militancy, he had been under surveillance by the Milan police and judicial authorities. As a result of the surveillance operation, the Italian police were probably on the verge of uncovering an activist network operating in northern Italy. Abu Omar's abduction, as the Milan judicial authorities expressly point out, sabotaged the Italian surveillance operation and thereby dealt a blow to the fight against terrorism. Is it conceivable or possible that an operation of this kind, with a deployment of resources on this scale in a friendly country that was an ally (being a member of the coalition in Iraq), was carried out without the Italian authorities – or at least the corresponding Italian officials – being informed? The Italian Government has denied having been informed. There has recently been a significant new development in the investigation by the Milan prosecuting authorities, however: an agent belonging to an elite *Carabinieri* unit has admitted taking part in Abu Omar's abduction as part of an operation co-ordinated by the military intelligence services (SISMI)[146]. But General Pollari, head of SISMI, had formally denied any SISMI participation in the abduction; he had even affirmed that he had only been informed of this episode after the abduction itself[147].

---

40/021/2005, 1 December 2005; and Human Rights Watch, *Still at Risk: "Diplomatic Assurances" No Safeguard against Torture*, Report No. 17, Vol. 3D, 17 April 2005.

[143] See the afore-mentioned HRW communiqué of 5 May 2005: the first visit Mr Agiza received from a Swedish diplomat was only five weeks after his arrival in Egypt, despite the fact that experience shows that torture and ill-treatment take place during the first days of detention. Furthermore, the Swedish diplomats, who were not trained to recognise signs of torture, apparently gave several days' notice of their visits, and all conversations were apparently monitored by the Egyptian warders.

[144] Sweden justifies the fact that it did not send its ambassador's first visit report, in which Mr Alzery's complaints of ill-treatment are recorded, for fear of reprisals against the detainees, given doubts about respect for confidentiality within UN-CAT. But in any case those complaints were known to the Egyptian authorities, who were represented during the ambassador's visit.

[145] I met the prosecutor heading the investigation, Armando Spataro, and was able to obtain as full information as confidentiality and procedural requirements permitted. The Abu Omar case is likewise described in the aforementioned book by Guido Olimpio, *Operazione Hotel California*, Feltrinelli, October 2005. The main documents in the judicial investigation have been collected and reproduced in a book by Guido Ruotolo and Vincenza Vasile: *Milano-Cairo. Viaggio senza ritorno. L'iman rapito in Italia dalla CIA*, Tullio Pironti Editore, 2005.

[146] See *Corriere della Sera* and *La Repubblica* of 11 May 2006.

[147] Statement of General Pollari at the meeting of the TDIP on 6 March 2006.

*Doc. 10957*

### 3.5.    Bisher Al-Rawi and Jamil El-Banna

163.    This case, which concerns two British permanent residents arrested in Gambia in November 2002 and transferred first to Afghanistan and from there to Guantanamo (where they still are), is an example of (ill-conceived) cooperation between the services of a European country (the British MI5) and the CIA in abducting persons against whom there is no evidence justifying their continued detention in prison and whose principal crime is to be on social terms with a leading Islamist, namely Abu Qatada.

164.    The information made public to date[148] shows that the abduction of Messrs Al-Rawi and El-Banna was indeed motivated by information – partly erroneous – supplied by MI5.

165.    Bisher Al-Rawi and Jamil El-Banna were arrested in Gambia on 8 November 2002. They intended to join Mr Al-Rawi's brother Wahab, a British citizen, and help him set up a mobile peanut processing plant. The British authorities were well aware of this business trip[149]. On 1 November, Messrs Al-Rawi and El-Banna left on their trip, but did not get very far. At Gatwick airport they were arrested by reason of a suspect item in Mr Al-Rawi's hand luggage.

166.    On the same day, a first telegram from MI5 informed the CIA that the two men had been arrested under the 2000 anti-terrorist act. That telegram contained false information, including the statement that Mr Al-Rawi was an Islamist extremist, and that the search of his luggage had revealed that he was carrying a sort of improvised electronic device which could be used, according to preliminary investigations, as a component of a home-made bomb[150].

167.    The two men spent 48 hours in police custody, until the police decided that the "suspicious device" was nothing other than a battery charger on sale in several electronic goods shops (Dixons, Argos, Maplins). Mr Al-Rawi explained this when he was arrested, but it had to be checked. The conclusion to the charger episode – that it was indeed a "harmless device" – was communicated to the Ministry of Foreign Affairs by MI5 in a telegram of 11 November 2002. Unfortunately, there is no evidence that this information was ever conveyed to the CIA. The allegations concerning this "device" reappeared in their "trial" before the CSRT (Combatant Status Review Tribunal)[151] as "evidence" that they were "enemy combatants".

168.    Messrs Al-Rawi and El-Banna returned home on 4 November 2002 and reorganised their trip to Gambia for 8 November. Meanwhile, several telegrams were sent by MI5 to the Americans concerning the two men, informing them that they knew Abu Qatada and that Mr El-Banna was the latter's "financier". It is true that the two men knew Abu Qatada[152]. On the other hand, according to the lawyers, Mr Al-Rawi had helped MI5 to prepare the non-violent arrest of Abu Qatada, and British agents had even thanked him for doing so[153].

169.    On 8 November 2002, the day when the two men flew to Gambia, MI5 sent another telegram giving the flight details, including the departure of the delayed flight and the estimated arrival time. The telegram states that "*this message should be read in the light of earlier communications*". In addition, the telegram of 8

---

[148] I wish to thank in particular my British colleague Andrew Tyrie, Chairman of the House of Commons All-Party Parliamentary Group (APPG) on renditions, who helped to arrange for two members of our committee secretariat to attend an APPG hearing withMr Al-Rawi and Mr El Banna's lawyers and family. This hearing took place on 28 March 2006. I also thank the two men's American and British lawyers, Mr Brent Mickum and Ms Gareth Peirce, along with Mr Clive Stafford-Smith, the legal director of REPRIEVE, for the detailed information they provided for my inquiries.

[149] Mr El-Banna informed his lawyer that two MI5 agents had come to his home and told him that they knew all about his planned trip. In reply to his question as to whether everything was in order, they said yes and wished him good luck. Mr El-Banna's wife confirmed this visit at the APPG hearing on 28 March 2006.

[150] Telegram of 1 November 2002, made public on 27 March 2006, with other telegrams dated 4, 8 and 11 November and 6 December 2002 ; these documents are normally classified secret, but came into the public domain after being cited on 22 and 23 March 2006 at a public hearing in the Queens Bench Division of the High Court in London, before Lord Justice Latham and Mr Justice Tugendhat. The telegrams were also the subject of the APPG hearing on 27 March 2006. It is clear to their lawyers that not everything is said in the telegrams, which moreover refer to other communications, including telephone calls.

[151] See US Department of Defense, unclassified Combatant Status Review Tribunal (CSRT) transcripts disclosed in the matter of *El-Banna et al v. Bush*, in the US District Court of Columbia (copies of all transcripts on file with the Rapporteur), October 2004.

[152] At the APPG hearing on 27 March 2006, Mr El-Banna's wife explained that their "social" relations derived from the fact that the three men had family ties with Jordan.

[153] Al-Rawi's cooperation with MI5 is said also to be the reason for several visits by MI5 agents to Guantanamo. The lawyers presented details of these conversations in public as recounted by their clients (copy in file). MI5 has not officially recognised this cooperation, which Al-Rawi also claimed in his depositions to the CSRT.

November does not mention, as the earlier telegrams do, that this information *"must not be used as the basis of overt, covert or executive action"*.

170.     At Banjul airport, Al-Rawi and El-Banna, accompanied by a collaborator, Mr El Janoudi, met Bisher Al-Rawi's brother Wahab, who had gone to Gambia one week before the others, and all four were arrested by Gambian agents. They were taken to a house outside Banjul. Mr Janoudi managed to telephone his wife in London, and another brother of Mr Al-Rawi, Numann, went to see his MP, Edward Davey, who informed the Foreign Ministry.

171.     During the following days, according to Wahab's account, American agents were very present, but the detainees never saw a British official despite the fact that they asked to see a consular representative. Wahab stated at the APPG hearing that the CIA and Gambian officials repeatedly alluded to the fact that *"it is the British who have told us to arrest you"*. Mr El-Banna says he has continually been told the same thing during his subsequent detention at Guantanamo Bay:

> *"My interrogator asked me 'Why are you so angry at America? It is your Government, Britain, the MI5, who called the CIA and told them that you and Bisher were in The Gambia and to come and get you. Britain gave everything to us. Britain sold you out to the CIA'"*[154].

172.     On 5 December 2002, after 27 days, Wahab was released and returned to the United Kingdom. Some days afterwards, on a Sunday, Bisher Al-Rawi and Jamil El-Banna were flown to Afghanistan in a military jet with over 40 seats. There were at least 7 or 8 American agents on board, including a female doctor. Through their lawyers, the two men gave a detailed account of their degrading and humiliating treatment, many details of which echo the treatment suffered by other victims of "renditions"[155].

173.     At Kabul, they were taken in less than 15 minutes to the prison identified as the "Dark Prison". The description of the inhuman detention conditions in this prison[156], an important link in the CIA "spider's web", corresponds in many details to that given by other victims of "renditions" who were brought there. After two weeks in this sinister prison, the two men were transferred to Bagram by helicopter. At Bagram  they were imprisoned and ill-treated for a further two months. The American interrogators allegedly offered Mr El-Banna large sums of money in exchange for false witness against Abu Qatada. When these offers failed to produce the expected result, the interrogators allegedly threatened to send him back for a year to the "Dark Prison", followed by 5 or 10 years in Cuba, and made shameful threats against his family living in London[157].

174.     Finally, the two men were transported to Guantanamo, where they were again subject to inhuman treatment. Mr Al-Rawi says he received many visits from MI5 agents, the first of them in early autumn 2003, and that he was interrogated by ten or so different CIA agents. One of the MI5 agents, he says, even apologised to him. In January 2004, two British agents ("Martin" and "Mathew") asked him whether he would be willing to work for MI5 again. Mr Al-Rawi replied that he would, provided that this would serve the cause of peace. Several months later, a certain "Alex" with whom Mr Al-Rawi had worked in London came to see him at Guantanamo, accompanied by an "attractive female agent". However, at the time of his "trial" before the CSRT, the British authorities refused to send to Guantanamo the witnesses he named or simply to confirm his links with MI5, thereby condemning him to continuous detention – detention which continues to this day, having lasted almost four years in all.

175.     The families of Messrs Al-Rawi and El-Banna and their lawyers at the London firm Birnberg, Peirce & Partners brought an action to oblige the British government to make representations to the United States through diplomatic channels in order to secure the release and repatriation of the two men as soon as possible. According to the latest information, the British government has acted along those lines with regard to Mr Al-Rawi, but not with regard to Mr El-Banna. The judgment at first instance, given in May 2006, dismissed the families' complaints.

176.     In view of these highly disturbing facts, I find that the British authorities must shed light on this case in full. I welcome the fact that our colleague, Andrew Tyrie, has devoted much energy to this matter in order for truth to be established in this disturbing case. Meanwhile, the United Kingdom, even if it has no

---

[154] See El-Banna's statement to his lawyer, *supra* note 68.
[155] They were dressed in diapers, wore hoods without eye-holes, had their ears blocked up, their legs shackled and their hands painfully handcuffed behind their backs, and were denied access to toilets.
[156] *"Diabolically"* loud music round the clock, total absence of light, rotten food, no possibility to wash or use a toilet, uncomfortable handcuffing and leg shackling, cold cells, inadequate clothing, and the frequent beating and trampling of prisoners.
[157] I prefer not to quote this extremely upsetting testimony.

*Doc. 10957*

recognised legal obligation, must make good the consequences of the apparently very imprecise communication between the MI5 and the American services. There is indeed little doubt that the arrest of the two men was largely triggered or at least influenced by the messages of November 2002, only part of which (the afore-mentioned telegrams) is public knowledge.

### 3.6.    Maher Arar

177.    Maher Arar, a Canadian citizen of Syrian origin, came to testify in public before the Temporary Committee of the European Parliament[158]. During a stopover on return from holiday in Tunisia, in September 2002, he was arrested at JFK airport in New York by American agents. After being detained in a high-security prison and interrogated for two weeks by the New York police, the FBI and the American immigration service, he was allegedly transported from New Jersey airport via Washington, Rome and Amman to a prison belonging to Syrian military intelligence[159]. He spent more than ten months there, during which he says he was tortured, abused and forced to make false confessions. During his stay in Syria, he says, he also heard the voice of a German prisoner being tortured. After a tenacious campaign by his wife, Mr Arar was able to have irregular contacts with Canadian diplomats posted in Syria. He says he has never been the subject of criminal charges in any country. Mr Arar stills suffers from post-traumatic stress syndrome following his terrible experience.

178.    The American Government considers the "rendition" of Arar as a legitimate procedure in conformity with its immigration rules[160].

179.    According to Mr Arar, the agents on board the aircraft never identified themselves, but he heard that they belonged to a *"special removal unit"*. In this specific case, the transfer of Mr Arar to Syria seems to be a well established example of the "outsourcing of torture", a practice mentioned publicly by certain American officials[161].

180.    The question which interests us more particularly, in view of our mandate, is whether and if so, to what extent, the European states concerned (in particular Italy and Greece) were aware of the illegal transport of Mr Arar and perhaps even gave logistical support[162].

181.    Another question is the role of the Canadian authorities in the matter. This question is the subject of a very thorough investigation by a special commission[163].

182.    The initial report of the investigator Stephen J. Toope was published on 14 October 2005[164]. Mr Toope, who has lengthy experience in working with torture victims, has convincingly established the truthfulness of Mr Arar's depositions, which he has compared with those of other former Syrian prisoners held in the same prison run by Syrian military intelligence (Far Falestin). His report, which also mentions the findings of specialist doctors whom Mr Arar consulted on his return, describes in detail Mr Arar's treatment in Syria, which he unhesitatingly regards as torture within the meaning of the United Nations Convention against Torture. However, that report does not cover the part played by the Canadian authorities in the matter. This point will be covered in the final report of the Commission, which is expected to be published by the end of the summer of 2006[165]. It is thus premature to draw any conclusions at this stage[166].

---

[158] Accompanied by his lawyer, he also had exhaustive talks with a member of the Committee's secretariat.
[159] This journey was retraced by a British investigative journalist, whose research is corroborated by data obtained by us from Eurocontrol and national air traffic control authorities. See *Flight logs related to the rendition of Maher Arar*, in the Appendix to this report.
[160] See Bellinger, *Briefing to European Delegation, supra* note XX: "With respect to Maher Arar, I can't comment on his case either. But I do know his case has gotten added to the list of so-called renditions, when in fact his removal was dealt with as an immigration matter, which is what all countries do when they find someone in their country and they don't want to prosecute them inside their countries. So he was expelled from the United States by order of an Immigration Court. I think that's a different situation. So this is not the same situation as these other cases."
[161] See the quotations reproduced in my information report of 22 January 2006.
[162] See *Flight logs related to the rendition of Maher Arar*, in the Appendix to this report.
[163] Commission of inquiry into the action of Canadian officials in relation to Maher Arar, set up on 5 February 2004 *"to throw light on the actions of the Canadian authorities concerning the deportation and detention of Maher Arar"*. The commissioner heading the inquiry is the Honourable Dennis R. O'Connor, deputy chief judge of Ontario.
[164] Available on the commission's website : www.commissionarar.ca; the reports of experts/witnesses, the rules of procedure and – albeit greatly truncated – summaries of the hearings in camera are among other items also published on this website.
[165] See the communiqué of 11 April 2006, indicating that the delay (five months after the date originally planned) is *"largely attributable to the process that was adopted to analyse reports in regard to the government's requests designed to protect certain information on grounds of confidentiality in connection with national security (CLSN)"*. The communiqué

183.    The working methods of this commission, a genuine commission of inquiry with real powers of investigation, empowered to take cognisance of classified information, strike me as very interesting. However, Mr Paul Cavalluzo, principal lawyer to the Commissioner, the Honourable Dennis O'Connor, has reportedly deplored the tendency of the Canadian authorities to use national security confidentiality; Mr Arar's lawyers, Lorne Waldman et Marlys Edwardh, have accused the Government to "hide behind" official secrecy considerations.

### 3.7.    Muhammad Bashmila and Salah Ali Qaru

184.    The cases of Mr Bashmila and Mr Ali Qaru are described in an Amnesty International report[167] based on inquiries made on the spot and intensive discussions with the victims. It is likely that they owe their recent release to Amnesty's commitment. The two men, who have never been accused of the slightest terrorist crimes, were arrested in Jordan and disappeared, as far as their families were concerned, into the American "spider's web" in October 2003[168]. According to AI's investigations, they were held in at least four secret American detention centres, probably in three different countries. The former detainees themselves say that they spent time in Djibouti, Afghanistan and - of particular interest to us - "*somewhere in eastern Europe*". The exact location of the place where they spent the final 13 months from the end of April 2004 onwards remains unknown. The men gave a precise description of their place of detention, which has not yet been published in full[169], and of the route along which they were taken. Particularly intriguing is their return flight to Yemen on 5 May 2005, reportedly a non-stop flight lasting approximately seven hours. I wrote to the Yemeni authorities and asked where the plane had come from, and the arrival of the aircraft on that date with the two men on board was officially confirmed to me. Unfortunately, although I wrote again, I have not yet received the specific information requested. Since the aircraft concerned was probably a military one, the information obtained from Eurocontrol has also been unable to clarify this matter. We have been unable to locate a site corresponding to the description provided.

### 3.8.    Mohammed Zammar

185.    Mr Zammar, a German of Syrian origin, was suspected of having been involved in the "Hamburg cell" of Al Qaeda and had been under police surveillance for several years in Germany. After 11 September 2001, he had been the subject of a criminal investigation for "support for a terrorist organisation", but there was insufficient evidence to keep him in prison.

186.    On 27 October 2001, he is reported to have left Germany for Morocco, where he spent several weeks. When he attempted to return to Germany, he was allegedly arrested by Moroccan officials at Casablanca airport early in December, and to have been questioned by Moroccan and American officials for over two weeks. Towards the end of December 2001, he is said to have been flown to Damascus, Syria, on a CIA-linked aircraft[170].

187.    The case has received extensive press coverage[171], and there have been allegations that Mr Zammar's arrest in Morocco was facilitated through the provision of information by German services, that he was tortured by Syrian services and that he was questioned in Syria by German officials.

188.    A detailed German government report to the *Bundestag*, a copy of which I have obtained[172], gives a balanced version of this affair.

---

describes in detail the procedures followed where the government invokes CLSN, disputes on the matter being settled in the last resort by the federal court.
[166] See the "summaries of hearings in camera" (note 163 above), in particular para. 12 pp and 33. Given the provisional and incomplete nature of these summaries, I prefer not to comment in greater detail.
[167] Below the radar: secret flights to torture and "disappearance", 5 April 2006, AI Index: AMR 51/051/2006. My particular thanks go to Mrs Anne Fitzgerald for her co-operation with our committee's secretariat on this subject.
[168] AI's report (pp 9-16) gives a precise description of the sufferings of the victims and their families.
[169] Cf AI report (pp 13 and 14). One particularly interesting piece of information is a geographical deduction based on the prayer times provided, which were taken from an Internet site (islamicfinder.org). The time of the sunset prayer ranged from 4.30 to 8.45 pm (allowing for the change to summer time, which the whole of Europe uses, but not Afghanistan, Jordan or Pakistan). This corresponds to a location north of the 41st parallel, so well to the north of the Middle East, and very probably within a Council of Europe member state.
[170] The Eurocontrol data available to us does not enable us to confirm this flight, which took place between two non-European airports.
[171] Examples are the items published in the Washington Post on 12 and 19 June 2002 and 31 January 2003, in *Der Spiegel* in July 2002 and November 2005, and in Focus of 20 September 2002, and shown on *Kalla Fakta* (the fourth Swedish TV channel) on 22 November 2004.

*Doc. 10957*

189.    Mr Zammar's arrest in Morocco was objectively facilitated by exchanges of information between the German services and their Dutch, Moroccan and also American counterparts. These exchanges of information about the travel plans of a person suspected of terrorist activities (the German government's report contains detailed information which seem to justify such suspicion) are part of normal international co-operation in the fight against terrorism. It cannot be deduced from the fact that the German services informed their colleagues of the dates on which Mr Zammar had flight reservations that it was their intention - or even that they suspected - that he would be arrested and held in violation of normal procedures. The facts date back to December 2001, well before the public revelations about the illegal practice of "rendition flights".

190.    The German Ministry for Foreign Affairs and the Damascus and Rabat Embassies intervened several times, firstly to establish Mr Zammar's whereabouts, then to give him consular assistance during his detention in Syria. Syria refused any kind of consular intervention, on the basis of its non-recognition of his renunciation of Syrian nationality when he underwent naturalisation in Germany, a  policy applied generally by Syria.

191.    German officials did indeed question Mr Zammar in Syria. While Mr Zammar is said to have told his German interrogators that he had been beaten both in Morocco and in the early stages of his detention in Syria, but nothing supports the conclusion that this mistreatment related to the presence and intervention of the German agents. The German officials are reported to have found him in a good physical and psychological condition, although he had lost a considerable amount of weight. Relations between Mr Zammar and his Syrian guards did not seem tense, although the German visitors did note a somewhat authoritarian relationship.

192.    As indicated above, a *Bundestag* committee of inquiry is looking into the matter, and it is appropriate to await its results.

### 3.9.    Binyam Mohamed al Habashi

193.    Binyam Mohamed al Habashi is an Ethiopian citizen who has held resident status in the United Kingdom since 1994. While many of his family members emigrated to the United States and became naturalised citizens there, Binyam moved to the UK as a teenager and claimed asylum. He spent seven years pursuing his education in London while his asylum application was considered in a protracted, ultimately unresolved process. He had problems with drugs and converted to Islam at the age of twenty.

194.    Binyam is now detained at Guantanamo Bay and has been selected as one of the first group of ten prisoners to appear before a special United States Military Commission, probably later in 2006. We were able to view Binyam's diary, an account of the last five years of his life, and a series of letters he has written from Guantanamo. A member of my team was also able to hear first-hand testimony from members of his family and his legal representatives in the United Kingdom.

195.    In treating Binyam's case in my report I shall avoid any reference to the charges he is likely to face before the Military Commission. Suffice to say that I regard such commissions generally as a flawed basis on which to prosecute allegations of the most serious nature, since the defendant's due process rights are severely impaired[173]. I do not consider these commissions to be fair hearings and I reiterate my position that the global effort to bring terrorist suspects to justice should depend primarily upon judicial remedies.

196.    Of greatest concern in Binyam's case are the accounts of torture and other serious human rights violations which he says he has suffered. He speaks of being wounded all over his body with a scalpel and a razor blade, beaten unconscious and hung from the walls in shackles. He suffered gross physical injuries, including broken bones. He was constantly threatened with death, rape and electrocution.

---

[172] Following my request to the Chair of the *Bundestag* committee responsible for monitoring the special services, I received a copy of the public version of this report. I also received from an anonymous source a version classified "confidential/for official use only", of which I made responsible use, in the spirit of the decision taken by the Legal Affairs Committee at its meeting of 13 March 2006 on the receipt of confidential information. I was also offered a copy of an even more detailed version classified "secret", which I opted not to accept for ethical reasons. I place my trust in the members of the *Bundestag* to whom this document was addressed to take the necessary action on the basis thereof, including appropriate action to alert me to any fact reported in this version directly related to my terms of reference as rapporteur.
[173] Reference to the Executive Order that established Military Commissions for Guantanamo detainees, signed by President Bush in Oct / Nov 2001.

197.    It is difficult to say whether this account actually reflects reality. Let us just recall that some of these acts are included in what has been called "enhanced interrogation techniques", which have been developed by the United States in the "war on terror"[174]. Furthermore many of the abuses described by Binyam bear striking similarities to the allegations of other detainees who have been held in the same detention facilities at various points over the last few years[175].

198.    Binyam's case is an example for the very numerous detainees – most of whose names and whereabouts we do not know – who have become trapped in the United States' spider's web during the course of the "war on terror". Binyam has been subjected to two CIA renditions, a US military transfer to Guantanamo Bay and several other clandestine transfers by plane and helicopter. He has been held in at least two secret detention facilities, in addition to military prisons. During his illegal interrogations, he has been confronted with allegations that could only have arisen from intelligence provided by the United Kingdom.

199.    Binyam's family told my representative that he disappeared in the summer of 2001. His close-knit family subsequently endured several years of desperate uncertainty about his whereabouts and well-being, only partially clarified by their first visit from FBI agents three years later, in 2004. Although they have received a handful of letters from him in Guantanamo, none of the family has been able to see or speak to Binyam for five years.

200.    According to his testimony, Binyam travelled voluntarily to Afghanistan in 2001[176] and spent some time there, probably several months, before crossing into Pakistan and seeking to return to the UK. He was arrested by Pakistani officials at Karachi Airport on 10 April 2002 for attempting to travel on a false passport. Within ten days of his arrest, he was interrogated by American officials. Upon asserting his right to a lawyer, and later upon refusing to answer questions, American officers are alleged to have told him: "*The law has been changed. There are no lawyers. You can co-operate with us the easy way, or the hard way. If you don't talk to us, you're going to Jordan. We can't do what we want here, the Pakistanis can't do exactly what we want them to do. The Arabs will deal with you.*"

201.    The initial interrogations in Karachi involved Pakistani, American and British agents. Binyam was never accused of a particular crime and was told by MI6 agents that "*they checked out my story and said they knew I was a nobody*". When he was discharged from Pakistani custody, however, he was not released. Instead, the Pakistani security services took him to a military airport in Islamabad and handed him over to the United States.

202.    Binyam testifies that he underwent his first rendition on 21 July 2002. He was set upon by unidentified people "*dressed in black, with masks, wearing what looked like Timberland boots*". He describes how they "*stripped [him] naked, took photos, put fingers up [his] anus and dressed [him] in a tracksuit. [He] was shackled, with earphones, and blindfolded*", before being forced onto an aircraft and flown to Morocco. Official flight records obtained by this inquiry show that the known rendition plane, N379P, took off from Islamabad on 21 July 2002 and flew to Rabat, Morocco.

203.    Binyam has described various secret detention facilities in which he was held in Morocco, including one prison that was submerged "*almost underground*" and one more sanitary place in which he was apparently placed to recover from injuries sustained from his torture. Between July 2002 and January 2004 Binyam was tortured on numerous occasions by a team of interrogators and other officials, most of whom were Moroccan. Some of the officials wore masks, while others did not; at least one interrogator, who identified herself as a Canadian, is thought to have been an American CIA agent.

204.    It appears that the object of the torture was to break Binyam's resistance, or to destroy him physically and psychologically, in order to extract confessions from him as to his involvement in terrorist activities. In addition to the sustained abuse and threats, the torturers used information, apparently obtained from intelligence sources, to indicate to Binyam that they knew a lot about him. Much of the personal information – including details of his education, his friendships in London and even his kickboxing trainer – could only have originated from collusion in this interrogation process by UK intelligence services.

---

[174] Reference to some of the many documents on interrogation techniques obtained by the ACLU in its series of applications under the Freedom of Information Act.
[175] In this regard, see the Human Rights Watch reports on Temara in Morocco, plus a range of NGO and detainee accounts from the Dark Prison in Kabul.
[176] Binyam told his lawyer that he wanted to travel to Afghanistan to see the Taliban with his own eyes and decide "*whether it was a good Islamic country or not*". He also wanted to get away from a social life in London that revolved around drug use.

*Doc. 10957*

205.     Binyam has described his ill-treatment in Morocco to his lawyer in several phases: an initial "softening up"; a routine "circle of torture"; and eventually a "heavy" abuse involving mental torment and the infliction of physical injury. In the first few weeks of his detention he was repeatedly suspended from the walls or ceilings, or otherwise shackled, and brutally beaten: "*They came in and cuffed my hands behind my back. Then three men came in with black ski masks that only showed their eyes... One stood on each of my shoulders and the third punched me in the stomach. The first punch... turned everything inside me upside down. I felt I was going to vomit. I was meant to stand, but I was in so much pain I'd fall to my knees. They'd pull me back up and hit me again. They'd kick me in the thighs as I got up. They just beat me up that night... I collapsed and they left. I stayed on the ground for a long time before I lapsed into unconsciousness. My legs were dead. I could not move. I'd vomited and pissed on myself.*"

206.     At its worst, the torture involved stripping Binyam naked and using a doctor's scalpel to make incisions all over his chest and other parts of his body: "*One of them took my penis in his hand and began to make cuts. He did it once and they stood for a minute, watching my reaction. I was in agony, crying, trying desperately to suppress myself, but I was screaming. They must have done this 20 to 30 times, in maybe two hours. There was blood all over. They cut all over my private parts. One of them said it would be better just to cut it off, as I would only breed terrorists.*"

207.     Eventually Binyam began to co-operate in his interrogation sessions in an effort to prevent being tortured: "*They said if you say this story as we read it, you will just go to court as a witness and all this torture will stop. I could not take any more... and I eventually repeated what they read out to me. They told me to say I was with bin Laden five or six times. Of course that was false. They continued with two or three interrogations a month. They weren't really interrogations – more like trainings, training me what to say.*"

208.     Binyam says he was subjected to a second rendition on the night from 21 to 22 January 2004. After being cuffed, blindfolded and driven for about 30 minutes in a van, he was offloaded at what he believes was an airport. Again, Binyam's description matches the "methodology" of rendition described earlier in this report: "*They did not talk to me. They cut off my clothes. There was a white female with glasses – she took the pictures. One of them held my penis and she took digital pictures. When she saw the injuries I had, she gasped. She said: 'Oh my God, look at that'.*"

209.     The second rendition of Binyam Mohamed took place within the "rendition circuit" that I have identified in this inquiry. The aircraft N313P, operated on behalf of the CIA, is shown in my official data to have flown from Rabat to Kabul in the early hours of 22 January 2004. Two days later, as part of the same circuit, the same plane flew back to Europe and was used in the rendition of Khaled El-Masri[177].

210.     Binyam Mohamed's ordeal continued in Kabul, Afghanistan, where he was held in the facility he refers to as "The Prison of Darkness"[178] for four months. Detention conditions in this prison amount to inhuman and degrading treatment. In addition, forcing prisoners to remain in painful positions, sleep alteration, sensory deprivation and other recognised "enhanced interrogation techniques"[179] are known to be deployed there routinely by the United States military and its partners. At various times, Binyam was chained to the floor with his arms suspended above his head, had his head knocked against the wall and describes "*torture by music*", involving the sounds of loud rap and heavy metal, thunder, planes taking off, cackling laughter and horror sounds that amounted to a "*perpetual nightmare*".

211.     Up until his transfer by helicopter to Bagram at the end of May 2004, Binyam was not allowed to see daylight. He was persistently interrogated and told about terrorist plots and activities in which he was accused of involvement. He was subjected to irregular eating patterns and "*weird*" sessions with psychiatrists.

212.     In a detention facility at Bagram Air Base, Afghanistan, Binyam was forced to write out a lengthy statement prepared by the Americans. The content of the statement is unknown to us. Binyam has told his lawyers that he wrote and signed this document in a state of complete mental disarray: "*I don't really remember [what I wrote], because by then I just did what they told me. Of course, by the time I was in Bagram I was telling them whatever they wanted to hear.*"

---

[177] References to the sections on rendition circuits and the individual case of El-Masri.
[178] Many other accounts in the file of the Rapporteur refer to this facility as the "Dark Prison" or the "Disco Prison".
[179] These so-called "enhanced interrogation techniques", which are considered acceptable in the context of some interrogations by the Americans, were exposed by the ACLU in its application under the *Freedom of Information Act.* In particular, these techniques are enumerated in a document from the FBI, available at www.aclu.org.

213.    The case of Binyam Mohamed is sufficient grounds for an urgent and decisive change of course in the international effort to overcome terrorism. The Council of Europe is duty-bound to ensure that secret detentions, unlawful inter-state transfers and the use of torture are absolutely prohibited and never resorted to again.

214.    It remains to be seen whether a Military Commission process will decide for or against Binyam Mohamed. The only certain legacy of this case is the deeply disturbing recognition that a human being has, in his own words, been completely dehumanised: *"I'm sorry I have no emotion when talking about the past, 'cause I have closed. You have to figure out all the emotional part; I'm kind of dead in the head."*

## 4.    Secret places of detention

215.    After the publication of allegations by the Washington Post and Human Rights Watch[180], we centred our search on certain sites in Poland and Romania.

### 4.1.    Satellite photographs

216.    We obtained from the European Union Satellite Centre (EUSC) in Torrejón a number of satellite photographs of the sites concerned[181], some taken at different times. We studied these with the assistance of an independent expert.

217.    These photographs do not constitute conclusive evidence. With the expert's help, we were able to identify several specific locations at a civil airport and a secret services base (in Poland) and at military airfields (in Romania) which would be very suitable for the secret detention of persons flown in from abroad. There are however hundreds of equally favourable locations throughout Europe. As the EUSC did not have available, for most of the places concerned, sequences of photographs which would have shown whether physical structures (huts, fences, watchtowers, and so on) had been altered (added or dismantled) at certain relevant times, the satellite photographs do not enable us to reach any conclusions with a high degree of certainty.

218.    On the other hand, they did enable us to request certain clarifications from the Polish and Romanian delegations. All the replies we received, in my opinion, show a lack of transparency and genuine willingness to co-operate in the authorities concerned[182].

### 4.2.    Documented aircraft movements

219.    As we showed above, the information received from Eurocontrol and certain national air traffic control authorities, confirmed by witnesses' accounts, makes it possible to be sure that certain flights were made between known detention centres and the suspected places in Poland and Romania. The geographical position of these places making them unlikely to be used for refuelling, the period spent on the ground in these places by these aircraft, and in particular the fact that the landings in question belong to well-established "rendition circuits"[183], allow us to suspect that they are or were places of detention which form part of the "spider's web" referred to above.

### 4.3.    Witnesses' accounts

220.    Accounts given by witnesses to Amnesty International[184] make it look very likely that a relatively large place of detention had to be located in a European country, without any more detail.

221.    A journalist working for German television[185] interviewed a young Afghan in Kabul who said that he had been held in Romania. This witness, very frightened and unwilling to give direct evidence to a member

---

[180] See para. 7 above.
[181] The following sites were captured in the satellite photographs: Cataloi, Fetesti and Mihail Kogalniceanu in Romania; and Szczytno / Szymany in Poland.
[182] In Poland's case, we detected, at an airfield said not to have been used for military purposes since the end of World War II, a very well-maintained double fence around a structure identified as containing munitions bunkers. Our question as to the reason for keeping this double fence in perfect condition did not receive a convincing reply. Where Romania is concerned, the authorities first stated that the construction works at the airbases concerned were merely being carried out to maintain existing infrastructure; only when the question was raised again, backed up by the only single-site photo sequence available to us, clearly showing the building of a new hangar and an extension of the aircraft parking area, did the Romanian authorities confirm that some new building had also been done.
[183] See para. 52 above.
[184] See para. 184 above, the case of Mr Bashmila and Mr Ali Qaru.

Doc. 10957

of my team, was reported to have been told by a guard to whom he had complained about his conditions of detention that he was lucky in fact to be in Romania.

222.    Let us recall also – as mentioned in my note of January 2006[186] - that according to a fax sent by the Egyptian Ministry for European Affairs to the Egyptian Embassy in London and intercepted by Swiss intelligence services, such centres had existed in Romania, Bulgaria, Macedonia, Kosovo and in Ukraine.

223.    Both sources from inside the CIA referred to by the Washington Post, ABC and HRW are said to have named Poland and Romania, but without indicating specific places[187].

### 4.4.    Evaluation

224.    Whilst to date no evidence, in the formal sense of the term, has come to light, many coherent and convergent elements provide a basis for stating that these secret CIA detention centres have indeed existed in Europe, and we have seen that several indicators point at these two countries. As explained above, even if these elements do not constitute evidence, they are sufficiently serious to reverse the burden of proof: it is now for the countries in question to address their "positive obligations" to investigate, in order to avoid endangering the credibility of their denials.

### 5.    Secret detentions in the Chechen Republic

225.    Although massive violations of human rights in Chechnya began and were denounced long before the American "spider's web" was woven, it is regrettable and worrisome to observe that the two principal world powers cite the fight against terrorism as a reason to abandon the principle of respect for fundamental rights. This creates a mechanism of "reciprocal justification" and sets a deplorable example for other states.

226.    It is hardly possible to speak of secret detention centres in Council of Europe member States without mentioning Chechnya. Mr Rudolf Bindig's very recent report also notes not only numerous cases of forced disappearance and torture, but also the existence of secret places of detention.

### 5.1.    The work of the European Committee for the Prevention of Torture (CPT)

227.    The situation in Chechnya, where unofficial places of detention are concerned, has already been roundly criticised by the CPT in two public declarations to which I referred in my memoranda of December 2005 and January 2006[188]. The positions expressed therein could not be clearer, but the Committee of Ministers of the Council of Europe has not yet given them the attention they deserve. During a very recent visit to the region, in May 2006, a CPT delegation again had grounds to believe that locations which might serve as unofficial places of detention were in the region[189].

### 5.2.    Damning recent accounts by witnesses

228.    Aaron Rhodes, Executive Director of the International Helsinki Federation for Human Rights (IHF), sent me an open letter dated 12 May 2006[190] accompanied by a report compiled by the IHF, with the help of Russian non-governmental organisations active in the region, containing damning accounts by the victims of secret detention and torture, often followed by enforced disappearance, in the North Caucasus region. Many of these cases were attributed to the *Kadyrovtsi*, the militia under the direct command of the current Prime Minister of the Chechen Republic, Ramzan Kadyrov. According to several of these accounts, some places used as unofficial places of detention were in Tsentoroy, the village where the Kadyrov family originated[191].

---

[185] Ashwin Raman, one of the makers of an ARD documentary shown on the ARD channel on 1 March and on SWF on 8 March 2006.
[186] Information note dated 22 January 2006, para. 5 and 52.
[187] *Ibid*, see para. 7.
[188] See the two Public Declarations concerning the Chechen Republic, CPT/Inf (2001) 15 and CPT/Inf (2003) 33, available at: http://www.cpt.coe.int/documents/rus/2001-07-10-eng.htm
and http://www.cpt.coe.int/documents/rus/2003-33-inf-eng.htm
[189] Cf. CPT press release: http://www.cpt.coe.int/documents/rus/2006-05-09-eng.htm. Exceptionally, a CPT visit was interrupted when access to the village of Tsentoroy (Khosi-Yurt), south-east of Gudermes, was denied on 1 May 2006; the visit resumed the next day, when the delegation gained access to the village early in the afternoon.
[190] See the letter entitled: "*Secret prisons in Europe should be of concern to the Council of Europe*", authored by Aaron Rhodes, IHF; 12 May 2006; http://www.ihf-hr.org/documents/doc_summary.php?sec_id=3&d_id=4249.
[191] See note 82 above.