229.    Concern about our Organisation's credibility means that these allegations deserve to be investigated in the same way as the violations committed by American services, especially as the Chechen Republic is on the territory of a member state of the Council of Europe.

**6.     Attitude of governments**

230.    It has to be said that most governments did not seem particularly eager to establish the alleged facts. The body of information gathered makes it unlikely that European states were completely unaware of what, in the context of the fight against international terrorism, was happening at some of their airports, in their airspace or at American bases located on their territory. Insofar as they did not know, they did not want to know. It is inconceivable that certain operations conducted by American services could have taken place without the active participation, or at least the collusion, of national intelligence services. If this were the case, one would be justified in seriously questioning the effectiveness, and therefore the legitimacy, of such services. The main concern of some governments was clearly to avoid disturbing their relationships with the United States, a crucial partner and ally. Other governments apparently work on the assumption that any information learned via their intelligence services is not supposed to be known[192].

231.    The most disturbing case – because it is the best documented – is probably that of Italy. As we have seen, the Milan prosecuting authorities and police have been able, thanks to a remarkably competent and independent investigation, to reconstruct in detail the *extraordinary rendition* of the imam Abu Omar, abducted on 17 February 2003 and transferred to the Egyptian authorities. The prosecuting authorities have identified 25 persons responsible for this operation mounted by the CIA, and have issued arrest warrants against 22 of them. The then Justice Minister in fact used his powers to impede the judicial authorities' work: as well as delaying forwarding requests for judicial assistance to the American authorities, he categorically refused to forward the arrest warrants issued against 22 American citizens[193]. Worse still: the same Justice Minister publicly accused the Milan judiciary of attacking the terrorist hunters rather than the terrorists themselves[194]. Furthermore, the Italian Government did not even consider it necessary to ask the American authorities for explanations regarding the operation carried out by American agents on its own national territory, or to complain about the fact that Abu Omar's abduction ruined an important anti-terrorism operation being undertaken by the Milan judiciary and police. As I stated in my January 2006 memorandum, it is unlikely that the Italian authorities were not aware of this large-scale CIA operation. As mentioned in chapter 3.4 above, the investigation in progress shows that Italian officials directly took part in Abu Omar's abduction and that the intelligence services were involved.

232.    In an effort to be impartial, I shall also discuss the example of my own country, Switzerland. As we shall see, a number of aircraft described as suspect and mentioned in the questionnaires sent to the member States landed in Geneva (and Zurich, as Amnesty International investigations subsequently showed). The United States did not respond to the Swiss authorities' requests for explanations for several months. A few hours before the annual clearance for aircraft flying on behalf of the American Government to overfly Swiss territory was due to expire, an American official apparently gave a Swiss Embassy representative in Washington verbal assurances that the United States had respected Switzerland's sovereignty and had not transported prisoners through Swiss airspace, thus simply reiterating the statement made by Ms Rice in Brussels on 5 December 2005. This assurance was very belated and, above all, not particularly credible in the light of the established facts: the Italian judicial authorities have established, on the basis of some very convincing evidence, that Abu Omar, abducted in Milan on 17 February 2003, was flown the same day from the Aviano base to the base at Ramstein in Germany, passing through Swiss airspace; this flight has been confirmed, moreover, by Swiss air traffic controllers. The Italian investigation also established that the head of the Milan operation stayed in Switzerland. The Swiss Government deliberately ignored these allegations[195] – despite their detailed and clearly serious nature – and settled for that vague, somewhat informal response from an official. It has taken a formalistic position, claiming that it did not have any evidence and, under international law, had to rely on the principle of trust. It clearly wished to renew the overflight clearance, which it quickly did without asking any further questions. The Confederal Prosecutor's Office has nevertheless opened a preliminary investigation to establish whether there have been violations of the law under Swiss jurisdiction in the Abu Omar case. At the same time, the Military Prosecutor's Office has begun an investigation aimed at identifying and punishing the perpetrator(s) of the leak which allowed the

---

[192] Some states' legislation expressly prohibits them from using or releasing information gathered by their intelligence services. This is the case in Hungary, for example.
[193] Article 4 of the extradition treaty between the United States and Italy also provides for the extradition of each country's own nationals. It should be added, however, that warrants issued by the Italian judiciary are enforceable in EU countries, as European arrest warrants do not have to be forwarded by the Ministry via diplomatic channels.
[194] ANSA agency, 27 February 2006, widely published in the Italian press.
[195] The Swiss federal prosecuting authorities have, however, instituted a preliminary investigation into these allegations.

*Doc. 10957*

publication of the Egyptian fax intercepted by the intelligence services. The journalists who published this are also being prosecuted, on the basis of rules whose compatibility with the principles of the freedom of the press in a democratic system seems highly doubtful. A revelation made these days rekindles the criticism directed at the authorities accused of servile obedience towards the United States: according to press reports, based on apparently well-informed sources, the Swiss authorities are said to have deliberately failed to execute an international arrest warrant brought by the Italian judicial authorities following the abduction of Abu Omar in February 2003. Robert Lady, the head of the detail wanted by the police, who was at the time in charge of the CIA in Milan holding the title and status of Consul of the United States, is said to have stayed in Geneva very recently; the police had been ordered to merely carry out discrete surveillance.

233. The principle of trust has also been invoked by other governments. This is the case with Ireland, for example: the government has stated that there was no reason to investigate the presence of American aircraft, since the United States had given assurances[196]. In Germany, the government and the ruling parties opposed – ultimately in vain – the establishment of a parliamentary commission of inquiry, despite the significant questions being raised about the role of the intelligence services, particularly in the case of the abduction of El-Masri. Lastly, in November 2005 I sent a request for information to the United States Ambassador (an observer to the Council of Europe). The Ambassador responded by sending me the public statement made by the American Secretary of State on 5 December 2005. In particular, the latter stated that the United States had not violated the sovereignty of European states, that "renditions" had saved human lives and that no prisoners had been transported for the purpose of torture[197]. European ministers, meeting in the framework of NATO, hastened to declare themselves satisfied with these assurances[198]. Or almost[199].

234. It should be pointed out that some governments have deliberately assisted in "renditions". This is especially well established with regard to Bosnia and Herzegovina, which has rendered six persons to the American forces outside of any legal procedure, as established by the national judicial authorities, as we have noted above. This certainly deserves to be stressed and welcomed. It is true that the Government of Bosnia and Herzegovina was regrettably not particularly determined, but it should not be forgotten that this young republic had been strongly pressured by a great power present on its territory. We have already criticised the Macedonian authorities, which have locked themselves up in categorical denial without having carried out any serious enquiry. Sweden has also rendered two asylum seekers to American operatives for "rendition" to the Egyptian authorities, as formally condemned by the UN Committee against Torture. The Swedish authorities, despite this international condemnation and parliamentary requests to this effect have yet to commence a proper inquiry into these facts[200].

235. When the previous memoranda, which set out interim summaries, were published, criticisms were voiced that the evidence referred primarily to NGO reports and accounts related in the press. It should be pointed that without the work undertaken by these organisations and the investigations of competent and tenacious journalists, we would not today be talking about this affair – which, nobody can now dispute, has some basis in fact. Indeed, governments did not spontaneously or autonomously take any real action to seek evidence for the allegations, despite their serious and detailed nature. Critics included those who, given their existing or previous positions and responsibilities, could have helped to establish the truth. Furthermore, it is shocking that some countries put pressure on journalists not to publish certain news items (I have mentioned the cases of the ABC and the *Washington Post*) or prosecuted them for publishing documents deemed confidential[201]. Such zeal would have been better employed in seeking to ascertain the truth – a fundamental requirement in a democracy – and prosecuting those guilty of perpetrating or tolerating any kind of abuse, such as illegal abductions or other acts contrary to human dignity.

---

[196] *We would not see any reason to because we have received categorical assurances from the US that they are not using Shannon in this way* (Irish Examiner, 22 February 2006).
[197] *The United States does not transport, and has not transported, detainees from one country to another for the purpose of interrogation using torture* (statement of 5 December 2005).
[198] The German Foreign Minister, Mr Steinmeier, emphasised the need for such clarification, because, he said, *we should not diverge from one another on the interpretation of international law* (AP 8 December 2005).
[199] Only Bernard Bot, the Dutch Foreign Affairs Minister, considered the American explanations "inadequate"; Scandinavian diplomats also protested against the American services' use of "methods on the edge of legality". On the whole, however, the Europeans, headed by Britain's Jack Straw, kept a low profile so as not to offend the "iron lady" of American diplomacy. (Le Figaro of 8 December 2005).
[200] As condemned by the Council of Europe's Commissioner for Human Rights in his statement on "fight against terrorism by legal means" published on the Council of Europe's website on 3 April 2006.
[201] In particular, this is what happened to the two Swiss journalists who, in early January 2006, published the content of the Egyptian fax, intercepted by Swiss intelligence services, mentioning the existence of detention centres in Eastern Europe. The two journalists have published a book outlining the circumstances by which they came into possession of the document: Sandro Brotz, Beat Jost, *CIA-Gefängnisse in Europa – Die Fax-Affäre und ihre Folgen*, Orell Füssli, 2006.

236. The American administration's attitude to the questions being raised in Europe about the CIA's actions was, once again, clearly illustrated during the fact-finding visit to the United States by a delegation from the European Parliament's Temporary Committee (TDIP): no or few replies were given to the numerous questions. I have already discussed the response to my request from the United States Ambassador to the Council of Europe (3.1.4). It is obvious that if the American authorities did not constantly raise the objection of secrecy for national security reasons, it would be far easier to establish the truth. We find that today, this secrecy is no longer justified. In a free and democratic society, it is far more important to establish the truth on numerous allegations of serious human rights violations, many of which are proven to a large extent.

**7.      Individual cases: judicial proceedings in progress**

**7.1.    A positive example: the Milan public prosecutor's office (Abu Omar case)**

237. In this case, the Italian judicial authorities and police have shown great competence and remarkable independence in the face of political pressures. Their competence and independence was already proven during the tragic years stained with blood by terrorism. The Milan public prosecutor's office was able to reconstitute in detail a clear case of "rendition" and a regrettable example of the lack of international cooperation in the fight against terrorism[202]. As I have already said[203], the Italian judicial authorities have brought international arrest warrants against 22 American officials. In addition, the ongoing investigation seems to be in the process of showing that operatives belonging to the Italian services have participated in the operation.

**7.2.    A matter requiring further attention: the Munich (El-Masri case) and Zweibrücken (Abu Omar case) public prosecutors' offices**

238. The German justice system gave its attention to the Abu Omar and El-Masri cases in terms of criminal proceedings for abduction against persons unknown. In the first-named case, normal co-operation took place with the Milan public prosecutor's office. As I have already stated, in my memorandum of January 2006, the Zweibrücken public prosecutor's office came up against a total lack of co-operation by the American authorities, who refused to provide any information on what had happened at the Ramstein base.

239. Where the second case is concerned, I have already[204] given some information showing that certain serious investigative measures have already been taken and that more remains to be done, especially in relation to the witnesses named by El-Masri and to clarification of the possible role played by the various German intelligence services.

**7.3.    Another matter requiring further attention: the Al Rawi and El Banna case**

240. Where the case of Al Rawi and El Banna is concerned, the British justice system has had to deal with an application by the families of the persons concerned attempting to force the UK government to intercede with the US government to obtain the release of both men, who are still held at Guantánamo Bay. It was in the framework of this procedure that the telegrams proving that the MI5 was involved in the two men's arrest in Gambia came into the public domain. After proceedings had begun, the UK authorities agreed to intercede on Mr Al Rawi's behalf, but not on that of his fellow detainee, Mr El Banna, although he had been arrested for the same reasons with the assistance of the UK services. In May 2006, the action was dismissed by the court of first instance.

241. In view of the circumstances which have led up to the arrest of these two men, one may think that the UK government is under at least a moral and political obligation to do everything in its power to actively intercede to secure their release from Guantanamo so that they can return to the country.

**7.4.    Sweden: what next in the Agiza and Alzery case?**

242. Sweden was condemned by the UN Committee against Torture in respect of the case of Mr Agiza and Mr Alzery, which led to an investigation by the parliamentary ombudsman, Mr Mats Melin. He noted that a preliminary investigation by the judicial authorities had culminated in the termination of the proceedings[205].

---

[202] I talked to Chief Prosecutor Mr Spataro for several hours and I wish to thank him for being so generous with his time.
[203] In para. 162
[204] In para. 103
[205] See above, para. 152

Doc. 10957

243.    According to some criticisms, which do not appear unfounded, different aspects of the case need further investigation. This disguised extradition, without any possibility of appeal and judicial scrutiny, and the ill-treatment at Bromma airport, still on the ground, under the eyes of Swedish officials, as well as the incomplete information provided to UN-CAT are serious matters which require that the whole truth be exposed.

**7.5.    Spain**

244.    The Palma de Mallorca public prosecutor's office has begun an investigation following the transmission of a *Guardia Civil* file containing the names of the passengers on the aircraft which took off from the local airport bound for Skopje, where they were most likely joined by Mr El-Masri and flown on to Afghanistan[206].

**7.6.    Mr El-Masri's complaint in the United States**

245.    With the assistance of the American Civil Liberties Union[207], Mr El-Masri has taken judicial action in Alexandria, in Virginia, seeking compensation from the CIA. On 19 May 2006, his complaint was rejected by the court of first instance, without a ruling on the merits of his application, as the court accepted the US government's argument that continuation of the proceedings would have jeopardised national security. In the course of the trial, the CIA's secret methods would indeed become the subject of discussions before the court.

**8.    Parliamentary investigations**

246.    As long ago as January, I called on national parliaments to put questions to their governments and to begin inquiries, where appropriate, to clarify the role of European governments in this affair. A large number of questions were indeed raised in the parliaments of numerous Council of Europe member States, which is very gratifying. Unfortunately, the government replies were almost without exception vague and inconclusive. The German and UK parliaments were particularly active, whereas parliamentary reactions in three of the main countries concerned by the allegations that are the subject of this report (Poland, Romania and "the former Yugoslav Republic of Macedonia") were particularly feeble, if not inexistent.

**8.1.    Germany**

247.    Opposition MPs in Germany, although few in number since the recent elections, have put numerous questions to their government[208]. The replies were very general in every case[209]. The government systematically hid behind the responsibility of the parliamentary monitoring committee (*parlamentarisches Kontrollgremium*, known as the PKG) for dealing with matters relating to the activities of the secret services. A number of questions relating to the subject of this report have effectively been discussed within the PKG, but the government's detailed report to this very select group, which works in very carefully maintained secrecy, was classified "secret". The chair of the committee, Mr Röttgen (CDU), in response to my request, sent me the "public" version of this report, which is, frankly, not very informative and does not mention the individual cases raised by the media. The government attempted to avoid setting up a committee of inquiry by sending all members of the *Bundestag* a more informative version, classified "confidential", which contains some information about some of the aforementioned individual cases[210]. At the insistence of the three opposition parties, a committee of inquiry has nevertheless been set up, and it started work in May[211]. Its mandate includes investigation of the allegations of collusion between the German authorities and the CIA in the case of Mr El-Masri. In short, the *Bundestag* has been highly active, urged on by the opposition parties in particular.

---

[206] I have in my possession a copy of this list, but I have no information on the states concerned.
[207] I should like to thank the ACLU for making detailed documentation about this case available to me.
[208] I should like to thank not only our Committee colleague Sabine Leutheusser-Schnarrenberger (Liberal), but also Mr Stroebele (Green party), for the information they have regularly supplied to me on this subject.
[209] The same is true of the replies given by other governments questioned by members of their parliaments, such as those of Belgium, the United Kingdom, Sweden and Ireland.
[210] The names of persons were represented by initials. See note 92 above in respect of my approach to the "confidential" and "secret" versions of this report.
[211] I have been invited to address this committee in the near future.

### 8.2 The United Kingdom

248. Our work regarding the United Kingdom benefited greatly from the efforts of a variety of interlocutors, whom I should like to salute in this report[212]. The United Kingdom parliament has not yet established a formal inquiry into possible British participation in abuses committed by the United States in the course of the "war on terror", but there have been several noteworthy parliamentary initiatives designed to broaden the public debate and encourage greater openness.

249. Late last year, one of the UK Parliament's standing committees, the Joint Committee on Human Rights (JCHR), launched an inquiry into UK Compliance with the United Nations Convention against Torture. As part of its mandate the Committee examined several issues of relevance to this inquiry, including the use of diplomatic assurances and the practice of "extraordinary rendition".

250. The JCHR held a series of evidentiary sessions, featuring Ministers of the United Kingdom Government[213] as well as representatives of non-governmental organisations[214]. Members of my team, on a visit to London in March 2006, met with a Committee Specialist of the JCHR and attended its evidentiary session with the UK Minister of State for the Armed Forces, Rt. Hon. Adam Ingram. In its report on UK Compliance with UNCAT published on 26 May 2006[215], the JCHR recognised the *"growing calls for an independent public inquiry"* in the UK, but ultimately decided that such an inquiry would be *"premature"* until the Government's own inquiries have been given a chance to publish the *"detailed information required"*.

251. In the meantime an ad-hoc body known as the "All-Party Parliamentary Group (APPG) on Extraordinary Renditions" has engaged Members of the UK Parliament belonging to all political parties. On Tuesday 28 March, members of my team attended the APPG's information session on the cases of Bisher Al-Rawi and Jamil El-Banna[216], which featured testimony from both men's legal representatives, MPs and family members. This session stimulated considerable media interest in the case and coincided with the public release of government telegrams passed on to the CIA in advance of the men's rendition. I wish to thank the Chairman of the APPG, Mr Andrew Tyrie MP, along with his dedicated staff, for their valuable support.

### 8.3. Poland: a parliamentary inquiry, carried out in secret

252. A parliamentary inquiry into the allegations that a "secret prison" exists in the country has been conducted behind closed doors in Poland. Promises made beforehand notwithstanding, its work has never been made public, except at a press conference announcing that the inquiry had not found anything untoward. In my opinion, this exercise was insufficient in terms of the positive obligation to conduct a credible investigation of credible allegations of serious human rights violations.

### 8.4. Romania and "the former Yugoslav Republic of Macedonia": no parliamentary inquiry

253. To my knowledge, no parliamentary inquiry whatsoever has taken place in either country, despite the particularly serious and concrete nature of the allegations made against both. What is more, the committee which supervises the secret services in "the former Yugoslav Republic of Macedonia" ceased operations three years ago[217], and this is particularly worrying in a country where the secret services not so very long ago played a particularly important and controversial role.

---

[212] In this regard, I should like to make particular mention of the London-based non-governmental organisation REPRIEVE, which has supported my team by providing contacts, research insights and materials relating to the cases they work on.
[213] For example, on 6 March 2006 the JCHR heard evidence from the Solicitor General and Minister of State in the Department for Constitutional Affairs, Harriet Harman, along with other officials from her department. An uncorrected transcript of the session is available online at:
http://www.publications.parliament.uk/pa/jt200506/jtselect/jtrights/uc701-iii/uc70102.htm
[214] On 21 November 2005 the JCHR heard evidence from Human Rights Watch, Amnesty International and REDRESS. An uncorrected transcript of the session is available online at:
http://www.publications.parliament.uk/pa/jt200506/jtselect/jtrights/uc701-i/uc70102.htm
[215] The full report is available online at: http://www.publications.parliament.uk/pa/jt200506/jtselect/jtrights/185/18502.htm; a full record of oral and written evidence was published in a separate volume, available at:
http://www.publications.parliament.uk/pa/jt200506/jtselect/jtrights/185/185-ii.pdf.
[216] See to the section of the report that treats these cases, at 3.5 above.
[217] Response of the Parliament of the former Yugoslav Republic of Macedonia (Sobranie) to the questionnaire of the TDIP Temporary Committee of the European Parliament. Available at: www.statewatch.org/rendition.

*Doc. 10957*

## 9. Commitment to combating terrorism

### 9.1. Fight against terrorism: an absolute necessity

254. The fight against terrorism is unquestionably a priority for every government and, above all, for the international community as a whole. The use of terror, previously employed primarily as a weapon against individual governments, has increasingly become a means of attacking a political and social model, and indeed a lifestyle and civilisation represented by large parts of the planet. Terrorism has taken on a clear international connotation in recent years, and it too has taken advantage of the tremendous technological progress made in the fields of arms, telecommunication and mobility. It is consequently vital to co-ordinate the fight against terrorism at the international level.

255. It has to be said, however, that there are still significant deficiencies in such co-ordination, and that it too often depends on the goodwill, but also the arbitrary nature, of intelligence services. An understanding of this phenomenon, its structures, the resources at its disposal and its leaders is essential in order to deal with the terrorist threat successfully. Intelligence services consequently play an important and irreplaceable role. That role must, however, be specified and delimited within a well-defined institutional framework consistent with the principles of the rule of law and democratic legitimacy. This also calls for effective supervisory mechanisms; the evidence under consideration has highlighted alarming flaws in such mechanisms. It is a well-known fact that the various American and European intelligence services have set up working groups and exchanged information. This initiative can only be welcomed. The events of recent years show, however, that international co-ordination is still seriously inadequate. The Milan imam's abduction is emblematic in this regard: the operation by CIA agents ruined the efforts of the Italian judiciary and police, who were involved in a major anti-terrorism investigation targeting precisely the Milan mosque[218].

256. The governments' very replies and especially their silence are a telling indication that intelligence services appear increasingly to work outside the scope of proper supervisory mechanisms. The way in which American services were able to operate in Europe, carrying out several hundred flights and transporting illegally arrested persons without any scrutiny, can only point to the participation or collusion of several European services – or, alternatively, incredible incompetence, a scenario which, frankly, is difficult to envisage. Indeed, everything seems to indicate that the American services were given considerable latitude and allowed to act as they saw fit, even though it would have been impossible not to be aware that their methods were incompatible with national legal systems and European standards relating to respect for human rights[219]. Such passivity on the part of European governments and administrative departments is disturbing, and such a careless, laissez-faire attitude unworthy.

257. The Council of Europe has already had the opportunity to voice clearly its concern *about certain practices that have been adopted, particularly in the fight against terrorism, such as the indefinite imprisonment of foreign nationals on no precise charge and without access to an independent tribunal, degrading treatment during interrogations, the interception of private communications without subsequently informing those concerned, extradition to countries likely to apply the death penalty or the use of torture, and detention or assault on the grounds of political or religious activism, which are contrary to the European Convention on Human Rights (ETS n° 5) and the protocols thereto, the European Convention for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment (ETS n° 126), and the Framework Decision of the Council of the European Union*[220].

### 9.2. The strength of unity and of the law

258. The Parliamentary Assembly has already expressed its views very clearly: it unreservedly shares *the United States' determination to combat international terrorism and fully endorses the importance of detecting and preventing terrorist crimes, prosecuting and punishing terrorists and protecting human lives*[221]. This determination must also be shared by all of Europe. Back in 1986, the Assembly regretted *the procrastination of European states in reacting multilaterally to the terrorist threat, and the absence up to the present time of a coherent and binding set of co-ordinated measures adopted by common consent*[222].

---

[218] This fact was expressly confirmed by Milan's Deputy Public Prosecutor, during his hearing before the European Parliament's Temporary Committee in Brussels on 23 February 2006.
[219] In an interview with the German magazine *Die Zeit* on 29 December 2005, Mr Michael Scheuer, former head of the CIA's "Bin Laden" unit and one of the architects of the "rendition" system further developed during Bill Clinton's presidency and with his agreement, stated that the CIA was within its rights to break all laws except American law. See also Michael Scheuer, former Chief of the Bin Laden Unit in the CIA Counter-Terrorist Centre, *supra* note 19.
[220] Recommendation 1713 (2005) of the PACE on *Democratic oversight of the security sector in member States*.
[221] Resolution 1433 (2005), on *Lawfulness of detentions by the United States in Guantánamo Bay*, § 1.
[222] Resolution 863 (1986) on the European response to international terrorism, § 3.

Despite the intervening years and the spectacular development of this threat, no significant progress has really been made. It is more necessary than ever to extend this *coherent and binding set of co-ordinated measures* to Europe and to other parts of the world, starting with the United States. The approach of simply leaving the United States to it and pretending not to know what is happening, in many cases even on one's own territory, is unacceptable. Only the adoption of a joint strategy by all the countries concerned can successfully counter the new threats, such as terrorism and organised crime. If, as the United States believes, existing legal instruments are no longer adequate to counter the new threats, the situation must be analysed and discussed on a joint basis.

259. It is highly likely that existing resources and arrangements will have to be adapted in order to combat international terrorism effectively. This is the view held by the United States Government, in particular[223]. Police investigation tools and the rules of criminal procedure clearly need to take into account the development of more serious forms of crime. However, such adaptation calls for multilateral consultation, presupposing dialogue, debate or even a frank and open confrontation, which clearly have yet to take place. On the contrary, the states of the European Union have just issued a particularly negative signal: giving in to what appears to be a nationalist reflex, in late April 2006 they turned down a Commission proposal to step up judicial and police co-operation under the Schengen Agreement[224].

260. Efforts to combat impunity are undoubtedly a crucial element in the fight against terrorism. It is unfortunate that the American administration has systematically opposed the establishment of a universal jurisdiction, refusing to ratify the Rome agreement on the establishment of the International Criminal Court[225]. Handing over terrorist suspects (without, moreover, any verification of the substance of the accusations by a judicial authority) to states one knows, or must presume, will not respect fundamental rights, is unacceptable. Relying on the principle of trust and on diplomatic assurances given by undemocratic states known not to respect human rights is simply cowardly and hypocritical.

261. The American administration states that *rendition* is a vital tool in the fight against international terrorism[226]. We consider that *renditions* may be acceptable, and indeed desirable, only if they satisfy a number of very specific requirements (which, with a few exceptions[227], has not been the case in any of the known *renditions* to date). If a state is unable, or does not wish, to prosecute a suspect, it should be possible to apply the following principle: no person genuinely suspected of a serious act of terrorism should feel safe anywhere in the world. In such cases, however, the person in question may be handed over only to a state able to provide all the guarantees of a fair trial, or – even better – to an international jurisdiction, which in my view should be established as a matter of urgency.

262. The UN High Commissioner for Human Rights, Louise Arbour, has publicly criticised the practice of handing over detainees – outside the scope of the justice system – to countries known to use torture, while demanding assurances that these prisoners will not be ill treated. She added that secret detention was a form of torture[228].

263. Abandoning or relativising human dignity and fundamental human rights is utterly inconceivable. All of history shows that arbitrary decisions, contempt for human values and torture have never been effective, have failed to resolve anything and, ultimately, have led only to a subsequent exacerbation of violence and brutality. In the end, such abuses have served only to confer a sense and appearance of legitimacy on those who attack institutions. In fact, giving in to this temptation concedes a major initial victory to the very people attacking our values. Furthermore, attempting to focus solely on security aspects, as is the case at present – with an outcome that is more than questionable – plays into the hands of the terror lords. It is imperative for a global anti-terrorism strategy to consider political and social aspects. Above all, we must be mindful of the strength of the values of the society for which we are fighting[229]. Benjamin Franklin inevitably comes to mind,

---

[223] *The captured terrorists of the 21st century do not fit easily into traditional systems of criminal or military justice, which were designed for different needs. We have had to adapt.* (Ms Rice, statement of 5 December 2005).
[224] See, for instance, Le Figaro of 28 April 2006.
[225] See, for example, Resolution 1336 (2003) on *Threats to the International Criminal Court*.
[226] *Rendition is a vital tool in combating transnational terrorism* (Ms Rice, in her statement of 5 December 2005).
[227] In particular, this applies to the case of the terrorist Carlos, which was mentioned by Ms Rice. She appears to forget, however, that Carlos was abducted in Sudan, where he enjoyed total impunity and was transported to France, where he was judged according to a procedure consistent with the European Convention on Human Rights.
[228] Le Monde of 9 December 2005.
[229] A judgment of the Israeli Supreme Court, called to rule on an alleged breach of the principle of equality following the distribution of gas masks on the West Bank during the Gulf War, contains the following remarkable passage written by the President of the Court, Aaron Barak, himself a survivor of the Kovnus ghetto in Lithuania: *"When the guns speak, the Muses fall silent. But when the guns speak, military commands must comply with the law. A society that wishes to be able to confront its enemies must above all be mindful that it is fighting for values worth protecting. The rule of law is one*

*Doc. 10957*

and his approach seems more relevant than ever: *they that can give up essential liberty to attain a little temporary security deserve neither liberty nor safety*[230].

264. Legality and fairness by no means preclude firmness, but confer genuine legitimacy and credibility on a state's inevitable preventive actions. In this respect, some of the international community's attitudes are disturbing. I have already mentioned the unacceptable practice involving the application of UN Security Council sanctions on the basis of black lists. Another example is the situation in Kosovo, where the international community intervened to restore peace, justice and democracy: the inhabitants of this region are still the only people in Europe – with the exception of Belarus – not to have access to the European Court of Human Rights; its prisons are a virtual black hole, not open for inspections or monitoring by the Committee for the Prevention of Torture. In the name of what legitimacy, and with what credibility, is this same international community entitled to lecture Serbia? *Examples are more effective than threats* (Corneille).

**10.    Legal perspectives**

**10.1.    The point of view of the United States**

265. In May 2006 the United States sent its first state delegation to the United Nations Committee against Torture (UN CAT) since the Bush Administration came to power. The delegation was headed by the Chief Legal Advisor to the Department of State, Mr John Bellinger.

266. Mr Bellinger oversaw the presentation of a 184-page submission to UN CAT, in which the United States set out its "exhaustive written responses" to most of the Committee's list of issues. The United States should certainly be commended for this level of engagement, notwithstanding that its policy regarding secret detentions and intelligence activities remained, for the most part, at a firm "*no comment*"[231].

267. There can have been few more opportune times at which to engage Mr Bellinger on discussion of pertinent legal issues than in the week of his return from the UN CAT to Washington, DC. In a briefing lasting about one hour[232], Mr Bellinger and his colleague Dan Fried, Assistant Secretary of State for European Affairs, provided us with a range of valuable perspectives, which I think it worthwhile to indicate in this report as the best contemporary first-hand portrayal of the US legal position.

268. Mr Bellinger made clear on several occasions that a programme of renditions remains a key strand of United States' foreign policy: "*As Secretary Rice has said, we do conduct renditions, we have conducted renditions and we will not rule out conducting renditions in the future.*"

269. He was very decisive, however, in drawing a distinction between the original meaning of rendition and the popular, media-driven notion of Extraordinary Rendition:

> "*To the extent that extraordinary rendition – as I have seen it defined – means the intentional transfer of an individual to a country, expecting or intending that they will be mistreated, then the United States does not do extraordinary renditions to begin with. The United States does not render people to other countries for the purpose of being tortured, or in the expectation that they will be tortured.*"

270. Dan Fried used the briefing to explain some of the underlying considerations for the United States in pursuit of its "war on terror":

> "*We are attempting to keep our people safe; we are attempting to fight dangerous terrorist groups who are active and who mean what they say about destroying us. We are trying to do so in a way consistent with our values and our international legal obligations. Doing all of those things in practice is not easy, partly because – as we've discovered as we've gotten into it – the struggle we are in does not fit neatly either into the criminal legal framework, or neatly into the law of war framework.*"

---

*of those values*"; in: Aaron Barak, *Democrazia, Terrorismo e Corti di giustizia*, Giurisprudenza Costituzionale, 2002, 5, p. 3385.
[230] Quoted just recently by Heinrich Koller, *Kampf gegen Terrorismus – Rechstaatlichen Grundlagen und Schranken*, conference held in Zurich on 19 January 2006 before the *Schweizeriche Helsinki Vereinigung für Demokratie, Rechtsstaat und Menschenrechte*.
[231] See the CAT submission of the United States and the newly-published comments of the Committee (at page 4) on secret detentions, available at www.usmission.ch.
[232] Detailed notes of the meeting with Mr Bellinger and transcribed comments are on file with the Rapporteur.

271.    With regard to the question of fitting into legal frameworks, I find it particularly noteworthy that the United States does not see itself bound to satisfy anyone's interpretation of international law but its own. Mr Bellinger continually expressed this view: *"We have to comply with our legal obligations. None of this can be done in an illegal way. We think from our point of view that we comply with all the legal obligations we have."*

272.    Similarly, in one of his longer explanations, Mr Bellinger defended the United States' record in the eyes of its European partners:

> *"For those who say we're not following our international obligations in certain cases, I have to say that sometimes it comes down to a disagreement on what the obligation is.*
>
> *With regard to Article 3 of CAT, this is a technical issue. The obligation under Article 3 of the Convention Against Torture requires a country not to return, expel or refouler an individual. For more than a decade, the position of the US Government, and our courts, has been that all of those terms refer to returns from, or transfers out from the United States.*
>
> *So we think that Article 3 of the CAT is legally binding upon us with respect to transfers of anyone <u>from</u> the United States; but we don't think it is legally binding <u>outside</u> the United States.*
>
> *Similarly the Senate of the United States and our courts for more than ten years have taken a position that the words 'substantial grounds' means 'more likely than not'. If we transfer a person from one point outside the United States to another point outside the United States then, as a policy matter, if we think there are substantial grounds to believe that the individual will be tortured or mistreated, we follow the same rules. I think it is a reasonable position for our courts to have set – that 'substantial grounds' means 'more likely than not'.*
>
> *What I can say, though, is that there are different legal regimes between the European Court of Human Rights and our courts, and you can't 'beat up' our courts and our Senate based on some things that they said ten years ago as how they interpret the law.*
>
> *You may wish that the ECtHR interpretation of the CAT was the same position that we have here, but it is not. We do, though, take <u>our</u> legal obligations seriously. And there needs to be a recognition that there may be different interpretation of the terms, but nonetheless the United States still takes our legal obligations seriously – and we do that."*

Mr Bellinger's interpretation also serves to explain why a detention facility like Camp Delta is situated at Guantanamo Bay, in Cuba, and not in the desert of Arizona. The United States' formalistic and positivist approach shocks the legal sensibilities of Europeans, who are rather influenced by "teleological" considerations. In other words, the European approach is to opt for an interpretation that affords maximum protection to the values on which the legal rule is based.

273.    Mr Bellinger was predictably reluctant to discuss the legal issues surrounding any of the cases of rendition that are alleged to have occurred, including the case studies treated in this report. He cited a considered policy on the part of the US Government to refrain from commenting:

> *"We have thought seriously about whether we can answer specific questions publicly and say that there were one, two, or three renditions and where they went through. But we have concluded that, due to the nature of intelligence activities, we simply cannot get into the business of confirming or denying specific questions – as much as we would like to. I'm not going to confirm or deny whether there have been any renditions that have gone through Europe at all."*

274.    The United States Government is always prepared, however, to explain the "hard choices" it feels it has to make to protect its citizens[233]. Mr Bellinger, for his part, described a hypothetical *"policy dilemma"* based loosely on a real-life scenario, where a member of Al-Qaeda is captured at the Kenyan border, *"trying to enter the country but the Kenyans don't want him there"*. The captive is known to be wanted by *"some other country such as Egypt, Pakistan or Jordan"* and the United States has an aircraft it could use to render him back. Mr Bellinger concluded his briefing by characterising the choice:

> *"If the choice is between letting a person go who's suspected of involvement in terrorism, or taking them back to their country of nationality, or some other country where they're wanted – then that's*

---

[233] See Secretary Rice's remarks upon her departure for Europe, Andrews Air Base, 5 December 2005: "*Protecting citizens is the first and oldest duty of any government. Sometimes these efforts are misunderstood. I want to help all of you understand the hard choices involved, and some of the responsibilities that go with them.*"

Doc. 10957

*your choice, because there's no extradition treaty and you obviously don't want us to put more people in Guantanamo.*

*If the choice is whether the person will disappear and be let go, or the country of his nationality or some other country wants him back, and the US is able to provide that – what should be done? That's your choice.*

*The United States says there are cases where in fact rendition might make sense."*

### 10.2. The point of view of the Council of Europe

#### 10.2.1. The European Commission for Democracy through Law (Venice Commission)

275.  The legal issues raised by the facts examined in this report, from the point of view of the Council of Europe, have been set out clearly and precisely by the Venice Commission, whom the Committee on Legal Affairs and Human Rights had asked for a legal opinion in December 2005[234].

276.  In its conclusion, the Venice Commission stresses the responsibility of the Council of Europe's member States to ensure that all persons within their jurisdiction enjoy internationally agreed upon fundamental rights (including the right to security of the person, freedom from torture and the right to life), even in the case of persons who are aboard an aircraft that is simply transiting through its airspace[235]. The Venice Commission also confirms that the obligations arising out of the numerous bilateral and multilateral treaties in different fields such as collective self-defence, international civil aviation and military bases, "*do not prevent States from complying with their human rights obligations*"[236].

277.  In reply to the specific questions asked by the Committee on Legal Affairs and Human Rights, the Venice Commission has drawn the following conclusions:

*"As regards arrest and secret detention*

a)  *Any form of involvement of a Council of Europe member State or receipt of information prior to an arrest within its jurisdiction by foreign agents entails accountability under Articles 1 and 5 of the European Convention on Human Rights (and possibly Article 3 in respect of the modalities of the arrest). A State must thus prevent the arrest from taking place. If the arrest is effected by foreign authorities in the exercise of their jurisdiction under the terms of an applicable Status of Forces Agreement (SOFA), the Council of Europe member State concerned may remain accountable under the European Convention on Human Rights, as it is obliged to give priority to its jus cogens obligations, such as they ensue from Article 3.*

b)  *Active and passive co-operation by a Council of Europe member State in imposing and executing secret detentions engages its responsibility under the European Convention on Human Rights. While no such responsibility applies if the detention is carried out by foreign authorities without the territorial State actually knowing it, the latter must take effective measures to safeguard against the risk of disappearance and must conduct a prompt and effective investigation into a substantiated claim that a person has been taken into unacknowledged custody.*

c)  *The Council of Europe member State's responsibility is engaged also in the case where its agents (police, security forces etc.) co-operate with the foreign authorities or do not prevent an arrest or unacknowledged detention without government knowledge, acting ultra vires. The Statute of the Council of Europe and the European Convention on Human Rights require respect for the rule of law, which in turn requires accountability for all form of exercise of public power. Regardless of how a State chooses to regulate political control over security and intelligence agencies, in any event effective oversight and control mechanisms must exist.*

---

[234] Opinion on the International Legal Obligations of Council of Europe Member States in Respect of Secret Detention Facilities and Inter-State Transport of Prisoners, adopted by the Venice Commission at its 66th Plenary Session (Venice, 17-18 March 2006) on the basis of comments by Mssrs Iain Cameron (Substitute Member, Sweden), Pieter van Dijk (Member, the Netherlands), Olivier Dutheillet de Lamothe (Member, France), Jan Helgesen (Member, Norway), Giorgio Malinverni (Member, Switzerland) and Georg Nolte (Substitute Member, Germany) – opinion no. 363/2005, CDL-AD(2006)009.
[235] cf. Opinion cited above, paras. 143-146.
[236] ibid., para. 156. See EU Network of Independent Experts on Fundamental Rights, Opinion No. 3-2006 on "*The Human Responsibilities of the EU Member States in the Context of the CIA Activities in Europe ('Extraordinary Renditions')*, 25 May 2006, at page 7. The Network reaches the same conclusion on the basis of Article 6(1) EU.

*d)*   *If a State is informed or has reasonable suspicions that any persons are held incommunicado at foreign military bases on its territory, its responsibility under the European Convention on Human Rights is engaged, unless it takes all measures which are within its power in order for this irregular situation to end.*

*e)*   *Council of Europe member States which have ratified the European Convention for the Prevention of Torture must inform the European Committee for the Prevention of Torture of any detention facility on their territory and must allow it to access such facilities. Insofar as international humanitarian law may be applicable, States must grant the International Committee of the Red Cross permission to visit these facilities.*

<u>As regards inter-state transfers of prisoners</u>

*f)*   *There are only four legal ways for Council of Europe member States to transfer a prisoner to foreign authorities: deportation, extradition, transit and transfer of sentenced persons for the purpose of their serving the sentence in another country. Extradition and deportation proceedings must be defined by the applicable law, and the prisoners must be provided appropriate legal guarantees and access to competent authorities. The prohibition to extradite or deport to a country where there exists a risk of torture or ill-treatment must be respected.*

*g)*   *Diplomatic assurances must be legally binding on the issuing State and must be unequivocal in terms; when there is substantial evidence that a country practices or permits torture in respect of certain categories of prisoners, Council of Europe member States must refuse the assurances in cases of requests for extradition of prisoners belonging to those categories.*

*h)*   *The prohibition to transfer to a country where there exists a risk of torture or ill-treatment also applies in respect of the transit of prisoners through the territory of Council of Europe member States: they must therefore refuse to allow transit of prisoners in circumstances where there is such a risk.*

<u>As regards overflight</u>

*i)*   *If a Council of Europe member State has serious reasons to believe that an airplane crossing its airspace carries prisoners with the intention of transferring them to countries where they would face ill-treatment in violation of Article 3 of the European Convention on Human Rights, it must take all the necessary measures in order to prevent this from taking place.*

*j)*   *If the state airplane in question has presented itself as a civil plane, that is to say it has not duly sought prior authorisation pursuant to Article 3 c) of the Chicago Convention, the territorial State must require landing and must search it. In addition, it must protest through appropriate diplomatic channels.*

*k)*   *If the plane has presented itself as a state plane and has obtained overflight permission without however disclosing its mission, the territorial State cannot search it unless the captain consents. However, the territorial State can refuse further overflight clearances in favour of the flag State or impose, as a condition therefor, the duty to submit to searches; if the overflight permission derives from a bilateral treaty or a Status of Forces Agreement or a military base agreement, the terms of such a treaty should be questioned if and to the extent that they do not allow for any control in order to ensure respect for human rights.*

*l)*   *In granting foreign state aircraft authorisation for overflight, Council of Europe member States must secure respect for their human rights obligations. This means that they may have to consider whether it is necessary to insert new clauses, including the right to search, as a condition for diplomatic clearances in favour of State planes carrying prisoners. If there are reasonable grounds to believe that, in certain categories of cases, the human rights of certain passengers risk being violated, States must indeed make overflight permission conditional upon respect of express human rights clauses. Compliance with the procedures for obtaining diplomatic clearance must be strictly monitored; requests for overflight authorisation should provide sufficient information as to allow effective monitoring (for example, the identity and status (voluntary or involuntary passenger) of all persons on board and the destination of the flight as well as the final destination of each passenger). Whenever necessary, the right to search civil planes must be exercised.*

*m)*   *With a view to discouraging repetition of abuse, any violations of civil aviation principles in relation to irregular transport of prisoners should be denounced, and brought to the attention of the competent*

Doc. 10957

*authorities and eventually of the public. Council of Europe member States could bring possible breaches of the Chicago Convention before the Council of the International Civil Aviation Organisation pursuant to Article 54 of the Chicago Convention.*

n)  As regards the treaty obligations of Council of Europe member States, the Commission considers that there is no international obligation for them to allow irregular transfers of prisoners or to grant unconditional overflight rights, for the purposes of combating terrorism. The Commission recalls that if the breach of a treaty obligation is determined by the need to comply with a peremptory norm (jus cogens), it does not give rise to an internationally wrongful act, and the prohibition of torture is a peremptory norm. In the Commission's opinion, therefore, States must interpret and perform their treaty obligations, including those deriving from the NATO treaty and from military base agreements and Status of Forces Agreements, in a manner compatible with their human rights obligations."

### 10.2.2 The Secretary General of the Council of Europe (Article 52 ECHR)

278.  The Secretary General has made use of his power of enquiry under Article 52 ECHR as rapidly and as completely as possible. In his report dated 28 February 2006[237], the Secretary General takes a clear position as regards member States' responsibilities:

> *"The activities of foreign agencies cannot be attributed directly to States Parties. Their responsibility may nevertheless be engaged on account of either their duty to refrain from aid or assistance in the commission of wrongful conduct, acquiescence and connivance in such conduct, or, more generally, their positive obligations under the Convention.[5] In accordance with the generally recognised rules on State responsibility, States may be held responsible of aiding or assisting another State in the commission of an internationally wrongful act.[6] There can be little doubt that aid and assistance by agents of a State Party in the commission of human rights abuses by agents of another State acting within the former's jurisdiction would constitute a violation of the Convention. Even acquiescence and connivance of the authorities in the acts of foreign agents affecting Convention rights might engage the State Party's responsibility under the Convention. Of course, any such vicarious responsibility presupposes that the authorities of States Parties had knowledge of the said activities."[238]*

As regards the result of the Secretary General's request for information, the report of 28 February concludes in a preliminary fashion that *"all forms of deprivation of liberty outside the regular legal framework need to be defined as criminal offences in all States Parties and be effectively enforced. Offences should include aiding and assisting in such illegal acts, as well as acts of omission (being aware but not reporting), and strong criminal sanctions should be provided for intelligence staff or other public officials involved in such cases. However, the most significant problems and loopholes revealed by the replies concern the ability of competent authorities to detect any such illegal activities and take resolute action against them. Four main areas are identified where further measures should be taken at national, European and international levels:*

*- the rules governing activities of secret services appear inadequate in many States; better controls are necessary, in particular as regards activities of foreign secret services on their territory;*

*- the current international regulations for air traffic do not give adequate safeguards against abuse. There is a need for States to be given the possibility to check whether transiting aircraft are being used for illegal purposes. But even within the current legal framework, States should equip themselves with stronger control tools;*

*- international rules on State immunity often prevent States from effectively prosecuting foreign officials who commit crimes on their territory. Immunity must not lead to impunity where serious human rights violations are at stake. Work should start at European and international levels to establish clear human rights exceptions to traditional rules on immunity;*

*- mere assurances by foreign States that their agents abroad comply with international and national law are not enough. Formal guarantees and enforcement mechanisms need to be set out in agreements and national law in order to protect ECHR rights."*[239]

---

[237] SG/Inf (2006)5, available at the Council of Europe's website (http://www.coe.int).
[238] ibid., para. 23 ; see also the excellent analysis of the case law of the European Court of Human Rights regarding member States' "positive obligations" in paras. 24-30
[239] *Ibid.*, p. 1 (non-official executive summary)