279. In this context, the Secretary General, referring to my memorandum of 21 January 2006, was worried about the fact that some countries have not replied, or have not replied completely, to his question concerning the involvement of any public official in such deprivation of liberty or transport of detainees, and whether any official investigation is under way or has been completed. Consequently, the Secretary General has asked additional questions to some countries. The replies are not yet in the public domain.

**11.   Conclusion**

280. Our analysis of the CIA "rendition" programme has revealed a network that resembles a "spider's web" spun across the globe. The analysis is based on official information provided by national and international air traffic control authorities, as well as other information including from sources inside intelligence agencies, in particular the American. This "web", shown in the graphic[240], is composed of several landing points, which we have subdivided into different categories, and which are linked up among themselves by civilian planes used by the CIA or military aircraft.

281. These landing points are used for various purposes that range from aircraft stopovers to refuel during a mission to staging points used for the connection of different "rendition circuits" that we have identified and where "rendition units" can rest and prepare missions. We have also marked the points where there are known detention centres (Guantanamo Bay, Kabul and Baghdad…) as well as points where we believe we have been able to establish that pick-ups of rendition victims took place.

282. In two European countries only (Romania and Poland), there are two other landing points that remain to be explained. Whilst these do not fall into any of the categories described above, several indications lead us to believe that they are likely to form part of the "rendition circuits'[241]. These landings therefore do not form part of the 98% of CIA flights that are used solely for logistical purposes[242], but rather belong to the 2% of flights that concern us the most. These corroborated facts strengthen the presumption – already based on other elements - that these landings are detainee drop-off points that are near to secret detention centres.

283. Analysis of the network's functioning and of ten individual cases allows us to make a number of conclusions both about human rights violations – some of which continue – and about the responsibilities of some Council of Europe member States.

284. It must be emphasised that this report is indeed addressed to the Council of Europe Member states. The United States, an observer state of our Organisation, actually created this reprehensible network, which we criticise in light of the values shared on both sides of the Atlantic. But we also believe to have established that it is only through the intentional or grossly negligent collusion of the European partners that this "web" was able to spread also over Europe.

285. The impression which some Governments tried to create at the beginning of this debate – that Europe was a victim of secret CIA plots – does not seem to correspond to reality. It is now clear – although we are still far from having established the whole truth - that authorities in several European countries actively participated with the CIA in these unlawful activities. Other countries ignored them knowingly, or did not want to know.

286. In the draft resolution, which sums up this report's conclusions, I have not directly named the countries responsible simply because there is not enough room in such a text to adequately develop the nuances of each individual case. In addition, we only know part of the truth so far, and other countries may still turn out to be implicated in light of future research or revelations. This explanatory note, however, explains the discovered facts in far greater detail. Finally, the purpose of this report is not to attribute "grades" to different member States, but to try to understand what really happened throughout Europe and to stop certain violations shown from reoccurring in future. I would add that a key element seems to be the urgent need to improve the international response to the threat of terrorism. This response presently appears today as largely inadequate and insufficiently coordinated.

287. Whilst hard evidence, at least according to the strict meaning of the word, is still not forthcoming, a number of coherent and converging elements indicate that secret detention centres have indeed existed and unlawful inter-state transfers have taken place in Europe. I do not set myself up to act as a criminal court, because this would require evidence beyond reasonable doubt. My assessment rather reflects a conviction

---

[240] See graphic annex to this report: "The global "spider's web" of secret detentions and unlawful inter-state transfers"
[241] See paragraph 51 above.
[242] See paragraph 49 above (quoting Michael Scheuer, architect of the rendition programme).

*Doc. 10957*

based upon careful examination of balance of probabilities, as well as upon logical deductions from clearly established facts. It is not intended to pronounce that the authorities of these countries are "guilty" for having tolerated secret detention sites, but rather it is to hold them "responsible" for failing to comply with the positive obligation to diligently investigate any serious allegation of fundamental rights violations.

288.    In this sense, it must be stated that to date, the following member States could be held responsible, to varying degrees, which are not always settled definitively, for violations of the rights of specific persons identified below (respecting the chronological order as far as possible):

- Sweden, in the cases of Ahmed Agiza and Mohamed Alzery ;
- Bosnia-Herzegovina, in the cases of Lakhdar Boumediene, Mohamed Nechle, Hadj Boudella, Belkacem Bensayah,  Mustafa Ait Idir and Saber Lahmar ( the "Algerian six") ;
- The United Kingdom in the cases of Bisher Al-Rawi, Jamil El-Banna and Binyam Mohamed ;
- Italy, in the cases of Abu Omar and Maher Arar ;
- "The former Yugoslav Republic of Macedonia", in the case of Khaled El-Masri ;
- Germany, in the cases of Abu Omar, of the "Algerian six", and Khaled El-Masri ;
- Turkey, in the case of the  "Algerian six".

289.    Some of these above mentioned states, and others, could be held responsible for collusion – active or passive (in the sense of having tolerated or having been negligent in fulfilling the duty to supervise) - involving secret detention and unlawful inter-state transfers of a non specified number of persons whose identity so far remains unknown:

- Poland and Romania, concerning the running of secret detention centres;
- Germany, Turkey, Spain and Cyprus for being "staging points" for flights involving the unlawful transfer of detainees;
- Ireland, the United Kingdom, Portugal, Greece and Italy for being "stopovers" for flights involving the unlawful transfer of detainees.

290.    Other States should still show greater willingness and zeal in the quest for truth, as serious indications show that their territory or their airspace might have been used, even unbeknownst, for illegal operations (the example of Switzerland was cited in this context).

291.    The international community is finally urged to create more transparency in the places of detention in Kosovo, which to date qualify as "black holes" that cannot even be accessed by the CPT. This is frankly intolerable, considering that the international intervention in this region was meant to restore order and lawfulness.

292.    With regards to these extremely serious allegations, it is urgent – that is the principal aim of this report – that all Council of Europe member States concerned finally comply with their positive obligation under the ECHR to investigate. It is also crucial that the proposals in the draft resolution and recommendation are implemented so that terrorism can be fought effectively whilst respecting human rights at the same time.

ANNEX



ANNEX

*Reporting committee*: Committee on Legal Affairs and Human Rights

*Reference to committee*: Doc 10748 and Reference No 3153 of 25 November 2005

*Draft resolution and draft recommendation* unanimously adopted by the Committee on 7 June 2006

*Members of the Committee* : Mr Dick **Marty** (Chairperson), Mr Erik **Jurgens**, Mr Eduard Lintner, Mr Adrien Severin (Vice-Chairpersons), Mrs Birgitta Alhqvist, Mr Athanasios Alevras, Mr Rafis Aliti, Mr Alexander Arabadjiev, Mr Miguel Arias, Mr Birgir Ármannsson, Mr José Luis Arnaut, Mr Abdülkadir Ateş, Mr Jaume **Bartumeu Cassany**, Mrs Meritxell Batet, Mrs Soledad Becerril, Mrs Marie-Louise **Bemelmans-Videc**, Mr Giorgi Bokeria, Mrs Olena Bondarenko, Mr Erol Aslan Cebeci, Mrs Pia Christmas-Møller, Mr Boriss **Cilevičs**, Mr Domenico Contestabile, Mr András Csáky, Mrs Herta **Däubler-Gmelin**, Mr Marcello Dell'Utri, Mrs Lydie Err, Mr Jan Ertsborn, Mr Václav **Exner**, Mr Valeriy Fedorov, Mr György **Frunda**, Mr Jean-Charles Gardetto, Mr Jószef Gedei, Mr Stef Goris, Mr Valery **Grebennikov**, Mrs Gultakin Hajiyeva, Mrs Karin Hakl, Mr Nick Harvey, Mr Michel **Hunault**, Mr Rafael **Huseynov**, Mrs Fatme Ilyaz, Mr Kastriot Islami, Mr Sergei Ivanov, Mr Tomáš Jirsa, Mr Antti Kaikkonen (alternate: Mr Kimmo **Sasi**), Mr Uyriy Karmazin, Mr Karol Karski, Mr Hans Kaufmann (alternate: Mr Andreas **Gross**), Mr Nikolay Kovalev, Mr Jean-Pierre Kucheida, Mrs Darja Lavtižar-Bebler, Mr Andrzej Lepper, Mrs Sabine Leutheusser-Schnarrenberger, Mr Tony Lloyd, Mr Humfrey Malins, Mr Andrea Manzella, Mr Alberto Martins, Mr Tito Masi, Mr Andrew McIntosh, Mr Murat Mercan, Mr Philippe Monfils, Mr Philippe Nachbar, Mr Tomislav Nikolić, Ms Ann Ormonde, Mr Rino Piscitello, Mrs Maria Postoico, Mr Christos **Pourgourides**, Mr Jeffrey Pullicino Orlando, Mr Martin Raguž, Mr François Rochebloine, Mr Armen Rustamyan, Mr Michael Spindelegger, Mrs Rodica Mihaela Stănoiu, Mr Christoph Strasser, Mr Petro Symonenko, Mr Vojtech **Tkáč**, Mr Øyvind **Vaksdal**, Mr Egidijus **Vareikis**, Mr Miltiadis Varvitsiotis (alternate: Mrs Elsa **Papadimitriou**), Mrs Renate Wohlwend, Mr Krysztof Zaremba, Mr Vladimir Zhirinovsky, Mr Zoran Žižić, Mr Miomir **Žužul**

N.B.: The names of the members who took part in the meeting are printed in **bold**

*Secretariat of the Committee*: Mr Drzemczewski, Mr Schirmer, Ms Heurtin, Mr Simpson