# EXHIBIT F

Case 5:07-cv-02798-JW    Document 52-20    Filed 12/14/2007    Page 1 of 13

Startpage > Adjudications > A review of the enforc...
« Back to search results
Date of the Adjudication: 2005-03-22
Registration Number: 2169-2004
Chefsjustitieombudsmannen Mats Melin

A review of the enforcement by the Security Police of a Government decision to expel two Egyptian citizens

In an adjudication of March 22, 2005, the Chief Parliamentary Ombudsman, *MatsMelin*, made the following observations.

## 1. SUMMARY OF THE OMBUDSMAN'S CRITICISM

My review of the enforcement by the Security Police of the Government's decision to expel two Egyptian citizens, A. and E.Z., on December 18, 2001, reveals serious shortcomings in the way in which this case was handled by the Security Police. I have therefore found reason to express extremely grave criticism of the Security Police. This criticism can be summarised as follows.

- Relinquishment of official authority

At Bromma airport the security police already failed to maintain control of the enforcement, thereby allowing American officials free hands to exercise public authority on Swedish territory. Relinquishing Swedish public authority in this way to foreign officials is not compatible with Swedish law.

- Degrading treatment

The enforcement was carried out in an inhuman and therefore unacceptable manner. The way in which A. and E.Z. were treated is alien to Swedish police procedures and cannot be tolerated. The treatment to which the two men were subjected was in some respects unlawful and must be characterised overall as degrading. Questions may also be raised as to whether the way in which the enforcement was carried out constituted a breach of Article 3 of the European Convention. The Security Police should have intervened to prevent this inhuman treatment.

- Passivity

The way in which the Security Police dealt with this case was characterised throughout by passivity - from the acceptance of the offer of the use of an American aircraft until completion of the enforcement. One example that can be mentioned is the failure of the Security Police to ask for information about what the security check demanded by the Americans would involve.

- Inadequate organisation

None of the officers present at Bromma airport had been assigned command of the operation. The officers from the Security Police who were there had relatively subordinate ranks. None of them

1

considered that they bore the ultimate responsibility for the enforcement. They also acted with remarkable deference to the American officials.

## 2. BACKGROUND AND INQUIRY

### 2.1 Introduction

During the spring of 2001, the Swedish Security Police (SÄPO) launched a case involving two Egyptian citizens, A. and E.Z. The Security Police then investigated and maintained surveillance of the two men for about six months. At the same time the Migration Board were dealing with applications for asylum from A. and E.Z. However, the Migration Board came to the opinion that in view of the nature of the case the final decision rested with the Government. The case was therefore referred to the Government offices during the autumn of 2001 for continued consideration.

On December 18, 2001, the Government decided to reject the applications submitted by A. and E.Z. for residence and labour permits and that the two men were to be expelled. In addition, it was decided that the expulsion order should be enforced without delay by the Security Police and that their destination was to be Egypt. In the decision it was stated that A. and E.Z. had occupied leading positions in an organisation that was guilty of terrorist acts and that they could be held responsible for the actions of the organisation in question. On the same day, A. and E.Z. were detained and taken to Bromma airport to await transport to Cairo in an American aircraft. Apart from Swedish and Egyptian officials, the plane was also carrying American security personnel. Before the plane took off, the American officials undertook a security check of A. and E.Z. inside the police station at the airport. This inspection involved various forms of force and coercive measures.

After the expulsion had been described in a programme called *KallaFakta* on the Swedish television channel TV4, I decided on May 25, 2004, to launch an inquiry on my own initiative.

### 2.2 The Parliamentary Ombudsman's inquiry and the public prosecutor's appraisal of the case etc.

*2.2.1 The extent of the Parliamentary Ombudsman's inquiry*

The Act with Instructions for the Parliamentary Ombudsmen (1986:765) contains provisions on the extent and the limits of the supervisory powers exercised by the Parliamentary Ombudsmen. These state, for instance, that public agencies, their officials and others employed by these agencies are subject to the supervision of the Parliamentary Ombudsmen, while this does not apply to the Government or Ministers. It can also be added that the Parliamentary Ombudsmen's supervisory powers only apply to Swedish public authorities.

In this case I have examined how the Security Police enforced the expulsion order made by the Government. My inquiry has therefore focused on establishing what occurred at Bromma airport and the manner in which the expulsion of the two Egyptians was carried out. Central issues in my

inquiry concerned the actions of the Security Police in connection with the use of public authority by foreign officials on Swedish territory and the use of force and coercive measures. The surveillance and investigation carried out by the Security Police in the months prior to the expulsion will not, however, be dealt with in any further detail.

In view of the restrictions that apply to the Parliamentary Ombudsmen's supervisory powers, my review does not therefore include the Government's expulsion order, nor on what its decision was based. Consequently, no opinion is expressed on the suspicions about A. and E.Z. On the same grounds, it does not concern the question of whether enforcement of the expulsion was possible in view of the provisions of Section 1 of Chapter 8 of the Aliens Act (1989:529) and Sweden's commitments according to international conventions, nor, therefore, does it include the issue of the value of any "assurances" made by Egypt. Furthermore, my review does not include the measures adopted by the Government to monitor the commitments made in the assurances, nor statements made by the Government to international inspection bodies.

The way in which the Government dealt with the expulsion of A. and E.Z. is subject to a review by the Parliamentary Committee on the Constitution.

*2.2.2 The Public Prosecutor's appraisal of the case*

The events in question were reported by an individual to the police and the prosecution agency for consideration of whether any crime had been committed in connection with the enforcement by the Security Police of the Government's expulsion order. On June 18, 2004, K.E., Assistant Chief District Prosecutor, decided not to institute a preliminary inquiry as there were no grounds for suspecting that any offence subject to criminal prosecution had been committed by a representative of the Swedish police force (reg. no. C00-7-565-04). In this decision a note was made that the question of whether any case arose from the actions of foreign citizens during the enforcement on board the aircraft had been referred to the Director of the Public Prosecution Agency in Stockholm.

In the exercise of her supervisory powers, A.B., at that time Acting Director of the Public Prosecution Agency, then conducted a review of the decision made by K.E. In her decision of November 3, 2004, she found that in view of the stringent safety and security requirements - in particular during the period in question - the measures invoked could not be considered to constitute a breach of the general principles applying to the actions of the police. She noted specifically in her decision that it concerned the measures adopted by foreign personnel as they were not operating independently at the time. In addition, A.B. made the assessment that there were no grounds for assuming that any offence subject to public prosecution had been committed by the captain of the foreign aircraft (reg. no.100 2004/0653).

**2.3 Conduct of the inquiry**

To begin with, documentation relating to the case was requested from the Security Police and the Government offices (the Ministry for Foreign Affairs and the Ministry of Justice). Then information was acquired verbally from Deputy Police Commissioner M.L., Chief Superintendent A.A., five other

3

senior officers at the Security Police, Inspector P.F. of the Stockholm County Police Authority's Border Control Unit at Bromma Airport and from K.J., E.Z.'s legal counsel. In addition P.F. showed the Parliamentary Ombudsman the premises used by the police at Bromma airport. The Security Police were then asked to submit written answers to certain specific questions. The response of the Security Police was supplemented by a written statement from M.L. and A.A. and two other officers. Finally a number of additional documents were requested from the Security Police.

## 2.4 The result of the inquiry

In the course of the Parliamentary Ombudsman's review relatively extensive information has come to light. In what follows a chronological account will be given of the way in which the case was dealt with and the main circumstances considered significant for the issues pertinent to my adjudication.

*2.4.1 Initial measures*

In May 2001, the Security Police initiated surveillance and investigation procedures concerning A. and E.Z. A. was then living in Karlstad and E.Z. in Stockholm. A.A. had overall responsibility for the handling of the case.

At this time, applications for asylum from A. and E.Z. were being considered by the Migration Board. In June 2001, the Security Police presented certain aspects of their case to representatives of the Migration Board and at the end of October 2001 the Security Police lodged objections to A. and E.Z.'s applications for asylum. At the beginning of November 2001, as laid down by Section 11 of Chapter 7 of the Aliens Act, the Migration Board referred the case to the Government. In the same month, the Security Police reported on the case to officials at the Department for Migration and Asylum at the Ministry for Foreign Affairs.

In November 2001, the Security Police came to the conclusion that expulsion could be required in this case. Planning began for the enforcement of an expulsion order, for instance of how arrests could be made in Karlstad and Stockholm and how the subsequent transport to Egypt could be arranged. Initially it was stated that no Government decision could be expected before January 2002. According to information on file at the Security Police, it was then intended that the Government would reach its decision on December 13, 2001, so that the journey was therefore planned to take place on December 15. On December 5, the Ministry for Foreign Affairs then announced that no decision could be expected before December 20.

The Ministry for Foreign Affairs and the Security Police seem, therefore, to have continued to discuss when, for instance, the Government could reach a decision in this case. On December 14, 2001, there is a journal entry in the Security Police's case file: "Inf. Foreign Ministry - decision Tuesday!" (i.e. December 18) and "Plane booked Wed. 8.15 a.m." (i.e. December 19) and also "place booked Kronoberg [Detention Centre] Tues-Wed". The Security Police had contacted the transport service of the National Prison and Probation Administration to request assistance in arranging air transport for A. and E.Z. to Egypt. Transport was chartered and departure scheduled for the morning of December 19, 2001. According to the Security Police it was difficult to arrange

4

slots to fly over Europe before that time. A.A. has stated that at some stage before December 17, 2001, he was informed that the Government intended to deal with the case on December 18, 2001, which meant that the expulsion could not take place immediately after the decision had been made. Some time before the expulsion decision was made, however, the Security Police received an offer from the American Central Intelligence Agency (CIA) of the use of a plane that was said to have what was referred to as direct access so that it could fly over Europe without having to touch down. Enforcement could then take place immediately after the Government made its decision on December 18, 2001. A.A. has said that the Americans attached no conditions to the use of this aircraft by the Security Police. He did in fact assume - as the aircraft was American - that some American personnel would be on board but also that officers from the Security Police would be able to accompany the flight. According to A.A., however, it was "purely a transport service" that the Americans were offering and no mention was made of any specific category of American personnel being on the plane.

*2.4.2 Security Police presentation of the case to the Foreign Minister on December 17, 2001*

On Monday December 17, 2001, the Security Police presented the case to A.L., then Foreign Minister. The Security Police officers present were A.A. and X, the case officer. A number of officials from the Ministry for Foreign Affairs were present, among them G.-B.A., State Secretary, S.-O.P., Director General, and staff from the Department for Migration and Asylum.

After a presentation by the staff from Department for Migration and Asylum, X presented the case from the perspective of the Security Police. He has stated that the Foreign Minister seemed satisfied with the presentation and with the grounds offered by the Security Police for rejection of the applications for asylum. Representatives of the Security Police have provided the Parliamentary Ombudsman with the following information on discussions about enforcement. A.A. presented the two alternative transport possibilities available: the aircraft booked for December 19, 2001 and the American offer. As there were security reasons for arranging the expulsion immediately after the Government had made its decision, the alternative of using the plane booked for December 19th was not considered satisfactory: there were demands that enforcement should take place without delay. According to A.A., great weight was probably given to the security considerations by both the Government offices and the Security Police during the presentation. He felt that there was some concern in the Government offices about this case. During the presentation, A.A. reported that if the American offer were accepted, enforcement could already take place during the evening of December 18, 2001. According to A.A. the Foreign Minister then withdrew with her most senior officials to discuss the issue, before assenting to acceptance of the American offer by saying "we'll do it that way". Even though A.A. was aware that neither the Government nor a Minister could make decisions concerning the exercise of the powers of a public agency, he construed the statement as a "direct signal". Officer X has also testified that the Foreign Minister was positive to the American offer. According to officer X, the Foreign Minister asked whether any members of her staff had a different opinion and, this not being the case, then said "That's what we'll do, we take

5

the American offer" or something similar. M.L. has stated that she was informed that both transport alternatives had been mentioned during the presentation. K.J. has stated that the officials at the Ministry for Foreign Affairs told him that during the presentation there was some concern that either the UN Committee against Torture or the European Court of Human Rights would have time to issue a staying order before enforcement could take place. There is also information in this case that there were fears that an attempt would be made to free A. and E.Z.

In the Security Police file one of the journal entries for December 17, 2001 reads "Presentation Ministry for Foreign Affairs/A.L. - Foreign Min. wants enforcement Tuesday evening - Yes to ordering plane through USA". A memorandum drawn up by the Security Police on February 7, 2002 contains the note: "After some consultation with the staff of the Ministry for Foreign Affairs the Foreign Minister then gave approval of the acceptance by SÄPO/RPS of the help offered by the USA for the transport of A. and E.Z.". In a memorandum dated February 12, 2002, J.D., then Head of the Security Police writes: "Representatives of the Ministry for Foreign Affairs were aware of who was to undertake the transport".

In May/June 2004 the Ministry for Foreign Affairs carried out its own internal analysis of what was said about this issue during the presentation. This involved asking a number of officials at the ministry to account for their memory of the meeting and some of the findings were as follows. One individual was extremely uncertain about whether enforcement was discussed but was of the opinion that if so, the aircraft was more probably Egyptian. His recollection was furthermore that he was surprised when he found out that an American plane was involved. Some had no recollection whatsoever of discussion of enforcement apart from that it was to be undertaken rapidly and by the Security Police. Some individuals remembered that there had been discussion of logistical problems in the airspace between Stockholm and Cairo. According to one official, the Americans were to provide assistance in this respect, while another stated that the Security Police needed help, probably from "our colleagues in the West". One individual had a clear memory of talking to A.A. on some occasion before the meeting, who then mentioned that the Security Police could not arrange Swedish transport at such short notice and therefore had to try to get hold of a foreign plane. It is likely that the Foreign Minister had been informed to this effect prior to the meeting so that she would be ready for the question. The Foreign Minister had, to the best of his recollection, no opinion about who should undertake the transport. He does not remember whether they discussed an aircraft of any particular nationality but was fairly convinced that the Foreign Minister would at least "have raised her eyebrows considerably if SÄPO had reported that it was to be an American plane". The same official also made a note that after the enforcement A.A. had rung to report that all had gone well but that the plane had turned out to be American and not Egyptian. Overall assessment of the information provided gave, according to the Ministry for Foreign Affairs, no support for the claim that during the presentation the Security Police had stated that the enforcement would take place using an American aircraft or with American participation. On the other hand, the information could suggest that American help would be provided in arranging slots for the flight. In addition, it was also pointed out that different "information cultures" were involved.

After this presentation the Security Police contacted the American intelligence service.

*2.4.3 December 18, 2001, the day of enforcement*

At lunchtime on Tuesday December 18, 2001, Y - the security police officer who had planned the enforcement - met American officials at Bromma airport. During the meeting he was informed that American security personnel would be on the plane, which was expected to land at Bromma at about 9 p.m. The Americans also stated that there was no room on the aircraft for Swedish police officers. Officer Y has stated that he emphasised that this was "our enforcement so we have to go along as well". The Americans then arranged for Security Police officers to travel on the flight.

During the meeting it was also said that the security personnel on the plane might be wearing hoods and that they wished to conduct a security check of A. and E.Z. before they boarded the plane. Without this examination the men could not be transported on the plane. According to Y this involved a body-search; no other procedures were discussed. As the Americans preferably wanted access to a room in which to perform the security check, the police unit responsible for passport control at Bromma airport was approached and it was agreed that the checks could be carried out there.

Officer Y contacted A.A. to inform him that the American officials wanted to conduct their own security check at Bromma. According to Y, A.A. had no objection to this. A.A. has stated that he probably was contacted on this matter but that he has no memory of it happening. He has also said that "purely hypothetically" he probably considered it was "relatively OK" to conduct a security check before permitting the Egyptians to board the aircraft "but obviously under the direction of or with the participation, as it were, of Swedish officers".

Later that day the Government decided, pursuant to the Aliens Act, to reject the applications of A. and E.Z. for residence and labour permits and that the two men were to be expelled. In addition it was decided that the Security Police were to enforce the expulsions without delay and that the destination was to be Egypt. According to the Security Police journal in the case file, notification of the Government's decision was received at 3.10 p.m.

As the officer with overall responsibility for the case, A.A. remained at Security Police headquarters in Stockholm for the entire day. At 4.43 p.m. he decided that A. and E.Z. were to be apprehended. At the request of the Security Police, the Migration Board decided that E.Z., who was in Stockholm, could be placed in a detention centre or a police cell until enforcement could take place. The grounds cited for this request involved both reasons of security and logistical considerations. At about the same time the units were alerted that were to apprehend the deportees, who were both, as has previously been pointed out, under surveillance.

The Security Police apprehended A. relatively quickly at a bus stop in Karlstad. A body search was carried out but no weapons or other dangerous objects were discovered. A. was informed of the decision in his own language, placed in a vehicle and driven to Bromma airport. According to the journal entry, A. was "apprehended and informed" at 4.55 p.m. No coercion was required during the

apprehension nor was A. handcuffed during the journey to Bromma. The medication needed by A. for his stomach problems was also procured from Karlstad.

The National Counter-terrorist Unit apprehended E.Z. at about 5 p.m. at his workplace in Stockholm. He was then taken to the Kronoberg Detention Centre, where he was detained until transport to Bromma airport could be arranged. A body search was also made of E.Z. and he was informed of the Government's decision in his own language. After a few hours E.Z. was taken to Bromma by the National Counter-terrorist Unit. At this time he was in handcuffs. However, no other coercive measures seem to have been invoked during his apprehension.

According to a log entry by officer Y dated December 21, 2001, about the transport of A. and E.Z., the two vehicles arrived at Bromma airport at 8.20 p.m. and 8.30 p.m. After they had been guided into the restricted area of the airport by authorised staff, the vehicles were parked outside the airport police station, where they then waited for some time. According to one Security Police officer, E.Z. became indignant when he understood that he had been taken to an airport and one of his remarks in his own language was that there would be bloodshed.

At this time there were five Security Police officers at the airport, among them officers X and Y. None of these five held senior rank, nor had any of them been assigned command of the operation. The American officials that Y had previously met during the day also arrived at the airport. Their task was to ensure that everything took place as agreed and they remained in the background all the time. In addition, Paul Forell, an officer of the Border Police, and some members of the National Counter-terrorist Unit and police officers from Karlstad were also present.

Just before 9 p.m. the American plane touched down. Officer Y went to speak to the occupants of the plane. These included, in addition to its crew, a security team of seven or eight, among them a doctor and two Egyptian officials. Officer Y informed the American officials that A. and E.Z. were waiting in the vehicles parked in front of the police station and the Americans were taken to them.

The security team, all of whom were disguised by hoods around their heads, then went up to the vehicles in which A. and E.Z. were sitting. One of the men was taken first to the police station by the team. Inside the station, in a small changing room, the American officials conducted what they had referred to as a security check. According to reports, a doctor was present in the changing room. When the check had been completed, the second man was sent for and the same procedure repeated.

The inquiry has revealed that this security check comprised at least the following. A. and E.Z. were subjected to a body search, their clothes were cut to pieces and placed in bags, their hair was thoroughly examined, as were their oral cavities and ears. In addition they were handcuffed and their ankles fettered, each was then dressed in an overall and photographed. Finally loose hoods without holes for their eyes were placed over their heads. A. and E.Z. were then taken out of the police station in bare feet and led to the aircraft.

In addition, K.J. has reported that E.Z. said that the security team had forced him to lean forwards in the changing room and he had then felt some object being inserted into his anal cavity. Afterwards he was equipped with a diaper. According to K.J., E.Z. then felt calmer, as if "all the muscles in his body were slack". E.Z. was, however, fully conscious for the entire journey. K.J. has added that E.Z. was blindfolded and placed in a hood and also forced to lie in an uncomfortable position on board the aircraft.

Officer Y has stated that "he has the impression" that he asked two of his fellow-officers to keep an eye on the two security cheks so that they had "some grasp as it were" of what was going on. There was only room for a very few people in the changing room. While the security cheks were taking place, Y himself was standing some distance away and could not see what was happening. The two Security Police employees, a police officer and a civilian interpreter, who were with the security team in the changing room have stated that they did not see suppositories being administered to A. and E.Z. or diapers being used. Their information reveals, however, that the changing room was very crowded and so they had difficulty in observing what was going on for the entire time. The Security Police officer says that because it was so crowded he left the changing room after only a short time. He did not, therefore, even see the garments being cut to pieces. The interpreter says that he was present for the entire time but that when E.Z. had been undressed he turned away for about 20 seconds. When he looked back, E.Z. was in principle fully clothed. According to both witnesses, the security team conducted the security inspection rapidly, efficiently and professionally. The members of the team did not speak to each other but communicated using hand signals. Nor did any of the other Security Police officials in attendance at Bromma state that they had noticed or been informed that A. and E.Z. had been administered suppositories or equipped with diapers.

The two men were then taken to the aircraft. Just before 10 p.m. the plane took off from Bromma for the flight to Egypt. Two representatives of the Security Police were on board the plane: officer Y and the civilian interpreter. The original intention had been for three people to accompany the plane to Egypt but late in the day they were informed by the captain of the plane that there was only room for two from the Swedish Security Police. A. and E.Z. were placed at the rear of the plane, each lying on a mattress to which they were strapped. Their handcuffs, ankle fetters and hoods were not removed during the flight to Egypt.

The transport log drawn up by officer Y contains the following entry: "They were kept under observation for the entire time and the guards were changed every other hour. The doctor in the escort inspected them all the time (A. and E.Z. were probably given a tranquilliser by the doctor before take-off)". According to officer Y these notes in the log should be regarded as his speculations, as this is what "one could gather as a doctor was with them". He did not, however, see this taking place.

Officer Y also wrote a memorandum dated December 18, 2001, about the measures adopted in connection with the expulsion. It contained the information that the body-search at the airport and the use of handcuffs and fetters was at the express order of the captain of the aircraft. In addition, it was noted that the explanation for requiring A. and E.Z. to wear hoods was that this was a policy

9

that had been laid down on the basis of the events of September 11, 2001, about the transport of deportees with terrorist links.

At about 3 a.m. the plane landed at Cairo. A. and E.Z. disembarked and were received by Egyptian officials. They were then driven off in a transit bus. At this point the Security Police officers considered that the enforcement had been completed.

*2.4.4 Subsequent measures*

On their return to Sweden, a meeting was held at Security Police headquarters about the enforcement. Those present at this meeting included officer Y, A.A. and M.L. The meeting was informed, for instance, that the Egyptians had been required to wear hoods. According to M.L. there may also have been discussion of the use of diapers and that one of the Egyptians was suffering from stomach problems, which was why this was needed. She has, however, pointed out that she is not certain on this point. A.A. has also said that he is uncertain about what was discussed at the meeting but believes that the diapers and the medication were raised in view of the entry on tranquillisers in officer Y's log of the journey.

Officer Y then reported the case to J.D. As has previously been noted, in February 2002 Jan Danielsson drew up a memorandum on the expulsion. In it he states, inter alia, that he can find no grounds for criticising those involved in the expulsion. This memorandum was submitted to the Ministry of Justice, which, on April 12, 2002, conducted a judicial appraisal of the way in which the Security Police had dealt with the enforcement. The Ministry of Justice accepted the Security Police's procedures, in principle, and noted that the Ministry's assessment concurred with the judgement expressed by J.D.

**2.5 The Parliamentary Ombudsman's referral of the case to the Security Police**

The case was referred to the Security Police with the request for a response on the following issues.

1. What legal grounds are there for allowing foreign officials to assist Swedish police officers in connection with the enforcement of a deportation or expulsion order and for permitting them to use coercive measures on Swedish territory? - What appraisal was made of these issues by the Security Police in this case?

2. What legal grounds are there for the use of force or coercion in the enforcement of a deportation or expulsion order ("repatriation")? - Were the coercive measures invoked in the case in question necessary and acceptable?

3. What assessment has been made by the Security Police of the conduct of its officers on this occasion?

4. Had command of the enforcement been assigned to any of the Swedish police officers present at Bromma airport, i.e. could any officer be considered to have operational command? - If not, for what reason had command not been assigned?

5. What judgement has been made by the Security Police on the question of who was in fact in control of the enforcement from the arrival of the two Egyptians at Bromma airport?

**2.6 The response of the Security Police**

The Security Police submitted a response to which were attached written statements by M.L. and A.A. and also officers X and Y (whose statements have been omitted). After beginning with an account of the legal provisions, K.B. went on to state the following.

**The events at Bromma**
The Security Police officers who carried out the enforcement have been questioned by the Parliamentary Ombudsman in this case and provided information that deals with the issues raised from different perspectives. In this response from the Security Police I have enabled these officers to submit additional information on which assessment of the questions raised by the Parliamentary Ombudsman may be based. The statements they have submitted are attached to this response. Two officers have informed me that they have nothing to add to what they have previously said. The Director General at the time, Jan Danielsson, has not submitted any further statement. This, of course, makes it difficult for me now, three years later, to undertake renewed review of the appraisals made of the issues raised by the Parliamentary Ombudsman by senior Security Police officers at the time of the enforcement.

The Security Police has, in the memorandum submitted by J.D. to the Ministry of Justice on the circumstances of the enforcement, undertaken an appraisal of the case in question in accordance with the issues raised by the Parliamentary Ombudsman. The memorandum was drawn up on the basis of the actual circumstances that were then known about the enforcement and have not changed in substance since then. I must therefore refer to this memorandum. The Ministry of Justice has, on the basis of this account, taken a standpoint in a memorandum dated April 12, 2002 on the measures that were justified in connection with the enforcement. The Ministry of Justice then found that the measures adopted were not obviously incompatible with Swedish law but that at the same time they were not totally in accord with Swedish police procedures. The conclusions reached by the Ministry were presented to the Minister of Justice on March 26, 2002. The Ministry of Justice took no measures as a result of the account presented in the Security Police's memorandum.

The issue of command is not touched upon in J.D.'s memorandum. From the information I have gathered it is clear that no specific officer had been assigned command at Bromma airport. As far as can be seen, the Security Police came to the conclusion that this was not the kind of operation that made it necessary to assign operational command at Bromma airport.

With regard to the actions of the Security Police officers, I can merely point out that the enforcement has been reviewed by the public prosecutor and that the Director of the Public Prosecution Agency in Stockholm as part of a review process --- have found no grounds for initiating a preliminary enquiry as a result of the measures adopted in connection with the enforcement. I assume that this review also comprised any use of coercion that took place during the enforcement.

**Experiences and measures**
One result of the appraisal made by the Ministry of Justice and other conclusions that can be drawn about the enforcement is, in my opinion, that the Security Police must develop in some respects and further improve both its decision-making procedures and the operational conduct of enforcement cases.

Effective counter-terrorism obviously requires active Swedish participation in international endeavours in this area. This must never, however, result in foreign officials being permitted to exercise their authority in Sweden. There is in my opinion, an essential difference between the enforcement of a Swedish deportation or expulsion order and international cooperation. For my part, I would find it alien to use a foreign aircraft with foreign security staff, as in this instance. The Security Police must have total control over the enforcement, although due consideration must be taken of the role of the captain of the aircraft.

The National Police Board is currently formulating regulations and general guidelines on the responsibilities of police officers and the management of cases involving enforcement of deportation and expulsion orders. One section will deal with repatriations by air. Pending the issue of these regulations, the National Police Board published a circular on October 14, 2002, with guidance for repatriation by air. The Security Police will, of course, comply with these instructions.

In my judgement, it is clear that some of the measures adopted after the two Egyptians had arrived at Bromma airport were excessive in relation to the actual risks that existed, in particular as Security Police officers had already made body-searches of the two men. There were also other shortcomings in the case, for instance in allowing foreign officials to take measures without adequate participation by Swedish police officers and the lack of any designated operational commander at Bromma airport.

We cannot, of course, exclude the possibility that, within the framework of international cooperation in counter terrorism, foreign officials may be present during some measures in Sweden, at interrogations for instance. In view of previous experience, including this case, the Security

Police will, however, carefully consider in advance to what extent and in what way these officials will participate and inform them of the conditions that apply.

In this context, I would also like to mention some organisational and procedural changes that will, overall, help to raise the quality and reliability of Security Police operational measures, including enforcement cases.

The governance of the Security Police is being reorganised and augmented at the moment to enable strategic planning and substantially enhanced direction and monitoring of its operational activities. The new structure will provide greater scope for more intensive analysis of various possible alternative courses of action, and also improved risk analysis for complex operations.

The allocation of authority and accountability in the Security Police will be made more explicit so that responsibility for the conduct of operational measures will more explicitly rest with the head of the unit concerned in certain operational areas. New and more stringent requirements will be introduced for documentary records and reports on operations. This will facilitate retrospective review and appraisal of sensitive and difficult operations.

The Director General will have at his disposal a special unit for internal review, which will provide support for senior officers on issues relating to the focus of and risks involved in major, sensitive operations, and also enable their quality, security and effectiveness to be monitored and evaluated. This unit will consist of senior commanders with considerable operational experience. The unit will also have access to legal expertise from the legal unit. At the moment the Security Police possesses good general competence in the area of international law and human rights on the issues relating to its operations, but additional specialist expertise at an advanced level will be made available in this area.

During 2005 an extensive training programme for newly recruited personnel will begin, which is intended to provide both enhanced basic training and training at specialist levels. In-service training for all personnel will be linked to this programme. Important elements in this training will involve international criminal and procedural law, international law and human rights. Special seminars will also be arranged to deal with the new regulations relating to the conduct of counter-terrorist measures.

**3. THE PARLIAMENTARY OMBUDSMAN'S APPRAISAL**

## 3.1 The Security Police actions in connection with the exercise of public authority by American personnel on Swedish territory etc.

### 3.1.1 The legal framework

The Instrument of Government (IG) is posited on the assumption that judicial and administrative measures are the concern of Swedish authorities. The constitution is based therefore on the principle that only Swedish police officers are empowered to use force or coercive measures, for instance, against individuals or exercise their authority in any other form (cf. SOU 2003:25 p. 194). However, the Riksdag can decide on exceptions to this principle (IG Chapter 10, Section 5, fourth paragraph).

One exception of this kind has been made in the Act on International Police Cooperation (2000:343), enacted as a result of Sweden's accession to the Schengen Convention. This act contains provisions that give foreign officials legal rights in specific circumstances to invoke measures on Swedish territory in the case of what is specified as cross border pursuit and surveillance.

However, there is no exception to the principle referred to in the case of police enforcement of deportation and expulsion orders. In situations like this, the fundamental rule that only Swedish police officers may exercise public authority on Swedish territory applies. This issue has recently been considered in a Government inquiry. On April 4, 2002, a special commissioner was appointed to review certain issues concerning the enforcement of deportation and expulsion orders. The inquiry, which was called the Inquiry into review of the regulations and praxis in connection with the enforcement of deportation and expulsion orders (Enforcement Inquiry) submitted its report