*Enforcement when identity is unclear etc.* (SOU 2003:25) in March 2003. The report contained the following evaluation of this issue (p. 199).

The conclusion reached in the Enforcement Inquiry is that the fundamental principle on which the current regulations are based, i.e. that public authority can only be exercised by the officials of the country whose territory it is, is apposite. The opinion of the inquiry is therefore that there is no reason at the moment to consider any legislative amendments to enable foreign officials to invoke coercive measures on Swedish territory over and above the possibilities afforded by the existing statutes.

The legal situation that applies today has been subject to the appraisal of the Parliamentary Ombudsmen in a number of previous adjudications. In a case concerning the regular police (JO 1974 p. 93) the Parliamentary Ombudsman, Wigelius, expressed the following opinion.

The participation [of foreign personnel] has been raised in a number of different cases. It is more than likely that there are grounds for adopting a liberal approach to foreign participation, but when it comes to the closer forms of participation there is good reason to advocate a more restrictive stance. One general endeavour should, of course, be to preclude as far as possible the kind of participation in which the foreign police officer, either because of lack of knowledge of the regulations that apply to police procedures in Sweden or for some other reason, may commit actions that would be regarded as the abuse of authority if committed by a Swedish police officer. It is of course of the utmost importance that all forms of participation are monitored continually on the part of Sweden, which in principle probably requires all such participation to take place in the presence of a Swedish officer.

A corresponding argument was presented in an adjudication by the Parliamentary Ombudsmen in 1984 (JO 1984/85 p. 131). In a case involving contacts between the Swedish Security Police and foreign security services, the Chief Parliamentary Ombudsman, Eklundh, endorsed the opinion cited above. He stressed in particular that the legal regulations in this area do not permit foreign police officers to conduct police activities in Sweden other than while assisting Swedish police officers, and that the participation of these police officers in Swedish police operations must always take place in the presence of Swedish officers.

It should be pointed out that these previous adjudications by the Parliamentary Ombudsmen have mainly involved the participation of foreign police officers in interrogations that have taken place in Sweden.

A memorandum recently drawn up by the Ministry of Justice on international legal assistance in criminal cases (Ds 2004:50) contains the statement that a fundamental requirement for both the participation of foreign police officers in Sweden and of Swedish officers abroad is that this may not involve measures that according to Swedish law would be considered to be the exercise of public authority. In addition, it is pointed out, with reference to the Parliamentary Ombudsmen's adjudications cited above, that this general principle should be considered to apply if there are no regulations permitting more extensive measures, as is the case, for instance, with the Act on International Police Cooperation (p. 116 f.)

The Security Police's own internal procedural directives lay down, for instance, that cooperation with foreign services or other authorities may not include exercise of their powers in Sweden.

As pointed out above, the Enforcement Inquiry found no reason to propose any legislative amendments in this respect. On the other hand, the agencies responsible were recommended to issue regulations on how their officials must act when involved in repatriation transport. In view of this, in February 2005 the National Police Board issued regulations and general guidelines for the

13

enforcement of deportation and expulsion orders involving travel by air (FAP 638-1). These lay down that the police authority is the enforcement agency even when assisted by a foreign agency (§15). Another stipulation is that security controls that involve body-searches or other methods that require statutory endorsement must be carried out on Swedish territory by Swedish police officers (§17). The general guidelines under this last regulation state that there may be reasons for foreign police officers or other officials representing foreign agencies to assist Swedish police officers in enforcement situations on Swedish territory, for instance in cases pursuant to the Act concerning Special Controls in Respect of Aliens (1991:572). This can occur in cases when another state assists by providing transport. The general guidelines under §17 also point out that a foreign police officer or other official may, on the orders of the captain or in some other emergency, use coercive measures on board an aircraft.

In its report the Enforcement Inquiry also raised another aspect that may be of some significance in this context, which is the position and powers of the captain on board an aircraft.

Section 1 of Chapter 5 of the Aviation Act (1957:297) lays down that the captain of an aircraft is the supreme authority on board. The captain may take the measures required to avoid danger, if the behaviour of any individual constitutes an immediate risk to the safety of the aircraft or safety on board. In carrying out these measures the captain may not adopt greater force than the circumstances require and force may only be used when other methods are of no avail. If force is resorted to, only the mildest form likely to achieve the desired result may be used and only for as long as is absolutely necessary. Members of the crew are to provide the captain with any assistance he may require. Passengers may also provide such assistance, if requested by the captain. If, because of imminent danger, measures must be taken immediately, members of the crew or passengers may themselves act without the captain's order (Chapter 5.4). A captain may also refuse to allow members of the crew, passengers or cargo on board the aircraft when the circumstances so demand (Chapter 5.3). The captain of a foreign aircraft has the same powers even in Swedish areas (Chapter 5.6).

In view of these regulations, the Enforcement Inquiry contained the following statement (p. 199).

> In the case of a foreign aircraft, certain security controls may be demanded before the individual in question is at all permitted to board the aircraft for transport from Sweden. In cases where security controls of this kind include body-searches or other coercive physical measures that require some basis in law, it is reasonable to assume that these measures may not be carried out on Swedish territory by foreign officials without such a legal basis. In view of the captain's responsibility for safety on board the aircraft and the regulations entitling him in certain cases to invoke violent measures, it cannot, however, be excluded that foreign officials may have the right, on his orders or in an emergency, to resort to some degree of coercion.

It can be pointed out that the Ministry of Justice's memorandum of April 2002 about this particular enforcement concluded with a reference to the appointment a few days earlier of a special commissioner to review regulations and praxis in connection with the enforcement of deportation and expulsion orders, i.e. the Enforcement Inquiry. In addition, it was pointed out that experience of the Egypt case had been taken into account when drafting the directives for this inquiry.

Finally, it may added that there are no regulations governing the possibilities open to the police of using foreign aircraft in enforcing deportation and expulsion orders.

14

*3.1.2 Adjudication*

For a long time the police in Sweden have had extensive international cooperation with the police in other countries and with international police organisations. This occurs, for instance, through participation in Interpol, Europol and Schengen, commitments in international conventions, bilateral agreements or simply through the exchange of valuable police information. It also seems as if international police cooperation is becoming more intensive, both within the scope of the European Union and at a more general international level. There may be good reasons for cooperation of this kind in itself and it may be necessary to prevent and oppose terrorism and other forms of cross-border criminality.

This international cooperation naturally involves the work of the Security Police to a great extent. It was pointed out, for example, in 1989 in a report on the working methods of the Security Police that international cooperation plays a very important role in enabling the security service to operate effectively, for instance in the field of counter-terrorism (SOU 1989:18 p. 61). Sweden has also ratified various conventions on combating international terrorism, such as the UN International Convention for the Suppression of the Financing of Terrorism.

It is therefore hardly remarkable that during its surveillance and investigation of A. and E.Z. the Security Police had contacts with the security services of other countries. However, a completely different state of affairs arises when this kind of cooperation evolves from merely exchanging information to permitting foreign police officers or security agents to take an active part in police operations and to exercise public authority in Sweden. There is, as K.B. remarks, an essential difference between the enforcement of a Swedish deportation or expulsion order and other forms of international cooperation.

To begin with, I wish to point out that the mere fact that a foreign police officer or official is present when Swedish police officers exercise their authority is not in conflict with current legislation. I can, therefore, envisage a situation in which a foreign security agent assists a Swedish police officer in a terrorist case by, for instance, being present and asking additional questions during an interrogation (cf. the opinions expressed in JO 1974 p. 93 and JO 1993/94 p. 88). Another conceivable situation could involve the presence of a foreign police officer while Swedish police officers are searching premises. Nor do I have any objections to the presence of a foreign official during the enforcement of a deportation and expulsion order. It is, however, important to point out that in these cases the public authority must be explicitly exercised by Swedish police officers and that the foreign officials have to remain in the background and adopt what is basically a passive role.

The inquiry into this case reveals, however, that during the brief period of time, about one hour, during which the American and Egyptian officials were on Swedish territory, the opposite circumstances applied. The Swedish Security Police officers remained in the background while the American officials exercised public authority on their own by, for instance, adopting coercive measures such as body- searches, physical examination and some degree of force in the use of

fetters and handcuffs. In section 3.2 below I will present my opinion of the force and coercive measures that were invoked during the enforcement in more detail.

Before dealing with the question of whether or not the exercise of public authority by American officials on Swedish territory was legal, there are grounds for touching to some extent on the reason for accepting the American offer.

The inquiry reveals, as has already been described, that from November 2001 and onwards, continuous discussions were taking place between the Ministry for Foreign Affairs and the Security Police concerning, among other things, when a Government decision could be expected. It transpires that it was said initially that no decision could be expected before January 2002. Information on file at the Security Police shows that subsequently it was intended that the Government should reach its decision on December 13, 2001, and the enforcement was therefore arranged for December 15. On December 5, the Ministry for Foreign Affairs then announced that no decision could be expected before December 20. This information must have been revised, however, as on December 14, the Ministry announced that the Government intended to make a decision in the case only four days later.

In other words, there seems to have been far from adequate planning. This lack of foresightedness appears to have contributed to the fact that the American offer came under discussion.

Indeed, the inquiry reveals that when the Security Police were attempting to charter a plan in the customary way via the National Prisons and Probation Administration's transport service, it was difficult at short notice to arrange slots for flights through Europe on the day when the decision would be made, December 18 2001. As the plane chartered could not leave until the morning of December 19 places were requisitioned for A. and E.Z. at the Kronoberg Detention Centre for the night of December 18. The difficulty of arranging the desired transport in immediate connection with the anticipated Government decision must be considered to be the reason why it was only shortly before the expulsion order was issued that the Security Police received the CIA offer of the use of a plane with a direct flight path through Europe on the day of the decision itself.

One question is whether this offer was discussed during the presentation of the case to the Ministry for Foreign Affairs on December 17, 2001. As the inquiry shows, the Security Police and the Ministry for Foreign Affairs have different opinions on this issue. A.A. and officer X have both stated that the two transport alternatives were presented at the meeting and that the Foreign Minister gave the "go-ahead" to acceptance of the American offer. The Ministry for Foreign Affairs claims, on its part, that there is no support for the assertion that the Security Police mentioned the American alternative during the presentation. I may conclude that the inquiry (by the Ministry for Foreign Affairs) into this issue was made in May/June 2004, i.e. about 2,5 years after the event, that the recollections of those interviewed seem to be vague and extremely disparate and that the information provided by the Security Police is corroborated by a journal entry and other written documents drawn up shortly after the meeting. Appraisal on the basis of the information available to me strongly suggests, therefore, that at this meeting the Foreign Minister was informed about

16

the alternative involving the use of an American aircraft for enforcement and the Security Police received the impression that this procedure had been accepted.

It should be emphasised that full responsibility for how the enforcement was implemented rests of course with the Security Police. In my opinion, it is nevertheless understandable that in the choice of transport the Security Police also took into account what it had come to believe was the Foreign Minister's attitude in this respect.

Here I would already like to point out that scarcely any objection on principle can be raised to the use of a foreign aircraft for the enforcement of a deportation or expulsion order, even though, of course, there may be situations when such a course of action may appear to be less than suitable.

It is also clear that during the presentation on December 17, 2001, nothing was said about the participation of foreign security personnel in the enforcement. As far as I have been able to determine, this information was not given to the Security Police until lunchtime on December 18, 2001.

Against this background, I have found no reason to go any further in my inquiry into what was discussed at the presentation to the Foreign Minister. In addition, as pointed out initially, Ministers are not subject to the supervision of the Parliamentary Ombudsmen.

With respect to the acceptance by the Security Police of the American offer, it is worth pointing out that, after the terrorist attack on September 11, 2001, the USA began what was termed a war against terrorism. There are therefore good reasons for asserting that the offer of the use of an American aircraft for transport by the American intelligence service only three months after the terrorist attack should have given rise to explicit questions from the Security Police about whether this offer was conditional on the requirement of any particular arrangements with regard to security. If such questions had been asked when the offer was received, it is likely that the required participation of American security personnel and security checks could have been taken into consideration when deciding whether to accept it or not. Questions like this would probably have been answered, not least in view of the fact that there seems to have been an American policy, developed on the basis of the events of September 11, 2001, that applied to the transport of deportees with terrorist links.

A.A., who handled contacts with the CIA, has said that no conditions were attached by the Americans to the use of the American plane by the Security Police. However, during my inquiry, no information has been submitted to suggest that this was ever discussed at all. Instead, the Security Police seems to have accepted the offer almost passively without investigating what it would mean in practice, merely assuming that they were talking about a "pure transport service". The circumstance that, according M.L., this was probably the first time the Security Police had used a foreign aircraft in a case like this, should have given rise to appraisal of the problems, for instance from a legal point of view, that acceptance of the American offer might entail. In this respect the Security Police displayed remarkable inadvertence.

17

After this, there is reason to turn to what occurred during officer Y's meeting at Bromma at lunchtime on December 18, 2001. As far as I have been able to determine, this is when the Security Police received information that security personnel would be accompanying the aircraft, that the personnel would be hooded, that they wanted to conduct their own security checks of A. and E.Z. and that there would not be room on the plane for any Swedish police officers. This information should have given rise to considerable apprehension about the ability of the Security Police to retain control over the enforcement. It was therefore not sufficient for the Security Police to assert that Swedish police officers were responsible for the enforcement by merely demanding that a pair of its representatives should be enabled to accompany the plane to Egypt. Information about the extent of the American involvement should at any rate have prompted those responsible at the Security Police to assign immediate operational command to an officer of sufficiently high rank to ensure on the spot that the Swedish police officers would retain control of events at Bromma in every respect and also during the flight to Egypt. In addition, the Security Police at this stage should have asked for information about what the security checks would comprise. If this had been provided, the Security Police would have had time to undertake a judicial appraisal of whether - and if so to what extent - checks of this kind were acceptable.

The inquiry suggests that officer Y informed A.A. and that the latter, without any further probing or consideration, approved that security checks could be made. Once again the Security Police acted passively. Officer Y has admittedly stated that a security check was all that had been mentioned, but the turn that the events took shows that these inspections went further than this and the measures taken by the American officials followed what appeared to be a well-drilled pattern. The fact that the Americans wanted access to a room should have raised doubts about whether it was merely a question of frisking the two men in the usual way.

The closer implications of the American demand to be allowed to make security checks do not therefore appear to have been clear to the Security Police before the inspections were being carried out at Bromma airport - if even then.

I will now turn to a discussion of the question of whether the behaviour of the Security Police in connection with the conduct of the American security personnel on Swedish territory is compatible with Swedish law.

As has been made clear by the account of the legal regulations, the legal situation in this area is relatively clear. Insofar as Swedish law does not otherwise provide, the Swedish legal system is based on the premise that police activities in Sweden are dealt with by Swedish police officers. At the moment, in other words, the Swedish legal system does not permit foreign officials to undertake police operations in Sweden unless they are assisting the Swedish police force and the participation of such officials in police operations in Sweden must always take place in the presence of a Swedish police officer.

One cogent reason for adhering to this principle is that criminal liability for misuse of office applies only to the exercise of Swedish authority (Criminal Code 20.1). In the cases where provision has

18

been made for a foreign police officer to exercise certain public authority in Sweden - as a result of agreement with other states - this liability has been extended to include officers in this position. Section 12 of the Act on International Police Cooperation (Schengen cooperation) stipulates that liability for misuse of office as laid down in 20.1 of the Criminal Code applies to foreign officials exercising their authority in Sweden on the same terms as if they were exercising Swedish authority. The foreign officials are therefore placed on the same footing in this respect as Swedish police officers. In my opinion it would be unacceptable to have a system which enabled foreign officials to exercise public authority in Sweden without being subject to the liability laid down in the Criminal Code for misuse of office. In addition, it may be worth pointing out that problems may arise in civil suits for indemnity for injuries or damage caused by foreign officials in Sweden (cf. Section 13 of the Act on International Police Cooperation).

In his statement A.A. has raised the issue of whether, in view of the international developments that have taken place in recent years both in and outside the EU, any change has taken place in attitudes to the extent to which foreign officials from other security or intelligence services can participate in operations in Sweden. As has already been shown, the answer must be in the negative. The previous opinions of the Parliamentary Ombudsman cited here still apply and also seem to have gained general support. Nor can I, for my part, see any reason for excluding the Security Police from the current system. On the contrary, there may be grounds for particular restrictiveness in allowing foreign security and intelligence services to operate on Swedish territory. In addition, it is my opinion that the growth in the extent and intensity of international police cooperation augments the need for firm and clear regulations.

Another question that has been raised in this case is whether the provisions of Chapter 5 of the Aviation Act can be invoked in support of the actions of the American officials on Swedish territory. Such support could be derived from the observations of the Enforcement Inquiry that in view of the captain's responsibility for security on board an aircraft and the regulations that entitle him in certain cases to use force, the possibility cannot be excluded that at his request or in an emergency foreign officials have the right to use some coercion.

However, the Aviation Act only grants the captain, and, in principle, if he so decides, members of the crew and passengers, power to resort to the use of force to maintain order and safety on board the aircraft. Recourse to force may only take place when other means are ineffectual and it may be invoked for no longer than is absolutely necessary. On the other hand, the captain does not have the right to order the use of force towards someone who is not on board his plane. Here his power is restricted to the right to refuse to allow passengers to board when the circumstances so require. If a captain, by virtue of this entitlement, demands at a Swedish airport that a passenger undergo some coercive measure before being allowed on board, it is obvious that this measure may not be implemented by anyone other than a Swedish police officer (cf. Section 17 in FAP 638-1).

Here too, therefore, I agree with the opinion that generally prevails that, to the extent that Swedish legislation does not provide otherwise, according to the current law foreign officials are not allowed to undertake police operations in Sweden except when assisting Swedish police officers and that the

19

participation of such officials in Swedish police operations must always take place in the presence of a Swedish officer. In my opinion there are particularly cogent reasons for upholding this principle when the police operation concerned may involve subjecting individuals to force or coercive measures.

The inquiry in this case shows that the American security officials did not merely assist the Security Police in their enforcement but that in reality they took over and were in control from the moment of their arrival at Bromma airport. Admittedly Swedish Security Police officers were present, but they remained passively in the background while the American officials were allowed to conduct the security checks on their own. This kind of complete transfer of the exercise of public authority to foreign officials on Swedish territory is not compatible with Swedish law.

Nor can the Security Police be considered to have been in control of the enforcement on board the aircraft. The enforcement of an expulsion is not complete until the deportee has been received in the destination country. The Swedish police therefore have full responsibility for the enforcement until that time. In this case it has even been shown that initially there was no room for Security Police officers on board the aircraft but that after objections had been raised by Swedish representatives two Swedish officials were allowed to accompany the flight. Of the two selected to do so, one had been assigned no explicit command and the other was a civilian interpreter who could not exercise police authority.

To sum up, it can be concluded that at Bromma airport the Security Police had already lost control of the enforcement. In reality, the Security Police officers at the airport relinquished the enforcement to American officials and gave them free hands to exercise public authority. There is no basis in law for conduct of this kind.

### 3.2 The use of force and coercive measures etc.

*3.2.1 The legal framework*

The European convention on the Protection of Human Rights and Fundamental Freedoms (European Convention) has had the force of domestic law in Sweden since 1994. Article 3 lays down that no one shall be subjected to torture or to inhuman or degrading treatment or punishment. A definition of the concept of torture may be found in the United Nations Convention against Torture or Other Cruel, Inhuman or Degrading Treatment or Punishment, which is known as the Torture Convention (see also Danelius, *Mänskligarättigheterieuropeiskpraxis* (*Human rights in European Praxis*), 2002, p. 71 f.).

In addition Chapter 2 of the Instrument of Government contains provisions about the fundamental freedoms and rights of citizens. All citizens shall be protected in their relations with the public administration against any physical violation and physical search (Section 6). The expression physical violation refers principally to the use of force against the human body but also includes medical examination, minor operations such as vaccination or taking blood samples and also similar actions of the kind often referred to as physical examination (Govt. Bill 1975/76:209 p. 147).

20

Physical examination is defined in its turn as an inspection of the surface and interior of the human body and examination of samples taken from the human body (Procedural Code 28.12, second paragraph). Body-search refers to the examination of garments and other items worn and also of bags, packages and other objects that someone is carrying (Procedural Code 28.12, third paragraph).

Foreigners in Sweden are, unless some other provision is made by legal statute, on the same footing as Swedish citizens in these respects (IG 22.2, second paragraph).

The use by the police of force and coercive measures implies a restriction of the protection against coercive physical violation and physical search cited above. This protection may only be restricted by law (IG 2:12, first paragraph).

The Aliens Act lacks provisions on the use of force and coercive measures in the enforcement of an expulsion order. Instead, when police assistance is required in the course of enforcement the provisions that regulate the actions of the police in general apply.

It should first be pointed out that in all forms of police operation, the principle of necessity and proportionality referred to in the first paragraph of Section 8 of the Police Act (1984:387) must be taken into account. According to this statute, a police officer may, in the execution of his official duties, only act in ways that can be justified in terms of the objective of his actions and other circumstances. If coercion has to be used, this may only be in the form and to the extent needed to attain the intended result.

The legal basis for the powers of the police to use force can be found in Section 10 of the Police Act. This lays down that a police officer, insofar as other methods are ineffectual and it can be justified in view of the circumstances, may use force to discharge his duties, for instance, if he is offered violence or the threat of violence (point 1), if someone who is to be detained, apprehended or in some other way lawfully deprived of liberty attempts to escape or the officer encounters some other form of resistance when enforcing such a deprivation of liberty (point 2), to prevent a criminal act or danger to life, health or valuable property or extensive damage to the environment (point 3), or if the action is needful in other respects for the sake of public order and security and that it is obvious that it cannot be carried out without violence (point 7).

The powers of the police to restrain individuals are regulated in Section 10a of the Police Act, together with the first paragraph of Section 15 of the Act on the Treatment of those Detained and Arrested, etc. (1976:371). These provisions permit a detainee to be restrained during transport and on other occasions outside the place of detention whenever this is required for the sake of safety or in order to prevent violent behaviour by the detainee, if other remedies are seen to be ineffectual and when required to safeguard the life and health of the detainee or other individuals. According to Section 10a of the Police Act, a police officer has the same rights to use restraints when he apprehends or restricts the liberty of an individual in some other way. Restraint is normally used to refer to a device that binds the hands or feet together (Berggren and Munck, *Polislagen(The Police*

21

*Act)*, 4. ed., p. 80). The manual issued by the Prison and Probation Administration states that the following types of restraints may be used: handcuffs, ankle fetters, waist chains, plastic restraints, stretchers and straitjackets.

Apart from the areas laid down in these statutes, there are no others, except for the special situations referred to in Chapter 24 of the Criminal Code on the general grounds for exemption from criminal responsibility, in which the police may resort to the use of force.

The provisions in the Police Act entitling police officers to use force do not apply to foreign police officers. It is quite another matter that a foreign police officer, like any other individual, is exempt from criminal responsibility if he comes to the assistance of a Swedish police officer (see 24.5 of the Criminal Code, cf. as well SOU 1987:14 p. 185).

The Police Act also contains a provision on body-searches. A police officer who makes a legal arrest or otherwise apprehends someone or removes them may, in connection with this measure, also conduct a body-search to the extent that this is required for the sake of safety, for instance, so that weapons and other dangerous objects can be impounded (Section 19). The kind of search required for the sake of order or safety when someone has been detained by the police is normally referred to in everyday terms as "frisking" (see Berggren and Munck, p. 120 f.). There are, however, no provisions in the Police Act that provide a legal basis for physical examinations.

Chapter 6 of the Aliens Act includes regulations on detention. If an alien is detained and placed in a Criminal Correction facility, detention centre or police cell, the rules laid down in Sections 2 and 2a-2c in the Act on the Treatment of those Detained and Arrested, etc. apply to physical searches and physical examinations. (Aliens Act 6.2, second paragraph).

There are no provisions that deal with the rights of police officers to wear masks in the course of their operations. Conduct of this kind, with the possible exceptions that may arise in the course of operations by the National Counter-terrorist Unit, are alien to the spirit of regular police activities. It has however been considered that in view of the duties of the Security Police, its officers are often required to use methods that are rarely adopted by the regular police. One example that may be cited is that Security Police officers sometimes have to assume another identity in order to safeguard both themselves and their families from being exposed to threat and other forms of reprisal (see for instance JO 1993/94 p. 88 and SOU 1990:51 p. 153).

There are also what are known as the protective regulations for civil aviation (see, for instance, the Act on the Protection of Civil Aviation (2004:1100) which came into force on January 1, 2005. This Act enables body-searches to be made in the course of a security check at an airport. Similar regulations were previously contained in the Act on Special Controls at Airports (1970:926).

In the regulations and general guidelines on the enforcement of deportation and expulsion orders by air (FAP 638-1) recently issued by the National Police Board, it is stipulated that if during the enforcement procedure an alien is treated by foreign officials in a way that is obviously incompatible

22

with what is regarded as acceptable in terms of Swedish law, the Swedish police officer responsible for the enforcement must intervene without delay. The police authorities shall in such cases promptly consider whether the enforcement is to be cancelled (Section 3, cf. also Section 16). One of the general guidelines under Section 3 states that if the treatment of the alien referred to in the regulation is of extremely brief duration and no repetition may be anticipated, the enforcement should not be cancelled.

*3.2.2 Adjudication*

To begin with, I should like to point out that for me it is self-evident that in a democratic state, subject to the rule of law, police officers must treat all those who become the object of police actions in a humane and dignified manner. This means that nobody may be subjected to degrading or humiliating treatment in the course of a police operation. Among its other provisions, the European Convention also lays down, as has been pointed out, as an unconditional rule that nobody may be subjected to inhuman or degrading treatment (Article 3). The following adjudication is therefore based on this fundamental acknowledgement of and respect for the freedoms and rights of every individual.

As can be seen from the presentation of the legal regulations, there are grounds in law for the use by the police of force and to some extent coercive measures in the enforcement of a deportation or expulsion order. Actions of this kind, such as the use of restraints, may not, however, become a matter of routine and in every individual case an appraisal must be made of whether the situation requires recourse to such means. There are, therefore, grounds for studying more closely whether the measures adopted in the case of A. and E.Z. were compatible with Swedish legislation and, if so, whether they were necessary.

In this case, it has been revealed that Swedish police officers made body-searches of A. and E.Z. when they were apprehended. They were then subjected to a security check at Bromma airport conducted by American officials. As has already been made clear, these checks comprised at least the following elements. A. and E.Z. were subjected to body-searches, their clothes were cut to pieces and placed in bags, their hair was thoroughly examined, as were their oral cavities and ears. In addition they were handcuffed and their ankles fettered, dressed in overalls and photographed. Finally loose hoods without holes for their eyes were placed over their heads. A. and E.Z. were then taken out of the police station in bare feet and conveyed to the aircraft where they were laid on mattresses to which they were strapped. The hoods, handcuffs and fetters were not removed during the flight to Egypt.

Where the body-searches are concerned, it can be observed that for the sake of safety, for instance, it is of course a matter of police routine to conduct a body-search of individuals when they are apprehended. I therefore have no objection to the body searches made by the Security Police officers of A. and E.Z. and can also, in view of the regulations and safety requirements that apply to air transport, accept that a second-body search was made immediately before boarding the aircraft.

23

I can also understand that for the sake of safety on board an aircraft, there may be grounds for handcuffing someone during a repatriation. I therefore have no objections to the decision to handcuff A. and E.Z. during the flight to Egypt. However, there seems to have been no obvious need for ankle fetters as well. At no stage during the enforcement had A. and E.Z. attempted to resist, either actively or passively, or shown any tendency to want to escape. In addition they were surrounded all the time by a large number of American, Swedish and Egyptian officials. The only incident that took place consisted of the remark E.Z. made at the airport.

The inspection of A. and E.Z.'s hair and the scrutiny of their oral cavities and ears must be considered to constitute a physical examination. There is no legal support for the use of this kind of coercive measure in this particular case.

A. and E.Z. were also made to wear hoods. Actions of this kind are alien to the conduct of the Swedish police although, in one or two cases, similar measures have unfortunately been adopted in Sweden recently. The response of the Security Police asserts, as does the memorandum drawn up by the Ministry of Justice in April 2002, that it is most appropriate to consider the use of hoods on the basis of Section 10 of the Police Act. In my opinion, there is a great deal to suggest that a measure of this kind cannot be evaluated by reference to this provision but that, instead, there are no regulations that apply. Even if the measure were to be appraised on the basis of Section 10 of the Police Act, in this case it was manifestly not a necessary element in the performance of official duties (cf. Berggren and Munck, p. 71). Moreover, in my judgement, it is patently obvious that the requirements for the use of force laid down in point 7, which the Security Police refer to in particular, were not fulfilled. In other words, there were no legal grounds for this measure. In this context it may also be pointed out that the UN's general principles for the protection of individuals deprived of their liberty emphasise, inter alia, that detainees may not be deprived of the ability to use their senses, vision or hearing, nor their sense of orientation in time and space.

I have no reason to comment on the fact that the American officials were wearing masks other than to point out that, as can be seen from the account of the legal regulations, in principle such conduct cannot be accepted in Sweden.

It has also been claimed that in the changing room tranquillisers were administered to A. and E.Z. rectally and that they were even made to wear diapers before being dressed in overalls. The Security Police officers who have been heard, including the two who were present in the changing room, have however stated that they did not at that time observe and were not subsequently informed that this was the case. Their accounts leave, however, some scope for the possibility that these actions may have taken place without their notice. Some support for the belief that drugs were administered coercively can be found in the information given by E.Z. to K.J. and the entry made by officer Y in the enforcement log, "A. and E.Z. were probably given a tranquilliser by the doctor before take-off". Officer Y has asserted that the entry was mere speculation on his behalf but has not, in my opinion, been able to provide any reasonable explanation as to what, in this case, his speculation was based on. I am therefore obliged to conclude that the inquiry cannot show with

24

certainty whether a coercive measure such as the forcible administration of drugs did take place or not. The same applies to whether the two men were made to wear diapers.

The lack of certainty that therefore prevails on this point is, as far as I can see, one outcome of the shortcomings in the way in which the Security Police organised the operation. As no Swedish police officers even diligently supervised the measures adopted by the foreign officials, it has been impossible subsequently to establish or repudiate the allegations of forcible medication.

Even though the inquiry has not, therefore, been able shed light on the circumstances in this respect, I would like to point out that coercive medication is one of the kinds of coercive physical measures referred to in 2.6 of the Instrument of Government and which therefore requires the support of law to be permitted. There is no such support in the Police Act. In the *travauxpréparatoires* to the legislation, it is specifically pointed out that in a society like Sweden, it can never be permissible for the police to use psychopharmaceuticals or other drugs in the course of an official enforcement. No support for methods of this kind may be derived from the Police Act but they should be considered unlawful. In addition, it is stated that this does not exclude the possibility that a court of law, by virtue of the general rule about emergencies in the Criminal Code, may consider it justifiable, in exceptional cases, for a police officer to have administered medicine to someone against their will in a situation of extreme emergency. (Govt. Bill. 1983/84:111 p. 92 f.).

Coercive medication in the current case would therefore have been unlawful.

I also have reason to consider whether the treatment of A. and E.Z. during the enforcement was compatible with the prohibition against torture and inhuman and degrading treatment enshrined in the European Convention and elsewhere. On this issue I would first like to point out that in both from the Torture Convention and from application by the European Court of Human Rights of the distinction made in Article 3 of the European Convention between torture and other forms of unlawful treatment, it is clear that torture is a concept reserved for cases involving the intentional infliction of severe pain or grave suffering intended, for instance, to obtain information or to punish or intimidate (see for example the judgment of the European Court of Human Rights of June 27, 2000 in the case of Salman v. Turkey). I, for my part, do not consider that the treatment to which A. and E.Z. were subjected in Sweden and during the flight to Egypt can be regarded as torture.

For some action to be considered to be in breach of article 3 in the European Convention in some other respect, the European Court of Human Rights has taken the view that the treatment, when all the circumstances have been taken into account, such as how long it lasted, its effect on the physical or mental health of the victim, as well as the victim's age and health, must attain a certain level of severity (see for instance the judgment issued on January 18, 1978, in the case of Ireland v. the United Kingdom). In particular, when the issue concerns whether or not some form of treatment is to be considered degrading, the court has taken into account whether the object has been to humiliate the individual concerned and also its effect on the individual's personality. When such treatment has occurred in connection with the deprivation of liberty, it must involve a violation that exceeds the humiliation inherent in arrest or detention (see for instance the judgment of March

12, 2003, in the case of Öcalan v. Turkey). It should be noted in particular that in the case mentioned the court considered that the circumstance that Öcalan for security reasons was blindfolded and handcuffed during a flight from Kenya to Turkey did not constitute a violation of Article 3 of the European Convention.

Nevertheless, I consider that the treatment to which A. and E.Z. were subjected, from the moment when their clothes were cut up and removed and they were hooded at Bromma airport until they arrived in Cairo, still wearing hoods, fettered and strapped to mattresses, must in its entirety be characterised as degrading. The possibility cannot be excluded that this treatment, even if it may have been prompted mainly for reasons of security, could also have been intended to humiliate. In my opinion therefore, questions could be raised as to whether the enforcement was implemented in a manner that constituted a breach of article 3 of the European Convention. Irrespective of whether or not this was the case, it is nevertheless clear that in the end the enforcement was carried out in an inhuman and therefore unacceptable manner.

I have previously observed that there was no basis in law for allowing the American officials to exercise public authority on Swedish territory. The Security Police should have reacted, therefore, as I have already pointed out, when a demand was made on December 18, 2001, to be allowed to conduct a security check. As has been made clear, the representatives of the Security Police remained passive on this issue. The officers present at Bromma airport were therefore surprised by the extent of the examinations. For this reason - and in view of the rapidity with which the examinations were made - I can understand that the Security Police officers made no analysis of the legality of the measures adopted. They should, however, even without such an analysis, have realised that there were grounds for intervening to prevent the inhuman treatment that A. and E.Z. were being subjected to.

Certain other circumstances may be assumed to have played a role when the Security Police allowed these events to occur. To begin with, no officer had been assigned operational command at Bromma airport. As a result none of the Swedish officers present - all of whom were of relatively junior rank - considered that they were ultimately responsible for the enforcement. K.B. has also referred to this shortcoming. It cannot be excluded that an operational commander with a relatively senior rank could have influenced the course of events. Instead, the Swedish Security Police officers were remarkably submissive to the American officials. The unclear organisation of the Swedish team may also have contributed to give the Americans the impression that there was no need to give the Security Police more detailed information about what was about to happen. Secondly, it cannot be excluded, either, that the Security Police officers present may have been burdened by their knowledge that the Government had decided on enforcement without delay and that the Ministry for Foreign Affairs, for instance, considered it important for enforcement to take place on the day the decision had been made.

It is mainly against this background that I have decided, albeit with some hesitation, to take no further action than to express my criticism in this adjudication.

## 3.3 Concluding comments

In the public debate, information has been offered to suggest that what occurred was the first American transport of prisoners in the hunt for presumed terrorists after September 11, 2001, and that the American officials were part of a special commando that undertook what have been called "extraordinary renditions". This term is used to refer to a process in which individuals suspected of being terrorists are secretly and with no basis in law taken to certain states that cooperate with the USA so that they can be interrogated there in a brutal manner. For instance, in *Chain of Command - the Road from 9/11 to AbuGhraib*, London 2004, Seymour M. Hersh alleges of the events at Bromma airport that "American operatives participated in what amounted to the kidnapping of two Egyptians" (p. 53).

My impression is that the enforcement involving A. and E.Z. cannot be regarded as a rendition of this kind. It is important to remember that the Security Police were conducting certain investigations and surveillance, that the Migration Board studied the applications for asylum submitted by the two men and that, above all, the Government rejected, by virtue of the Aliens Act, A. and E.Z.'s applications for residence and labour permits and decided that the two men were to be expelled to their native country. This was not therefore a case in which "American agents" alone removed the two men.

In international police cooperation it is important to consider the legal aspects and restrictions that apply. It is obvious that the Security Police did not pay sufficient consideration to the difficulties that could be linked to acceptance of the American offer. In this adjudication I have accounted for considerable shortcomings in the way in which the Security Police dealt with the enforcement. In my opinion, the most striking deficiency is the passivity shown by the Security Police throughout. This failing, combined with the lack of any designated operational commander at Bromma airport, resulted, in my view, in the Security Police losing control of the way in which events developed.

I have also pointed out that A. and E.Z. were subjected to inhuman treatment. I would like to emphasise that treatment of this kind is alien to Swedish police procedures and cannot be tolerated.

Foreign officials who assist Swedish police officers in Sweden are not, in principle, entitled to use force and may not resort to other forms of coercion. If, nevertheless, foreign officials take such measures or, as in this case, go so far as to act in a way that is not acceptable according to Swedish legal standards, Swedish police officers must intervene to put a stop to this without delay. I consider that in this case the Security Police officers should have aborted the enforcement. Had they done so, it could then have taken place with the aircraft that was ready to depart on the morning of the following day.

Finally, I find reason to comment on the contents of the statements submitted by officers X and Y to the Parliamentary Ombudsman. In important respects they fail to express self-critical reflection. In their opinion, for instance, the Security Police had control of the enforcement. In addition, Security Police officer Y states that the enforcement of A. and E.Z. "did not go so far that the two concerned

were subject to any more discomfort that can be considered necessary given the order that was being enforced". I am disturbed by the lack of self-criticism in this attitude, particularly in an operational area that is characterised by secrecy and closed to public control. At the same time, I note with satisfaction K.B.'s assertion that it would be alien for him to use a foreign aircraft with foreign security personnel in the way this occurred in this case.

I take it for granted that the Security Police will adopt cogent measures to avoid any repetition of what occurred. As can be seen from its official response, work has already started on reorganising its operations, enhancing its internal controls and training. In addition, the National Police Board recently issued regulations and general guidelines in this area.

With the extremely grave criticism of the Security Police that I have found reason to express, I conclude this case.

« Back to search results
Last modified: 2005-04-28

The Parliamentary Ombudsmen JO · Postal Address: Box 16327, SE-103 26 Stockholm, Sweden · Visiting Address: Västra Trädgårdsgatan 4 · Telephone: +46 8 786 40 00 · Text phone: +46 8 786 61 15 · Fax: +46 8 21 65 58 · E-mail: justitieombudsmannen@riksdagen.se ·
Information about cookies