# EXHIBIT G

Case 5:07-cv-02798-JW     Document 52-22     Filed 12/14/2007     Page 1 of 6

SVERIGES
RIKSDAG

Home / Documents / Reports and statements... / The Swedish Government...

# The Swedish Government's handling of matters relating to expulsion to Egypt

## Extract from Scrutiny Report 2005/06:KU2

[Unofficial translation]

### Background

On 18 December 2001, the Swedish Government decided to reject applications for residence and work permits and for official refugee status and travel documents from two men, Ahmed Agiza and Mohammed El Zary, and Agiza's family, all Egyptian citizens. At the same time, the Government decided to expel them to Egypt. According to the decisions, the expulsion of the two men was to be implemented with immediate effect, while the expulsion of Agiza's family would take place as soon as possible. – The decision was made at a time when no special Minister for Migration had been appointed, and for this reason the government minister reporting on the matter was Anna Lindh, who was then Minister for Foreign Affairs.

In the decisions, the Government noted in regard to each of the men that the circumstances of the cases, primarily their own statements regarding their activities in their own country and the treatment they had received there, were such that they might indeed be regarded as refugees in accordance with Ch. 3 Sec. 2 of the Swedish Aliens Act (1989:529). With reference to the fact that refugees too according to Ch. 3 Sec. 4 Para. 2 Point 1 of the same Act may be refused residence permits if there are special reasons for this given what is known about their previous activities or with respect to the security of the realm and in consideration of data provided by the Swedish Security Service, the Government rejected the men's applications for official refugee status, etc. Considering guarantees that had been given, the Government also failed to find that there was any reason to grant the men residence permits in the capacity of persons in need of protection according to Ch. 3 Sec. 3 Para. 1 Point 1 of the Swedish Aliens Act. This section of the law concerns an alien who without being a refugee leaves the country of which he or she is a citizen because he or she has a well-grounded fear of capital or corporal punishment or of being subjected to torture or other inhumane or degrading treatment or punishment. Nor were there any other reasons for granting either of the men a residence permit, and for this reason they were to be expelled in accordance with Ch. 4 Sec. 1 Para. 1 Point 2 of the Swedish Aliens Act.

In the view of the Swedish Government, in the light of the guarantees received by them, no obstacles could be considered to stand in the way of enforcement. In the light of the circumstances of the cases, the Swedish Security Service was obliged to

implement the expulsion orders affecting the two men in accordance with Ch. 8 Sec. 11 Para. 2 Point 3.

The guarantees obtained by the Government included an exchange of aides-mémoire with Egypt.

Before very long, reports that the men were subjected to torture or other treatment in conflict with international conventions on human rights began to appear. In addition to this, in May 2004 the TV4 current affairs programme Kalla fakta [Cold facts] presented reports that the expulsion had been carried out by foreign officials in a particularly inhumane manner. The programme also presented information about American actions in connection with the transfer of undesirable persons to states where they were at risk of being subjected to torture, a procedure known as *extraordinary renditions*.

Agiza's family was later granted residence permits on humanitarian grounds.

## The Committee's assessment

The Committee has previously examined the Government's handling of the cases involving the expulsions of Agiza and El Zary. The reports that have now been made to the Committee, together with new data that have emerged, give the Committee reason to take up these cases again. A significant factor in relation to the feasibility of examining the handling of the cases is that Anna Lindh, Minister for Foreign Affairs, who was the Government's rapporteur at the time of the decisions, is no longer alive.

It is provided in Ch. 11 Sec. 8 of the Instrument of Government that "No judicial or administrative function may be performed by the Riksdag except inasmuch as this follows from fundamental law or from the Riksdag Act". In the Committee's view, this provision entails that the material content of an administrative decision taken by the Government should not as a rule be assessed in the constitutional scrutiny performed by the Committee. The scrutiny should instead in the first instance be directed towards the formal aspects of the case and issues concerning its handling.

Concerning *the suspicions about the men* that led the Government to determine that they should be excluded from protection as refugees or comparable protection – in other words, that they should be expelled – the Committee has asked questions about the way in which the Government obtained the factual material for making its assessment. The Committee notes that this procedure cannot be equated with the trial of a case in court, and that the requirements of proof with respect to decisions on refusal of entry or expulsion in security matters are not the same as those needed for conviction in a criminal trial.

The element in the handling of the case which there is reason to examine more closely *is the acceptance of the "guarantee" or the diplomatic assurances*. According to the Government, the guarantee was a precondition for the decisions to expel the men to their homeland, Egypt. It comprised the exchange of aides-mémoire and what took place during a conversation between State Secretary Gun-Britt Andersson and a representative of Egypt.

Participants in the public debate and various Human Rights bodies have criticised both the wording of the guarantee and its existence at all. The prohibition against expelling or in some other way removing aliens to a country in which there is good reason to believe that they would be at risk of being subjected to torture or other inhumane or degrading treatment or punishment is absolute. In 2004, the Council of Europe's Commissioner for Human Rights stated in a report that a crucial criterion in assessing the reliability of diplomatic guarantees must be that the recipient state should not practise or tolerate torture or abuse. In 2004, the UN Special Rapporteur on Torture stated in a report that guarantees of this kind – if they are to be used at all – must be unambiguous and that a system must be put in place to monitor their observance. No detailed plan for implementing follow-up had been agreed with the Egyptian authorities, and indeed none appears to have existed at all in the run-up to the decision. It is not unreasonable to argue that the difficulties a follow-up would entail should have been anticipated prior to the decision to rely on the guarantee and as a consequence of this reliance to expel the men to their own country.

The Government declared that a crucial factor in its assessment of the guarantee's reliability was its confidence in Egypt's will to demonstrate that it is a serious participant in the international community by fulfilling obligations it had taken upon itself. In the Committee's view, the assessment made of the guarantee needs to be seen in the light of UN Security Council resolution 1373 on cooperation to prevent terrorist acts, adopted on 28 September 2001, ie just over two weeks after the terror attacks in the USA on 11 September the same year.

The Committee is not in a position to judge whether the men were subjected to torture or other treatment in conflict with the convention. Many things, however, indicate that this happened. Regardless of whether this is so or not, it may now be noted with reference to what has been mentioned that the acceptance of the guarantee, which led to the expulsion of the two men, ought not to have occurred.

Many question marks have been generated by *the events at Bromma Airport* on the evening of 18 December 2001. These events have been examined by the Parliamentary Ombudsman (JO), who reported his findings on the background and course of the events in the decision referred to above . The actions of the Swedish Security Service do not fall within the scope of the Committee's review.

The Parliamentary Ombudsman found in his assessment that there was a good deal of evidence that Anna Lindh, the Minister for Foreign Affairs, at the briefing at the Ministry for Foreign Affairs on 17 December 2001 was informed about the alternative entailing the use of an American plane for the implementation of the measure and that the Security Service when choosing the mode of transport to be used also took into consideration what they had come to perceive as the position of the Minister on this matter. It has not been possible to reach complete clarity either as to whether the Minister was reached by this information at the briefing, or as to whether the information was available elsewhere in the Government Offices. The Swedish Security Service kept diary notes of its meetings with the ministries. No equivalent documentation exists within the Government Offices. In the view of the Committee, it is not satisfactory that the procedures used in the preparation of government matters should have left scope for significant obscurity regarding what took place. This has made subsequent examination of the circumstances surrounding the case considerably more difficult.

It does however appear indisputable that the possibility of receiving foreign assistance, at any rate with respect to the allocation of time-slots, was mentioned during the briefing, which raises the issue of the independence of the administrative authorities involved, in the light of Ch. 11, Sec. 7 of the Instrument of Government. According to this provision, no public authority nor the Riksdag nor the decision-making body of a local authority may determine how an administrative authority shall decide in any given case relating to the exercise of public authority with respect to a private subject (or to a local authority, or in connection with the application of law). At the same time, Ch. 10, Sec.8 of the Instrument of Government provides that the head of the ministry responsible for foreign affairs shall be kept informed whenever a matter arises at another state authority which has significance for relations with another state or international organisation. According to the ordinance concerning the duties of the Security Service, this Service is also obliged to provide the Government with information where appropriate. In the present case, the head of the Ministry for Foreign Affairs was also – as it happened – the government minister reporting the matter.

The Government's decision regarding the two men stated that their expulsion was to be implemented with immediate effect. Questions have been raised as to whether the Minister for Foreign Affairs, by expressing at the briefing prior to the Government's decision that she preferred implementation to take place on the same day as the decision was announced, infringed upon the provision set out in Ch.11, Sec. 7 of the Instrument of Government. The key issue here concerns what the Minister for Foreign Affairs heard and said, what her intentions were and how they were to be interpreted. Her own opinion on the matter can no longer be ascertained. The Committee is therefore unable to gain full clarity in this matter. This does not alter the fact that the Security Service, as its representatives have stated and as has been confirmed by the Parliamentary Ombudsman, bears responsibility for how the expulsion order was actually enforced.

Criticism has also been levelled at the circumstance that *the Government's decision could not be appealed*, and that the decision to expel Agiza also included his family, and that no appeal could be lodged against this part of the decision either. This meant that there was no obstacle to the immediate enforcement of the decisions. The Swedish Aliens Act provided scope for this handling of the matter.

Questions have been raised as to whether fears that the men would request inhibition from an international body before the expulsion orders could be enforced influenced the Government's decision. As was maintained by representatives of the Government Offices at the Committee hearing, it is evident that such considerations may not be allowed to influence a matter.

The two men who were expelled from Sweden were informed of the decisions by the authority responsible for enforcement of these decisions, while their legal representatives were informed by way of registered letters. This procedure does not conflict with a praxis of apprising legal representatives of a decision with all due dispatch.

The Committee has stated above that there was no detailed plan for monitoring the observance of the guarantee. This shortcoming is reflected in *the actual follow-up of*

*the guarantee*. The follow-up does not comply with the recommendations later presented by the UN Special Rapporteur on Torture, and neither does it conform to the praxis developed by the Red Cross. One major failing is, of course, that the first visit to the men was not conducted earlier. In the opinion of the Committee, the shortcomings in the actual follow-up are, however, mainly a consequence of the lack of prior planning. The conditions for an acceptable follow-up of the observance of the guarantee would naturally have been better if such a procedure had been planned and agreed with the Egyptian authorities before the men were expelled from Sweden.

With regard to *behaviour in relation to the UN Committee against Torture*, the Committee on the Constitution notes that the UN Committee has criticised Sweden for not providing it with available information. An account has been given above of the reasons for the actions given by the Government Offices, and the assessments that were made. It is, of course, important that Sweden acts with respect to the UN Committee in a way that provides any and all documentation necessary for making an assessment and that Sweden does not expose itself to criticism for a lack of cooperation with this UN body.

Questions about the Riksdag
020-349 000 (national calls)
E-mail: riksdagsinformation@riksdagen.se