# EXHIBIT B

| UNITED NATIONS | | **A** |
|---|---|---|



**General Assembly**

Distr.
GENERAL

A/HRC/4/33/Add.3
5 January 2007

Original: ENGLISH

HUMAN RIGHTS COUNCIL
Fourth session
Item 2 of the provisional agenda

# IMPLEMENTATION OF GENERAL ASSEMBLY RESOLUTION 60/251 OF 15 MARCH 2006 ENTITLED "HUMAN RIGHTS COUNCIL"

Report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, Manfred Nowak

Addendum

## MISSION TO JORDAN*

---

\* The summary of this mission report is being circulated in all official languages. The report itself is contained in the annex to the summary and is being circulated in the language of submission and in Arabic. The appendix is available in English only.

GE.07-10107  (E)    190107

## Summary

The Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment undertook a visit to Jordan from 25 to 29 June 2006. He expresses his appreciation to the Government for the full cooperation it extended to him. The report contains a study of the legal and factual aspects regarding the situation of torture or ill-treatment in Jordan.

Many consistent and credible allegations of torture and ill-treatment were brought to the attention of the Special Rapporteur. In particular, it was alleged that torture was practised by General Intelligence Directorate (GID) to extract confessions and obtain intelligence in pursuit of counter-terrorism and national security objectives, and within the Criminal Investigations Department (CID), to extract confessions in the course of routine criminal investigations. Given that these two facilities were the ones most often cited as the two most notorious torture centres in Jordan, on the basis of all the evidence gathered, the denial of the possibility of assessing these allegations by means of private interviews with detainees in GID, and taking into account the deliberate attempts by the officials to obstruct his work, the Special Rapporteur confirms that the practice of torture is routine in GID and CID.

With respect to conditions of detention in prisons and pretrial detention centres, the Special Rapporteur found that the Al-Jafr Correction and Rehabilitation Centre was in fact a punishment centre, where detainees were routinely beaten and subjected to corporal punishment amounting to torture. The conditions in both the Siwaqa and the Juweidah (Male) Correction and Rehabilitation Centres were found to be more humane, although he continued to receive credible reports of regular beatings and other forms of corporal punishment by prison officials there. No allegations of ill-treatment were received in the Juweidah (Female) Correction and Rehabilitation Centre, though he remains critical of the policy of holding females in "protective" detention, under the provisions of the 1954 Crime Prevention Law, because they are at risk of becoming victims of honour crimes.

The Special Rapporteur concludes that the practise of torture persists in Jordan because of a lack of awareness of the problem, and because of institutionalized impunity. The heads of the security forces and of all the detention facilities he visited denied any knowledge of torture, despite having been presented with substantiated allegations. Moreover, in practice the provisions and safeguards laid out in Jordanian law to combat torture and ill-treatment are meaningless because the security services are effectively shielded from independent criminal prosecution and judicial scrutiny as abuses by officials of those services are dealt with by special police courts, intelligence courts and military courts, which lack guarantees of independence and impartiality. The fact that no official has ever been prosecuted for torture under article 208 of the Penal Code underlines this conclusion. Accordingly, he recommends a number of measures to be adopted by the Government in order to comply with its commitment to prevent and suppress acts of torture and other forms of ill-treatment. In view of the clear commitment of the Government to human rights, the Special Rapporteur is sure that every effort will be taken to implement his recommendations.

Annex

# REPORT OF THE SPECIAL RAPPORTEUR ON TORTURE AND OTHER CRUEL, INHUMAN OR DEGRADING TREATMENT OR PUNISHMENT, MANFRED NOWAK, ON HIS MISSION TO JORDAN
(25 to 29 June 2006)

## CONTENTS

|  |  | *Paragraphs* | *Page* |
|---|---|---|---|
| Introduction | | 1 - 8 | 5 |
| I. | LEGAL FRAMEWORK | 9 - 24 | 6 |
| | A. International level | 9 | 6 |
| | B. Domestic level | 10 - 24 | 6 |
| | 1. Constitutional protection of human rights, including the prohibition of torture and other cruel, inhuman or degrading treatment or punishment | 10 | 6 |
| | 2. Provisions of the Penal Code criminalizing torture | 11 - 15 | 6 |
| | 3. Safeguards against torture and ill-treatment during arrest and detention | 16 - 21 | 7 |
| | 4. Investigation of acts of torture | 22 - 24 | 9 |
| II. | THE SITUATION OF TORTURE AND ILL-TREATMENT | 25 - 39 | 10 |
| III. | REASONS FOR THE WIDESPREAD PRACTICE OF TORTURE IN JORDAN | 40 - 63 | 13 |
| | A. State response to terrorism and threats to national security | 40 - 47 | 13 |
| | B. Lack of awareness | 48 - 51 | 16 |
| | C. Impunity | 52 - 63 | 17 |
| IV. | CONCLUSIONS AND RECOMMENDATIONS | 64 - 73 | 20 |

## CONTENTS (*continued*)

|  |  | Paragraphs | Page |
|---|---|---|---|
| **Appendix** | | | |
| Places of detention - individual cases | | 1 - 55 | 25 |
| I. | GENERAL INTELLIGENCE DIRECTORATE, AMMAN | 4 - 5 | 25 |
| II. | AL-JAFR CORRECTION AND REHABILITATION CENTRE, AL-JAFR | 6 - 17 | 26 |
| III. | SIWAQA CORRECTION AND REHABILITATION CENTRE, SIWAQA | 18 - 22 | 29 |
| IV. | JUWEIDAH CORRECTION AND REHABILITATION CENTRE, AMMAN | 23 - 38 | 30 |
| V. | JUWEIDAH WOMEN'S CORRECTION AND REHABILITATION CENTRE, AMMAN | 39 - 43 | 33 |
| VI. | PUBLIC SECURITY DIRECTORATE, CRIMINAL INVESTIGATION DEPARTMENT, AMMAN | 44 - 55 | 34 |

39. The only prison where the Special Rapporteur did not receive allegations of ill-treatment is Juweidah (Female) Correction and Rehabilitation Centre, where he was satisfied with the commitment of the prison management to the well-being of the inmates. Nevertheless, the Special Rapporteur, after talking to women concerned, is highly critical of the current policy of taking females under the provisions of the Crime Prevention Law into "protective" detention because they are at risk of becoming victims of an honour crime. According to the Special Rapporteur, depriving innocent women and girls of their liberty for as long as 14 years can only be qualified as inhuman treatment, and is highly discriminatory.

### III. REASONS FOR THE WIDESPREAD PRACTICE OF TORTURE IN JORDAN

#### A. State response to terrorism and threats to national security

40. The Special Rapporteur recognizes the significant challenges faced by the country given its strategic location in the Middle East region, and not least the prevailing sensitive security situation and the continued threat of terrorism. Notably, Jordan is a party to several international counter-terrorism conventions, which is a demonstration of its commitment to cooperate globally in the fight against terrorism. He fully recognizes the obligation of the Government to ensure the security of its people. However, he emphasizes that such measures must respect international human rights norms, in particular the absolute prohibition of torture, as contained in the Convention against Torture that Jordan has ratified.

41. The Special Rapporteur notes that GID is the pre-eminent institution entrusted with counter-terrorism activities in Jordan. Before and in the course of his mission he received a number of serious, consistent and credible allegations of torture by GID officials, in particular regarding suspected terrorists.[8]

42. On 25 June 2006, the Special Rapporteur visited the premises of the General Intelligence Directorate and was received by the Assistant Director, Brigadier Ziyad Sharidah, the Head of the Counter-Terrorism Unit, Mr. Ali Birjak, and the Legal Counsel, Mr. Yousef Masarwa. The Assistant Director presented him with information about the Department and the detention centre. The Special Rapporteur asked questions and requested several clarifications, and the deputy director and officers answered all his queries. The Special Rapporteur was provided, at his request, with a list of the names of all the prisoners being held at the Department's detention centre, together with details of the charges against them and the date on which each person had been taken into detention. When he sought to visit the GID detention centre on 26 June 2006, in order to investigate allegations for himself, he was denied private interviews with detainees.[9]

43. The Special Rapporteur further notes that Jordan has repeatedly been mentioned in relation to the practice by the United States of America of "extraordinary renditions". One case concerns two Yemeni nationals, Saleh Nasser Salim Ali and Muhammad Faraj Ahmed

---

[8] See notes 10 and 13, below.

[9] For a description of the incident, see the appendix below.

Bashmilah (see E/CN.4/2006/6/Add.1, paragraph 126), who provided credible evidence that they had been held by United States forces in secret places of detention in Jordan.[10] Another case, which the Special Rapporteur discussed with GID representatives, concerns Mr. Maher Arar.[11]

---

[10] See Amnesty International, USA/Jordan/Yemen. Torture and secret detention: Testimony of the "disappeared" in the "war on terror", AI Index: AMR 51/108/2005. By letter dated 18 January 2006, the Government informed that the allegations are false as there is no record showing that the two men had been arrested for the violations of either the penal, disciplinary or administrative codes. They do not have documented files indicating they pose a security concern, eliminating the possibility of their arrest for what may be described as "terrorism". In a letter dated 10 October 2006, the Government informed that there was "no truth to the allegations that they were tortured in secret prisons run by United States forces in Jordan. [Salah Nasser Salim Ali] was arrested on 4 September 2005 for being a member of al-Qaeda and for entering the country on a forged passport bearing the name of his brother (Salah). He was deported on 8 September 2005. [Muhammad Faraj Ahmed Bashmilah] was brought in to the Department for questioning on 21 October 2003. He was then told to leave the country, which he did on 26 October 2003".

[11] On 26 September 2002, Mr. Maher Arar, a citizen of both Canada and Syria, arrived at John F. Kennedy International Airport in New York on a flight from Zurich, Switzerland. He had started his trip in Tunisia and was connecting through New York on his way to Montreal. Upon his arrival at the airport in New York, he was detained by American authorities. On 7 October 2002, the Regional Director of the United States Immigration and Naturalization Service (INS) issued an order finding Mr. Arar to be a member of al-Qaeda and directing his removal from the United States (United States Immigration and Naturalization Service, "Final Notice of Inadmissibility", 7 October 2002, signed by Deputy Attorney-General Larry Thompson, concerning Mr. Arar's imminent removal). On 8 October 2002, Mr. Arar was awakened at 3 o'clock in the morning at the Metropolitan Detention Centre in New York, and told that it was decided by the United States that he was to be removed to Syria (see letter dated 18 January 2005 from the United States Department of Justice, asserting the State's secret privilege in relation to, inter alia, Mr. Arar's removal to Syria; CBS News, *60 Minutes II*, transcript of "His year in hell", 21 January 2004: "… Imad Moustapha, Syria's highest-ranking diplomat in Washington, says … Syrian intelligence had never heard of Arar before the United States Government asked Syria to take him."; the *Globe and Mail*, "US trusted Syria's assurances on Arar: Ashcroft", 21 November 2003; *Washington Post*, "Man was deported after Syrian assurances", 20 November 2003; and the Syrian Deputy Foreign Minister Mouallem has explained that the United States decision to remove Mr. Arar to Syria via Jordan had taken his Government by surprise; the Syrian authorities had not asked for him; they had expected him to be sent to Canada; but because of the international campaign against terrorism, Syria had had no choice but to take Mr. Arar and question him on his alleged affiliation with al-Qaeda). Mr. Arar was taken to New Jersey, put on a corporate jet, and flown to Amman, Jordan, with brief stops in Washington, D.C., Portland, Maine, and Rome, Italy (*New York Times*, "Suit by detainee on transfer to Syria finds support in jet's log", 30 March 2005; *Human Rights Watch*, US/Canada: Transfer of Maher Arar to Torture; and in response to a request under the 1985 *Access to Information Act*, the Canadian Government has indicated that the Department for Foreign Affairs and International Trade learned that Mr. Arar was transferred from the United States to Jordan

44.     The Assistant Director of GID, Brigadier Ziyad Sharidah, and the Head of the Counter-Terrorism Unit, Colonel Ali Birjak, explained to the Special Rapporteur that Mr. Arar arrived in Amman as a normal passenger on a Royal Jordanian Airlines flight. Upon his arrival, a border control officer alerted GID that Mr. Arar's name was on a list of wanted terrorists. GID officials stated that he was not arrested but was asked to leave the country, and was given a choice of any destination to go to. However, because there were no flights to any of the countries Mr. Arar had selected, he ultimately asked GID to bring him to Syria by car, which GID did. Brigadier Sharidah and Colonel Birjak repeatedly insisted on this account to the Special Rapporteur that Mr. Arar had not been arrested but was voluntarily brought, by his own request, to Syria with the assistance of GID. This account was reaffirmed in the Government's comments to the draft report of 10 October 2006.

45.     In the view of the Special Rapporteur, it is astonishing that high-level intelligence officials provided him an account which is clearly contradicted by the well-substantiated and partly proven allegations, as well as the evidence obtained so far and made public in this well-known case. Moreover, he is surprised that the Government reaffirmed this same account to him.

46.     Based on the many consistent and credible allegations and the consistency of the testimonies of former detainees in relation to the torture methods used, as well as descriptions of the interrogation cells he inspected at GID, the denial of private interviews by GID officials, and the lack of credibility of the GID officials he met, the Special Rapporteur concludes that the allegations that torture is routinely practised by GID have to be taken as accurate.

47.     Moreover, despite Jordan's obligation to prohibit non-refoulement under article 3 of the Convention against Torture, GID has participated in activities that attempt to circumvent this

---

by private plane, cited in the September 2006 Commission of Inquiry report, below). Throughout the journey, he was chained and shackled in the back of the plane. The shackles were removed only at the end of the trip, when he was given the opportunity to have a meal with his guards. On 9 October, in the middle of the night, he arrived in Amman and was transported blindfolded to a detention centre. He was then taken into a room, where the blindfold was removed. He was asked routine questions and then blindfolded again before being led to a cell. The next morning, he was told that he was going to Syria. Later that day, he was blindfolded and put into a vehicle. Around 5 o'clock in the afternoon, Mr. Arar was in Syria, in the Far Falestin detention centre, also called the Palestine Branch, which was run by the Syrian Military Intelligence (SMI). He was held incommunicado until 21 October. See *Report of Professor S. Toope*, Government of Canada, Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar, 14 October 2005; Government of Canada, Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar, *Report of the Events Relating to Maher Arar: Analysis and Recommendations*, 18 September 2006. See also the Report of the Special Rapporteur on Torture to the General Assembly (A/60/316) of 30 August 2005, paragraphs 33, 48-50.

A/HRC/4/33/Add.3
page 16

prohibition in the context of global cooperation in counter-terrorism activities. The Special Rapporteur reiterates that counter-terrorism measures employed by the Government must respect international human rights norms, in particular the absolute prohibition of torture.[12]

### B. Lack of awareness

48.     The Special Rapporteur notes information provided by the Government that it promotes human rights concepts through awareness-raising programmes disseminated by the media and it recently incorporated these concepts into the academic curricula:

> Security institutions spare no effort to train and educate security staff and staff of correction and rehabilitation centres about human rights, so as to enable them to better perform their duties in conformity with the regulations and laws in force and in a manner that reflects Jordan's adherence to international human rights treaties, particularly the Convention against Torture. Some courses are delivered locally, at the police academy, and others are delivered abroad, with officers and men being sent to other countries to learn from the experiences of prisons elsewhere. The National Centre for Human Rights has run training courses for administrators of correction and rehabilitation centres, criminal investigators, and general intelligence officers. Several courses on management of correction and rehabilitation centres have been run, in conjunction with Penal Reform International, to train participants about prisoners' welfare and the Standard Minimum Rules for the Treatment of Prisoners. Other courses have been run, in cooperation with UNDP, on the subject of guaranteeing a fair trial according to international standards. Public Security and General Intelligence officers have also taken part in courses on crime prevention, human rights, and the Convention against Torture.

49.     However, despite these activities, in various meetings with government officials the Special Rapporteur found a lack of awareness of the seriousness of torture. An illustration of this is that most directors of Correction and Rehabilitation Centres, heads of security forces and even members of Government were satisfied that disciplinary sanctions, such as reductions of salary or delayed promotions, constituted appropriate penalties for this practice. This consensus might not be completely surprising, especially given that in the Penal Code torture is classified only as a misdemeanour, subject to a maximum penalty of three years' imprisonment.

50.     More surprising, however, was the finding that none of the directors of prisons, pretrial or police detention centres had allegedly been aware of any allegations of torture. This is in sharp contrast to the considerable number of well-founded allegations which the Special Rapporteur

---

[12] See, for example, reports of the Special Rapporteur on torture to the General Assembly (A/60/316) and (A/61/259); and the report to the Commission on Human Rights (E/CN.4/2006/6).

received from detainees within only a one-week visit. In addition, it is well-documented that the practice of torture in Jordan has been alleged by various credible NGOs and other sources.[13]

51. The Special Rapporteur recalls that the practice of torture constitutes one of the most severe violations of human rights and human dignity, and States parties to the Convention against Torture therefore have an obligation to carefully investigate every allegation of torture with the aim of bringing the perpetrators to justice.

### C. Impunity

52. Notwithstanding the provisions and safeguards laid out in Jordanian law to combat torture described above, in practice they are totally meaningless because the security services are effectively shielded from independent criminal prosecution and accountability.

53. A torture victim in Jordan who seeks redress, especially one who is a criminal suspect still in detention, faces an impenetrable wall of conflicting interests. In simple terms, the person whom a suspect is accusing of committing torture is the same person who is guarding him or her, and the same person who is appointed to investigate and prosecute the allegations of torture being made against him.

54. The Public Security Directorate under the Ministry of the Interior is the authority charged with the investigation of crime and the interrogation of suspects, as well as the administration of detention of suspects throughout all stages of the criminal proceedings (i.e. upon arrest, in pretrial detention, and upon conviction).[14] The same authority, through its system of internal special prosecutors and police courts, is also the sole authority tasked with investigating and prosecuting violations committed by its own officials.[15] Similarly, according to article 7 of the 1964 General Intelligence Directorate Law, GID officers are tried by an intelligence court comprising of GID officials. The same is true for military personnel who are tried and sentenced by military courts. In other words, it is only the special police, intelligence and military courts and not the ordinary prosecutors and criminal courts which have the competence to bring to justice any security official accused of torture, as defined in article 208 of the Penal Code.

---

[13] *Amnesty International*, "Middle East and North Africa: Jordan, Report 2006", and "Your confessions are ready for you to sign", July 2006; and *Human Rights Watch*, "Summit should address torture problem", 7 February 2006, and "Suspicious sweeps: The General Intelligence Department and Jordan's rule of law problem", September 2006; and *United States Department of State*, Country Reports on Human Rights Practices 2005, Jordan.

[14] 1965 Public Security Law. Note that criminal suspects detained by GID remain in its facility up until the time they have received their final sentence by the State Security Court. Convicted military personnel serve their time in military facilities.

[15] The 1965 Public Security Law provides that security officers must be tried by a "police court" where the judges and the prosecutor are security officers themselves.

55.     Typically, for a victim to bring charges of torture against a security officer, his or her lawyer must file a claim with the public prosecutor who then transfers the file to the Public Security Director's special prosecutor, a security officer with legal training, appointed by the Public Security Director. The Director also appoints the panel of officers that comprises the special police court, which decides on cases of abuses by officers. Moreover, the Director is empowered to annul the decisions of the special police court. In such a system, the presumption weighs heavily against transparency, independence and impartiality.

56.     Evidence in support of impartial scrutiny by these institutions would include the existence of functioning complaints mechanisms for reporting allegations of torture, a record of investigations into the allegations, and examples of successful prosecutions of security officers. From the heads of all the detention facilities - criminal investigation, pretrial, prison, and intelligence - he visited, the Special Rapporteur heard a chorus of denials of any knowledge of torture allegations received from criminal suspects or detainees. These denials were surprising, despite the officials being confronted with clear and credible allegations of torture by security officials, which were substantiated by forensic medical evidence.

57.     The Special Rapporteur reports that no ex officio investigations are undertaken even in the face of serious injuries sustained by a criminal suspect; not one official could demonstrate to the Special Rapporteur serious steps taken to investigate allegations, including at the very least the prompt and timely medical documentation of injuries sustained by detainees.[16] Given that throughout the world, the use of torture to extract confessions almost invariably takes place within the initial period following arrest and prior to being transferred to pretrial detention, a striking illustration of the indifference to the situation of criminal suspects was the response by the director of the Juweidah Correction and Rehabilitation Centre (the country's principal pretrial detention facility) that investigating such allegations was not his responsibility.

58.     While categorical in maintaining that torture does not exist, security officials routinely cited to the Special Rapporteur examples of disciplinary sanctions as evidence against impunity for those isolated acts of ill-treatment not amounting to torture. Examples of sanctions included loss of salary imposed on officers, or dismissals from service. The Special Rapporteur emphasizes that administrative sanctions on their own are insufficient to prevent and deter acts of cruel, inhuman or degrading treatment or punishment.

59.     No official has ever been prosecuted for torture under article 208 of the Penal Code.[17] A stark example of impunity for torture under article 208 of the Penal Code is illustrated by the

---

[16] Recourse to forensic medical expertise at the State-run National Institute of Forensic Medicine is made only upon the request of the prosecutor; victims of torture cannot privately approach the institute for an independent examination. Moreover, the process of securing an examination is fraught with significant delays, which has obvious implications for documenting injuries.

[17] The Government cited data from the Public Security Department that complaints against the police which the Police Prosecution Department or police courts dealt with were investigated in a completely impartial and objective manner. For offences of wounding and ill-treatment committed by general security officers in 2005-2006, there were 14 convictions, and

case of Zaher Abed Al-Jalil Abu Al-Reesh (see appendix, paragraph 46), where the Special Rapporteur established beyond any reasonable doubt a serious case of torture which had happened during the week of his fact-finding mission, and for which the evidence was corroborated by witness testimony, his own forensic doctor, and by two forensic doctors from the National Institute of Forensic Medicine. Concerning investigations and prosecutions into these allegations, the Government responded, by letter dated 10 October 2006, "that when questioned, [Zaher Abed Al-Jalil Abu Al-Reesh] asked for no charges to be brought against the two culprits. The commission of inquiry decided to refer the two culprits to the police court to be tried for: conspiracy to wound, in violation of article 334 of the Penal Code and pursuant to article 76 of the same Code; and disobeying orders and instructions, in violation of article 37, paragraph 4, of the Public Security Act". According to the Penal Code, article 334 carries a maximum penalty of one year imprisonment and a fine of 25 Jordanian dinars, and article 37 (4) of the Public Security Law, concerning disciplinary sanctions, carries a maximum of two months' imprisonment, loss of two months salary, and a lowering of his rank.

60.    Paradoxically, while law enforcement officials maintain that torture allegations are unheard of within their institutions, the Court of Cassation has overturned a number of convictions on the grounds that security officials had obtained confessions from defendants under torture.[18] Regrettably even these findings do not spur any official investigations into wrongdoings by officials and none of the security officials involved in these cases have ever been brought to justice.

61.    What is more, the decisions and rulings of the Court of Cassation related to cases where criminal suspects are prosecuted under special courts are at the same time cited by government officials to defend the system, pointing to the existence of independent oversight in the form of appeals of special court decisions to the Court.

---

14 complaints were dismissed. From 1 January to 21 June 2006, there were three convictions, two complaints were dismissed and three complaints remain under investigation. Despite requests no information was provided in relation to the nature of the allegations, the decisions of the convictions and dismissal, and the nature of the sentences handed down.

[18] See for example, Court of Cassation Decision No. 450/2004 of 17 March 2004: "If the court concludes that a confession which an accused person gave to the police was obtained in circumstances that cast doubt on its validity and as the result of beating and physical torture, the court is entitled to disregard the confession"; and Decision No. 1513/2003 of 4 May 2006: "Statements obtained as a result of violence and coercion cannot be relied upon to convict a defendant." Examples of Court of Cassation rulings invalidating special court judgements: Ruling No. 271/91 of 1 October 1992; Ruling No. 327/94 of 22 August 1994; Ruling No. 746/98 of 20 January 1998; Ruling No. 51/98 of 23 March 1998, which states that if irrefutable evidence is found that the appellant's statements were obtained under duress and torture and without his consent, then the statements must be struck from the record, because they are null and void; Ruling No. 256/98 of 19 May 1998; Ruling No. 552/99 of 23 August 1999; and Ruling No. 820/2003 of 22 November 2003.

A/HRC/4/33/Add.3
page 20

62. However, with respect to the question of *impunity* and the *prosecution by special courts of police or intelligence officers for torture or ill-treatment*, no evidence has been produced to indicate examples of where special court acquittals of police officers have been successfully appealed to the Court of Cassation, if appealed at all.

63. This leads to the conclusion that impunity is total. The special court system does not work effectively at all. The absence of a crime of torture in accordance with article 1 of the Convention against Torture is only part of the problem. At the heart of it lies a system where the presumption of innocence is illusory, primacy is placed on obtaining confessions, public officials essentially demonstrate no sense of duty, and assume no responsibility to investigate human rights violations against suspected criminals, and the system of internal special courts serves only to shield security officials from justice.

## IV. CONCLUSIONS AND RECOMMENDATIONS

64. The Special Rapporteur concludes that the practice of torture is widespread in Jordan, and in some places routine, namely the General Intelligence Directorate, the Public Security Directorate's Criminal Investigation Department, as well as Al-Jafr Correction and Rehabilitation Centre.

65. The total denial of knowledge of torture allegations is astonishing, and points to a lack of awareness and recognition by officials of the nature of the prohibition of torture and ill-treatment, and of its gravity and severity.

66. The Special Rapporteur notes that article 208 of the Penal Code is not in line with the definition of torture contained in article 1 of the Convention against Torture, is not treated as a significant crime but rather as a misdemeanour, and is not subject to penalties appropriate to its gravity. Indeed, in the opinion of officials, minor disciplinary sanctions seem to be adequate and sufficient sanctions for acts amounting to torture. Notwithstanding the shortcomings of this provision and despite the assertions by the Government that the Convention is a binding part of domestic law, it has never been applied because ordinary courts have no competence to invoke it against military, intelligence or public security officers.

67. Taken together, the lack of awareness and recognition, and the absence of any effective legislation to prohibit and criminalize torture creates a system of total impunity that allows torture to be practised in Jordan unchecked.

68. In view of Jordan's position as a Vice-Chair of the United Nations Human Rights Council; the stated political commitment, at the highest levels, to the promotion of a human rights culture in the country and the dissemination of information about these issues at the governmental and public levels; the reaffirmation of the Government's commitment to the Convention against Torture and the human rights treaties to which it is a party; its condemnation of all practices of torture and ill-treatment and its intention to impose the highest penalties on any public official found guilty of torture and ill-treatment; its willingness to continue to cooperate with the Special Rapporteur and with the