1  STEVEN M. WATT* swatt@aclu.org
   BEN WIZNER (SBN 215724) bwizner@aclu.org
2  JAMEEL JAFFER* jjaffer@aclu.org
   STEVEN R. SHAPIRO* sshapiro@aclu.org
3  AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
4  125 Broad Street, 18th Floor
   New York, NY  10014
5  Tel. 212.549-2500 / Fax 212.549.2651

6  ANN BRICK (SBN 65296) abrick@aclunc.org
   ACLU FOUNDATION OF
7  NORTHERN CALIFORNIA
   39 Drumm Street
8  San Francisco, CA 94111
   Tel. 415.621.2493 / Fax 415.255.1478
9
10 Additional Counsel Listed on Next Page

11

12                 **IN THE UNITED STATES DISTRICT COURT**

13           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

14                          **SAN JOSE DIVISION**

15 **BINYAM MOHAMED;**
   **ABOU ELKASSIM BRITEL;**
16 **AHMED AGIZA;**
   **MOHAMED FARAG AHMAD**
17 **BASHMILAH;**
   **BISHER AL-RAWI,**

18              **Plaintiffs,**

19        **v.**

20 **JEPPESEN DATAPLAN, INC.,**

21              **Defendant.**

22

23

| | |
|---|---|
| | **Civil Action No. 5:07-cv-02798 (JW)** |
| | **DECLARATION OF STEVEN MACPHERSON WATT IN SUPPORT OF PLAINTIFFS' OPPOSITION TO THE UNITED STATES' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT** |

24

25

26

27

28

CLIVE STAFFORD SMITH*† clivess@mac.com
ZACHARY KATZNELSON† (SBN 209489) zachary@reprieve.org.uk
REPRIEVE
PO Box 52742
London EC4P 4WS
England
Tel. +44 (0)207 353 4640 / Fax +44 (0)207 353 4641

PAUL HOFFMAN (SBN 71244) hoffpaul@aol.com
SCHONBRUN DESIMONE SEPLOW
HARRIS & HOFFMAN LLP
732 Ocean Front Walk, Suite 100
Venice, CA 90291
Tel 310.999.7040, ext. 4 / Fax 310.999.7040

HOPE METCALF* hope.metcalf@yale.edu
NATIONAL LITIGATION PROJECT
ALLARD K. LOWENSTEIN INTERNATIONAL
HUMAN RIGHTS CLINIC
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06520
Tel. 203.432.9404 / Fax 203.432.9128

MARGARET L. SATTERTHWAITE*++ satterth@juris.law.nyu.edu
INTERNATIONAL HUMAN RIGHTS CLINIC
WASHINGTON SQUARE LEGAL SERVICES, INC.
NEW YORK UNIVERSITY SCHOOL OF LAW
245 Sullivan Street
New York, NY 10012
Tel. 212-998-6657 / Fax 212-995-4031

**Attorneys for Plaintiffs BINYAM MOHAMED, ABOU ELKASSIM BRITEL, AHMED AGIZA, MOHAMED FARAG AHMAD BASHMILAH, and BISHER AL-RAWI**
**\* Admitted Pro Hac Vice**
**† Attorneys for and on behalf of Plaintiff BINYAM MOHAMED only**
**++ Attorney for and on behalf of Plaintiff MOHAMED FARAG AHMAD BASHMILAH only**

## DECLARATION OF STEVEN MACPHERSON WATT IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

I, **STEVEN MACPHERSON WATT**, under penalty of perjury, declare as follows, pursuant to 28 U.S.C. § 1746:

1.  I am a senior staff attorney with the American Civil Liberties Union and co-counsel in this action.  I submit this declaration in support of Plaintiffs' Opposition to the United States' Motion to Dismiss or, in the Alternative, for Summary Judgment.

2.  Specifically, I submit this declaration to demonstrate the significant number of documents in the public domain regarding the Central Intelligence Agency's rendition program, and the renditions of Mr. Mohamed, Mr. Britel, Mr. Agiza, Mr. Bashmilah and Mr. Al-Rawi in particular.  These documents comprise, *inter alia*, public statements by U.S. government officials describing in detail the parameters of the rendition program, official unclassified U.S. government documents detailing the program, and documentation from international inter-governmental and national parliamentary inquiries and criminal and journalistic investigations into European states' involvement in the U.S. rendition program.  In addition, hundreds of articles in major newspapers have described the rendition cases of plaintiffs and others, as have numerous U.S. and international television documentary programs.  The documentation referenced in this declaration represents just a fraction of an extensive and growing number of documents describing the U.S. rendition program that are currently publicly available.

3.  Since September 11, 2001, senior officials within the U.S. government, including the President, current Secretary of State Condoleezza Rice, former Secretary of State Colin Powell, current CIA Director Michael Hayden, former CIA Directors Porter

1  Goss and George Tenet, and senior intelligence and administration officials have
2  spoken publicly about the rendition program.

3  4.  As these government officials and others have explained, the rendition program was
4  established well before the September 11 attacks.  However, since September 11, the
5  program's primary objective has changed from the transfer of suspects to stand trial in
6  other nations to the clandestine apprehension, transfer, detention, and interrogation of
7  foreign nationals suspected of involvement in terrorism outside the United States.

8  5.  On September 6, 2006, President Bush publicly acknowledged the existence of the
9  current rendition program and defended its utility.  Confirming earlier media reports,
10  the President announced that: "Working with our allies, we've captured and detained
11  thousands of terrorists and enemy fighters in Afghanistan, in Iraq, and other fronts of
12  this war on terror."  He acknowledged that some of those captured had been
13  "transferred to an environment where they can be held secretly, questioned by
14  experts."  The President confirmed that "a small number of suspected terrorist leaders
15  and operatives captured during the war have been held and questioned outside the
16  United States, in a separate program operated by the Central Intelligence Agency."
17  He singled out several of them by name -- Abu Zubaydah, Khalid Sheikh
18  Mohammed, and Ramzi bin al Shibh – and noted that the information these three men
19  and others provided during their interrogation "has given [the U.S. government]
20  information that has saved innocent lives by helping . . . stop new attacks -- here in
21  the United States and across the world."  The President revealed that during
22  interrogations an "alternative set" of procedures had been employed and that "[a]ll
23  those involved in the questioning of the terrorists [we]re carefully chosen and . . .

screened from a pool of experienced CIA officers.  Those selected to conduct the

most sensitive questioning had to complete more than 250 additional hours of

specialized training before they are allowed to have contact with a captured terrorist."

The President stated that the program "has detained only a limited number of

terrorists at any given time – and once we've determined that the terrorists held by the

CIA have little or no additional intelligence value, many of them have been returned

to their home countries for prosecution and detention by their governments."  Finally,

the President announced that the CIA rendition program "has been, and remains, one

of the most vital tools in our war against the terrorists" and that at all times it operated

within a legal framework:

> This program has been subject to multiple legal reviews by the Department of
> Justice and CIA lawyers; they've determined it complied with our laws. This
> program has received strict oversight by the CIA's Inspector General. A small
> number of key leaders from both political parties on Capitol Hill were briefed
> about this program.

Specifically, as regards the "alternative" interrogation techniques employed, the

President confirmed: "These procedures were designed to be safe, to comply with our

laws, our Constitution, and our treaty obligatons."  Attached hereto as Exhibit A is

a true and correct copy of President George W. Bush, *President Discusses Creation of*

*Military Commissions to Try Suspected Terrorists*, (Sept. 6, 2006) transcript

*available at* http://www.whitehouse.gov/news/releases/2006/09/print/20060906-

3.html.

6.   Before this statement, President Bush had publicly referenced the rendition program

on numerous other occasions.  During a March 16, 2005 press conference, the

President was asked why he "approved of and expanded the practice of what's called

rendition, of transferring individuals out of U.S. custody to countries where human rights groups and . . . the State Department say torture is common for people under custody." The president answered that in the "post-9/11 world, the United States must make sure we protect our people and our friends from attack . . . . And one way to do so is to arrest people and send them back to their country of origin with the promise that they won't be tortured." Attached hereto as Exhibit B is a true and correct copy of the *President's Press Conference* (Mar. 16, 2005) transcript *available at* http://www.whitehouse.gov/news/releases/2005/03/20050316-3.html.

7. One month later, the President was again asked to comment on his justification for "the practice of renditioning, where U.S. agents who brought terror suspects abroad, taking them to a third country for interrogation?" The President replied: "We operate within the law and we send people to countries where they say they're not going to torture the people . . . . [W]e expect the countries where we send somebody to, not to torture, as well. But you bet, when we find somebody who might do harm to the American people, we will detain them and ask others from their country of origin to detain them . . . . [W]e've got guidelines. We've got law. But you bet . . . we're going to find people before they harm us." Attached hereto as Exhibit C is a true and correct copy of the *Press Conference of the President* (Apr. 28, 2005) transcript *available at* http://www.whitehouse.gov/news/releases/2005/04/20050428-9.html.

8. Both the current Secretary of State, Condoleezza Rice, and her predecessor, Colin Powell, have publicly commented on the rendition program. In December 2005, on her departure for official state visits to several European countries, including Germany, Secretary of State Rice defended the post 9/11 form of the rendition

program as "a vital tool in combating transnational terrorism."  She explained that the United States "must track down terrorists who seek refuge in areas where governments cannot take effective action, including where the terrorists cannot in practice be reached by the ordinary processes of law."  She continued:  "For decades, the United States and other countries have used 'renditions' to transport terrorist suspects from the country where they were captured to their home country or to other countries where they can be questioned, held, or brought to justice."  The United States, she said, did not "have the luxury of only using law enforcement techniques," but required other options when it was unable to "prosecute someone that is a known terrorist or a suspected terrorist . . . ."  She added:

> In some situations, a terrorist suspect can be extradited according to traditional judicial procedures.  But there have long been many other cases where, for some reason, the local government cannot detain or prosecute a suspect, and traditional extradition is not a good option.  In those cases the local government can make a sovereign choice to cooperate in a rendition.

Secretary Rice denied that individuals were rendered to permit coercive interrogation techniques:  "The United States has not transported anyone, and will not transport anyone, to a country when we believe he will be tortured.  Where appropriate, the United States seeks assurances that transferred persons will not be tortured."  Secretary Rice explained that persons detained by the United States may "be held for an extended period if the intelligence or other evidence against them has been carefully evaluated and supports a determination that detention is lawful."  She confirmed that foreign governments play a role in the process:  "Some governments choose to cooperate with the United States in its intelligence, law enforcement, or military matters," and in return for their cooperation, the United States shares

intelligence it gathers. Attached hereto as Exhibit D is a true and correct copy of Secretary of State Condoleezza Rice's *Remarks Upon Her Departure for Europe,* Andrews Air Force Base, (Dec. 5, 2005) transcript *available at* http://www.state.gov/secretary/rm/2005/57602.htm.

9. In a press briefing the following day, Secretary Rice and German Chancellor Merkel fielded questions on rendition. In relation to the case of Khaled El-Masri, who was allegedly rendered from Macedonia to Afghanistan in 2004, Secretary Rice stated:

> When and if mistakes are made, we work very hard and as quickly as possible to rectify them. Any policy will sometimes have mistakes and it is our promise to our partners that should that be the case, that we will do everything that we can to rectify those mistakes. I believe that this will be handled in the proper courts here in Germany and if necessary in American courts as well.

Attached hereto as Exhibit E is a true and correct copy of the *Joint Press Briefing by Condoleezza Rice and Angela Merkel,* (Dec. 6, 2005) transcript *available at* http://www.state.gov/secretary/rm/2005/57672.htm.

10. On the same day, in Washington D.C., White House Press Secretary Scott McClellan, citing Secretary Rice's comments, reiterated that the United States has long engaged in renditions of terror suspects, and denied that those suspects were tortured. Attached hereto as Exhibit F is a true and correct copy of the *Press Briefing by Scott McClellan*, (Dec. 6, 2005) transcript *available at* http://www.whitehouse.gov/news/releases/2005/12/print/20051206-3.html.

11. During a public meeting in Australia, Secretary Rice confirmed that "the practice of rendition is something that's been practiced way before September 11th when extradition isn't an option because sometimes you have to take people off the streets." Attached hereto as Exhibit G is a true and correct copy of Secretary of State

Condoleezza Rice's *Remarks at Town Hall Meeting with University of Sydney Students,* (Mar. 16, 2006) transcript *available at*

http://www.state.gov/secretary/rm/2006/63166.htm.

12. In December 2005, former Secretary of State Colin Powell spoke candidly with the media about the rendition program.  He told BBC News that renditions took place with the awareness of European governments over a period of years:

> Well, most of our European friends cannot be shocked that this kind of thing takes place . . . .  The fact that we have, over the years, had procedures in place that would deal with people who are responsible for terrorist activities, or suspected of terrorist activities, and so the thing that is called rendition is not something that is new or unknown to my European friends.

Attached hereto as Exhibit H is a true and correct copy of *Powell Raps Europe on CIA Flights*, BBC NEWS, (Dec. 17, 2005) *available at*

http://news.bbc.co.uk/2/hi/americas/4538788.stm.

13. During a "press gaggle," White House Press Secretary Tony Snow was asked about a June 2006 Council of Europe Report that contended that many European countries had participated in or aided rendition flights.  Snow responded that "[n]ations have to work together on intelligence matters" and that rendition "has been practiced by nations for a very long time."  Snow left open the possibility of future renditions, explaining that "rendition is not something that began with this administration, and it's certainly going to be practiced, I'm sure, in the future."  Attached hereto as Exhibit I is a true and correct copy of *Press Gaggle by Tony Snow*, (Nov. 16, 2006), transcript *available at*

http://www.whitehouse.gov/news/releases/2006/06/print/20060607-2.html.

14. Former Director of National Intelligence John Negroponte admitted that the U.S. government was holding "high-value detainees" in an interview with Time Magazine. The interviewer asked him: "What is the endgame for the three dozen or so high-value detainees?" Mr. Negroponte answered: "I'm not going to get into that one really. You know, these people are being held. And they're bad actors. And as long as this war on terror continues, I'm not sure I can tell you what the ultimate disposition of those detainees will be." Attached hereto as Exhibit J is a true and correct copy of Michael Duffy & Timothy J. Burger, *Ten Questions for John Negroponte*, TIME (Apr. 16, 2006), at 6, *available at*
http://www.time.com/time/printout/0,8816,1184080,00.html.

15. During the 9/11 Commission of Inquiry, senior intelligence officials, gave both written and oral testimony on the rendition program. Christopher Kojm, who from 1998 until February 2003 served as Deputy Assistant Secretary for Intelligence Policy and Coordination in the U.S. State Department's Bureau of Intelligence and Research, described the CIA's role in liaising with foreign government intelligence agencies to effect renditions, stating that the Agency "plays an active role, sometimes calling upon the support of other [government] agencies for logistical or transportation assistance" but remaining the "main player" in the process. Attached hereto as Exhibit K is a true and correct copy of *Intelligence Policy and National Policy Coordination: Hearing of the National Commission on Terrorist Attacks Upon the United States,* (Mar. 24, 2004) (statement by Christopher Kojm, Deputy Executive Director, National Commission on Terrorist Attacks Upon the United States, and

former Deputy Assistant Secretary of State), transcript *available at* http://www.9-11commission.gov/archive/hearing8/9-11Commission_Hearing_2004-03-24.pdf.

16. In a written statement submitted to the 9/11 Joint Inquiry Committee, former C.I.A. Director Tenet described the CIA's role in pre-September 11 renditions. He explained that:

> During the Millennium threat period . . . [o]ver a period of months, there was close, daily consultation that included Director Freeh, the National Security Adviser, and the Attorney General. We identified 36 additional terrorist agents at the time around the world. We pursued operations against them in 50 countries. Our disruption activities succeeded against 21 of these individuals, and included arrests, renditions, detentions, surveillance, and direct approaches.

The CIA, he explained, worked "with numerous European governments, such as the Italians, Germans, French, and British," and "[by] 11 September, the CIA (in many cases with the FBI) had rendered 70 terrorists to justice around the world." Attached hereto as Exhibit L is a true and correct copy of *Written Statement for the Record of the Director of Central Intelligence Before the Joint Inquiry Committee,* (Oct. 17, 2002) *available at* https://www.cia.gov/newsinformation/speechestestimony/2002/dci_testimony_10172002.html.

17. In the written statement he submitted to the 9/11 Commission of Inquiry, Tenet elaborated upon a number of specific instances of CIA involvement in renditions, including assisting "another foreign partner in the rendition of a senior Bin Laden associate" and assisting the Jordanian government in "render[ing] to justice" "terrorist cells that planned to attack religious sites and tourist hotels." Attached hereto as Exhibit M is a true and correct copy of *Written Statement for the Record of the*

*Director of Central Intelligence Before the National Commission on Terrorist Attacks Upon the United States,* (Mar. 24, 2004) *available at* http://www.9-11commission.gov/hearings/hearing8/tenet_statement.pdf.

18. Based upon the testimony taken and written statements received, the 9/11 Commission staff developed initial findings that they later made available to the public.  Under the heading "Rendition," these findings reveal that officials of the CIA, FBI, State Department, and foreign governments cooperated in the rendition of suspected terrorists.  Specifically, they conclude that "the CIA helps to catch and send [the suspect] to the United States or a third country," and that renditions were "an important component of U.S. counterterrorism policy throughout the period leading up to 9/11" and "are still widely used today."  Attached hereto as Exhibit N is a true and correct copy of the relevant section of *Staff Statement No. 7, National Commission on Terrorist Attacks Upon the United States*, *available at* http://www.9-11commission.gov/staff_statements/staff_statement_7.pdf.

19. Most recently, Tenet, when asked by CNN's Wolf Blitzer about allegations made by Khalid El-Masri, who alleged that he had been rendered to Afghanistan and tortured by the CIA, replied that "I don't believe what he [El-Masri] says is true."  Attached hereto as Exhibit O is a true and correct copy of *The Situation Room's Interview With Former CIA Director George Tenet,* (May 2, 2007) *available at* http://transcripts.cnn.com/TRANSCRIPTS/0705/02/sitroom.02.html.

20. Former CIA Director Porter Goss has also testified about the rendition program in an open session of the Senate Armed Services Committee.  In response to Senator

Kennedy's questions about the existence of the rendition program and the transfer of

terrorist suspects by the CIA, Goss stated:

> [O]n the subject of transferring dangerous terrorists and how that all comes about,
> there are obviously a number of equities involved.  We have liaison sources, we
> have our other government agencies.  The idea of moving people around,
> transferring people for criminal or other reasons, by government agencies is not
> new.  For us in the intelligence business, the idea of helping out dealing with
> terrorists has been around for about 20 years.  And we do have policies and
> programs on how to do it.  We also have liaison partners who make requests of us,
> and we try to respect not only the sovereign rights of other countries, but all of the
> conventions and our own laws and, of course, the Constitution. And as far as I
> know, we do that.

A copy of the transcript *Threats to U.S. National Security: Before the Senate*

*Armed Services Committee*, 109th Cong., 4 (2005) (Responses to Senators

McCain and Kennedy) is *available at*

http://www.humanrightsfirst.org/us_law/etn/docs/fedwires125g.htm.

21. The current CIA Director, General Michael Hayden, has also openly discussed and

defended the rendition program during a public speech and subsequent question-and-

answer session at the Council on Foreign Relations in New York on September 7,

2007.  General Hayden's speech focused on what he described as the CIA's

"rendition, detention and interrogation programs" and the Agency's "close

collaboration with allied intelligence services."  In his remarks, General Hayden

emphasized that the program is "very closely controlled and lawfully conducted" and

revealed that "[m]ore than 70 percent of the human intelligence reporting used in [the

National Intelligence Estimate] is based on information from detainees."  He

discussed the genesis of the current program, noting that "[i]t began with the capture

of Abu Zubaydah in the spring of 2002."  General Hayden also gave the audience

statistical data relative to the program, revealing that "[f]ewer than 100 people had been detained at CIA's facilities, and that" "the number of renditions – that's moving a terrorist from A to B – apart from that 100 that [the CIA] has detained . . .is . . . mid-range two figures." General Hayden elaborated on certain operational details about the CIA's programs and those involved: the "CIA handles a very small number of senior al Qaeda leaders. The average age of interrogators is 43. The amount of training for [interrogators] is 240 hours." And, in disparaging one of the findings of the European Parliament's investigation into renditions that "at least 1,245 flights operated by the CIA flew into European airspace and stopped over at European airports between the end of 2001 and the end of 2005," General Hayden maintained that the "actual number of rendition flights ever flown by CIA is a tiny fraction of that."

22. General Hayden confirmed that the rendition program involved both the rendition of terror suspects to detention and interrogation by the CIA and renditions to detention and interrogation by other governments. He repeatedly sought to justify both these types of renditions and the interrogation techniques employed by reference to a legal framework. Specifically, in regards to renditions to other governments, Hayden stated:

> [W]e do not circumvent any restrictions that we have on ourselves. There is a standard that we have to – have to apply in each and every case. We have to receive assurances and we have to have confidence in the assurances that this individual will be handled in a way that is consistent with international law. And we are required to maintain awareness of how this individual is handled. Now that's not an invasive right to go to an ally with a clip board and see how they're running day-to-day activity with a detainee, but as an intelligence agency we have a broad responsibility that the assurances we receive at the beginning – that we continue to have confidence that we should have in those assurances . . . . We have to believe that it is less rather than more likely that the individual will be tortured.

General Hayden explained that this standard was adopted from the "legislative history for the Senate working to pass the International Covenant Against Torture."  In relation to a question on specific interrogation techniques employed, General Hayden, stated that they too were in compliance with U.S. law, including a Presidential "executive order in the Federal Register," U.S. obligations under Common Article 3 of the Geneva Conventions, and the Convention Against Torture's "legislative history to the prohibition in domestic law against cruel and inhuman punishment articulated by the 5th, 8th and 14th Amendments to the Constitution."  General Hayden also stated that the techniques used by the CIA were "different from what is contained in the Army Field Manual" and added that the methods contained in the manual "did not exhaust[] the universe of lawful interrogation techniques consistent with the Geneva Convention . . . ."

In any event, Hayden explained, the limitations imposed by the Army Field Manual were not applicable to the CIA because the CIA is not part of the Department of Defense.  Attached hereto as Exhibit P is a true and correct copy of *A Conversation with Michael Hayden*, Council on Foreign Relations, (Sept. 7, 2007), *available at* http://www.cfr.org/publication/14162/conversation_with_michael_hayden_rush_transcript_federal_news_service.html.

23. In October, General Hayden followed this meeting with a one hour in-depth interview on PBS with Charlie Rose. During this interview, Hayden affirmed many of the statements made relative to the CIA's "rendition, detention and interrogation programs" during his presentation before the Council on Foreign Relations.  General

Hayden confirmed the number of persons who had been rendered by the CIA since

September 11 as "mid-range, two figures," and stated that the CIA had itself detained

"fewer than a hundred," of whom "fewer than a third" were subjected to "enhanced

interrogation techniques."  Commenting on CIA interrogation techniques, General

Hayden noted that the CIA acts in accordance with prescribed standards that were

authorized under U.S. and international laws:

> There are absolute standards.  Those standards are embodied in our law.  They're in the Military Commissions Act, for example.  They're in how we ratify the Convention Against Torture.  They're in domestic U.S. law that forbid [sic] different aspects of torture.  Some things are just absolutely forbidden.  Some things are just wrong.  And they're mentioned very specifically.

Attached hereto as Exhibit Q is a true and correct copy of Transcript of Director

Hayden's Interview with Charlie Rose, (Oct. 24, 2007) *available at*

https://www.cia.gov/news-information/press-releases-statements/interview-with-

charlie-rose.html.

24. General Hayden's most recent exposition of the rendition program was on December

6, 2007.  In justifying the destruction of CIA videotapes showing the interrogation of

certain detainees held by the CIA, General Hayden, in highly specific terms,

confirmed the existence of the program and defended its legality.  A copy of the

transcript of General Hayden's remarks is available at https://www.cia.gov/news-

information/press-releases-statements/taping-of-early-detainee-interrogations.html

("The press has learned that back in 2002, during the initial stage of our terrorist

detention program, CIA videotaped interrogations, and destroyed the tapes in 2005. ...

Over the course of its life, the Agency's interrogation program has been of great value

to our country.  It has helped disrupt terrorist operations and save lives.  It was built

on a solid foundation of legal review.  It has been conducted with careful

supervision.”).

25. In an article in the Washington Post on December 1, 2007, a spokesman for the CIA,

Paul Gimigliano, in response to questions about the CIA's liaison with Jordanian

intelligence in the rendition program, stated that: “The United States does not transfer

individuals to any country if it believes they will be tortured there . . . .  Setting aside

the myths, rendition is, in fact, a lawful, effective tool that has been used over the

years on a very limited scale, and is designed to take terrorists off the street.”

Attached hereto as Exhibit R is a true and correct copy of Craig Whitlock, *Jordan's

Spy Agency: Holding Cell for the CIA*, WASH. POST. Dec. 1, 2007, at A1, *available at*

http://www.washingtonpost.com/wp-

dyn/content/article/2007/11/30/AR2007113002484_pf.html.

26. Michael Scheuer, a former CIA official, has repeatedly described the origins and

initial objectives of the rendition program, and how those objectives have

dramatically altered since September 11.  Most recently, Scheuer, a 22-year veteran of

the CIA and Chief of the Bin Laden Unit at the Counterterrorist Center from 1996 to

1999, and an architect of the rendition program, has described the program in a

Congressional hearing focused on extraordinary rendition:

> The Rendition Program was initiated because President Clinton and Messrs. Lake,
> Berger and Clarke requested that the CIA begin to attack and dismantle al-Qaeda.
> These men made it clear from the first that they did not want to bring those captured
> to the United States or to hold them in U.S. custody . . . .  After 9/11 and under
> President Bush, rendered al-Qaeda operatives have been most often kept in U.S.
> custody.

A copy of the transcript of *Extraordinary Rendition in U.S. Counterterrorism Policy: The Impact on Transatlantic Relations*: Before H. Subcomm. on International Organizations, Human Rights, and Oversight and H. Subcomm. on Europe, Comm. on Foreign Affairs, 110th Cong. 18-45 (2007) (Testimony of Michael Scheuer) is *available at* http://foreignaffairs.house.gov/110/34712.pdf.  During an interview on national television, Mr. Scheuer also said that "[t]he direction [from the politicians] was find, apprehend and hold senior members of Al Qaeda and try to find out what they know about coming attacks against the United States," adding that, at the time, "the U.S. government is willing to hold these people at various incarceration sites around the world."  A copy of the transcript of *Interview of Michael Scheuer*, PBS Frontline, (Oct. 18, 2005) is *available at* http://www.pbs.org/wgbh/pages/frontline/torture/interviews/scheuer.html.

Finally, Mr. Scheuer wrote in the New York Times that "[r]enditions were called for, authorized and legally vetted not just by the N.S.C. and the Justice Department, but also by the presidents – both Mr. Clinton and George W. Bush," and "if mistakes were made, like the alleged cases of innocent detainees, they should be corrected . . . ."  A copy of Michael Scheuer, *A Fine Rendition*, N.Y. TIMES, (Mar. 11, 2005), at A23 is *available at* http://www.nytimes.com/2005/03/11/opinion/11scheuer.html..

27. Robert Baer, a former covert officer for the CIA who left the agency after 21 years, has confirmed that one goal of the rendition program is to employ harsher interrogation tactics:  "If you send a prisoner to Jordan you get a better interrogation. If you send a prisoner, for instance, to Egypt you will probably never see him again, the same way with Syria."  A copy of the transcript of this interview *"File on Four"* –

*Rendition,* BBC, (Feb. 8, 2005) is *available at*

http://news.bbc.co.uk/nol/shared/bsp/hi/pdfs/15_02_05_renditions.pdf.

28. Tyler Drumheller, a 26-year veteran of the CIA who was head of covert operations in Europe from 2001 to 2005, publicly acknowledged his involvement with the rendition program in an interview with the German magazine *Der Spiegel*: "I once had to brief Condoleezza Rice on a rendition operation, and her chief concern was not whether it was the right thing to do, but what the president would think about it . . . .  This is no way to run a covert policy."  Drumheller also described the rendition teams as "drawn from paramilitary officers who are brave and colorful.  They are the men who went into Baghdad before the bombs and into Afghanistan before the army."  A copy of this interview, *We Probably Gave Powell the Wrong Speech*, (Jan. 29, 2007) is *available at* http://www.spiegel.de/international/spiegel/0,1518,462782,00.html.

29. Since 2003, Members of Congress have publicly debated the rendition program and proposed concrete legislative measures for its reform or abolition.  In response to a letter from Senator Leahy expressing concerns about rendition and its failure to comport with U.S. obligations under the Convention Against Torture, William J. Haynes II, General Counsel of the Department of Defense wrote:  "Should an individual be transferred to another country to be held on behalf of the United States, or should we otherwise deem it appropriate, United States policy is to obtain specific assurances from the receiving country that it will not torture the individual being transferred to that country."  A copy of the *Letter from William J. Haynes II to Senator Patrick Leahy*, (June 25, 2003) is available at http://hrw.org/press/2003/06/letter-to-leahy.pdf.

30. Senator Leahy has introduced legislation to address the rendition of any individual by the United States to another country.  A copy of *Convention Against Torture Implementation Act 2005,* S. 654, 109th Cong., (2005) is *available at* http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=109_cong_bills&docid=f:s654is.txt.pdf.  Representative Markey has introduced similar legislation in the House.  A copy of *Torture Outsourcing Prevention Act,* H.R. 952, 109th Cong., (2005) is *available at* http://www.theorator.com/bills109/hr952.html.  In introducing the bill, Representative Markey stated:  "Under the name 'extraordinary rendition,' the CIA reportedly sends terrorism suspects, sometimes on the flimsiest of evidence, to foreign countries that are known to employ torture in prisoner interrogation . . . ." A copy of Rep. Markey's comments, Introduction of Legislation Prohibiting Extraordinary Rendition, Cong. Rec. E1225 (Jun. 23, 2004) (statement of Rep. Markey) House of Representatives, (June 23, 2004) is *available at* www.fas.org/irp/congress/2004_cr/rendition.html.  Most recently, on July 25, 2007, Senator Biden introduced legislation to "prohibit extraterritorial detention and rendition."  A copy of this Bill, National Security with Justice Act of 2007, S. 1876, 110th Cong., (2007) is *available at* http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=110_cong_bills&docid=f:s1876is.txt.pdf

31. In 2007, public hearings were convened by three separate senate committees to hear testimony on the rendition program, including the CIA's detention and treatment of detainees, the alleged use of European countries to facilitate the transfer and detention of terror suspects, and the rendition of a Canadian citizen, Maher Arar, from the

United States to detention and interrogation under torture in Syria in 2002.  (1) *Rendition, Extraterritorial Detention, And Treatment Of Detainees: Restoring Our Moral Credibility And Strengthening Our Diplomatic Standing*: *Before the S. Foreign Relations Comm.*, 110th Cong. (2007); Opening statements by the Chairman, Ranking Member, and witnesses are *available at* http://www.senate.gov/~foreign/hearings/2007/hrg070726a.html; (2) *Rendition to Torture: The Case of Maher Arar: H. Comm. on Foreign Affairs, Subcomm. on International Organizations, Human Rights, and Oversight, and the H. Comm. on the Judiciary, Subcomm. on the Constitution, Civil Rights, and Civil Liberties*, 110th Cong. (2007); full hearing transcript *available from* www.cq.com; and (3) *Extraordinary Rendition in U.S. Counterterrorism Policy: The Impact on Transatlantic Relations*: Before H. Subcomm. on International Organizations, Human Rights, and Oversight and H. Subcomm. on Europe, Comm. on Foreign Affairs, 110th Cong. (2007) Op. Cit. at ¶ 26, *available at* http://www.fas.org/irp/congress/2007_hr/rendition.pdf.

32. The interest of members of Congress in the rendition program has also prompted a series of reports by the Congressional Research Service -- the first published in 2005 and the latest in October, 2007 -- that comprehensively detail the history of the program, its current parameters, and the legal constraints on its use under domestic and international law.  A copy of the most recent of these reports, R*enditions and Constraints Imposed by Laws on Torture*, (Oct. 12, 2007) is *available at* http://www.fas.org/sgp/crs/natsec/RL32890.pdf.

33. National and international Human Rights organizations in numerous reports have documented the existence of the program and cited in detail to many examples of its use by the United States around the world.  *See, e.g.*:

i. Human Rights Watch, *Empty Promises: Diplomatic Assurances No Safeguard Against Torture* (Apr. 2004), *available at* http://www.hrw.org/reports/2004/un0404/ (documenting specific rendition cases, including the rendition of Plaintiff Agiza and discussing use and efficacy of "diplomatic assurances" in the process);

ii. International Federation for Human Rights, *Morocco: Human Rights abuses in the fight Against Terrorism* (July 2004), *available at* http://www.fidh.org/IMG/pdf/maroc379-2.pdf (documenting widespread torture and other abuse of persons detained under Moroccan anti-terror laws, and renditions to Morocco, including allegations of Plaintiff Britel);

iii. Human Rights Watch, *The United States' "Disappeared": The CIA's Long-Term "Ghost Detainees"* (Oct. 12, 2004), *available at* http://www.hrw.org/backgrounder/usa/us1004/us1004.pdf (recounting U.S.'s detention of 11 detainees, the history of disappearances in international law and practice, the laws that it violates, and the CIA's "different rules" for detention and interrogation);

iv. Amnesty International, USA/Yemen, *Secret Detention in CIA "Black Sites"* (Nov. 8, 2005), *available at* http://web.amnesty.org/library/pdf/AMR511772005ENGLISH/$File/AMR5117

705.pdf (documenting U.S. and Yemeni governments' involvement in rendition, including rendition of Plaintiff Bashmilah);

v.   Center for Human Rights and Global Justice, *Fate and Whereabouts Unknown: Detainees in the "War on Terror"* (Dec. 17, 2005), *available at* http://www.chrgj.org/docs/Whereabouts%20Unknown%20Final.pdf (describing various methods of holding detainees who have been subject to rendition);

vi.   Amnesty International, USA, *Below the Radar: Secret Flights to Torture and Disappearance* (Apr. 5, 2006), *available at* http://web.amnesty.org/library/Index/ENGAMR510512006 (describing use of privately owned aircraft in U.S. rendition program and tying their use to specific rendition flights, including those of plaintiffs);

vii.   Association of the Bar of the City of New York and Center for Human Rights and Global Justice, *Torture By Proxy: International and Domestic Law Applicable to "Extraordinary Renditions"* (2004, modified June 2006), *available at* http://www.chrgj.org/docs/TortureByProxy.pdf (documenting U.S. involvement in numerous renditions, including Plaintiffs Mohamed, Agiza, and Bashmilah, and setting forth applicable legal framework); and

viii.   Amnesty International et al., *Off the Record: U.S. Responsibility for Enforced Disappearances in the "War on Terror"* (June 2007), *available at* http://hrw.org/backgrounder/usa/ct0607/ct0607web.pdf (presenting information on 39 detainees suspected to have been held at CIA "black site" detention facilities outside the United States and who remain missing).

34. Concern among European nations about complicity in the rendition program through the operation of U.S.-run detention centers in certain European countries and the use of European airspace and airports by the CIA to facilitate the program has resulted in inter-governmental inquiries by the Council of Europe and European Parliament, as well as separate criminal investigations and public inquiries in at least 18 countries, including France, Italy, Spain, Sweden, United Kingdom, Portugal, Germany and Canada.

   i.  Attached hereto as Exhibit S are true and correct copies of (a) Council Of Europe's Parliamentary Assembly Committee on Legal Affairs and Human Rights (Rapporteur Dick Marty), *Alleged Secret Detentions and Unlawful Inter-state Transfers Involving Council of Europe Member States* (June 12, 2006), *available at* http://assembly.coe.int/Documents/WorkingDocs/doc06/edoc10957.pdf (based on interviews with U.S. and European government officials, official information provided by national and international air traffic control authorities and other documentation, and testimony from witnesses -- including plaintiffs – and documenting, *inter alia,* the evolution of the rendition program; its operation in Europe since September 11; the specific modus operandi of renditions; and the legal framework within which it purportedly operates; and (b) Council Of Europe's Parliamentary Assembly Committee on Legal Affairs and Human Rights (Rapporteur Dick Marty), *Secret Detentions and Illegal Transfers of Detainees Involving Council of Europe Member States: Second Report* (June 11, 2007), *available at*

http://assembly.coe.int/Documents/WorkingDocs/Doc07/edoc11302.pdf
(identifying specific aircraft used by the CIA to effect renditions; based on an
analysis of data on their movement through European airspace and "credible and
concordant testimonies" concluding that the CIA had operated secret detention
centers in Poland and Romania as part of the U.S. "High Values Detainee"
program);

ii.   Attached hereto as Exhibit T is a true and correct copy of European Parliament,
TDIP Temporary Committee (Rapporteur Giovanni Fava), *Report on the alleged
use of European countries by the CIA for the transportation and illegal
detention of prisoners* (Jan. 30, 2007), *available at*
http://www.europarl.europa.eu/comparl/tempcom/tdip/final_report_en.pdf
(from witness testimonies, interviews with U.S. and European government
officials and an analysis of flight records from national and international air
traffic control authorities, concluding that the U.S. rendition program has
operated in Europe since September 11; identifying specific aircraft used by the
CIA to effect renditions, including rendition of plaintiffs); *see also*, *Working
Document No. 7 on 'Extraordinary Renditions'* (Nov. 16, 2006), *available at*
http://www.europarl.europa.eu/comparl/tempcom/tdip/working_docs/pe380593_
en.pdf; *Working Document No. 8 on the Companies Linked to the CIA, Aircraft
Used by the CIA and the European Countries in which CIA Aircraft Have Made
Stopovers* (Nov. 16, 2006), *available at*
http://www.europarl.europa.eu/comparl/tempcom/tdip/working_docs/pe380984_
en.pdf ; and *Working Document No. 9 on Certain European Countries Analyzed*

*During the Work of the Temporary Committee* (Feb. 26, 2007), *available at*
http://www.europarl.europa.eu/comparl/tempcom/tdip/working_docs/pe382420_
en.pdf;

iii.    Attached hereto as Exhibit U is a true and correct copy of All Party
Parliamentary Group (UK), *APPG Measures on Rendition* (Sept. 25, 2007)
(explaining UK involvement in renditions by the United States, highlighting
why current UK arrangements are inadequate to prevent future renditions, and
proposing new measures);

iv.    Craig Whitlock, *New Swedish Documents Illuminate CIA Action: Probe Finds
'Rendition' Of Terror Suspects Illegal*, WASH. POST, May 21, 2005, at A1,
*available at* http://www.washingtonpost.com/wp-
dyn/content/article/2005/05/20/AR2005052001605.html (reporting on ten-
month investigation into rendition of Plaintiff Agiza and another Egyptian
asylum seeker, Mohamed El-Zery);

v.    Giles Tremlett, *Spanish Police Expose More CIA Links To Secret Flights Of
Detainees*, THE GUARDIAN (UK), Nov. 15, 2005, at 18, *available at*
http://www.guardian.co.uk/spain/article/0,,1642828,00.html (reporting that
Spanish police have traced up to 42 suspected CIA operatives believed to have
taken part in secret flights carrying detained or kidnapped Islamic terror suspects
to interrogation centers and jails in Afghanistan, Egypt, and elsewhere);

vi.    Craig Whitlock, *Europeans Probe Secret CIA Flights: Questions Surround
Possible Illegal Transfer of Terrorism Suspects*, WASH. POST, Nov. 17, 2005, at
A22, *available at* http://www.washingtonpost.com/wp-

dyn/content/article/2005/11/16/AR2005111602198.html (reporting that officials in Spain, Sweden, Norway and European Parliament had opened formal inquiries or demanded answers from U.S. officials about CIA rendition flights within their respective jurisdictions);

vii.  Eric Decouty, *La France Enquete Sur Les Avions de la CIA*, LE FIGARO (France) (Oct. 15, 2007), *available at* http://www.lefigaro.fr/france/20060302.FIG000000200_la_france_enquete_sur_les_avions_de_la_cia.html (reporting that Attorney General for Bobigny had opened criminal investigation into use of Bobingy airport by CIA for rendition flights);

viii.  *German spy probe to include CIA "kidnap" flights,* REUTERS (Mar. 10, 2006), *available at* http://www.redorbit.com/news/international/423487/german_spy_probe_to_include_cia_kidnap_flights/# (reporting on commencement of German parliamentary inquiry into alleged kidnapping of Khaled El-Masri by CIA);

ix.  Mark Landler, *German Court Challenges C.I.A. Over Abduction,* N.Y. TIMES, Feb. 1, 2007, at A1, *available at* http://www.nytimes.com/2007/02/01/world/europe/01germany.html?_r=1&oref=slogin (reporting on issuance of arrest warrants for 13 members of "C.I.A. abduction team" in Munich, Germany, in connection with rendition of Khaled El-Masri);

x.  John Goetz, Marcel Rosenbach, Holger Stark, *C.I.A. Arrest Warrants Strain U.S.-German Ties*, SPIEGEL ONLINE (Germany) (June 25, 2007), *available at*

http://www.spiegel.de/international/germany/0,1518,490514,00.html (discussing

progress in German investigation and identification of CIA participants in

rendition of Khaled El-Masri);

xi.   *Portugal Joins States Probing CIA Flights*, UPI (Feb. 7, 2007), *available at*

http://www.upi.com/Security_Terrorism/Analysis/2007/02/07/portugal_joins_st

ates_probing_cia_flights/9324// (reporting on opening of investigation into CIA

rendition flights that allegedly used Portuguese airports);

xii.  Attached hereto as Exhibit V is a true and correct copy of Craig Whitlock, *Milan*

*Court Indicts 26 Americans in Abduction*, WASH. POST, Feb. 17, 2007, at A1

(reporting on indictments of 25 CIA operatives, including head of CIA Milan

substation, and U.S. Air Force servicemember in Italy, with kidnapping and

other crimes in connection with rendition of Abu Omar);

xiii. Attached hereto as Exhibit W is a true and correct copy of U.K Intelligence and

Security Committee, *Rendition* (July 2007), *available at*

http://www.cabinetoffice.gov.uk/upload/assets/www.cabinetoffice.gov.uk/public

ations/intelligence/20070725_isc_final.pdf . (finding that the government of the

United Kingdom was aware of, and in some cases assisted through shared

intelligence, the rendition of persons who were "UK nationals or lived in the UK

or were believed to possess intelligence about terrorist activity in or relating to

the UK," including Plaintiffs Mohamed and Al-Rawi.); and

xiv.  *Report of the Events Relating to Maher Arar: Factual Background* (Sept. 18,

2006), and *Report of the Events Relating to Maher Arar: Analysis and*

*Recommendations* (Dec. 6, 2006), *available at*

http://www.ararcommission.ca/eng/26.htm. (reporting on the findings of a

Commission of Inquiry convened in Canada following the rendition of a

Canadian citizen, Maher Arar, by U.S. officials to detention and interrogation in

Syria.  Public hearings commenced in May 2005, and the Commission issued its

factual report in September 2006 and its analysis and recommendations in

December 2006.  The carefully assembled reports, which total over 1,200 pages

and were based on a review of the testimony of over 70 persons and 21,500

documents, painstakingly detail the events surrounding Mr. Arar's rendition.

The Inquiry's report makes clear that the United States government removed

Mr. Arar to Syria, where he was tortured and kept in custody for a year.).

35.  The United Nations has also examined the U.S. rendition program.  In 2006, the U.N.

Committee Against Torture (CAT) conducted a review of the U.S. rendition program.

As part of the review process, the United States submitted an exhaustive written

response to the Committee's written inquiries, and a large delegation from the United

States also defended U.S. practices orally over the course of two days of Committee

hearings in Geneva.  In both the written and oral responses, the United States admitted

that renditions have taken place but claimed that they would not take place in

situations where detainees would be tortured.  A copy of the [Written] Response of

the United States of America [to Questions Asked by the Committee Against Torture]

(2006) is *available at* http://www.state.gov/documents/organization/68662.pdf; *see*

*also*, John Bellinger, U.S. Department of State Legal Adviser, U.S. Delegation Oral

Response to Questions Asked by the Committee Against Torture (May 5, 2006),

*available at* http://www.state.gov/g/drl/rls/68561.htm.  Legal Adviser Bellinger also

conducted a "media roundtable" in Brussels, in which he admitted that renditions had taken place in the post-September 11 era, particularly prior to 2004. A copy of the Transcript of Legal Advisor Bellinger's Media Roundtable in Brussels (May 4, 2006) is *available at* http://useu.usmission.gov/Dossiers/Detainee_Issues/May0406_Bellinger_CIA_Flights.asp.

36. Despite the State Department's efforts to defend U.S. practices, the CAT's resulting report was highly critical of the United States. The report expressed specific concern about "the occurrence of cases of extraterritorial torture of detainees," the failure of the United States to always "register persons detained in territories under its jurisdiction outside the United States," the establishment of secret detention facilities, U.S. involvement in enforced disappearances, U.S. refusal to uphold the CAT's requirement of *non-refoulement* outside the boundaries of the United States, and the use of "diplomatic assurances" to justify sending detainees to countries where the United States knows there is nevertheless a high likelihood of torture. A copy of United Nations Committee Against Torture, *Consideration of Reports Submitted by States Parties Under Article 19 of Convention: Conclusions and Recommendations of the Committee Against Torture* (July 25, 2006) is *available at* http://www.unhchr.ch/TBS/doc.nsf/e121f32fbc58faafc1256a2a0027ba24/e2d4f5b2dc cc0a4cc12571ee00290ce0/$FILE/G0643225.pdf.

37. The U.N. Committee Against Torture (CAT) and the U.N. Human Rights Committee also separately considered the rendition of Plaintiff Agiza and another Egyptian asylum seeker, Mohammed al-Zery, both of whom were rendered from Sweden to

Egypt on December 18, 2001.  In the course of its deliberations, the CAT considered

evidence of CIA involvement produced by the parties.  In *Agiza v. Sweden*, the CAT

found Sweden in violation of article 3 (prohibition against rendition to torture) of the

U.N. Convention Against Torture.  A copy of the decision *Agiza v. Sweden*,

CAT/C/34/D/233/2003 (May 24, 2005) is *available at*

http://www.unhchr.ch/tbs/doc.nsf/(Symbol)/4dec90a558d30573c1257020005225b9?

Opendocument.  The U.N. Human Rights Committee (HRC) also found Sweden in

violation of the torture ban in connection with the rendition of the other Egyptian

asylum seeker, Mohammed El-Zery, despite Sweden's having obtained "diplomatic

assurances" from Egypt against torture.  In *El-Zery v. Sweden*, the HRC found that

such assurances did not provide an effective safeguard against torture or ill-treatment.

A copy of the decision, *El-Zery v. Sweden*, CCPR/C/88/D/1416/2005 (Nov. 10, 2006)

is *available at*

http://www.unhchr.ch/tbs/doc.nsf/(Symbol)/13fac9ce4f35d66dc12572220049e394?O

pendocument.  Sweden later acknowledged its wrongdoing in both cases and repealed

the expulsion orders that had enabled their rendition.  Attached hereto as Exhibit X is

a true and correct copy of *Sweden Admits Error in Expelling Egyptian*, TORONTO

STAR, Mar. 2, 2007, at A9.  *See also* Exhibit C to Declaration of Anna Wigenmark,

filed herewith.

38. Both the U.N. Special Rapporteur on Torture and the U.N. Special Rapporteur on the

Promotion and Protection of Human Rights while Countering Terrorism have

expressed grave concerns in the cases of a number of victims of rendition, including

some of the plaintiffs.  On August 30, 2005, the U.N. Special Rapporteur on Torture

submitted a report to the U.N. General Assembly that includes an analysis of specific

rendition cases -- including some of the plaintiffs -- and U.S. involvement therein.

The report concludes that the renditions violated key provisions of the U.N.

Convention Against Torture.  A copy of the *Report of the U.N Special Rapporteur on*

*Torture to the U.N. General Assembly* (Rapporteur Manfred Nowak) (Aug. 30, 2005)

is *available at* http://documents.un.org/welcome.asp?language=E, [click on "Simple

Search," enter "A/60/316" under "Symbol," click on "Search," then click on

A/60/316, then click on "English."].

39. On May 29, 2007, the U.N. Special Rapporteur on the Promotion and Protection of

Human Rights while Countering Terrorism issued a preliminary report on his findings

following a ten day visit to the United States. This report references specific rendition

cases -- including some of the plaintiffs -- and U.S. involvement therein.  He notes

"that the refusal of the Acting General Counsel for the CIA to engage in any

meaningful interaction, and in the light of corroborating evidence . . . supports the

suspicion that the CIA has been involved and continues to be involved in the

extraordinary rendition of terrorism suspects and possibly other persons."  He further

notes that the CIA's use of "civil aircraft" to transport "persons subjected to

extraordinary rendition, whether by contract or by the establishment of airlines

controlled by the Agency is in violation of the Chicago Convention on Civil

Aviation."  A copy of the *Preliminary Findings on Visit to United States by Special*

*Rapporteur on Promotion and Protection of Human Rights While Countering*

*Terrorism* (Rapporteur Martin Scheinin) (May. 29, 2007) is *available at*

http://www.unhchr.ch/huricane/huricane.nsf/view01/338107B9FD5A33CDC12572EA

005286F8?opendocument.

40. Documentary evidence and media reports indicate that U.S. government agencies

have also inquired into the lawfulness of the rendition program.  In August 2005, a

legal memorandum drafted by the FBI analyzing interrogation techniques in place at

Guantánamo became publicly available.  The memorandum includes a legal analysis

of rendition as one of four interrogation techniques employed on detainees at

Guantánamo, and notes that one of the techniques contemplates the transfer of

detainees from Guantánamo, "either temporarily or permanently, to Jordan, Egypt or

another third country to allow those countries to employ interrogation techniques that

will enable them to obtain the requisite information."  The memorandum concludes

that U.S. officials engaging in rendition could be prosecuted for conspiracy to commit

torture under applicable U.S. laws.  Attached hereto as Exhibit Y is a true and correct

copy of the Federal Bureau of Investigation, *Memorandum on Legal Analysis of*

*Interrogation Techniques* (Nov. 27, 2002); *see also* Michael Isikoff, *Exclusive: Secret*

*Memo – Send to Be Tortured*, NEWSWEEK (Aug. 8, 2005) at 7, *available at*

http://www.newsweek.com/id/56347 (quoting unnamed senior U.S. law-enforcement

official familiar who stated that "the memo reflects concerns among many agents and

lawyers about 'rendition.'").

41. According to media reports, the Inspector General of the CIA is conducting an

investigation of the rendition program and specific instances of mistakes that have

been made in relation to its implementation.  *See* Dana Priest, *Wrongful*

*Imprisonment: Anatomy of a CIA Mistake*, WASH. POST, Dec. 4, 2005, at A1,

*available at* http://www.washingtonpost.com/wp-dyn/content/article/2005/12/03/AR2005120301476.html (reporting that the "CIA Inspector General is investigating a growing number of what it calls 'erroneous renditions' according to several former and current intelligence officials. One official said about three dozen names fall in that category; others believe it is fewer. The list includes several people whose identities were offered by al Qaeda figures during CIA interrogations."); *CIA Watchdog Looks into 'Erroneous Renditions': Inspector general investigates cases of people mistaken as terror suspects*, ASSOCIATED PRESS (Dec. 27, 2005), *available at* http://www.msnbc.msn.com/id/10618427/ (citing current intelligence official and reporting that CIA's inspector general is investigating fewer than 10 cases of potentially "erroneous renditions"); Mark Mazzetti and Scott Shane, *C.I.A. Watchdog Becomes Subject of C.I.A. Inquiry*, N.Y. TIMES, Oct.12, 2007, at A1, *available at* http://query.nytimes.com/gst/fullpage.html?res=9E06E3DF143FF931A25753C1A9619C8B63 (reporting that: "A report by Mr. Helgerson's Office completed in the spring of 2004 warned that some C.I.A. approved interrogation procedures appeared to constitute cruel, inhuman or degrading treatment, as defined by the International Convention Against Torture.").

42. Egyptian officials have openly acknowledged their role in cooperating with the United States intelligence services in the rendition program, and Human Rights Watch has documented Egypt's role in the program as far back as 1994. A copy of the transcript of a Meet the Press interview between NBC's Tim Russet and Egyptian Prime Minister Ahmed Nazif (May 15, 2005) is *available at*

http://www.msnbc.msn.com/id/7862265/ (asked how many terrorism suspects had

been sent to Egypt by the United States since 9/11, Prime Minister Nazif responded:

"I don't know the exact number, but I know that people have been sent there.  The

numbers have varied.  Some have the number 60 or 70.  But I think that it's important

– you know, when you have Egyptians that have been arrested abroad, we seek to

bring them back to the country.  Now, to say that we're bringing them back to torture

them, I think is not a very accurate statement.  We shouldn't be doing that.  We're not

doing that.  But it happens sometimes . . . .").  The Human Rights Watch report, *Black

Hole: The Fate of Islamists Rendered to Egypt* (May, 2005) is *available at*

http://hrw.org/reports/2005/egypt0505/ (based on interviews with exiled activists,

Egyptian lawyers, human rights groups, and family members of current detainees, as

well as reviews of English and Arabic press accounts, identifying at least 63

individuals who have been rendered to, and in a few cases from, Egypt since 1995

[*see* Appendix I].  Human Rights Watch notes that the United States was actively

involved in the rendition process.).

43. Media reports on the rendition program generally, and plaintiffs' rendition

specifically, are too numerous to assemble.  A Westlaw "ALLNEWS" search

confined to "rendition" and plaintiffs' names in the period from January 2005 to

November 15, 2007 revealed 528 news articles in that database alone.  Articles about

the rendition program have appeared on the front pages of the Washington Post, New

York Times, and Los Angeles Times, and have been prominently featured in The

New Yorker, Newsweek, and other major publications around the world.  The case of

just one well-known victim of the rendition program, Khaled El-Masri, has been

featured on CBS' 60 Minutes, PBS Frontline, Dateline NBC, and ABC News. *See,*

*e.g.*:

   i.  Attached hereto as Exhibit Z is a true and correct copy of Anthony Shadid, *US,*

        *Egypt Raids Caught Militants*, B. GLOBE, Oct. 7, 2001, at A1 (discussing pre-

        9/11 rendition program in detail and suggesting that program may be employed

        by U.S. to fight terrorism going forward);

  ii.  Attached hereto as Exhibit AA is a true and correct copy of Alissa Rubin,

        *Pakistan Hands Over Man in Terror Probe*, L.A. TIMES, Oct. 28, 2001; Masood

        Anwar, *Mystery Man Handed Over to US Troops in Karachi*, THE NEWS

        INTERNATIONAL (Pakistan), Oct. 26, 2001, *available at*

        http://209.157.64.200/focus/f-news/556778/posts (reporting on the rendition of

        Jamil Qasim Saeed Mohammad from Pakistan in 2001 by U.S. forces and the

        use of a Gulfstream aircraft registered N379P in the process);

 iii.  Attached hereto as Exhibit BB is a true and correct copy of Andrew Higgins &

        Christopher Cooper, *CIA-Backed Team Used Brutal Means to Crack Terror*

        *Cell: Albanian Agents Sent Egyptians Back to Cairo, Prisoners Allege They*

        *Were Tortured There*, WALL ST. J., Nov. 21, 2001, at A1. (detailing pre-

        September 11 rendition of suspected Islamic militant by the C.I.A. from Croatia

        to detention and interrogation in Egypt);

 iv.  Attached hereto as Exhibit CC is a true and correct copy of Anthony Shadid, *In*

        *Shift, Sweden Extradites Militants to Egypt*, B. GLOBE, Dec. 31, 2001 (reporting

        on extradition of plaintiff Ahmed Agiza and another Egyptian asylum seeker

        from Sweden to Egypt);

v.  By Rajiv Chandrasekaran and Peter Finn, *U.S Behind Secret Transfer of Terror Suspects*, WASH. POST March 11, 2002, at A1, *available at* http://www.truthout.org/docs_02/03.25C.Secret.Transfer.htm (reporting on the rendition of Muhammad Saad Iqbal Madni from Indonesia to Egypt on board a Gulfstream V aircraft);

vi.  Attached hereto as Exhibit DD is a true and correct copy of Dana Priest & Barton Gellman, *U.S. Decries Abuse But Defends Interrogations: "Stress and Duress" Tactics Used on Terrorism Suspects Held in Secret Overseas Prisons*, WASH. POST, Dec. 26, 2002, at A1 (interviewing U.S. officials involved in renditions and quoting one official as saying: "We don't kick the [expletive] out of them.  We send them to other countries so *they* can kick the [expletive] out of them.");

vii.  Stephen Grey, *America's Gulag*, NEW STATESMAN (May 17, 2004), *available at* http://www.newstatesman.com/200405170016 (reporting on the CIA's use of private aircraft; a worldwide network of detention facilities and their cooperation with foreign intelligence agencies in the rendition program);

viii.  Don Van Natta, Jr. & Souad Mekhennet, *German's Claim of Kidnapping Brings Investigation of U.S. Link*, N.Y. TIMES,  Jan. 9, 2005, at 11, *available at* http://www.nytimes.com/2005/01/09/international/europe/09kidnap.html (offering comprehensive account of story of Khaled El-Masri, describing his rendition and alleged involvement of CIA);

ix.  Jane Mayer, *Outsourcing Torture*, THE NEW YORKER, (Feb. 14, 2005), *available at* http://www.newyorker.com/printables/fact/050214fa_fact6 (providing

comprehensive accounting of rendition program from its initial inception through early 2005);

x.   Michael Hirsh, Mark Hosenball and John Barry, *Aboard Air CIA*, NEWSWEEK, (Feb. 28, 2005), *available at* http://www.newsweek.com/id/48864 (interviewing rendition victims and describing rendition program including the use of specific aircraft, including a Gulfstream V jet, registered, N379P);

xi.  Douglas Jehl & David Johnston, *Rule Change Lets CIA Freely Send Suspects Abroad to Jails*, N.Y. TIMES, Mar. 6, 2005, at 11, *available at* http://www.nytimes.com/2005/03/06/politics/06intel.html (explaining that current rendition program was authorized by President George W. Bush six days after September 11, 2001);

xii. CIA Flying Suspects to Torture?, 60 MINUTES (CBS television broadcast) (Mar. 6, 2005), transcript *available at* http://www.cbsnews.com/stories/2005/03/04/60minutes/main678155.shtml (discussing rendition program, and describing U.S. modus operandi:  "masked men in an unmarked jet seize their target, cut off his clothes, put him in a blindfold and jumpsuit, tranquilize him and fly him away.");

xiii. Dana Priest, *CIA Holds Terror Suspects in Secret Prisons*, WASH. POST, Nov. 2, 2005, at A1, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2005/11/01/AR2005110101644.html (describing establishment of network of CIA-run "black site" detention facilities worldwide; explaining that prisoners held within covert system were divided into two tiers:

(1) major terrorism suspects, held at black sites; and (2) prisoners with limited intelligence value, who are transferred to custody of foreign governments);

xiv.  Dana Priest, *Wrongful Imprisonment: Anatomy of a CIA Mistake*, WASH. POST, Dec. 4, 2005, at A1, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2005/12/03/AR2005120301476.html (describing in detail the decision-making process during Khaled El-Masri's rendition, including internal CIA discussions and role of German and Macedonian governments);

xv.  Brian Ross & Richard Esposito, *Sources Tell ABC News Top Al Qaeda Figures Held in Secret CIA Prisons*, ABC NEWS (Dec. 5, 2005), *available at* http://abcnews.go.com/WNT/Investigation/story?id=1375123. (reporting on the scramble to shut down secret prisons in Poland and Romania and move CIA rendition and detention operations to North Africa in advance of Secretary of State Rice's visit to Europe);

xvi.  Craig Whitlock, *Courted as Spies, Held as Combatants*, WASH. POST, Apr. 2, 2006, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2006/04/01/AR2006040101465_pf.html (reporting on British and American role in rendition and detention of Plaintiff Bisher Al-Rawi);

xvii.  Tim Golden, *Guantánamo Terror Suspect Mocks Tribunal*, N.Y. TIMES, Apr. 7, 2006, at A18, *available at* http://www.nytimes.com/2006/04/07/us/nationalspecial3/07gitmo.html (discussing Binyam Mohamed's account of rendition and torture in Morocco and Afghanistan);

xviii.  Jerome Taylor, *CIA Sent Me To Be Tortured in Afhgan Prison, Says Algerian*, INDEPENDENT (U.K.), July 8, 2006, at 32, *available at* http://news.independent.co.uk/world/politics/article1166575.ece (discussing Laid Saidi's account of rendition and torture, and noting that Ahmed Agiza and Muhammed al-Zery had described the use of "an almost identical procedure" in effecting their renditions);

xix.  Stephen Grey, *Our Dirty Little Torture Secret*, SUNDAY TIMES (UK), Oct. 22, 2006, *available at* http://www.timesonline.co.uk/tol/news/article608386.ece (discussing rendition of plaintiff Binyam Mohamed);

xx.  Stephen Grey, *Kidnapped to Order*, aired on Channel 4 News (London, U.K.), (June 11, 2007), summary *available at* http://www.channel4.com/news/articles/dispatches/kidnapped+to+order/552067 (detailing harm caused by rendition program, and featuring interviews of witnesses and participants); and

xxi.  Frontline World, *Extraordinary Rendition*, aired on PBS (Nov. 7, 2007), *available at* http://www.pbs.org/frontlineworld/stories/rendition701/ (featuring interviews with victims of the rendition program, including Plaintiff Bisher Al-Rawi; Egyptian General Ahmad Omar speaking on the cooperation between U.S. and Egyptian intelligence agencies; and Tyler Drumheller, the CIA's former Director in Europe.).

44. Much information about the role of private airline corporations in the rendition program, including the role of Defendant Jeppesen Dataplan Inc., has been uncovered in the course of criminal and journalistic investigations and other inquiries in Europe.

Information is now widely available identifying the role of particular corporations and aircraft in the renditions of specific individuals, including Plaintiffs Mohamed, Britel, Agiza, Bashmilah, and Al-Rawi.

45. The Council of Europe in the course of its inquiry into the rendition program compiled a database of aircraft involved in the program and their movements. Op. Cit. Exh. S(a) at p.14.  This database was based on publicly available information, including flight plans and other records for the period between the end of 2001 to 2005, obtained from the inter-governmental agency responsible for air traffic control in Europe, Eurocontrol, and other flight data from aviation authorities in the United States and elsewhere. *Id*.  From this information, the Council of Europe identified a Gulfstream V Jet aircraft, registered with the U.S. Federal Aviation Administration (FAA) as N379P, and a Boeing 737 Business Jet, registered with the FAA as N313P, as two of the aircraft involved in the rendition program.

46. Photographs of these two aircraft as well as their current FAA registration details are publicly available.  *See* http://www.airliners.net/search/photo.search?regsearch=N379P (N379P), and http://www.airliners.net/search/photo.search?cnsearch=33010/1037&distinct_entry=true (N4476S – formerly registered as N313P); *see also* Federal Aviation Administration Registry for N379P, *available at* http://registry.faa.gov/aircraftinquiry/NNumSQL.asp?NNumbertxt=379P; and Federal Aviation Administration Registry for N4476S (formerly N313P), *available at* http://registry.faa.gov/aircraftinquiry/NNumSQL.asp?NNumbertxt=4476S&status=is+not+Assigned%2FReserved.

47.  The role of these two aircraft and others in the rendition program has also been documented by the European Parliament in the course of its inquiry into the operation of the rendition program in Europe.  Attached hereto as Exhibit EE is a true and correct copy of the European Parliament, TDIP Temporary Committee (Rapporteur Giovanni Fava), Working Document No. 8 on the Companies Linked to the CIA, Aircraft Used by the CIA and the European Countries in which CIA Aircraft Have Made Stopovers (Nov. 16, 2006), *available at* http://www.europarl.europa.eu/comparl/tempcom/tdip/working_docs/pe380984_en.pdf.

48. After identifying these two aircraft through analysis of flight records, including flight plans, and other flight data and witness testimonies, the Council of Europe and the European Parliament linked these two aircraft to the rendition of plaintiffs. *See* Op. Cit. Exh. S(a); Op. Cit. Exh. T; *see also* Declarations of Clive Stafford-Smith, Abou Elkassim Britel, Anna Wigenmark, Mohamed Bashmilah, and Bisher Al-Rawi in Support of Plaintiffs' Opposition to the United States' Motion to Dismiss or, in the Alternative, for Summary Judgment, filed herewith.

49. Numerous media reports and two books on the rendition program have also documented the involvement of privately owned and operated aircraft, including N379P and N313P, in the program both generally and specifically in the rendition of plaintiffs.  *See, e.g*:

    i. *The Broken Promise*, *Part I,* Kalla Fakta (television broadcast on Sweden's TV 4) (May 17, 2004), English transcript *available at* http://www.hrw.org/english/docs/2004/05/17/sweden8620.htm (discussing role

played by aircraft with FAA registration number N379P and owned by defendant Premier Executive Transportation in rendition of Plaintiff Agiza from Sweden to Egypt in December, 2001);

ii. Dana Priest, *Jet Is an Open Secret in Terror War*, WASH. POST, Dec. 27, 2004, at A1, *available at* http://www.washingtonpost.com/wp-dyn/articles/A27826-2004Dec26.html  (discussing generally use of CIA "front companies" in rendition program);

iii.  Scott Shane, Stephen Grey, and Margot Williams, *CIA Expanding Terror Battle Under Guise of Charter Flights*, N. Y. TIMES, May 31, 2005, at A1, *available at* http://www.nytimes.com/2005/05/31/national/31planes.html (discussing history and current role of private charter air companies in the rendition program);

iv.  A.C. Thompson and Trevor Paglen, *The CIA's Torture Taxi*, S. F. BAY GUARDIAN, Dec.14-20, 2005, Vol. 40, No. 11, *available at* http://www.sfbg.com/40/11/cover_plane.html (describing institutional structure of alleged CIA front airlines, including one company's ownership of aircraft registered N4476S, based upon examination of publicly available company registration documents and annual returns); *see also* TREVOR PAGLEN & A.C. THOMPSON, TORTURE TAXI: ON THE TRAIL OF THE CIA'S RENDITION FLIGHTS (2006) (describing same in more extensive detail);

v. *Op. Cit*. ¶ 33(iv), Amnesty International, *Below the Radar: Secret Flights to Torture and Disappearance* (Apr. 5, 2006) (describing rendition program and its support network of aircraft and airports and documenting over 1000 flights linked to renditions based on several sources including, *inter alia*, U.S. Federal

Aviation Administration flight records; European flight records; actual flight logs; aircraft movements recorded by airport authorities; and airport records acquired in criminal and parliamentary investigations);

vi. STEPHEN GREY, GHOST PLANE: THE TRUE STORY OF THE CIA TORTURE PROGRAM (2006) (by reference to flight logs, interviews with high level U.S. and European officials, and eye-witnesses testimony, tracing the history of the CIA rendition program from its roots to its current form and identifying the involvement of specific aircraft, including N379P and N313P in the rendition of specific individuals, including plaintiffs.).

50. The Council of Europe, through its detailed examination of flight plans obtained from Eurocontrol and other information, has also documented the role of Jeppesen in providing flight planning and logistical support to aircraft and flight crews used in the rendition program. In its 2007 report, the Council identified Jeppesen as "the aviation services provider customarily used by the CIA" and noted that Jeppesen filed "multiple 'dummy' flight plans for many of these flights." Op. Cit. Exhibit S(b) at p.37.

51. The Council of Europe was able to identify Jeppesen as the entity responsible for filing specific flight plans because of a unique code, KSFOXLDI, assigned to Jeppesen in the Aeronautical Fixed Telecommunication Network (AFTN).[1]  Every

---

The AFTN is the worldwide system of aeronautical fixed circuits provided, as part of the aeronautical fixed service, for the exchange of messages and/or digital data between aeronautical fixed stations having the same or compatible communications characteristics.  AFTN comprises aviation entities including: ANS (Air Navigation Services) providers, aviation service providers, airport authorities and government agencies, to name a few.  It exchanges vital information for aircraft operations such as distress messages, urgency messages, flight safety messages, meteorological messages, flight regularity messages, and aeronautical administrative messages.

flight plan submitted by Jeppesen to air traffic control authorities, including Eurocontrol, notes this code as the "originator code," i.e., the entity responsible for filing the plan. Attached hereto as Exhibit FF is a true and correct copy of relevant pages of Eurocontrol, Integrated Initial Flight Plan Processing System, IFPS Users Manual, noting that: "The AFTN address KSFOXLDI is a collective address for Jeppesen flight planning services in San Francisco." A complete copy of the Manual is available at http://www.cfmu.eurocontrol.int/cfmu/gallery/content/public/userdocs/docs/IFPS_Users_Manual_12_0_external.pdf.

52. By way of background, the owners or operators of every civilian aircraft traveling through European airspace must notify Eurocontrol of its intended flight path. Notification is provided in the form of a flight plan mapping out the aircraft's itinerary. In the aviation industry, it is common practice for owners and operators of aircraft to contract out the logistics of getting an aircraft from point A to point B, including submission of flight plans, to a corporation, such as Jeppesen, specializing in provision of such services. Once completed, and in advance of departure, flight plans are submitted to Eurocontrol. Flight plans detail dates of travel, start point and end destinations, as well as the locations of any intended lay over destinations. They are required to note the entity responsible for filing the plan and must do so using the filer's AFTN address as the filer, or "originator." *Id.* (specifying requirements for submission of flight plans).

53. The role of Jeppesen in providing flight and logistical support services to aircraft and air crew used in the rendition program has been widely reported. *See, e.g.*:

i. Jane Mayer, *Outsourcing: The C.I.A.'s Travel Agent*, THE NEW YORKER, (Oct. 30, 2006) *available at* http://www.newyorker.com/archive/2006/10/30/061030ta_talk_mayer (describing role of Jeppesen in planning the CIA's extraordinary rendition flights, and quoting former Jeppesen employee's recounting of a corporate meeting at which Jeppesen's managing director, as well as another executive, told the employee that Jeppesen handled the rendition flights);

ii. Claudio Gatti, *Boeing Unit to Face Suit in CIA Seizures*, INT'L HERALD TRIBUNE May 29, 2007, at 3, *available at* *http://www.iht.com/articles/2007/05/29/news/rendition.php* (noting that an independent investigation by the Italian newspaper *Il Sole 24 Ore* "independently found evidence that two of the three plaintiffs in the ACLU lawsuit . . . were transported . . . with the logistical support from Jeppesen");

iii. Bob Egelko, Firm Reportedly Filed Bogus CIA Flight Plans, S. F. CHRONICLE June 13, 2007, *available at* http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2007/06/13/BAGQGQECQC1.DTL&hw=Firm+Reportedly+Filed+Bogus+CIA+Flight+Plans&sn=001&sc=1000 (discussing Council of Europe report and Jeppesen's role in the rendition program).

54. Telexes obtained in the course of a criminal investigation in Spain further substantiate Jeppesen's involvement in the rendition program. These telexes, obtained in the course of an investigation into the alleged use of Mallorca airport as a "staging post" for CIA rendition flights, documents the registration numbers of aircraft that this investigation, as well as the aforementioned European inquiries, have identified as

involved in the rendition program, including N313P, N4476S, and N8068V. The telexes also identify Jeppesen, through its local agent, as the entity responsible for organizing the logistical support for these aircraft and their crew, and are available at http://www.ghostplane.net/elmasri. *See also* Armen Keteylan & Phil Hirschkorn, *Muslim Says He Was Abducted by U.S.*, CBS News (Nov. 28, 2006), *available at* http://www.cbsnews.com/stories/2006/11/28/cbsnews_investigates/printable2213638. shtml (discussing Spanish documents unearthed by journalist Stephen Grey that link Jeppesen to rendition flights).

55. Flight records and other documentary evidence also substantiate Jeppesen's involvement in the rendition of plaintiffs.  For example, the involvement of Jeppesen in providing flight planning and other logistical assistance to the aircraft used in Mr. Agiza's rendition is confirmed by documents uncovered in the course of investigations into his rendition.

56. An invoice numbered 19122416 from Luftfartsverket Division Stockholm to Jeppesen Dataplan and a related record from the Swedish Civil Aviation Administration ("SCAA") notes that on December 18, 2001 Jeppesen paid for the following fees for a Gulfstream V aircraft, registration number N379P: Noise, Landing, Terminal Navigation, Emission, Passenger and Security. The SCAA record further notes that the aircraft landed at Bromma airport, Sweden at 19:54 on December 18, 2001 and departed for Cairo the same day at 20:49. This record also notes that a total of nine passengers were on board the aircraft. Attached hereto as Exhibit GG is a true and correct copy of invoice number 19122416 together with related SCAA record.

57. The originator code on the "local data string" for the related flight plan, further evidences Jeppesen's involvement in arranging the logistics for this flight. The "originator code," i.e., the entity responsible for filing the flight plan, is identified by the code number KSFOXLDI. As noted above, in the aviation industry, this code is unique to Jeppesen Dataplan, Inc. Attached hereto as Exhibit HH is a true and correct copy of the local data string relevant to Mr. Agiza's rendition flight.

58. The same Jeppesen-specific originator code, KSFOXLDI, is also present on "local data strings" relative to flight plans filed for aircraft used in the renditions of plaintiffs Britel, Bashmilah, and Al-Rawi. *See* Declarations of Abou Elkassim Britel, Mohamed Farag Ahmad Bashmilah, and Bisher Al-Rawi, filed herewith.

*     *     *     *

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of  December, 2007.

__/s/ Steven Macpherson Watt__

Steven Macpherson Watt