found that al-Mihdhar and al-Hazmi had entered the US on 15 January 2000. It determined that al-Mihdhar departed the US on 10 June 2000 and reentered on 4 July 2001. CTC found no record of al-Hazmi's departure from the US.

- On 23 August, CIA sent a message—marked "immediate"—to the Department of State, INS, Customs, and the FBI requesting to enter al-Mihdhar and al-Hazmi, Bin Ladin-related individuals, into VISA/VIPER, TIPOFF and TECS. The message said that CIA recommends that al-Mihdhar and al-Hazmi be watchlisted immediately.

There are at least two points before August 2001 when these individuals were on our scope with sufficient information to have been watchlisted. During the intense operations to thwart the Millennium and Ramadan threats, the watchlist task in the case of these two al-Qaida operatives slipped through. The error exposed a weakness in our internal training and an inconsistent understanding of watchlist thresholds. Corrective steps have been taken.

- The CIA and the State Department are cooperating to transform the TIPOFF all-source watchlist into a National Watchlist Center. This center will serve as the point of contact and coordination for all watchlists in the US Government.

- We have increased managerial review of the system to reduce the chance that watchlist opportunities will be missed in the crush of other urgent business.

- We have designed a database and assembled a team to consolidate information on the identities of known and suspected terrorists, and to flag any that has not been passed to the proper audience.

- We have lowered the threshold for nominating individuals for the watchlist and clarified that threshold for our officers

- We have lowered the threshold for dissemination of information that used to be held closely as "operational."

These corrective steps notwithstanding, we must not underestimate our enemies' capabilities.

- We know that the plot was extremely resilient.

- We know that al-Qa'ida deliberately chose young men who had no record of affiliation with terrorist activities; 17 of the 19 hijackers were clean in this respect.

- We know that al-Hazmi and al-Mihdhar tried to become pilots but abandoned the effort because of poor technical and English language skills. By the end of 2000, a replacement pilot for Flight 77, Hani Hanjur, was in the United States.

- We know that Ramzi bin Al-Shib tried on multiple occasions to get into the US and failed, and yet the plot continued.

- Finally, we know that Zacarias Moussaoui was arrested but refused to provide information on the plot.

### Runup to 9/11—the Warning Issue

In the months leading up to 9/11, we were convinced Bin Ladin meant to attack Americans, meant

to kill large numbers, and that the attack could be at home, abroad, or both. And we reported these threats urgently.

Our collection sources "lit up" during this tense period. They indicated that multiple spectacular attacks were planned, and that some of these plots were in the final stages.

- Some of the reporting implicated known al-Qaida operatives.

- The reports suggested that the targets were American, although some reporting simply pointed to the West or Israel.

- But the reporting was maddeningly short on actionable details. The most ominous reporting, hinting at something large, was also the most vague. The only occasions in this reporting where there was a geographic context, either explicit or implicit, it appeared to point abroad, especially to the Middle East.

- By long established doctrine, we disseminated these raw reports immediately and widely to policymakers and action agencies such as the military, State Department, the FAA, FBI, Department of Transportation, the INS, and others.

- This reporting, by itself, stood as a dramatic warning of imminent attack.

Our analysts worked to find linkages among the reports, as well as links to past terrorist threats and tactics. We considered whether al-Qa'ida was feeding us this reporting—trying to create panic through disinformation—yet we concluded that the plots were real. When some reporting hinted that an attack had been delayed, we continued to stress that there were, indeed, multiple attacks planned and that several continued on track. And when we grew concerned that so much of the evidence pointed to attacks overseas, we noted that Bin Ladin's principal ambition had long been to strike our homeland. Nevertheless with specific regard to the 9/11 plot, we never acquired the level of detail that allowed us to translate our strategic concerns into something we could act on.

The Intelligence Community Counterterrorism Board also issued several threat advisories during the summer 2001. These advisories—the fruit of painstaking analytical work—contained phrases like "al-Qa'ida is most likely to attempt spectacular attacks resulting in numerous casualties," and "al-Qa'ida is prepared to mount one or more terrorist attacks at any time."

A sign that our warnings were being heard—both from our analysis and from the raw intelligence we disseminated—was that the FAA issued two alerts to air carriers in the summer of 2001.

Our warnings complemented strategic warnings we had been delivering for years about the real threat of terrorism to America.

- Recall, Mr. Chairman, my testimony in open session before your committee on February 2, 1999 when I told you "there is not the slightest doubt that Usama Bin Ladin, his worldwide allies, and his sympathizers are planning further attacks against us." I told you "he will strike wherever in the world he thinks we are vulnerable" and that we were "concerned that one or more of Bin Ladin's attacks could occur at any time."

- In February 2000, I testified in open session that, "Everything we have learned recently confirms our conviction that (UBL) wants to strike further blows against America" and that he could strike "without additional warning."

- Again in 2001 I told you that "terrorists are seeking out 'softer' targets that provide opportunities for mass casualties" and that Bin Ladin is "capable of planning multiple attacks with little or no warning."

- In a National Intelligence Estimates in 1995 we warned, *"As an open and free democracy, the United States is particularly vulnerable to various types of terrorist attacks. Several kinds of targets are especially at risk: National symbols such as the White House and the Capitol, and symbols of US capitalism such as Wall Street; power grids, communications switches, water facilities, and transportation infrastructure—particularly civil aviation, subway systems, cruise lines, and petroleum pipelines; places where large numbers of people congregate, such as large office buildings, shopping centers, sports arenas, and airport and other transportation terminals."*

- The same estimate also said, *"We assess that civil aviation will figure prominently among possible terrorist targets in the United States. This stems from the increasing domestic threat posed by foreign terrorists, the continuing appeal of civil aviation as a target, and a domestic aviation security system that has been the focus of media attention: We have evidence that individuals linked to terrorist groups or state sponsors have attempted to penetrate security at US airports in recent years. The media have called attention to, among other things, inadequate security for checked baggage. Our review of the evidence obtained thus far about the plot uncovered in Manila in early 1995, suggests the conspirators were guided in their selection of the method and venue of attack by carefully studying security procedures in place in the region. If terrorists operating in this country are similarly methodical, they will identify serious vulnerabilities in the security system for domestic flights."*

- In a National Intelligence Estimate in 1997, we said *"Civil aviation remains a particularly attractive target for terrorist attacks in light of the fear and publicity the downing of an airliner would evoke and the revelations last summer of the vulnerability of the US air transport sector."*

### *Message Received*

In February 1997, the White House Commission on Aviation Safety and Security reported that:

*"The Federal Bureau of Investigation, the Central Intelligence Agency, and other intelligence sources have been warning that the threat of terrorism is changing in two important ways. First, it is no longer just an overseas threat from foreign terrorists. People and places in the United States have joined the list of targets, and Americans have joined the ranks of terrorists. The bombings of the World Trade Center in New York and the Federal Building in Oklahoma City are clear examples of the shift, as is the conviction of Ramzi Yousef for attempting to bomb twelve American airliners out of the sky over the Pacific Ocean. The second change is that in addition to well-known, established terrorist groups, it is becoming more common to find terrorists working alone or in ad-hoc groups, some of whom are not afraid to die in carrying out their designs."*

In its publication, "Criminal Acts against Civil Aviation 2000," the FAA stated:

*"Although Bin Ladin is not known to have attacked civil aviation, he has both the motivation and the wherewithal to do so. Bin Ladin's anti-Western and anti-American attitudes make him and his followers a significant threat to civil aviation, especially U.S. civil aviation."*

In discussing the plot by convicted World Trade Center bomber Ramzi Yousef to place explosive

devices on as many as 12 U.S. airliners flying out of the Far East, the FAA's report points out that at least one other accused participant in the conspiracy remains at large, and

*"There are concerns that this individual or others of Yousef's ilk who may possess similar skills pose a continuing threat to civil aviation interests — Increased awareness and vigilance are necessary to deter future incidents — be they from terrorists or non-terrorists. It is important to do the utmost to prevent such acts rather than to lower security measures by interpreting the statistics as indicating a decreasing threat."*

We have heard the allegation that our analysts erred by not explicitly warning that hijacked aircraft might be used as weapons. Your staff has been given access to over half a million pages of documents and interviewed hundreds of intelligence officials in their efforts to investigate this complex issue. The documents we provided show some 12 reports, spread over seven years, which pertain to possible use of aircraft as weapons in terrorist attacks.

- We disseminated those reports to the appropriate agencies—such as the FAA, Department of Transportation, and FBI—as they came in. Moreover, we also provided sanitized versions of intelligence reports that were about threats to civil aviation so they could be distributed more widely through the airline industry.

- But if one goes back and collects the reports over the same period that pertained to possible truck bombs, car bombs, assassinations, kidnappings, or attacks using chemical, biological, radiological or nuclear devices, those lists would have been far longer. A quick scan of such reporting since 1996, for example, showed about 20 times as many reports concerning car bombs and about five times as many reports concerning weapons of mass destruction.

## BUDGET AND RESOURCES

To evaluate our work on al-Qa'ida before 9/11 objectively, it is essential that you look at three issues: global geopolitical issues we were grappling with — including counterterrorism; resource changes throughout the 1990s that affected our ability to fight the counterterrorism fight; and the overall health of US intelligence during this period. It is simply not enough to look at al-Qa'ida in isolation.

The last decade saw a number of conflicting and competing trends: military forces deployed to more locations than ever in our nation's history; a growing counterproliferation and counterterrorism threat; constant tensions in the Mid East and, to deal with these and a host of other issues, far fewer intelligence dollars and manpower. At the end of the Cold War, the Intelligence Community, like much of the National Security Community, was asked by both Congress and successive Administrations to pay the price of the "peace dividend."

The cost of the "peace dividend" was that during the 1990s our Intelligence community funding declined in real terms - reducing our buying power by tens of billions of dollars over the decade. We lost nearly one in four of our positions. This loss of manpower was devastating, particularly in our two most manpower intensive activities: all-source analysis and human source collection. By the mid-1990s, recruitment of new CIA analysts and case officers had come to a virtual halt. NSA was hiring no new technologists during the greatest information technology change in our lifetimes. It is absolutely essential that we understand that both Congress and the Executive Branch for most of the decade embraced the idea that we could "surge" our resources to deal with emerging intelligence challenges, including threats from terrorism. And surge we did.

- As I "declared war" against al-Qa'ida in 1998 — which was in the aftermath of the East Africa

embassy bombings — we were in our fifth year of round-the-clock support to Operation Southern Watch in Iraq.

- Just three months earlier, we were embroiled in answering questions on the India and Pakistan nuclear tests and trying to determine how we could surge more people to understanding and countering weapons of mass destruction proliferation.

- In early 1999, we surged more than 800 analysts and redirected collection assets from across the Intelligence Community to support the NATO bombing campaign against the Federal Republic of Yugoslavia.

During this time of increased military operations around the globe, the Defense Department was also reducing its tactical intelligence units and funding. This caused the Intelligence Community to stretch our capabilities to the breaking point — because national systems were covering the gaps in tactical intelligence. It is always our policy to give top priority to supporting military operations.

While we grappled with this multitude of high priority, overlapping crises, we had no choice but to modernize selective intelligence systems and infrastructure in which we'd deferred necessary investments while we downsized — or we would have found ourselves out of business. We had a vivid example of the cost of deferring investments a few years ago when NSA lost all communications between the headquarters and its field stations and we were unable to process any of that information for several days. We have a more current example of the cost of deferred investments today as we struggle to recapitalize our aging satellite constellation — another "return" on the peace dividend, given that conscious decisions to accept risk and defer replacing these systems were made in the mid-1990s. At the same time, we added the National Imagery and Mapping Agency to the Intelligence Community along with enormous funding shortfalls required to merge and modernize its geospatial and imagery functions.

Throughout the Intelligence Community during this period we made difficult resource reallocation decisions to try to rebuild critical mission areas affected by the funding cuts. For example,

- In CIA we launched a program to rebuild our Clandestine Service. This meant overhauling our recruitment and training practices and our infrastructure. We launched similar initiatives to rebuild our analytic depth and expertise, and to re-acquire our leading edge in technology. Although we will not be given credit for these efforts in the war on terrorism, they most assuredly contributed to that effort.

- NSA made the hard decision to cut additional positions to free up pay and benefit dollars to patch critical infrastructure problems and to modestly attempt to capitalize on the technology revolution.

But with the al-Qa'ida threat growing more ominous, and with our resources devoted to countering it clearly inadequate, we began taking money and people away from other critical areas to improve our efforts against terrorism.

Despite the resource reductions and the enormous competing demands for our attention, we managed to triple Intelligence Community-wide funding for counterterrorism from fiscal year 1990 to 1999. The Counterterrorism Center's resources nearly quadrupled in that same period. As your own Joint Inquiry Staff charts show, we had significantly reallocated both dollars and people inside our programs to work the terrorism problem. This inquiry has singled out CIA resources specifically and I want to address it specifically.

From a budget perspective, the last part of the 1990s reflects CIA's efforts to shift to a wartime footing against terrorism. CIA's budget had declined 18 percent in real terms during the decade and we suffered a loss of 16 percent of our personnel. Yet in the midst of that stark resource picture, CIA's funding level for counterterrorism just prior to 9/11 was more than 50 percent above our FY 1997 level. CTC personnel increased by over 60% for that same period. The CIA consistently reallocated and sought additional resources for this fight. In fact, in 1994, the budget request for counterterrorism activities equaled less than four percent of the total CIA program. In the FY 2002 CIA budget request we submitted prior to 9/11, counterterrorism activities constituted almost 10 percent of the budget request. During a period of budget stringency when we were faced with rebuilding essential intelligence capabilities, I had to make some tough choices. Although resources for virtually everything else in CIA was going down, counterterrorism resources were going up.

But after the US embassies in Africa were bombed, we knew that neither surging our resources nor internal realignments were sufficient to fund a war on terrorism. So in the fall of 1998, I asked the Administration to increase intelligence funding by more than $2.0 billion annually for fiscal years 2000-2005 and I made similar requests for FY 2001-2005 and FY 2002-2007. Only small portions of these requests were approved. Counterterrorism funding and manpower needs were number one on every list I provided to Congress and the Administration and, indeed, it was at the top of the funding list approved by Speaker Gingrich in FY1999, the first year in which we received a significant infusion of new money for US intelligence capabilities during the decade of the 90s.

That supplemental and those that followed it, that you supplied, were essential to our efforts - they helped save American lives. But we knew that we could not count on supplemental funds to build multi-year programs and that's why we worked so hard to reallocate our resources and to seek five year funding increases. Many of you on this Committee and the Appropriations Committees understood this problem very well. You were enormously helpful to us. And we are grateful.

I want to conclude with a couple of comments about manpower. In CIA alone, I count the equivalent of 700 officers working counterterrorism in August 2001 at both headquarters and in the field. That number does not include the people who were working to penetrate either technically or through human sources a multitude of threat targets from which we could derive intelligence on terrorists. Nor does it include friendly liaison services and coalition partners. You simply cannot gauge the level of effort by counting only the people who had the words "al-Qa'ida" or "bin Ladin" in their position description.

We reallocated all the people we could given the demands placed on us for intelligence on a number of the highest priority issues like chemical, nuclear and biological proliferation and support to operational military forces, and we surged thousands of people to fight this fight when the threat was highest. But when we realized surging wasn't sufficient, we began a sustained drumbeat both within the Administration and here on the Hill that we had to have more people and money devoted to this fight.

We can argue for the rest of the day about the exact number of people we had working this problem but what we never said, was that the numbers we had were enough. Our officers told your investigators that they were always shorthanded. They were right. America may never know the names of those officers, but America should know they are heroes. They worked tirelessly for years to combat bin Ladin and al-Qa'ida and have responded to the challenge of combating terrorism all during this time, with remarkable intensity. Their dedication, professionalism and creativity stopped many al-Qa'ida plots in their tracks — they saved countless American lives. Most of them are still in this fight — are essential to this fight — and they honor us by their continued service.

Thanks to the last two emergency supplementals and the Administration's FY03 budget request,

which both Houses approved during the past week, we have begun to move aggressively to reverse the funding shortfalls that have had such an impact on the nation's intelligence capabilities. But we have hardly scratched the surface in our efforts to recover from the manpower reductions, and we cannot reconstitute overnight the cadre of seasoned case officers and assets overseas, or the expert team of analysts we've lost. It will take many more years to recover from the capabilities we lost during the resource decline of the 1990s.

## FINAL OBSERVATIONS

*Success against the terrorist target must be measured against all elements of our nation's capabilities, policies and will. The intelligence community and the FBI are important parts of the equation, but by no means the only parts. We need a national, integrated strategy in our fight against terrorism that incorporates both offense and defense. The strategy must be based on three pillars:*

- Continued relentless effort to penetrate terrorist groups, whether by human or technical means, whether alone or in partnership with others.

- Second, intelligence, military, law enforcement, and diplomacy must stay on the offense continually against terrorism around the world. We must disrupt and destroy the terrorists' operational chain of command and momentum, deny them sanctuary anywhere and eliminate their sources of financial and logistical support.

*Nothing did more for our ability to combat terrorism than the President's decision to send us into the terrorist's sanctuary. By going in massively, we were able to change the rules for the terrorists. Now they are the hunted. Now they have to spend most of their time worrying about their survival. Al-Qa'ida must never again acquire a sanctuary.*

- Third, on defense, we need systematic security improvements to protect our country's people and infrastructure and create a more difficult operating environment for terrorists. The objective is to understand our vulnerabilities better than the terrorist do, take action to reduce those vulnerabilities, to increase the costs and risks for terrorists to operate in the United States and, over time, make those costs unacceptable to them.

We have learned an important historic lesson: We can no longer race from threat to threat, resolve it, disrupt it *and then move on. Targets at risk remain at risk.*

- In 1993, the first attack on the World Trade Center did, in comparative terms, modest damage. A plot around the same time to attack New York City tunnels and landmarks was broken up. We all breathed a sigh of relief and moved on, focusing the effort mostly on bringing perpetrators to justice. *The terrorists came back.*

- At the Millennium, a young terrorist panicked at a Canada-US border crossing and his plan to attack an airport in Los Angeles was exposed and thwarted. We breathed another sigh of relief and prepared for his trial. *Al Qa'ida's plan has only been delayed.*

- Last winter, another young terrorist on an airliner ineptly tried to detonate explosives in his shoes and was stopped by alert crew and passengers. At this point, we're smarter—we started checking everyone's shoes for explosives. *It is not nearly enough.*

- In the last year, we have gone on high alert several times for good reason, only to have no attack occur. We all breathed a sigh of relief and thought, "maybe it was a false alarm." *It*

*wasn't.*

- *We must design systems that reduce both the chances of an attack getting through and its impact if it does. We must address both the threat and our vulnerability. We must not allow ourselves to mentally "move on" while this enemy is still at large.*

I strongly support the President's proposal to create a Department of Homeland Security. The nation very much needs the single focus that this department will bring to homeland security. We have a foreign intelligence community and law enforcement agencies, but we have not had a cohesive body responsible and empowered for homeland security. The President's proposal closes that gap while building bridges between all three communities.

- The Department's most important role will be to correlate threat warnings and assessments about evolving terrorist strategies with a fine-grained understanding of the vulnerabilities of all sectors of the homeland and translate that into a *system* of protection for the people and infrastructure of the United States.

While the Department will be vital to our homeland defense, the most valued resource for our work against terrorism has always been and will forever be our people.

Moving from this necessary organizational change, I cannot emphasize enough our overwhelming need to recruit and train the intelligence officers we need to win this war.

Terrorists have a tactical advantage. They can pick and choose any target they please, who are willing to sacrifice their lives, and who don't care how many innocents they hurt or kill have tactical advantage. Developing the intelligence to combat them is manpower intensive. With the personnel we have invested in counterterrorism today, we can do much more than we could before 9/11, but more are still needed. I remind you that we lost nearly 1-in-4 of our positions since the end of the Cold War.

Our people also need better ways to communicate. Moreover, we also need systems that enable us to share critical information quickly across bureaucratic boundaries. Systems to put our intelligence in front of those who need it wherever they may be, whatever their specific responsibilities for protecting the American people from the threat of terrorist attack. That means we must move information in ways and to places it has never before had to move. We are improving our collaborative systems. We need to improve our multiple communications links—both within the Intelligence Community and now in the Homeland Security community as well. Building, maintaining, and constantly updating this system will require a massive, sustained budget infusion, separate from our other resource needs.

Now, more than ever before, we need to make sure our customers get from us exactly what they need — which generally means exactly what they want — fast and free of unnecessary restrictions. Chiefs of police across the country express understandable frustration at what they do not know. But there's something else: Intelligence officers in the federal government want to get their hands on locally collected data. Each could often use what the other may already have collected. The proposed Department of Homeland Security will help develop this vertical sharing of information. So, too, will the Intelligence Community's experience in supporting our armed forces. We're going to have to put that experience to work in "supporting the mayor." We don't have the luxury of an alternative.

One last point with regard to our human talent. As critical as terrorism is, our people will not concentrate solely on counterterrorism. Even in the last year, when national attention was focused

on terror, other events occurred which demanded the attention of experienced intelligence officers. The risk of an Indian-Pakistani war and the deterioration of the situation in the Mid East are just two examples. The Intelligence Community must keep skilled, experienced officers on all such issues.

## CONCLUDING STATEMENT

Our effectiveness has increased since September 11, and the Intelligence Community will continue to pursue a strategy of bringing the war to the terrorists.

But in the counterterrorism business there is no such thing as 100 percent success—there will never be.

- Some of what terrorists plan and do will remain hidden. The al Qa'ida practice is to keep their most lethal plots within a small, tightly knit group of fanatics. This is not an *impossible* target, but it is among our *hardest*.

- Total success against such targets is impossible. Some attackers will continue to get through us.

It may be comforting on occasion to think that if we could find the one process that went wrong, then we could remedy that failing and return to the sense of safety we enjoyed prior to 9/11. The reality is that we were vulnerable to suicidal terrorist attacks and we remain vulnerable to them today. That is not a pleasant fact for Americans to live with, but it is the case. There are no easy fixes. We will continue to look incisively at our own processes and to listen to others in an ongoing effort to do our jobs better. But we must also be honest with ourselves and with the public about the world in which we live.

The fight against international terrorism will be long and difficult.

- It will require the patience and diligence that the President has asked for.

- It will require resources—sustained over a multi-year period—to re-capitalize our intelligence infrastructure on a pace that matches the changing technical and operational environment we face.

- It will also require countries that have previously ignored the problem of terrorism or refused to cooperate with us to step up and choose sides.

It will require all of us across the government to follow the example of the American people after September 11 — to come together, to work as a team, and pursue our mission with unyielding dedication and unrelenting fidelity to our highest ideals. We owe those who died on September 11 and all Americans no less.

- Privacy
- Copyright
- Site Policies
- USA.gov
- FOIA
- DNI.gov
- NoFEAR Act