# EXHIBIT N



**Intelligence Policy**

*Staff Statement No. 7*

Members of the Commission, with your help, your staff has developed initial findings to present to the public on the use of our intelligence agencies in countering terrorism. These findings may help frame some of the issues for these hearings and inform the development of your judgments and recommendations. Today we will focus on the role of the Central Intelligence Agency as an instrument of national policy. The issues related to the collection of intelligence, analysis and warning, and the management of the intelligence community will be taken up at the Commission's hearings next month.

This report reflects the results of our work so far. We remain ready to revise our understanding of events as our investigation progresses. This staff statement represents the collective effort of a number of members of our staff. Alexis Albion, Michael Hurley, Dan Marcus, Lloyd Salvetti, and Steve Dunne did much of the investigative work reflected in this statement.

For this area of our work we were fortunate in being able to build upon a great deal of excellent work already done by the Congressional Joint Inquiry. The Central Intelligence Agency has cooperated fully in making available both the documents and interviews that we have needed so far on this topic.

**Framing the Issue**

The CIA plays a dual role in counterterrorism. Like other members of the Intelligence Community, the CIA is an intelligence producer: it collects and analyzes foreign intelligence and provides this information to policymakers. When directed by the president, the CIA is also responsible for executing policy through the conduct of covert action. U.S. law defines a covert action as a U.S. government activity to influence conditions in another country, "where it is intended that the role of the United States Government will not be apparent or acknowledged publicly." The law requires a formal presidential finding to authorize a covert action, which is also briefed to congressional leaders. Significant actions under a finding are often authorized in a separate Memorandum of Notification informing congressional leaders.

The Director of Central Intelligence (DCI), from whom you will hear his morning, also has dual responsibilities. He is the president's senior intelligence adviser. He is also the head of an agency, the CIA, that executes policy. In speaking with the Commission, DCI Tenet was blunt: "I am not a policymaker." He presents intelligence and offers operational judgments, but he says

it is ultimately up to policymakers to decide how best to use that intelligence. "It is their job to figure out where I fit into their puzzle," Tenet said.

Both the DCI and the Deputy Director for Operations, James Pavitt, invoked lessons learned from the Iran-Contra scandal: the CIA should stay well behind the line separating policymaker from policy implementer. The CIA does not initiate operations unless it is to support a policy directive, said Tenet. For Pavitt, the lesson of Iran-Contra was, "we don't do policy from out here…and you don't want us to."

Yet, as a member of the National Security Council, the DCI is one of a handful of senior officials who advises the president on national security. The DCI's operational judgments can, and did, influence key decisions on the U.S. government's policy toward al Qaeda. As we reported yesterday, the DCI may be designated as the President's envoy for conducting relevant diplomacy with foreign governments, as in the case of Saudi Arabia. In confronting terrorism before 9/11 and today, the DCI was, and is, both the principal analyst of the terrorist enemy and the commander for many operations in the field. Day-to-day conduct of the current war on terrorism is managed principally at CIA headquarters. In the case of al Qaeda, the line between policymaker and policy implementer is hard to discern.

**Renditions**

Under the presidential directives in the Clinton administration, PDD-39 and PDD-62, the CIA had two main operational responsibilities for combating terrorism—rendition and disruption. PDD-62 remained in effect during the first months of the Bush administration and was still in force on 9/11. These operations are managed out of an Intelligence Community center, the Counterterrorist Center (CTC). Though it includes analysts, the CTC has always given primacy to operations. The director of the CTC effectively reports to the DCI through the CIA's deputy director for operations.

We will first discuss the CIA's support with renditions. In other words, if a terrorist suspect is outside of the United States, the CIA helps to catch and send him to the United States or a third country.

In ordinary criminal cases, the foreign government makes an arrest. The Justice Department and the FBI seeks to extradite the suspect. The State Department facilitates the process.

The world of counterterrorism rarely follows these usual procedures. Overseas officials of CIA, the FBI, and the State Department may locate the person, perhaps using their own sources. If possible, they seek help from a foreign government. Though the FBI is often part of the process, the CIA is usually the major player, building and defining the relationships with the foreign government intelligence agencies and internal security services.

The CIA often plays an active role, sometimes calling upon the support of other agencies for logistical or transportation assistance. Director Tenet has publicly testified that 70 terrorists were rendered and brought to justice before 9/11.

2

These activities could only achieve so much. In countries where the CIA did not have cooperative relationships with local security services, the rendition strategy often failed. In at least two such cases when the CIA decided to seek the assistance of the host country, the target may have been tipped off and escaped. In the case of Bin Ladin, the United States had no diplomatic or intelligence officers living and working in Afghanistan. Nor was the Taliban regime inclined to cooperate. The CIA would have to look for other ways to bring Bin Ladin to justice.

**Disruptions**

Under the relevant directive of the Clinton administration, foreign terrorists who posed a credible threat to the United States were subject to "preemption and disruption" abroad, consistent with U.S. laws. The CIA had the lead. Where terrorists could not be brought to justice in the United States or a third country, the CIA could try to disrupt their operations, attacking the cells of al Qaeda operatives or affiliated groups. In 1996, the CTC devised an innovative strategy combining intelligence and law enforcement tools to disrupt terrorist activity around the world. That strategy encouraged foreign intelligence services to make creative use of laws already in place to investigate, detain, and otherwise harass known or suspected terrorists.

Disruptions of suspected terrorist cells thwarted numerous plots against American interests abroad, particularly during high threat periods. After the Embassy bombings of 1998 the U.S. government disrupted planned attacks against at least one American embassy, in Albania. In late 1999 preceding the Millennium celebrations, the activities of 21 individuals were disrupted in eight countries. In two subsequent phases of intensive threat reporting—the Ramadan period in late 2000, and the summer prior to 9/11—the CIA again went into what the DCI described as "Millennium threat mode," engaging with foreign liaison and disrupting operations around the world. At least one planned terrorist attack in Europe may have been successfully disrupted during the summer of 2001. Renditions and disruptions continued as an important component of U.S. counterterrorism policy throughout the period leading up to 9/11. They are still widely used today.

**Using Covert Action in Afghanistan**

To disrupt Usama Bin Ladin himself or his base in Afghanistan, a very different strategy of disruption would have to be developed. In 1996, as an organizational experiment undertaken with seed money, the CTC created a special "Issue Station" devoted exclusively to Bin Ladin. Bin Ladin was then still in Sudan and was considered by the CIA to be a terrorist financier. The original name of the station was "TFL," for terrorist financial links. The Bin Ladin (UBL) Station was not a response to new intelligence, but reflected interest in and concern about Bin Ladin's connections.

The CIA believed that Bin Ladin's move to Afghanistan in May 1996 might be a fortunate development. The CIA knew the ground in Afghanistan, as its officers had worked with indigenous tribal forces during the war against the Soviet Union. The CIA definitely had a lucky break when a former associate of Bin Ladin walked into a U.S. embassy abroad and provided an abundance of information about the organization. These revelations were corroborated by other

3

intelligence. By early 1997, the UBL Station knew that Bin Ladin was not just a financier but an organizer of terrorist activity. It knew that al Qaeda had a military committee planning operations against U.S. interests worldwide and was actively trying to obtain nuclear material. Although this information was disseminated in many reports, the unit's sense of alarm about Bin Ladin was not widely shared or understood within the intelligence and policy communities. Employees in the unit told us they felt their zeal attracted ridicule from their peers.

In 1997 CIA headquarters authorized U.S. officials to begin developing a network of agents to gather intelligence inside Afghanistan about Bin Ladin and his organization and prepare a plan to capture him. By 1998 DCI Tenet was giving considerable personal attention to the UBL threat.

Since its inception, the UBL Station had been working on a covert action plan to capture Bin Ladin and bring him to justice. The plan had been elaborately developed by the spring of 1998. Its final variant in this period used Afghan tribal fighters recruited by the CIA to assault a terrorist compound where Bin Ladin might be found, capture him if possible, and take him to a location where he could be picked up and transported to the United States. Though the plan had dedicated proponents in the UBL unit and was discussed for months among top policymakers, all of CIA's leadership, and a key official in the field, agreed that the odds of failure were too high. They did not recommend it for approval by the White House.

After the East Africa bombings, President Clinton signed successive authorizations for the CIA to undertake offensive operations in Afghanistan against Bin Ladin. Each new document responded to an opportunity to use local forces from various countries against Bin Ladin himself, and later his principal lieutenants. These were authorizations for the conduct of operations in which people on both sides could be killed. Policymakers devoted careful attention to crafting these sensitive and closely held documents.

In accordance with these authorities, the CIA developed successive covert action programs using particular indigenous groups, or proxies, who might be able to operate in different parts of Afghanistan. These proxies would also try to provide intelligence on Bin Ladin and his organization, with an eye to finding Bin Ladin and then ambushing him if the opportunity arose.

The CIA's Afghan assets reported on about half a dozen occasions before 9/11 that they had considered attacking Bin Ladin, usually as he traveled in his convoy along the rough Afghan roads. Each time, the operation was reportedly aborted. Several times the Afghans said that Bin Ladin had taken a different route than expected. On one occasion security was said to be too tight to capture him. Another time they heard women and children's voices from inside the convoy and abandoned the assault for fear of killing innocents, in accordance with CIA guidelines.

*The Plan*

As time passed, morale in the UBL unit sagged. The former deputy chief told the Joint Inquiry that they felt like they were "buying time," trying to stop UBL and "disrupting al Qaeda members until military force could be used." In June 1999 National Security Adviser Berger reported to President Clinton that covert action efforts against Bin Ladin had not been fruitful.

4

In the summer of 1999 new leaders arrived at the CTC and the UBL unit.  The new director of CTC was Cofer Black.  He and his aides worked on a new operational strategy for going after al Qaeda.  The focus was on getting better intelligence.  They proposed a shift from reliance on the Afghan proxies alone to an effort to create the CIA's own sources.  They called the new strategy simply, "The Plan."  CTC devised a program for hiring and training better officers with counterterrorism skills, recruiting more assets, and trying to penetrate al Qaeda directly.  The Plan also aimed to close up gaps in intelligence collection within Afghanistan, by enhancing technical collection and recruiting forces capable of tracking and capturing Bin Ladin wherever he might travel.  The Plan also proposed increasing contacts between the CIA and the Northern Alliance rebels fighting the Taliban.

*The Predator*

The Plan resulted in increased reporting on al Qaeda.  Still, going into the year 2000, the CIA had never laid American eyes on Bin Ladin in Afghanistan.  President Clinton prodded his advisers to do better.  NSC Counterterrorism Coordinator Richard Clarke helped Assistant DCI for Collection Charles Allen and Vice Admiral Scott Fry of the Joint Staff work together on the military's ongoing efforts to develop new collection capabilities inside Afghanistan.  With the NSC staff's backing, the CTC and the military came up with a proposal to fly an unmanned drone called the Predator over Afghanistan to survey the territory below and relay video footage.  That information, the White House hoped, could either boost U.S. knowledge of al Qaeda or be used to kill Bin Ladin with a cruise missile.  The Predator had performed well in the recent Kosovo conflict, where it spotted Serb troop concentrations.  The aircraft is slow and small, but it is hard to see and intercept.

Assistant DCI Allen said that the CIA's senior management was originally reluctant to go ahead with the Predator program, adding that "it was a bloody struggle."  But the NSC staff was firm, and the CIA agreed to fly the Predator as a trial concept.  Drones were flown successfully over Afghanistan 16 times in fall 2000.  At least twice the Predator saw a security detail around a tall man in a white robe whom some analysts determined was probably Bin Ladin.  The Predator was spotted by Taliban forces.  They were unable to intercept it, but the Afghan press service publicized the discovery of a strange aircraft that it speculated might be looking for Bin Ladin.  When winter weather prevented the Predator from flying during the remainder of 2000, the CTC looked forward to resuming flights in 2001.

*U.S.S. Cole*

When the American destroyer, the *U.S.S. Cole,* was bombed in Yemen in October 2000, al Qaeda was immediately suspected of having struck again.  The CTC developed an offensive initiative for Afghanistan, regardless of policy or financial constraints—it was called the "Blue Sky memo."  In December 2000, the CIA sent this to the NSC staff.  The memo recommended increased support to anti-Taliban groups and to proxies who might ambush Bin Ladin.  The CTC also proposed a major effort to back Northern Alliance forces in order to stave off the Taliban army and tie down al Qaeda fighters, thereby hindering terrorist activities elsewhere.  No action was taken on these ideas in the few remaining weeks of the Clinton administration.  The "Blue

5

Sky" memo itself was not apparently discussed with the incoming top Bush administration officials during the transition. The CTC began pressing these proposals after the new team took office.

**The Bush Administration**

The CIA briefed President-elect George W. Bush and incoming national security officials on covert action programs in Afghanistan. Deputy DCI McLaughlin said that he walked through the elements of the al Qaeda problem with National Security Adviser Condoleezza Rice, including an explanation of the special authorities signed by President Clinton. DCI Tenet and Deputy Director for Operations Pavitt gave an intelligence briefing to President-elect Bush, Vice President-elect Cheney, and Dr. Rice, which included the topic of al Qaeda. Pavitt recalled conveying that Bin Ladin was one of the gravest threats to the country. President-elect Bush asked whether killing Bin Ladin would end the problem. Pavitt said he and the DCI answered that killing Bin Ladin would have an impact but not stop the threat. CIA later provided more formal assessments to the White House reiterating that conclusion. It added that the only long-term way to deal with the threat was to end al Qaeda's ability to use Afghanistan as a sanctuary for its operations.

*Arming Predator*

During fall 2000, Clarke and other counterterrorism officials learned of a promising and energetic Air Force effort that was already trying to arm the Predator with missiles. Clarke and Assistant DCI Allen urged flying the reconnaissance version of the Predator in the spring, as soon as the weather improved, and using the armed Predator against Bin Ladin as soon as possible.

DCI Tenet, supported by military officers in the Joint Staff, balked at this plan. They did not want to go ahead with reconnaissance flights alone and argued for waiting until the armed version was ready before flying Predator again at all. Given the experience in the fall of 2000, they worried that flying the reconnaissance version would forfeit the element of surprise for the armed Predator. They also feared one of these scarce aircraft might be shot down, since Taliban radar had previously tracked it, forcing it into a more vulnerable flight path. They also contended that there were not enough Predators to be able to conduct reconnaissance flights over Afghanistan and still have aircraft left over for the testing then underway in the United States to develop the armed version.

Clarke believed that these arguments were stalling tactics by CIA's risk-averse Directorate of Operations. He wanted the reconnaissance flights to begin on their own both for collection and to allow for possible strikes with other military forces. He thought the reconnaissance flights could be conducted with fewer aircraft than had been used in 2000, so that testing on the armed version might continue.

DCI Tenet's position prevailed. The reconnaissance flights were deferred while work continued on the armed version.

6

The armed Predator was being readied at an accelerated pace during 2001. The Air Force officials who managed the program told us that the policy arguments, including quarrels about who would pay for the aircraft, had no effect on their timetable for operations. The timetable was instead driven by a variety of technical issues. A program that would ordinarily have taken years was, they said, finished in months; they were "throwing out the books on the normal acquisition process just to press on and get it done." In July, Deputy National Security Adviser Stephen Hadley ordered that the armed Predator be ready by September 1. CIA officials supported these accelerated efforts. The Air Force program manager told us that they were still resolving technical issues as of 9/11, and "we just took what we had and deployed it."

Meanwhile policymakers were arguing about the unprecedented step of creating a missile system for use by an agency outside of the Department of Defense. DCI Tenet was concerned.

At a meeting of NSC principals on September 4, National Security Adviser Rice summarized a consensus that the armed Predator was not ready, but that the capability was needed. The group left open issues related to command and control. In the meantime, the Principals Committee agreed the CIA should consider going ahead with flying reconnaissance missions with the Predator. Shortly after the meeting, DCI Tenet agreed to proceed with such flights.

*Developing a New Strategy*

In March 2001, National Security Adviser Rice tasked DCI Tenet to draw up a new document on covert action authorities for Afghanistan that would consolidate existing authorities and add new, broader ones. DCI Tenet presented these draft documents to Deputy National Security Adviser Hadley later that month, but observed that ordinarily policy should be developed first and then the authorities should be devised to implement the policy, rather than doing it the other way around. Hadley agreed and, with Rice's evident approval, the draft authorities were put aside until the new administration had finished determining what its new policies would be for al Qaeda, Afghanistan, and Pakistan.

This policy review apparently began in March and continued throughout the spring and summer of 2001. At the end of May, National Security Adviser Rice met with DCI Tenet and their counterterrorism experts. She asked about "taking the offensive" against al Qaeda, and asked Clark and the CTC chief Cofer Black to develop a full range of options. A plan for a larger covert action effort was a major component of the new al Qaeda strategy, codified in a draft presidential directive that was first circulated in early June. The emerging covert action plan built upon ideas the CIA and Clarke had been working on since December 2000. A notable change was that Rice and Hadley wanted to place less emphasis on the Northern Alliance, and more on anti-Taliban Pashtuns. Clarke was impatient to get at least some money to the Northern Alliance right away in order to keep them in the fight.

Meanwhile, the Intelligence Community began to receive its greatest volume of threat reporting since the Millennium plot. By late July, there were indications of multiple, possibly catastrophic, terrorist attacks being planned against American interests overseas. The CTC identified 30 possible overseas targets and launched disruption operations around the world.

7

Some CIA officials expressed frustration about the pace of policymaking during the stressful summer of 2001. Although Tenet said he thought the policy machinery was working in what he called a rather orderly fashion, Deputy DCI McLaughlin told us he felt a great tension— especially in June and July 2001—between the new administration's need to understand these issues and his sense that this was a matter of great urgency. Officials, including McLaughlin, were also frustrated when some policymakers, who had not lived through such threat surges before, questioned the validity of the intelligence or wondered if it was disinformation, though they were persuaded once they probed it. Two veteran CTC officers who were deeply involved in UBL issues were so worried about an impending disaster that one of them told us that they considered resigning and going public with their concerns. DCI Tenet, who was briefing the President and his top advisers daily, told us that his sense was that officials at the White House had grasped the sense of urgency he was communicating to them.

By early August, DCI Tenet said that intelligence suggested that whatever terrorist activity might have been originally planned had been delayed. At the same time, the Deputies Committee reached a consensus on a new Afghan policy, paving the way for Northern Alliance aid. NSC principals apparently endorsed the new presidential directive on al Qaeda at their meeting on September 4.

On September 10, Deputy National Security Adviser Hadley formally tasked DCI Tenet to draw up new draft authorities for the broad covert action program envisioned in that directive, including significant additional funding and involving Pashtun elements as well as the Northern Alliance. Hadley also asked Tenet to include a separate section in these new authorities authorizing a further range of covert action activities to disrupt command-and-control elements of al Qaeda.

Events would, of course, overtake this tasking. Within days of the September 11 attacks, a new counterterrorism policy was in place.

**Key Issue Areas**

The story of CIA activities before 9/11 brings up a number of key issues for considering how policymakers made use of covert capabilities for attacking Bin Ladin. These issues include the CIA's authorities and capabilities for going after Bin Ladin in Afghanistan.

*Capture or Kill?*

Many CIA officers, including Deputy Director for Operations Pavitt, have criticized policymakers for not giving the CIA authorities to conduct effective operations against Bin Ladin. This issue manifests itself in a debate about the scope of the covert actions in Afghanistan authorized by President Clinton. NSC staff and CIA officials differ starkly here.

Senior NSC staff members told us they believed the president's intent was clear: he wanted Bin Ladin dead. On successive occasions, President Clinton issued authorities instructing the CIA to use its proxies to capture or assault Bin Ladin and his lieutenants in operations in which they

8

might be killed. The instructions, except in one defined contingency, were to capture Bin Ladin if possible.

Senior legal advisers in the Clinton administration agreed that, under the law of armed conflict, killing a person who posed an imminent threat to the United States was an act of self-defense, not an assassination. As former National Security Adviser Berger explained, if we wanted to kill Bin Ladin with cruise missiles, why would we not want to kill him with covert action? Clarke's recollection is the same.

But if the policymakers believed their intent was clear, every CIA official interviewed on this topic by the Commission, from DCI Tenet to the official who actually briefed the agents in the field, told us they heard a different message. What the United States would let the military do is quite different, Tenet said, from the rules that govern covert action by the CIA. CIA senior managers, operators, and lawyers uniformly said that they read the relevant authorities signed by President Clinton as instructing them to try to capture Bin Ladin, except in the defined contingency. They believed that the only acceptable context for killing Bin Ladin was a credible capture operation.

"We always talked about how much easier it would have been to kill him," a former chief of the UBL Station said. Working-level CIA officers said they were frustrated by what they saw as the policy restraints of having to instruct their assets to mount a capture operation. When Northern Alliance leader Massoud was briefed on the carefully worded instructions for him, the briefer recalls that Massoud laughed and said, "You Americans are crazy. You guys never change."

To further cloud the picture, two senior CIA officers told us they would have been morally and practically opposed to getting CIA into what might look like an assassination. One of them, a former CTC chief, said he would have refused an order to directly kill Bin Ladin.

Where NSC staff and CIA officials agree is that no one at CIA, including Tenet and Pavitt, ever complained to the White House that the authorities were restrictive or unclear. Berger told us: "If there was ever any confusion, it was never conveyed to me or the President by the DCI or anybody else."

*The Trouble with Proxies*

Senior CIA officials were cautious about engaging U.S. personnel within Afghanistan. CIA officers faced enormous dangers in Afghanistan, a large, desolate country in the midst of a civil war, where there were no reliable means for either inserting or extracting personnel. They did, however, take on significant risk. CIA teams penetrated deep into Afghanistan on numerous occasions before 9/11—for example, to evaluate airfields suitable for capture operations. These were hazardous missions: officers flew through mountainous terrain on rickety helicopters exposed to missile attack from the ground. CIA personnel continued these missions over the course of the next year, and on each occasion risked their lives.

But reluctance to authorize direct action by CIA personnel against Bin Ladin inside the Afghanistan sanctuary led policymakers to rely on local forces, or proxies. These groups

9

provided intelligence on Bin Ladin's location and on al Qaeda forces and training camps; they also were asked to conduct operations to capture Bin Ladin.

For covert action programs, proxies meant problems. First, proxies tend to tell those who pay them what they want to hear. The CIA employs many means to test and verify the truth of the intelligence its agents provide, but these tests are not foolproof. Second, a strategy emphasizing proxies takes significant time to produce the desired results. Proxy forces invariably need training and instruction to carry out operations.

Both these factors bedeviled the CIA's use of proxy forces in Afghanistan before 9/11. The most widely used forces were tribal fighters with whom CIA officers had established relations dating back over a decade to the jihad against Soviet occupation. CIA officers dealing with these tribal fighters had some confidence in their ability to target Bin Ladin.

These agents collected valuable intelligence at great personal risk. Yet when it came to their ability to conduct paramilitary operations, senior CIA officials had their doubts. As was mentioned earlier, senior CIA officials did not go forward with a spring 1998 plan to use Afghan forces to capture Bin Ladin. This was in part because they were not convinced that the Afghans could carry out the mission successfully. There is little evidence that the CIA leadership ever developed greater faith in the operational skills of these proxy forces for paramilitary action. Deputy Director for Operations Pavitt said he does not know if the attempted ambushes against Bin Ladin that the tribal fighters reported ever actually occurred.

The CIA employed proxy forces other than the Afghan tribal groups against Bin Ladin, but with no more confidence in their abilities. DCI Tenet thought the most able proxies were the hardened warriors of Massoud's Northern Alliance who had been at war with the Taliban for years. Though there was continuing disagreement within the Agency about relying on the Northern Alliance, CIA leaders put more and more weight behind this option through 2000 and 2001. They were always aware that the primary objective of Massoud's forces was to defeat the Taliban, not to find Bin Ladin or attack al Qaeda.

By deciding to use proxies to carry out covert actions in Afghanistan before 9/11, both administrations placed the achievement of policy objectives in the hands of others.

**Conclusion**

Before 9/11 no agency did more to attack al Qaeda, working day and night, than did the CIA. But there were limits to what the CIA was able to achieve by disrupting terrorist activities abroad and using proxies to try to capture Bin Ladin and his lieutenants in Afghanistan. CIA officers were aware of these limitations. One officer recognized as early as mid-1997 that the CIA alone was not going to solve the Bin Ladin problem. In a memo to his supervisor he wrote, "All we're doing is holding the ring until the cavalry gets here." Deputy Director for Operations Pavitt told Commission staff that "doing stuff on the margins" was not the way to get this job done. If the U.S. government was serious about eliminating the al Qaeda threat, it required robust, offensive engagement across the entire U.S. government.

DCI Tenet also understood the CIA's limitations. He told staff that the CIA's odds of success in Afghanistan before 9/11 were between 10 and 20 percent. This was not because the CIA lacked the capabilities to attack the target, he said, but because the mission was extremely challenging. Covert action was not "a silver bullet," but it was important to engage proxies and to build various capabilities so that if an opportunity presented itself, the CIA could act on it. "You could get really lucky on any given day," Tenet said.

Indeed, serendipity had led to some of the CIA's past successes against al Qaeda. But absent a more dependable government strategy, CIA senior management relied on proxy forces to "get lucky" for over three years, through both the late Clinton and early Bush administrations. There was growing frustration within the CTC and in the NSC staff with this lack of results. The development of the Predator and the push to aid the Northern Alliance were certainly products of this frustration.

The Commission has heard numerous accounts of the tireless activity of officers within the CTC and the UBL Station trying to tackle al Qaeda before 9/11. DCI Tenet was also clearly committed to fighting the terrorist threat. But if officers at all levels questioned the effectiveness of the most active strategy the policymakers were employing to defeat the terrorist enemy, the Commission needs to ask why that strategy remained largely unchanged throughout the period leading up to 9/11.