# EXHIBIT P

Case 5:07-cv-02798-JW     Document 54-20     Filed 12/14/2007     Page 1 of 17

# COUNCIL ON FOREIGN RELATIONS
A Resource for Nonpartisan Information and Analysis

home > by publication type > transcripts > A Conversation with Michael Hayden [Rush Transcript; Federal News Service]

## Transcript

**A Conversation with Michael Hayden [Rush Transcript; Federal News Service]**

**Speaker:** Michael V. Hayden, U.S. Air Force (Retired), Director of the Central Intelligence Agency
**Presider:** Stephen Friedman, Chairman, Stone Point Capital

September 7, 2007
Council on Foreign Relations
New York, NY

♫ Audio

| Related Materials |
|---|
| Letter from Lt. Gen. Michael Hayden to Rep. Nancy Pelosi regarding NSA surveillance<br>By Michael V. Hayden<br>Essential Documents<br>October 18, 2001 |
| A Conversation with Michael V. Hayden (Video)<br>Video<br>September 7, 2007 |
| A Conversation with Michael V. Hayden (Audio)<br>Audio<br>September 7, 2007 |
| MI5 Director General's Speech on Intelligence, Counter-Terrorism and Trust<br>Essential Documents<br>November 5, 2007 |
| The ISI and Terrorism: Behind the Accusations<br>By Eben Kaplan, Associate Editor<br>Backgrounder<br>Updated: October 19, 2007 |

**See Also**

Intelligence, Terrorism

Council on Foreign Relations, New York City, New York

September 7, 2007

STEPHEN FRIEDMAN: (Off mike) -- line-up for the next 30 days or so of council events: on September 25th, Stephen Harper, the prime minister of Canada; on the 26th, Foreign Minister D'Alema of Italy; on the 26th, President Karzai of Afghanistan; on the 27th, Prime Minister Erdogan of Turkey; and on the 27th, President Uribe of Colombia; on October 1st, Foreign Minister Mukherjee of India -- a stellar cast.

Now it's going to be my pleasure to introduce the general. First let me just give you the normal council ground rules for this type of meeting. Please turn off your cellphones and BlackBerries and any other wireless devices. Remember this meeting is very much on the record. In fact, it is being teleconferenced.

Now just brief words about Mike Hayden:

Anyone here who's had the privilege of working with senior leadership in our uniformed military knows the talent that we're fortunate as a nation to have. Mike Hayden is one of the few people in the -- in our military history who's attained his fourth star as an intel pro, which is a measure of the esteem in which he's held by people who deal with him and by his

leaders.

For those who worry about the importance of truth being spoken to power, when it is in Hayden's watch, I think you have no need to fear. He is a very direct person, and today you'll all benefit from that. So let me just introduce General Mike Hayden. (Applause.)

GENERAL MICHAEL V. HAYDEN: Thank you, Steve. That's very kind. I'm almost overwhelmed by that line-up you had there. I assure you, I'm the lead-off hitter, and my only purpose is to just get on base for the folks who are coming behind me. (Laughter.)

Thanks for the opportunity to be here, and it's a pleasure to be in New York, to spend some time with such a distinguished group -- I'm looking out here, seeing a lot of familiar faces and old friends -- and an opportunity to talk about the organization I actually have the privilege to lead, the Central Intelligence Agency.

We're an organization with a clear objective: to protect the American people. We have a number of missions that feed into that, to protect America, and one of those missions we share with the council, which is to help our policymakers make sense of global events.

And the range of issues before us both are as wide as the world we both study: nuclear proliferation, emerging security threats, the rise of new economic centers, scramble for natural resources, and the list goes on.

Our nation counts on us to have the expertise and the insight to flag the risks and the opportunities that lie ahead, and to keep our eye on all the critical international concerns that face our nation right now.

But of the subjects we cover, none commands more attention than terrorism. I think it's very unlikely that there will ever come a time when a CIA director visits New York and his or her thoughts aren't shaped by 9/11. We're at war, and this city, still strong and vibrant, has been a battlefield in that war.

Now, I don't make a lot of public speeches. That's probably the way it should be for someone in my line of work. But I actually asked Richard and the council to be able to speak to you today.

Like anyone who feels deeply about the safety and well-being of his countrymen, and the value and the integrity of his colleagues, I believe there are some things that need to be said.

Let me repeat that. Like anyone who feels deeply about the safety and well-being of his countrymen, and the value and integrity of his colleagues, there are things that should be said. And sometimes our citizens should hear them from the person who's running their Central Intelligence Agency.

So this afternoon, I want to talk to you about the agency, the new kind of war that our nation has asked us to fight, and something I'm going to call the question of space. If you take nothing else from what I say here this afternoon, I hope it will be this. Our agency, the CIA, operates only within the space given to us by the American people. That's how we want it to be, and that's how it should be.

That space is defined by the policymakers that we all elect and by the laws our representatives pass. But once the laws are passed and the boundaries are set, the American people expect CIA to use every inch we're given to protect our fellow citizens.

So let's talk a little bit about that space. The intelligence services of free societies

America reflect the principles of the republic that are most worth defending. We at CIA work very hard to live up to them, even as we operate in the shadow world of espionage.

That sets up a natural tension, but frankly, for us, that's simply the cost of doing business. Our agency is convinced, absolutely convinced, that it's our obligation to conform to the needs of our free society and not vice versa.

That's the society that we all signed up to defend. So no matter what the external threat is, we at CIA feel just as strongly as any American that our DNA as a nation must not, cannot be altered.

But unlike most Americans, it's also our responsibility to confront that external threat unceasingly, every minute of every hour. And that, too, is an obligation that we at CIA feel very acutely.

So let me make very clear how my agency views the fight at hand. I think it speaks to what a lot of Americans believe, as well. But here's how we see it.

Our nation is in a state of armed conflict with al Qaeda and its affiliates. It's a conflict that is global in scope, and a precondition for winning that conflict is to take the fight to the enemy wherever he may be. From my vantage point, measured by the required intensity of effort or the profound nature of the threat, it's very hard to see this thing as anything less than war. I've seen public references to, quote, "the so-called war on terrorism" or, quote, "the Bush's administration's war on terrorism," but for us it's simply war. It's a word we use commonly without ambiguity in the halls of the Pentagon and at Langley.

We who study and target this enemy see a danger more real than anything our citizens at home have confronted since our Civil War. And even when you consider the Cold War and mutually assured destruction, in which the potential danger was actually catastrophic, the fact is the destruction never came. This war is different. In a very real sense, anyone who lives or works in a major city is as much a potential target as the victims of 9/11 or of the London subway bombings or the strikes in Madrid or any of the other operations we've seen in Morocco, Jordan, Indonesia, Algeria, Pakistan, Kenya and elsewhere.

That's my take on the strategic threat we face, and that's without the precise language of a National Intelligence Estimate. But the National Intelligence Council did publish its findings on that threat to the homeland earlier this summer. You had analysts in CIA and from throughout the intelligence community engage in a very careful, meticulous study of the issues based on their expertise and based on both open and classified sources. And I think they did a good job and I have tremendous respect for their work, and for us here this afternoon, I'd like to draw from their judgments to the extent I can in this public setting.

First, our analysts assess with high confidence that al Qaeda's central leadership is planning high-impact plots against the American homeland.

Second, those same analysts assess -- again, with high confidence -- that al Qaeda has protected or regenerated key elements of its homeland attack capability. That means safe haven in the tribal areas of Pakistan. That means operational lieutenants. That means a top leadership engaged in planning. Al Qaeda's success with that last remaining element, which is planning operatives in this country, is less certain.

And third, we assess -- once again, with high confidence -- that al Qaeda is focusing on targets that would produce mass casualties, dramatic destruction and significant economic aftershocks.

Case 5:07-cv-02798-JW    Document 54-20    Filed 12/14/2007    Page 5 of 17

I want to be as clear as I can about the danger we face. I want to do that for two reasons. First, I'm the CIA director, and warning about foreign threats to our security is actually part of my job. But second, in discussing the operational space available to my agency, I want to explain to you, and through you to the American people, exactly why we feel so strongly about using every inch we have been given.

We bear responsibility for standing watch on this threat. That fact alone has the very distinctive effect of focusing the mind. But we bear an additional responsibility, as well. We're charged with prosecuting an expeditionary campaign to actually help capture or kill those behind the threat. And this, this is a form of warfare unlike any other in our country's history.

It's an intelligence war as much as a military one. Actually, maybe it's an intelligence war more than it's a military one. In the post-9/11 era, intelligence is more crucial to the security of the republic than ever before. Now, that's, I recognize, a pretty sweeping assertion, so let me try to spell out what I mean with maybe an historical analogy.

I mentioned mutually assured destruction in the Cold War. If that war ever came, the Soviet Union's most deadly forces -- ICBMs, tank armies -- they were actually relatively easy to find, but they were very hard to kill. Intelligence was important, don't get me wrong, but intelligence was overshadowed by the need for raw, shear fire power.

Today the situation is reversed. We're now in an age in which our primary adversary is easy to kill, he's just very hard to find. So you can understand why so much emphasis in the last five years has been placed on intelligence. Moreover, the moment of an enemy's attack may be just that, a moment, a split second, the time it takes for an airliner to crash or a bomb to detonate. There can be little or no time to defeat him on the battlefield he's chosen.

But behind that point of attack, behind that battlefield he's picked is a trail, a trail of planning, travel, communications, training and all of the other elements that go into a large scale terrorist operation. This is where there are secrets we can steal, operatives we can capture and interrogate, plots we can and must disrupt. That's the theater of operations for your -- for America's clandestine intelligence service. That's where the American people expect us to fight, and in this fight, we've leveraged every inch of the space, the space we've been given to operate.

I want to briefly discuss two important aspects of our post-9/11 operations to put them into proper perspective, and they have to do with that space question. First is our rendition, detention and interrogation programs, and then I want to talk a little bit about our close collaboration with allied intelligence services.

Now, the first thing you need to know about those renditions, detentions and interrogations programs, which, I should add, are very carefully controlled and lawfully conducted, is that although I'm talking about them today, they are hardly the centerpiece of our effort, nor are they nearly as big as some think. But the intelligence they've produced is absolutely irreplaceable, and that intelligence has been used not only by this nation's national security agencies, but by our fellow members of the Atlantic alliance and other allies. It's been crucial in giving us a better understanding of the enemy we face as well as leads on taking other terrorists off the battlefield.

Intelligence is sometimes described as an analogist to putting the pieces of a puzzle together, except we hardly ever get to see the picture on the top of the box. The individuals that we detain provide us with a bunch of new puzzle pieces, but most importantly, very often they have seen the picture on the top of the box.

For example, that National Intelligence Estimate I mentioned earlier about threats to the homeland, in terms of its judgments and assumptions, is actually informed by the intelligence we've obtained from our detention program. More than 70 percent of the human intelligence reporting used in that estimate is based on information from detainees.

A year and a day ago, the president publicly acknowledged the existence of CIA's detention and interrogation program. It began with the capture of Abu Zubaydah in the spring of 2002. Fewer than 100 people had been detained at CIA's facilities. And I mentioned renditions, the number of renditions -- that's moving a terrorist from A to B -- apart from that 100 that we've detained, the number of renditions is actually even a smaller number, mid-range two figures. These programs are targeted and they are selective. They were designed only for the most dangerous terrorists and those believed to have the most valuable information, such as knowledge of planned attacks, but they've also been the subject of wild speculation both here and overseas.

A case and point, a European parliament temporary committee has claimed that -- and I'm quoting now -- "at least 1,245 flights operated by the CIA flew into European airspace and stopped over at European airports between the end of 2001 and the end of 2005." And the report said so in a context that implied that many or even most of these were rendition flights. The actual number of rendition flights ever flown by CIA is a tiny fraction of that. And the suggestion that even a substantial number of those 1,245 flights were carrying detainees is frankly absurd on its face.

What did some of these flights carry? Could be equipment to support our people in the field, could be documents that we're sharing with our allies, could be me. Flights like the ones I take to visit our allies are actually a good thing. They're signs of our close cooperation.

As a method used against the most dangerous terrorists, there's nothing new about renditions also, by the way, for either America or its allies. Consider the cases of Carlos the Jackal or Abdullah Ocalan, both of whose renditions were upheld by European courts. Renditions before and since 9/11 share some basic features. They have been conducted lawfully, responsibly and with a clear and single purpose: Get terrorists off the street and gain intelligence on those still at large.

Our detention and interrogation programs flow from the same inescapable logic. And a lot of what you hear about our interrogation and debriefing techniques is not only false, it actually tends to obscure a point that we and our officers understand very well. When face to face with a detained terrorist, the most effective tool bar none is knowledge. That means things like familiarity with the subject's background, knowing the right questions to ask, countering lies with facts.

We had one detainee, for example, who became quite cooperative in his briefing, when he arrived at a site and we told him not only who we were, we also told him who he was. And then we added where he came from and a great deal of his operational history. If CIA with all of our expertise in counterterrorism had not stepped forward to hold and interrogate men like Abu Zubaydah and Khalid Sheikh Mohammed, people in America, people in Europe, people elsewhere would be right to ask why. We shouldered that responsibility for just one reason: to learn all we can about our nation's most deadly enemies, so that our operations to undermine them are as effective as possible.

Now, I know serious people in free societies are still grappling with how best to address the fight against terrorists in a way that's both effective in protecting our

exchange of ideas between our societies is actually building a stronger consensus on the way forward. And it's not hard to see some signs of this cross-pollination and a growing realization that we are all confronting a distinctly new type of threat.

Germany's interior ministry, Wolfgang Schauble, recently cast the situation in these terms, and I'm quoting him now. "The fact is that the old categories no longer apply. The fight against international terrorism cannot be mastered by the classic methods of the police. We have to clarify whether our constitutional state is sufficient for confronting the new threats."

While the dialogue continues on how best to conduct this fight, we and our partners do stand united on its larger purpose. And this much is certain: America cannot win this war without allies. Steve Kappes is my deputy. Steve and I have gone to literally dozens of countries in our first year as head of the agency. Many of these countries we've visited more than once.

I cannot overstate how vital these relationships are to our overall effort. For when I'm talking about winning this war, I do so in full knowledge. It's a highly complex struggle, a long-term struggle, and it's fought on two levels: what I call the close battle and the deep battle. And our foreign partners are pivotal to success on both those fronts.

Close fight -- that's the one I've been referring to until now -- is pretty straightforward. It's about people who want to kill us. They can't be stopped unless we kill or capture them. And on this front, our foreign partners extend our reach, and they help us across the spectrum of our operations. The efforts of multiple services are often coordinated against a terrorist or group that has regional or global affiliations and doesn't respect the boundaries of nation-states.

Our collaboration has disrupted attacks that could have been on the same scales as those of 9/11 -- the U.K. airliner plot, the takedowns of Khalid Sheikh Mohammed, Mullah Dadullah and many, many others show what can be accomplished by close teamwork among allies. We've used the teamwork in every lawful tactic at our disposal, every inch of the space we've been given to protect all of our citizens from terrorist brutality. With that strong success in the close fight, we face an adaptive and resilient enemy who poses a heightened threat, as I mentioned earlier.

I talked recently with a reporter friend of mine about my hard-to-find/easy-to-kill model. And with his usual insight, my friend added -- once again, contrasting it to the Cold War -- that al Qaeda, in addition to being hard to find, was actually quick to regenerate. And al Qaeda has compensated for losing its Afghan safe haven and key operational lieutenants by regrouping in Pakistan's tribal areas, where they've recruited from a ready pool of adherents. And therein lies what I described a minute ago, the deep battle: Blunting the jihadists' appeal to disenchanted young Muslim men and, increasingly, young Muslim women as well. The deep fight requires discrediting and eliminating the jihadist ideology that motivates this hatred and violence. It requires winning what is essentially a war of ideas.

And I recognize that some of the actions required by the close fight can make fighting the deep fight even more complicated. But it's actually very rare in life that doing nothing is a legitimate or a morally acceptable course of action. Responsibility demands action, and dealing with the immediate threat must naturally be a top priority.

Killing, capturing terrorists keeps them at bay and protects our people, but defeating the world view responsible for producing those terrorists diminishes the

threat itself. Winning the war of ideas actually defines the long-term victory that we seek.

I need to be very clear about this -- this conflict is not about religion. This war of ideas is not about Islam; it's about fanatics whose victims have most often been other Muslims. The terrorists must be exposed for the scourge they are, reviled for the horror and suffering they inflict; only then can they be uprooted at their very source.

The deep fight, I should add, is a fight that our whole society has to wage. This war of ideas is something that CIA can contribute to, but we are not the decisive factor. And that deep fight requires that jihadists' ideas of violence and extremism and intolerance be countered by ideas of peace, moderation and inclusion. It requires a tireless global campaign by a broad coalition of nations and societies. But, frankly, it's our friends in the Islamic world, repulsed by al Qaeda's savage distortion of their faith, who must take a leading role.

Any discussion of war and particularly the war of ideas would be incomplete without reference to global media. It is indeed one of the decisive battlegrounds in the post-9/11 era. It's where al Qaeda can attempt to spread its grand illusion of a noble struggle, or it can be where its operatives can be revealed as murderers who try to justify their atrocities with a violent, bankrupt ideology.

The duty of a free press is to report the facts as they are found. By sticking to that principle, journalists accomplish a great deal in exposing al Qaeda and its inherents for what they truly are. And just as they report on terrorists, it's the job of journalists to report on how the war against terrorism is being fought. And when their spotlight is cast on intelligence activities, sound judgment and a thorough understanding of all the equities at play are critically important.

Revelations of sources and methods or what seems to me to be an impulse to drag anything CIA does to the darkest corner of the room can make it very difficult for us to perform our vital work. When our operations are exposed -- you know, the legal, authorized operations overseen by Congress? -- when those operations are exposed, it reduces the space and it damages the tools we use to protect Americans.

After the press report on how banking records in the international Swiss network could be monitored, I read a claim that this leak -- and I'm quoting now -- "bears no resemblance to security breaches" -- why disclosure of troop locations that would clearly compromise the immediate safety of specific individuals -- I could not disagree more strongly. In a war that largely depends on our success on collecting intelligence on the enemy, publishing information on our sources and methods can be just as damaging as revelations of troop or ship movements have been in the past. Now the compromise to safety can be both immediate and lasting, and it extends beyond specific individuals. Each revelation of our methods in tracking terrorists, tracking WMD, tracking other threats allows our enemies to cover their tracks and change their practices. We'll respond, but it takes us valuable time to readjust.

Now, some are out there who say there's no evidence that leaks of classified information have actually harmed national security. As CIA director, I'm telling you there is and they have. Let me give you just two examples. In one case, leaks provided ammunition for a government to prosecute and imprison one of our sources whose family was also endangered. The revelations had an immediate chilling affect on our ability to collect against a top priority target. In another, a spade of media reports cost us several promising counterterrorism and counterproflieration assets. Sources not even involved in the operation that was

they stopped reporting.

I mentioned earlier how our liaison relationships with our foreign partners are critical to the war effort. Several years before the 9/11 attacks, a press leak of liaison intelligence prompted a country's service to stop cooperating with us on counterterrorism for two years. More recently, more than one foreign service has told us that because of public disclosures they had to withhold intelligence they otherwise would have shared with us, and that gap of information puts Americans at risk.

Look, I know those who are entrusted with America's secrets and break that trust by divulging those secrets are guilty of a crime, but those who seek such information and then choose to publish it are not without responsibilities. I've got a deep respect for journalists and for their profession. Many of them, especially since 9/11, have actually given their lives in the act of keeping our citizens and our society informed. They're smart, they're dedicated, they're courageous men and women. I count many of them in -- and let me choose my words carefully -- I count many of them as callings. We each have an important role to play in the defense of the republic, but my point is, there are times when life and death issues are at stake when intelligence activities is a subject of press reports.

On their own journalists often simply don't have all the facts needed to make the call on whether the information can be released without harm. I've heard some justify a release based on their view of the sensitivity of their story's content with no understanding of the affect the release have -- may have on the -- the release may have on the intelligence source at the heart of the story. As I said, journalists and intelligence officers have important roles to play in the defense of the republic. A free press is critical to good government. But when the media claims an oversight role on clandestine operations, it moves that clandestine operation into an arena where we cannot clarify, we cannot explain, we cannot defend our actions without doing even further damage to our national security.

It's important -- as I say this, it's important to bear in mind that my agency is subject to another oversight mechanism that has full access to our operations and takes our security requirements into account, it's your representatives in Congress.

The CIA has asked for robust authorities -- remember, the space -- so that we can better fulfill our responsibility to prevent another attack like 9/11, but we have not asked for those authorities without congressional oversight. Close interaction with Congress -- it is an essential part of our -- the agency's social contract with the American people.

Let me give you some statistics -- all of them are for this calendar year, all right; it's 2007 -- that underscore how we vigorously support the oversight we have from the elected representatives in Congress.

In 2007 to date, CIA officers have testified in 57 congressional hearings, and we're responding to 29 congressionally legislated requests for information. We have answered 1,140 QFRs -- that's Questions For the Record -- as well as 254 other letters, questions and requests. CIA experts have given more than 500 briefings to members of Congress and their staffs. We have issued some 100 congressional notifications about our sensitive programs. Everything is on the table. I personally have briefed the Hill nine times since last September on renditions, detentions and interrogations.

I mention all this because, contrary to some of the things you might read in a book, glean from a movie or read in the newspaper, we actually act at CIA within a strong framework of law and oversight. We are responsive to both ends of

Pennsylvania Avenue.

We have an Office of General Counsel. We have an Office of General Counsel that is actually larger than many of our foreign intelligence partners. And our OGC offices, our General Counsel Offices, have a defining say in how we conduct our operations.

We work hard to earn the public trust, because we need that public trust to do our job. It's especially important because the counterterrorism part of our global mission isn't going away any time soon. This war will define our priorities well into the future.

All of you here at the council play a special role in informing this public debate, this public debate on this and every other major issue of foreign policy and national security, so I want to thank you for giving me the opportunity to talk about the work we do at the agency and to help contribute to the broader public understanding of our effort.

I came here as a member of two organizations that mean a lot to me, and one's obvious, see -- the Air Force -- and CIA. And as luck would have it, this month marks the 60th anniversary of both -- both created by the same National Security Act. I've been with the Air Force for 38 of its 60 years; it really hurts me to say that. (Laughs, laughter.) That's a long time. Another harmful way would be something like 50 percent of the history of manned flight, but I don't want to go there. (Laughs, laughter.) I'm proud to be an airman, to wear the uniform, to be part of that great family.

I've been with the agency for about 16 months, but I've actually worked closely with its offices for much of my career. I have a much deeper familiarity with CIA than a 16-month tenure would suggest. We at CIA are no stranger to criticism, and that's been true throughout our history. Sometimes it's justified; often, it's not. Much of what I've seen in the press and read in some books simply doesn't square with the devotion and skill I see every day, whether I'm at Langley or I'm in a war zone. The men and women of CIA are among the most gifted, talented people I've ever had the good fortune to work with. And at the rate of 130,000 applications a year, we've had the opportunity to pick some exceptionally intelligent, creative officers.

America hasn't just been lucky, and it isn't as if the terrorists have been lazy or just aren't trying. Those notions fail to explain the lack of an attack inside our homeland for the last six years. Our nation's bulwark is that group of experts at CIA, the National Counterterrorism Center, across the entire intelligence community who help prosecute this war with their deep knowledge of the enemy and their tight collaboration against a shared target.

I've been out to visit our people in Iraq, Afghanistan, other places where the risk and hardship for CIA employees are greatest. I've seen them work seamlessly with their colleagues in the armed forces, participating in joint operations that have brought the fight directly to the enemy.

And I've seen our officers here at home take quiet satisfaction in seeing the photograph of a terrorist they've tracked for years show up on CNN after his capture. It might be a face and a name unrecognizable to most viewers but not to those who have written countless cables, drafted finished intelligence reports, briefed dozens of policymakers and congressmen on that one target. Each of those victories adds up to a safer America; each is testimony to the tireless dedication and resolve of our men and women for whom the memory of 9/11 is neither distant nor diminished.

At our headquarters building in counterterrorism office that I get to go to a lot, you walk in, there's a bulk head there, you've got to break left or right when you come in, and there's a sign; there's a sign that's been up there for about six years. And at first glance it looks just like a convenience, but once you've actually read it, it never blends into the paperwork. The sign simply says, "Today's date is September 12th, 2001." That's how we approach this war with no apologies, and we do so knowing we must continue and earn the trust of the American people for that operational space we need to do what the nation has asked of us.

Thank you, and I'd be very happy to take your questions. (Applause.)

FRIEDMAN: Just to remind you of the ground rules, please wait for the microphone and speak directly into it. Please state your name and affiliation, and above all, please limit yourself to one question and make it as concise as you can.

Ma'am.

QUESTIONER: I'm Lucy Komisar. I'm a journalist. I wonder whether looking back a little bit in history you think there are any lessons to learn from the fact that the CIA, having overthrown Mossadeq in Iraq, set the stage for the problems that we are facing now -- I'm sorry -- in Iran, but of course it extends to Iraq.

HAYDEN: The refuge of all intelligence officers, that sounds like a policy question. (Laughter.)

All I can tell you, all right, is that the Central Intelligence Agency within a framework of law carries out the foreign policy of the United States that is constructed by the people that we elect in both the executive and legislative branch.

Yeah, sir, please.

FRIEDMAN: Okay, you'll go. Okay, Kenny.

QUESTIONER: One of the great -- thank you very much for your -- I'm Kenneth Bialkin, Skadden, Arps. One of the great debates in America today is whether to say or go in Iraq. You mentioned the war we have with al Qaeda. Can you please give us the benefit of any assessment that you may have regarding the impact on al Qaeda, its ability to conduct that war here or elsewhere should we -- if I may use a pejorative phrase -- abandon the field?

HAYDEN: Sure. Complex question, and I'm going to give you far too brief an answer, and you've got Dave Petraeus and Ambassador Crocker coming back next week who will elaborate on the situation there.

Life and particularly this kind of slice of life is always complicated. We had a National Intelligence Estimate in the past or so that actually said Iraq has become a cause celebre for jihadist recruitment and then that's a true fact, all right. That reality exists. On the other hand, we also have a letter from Ayman al-Zawahiri to then-Abu Musaab al-Zarqawi in Iraq that called Iraq the central front in the global war for al Qaeda and that their plans would be to create a caliphate beginning in the Sunni heartland of Iraq and spreading both west and east, into The Levant as well. So you've got those realities as well.

If you look at what we need to achieve in Iraq -- and there are a whole list of things -- I've got to put at the top of my list it cannot become a safe haven for those who are threatening the United States.

FRIEDMAN: Roland.

QUESTIONER: General, my name is Roland Paul. I'm a lawyer. Some years ago I

was in the government and had the pleasure and privilege of visiting Langley several times.

You mentioned in your remarks that al Qaeda has reconstituted itself in the tribal regions of Pakistan. I know that President Musharraf has made some efforts to eliminate them. But what do you think is necessary and appropriate to eliminate those bases of al Qaeda in Pakistan?

HAYDEN: It's a very difficult challenge and it's hard to imagine a better ally we've had, tentatively, a better ally that we've had in the war than President Musharraf in Pakistan and his military intelligence services.

But you're talking about an area which historically no central government has had control over, and an area that has its own culture and its own traditions that actually make it readily comfortable for al Qaeda to establish a presence. This has become a more serious question for us as al Qaeda has begun to reconstitute. And we're working very closely with our allies in the region and, I should say, on both sides of the border, in Afghanistan, in Pakistan, to do everything we can to deny them this safe haven.

I mentioned earlier that a friend of mine pointed out that, you know, "easy to kill, hard to find, quick to regenerate." And this is a very asymmetrical kind of war. People with safe haven in the FATA, in the Federally Administered Tribal Area, or across the border in Afghanistan, only have to number in three figures, in the hundreds, for them to actually begin to constitute a source of a serious threat against the homeland. Now compare that to 30 years ago and count up the number of Soviet troops and Group Soviet Forces Germany, and you get a sense of the challenge we have here.

So I think continue to work as closely as possible with all of our allies and work as aggressively as possible against the enemy.

FRIEDMAN: Madam?

QUESTIONER: Thank you. Mary Boise (sp), Boise-McGuinness (sp) Law Firm. General, thank you for your service.

HAYDEN: Thank you.

QUESTIONER: Using your terms, what space does the CIA not have that you think it should have and that you think is important for success in the close and the deep fight?

HAYDEN: I'm going to give you an answer from the heart; it's going to be a little oblique, but I think it has a lot of truth to it as I see it.

Kept using the word operational space, or the space provided to us by the American people. In one way, defining that -- and I mention it in the text -- was the laws that we have, but there's more to it than that. All right.

The Central Intelligence Agency and the great Americans who work for CIA, in CIA, live in a larger political culture, and that political culture -- particularly I would use the word -- I mean, if you give me three minutes, I'd think of a better one -- but elite political culture, right, seems to be at the moment squeezing, at least psychically, that operational space; that the things that the nation has asked us to do and the things we are doing on behalf of the nation, its legitimacy is being questioned by certain segments of the population.

Let me be real harsh, and this is probably a bit unfair, all right. I talked about going into the CTC, the Counterterrorism Center and saying today's date is

down the GW Parkway, it's not long before it begins to feel like September 10th. And I'm not talking about in terms of threat. I'm talking about in the willingness of the broader political culture to be comfortable with the things we believe are both lawful and necessary for us to fight this war. That's really what I'm talking about.

FRIEDMAN: Let's just go way to the back. This gentleman way back in the last row.

QUESTIONER: Richard Esposito, ABC News. General, in the past, al Qaeda's just released its tapes. In the current one, they seem to be hyping and trying to create a buzz. What's going on with al Qaeda? Is there any real threat? We gather there's a lot of chest thumping in the tape.

HAYDEN: Yeah. I'll come back to the NIE and then build from it. You know, we don't get three or four things they need to have: safe haven, leadership, to plan strategy, and then operational lieutenants to carry it out, and so on. The NIE says that exists.

What we don't know that exists: have they been able to move operatives inside the homeland. We do see them -- and I have to be by necessity a bit incomplete here, but we do see them working to train people whom you and I wouldn't raise an eyebrow about if they were getting off the plane with us at Kennedy; people whose identity makes it easier -- whose persona makes it easier for them to come into America and to blend into American society. That's going on, all right? That's a reality. And that's the picture we have of al Qaeda. And that willingness to attack the homeland by all that we have, by every source and method, is no way diminished.

FRIEDMAN: The gentleman there in the center.

QUESTIONER: General, I'm Harrison Goldin. thank you very much for your cogent and persuasive presentation, and thank you for your service.

In delineating the kind of oversight that the CIA has and welcomes, you didn't speak about the courts. I wonder if you would care to say a word about your view as to what the limits are of judicial oversight over intelligence activity, as you see it.

HAYDEN: Yeah. To be fair, and primarily, certainly since the mid-1970s and what we put together then in terms of oversight, after Church, Pike and so on, it was the Congress who had that primary oversight function of the activities of intelligence agencies, and the members are cleared, fully cleared, and we can operate in a box in which classified information can be freely exchanged.

That said, the courts also affect what it is we can do as an agency. Let me pick two examples.

I talked about detentions, interrogations, and how they've always been lawful. But you know, to turn that page and to dig a bit deeper into that, "always lawful," but the law on which it's based has actually developed in the course of the last six years, whether it be the Detainee Treatment Act, the Military Commissions Act or the Hamdan decision, which, you know, created new realities to which we have to respond as an agency. And we have, and that's the way it should be.

In my personal experience, the most robust judicial oversight that I've seen in my life as an intelligence officer has been through the FISA Court and particularly in my job twice removed as the head of the National Security Agency. And there the court plays a very powerful and, I should say, on balance, a very, very productive

role in enabling NSA to do what it needs to do to collect intelligence.

FRIEDMAN: Do you want to comment on e-mails coming through --

HAYDEN: No.

FRIEDMAN: (Inaudible.)

Okay. Sir, on the aisle.

QUESTIONER: I'm Mike Posner from Human Rights First. General Hayden, you spoke at the beginning of your remarks about the distinction between law and rules and then space. And I want to focus n the rules relating to interrogations.

Last year about this time, the president spoke, and he asked Congress for authority for the agency to be involved in what he called enhanced interrogation techniques. This is things like stress positions, use of dogs, hypothermia, mock drowning, waterboarding. The Congress said no to that, led by Senators McCain, Graham and Warner. The military's also said no to that, and all of the senior military lawyers have been very clear that those techniques violate Common Article 3 of the Geneva Conventions, in public testimony before Congress.

And yet a month -- six weeks ago, the administration passed an executive order seemingly allowing again the CIA to engage in these enhanced techniques.

From my perspective, it seems to me like this is more than asking for space; what you're really trying to do is change the rules. The question is, why do you need these enhanced techniques? Why shouldn't every U.S. agency operate by a single standard compliant with Common Article 3?

HAYDEN: First let me make comment on your listing of techniques and just frankly add that it's a pretty good example of taking something to the darkest corner of the room and not reflective of what my agency does.

Now let's talk about the history, last October. With the Hamdan decision, the Supreme Court extended the protection of Common Article 3 to the unlawful combatants of al Qaeda. I'm not a lawyer, but I'm frankly surprised by that aspect of the decision, in that Common Article 3 refers to conflicts not of an international character. And this one does certainly seem to be conflict of an international character.

Our problem was not that we wanted the Congress to approve any techniques. Our problem was, we didn't know what Common Article 3 meant in the context of American law. When the Senate ratified a variety of other portions of the Geneva Convention, the legislative history or specific statements of the Senate clarified the meaning of the international treaty in terms of American law. For example, the Convention Against Torture is carefully hooked in the legislative history to the prohibition in domestic law against cruel and inhuman punishment articulated by the 5th, 8th and 14th Amendments to the Constitution.

The Congress had made no clarifying language with regard to Common Article 3. And any, I think, fair reading of Common Article 3 would point out that it would be very hard for me to direct an officer of the agency to do things with the vagaries of the language in Common Article 3. So I wasn't looking for a carve out; I was looking for a definition.

One of the outs that was offered to the agency was that we in the -- it turns out to be the Military Commissions Act. We in the Military Commissions Act will criminalize certain kinds of activities. And as long as your officers don't do these activities, they won't be prosecuted. And therefore you'll be safe from -- well,

you'll be safe from prosecution.

The agency as a whole and myself in particular rejected that solution. Because what it -- what it would put me in the position of doing would be to turn to an agency officer and say, I would like you to do this with regard to this detainee, okay; I have no idea whether or not it violates the Geneva Convention, because I don't know what it means, but I'm pretty sure you'll never go to court for it, so would you go do that for me? And that's about the worst locker room speech I can imagine giving to an agency employee.

So we insisted on clarity for Common Article 3. The Congress decided that they would not offer that clarity but they then would instead reinforce the already existent presidential right to define the meaning for treaties for the United States. And so there's actual language in the Military Commissions Act that has the president doing that, and it requires him to publish his executive order in the Federal Register, which is what he did.

It's clear that what it is we do as agency is different from what is contained in the Army Field Manual. I don't know of anyone who has looked at the Army Field Manual who could make the claim that what's contained in there exhausts the universe of lawful interrogation techniques consistent with the Geneva Convention. The Army Field Manual was crafted to allow America's Army to train large numbers of young men and women to debrief and interrogate, for tactical purposes, transient prisoners on a fast-moving battlefield.

CIA handles a very small number of senior al Qaeda leaders. The average age of our interrogators is 43. The amount of training for this specific activity is 240 hours. So the reason we're not covered by the Army Field Manual is that we're not in the DOD. We weren't consulted about the Army Field Manual, and no one ever claimed that the Army Field Manual exhausted all the lawful tools that America could have to protect itself.

FRIEDMAN: Thank you.

Sir.

QUESTIONER: Thank you. Stephen Kass, Carter Ledyard & Milburn.

General, in view of the extensive training that you just referred to for the very highly qualified people who provide, I gather you said, 70 percent of the information that goes into the National Intelligence Estimate, in view of the critical nature of that information, what is the operating reason for sending people abroad to be interrogated by other countries with less qualified people, not under your control, when the information is so important, unless that reason is to circumvent the restrictions on U.S. operations?

HAYDEN: Thanks for the question, because it allows me to clarify the other half of detentions and renditions. And it's actually curious that it's not the first time it's happened where I've actually been told to -- why do you conduct renditions, because detentions are so good? Don't get that all the time, so -- (laughs/laughter). In many instances -- all right? -- both justice and intelligence is better served by the movement of the individual to a country against which the individual has committed a crime or a country of which that individual is a citizen. All right? And it's a judgment case.

Now, we do not do it -- we do not do it to circumvent any restrictions that we have on ourselves. There is a standard that we have to -- have to apply in each and every case. We have to receive assurances -- and we have to have confidence in the assurances -- that this individual will be handled in a way that is consistent

individual is handled. Now, that's not an invasive right to go to an ally with a clip board and see how they're running day-to-day activity with a detainee, but as an intelligence agency, we have this broad responsibility that the assurances we receive at the beginning -- that we continue to have confidence that we should have in those assurances.

The standard we use is that -- and it's pretty straightforward -- it's more or less likely -- before you jump to conclusions, let me finish the explanation. We have to believe that it is less rather than more likely that the individual will be tortured. And I've had very well-informed people say, "Where did you get that standard?" And the answer is, from the Senate of the United States. That's in the legislative history for the Senate working to pass the International Convention Against Torture.

Clearly, we're not looking to shave this 49/51. All right? We want true assurances that the individual will be treated well. So we don't do it, as some have suggested, to circumvent.

FRIEDMAN: We've reached pretty much the allotted time. Let me take just one more, from that patient lady there.

QUESTIONER: Hi. I'm Carroll Bogert from Human Rights Watch. And just following on what you just said, I myself personally did research in Russia into the fate of some detainees who were rendered there on assurances from the Russian government that they would not be tortured. The State Department's own Human Rights Reports could not have been more clear that torture is very prevalent in Russia. And I wonder on what basis you think a country that conducts torture and is known to conduct torture can be trusted with -- by giving a bilateral assurance to the U.S. government that somehow the spots of their leopard have changed.

HAYDEN: As I said in the prepared remarks, life rarely gives you the opportunity to just observe and do nothing. If my agency has custody of somebody, we've got to do something. And let's walk through the options: detention, Guantanamo or renditions. And we've got to make a judgment based on the information we have available.

I should add that the statute that deals with renditions and the standards that we apply, clearly -- clearly the overall history of a state has to be considered. But the statute requires us to make the judgment based upon our belief specifically about the individual on which the rendition is being conducted.

FRIEDMAN: I ask you to join me in thanking Mike Hayden for a terrific --
(applause).

(C) COPYRIGHT 2007, FEDERAL NEWS SERVICE, INC., 1000 VERMONT AVE.

NW; 5TH FLOOR; WASHINGTON, DC - 20005, USA. ALL RIGHTS RESERVED. ANY REPRODUCTION, REDISTRIBUTION OR RETRANSMISSION IS EXPRESSLY PROHIBITED.

UNAUTHORIZED REPRODUCTION, REDISTRIBUTION OR RETRANSMISSION CONSTITUTES A MISAPPROPRIATION UNDER APPLICABLE UNFAIR COMPETITION LAW, AND FEDERAL NEWS SERVICE, INC. RESERVES THE RIGHT TO PURSUE ALL REMEDIES AVAILABLE TO IT IN RESPECT TO SUCH MISAPPROPRIATION.

FEDERAL NEWS SERVICE, INC. IS A PRIVATE FIRM AND IS NOT AFFILIATED WITH THE FEDERAL GOVERNMENT. NO COPYRIGHT IS CLAIMED AS TO ANY PART OF THE ORIGINAL WORK PREPARED BY A UNITED STATES GOVERNMENT OFFICER OR EMPLOYEE AS PART OF THAT PERSON'S OFFICIAL DUTIES.

FOR INFORMATION ON SUBSCRIBING TO FNS, PLEASE CALL JACK GRAEME AT 202-347-1400.

THIS IS A RUSH TRANSCRIPT.

------------------------

Copyright 2007 by the Council on Foreign Relations. All Rights Reserved.