# EXHIBIT Q

Central Intelligence Agency
The Work of a Nation. The Center of Intelligence

Search 

# Press Releases & Statements

# Transcript of Director Hayden's Interview with Charlie Rose

(Posted with permission from the Charlie Rose Show
watch the interview at www.charlierose.com/home [external link disclaimer])

**October 24, 2007**

---

*Director of the Central Intelligence Agency, General Michael V. Hayden, appeared on the Charlie Rose show on October 22, 2007. Below is the transcript of their conversation.*

**CHARLIE ROSE (Host):** General Michael Hayden is here. He is the Director of the Central Intelligence Agency. He was the first ever Deputy Director of National Intelligence. He was the Director of the National Security Agency from 1999 to 2005. He has overseen some of the most controversial national security programs--the NSA's warrantless eavesdropping on US citizens and the CIA's rendition and enhanced interrogation programs. He has said he wants to use a full authority allowed by law and that his spikes will have chalk on them. I am pleased to have General Hayden at this table to talk about his sense of what the CIA's mission is, and how he puts that within the framework of the constitutional framework of the United States, and the challenge he sees from the rest of the world. So I say welcome, first.

**D/CIA:** Thank you. Thanks for the opportunity to be here.

**ROSE:** Tell me what you think the CIA's mission is.

**D/CIA:** In general, it's to defend the Republic, and you need to understand the Republic in the broadest sense. It's to defend the security, the safety, the physical safety of the American people. It's to defend the interests of the United States of America, and it's to defend a value system that this nation represents.

**ROSE:** You have also said that it has to protect America and it has to help policymakers understand the world around them.

**D/CIA:** Yes. Intelligence in any form, but particularly from my agency. If you know, Charlie, we've got the largest group of analysts in the Intelligence Community, and the only group of analysts

Case 5:07-cv-02798-JW     Document 54-21     Filed 12/14/2007     Page 3 of 19

that's not attached to some Cabinet-level department. So that autonomy gives us great opportunity, but also creates some burdens for us as well in terms of the requirement for us to be absolutely objective. And what I tried to describe--and I do this with our analysts--is that intelligence exists in that nexus between the world as it is and the world as we want it to be. And it's in that nexus that policy is formed. And the challenge for intelligence--but particularly for the analysts of the CIA--is to be in that nexus, to be relevant to the policymakers' questions, while at the same time not being captured by the policymakers' preferences. That's really demanding. It's hard to do, but that's the space where we've got to work.

**ROSE:** That's one of the questions that has arisen within this Administration with the Vice President and his office--whether intelligence has been captured.

**D/CIA:** Captured? How do you mean captured?

**ROSE:** Well, captured, whether the Vice President has his own intelligence and whether the Vice President, you know, is a different figure in terms of--and you've seen this up close, because you were the deputy to John Negroponte when he was the Director of National Intelligence.

**D/CIA:** Right. No. I mean all policymakers come to the creation of policy with their own personal histories, with their own view of man, with their own view of the world, with their own view of the best possible approaches that the Republic could have. We're part of that mix. We bring a view of the world into that--into that conversation.

**ROSE:** The CIA brings a view of the world into that conversation.

**D/CIA:** That's correct.

**ROSE:** Without policy recommendations.

**D/CIA:** We have to be policy relevant. Otherwise we're spending an awful lot of your tax dollars just to be interesting. What we need to be is relevant, so we've got to answer the questions that policymakers put to us. And frankly, we've got to answer a few questions that they don't think to put to us as well. But the fact that a policymaker disagrees with us--or more frequently, a policymaker challenges us--makes us stand by our assumptions, makes us stand by our conclusions. That's the cost of doing business, and if you're a really good analyst, you actually welcome that. That's not something that should put you off.

**ROSE:** So if you see a policymaker question your view or your analyst with great enthusiasm, you welcome that?

**D/CIA:** We do.

**ROSE:** Because you want to know whether you're doing the right thing.

**D/CIA:** That's right. And that actually is one metric, one measure, of the relevance of what it is we're saying to the policymakers' formulation of policy.

**ROSE:** Here's the flip side of that.

**D/CIA:** Sure.

Case 5:07-cv-02798-JW   Document 54-21   Filed 12/14/2007   Page 4 of 19

**ROSE:** Policymakers have made a decision about a certain policy, and they're just looking--they are out there looking for some intelligence that you'll give them that will support a point of view that they already have. That's the danger that some people worry about.

**D/CIA:** Of course. That exists in any human endeavor. That, you know, human nature being what it is. Anyone can go into a question, particularly a complex question with a preconceived point of view. And one can go through--there's massive amounts of data out there now. Let me step back and give you an example from people in my community. It's going to sound a little defensive, but, you know, in our conversation before we started, you said you wanted this to be a candid conversation. All right? It's pretty easy looking back after 9/11, looking into that vast ocean of data that existed prior to 9/11, and pick out the threads that show you how one could have arrived at a conclusion that the attacks were imminent, that the attacks would be of this nature, that they would happen at this time, and so on. So there is so much data out there that the human mind has to come at that data with at least some hypotheses.

**ROSE:** Okay, but--

**D/CIA:** A policymaker can do that. But so can we, and their hypotheses and ours can legitimately bump up against one another.

**ROSE:** Do you accept all the conclusions of the 9/11 Commission?

**D/CIA:** Yes.

**ROSE:** That's a case where they looked at everything and made certain--

**D/CIA:** Conclusions in terms of the recommendations--

**ROSE:** Right.

**D/CIA:** --they made to our community. And by and large, almost all those recommendations have been enacted.

**ROSE:** When you look at this statement, "America needs something that arguably goes against our grain, a truly great intelligence service that can be operated powerfully, invisibly, legally"--

**D/CIA:** It actually states quite clearly and simply starkly the dilemma of a secret intelligence service inside of a free society. But a free society needs a secret intelligence service as much as, if not more than, other forms of government around the world. And that presents us with great challenges--not us as an Agency, but it presents us as a people with these kinds of great challenges.

**ROSE:** Do we have a great intelligence service?

**D/CIA:** I believe we do have a great intelligence service. Is it good enough in all circumstances? Of course not. We live in the human condition. We try to make it better each day. But one of the messages I feel compelled to give to the American public is that the CIA and the American Intelligence Community writ large is in a class by its own. If we were comparing our intelligence services to the intelligence services around the world, and we were grading on a curve, we'd have to give ourselves an A-plus.

**ROSE:** All right. Let me just--

**D/CIA:** But life and the American people don't grade on the curve. It's an absolute scale. And that demands that we be better at everything we do.

**ROSE:** So you are saying to us, "I don't know of any nation that has a better intelligence service, and I've seen many of them, because it is my job to have relationships with many of them."

**D/CIA:** It would be unfair of me to endorse precisely what you just said. But when you think of the scale of intelligence that our nation must have, and to give you that mix of both global coverage, which no one--no other nation--currently has, and excellence, you can see where the bar is for the American Intelligence Community. It's very demanding.

**ROSE:** When you came there, people said the following things. They said he's there to calm a troubled agency, to restore the luster and restore the professionalism. Have you done that? Have you had to do that? Have you had to change a culture over there?

**D/CIA:** What you say roughly captures some of the things that we had to take on when I came there with Steve Kappes and Michael Morell.

**ROSE:** Who had quit?

**D/CIA:** That's right--who had left about 16 months ago. All right, the first thing we had to do, and I said this in my confirmation hearings, was to get the Agency out of the news as source or subject. There is no worse place for an intelligence service like CIA to be than on Page 1, above the fold in your daily newspaper. That's a distraction to the kind of work that the Agency has to do. So the first thing we wanted to do--this is really very simple. And Steve and Michael and I, my first message to the workforce was simply this: let's just go back to work. Let's just go what it is, go back and do what it is we know we have to do to defend America, to defend the Republic the way I described it a few minutes ago.

**ROSE:** Have you reached a point now where you think it's important to communicate something about the CIA? We asked you to come here, and it was not the first invitation. You appeared at the Council of Foreign Relations.

**D/CIA:** Yes.

**ROSE:** You made a speech, which was a candid and forceful speech about how you saw the CIA. Have you reached a point where you think it's important to communicate?

**D/CIA:** It is.

**ROSE:** Because you are bothered by something?

**D/CIA:** I am. And let me try to describe the narrative--

**ROSE:** Okay.

**D/CIA:** --that perhaps has gotten me, gotten the Agency to this point. As I said in my confirmation hearing, out of the press as source or subject. Settle down. Back to work. Do our mission. And I think we've been somewhat successful in doing that.

But there are other dynamics at work here as well. Many of the things this agency does on behalf of

the American people have become controversial, have become controversial in a way that affects the workforce. I mean, these aren't people separated from the American political culture who come to work at Langley and our activities around the world. These people are fully, completely Americans. They are affected by what goes on in the broader political culture when it's discussing the kind of work that they do. I think that public discourse has not been well informed. And so I am here. I was at the Council on Foreign Relations last month to give our perspective on some of these critical questions about the Agency that are now out there in the public forum.

**ROSE:** All right. Let's talk about the idea that you cited in the Council on Foreign Relations, just to give you some sense of information and how you see the battle and what techniques and means that you use in the battle.

**D/CIA:** Right.

**ROSE:** You have said the United States is at war. There is a state of armed conflict, and that the CIA is a vital element of that war. Tell me about the war and what you think the challenge is, because you say that everybody--that there's a real danger, more so than any time since the Civil War.

**D/CIA:** Right.

**ROSE:** And that everybody in America who lives in a major city is a possible target.

**D/CIA:** That's right. And that statement, you know, as I believe I put it, we believe we are in a state of armed conflict with al-Qaeda and its affiliates, that this conflict is global in scope, and that the only way we can win that war and to defend the Republic is to take that war to the enemy wherever he may be.

**ROSE:** Okay.

**D/CIA:** I recognize that I said it so starkly. I recognize that that is not a universally held view globally. And much to my disappointment, it is not a universally held view domestically. We had a meeting at--

**ROSE:** That we were at war or the nature of the enemy?

**D/CIA:** No, no. That this is a war.

**ROSE:** Right.

**D/CIA:** And that we must consider it a war, that it isn't a law enforcement problem or some other kind of approach to this particular problem that we're facing today, that this is an armed conflict. After the attacks on September 11th, we all learned lessons. You asked me about the 9/11 Commission and so on. One of the ones that I internalized personally because of my experience at that time as the Director of the National Security Agency was that this was not, in its essence, primarily a law enforcement issue. This was an armed conflict.

That is, again, not universally accepted by other governments in the world. And in March, I was invited to talk. The German ambassador asked me to come to his residence. Germany at that time was in the chair of the European Union. And he had this every-other-week meeting with the ambassadors to the United States from the countries of the European Union. And I went there at

lunch to speak. It was a very good exchange of ideas. But I made that point precisely the way I said it: "We are in a state of armed conflict." And that's a view that I know is not held by many of the governments that are represented in that room.

**ROSE:** Well, it is said that the British have been successful because they believed it is a police effort, that that's why they've been able to roll up some of those people that they have in Britain.

**D/CIA:** Right. And the British are wonderful partners. And we share information with them intimately. And their success is our success and vice versa. Rolling up people on the verge of an attack in Great Britain is not a comforting measure of success in this war. You know, if we try to defeat this enemy at the moment of attack, and it may be just that. It may be the moment of attack.

**ROSE:** Right.

**D/CIA:** We may not be able to defeat him on the battlefield he has chosen, but that moment of attack has a trail. That trail goes back--it goes back in time. It goes back in space. It goes back in actors. And if we can attack back there against those people who are plotting, against those people who are planning, against those facilitators, I'd rather bet the safety of the Republic and the safety of our allies on that kind of an approach rather than--if you want to use a sports metaphor--playing a little offense rather than having a perpetual first down and goal on the three-yard line in the homeland.

**ROSE:** I mean, is there anybody that doesn't think that this is a serious challenge to America's national security and we ought to take the battle to them and we ought to use--and be vigorous in our effort--to find out where the leadership is, what their targets are, what their means are, and whether they have the possibility in the United States, which you say you don't know--

**D/CIA:** Right.

**ROSE:** --to do damage to the United States in the homeland.

**D/CIA:** To clarify the last points that you made, what we don't know is whether or not they have operatives in the homeland. The other preconditions for attack we've stated pretty clearly. We think exist. But take your question and take it out of the abstract, and let's move it to the very practical, all right?

When I was at the Council on Foreign Relations, I said, you know, I have to act. I'm the head of the CIA. And I can't simply admire the problem or relish in its complexities. If I pick up someone who will do harm to America, if we're able to somehow get our hands on someone like that, I think I realistically have three options: I can detain him under the authorities the President has given us if he meets certain criteria. I can conduct a rendition. That is, taking that person to some other country, a third country. Or I can send that person to Guantanamo. And I said that very starkly at the Council on Foreign Relations to say those are the options that I have. Now I later learned, someone else had commented, well you could put him into a judicial process. That's the question that I see an awful lot on friction on.

**ROSE:** Okay, let me just tell you who argues the judicial process--Colin Powell. Colin Powell says we have nothing to fear from putting them in a judicial process.

**D/CIA:** That--I don't think we have anything to fear by putting them into a judicial process, if that is possible, but that cannot be our only approach to this problem. There are many people about whom I have more than sufficient intelligence to know that they intend to do great harm to the

Transcript of Director Hayden's Interview with Charlie Rose — Central Intelligence Agen.  Page 7 of 26

Case 3:07-cv-02798-JW    Document 54-21    Filed 12/14/2007    Page 8 of 9

United States, but it's the kind of information that may not be admissible in a court of law, or it may be the kind of information that I cannot submit to a judicial process because of the threat it would impose to sources and methods. Back to the premise, this is a war, this is not a law enforcement activity.

**ROSE:** You think that's true about Khalid Sheikh Mohammed?

**D/CIA:** It was true for a while.

**ROSE:** That you--before you captured him or after you captured?

**D/CIA:** No--

**ROSE:** That you didn't have the evidence to put him on trial?

**D/CIA:** No, no. Remembering that the premise here is that this is a war.

**ROSE:** Right.

**D/CIA:** That the safety of the nation for a period of time was better served by keeping him in a dentition facility with the Central Intelligence Agency where our access to him had no filter, had no interruption, so that we could develop from him all the information that we did develop from him that prevented future attacks. At some point, and I realize, a captured al-Qaeda senior like Khalid Sheikh Mohammed--his intelligence value never bleeds off to zero. But at some point, at some point, the intelligence value has to be measured against the other tools that the nation has at its disposal, and in this case, the summer of last year and the summer of 2006, the decision was made for KSM and for the 13 other people who were in custody at that time that the intelligence value had aged off to such a point that they could be moved to the next step of the process and that they can be prosecuted. Now the difficulty of prosecution--and that's not in my inbox. You read the press and the coverage as closely as I, and you can see all the complications that we have to work through as a society to prosecute.

**ROSE:** Let's separate two things. One, General Powell I think was talking about Guantanamo primarily. Now, are you making the same distinction? I mean KSM is now in Guantanamo, yes?

**D/CIA:** Yes.

**ROSE:** So should he have judicial process now, or do you think that as long as you think he is an asset that might tell you something, you should not give him and put him into some recognized judicial process?

**D/CIA:** We have made the judgment that the intelligence value of those individuals, the 14 that we moved there last September and the one additional person that we moved there this past year, Abd al-Hadi al-Iraqi, that the intelligence value of those people have degraded to a point that these other needs now take dominance. And we can't put them through a judicial process.

**ROSE:** I think what most Americans--

**D/CIA:** And I should add, okay, we are not the nation's jailers. We are the nation's intelligence service. We hold these people because they have intelligence value, and when they don't have intelligence value, other agencies, other arms of the US government have to step up. It could be a

Case 3:07-cv-02798-JW    Document 54-21    Filed 12/14/2007    Page 9 of 19

legal process. It could be indefinite detention as a combatant at Guantanamo.

**ROSE:** I want to get to torture and all that and interrogation in just a moment, but let me just stay with the argument where you are: rendition. Rendition is where you take somebody and you transport them to another country.

**D/CIA:** Correct.

**ROSE:** Correct?

**D/CIA:** Right.

**ROSE:** How many people have you done this to?

**D/CIA:** Mid-range, two figures since September 11, 2001. A pace somewhat behind the number of renditions conducted in the 1990s.

**ROSE:** Who was renditioned in the 1990s?

**D/CIA:** There were a whole variety of people that were moved between countries.

**ROSE:** Are we talking about a hundred people since 9/11?

**D/CIA:** No, mid-range, two figures.

**ROSE:** Two figures. So 50, 60. Whatever. Doesn't matter. Have been renditioned to somewhere.

**D/CIA:** Right.

**ROSE:** When you take them there, what happens? Who is in charge of the interrogation? What role does the CIA play? How much can the CIA do or does the CIA want to look the other way, is the impression of many people, as you know.

**D/CIA:** No, I understand. And that's--you've asked me, why did I want to come on the show now? It's these kind of impressions that need to be corrected. Let me scale this. I'm sorry. This maybe a slightly longer answer than you--

**ROSE:** Go ahead.

**D/CIA:** --bargained for. All right. The total number of people detained by the CIA is fewer than a hundred. In the life of the program, since the capture of Abu Zubaydah in March of 2002. Of these people detained, the number against whom we have used any kind of enhanced interrogation techniques is fewer than a third of the fewer than a hundred.

**ROSE:** Okay.

**D/CIA:** All right. Beyond those people, okay, that we've actually detained, there is another group of people, as you've described, on whom we've conducted renditions. We have moved them from one country to another.

Case 3:07-cv-02798-JW   Document 54-21   Filed 12/14/2007   Page 10 of 19

**ROSE:** Why do you do that? Why is that necessary?

**D/CIA:** In order to take them off the battlefield. Now you ask me why don't I just detain them? The reason is that under the authorities--the authorities under which we operate have clear criteria for people to be detained by the Central Intelligence Agency, and it's not run-of-the-mill al-Qaeda. For people who want to do us harm, who may not meet the criteria of detention, but whom everyone would agree have to be taken off the battlefield.

**ROSE:** And you say under--without equivocation, that you do not go turn them over to foreign intelligence services because they have means and methods that you would be uncomfortable using. That is a fact?

**D/CIA:** That is a fact. And that is US law. Let me talk just for a moment about the requirements that we have to meet when we conduct a rendition. We have to believe that mistreatment of that individual is less rather than more likely, and we talked about this at the Council in Foreign Relations as you've described--

**ROSE:** That's the test.

**D/CIA:** And the overall history of the receiving government is obviously something that we have to take into account. But the law requires us to make an independent judgment on this individual. And the criteria that exists in the legislative history of our treaty ratification that creates this requirement for us is less rather than more likely. Now you may argue, and some have, that's a relatively low bar. And I've said in other audiences, we're not looking to do this 49/51. When we seek assurances from the receiving nation, we want assurances, we want them to mean those assurances and we have a responsibility, we, plural--the United States government, including its intelligence services--that the United States government as a whole, to do our very best to ensure that the receiving government lives up to those promises.

**ROSE:** Is there a CIA person always there in terms of interrogation?

**D/CIA:** No, of course not.

**ROSE:** So you don't know. You just have a promise from that government, from the leadership of that government that that's what they're going to do?

**D/CIA:** We have a promise and a commitment from that government. Clearly, in most instances, you would assume, I think, that we have a relationship with that government and with that service. For them to do something beyond their promised behavior for us is not something they would take lightly. We rely on that and all the tools at our disposal to ensure that they've lived up to their commitment.

**ROSE:** You have--I'll come back to this later. You have said there are two things. There is a close battle and a deep battle.

**D/CIA:** Yes.

**ROSE:** The close battle is what we have been talking about. The deep battle is trying to influence hearts and minds--

**D/CIA:** Right.

**ROSE:** --trying to prevent people or provide an alternative so they don't go joining groups that wish us harm. Do you also agree that how you do the close battle may very well influence, so if, in fact, you're doing things--

**D/CIA:** Yes, absolutely. I agree.

**ROSE:** And--or if your reputation is doing things, then you're in trouble, because it hurts your effort, and there are many people today that believe, around the world, that that's the reality, and they're saying America is not what it represents itself to be.

**D/CIA:** Right, right.

**ROSE:** I'm not telling you anything--

**D/CIA:** And let me agree as strongly as I humanly can that the close battle and how we fight it is connected to the deep battle. The close battle being taking off the battlefield those who would kill or harm America or its allies. And the deep battle being that long-term war of ideas in which that which seems to motivate those folks we now have a problem with in the close fight, that which seems to motivate them is muted and changed--a change in belief or an attitude or in the causes. The underlying causes that create those who seem to want to act against us. They are absolutely connected. But one of the reasons we're talking here today, one of the reasons I talked to the Council on Foreign Relations, is to try to describe, to the best of our ability--and it's really hard for a secret intelligence service to talk about things that are secret--but to describe to the best of our ability what it is we are really doing, rather than the phrase you used a minute ago, the appearance or the assumption or some other word that describes--what's the right word, Charlie? Propaganda, of what it is my agency is actually trying to do. When I tell audiences that want to be thoughtful, that in the life of this program it's fewer than a hundred, with regard to interrogation techniques it's fewer than a third, and the number of renditions is actually smaller than that, mid-range, two figures. Now we can begin to have something of a reasonable conversation about reality rather than image.

**ROSE:** I need some help with terms here. What does enhanced technique mean? The President has come back and said enhanced technique executive order, okay. You have changed--you have added to that, I think, or maybe the President did, that there can be no enhanced technique that you haven't approved.

**D/CIA:** That's correct.

**ROSE:** All right. What is enhanced technique? What are we talking about here?

**D/CIA:** Well--

**ROSE:** Is it something close to torture?

**D/CIA:** No. First of all, as you know, I'm not going to talk about any specific techniques.

**ROSE:** Right.

**D/CIA:** All right?

**ROSE:** Whether it's waterboarding or anything else, you can't qualify it as an enhanced technique

Case 5:07-cv-02798-JW    Document 54-21    Filed 12/14/2007    Page 12 of 19

or not.

**D/CIA:** That's correct. And I can't comment on--

**ROSE:** Sleep deprivation or--

**D/CIA:** And I can't comment on any of the techniques we may or may not have used. That's right. All right?

**ROSE:** But you can't tell me whether those are acceptable or whether those are enhanced techniques? In other words, a lot of us want to know, what's your definition of torture, and how does it differ from what might be a conventional definition of torture? Is sleep deprivation torture, you know, is waterboarding torture? What is torture, regardless of whether you've used it or not?

**D/CIA:** Amongst that you've asked me for a personal opinion.

**ROSE:** Right.

**D/CIA:** All right. And let me put that up on the table and then move beyond it. My personal opinion isn't of great value to this conversation. What matters is US law. But before leaving personal opinion, let me tell you that the actions I've asked our officers to do, in my time as Director, my personal conscience is very content with what it is I've asked them to do. Okay--

**ROSE:** Whether it had to do with--KSM, or even the people who have plotted 9/11?

**D/CIA:** Right.

**ROSE:** And they were the ones who plotted 9/11, two of them.

**D/CIA:** Right. I'm talking about--

**ROSE:** Your conscience is clear--

**D/CIA:** In terms of my conscience--

**ROSE:** Your conscience clear as to whatever was done to those people during your time as Director of the CIA.

**D/CIA:** Absolutely. Absolutely.

**ROSE:** What about before?

**D/CIA:** Well, let me get to the earlier question you asked. You said what are enhanced techniques?

**ROSE:** Right.

**D/CIA:** And I'm going to have to work backwards a little bit from this, all right? But the other document that's out there, all right, the other document that people point to and say, why can't you follow this document?

**ROSE:** Right.

**D/CIA:** Is the Army Field Manual. And what I will describe for you is that enhanced techniques, all right, are in that range between the Army Field Manual, okay, and the limits of what US law and US treaty obligations allow. No one has ever claimed that the Army Field Manual exhausts all the lawful interrogation techniques that the American Republic can use to defend itself.

**ROSE:** Just for the benefit of--the Army Field Manual is what the military and the Department of Defense uses as its standard.

**D/CIA:** That's correct. And I think it's a powerful document for America's Army and for the Department of Defense.

**ROSE:** What's at the other end, so I can understand what's in between? What is it that American Constitution and the American law allow?

**D/CIA:** Well, now we're getting into--talk much longer, we'll be getting into very specific techniques. Let me build from the Army Field Manual forward to give you some sense as to what that range might be between the limits of the Field Manual and the limits of US law and US treaty obligation. The Army Field Manual was written to develop and describe a set of techniques that the US Department of Defense--and by the way, that's a friendly institution for me. That's where I have my roots.

**ROSE:** Your career.

**D/CIA:** Right. That America's Army is confident that you can teach 20, 21, 22-year-old interrogators to do, in battlefield circumstances, in fast-moving situations, sometimes with minimal supervision in order to get tactically relevant information from captured enemy combatants in almost all cases who will be lawful combatants under the Geneva Convention. Why anyone would think a document that meets that description should be the document that controls the activities of the Central Intelligence Agency, I don't understand. There are other things that are perfectly lawful that are within the limits of our treaty obligations--the Convention Against Torture, Common Article 3 of the Geneva Convention.

**ROSE:** Why can't anybody define to me what's lawful, though, between the Army Field Manual and the American Constitution? Just define for me what's lawful.

**D/CIA:** Because--because--and this point, if you were in my office at Langley, and we were talking, I'd probably hit a button and have three or four lawyers come down and back-stop me.

**ROSE:** Right.

**D/CIA:** But for the GI director of Central Intelligence Agency, I am familiar enough with US law to know that that limit up here is tied into beyond the Army Field Manual, a limit beyond which CIA cannot go. It's tied into a body of US law, a body of US precedent. It's tied to how we have articulated domestically our requirements under the 5th, 8th, and 14th Amendments to the US Constitution. And my lawyers tell me that the sum total of law tied to those constitutional amendments is summarized by the standard of "shock the conscience." And shock the conscience--

**ROSE:** If you shock the conscience, it's illegal.

**D/CIA:** That's right.

**ROSE:** Unconstitutional.

**D/CIA:** It would be a violation of--depending on how badly it's shocked the conscience, one could consider it torture. One could also consider it to be cruel, inhuman, and degrading activity, all of which are equally forbidden inside of US law.

**ROSE:** What do you say to somebody who says, if you captured somebody that planned, let's say you captured Osama Bin Laden tomorrow, who may very well know what plans there are. All--whatever is necessary, do. What do you say to those Americans who say the reverse? I'm not worried about the Constitution.

**D/CIA:** Yeah.

**ROSE:** I'm worried about protecting--

**D/CIA:** Protecting America.

**ROSE:** --the homeland.

**D/CIA:** That's correct.

**ROSE:** And this person may know things that will kill Americans. Go to it, General.

**D/CIA:** There are absolute standards. Those standards are embodied in our law. They're in the Military Commissions Act, for example. They're in how we ratify the Convention Against Torture. They're in domestic US law that forbid different aspects of torture. Some things are just absolutely forbidden. Some things are just wrong. And they're mentioned very specifically.

**ROSE:** It would shock the conscience.

**D/CIA:** It's beyond--

**ROSE:** Beyond shock the conscience.

**D/CIA:** And it's--and they would shock the conscience to such a degree, okay, that American jurisprudence cannot imagine circumstances when they would not shock the conscious, all right? But then are a whole bunch other activities. I read an interesting piece in today's Wall Street Journal, and I'm paraphrasing here, and I probably won't get it perfectly right. But they were talking about the shock the conscience standard, all right? And they pointed out that if they took you and me, all right, people of our age, and put us, you and me, through what Marine Corps recruits go through at Paris Island and forced us to do that, that would probably shock the conscience. But it's not illegal to do it to Marine Corps recruits, all right? That same behavior is not absolutely wrong--

**ROSE:** Are you talking about things like sleep deprivation, cold and extreme, and--

**D/CIA:** All the things, all the stresses that we put these recruits through, all right? But we don't think that's torture or cruel, inhuman, and degrading--

Case 3:07-cv-02798-JW    Document 54-21    Filed 12/14/2007    Page 15 of 19 of 26

**ROSE:** But I don't think when people think about torture that's what they're talking about. You know? This leads to another--

**D/CIA:** Well, that's a wonderful point because maybe that is what I'm talking about.

**ROSE:** So we're saying we do--do that it's torture. If we do that, it's not torture, that's what you're saying?

**D/CIA:** Again, I'm not going to talk about--

**ROSE:** I know that, but what you just said to me. But there is--I mean, if--I--you would say to me, clearly the United States does not torture.

**D/CIA:** Right.

**ROSE:** The President said that. The United States does not torture.

**D/CIA:** That's right.

**ROSE:** And under no circumstance would we do it because no information is worth violating our DNA. Is that what you'd say?

**D/CIA:** I've actually talked about conducting this war in a way that does not change our DNA as a people. That's a phrase I've actually used. That's right.

**ROSE:** What do we know about interrogations? What do we know about what works because I read a range of people say that those people who think beating someone up is the way to get them to talk have gotten it wrong.

**D/CIA:** Right.

**ROSE:** The way time after time it's proven that you get information is over process that has more to do with psychology than it does with force.

**D/CIA:** Right.

**ROSE:** Is that right or wrong?

**D/CIA:** Well, first of all, just a footnote in our conversation. We don't beat anybody up.

**ROSE:** All right.

**D/CIA:** Let's move on from that.

**ROSE:** No matter what they've done?

**D/CIA:** That's right. I mean, again, I said earlier, we're not the nation's jailers.

**ROSE:** Right.

**D/CIA:** And we're not out there to punish either. We're out there to learn. We're out there--

**ROSE:** And get information.

**D/CIA:** We're out there to get information. That's right. We have found universally, and I can say this without qualification the most powerful tool we have in gaining information from a captured detainee is our knowledge. We had one instance where we had a detainee. We took him into our custody. We told him who we were and we also told him who he was.

**ROSE:** Show him you knew a lot about him?

**D/CIA:** That's correct. And in that case, proved to be sufficient.

**ROSE:** Because? What was at work?

**D/CIA:** Well, what was at work was that we knew more about him than he expected. In many ways, we knew more about him than he knew himself.

**ROSE:** So he had assumed he had no reason not to disclose?

**D/CIA:** Well, we were, again, the purpose of this is to get information from him. And if you can challenge his misleading stories, if you can deconstruct his cover story, those things allow us to take information and to gain that information. Now you talked earlier-- and I need to come back to this-- because the belief out there is that torture does not work. All right?

**ROSE:** Some believe that.

**D/CIA:** I believe that. All right? And let me turn that syllogism on its head. Right? This does work. These fewer than a hundred detainees that we've had have created just under nine thousand intelligence reports. They comprise some of the most critical information we've ever gained on al-Qaeda. If you accept the premise that torture doesn't work, then you have to accept the fact that this did work. It provided us with very reliable, massive amounts of information.

**ROSE:** Okay, let me just ask this, just for the benefit of this. You have learned important things from those people who were in rendition, very important things that have enabled you to do better in the fight against terrorism, al-Qaeda, whatever you might perceive to be the enemy.

**D/CIA:** Right.

**ROSE:** And you're saying I'd be happy for anybody to know what techniques we used in order to get them to give us this vital information? I would have no problem if being on the front page of the New York Times what techniques we used because we don't torture, because I don't believe torture works. What works is psychology, what works is giving them information that we know about them, what works is--

**D/CIA:** I am unable to tell a quarter billion Americans what it is we're doing on their behalf.

**ROSE:** Because?

**D/CIA:** Because that information would become available to our enemies, and would become the table of contents of their training manual against us. Having said that, I wish I could tell a quarter

Case 3:07-cv-02798-JW    Document 54-21    Filed 12/14/2007    Page 17 of 19

billion Americans what we're doing on their behalf. I believe the vast majority of the American people would be quite comfortable with what their secret intelligence service is doing.

**ROSE:** And that's your message?

**D/CIA:** Yeah.

**ROSE:** When you look at the information, just help me understand how valuable the information has been from people like KSM, Abu Zubaydah--

**D/CIA:** Right. Detainees writ large. Those al-Qaeda members we have captured have been historically the single greatest source of information we've had on al-Qaeda. To use a metaphor that may explain what we're about, intelligence is often described as putting the pieces of a puzzle together. In almost all circumstances, our analysts have pieces of the puzzle incomplete, never all the pieces. And they've never seen the picture on the top of the box. A detainee very frequently has a lot of pieces, and the detainee has seen the picture on the top of the box. That kind of information is invaluable.

The people we have in our program are not run-of-the-mill al-Qaeda. These are high value detainees. There are criteria which I unfortunately cannot describe. There are criteria which must be met before people can be detained in this program by the Central Intelligence Agency. So we are talking about people whom we have every expectation, have seen the tops of quite a few puzzle boxes.

**ROSE:** It is said that the CIA is studying the effectiveness and retaining a jettison techniques on a sliding scale. Now I assume what that means is that if you're getting a lot of information with a certain technique, that it becomes a much more valuable technique. Can you help me understand this?

**D/CIA:** Yeah. There is kind of a myth out there, and I'm going to be too flippant, maybe irreverent in describing it. That somehow, you know, it's Tuesday, we go in, meet the detainee, and say it's Tuesday, let's use number 12 or number 6. I mean that's not what this is about. We work very hard to get into a relationship with this detainee that CIA, the United States Army, or any other interrogator would describe as "debriefing." A conversation with someone who is now sitting there talking to you about the things you're interested in. So that's, I think, the first thing I need to point out. Secondly, the way you phrased your question, Charlie, accused us of being a learning organization. Guilty.

**ROSE:** Okay.

**D/CIA:** We are a learning organization. And clearly, we have developed experience over the years in which this program has--

**ROSE:** Tell me what's the most important thing you've learned.

**D/CIA:** I don't mean to dodge the question, but I'm going to tell you what I think the most important thing we've learned is this. And we have adjusted the program based upon these realities. It was our belief last summer, if you recall, we had the detainee treatment Act. We had the Hamdan decision. We had these 14 individuals in CIA custody, even though we had a belief--and some of them in our custody for years. Even though we had a belief that we were not the nation's jailers. And that we had to move on. We had to move forward. We believed this program, you can probably tell from some of my comments, we believe this program was appropriate, lawful and effective. But

we needed it to move forward inside the broader American political culture. So we made a conscious decision inside CIA, and we worked this decision, this belief inside the Administration, that this program, if it were to go forward, had to go forward on something more than just a definition of its lawfulness. That it had to go forward with not just a definition of its lawfulness, but it had to have I guess what I'd call both policy and political legs. So that this was not the CIA's program, that this was America's program. And so what we did, beginning last September, was actually the day the president spoke in the White House announcing that the 14 had been brought to Guantanamo. I began to dialogue with Congress. I briefed all members of both of our oversight committees on all aspects of the detention and interrogation program, sought their thoughts on techniques that we may want to use going forward, and only after we had had that dialogue--now, to be fair, so that no one misunderstands here, we didn't ask the committees to vote on anything. But we laid out what it was we were doing. We had pretty rich dialogue. Their views informed my judgment, and that at the end of the day, and actually in 2007, we went forward to the President, to the Department of Justice, with a program. I can't describe that program to you, but I would suggest to you that it would be wrong to assume that the program of the past is necessarily the program moving forward into the future.

**ROSE:** There is also this. It would seem to me you would less and less need it as you go forward. And I still don't understand, and I hear you but I don't understand why it's necessary to take it to foreign countries where nobody can see, nobody knows anything, but, again, you say that's because you have nowhere else to bring them.

**D/CIA:** My choices are limited.

**ROSE:** Right.

**D/CIA:** All right?

**ROSE:** But you have nowhere else you can take them, other than to some foreign country where you turn it over to some foreign government.

**D/CIA:** Well, I'm open to ideas. I can keep them. That's detention. I can move them to a foreign government. That's rendition. We can move them to Guantanamo.

**ROSE:** I think most Americans would prefer detention or Guantanamo, I think, because you're putting people in the hands of other people and you're just going on just a promise --

**D/CIA:** It's more than just a promise. I told you that the care we're required to take, and in many cases, these people are actually criminals, wanted, in their--

**ROSE:** In their countries--

**D/CIA:** In their countries--

**ROSE:** And that's why the regions you choose--I know that argument. Here is another argument that you make. There is this thing called a space that you say, the space is to give the CIA space to do what it needs to do, because it's engaged in a war, and in this space, it's been given it by the Constitution. You believe that certain kinds of things happening in our country, or in part of what's happening, one is media, influenced and tighten the space. You believe that press coverage in some ways limits your maneuverability and restricts your space. Right?

Case 3:07-cv-02798-JW   Document 54-21   Filed 12/14/2007   Page 19 of 19

**D/CIA:** I'm tempted to say yes, but I'm reluctant to, because I know the importance of a free press. I know what it means to me as a citizen. I know what it means to CIA officers because they're all American citizens as well. I guess what I'm looking for--what puzzles me is not that we're the subject of many stories. I'd rather we weren't the subject of so many, but that happens. What puzzles me is to why there seems to be this temptation--almost irresistible--temptation to take any story about us and move it into the darkest corner of the room.

**ROSE:** Tell me what you mean by that. You've said that before.

**D/CIA:** Let me give you an example.

**ROSE:** What's the darkest corner of the room?

**D/CIA:** There was a story about 10 days ago from a rather large newspaper up the street.

**ROSE:** Right. This would be the New York Times.

**D/CIA:** It would be. That talked about--they claimed that there had been a Department of Justice opinion in the spring of 2005, that --and if you read the article, you would seem to get the impression that it expanded the authorities of CIA, or expanded the number of techniques that would be used. And all of us at the Agency looked at the story and maybe this is our narrow perspective. I mean we all kind of have a point of view depending on what it is we do day in and day out. We were looking at the story, something of a narrative disbelief. Number one, and I can't get too far in detail about this, which I truly do regret. The opinion that Justice gave the CIA in the spring of 2005 was the result of a request from our Agency for greater clarity on the program, legal clarity, on a program that was already existing. That's one fact. Number two, that's history. Since the time of the decision that the New York Times reported on in the spring of 2005, we had the Detainee Treatment Act in December of 2005, we had the Hamdan decision in the summer of 2006, we had the Military Commissions Act in the fall of 2006. They have all changed the legal landscape under which CIA's program is operated.

**ROSE:** Made it more restrictive.

**D/CIA:** It changed the legal framework and so--that to look at an opinion Justice offered in the spring of 2005--that simply has no relevance to the lawfulness or the legal opinion under which CIA is operating in the fall of 2007.

**ROSE:** Okay. But you also mean that, for example, there was reporting by the New York Times, too, about Swiss bank accounts. I've forgotten exactly the details. But Bill Keller, the editor, they went ahead with the story.

**D/CIA:** This is a Swift story.

**ROSE:** Did you know beforehand the story was coming?

**D/CIA:** Yes. And--

**ROSE:** Was there any effort by anybody to talk to Bill Keller of the New York Times and say, "This will do damage to us if you run this story?"

**D/CIA:** This is largely handled by the Department of Treasury because it's more in their lane than