explanation was that within a very short space of time, a detainee is transformed into a state of almost total immobility and sensory deprivation. *"The CIA can do three of these guys in an hour. In twenty minutes they're good to go."*[64] An investigating officer for the Swedish Ombudsman was struck by the *"fast and efficient procedure"* used by the American agents[65], while the Swedish interpreter who witnessed the CIA operation at Bromma Airport said simply: *"It surprised me how the heck they could have dressed him so fast"*.[66]

85.    The general characteristics of this "security check" can be established from a host of testimonies as follows[67]:

   i.   it generally takes place in a small room (a locker room, a police reception area) at the airport, or at a transit facility nearby.

   ii.  the man is sometimes already blindfolded when the operation begins, or will be blindfolded quickly and remain so throughout most of the operation.

   iii. four to six CIA agents perform the operation in a highly-disciplined, consistent fashion – they are dressed in black (either civilian clothes or special "uniforms"), wearing black gloves, with their full faces covered. Testimonies speak, variously, of *"big people in black balaclavas"*[68], people *"dressed in black like ninjas"*[69], or people wearing *"ordinary clothes, but hooded"*[70].

   iv.  the CIA agents *"don't utter a word when they communicate with one another"*[71], using only hand signals or simply knowing their roles implicitly.

   v.   some men speak of being punched or shoved by the agents at the beginning of the operation in a rough or brutal fashion[72]; others talked about being gripped firmly from several sides

   vi.  the man's hands and feet are shackled.

   vii. the man has all his clothes (including his underwear) cut from his body using knives or scissors in a careful, methodical fashion; an eye-witness described how *"someone was taking these clothes and feeling every part, you know, as if there was something inside the clothes, and then putting them in a bag"*[73].

   viii. the man is subjected to a full-body cavity search, which also entails a close examination of his hair, ears, mouth and lips.

   ix.  the man is photographed with a flash camera, including when he is nearly[74] or totally naked[75]; in some instances, the man's blindfold may be removed for the purpose of a photograph in which his face is also identifiable[76].

---

[64] *Ibid.*

[65] See Office of the Parliamentary Ombudsman (Sweden), *Interview conducted with state official X of the Security Police (Säpo)*, Case No. 2169-2004, 30 September 2004 (translated transcript on file with the Rapporteur – hereinafter "Interview with Swedish Säpo interpreter"); comment made at page 23.

[66] *Ibid*, observation made by the Säpo interpreter in answer to a question, at page 13.

[67] The person subjected to the "security check" is referred to generically as "the man", because we have not thus far heard of any cases in which it has happened to women. This overview contains aspects common to several renditions, while excerpts from individual testimonies are cited separately hereunder.

[68] See Bisher Al-Rawi, statement made to his lawyer during an interview at Guantanamo Bay (contained in unclassified attorney notes), submitted to the High Court of Justice in Case No. 2005/10470/05 through the *Witness Statement of Clive Stafford Smith* (hereinafter "Al-Rawi statement to lawyer"), at page 31.

[69] See Jamil El-Banna, statement made to his lawyer during an interview at Guantanamo Bay (contained in unclassified attorney notes), submitted to the High Court of Justice in Case No. 2005/10470/05 through the *Witness Statement of Clive Stafford Smith* (hereinafter "El-Banna statement to lawyer"), at page 40.

[70] See Interview with Swedish Säpo interpreter, *supra* note 85, at page 10.

[71] See Office of the Parliamentary Ombudsman (Sweden), *Interview conducted with Kjell Jönsson, Swedsh lawyer for Mohamed Alzery*, Case No. 2169-2004, September 2004 (translated transcript on file with the Rapporteur – hereinafter "Ombudsman's Interview with Swedish lawyer Jönsson"); at page 6.

[72] See Declaration of Khaled El-Masri in support of Plaintiff's Opposition to the United States' Motion to Dismiss, in *El-Masri v. Tenet et al*, Eastern District Court of Virginia in Alexandria, 6 April 2006 (hereinafter "El-Masri statement to US Court in Alexandria, 6 April 2006") at page 9: "As I was led into this room I felt two people violently grab my arms… They bent both my arms backwards. This violent motion caused me a lot of pain. I was beaten severely from all sides."

[73] See Interview with Swedish Säpo interpreter, *supra* note 65, at page 13.

[74] See Interview with Swedish Säpo interpreter, *supra* note 65, at page 13: "he wasn't naked, he had his underpants on; the upper body was undressed and then his picture was taken."

[75] See Binyam Mohamed Al-Habashi, statement made to his lawyer during an interview at Guantanamo Bay, contained in unclassified attorney notes of Clive A. Stafford Smith, dated 1 August 2005 (document on file with the Rapporteur – hereinafter "Binyam Mohamed statements to lawyer at Guantanamo"), at page 19: "there was a white female with glasses… One of them held my penis and she took digital pictures."

[76] See El-Masri statement to US Court in Alexandria, 6 April 2006, *supra* note 71, at page 9: "They took off my blindfold… As soon as it was removed, a very bright flashlight went off and I was temporarily blinded. I believe from the sounds that they had taken photographs of me throughout."

x. some accounts speak of a foreign object being forcibly inserted into the man's anus; some accounts speak more specifically of a tranquiliser or suppository being administered *per rectum*[77] - in each description this practice has been perceived as a grossly violating act that affronts the man's dignity.

xi. the man is then dressed in a nappy or incontinence pad and a loose-fitting "*jump-suit*" or set of overalls; "*they put diapers on him and then there is some handling with these handcuffs and foot chains, because first they put them on and then they are supposed to put him in overalls, so then they have to alternately unlock and relock them*"[78].

xii. the man has his ears muffled, sometimes being made to wear a pair of "*headphones*"[79]

xiii. finally a cloth bag is placed over the man's head, with no holes through which to breathe or detect light; they "*put a blindfold on him and after that a hood that apparently reaches far down on his body*"[80].

xiv. the man is typically forced aboard a waiting aeroplane, where he may be "*placed on a stretcher, shackled*"[81], or strapped to a mattress or seat, or "*laid down on the floor of the plane and they bind him up in a very uncomfortable position that makes him hurt from moving*"[82].

xv. in some cases the man is drugged and experiences little or nothing of the actual rendition flight[83]; in other cases, factors such as the pain of the shackles or the refusal to allow him to drink water or use the toilet make the flight unbearable: "*this was the hardest moment in my life*"[84].

xvi. in most cases, the man has no notion of where he is going, nor the fate that awaits him upon arrival.

86.    This manner of treating detainees has been heavily criticised by the lawyers of many of the persons subjected to rendition. In his testimony to the Swedish Ombudsman, Kjell Jönsson, the Swedish lawyer for Mohamed Alzery[85], stated his concern that the measures taken before the rendition were disproportionate to the security needs: "from Alzery's point of view it would have been perfectly enough to ask him to co-operate and he would have done that just like he always has done before"[86].

87.    Perhaps the most troubling aspect of this systematic practice, however, is that it appears to be intended to humiliate. Many accounts speak of these measures being taken despite "strong resistance", both physical and verbal, on the part of the detainee. The nudity, forced shackling "like an animal"[87] and being forced to wear nappies appear offensive to the notions of dignity held by the detainees. In my view it is simply not acceptable in Council of Europe member States for security services, whether European or foreign, to treat people in a manner that amounts to such "extreme humiliation"[88].

### 2.7.2.    The effects of rendition and secret detention on individuals and families

88.    In compiling this report, members of my team and I have met directly with several victims of renditions and secret detentions, or with their families. In addition, we have obtained access to further first-hand accounts from victims who remain detained, in the form of their letters or diaries, unclassified notes from their discussions with lawyers, and official accounts of visits from Embassy officials.

89.    Personal accounts of this type of human rights abuse speak of utter demoralisation. Of course, the despair is greatest in cases where the abuse persists – where a person remains in secret detention, without knowing the basis on which he is being held, and where nobody apart from his captors knows about his

---

[77] See Ombudsman's Interview with Swedish lawyer Jönsson, *supra* note 70, at page 6: "they bend him forward and he can feel that something is being pushed up his rectum… after that he felt calmer and felt a muscle relaxation in all his body, but he was wide awake, so he was not sedated".
[78] See Ombudsman's Interview with Swedish lawyer Jönsson, *supra* note 70, at page 6.
[79] See El-Masri statement to US Court in Alexandria, 6 April 2006, *supra* note 71, at page 9. Also see reference to "earmuffs" in Al-Rawi statement to lawyer, *supra* note 67, at page 31; and reference to "earphones" in Binyam Mohamed statements to lawyer at Guantanamo, at page 5.
[80] See Ombudsman's Interview with Swedish lawyer Jönsson, *supra* note 70, at page 6.
[81] See Al-Rawi statement to lawyer, *supra* note 67, at page 31.
[82] See Ombudsman's Interview with Swedish lawyer Jönsson, *supra* note 70, at page 6.
[83] See El-Masri statement to US Court in Alexandria, 6 April 2006, *supra* note 71, at page 10: "They put something over my nose. I think it was some kind of anaesthesia. It felt like the trip took about four hours, but I don't really remember. I was mostly unconscious for the duration".
[84] See Al-Rawi statement to lawyer, *supra* note 67, at page 31.
[85] For more detail on the cases of Ahmed Agiza and Mohamed Alzery, please refer to the case study in the following section.
[86] See Ombudsman's Interview with Swedish lawyer Jönsson, *supra* note 70, at page 8.
[87] The detainee who made this statement asked that he remain anonymous.
[88] The words "extreme humiliation" are used in the Ombudsman's Interview with Swedish lawyer Jönsson, *supra* note 70, at page 8. In El-Masri statement to US Court in Alexandria, 6 April 2006, *supra* note 71, at page 9, he talks of "degrading and shameful" acts that left him feeling "terrified and utterly humiliated".

exact whereabouts or wellbeing. The uncertainty that defines rendition and secret detention is torturous, both for those detained and those for whom they are "disappeared"[89].

90.     Yet the ordeal continues long after a detainee is located, or even released and able to return home. Victims have described to us how they suffer from flashbacks and panic attacks, an inability to lead normal relationships and a permanent fear of death. Families have been torn apart. On a personal level, deep psychological scars persist; and on a daily basis, stigma and suspicion seem to haunt anybody branded as "suspect" in the "war on terror". In short, links with normal society appear practically impossible to restore.

91.     I salute the remarkable courage and resilience of those who have been held in secret detention and subsequently released, like Khaled El-Masri and Maher Arar. Both these men have spoken eloquently to us about what moves them to recount their experiences despite the obvious pain and trauma of doing so. From these words we must draw our own resolve to uncover the secret abuses of the spider's web and ensure that they never again be allowed to occur. From Mr El-Masri, "all I want is to know the truth about what happened to me and to have the American Government apologise for what it did"[90]; from Mr Arar, "the main purpose of talking about my torture is to prevent the same treatment from ever happening to another human being"[91].

## 3.      Specific examples of documented renditions

### 3.1.     Khaled El-Masri

92.     We spoke for many hours with Khaled El-Masri, who also testified publicly before the Temporary Committee of the European Parliament, and we find credible his account of detention in Macedonia and Afghanistan for nearly five months.

#### 3.1.1.     The individual account of Mr El-Masri

93.     A summary of the unprecedented suffering endured by Mr El-Masri reads as follows:

94.     [A]ccording to the statement of facts presented to the US District Court[92], Khaled El-Masri, a German citizen of Lebanese descent, travelled by bus from his home near Neu Ulm, Germany, to Skopje, Macedonia, in the final days of 2003. After passing through several international border crossings without incident, Mr El-Masri was detained at the Serbian-Macedonian border because of alleged irregularities with his passport. He was interrogated by Macedonian border officials, then transported to a hotel in Skopje. Subsequent to his release in May, 2004, Mr El-Masri was able to identify the hotel from website photographs as the Skopski Merak, and to identify photos of the room where he was held and of a waiter who served him food. Over the course of three weeks, Mr El-Masri was repeatedly interrogated about alleged contacts with Islamic extremists, and was denied any contact with the German Embassy, an attorney, or his family. He was told that if he confessed to Al-Qaeda membership, he would be returned to Germany. On the thirteenth day of confinement, Mr El-Masri commenced a hunger strike, which continued until his departure from Macedonia. After 23 days of detention, Mr El-Masri was videotaped, blindfolded, and transported by vehicle to an airport.

95.     There, he was beaten, stripped naked, and thrown to the ground. A hard object was forced into his anus. When his blindfold was removed, he saw seven or eight men, dressed in black and hooded. He was placed in a diaper and sweatsuit, blindfolded, shackled, and hurried to a plane, where he was chained spreadeagled to the floor. He was injected with drugs and flown to Baghdad, then on to Kabul, Afghanistan, an itinerary that is confirmed by public flight records. At some point prior to his departure, an exit stamp was placed in his passport, confirming that he left Macedonia on January 23, 2004.

96.     Upon arrival in Kabul, Mr El-Masri was kicked and beaten and left in a filthy cell. There he would be detained for more than four months. He was interrogated several times in Arabic about his alleged ties to 9/11 conspirators Muhammed Atta and Ramzi Bin Al-Shibh and to other alleged extremists based in

---

[89] See Louise Arbour, United Nations High Commissioner for Human Rights, *Human Rights: A casualty of the war on terror?*; interview for UN World Chronicle No. 996, 7 December 2005 (transcript provided by UN Television, on file with the rapporteer): "Secret detention under these extreme conditions is an unacceptable treatment, both of the person detained and I would certainly suggest of members of their families [for whom], for all purposes, these people have disappeared."
[90] Khaled El-Masri made this statement to me during our meeting in Strasbourg in April 2006.
[91] Maher Arar made this statement to my representative during their meeting in Brussels in March 2006.
[92] See El-Masri statement to US Court in Alexandria, 6 April 2006, *supra* note 71.

*Doc. 10957*

Germany. American officials participated in his interrogations. All of his requests to meet with a representative of the German government were refused.

97.     In March, Mr El-Masri and several other inmates commenced a hunger strike. After nearly four weeks without food, Mr El-Masri was brought to meet with two American officials. One of the Americans confirmed Mr El-Masri's innocence, but insisted that only officials in Washington, D.C. could authorize his release. Subsequent media reports confirm that senior officials in Washington, including the CIA Director Tenet, were informed long before Mr El-Masri's release that the United States had detained an innocent man. Mr El-Masri continued his hunger strike. On the evening of April 10, Mr El-Masri was dragged from his room by hooded men and force-fed through a nasal tube.

98.     At around this time, Mr El-Masri felt what he believed to be a minor earthquake. Geological records confirm that in February and April, there were two minor earthquakes in the vicinity of Kabul.

99.     On May 16, Mr El-Masri was visited by a uniformed German speaker who identified himself as "Sam". "Sam" refused to say whether he had been sent by the German government, or whether the government knew about Mr El-Masri's whereabouts. Subsequent to his release, Mr El-Masri identified "Sam" in a photograph and a police lineup as Gerhard Lehmann, a German intelligence officer.

100.    On May 28, 2004, Mr El-Masri, accompanied by "Sam", was flown from Kabul to a country in Europe other than Germany. He was placed, blindfolded, into a truck and driven for several hours through mountainous terrain. He was given his belongings and told to walk down a path without turning back. Soon thereafter, he was confronted by armed men who told him he was in Albania and transported him to Mother Theresa Airport in Tirana. There, he was accompanied through customs and immigration controls and placed on a flight to Frankfurt.

101.    Upon his return to Germany, Mr El-Masri contacted an attorney and related his story. The attorney promptly reported Mr El-Masri's allegations to the German government, thereby initiating a formal investigation by public prosecutors. Pursuant to their investigation, German prosecutors obtained and tested a sample of Mr El-Masri's hair, which proved consistent with his account of detention in a South-Asian country and deprivation of food for an extended period. That investigation, as well as a German parliamentary investigation of Mr El-Masri's allegations, is ongoing.

### 3.1.2.   Elements of corroboration for Mr El-Masri's account

102.    Mr El-Masri's account is borne out by numerous items of evidence, some of which cannot yet be made public because they have been declared secret[93], or because they are covered by the confidentiality of the investigation underway in the office of the Munich prosecuting authorities following Mr El-Masri's complaint of abduction.

103.    The items already in the public domain are cited in the afore-mentioned memorandum[94] submitted to the Virginia court in which Mr El-Masri lodged his complaint:

- Passport stamps confirming Mr El-Masri's entry to and exit from Macedonia, as well as exit from Albania, on the dates in question;
- Scientific testing of Mr El-Masri's hair follicles, conducted pursuant to a German criminal investigation, that is consistent with Mr El-Masri's account that he spent time in a South-Asian country and was deprived of food for an extended period of time;
- Other physical evidence, including Mr El-Masri's passport, the two t-shirts he was given by his American captors on departing from Afghanistan, his boarding pass from Tirana to Frankfurt, and a number of keys that Mr El-Masri possessed during his ordeal, all of which have been turned over to German prosecutors;
- Aviation logs confirming that a Boeing business jet owned and operated by defendants in this case, then registered by the FAA as N313P, took off from Palma, Majorca, Spain on January 23, 2004; landed at the Skopje airport at 8:51 p.m. that evening; and left Skopje more than three hours later, flying to Baghdad and then on to Kabul, the Afghan capital;

---

[93] The information in question appears in the report of the German Federal Government to the parliamentary committee monitoring the secret services (PKG) ; I was able to obtain from the chairman of that committee a "public" version of the report, which contains no particulars of individual cases. A version classified "confidential - for official use only" was handed to me by a journalist. This information enabled me to form a judgment as to the credibility of Mr El-Masri's account, but I have chosen to preserve the confidentiality of that report although, to be frank, I believe that the public should have access to this kind of information. To my knowledge, there is an even fuller version classified "secret", which I declined to obtain out of respect for German parliamentary procedure.

[94] See El-Masri statement to US Court in Alexandria, 6 April 2006, *supra* note 71.

- Witness accounts from other passengers on the bus from Germany to Macedonia, which confirm Mr El-Masri's account of his detention at the border;
- Photographs of the hotel in Skopje where Mr El-Masri was detained for 23 days, from which Mr El-Masri has identified both his actual room and a staff member who served him food;
- Geological records that confirm Mr El-Masri's recollection of minor earthquakes during his detention in Afghanistan;
- Evidence of the identity of "Sam," whom Mr El-Masri has positively identified from photographs and a police line-up, and who media reports confirm is a German intelligence officer with links to foreign intelligence services;
- Sketches that Mr El-Masri drew of the layout of the Afghan prison, which were immediately recognizable to another rendition victim who was detained by the U.S. in Afghanistan;
- Photographs taken immediately upon Mr El-Masri's return to Germany that are consistent with his account of weight loss and unkempt grooming.

Numerous government inquiries, including the German prosecutors' investigation, a German parliamentary investigation, and various intergovernmental human rights inquiries, are almost certain to produce additional corroborating evidence.

### 3.1.3.    The role of "the former Yugoslav Republic of Macedonia"

104.    The role of "the former Yugoslav Republic of Macedonia" in the rendition of Khaled El-Masri has yet to be fully understood. The information collected on site by a member of my team appears to show a certain ambiguity in the Macedonian position. In effect, the Government of Macedonia has adopted an "official line" of complete negation, repeated in a rigid and stereotyped fashion.

105.    I am indebted to the delegation from the European Parliament for arranging and administering an excellent programme of meetings with the highest-level representatives of the Macedonian Government and Parliament[95]. I share many of the reflections of my colleagues from the European Parliament in their review of these meetings, not least the sense of discomfort that in many areas the Macedonian authorities fell short of genuine transparency[96].

#### 3.1.3.1. The position of the authorities

106.    The "official line" of the Macedonian Government was first contained in a letter from the Minister of Interior, Ljubomir Mihajlovski, to the Ambassador of the European Commission, Erwan Fouere, dated 27 December 2005. In its simplest form, it essentially contains four items of information "*according to police records*": first, Mr El-Masri arrived by bus at the Macedonian border crossing of Tabanovce at 4 pm on 31 December 2003; second, he was interviewed by "*authorised police officials*" who suspected "*possession of a falsified travel document*"; third, approximately five hours later, Mr El-Masri "*was allowed entrance*" into Macedonia, apparently freely; and fourth, on 23 January 2004, he left Macedonia over the border crossing of Blace into Kosovo.

107.    Mr Mihajlovski restated exactly the same Government position in response to a parliamentary question in the Sobranie on 26 January 2006[97]. He cited "*official evidence of the Ministry of Interior*" and went on to describe the allegations as "*speculative and unfounded*".

108.    The President of the Republic, Branko Crvenkovski, set out a firm stance in the very first meeting with the European Parliament delegation, providing a strong disincentive to any official who may have wished to break ranks by expressing an independent viewpoint: "*Up to this moment, I would like to assure you that I have not come across any reason not to believe the official position of our Ministry of Interior. I have no additional comments or facts, from any side, to convince me that what has been established in the official report of our Ministry is not the truth.*"

---

[95] The programme of meetings took place between 27 and 29 April 2006.

[96] President Branko Crvenkovski said in his opening remarks on 27 April 2006: "*Macedonia is completely determined and open for co-operation with you. What I want to repeat is that we're completely prepared to establish the truth… Our joint task is to find out the truth and not to respond to the current public opinion or the positions of the media*"; Siljan Avramovski, the former Head of the UBK, Macedonia's counter-intelligence service stated on 28 April: "*We will provide maximum transparency and openness in our discussions*". These were fairly typical of the sentiments expressed by all the officials who met with the delegation.

[97] Mr Slobodan Casule, a prominent opposition politician who met with the European delegation on 27 April 2006, posed the question. He said he sought clarification about the El-Masri case because he believes that "*such issues should be opened and closed within the Parliament*".

Doc. 10957

109.    On Friday 28 April the official position was presented in far greater detail during a meeting with Siljan Avramovski, who was Head of the UBK[98], Macedonia's main intelligence service, at the time of the El-Masri case. Avramovski stated that the UBK's "Department for Control and Professional Standards" had undertaken an investigation into the case and traced official records of all Mr El-Masri's contact with the Macedonian authorities. The further details as presented by Mr Avramovski[99] are summarized as follows:

> Mr El-Masri arrived on the Macedonian border on 31 December 2003, New Year's Eve. The Ministry of Interior had intensified security for the festive period and was operating a higher state of alert around the possible criminal activity. In line with these more intense activities, bus passengers were being subjected to a thorough security check, including an examination of their identity documents.

> Upon examining Mr El-Masri's passport, the Macedonian border police developed certain suspicions and decided to "*detain him*". In order not to make the other passengers wait at the border, the bus was at this point allowed to continue its journey.

> The objective of holding Mr El-Masri was to conduct an interview with him, which (according to Avramovski) was carried out in accordance with all applicable European standards. Members of the UBK, the security and counter-intelligence service, are present at all border points in Macedonia as part of what is described as "Integrated Border Management and Security". UBK officials participated in the interview of Mr El-Masri.

> The officials enquired into Mr El-Masri's reasons for travelling into the country, where he intended to stay and whether he was carrying sufficient amounts of money. Avramovski explained: "I think these were all standard questions that are asked in the context of such a routine procedure – I don't think I need to go into further details".

> At the same time, Macedonian officials undertook a preliminary visual examination of Mr El-Masri's travel documents. They suspected that the passport might be faked or forged – noting in particular that Mr El-Masri was born in Kuwait, yet claimed to possess German citizenship.

> A further passport check was carried out against an Interpol database. The border point at Tabanovce is not linked to Interpol's network, so the information had to be transmitted to Skopje, from where an electronic request was made to the central Interpol database in Lyon. A UBK official in the Analytical Department apparently made this request using an electronic code, so the Macedonian authorities can produce no record of it. Mr El-Masri was made to wait on the border point while the Interpol search was carried out.

> When it was established that there existed no Interpol warrant against Mr El-Masri and no further grounds on which to hold him[100], he was released. He then left the border point at Tabanovce, although Macedonian officials were not able to describe how. Asked directly about this point in a separate meeting, the Minister of Interior, Mr Mihajlovski said: "*we're not able to tell you exactly what happened to him after he was released because it is not in our interest; after the person leaves the border crossing, we're not in a position to know how he traveled further*"[101].

> The Ministry of Interior subsequently established, according to Avramovski, that Mr El-Masri had stayed at a hotel in Skopje called the "Skopski Merak". Mr El-Masri is said to have checked in on the evening of 31 December 2003 and registered in the Guest Book. He stayed for 23 nights, including daily breakfast, and checked out on 23 January 2004.

> The Ministry then conducted a further check on all border crossings and discovered that on the same day, 23 January 2004, in the evening, Mr El-Masri left the territory of Macedonia over the border crossing at Blace, into the territory of Kosovo. When asked whether Mr El-Masri had received a stamp to indicate his departure by this means, Avramovski answered: "*Normally there should be a*

---

[98] Uprava za Bezbednosti i Kontrarazuznavanje, or the Security and Counter-Intelligence Service.
[99] Meeting with Siljan Avramovski, now Deputy Director of UBK in the Ministry of Interior, 28 April 2006, transcript on file with the Rapporteur.
[100] Avramovski stated that Macedonian border police decided for themselves that Mr El-Masri's passport was genuine, after an unspecified process or length of examination "*At our border points, expert members of the border police are qualified to assess whether a passport is counterfeit or not. When they decided that it was genuine, they took no further action. They did not inform the German Embassy; they didn't feel the need to request any documents against which to compare the passport.*"
[101] Meeting with Ljubomir Mihajlovski, Minister of Interior, 28 April 2006, transcript on file with the Rapporteur.

> stamp on the passport as you cross the border out of Macedonia, but I can't be sure. UNMIK is also present on the Kosovo border and is in charge of the protocol on that side... My UBK colleague has just informed me that he has crossed the border at Blace twice in recent times and didn't receive a stamp on either occasion."

Avramovski concluded his summary with the words: "*This is the truth of the case that has been exploited by the media – the so-called El-Masri case.*"

110.    In a separate meeting directly following Avramovski's briefing, Minister Mihajlovski retained the position and added very few further details. Both officials were keen to talk about the case as if it were a routine matter, one which only came to their attention when it was reported in the local and international press. They referred repeatedly to the media "prejudice" and "pressure" against Macedonia. Mihajlovski even implied that there was a conspiracy theory at play, designed to discredit the country: "*Who is really behind all of this? This case is making so much damage to the country. If you can get a reason why it is happening, please send us a message; tell us.*"

111.    It seems clear that the Macedonian public has reacted negatively to the El-Masri affair. Most Macedonians feel aggrieved that their country has been given such a bad press and is associated with what is often portrayed as a manipulative operation. Many regard the international media interest as a thinly veiled attempt to discredit Macedonia's prospects for European integration. In reality, it seems that the Macedonian Government is itself responsible for this situation. More transparency, and a greater degree of preparedness genuinely to seek the truth, rather than locking themselves into a pre-established, dogmatic scheme, would have certainly avoided much criticism and suspicion.

### 3.1.3.2. Further elements

112.    The Government's official line is based on what Mr Avramovski called "*a reconstruction after the fact, based on information we established through documents and discussions*" with, inter alia, "*employees of the hotel*". There is no doubt in my mind that the Ministry of Interior has put together a very thorough reconstruction of the case; just not an accurate one. Equally I accept that the Ministry has undertaken "*discussions*" with witnesses, including hotel employees; but I regard these as efforts to harmonise the official line, not to establish the truth.

113.    One could, with sufficient application, begin to tease out discrepancies in the official line. For example, the Ministry of Interior stated that "*the hotel owner should have the record of Mr El-Masri's bill*", while the hotel owner responded to several inquiries, by telephone and in person, by saying that the record had been handed over to the Ministry of Interior.

114.    Contacts we were able to make with sources close to the administration and to the intelligence services have enabled us to obtain much more credible information, in order to better understand what really happened. We can consequently present a more coherent analysis of this case. For obvious reasons, the sources contacted locally wish to stay anonymous, at least for the time being.

115.    The Government's public portrayal seems at first glance perfectly plausible. However, it ceases to be credible when it asserts that El-Masri was allowed to proceed freely from Tabanovce on the evening of 31 December 2003. In reality, that evening signalled the beginning of his five-month ordeal in secret detention ordered by the CIA.

116.    What is not said in the official version is the fact that the Macedonian UBK routinely consults with the CIA on such matters (which, on a certain level, is quite comprehensible and logical). According to confidential information we received (of which we know the source), a full description of Mr El-Masri was transmitted to the CIA via its Bureau Chief in Skopje for an analysis similar to the one Avramovski says was undertaken by Interpol: did the person in question have contact with terrorist movements, in particular with Al Qaida? Based on the intelligence material about Khaled El-Masri in its possession – the content of which is not known to us – the CIA answered in the affirmative. The UBK, as the local partner organisation, was requested to assist in securing and detaining Mr El-Masri until he could be handed over to the CIA for transfer.

117.    The UBK has an excellent reputation for its professionalism. It is well practiced in the conduct of clandestine surveillance and detention operations, having exploited its own network of "secret apartments"

*Doc. 10957*

for decades[102]. Information obtained from our internal sources indicates that the UBK is equally skilled in working on behalf of the CIA. – we even learned of one previous collaborative operation between these services in the past, targeted at apprehending suspected Islamic terrorists. In the El-Masri case, according to our understanding, this co-operation was particularly efficient and the Macedonian services fulfilled the expectations of the CIA.

118.    The choice of the Skopski Merak hotel as a detention site warrants comment. The Macedonian authorities have categorically denied that this hotel could have served as a place for detention, considering such a possibility as downright ridiculous. Avramovski said he could "*absolutely*" rule out the prospect of Mr El-Masri's being held there:

> "*Look, I can state this very specifically and decisively. The 31 December is New Year's Eve – that period is a holiday, there are always a lot of guests, many of them tourists, in the hotel to celebrate the New Year. There is not even a theoretical possibility [laughing] that a person could be detained in an open hotel, where there's a constant flow of people coming and going. There were many guests there at the time, including foreign nationals – it's a well-known, open hotel with a fine reputation in this city!*"

In fact, a busy place with this hotel's features lends itself very well to a clandestine operation, given that a top-floor room facing away from the street was used.

119.    Whilst the operation was driven and directed by CIA agents, the Americans kept a very low profile throughout the operation in Macedonia. The CIA transmitted to UBK the questions to ask the suspect, without ever taking part in any interrogation.

120.    Several of our interviewees told us – with varying degrees of knowledge – that German intelligence was informed of the fact that Mr El-Masri was in Macedonian custody in the days immediately following the arrest, but not about the operational details. Intelligence material from Germany was added to the dossier from which questions were later asked, both in Macedonia and in Afghanistan, by interrogators of various nationalities.

121.    According to our insider sources in the intelligence community, whom we consider serious and well-informed, approximately 20 officials were involved overall on the Macedonian side, including "four or five" politically responsible persons in Government. Three teams of three agents rotated in the task of guarding and surveillance. Technicians and analysts helped to compile the record of the operation, which was a running log rather than a cumulative written report. An operational commander and a deputy marshalled the Macedonian agents and took responsibility for reporting to their liaisons in the CIA.

122.    The period for which the Macedonians held Mr El-Masri in advance of his rendition – 23 days – was abnormally long for any operation involving the CIA. Partner agencies and CIA officials alike prefer to keep the time between the initial arrest and the transfer to a CIA detention centre as short as possible[103].

123.    The delay in this case appears to have been caused by logistical reasons, in particular related to the availability of an aircraft. A flight on an unusual route, from Skopje into the Middle East, had to be incorporated into an existing schedule for that month, which, as established above in the description of the newly-discovered rendition circuit, included other detainee transfers.

124.    According to further eye-witness accounts from persons in the civil aviation sector, who described the presence and movements of the suspect rendition plane at Skopje airport that evening, the aircraft thought to have taken Mr El-Masri on board did not follow regular procedures. The manner in which the plane registered with ground staff and paid its "route charge" fees was highly unusual – as the Ministry of Interior himself confirmed, no passengers even left the plane to enter the terminal building and thus cross officially onto Macedonian territory. Instead the plane taxied into position at the far end of the runway, more than a kilometre from the terminal. A detail of armed Macedonian security police formed a lookout nearby,

---

[102] The Macedonian Helsinki Committee for Human Rights has researched questions of secret detention and produced a variety of credible reports (copies of which are on file with the Rapporteur). In many cases, people are held in secret apartments to get them "out of the system" for an indefinite period of time, for the UBK to interrogate them and elicit confessions. Further still, in the notorious "Rastanski Lozja" case of March 2002, Macedonian police were said to have shot dead "seven members of a terrorist group" in what seemed like an act of summary exection. The Helsinki Committee wrote in its Annual Report of 2002: "the largest number of human rights violations was perpetrated by officers of the special units at the Ministry of Interior".

[103] See, for example, Michael Scheuer, former Chief of the Bin Laden Unit in the CIA Counter-Terrorism Center, interview carried out by the Rapporteur's representative, *supra* note 19.

under strict instructions to face away from the plane itself. Asked whether such a measure was conventional for foreign aircraft, Minister of Interior Mihajlovski answered:

> "*No, no. Not at all. The plane is not Macedonian territory; if Spain sends us a plane, it's the territory of Spain. If there's a bomb on board we must come inside; but otherwise it's like a ship, a diplomatic territory*".

125.    All these factual elements indicate that the CIA carried out a "rendition" of Khaled El-Masri. The plane in question had finished transferring another detainee just two days earlier and the plane was still on the same "rendition circuit". The plane and its crew had spent the interim period at Palma de Mallorca, a popular CIA staging point. The physical and moral degradation to which Mr El-Masri was subjected before being forced aboard the plane in Macedonia corresponds with the CIA's systematic "rendition methodology" described earlier in this report. The destination of the flight carrying Mr El-Masri, Kabul, forms a hub of CIA secret detentions in our graphic representation of the "spider's web".

126.    All the indications are that the Macedonian authorities have decided to deny their part in the abduction of El-Masri, admitting only what has already been clearly proven and trying to conceal the rest. It is regrettable that the will is lacking to perform a true inquiry and that Parliament has not shown the initiative to take up the issue (as the German *Bundestag* has done in the same case). To this must be added the further accusations of the Macedonian Helsinki Committee for Human Rights. According to reports produced by this NGO, suspects were and still are interrogated and sometimes imprisoned and ill-treated for several days, outside the normal arrest and custody system[104], specifically in the "apartments" that had been widely used by the previous regime.

127.    It is worth repeating that the analysis of all facts concerning this case points in favour of the credibility of El-Masri. Everything points in the direction that he was the victim of abduction and ill-treatment amounting to torture within the meaning of the term established by the case-law of the United Nations Committee against Torture. In addition, numerous indications support the conclusion that German services participated in a manner that still remains to be precisely established  (not excluding the fact that the same services were in the end instrumental in El-Masri's release; the latter told me that he considered "Sam" as his guardian angel, a kind of "life insurance')[105].

128.    The detailed information with which El-Masri was confronted during his interrogations in Skopje and in Afghanistan included details of his private life in Neu-Ulm. It is hard to imagine that such information could have been obtained by foreign services without help from their German counterparts. For example, the interrogators in Afghanistan knew that El-Masri had met a certain Reda Seyam[106] at the *Multikulturhaus* and had agreed to get a car, which Seyam had just bought with his help and had registered in the name of El-Masri's wife in order to save on the cost of insurance. El-Masri assured me that he had shared this information only with Seyam and his wife. In addition, the same interrogators confronted him with bank details of money transfers between his bank in Neu-Ulm and an account in Norway[107]. Such bank details are not normally accessible to foreign services.

---

[104] My representative who travelled to Macedonia was able to see former "secret apartments", which are now closely supervised by NGOs defending human rights.

[105] In a recent development, the BND was forced to admit that one of its agents had indeed heard about El-Masri's detention at the hands of the Macedonian services and his hand-over to the Americans as early as January 2004 in a civil service canteen in Skopje (see Spiegel-Online of 31 May and 1 June 2006). The German Minister of the Interior tried to play down the importance of this revelation by calling it a mere breakdown of communications, as the higher echelons of the BND had not been informed. Nonetheless it is interesting to note that the truthfulness of the content of this conversation was never called into question.

[106] According to a German source, Mr Seyam, a German national of Indonesian origin, had returned in an unbelievable manner from a stay in that country. He had allegedly been arrested by the Indonesian authorities who suspected him of involvement in the Bali bombing. He had been released for lack of evidence, and taken back to Germany by German agents, who had been sent in order to prevent Mr Seyam "handed over" to the Americans, who were apparently already waiting. Mr Seyam then allegedly went to Neu-Ulm at the instigation of his German "rescuers", who recommended that he go to the *Multikulturhaus*. The latter, according to the source, was under observation by both the *Baden-Württemberg* services (who had "planted" an informer there in the person of Dr Yousif, an Islamic preacher at the centre and an old acquaintance of Mr Seyam) and those of neighbouring Bavaria who – not knowing that Yousif was working for *Baden-Württemberg* – regarded him as a "preacher of hate". It was in this Islamic cultural centre frequented by Mr El-Masri that the latter came to know Mr Seyam (against whom a judicial investigation had also been opened in Germany, and closed shortly afterwards for lack of evidence). The two men, both looking for housing for their large families, became friends.

[107] According to Mr El Hasri, these were money transfers relating to Norwegian customers in connection with his car sales activity.

*Doc. 10957*

129.    In my opinion, this detailed knowledge of Mr El-Masri's – real – life also rules out the theory that Mr El-Masri was the victim of mere mistaken identity[108], being confused with a person of the same (or similar) name, whose name appeared in the American Congressional report on the 11 September attacks[109] as having travelled by train in Germany together with members of the "Hamburg cell" of the terrorists of 11 September, including one of the murderous pilots, Muhammad Atta[110].

130.    As regards the identity of "Sam", who came and interrogated Mr El-Masri in Afghanistan and accompanied him back on the return flight to Europe, speaking German with a Northern accent, Mr El-Masri remains convinced that this is Mr Lehmann, an agent of the German *Bundeskriminalamt*. He had identified him with "100%" certainty on photographs and a videotape, and with "90%" certainty at a surprise police lineup on 22 February 2006[111].

131.    Mr El-Masri has also been the victim of a defamatory campaign. The press service of the Baden-Württemberg Ministry of the Interior had indicated that El-Masri was a member of "Al Tawid", implying "Al Tawid al Jihad", a group belonging to Al Quaida and headed by Abu Musab al-Zarkawi. According to Mr Gnjidic, the confusion was deliberate: El-Masri did belong to a militant anti-Syrian party (a nationalist party of the left also including Islamist elements) called "Al Tawid", founded in 1982 and wound up in 1985 after the Syrian invasion. Whereas certain members were captured by the Syrians, El-Masri fled and sought political asylum in Germany, for precisely that reason. That group allegedly had absolutely nothing in common (except part of the name, which means "all-powerful god") with the terrorist group headed by al-Zarkawi. Mr El-Masri was again faced with this confusion at his hearing by the Temporary Committee of the European Parliament, where at least one EP deputy asked him to what other terrorist groups he belonged. As Mr El-Masri was still in a fragile psychological state, I find it particularly odious that he was also the subject of an article, with a photograph, in the local press[112] once again insinuating his links with terrorist circles without any evidence whatsoever. He told us that he now hardly dares to leave his home.

132.    The case of Khaled El-Masri is exemplary. Some aspects still require further investigation and it is for that reason that inquiries are ongoing in the *Bundestag*'s Committee of Inquiry and by the Munich prosecutors. The story of El-Masri is the dramatic story of a person who is evidently innocent – or at least against whom not the slightest accusation could ever be made - who has been through a real nightmare in the CIA's "spider's web", merely because of a supposed friendship with a person suspected at some point in time of maintaining contacts with terrorist groups. El-Masri is still waiting for the truth to be established, and for an apology. His application to a court in the United States has been rejected, at least in the first instance: not because it seemed unfounded, but because the Government brought to bear so-called "national security" and "state secrecy" interests. This speaks for itself.

### 3.2.    "The Algerian Six"

133.    Six Bosnians of Algerian origin – four Bosnian citizens and two longstanding residents[113] were arrested in October 2001 by order of the Supreme Court of the Federation of Bosnia and Herzegovina and

---

[108] This appears to be the argument of the German government, in the context of the talks between Federal Chancellor Angela Merkel and American Secretary of State Condoleezza Rice (cf. the link to the record of the joint press conference by Mrs Merkel and Mrs Rice on 6 December 2005 [http://www.state.gov/secretary/rm/2005/57672/htm]. Mrs Merkel confirmed that she had spoken to Mrs Rice about the El-Masri case and said that the American government, the American administration, had admitted that the man had been taken by mistake and that the American administration did not deny in principle that this had occurred).

[109] Page 165.

[110] Mr El Masri stated in our talks that he had not even been questioned about this train journey mentioned in the report on 11 September. In his written deposition to the Virginia court (Declaration of Khaled El-Masri in support of plaintiff's opposition to the United States' motion to dismiss […] dated 6 April 2006, p. 13), he said that he was interrogated in Afghanistan also about his alleged association with important terrorists such as Muhammad Atta, Ramzi Bin Al-Shibh and other presumed extremists based in Germany.

[111] To the surprise of El-Masri and his lawyer, Mr Gnjidic, the prosecutor's office immediately announced to the press that the identification of "Sam" had failed. Subsequently the magazine "Stern" unearthed a CIA agent of German origin, Thomas V., who spoke German with the "north German" accent detected in "Sam" by El-Masri, who had been posted in 2000 to the United States Consulate General in Hamburg and who might be "Sam"[111]. The Munich prosecutor in charge of the case, Mr Hofmann, now rules out the possibility of "Sam" being the same person as the federal agent Lehmann, believing that it is now almost fully established that he was present at the *Bundeskriminalamt* office in Berlin throughout May 2004. But Mr El-Masri and his German lawyer Gnjidic remain convinced that "Sam" is indeed Lehmann, and that the Thomas V. trail was intended mainly to exonerate the German services.

[112] See Neu Ulmer Zeitug, *Islamisten zieht es nach Ulm; Multi-Kultur-Leute treffen sich jetzt im Donautal – Welche Rolle spielt Khaled El-Masri?* 15 March 2006.

[113] Mustafa Ait Idir, Hadz Boudella, Lakhdar Boumediene, Saber Lahmar and Mohammed Nechle and Belkacem Bensayah.

detained on remand. They were suspected of having planned bomb attacks on the American and British embassies.

134.    The investigation, between October 2001 and January 2002, did not reveal any evidence linking these men to a terrorist plot. On 17 January 2002, the office of the federal prosecutor informed the investigating magistrate at the supreme court that he had no reason to keep the men in custody any longer. On that same day at about 3pm the investigating magistrate ordered the immediate release of the six men.

135.    Again on the same day, at about 5pm, the Human Rights Chamber of Bosnia and Herzegovina issued an interim order, following an application lodged by four of the men[114]. The order, which had statutory force in Bosnia according to the Dayton peace accords, required the Government of Bosnia and Herzegovina to take all necessary steps to prevent the forcible deportation of the applicants from Bosnia and Herzegovina.

136.    However, on the evening of 17 January 2002 the six men were arrested by Bosnian police officers, and handed over to members of the United States military forces stationed in Bosnia and Herzegovina on the morning of 18 January. This is recorded as an established fact in a judgment of the Human Rights Chamber for Bosnia and Herzegovina of 4 April 2003[115]. The Chamber refers to a document of the Council of Ministers dated 4 February 2002, according to which members of the police forces of the Federation under the authority of the Federal Minister of the Interior and of forces of the Minister of the Interior of the Canton of Sarajevo handed the applicants over to the American forces at the Butmir base on 18 January at 6am.

137.    According to the victims' evidence, transmitted by their lawyers[116], the six victims were handcuffed in uncomfortable positions and hooded so that they could not see the aircraft which they were forced to board, at a given time on 18 or 19 January 2002. According to the lawyers, official documents obtained in the course of the judicial proceedings in progress show that two aircraft were assigned to this operation[117], and that the aircraft which the six men were made to board was at the Tuzla military base. After a flight of several hours, the aircraft landed and the six men were made to disembark, at a place which they describe as very cold[118]. During the flights the men were beaten and tied up in uncomfortable positions. At the stopover – probably Incirlik – they were joined by other detainees, some of whom said they came from Afghanistan. The human cargo arrived at Guantanamo on 20 January 2002.

138.    The six men have been prisoners at Guantanamo until the present time, that is to say for over four years.

139.    The illegal nature of these detentions was recognised by the Human Rights Chamber for Bosnia[119]. In the three decisions, the Chamber invited the Government of Bosnia to assist the six men, including recourse to diplomatic and judicial means. In the decision of 4 April 2003 concerning Mr Ait Idir, the Chamber even ordered the Government of Bosnia to take all possible steps to secure the release of the applicant and his return home[120].

140.    The Bosnian government has recognised its legal obligations but not complied with them.

---

[114] cf. Boudella, Boumediene, Nechle and Lahmar v. Bosnia and Herzegovina and the Federation of Bosnia and Herzegovina, Human Rights Chamber for Bosnia and Herzegovina, cases nos. CH/02/8679, CH/02/8690, CH/O2/8691, Order for Provisional Measures and on the Organization of the Proceedings, 17 January 2001.

[115] Case no. CH/O2/9499, Bekasem Bensayah against Bosnia and Herzegovina and the Federation of Bosnia and Herzegovina (cf. in particular paras. 50 et 164).

[116] The international law firm Wilmer Hale, which supplied written documentation and oral testimony (Mrs Karin Matussek on 11 April 2006 to our committee, and Mr Steven Oleskey to the temporary committee of the European Parliament, on 25 April 2006.) My representative also met with four WilmerHale attorneys working on this case at their offices in Boston, USA in May 2006. I am grateful to this firm for its excellent cooperation.

[117] Two C-130 cargo planes bearing serial numbers UJM166301019 and UQU09Z10L019, one of which also used the American base at Ramstein in Germany for the purposes of this operation. The documents in question also show that the aircraft transporting the six men stopped over at the American base at Incirlik in Turkey.

[118] The six men think it might have been in Turkey, on the basis of what little they were able to see and hear.

[119] Afore-mentioned judgment of 4 April 2003 concerning Mr Bensayah and Mr Ait Idir; in a judgment of 11 October 2002, the Chamber had already decided the cases of the other four men (Boudellaa, Boumediene, Nechle and Lahmar against Bosnia and Herzegovina and the Federation of Bosnia and Herzegovina, cases nos. CH/02/8679, CH/02/8689, CH/02/8690, CH02/8691, decision of 11 October 2002).

[120] Idem, para. 168.

*Doc. 10957*

141.    In the Council of Ministers document cited by the Human Rights Chamber[121], the Government of Bosnia and Herzegovina admitted that the six men had been "handed over" to the American forces by the Bosnian authorities without extradition formalities being observed[122].

142.    On 21 April 2004, the Human Rights Committee of the Parliament of Bosnia and Herzegovina exhorted the Bosnian executive to execute the decision of the Human Rights Chamber and start proceedings with the United States for the repatriation of the detainees. Its report was endorsed by the parliament chamber on 11 May 2004.

143.    On 11 March 2005, the Minister of Justice confirmed that the Bosnian government had sent a letter to the American government requesting the return of the six men.

144.    On 21 June 2005, the Bosnian Prime Minister Mr Adnan Terzic confirmed before the Parliamentary Assembly of the Council of Europe[123] the importance of this case as an indicator of democratic progress in Bosnia, and declared his willingness to identify the best way of ensuring the release of the six Bosnian citizens and former residents from Guantanamo, in accordance with Parliamentary Assembly Resolution 1433 (2005).

145.    Lastly, on 16 September 2005, the Bosnian parliament adopted a resolution inviting the Council of Ministers of Bosnia and Herzegovina to make contact with the American government in order to resolve the problem of the six men as rapidly as possible.

146.    It is all the more surprising that, in spite of all these promising declarations, including that of the Prime Minister to the Parliamentary Assembly of the Council of Europe, there has been no government initiative aimed at the release of the six men.

147.    According to their lawyers[124], the American government has declared on several occasions that it is willing to enter into bilateral discussions with the governments of countries whose citizens are detained at Guantanamo in order to arrange their repatriation, subject to adequate security conditions. In the case of the six men in question, such measures would be unnecessary anyway, since the charges against them have already been investigated by the competent authorities and those investigations have shown that they are innocent. Nonetheless, the Bosnian government has apparently made no credible move to initiate negotiations in that direction[125].

148.    The innocence of the men in question – which is in any event presumed, and is in no sense a condition for treating the suspects in accordance with legal rules – has just been strengthened by a report drawn up by the German military. This report, produced in decidedly unusual circumstances[126], which also

---

[121] Note 115 above.
[122] The Human Rights Chamber, in the above-mentioned Bensayah judgment (note 114), explains in a relevant manner that the "handing over" of the applicant can in no way be deemed to constitute extradition. In particular, the note dated 17 January 2002 from the US embassy cannot be regarded as a request for extradition by the United States. In that note, the US embassy in Sarajevo informs the Government of Bosnia and Herzegovina that it is willing to take charge of the six Algerian citizens in question and offers to arrange for the physical transfer of these persons at a time and place suitable to both parties.
[123] In reply to a question from our former colleague Kevin McNamara, following Resolution 1433 (2005) adopted by the Parliamentary Assembly on 26 April 2005, calling on all Council of Europe member States, including Bosnia and Herzegovina, to protect the rights of their citizens or residents detained at Guantanamo and to have them released and repatriated.
[124] Memorandum of 12 April 2006, addressed to the Temporary Committee of the European Parliament.
[125] See Matthew A. Reynolds, Acting Assistant Secretary, Legislative Affairs, US Department of State, letter to Senator James M. Jeffords, response to a requeset for information (copy on file with the Rapporteur), 15 June 2005: *"Although the Government of Bosnia and Herzegovina has made several inquiries regarding the condition of each detainee and has asked for their release, it has not indicated that it is prepared or willing to accept responsibility for them upon transfer."*
[126] German military personnel posed as journalists in order to conduct an interview with Mr Bensayah's wife, Mrs Anela Kobilica, on 17 June 2003. The report subsequently drawn up by the German military concluded that the grounds on which the six men were arrested and deported were *"highly dubious"* and that documents examined gave rise to the suspicion that at least some of the six had been *"subjected to an injustice"*.

aroused the interest of the German media and parliamentarians[127], concluded *inter alia* that the reasons for arresting the six men were "highly dubious"[128].

149.    In my opinion, the case of the "Bosnian six" is another well documented example of the abduction of European citizens and residents by the American authorities with the active collusion of the authorities of a Council of Europe member state. The government of Bosnia and Herzegovina has the merit of no longer denying the fact that it handed over the six men to the American forces. According to information I have received[129], the Bosnian authorities acted under extraordinary pressure from the American embassy in Sarajevo, but the fact remains that they acted in violation of clear decisions by the Supreme Court and the Human Rights Chamber ordering the release of these men. If the damage to the good human rights reputation of Bosnia and Herzegovina is to be repaired, official recognition of the facts is an important step in the right direction, but it must be followed as swiftly as possible with credible diplomatic intervention vis-à-vis the American government in order to secure the rapid repatriation of these six men, who have now been festering in Guantanamo Bay for over four years.

### 3.3.    Ahmed Agiza and Mohammed Alzery (El Zari)

150.    The case of the two Egyptian asylum-seekers "handed over" by the Swedish authorities to American agents who took them to Egypt, where they were tortured in spite of diplomatic assurances given to Sweden, is another very well documented case. It led to Sweden's being condemned by the United Nations Committee against Torture (UN-CAT)[130]. The Swedish authorities were also criticised for having attempted to conceal the facts from UN-CAT[131].

151.    The affair was brought to public notice mainly by the "Kalla Fakta"[132] television programme, and research by the Swedish investigative journalists blew open the secret system of CIA aircraft transporting clandestine prisoners in the "war against terrorism". The aircraft used for this operation – a Gulfstream, number N379P – has become one of the most notorious "rendition" aircraft[133].

152.    The behaviour of the Swedish secret police (Säpo) gave rise to a detailed investigation by the Swedish parliamentary ombudsman, Mats Melin[134]. The judicial authorities also examined the case and concluded that there were no grounds for a criminal prosecution against either the Swedish agents involved, or the pilot of the aircraft, or other American agents who were part of the team responsible for transporting Mr Agiza and Mr Alzery to Egypt[135].

---

[127] See, for example, http://www.tagesschau.de/aktuell/meldungen/0,1185,OID5072374,00.html. Journalists' associations protested vehemently at methods of investigation that involved intelligence agents masquerading as journalists, as this exposed real journalists to suspicion and possible reprisals.
[128] From a confidential source, I received a copy of this report, which, it was claimed, was deleted from the German military archives and never received by the German embassy in Sarajevo, to which it was said originally to have been addressed. See *Supplementary Intelligence Report*, 16 July 2003 (copy on file with the Rapporteur).
[129] See for example the Wilmer Hale memorandum of 12 April 2006, at page 3, supported by a wealth of documents given to us by Wilmer Hale, copies of which are all on file with the Rapporteur.
[130] United Nations Committee against Torture, decision of 20 May 2005, CAT/C/34/D/233/2003; see also United Nations Committee against Torture, Conclusions and recommendations of the Committee against Torture: Sweden. 06/06/2002, CAT/C/CR/28/6 (Concluding Observations/Comments), and the Swedish reply (Comments by the Government of Sweden on the Concluding Observations of the Human Rights Committee (CCPR/CO/74/SWE) of 14 May 2003. In that reply (para. 16), the Swedish government said that in its opinion, the "assurances" given by Egypt were being and would continue to be fully respected, and that the government had received no information to cast doubt on that conclusion.
[131] See "Kalla Fakta" (note 131 below), page 10 : the Swedish reply to the final observations (note 129 above) seems to be contradicted by the first report of the Swedish Ambassador in Egypt, according to which Mr Agiza had spoken to him about the abuse and violence which he and Mr Alzery had suffered. According to "Kalla Fakta", the Swedish government had filed this information and refused to hand it to the United Nations. In its decision of 20 May 2005 (note 129 above, para. 13.10), UN-CAT notes that Sweden has not fulfilled its obligation to co-operate fully with the Committee, and has not made all the relevant and necessary information for resolving the case available to the Committee.
[132] Translation of the title of the programme: "Cold facts"; a transcript of the broadcast of 22 November 2004 was provided to me by TV4.
[133] Kalla Fakta has given an account of its research into the owner of N379P, Premier Executive Transport Services. Posing as potential clients, journalists satisfied themselves as to the governmental, clandestine nature of this firm (cf. transcript, note 131 above, pages 4-5).
[134] See Mats Melin, Parliamentary Ombudsman (Sweden), *A review of the enforcement by the Security Police of a Government decision to expel two Egyptian citizens*, Adjudication No. 2169-2004, dated 22 March 2005. (Translated copy on file with the Rapporteur.)
[135] *Ibid*, at page 3.

*Doc. 10957*

153.    In short, the facts occurred in the following manner: on 18 December 2001, Mr Agiza and Mr Alzery, Egyptian citizens seeking asylum in Sweden, were the subject of a decision dismissing the asylum application and ordering their deportation on grounds of security, taken in the framework of a special procedure at ministerial level. In order to ensure that this decision could be executed that same day, the Swedish authorities accepted an American offer to place at their disposal an aircraft which enjoyed special overflight authorisations[136]. Following their arrest by the Swedish police, the two men were taken to Bromma airport where they were subjected, with Swedish agreement, to a "security check" by hooded American agents.

154.    The account of this *"check"* is especially interesting, as it corresponds in detail to the account given independently by other victims of "rendition", including Mr El-Masri. The procedure adopted by the American team, described in this case by the Swedish police officers present at the scene[137], was evidently well rehearsed: the agents communicated with each other by gestures, not words. Acting very quickly, the agents cut Agiza's and Alzery's clothes off them using scissors, dressed them in tracksuits, examined every bodily aperture and hair minutely, handcuffed them and shackled their feet, and walked them to the aircraft barefoot.

155.    The ombudsman condemns as degrading the way in which the detainees were treated from the time when they were taken charge of by the American agents until the end of the operation when the two men were handed to the Egyptian authorities. He does not consider that it constitutes torture for the purposes of Article 3 of the European Convention on Human Rights, but asks the question – though he does not answer it – whether the execution of the deportation order nonetheless violates Article 3. In any event, he finds that the operation was carried out in an inhuman and therefore unacceptable manner.[138].

156.    According to the ombudsman's findings, the Swedish officers, who were poorly led, lost control of the operation from the start of the American team's intervention. They ought to have intervened to put an end to the degrading treatment of the detainees, which was not justified on security grounds since the Swedish police had already carried out a body search on the detainees at the time of arrest.

157.    Prior to deportation of the two men to Egypt, Sweden sought and obtained "diplomatic assurances" that they would not be subjected to treatment contrary to the anti-torture convention, would have fair trials and would not be subjected to the death penalty. The "assurances" were even backed up by a monitoring mechanism, regular visits by the Swedish Ambassador and participation by Swedish observers at the trial.

158.    Developments in the case show that these "assurances" were not honoured. Mr Alzery's lawyer, Kjell Jonsson[139], states that extremely grave acts of torture took place[140]. Although Mr Alzery was released from prison in October 2003, he is not allowed to leave his village without permission from the authorities. Mr Agiza was sentenced to 25 years imprisonment by a military court in a trial from which the Swedish observers were excluded for the first two days out of a total of four. Despite the fact that Mr Agiza complained of torture during his detention, which lasted over two years after his forced return to Egypt, and despite the fact that the prison doctor's report did record physical injuries sustained in prison, the military court did not act on the defence request for an independent medical examination[141].

159.    The UN-CAT decision shows that the "diplomatic assurances", even with follow-up clauses attached, are not such as to prevent the risk of torture[142]. The deporting state therefore still bears responsibility.

---

[136] An internal Säpo report seems to indicate that the American involvement was approved by the Ministry of Foreign Affairs; persons who attended the meeting with the minister and were questioned by the ombudsman have no recollection that this was mentioned.
[137] Owing to lack of space in the room made available to the Americans, the Swedish police were not able to observe everything. In particular, they did not see that (tranquillising) suppositories were administered and that diapers were affixed, as the detainees maintain, and as was done in other "renditions". See the earlier section of this report on the "Human Impact of Renditions and Secret Detentions".
[138] See the report by Mats Melin, *supra* note 134, page 23.
[139] Mr Jonsson testified before the Temporary Committee of the European Parliament on 23 March 2005; he spoke at great length with a member of my team during his visit to Brussels.
[140] Electric shock torture was used, with electrodes fixed to the most sensitive parts of the body, in the presence of a doctor who assesses what electrical charge the prisoner can survive. In order to prevent marks, the places affected are treated specially at the end of each torture session.
[141] A representative of Human Rights Watch observed the entire trial ; the observed violations of the rights of the defence are listed in a HRW communiqué of 5 May 2005 (Sweden Implicated in Egypt's abuse of Suspected Militant – Egypt violated diplomatic promises of fair trial and no torture for terrorism suspect (http://hrw.org/english/docs/2004/05/05/egypt8530_txt.htm).
[142] Diplomatic assurances are not the focus of my mandate; here, nevertheless, are two very pertinent reports on the subject: Amnesty International, *"Diplomatic Assurances" – no protection against torture or ill-treatment*, report No. ACT