# EXHIBIT S (b)

Parliamentary **Assembly**
**Assemblée** parlementaire



**Doc. 11302 rev.**
11 June 2007

# Secret detentions and illegal transfers of detainees involving Council of Europe member states: second report

Report
Committee on Legal Affairs and Human Rights
Rapporteur: Mr Dick MARTY, Switzerland, Alliance of Liberals and Democrats for Europe

*Summary*

The Legal Affairs and Human Rights Committee now considers it factually established that secret detention centres operated by the CIA have existed for some years in Poland and Romania, though not ruling out the possibility that secret CIA detentions may also have occurred in other Council of Europe member states.

Analysis of the data on the movements of certain aircraft, obtained from different sources, including international air traffic control authorities, and supplemented by numerous credible and concordant testimonies, has enabled the places in question to be identified.

These secret places of detention formed part of the "HVD" (High Value Detainees) programme publicly referred to by the President of the United States on 6 September 2006.

The "HVD" programme was set up by the CIA with the co-operation of official European partners belonging to Government services and kept secret for many years thanks to strict observance of the rules of confidentiality laid down in the NATO framework. The implementation of this programme has given rise to repeated serious breaches of human rights.

The Committee earnestly deplores the fact that the concepts of state secrecy or national security are invoked by many governments (United States, Poland, Romania, "the former Yugoslav Republic of Macedonia", Italy and Germany, as well as the Russian Federation in the Northern Caucasus) to obstruct judicial and/or parliamentary proceedings aimed at ascertaining the responsibilities of the executive in relation to grave allegations of human rights violations. The Committee also stresses the need to rehabilitate and compensate victims of such violations. Information as well as evidence concerning the civil, criminal or political liability of the state's representatives for serious violations of human rights must not be considered as worthy of protection as state secrets.

The scope of the executive's reserved area, exempted by virtue of state secrecy and national security from parliamentary and/or judicial review, must conform with the principles of democracy and the rule of law.

The Committee on Legal Affairs and Human Rights solemnly restates its position that terrorism can and must be combated by methods consistent with human rights and rule of law. This position of principle, founded on the values upheld by the Council of Europe, is also the one that best guarantees the effectiveness of the fight against terrorism in the long term.

*Doc. 11302 rev.*

## A.   Draft resolution

1.   The Parliamentary Assembly recalls its Resolution 1507 (2006) and Recommendation 1754 (2006) on alleged secret detentions and unlawful inter-state transfers of detainees involving Council of Europe member states, and refers to the report of 12 June 2006[1] revealing the existence of a "spider's web" of illegal transfers of detainees woven by the CIA in which Council of Europe member states were involved, and expressing suspicions that secret places of detention might exist in Poland and Romania.

2.   It now considers it factually established that such secret detention centres operated by the CIA have existed for some years in these two countries, though not ruling out the possibility that secret CIA detentions may also have occurred in other Council of Europe member states.

3.   Analysis of the data on the movements of certain aircraft, obtained from different sources, including international air traffic control authorities, and supplemented by numerous credible and concordant testimonies, has enabled the places in question to be identified.

4.   These secret places of detention formed part of the "HVD" (High Value Detainees) programme publicly referred to by the President of the United States on 6 September 2006.

5.   Analysis of this programme, on the basis of information obtained from many sources on both sides of the Atlantic, shows that detainees considered especially sensitive - some of whom were mentioned by the President of the United States – were held in Poland. For logistical and security reasons, detainees considered to be less important were held in Romania.

6.   The "HVD" programme was set up by the CIA with the co-operation of official European partners belonging to government services and kept secret for many years thanks to strict observance of the rules of confidentiality laid down in the NATO framework. The implementation of this programme has given rise to repeated serious breaches of human rights.

7.   The detainees were subjected to inhuman and degrading treatment, sometimes protracted. Certain "enhanced" interrogation methods used fulfil the definition of torture and inhuman and degrading treatment in Article 3 of the European Convention on Human Rights and the United Nations Convention against Torture. Furthermore, secret detention as such is contrary to many international undertakings both of the United States and of the Council of Europe member states concerned.

8.   The Assembly earnestly deplores the fact that the concepts of state secrecy or national security are invoked by many governments (United States, Poland, Romania, "the former Yugoslav Republic of Macedonia", Italy and Germany, as well as the Russian Federation in the Northern Caucasus) to obstruct judicial and/or parliamentary proceedings aimed at ascertaining the responsibilities of the executive in relation to grave allegations of human rights violations and at rehabilitating and compensating the alleged victims of such violations.

9.   Information as well as evidence concerning the civil, criminal or political liability of the state's representatives for serious violations of human rights must not be considered as worthy of protection as state secrets. If it is not possible to separate such cases from true, legitimate state secrets, appropriate procedures must be put into place ensuring that the culprits are held accountable for their actions while preserving state secrecy.

10.   The scope of the executive's reserved area, exempted by virtue of state secrecy and national security from parliamentary and judicial review under legislation or in accordance with practice dating from the worst period of the Cold War, must be reconsidered to take into account the principles of democracy and rule of law.

11.   The Assembly is also anxious about the threats to the European governments' freedom of action resulting from their covert involvement in the CIA's unlawful activities. The disclosure of the truth, necessary on grounds of principle, is also the best way of restoring the vital co-operation between secret services for the prevention and suppression of terrorism on a sound and sustainable basis.

12.   Only Bosnia and Herzegovina and Canada, the latter an observer to the Council of Europe, have fully acknowledged their responsibilities with regard to the unlawful transfers of detainees.

---

[1] Doc 10957.

13. The Romanian parliamentary delegation has shown a firm resolve to co-operate with the Assembly, but has itself encountered the government authorities' reluctance to shed all possible light on the CIA's questionable activities in Romanian territory.

14. In Italy, the trial of the kidnappers of Abu Omar runs into obstacles due to considerations of state secrecy. The Assembly is deeply perturbed by the proceedings brought recently against the Milan public prosecutors themselves for breach of state secrecy. It regards such proceedings as intolerable impediments to the independence of justice.

15. In Germany, the work of the *Bundestag* commission of inquiry is proceeding energetically. But the prosecutorial authorities, engaged in the hunt for the kidnappers of Khaled El-Masri, still meet with lack of co-operation on the part of the American and Macedonian authorities. Khaled El-Masri still awaits the rehabilitation and redress of damages owed to him, in the same way as Maher Arar, the victim in a comparable case in Canada.

16. The Assembly solemnly restates its position that terrorism can and must be combated by methods consistent with human rights and rule of law. This position of principle, founded on the values upheld by the Council of Europe, is also the one that best guarantees the effectiveness of the fight against terrorism in the long term.

17. The Assembly therefore calls upon:

17.1. the parliaments and judicial authorities of all Council of Europe member states to:

17.1.1. elucidate fully, by reducing to a reasonable minimum the restrictions of transparency founded on concepts of state secrecy and national security, the secret services' wrongful acts committed on their territory with regard to secret detentions and unlawful transfers of detainees; and

17.1.2. ensure that the victims of such unlawful acts are fittingly rehabilitated and compensated;

17.2. the media to fully perform their role as champions of transparency, truth, tolerance and of human rights and dignity; and

17.3. the competent authorities of all member states to implement the other proposals embodied in its Resolution 1507 (2006).

18. Finally, the Assembly reaffirms the importance of setting up within it a genuine European parliamentary inquiry mechanism.

*Doc. 11302 rev.*

**B.    Draft recommendation**

1.    The Parliamentary Assembly refers to its Resolution ... (2007) on secret detentions and illegal transfers of detainees involving Council of Europe member states. It also recalls its Recommendation 1754 (2006) on alleged secret detentions and unlawful inter-state transfers of detainees involving Council of Europe member states, noting with regret that the Committee of Ministers has not as yet acted positively either on its own proposals or on those of the Secretary General of the Council of Europe submitted in June 2006, which the Assembly fully endorses.[2]

2.    The Assembly condemns the deafening silence of the Committee of Ministers as regards the 3rd public statement of the Council of Europe Anti-Torture Committee concerning the existence of secret detention facilities in the Chechen Republic of the Russian Federation, made on 13 March 2007. It urges the Committee of Ministers to play its full role as the decision-making body of the Council of Europe, the organisation which is guardian of human rights in Europe.

3.    Given that the concepts of state secrecy or national security are invoked by many governments to obstruct judicial or parliamentary proceedings aimed at ascertaining the responsibilities of the government authorities in relation to grave allegations of human rights violations and at rehabilitating and compensating the presumed victims of such violations, the Assembly invites the Committees of Ministers to prepare a recommendation on the matter, in order to:

3.1.    ensure that information and evidence concerning the civil, criminal or political liability of the State's representatives for grave human rights violations committed are excluded from protection as state secrets;

3.2.    introduce appropriate procedures ensuring that the culprits are accountable for their actions while preserving lawful state secrecy and national security, when secrets unworthy of protection are inextricably linked with lawful state secrets.

4.    The Committee of Ministers should be guided in particular by the Canadian procedures followed in the case of Maher Arar and by national parliamentary inquiry procedures such as the rules of the German *Bundestag* commissions of inquiry providing for the possibility of the commission's appointing a special investigator.

5.    The Committee of Ministers is invited to inform the Assembly, before the end of 2007, of the progress of its work on the implementation of the Secretary General's proposals, and of the Assembly's Recommendation 1754 (2006).

---

[2] Follow-up to the Secretary General's reports drawn up under Article 52 ECHR on the question of secret detention and transport of detainees suspected of terrorist acts, notably by or at the instigation of foreign agencies (SG/Inf(2006)5 and SG/Inf(2006)13), document SG(2006)01.

4

Case 5:07-cv-02798-JW   Document 54-29   Filed 12/14/2007   Page 6 of 12

*Doc. 11302 rev.*

C.   **Explanatory memorandum**
     by Mr Dick Marty, Rapporteur

**Table of contents**

**Introductory remarks - an overview**

I.   **The "dynamics of truth"**
i.   How President Bush's disclosure of the Central Intelligence Agency (CIA) secret detention programme has accelerated the "dynamics of truth"
ii.  The responsibility to provide a truthful account and the importance of confidential sources
iii. The concept: the development of the "High-Value Detainee" (HVD) Programme operated by the Central Intelligence Agency (CIA)
iv.  The evolution of specific "black sites" in the HVD programme

II.  **Secret detentions in Council of Europe member States**
i.   The framework
     a. Securing CIA clandestine operations overseas on the platform of the North Atlantic Treaty Organisation (NATO)
     b. Invocation of Article V of the North Atlantic Treaty
     c. NATO authorisations for US operations in the "war on terror"
     d. The wider NATO system and the "war on terror"
ii.  Bilateral arrangements
     a. Securing agreements with certain countries to host "black sites" for HVDs
     b. The United States' choice of European partners
iii. Responsible political authorities and preservation of secrecy in Poland and Romania
     a. Application of the NATO framework in Poland
     b. Application of the NATO framework in Romania
     c. Preserving secrecy through military intelligence partnerships
     d. Preserving secrecy and NATO Security Policy

III. **Secret detention operations in Poland**
i.   Partnering with military intelligence in Poland
ii.  Responsible political authorities in Poland
iii. The anatomy of CIA secret transfers and detentions in Poland
     a. Transfer of HVDs into CIA detention in Poland
     b. Arrivals and "drop-offs" at Szymany Airport
     c. Secret detention operations at Stare Kiejkuty

IV.  **Secret detention operations in Romania**
i.   Partnering with military intelligence in Romania
ii.  Responsible political authorities in Romania
iii. The anatomy of CIA secret transfers and detentions in Romania
     a. Creating a secure area for CIA transfers and detentions
     b. Transfer of detainees into Romania: the cover-up persists

V.   **Human rights abuses involved in the CIA secret detention programme**
i.   Re-humanising the people held in secret detention
ii.  Reconstructing the conditions in a CIA secret detention cell
iii. Confinement, isolation and insufficient provisions
     a. Careful physical conditioning of detainee and cell
     b. Permanent surveillance
     c. Mundane routines become unforgettable memories
     d. Exertion of physical and psychological stress

*Doc. 11302 rev.*

**VI. Secrecy and cover-up: how the United States and its European partners evade responsibility for CIA clandestine operations**
i.   *A case study of Khaled El-Masri*
   a. *Exposing El-Masri's secret "homeward rendition" to Europe*
   b. *The "legal vacuum": denial of accountability to El-Masri in Germany and in the United States*
   c. *The German parliamentary committee of inquiry and the work of the prosecutors in Munich*
      - *The Bundestag committee of inquiry*
      - *The Munich Prosecutor's office*
   d. *Deception and failure to account on the part of "the former Yugoslav Republic of Macedonia"*
ii.  *Complicity and accountability in other rendition cases*
   a. *The role of the Italian authorities in the case of Abu Omar*
   b. *The role of the Canadian authorities in the case of Maher Arar*
   c. *Proposal by the All Party Parliamentary Group on Extraordinary Rendition (APPG) to improve the UK's mechanisms dealing with rendition requests*

**VII. Secret detentions and renditions: the diminishing effect on respect for human rights worldwide**
i.   *A collateral damage of the war on terror: diminishing respect for human rights*
ii.  *Continued secret detentions in the Chechen Republic and failure to cooperate with the CPT: unacceptable collateral damage to the values of the Council of Europe*
   a. *CPT 3rd Public Statement and detentions in the village of Tsentoroy*
   b. *Alleged secret detentions in Grozny*

**VIII. Need for consensus solutions to the HVD dilemma whilst ensuring respect for human rights**
i.   *Towards consensus definitions of phrases used in the "war on terror"*
ii.  *Towards consensus standards on interrogation techniques*
iii. *Perceptions of the HVD programme and its likely reactivation*
iv.  *Concluding thoughts*

**Appendices**

1.   Disguised CIA flights into Szymany Airport, Poland
2.   The "secure zone" for CIA transfers and secret detentions in Romania
3.   Relevant flight logs from the Marty database

*****

**Introductory remarks – an overview**

1.   What was previously just a set of allegations is now proven: large numbers of people have been abducted from various locations across the world and transferred to countries where they have been persecuted and where it is known that torture is common practice. Others have been held in arbitrary detention, without any precise charges levelled against them and without any judicial oversight – denied the possibility of defending themselves. Still others have simply disappeared for indefinite periods and have been held in secret prisons, including in member states of the Council of Europe, the existence and operations of which have been concealed ever since.

2.   Some individuals were kept in secret detention centres for periods of several years, where they were subjected to degrading treatment and so-called "enhanced interrogation techniques" (essentially a euphemism for a kind of torture), in the name of gathering information, however unsound, which the United States claims has protected our common security. Elsewhere, others have been transferred thousands of miles into prisons whose locations they may never know, interrogated ceaselessly, physically and psychologically abused, before being released because they were plainly not the people being sought. After the suffering they went through, they were released without a word of apology or any compensation – with one remarkable exception owing to the ethical and responsible approach of the Canadian authorities – and also have to put up with the opprobrium of doubts surrounding their innocence and, right here in Europe, racist harassment fuelled by certain media outlets. These are the terrible consequences of what in some quarters is called the "war on terror."

3.   While the strategy in question was devised and put in place by the current United States administration to deal with the threat of global terrorism, it has only been made possible by the collaboration at various institutional levels of America's many partner countries. As was already shown in my report of 12

6

June 2006 (PACE Doc 10957), these partners have included several Council of Europe member states. Only exceptionally have any of them acknowledged their responsibility – as in the case of Bosnia and Herzegovina, for instance – while the majority have done nothing to seek out the truth. Indeed many governments have done everything to disguise the true nature and extent of their activities and are persistent in their unco-operative attitude. Moreover, only very few countries have responded favourably to the proposals made by the Secretary General of the Council of Europe at the end of the procedure initiated under Article 52 of the European Convention of Human Rights ("ECHR") (see document SG(2006)01).

4.      The rendition, abduction and detention of terrorist suspects have always taken place outside the territory of the United States, where such actions would no doubt have been ruled unlawful and unconstitutional. Obviously, these actions are also unacceptable under the laws of European countries, who nonetheless tolerated them or colluded actively in carrying them out. This export of illegal activities overseas is all the more shocking in that it shows fundamental contempt for the countries on whose territories it was decided to commit the relevant acts. The fact that the measures only apply to non-American citizens is just as disturbing: it reflects a kind of "legal apartheid" and an exaggerated sense of superiority. Once again, the blame does not lie solely with the Americans but also, above all, with European political leaders who have knowingly acquiesced in this state of affairs.

5.      Some European governments have obstructed the search for the truth and are continuing to do so by invoking the concept of "state secrets". Secrecy is invoked so as not to provide explanations to parliamentary bodies or to prevent judicial authorities from establishing the facts and prosecuting those guilty of offences. This criticism applies to Germany and Italy, in particular. In Germany, the concept of 'core executive privilege' seems to allow the Government to withhold some relevant information from the parliamentary committee of inquiry. Some of its members have recently seized the Federal Constitutional Court in order to oblige the Government to disclose more information. As far as Italy is concerned, it is striking to note that state secrets are invoked against the prosecutor in charge of investigating the Abu Omar case on grounds almost identical to those advanced by the authorities in the Russian Federation in its crackdown on scientists, journalists and lawyers, many of whom have been prosecuted and sentenced for alleged acts of espionage. The same approach led the authorities of "the former Yugoslav Republic of Macedonia" to hide the truth and give an obviously false account of the actions of its own national agencies and the CIA in carrying out the secret detention and rendition of Khaled El-Masri.

6.      Invoking state secrets in such a way that they apply even years after the event is unacceptable in a democratic state based on the rule of law. It is frankly all the more shocking when the very body invoking such secrets attempts to define their concept and scope, as a means of shirking responsibility. The invocation of state secrets should not be permitted when it is used to conceal human rights violations and it should, in any case, be subject to rigorous oversight. Here again, Canada seems to demonstrate the right approach, as will be seen later in this report.

7.      There is now enough evidence to state that secret detention facilities run by the CIA did exist in Europe from 2003 to 2005, in particular in Poland and Romania. These two countries were already named in connection with secret detentions by Human Rights Watch in November 2005. At the explicit request of the American government, the Washington Post simply referred generically to "eastern European democracies", although it was aware of the countries actually concerned. It should be noted that ABC did also name Poland and Romania in an item on its website, but their names were removed very quickly in circumstances which were explained in our previous report. We have also had clear and detailed confirmation from our own sources, in both the American intelligence services and the countries concerned, that the two countries did host secret detention centres under a special CIA programme established by the American administration in the aftermath of 11 September 2001 to "kill, capture and detain" terrorist suspects deemed to be of "high value". Our findings are further corroborated by flight data of which Poland, in particular, claims to be unaware and which we have been able to verify using various other documentary sources.

8.      The secret detention facilities in Europe were run directly and exclusively by the CIA. To our knowledge, the local staff had no meaningful contact with the prisoners and performed purely logistical duties such as securing the outer perimeter. The local authorities were not supposed to be aware of the exact number or the identities of the prisoners who passed through the facilities – this was information they did not "need to know." While it is likely that very few people in the countries concerned, including in the governments themselves, knew of the existence of the centres, we have sufficient grounds to declare that the highest state authorities were aware of the CIA's illegal activities on their territories.

9.      We are not an investigating authority: we have neither the powers nor the resources. It is not therefore our aim to pass judgments, still less to hand down sentences. However, our task is clear: to assess, as far as possible, allegations of serious violations of human rights committed on the territory of

*Doc. 11302 rev.*

Council of Europe member states, which therefore involve violations of the European Convention on Human Rights. We believe we have shown that the CIA committed a whole series of illegal acts in Europe by abducting individuals, detaining them in secret locations and subjecting them to interrogation techniques tantamount to torture.

10.     In most cases, the acts took place with the requisite permissions, protections or active assistance of government agencies. We believe that the framework for such assistance was developed around NATO authorisations agreed on 4 October 2001, some of which are public and some of which remain secret. According to several concurring sources, these authorisations served as a platform for bilateral agreements, which – of course – also remain secret.

11.     In our view, the countries implicated in these programmes have failed in their duty to establish the truth: the evidence of the existence of violations of fundamental human rights is concrete, reliable and corroborative. At the very least, it is such as to require the authorities concerned at last to order proper independent and thorough inquiries and stop obstructing the efforts under way in judicial and parliamentary bodies to establish the truth. International organisations, in particular the Council of Europe, the European Union and NATO, must give serious consideration to ways of avoiding similar abuses in future and ensuring compliance with the formal and binding commitments which states have entered into in terms of the protection of human rights and human dignity.

12.     Without investigative powers or the necessary resources, our investigations were based solely on astute use of existing materials – for instance, the analysis of thousands of international flight records – and a network of sources established in numerous countries. With very modest means, we had to do real "intelligence" work. We were able to establish contacts with people who had worked or still worked for the relevant authorities, in particular intelligence agencies. We have never based our conclusions on single statements and we have only used information that is confirmed by other, totally independent sources. Where possible we have cross-checked our information both in the European countries concerned and on the other side of the Atlantic or through objective documents or data. Clearly, our individual sources were only willing to talk to us on the condition of absolute anonymity. At the start of our investigations, the Committee on Legal Affairs and Human Rights authorised us to guarantee our contacts strict confidentiality where necessary. This willingness to grant confidentiality to potential "whistleblowers" was also communicated to Mr Franco Frattini, Vice-President of the European Commission with responsibility for the area of freedom, security and justice, so that he could also notify the relevant ministers in EU countries. Guarantees of confidentiality undoubtedly contributed to a climate of trust and made it possible for many sources to agree to talk to us. The individuals concerned are not prepared at present to testify in public, but some of them may be in the future if the circumstances were to change.

13.     The Polish authorities recently criticised us for not travelling to their country to visit the facility suspected of having housed a detention centre. However, we see no point in visiting the site: we are not forensic science experts and we have no doubts about the capability of those who would have removed any traces of the prisoners' presence. Moreover, a meeting at the site would only have been worthwhile if the Polish authorities had first replied to the questions we put to them on numerous occasions and to which we are still awaiting replies.

14.     We are fully aware of the seriousness of the terrorist threat and the danger it poses to our societies. However, we believe that the end does not justify the means in this area either. The fight against terrorism must not serve as an excuse for systematic recourse to illegal acts, massive violation of fundamental human rights and contempt for the rule of law. I hold this view not only because methods of this nature conflict with the constitutional order of all civilised countries and are ethically unacceptable, but also because they are not effective from the perspective of a genuine long-term response to terrorism.

15.     We have said it before and others have said it much more forcefully, but we must repeat it here: having recourse to abuse and illegal acts actually amounts to a resounding failure of our system and plays right into the hands of the criminals who seek to destroy our societies through terror. Moreover, in the process, we give these criminals a degree of legitimacy – that of fighting an unfair system – and also generate sympathy for their cause, which cannot but serve as an encouragement to them and their supporters.

16.     The fact is that there is no real international strategy against terrorism, and Europe seems to have been tragically passive in this regard. The refusal to establish and recognise a functioning international judicial and prosecution system is also a major weakness in our efforts to combat international terrorism. We also agree with the view expressed by Amnesty International in its recent annual report: governments are taking advantage of the fear generated by the terrorist threat to impose arbitrary restrictions on fundamental

freedoms. At the same time, they are paying no attention to developments in other areas that claim many more lives, or they display a disconcerting degree of passivity. We need only cast our minds to human trafficking or the arms trade: how is it possible, for example, that aeroplanes full of weapons continue to land regularly in Darfur, where a human tragedy with tens of thousands of victims is unfolding?

17.     In our view, it is also necessary to draw attention to an aspect we believe to be very dangerous: the legitimate fight against terrorism must not serve as a pretext for provoking racist and Islamophobic reactions among the public. The Council of Europe has rightly recognised the fundamental importance of intercultural and interfaith dialogue. The member states and observers really should carry these efforts forward and maintain the utmost of vigilance on the issue. Any excesses in this respect could have disastrous consequences in terms of an expanded future terrorist threat.

18.     In the course of our investigations and through various specific circumstances, we have become aware of certain special mechanisms, many of them covert, employed by intelligence services in their counter-terrorist activities. It is not for us to judge these methods, although in this area, too, great liberties appear to be taken with lawfulness. Many of these methods give rise to chain reactions of blackmail and lies between different agencies and institutions in individual states, as well as between states. Therein may lie at least a partial explanation for certain governments' fierce opposition to revealing the truth. We cannot go into the details of this phenomenon without putting human lives at risk. Let me reiterate that we are fully convinced of the strategic importance of the work of intelligence services in combating terrorism. However, we believe equally strongly that the relevant agencies need to be subject to codes of conduct, accompanied by robust and thorough supervision.

19.     With the mandate assigned to us, we believe that the Assembly has reached the limits of its possibilities. The resources at our disposal to address the issues presented to us are totally inadequate for the task. The Council of Europe should give serious consideration to equipping itself with more effective and more binding instruments for dealing with such grave instances of massive and systematic violations of human rights. This is more necessary now than ever before, since it is clear that we are facing a worrying process of the erosion of fundamental freedoms and rights.

20.     We must condemn the attitude of the many countries that did not deem it necessary to reply to the questionnaire we sent them through their national delegations. Similarly, NATO has never replied to our correspondence.

21.     In presenting this report, the Rapporteur expresses his gratitude to the staff of the Committee's secretariat for their outstanding commitment and dedication. Very special thanks and acknowledgment go to the young staff member who was specifically assigned to this investigation: he has displayed absolutely amazing analytical skills and tenacity.

**I.      The "dynamics of truth"**

*i.      How President Bush's disclosure of the Central Intelligence Agency (CIA) secret
        detention programme has accelerated the "dynamics of truth"*

22.     When President Bush decided on 6 September 2006 to reveal the existence of the covert programme implemented by the CIA to arrest, detain and interrogate overseas high-value terrorist suspects [3], he simply glossed over the most delicate aspects, such as the implementation means chosen and (not) obtaining the prior support from the United States Congress for his Administration's "war against terrorism".

23.     President Bush's disclosure was carefully worded so as to provide very little factual insight that was genuinely new or unknown. It was instead couched in imperative terms that portrayed the President as a strong Commander-in-Chief trying to prevent threats to the United States by methods - such as the CIA's interrogation techniques - which were *"tough... safe, and lawful, and necessary"*.

24.     The end was portrayed as paramount – *"we're getting vital information necessary to do our jobs, and that's to protect the American people and our allies"*; the means of getting there inconsequential – *"I cannot describe the specific methods used – I think you understand why"*.

---

[3] The White House, Office of the Press Secretary, "Remarks by the President on the Global War on Terror" (*War against terrorism is a struggle for freedom and liberty, Bush says*), speech delivered in the East Room of the White House, 06.09.2006; hereinafter "Remarks by President Bush, 06.09.2006".

9

*Doc. 11302 rev.*

25. Just under six weeks later, the US Congress responded to President Bush's clarion call[4] by passing the Military Commissions Act 2006 into law. As President Bush had expressly requested, the legislation draws distinctions between United States citizens and non-citizens, strips away the time-honoured right of detainees to challenge the basis for their detention (*habeas corpus*), and insulates US service personnel from prosecution for violations of Common Article 3 of the four Geneva Conventions. The process that lay ahead for captured terrorist suspects was thereby mapped out, whilst the Administration tried to cover the tracks that had led them there.

26. The limited disclosures of 6 September 2006, afforded a fresh focus to the mandate of my inquiry. One thing was now certain, personally acknowledged by the President of the United States: the existence of secret detention centres, which I had already confirmed in my June 2006 report. We are, however, faced with unresolved allegations that Council of Europe member States have colluded with the United States in serious human rights violations such as enforced disappearances, incommunicado (secret) detentions, and torture or cruel, inhuman and degrading treatment. President Bush's assertion that Europeans too had benefited from the programme[5] - which has not been substantiated by any evidence – must be put into its proper perspective if it were shown that we had forsaken our democratic values and the rule of law in order to share in those benefits.

27. In my view the protection of fundamental human rights is every bit as important as the preservation of national security cited by President Bush; indeed I hold these two objectives to be complementary, mutually reinforcing and in no way contradictory.

28. If we are to understand clearly the relationship between human rights and national security imperatives for the future, then we cannot content ourselves with partial truths about how the policies in question have been developed and implemented in the past. It is therefore our duty to get right to the bottom of the CIA's secret detention programme in all its systemic components. The programme must not simply pass into history as a policy that seemed to breach our supposedly inviolable human rights, but about which we never learned the truth and for which we never exercised political and legal accountability. We have a right and the duty to know the truth and to analyse critically the means and methods being used in our name towards the stated goal of enhancing our common security. It is therefore indispensable to clarify the precise operational and legal basis of the CIA's covert programme, and in particular to establish the extent to which Council of Europe member states were involved.

29. Building upon the June 2006 interim report[6], I have now concentrated on placing the CIA programme properly within the "global spider's web" – the image I used to describe the system of secret detentions and detainee transfers spun out around the world by the US Government and its allies. In this context, our interest has been concentrated on the role played by the member States of the Council of Europe that acted as "hosts" for CIA secret detentions.

30. As this report will make clear, the HVD programme has depended on extraordinary authorisations – unprecedented in nature and scope – at both national and international levels. The secret of its very existence was successfully guarded for several years, and until today, very little detail has been published about the terms used to refer to it, the way the system has operated, the underlying authorisations and arrangements that have sustained it, or even the reasons as to why it has so successfully been covered up.

31. Questions such as where the detention sites have been located and what conditions the detainees have been kept in were declared last year by President Bush to be too sensitive for him to answer officially, on the grounds that *"doing so would provide our enemies with information they could use to take retribution"*.[7]

---

[4] *Ibidem.* The transcript shows that President Bush struck a chord with his White House audience, which included relatives of victims of the 9/11 attacks: *"Congress is in session just for a few more weeks, and passing this legislation ought to be the top priority. (Applause.)… For the sake of our security, Congress needs to act, and update our laws to meet the threats of this new era. And I know they will."*
[5] *Ibid.* "*Information from the terrorists questioned in this program helped unravel plots and terrorist cells in Europe and other places. It's helped our allies to protect their people from deadly enemies.*"
[6] See Dick Marty, Committee on Legal Affairs and Human Rights, Council of Europe Parliamentary Assembly, "Alleged secret detentions and unlawful inter-state transfers of detainees involving CoE member States", Doc. 10957, 12.06.2006, available at http://assembly.coe.int/Main.asp?link=/Documents/WorkingDocs/Doc06/EDOC10957.htm (hereinafter "Marty Report 2006, Council of Europe Doc. 10957").
[7] Remarks by President Bush, 06.09.2006, *supra* note 3.

32.     Indeed, even when the revelations of secret detentions in "several democracies in Eastern Europe" first emerged in November 2005,[8] the publication responsible for breaking the story, *The Washington Post*, made a decision not to publish the names of the states which had hosted CIA "black sites", although it was aware of this information. *The Post's* decision followed a meeting at the White House and an explicit appeal from the US Government to refrain from naming the countries involved.[9] *The Post's* Staff Writer Dana Priest, who wrote the article in question, explained the rationale behind the newspaper's decision in the following terms:

> *"Political embarrassment was not a consideration; it really turned on the safety and co-operation questions. We did not publish the names of the countries involved because those countries were co-operating on other efforts that were not controversial, some of which the Post knew about from independent sources and which we considered to be valuable. Knowing those efforts to be vital to our international programmes, we thought that those efforts might stop if the countries' names were published, and that this would not be good."*[10]

33.     While one might understand this decision, I have chosen to adopt a different position from that of *The Washington Post* on this issue, whilst maintaining a strict policy of confidentiality with regard to my individual sources. It should also be borne in mind that the very earnest international NGO Human Rights Watch had explicitly cited Poland and Romania among the countries in which there had been secret detention centres. Moreover, it is difficult to accept that the reasons given at the time by the *Washington Post* are still valid today.

### ii.     The responsibility to provide a truthful account and the importance of confidential sources

34.     Especially in light of its unparalleled pedigree for protecting and promoting human rights on our continent, the Council of Europe holds a unique responsibility in providing a truthful account. It has been said that the paradigm of US detainee treatment in the course of the "war on terrorism" has been to carry out its most odious acts extra-territorially – including in Europe – because it knows that such acts would not be permissible at home under the laws and Constitution of the United States. This is a paradigm of political expediency. But how not to see in it a form of contempt towards other countries, notably Cuba (Guantanamo!) and Europe: what is not good enough for the United States is for others!

35.     In direct response, the paradigm of this report is one based on principles and values. We assert that in order to retain the moral authority necessary to defeat the global terrorist threat, we must ensure that every detainee in our custody – notwithstanding the acts of which he is accused, or whether he is held in Europe or elsewhere – is accorded the same fundamental human rights we would expect to be accorded ourselves and which, moreover, we uphold for even the worst criminals. Not even war authorises conduct of any sort; for example, the Geneva Conventions, the cornerstone of international humanitarian law laying down the limits to the barbarity of war, also prohibit secret detention centres.

36.     From the outset of my mandate as Rapporteur on this issue, I have argued that transparency and accountability would in fact prove to be healthy for all the member States of the Council of Europe, not least for the countries which have hosted CIA "black sites".

37.     The perpetual cycle of allegations and unsubstantiated rumours since November 2005 has merely served to fuel mutual suspicion and distrust between our governments and peoples. The uncertainty has disrupted open political debate and provided an unwelcome distraction from the most urgent task of developing more viable democratic strategies to combat the growing terrorist threat in accordance with the rule of law.

38.     Thus my decision to name the countries concerned should not be construed as an attempt to single out scapegoats or to drive a wedge between members of the European family. On the contrary, my investigations demonstrate clearly that responsibility is broadly shared on both sides of the Atlantic and on our continent.

---

[8] See Dana Priest, "CIA Holds Terror Suspects in Secret Prisons – Debate is Growing within Agency about Legality and Morality of Overseas System set up after 9/11", *The Washington Post*, 02.11.2005.
[9] See Howard Kurtz, "Bush Presses Editors on Security", *The Washington Post*, 26.12.2005, available at http://www.washingtonpost.com/wp-dyn/content/article/2005/12/25/AR2005122500665_pf.html. For further commentary, see also Marty Report 2006, section 1.3, at p. 9.
[10] Dana Priest, speaking at the seminar entitled "Secrecy and Government: America Faces the Future", hosted by the Center on Law and Security, NYU School of Law, New York, 12.04.2007.