*Doc. 11302 rev.*

39.    From the very beginnings of the "war on terror" advocated by the United States, European governments could not ignore its true nature ; all the members and partners of NATO signed up to the same "permissive" – not to say illegal – terms that allowed CIA operations to permeate throughout the European continent and beyond; all knew that CIA practices for the detention, transfer and treatment of terrorist suspects left open considerable scope for abuses and unlawful measures; yet all remained silent and kept the operations, the practices, their agreements and their participation secret.

40.    Now it is time for the member States of the Council of Europe to muster a similar collective spirit in acknowledging the truth about the past and regrouping to face the considerable challenges to be faced in the future. The methods used not only proved to be of questionable usefulness, but above all they also gave a semblance of legitimacy to terrorist movements and even gave rise to some feeling of sympathy for them.

41.    As Council of Europe Rapporteur I have talked persistently about my belief in the "dynamics of truth" – that each drop of truth will lead forward to another drop of truth, and that a steady trickle will ultimately develop into an irreversible flow. Seen in this regard, my report of June 2006, which mapped out the "global spider's web" and exposed CIA "rendition circuits" for the first time, was but a small contribution to a pool of outstanding investigative work by journalists[11] and non-governmental organisations[12] that continues to grow to the present day.

42.    Yet while the momentum was gathering last year, we were perfectly aware that we would still have to overcome formidable obstacles in order to get to the truth about the CIA programme of secret detentions in Europe. State secrecy has been systematically invoked at national level in several instances both to deny us access to classified documents and to thwart action taken by the competent judicial and parliamentary authorities.[13] Moreover, as I demonstrate later in this report,[14] the secrecy and security of information policies adopted by states in the framework of the North Atlantic Treaty Organisation (NATO) are just as impenetrable when applied as barriers to transparency as they have proven since they were selected to act as coverage for CIA clandestine operations.

43.    To encourage even a minor departure from strict adherence to these regimes of silence, secrecy and cover-up would require a rare convergence of factors. The first signs of cracks would have to appear in alliances that had hitherto been absolutely watertight. The motivation for insiders on one or both sides of the Atlantic to talk to us would surely derive only from their fear of betrayal – either by their colleagues, their political masters or their transatlantic partners.

44.    The catalyst for those involved in the HVD programme to talk candidly to our team appears ultimately to have come from the American side – albeit that a degree of ambiguity about who was "allowed" to say what appears to have worked in our favour. My representative, who was on-the-spot in Washington, DC when President Bush disclosed the existence of the CIA's covert overseas detention and interrogation programme, received an off-the-record briefing.

---

[11] In particular, I wish to recognise the following journalistic contributions, which depended on original investigative work to bring to light original facts and new dimensions to the global system of secret detentions and detainee transfers: Stephen Grey on extraordinary renditions and outsourcing of torture (see "America's Gulag," in *The New Statesman*, 17.05.2004; "US Accused of Torture Flights," in *The Sunday Times*, 14.11.2004; and "Les Etats-Unis inventent la delocalisation de la torture,: in *Le Monde Diplomatique*, April 2005); Dana Priest on CIA programmes, including secret detentions in Europe ("CIA Holds Terror Suspects in Secret Prisons – Debate is Growing within Agency about Legality and Morality of Overseas System set up after 9/11," in *The Washington Post*, 2.11.2005; and "Foreign Network at Front of CIA's Terror Fight – Joint Facilities in Two Dozen Countries account for bulk of Agency's post-9/11 successes," in *The Washington Post*, 18.11.2005); Jane Mayer on rendition policies, interrogation techniques and torture memos ("Outsourcing Torture: The secret history of America's 'extraordinary rendition' programme," in *The New Yorker*, 14 and 21.02.2005; "A Deadly Interrogation – Can the CIA legally kill a prisoner?" in *The New Yorker*, 14.11.2005; and "The Memo – How an internal effort to ban the abuse and torture of detainees was thwarted," in *The New Yorker*, 27.02.2006) ; Brian Ross and Richard Esposito on enhanced interrogations and the clear-out of European sites ("CIA's Harsh Interrogation Techniques Described – Sources Say Agency's Tactics lead to Questionable Confessions, Sometimes to Death", *ABC News*, 18.11.2005; and "Sources Tell ABC News Top Al-Qaeda Figures held in Secret CIA Prisons: 10 out of 11 Terror Leaders subjected to "Enhanced Interrogation Techniques," *ABC News*, 5.12.2005); Don Van Natta Jr. and Souad Mekhennet on the El-Masri case ("German's Claim of Kidnapping brings Investigation of US link," in *The New York Times*, 9.01.2005); Nick Hawton on the cover-up regarding secret flights into Poland ("Chasing Shadows," *BBC Radio 4*, 2.01.2007); and *The Chicago Tribune* on undeclared flights in both Poland and Romania (John Crewdson, "Elusive jet may hold clue to secret prisons – Mystery Gulfstream landed in Romania," in *The Chicago Tribune*, 13.09.2006; and Tom Hundley, "Remote Polish airstrip holds clues to secret CIA flights," 06.02.2007).

[12] I am deeply grateful to all our allies in the non-governmental field, whose dedication to the cause and tireless support for my inquiry – much of it behind the scenes – has proven invaluable. For their professional approach throughout the last two years and for their reporting, research and representations too extensive to enumerate individually here, I wish to thank in particular: the American Civil Liberties Union, Amnesty International, the Brennan Centre for Justice at NYU School of Law, the Centre for Human Rights and Global Justice at NYU School of Law, the Centre for Constitutional Rights, Human Rights First, Human Rights Watch, the International Commission of Jurists, REPRIEVE, Statewatch and the Swedish Helsinki Committee for Human Rights. I salute your work and that of the many other NGOs active in the field who have supported me anonymously or whose names I have inadvertently failed to mention.

[13] Pertinent examples of the invocation of state secrecy in at least two different jurisdictions are provided in the section entitled "A case study of Khaled El-Masri," at section VI.i later in this report.

[14] See section entitled "Preserving Secrecy and the NATO Security Policy," at section II.iii. later in this report.

45.     Thereafter, one of the most challenging aspects of our investigation has been our effort to access the structures where the information is held within the different European states. Towards this end our team has undertaken visits and developed sources in both the political and intelligence spheres in various countries, sometimes pursuing multiple contacts over a period of months.

46.     Consequently, all of the conclusions drawn in this report rely upon multiple sources, which validate and corroborate one another. Indeed, in the course of my inquiry, our team has spoken – and in many cases conducted interviews – with over 30 one-time members (serving, retired or having carried out contract work) of intelligence services in the United States and Europe.

47.     However, by necessity, the majority of these conversations have taken place under conditions of strict confidentiality, in order to enable the individuals concerned to be able to speak freely and without fear of consequence.

48.     It is my firm conviction that what I publish here poses no threat to the individual or collective safety of any of my sources, some of whom have taken considerable personal risks to speak to us. Thus I do not identify by name the sources of many specific quotes and other items of information, nor do I attribute them too specifically to the office held by the speaker, such that no reader is able to identify the individuals who spoke in confidence to us and whose anonymity, at least for the moment, must be preserved.

49.     These rules on confidentiality, imposed upon us because of the lack of collaboration from the states concerned, cannot and should not prevent me from naming individual office-holders who occupied key positions of power at the relevant times and who thus answer for the decisions they took on behalf of their states.

50.     In the sections that follow, I have therefore drawn upon multiple sources in the US and European intelligence communities in an attempt to lay bare the anatomy of this controversial programme. In so doing, I believe that I have been able to provide the most in-depth account to date of the conceptual development of the HVD programme, the NATO framework so vital to the programme's operations, details of the bilateral arrangements for its operations, and important strands of evidence that belie the repeated denials of high-ranking officials – including several Presidents and Prime Ministers – about what took place and what they knew. Certainly we are far from knowing the whole truth. The information we have gathered is, however, sufficiently concrete – and worrying – to encourage states at last to do all they can to get to the bottom of what took place in their countries and within certain of their institutions.

### iii.     *The concept: the development of the "High-Value Detainee" (HVD) Programme operated by the Central Intelligence Agency (CIA)*

51.     For the sake of clarity reference should be made to the CIA's covert programme using the correct terminology: among well-informed quarters, the programme is known as the "High-Value Detainee" programme, or simply the "HVD Programme".

52.     The HVD programme has formed a very specific, narrow and unique strand of the United States' counter-terrorist operations in the period since 11 September 2001. Indeed, one reason why it has been so successfully covered up is that one can easily lose sight of this programme among the sizeable and still growing tally of people detained in the course of the "war on terror".

53.     There have been scores of sites in which thousands of prisoners have been held for varying periods of time either by one or more agencies of the US Government, or on its behalf by foreign allies.

54.     Among the most highly-populated and well-known of these detention sites – and indeed, hosts to CIA detainees at one time or another – have been the various internment "camps" on the US Naval Base at Guantanamo Bay, the Bagram Airfield in Kabul, Afghanistan and the Abu Ghraib facility in Baghdad, Iraq. The public has been able to get some sort of picture of these sites, not from transparent information provided by the competent authorities but rather from leaks, statements from former inmates and secretly filmed images of detainee abuse.

55.     Even in this context, the HVD programme is different. One senior source in the CIA Counterterrorism Centre told us: "If a guy is captured on the battlefield and sent to [Guantanamo], that's got nothing to do with it. But I think there is a tendency in the media, in Europe and in America, to blend together what the FBI is doing, what the military is doing and what the CIA is doing – to attribute it all to the same programme. And frankly, you can't do that. The HVD programme is a very structured, very rigorous programme."

Doc. 11302 rev.

56.      In my understanding, the narrative of the HVD programme has played out largely over a five-year period, from September 2001 to September 2006. CIA insiders told us that there was widespread surprise that it operated and remained secret quite as long as it did. From 2004 onwards, the President was being strongly advised to place a time limit on the programme because it was regarded as having been somewhat improvisational in its nature and therefore could not be sustained: "every period in history has its bookends".

57.      The conception of the HVD programme can be traced to the days immediately after 11 September 2001, when senior CIA officials (including CIA Director George Tenet) worked with the political principals of the Bush Administration (including President Bush himself) to conceive, debate and formulate strategies to "give some extra potency" to America's "frontline officials" in combating and countering the global terrorist threat.

58.      On 17 September 2001 President Bush signed a classified Presidential Finding[15] as a means of granting the CIA important new competences relating to its covert actions: new choices it could make and new ways it could respond if confronted with Al-Qaeda targets in the field. On the day this document was signed – the Sunday after the 11 September attacks – senior members of the CIA's Counter-Terrorism Center (CTC) and selected foreign counterparts were made familiar with its contents in a meeting in Washington, DC.[16]

59.      Our team has spoken with several American officials who have seen the text of the Presidential Finding and participated in the operations that put it into action. Two particularly striking observations have emerged from these discussions. First, by putting "*a lot of stock in Special Activities*"[17] the Finding "*redefined the role of the Agency*", even in the eyes of some of its own, more conservative senior officials. Second, the "*really broad, not specific*" scope of the covert actions authorised in the Finding meant that the CIA was instantly granted enough room for manoeuvre to design a secret detentions programme overseas[18].

60.      One senior former CTC official said the broad scope and enhanced paramilitary powers for the CIA were negotiated into the terms of the Finding with "*revenge for the 9/11 attacks*" in mind. Another former CTC official with direct responsibility for geographical areas in which Al Qaeda was operating told us:

> "*This Administration needed some public successes, so they put a lot more pressure on us to find these people, and they decided to hold these people themselves. I think those are the two major changes post-9/11.*"

61.      Thus, there had emerged a category of terrorist suspects whom the CIA considered of high value and to whose capture, detention, transfer and interrogation it would ultimately dedicate an entire covert programme. The men in this category had mostly been picked out already as "High-Value Targets", or HVTs,[19] and once in the custody of the CIA they would become "High-Value Detainees", or HVDs.[20]

---

[15] The US Government finally conceded the <u>existence</u> of this classified Presidential Finding in response to a Freedom of Information Act (FoIA) litigation brought by the American Civil Liberties Union (ACLU) in 2006. Nonetheless, the precise scope and contents of the Finding remain unknown and, according to Congressional staffers, even senior members of the relevant House and Senate Select Committees have not been allowed to access it. See ACLU Press Release, "CIA Finally Acknowledges Existence of Presidential Order on Detention Facilities Abroad", 14.11.2006, available at http://www.aclu.org/safefree/torture/27382prs20061114.html; see also US Senator Patrick Leahy, "Comments of Senator Patrick Leahy (D-Vt.), Incoming Chairman, Senate Judiciary Committee, on Department of Justice's Response to Request for Documents relating to Bush Administration's Interrogation Policies", 2.01.2007, available at http://leahy.senate.gov/press/200701/010207.html.

[16] The former Chief of CIA Clandestine Operations in Europe, Tyler Drumheller, recounts the meeting of 17.09.2001 in his memoirs: "*Cofer [Black, then Chief of the CTC] presented a new Presidential authorisation that broadened our options for dealing with terrorist targets – one of the few times such a thing had happened since the CIA was officially banned from carrying out assassinations in 1976. It was clear that the Administration saw this as a war that would largely be fought by intelligence assets. This required a new way of operating*'. See Tyler Drumheller, *On the Brink: An Insider's Account of How the White House Compromised American Intelligence*, Carroll & Graf, New York, 2006 (hereinafter "Tyler Drumheller, *On the Brink*"); at p. 35.

[17] The Special Activities Division is akin to a paramilitary wing of the CIA; the kinds of "activities" referred to here include renditions and, in exceptional circumstances, assassinations of suspected Al-Qaeda members.

[18] I am certain that the HVD programme has its *general* origins in the 17.09.2001 Finding, because our sources were unanimous on the question of the latitude this document afforded to the CIA. However we were also told separately of the existence of further classified documents (thought to have been signed in 2002) that actually use the term "black sites" in relation to *specific* facilities.

[19] Public citations of the acronym "HVT" have become more common in the course of the "war on terror". It is commonly used, for example, among members of the US Armed Forces, particularly those who have been deployed to track down prominent Baath'ists and insurgents in Iraq, such as Uday and Qu'say Hussein, or Abu Musab al-Zarqawi. See Defense Technical Information Center, "Loss of High-Value Targets" available at http://www.dtic.mil/doctrine/jel/doddict/data/h/02467.html.

[20] The acronym "HVD" has also now been adopted in public citations used by the Office of the Director of National Intelligence (DNI) and the Department of Defense (DoD). See, for example, Office of the Director of National Intelligence (DNI), "Summary of the High-Value Terrorist Detainee Program", 06.09.2006, available at: http://www.defenselink.mil/pdf/thehighvaluedetaineeprogram2.pdf.

62.      The profile of the HVTs was that of orchestrators, planners, leading operatives and providers of logistics for some of the most devastating terrorist plots attributed to Al-Qaeda and to its associates. In our discussions, current and former CIA officials have been keen to emphasise, even in hindsight, that their targets span only a very limited range. One asserted: "if you look down the list of the people we've picked up since 9/11, the Agency has maintained a very high level of pertinence in terms of our targets." Another confirmed: "we didn't want the insurgents; we wanted the leadership."

63.      CIA dossiers compiled on these men were comprehensive and constantly being updated. As my representative was told by Michael Scheuer, former Chief of the Bin Laden Unit: "the one problem we never had was lack of information."[21] Intelligence on the HVTs was replete with references to their involvement in the 9/11 attacks and the evolution of its feeder cells, or in other major events in the global escalation of terrorism, such as the dual attack on US Embassies in East Africa, the assault on the US Navy ship USS Cole, or the Bali nightclub bombings.

64.      Just as the CIA rendition programme - instigated in the 1990s and escalated in the post-9/11 years - maintained its "safety net" of having obtained legal approval for every operation it launched,[22] the CIA's post-9/11 HVD programme was designed and vetted in consultation with various lawyers in the Justice Department, the CIA and in the Presidential Administration. All three of these sets of lawyers, as our sources confirmed, have approved so-called "Kill, Capture or Detain" orders, or "K-C-D orders", for high-value targets with whom the CIA came into contact.

65.      The template for the High-Value Detainee programme was not drawn out of the KCD's Detain (or "D") category, since this was said to be a more general responsibility (shared with the military and local counterparts) for those persons picked up in the course of counter-terrorist activities about whose intelligence value the CIA unit on the ground was less certain:

> "D was like our default option: Detain. Like if we pick up some guy in a raid where we also got one of the HVTs, like [Ramzi] bin Al-Shibh, and maybe we've got nothing on this guy, but obviously we're still gonna hold him."

66.      According to our sources, the tailor-made HVD programme actually grew out of the KCD's Capture (or "C") category, which comprised targets whom the CIA set out expressly to capture, sometimes offering multi-million dollar US Government rewards for decisive tip-offs. The design of a special HVD programme helped to address a key "what next?" question, as one well-placed source explained:

> "We knew that we would have some successes when we went out to get these guys, with the resources we were throwing at it and the support of our friends in the Pakistani Services[23]. So the real question was "what are we gonna do with them when we got them?"

67.      The CIA ruled out the prospect of having its HVTs handed over to or shared with the US military or the FBI, let alone foreign services – "these high-value targets are not moved between agencies or nations" – believing that the security and integrity of the resultant interrogations, in particular, could not be guaranteed. On the same grounds Guantanamo Bay "offered nothing" akin to the secrecy and isolation that the CIA demanded: "*Guantanamo was a real mess. The interrogators there were FBI and military… [who] thought they knew what they were looking for, but they didn't know who they were talking to. The United States had a laboratory at Guantanamo, for the first time, to understand the insurgent arm of Al Qaeda… [but] we screwed it up!*"

68.      Hence the concept of "black sites", a handful of facilities of limited size and capacity in different parts of the world, where the CIA exclusively would be the jailer.

*iv.      The evolution of specific "black sites" in the HVD programme*

69.      A significant breakthrough, which became the trigger for the operations of the HVD programme, was the CIA's capture of Abu Zubaydah in March 2002. Mr Zubaydah's peculiar importance from the US

---

[21] Michael Scheuer, former Chief of the Bin Laden Unit in the CIA's Counterterrorism Center, interview carried out by the Rapporteur's representative in Washington, DC, May 2006. Scheuer told us: "We had built up dossiers on all the important people in Al Qaeda within six months after we started the rendition programme. So it was just a matter of keeping those files updated. The approval of the senior levels of the Government and the lawyers' approval, if you pushed them, could be gotten very quickly because everything was ready."
[22] For my comprehensive account of "The evolution of the rendition programme", including its legal and operational considerations, see The Marty Report 2006, *supra* note 6.
[23] The phrase used here is understood to be a reference to the Inter Services Intelligence Agency, or ISI, which is Pakistan's military intelligence branch and is renowned for its close co-operation with the CIA.

*Doc. 11302 rev.*

Government's perspective has been well documented – not least in President Bush's speech of 6 September 2006 – in which he was mentioned 12 times, including to acknowledge that an *"alternative set of procedures"*[24] was introduced specifically for his interrogation. In the ensuing period of approximately two-and-a-half years, information garnered from HVD interrogations using these procedures is said to have proved crucial in combating Al-Qaeda's worldwide terrorist operations.[25]

70.    There are two more specific locations to be considered as "black sites" and about which we have received information sufficiently serious to demand further investigation; we are however not in a position to carry out adequate analysis in order to reach definitive conclusions in this report. First we have received concurring confirmations that United States agencies have used the island territory of **Diego Garcia**, which is the international legal responsibility of the United Kingdom, in the "processing" of high-value detainees. It is true that the UK Government has readily accepted "assurances"[26] from US authorities to the contrary, without ever independently or transparently inquiring into the allegations itself, or accounting to the public in a sufficiently thorough manner. Second we have been told that **Thailand** hosted the first CIA "black site," and that Abu Zubaydah was held there after his capture in 2002. CIA sources indicated to us that Thailand was used because of the ready availability of the network of local knowledge and bilateral relationships that dated back to the Vietnam War.[27] In line with the approach of most US partner countries, the Thai Government has denied these allegations outright.[28]

71.    The HVD programme has, to a certain extent, grown out of an assertion of *independence* on the part of the CIA in the exercise of "exclusive custody" over its high-value detainees for as long as it continues to question them. However, as my findings in the following sections demonstrate, the CIA's clandestine operations in Europe – including its transfers and secret detentions of HVDs - were sustained and kept secret only through their operational *dependence* on alliances and partnerships in what is more traditionally the military sphere.

## II.    Secret detentions in Council of Europe member states

### i.    The framework

#### a. Securing CIA clandestine operations overseas on the platform of the North Atlantic Treaty Organisation (NATO)

72.    By enacting an extraordinary authorisation for CIA covert action through a Presidential Finding within national law, the Bush Administration furnished the Agency with the first half of the operational framework it required to spearhead the United States' "global war on terror."[29] To recap, the key elements of this

---

[24] This phrase is understood to be a reference to the regime of CIA "enhanced interrogation techniques", which were subsequently used to interrogate several other HVDs. For a description of these techniques and the (operational and legal) implications of resorting to them, please see section V and VIII later in this report.

[25] As President Bush has presented it, when all the leads yielded from these interrogations are taken together ("corroborated by intelligence … that helped us to connect the dots"), then the cumulative product has "played a role in the capture or questioning of nearly every senior Al-Qaeda member or associate detained by the US and its allies since this programme began". See also Office of the Director of National Intelligence (DNI), "Summary of the High-Value Terrorist Detainee Program", 06.09.2006, available at http://www.defenselink.mil/pdf/thehighvaluedetaineeprogram2.pdf.

[26] See, for example, United Kingdom Parliament, Publications and Records; "Written Answers for 21.06.2004", in *House of Commons Hansard*; point 13, column 1222W, Questions to the Rt. Hon. Jack Straw, UK Foreign Secretary, available at http://www.publications.parliament.uk/pa/cm200304/cmhansrd/vo040621/text/40621w13.htm#40621w13.html_wqn9. Mr Straw said: "The United States authorities have repeatedly assured us that no detainees have at any time passed in transit through Diego Garcia or its territorial waters or have disembarked there and that the allegations to that effect are totally without foundation. The Government are satisfied that their assurances are correct."

[27] One CIA source told us: "in Thailand, it was a case of 'you stick with what you know';" however, since the allegations pertaining to Thailand were not the direct focus of our inquiry, we did not elaborate further on these references in our discussions. The specific location of the "black site" in Thailand has been publicly alleged to be a facility in Udon Thani, near to the Udon Royal Thai Air Force Base in the north-east of the country. This base does have long-standing connections to American defence and intelligence activities overseas: during the Vietnam War it served as both a deployment base for the US Air Force and the Asian headquarters of the CIA-linked aviation enterprise, Air America.

[28] See, for example, *The Bangkok Post*, "Thaksin denies Thailand had 'CIA secret prison'", 5.11.2005, available at http://www.bangkokpost.com/breaking_news/breakingnews.php?id=59604.

[29] At this point I shall leave aside my discomfort with the phrase "war on terror" as a characterisation of the broad spectrum of counterterrorist policies pursued by the United States in recent years – it was the phrase accepted in all quarters in the immediate post-9/11 period. In this regard I agree with Anderson and Massimino, the authors of an excellent policy study recently released in the US: "The very idea of a 'global war on terror' is today seen as the policy of a particular presidential administration in a way that it was not immediately following September 11"; see Kenneth Anderson and Elisa Massimino, "The Cost of Confusion: Resolving Ambiguities in Detainee Treatment", part of the series entitled *Bridging the Foreign Policy Divide*, The Stanley Foundation, March 2007; hereinafter "Anderson and Massimino, "Resolving Ambiguities in Detainee Treatment". My conclusion that President Bush put the CIA at the forefront of his "war machinery" is corroborated by numerous CIA insiders; see, for example, Tyler Drumheller, *On the Brink*, *supra* note 16, at p. 35: "It was clear that the administration saw this as a war that would largely be fought by intelligence assets". See also, Michael

*Doc. 11302 rev.*

authorisation were <u>permissions</u> that were as broad as possible, and <u>protections</u> (from interference and oversight) that were as robust as possible.

73.    The second half of the equation was then to identify the means by which to integrate the key elements of US national policy into an international, intergovernmental approach.

74.    According to our sources, the CIA simply could not embark upon sensitive covert action to dismantle terrorist networks and kill, capture or detain their members overseas without the express knowledge and approval of key US allies – particularly European allies: "we wouldn't have even dreamed of it."[30] On the contrary, the CIA depended on the US Government to secure equally broad permissions and equally robust protections from its foreign allies and their respective intelligence agencies as the ones that had been granted at home.

75.    The need for unprecedented <u>permissions</u>, according to our sources, arose directly from the CIA's resolve to lay greater emphasis on the **paramilitary activities** of its Counterterrorism Center in the pursuit of high-value targets, or HVTs. The US Government therefore had to seek means of forging **intergovernmental partnerships with well-developed military components**, rather than simply relying upon the existing liaison networks through which CIA agents had been working for decades.

76.    One former senior CIA official told us that administration officials approached multilateral negotiations "like they wanted to raise [the CIA]'s status up to a kind of super military-civilian Agency". Specifically the US Government set out to achieve permissions "from as many allied countries as possible" that would allow CIA agents to collaborate directly with foreign military officials, operate "on a no-questions-asked basis" at military installations, and travel free from inspection in military or civilian vehicles and aircraft.

77.    In relation to the last point, as I discussed in my report last year,[31] the lines between civilian and military classifications in the aviation world were about to become incredibly blurred. Conventional legal understandings of civilian and state flights[32] were about to be fundamentally challenged, or at least the latitude in those definitions exploited to its maximum potential.

78.    The US Government's post-9/11 detainee transfer operations would frequently make use of practices that were previously considered "anomalies,"[33] such as: civilian aircraft landing on state duty at military airfields; military cargo planes registered under civilian operators; and civilian agents and contractors travelling on military travel orders. The CIA's expanding and evolving "rendition" programme, which would ultimately also be used for the transportation of High-Value Detainees, required cover that would encompass all of these anomalies and more.

79.    In terms of <u>protections</u>, the US Government insisted on the most stringent levels of **physical security for its personnel**, as well as **secrecy and security of information** during the operations the CIA would carry out in other countries.

---

Scheuer, interview with the Rapporteur's representative, *supra* note 21: "The Agency felt the brunt of the executive branch's desire to show the American people victories."

[30] Our sources have continually emphasised to us how keenly the United States has sought to observe the "sovereignty" of its allies, particularly those in Europe. From an intelligence perspective, the notion of "unilateral actions on European turf" has been characterised to us as "counter-productive" and "a surefire way of destroying the trust". More importantly, from a political perspective, the art of "coalition-building" is just as important for covert action as for large-scale military operations. It affords the US Government the opportunity, as one official described it to us, "to cover our backs by saying 'hey, we're not the only ones'". In this regard, it is relevant to consider the policy statements made by members of the Bush administration to defend its detention and rendition practices after the fact: see, in particular, Secretary Condoleezza Rice, US Secretary of State, "Remarks Upon Her Departure for Europe", Andrews Air Force Base, 5 December 2005: "The intelligence so gathered has stopped terrorist attacks and saved innocent lives – in Europe as well as in the United States and other countries. The United States has fully respected the sovereignty of other countries that co-operate in these matters."

[31] For my discussion of means of transporting detainees between points on the "global spider's web", see The Marty Report 2006, *supra* note 6, at sections 2.2 to 2.4, pages 15 to 18.

[32] For an authoritative analysis of the applicable general principles of aviation law, see the Opinion on the International Legal Obligations of CoE Member States in respect of Secret Detention Facilities and Inter-state Transport of Prisoners, adopted by the Venice Commission at its 66th Plenary Session, 17.03.2006; Opinion No. 363/2005, CDL-AD(2006)009, available at http://www.venice.coe.int/docs/2006/CDL-AD(2006)009-e.asp (hereinafter "Venice Commission Opinion, 17.03.2006"); at §§ 86-104.

[33] An aviation expert whom we consulted confidentially used the phrase "anomalies" to describe the practices I refer to here. There are numerous examples of each of these "anomalies" in the comprehensive database of aircraft movements I have compiled since the outset of my inquiry (database held confidentially by the Rapporteur). In this regard I am especially grateful to Eurocontrol, the European Organisation for the Safety of Air Navigation, for having provided me with extensive records in various formats in response to my requests for information. I have been able to supplement and verify Eurocontrol records with information from multiple sources, including from the US Federal Aviation Authority (FAA) and state institutions in different CoE member States, such as transport ministries, aviation authorities, airport operators and state airlines. Hereinafter my database of aircraft movements is referred to simply as "The Marty Database".

*Doc. 11302 rev.*

80.      Reflecting on what our sources have described in this regard, I consider that the stated US policy has, in fact, on the pretext of guaranteeing security, intentionally created a framework enabling it to evade all accountability. We have been told that the US Government sought a means of "insulating" the CIA's activities (and those of its partner intelligence agencies) from conventional democratic controls in the foreign countries it operated in, not to mention from what it saw as any "unsavoury disputes over jurisdictional issues."

81.      Yet in my view, checks and balances through national parliamentary and judicial oversight, as well as accepted international laws governing territorial sovereignty, are the very foundations upon which our systems of democratic accountability are built. In times of crisis, such as the immediate aftermath of the 9/11 attacks, these foundations must be strengthened by demonstrations of collective resolve, not weakened by acts of unilateral brinkmanship.

82.      It is now clear to me that as they went to their international allies with their proposals, the United States insisted – non-officially but explicitly – upon a clear set of unilateral prerogatives: only American officials would choose exactly who they wanted to work with; only US policies would define exactly the terms of the relationship; and only US interpretations of the applicable law (including whether or not it applied) would be held to bind its actions overseas.

83.      Based upon my investigations, confirmed by multiple sources in the governmental and intelligence sectors of several countries, I consider that I can assert that the means to cater to the CIA's key operational needs on a multilateral level were developed under the framework of the **North Atlantic Treaty Organisation (NATO)**.

### b. Invocation of Article V of the North Atlantic Treaty

84.      It should be recalled that the United States turned to the international community at an unprecedented moment in history. As a prominent US Congressman remarked recently, "in the wake of the horrific attack on the United States on September 11th [2001], we were moved by the extraordinary support and the outpouring of sympathy from across the globe."[34] These sentiments manifested themselves in a unique and almost universally shared conviction that the United States should be granted strong support for its international counter-terrorist efforts, including for the use of military force.

85.      This conviction was most pronounced within the NATO Alliance. On 12 September 2001, NATO thereby invoked the principle of collective defence according to Article 5 of the North Atlantic Treaty,[35] and this for the first time in its 52-year existence. Initially, the invocation was considered provisional because it began with a conditional clause:

> *"If it is determined that this attack was directed from abroad against the United States, it shall be regarded as an action covered by Article 5 of the Washington Treaty."*[36]

86.      During the weeks that followed, several of the most senior officials in the Bush Administration delivered "a series of classified briefings for the NATO members presenting evidence that Al Qaeda had planned and executed the attacks"[37] and outlining their intended response. There is evidence in the following excerpt from an account by a then NATO Assistant Secretary-General that some of the United States' "unilateral prerogatives" described by our sources were articulated in quite explicit terms during these briefings:

---

[34] Representative William Delahunt (D-Ma), Chairman of the International Organisations, Human Rights and Oversight Sub-Committee of the House Foreign Affairs Committee, opening remarks on the subject "Extraordinary Rendition in US Counterterrorism Policy: The Impact on Transatlantic Relations", 17.04.2007. Mr Delahunt also said: "I shall never forget the headline from the French newspaper *Le Monde* that proclaimed, 'Today, we are all Americans.' Sadly, that support has eroded dramatically... World opinion has turned against the United States in recent years [and]... this reality, this trend of opinion against the United States has profound negative consequences for our national interests."

[35] Article 5 of the North Atlantic Treaty provides as follows: "*The Parties agree that an armed attack against one or more of them in Europe or North America shall be considered an attack against them all and consequently they agree that, if such an armed attack occurs, each of them, in exercise of the right of individual or collective self-defence recognised by Article 51 of the Charter of the United Nations, will assist the Party or Parties so attacked by taking forthwith, individually and in concert with the other Parties, such action as it deems necessary, including the use of armed force, to restore and maintain the security of the North Atlantic area. Any such armed attack and all measures taken as a result thereof shall immediately be reported to the Security Council. Such measures shall be terminated when the Security Council has taken the measures necessary to restore and maintain international peace and security.*"

[36] See NATO Press Release (2001) 124, "Statement by the North Atlantic Council", 12.09.2001.

[37] See Nora Bensahel, *Counterterror Coalitions: Co-operation with Europe, NATO and the European Union*, The Rand Corporation, USA, 2003 (hereinafter "Bensahel, *Counterterror Coalitions*"); at pp. 6-7. According to Bensahel, the US policy-makers who briefed NATO included Deputy Secretary of State Richard Armitage, Deputy Secretary of Defence, Paul Wolfowitz and State Department Co-ordinator for Counterterrorism, Frank Taylor.

> *"I was present in the [North Atlantic] Council two weeks after NATO invoked Article 5 when then US Deputy Secretary of Defence Paul Wolfowitz set out his post-9/11 doctrine to the effect that the mission determines the coalition. This was, in my opinion, a fundamental misjudgement about the nature of the Alliance that devalued the importance of strategic solidarity."[88]*

87.    The US Administration's briefings had their desired effect of lifting the conditional clause in the North Atlantic Council's original statement. On 2 October 2001, the NATO Allies declared their unanimous assessment that the 9/11 attacks had been directed against the United States from abroad and that Article 5 was therefore activated.[39]

88.    Collective measures in the context of a military intervention in Afghanistan were widely anticipated – indeed, as one study noted, "many NATO members hoped that invoking Article 5 would lead the United States to conduct any military response against Al Qaeda under the NATO flag, or at least co-ordinate its actions with the integrated military structure and political institutions."[40]

89.    However, the expected mobilisation of NATO forces for a multilateral action in Afghanistan never materialised. In fact, NATO support in the conventional military sense was neither an automatic consequence in the invocation of Article 5[41] nor, as our sources have confirmed, what the US Government was looking for.[42] It is precisely upon this unexpected dynamic that my finding regarding the development of CIA clandestine operations under the NATO framework hinges.

90.    There was a **critical, almost paradoxical policy choice** in the US Government's stance towards the NATO alliance in early October 2001. The invocation of Article 5 could have been developed[43] as a basis upon which to conduct a military campaign of a conventional nature, deploying Army, Navy and Air Force troops in a joint NATO operation. Instead it became a **platform from which the United States obtained the essential permissions and protections it required to launch CIA covert action in the "war on terror"**.

### c. NATO authorisations for US operations in the "war on terror"

91.    The key date in terms of the NATO framework is **4 October 2001**, when the NATO Allies met in a session of the North Atlantic Council to consider a set of concrete proposals from the United States. In a press statement after the session,[44] NATO Secretary-General Lord Robertson announced that the Allies had "agreed today – at the request of the United States – to take eight measures, individually and collectively, to expand the options available in the campaign against terrorism."[45] The eight specific measures agreed to[46] were as follows:

- Enhance intelligence-sharing and co-operation, both bilaterally and in the appropriate NATO bodies, relating to the threats posed by terrorism and the actions to be taken against it

---

[38] See Edgar Buckley, former NATO Assistant Secretary-General for Defence Planning and Operations (from 1999 to 2003), "Invoking Article 5", in *NATO Review*, Summer 2006, available at http://www.nato.int/docu/review/2006/issue2/english/art2.html (hereinafter "Buckley, "Invoking Article 5"").

[39] See NATO Press Release of 02.10.2001, "Statement by NATO Secretary-General Lord Robertson".

[40] See Bensahel, *Counterterror Coalitions, supra* note 37, at p. 7.

[41] Article 5 refers to "such action as [each Party] deems necessary" and does not limit this action to the use of military force. It should be noted that France and Germany emphasised the fact that the obligation to assist under Article 5 did not automatically incur a duty to take part in US-led military action. In this regard, see Tom Lansford, *All for One: Terrorism, NATO and the United States*, Ashgate, UK, 2003, at p. 88; and Martin Reichard, *The EU-NATO Relationship: A Legal and Political Perspective*, 2006, at p. 190.

[42] See also Philip Gordon, "NATO After 11 September", in *Survival*, Vol. 43, No. 4, Winter 2001 – 2002, at p. 92. A senior US official stated: "I think it's safe to say that we won't be asking SACEUR [the NATO Supreme Allied Commander for Europe] to put together a battle plan for Afghanistan." Further, see Nicholas Fiorenza, "Alliance Solidarity", *Armed Forces Journal International*, December 2001, at p. 22. A military official asked rhetorically: "If you were the US, would you want 18 other nations watering down your military planning?". Both cited in Bensahel, *Counterterror Coalitions, supra* note 37, at pp. 7 and 16.

[43] For a perspective on how the invocation of Article 5 did not unfold entirely as NATO had expected, see, for example, Buckley, "Invoking Article 5", *supra* note 38: "In the intervening years, I have heard frequent criticism of the decision to invoke Article 5. I have, for example, heard people say that we were unwise to commit ourselves to a course of action which was not fully implemented and which turned out to be unwanted by the United States... I share the frustration of those who believe that the United States could have done more to engage the Alliance in its efforts against the Taliban and Al Qaeda."

[44] See NATO, "Statement to the Press by NATO Secretary General, Lord Robertson, on the North Atlantic Council Decision on Implementation of Article 5 of the Washington Treaty following the 11 September Attacks against the United States", Brussels, 04.10.2001, available at http://www.nato.int/docu/speech/2001/s011004b.htm (hereinafter referred to as "Statement to the Press by NATO Secretary General, Lord Robertson, 4.10.2001").

[45] *Ibidem.* Note the similarity in the language of "options" used to describe the intergovernmental NATO authorisation and likewise (ref. Tyler Drumheller, *supra* note 16) the US domestic covert action authority in the Presidential Finding of 17.09.2001: "broadened our options for dealing with terrorist targets."

[46] Some of the descriptions of the measures have been shortened or paraphrased here in order to present them more simply. For the original language in which they were presented to the public, see the Statement to the Press by NATO Secretary General, Lord Robertson, 04.10.2001, *supra* note 44.

*Doc. 11302 rev.*

- Assist states subject to increased terrorist threats as a result of their support for the campaign against terrorism
- Provide increased security for US and other allied facilities on NATO territory
- Backfill selected Allied assets in NATO's area of responsibility that are redeployed in support of counterterrorism operations
- Provide blanket overflight clearances for the United States' and other Allies' aircraft for military flights related to operations against terrorism
- Provide access to ports and airfields on NATO territory, including for refuelling, for United States and other Allies for operations against terrorism
- Deploy elements of the NATO Standing Naval Forces to the eastern Mediterranean, if called upon
- Deploy elements of NATO Airborne Early Warning Force to support operations against terrorism, if called upon.

92.     The first criterion on which these measures were extraordinary was in the nature of their conception. According to a former senior NATO official, "in contrast to many other international organisations, responsibility for drafting documents and resolutions in NATO lies with the International Staff."[47] Yet as Lord Robertson reiterated in his statement, "these measures were requested by the United States following the determination that the 11 September attack was directed from abroad."[48] Indeed, as our American sources told us, even the exact language in which the actual measures were formulated and agreed upon was conceived, drafted, re-drafted and put forward unilaterally by the United States.

93.     Second and most significant, these measures do not constitute an agreement to undertake collective self-defence.[49] In my analysis these measures more closely comprise the very permissions and protections the United States had sought for itself as it embarked on its own military, paramilitary and intelligence-led counterterrorism operations.[50] Just as President Bush had done on 17 September 2001, the NATO Allies, on 4 October 2001, afforded the CIA a mandate to pursue its "war on terror", without a published text.

94.     Council of Europe officials attempted to obtain a copy of the "agreement" of 4 October 2001 from NATO Legal Services on several occasions.[51] In a response dated 6 April 2006,[52] NATO's Legal Advisor, Mr Baldwin De Vidts, submitted that the "agreement" in question was actually more properly characterised as a set of "decisions taken by the North Atlantic Council on that date"; he explained:

> "It is to be noted that your request does not relate to a formal document signed by the member States but to an internal decision noted in a corresponding decision sheet drawn up by the International Secretariat to reflect the decisions as taken by the Council on that date."

95.     In the same letter, Mr De Vidts stated that "in principle, such documents are not made public, which is certainly the case if they are classified."[53] In a subsequent follow-up letter sent on my behalf, I indicated to NATO Legal Services, in accordance with my authorisation as AS/Jur Rapporteur, that I would be prepared to treat the document in a confidential manner.[54] However, Mr De Vidts replied in the following terms:

---

[47] See Buckley, "Invoking Article 5", *supra* note 38.

[48] See Statement to the Press by NATO Secretary General, Lord Robertson, 04.10.2001, *supra* note 44.

[49] I take the view that only the last two measures could be considered as responses in the category of "classic" collective self-defence. In recognising this point, one observer has argued that a broad approach to military and non-military measures was consistent with the US approach to counterterrorism: see Reichard, *supra* note 41, at p. 188. I would add, however, these measures are somewhat ceremonial in character; both of them begin with a phrase "that the Alliance is ready to deploy", and the first of them states that the purpose of such a deployment would be "to provide a NATO presence and demonstrate resolve." The "classic" self-defence provisions therefore stop short of any genuine commitment to military action. The real practical substance of these measures is to be found in the other clauses.

[50] In its published material, NATO makes clear that the period after the invocation of Article 5 accommodates a range of individual and collective policy choices: "Any collective action by NATO will be decided by the North Atlantic Council. The United States can also carry out independent actions, consistent with its rights and obligations under the UN charter. Allies can provide any form of assistance they deem necessary to respond to the situation." See NATO, *What is Article 5?*, available at http://www.nato.int/terrorism/five.htm.

[51] I refer here to various individual items of correspondence sent to Mr Baldwin De Vidts, NATO Legal Advisor, by both Mr G. Buquicchio, Secretary of the European Commission for Democracy through Law (Venice Commission), and Mr A. Drzemczewski, Head of Secretariat of the PACE Committee on Legal Affairs and Human Rights (AS/Jur). Copies of all correspondence on file with the Rapporteur.

[52] Letter to Mr G. Buquicchio, Secretary of the Venice Commission, from Mr Baldwin De Vidts, NATO Legal Advisor, Reference CJ(2006)0230, dated 06.04.2006. Regrettably this response came three weeks after the issue of the Venice Commission's opinion on the matter, dated 17.03.2006. See the reference to this correspondence in the Opinion on the International Legal Obligations of CoE Member States in respect of Secret Detention Facilities and Inter-state Transport of Prisoners, adopted by the Venice Commission at its 66th Plenary Session, 17.03.2006; Opinion No. 363/2005, CDL-AD(2006)009 (hereinafter "Venice Commission Opinion, 17.03.2006"), at § 4.

[53] Letter to Mr G. Buquicchio, Secretary of the Venice Commission, dated 06.04.2006, *Ibidem*.

[54] Letter to Mr De Vidts from Mr Drzemczewski, Head of the Secretariat, PACE Committee on Legal Affairs and Human Rights (AS/Jur), dated 24.03.2006.

*Doc. 11302 rev.*

> *"I can only but confirm that the decision sheet of the North Atlantic Council dated 4 October 2001 is a classified document. I have to state that in order to have access to NATO classified information, such person should have an appropriate security clearance."*[55]

96.    Notwithstanding this general rule, which I understand to be a reflection of broader issues around transparency within NATO,[56] there was a further noteworthy feature of the 4 October 2001 measures to emerge from our correspondence with NATO Legal Services. Qualifying his earlier point, Mr De Vidts stated:

> *"However, with regard to certain decisions separate communications to the public in general are made. This has also been the case for <u>some of the decisions</u> taken on 4 October 2001 by the North Atlantic Council"* (emphasis added)

97.    The clear indication here is that the public record[57] is not a complete reflection of the measures agreed by the NATO Allies and the considerations underpinning them. It is my conclusion, again confirmed by my American sources, that there were **additional components to the NATO authorisation of 4 October 2001 that have remained secret**.

98.    In the course of my inquiry, I have made repeated requests for information regarding the full scope of the NATO authorisation, specific elements of its practical application, and whether its provisions remain in force to the present day. Regrettably, NATO itself has been largely unresponsive to my requests.[58]

99.    Nevertheless, my further analysis of the NATO framework has shown that the authorisations of 4 October 2001 were vital in paving the way for the United States to develop its most important partnerships in the context of the "war on terror". In particular, the CIA would exploit both the blanket overflight clearances and the access to airfields to carry out its clandestine operations through the airspace and on the territory of a broad range of foreign states.

100.    The **blanket overflight clearances** granted in this regard were especially significant. In the NATO public statement, the clearances were said to apply to *"military flights related to operations against terrorism"* but, even without sight of the classified parts of the authorisation, this characterisation is misleadingly narrow.

101.    "Military flights" is a term relating to the *function* of the flight, not the type of aircraft used. In international aviation law, the status of an aircraft is determined by the function it is performing at any given time[59] - and flights performing "military" functions would necessarily fall into the category of "state aircraft."[60]

102.    "State aircraft" enjoy precisely the type of immunity from the jurisdiction of other states that the US Government sought to achieve for aircraft operating on behalf of the CIA: *"they cannot be boarded, searched*

---

[55] Letter in reply to Mr Drzemczewski's letter of 24.03.2006 from Mr De Vidts, NATO Legal Advisor, Reference CJ(2006)0330, dated 13.04.2006. It should be noted that NATO is accustomed to rejecting requests for "NATO information". Even unclassified information remains for the most part inaccessible, based on the following principle: "NATO unclassified information… can only be used *for official purposes*. Only individuals, bodies or organisations that require it for official NATO purposes may have access to it… NATO information marked in this manner is subject to release via agreement from its originators and subject to recognised storage procedures for its protection" – see letter from Wayne Rychak, Director, NATO Office of Security, to Jacob Visscher, General Secretariat of the Council of the European Union 6.02.2002 (emphasis in original); cited in Alasdair Roberts, "Entangling Alliances: NATO's Security of Information Policy and the Entrenchment of State Secrecy", Cornell International Law Journal, 36.2 (November 2003): 329 – 360, at page 9 in the text.

[56] For insight into the NATO secrecy and security of information regime and its negative impact on transparency in general, I have found the work of the Canadian specialist on transparency issues, Professor Alasdair Roberts, very informative. Specific articles can be found at www.aroberts.us/reseach.html.

[57] The only public record of the 4.10.2001 meeting of the North Atlantic Council is the Statement to the Press by NATO Secretary General, Lord Robertson, 4.10.2001, *supra* note 4. Mr De Vidts attached a print-out of this statement from the NATO website to his letter of 13.04.2006.

[58] Regrettably, NATO itself has been largely unresponsive to our repeated requests for information regarding the full scope of the authorisation, elements of its practical application, and whether its provisions remain in force to the present day. We have sent five separate items of correspondence to Mr De Vidts: letters from Mr Drzemczewski, Head of the Secretariat, PACE Committee on Legal Affairs and Human Rights (AS/Jur) dated 24.03.2006 and 26.04.2006; e-mails of 27.09.2006 and 09.11.2006; and fax of 09.11.2006, receipt of which was confirmed in a telephone conversation with Mr De Vidts' office on 05.12.2006. We have thus far received only a single, incomplete reply: letter from Mr De Vidts, dated 13.04.2006; the reply was incomplete because Mr De Vidts said that one of our questions "is under consideration and at our earliest convenience I will contact you about these issues". On 27.03.2007 I wrote to Mr Jaap de Hoop Scheffer, Secretary-General of NATO, requesting clarification on the outstanding questions. I have yet to receive any response to my letter.

[59] See the Venice Commission Opinion, 17.03.2006, *supra* note 52, at § 91.

[60] The Venice Commission notes that *"as a general rule, 'aircraft are recognised as state aircraft when they are under the control of the State and used exclusively by the State for state intended purposes',"* citing Diederiks-Verschoor, Introduction to air law, Kluwer, p. 30, § 12. "Military flights," as defined by the NATO Allies in the context of this authorisation, cannot be interpreted to be anything other than "for state intended purposes." See the Venice Commission Opinion, 17.03.2006, *Ibidem*, at § 91.

*Doc. 11302 rev.*

*or inspected by foreign authorities, including host State's authorities."*[61] The conventional constraint on "state aircraft" is that they are usually *"not permitted to fly over or land in foreign sovereign territory otherwise than with express authorisation of the State concerned."*[62] However, with "blanket overflight clearances" under the NATO framework this constraint could be conveniently circumvented.[63]

103.    Similarly, the provision of **access to airfields** for operations against terrorism secured landing rights at military bases and dual military-civilian airfields for aircraft operating on behalf of the CIA under a NATO "cover".[64]

104.    Accordingly there would be two prerequisites for CIA clandestine operations to fulfil in order to remain within the NATO framework. The first would be to ensure that the aircraft used in such operations were, in their function, designated as "military flights" or "state flights". The second would depend on the state whose airspace or territory was at issue having agreed to the terms of the "blanket" NATO authorisations of 4 October 2001.

105.    It is therefore all the more pertinent to note that the range of countries who agreed to these authorisations in the context of the US "war on terror" extended well beyond the NATO member states, into a total of as many as 40 countries.[65] One year after the NATO authorisations, the United States Government declared: *"Our Allies have delivered on that [Article 5] obligation with concrete actions, both individually and collectively: all 18 NATO Allies*[66] *and the 9 NATO 'aspirants*[67] *have provided blanket overflight rights, ports / bases access, refuelling assistance, and increased law-enforcement co-operation."*[68]

### d. The wider NATO system and the "war on terror"

106.    Aside from the specific authorisations detailed above, the wider NATO system comprises further important elements that have been developed as part of the post-9/11 framework for CIA clandestine operations – including the High-Value Detainee Programme. I intend to examine these elements in the following section as they have been applied to specific countries with which the United States has agreed bilateral arrangements in the course of the "war on terror". For now it suffices to acknowledge the general NATO multilateral treaties or policies on which those arrangements are based.

107.    First is the system of NATO "SOFAs" (Status of Forces Agreements), which define the legal status of one state's armed forces on the territory of another state. The general rules of such relationships are set out in the multilateral SOFA for all NATO members,[69] the provisions of which also apply to "aspirant" states through their participation in the "Partnership for Peace"[70].

108.    A state does not abandon its sovereignty when it signs a SOFA; on the contrary, SOFAs usually reflect different sets of legal rights and responsibilities that accrue for both the sending state and the host

---

[61] See the Venice Commission Opinion, 17.03.2006, *Ibidem*, at § 93.

[62] Article 3(c) of the Chicago Convention on International Civil Aviation, 1944, as cited in the Venice Commission Opinion, 17.03.2006, *Ibidem*, at § 93.

[63] For another in-depth analysis of the law applicable to civil and state aircraft, including the applicable permissions / immunities and selected references to NATO, see Center for Human Rights and Global Justice, *Enabling Torture: International Law Applicable to State Participation in the Unlawful Activites of Other States*, NYU School of Law, 2006, available at http://www.chrgj.org.

[64] See the reference in Lansford, *supra* note 41, at p. 112: this agreement "allowed for more streamlined planning and the formulation of missions, especially the transfer of assets from one theater to another." Further references to the terminology of "theaters" in the "war on terror" – specifically relating to the transfer of detainees – were used frequently in our discussions with sources concerning secret detentions in Romania.

[65] See Lansford, *supra* note 41, at p. 112: "when the American-led attacks began, some 40 nations gave the coalition permission to use their airspace for operations."

[66] At the time of this statement, the United States' 18 NATO Allies were: Belgium, Canada, Czech Republic, Denmark, France, Germany, Greece, Hungary, Iceland, Italy, Luxembourg, Netherlands, Norway, Poland, Portugal, Spain, Turkey and the United Kingdom. All of them except Canada were then and are now also member States of the Council of Europe.

[67] At the time of this statement, the 9 NATO "aspirants" (or candidates for accession) were: Albania, Bulgaria, Estonia, Latvia, Lithuania, Romania, Slovakia, Slovenia and "the former Yugoslav Republic of Macedonia". All of them were then and are now also member States of the Council of Europe.

[68] See US Department of State, "NATO: Coalition Contributions to the War on Terrorism", Fact Sheet of 31.10.2002, available at http://www.state.gov/p/eur/rls/fs/14627.htm. Indeed, within days of the authorisations, US Secretary of State Colin Powell made special mention of *"all the NATO nations making commitments under the Article 5 invocation to give us overflight rights and other things that have proven so helpful to our efforts."* See US Department of State, "Colin Powell Holds Media Availability with NATO Secretary General George Robertson, 10.10.2001, available at http://transcripts.cnn.com/TRANSCRIPTS/0110/10/se.16.html.

[69] See NATO Status of Forces Agreement (SOFA) of 19.06.1951, "Agreement between the Parties to the North Atlantic Treaty Regarding the Status of their Forces", available at http://www.nato.int/docu/basictxt/b510619a.htm.

[70] See NATO Partnership for Peace SOFA (PfP-SOFA) of 1995, ""Agreement among the State Parties to the North Atlantic Treaty and the other States participating in the Partnership for Peace Regarding the Status of their Forces", available at http://www.nato.int/docu/basictxt/b950619a.htm. It is important to note that, since it came into force in 1995, this PfP-SOFA has entitled signatories to the Partnership for Peace (PfP) that are not yet members of NATO to nevertheless sign so-called "SOFA Supplementals" with NATO member States. Signatories to the PfP are available at http://www.nato.int/pfp/sig-date.htm.