state.[71] The majority of SOFAs are agreed on the bilateral level and are sometimes complemented by further, more finite defence agreements that cover foreign forces stationed at particular bases or facilities. Several CoE member states have acknowledged the applicability of SOFA-type agreements to their relationships with the United States in the context of the "war on terror."[72]

109.    An additional relevant element of the wider NATO system is its **secrecy and security-of-information regime**. The NATO Security Policy[73] and its supporting Directive on the Security of Information[74] are among the most formidable barriers to disclosure of information that one might ever come across. It is easy to understand why an institution or state agency wishing to carry out clandestine operations would opt to bring them under the protections of the NATO model.

110.    In addition to its own rules, NATO insists that strict regimes protecting classified information exist on a national level. The Membership Action Plan of 1999 implored the NATO "aspirants" – specifically, nine countries in Central and Eastern Europe – to introduce "*sufficient safeguards and procedures to ensure the security of the most sensitive information as laid down in the NATO security policy*."[75] Indeed commentators have rightly raised concern around the stringent rules on state secrecy that several countries have introduced as part of their accession to NATO[76] and, particularly, "*whether NATO's requirements are unduly biased against transparency… [and] tilted toward secrecy to an unwarranted degree.*"[77] It seems natural that such a security of information regime suited the purposes of the CIA.

111.    Finally, with regard to the particular scope of my inquiry, it is apt to point out that NATO Allies and Partners have also developed various forms of co-operation in the realms of Air Defence and Air Traffic Management.[78] Inevitably these initiatives have developed new dimensions and complexities in the worlds of civil and military aviation, some of which may not yet be properly regulated and may permit unlawful clandestine operations using aircraft to pass "under the radar." In the course of analysing my database of aircraft movements, I have also noted that NATO has established a co-operation with Eurocontrol, which aims at "*developing civil-military air traffic procedures in the light of the new security environment.*"[79]

---

[71] See the Venice Commission Opinion, 17.03.2006, *supra* note 52, at §§ 106 and 107. For a general overview, see also the EU Network of Independent Experts on Fundamental Rights, "The Human Rights Responsibilities of the EU Member States in the context of the CIA activities in Europe," 25.05.2006, available at:
   http://ec.europa.eu/justice_home/cfr_cdf/doc/avis/2006_3_en.pdf.
[72] In this regard, it should be noted that nine different CoE member States made reference to NATO, SOFAs or defence agreements with the United States in their replies to the Secretary General of the Council of Europe in the enquiry under Article 52 ECHR. For copies of all member States' replies and the SG's report on his findings, SG/Inf(2006)5, see the Special File at http://www.coe.int/T/E/Com/Files/Events/2006-cia/. In particular, Germany, the Netherlands, Poland and Romania made reference to Article 7 of the NATO SOFA as a provision that determines their potential jurisdiction over foreign forces operating on their territories. Article 7 of the multilateral NATO SOFA provides: "The authorities of the receiving State shall have the right to exercise exclusive jurisdiction over members of a force or civilian component and their dependents with respect to offences, including offences related to the security of that State, punishable by its law but not by the law of the sending State."
[73] NATO's comprehensive Security Policy was modified and updated through a Fundamental Review by the NATO Security Committee (NSC), which concluded in early 2002. The policy is now contained in two documents approved by the North Atlantic Council: C-M(2002)49, "Security within the North Atlantic Treaty Organisation (NATO)'; and C-M(2002)50, "Protection Measures for NATO Civil and Military Bodies, deployed NATO Forces and Installations (Assets) against Terrorist Threats". The first of these documents, C-M(2002)49, which entered into force on 17.06.2002, contains the applicable rules on classification, handling and protection of sensitive information, as well as rules on establishment of and access to NATO Security Areas, and rules relating to NATO personnel. C-M(2002)49 was released on 01.08.2006 by the Hungarian National Security Superintendence in response to a freedom of information request by the Hungarian Civil Liberties Union (HCLU); copy on file with the Rapporteur. C-M(2002)49 is hereinafter referred to as "NATO, Security within the North Atlantic Treaty Organisation, 17.06.2002".
[74] NATO Security Committee, "Directive on the Security of Information", Document AC/35-D/2002, Second Revision, issued 04.02.2005. AC/35-D/2002-REV2 was released in October 2006 by the Hungarian National Security Superintendence in response to a freedom of information request by the Hungarian Civil Liberties Union (HCLU); copy on file with the Rapporteur. AC/35-D/2002-REV2 is hereinafter referred to as "NATO Security Committee, Directive on the Security of Information, 04.02.2005".
[75] See NATO, "Membership Action Plan", Press Release NAC-S(99) 66, Brussels, 24.04.1999.
[76] For insight into the NATO secrecy and security of information regime and its negative impact on transparency in general, I have drawn from the work of the Canadian specialist on transparency issues, Professor Alasdair Roberts, who is based at the Maxwell School of Syracuse University in the United States. For specific articles, refer to Professor Roberts' website at www.aroberts.us/reseach.html.
[77] See Alasdair Roberts, "NATO, Secrecy and the Right to Information", *East European Constitutional Review*, (Fall / Winter 2003) 86, at p. 87.
[78] See NATO Partnership Action Plan against Terrorism, 22.11.2002, available at http://www.nato.int/docu/basictxt/b021122e.htm; at § 16.2.3.
[79] See Report on the Partnership Action Plan against Terrorism, 23.06.2004, available at http://www.nato.int/docu/basictxt/b040623be.htm; at § 7.4.

Doc. 11302 rev.

### ii.     Bilateral arrangements

#### a.  Securing agreements with certain countries to host "black sites" for HVDs

112.    Despite the importance of the multilateral NATO framework in creating the broad authorisation for US counter-terrorism operations, it is important to emphasise that the key arrangements for CIA clandestine operations in Europe were secured on a **bilateral level**.

113.    According to US sources, such bilateral arrangements (referred to simply as "bilaterals") exist under many different forms in Europe alone. For example, at the lower end of the range, bilaterals can institute ad hoc collaboration on a single operation to capture, detain or transfer a particular target. The well-documented cases of Abu Omar's abduction in Milan[80] and Khaled El-Masri's 23-day ordeal in a hotel in Skopje before being handed over to a rendition team[81] are instances in which the CIA worked with partner intelligence services in Italy[82] and the "former Yugoslav Republic of Macedonia",[83] respectively, in this manner.

114.    In the middle of this range, bilateral agreements signed pursuant to the multilateral NATO framework, and in conformity with NATO standards, have often encompassed elements of intelligence co-operation. Alternatively they have granted "civilian" components – a phrase often used loosely for those operating on behalf of the CIA – the same privileges and permissions that would normally be reserved for members of the military forces. Romania's "SOFA supplemental" agreement with the United States on 31 October 2001, analysed later in this section, appears to be a good example of such a middle-range "bilateral". It also demonstrates the potential for partnership and co-operation to intensify over a period of several years.

115.    The bilaterals at the top of this range are classified, highly guarded mandates for "deep" forms of co-operation that afford – for example – "infrastructure", "material support" and / or "operational security" to the CIA's covert programmes. This high-end category has been described to us as the intelligence sector equivalent of "host nation" defence agreements – whereby one country is conducting operations it perceives as being vital to its own national security on another country's territory.

116.    The classified "host nation" arrangements made to accommodate CIA "black sites" in Council of Europe member states fall into the last of these categories.

117.    The CIA brokered "operating agreements" with the Governments of Poland and Romania to hold its High-Value Detainees (HVDs) in secret detention facilities on their respective territories. Poland and Romania agreed to provide the premises in which these facilities were established, the highest degrees of physical security and secrecy, and steadfast guarantees of non-interference.

118.    We have not seen the text of any specific agreement that refers to the holding of High-Value Detainees in Poland or Romania. Indeed it is practically impossible to lay eyes on the classified documents in question or read the precise agreed language because of the rigours of the security-of-information regime, itself kept secret, by which these materials are protected.

119.    However, we have spoken about the High-Value Detainee programme with multiple well-placed sources in the governments and intelligence services of several countries, including the United States, Poland and Romania. Several of these persons occupied positions of direct involvement in and/ or influence over the negotiations that led to these bilateral arrangements being agreed upon. Several of them have knowledge at different levels of the operations of the HVD programme in Europe.

120.    These persons spoke to us upon strict assurances of confidentiality, extended to them under the terms of the special authorisation I received from my Committee last year.[84] For this reason, in the interests

---

[80] For a detailed account of the abduction of the Egyptian citizen Hassan Osama Mustafa Nasr (known as Abu Omar) in Milan, see the Marty Report 2006, *supra* note 6, at p. 37, § 162. For an analysis of this case based on extensive contact with insider sources in the CIA, see the recent article by Matthew Cole, "Blowback", *GQ Magazine*, March 2007, available at http://www.matthewcole.com/pdfs/Blowback-GQ.pdf.
[81] For a detailed account of the ordeal experienced by the German citizen Khaled El-Masri in Macedonia and Afghanistan, see the Marty Report 2006, *supra* note 6, at pages 25 to 32, paragraphs 93 to 132. For new details of this case, refer to section VI.i in the present report entitled "A case study of Khaled El-Masri."
[82] Reference to the particular service involved – SISMI – based on material from the prosecution case documents compiled by Armando Spataro.
[83] In "the former Yugoslav Republic of Macedonia" , as I described last year, the partner service with which the CIA collaborated to detain and transfer Khaled El-Masri was the UBK – Uprava za Bezbednosti i Kontrarazuznavanje, or the Security and Counter-Intelligence Service. See the Marty Report 2006, *supra* note 6, in particular at pp. 29 to 30, §§ 116 to 119.
[84] Reference to the written record of the meeting of the PACE Committee on Legal Affairs and Human Rights (AS/Jur) in Paris on 13.03.2006 (Synopsis No 2006/25), by which the Committee authorised my inquiry to treat information in confidence. Based upon this

of protecting my sources and preserving the integrity of my investigations, I will not divulge individual names. Yet I can state unambiguously that their testimonies – insofar as they corroborate and validate one another – count as credible, plausible and authoritative.

121.    I am convinced that these individuals who were or still are in highly-placed positions within the system spoke the truth to us. This was not always simply because they valued truth. In most cases they did so because, to paraphrase one high-ranking politician we interviewed, they did not want the truth to come out *on somebody else's terms*.

122.    In short, we used our considerable network of contacts in Poland, Romania, the United States and elsewhere, along with our own form of "intelligence work", to ensure that in our discussions with our sources, the "dynamics of truth" were also at play.

### b. The United States' choice of European partners

123.    It is interesting to note that the United States chose, in the case of Poland and Romania, to form special partnerships with countries that were economically vulnerable, emerging from difficult transitional periods in their history, and dependent on American support for their strategic development.

124.    In terms of both political and intelligence considerations, several sources confirmed that much of the Eastern European "bloc" was considered "out of bounds" for the CIA in contemplating sites for its covert HVD programme. A long-serving CIA officer shared the following analysis with us:

> "*In a lot of those countries, there is still a mindset formed during the Cold War that we are not always on their side. There's a certain tendency to be less than open to our advances. You have to remember most of the East European services are KGB services and that doesn't change overnight.*
>
> *I think Poland is the main exception; we have an extraordinary relationship with Poland. My experience is that if the Poles can help us they will. Whether it's intelligence, or economics, or politics or diplomacy – they are our allies. I guess if there is a special relationship outside of the "four eyes"[85] group, then it is the Americans and the Poles.*"

125.    In Poland's case, a specific strategic incentive tied in with the NATO framework was the United States' staunch support for the establishment in Poland of the lucrative "NATINADS" programme – the NATO Integrated Air Defence System. Poland participated in the US-led military coalitions in both Afghanistan and Iraq, notably contributing significant Special Forces deployments to Operation Enduring Freedom,[86] and later assuming control of one of the "zones" of allied control in Iraq. An ongoing process of realignment and reform of intelligence structures is dedicated primarily to purging the secret services of so-called "communist remnants".

126.    The United States negotiated its agreement with Poland to detain CIA High-Value Detainees on Polish territory in 2002 and early 2003. We have established that the first HVDs were transferred to Poland in the first half of 2003. In accordance with the operational arrangements described below, Poland housed what the CIA's Counterterrorism Centre considered its "most sensitive HVDs," a category which included several of the men whose transfer to Guantanamo Bay was announced by President Bush on 6 September 2006.

127.    We received confirmations – each name from more than one source – of eight names of HVDs who were held in Poland between 2003 and 2005[87]. Specifically, our sources in the CIA named Poland as the "black site" where both Abu Zubaydah and Khalid Sheikh Mohamed (KSM) were held and questioned using "enhanced interrogation techniques." The information known about these interrogations has formed the basis

---

authorisation, I engaged in an exchange of letters with European Commissioner Franco Frattini. Copies of this correspondence as well as the above-mentioned synopsis are held on file with the rapporteur. The assurance of absolute confidentiality with which I have provided my sources, scrupulously observed by the team members who attended the interviews, has proven to be an important, if not decisive, asset to progress in our inquiry.

[85] The "four eyes" group is this CIA officer's reference to the very strong four-way co-operation on intelligence matters between the secret services of the United States, Canada, the United Kingdom and Australia: "it's just a whole different degree of trust between those four."

[86] See Bensahel, *Counterterror Coalitions, supra* note 37, at p. 10; Table 2.1, "Summary of European and Canadian Contributions to Operation Enduring Freedom".

[87] In addition to these sources, a single CIA source told us that there were "up to a dozen" HVDs in Poland in 2005, but we were unable to confirm this number. Among the eight names repeated to us from several sources were Ramzi bin al-Shibh, Tawfiq bin Attash and Ahmed Khalfan [al-]Ghailani.

*Doc. 11302 rev.*

of heated debate in the United States and the wider international community, leading, in Zubaydah's case[88], to high-level political and legislative manoeuvres and, in KSM's case, to the admission of some troubling judicial precedents[89].

128.    For reasons of both security and capacity, the CIA determined that the Polish strand of the HVD programme should remain limited in size. Thus a "second European site" was sought to which the CIA could transfer its detainees with "no major logistical overhaul". Romania, used extensively by United States forces during Operation Iraqi Freedom in early 2003, had distinct benefits in this regard: as a member of the CIA's Counterterrorist Centre remarked about the location of the proposed detention facility, "our guys were familiar with the area".

129.    Our sources on both sides of the agreement – in Romania and the United States – emphasised the importance of both trust and national interest as factors underpinning their negotiations. Military assistance – reflected since in the Agreement of December 2005[90] – also significantly influenced the decision to provide facilities and resources, as one American source reflected:

> "The bilateral arrangements were built on two things: personal relationships and material investment. If your men on the ground have a very good personal relationship with the men in the partner service; that means a lot. And it also means a lot if the Romanians are gonna get their runways improved, new barracks built and new military hardware; that means a lot."

130.    Romania was developed into a site to which more detainees were transferred only as the HVD programme expanded. I understand that the Romanian "black site" was incorporated into the programme in 2003, attained its greatest significance in 2004 and operated until the second half of 2005. The detainees who were held in Romania belonged to a category of HVDs whose intelligence value had been assessed as lower but in respect of whom the Agency still considered it worthwhile pursuing further investigations.

131.    Asked to provide names of those held in Romania, a senior official in the CIA's Counterterrorism Centre, who was directly involved in operating the programme, said: "*Look we don't talk about names, okay. We've got a target range that we know less about. We're acting on their intell[igence] value when we're less certain.*"

132.    Our sources told us that some of the targets in this "lower" HVD category had in fact been identified, and sometimes even apprehended, by a foreign intelligence service before they were made available to the CIA. Upon our strict assurance of anonymity, one CIA case officer was willing to describe limited details of a scenario in which a detainee had been "*offered to us by our liaisons*" and was later transferred to Romania. The detainee was of Afghan nationality.

133.    Examples of the profile of those held in Romania were provided to us by two separate American sources. We understand that the profile fits categories such as:

- associates and suspected operatives of key Taliban leaders like Mullah Omar;
- foreign fighters suspected of having performed roles for the Taliban in Afghanistan, including provision of logistics;
- leaders of branches of suspected "support networks" for the insurgencies in Iraq and Afghanistan; or
- suspected leaders of terrorist factions in the Middle East.

134.    The majority of the detainees brought to Romania were, according to our sources, extracted "*out of [the] theater of conflict*". This phrase is understood as a reference to detainee transfers originating from Afghanistan and, later, Iraq.

---

[88] The individual circumstances of Abu Zubaydah's interrogations remain largely unknown, but the introduction of "enhanced interrogation techniques" for the CIA's use on him has sparked the debate to which I refer. For an insightful early account of CIA interrogation practices, see Jane Mayer, "A Deadly Interrogation – Can the CIA legally kill a prisoner?" in *The New Yorker*, 14.11.2005, available at http://www.newyorker.com/archive/2005/11/14/051114fa_fact.

[89] Specifically I refer to the admission into evidence of the "Substitution for the Testimony of Khalid Sheikh Mohamed" in the context of the trial of Zacarius Moussaoui; as well as the well-founded reservations that the testimony in question had been procured under torture or other forms of ill-treatment, it is worth mentioning the troubling preamble transmitted to the jury introducing KSM's testimony : "Although you do not have the ability to see the witness' demeanour as he testifies, you must approach these statements with the understanding that they were made under circumstances designed to elicit truthful statements from the witness." For the full testimony, and other materials related to the Moussaoui trial, see Reporters Committee for Freedom of the Press, "Moussaoui Trial exhibits and documents," available at http://www.rcfp.org/moussaoui/.

[90] For detailed discussion of the Agreement between Romania and the United States of December, dated 6 December 2005, refer to section II.iii.b entitled "Application of the NATO framework in Romania."

135.    More specifically, the description of an "out-of-theater" detention facility presents the mirror image of the kinds of prisons operated "in-theater," which are customarily referred to by United States Forces as "Theater Internment Facilities" – one notable example being the "Bagram Theater Internment Facility."[91] CIA detainees are known to have been held at facilities such as Bagram both before[92] and after[93] having been subjected to rendition, and to secret detention in other countries.

### iii.    Responsible political authorities and preservation of secrecy in Poland and Romania

136.    To reveal the means by which bilateral arrangements were put in place for CIA detentions in Poland and Romania, we must trace a trajectory of deepening co-operation with the United States that spans over several years. During the immediate post-9/11 period, when America was identifying its key strategic partnerships for the "war on terror," both Poland and Romania were in the midst of their own processes of "strategic realignment," eager to secure their positions as indispensable members of the NATO Alliance and friends of the United States.

137.    In the course of a lengthy discussion with us about the CIA's choice of partner countries in Eastern Europe, one high-ranking Eastern European politician involved in the programme said to us:

> "*Poland and Romania; you don't know why? [It is] because we are the only two countries who are truly pro-Occident. But now we are in danger of being seen as an experiment... It is most unfortunate.*"

138.    When America began developing its strategy for the "war on terror" under the NATO framework, Poland was already a member of the NATO Alliance, while Romania was a NATO "aspirant", or accession candidate. This difference in status proved to be of little consequence, however, as both countries followed remarkably similar paths in terms of harmonising their laws and structures with the NATO framework. The role of the United States was crucial to the reform processes in both countries, particularly in terms of the intelligence services and oversight structures that monitor them.

#### a.    Application of the NATO framework in Poland

139.    Poland became a member of NATO on 12 March 1999 and the multilateral NATO SOFA agreement entered into force in Poland in 2000.[94] In the five years directly preceding its NATO accession, Poland had signed several noteworthy agreements with the United States[95] in the realms of defence,[96] aviation,[97] extradition[98] and judicial assistance,[99] which paved the way for a very close co-operation both within and outside the NATO Alliance.

---

[91] For example, official documents refer extensively to the "Bagram Theater Internment Facility" (or "BTIF") as the name given to the detention facility operated by the US Department of Defense at the Bagram Airfield in Afghanistan. See, *inter alia*, Declaration of Colonel Rose M. Miller, Commander of Detention Operations, CJTF-76, in *Ruzatullah et al v. Rumsfeld*, before the US District Court for the District of Columbia, 19.11.2006; at § 3.

[92] I have information in my possession relating to at least three different detainees who were held at Bagram *before* being transferred out to secret detention in another country. I have undertaken to treat this information in confidence, so I shall not refer here to names or precise periods in which they were detained.

[93] I reported last year on the case of Binyam Mohamed al-Habashi, an Ethiopian citizen and former UK resident, who was detained at Bagram between May and September 2004 *after* having been held in CIA custody in Pakistan, Morocco and the "Dark Prison" in Kabul, and subjected to two separate renditions. See the Marty Report 2006, *supra* note 6, at section 3.9, pp. 42 to 45.

[94] See Stefan Meller, Minister of Foreign Affairs of the Republic of Poland, Response of the Republic of Poland to Questions addressed by the Secretary-General of the Council of Europe with regard to Article 52 ECHR, dated 17.02.2006 (hereinafter "Response of Poland to CoE Secretary General under Article 52 ECHR"), available at http://www.coe.int/T/E/Com/Files/Events/2006-cia/Poland.pdf, at p. 5. The Polish authorities pointed out that: "The [NATO SOFA] Agreement, however, does not confer jurisdictional immunity on members of foreign armed forces, but elaborates the rules of determining jurisdiction with regard to prohibited acts on the territory of the host State. In particular, the Agreement grants the sending State the primary right to exercise jurisdiction over a member of its forces or of their civilian component in relation to offences arising out of any act or omission done in the performance of official duty [SOFA, Article 7(2),(II)]. It should also be underlined that in the light of the NATO SOFA, all members of the armed forces of a foreign State staying on the territory of the Republic of Poland are obliged to respect Polish law."

[95] For a full record of (unclassified) bilateral treaties between the United States and Poland, see US Department of State, *Treaties in Force – A list of Treaties and other International Agreements of the United States in Force on January 1, 2006*, "Poland", at pp. 263-266.

[96] See, for example, *Acquisition and Cross-Servicing Agreement*, with annexes, signed at Warsaw, 22.11.1996; entered into force 22.11.1996, TIAS.

[97] See, for example, *Memorandum of Agreement concerning Assistance in developing and modernising Poland's Civil Aviation Structure*, signed at Washington and Warsaw, 9 and 14.01.1998; entered into force 14.01.1998, TIAS.

[98] See *Extradition Treaty between the United States and the Republic of Poland*, signed at Washington, 10.07.1996; entered into force 17.09.1999, TIAS.

[99] See *Treaty on Judicial Assistance with Criminal Matters*, with forms. Done at Washington, 10.07.1996; entered into force 17.09.1999, TIAS.

*Doc. 11302 rev.*

140.    Poland told the Council of Europe that, in addition to its obligations under multilateral treaties, it has concluded an unspecified number of "agreements governing special forms of co-operation."[100] Whilst we do not know the precise scope of these agreements, the one example given by the Polish authorities – that of "trans-frontier surveillance" – confirms that in at least some of their thematic coverage they pertain directly to the work of the intelligence services. We have been unable to obtain copies of Poland's "bilaterals" with the United States, which it is safe to assume fall under this bracket, because they are classified.

141.    Poland's Classified Information Act, which entered into force in March 1999,[101] is part of a fairly typical apparatus among new NATO members[102] for dealing with sensitive information in accordance with the NATO Security Policy. For example, the Act's restrictive procedures for granting or denying "security clearance"[103] to individuals wishing to access classified information were challenged as unconstitutional by the Polish ombudsman.[104] However these provisions were compulsory for NATO membership and – of no small coincidence – would transpire to be vital to the preservation of secrecy around the operations of the CIA's HVD programme in Poland.

### b. Application of the NATO framework in Romania

142.    In the case of Romania, the processes of acceding to NATO and developing a bilateral framework with the United States, under which the CIA could operate on Romanian territory, proceeded almost simultaneously.

143.    According to our sources, the statement of President Ion Iliescu[105] in response to the attacks of 11 September 2001 was Romania's "critical turning point." In that statement, President Iliescu signalled Romania's intention "to act as a *de facto* member of the NATO alliance," setting a clear tone at a time when fellow former Eastern-bloc countries were likewise scrambling to demonstrate their loyalty to the United States.

144.    Indeed, Romania could be said to have outdone even many NATO members in the immediacy of its demonstrations of support for the "war on terror." In its session of 19 September 2001, the Romanian Parliament gave its "formal approval" to President Iliescu's stated position and "approved basing and overflight permission for all US and coalition partners"[106] – thus pre-empting the North Atlantic Council's multilateral authorisations of 4 October 2001 by more than two weeks. A source involved in drafting this permission confirmed to us that its scope was deliberately designed to cover aircraft operated by or on behalf of the CIA.

145.    Furthermore the most important domestic implication of the Romanian Parliament's approval for President Iliescu's pro-American stance was that, in the process, it effectively mandated the President, working through his Office of National Security, to sign NATO-type agreements and bilateral operational orders with the United States.

146.    In exercise of this mandate, President Iliescu negotiated and signed what the Romanian authorities describe as a "SOFA Supplemental"[107] – the *Agreement between Romania and the United States of America regarding the Status of US Forces in Romania*[108] - on 30 October 2001. Along with the multilateral NATO

---

[100] See Response of Poland to CoE Secretary General under Article 52 ECHR, *supra* note 94, at p. 3.

[101] See *Classified Information Act*, Polish Journal of Laws, No. 11, item 95; copy available from the Helsinki Foundation for Human Rights and the Helsinki Committee for Human Rights in Poland.

[102] On this point, see Alasdair Roberts, "NATO, Secrecy and the Right to Information", *supra* note 56.

[103] For commentary on the security clearance procedures by a local journalist, see Pawel Wronski, "Przeswietl sie i dowiedz sie. Z tajemnicami do NATO" (Submitting to clearance and getting to know. Our secrets and NATO), in *Gazeta Wyborcza*, No. 7, 9-10.01.1999.

[104] See International Helsinki Federation for Human Rights, *Human Rights in the OSCE Region: Report 2000 (Events of 1999)*, "Annual Report on Poland", available at http://www.ihf-hr.org/documents/doc_summary.php?sec_id=3&d_id=1784, at p. 286.

[105] See Xinhua News Agency, "Romanian President Firmly Condems Terrorism", Bucharest, Romania, 11.09.2001; excerpt available as part of a compilation entitled "NATO Aspirant Countries condemn the terrorist attacks on the USA", at http://stoianov.president.bol.bg/nato_summit/en/condemnation.html. Just over a year later, in a statement during President Bush's visit to Bucharest on 23.11.2002, President Iliescu declared that the United States and Romania had "identical positions on the way to address the great challenges that the international community is facing, including the threat of terrorism."

[106] See US Department of Defence, Fact Sheet of 7.06.2002, "International Contributions to the War against Terrorism", available at http://www.defenselink.mil/news/Jun2002/d20020607contributions.pdf.

[107] "Answers of the Romanian Delegation to the Questionnaire on the Alleged Secret Detention Centres", appended to the letter to me from Gyorgy Frunda, Chairperson of the Romanian Delegation to PACE, 20.01.2006; at p. 1. This agreement is said to be supplementary to the NATO SOFA of 1951, of which Romania only became a party when it joined NATO on 29.03.2004. It should be noted that in 2001, when Romania was not a party to the 1951 Agreement, it at the time relied upon its signature of the PfP SOFA of 1995 as the basis for its supplemental. See the section II.i. earlier in this report on the wider NATO system and the 'war on terror', and the accompanying references, *supra* note 42.

[108] See the *Agreement between Romania and the United States of America regarding the Status of US Forces in Romania*, signed at Washington, DC on 30.10.2001; entered into force on 10.06.2002, TIAS (hereinafter referred to as "Romanian SOFA Supplemental").

SOFA, this agreement is said by the Romanian authorities *generally* to "settle the jurisdiction, the legal responsibilities and other aspects regarding the status of one party's armed forces personnel… and of contractors of those armed forces when acting on the other party's territory".[109] In reality, however, they are *specifically* one-way arrangements, legislating for an increased size and scope of US activity on Romanian soil.

147.    When examined with hindsight, the 2001 agreement reveals a **permissive attitude on the part of the Romanian authorities**, broadly towards US military and quasi-military operations on Romanian territory, and in particular towards the actions of American service personnel. The "SOFA Supplemental" created a "special regime of access on national territory",[110] which it extended not only to "members of the military forces"[111] in a conventional sense, but also to "members of the civilian airline companies"[112] and anyone else who is "declared by the American authorities to be part of the US armed forces, and can present a travel order issued by the US Military". The breadth of the designation used here represented the perfect opening for the CIA to conduct its clandestine operations in the country.[113]

148.    It is my conclusion that under the October 2001 bilateral agreement, along with any additional classified annexes agreed at that time or subsequently, personnel brought into the country under the banner of the United States military **have in practice operated on Romanian territory with complete freedom from scrutiny or interference by their national counterparts** ever since.

149.    In this context it is important to consider a more recent "access agreement" between Romania and the United States, signed on 6 December 2005, which deals primarily with the activities of US forces based at a selected number of Romanian military facilities.[114]

150.    Under this new agreement, US forces – including their "civilian component" – enjoy extraordinarily free use of certain Romanian airbases and other facilities for "training, transit… refuelling of aircraft, accommodation of personnel, communications, staging and deploying of forces and material … and for other such purposes as the Parties or their Designated Authorities may agree."[115]

151.    In terms of permissions, all US Government aircraft and vehicles are "free from inspection." In addition, an apparently blanket authorisation to "over-fly, conduct aerial refuelling, land and takeoff in the territory of Romania" is granted to both US Government aircraft and "civil aircraft … operating exclusively under contract to the United States Department of Defense."[116] Indeed, an equally permissive approach is applied to almost every aspect of the agreement, from the "construction activities" undertaken by US forces[117] to the apparently unquestioning acceptance as "valid" of "all professional licences."[118]

---

For a full record of (unclassified) bilateral treaties between the United States and Romania, see US Department of State, *Treaties in Force – A list of Treaties and other International Agreements of the United States in Force on January 1, 2006*, "Romania", at pp. 270 to 272.

[109] "Answers of the Romanian Delegation to the Questionnaire on the Alleged Secret Detention Centres", appended to the letter to me from Gyorgy Frunda, Chairperson of the Romanian Delegation to PACE, 20.01.2006; at p. 1.

[110] This phrase is understood to describe the permission given to "enter, exit and move freely within the territory", with a US military travel order sufficing as identification.

[111] See Romanian SOFA Supplemental, 30.10.2001, *supra* note 108, at Article II(2).

[112] It is unclear whether this reference to "the civilian airline companies" indicates that there is a specific numbered or named list of US-registered companies whose members fall under the "special regime of access" referred to. However, in a comparable scenario, it has in the past been disclosed in documents released by the US Department of Defence under a Freedom of Information Act request that specific US aviation companies (including several of those known to be involved in detainee transfer operations) have been awarded "classified contracts" by certain units of the US armed forces. See Seth Hettena, The Associated Press, "Navy contracted planes used in CIA missions", 24.09.2005, available at http://www.usatoday.com/news/washington/2005-09-24-navy-cia_x.htm

[113] In addition, it is known that the meanings of important "cover" designations often used by the CIA are set forth in the 2001 SOFA Supplemental. These include the terms "civilian component", "dependent" and "United States contractor" – all of which categories were also granted the same permissions and protections as conventional military officers. Unfortunately, I have not as yet been able to obtain the sections of the agreement in which the meanings of those terms are defined.

[114] See *Agreement between the United States of America and Romania regarding the activities of United States Forces located on the territory of Romania*, done at Bucharest, 6.12.2005; (hereinafter "Romanian Access Agreement"); copy on file, submitted officially to the Rapporteur in May 2006 after its adoption by the Romanian Parliament. It is worth pointing out that the references to "Implementing Arrangements" in this text afford the Parties a considerable degree of latitude as to how they put the agreement into practice: "The technical details regarding the agreed facilities and areas shall be in accordance with Implementing Arrangements to be concluded for each facility and area" [at Article II(1)]; and "As appropriate, the Parties or their Designated Authorities may enter into Implementing Arrangements to carry out the provisions of this Agreement" [at Article XI].

[115] See Romanian Access Agreement, 6.12.2005, *Ibidem*, at Article II(1). It is relevant to note that the "Designated Authorities" in question are the Ministry of National Defence of Romania and the Department of Defense of the United States of America, respectively.

[116] See Romanian Access Agreement, 6.12.2005, *Ibidem*, at Article VII. In the final clause, the fact that the exempted civil aircraft have to be under exclusive contract to the Department of Defense (rather than the US Government more generally) is a clear indication of the military nature of the arrangements.

[117] See Romanian Access Agreement, 6.12.2005, *Ibidem*, at Article II(4).

[118] See Romanian Access Agreement, 6.12.2005, *Ibidem*, at Article IX.

*Doc. 11302 rev.*

152.    In terms of protections, Romania's key obligations seem to be to give "due regard to United States' operational and security concerns,"[119] and to "take all reasonable measures within its power to ensure the protection, safety and security of United States forces' property."[120]

153.    I have viewed the Romanian Access Agreement in sharpest focus, however, when I consider it in the light of testimony received from Romanian and American officials about the bilateral "operating agreements" that prevailed previously. Sources on both sides confirmed to me that the provisions of the December 2005 Access Agreement are best understood as arrangements that have prevailed for several years but have only latterly been formalised.

154.    This incremental method of formalising such "bilaterals" has in fact been used by the US in other countries in which its forces have been undertaking important detention operations in the context of the "war on terror." The most conspicuous example is Afghanistan, where last year's Accommodation and Consignment Agreement for Lands and Facilities at Bagram Airfield[121] (signed on 28 September 2006) represents the furthest extension of the US model of permissions and protections that I have yet to encounter.[122] It was described in testimony before a US court as being an agreement that "follows similar such arrangements dating back to at least 2003".[123] Indeed, I am aware of an earlier document referred to as "Note No. 202",[124] which indicates that the initial bilateral arrangements in Afghanistan – in strikingly similar terms to the situation in Romania – were agreed upon essentially by members of the executive[125] without reference to parliamentary oversight mechanisms.

155.    The Romanian authorities have indicated to us on two occasions that the NATO framework described here has been the basis for the operations of the CIA in Romania. The first reference came in response to my question about whether the Government is "systematically informed of the activities of foreign secret services (in particular the CIA) on national territory."[126] Romania replied[127] by citing the NATO framework's *Agreement on Classified Information* and a bilateral *military* instrument, the *Agreement on the Protection of Military Classified Information*,[128] thus making clear that CIA activities now fall unambiguously under the secrecy regime instituted under the NATO Security Policy. As in several other Eastern European countries who adopted more stringent secrecy policies as part of their NATO accession, Romania's

---

[119] See Romanian Access Agreement, 6.12.2005, *Ibidem*, at Article II(3).

[120] See Romanian Access Agreement, 6.12.2005, *Ibidem*, at Article VI(1).

[121] See the *Accommodation Consignment Agreement for Lands and Facilities at Bagram Airfield between the Islamic Republic of Afghanistan (represented by HE General Abdul Rahim Wardak, Minister of Defense) and the United States of America*, made and entered into by the Host Nation and the Lessee on 28.09.2006 (hereinafter referred to as the "Bagram Agreement"); copy on file with the Rapporteur.

[122] See, for example, the Bagram Agreement, 28.09.2006, *Ibidem*, at § 9: "The Host Nation [Afghanistan] covenants and warrants that the United States shall have exclusive, peaceable, undisturbed and uninterrupted possession of the Premises during the existence of this agreement. The United States shall hold and enjoy the Premises during the period of the agreement without any interruption whatsoever by the Host Nation or its agents." As is clearly stated in § 13, the Bagram Agreement of 2006 "supersedes all previous agreements between the United States and Host Nation for the use of Bagram Airfield" – implicitly meaning that any formal or informal arrangements that had prevailed prior to September 2006 had finally been brought into one coherent written text. A similar situation can surely be said to apply in Romania with the signature of the Access Agreement of December 2005.

[123] See Declaration of Colonel Rose M. Miller, Commander of Detention Operations, CJTF-76, in *Ruzatullah et al v. Rumsfeld*, before the US District Court for the District of Columbia, 19.11.2006; at § 5. Also note Colonel Miller's statements that "each nation separately controls access to its respective compound on the Airfield" and that "the US does not have complete, plenary jurisdiction".

[124] Note No. 202, dated 26.09.2002, is reproduced in a translated document obtained by Amnesty International, which transmits the concurrence of the Afghanistan Ministry of Foreign Affairs with this note to the US Embassy in Kabul; see Document No. 93 of the Ministry of Foreign Affairs (America and Canada Political Affairs Division), dated 28.05.2003.

[125] Note No. 202 was signed by the Minister of Foreign Affairs of the Transitional Islamic State of Afghanistan, Doctor Abdullah, on behalf of the transitional government. No reference is made to any pursuant procedure for approval of this document, nor am I aware of one having taken place. Furthermore, in the final paragraph, "the parties waive any and all claims against each other for damage to or loss or destruction of property owned by either party, or death or injury to any military or civilian personnel of the armed forces of either party, as a result of activities in Afghanistan under this agreement."

[126] See my letter of 19.12.2005 to Chairpersons of National Delegations to PACE, which contained "Questions which members of the Parliamentary Assembly might put to their respective governments in their national parliaments," reproduced as Appendix II to *Information Memorandum II*, 22.01.2006.

[127] "Answers of the Romanian Delegation to the Questionnaire on the Alleged Secret Detention Centres", appended to the letter to me from Gyorgy Frunda, Chairperson of the Romanian Delegation to PACE, 20.01.2006; at p. 1.

[128] See the *Agreement between Romania and the United States of America on the Protection of Military Classified Information*, done in Washington, 21.06.1995, entered into force 2003; cited *Ibidem*.

legislation on classified information was expedited through Parliament[129] and criticised by civil society for being unbalanced.[130]

156.    The second reference was part of an apparent acceptance, in principle, that United States agencies and personnel have carried out detainee transfer operations in Romania in the context of the NATO framework. The following statement was delivered by the Chairperson of the Romanian Delegation to PACE, Mr Gyorgy Frunda, during the PACE Plenary Debate on my report in June 2006:

> "Concerning the transfer of prisoners, from the first moment we said that **Romania collaborated with the United States and with other members of NATO. Aircraft landed in Romania and transported persons.** We did not and do not know who the persons are because, do not forget, the aircraft are under the authority of the countries where they are registered. **The countries in which the airports are located do not have legal instruments to see what happens on board.** That is why United States authorities have to answer not only political but juridical questions about whether persons were harassed or wrongly treated... on the airplanes."[131]

157.    Our continuing investigations since June 2006 have allowed us to put this statement into context. Romania is right to state that the NATO framework on the multilateral level did enable detainee transfers through many Council of Europe member states, including larger nations like Germany mentioned in my report last year. Romania, like Poland, went beyond the multilateral framework, however, when it expanded the scope and purpose of the authorisations it granted the United States. According to one of our sources involved in making the key bilateral arrangements, Romania "knew what the United States needed from its allies and in what areas we could assist them." It was therefore perceived to be in the national interest to extend a further level of support: "[having] worked on the secret flights... we worked directly with associates of the CIA on establishing prisons here."

### c. Preserving secrecy through military intelligence partnerships

158.    In the course of our discussions with intelligence officials in the United States, a senior member of the CIA Counterterrorist Center made the following remarks to our team:

> "Many European countries have multiple security services. And in most countries the Agency deals with all of them: with the police, with the anti-terrorism police, with foreign intelligence, with other units – and of course with military intelligence ... But for the HVD programme we worked strictly in line with 'need-to-know'."

159.    There are two essential items of information in this statement, both of which have ultimately proved indispensable to our understanding of how the HVD programme worked in Europe. One item – military intelligence partnerships – goes to the heart of how the CIA formed its relationships; the other – preservation of secrecy – reveals important structural considerations. I shall deal with the structural considerations first.

### d. Preserving secrecy and NATO Security Policy

160.    Our source's use of the expression "need-to-know" encapsulates one of the means used to keep the HVD programme in Europe secret.[132] Through discussion with several other sources we have established that classified information about the bilateral arrangements between the CIA and its partner services in Poland and Romania was **treated according to a strict security of information regime drawn from the terms of NATO's Security Policy.**

---

[129] Alasdair Roberts cites a revealing news report about the passage of the Romanian legislation in April 2002: "[On 3 April] a certain Colonel Constantin Raicu [of the Romanian Intelligence Service], who is in charge of the protection of state secrets, came down like a storm on the members of the Senate Juridical Commission, telling them: 'This morning we have received signals from [NATO in] Brussels indicating that if the bill on classified information is not passed before 16 April, they cannot exclude adopting a critical attitude regarding Romania. We agree with any form – the colonel added – but please, pass it as soon as possible, or we will be facing huge problems.' The Senators... grasped the situation very quickly, and they approved the draft bill in the form passed by the Chamber of Deputies." See *Bucharest Ziua*, "NATO used as a Scarecrow to pass Law on Secrets," 08.04.2002, www.ziua.ro, cited in Alasdair Roberts, "NATO, Secrecy and the Right to Information", *supra* note 56, at p. 87.
[130] See International Helsinki Federation for Human Rights, *Human Rights in the OSCE Region: Report 2002 (Events of 2001)*, "Annual Report on Romania", available at http://www.ihf-hr.org/documents/doc_summary.php?sec_id=3&d_id=1782, at p. 257.
[131] Contribution of Mr Gyorgy Frunda, Chairperson of the Delegation of Romania to PACE, at the 17th Sitting of the Plenary of the Parliamentary Assembly during its 2006 Session, Strasbourg, 27.06.2006.
[132] We initially probed into the means used to keep the HVD programme secret because of a tip-off from an insider source. The source had indicated that the NATO framework "holds the key" to understanding the European dimension of the programme, in terms of both "physical security and security of information."

*Doc. 11302 rev.*

161.    Under the terms of the NATO Security Policy,[133] *"individuals in NATO nations … shall only have access to NATO classified information for which they have a need-to-know. No individual is entitled solely by virtue of rank or appointment or PSC [Personnel Security Clearance] to have access to NATO classified information."*[134] In the context of the HVD programme, according to a senior CIA official, the CIA classified its operational information into "tiny little pieces," each of which would be assessed separately under the "need-to-know" principle in order to prevent any single foreign official from seeing the "bigger picture" of what was actually happening:

> *"The Agency could be bringing UBL [Usama bin Laden] himself from an airplane into a prison in your country, but on every tiny little piece of the classified operational information, if we figure you don't need to know that information then frankly, as an individual, you will never know it."*

162.    The body that generates any piece of classified information retains what is known as "originator control,"[135] an undisputed right to set parameters as to which individuals receive the information, how they are briefed, what they are allowed to do with the information, and whether the information will ever be declassified, or have its classification reduced.[136] It is generally accepted that "the principle of originator control trumps the need-to-know principle;"[137] otherwise put, based on this principle, the CIA was able to exclude from the information loop even those individuals (specifically, some politicians) whom it might have perceived to have a genuine need to know the "bigger picture."

163.    Finally, the CIA's choice of its "point men" in Poland and Romania – key individuals in each country who vouched for absolute, unwavering adherence to the rules by their own national services – reflected the same considerations of "loyalty, trustworthiness and reliability"[138] integral to NATO rules on personnel security. When discussing the kinds of people as their liaisons, our CIA sources referred to relationships of "trust developed over decades" and interpretations of national security issues that were "99% in harmony with one another".

164.    By preserving the secrecy of the covert HVD programme on a NATO-compliant basis, the CIA achieved several of its central objectives: it hand-picked the services and the "point men" it would work with in the countries in question; it limited to an absolute minimum the number of Polish and Romanian counterparts who knew about even "tiny little pieces" of these operations in their own countries; and it ruled out any distribution whatsoever of the classified information beyond these small circles, unless expressly approved by the US Government itself.

165.    Yet none of these restrictive rules mitigates the fact that Poland and Romania, as host countries, were knowingly complicit in the CIA's secret detention programme. When we sought confirmation from one of our sources in the CIA that these were bilateral (rather than unilateral) arrangements, and that every programme was carried out with the express authorisation of the relevant partner state, we received this emphatic response:

> *"One of the great enduring legacies of the Cold War, which has carried into these alliances, is that NATO countries don't run unilateral operations in other NATO countries. It's a tradition that is almost sacrosanct. We [the CIA] just don't go trampling on other people's turf, especially not in Europe."*

166.    Hence the importance of our source's affirmation that the CIA forms important intelligence partnerships **not just with civilian counterparts but also in the military sphere.** As our inquiry progressed, we realised that the CIA's fellow civilian intelligence agencies (domestic and foreign) are not necessarily the most appropriate choices as partners or liaisons on highly secretive operations due to their encumbered civilian oversight mechanisms. Thus, an integral part of our investigative strategy, building on

---

[133] See NATO, Security within the North Atlantic Treaty Organisation, 17.06.2002, *supra* note 73. The policy is designed to ensure that a "common degree of protection" is applied both to NATO's own information and to information exchanged among NATO members on a bilateral level. Both categories of information are referred to as "NATO classified information" in the context of this policy.

[134] *Ibidem*, in Enclosure "C" – Personnel Security, at the section entitled "Application of the 'Need-to-Know' Principle," p. 2, § 6. In a handbook accompanying an earlier version of the policy, this "fundamental principle" was reiterated to mean that information should be limited in its distribution for *work purposes only*, and not "merely because a person occupies a particular position, however senior." See NATO Security Committee, *A Short Guide to the Handling of Classified Information*, Document AC/35-WP/14:4, Brussels, 22.08.1958.

[135] *Ibidem*, in Enclosure "B" – Basic Principles and Minimum Standards of Security, at the section entitled "Basic Principles," p. 3, § 9(g).

[136] *Ibidem*. See, *inter alia*, Enclosure "B" – Basic Principles and Minimum Standards of Security, at the section entitled "Basic Principles," p. 2, § 9(b): "classified information shall be disseminated solely on the basis of the principle of need-to-know to individuals who have been briefed on the relevant security procedures… only security cleared individuals shall have access."

[137] See Alasdair Roberts, "NATO, Secrecy and the Right to Information", *supra* note 56, at p. 89.

[138] *Ibidem*, in Enclosure "B" – Basic Principles and Minimum Standards of Security, at the section entitled "Personnel Security," p. 4, § 11; see also the supporting provisions in Enclosure "C" – Personnel Security, pp. 1-4. In the previous version of the NATO policy, C-M(55)15(Final) as reissued in 1964, anyone receiving a security clearance was assessed to have shown "unquestioned loyalty [and] such character, habits, associated and discretion as to cast no doubt upon their trustworthiness."

our knowledge of the NATO framework, was to apply equal scrutiny to the **CIA's partnerships with military intelligence services**.

## III.    Secret detention operations in Poland

### i.    *Partnering with military intelligence in Poland*

167.    Since the May 2002 "quasi-reform"[139] of its secret services, Poland has had two civilian intelligence agencies: the Internal Security Agency (*Agencja Bezpieczenstwa Wewnetrznego, or ABW*); and the Foreign Intelligence Agency (*Agencja Wywiadu, or AW*). Neither of these services was considered a viable choice as a CIA partner for the sensitive operations of the HVD programme in Poland, precisely because they are "subject to civil supervision, both by Parliament and Government."[140] Since their creation, the Heads of both the *ABW* and the *AW* have been appointed and tasked by the Prime Minister, and are directly accountable to the Council of Ministers, initially through a Cabinet Committee chaired by the PM (*Kolegium do Spraw Sluzb Specjalnych*) and latterly through the position of Minister-Coordinator for the Special Services.[141] The *ABW* and the *AW* are both also answerable to the Commission for Special Services in the Polish Parliament (*Sejmowa Komisja do Spraw Sluzb Specjalnych*).

168.    According to our sources, the CIA determined that the bilateral arrangements for operation of its HVD programme had to **remain absolutely outside of the mechanisms of civilian oversight**. For this reason the CIA's chosen partner intelligence agency in Poland was the **Military Information Services** (*Wojskowe Sluzby Informacyjne, or WSI*), whose officials are part of the Polish Armed Forces and enjoy "military status" in defence agreements under the NATO framework. The *WSI* was able to maintain far higher levels of secrecy than the two civilian agencies due to its recurring ability to emerge "virtually unscathed"[142] from post-Communism reform processes designed at achieving democratic oversight.

169.    The *WSI* was formally accountable to the Minister of Defence, but our sources describe it as having operated more as a kind of "cartel" serving the self-interests of particular elite groups. I find it especially interesting that Poles we spoke to regard the processes of military intelligence reform[143] as smokescreens aimed at *obstructing* transparency and *preserving* corrupt access to state resources.[144] There is no doubt that the *WSI* is an agency quite accustomed to covert action that challenges the boundaries of legality and morality.

170.    From our interviews with current and former Polish military intelligence officials, we have established that the *WSI*s role in the HVD programme comprised two levels of co-operation. On the first level, **military intelligence officers provided extraordinary levels of physical security** by setting up temporary or permanent military-style "buffer zones" around the CIA's detainee transfer and interrogation activities. This approach was deployed most notably to protect the CIA's movements to and from, as well as its activities within, the military training base at Stare Kiejkuty. Classified documents, the existence of which was made

---

[139] See Andrzej Zybertowicz, "An Unresolved Game – The role of the Intelligence Services in the nascent Polish Democracy", conference paper published jointly by the Geneva Centre for the Democratic Control of Armed Forces (DCAF), the Norwegian Parliamentary Intelligence Oversight Committee, and the Human Rights Centre at the Department of Law, Durham University, Oslo, September 2003, copy on file with the Rapporteur (hereinafter "Zybertowicz, The Role of the Polish Intelligence Services"), at p. 2: "when the Polish Parliament passed the new law on secret services… instead of explanation of [the] many scandals and taking legal measures towards those responsible, instead of accountability, the public opinion has been offered a quasi-reform of the services. It deserves this label because, among other things, it did not meet [the] objects of its own designers."

[140] See Response of Poland to CoE Secretary General under Article 52 ECHR, *supra* note 94, at p. 2. The phrase is used in this context to describe the system of oversight for the AW: "Parliament [the *Sejm*] exercising its prerogatives through the Commission for Special Services, also controls the Polish Foreign Intelligence Agency in matters relating to its co-operation with partner secret services of other States."

[141] The position of Minister-Coordinator for the Special Services was created in November 2005 and is presently filled by Minister Zbigniew Wassermann.

[142] See Zybertowicz, The Role of the Polish Intelligence Services, *supra* note 139, at pages 3 and 6-7.

[143] Reform of the military intelligence services in Poland has been a contentious issue since the early 1990s, and a topical one throughout my mandate as Rapporteur. Prior attempts at regulating the *WSI* appear to have been half-hearted, at best. From its creation in August 1991 to December 1995 it operated exclusively under secret military orders; then until July 2003 it came under the nominal control of the Ministry of Defence, but without close legal oversight. Even the Law on the Military Secret Services passed by Parliament on 9.07.2003 contained no external verification procedures. Since late 2005, at the instruction of Prime Minister Jaroslaw Kaczynski, the *WSI* has been gradually dissolved and replaced by a restructured military counter-intelligence unit. Deputy defence minister Antoni Macierewicz, who heads the new unit, published a report on the dissolution in February 2007, but the process appears to have done little to assuage public scepticism or criticism. For analysis of the report and reactions to it, see *inter alia* Joanna Najfeld, "Polish Military Intelligence involved in Illegal Activities," Network Europe, 23.02.2007, available at http://networkeurope.radio.cz/feature/polish-military-intelligence-involved-in-illegal-activities.

[144] See also Zybertowicz, The Role of the Polish Intelligence Services, *supra* note 139, at pages 6-7. The author lists what he sees as the objects of "self-reform" in the *WSI*, including "to prevent outsiders – including democratically established control and oversight bodies – from obtaining thorough access to the Services", "to present the *WSI* as a useful ally to the NATO authorities", and to retain an "upper hand in economic institutional rearrangements, including key financial flows and major privatisation schemes."