*Doc. 11302 rev.*

known to our team, describe how *WSI* agents performed these security roles under the guise of a Polish Army Unit (*Jednostka Wojskowa*) denoted by the code *JW-2669*, which was the formal occupant of the Stare Kiejkuty facility.[145]

171.   On the second level, the *WSI*'s assistance depended to a large extent on its **covert penetration of other state and parastatal institutions through its collaboration with undercover "functionaries" in their ranks**. Our sources have indicated to us that *WSI* collaborators were present within institutions including: the Polish Air Navigation Services Agency (*Polska Agencja Zeglugi Powietrznej*), where they assisted in disguising the existence and exact movements of incoming CIA flights;[146] the Polish Border Guard (*Straz Graniczna*), where they ensured that normal procedures for incoming foreign passengers were not strictly applied when those CIA flights landed; and the national Customs Office (*Główny Urzad Celny*), where they resolved irregularities in the non-payment of fees related to CIA operations. Thus the military intelligence partnership brought with it influence throughout a society-wide "undercover community,"[147] none of which was checked by the conventional civilian oversight mechanisms.

172.   When asked to give an example of a *WSI* collaborator who occupied an important position in the operation of the CIA's covert programme, several Polish sources named Mr Jerzy Kos, former Chairman of the Board of Mazury-Szczytno Airport Company (*Porty Lotnicze "Mazury Szczytno"*) and Director of Szymany Airport throughout 2003 and 2004.[148] A source in Polish military intelligence said: "anyone who has contact with the Americans is our man. The Director [Kos] is our man". Another senior Polish official familiar with the arrangements explained to us:

> "Polish military intelligence operatives were appointed to these positions. We said to place them anywhere with importance to the way this programme is run. This is how you come to know Mr Kos as the Director at Szymany Airport."

173.   Mr Jerzy Kos went on to become a director of the Polish private construction company "*Jedynka Wroclawska SA*" and was taken hostage in Iraq in June 2004 whilst pursuing company projects there. When Mr Kos was brought to safety shortly afterwards in a rare raid by US Special Forces,[149] media outlets reported that the rescue operation attested to Mr Kos' links to the intelligence services.[150] Indeed, my inquiry has been informed that Mr Kos' "connections with [the] Polish secret service" in his business affairs have been "confirmed quite unambiguously"[151] during judicial proceedings[152] relating to the subsequent bankruptcy of *Jedynka Wroclawska*. As a military intelligence operative facilitating the uniquely sensitive covert actions of the CIA in Poland, Mr Kos was one link in a chain of operations that led right to the top of Polish Government.

---

[145] One of the few means of verifying – through independent public sources – the fact that *JW-2669* was stationed at Stare Kiejkuty during this period is through photogrammetric studies of activity on Internet servers by users with particular "net-names". In outputs from such studies, *inter alia* of 23.10.2003, the "net-name" *JW-2669* is registered as being assigned to "Jednostka Wojskowa 2669, Stare Kiejkuty".
[146] For more information on the means used to cover up CIA flights into Poland, see section III.iii below, entitled "The anatomy of CIA secret transfers and detentions in Poland."
[147] As in many former communist countries, the secret services in Poland are accustomed to using networks of operatives and informants that span many of the most important institutions of the state, as well as the private sector. These networks comprise what is known as the "undercover community." For a description of this "crucial notion" in Poland, which the author refers to as "the security complex," see Zybertowicz, The Role of the Polish Intelligence Services, *supra* note 139, at pages 4-5.
[148] Between 2002 and 2004, the commercial company headed by Mr Kos shared responsibility for operating Szymany Airport with a military unit stationed on site. The airport had a mixed "civil-military" character, whereby aircraft registered as undertaking "military flights" were dealt with under special procedures.
[149] See, for example, Fox News, "Polish Iraq Hostage Praises US Rescuers", Warsaw, 10.06.2004; available at http://www.foxnews.com/story/0,2933,122359,00.html.
[150] The Italian press, for example, reported that Mr Kos was the "007 of Warsaw" and bore a "subcutaneous microchip" that allowed rescuers to trace the location at which he and his fellow hostages were being held; see La Repubblica, "Ostaggi liberati grazie a un microchip sottopelle", 16.06.2004, available at http://www.repubblica.it/2004/f/sezioni/politica/ostliberi2/chipinchiesta/chipinchiesta.html. On 15.06.2004 AP quoted Mr Kos himself as having said: "They [the kidnappers] thought I am an American co-operating with the CIA and I tried to explain that I am a Pole, that I was there to build houses."
[151] Letter to my inquiry from Justice Jaroslaw Horobiowski, Judge in the District Court for Wroclaw-Fabryczna (Bankrupty and Pre-insolvency Proceedings), dated 7.11.2006, copy on file with the Rapporteur. Mr Kos' business affairs given as examples by Justice Horobiowski in this regard are "his role [with] *Jedynka Wroclawska* in Iraq, his mysterious kidnapping, then [the] strange circumstances of his rescuing, and his being director of the (former military) airport in Szymany." Justice Horobiowski also states that the revelations about secret service connections were made by some former directors of the company.
[152] In addition to the statements in court, trade unionists wrote an open letter stating that Mr Kos' posting to Iraq may also have entailed some intelligence functions. See letter on behalf of *Jedynka Wroclawska SA* to Wroclaw Prosecutor Leszek Karpina, dated 26.04.2006, copy on file with the Rapporteur.

*ii.   Responsible political authorities in Poland*

174.   During several months of investigations, our team has held discussions with various Polish sources, including civilian and military intelligence operatives, representatives of state or municipal authorities, and high-ranking officials who hold first-hand knowledge of the operations of the HVD programme in Poland. Based upon these discussions, which have come to the same conclusions, my inquiry allows me to state that some individual high office-holders knew about and authorised Poland's role in the CIA's operation of secret detention facilities for High-Value Detainees on Polish territory, from 2002 to 2005. The following persons could therefore be held accountable for these activities: the President of the Republic of Poland, Aleksander KWASNIEWSKI, the Chief of the National Security Bureau (also Secretary of National Security Committee), Marek SIWIEC, the Minister of National Defence (Ministerial oversight of Military Intelligence), Jerzy SZMAJDZINSKI, and the Head of Military Intelligence, Marek DUKACZEWSKI.

175.   In my analysis the hierarchy for control of the Polish Military Information Services, or *WSI*, was chronically lacking in formal oversight and independent monitoring. As a result the structure described here from 2002 to 2005 depended to a great extent on close relationships of trust and professional familiarity, both among the Polish principals and between the Poles and their American counterparts. Several of our sources characterised the bonds between these four individuals as being a combination of loyal personal allegiance ("we all serve one another") and strong common notions of national duty ("... but first we serve the Republic of Poland").

176.   There was complete consensus on the part of our key senior sources that President Kwasniewski was the foremost national authority on the HVD programme. One military intelligence source told us: "Listen, Poland agreed from the top down... From the President – yes... to provide the CIA all it needed." Asked whether the Prime Minister and his Cabinet were briefed on the HVD programme, our source said: "Even the *ABW* [Internal Security Agency] and *AW* [Foreign Intelligence Agency] do not have access to all of our classified materials. Forget the Prime Minister; it operated directly under the President."

177.   Our investigations have revealed that the state office from which much of the strength of this Polish accountability structure derived was the **National Security Bureau** (*Biuro Bezpieczenstwa Narodowego, or BBN*), located in the Chancellery of President Kwasniewski. Our sources confirmed to us that the bilateral operational arrangements for the HVD programme in Poland were "negotiated on the part of the President's office by the National Security Bureau [*BBN*]."

178.   Marek Dukaczewski, an outstanding military intelligence officer ultimately promoted to the rank of General, served the BBN in the Chancellery of his close friend Aleksander Kwasniewski for the first five years of the latter's Presidency, from 1996 to 2001. Mr Dukaczewski worked directly alongside Marek Siwiec during this period, whilst Mr Siwiec was a Secretary of State in the Presidential Chancellery and then became Chief of the BBN. Jerzy Szmajdzinski was appointed Minister of National Defence for Mr Kwasniewski's second term, in October 2001. Shortly afterwards, Mr Dukaczewski was nominated Head of the Military Information Services, the *WSI*, starting in December 2001.

179.   Besides this accountability structure, which remained in place from the immediate aftermath of the 11 September 2001 attacks throughout Poland's involvement in the CIA's covert HVD programme, probably no other Polish official had knowledge of it. Indeed, the "highest level of classification" at national and intergovernmental levels, understood to match NATO's "Cosmic Top Secret" category,[153] still attaches to the information pertaining to operations in Poland. Our unravelling of such secrecy to expose Polish participation in unlawful detention and transfer operations is perhaps the greatest testament to the "dynamics of truth" in motion. However an alternative interpretation, which provided my inquiry with motivation in the face of systematic cover-up, came in one of our most memorable moments of testimony from a top-level Polish source. He stated simply:

> *"Listen, there are no secrets in war. There is no intelligence in war. You cannot keep something secret in a time of conflict."*

---

[153] See NATO, Security within the North Atlantic Treaty Organisation, 17.06.2002, *supra* note 73; in Enclosure "B" – Basic Principles and Minimum Standards of Security, at p. 5, § 18(a). In NATO terms, the category of security classification attached to the bilateral operations of the HVD Programme is known as "COSMIC TOP SECRET (CTS)", a category for which "unauthorised disclosure would result in exceptionally grave damage" to NATO and / or to participating member States.

*Doc. 11302 rev.*

### iii. The anatomy of CIA secret transfers and detentions in Poland

180.    Notwithstanding the approach of the Polish authorities towards this inquiry,[154] our team was able to uncover new documentary evidence from two separate Polish sources showing actual landings in Poland by aircraft associated with the CIA.

181.    These sources corroborate one another and provide the first verifiable records of a number of landings of "rendition planes" significant enough to prove that CIA detainees were being transferred into Poland. I can now confirm that at least ten flights by at least four different aircraft serviced the CIA's secret detention programme in Poland between 2002 and 2005. At least six of them arrived **directly from Kabul, Afghanistan** during precisely the period in which our sources have told us that High-Value Detainees (HVDs) were being transferred to Poland. Each of these flights landed at the same airport I named in my 2006 report as a detainee drop-off point: **Szymany**.

182.    The most significant of these flights, including the aircraft identifier number, the airport of departure (ADEP), as well as the time and date of arrival into Szymany, are the following:

i.    N63MU from DUBAI, arrived in SZYMANY at 14h56 on 5 December 2002
ii.   N379P from RABAT, arrived in SZYMANY at 02h23 on 8 February 2003
iii.  N379P from KABUL, arrived in SZYMANY at 16h00 on 7 March 2003
iv.   N379P from KABUL, arrived in SZYMANY at 18h03 on 25 March 2003
v.    N379P from KABUL, arrived in SZYMANY at 01h00 on 5 June 2003
vi.   N379P from KABUL, arrived in SZYMANY at 02h58 on 30 July 2003
vii.  N313P from KABUL, arrived in SZYMANY at 21h00 on 22 September 2003
viii. N63MU from KABUL, arrived in SZYMANY at an unrecorded time on 28 July 2005

183.    My first observation regarding the dates of these flights is that several of them conform closely to the dates on which particular "High-Value Detainees" (HVDs) were transferred to CIA "black sites," particularly in outward movements from Kabul, Afghanistan. The most conspicuous example pertains to the so-called "mastermind" of the 9/11 attacks, Khalid Sheikh Mohamed (KSM), who was captured in Rawalpindi, Pakistan on 1 March 2003[155]. Our insider sources have told that KSM was transferred to a secret CIA facility "within days" of his arrest; and from analysis of materials supporting the 9/11 Commission Report[156], we know that the process of interrogating him commenced shortly afterwards[157], and continued throughout 2003. It is noteworthy that the well-known rendition plane N379P undertook a clandestine flight from Kabul to Szymany on 7 March 2003, less than one week after KSM's arrest. Whilst it is not possible at this stage to state the fact definitively, it is likely that the transfer of KSM and several other HVDs into Poland throughout 2003 took place on the flights uncovered in this report.

184.    The full extent of my proof, however, goes beyond merely the number of confirmed flights into Szymany and their concordance with suspected dates of HVD transfers. Through our careful analysis of hundreds of pages of raw aeronautical "data strings,"[158] we can now demonstrate that in the majority of

---

[154] The approach of the Polish authorities towards my inquiry is dealt with in further detail below. The official position of the Polish Government remains unchanged since it was announced on 10.12.2005: "The Polish Government strongly denies the speculation occasionally appearing in the media as to the existence of secret prisons on the territory of the Republic of Poland, supposedly used for the detention of foreigners suspected of terrorism. There are no such prisons in Poland and there are no prisoners detained in contravention of the laws and international conventions to which Poland is a party." Most recently it was reproduced in submissions before the United Nations Committee Against Torture (CAT) in Geneva; see *Written replies by the Government of Poland to the list of issues (CAT/C/POL/Q/4/Rev.1) to be taken up in connection with the consideration of the fourth periodic report of Poland (CAT/C/67/Add.5)*, UN Document CAT/C/POL/Q/4/Rev.1/Add.1, 30.03.2007, available at http://www.ohchr.org/english/bodies/cat/cats38.htm; response to Question 12, at p. 23, § 72.
[155] On the capture of KSM, see *inter alia* B. Raman, "How significant is Khalid Sheikh's arrest?" on Rediff.com, 3.03.2003, available at http://in.rediff.com/news/2003/mar/03raman.htm; and BBC News Online, "Bush hails 'Al-Qaeda killer' arrest," 4.03.2003, available at http://news.bbc.co.uk/2/hi/south_asia/2817441.stm.
[156] The full report and records of the National Commission on Terrorist Attacks upon the United States (the "9/11 Commission") are available online at http://www.9-11commission.gov/. In particular, Chapters 5 and 7 of the Commission Report are said to "rely heavily on information obtained from captured Al-Qaeda members;" specifically ten detainees, including Khalid Sheikh Mohamed, "whose custody has been confirmed officially by the US Government." See the inset on "Detainee Interrogation Reports," in Chapter 5, at page 146. For specific dates on which KSM and other "high-value detainees" were interrogated, see, in particular, "Notes to Chapter 5", in Notes to the 9/11 Commission Report, at pages 488 to 499.
[157] Interrogations of KSM are dated as early as 12.04.2003, just over a month after his capture; see "Notes to Chapter 5", 9/11 Commission Report, *ibidem*. Further interrogations are dated at frequent intervals throughout 2003 and 2004.
[158] "Data strings" are exchanges of messages or digital data (mostly in the form of coded text and numbers) between different entities around the world on a network known as the AFTN (Aeronautical Fixed Telecommunication Network). "Data strings" record all communications filed in relation to each particular aircraft as its flights are planned in advance, and as it flies between different international locations. The filings come from diverse entities, including aviation service providers, ANS (Air Navigation Services) authorities, airport authorities and government agencies. I have obtained complete sets of "data strings" for about twenty flight circuits, which I selectively requested from the AFTN system. The selected circuits include each of the circuits featuring undeclared flights of CIA

Doc. 11302 rev.

cases these CIA flights were **deliberately disguised so that their actual movements would not be tracked or recorded** – either "live" or after the fact – by the supranational air safety agency Eurocontrol. The system of cover-up entailed several different steps involving both American and Polish collaborators.

185.   The aviation services provider customarily used by the CIA,[159] **Jeppesen International Trip Planning**,[160] filed multiple "dummy" flight plans for many of these flights. The "dummy" plans filed by Jeppesen – specifically, for the N379P aircraft – often featured an airport of departure (ADEP) and / or an airport of destination (ADES) that the aircraft never actually intended to visit. If Poland was mentioned at all in these plans, it was usually only by mention of Warsaw as an alternate, or back-up airport, on a route involving Prague or Budapest, for example. Thus the eventual flight paths for N379P registered in Eurocontrol's records were inaccurate and often incoherent, bearing little relation to the actual routes flown and almost never mentioning the name of the Polish airport where the aircraft actually landed – Szymany.

186.   The **Polish Air Navigation Services Agency** (*Polska Agencja Zeglugi Powietrznej*), commonly known as PANSA, also played a crucial role in this systematic cover-up. PANSA's Air Traffic Control in Warsaw[161] navigated all of these flights through Polish airspace, exercising control over the aircraft through each of its flight phases[162] right up to the last phase, when control was handed over to the authority supervising the airfield at Szymany,[163] immediately before the aircraft's landing. PANSA navigated the aircraft in the majority of these cases without a legitimate and complete flight plan having been filed for the route flown.

187.   Moreover, in certain instances PANSA took on the **responsibility of filing the onward flight plan for the next leg of the circuit after Szymany**. We know that PANSA filed such flight plans in instances where Szymany had been omitted completely from the original Jeppesen flight plans, and where the aircraft was required to fly onwards from Szymany to a destination outside Poland. Similarly in at least one instance where the aircraft flew onwards from Szymany to Warsaw – and thus did not require initially to leave Polish airspace – PANSA simply navigated the onward flight without a flight plan.

188.   It is also noteworthy that Jeppesen appears to have followed PANSA's contributions to these operations very closely, acting upon responses from the flight management system to PANSA's communications within minutes of their being received. Furthermore, both Jeppesen and PANSA have co-ordinated their actions with the in-flight communications from the aircraft's Pilot-in-Command.[164]

---

aircraft into Szymany, as well as circuits featuring landings in Romania and a large number of rendition operations pertaining to individual detainees whose cases I dealt with in my report of 2006. Our team has conducted an in-depth analysis of all these "data strings," together with information in the Marty database and in consultation with aviation experts.
[159] Jeppesen International Trip Planning is the travel service of Jeppesen Dataplan, an aviation services provider based in San Jose, California and a subsidiary of Boeing, the world's largest aerospace company. On 30 May 2007, the ACLU announced a lawsuit against Jeppesen Dataplan for its involvement in the renditions of three individuals: Ahmed Agiza, Binyam Mohamed and El-Kassim Britel. See American Civil Liberties Union, "ACLU Sues Boeing Subsidiary for Participation in CIA Torture and Kidnapping," 30 May 2007, available at http://www.aclu.org/safefree/torture/29920prs20070530.html. For the first revelations about Jeppesen's involvement in CIA detainee transfers, including the rendition of Khaled El-Masri, see Jane Mayer, "Outsourcing: The CIA's Travel Agent", in *The New Yorker*, 30.10.2006, available at http://www.newyorker.com/archive/2006/10/30/061030ta_talk_mayer. The Managing Director of Jeppesen is quoted in the article as having said: "*We do all the extraordinary rendition flights – you know, the torture flights. Let's face it, some of these flights do end up that way.*"
[160] Communications, notably flight plans, filed by Jeppesen International Trip Planning are identified in the AFTN system by the use of the company's "originator address," which is KSFOXLDI.
[161] The entire national airspace of Poland comprises one single Flight Information Region (FIR), denoted by the four-letter code EPWW. Poland therefore has only one Area Control Centre (ACC). All air traffic into Poland is controlled by the Polish Air Navigation Services Agency, PANSA, from its Air Traffic Management Centre at Warsaw Airport. For an excellent overview of Polish Air Traffic Control, see PANSA, "Air Traffic Control", available at http://www.polatca.pansa.pl/kontrola_eng.htm.
[162] We have identified the relevant "data strings" communications about these flights being sent from the AFTN address "EPWAZPZX", which denotes the "Approach Control Centre – Air Traffic Service Reporting Office at Warsaw Airport". In addition to the phase of general "Region Control" for all of Poland, the phase of "Approach control" for Szymany Airport, during which the movements of all civil or military aircraft are controlled within a specified range of the airport, is dealt with from Warsaw. Szymany Airport does not meet the criteria (i.e. passenger airports that maintain fixed flight connections) to have its own Approach Control unit so it relies on the unit at Warsaw Airport.
[163] We have identified the relevant "data strings" communications about these flights being sent to the AFTN address "EPSYYDYX", which denotes the "Authority Supervising the Aerodrome at Szymany Airport". Several airport officials who were present at Szymany Airport when these flights arrived in 2003 have told us that their notification came from military sources in Warsaw and that all arrangements for the landings were handled using special military units on the ground. Polish Air Traffic Control explains these procedures in the following terms: "Military operations carried out in the military aerodrome zones are controlled by a military unit that directly co-operates with the Approach Control." From our Polish insider sources, we know that the Director of Military Operations, working with PANSA Approach Control in Warsaw, as well as key officials in the Border Guards who notified Szymany of the landings, and military officers who took over from civilian officials at Szymany to deal with them on the ground, were working on behalf of Polish military intelligence in collaboration with the CIA.
[164] We have been able to establish through our investigations that the men registered as Pilot-in-Command (PIC) for the undeclared flights into Szymany are established CIA pilots. We have records of their full names and have been able similarly to vouch for their engagement as pilots in multiple detainee transfer operations involving other countries. We have also confirmed their appearance on

189. Accordingly, several circuits we have analysed show the following "sequencing" of flight navigation responsibilities for a typical circuit of N379P involving a landing at Szymany, which demonstrate a calculated cover-up of the aircraft's movements:

- Jeppesen files flight plans for every element of the circuit up to and including N379P's return to Europe from Kabul; typically Jeppesen's flight plan(s) from Kabul onwards reflect fictitious routes, featuring false airports of destination and departure that are registered in the Eurocontrol flight management system;
- N379P's Pilot-in-Command then flies from Kabul into Polish airspace, at which point the Polish authorities (PANSA) take over to navigate the aircraft to a landing at Szymany Airport without a corresponding flight plan, but in conjunction with Polish military authorities in Warsaw and on the ground;
- PANSA also handles onward flight planning for N379P's departure from Szymany, either by navigating the aircraft to a stopover in Warsaw or by filing a flight plan for its next international destination, such as Prague or Larnaca;
- Jeppesen resumes its planning role once N379P has left Szymany, filing flight plans for the remaining elements of the circuit, starting from either Warsaw or the first international airport after Szymany, continuing until the aircraft's return to its base in the United States.

190. The analysis of "data strings" has also enabled me to confirm further intricate details of the "anatomy" of these CIA clandestine operations. For example, each of these flights was operated under a "special status" or STS designation.[165] The aircraft were thereby exempted from adhering to the normal rules of air traffic flow management (ATFM), and did not, for example, have to wait at airports for approved departure slots. Since such exemptions are only granted when "specifically authorised by the relevant national authority,"[166] they provide further evidence of Polish complicity in the operations. The clearest proof of Poland's knowledge and authorisation of such landings is demonstrated by the following two-line message, contained in several "data strings" for flights of N379P in 2003:

**"STS/ATFM EXEMPT APPROVED**
*POLAND LANDING APPROVED"*

191. "Data strings" have also enabled us to trace the official overflight and landing permits obtained from various other countries for these flights; the times and "waypoints" at which the aircraft entered or departed the national airspace of each country; and the actual routes flown between Szymany and other points on the "global spider's web". I have used all of this information to create the graphic representations of "Disguised CIA flights into Szymany Airport, Poland,"[167] which accompany this report as an appendix.

192. In concluding this section it is only fitting that I should note here, with considerable regret, that the cover-up of CIA flights into Szymany seems to have carried over into the approach adopted by the Polish authorities towards my inquiry on the specific question of national aviation records. In over eighteen months of correspondence, Poland has failed to furnish my inquiry with any data from its own records confirming CIA-connected flights into its airspace or airports. The excuses from the Polish authorities for having failed to do so unfortunately do not seem to be credible.

193. In my report of 2006, I commented that the absence of flight records from Poland was "unusual,"[168] to say the least. Mr Karol Karski, Chairperson of the Polish Delegation to PACE, suggested that I "did not use the information received from Poland honestly"[169] and stated, in his subsequent correspondence, that he hoped to "answer [my] request exhaustively" having "addressed one more time the relevant Polish authorities and asked for proper information". He then repeated a familiar undertaking:

---

flight manifests with known CIA "rendition teams" by referring to documents provided to us confidentially from on an ongoing judicial inquiry in a Council of Europe member State.
[165] The status of the flight goes to the all-important question as to whether the function it is performing is considered to be "state," "civilian" or "military." These undeclared flights into Szymany, which we understand to have been operated as "military flights", eased their passage into Poland by securing exemptions as "special status", or STS, flights. STS designators are very strictly limited, because once granted they allow deviations from planned routes and other important exemptions. See Eurocontrol, User Relations and Development Bureau, *IFPS Users Manual*, Edition No. 11.2, 30.03.2007 (hereinafter "Eurocontrol IFPS Users Manual"), available at http://www.cfmu.eurocontrol.int; at Section 50, "Special Status Flights (STS)", p. 50-1.
[166] The particular STS indicator used by flights into Szymany was "AFTMEXEMPTAPPROVED". According to Eurocontrol: "*This exemption designator shall only be used with the proper authority. Any wrongful use of this designator to avoid flow restriction shall be regarded by the relevant states as a serious breach of procedure and shall be dealt with accordingly.*" See Eurocontrol IFPS Users Manual, *Ibidem*, at Section 54, "STS/AFTMEXEMPTAPPROVED Indicator", p. 54-1.
[167] See Appendix No. 1 to the present report, entitled "Disguised CIA flights into Szymany Airport, Poland."
[168] See Marty Report 2006, Council of Europe Doc. 10957, *supra* note 6, at section 2.6.2, "The case of Poland", §§ 63 to 75, pages 20 to 21.
[169] Contribution of Mr Karol Karski, Chairperson of the Delegation of Poland to PACE, at the 17th Sitting of the Plenary of the Parliamentary Assembly during its 2006 Session, Strasbourg, 27.06.2006.

> "*I would like to assure you that I will transmit to you the complete data as soon as I will be provided with it.*"[170]

194. After several further months passed,[171] Mr Karski ultimately responded with the following three items of information:[172]

- "*the Polish Government has definitively closed the investigation into alleged secret CIA prisons and in this connection, once again explicitly denies all speculations appearing in the media*";
- "*the European Parliament's Temporary [TDIP] Committee… has all the information available to the Polish side, concerning the aircraft listed in [your] letter*"; and
- "*the registers of flight movements over the territory of Poland in 2001 to 2005 are in Eurocontrol databases.*"

195. This response of the Polish authorities is patently unsatisfactory. The third item of information is belied by the findings I have presented above, along with the accompanying graphic and data in the annex. Meanwhile the second statement suggests that the Polish Government is attempting to deceive both the CoE and the European Parliament by playing the institutions off against one another.[173]

196. On the whole, Mr Karski's response casts the Polish authorities in a negative light, whichever one of two possible conclusions I might choose to draw. Is the Polish Government unable to lay its hands on official data from Polish sources, which our team successfully uncovered and which at least one airport official is publicly known[174] to possess? Or have the Polish authorities willfully withheld valuable information from my inquiry? I strongly hope that the Polish authorities now take the situation in hand and retrace fully the unfolding of this situation and establish respective responsibilities.

### a. Transfer of HVDs into CIA detention in Poland

197. Our enquiry regarding Poland included talks with Polish airport employees, civil servants, security guards, Border Guards and military intelligence officials who hold first-hand knowledge of one or more of the undeclared flights into Szymany. Their testimonies are crucial in establishing what happened in the time after these CIA-associated aircraft landed at Szymany. The following account is a compilation of testimonies from our confidential sources about these events.

### b. Arrivals and "drop-offs" at Szymany Airport

- Each of these landings was preceded, usually less than 12 hours in advance, by a telephone call to Szymany Airport from the Warsaw HQ of the Border Guards (*Straz Graniczna*), or a military intelligence official, informing the Director Mr Jerzy Kos of an arriving "American aircraft"
- The airport manager, who assumed the flights were coming from the United States, was instructed to adhere to "strict protocols" to prepare for the flights, including: clearing the runways of all other aircraft and vehicles; and making sure that all Polish staff were brought in to the terminal building from the vicinity of the runway, including local security officials and airport employees
- The perimeter and grounds of the airport were secured by military officers and Border Guards, the latter of whom were registered on a roll-call document that lists names of those present on more than five dates between 2002 and 2005
- American officials from the nearby Stare Kiejkuty intelligence training base assumed "control" on the dates in question, arriving in several passenger vans in advance of the landing; "everything Americans," said one Polish source present for several landings, "even the drivers [of the vans] were Americans."

---

[170] Letter to me from Mr Karol Karski, Chairperson of the Polish Delegation to PACE, 28.12.2006.
[171] On 14.03.2007, I sent a reminder letter to Mr Karski on this issue, concluding: "*I respectfully urge you to re-emphasise to the Polish authorities the importance of sending me a swift and comprehensive reply to my letter, along with the requested data.*"
[172] Letter to me from Mr Karol Karski, Chairperson of the Polish Delegation to PACE, 28.03.2007.
[173] When I read that "*all the information on the Polish side*" had been given to the EP's TDIP Committee, I recalled the resolution adopted on 12.02.2007 by the very same Committee, in which it regrets that "*contradictory statements were made about the flight plans for those CIA flights, which were first said not to have been retained, then said probably to have been archived at the airport, and finally claimed to have been sent by the Polish Government to the Council of Europe.*" See European Parliament Resolution on the alleged use of European countries by the CIA for the transportation and illegal detention of prisoners (A6-0020/2007 – Rapporteur: Giovanni Claudio Fava), 12.02.2007, at § 172. It is scarcely credible for the Polish Government to practice such evasion towards me and my fellow Parliamentarians.
[174] See Tom Hundley, "Remote Polish airstrip holds clues to secret CIA flights," *Chicago Tribune*, 6.02.2007, available at http://www.chicagotribune.com/news/nationworld/chi-0702060187feb06,1,1986708.story The article says: "Jaroslaw Jurczenko, the airport's director, denied that flight records had ever been lost for the mysterious landings and provided the *Tribune* with documentation for seven of the flights in question."

*Doc. 11302 rev.*

- A "landing team" comprising American officials waited at the edge of the runway, in two or three vans with their engines often running; the aircraft touched down in Szymany and taxied to a halt at the far end of the runway, several hundred metres (and out of visible range) from the four-storey terminal control tower
- The vans drove out to the far end of the runway and parked at close proximity to the aircraft; officials from within the vans were said to have boarded the aircraft "every time", although it is not clear whether any then stayed on board
- All the officers charged with "processing" the passengers on these aircraft were Americans; no Polish eye-witness has yet come forward to state whether or not any detainees disembarked the aircraft upon any of these landings – indeed, it may be that no Polish eye-witness to such an event exists
- However, asked where the HVDs actually entered Poland, one of our sources in Polish military intelligence confirmed that "it was on the runway of Szczytno-Szymany"; another said "they come on planes and they entered at this airport"
- Documentation, in Polish, attests to persons having been "picked up" [verbal translation] at Szczytno-Szymany in conjunction with at least two aircraft landings in 2003; the documentation also refers to the dispatch of vehicles to the airport from the military unit stationed at the Stare Kiejkuty facility
- Having spent only a short time next to the aircraft after each landing, the vans then drove back past the side of the terminal building, without stopping, before leaving airport premises through the front security gate; the vans put their "headlights up to full level" and airport officials say they "turned our eyes away"
- The vans then drove less than two kilometres along a simple tarmac road, lined by thick pine forest on both sides, through an area which was entirely out of bounds to private or commercial vehicles during these procedures, having been cordoned off for "military operations"; at the end of the tarmac road, the vans travelled north-east beyond Szczytno for approximately 15 to 20 minutes before joining an unpaved access road next to a lake[175]
- At the end of this access road they reached an entrance of the Stare Kiejkuty intelligence training base, where multiple sources have confirmed to me that the CIA held High-Value Detainees (HVDs) in Poland.

### c. Secret detention operations at Stare Kiejkuty

198. The stringent limitations on information about what happened to detainees "dropped-off" at Szymany are perhaps the best example of the "need-to-know" principle of secrecy in practice. Polish officials were not involved in the interrogations or transfers of HVDs, nor did they have personal contact. In explaining his understanding of HVD treatment or conditions in detention, one Polish source said:

> *"I have no understanding of detainee treatment. We were not "treating" the detainees. Those were the responsibilities of the Americans."*

199. We were told that senior Polish military intelligence officials who visited Stare Kiejkuty were ordered to "limit rotation and operational demands on Polish officers to make the HVD programme work." Beyond this fleeting insight, however, neither Polish nor American sources who discussed the HVD programme with us would agree to speak about the exact "operational details" of secret detentions at Stare Kiejkuty, nor would they confirm how long it was operated for, which other facilities were used as part of the same programme in Poland, nor how and when exactly the detainees left the country.

200. The legacy of the HVD programme in Poland is palpable in the self-perceptions of those Polish officials who participated in its operations. The members of military intelligence with whom we spoke seemed, on one level, to be in denial as to whether secret detentions in violation of Poland's human rights obligations had taken place in their country; yet, on another level, they showed signs of resentment mainly that their American allies had betrayed their bond of trust by leaking details of the programme. These contradictory sentiments, often difficult to gauge accurately, are aptly captured by the following statement:

> *"The [Stare Kiejkuty] base was America's choice; our job was their security. If any American is here, it is America's responsibility, but he also becomes Poland's responsibility too. So it is my responsibilty..."*

### IV. Secret detention operations in Romania

#### i. Partnering with military intelligence in Romania

201. In Romania, after the December 1989 Revolution and the dismantling of the repressive *Securitate* in 1990, the reforms of the intelligence services were focussed, understandably, on preventing the politicisation and abuse of internal state security structures. Similarly, much of the subsequent discussion around

---

[175] A member of our team re-traced the route from Szymany Airport to the Stare Kiejkuty intelligence training base.

democratic oversight in the country has looked at ways of controlling "institutional actors and leading political figures with authority over the security and intelligence domain who disregard the legal stipulations regarding political neutrality."[176]

202. As I have analysed Romania's complex array of different agencies and sub-structures that collect intelligence for the state,[177] I have realised that preserving political neutrality is merely one of a variety of competing considerations that affect the objectivity and effectiveness of their accountability structures.[178] In the context of my inquiry, it seems to me that while Romania has made at least superficial efforts to rid its civilian intelligence services of the scourges of their *Securitate* past, its oversight mechanisms do not go far enough to prevent the exercise of what could be called "unitary executive authority" – on the part of the President – over military intelligence services and the wider defence community.

203. This analysis conforms to the testimony of our Romanian sources, who said that the Americans **chose to work with the military intelligence services because the military "cover" afforded the CIA flexible deployment options and guarantees of secrecy under the NATO framework**. As the following comparison shows, there are substantial disparities between the respective monitoring mechanisms in the civilian and military spheres.

204. First, in the civilian sphere, Romania's two main agencies of the post-Communist era, the Romanian [Domestic] Intelligence Service (*Serviciul roman de informatii, or SRI*) and the Foreign Intelligence Service (*Serviciul de informatii externe, or SIE*) were created under specific laws[179] and a multi-layered oversight structure, which purport to immunise them from manipulation along party-political lines. The SRI and the SIE operate independently of government and are not subordinated to the incumbent executive. They are each subjected to parliamentary scrutiny through dedicated Special Parliamentary Committees.[180] The **Supreme Council of National Defence** (*Consiliul Suprem de Aparare a Tarii, or CSAT*), an autonomous administrative body chaired by the non-partisan Office of the President,[181] organises and continually monitors the activities of the SRI and the SIE, in line with its mandate to co-ordinate the overall national security and defence of the country. As such, the possibilities for a handful of people at the heart of government to use the SRI or the SIE to pursue their own personal, political or strategic agenda are exceedingly narrow.

205. In contrast, intelligence gathering in the military sphere is a competence formally overseen by the Ministry of National Defence,[182] through its **General Directorate for Defence Intelligence** (*Directia*

---

[176] See Larry Watts, Office of the National Security Advisor of the Romanian President, "Control and Oversight of Security Intelligence in Romania", Working Paper No. 111, published by the Geneva Centre for the Democratic Control of Armed Forces (DCAF), Geneva, February 2003, copy on file with the Rapporteur (hereinafter "Watts, Oversight of Security Intelligence in Romania"), at p. 27. The author recommends that "real sanctions should be introduced and enforced" in such instances where rule of law is subverted by political considerations.

[177] There are at least six different secret services in Romania, several of them housed under individual Government Ministries. The agencies that I have not discussed specifically in this section include the General Directorate of Intelligence and Internal Protection (*Directia Generala de Informatii si de Protectie Interna, or DGIPI*) in the Ministry of the Interior, and the Independent Protection and Anti-Corruption Agency (*Serviciul Independent de Protectie si Anticoruptie, or SIPA*) in the Ministry of Justice.

[178] For a much more developed discussion of the relevant considerations, see: European Commission for Democracy through Law (Venice Commission), "Report on the Democratic Oversight of the Security Services", Study No. 388/2006, CDL-DEM(2007)001, 24.05.2007. In its concluding remarks, the Commission highlights "recurring issues in the design of oversight procedures", as follows: "First is the need to establish mechanisms to prevent political abuse while providing for effective governance of the agencies. Overall, the objective is that security and intelligence agencies should be insulated from political abuse without being isolated from executive governance;" and "the challenge for oversight and accountability is to adapt or devise processes that simultaneously command democratic respect while protecting national security;" at pp. 49-50, § 215 to 226. (Soon to be issued as CDL-AD(2007)016 –available on http://venice.coe.int, see especially footnote 6).

[179] For the SRI, see the *Law on the Organisation and Functioning of the Romanian Intelligence Service (SRI)*, Law No. 14/1992; for the SIE, see the *Law on the Organisation and Functioning of the Foreign Intelligence Service (SIE)*, Law No. 1/1998.

[180] For the SRI, see the *Decision of the Romanian Parliament on the Organisation and Functioning of the Joint Committee of the Senate and the Chamber of Deputies for Parliamentary Oversight of the Romanian Intelligence Service (SRI)*, Decision No. 30/1993; for the SIE, see the *Decision of the Romanian Parliament on the Organisation and Functioning of the Special Committee for Parliamentary Oversight of the Foreign Intelligence Service (SIE)*, Decision No. 44/1998. Indeed, some commentators say that the increased transparency and growing public trust in the SRI and the SIE owe largely to the strength of these parliamentary accountability mechanisms. See, for example, Watts, Oversight of Security Intelligence in Romania, *Ibidem*: "Romania's semi-presidential system has proven itself capable of blocking the over-accumulation and over-centralisation of power by government executives."

[181] In addition to the President (Chair), the membership of the CSAT includes: the Prime Minister (Vice-Chair); the Ministers of Defence, Economy and Commerce, Finance, Justice, Interior and Administrative Reform, and Foreign Affairs; the Directors of the SRI and SIE; the Presidential Advisor on National Security; and the Chief of General Staff; see the CSAT website at: http://csat.presidency.ro/. The CSAT is regulated under a 2002 statute - Law No. 415/2002 – and its activities are themselves reported regularly to the Parliamentary Committee for Defence, Public Order and Security. For further discussion on related matters, see also Karoly Szabo, "Parliamentary Overview of Intelligence Services in Romania," workshop paper published by the Geneva Centre for the Democratic Control of Armed Forces (DCAF), delivered at the workshop on "Democratic and Parliamentary Oversight of Intelligence Services", Geneva, 3-5.10.2002, copy on file with the Rapporteur.

[182] The Ministry of National Defence (*Ministerul Apararii Nationale*) was renamed as the Ministry of Defence (*Ministerul Apararii*) in April 2007. I have used its old name, which applied in the period in question.

*Doc. 11302 rev.*

Generala de Informatii a Apararei, or DGIA). What little parliamentary scrutiny of defence intelligence is supposed to exist[183] certainly does not apply to its organisational, planning or operational aspects. On the contrary, strict compatibility with NATO structures, insisted upon as a criteria for NATO accession, means that the majority of Romanian military intelligence activities are kept secret from all but those who "need to know".

206. According to our sources, the relevant sub-unit of the DGIA that worked with the CIA on its clandestine operations was the **Directorate for Military Intelligence and Representation** (*Directia Informatii si Reprezentare Militara, or DIRM*), also known as the **"J2" Unit**. This unit was not involved in transporting, holding or interrogating any detainees – since these were tasks performed solely by the Americans – but, according to one Romanian officer, the "J2" officers "co-operated and adjusted" to accommodate the CIA personnel's needs.

207. As part of a wider restructuring of the DGIA in 2003,[184] the "J2" unit increased in scope and importance at a very strategic moment in Romania's co-operation with the United States, just as American forces were deploying into the country in large numbers to launch their aerial missions into Iraq for Operation Iraqi Freedom.[185] The place at which these US forces were stationed, the 86th **Air Force Base at Mihail Kogalniceanu Airfield**,[186] became the most significant point in the country for a whole range of collaborative activities in a "partnership" between Romanian and American personnel.

208. A noteworthy aspect of this partnership was that everything was carried out under the NATO framework. The deployment at MK Airfield in February 2003 was authorised in a Memorandum of Understanding signed by President Ion Iliescu in late 2002, in which the terms of NATO-SOFA and the bilateral SOFA-Supplemental were expressly referenced. "NATO concepts" were applied to the deployment, including MK's designation as an APOD / APOE,[187] and the phase being referred to as "regrouping." Most important of all, a **Joint Operations Centre** was established in which American and Romanian personnel "from each and every branch" of their respective armed forces and services worked together side-by-side throughout the Operation, sharing operational knowledge **in strict accordance with the NATO Security Policy**.

209. Members of the Directorate for Military Intelligence, the "J2" Unit, participated in the Joint Operations Centre,[188] which – as our American sources confirmed – also received "visits"[189] from operatives of the CIA's Counterterrorist Centre (CTC) between February and June 2003. While the whole four-month period of Operation Iraqi Freedom at MK Airfield was characterised as "a military activity in support of a military operation," the relationships formed and strengthened between members of the respective intelligence services – both individually and collectively – were just as indispensable in the broader context of the "war on terror."[190] The Operation was construed as a welcome "dry-run" for Romania in NATO and for potential future bilateral actions between the partners.

---

[183] Formally speaking, military intelligence activities are supposed to be subject to the same parliamentary scrutiny as all the activities of the Ministry of National Defence, namely through the Committees on Defence, Public Order and National Security in both the Senate and the Chamber of Deputies of the Romanian Parliament. In reality, these Committees are far removed from the actual work of the DGIA services.

[184] See, for example, Doru Dragomir, "Hurricane in the Army's Secret Services", Bucharest Ziua, 9.04.2003, at p. 9; available online at http://www.ziua.net/.

[185] Between February and June 2003, United States Armed Forces (both airforce and ground troops) deployed an expeditionary group for operations in Iraq at the 86th Air Force Base – Mihail Kogalniceanu Airfield ("MK Airfield"), near Constanta, Romania. According to Romanian military personnel at the airfield, the deployment reached up to "5,000 bodies" at its peak, albeit that most of the troops were only there temporarily, or in transit. MK Airfield was used for the purpose of "regrouping and resupplying air deployments before entering action in theatre in Iraq."

[186] At the time of Operation Iraqi Freedom, and up until 27.04.2004, MK stood on its own as the 57th Air Force Base of the Romanian Air Force. From 1.05.2004, the self-standing air force base at MK was "disbanded" and Romanian military air traffic reduced significantly, as part of wider restructuring in the Ministry of National Defence. The MK Airfield is therefore now administered from Fetesti as an extension of the 86th Air Force Base; the only active unit located at MK is the 863 Helicopter Squadron.

[187] APOD stands for Aerial Port of Debarkation; APOE stands for Aerial Port of Embarkation. Under NATO concepts these references mean that MK Airfield was hosting primarily transport aircraft that were bringing in and shipping out personnel and equipment.

[188] Confirmed in interviews by the Rapporteur's representative with Romanian military personnel stationed at MK Airfield. Military intelligence was the second of nine categories of military staff that participated in the Joint Operations Centre. The other categories were: personnel, operations, logistics, planning, communications, training, finance and budget, and "cimic" – or civil-military co-operation.

[189] Visits by US official's to Romanian facilities in the context of their classified bilateral arrangements are regulated under the NATO framework and the *Agreement on the protection of military classified information* of 21 June 1995 (entered into force in 2003). See "Answers of the Romanian Delegation to the Questionnaire on the Alleged Secret Detention Centres", appended to the letter to me from Gyorgy Frunda, Chairperson of the Romanian Delegation to PACE, 20 January 2006; at page 1. Article 5(1) of the 1995 Agreement states as follows: "The authorisation for "visits" by one party to units or installations of the other party where access to state classified military information is necessary, will be limited to official purposes… [and] to government officials both parties have agreed upon."

[190] One example of how Romanian military intelligence continued to collaborate with the United States in the "war on terror" was Parliament's endorsement in March 2004 of President Iliescu's proposals to send a special military intelligence detachment of 30

210. Continuity in the evolving relationship between American and Romanian services can perhaps best be illustrated by highlighting the role of the then Head of the Directorate of Military Intelligence and Representation (*Sef al Directiei de Informatii si Reprezentare Militara*), **Sergiu Tudor Medar**. General-Lieutenant Medar served in the United States for seven years in the 1990s, heading the Office of the Romanian Defense Attache in Washington, DC until 1999. Between 2000 and 2003 he headed the original incarnation of the Directorate of Military Intelligence in the DGIA; then from 2003 until the end of 2005 he was Head of the restructured "J2" Unit. General-Lieutenant Medar was a prescient choice for the CIA as a liaison for secret detention operations in Romania: not only was he trusted beyond doubt in both US and NATO military circles; he was also, as the following quote attests, aware of the potential perils of partnering with military intelligence to achieve an essentially political goal:

> "*The civilian leadership's tendency in using its control over intelligence for political purposes is likely to be even bigger than its desire to keep the military component under its firm control. Some equilibrium must be established between the professional experience of the Military Intelligence Service and the authority of the civilian political leadership.*"[191]

### ii. Responsible political authorities in Romania

211. During several months of investigations, our team has held discussions with numerous Romanian sources, including civilian and military intelligence operatives, representatives of state and municipal authorities, and high-ranking officials who hold first-hand knowledge of CIA operations on the territory of Romania. Based upon these discussions, my inquiry has concluded that the following individual office-holders knew about, authorised and stand accountable for Romania's role in the CIA's operation of "out-of-theatre" secret detention facilities on Romanian territory, from 2003 to 2005: the former President of Romania (up to 20 December 2004), Ion ILIESCU, the current President of Romania (20 December 2004 onwards), Traian BASESCU, the **Presidential Advisor on National Security** (until 20 December 2004), Ioan TALPES, the **Minister of National Defence** (Ministerial oversight up to 20 December 2004), Ioan Mircea PASCU, and the **Head of Directorate for Military Intelligence**, Sergiu Tudor MEDAR.

212. Collaborating with the CIA in this very small circle of trust, Romania's leadership in the fields of national security and military intelligence effectively **short-circuited the classic mechanisms of democratic accountability**. Both of the political principals, President Iliescu and National Security Advisor Talpes, sat on (and most often chaired) the CSAT - the Supreme Council of National Defence – throughout this period, yet they withheld the CIA "partnership" from the other members of that body who did not have a "need to know." This criterion excluded the majority of civilian office-holders in the Romanian Government from complicity at the time. Similarly, the Directors of the respective civilian intelligence agencies, the SRI and the SIE, were not briefed about the operational details and were thus granted "plausible deniability".

213. We were told that the confidants on the military side, Defence Minister Pascu and General-Lieutenant Medar, had concealed important operational activities from senior figures in the Army and powerful structures to which they were subordinated. According to our sources, "co-operation with America in the context of the NATO framework" was used as a general smokescreen behind which to hide the operations of the CIA programme.

214. Sergiu Medar's role here merits special attention. Of the four named offices of state in which individuals held knowledge of the CIA's programme, Medar was the only office-holder who "crossed over" from the Presidency of Ion Iliescu to the Presidency of Traian Basescu. Medar remained Head of the "J2" Unit for another year after the handover of power to President Basescu on 20 December 2004; indeed, it appears that he stayed in position right through to the clear-out of the European "black sites", which we believe to have occurred in November or early December 2005.

215. It is also worth commenting on General-Lieutenant Medar's close relationship with the current President Traian Basescu. When Basescu assumed office, in December 2004, his very first Presidential Decree granted Sergiu Tudor Medar the decorated status of Three-Star General. In 2005 Basescu appointed Medar as his National Security Advisor and, in 2006, selected him as the first Head of the consolidated

---

officers to serve in the International Security Assistance Force (ISAF) in Afghanistan. See Rompres News Agency, Bucharest, "Parliament approves Romanian military intelligence unit for Afghanistan," reproduced on BBC Monitoring, 2.03.2004, available at http://www.roembus.org/english/news/international_media/2004/march/02/BBC_Monitoring_20_03_2004_Parliament%20approves%20 Romanian%20military%20intelligence%20unit%20for%20Afghanistan.htm.
[191] See Sergiu Medar, "The role of military intelligence in the process of military and political-military decision-making" (original in Romanian), internal document of the Directorate for Military Intelligence, Bucharest, 2000; cited in Florin Ureche, "Civilian Control over Military Intelligence Services", in *Romanian Military Thinking*, April 2006, pp. 63-74, copy on file with the Rapporteur.