*Doc. 11302 rev.*

National Intelligence Directorate. Relationships of trust, loyalty and familiarity are vital to the preservation of secrecy, as the NATO Security Policy makes clear.

216.   Ioan Talpes, the then **Presidential Advisor on National Security** (*Consilierul prezidential pentru securitate nationala*), was also an instrumental figure in the CIA programme from its inception. According to our sources, Talpes guided President Iliescu's every decision on issues of NATO harmonisation and bilateral relations with the United States; it has even been suggested that Talpes was the one who initiated the idea of making facilities on Romanian soil available to US agencies for activities in pursuit of its "war on terror." After December 2004, although Talpes no longer acted as the Presidential Advisor on National Security, he quickly become Chair of the Senate Committee on Defence, Public Order and National Security, which meant that he exercised at least a theoretical degree of "parliamentary oversight" over his own successor in the Advisor role.

217.   Several of our Romanian sources commented that they felt proud to have been able to assist the United States in detaining "high-value" terrorists – not only as a gesture of pro-American sentiment, but also because they thought it was "in the best interests of Romania."

218.   Those involved in the programme further recounted fond tales of how the US has recognised their individual contributions over the years: some Romanian officials were invited to CIA Headquarters at Langley, Virginia where they received awards; most got to meet key figures in the Bush Administration, at home and abroad; and at least one high-level group of delegates from Bucharest accepted personal thanks from President Bush in the Oval Office.

### iii.   *The anatomy of CIA secret transfers and detentions in Romania*

#### a. *Creating a secure area for CIA transfers and detentions*

219.   When the United States Government made its approach for the establishment of a "black site" in Romania – offering formidable US support for Romania's full accession into the NATO Alliance as the "biggest prize" in exchange – it **relied heavily upon its key liaisons in the country** to make the case to then President Iliescu. As one high-level Romanian official who was actually involved in the negotiations told us, it was "proposed to the President that we should provide full protection for the United States from an intelligence angle. Nobody from the Romanian side should interfere in these [CIA] activities".

220.   In line with its staunch support under the NATO framework, Romania entered a bilateral "technical agreement" with the intention of giving the US the full extent of the permissions and protections it sought. According to one of our sources with knowledge of the arrangement, there was an

> "... *order [given] to our [military] intelligence services, on behalf of the President, to provide the CIA with all the facilities they required and to protect their operations in whichever way they requested ...*".

221.   From extensive discussions with our Romanian sources, I understand that the manner of protection requested by the CIA was for Romanian military intelligence officers on the ground to create an area or "zone" in which the CIA's physical security and secrecy would be impenetrably protected, even from perceived intrusion by their counterparts in the Romanian services. A source in Romanian military intelligence described the notion of a "secure area" as follows:

> "*We were the ones responsible for proper security for the CIA operations. It is not possible for we Romanians to enter or to see inside the area. Americans can come and go, no interference, no restriction – anything is possible. It is normal, because they are our allies, the Americans, yes.*"

222.   The precise location and character of the "black site" were not, to the best of my knowledge, stipulated in the original classified bilateral arrangements between Romania and the United States. Our team discussed those questions with multiple sources and we believe that to name a location explicitly would go beyond what it is possible to confirm from the Romanian side. One senior source in military intelligence objected to the notion that anyone but the Americans would "need to know" this information:

> "*But I tell you that our Romanian officers do not know what happened inside those areas, because we sealed it off and we had control. There were Americans operating there free from interference – only they saw, only they heard – about the prisoners.*"

223. Nonetheless we were able to confirm the approximate borderlines of the CIA's "outer perimeter" for its secure area in Romania. We were assisted by a source in military intelligence, a detailed map and an annex to the Access Agreement of 2005, in which reference is made to "facilities"[192] generally and to one relevant "manoeuvre area" in particular.[193] Our source used his right index finger to draw an invisible elliptical perimeter on the map, which encompassed a vertical column between the towns of Tulcea (to the north) and Constanta (to the south), as well as an area extending approximately 50 kilometers inland (to the west) and in the opposite direction to the Black Sea coast (to the east).[194] Referring to the role of the Romanian "J2" Unit in supporting bilateral arrangements with the CIA, our source said: *"We have to seal [this] entire area and limit access there."*

224. The secure area in question includes several current and former military installations, including all of those facilities named in the Access Agreement of 2005, which have been used by the United States under a "special regime of access" since late 2001.[195] Nonetheless, the main reason that led one of our CIA sources to say that his "guys were familiar with the area" was its inclusion of the landing point at which scores of civil and military flights carrying American service personnel have landed throughout the "war on terror": Mihail Kogalniceanu Airfield.

225. In the light of all that I have said above about MK Airfield, I only wish to draw attention to one further factor that has made it a venue so conducive to "partnership" with the CIA: its "dual" military-civilian character.[196] Military personnel worked routinely with civilian Air Traffic Controllers in processing both civil and military flights at the Airfield – each according to the applicable aviation rules. The system used at MK Airfield bears great similarities, albeit on a much smaller scale, to the system used at Kabul Airport (OAKB),[197] which became such a hub in the context of coalition military activities in Afghanistan and simultaneously a destination or departure point for multiple known renditions of CIA detainees on board civilian aircraft since the start of the "war on terror".

226. During the period of interest to my inquiry – from 2002 until 2005 – the civilian section of the MK Airfield had a Director General with a formidable "dual" civil-military character of his own. **Rtd. Colonel Mircea Dionisie** was a former controlling **Commander of the military Air Force Base** at MK Airfield in the communist pre-1989 era. He returned to the Airfield in 2002 and became the **Director General of the civilian airport**, now known as *Aeroportul International Mihail Kogalniceanu Constanta* (AIMKC).[198] Rtd. Colonel Dionisie stayed in this position until 12 July 2005 and therefore oversaw the bulk of the flights into and out of the MK Airfield, the exact movements of which – as well as their connections to CIA detainee transfers – my inquiry has attempted to trace.

### b. Transfer of detainees into Romania: the cover-up persists

227. Our efforts to obtain accurate actual flight records pertaining to the movements of aircraft associated with the CIA in Romania were characterised by obfuscation, inconsistency and genuine confusion. I must begin this assessment, however, by commending my colleagues and their assistant in the Romanian Delegation to PACE and, in particular, its Chairperson Gyorgy Frunda, for demonstrating exceptional good

---

[192] The four named facilities are as follows: Smardan Training Range; Babadag Training Area and Rail Head; Mihail Kogalniceanu Air Base, co-located with 34th Mechanised Brigade Base; and Cincu Training Range.
[193] See "Annex A – Facilities", the first of two annexes to the Access Agreement between Romania and the United States, 6.12.2005, at p. 9. Under the last of the four named facilities, Cincu Training Range, the "manouvre area" is described as follows: "comprised of areas in Tulcea and Constanta counties ("Judetul" in Romanian), bounded generally by the towns of Babadag in the north, Babadag Training Area in the east, Tariverde in the south and Horia in the west."
[194] In total, the perimeter line encompasses an area of about 1,500 square kilometers of territory in south-eastern Romania. See Appendix No. 2 to the present report, entitled "The 'secure zone' for CIA transfers and detentions in Romania."
[195] See the discussion on bilateral NATO SOFA arrangements between Romania and the United States earlier in this report, at section II.iii.b, entitled "Application of the NATO framework in Romania."
[196] The "dual use" character of MK Airfield dates back to 1961, when the Romanian Ministry of National Defence handed over the following elements of the airfield to the civilian authorities of Constanta International Airport: the runway / landing strip; the "parking aprons" for both light and heavy aircraft; the terminal buildings, including the Air Traffic Control Tower; and the main entrance / exit points from the adjacent highway. This restructuring created two "sections" on the MK Airfield: a civilian section and a military section. According to our discussions with Romanian military personnel stationed at the MK Airfield, the civilian and military sections keep one another informed only "for operational reasons [e.g. use of the runway] and on a need-to-know basis." These personnel told us that "*everybody plays by the rules, and that is one of the main reasons for the military side's close co-operation with the civilian side.*"
[197] It is a little known fact that Romanian personnel managed and operated Kabul Airport as one of their tasks in the context of their NATO deployment, 2004 to 2006. Our team spoke with a senior military officer who was seconded directly from MK Airfield to serve for several months at OAKB.
[198] Denoted by the ICAO code "LRCK". *Aeroportul International Mihail Kogalniceanu Constanta* (AIMKC) is the new name of the airport. It was previously called simply *Aeroportul International Constanta* (AIC), but – according to its current Director General – took on the additional MK in its name in order to benefit from the "free publicity" generated by the media scandal over CIA flights allegedly having landed at MK Airfield. Mihail Kogalniceanu was the first President of Romania and – in addition to the MK Airfield – also gave his name to a town about 50 kilometres north of Constanta. Romanians tell me it was the first town in the country to have an entirely literate population.

45

*Doc. 11302 rev.*

faith and professionalism, and for extending the very best of co-operation and assistance to my inquiry. It is unfortunate that the Romanian authorities more generally did not match the levels of thoroughness and transparency shown by this Delegation.

228. Specifically I hold three principal concerns with the approach of the Romanian authorities towards the repeated allegations of secret detentions in Romania, and towards my inquiry in particular. In summary, my concerns are: far-reaching and unexplained inconsistencies in Romanian flight and airport data; the responsive and defensive posturing of the national parliamentary inquiry, which stopped short of genuine inquisitiveness; and the insistence of Romania on a position of sweeping, categorical denial of all the allegations, in the process overlooking extensive evidence to the contrary from valuable and credible sources.

229. First I was confounded by the clear **inconsistencies in the flight data** provided to my inquiry from multiple different Romanian sources. In my analysis I have considered data submitted directly from the Romanian Civil Aeronautical Authority (RCAA),[199] data provided by the Romanian Senate Committee,[200] and data gathered independently by our team in the course of its investigations. I have compared the data from these Romanian sources with the records maintained by Eurocontrol, comprehensive aeronautical "data strings" generated by the international flight planning system, and my complete Marty Database. The disagreement between these sources is too fundamental and widespread[201] to be explained away by simple administrative glitches, or even by in-flight changes of destination by Pilots-in-Command, which were communicated to one authority but not to another. There presently exists **no truthful account of detainee transfer flights into Romania**, and the reason for this situation is that the Romanian authorities probably do not want the truth to come out.

230. I found it especially disappointing that the Senate Inquiry Committee chose to interpret its mandate in the rather restrictive terms of defending Romania against what it called "serious accusations against our country, based solely on 'indications', 'opinions', 'probabilities', 'extrapolations' [and] 'logical deductions'."[202] In particular, the Committee's conclusions are not framed as coherent findings based on objective fact-finding, but rather as "clear responses to the specific questions raised by Mr Dick Marty,"[203] referring to both my 2006 report and subsequent correspondence. Accordingly the categorical nature of the Committee's "General Conclusions,"[204] "Conclusions based on field investigations and site visits"[205] and "Final Conclusions"[206] cannot be sustained. The Committee's work can thus be seen as an exercise in denial and rebuttal, without impartial consideration of the evidence. Particularly in the light of the material and testimony

---

[199] See, for example, *Information from the records of the Romanian Civil Aeronautic Authority (RCAA) and the Romanian Ministry of National Defence*, contained as Appendices to the letters sent to me by Gyorgy Frunda, Chairperson of the Romanian Delegation to PACE, dated 24.02.2006 and 7.04.2006.
[200] The committee to which I refer is the "Senate Committee of Inquiry to investigate the allegations regarding the use of Romanian territory for CIA detention facilities or flights by CIA-chartered aircraft", established under Article 1 of Decision No. 29 of the Senate, Parliament of Romania, 21.12.2005 (hereinafter referred to as the "Senate Inquiry Committee"). The Chairperson of the Committee was Senator Norica Nicolai, supported by Vice-Chair George Cristian Maior and Secretary Ilie Petrescu. The Committee released its final report on 5.03.2007 (hereinafter "Senate Inquiry Committee Final Report, 5.03.2007" – page numbers refer to the original, Romanian version), a copy of which was submitted as an attachment to Senator Nicolai's letter to me dated 20.03.2007. My inquiry was also provided with copies of most of the annexes to the final report, including substantial information from airport authorities, handling service providers and the national Air Traffic Services Administration (ROMATSA). I am grateful to Senator Nicolai for facilitating access for my inquiry to important information in Romania.
[201] In my letters to the Romanian authorities, I highlighted crucial inconsistencies in flight data relating to the movements of a host of CIA-linked aircraft in Romania, including N313P, N379P and N85VM. The documentation I received back from the Senate Inquiry Committee helps to establish certain landings, but is not authoritative enough to state categorically the exact paths flown by these aircraft, nor the full list of locations in Romania at which they did or did not land. I cannot, for example, content myself with "evidence" that aircraft changed their routes or destinations based on hand-written annotations on flight plans. In several cases I have "data strings" attesting to communications relating to these aircraft that do not correspond with the Senate Inquiry Committee's version of events.
[202] See Senate Inquiry Committee Final Report, 5.03.2007, *supra* note 200, at Chapter 2, "References to Romania", page 5.
[203] See Senate Inquiry Committee Final Report, 5.03.2007, *supra* note 200; generally at Chapter 5, "Conclusions reached by the Committee based on its documentation and monitoring activities"; and specifically at pages 10, 11, 12 and 13.
[204] By way of example, the first general conclusion states categorically: "Neither the Romanian Civil Aeronautic Authority nor any other institutions or structures of state with relevant competences in the field investigated by the Committee has any knowledge about civilian aircraft operated or chartered by the CIA or by any other company on behalf of the CIA, landing or flying over national territory;" *Ibidem*, at page 10.
[205] The Committee rules out embarkation or disembarkation of any passengers on the key flights listed in the Marty Report of 2006, and states that aircraft associated with the CIA landed only in Bucharest. With regard to MK Airfield, the Committee "concludes that there is no facility that could have been used for the purpose of detention, not even on an ad-hoc basis. Moreover, none of the flights considered suspicious by the Marty Inquiry, by NGOs or by the media has ever landed at this airport;" *Ibidem*, at page 11. Among other evidence, our team obtained records of actual flights into MK Airfield by aircraft associated with the CIA, which directly contradicts the Committee's claim.
[206] Final Conclusion No. 5 states as follows: "On the question of whether certain Romanian institutions could have participated knowingly or participated through omission or negligence in unlawful detainee transfer operations in Romanian airspace or at Romanian airports, the Committee's response is negative;" *Ibidem*, at page 14. It should be noted that other final conclusions are not so categorical, however, particularly with regard to whether secret detention facilities could have existed in locations other than the grounds or immediate vicinity of the named airports.

I have received from sources in Romania, the Committee does not appear to have engaged in a credible and comprehensive inquiry.

231. The Romanian national delegation to PACE, in their carefully worded reply, ruled out the existence of unlawful CIA activity,[207] and appeared to offer prospects of constructive and transparent co-operation in the search for the truth. However the Romanian Government and Parliament have preferred to keep control of information by directing everything through the Senate Committee,[208] and ultimately reverted to their initial position of complete denial.[209]

### V. Human rights abuses involved in the CIA secret detention programme

#### i. Re-humanising the people held in secret detention

232. The policy of secret detentions and renditions pursued by the current US administration has created a dangerous precedent of dehumanisation. Many of the people caught up in the CIA's global spider's web[210] are rightly described as "ghost prisoners"[211] because they have been made "invisible" for many years.[212]

233. Meanwhile the US Government's descriptions of its captives in the "war on terror" can only serve to exacerbate this dehumanising effect. The Administration routinely speaks of "aliens", "deadly enemies" and "faceless terrorists," with the clear intention of dehumanising its detainees in the eyes of the American population. The NGO community, for its part, calls them "ghost prisoners".

234. By characterising the people held in secret detention as "different" from us – not as humans, but as ghosts, aliens or terrorists – the US Government tries to lead us into the trap of thinking they are not like us, they are not subjects of the law, therefore their human rights do not deserve protection.

235. President Bush has laid this trap on multiple occasions as a means of diverting attention from the abusive conditions in which certain detainees in US custody are being held.[213] Our team heard first-hand how distinctions are drawn in the mind of guards and interrogators: in an interview with one of our CIA sources who has extensive knowledge of detainee treatment, we asked whether a known form of detainee treatment should be considered as abusive. *"Here's my question,"* replied our source. *"Was the guy a*

---

[207] See inter alia "Answers of the Romanian Delegation to the Questionnaire on the Alleged Secret Detention Centres", appended to the letter from Gyorgy Frunda, Chairperson of the Romanian Delegation to PACE, to Dick Marty, 20.01.2006; pp. 5 to 6. The language of such submissions was carefully worded so as not to exclude the types of CIA operations I have described in this report: *"No Romanian authority has any knowledge or information about any aircraft illegally transporting prisoners. No Romanian authority has been, legally or illegally, involved in secret transportation of prisoners… The Romanian Government has never issued any authorisation for any transport of prisoners via Romania."*

[208] In two written decisions, on 14 and 21.11.2006, the Romanian Senate rejected the requests of the Romanian Delegation to PACE to respond to my correspondence directly, and instead assigned to the Senate Committee the sole authority for preparing Romania's official responses. These decisions were followed by a four-month period during which we received no communications, ended only by Senator Nicolai's submission of the Final Report by letter dated 20.05.2007.

[209] At the end of my inquiry, the official position of Romania has developed no further than the original denials it adopted at the beginning. See "Response of the Romanian Government on the investigation initiated by the Secretary General of the Council of Europe, in accordance with Article 52 ECHR", appended to the letter from Mihal-Razvan Ungureanu, Romanian Minister of Foreign Affairs, to Terry Davis, 15.02.2006; at page 4: *"… no public official or other person acting in an official capacity has been involved in any manner in the unacknowledged deprivation of liberty of any individual, or transport of any individual while so deprived of their liberty… Official investigations have been conducted by several Government authorities [whose] results confirmed that no such activities took place on Romanian territory."*

[210] For the most comprehensive and authoritative known list of persons detained at one point by the United States, and whose fate and whereabouts remain unacknowledged, see the following report produced jointly by six leading human rights organisations: Amnesty International, Cageprisoners, Center for Constitutional Rights, Center for Human Rights and Global Justice at NYU School of Law, Human Rights Watch and REPRIEVE, "Off the Record – US Responsibility for Enforced Disappearances in the 'War on Terror'," 7 June 2007, available at http://www.chrgj.org/docs/OffRecord/OFF_THE_RECORD_FINAL.pdf.

[211] See, for example, various reports by Human Rights Watch: most recently "Ghost Prisoner – Two Years in Secret CIA Detention", HRW Volume 19, No. 1(G), February 2007, available at: http://hrw.org/reports/2007/us0207/us0207webwcover.pdf; and earlier "List of 'Ghost Prisoners' possibly in CIA custody", 30 November 2005, available at http://hrw.org/english/docs/2005/11/30/usdom12109.htm.

[212] In its report entitled "USA / Yemen: Secret Detention in CIA 'Black Sites'", Amnesty International described how one detainee had been transformed from a person his father described as a "very gentle man, who is always laughing", to someone who sat through an encounter with "never even the ghost of a smile on his face". See AI Index: AMR 51/177/2005, 8 November 2005, available at http://web.amnesty.org/library/index/engamr511772005; at page 2.

[213] The speech delivered by President Bush on 06.09.2006 is a prime example of the type of rhetoric used to convince the audience that the people in US custody are inhuman and undeserving of empathy. The speech is strewn with references to "dangerous men", "terrorist enemies" and "those who kill Americans". Talking about Guantanamo Bay, President Bush states: "It's important for Americans and others across the world to understand the kind of people held". In his conclusion, President Bush states: "The adversaries are different… We're fighting for the cause of humanity, against those who seek to impose the darkness of tyranny and terror upon the entire world."

*Doc. 11302 rev.*

*terrorist? 'Cause if he's a terrorist then I figure he got what was coming to him. I've met a lot of them and one thing I know for sure is that they ain't human – they ain't like you and me."*

236. Yet what has struck me most often as I have examined the cases of scores of people held in secret detention – some of whom I have met – is precisely the opposite: these detainees' ordeals have affected me profoundly as I have always thought of them as fellow human beings. The worst criminals, even those who deserve the harshest punishment, must be given humane treatment and a fair trial. This, moreover, is what makes us a civilised society.

237. It is for these reasons that we must combat their being seen as "ghost prisoners" by repeatedly pointing out that persons detained in the course of counter-terrorist operations are and remain human beings whose human rights must be protected and who are entitled to humane treatment as laid down in the ECHR. In this section of my report I have set out expressly to place the emphasis on the human aspects of these people held in secret detention.

*ii.    **Reconstructing the conditions in a CIA secret detention cell***

238. We must try to visualise the ordeal of secret detention in order to be able to appreciate fully the physical and psychological plight of its victims. For this purpose, I am attempting in this section to reconstruct as many aspects as possible of the conditions in a CIA secret detention cell.

239. A reconstruction of this nature is the first step towards regaining respect for fundamental human rights, because it forces us to ask ourselves the question: "what if the tables were turned?" This is the root of the Geneva Conventions..

240. In this context, the policy debate in the United States around detainee treatment has given rise to interesting contributions, many of which rightly assert that *"issues of detainee treatment raise profound questions of American values"*.[214] In the US political sphere, the McCain Amendment[215] to the Detainee Treatment Act seems to offer us a threshold for the specific acts that we should and should not allow with regard to the detention, transfer and interrogation of foreign captives. This threshold can be summarised as follows:

> If even one single American captive were to be held under these conditions or treated in this manner, and the American population would find it abhorrent or unacceptable, then America should not be practising the acts in question against detainees whom it holds from other countries.

241. The fact of being detained outside any judicial or ICRC control in an unknown location is already a form of torture, as Louise Arbour, UN High Commissioner for Human Rights has said. All the member states of the Council of Europe have a duty not to tolerate such treatment either on their territory or elsewhere.

242. In the following paragraphs I seek to convey the most intimate, always undeniably human experiences of being held and interrogated in such conditions. I have grouped these conditions under the following five thematic headings: confinement, isolation and insufficient provisions; careful physical conditioning of detainee and cell; permanent surveillance; mundane routine becomes unforgettable memories; and exertion of physical and psychological stress.

243. The descriptive testimonies on which the text is based have been kept strictly anonymous – largely upon the request of those who provided them – in order to protect the sources from which they emanate. These sources are mostly former or current detainees, human rights advocates, or people who have worked in the establishment or operations of CIA secret prisons.

244. The persons who endured these ordeals have also been granted anonymity. The following conditions and characteristics applied to several persons in every case, not specifically to any one individual.

---

[214] See, most notably: Kenneth Anderson and Elisa Massimino, "The Cost of Confusion: Resolving Ambiguities in Detainee Treatment", part of the series entitled *Bridging the Foreign Policy Divide*, The Stanley Foundation, March 2007, available at http://www.stanleyfoundation.org/resources.cfm?ID=212; hereinafter "Anderson and Massimino, "Resolving Ambiguities in Detainee Treatment".
[215] The McCain Amendment, as it is popularly known, was the initiative of Republican Senator John McCain, who himself had been held captive during the Vietnam War. The Amendment passed before the United States Senate on 5 October 2005 (90 votes in favour, 9 against), but its force was weakened due to the use of a Presidential Signing Statement in which President Bush said that his *"constitutional authority"* as Commander in Chief took precedence in *"protecting the American people from further terrorist attacks."*

### iii. Confinement, isolation and insufficient provisions

245. Detainees were taken to their cells by *strong people who wore black outfits, masks that covered their whole faces, and dark visors over their eyes.* Clothes were *cut up and torn off;* many detainees were then kept naked for *several weeks.*

246. Detainees were only a bucket to urinate into, a bowl from which to eat breakfast and dinner (delivered at intervals, in silence) and a blanket.

247. Detainees went through months of *solitary confinement and extreme sensory deprivation* in cramped cells, shackled and handcuffed at all times.

248. Detainees were given *old, black blankets* that were too small to lie upon at the same time as attempting to cover oneself.

249. Detainees received *unfamiliar food, like canned beef and rice*, many only ate in order to give some warmth against *cruel cold weather.*

250. Food was *raw, tasteless* and was often tipped out *carelessly on a shallow dish so part of it would waste.* Apart from a *thin foam mattress* to lie on or rest against, many cells had a bare floor and blank walls.

251. At one point in 2004, eight persons were being kept together in one CIA facility in Europe, but were administered according to *a strict regime of isolation.* Contact between them through sight or sound was *forbidden... and prevented* unless it was expressly decided to create *limited conditions where they could see or come into contact with one another because it would serve [the CIA's] intelligence-gathering objectives to allow it.*

252. A common feature for many detainees was the *four-month isolation regime.* During this period of over 120 days, absolutely no human contact was granted with anyone but masked, silent guards. *There's not meant to be anything to hold onto. No familiarity, no comfort, nobody to talk to, no way out. It's a long time to be all alone with your thoughts.*

#### a. Careful physical conditioning of detainee and cell

253. In the process of being transferred into secret detention, all detainees are *physically screened* in order to assess their health and conditioning, identify any injuries or scars they may bear, and *get a complete picture to compare them against once they are in detention.* These screenings, for which the subject is stripped naked, used a *body chart,* similar to the inventory diagrams provided by rent-a-car companies upon leasing a vehicle, on which specific marks are noted. In every case, the subject is videotaped or at least photographed naked before transfer.

254. The air in many cells emanated from a ventilation hole in the ceiling, which was often controlled to produce extremes of temperature: *sometimes so hot one would gasp for breath, sometimes freezing cold.*

255. Many detainees described *air conditioning for deliberate discomfort.*

256. Detainees were exposed at times to *over-heating in the cell*; at other times *drafts of freezing breeze.*

257. Detainees never experienced natural light or natural darkness, although most were *blindfolded many times so they could see nothing.*

#### b. Permanent surveillance

258. Detainees speak hatefully about the *surveillance cameras*, positioned so that *in every inch of the cell they would be observed.*

259. Detainees were also listened to by interrogators, over *hidden microphones in the walls.*

260. Notwithstanding the presence of video cameras inside the cells, masked prison guards regularly *looked in and knocked on the door of the cell, demanding detainees to raise their hands to show that they are alive.*

*Doc. 11302 rev.*

### c. Mundane routines become unforgettable memories

261. Breakfast was delivered in the morning, followed by lunch in the early afternoon. The morning food was typically *two or three triangles of cheese with no foil, two slices of tomato, some boiled potatoes, bread and olives*. The afternoon food was typically *boiled white rice with sliced luncheon meat.*

262. On some special occasions, including certain religious holidays, special foods including cooked meat with sauce, nuts and dates, fresh fruit and vegetables, or pieces of chocolate were delivered to the cells. There was even provision for treats *like unwrapped candy bars and dessert cakes*.

263. Special routines developed around the delivery of food. The light bulb, which was *always on*, would be briefly turned off; the food would be delivered; and then the light bulb would be turned back on again. There was a hatch in the door of the cell for delivery of food but it was *completely unpredictable whether the guards would use the hatch, or open the doors and bring the food in.*

264. Detainees had a bucket for a toilet, which was *about a foot deep and ten inches in diameter*.

265. At time the electricity supply went dead. The music stopped and the light went out. For a brief period one could heard *different voices shouting*, some more distant than others but all incoherent.

### d. Exertion of physical and psychological stress

266. There was a *shackling ring* in the wall of the cell, about half a metre up off the floor. Detainees' hands and feet were clamped in *handcuffs and leg irons*. Bodies were regularly forced into *contorted shapes* and chained to this ring for long, painful periods.

267. Most persons in CIA custody attempted sooner or later to resist or protest their treatment and interrogation. Yet their efforts would largely be in vain. According to one source involved in CIA interrogation: "*you know they are starting to crack when they come back at you; when they get really vocal or they try to challenge your authority. So you hold out… you push them over the edge*".

268. The sound most commonly heard in cells was *a constant, low-level hum of white noise from loudspeakers*. Other recollections speak of an external *humming noise*, like aircraft, engines or a generator. The constant noise was punctuated by blasts of *loud Western music* – rock music, rap music and *thumping beats*, or *distorted verses from the Koran*, or *irritating noises* – thunder, planes taking off, cackling laughter, *the screams of women and children*.

269. Detainees were subjected to *relentless noise and disturbance* were deprived of the chance to sleep.

270. The *torture music* was turned on, or at least *made much louder*, as punishment for perceived infractions *like raising one's voice, calling out, or not waving quickly enough when guards demanded a response from you.*

271. The gradual escalation of *applied physical and psychological exertion*, combined in some cases with more *concentrated pressure periods* for the purposes of interrogation, is said to have caused many of those held by the CIA to develop enduring psychiatric and mental problems.

### VI.    Secrecy and cover-up: how the United States and its European partners evade responsibility for CIA clandestine operations

#### i. A case study of Khaled El-Masri

272. The circumstances of the abduction of German citizen Khaled El-Masri are exposed in some detail in my first report of June 2006[216]. At that time it had not been possible to determine the exact circumstances of Mr El-Masri's return to Europe.

273. We believe we have now managed to retrace in detail Mr El-Masri's odyssey and to shed light on his return to Europe: if we, with neither the powers nor resources, were able to do so, why were the competent authorities unable to manage it? There is only one possible explanation: they are not interested in seeing the truth come out.

---

[216] *Supra* note 6, pp. 25-29.

### a.   Exposing El-Masri's secret "homeward rendition" to Europe

274.   In addition to reporting on the system of secret detentions in CoE member States, my inquiry also set out to shed light on one of the unsolved mysteries of the "global spider's web," captured by the following question: In the course of its covert operations, how does the CIA return home a detainee whom it concedes to have been an innocent victim of erroneous rendition and secret detention?

275.   Our case study is that of the German citizen Khaled El-Masri, whose ordeal at the hands of the UBK[217] in "the former Yugoslav Republic of Macedonia" and the CIA in Afghanistan, from 1 January to 28 May 2004, I documented in comprehensive detail in my report last year.[218] We were able to prove the involvement of the CIA in Mr El-Masri's transfer to Afghanistan by linking the flight that carried him there – on the aircraft N313P, flying from Skopje ("the former Yugoslav Republic of Macedonia") to Baghdad (Iraq) to Kabul (Afghanistan) on 24 January 2004 – to another known CIA detainee transfer on the same plane two days earlier, thus establishing the first "rendition circuit."[219]

276.   Upon Mr El-Masri's arrival in Afghanistan, he was taken to a CIA secret detention facility near Kabul and held in a "small, filthy, concrete cell"[220] for a period of over four months. During this period the CIA discovered that no charges could be brought against him and that his passport was genuine,[221] but inexplicably kept Mr El-Masri in his squalid, solitary confinement for several weeks thereafter.

277.   Mr El-Masri told us about his eventual release on 28 May 2004 in as much detail as he was able to recollect,[222] but there were naturally some important unanswered questions in his account, precisely because the CIA did not want him to know what was happening to him. Mr El-Masri was blindfolded throughout his return flight to Europe, immediately bundled into the back of a van upon arrival and driven for several hours "up and down mountains, on paved and unpaved roads." The men who transported him in the van spoke a language he did not recognise. When his blindfold was eventually removed Mr El-Masri found himself in unfamiliar, mountainous terrain, in the dark, instructed to walk along an isolated path without looking over his shoulder. He said he feared that he was "about to be shot in the back and left to die," with nobody having any idea of how he had got there.

278.   In the ensuing three years, Mr El-Masri's case has been investigated and reported extensively, including by the *Untersuchungsausschuss* of the German Bundestag and by German prosecutors, both of which I shall address below. Yet a key piece of the jigsaw, namely the means by which Mr El-Masri was returned from Afghanistan to an unknown point in Europe[223], has eluded investigators until now.

279.   Today I think I am in a position to reconstruct the circumstances of Mr El-Masri's return from Afghanistan: he was flown out of Kabul on 28 May 2004 on board a CIA-chartered Gulfstream aircraft with the tail number **N982RK to a military airbase in Albania called Bezat-Kuçova Aerodrome**.[224] We have

---

[217] UBK stands for Uprava za Bezbednosti I Kontrarazuznavanje; it is the Security and Counter-Intelligence Service of the Former Yugoslav Republic of Macedonia.

[218] See the Marty Report 2006, *supra* note 6, at pp. 25 to 32, §§ 92 to 132.

[219] I used the phrase "rendition circuit" to describe consecutive detainee transfer operations by the same CIA-linked aircraft in quick succession. For more details, see the Marty Report 2006, *supra* note 6, at pages 18 to 19, §§ 52 to 55. Also see Appendix No. 1 to the same report, "Flight logs related to the Successive Rendition Operations of Binyam Mohamed and Khaled El-Masri in January 2004."

[220] For a full description of Khaled El-Masri's ordeal in his own words, see Declaration of Khaled El-Masri in support of Plaintiff's Opposition to the United States' Motion to Dismiss, in *El-Masri v. Tenet et al*, Eastern District Court of Virginia in Alexandria, 6.04.2006 (hereinafter "El-Masri statement to US Court in Alexandria, 06.04.2006"), available at http://www.aclu.org/pdfs/safefree/elmasri_decl_exh.pdf.

[221] Several news media outlets have published insider accounts of the process by which the CIA learned of their mistake but failed to act to rectify it. See, for example, NBC Investigative Unit, "CIA accused of detaining innocent man – If the Agency knew he was the wrong man, why was he held?" 21.04.2005. The article states: "In March [2004]... the CIA finally finished checking his passport and found it was not a fake... The CIA realised it had the wrong man, a genuine German citizen, in custody... Condoleezza Rice learned of the mistake and ordered El-Masri's immediate release... But that didn't end the case. About two weeks later, Rice learned El-Masri was still being held and ordered him released again. In late May [2004], he was finally freed."

[222] Our team has spent many hours meeting with Khaled El-Masri, notably between March and May 2006, during which he has courageously recounted his experiences to us. We have also met extensively with his German lawyer, Manfred Gnjidic, and his American attorneys at the American Civil Liberties Union (ACLU) in New York. We are grateful to all of them for their commitment and assistance to our inquiry.

[223] See El-Masri statement to US Court in Alexandria, 06.04.2006, at p. 21. "Sam", a German-speaking official who accompanied Mr El-Masri on this flight, told him that he "would eventually land in a European country but that it would not be Germany itself."

[224] The military airbase in question appears to have two variations on its name: the first is Bezat-Kuçova; the other is Berat-Kuçovë. The airbase is denoted by the ICAO code LAKV. It is situated in the south of Albania, between the towns of Vlorë and Korcë, about 40 miles (64 km) south of the capital Tirana. The airbase underwent a comprehensive renovation and upgrade between 2002 and 2004 in order to bring it into line with NATO standards, as part of Albania's NATO accession process.

*Doc. 11302 rev.*

obtained primary data on this extraordinary homeward rendition from three separate sources and we are able to publish the relevant flight logs from the Marty Database as an appendix to this report.[225]

280.   Our team was first alerted to an unusual "flight circuit" through European airspace on the date in question by a submission from the national aviation authorities of Bosnia and Herzegovina (BiH).[226] The submission cited three "diplomatic permissions for state aircraft," which it said had been issued in relation to "flight movements for the needs of CIA, USA." The most relevant of these permissions, of which I subsequently obtained a copy,[227] was described as follows:

> "On the 26 May 2006 permission [was] issued to the company "RICHMON AVIATION" [sic] for traveller charter flight on the day of 28 May 2004. Line: Auki/Gwaunaru'u – Sarajevo – Prag. Aircraft type: Gulsstrim III, Registration N982RK, which is also its call sign."

281.   Three elements of this permission caught our attention: the role of the charter company Richmor Aviation;[228] the outlandish notion that a Gulfstream III would fly to Sarajevo from the Solomon Islands airport of Auki/Gwaunaru'u;[229] and the mention of 28 May 2004, which we knew as the date on which Khaled El-Masri was released. The first of these elements was the key to our locating the flight logs for the N982RK aircraft; the second was evidence of a smokescreen on the part of the CIA to cover up the aircraft's actual arrival from Bezat-Kuçova Aerodrome; and the third was the match we had been looking for to solve the mystery of the circumstances of Mr El-Masri's return to Europe.

282.   We have since received confirmation from CIA insiders that Albania was indeed the country to which the Agency opted to send Mr El-Masri from Afghanistan. We were told by these American sources that originally the CIA had asked "the former Yugoslav Republic of Macedonia" whether it would accept a "reversal" of the January 2004 rendition, but that this approach was instantly rejected: *"You can imagine that was the last thing the Macedonians wanted! They had no reason to take the problem back."*

283.   The CIA's second choice of Albania was favourable from a geographical point of view since it opened the option to drive Mr El-Masri to the Macedonian border immediately upon arrival and thus set him free in a state of disorientation that might diminish his credibility if he went public with his story. From a policy point of view, Albania has also proven to be a willing bilateral partner in providing the United States with a "dumping ground"[230] for its unwanted detainees in the "war on terror." At least eight former inmates of Guantanamo Bay remain stranded in Albania[231] because their refugee status does not allow them to go home to their families.

284.   At the end of his own ordeal, Mr El-Masri was not shot in the back but instead confronted by police guards at a checkpoint on what appeared to be the border between "the former Yugoslav Republic of Macedonia" and Albania. From there he was driven for about six hours to Tirana, Albania's capital city, and sent home to Germany on a commercial flight from Mother Theresa Airport to Frankfurt. He received a boarding card for this final flight and an Albanian exit stamp in his passport for 29 May 2004.

285.   There have been other new developments concerning in particular the activities of the prosecutor's office in Munich, the proceedings in the German Bundestag's parliamentary committee of inquiry (*Untersuchungsausschuss/UA*), Mr El-Masri's civil lawsuit against the CIA before US courts, and, last but not least, his personal situation.

---

[225] See Appendix No. 3 to the present report, entitled "Flight logs related to the secret 'homeward rendition' of Khaled El-Masri in May 2004."
[226] Submission No. 02-292.7-525-6/06, "Report on flight movements", prepared by Mr Dorde Ratkovic, Director General, Directorate for Civil Aviation in the BiH Ministry of Transport and Communications, Sarajevo, 17.05.2006; attached to the letter to me from Mr Elmir Jahic, Chairperson of the BiH Delegation to PACE, Sarajevo, 14.06.2006.
[227] Permission No. 292.7-361/04 issued by Hasan Hedzepagic, Senior Advisor for Flight Authorisation, Directorate for Civil Aviation in the BiH Ministry of Transport and Communications, Sarajevo, 26.05.2004, sent as a fax to "Richmon [sic] Aviation", USA; attached to the letter to me from Aljosa Campara, Secretary General of the BiH Delegation to PACE, "Report on flight movements – copies of permissions issued", Sarajevo, 8.01.2007.
[228] We were familiar with Richmor Aviation as the operator of the aircraft with the tail number N85VM, which was used in the CIA's rendition of the Egyptian cleric Abu Omar on 17.02.2003. See Appendix No. 4 to the Marty Report 2006, "Flight logs related to the rendition of Abu Omar."
[229] Quite apart from the fantastical route, the N982RK aircraft's maximum flight capacity of 6 hours 52 minutes, as listed in the "data strings" I have obtained, would make it impossible to complete this journey.
[230] The phrase "dumping ground" is used by the US lawyer of five Uighur Muslims from western China who were sent to Albania in May 2006 upon their release from Guantanamo Bay; see BBC News Online, "Albania takes Guantanamo Uighurs", available at http://news.bbc.co.uk/2/hi/americas/4979466.stm.
[231] See, for example, BBC News, "Guantanamo refugee rues asylum deal," 18.05.2007, available at http://news.bbc.co.uk/2/hi/africa/6668167.stm. The nationalities of the eight men in Albania are listed as: an Algerian, an Egyptian, an Uzbek and the five Uighurs.

286. The case against Mr El-Masri's kidnappers before the Munich prosecutor's office is still pending. Upon the initiative of the prosecutor, international arrest warrants were launched against 13 suspected CIA agents in January 2007.[232] The Bavarian judicial authorities did not in any way interfere with the launch of these arrest warrants, but no progress has as yet been made in apprehending the persons concerned or even identifying them by their actual names.

287. In Germany – in contrast to Italy - it is not possible to try suspects *in absentia*. In reply to a formal request for judicial cooperation addressed to the Macedonian authorities in early 2006, the prosecutors were given only the "official version" of the events as already publicly stated by the authorities.[233]

288. Nor has any progress been made in identifying "Sam", the German-speaking agent who, it is claimed, accompanied Mr El-Masri home from Afghanistan[234]. It was revealed recently[235] that then Interior Minister Schily was personally present in Kabul at the time when "Sam" announced to Mr El-Masri that he would soon be repatriated. But the prosecutor sees no link between Mr Schily's presence and the allegations made by Mr El-Masri himself that "Sam" was in fact a German federal agent.

289. It has been revealed that the telephones of Mr El-Masri's lawyer, Mr Gnjidic, were tapped from January until May 2006 on the instructions of the prosecutor's office. At the time, there were also long conversations between Mr Gnjidic and my collaborator as part of the mandate given to me by the Parliamentary Assembly. The prosecutor in charge[236] informed me that the reason for the wire-tap, which was court-approved as provided for by law[237], was to document any possible attempts made by the suspected kidnappers to contact Mr Gnjidic with a view to offering Mr El-Masri a settlement. As no such contacts were made, however, the wire-tap was terminated. Mr Gnjidic, who had not been informed of this wire-tap in advance, appealed against the decision authorising the surveillance. Its extension beyond March was found unlawful on appeal, but the legality of the initial wire-tap was upheld. Mr Gnjidic then lodged a constitutional complaint (*Verfassungsbeschwerde*) against the authorisation of the initial wire-tap before the Federal Constitutional Court (*Bundesverfassungsgericht*). In submissions to this court,[238] the Federal Ministry of the Interior commented that if it found the wire-tap justified. On 17 May 2007, the Federal Constitutional Court held that the wire-tap had violated Mr Gnjidic's constitutionally protected right to privacy.

290. Whilst the Bundestag's parliamentary committee of inquiry (UA) has not yet completed its work, it is now undisputed in this body that Mr El-Masri's account of his ordeal is true[239]. This means that there is no longer any doubt that the Macedonian authorities' official version is inaccurate[240]. This confirms our belief that the latter consciously concealed the truth.

291. Disagreement between the representatives of the German Government and opposition parties in the Bundestag committee of inquiry continues to exist as to the extent to which different German authorities were involved or at least informed of Mr El-Masri's case, and when. The testimonies of a Telecom employee and a junior member of the German intelligence services – claiming that Macedonian officials informed the German embassy in Skopje of Mr El-Masri's detention before he was transported to Afghanistan - were not considered by the majority of the committee to be sufficiently conclusive to be able to hold the political leadership accountable[241].

292. More generally, opposition members on the committee have voiced their frustration that the executive is limiting the possibility for the committee to elucidate the truth by invoking official secrecy, refusing access to key files or testimony on this ground. Information relating to the "core field of executive privilege" and information which must be kept secret in the higher interests of the state *(Staatswohl)* is not available to the UA even when meeting in camera. It is the executive itself which decides what information falls into this category, apparently without any parliamentary control; the current trend is to extend this

---

[232] In its press release of 31.01.2007, the Prosecutor's Office acknowledged having received additional information from the Milan Prosecutor's Office and from the Council of Europe's Rapporteur, Dick Marty.
[233] See Marty report 2006, *supra* note 6, p. 27, §§ 106-111.
[234] See Marty report 2006, *supra* note 6, p. 26, §§ 99-100, p. 27, § 103, p. 32, § 130.
[235] See n-tv, 23.11.2006.
[236] Mr Martin Hofmann, whom I met in December 2006 in Geneva. I should like to thank Mr Hofmann for his kind cooperation.
[237] A prolongation of the wire-tap was subsequently refused by the competent judge.
[238] On file with the inquiry.
[239] According to Max Stadler, Liberal member of the Bundestag's committee of inquiry and the *Parlamentarisches Kontollgremium (PKG)* who spoke with a member of our team on 25.05.2007, this is the opinion of all members, including those from the party currently in power.
[240] Mr Stadler, *supra* note 239, indicates that this is also the view of the committee of inquiry, which does not however believe that its terms of reference allows it to record this officially.
[241] The political leadership could only be held responsible for "organisational error" for failing to report back with the relevant information in good time.