*Doc. 11302 rev.*

concept of knowledge restricted to the executive, a move which has come in for much criticism from the members of the UA. The latter have recently decided to refer this matter to the Federal Constitutional Court[242]. Even classified information which does not fall into this category has to be dealt with in camera by the committee, which means that it cannot be publicised by the members of the UA; this too has been criticised by some members of the Bundestag[243].

293.    Prosecutor Hofmann, who also testified before the UA, had transmitted the entire case file to the committee, including elements that were classified as secret. But during his public testimony, he was obliged to withhold his answers to certain questions relating to classified documents. His offer to discuss the classified material in a closed session was not taken up, although this procedure had been followed for other witnesses.

294.    As a result of the UA's work, the German government and government departments have been made more aware of human rights aspects and the rule of law[244]. The UA recently agreed to avail itself, for the first time, of the possibility provided for in the law governing committees of inquiry to appoint a "special investigator" with effect from the summer 2007 parliamentary recess, tasked on behalf of the UA with looking into the CIA rendition flights[245].

295.    Meanwhile Mr El-Masri's civil lawsuit in the United States against the CIA is entering its final phase: an appeal to the US Supreme Court, after the rejection of his case on grounds of state secrecy in the first instance, upheld by the court of appeal[246], was announced by Mr Gnijdic on 30 May 2007.

296.    Against this background, Mr El-Masri himself is still suffering severely from the psychological consequences of the ordeal he has gone through. He has been repeatedly victimised by personal attacks in the local media and has been unable to find employment in the last three years. In January 2007, he lashed out physically at a vocational training officer, who he felt had treated him unfairly. On 17 May 2007, he was arrested in Neu-Ulm as a suspect in a case of arson and placed in a psychiatric hospital[247]. This dramatic development in Mr El-Masri's personal situation merely confirms the repeated claims by his lawyer, Mr Gnjidic, that Mr El-Masri is in desperate need of immediate professional psycho-social post-traumatic care[248]. According to his current therapist[249], the conflict between his post-traumatic care and the pressure arising from the various ongoing procedures to establish the truth simply adds to Mr El-Masri's problems.

297.    It is therefore all the more regrettable that Mr El-Masri has not yet been given an official apology for the abuses he has suffered, despite the fact that Mr Schily has stated before the *Untersuchungsausschuss* that Mr El-Masri is innocent and that the Americans have long since offered their own apology to the German Government.

298.    I have the following comments regarding these developments in the El-Masri case.

   **b.    The "legal vacuum": denial of accountability to El-Masri in Germany and in the United States**

299.    In the present state of affairs, Mr El-Masri is unable to hold accountable those responsible for his ordeal both in Germany and in the United States. The core of the problem is the doctrine of state secrecy, which at present constitutes an absolute obstacle to the effective prosecution of Mr El-Masri's kidnappers in

---

[242] Tagesthemen.de of 21.05.2007, citing Dr. Max Stadler.
[243] Mr Stadler has alluded to "organised leaks" by members of government parties designed or at least objectively likely to mislead the public on the substance of the in camera discussions – one case in point was the private hearing of officers who had interrogated Mr Kurnaz in Guantanamo Bay and the matter of the American "offer", apparently refused by the German authorities, to allow Mr Kurnaz to be repatriated.
[244] Mr Stadler gave as an example an apparently similar case of a long-term German resident arrested in Pakistan who was able to return to Germany without the government raising the objections it did in the case of Mr Kurnaz; a second example is the approach adopted by the Bundestag's Legal Affairs Committee to a bill to facilitate information exchange between executive services in the fight against terrorism. The Committee insisted on including measures to prevent this being misused for rendition purposes.
[245] Mr Stadler insisted that this "special investigator" would not be replacing the Committee but would be preparing the way by carrying out preliminary investigations which would facilitate the UA's subsequent work.
[246] No 06-1667 of 02.03.2007 (4th circuit).
[247] He is suspected of having laid fire to a wholesale market in Neu-Ulm (cf. Spiegel online 17.05.2007).
[248] Letter from Mr Gnjidic to Chancellor Merkel of 26.04.2007, passed on to the Bavarian Prime Minister's Office by letter from the Chancellor's office of 11.05.2007 with a request to take this issue up as a matter of urgency (copy of both letters on file); since February 2006, Mr El-Masri has received limited therapy (70 hours) from the treatment centre for torture victims in Neu-Ulm, but this therapy was considered as insufficient both by Mr Gnjidic and by the therapist herself (cf. SPIEGEL-online 18.05.2007). Although Mr El-Masri had asked for treatment at the centre shortly after his return to Germany in 2004, it took until 2006 for Mr Gnjidic to obtain the required health insurance funding agreement to start this limited treatment.
[249] Cf. Spiegel-online, 18.05.2007 (interview with Ms Gerlinde Dötsch).

Germany, the full clarification of responsibilities in the *Untersuchungsausschuss* and Mr El-Masri's civil lawsuit against the CIA in the United States.

300.    As Mr Gnjidic has said so aptly in his complaint against the wire-tap of his law office: whilst the domain of professional secrecy - the traditionally protected relationship between lawyers and doctors and their clients, journalists and their sources - is gradually shrinking, the realm of state secrecy is increasingly expanding. "Equality of arms" - part of the "fair trial" requirements under Article 6 ECHR - becomes a hollow phrase under these conditions[250].

301.    The US Supreme Court, if it chooses to hear Mr El-Masri's case, and the German Federal Constitutional Court, following the appeal lodged by the minority representatives of the Bundestag's committee of inquiry, will have to take a position on the extent to which the executive is allowed to act in complete secrecy, without the possibility for either judicial or parliamentary scrutiny of its actions. Here, we have on the one hand lawyers and judges – in favour of judicial and/or parliamentary control, and on the other the executive, and in particular the intelligence agencies and other special services, claiming the freedom to act in secrecy on the pretext of the supposed higher interests of the state. Mr Gnjidic's constitutional complaint, in contrast, has led to a clearer definition of the realm of professional secrecy.

302.    These are undeniably key issues for the defence of human rights and for the fight against terrorism. Short-circuiting the different mechanisms of judicial and parliamentary control does not make the fight against terrorism more effective. Rather, this vacuum can lead to arbitrary action and all sorts of dysfunctioning. While certain operational means must of course remain confidential, there is nothing to prevent making provision for transparent procedures for subsequent review. Continuing to invoke state secrecy years after the events is unacceptable in a democratic society.

303.    Moreover, state secrecy cannot in any circumstances justify or conceal criminal acts and serious human rights violations. From the point of view of the rule of law, the ruling of the US Court of Appeal (4th circuit) in Mr El-Masri's case[251] is disappointing and regrettable: whilst the Court of Appeal acknowledges that it is for the courts to decide on the extent of state secrecy[252], it takes a very restrictive stance as to the scope of judicial review, insisting on the court being obliged to accord the "utmost deference" to the responsibilities of the executive branch[253]. This "deference" goes so far that "*in certain circumstances a court may conclude that an explanation by the Executive of why a question cannot be answered would itself create an unacceptable danger of injurious disclosure. [...] In such a situation, a court is obliged to accept the executive branch's claim of privilege without further demand*"[254].

304.    One may legitimately ask how such reasoning can be reconciled with the fundamental principles of the rule of law. The case law of the US Supreme Court cited in support of this wide interpretation of the state secrecy doctrine[255] dates back to the 19th century and the worst periods of the Cold War, when there was an almost blind trust in the infallibility and incorruptibility of its secret services. It is therefore to be hoped that the United States Supreme Court will use the opportunity of the El-Masri case to take a fresh approach to and modernise the "state secrets doctrine", to bring it into line with the principle of the separation of powers and the requirement for transparency in a genuinely democratic society.

305.    In *Fitzgerald*[256], another United States Court of Appeal rightly points out that *"[w]hen the state secrets privilege is validly asserted, the result is unfairness to individual litigants – through the loss of important evidence or dismissal of a case – in order to protect a greater public value.*" How can it be seriously argued that information establishing the responsibility of State officials in serious violations of human rights is of "a greater public value" deserving protection in a democratic society?

306.    The principle of judicial self-restraint is certainly a good thing, but this is truly corrupted when it results in a denial by the judicial system of its own role, leading to impunity for the perpetrators of serious human rights violations.

---

[250] Mr Gnjidic's graphic comparison : the lawyer gets to fight with a pocket knife, the executive with a sword.
[251] No. 06-1667 of 02.03.2007.
[252] Quoting the US Supreme Court in *Reynolds* (345 US at 9-10) "[j]udicial control over the evidence in a case cannot be abdicated to the caprice of executive officers".
[253] Again quoting the US Supreme Court (*Nixon*, 418 US at 710).
[254] Court of Appeal (*supra* note 246) p. 12, with references to the US Supreme Court's *Reynolds* judgment (345 US at 9).
[255] The *Reynolds* case dates back to 1953; another leading case (*Totten v. United States, 92 US 105)* to 1875, and the *United States v. Nixon (418 US 683)* to 1974; *Chi.& S. Air Lines, Inc., v. Waterman S.S.Corp., 333 US 103, 111* to 1972.
[256] 776 F.2d at 1238 n.3 (cited by the Court of Appeal in the El-Masri case, *supra* note 246, p. 23).

*Doc. 11302 rev.*

307.    Judges, prosecutors and lawyers cannot *a priori* be considered national security risks, any more than other agents of States themselves. If necessary to safeguard legitimate state secrets that may well be intertwined with illegitimate ones, judicial personnel participating in proceedings involving state secrets can be subjected to a specific clearing or vetting procedure, as is done in a number of jurisdictions, and placed under an obligation to maintain the secrecy of the information they are given access to[257].

308.    In order to ensure accountability, information pertaining to serious human rights violations committed by agents of the executive should not, and need not be permitted to be shielded by the notion of state secrecy or national security.

309.    What applies to courts must also apply to parliamentary committees of inquiry: the executive must not be allowed to thwart inquiries into its own possible wrongdoings by classifying relevant information.

### c.    The German parliamentary committee of inquiry and the work of the prosecutors in Munich

#### - The Bundestag committee of inquiry

310.    The German parliamentary committee of inquiry responsible for establishing the facts in the El-Masri case is emblematic. Of course the *Bundestag's* decision to conduct a serious inquiry into the case of Mr El-Masri and into possibly reprehensible activities by the German special services is welcome. It is, however, regrettable that most members of the committee have to date been content to receive documentation that has been rendered very incomplete by government censorship. The committee has also frequently been quick to accept the reasons given by witnesses for refusing to give evidence: on each occasion, "state secrecy" or the so-called doctrine of *exekutive Eigenverantwortung* (the domain of the executive's own responsibility, exempt from parliamentary scrutiny) has been accepted. It should also be made clear that the standing committee responsible for supervising the activities of the secret services (*Parlamentarisches Kontrollgremium (PKG)*) has access to secret information[258], and that the parliamentary committee of inquiry was granted access behind closed doors both to classified documents and to witness testimony on matters classified as secret. What is in dispute between majority and minority representatives is the extent to which parliamentarians can demand access to classified materials, and what use they can make of it in public if they consider that the matter in question requires their constituents to be informed. This matter needs clarification, generally and also for future reference. The parliamentary committee of inquiry is fulfilling its supervisory remit in the interest of parliament as a whole, and its work must not be primarily influenced by considerations of short-term political rivalry[259]. Any majority, in a democratic system, can become the minority at the next election, and should have an interest in protecting parliamentary scrutiny of executive action. I therefore welcome the decision of the opposition representatives on the parliamentary committee of inquiry to apply to the Federal Constitutional Court for a clearer definition of the scope of the doctrine of the executive's own responsibility (*exekutive Eigenverantwortung*)[260].

311.    My last remark about the parliamentary committee of inquiry concerns the reception of its work by public opinion. The committee's work revealed some very questionable aspects of certain decisions taken by the former Minister in charge of the coordination of the special services (now Minister for Foreign Affairs), in particular as regards the case of Mr Kurnaz; the latter could apparently have been released from Guantanamo by the United States much earlier, if only the German authorities had agreed to repatriate him[261]. Whilst some media outlets raised the question of whether the Minister concerned should remain a member of the Government, his popularity as measured by opinion polls did not suffer at all; it even grew.

---

[257] In the same way as the procedure described by the 4th Circuit Court of Appeals (*supra* note 246, pp. 11-12 and 21-22) for the judicial review of the issue whether the information sought to be protected qualifies as privileged under the state secrets doctrine.

[258] On the other hand, this body has no power to summon witnesses. The government is under an obligation to "report" to the PKG, but there is no statutory obligation (subject to criminal penalty) like that which exists for witnesses summoned by a committee of inquiry, for the executive's representatives on the PKG to tell the truth.

[259] As seems to be the case, according to Mr Stadler, within the German parliamentary committee of inquiry: while the representatives of government parties, especially the Christian Democrats who were in the opposition at the material time, take a very active and open attitude during the examination of witnesses, government discipline comes fully into play when the facts are being assessed, with the representatives of government parties never having voted for a motion to take evidence (*Beweisantrag*) tabled by minority representatives or having tabled such a motion themselves.

[260] cf. tagesthemen.de of 21.05.2007, announcing the appeal to the Federal Constitutional Court.

[261] The Assembly's Rapporteur on Guantanamo, Kevin McNamara (United Kingdom/SOC), received on 28.02.2005 an official reply from the German Government regarding the case of Mr Kurnaz to a questionnaire sent to all member states as to whether the authorities knew of a national or permanent resident now held in Guantanamo and if so, what they were doing to secure the person's repatriation. The answer was laconic: The US authorities were not approached by the German authorities as Turkey is responsible for and able to grant diplomatic protection to Mr Kurnaz. In Resolution 1433 (2005) the Assembly appealed to all member states "*to enhance their diplomatic and consular efforts to protect the rights and ensure the release of any of their citizens, nationals or former residents currently detained at Guantanamo Bay, whether legally obliged to do so or not*".

The cases of Mr El-Masri and Mr Kurnaz, whose responsibility was never established, and who suffered extreme hardships, spending months and years in unlawful detention without any excuse having been offered or compensation paid, gave rise to unpleasant comments in the tabloid press about these two men of Arab origin and of Muslim faith[262]. The apparent success of this media strategy may also be a symptom of latent islamophobia[263], a worrying phenomenon which should cause concern to political leaders and to all who play an active role in civil society.

### - The Munich Prosecutor's office

312.    The prosecutors in Munich continue to encounter difficulties as a result of the refusal by the authorities in the United States and "the former Yugoslav Republic of Macedonia" to co-operate in the search for the truth. The assistance of these countries' authorities is vital in order to prove the facts and establish responsibilities. It has now been established that there is no truth whatsoever in the replies given by the Macedonian authorities. Another official request for assistance, containing very specific questions, would seem to be necessary.

### d. Deception and failure to account on the part of "the former Yugoslav Republic of Macedonia"

313.    A Macedonian parliamentary committee concluded on 18 May that the country's secret services "did not overstep their powers" in the case of Mr El-Masri.[264] Its Chairman, Mr Rahic, was quoted in the media as saying that "until El-Masri's account is proved and we are presented with strong evidence, we will believe the Interior Ministry". This seems a fairly rash thing to say, even allowing for the fact that this report had not been published when those words were spoken. However, the new facts now brought into the public domain should finally trigger action on the basis of the "readiness of this committee and the parliament of the Republic of Macedonia to fully investigate and solve this case", to which Mr Rahic reportedly referred.

314.    The "official version" of Mr El-Masri's involuntary stay in "the former Yugoslav Republic of Macedonia" has definitely become utterly untenable, in the light of not only the work of the *Bundestag's* committee of inquiry, but also the information that we believe we can provide about the arrangements for Mr El-Masri's secret return to Europe. It is now high time for those responsible for the deception - vis-à-vis the German *Bundestag*, the Munich prosecutors, the European Parliament and the Council of Europe - to offer their apologies to the unfortunate protagonist in this case and to divulge once and for all the whole truth. There is a feeling that responsibility for this refusal to tell the truth lies with the highest representatives of the State, who seem likely to have orchestrated the presentation of this official version[265]. For the sake of restoring the mutual trust indispensable for European co-operation in this sensitive field, I urge the Macedonian President and Parliament to show a willingness to co-operate in the search for the truth without further delay.

315.    The positive example of Bosnia and Herzegovina, which has fully acknowledged the facts relating to "its" case of rendition[266], deserves to be re-emphasised here. Its authorities showed responsibility and sincerity, and should also be congratulated on their country's recent election by the UN General Assembly to membership of the United Nations Human Rights Council[267].

## ii.    Complicity and accountability in other rendition cases

### a. The role of the Italian authorities in the case of Abu Omar

316.    New developments in this case, described in some detail in the June 2006 report[268] include new arrest warrants delivered on 3 July 2006 against four more US citizens, including Jeffrey Castelli, the director of the Italian office of the CIA at the time of the abduction, which increased the number of arrest warrants against American agents to 26. In July 2006, two arrest warrants were also delivered against Italian agents

---

[262] See BILD.de, 22.05.2007 (*"Warum lassen wir uns von so einem terrorisieren"*); 05.02.2007 (*"Ausgerechnet El-Masri"*); 31.01.2007 (*"Wie wurde aus diesem Libanesen eigentlich ein Deutscher?"*). This campaign by BILD is criticised by Hans Leyendecker in the Süddeutsche Zeitung of 21.05.2005.
[263] Mr Stadler also said that he was disappointed by this lack of solidarity with victims perceived as "alien". Even inside the parliamentary committee of inquiry, some members remained hesitant until such time as the MPs personally heard moving accounts of their appalling sufferings given by Mr El-Masri and Mr Kurnaz.
[264] In a letter of 05.06.2007 the Head of the Macedonian Delegation, Mr Sambevski, transmitted this assessment to me officially.
[265] See Marty report 2006, *supra* note 6, pp. 27-28 (§§ 106-111).
[266] See Marty report 2006, *supra* note 6, pp. 32-23 (§§ 133-149).
[267] In place of Belarus, the candidature of which was strongly opposed by the Parliamentary Assembly's Legal Affairs Committee in a public appeal adopted on 14.05.2007.
[268] See Marty report 2006, *supra* note 6, p. 37 (§ 162).

*Doc. 11302 rev.*

working for SISMI, the military intelligence agency (Mr Pignero and Mr Mancini). By November 2006, the Milan Prosecutor's office had fulfilled all technical requirements for the transmission by the Italian Minister of Justice of the relevant extradition requests to the American authorities. But to date, the Minister has still not transmitted these requests. It may be helpful to point out that the treaty on judicial assistance between the United States and Italy explicitly provides for extradition even of their nationals.

317.    In November 2006, Mr Pollari was removed from his post as director of SISMI "in the course of a reorganisation of the secret services"[269].

318.    In a letter smuggled out of his prison in Egypt (published by the *Chicago Tribune* and the *Corriere della Sera* on 7 January 2007), Abu Omar described in detail how he was abducted from Italy and the abominable tortures to which he was subjected in Egypt, which go well beyond the dehumanising methods used in the CIA's own secret prisons network[270].

319.    In February 2007, 26 US citizens and seven Italians, including Mr Pollari, were formally indicted, the trial being due to begin on 8 June 2007.[271] Mr Pollari, the only defendant who appeared during the preliminary hearing, has insisted that Italian intelligence played no role in the alleged abduction, and told the judge he was unable to defend himself properly because documents clarifying his position were not permitted in the proceedings because they contain state secrets[272]. In fact, the evidence collected by the prosecution is overwhelming: SISMI had been informed of the operation relating to Mr Omar, and Italian agents certainly did take part in the operation.

320.    In February and March, the Italian Government asked the Constitutional Court to annul the committal for trial of the 33 defendants in the Abu Omar case, as the prosecution had exceeded its powers, using documents which were classified and tapping phone conversations of Italian intelligence agents in their pursuit of the suspects. The Constitutional Court declared both government applications admissible, but has not to date ruled on their merits[273]. Italian Prime Minister Romano Prodi declared[274] that important information relating to the co-operation between the CIA and the Italian military intelligence constituted a state secret, and that, on the Abu Omar case, he "was following Mr Berlusconi's line"[275]. Worse still, the previous government had not explicitly raised the issue of state secrecy, whereas the current Minister of Justice had not hesitated to apply to the Constitutional Court, taking the view that the judges in Milan had encroached on an area reserved for the executive.

321.    But how can it be forgotten that a senior Italian official, General Pollari, head of military intelligence, lied unashamedly to the European Parliament? How is it possible to explain the deafening silence of the Berlusconi and Prodi governments in relation to the kidnapping of Abu Omar - who held refugee status - by an American commando operation, and to the sabotaging by this operation of a major anti-terrorist investigation being carried out by the Milan prosecution service?

322.    In my previous report, I had already applauded the competence and high-quality work of Milan's judges and police. It is distressing to see now the kind of treatment to which judges of such merit as Armando Spataro and Ferdinando Pomarici are being subjected, prosecutors who have for years, not without great personal risk, been committed to combating terrorism, always effectively and with strict respect for the rule of law. The point has now been reached at which these judges stand accused of violating state secrecy!

323.    In Italy, as in Germany, irrespective of the alternation in political power between parties, the same line has apparently been chosen, namely the preservation at any price of relations (and especially of interests) with the powerful ally, with "state secrecy" being invoked whenever an unpleasant truth might become public. This also enables conduct which is against the law to be covered up, and government offices to evade their responsibilities, and it is a very serious obstacle to the independence of the judicial system.

324.    Our colleague Christos Pourgourides has demonstrated in his report adopted by the Assembly in April 2007 on "Fair trial issues in cases involving espionage and state secrecy"[276] how overly broad and unclear legislation on state secrecy has been abused to imprison and silence independent scientists,

---

[269] www.wsws.org, 29.01.2007.
[270] See my description of these methods, *supra* at section V.iii.
[271] BBC NEWS/World/Europe/Italy orders CIA kidnapping trial ; Chicago Tribune online edition, 17.03. 2007.
[272] Times Online, 16.02.2007.
[273] See Chicago Tribune online edition, 17.03.2007.
[274] www.wsws.org, 29.01.2007.
[275] See Reuters, 10.02.2007.
[276] See Doc 11031 (available at http://www.coe.int).

journalists and lawyers and "whistleblowers". This inquiry shows that overly broad and unclear concepts of state secrecy also stand in the way of accountability of the executive for blatant human rights violations. In the same way as Mr Pourgourides has rightfully argued that information that is already in the public domain cannot be a "state secret"[277], we must strive for recognition that information on serious human rights abuses committed by executive authorities must not be kept under wraps as "state secrets" either. I can only wish my friend Armando Spataro success in his struggle for these principles in Italy.

### b. The role of the Canadian authorities in the case of Maher Arar

325.    After the rather dark picture conveyed by the attitudes of several European governments, it is comforting to mention a positive example, that of Canada, which holds observer status with the Parliamentary Assembly of the Council of Europe.

326.    The case of Maher Arar, the Canadian citizen abducted in New York and subjected to torture in a Syrian prison, must serve as an example to European states, showing that this kind of case may be understood in a more dignified way, more appropriate to a state governed by the rule of law.

327.    A special commission of inquiry[278] conducted a separate inquiry into the facts and a detailed examination of the various political aspects, in order to establish the facts and to draw conclusions from the shortcomings evident in this case. The Report of the Events Relating to Maher Arar – Analysis and Recommendations (364 pages) was published in July 2006. The commission's official website provides ample information about the terms of reference of the inquiry, the role of the commissioner and counsel, and the commission's rules of procedure. The website also provides in great detail background documents of the factual inquiry (including transcripts of public hearings, and summaries of in camera hearings, reports from expert witnesses and the detailed "Fact Finder's Report"). Similar information is published as regards the examination of political aspects.

328.    In the framework of this report, I do not, unfortunately, have the resources to analyse and comment on this important work in any detail. This is very regrettable, but it is highly desirable to draw on the work done by the Canadian commission of inquiry in the process of the follow-up that must be given to the Assembly's recommendations by the Committee of Ministers, to ensure that similar abuses and mistakes never happen again in our member states.

329.    Not surprisingly, a central issue for the commission on the case of Maher Arar was once again that of official secrecy and national security. But contrary to the situation in Europe and in the United States, Canada appears to have found a workable solution that safeguards both accountability and true national security interests. In simplified terms, the commissioner, an experienced judge, was given access to all the information required. Certain documents, which the government considered secret in the interest of national security, national defence or international relations, were examined in a procedure in which both parties were heard, and were not reproduced in the public version of the report (although attention was drawn to their absence). Thus it is not the government which is the sole arbiter of what should be regarded as a state secret. Such a procedure deserves the greatest attention in the preparation of the terms of reference for the new Council of Europe investigation mechanism which we propose to set up.

330.    The Commissioner of the Inquiry, Justice Dennis O'Connor, stated that he was "*able to say categorically that there is no evidence to indicate that Mr Arar has committed any offence or that his activities constitute a threat to the security of Canada*"[279] – thus unequivocally clearing Mr Arar's name. He was able to make this statement being "*satisfied that I have been able to examine all the Canadian information relevant to the mandate. [...] I received some of the evidence in closed, or in camera hearings and am unable to refer to some of the evidence heard in those hearings in the public version of this report. However, I am pleased to say that I am able to make public all of my conclusions and recommendations, including those based on in camera evidence.*"[280]

331.    I should like to conclude by citing Mr Arar himself[281], who gave an excellent description of the role and function of the principle of accountability: "*This is because accountability is not about seeking revenge; it is about making our institutions better and a model for the rest of the world. Accountability goes to the heart of our democracy. It is a fundamental pillar that distinguishes our society from police states.*"

---

[277] While this seems self-explanatory, it was called into question by the US Court of Appeal, *supra* note 246, at p. 20, footnote 5.
[278] See www.ararcommission.ca
[279] Report, available at http://www.ararcommission.ca , hereinafter: Arar Commission Report, p. 9.
[280] Arar Commission Report, p. 10.
[281] See http://www.maherarar.ca - A Message from Maher Arar.

*Doc. 11302 rev.*

332.    Explaining how he has been able to cope with the stress of surviving torture, the stress of not being able to find a job, the stress endured at the inquiry, he wrote: "*I draw my strength from my faith; from my loving, caring, strong wife; and from the support and generosity I have received from Canadians. I have rediscovered Canada through its people, people who made me feel proud of being Canadian.*"

333.    These are impressive words coming from a man who was held for a year in the most abject conditions, including torture, in a prison run by the Syrian secret services, to which he had been handed over by the CIA, which had been able to rely on the co-operation of their Canadian counterparts, who had supplied completely baseless information about alleged links with El-Qaida. Mr Arar's ordeal continued after his return to Canada, which had been delayed by all kinds of setbacks, with leaks of information being organised with the intention of discrediting him and trying to justify the behaviour of the services responsible for his abduction.

334.    Canada's attitude deserves to be highlighted, for the way in which the country's institutions coped with this serious and awkward case. Canadian society managed to resist some press attempts to condition its reaction, and unhesitatingly displayed solidarity with a man who had suffered such injustice[282]. Mr Arar also benefited from psychosocial assistance and received substantial compensation from the government for the damage suffered[283]. The Canadian public also expects the recommendations set out in the report to be implemented and those responsible to be brought to account for their conduct[284]. There are striking differences in every respect between the way in which the Arar case was dealt with and the attitude taken to the El-Masri case. In particular, it should finally be pointed out that neither the United States nor Syria saw fit to co-operate with the Canadian commission of inquiry. Mr Arar's civil action against US authorities has run into the same difficulties due to the doctrine of state secrecy as that of Mr El-Masri.

### c. Proposal by the All Party Parliamentary Group on Extraordinary Rendition (APPG) to improve the UK's mechanisms dealing with rendition requests

335.    While the APPG did not achieve any progress regarding the specific cases of UK residents abducted in Gambia and finally taken to Guantanamo Bay[285], its chair, Mr Andrew Tyrie, has recently submitted a proposal to the UK Government to improve the UK's mechanisms in this area, aimed at improving the protection of detainees transported through the UK, increasing transparency and defining responsibilities more clearly[286]. The APPG also expressed its support for the proposals made by the Secretary General of the Council of Europe following the opening of a procedure under Article 52 of the ECHR, and for the work of the Parliamentary Assembly, including the resolution and recommendation proposed with the report of June 2006. There is no possible doubt in group members' minds that "extraordinary renditions" have indeed taken place.

336.    The House of Commons Intelligence and Security Committee, however, has yet to publish its report on extraordinary renditions[287].

## VII.    Secret detentions and renditions: the diminishing effect on respect for human rights worldwide

### i.    A collateral damage of the war on terror: diminishing respect for human rights

337.    The policy pursued by the current US Administration has undeniably been a contributory factor in tarnishing the image of the United States, a country regarded as a model of democracy and respect for individual freedoms. The huge wave of sympathy for the American people following the tragic events of 11 September rapidly gave way to incomprehension, irritation, and even overt hostility. The commission of unlawful acts - abductions, the exporting of torture to other countries even though they are regarded as "rogue states", the setting up of detention centres beyond any judicial supervision - has severely affected the moral authority of the United States. Worse still, the world's greatest power is becoming a negative role model for other countries, which feel that they may legitimately follow the same path and flout human rights. The systematic exporting of such activities outside American territory also constitutes a form of contempt for

---

[282] Canadian society does seem particularly sensitive, as the recent arguments about alleged ill-treatment meted out to two Afghan detainees seem to show (see LeDevoir.com, file:///Users/dick/Desktop/Afghanistan%20-%20Le%20Canada%20n'a%20pas%20vérifié%20les%20allégations%20de%20torture.webarchive)

[283] In January 2007, Mr Arar received $ Can 11.5 (about € 7.5 million) in compensation, and a formal public apology from the Canadian Prime Minister.

[284] Cf. CBC news item of 29.01.2007.

[285] See Marty report 2006, *supra* note 6, page 46.

[286] Letter of 18.05.2007 (on file).

[287] The report must first be addressed to the Prime Minister, who shall decide about what can be made public.

the rest of the world, and the reservation of such methods exclusively for non-Americans is an expression of an "apartheid" mentality in the legal sphere. This feeling is further reinforced by the US Administration's systematic refusal to place itself under the jurisdiction of an international court, although it is always ready to impose such jurisdiction on others[288]. This attitude merely fuels deplorable and damaging anti-Americanism, for it creates a movement of sympathy for Islamic fundamentalism, thereby giving a feeling of legitimacy to the criminal groups which resort to terror. The collateral damage caused by the "war on terrorism" being waged by the current US Administration is very serious. More serious, and more intolerable, however, is the attitude taken by many European governments, which have allowed - when they have not directly co-operated in - a whole series of unlawful acts on their territory, acts which the US Administration itself refused to commit in its own country.

**ii.    Continued secret detentions in the Chechen Republic and failure to cooperate with the CPT: unacceptable collateral damage to the values of the Council of Europe**

**a. CPT 3rd Public Statement and detentions in the village of Tsentoroy**

338.    The June 2006 report referred to serious allegations about enforced disappearances, and about the existence of secret detention centres and the systematic use of torture in Chechnya. Subsequently the CPT (European Committee for the Prevention of Torture) has issued new concrete conclusions about this region, in the third public declaration published recently.

339.    Under Article 10(2) of the European Convention for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment, the Committee may make, by a two-thirds majority, a public declaration after a Party to the Convention "*fails to cooperate or refuses to improve the situation in the light of the Committee's recommendations.*" According to the statement, "*the CPT remains deeply concerned*" by the fact that "*[r]esort to torture and other forms of ill-treatment by members of law enforcement agencies and security forces continues, as does the related practice of unlawful detentions*"[289] and that investigations into these cases are largely ineffective.[290] This statement follows two previous public statements also concerning the Chechen Republic in July 2001 and July 2003, which illustrates the extreme gravity of the situation. Member states' duty to cooperate with the CPT and the follow-up to be given to the CPT's public statements by the Council of Europe generally deserve to be the subject of a separate report by the Committee on Legal Affairs and Human Rights.

340.    In the framework of my mandate concerning allegations of secret detentions in Council of Europe member states, I invited the chair of the Russian delegation to PACE, Mr Konstantin Kosachev, to comment on the CPT's 3rd public statement and the allegations of secret detentions in the village of Tsentoroy. In his answer dated 15 May 2007, Mr Kosachev wrote the following:

> "*According to the Ministry of the Interior of the Russian Federation, the delegation of the CE Committee for the Prevention of Torture (CPT) headed by Mr M. Palma visited the village of Tsentoroy (Kurchaloevskiy region of the Chechen Republic) and inspected all the premises they were interested in. They did not find either secret detention facilities there or any facts proving the rumours of their existence. No applications or complaints from residents were lodged to the law-enforcement bodies of the Chechen Republic about illegal detentions of people with their further stationing in the village of Tsentoroy (Kurchaloevskiy region of the Chechen Republic).*
>
> *The CPT report of November 2006 on the results of the two visits of the Committee said that there were illegal detention facilities in the village of Tsentoroy (Kurchaloevskiy region of the Chechen Republic). In response, the Ministry of the Interior of the Russian Federation carried out thorough additional inspections. The information brought to the notice of the European community and the Parliamentary Assembly of the Council of Europe was not confirmed.*
>
> *The FSB of the Russian Federation does not have any information about the existence of any secret detention centre in the village of Tsentoroy (Kurchaloevskiy region of the Chechen Republic).*"

341.    Under the Anti-Torture Convention, the CPT is duty-bound to maintain the confidential character of its work, and can therefore not comment publicly on this reply. But the Russian authorities have failed to

---

[288] It should not be forgotten that the United States is still refusing to ratify the treaty setting up the International Criminal Court; as at 01.01.2007, 104 States had acceded to the Rome Statute governing the ICC.
[289] CPT, Public statement concerning the Chechen Republic of the Russian Federation, made on 13.03.2007 and relating to a visit in November 2006 (available at http://www.coe.int.
[290] *Ibid.*

*Doc. 11302 rev.*

provide a specific response to the point that I highlighted in my own letter, namely that it transpires from an official reply given to the CPT by the Russian authorities, which the CPT made public in part (in the above-mentioned Public Statement[291]), that at least one secret detention facility – i.e. a place of detention that was not declared as such vis-à-vis the CPT – has existed within the premises of the Chechen President's Security Service in the village of Tsentoroy[292]. I do not consider the above reply – a general denial - as a sufficient response to the specific issue I raised in my letter. The declaration in Mr Kosachev's letter that the CPT delegation visiting Tsentoroy did not find either secret detention facilities there or any facts proving the rumours of their existence and that no applications or complaints regarding unlawful detentions in this locality were received by local law enforcement authorities is clearly contradicted by the CPT's own public findings:

> "*In the course of the 2006 visits, the CPT's delegation again spoke with a number of persons who gave detailed and credible accounts of being unlawfully held – on occasion for prolonged periods – in places in the Chechen Republic. Frequent reference was made to facilities located in the village of Tsentoroy in the Kurchaloy district […] . In certain cases, **formal complaints had been lodged with the prosecution services** relating to unlawful detention and ill-treatment at Tsentoroy. […] The CPT's delegation gained access to Tsentoroy on 2 May 2006 […]. **The layout of the compound and, more specifically, the location and internal features of the secure rooms and adjacent ante-room, corresponded closely to descriptions which the delegation had received from persons who alleged that they had been held there** (and subjected to various forms of ill-treatment).*"

### b. Alleged secret detentions in Grozny

342.    Another allegedly illegal prison in the Chechen Republic – located in Grozny, the capital of the Chechen Republic – is under discussion before the Sub-Committee on Human Rights. Prompted by a publication of the Russian human rights group "Memorial"[293] alleging the destruction of evidence concerning acts of torture and enforced disappearance by the destruction of a former school building, which had until recently housed a notorious detention centre of the Ministry of the Interior of the Chechen Republic, the Sub-Committee asked the Russian Prosecutor General's Office for explanations. The building was razed to the ground within hours of "Memorial" going public with its findings of damning inscriptions on the walls of cells and other evidence collected on the premises, which "Memorial" documented on video to the extent possible. The explanations given to the Sub-Committee in the Prosecutor General's reply of 11 September 2006 were not considered satisfactory by the Sub-Committee. Its additional questions of 12 October 2006 were answered on 21 May 2007. I prefer not to comment on these replies now, as they are yet be discussed by the Sub-Committee[294].

343.    Whilst I am not in a position to draw any final conclusions from the as yet incomplete information presented above, regarding the razed detention centre in Grozny, there no longer seems to be any doubt, in the light of the CPT's public statement, that persons had been detained secretly in Tsentoroy[295]. I also cannot help noticing the general lack of transparency permeating detentions in the North Caucasus characterised by thousands of disappearances that are still not elucidated, especially in cases where there are indications that one or the other of the State institutions responsible for law enforcement was involved. In several recent decisions, the European Court of Human Rights has condemned the Russian Federation for failing seriously and effectively to investigate such cases[296].

---

[291] In a letter of 20.03.2007 published on the website of the Russian Ministry of Foreign Affairs, the Ministry's Director of Humanitarian Cooperation and Human Rights complained to the CPT chair about the publication of certain elements of reply the Russian authorities consider as confidential.

[292] I refer, in particular, to page 24 of document CPT/Inf (2007)17.

[293] Human Rights Center Memorial, May 2006 (on file, English version provided by International Helsinki Federation, Vienna, on 14.06.2006, complete with transcription of wall inscriptions, and photographs taken by Memorial); see also "Unofficial Places of Detention in the Chechen Republic", International Helsinki Federation, Vienna, 15.05.2006 (addressed to me shortly before the publication of the June 2006 Interim Report) http://www.ihf-hr.org/viewbinary/viewdocument.php?doc=1&doc_id=6810.

[294] The topic was last on the Sub-Committee's agenda on 18.04.2007; on the same day, the Russian delegation informed the Sub-Committee's Chair that no reply had yet been received from the Prosecutor General's Office. The Sub-Committee therefore postponed consideration of this matter "for one last time". A reply was received by the Sub-Committee's chair on 21.05.2007.

[295] Cf. Public Statement, §§ 28 and 29 (*supra* note 289) and p. 24 of document CPT/Inf (2007)17, quoting from an official reply by the Russian authorities: "*In the course of the investigation it was established that on the night of 7 November 2004, "D", a member of an armed group (gang), was detained in the Khasavyurt district of the Republic of Dagestan by officers from the ChR President's Security Service and taken to the Security Service base in Tsentoroy. On 8 November 2004 he was transferred to Gudermes ROVD.*" (emphasis added).

[296] Akhmadova and Sadulayeva v. Russia (10.05.2005), Application No 40464/02; Bazorkina v. Russia (27.07.2006), Application No 69481/01; Baysayeva v. Russia (05.04.2007).

344.    As a confidence-building measure, I propose that the Assembly invites the Russian Federation to fully publish the CPT's reports and to work closely with this body to stamp out the practice of secret detentions from its territory, including the North Caucasus.

## VIII.    Need for consensus solutions to the HVD dilemma whilst ensuring respect for human rights

345.    The typical response from members of the Bush Administration when confronted with reports on the impact of United States' policies in the context of the "war on terror" is two-fold. First, they will state that the criticisms are overstated and counter-productive;[297] second, they will complain that the authors of such reports make little effort to propose viable solutions to what they see as an intractable dilemma: how do we target, capture, detain and "bring to justice" the people we suspect of being "high-value" terrorists? John Bellinger tends to pose a simple question to his European counterparts:

> *"I guess I ask you, what is the solution to this problem?"*[298]

346.    In view of the importance and the complexity of terrorism, it seems indispensable to attempt to form an international consensus on its precise nature and scope, as well as on the means to fight against it. Since the US Government continually re-emphasises that its "war on terror" is for the good of citizens of the wider free world, and Europeans in particular, then it is imperative that we agree upon the principles and legal standards that govern it.[299]

347.    We must further ensure that we do not allow our collective vision and judgment to be clouded on issues such as detainee treatment, which I have addressed here through the lens of interrogation techniques.

348.    As I conclude this inquiry, my overwhelming conviction is that clearer and fairer terms of engagement can only result from our finding consensus on how to react. It is also indispensable to take into account political considerations which foster terrorism and the means of modifying them.

### i.    *Towards consensus definitions of phrases used in the "war on terror"*

349.    I believe that three definitions in particular are in urgent need of clarification. The first of these is the notion of a "war" against international terrorists. The policy of the Bush Administration **characterises "war" in unfeasibly broad terms**. It is easy to see why the metaphor of "war" plays a formidable political role in rallying American support for US foreign policy, but it also serves to weaken and destabilise the essential framework upon which the "laws of war" are based.

350.    In the context of my inquiry, I have analysed US "programmes" that President Bush has placed squarely under his "war on terror" metaphor: primarily the "High-Value Detainee" or HVD programme, and the "rendition" programme. Yet these activities rarely resemble war as we know it in the classic military sense. Accordingly I agree with the following assessment of two prominent American commentators:

> *"Insofar as counterterrorism policy requires all of the tools of government, most of these tools will not in fact be the tools of war in the actual meaning of armed conflict. Instead they will involve surveillance, interdiction of terrorist financing, intelligence gathering, diplomacy and other methods. Thus the language of global war is necessarily metaphorical."*[300]

351.    The second ill-conceived expression is that of the "enemy," the present definition of which is an affront to international human rights and, in particular, to our notions of equality before the law. From as early

---

[297] See John Bellinger, Chief Legal Advisor to the US Secretary of State, and Dan Fried, Assistant Secretary of State, Bureau of European and Eurasian Affairs; *Joint Briefing to European Delegation during the visit of the TDIP Temporary Committee of the European Parliament to Washington, DC*, 11.05.2006 (hereinafter "Bellinger, *Briefing to European Delegation*, or Fried, *Briefing to European Delegation*"). Assistant Secretary of State Fried told the delegation: "The undisciplined public discussion, unbalanced by unintelligent conclusions from responsible people such as yourselves can have an unintended consequence of making it more difficult to work effectively to the benefit of your Governments and your societies as well as ours."

[298] Bellinger, *Briefing to European Delegation, Ibidem.*

[299] I do not intend, in this brief section, to repeat my comparative analysis of "Legal Perspectives" in the US and the Council of Europe contained in my report last year, as I feel that it remains just as pertinent today: see the Marty Report 2006, *supra* note 6, at section 10, pp. 54 -59, §§ 265-279.

[300] See Anderson and Massimino, *"Resolving Ambiguities in Detainee Treatment"*, *supra* note 214, at p. 3. The authors also state, at p. 14: "The counterterrorism policies of any new [US] administration or new Congress ... must start from the view that counterterrorism operates across a wide range of activities. At one end is law enforcement ... at the other end is war ... The real action against terrorists themselves takes place in a zone between those two extremes."

*Doc. 11302 rev.*

as President Bush's Military Order of 13 November 2001,[301] to as recently as the Military Commissions Act of 2006,[302] **notions of "otherness" – particularly foreign nationality – have been at the heart of United States policy on detaining terrorist suspects**.

352.    I firmly believe that the same basic human rights standards should be applied equally regardless of whether a detainee is American or non-American, whether ally or adversary, whether of the highest or lowest "value", whether targeted by the CIA, the DoD or the FBI, and whether held on the territory of the United States or overseas. By acting otherwise in its practice and its legislation, the US Government has instituted a form of **legal apartheid**, where human rights and legal protections are applied to detainees in lesser or greater measure on an entirely discriminatory basis.

353.    Nowhere has this legal apartheid been more apparent than in the subject matter of this report – the CIA's covert programme to hold foreign "enemy" HVDs in secret detention overseas, including on the territory of Council of Europe member states. It is high time that we end this untenable discrimination – and with it we must banish forever the Bush Administration mindset that effectively says "if it is illegal for us to use such a practice at home or on our own citizens, let us export or outsource it so we will not be held to account for it."

354.    The third definition we must clarify is that of the "combatant". The strategic choice of the Bush Administration to persist with the "war on terror" metaphor has ultimately had the effect of "conferring on suspected terrorists the elevated status of combatants"[303] – when in reality they ought to be dealt with in the same manner as other members of international criminal networks, such as arms traders, drugs smugglers or human traffickers. I believe that giving such status to members of Al Qaeda has served to galvanise its leadership and reinforce its self-perception as a revolutionary "people's army." Khalid Sheikh Mohamed and other HVDs have capitalised on their status to send "political" messages during their CSRT hearings at Guantanamo Bay.[304] I also agree with the US Army's own assessment that "insurgents" given a sense of legitimacy will surely harden as adversaries, not least in their effective resistance to interrogation.[305]

**ii.    Towards consensus standards on interrogation techniques**

355.    It has now been widely agreed in America and internationally that the "enhanced interrogation techniques"[306] used on the CIA's "high-value" detainees in secret detention overstepped the mark in terms of what is legal, moral and effective. Two very recent commentaries in this area – one by a UN Special Rapporteur[307] and one by an expert group of American "intelligence scientists"[308] – provide arguments in favour of review and strict regulation of interrogation techniques.

---

[301] See Office of the Press Secretary, The White House, "President Issues Military Order: Detention, Treatment and Trial of Certain Non-Citizens in the War Against Terrorism", 13.11.2001, full text available at:
http://www.whitehouse.gov/news/releases/2001/11/print/20011113-27.html.
[302] See Military Commissions Act of 2006, http://www.loc.gov/rr/frd/Military_Law/MC_Act-2006.html. The Act makes explicit distinctions between US citizens and non-citizens, or "aliens", as grounds for affording lesser legal protections (including denial of *habeus corpus* rights) to the latter category.
[303] See Human Rights First, "Testimony of Elisa Massimino before the US House of Representatives, Committee on Armed Services", 29.03.2007, available at http://www.humanrightsfirst.org/. HRF made a compelling case to Congress to review several of the problematic definitions I have discussed here: "How we treat our terrorist suspects – including how we try them – speaks volumes about who we are as a nation, and our confidence in the institutions and values that set us apart. The distinction between the United States and its terrorist enemies has narrowed over the course of this conflict."
[304] I refer here to the Combatant Status Review Tribunal (CSRT) hearings in which KSM and other detainees among the fourteen HVDs at Guantanamo Bay appeared earlier this year, available at:
http://www.defenselink.mil/home/features/Detainee_Affairs/. See, for example, Department of Defense, "Unclassified Verbatim Transcript of CSRT Hearing for ISN 10024" [known to be Khalid Sheikh Mohamed], 10.03.2007. KSM declared himself a "combatant" with the phrase: "For sure, I am American enemies." He also attempted to position himself as a "revolutionary" by stating: "we [Al Qaeda] consider we and George Washington doing same thing."
[305] In this regard, see US Department of Defense, Army Field Manual on Interrogation, FM3-24/MCWP3-33.5, December 2006, at pages 1 to 23. Under the section entitled "Counterinsurgency", the Manual states: "It is easier to separate an insurgency from its resources and let it die than to kill every insurgent [because] dynamic insurgencies can replace losses quickly. Skilful counterinsurgents must thus cut off the sources of that recuperative power." One such source is said to be the status afforded to an insurgent by his enemy.
[306] Six of these "enhanced interrogation techniques" were described in an ABC News report in November 2005, summarised as follows: "water boarding" (induced fear of drowning on a detainee strapped to a board); "cold cell" (naked at 50 degrees Fahrenheit, repeatedly doused with cold water); "long-time standing" (shackled in a stress position for up to 40 hours, causing extreme pain and sleep deprivation); "attention slap" (open-handed strike across the face); "belly slap" (hard, open-handed strike to the stomach); and "attention grab" (taking hold of the detainee's shirt, shaking forcefully). See Brian Ross and Richard Esposito, "CIA's Harsh Interrogation Techniques Described – Sources Say Agency's Tactics lead to Questionable Confessions, Sometimes to Death", ABC News, 18.11.2005, available at:
http://abcnews.go.com/WNT/Investigation/story?id=1322866.
[307] See Martin Scheinin, UN Special Rapporteur on the Promotion and Protection of Human Rights and Fundamental Freedoms while Countering Terrorism, "Press Conference discussing Preliminary Findings on Visit to United States," 16-25.05.2007 (hereinafter "Scheinin, 'Preliminary Findings on Visit to US'").