*Doc. 11302 rev.*

*Reporting committee*: Committee on Legal Affairs and Human Rights

*Reference to committee*: Bureau decision of 30 June 2006, Reference No 3253 of 30 June 2006

*Draft resolution and draft recommendation* adopted by the Committee on 8 June 2007 respectively with 2 votes against and unanimously with 2 abstentions

*Members of the Committee*: Mr Dick **Marty** (Chairperson), Mr Erik **Jurgens**, Mr György Frunda, Mrs Herta Däubler-Gmelin (Vice-Chairpersons), Mr Athanasios **Alevras**, Mr Miguel Arias, Mr Birgir Ármannsson, Mrs Aneliya Atanasova, Mr Abdülkadir Ateş, Mr Jaume **Bartumeu Cassany**, Mrs Meritxell Batet, Mrs Soledad Becerril, Mrs Marie-Louise **Bemelmans-Videc**, Mr Erol Aslan Cebeci, Mrs Pia Christmas-Møller, Mrs Ingrīda Circene (alternate: Mr Boriss **Cilevičs**), Mrs Lydie Err, Mr Valeriy **Fedorov**, Mr Aniello Formisano, Mr Jean-Charles **Gardetto**, Mr Jószef Gedei, Mr Stef Goris, Mr Valery Grebennikov, Mr Holger **Haibach**, Mrs Gultakin Hajiyeva, Mrs Karin Hakl, Mr Nick Harvey, Mr Andres **Herkel**, Mr Serhiy **Holovaty**, Mr Michel Hunault, Mr Rafael Huseynov, Mrs Fatme Ilyaz, Mr Kastriot Islami, Mr Želiko **Ivanji**, Mrs Kateřina Jacques, Mr Karol Karski, Mr Hans Kaufmann (alternate: Mr Andreas **Gross**), Mr András Kelemen, Mrs Kateřina Konečná, Mr Nikolay Kovalev (alternate: Mr Yuri **Sharandin**), Mr Jean-Pierre Kucheida, Mr Eduard Kukan, Mrs Darja Lavtižar-Bebler, Mr Andrzej Lepper, Mrs Sabine **Leutheusser-Schnarrenberger**, Mr Tony Lloyd, Mr Humfrey Malins, Mr Pietro **Marcenaro**, Mr Alberto Martins, Mr Andrew McIntosh, Mr Murat Mercan, Mrs Ilinka Mitreva, Mr Philippe Monfils, Mr João Bosco **Mota Amaral**, Mr Philippe Nachbar, Mrs Nino Nakashidzé, Mr Tomislav Nikolić, Mrs Carina Ohlsson, Ms Ann Ormonde (alternate: Mr Patrick **Breen**), Mr Claudio Podeschi, Mr Ivan **Popescu**, Mrs Maria Postoico, Mrs Marietta de Pourbaix-Lundin, Mr Christos **Pourgourides**, Mr Jeffrey Pullicino Orlando, Mr Valeriy Pysarenko, Mr François Rochebloine, Mr Francesco Saverio Romano, Mr Armen Rustamyan, Mr Kimmo **Sasi**, Mr Christoph **Strässer**, Mr Mihai Tudose, Mr Vasile Ioan Dănuț **Ungureanu**, Mr Øyvind **Vaksdal**, Mr Egidijus **Vareikis**, Mr Miltiadis Varvitsiotis (alternate: Mrs Elsa **Papadimitriou**), Mrs Renate Wohlwend, Mr Marco Zacchera, Mr Krysztof **Zaremba**, Mr Vladimir Zhirinovsky, Mr Miomir Žužul

N.B.: The names of the members who took part in the meeting are printed in **bold**

*Secretariat of the Committee*: Mr Drzemczewski, Mr Schirmer, Mrs Maffucci-Hugel, Ms Heurtin, Mrs Schuetze-Reymann

Parliamentary **Assembly**
**Assemblée** parlementaire



**Doc. 11302 Addendum**
19 June 2007

# Secret detentions and illegal transfers of detainees involving Council of Europe member states: second report

Appendix to the report
Committee on Legal Affairs and Human Rights
Rapporteur: Mr Dick MARTY, Switzerland, Alliance of Liberals and Democrats for Europe

*Summary*

1. Dissenting opinion by the delegation of Poland to the Parliamentary Assembly (letter of 14 June 2007)

2. Dissenting opinion by the delegation of Romania to the Parliamentary Assembly (letter of 15 June 2007)

http://assembly.coe.int

F – 67075 Strasbourg Cedex, e-mail: assembly@coe.int
tel : + 33 3 88 41 2000, fax + 33 3 88 41 2776

*Doc. 11302 Addendum*

1. **Dissenting opinion by the delegation of Poland to the Parliamentary Assembly (letter of 15 June 2007)**

**"Position of the Polish Delegation to the Parliamentary Assembly of the Council of Europe on 'Secret detentions and illegal transfers of detainees involving Council of Europe member states: second report'**

From the beginning when the issue of alleged CIA secret detention centres appeared in the media, the Government of Poland strongly denied the speculation as to the existence of such centres on the territory of the Republic of Poland, supposedly used for the detention of foreigners suspected of terrorism.

At the same time the Government of Poland cooperated with Senator D. Marty in his investigation carried out in relation to the above mentioned media speculations. One should underline that Mr. D. Marty did not present any concrete evidence against Poland. His arbitrary and unduly statements were not met with appreciation by the Council of Europe but gained wide impact in the media.

The Polish Delegation to the Parliamentary Assembly of the Council of Europe cooperated in an honest and open manner with Senator D. Marty facilitating the implementation of his task as well as providing assistance in his contacts with the Polish authorities.

The Polish Government has conducted its own internal investigation, in order to verify the information, which has proven that the accusations were totally unfounded. Currently Poland is not in the possession of any new information, which would indicate a change in this state of affairs.

Therefore we wish to express our most profound astonishment to the adoption by the Committee on Legal Affairs and Human Rights of the Council of Europe Parliamentary Assembly on the 8 June 2007 of the second report, which to a large extent refers to Poland. The Report is based on suspicions, which were not confirmed by any evidence.

The clear Polish position has been conveyed by the Polish Minister of Foreign Affairs in a letter to the Secretary General of the Council of Europe Mr. Terry Davis (17 February 2006) as well as by the Head of the Polish Delegation to the Council of Europe Parliamentary Assembly in a letter to Mr Marty (on 23 January 2006).

The Polish Delegation to the Parliamentary Assembly of the Council of Europe rejects the report and expresses indignation at its content."

*Signed:*

| | |
|---|---|
| Tadeusz IWIŃSKI<br>Chairman of the Polish delegation<br>2001 – January 2006 | Karol KARSKI<br>Chairman of the Polish Delegation<br>since January 2006 |

*Doc. 11302 Addendum*

**2.   Dissenting opinion by the delegation of Romania to the Parliamentary Assembly (letter of 15 June 2007)**

**"Romanian Delegation comments on the Parliamentary Assembly report 'secret detentions and illegal transfers of detainees involving council of Europe member states: second report'**

After the first allegations were published by the press, the Romanian delegation to PACE has strongly supported the proposal to initiate a serious inquiry on this issue. Our position was based on the assessment that such an important issue as the allegations concerning unlawful transfer of detainees and secret detention centres should legitimately be placed on the agenda of the Council of Europe, as there is no freedom without security, and no security without freedom.

*I.   In the context of the spreading of allegations about so-called extra-judiciary renditions from or transiting European states and "existence of illegal CIA detention centres", the Romanian Authorities have launched an internal process of investigating those allegations, notably those referring – directly or indirectly – to our country.*

All competent institutions of Romanian Administration initiated independent inquires on the allegations on the existence of illegal CIA detention centres on Romanian territory and were made public.

Moreover, the genuine determination of Romanian authorities to find the truth led to the establishment, on the 21st of December 2005, of an independent Parliamentary Enquiry Commission for the Investigation of the Allegations on the existence of CIA detention centres in Romania. All the Romanian institutions which might have connection with this field provided any data or other information necessary for the work of the Commission, aiming at the assessment of the real situation. The findings of the Commission were endorsed by the Parliament in its plenary and made public. The report and other information needed to clarify the circumstances which raised concerns or formed the basis of the accusations were conveyed by the Romanian authorities to international bodies including to the PACE special rapporteur.

In full transparency, in 2005, the Romanian authorities have also decided "to allow and encourage investigations at all the locations suspected to have hosted CIA centres, on the territory of Romania". Therefore, the airports Mihail Kogalniceanu of Constanta (including the military airbase) were inspected by representatives of international NGOs, as well as by Romanian and foreign journalists.

All these separate investigations proved the lack of any evidence to confirm the existence or the mere possibility of presence of illegal detention centres and concluded that the accusations against Romania were groundless.

These findings were reflected in the official positions assumed publicly by the Presidency of Romania, the Government of Romania, the Ministry of Foreign Affairs, the Ministry of Defence, the Ministry of Administration and Internal Affairs and the Romanian Intelligence Service.

The Romanian authorities were opened to all demands on these issues, stemming from international bodies (the Council of Europe and the European Parliament), non-governmental organisations and media. At the requests of the Secretary General of the Council of Europe, Mr. Terry Davis, and the Special rapporteur of PACE, Romania offered all the data on this issue and the necessary explanations regarding national supervision mechanisms of foreign intelligence services which would have acted on Romanian soil and also concerning the jurisdictional framework over foreign flights transiting national territory.

As a responsible member of the international community, Romania used its capacity and its will to observe international commitments and implement the rule of law and the democratic values on its territory.

*Doc. 11302 Addendum*

II.   In this context, the Romanian delegation was surprised by the conclusions of the second report prepared by PACE special rapporteur, Mr. Dick Marty and the proposals included in the project of resolution/recommendation, which contradicts the outcome of all the inquires that have been undertaken independently by different Romanian institutions.

In these circumstances, regrettably, the Romanian authorities were put in the position of seriously questioning the impartiality of the demarches made by the rapporteur. While welcoming his commitment to human rights, we strongly reject the accounts and the conclusions of the rapporteur regarding Romania. The new accusations launched by Mr. Marty against Romania are exclusively founded on speculations, self-quotations, pretended confidential sources, and inferences backed by mass-media allegations.

Without bringing pertinent evidence and refusing to undertake on the spot visits, the rapporteur is citing the names of former or present Romanian dignitaries and institutions, part of the national security system of our country, ignoring such a fundamental principle as the presumption of innocence, under the cover of a so-called political message. The Romanian authorities have been forced to defend themselves against grave accusations, brought upon unrevealed grounds.

By his approach, consisting in disregard of relevant information, in order to arrive at pre-established conclusions, the rapporteur presents opinions as truths and insinuations as facts. We consider that the report tends to discredit the efforts of the Romanian democratic institutions and of the whole Romanian society to meet the higher standards of human rights protection and public accountability.

Moreover, the report shades an undue bad light on a defender of democratic values, namely NATO. Accordingly, the cooperation framework of this organisation is depicted as a cover for illegal operations, amounting to torture, inhumane or degrading treatments.

In the same way, the report challenges the reputation of the Parliamentary Assembly of the Council of Europe. It goes without saying that the Romanian authorities are bound to defend the credibility of the PACE, by reaffirming their steady commitment towards the values it stands for, as well as their readiness to engage in authentic demarches aiming at the promotion of those values. Bearing this in mind, we express the hope that the collective wisdom of the PACE will find ways to address the issues raised by the distinguished rapporteur, placing them in a just perspective.

III.   With regard to the specific allegations made in the report of the Senator Dick Marty, we stress the following:

1.   The General Directorate for Defence Intelligence (Direcția Generală de Informații a Apărării – DGIA) is the departmental structure of the Ministry of Defence, specialized in collection, check and use of the external military intelligence and responsible with the counter-information and security of the Army. In conformity with legal provisions, the institution is subjected to the democratic civil control through the Minister of Defence, to whom it is directly subordinated.

DGIA is also subjected to the parliamentary control, of the Committees of Defence, Public Order and National Security of the Senate and of the Chamber of Deputies, as well as of the CSAT (Supreme Council of National Defence). On a regular basis, the decisional staff of DGIA presents reports of activity to the competent parliamentary committees. Also, at the request of the presidents of the parliamentary Committees, the chief of DGIA elaborates viewpoints on specific issues.

2.   The Directorate for Military Intelligence (Direcția de Informații Militare – DIM/J2) is a component of DGIA: DIM/J2 has as main duties the collection, processing and dissemination of external military intelligence referring to armed conflicts, terrorist activities and other activities outside the national territory which might endanger the national security of Romania, of allies and partners. DIM/J2 has not concluded bi- or multilateral cooperation agreements with civil intelligence services, like CIA, its specific activities being deployed only in cooperation with similar military structures. As a consequence, DIM/J2 could not and did not deploy operations or other types of activities similar to those indicated in the report of Mr. Dick Marty.

Competences with regard to proportioning, restructuring and reorganising DIM/J2 belong exclusively to political-military decision-makers of the Romanian State and they are in conformity with the

*Doc. 11302 Addendum*

provisions of the Strategy on the National Security of Romania and other existing strategies on adapting of the military structure with a view to ensuring national, and European security, as well as to complying with its obligations as a NATO and EU Member State.

3.   With reference to the Joint Operations Centre, we underline that there has not been and there is not such structure on the Romanian territory. Consequently, DGIA staff could not have participated to activities of the type indicated in the Report.

4.   The decision-making staff of the DGIA was not involved neither institutionally, nor individually, in actions and activities of cooperation with US civil intelligence structures, as such involvement would have exceeded their competencies and internal regulations in force. The assertions about pretended information got from a supposed agent of the Romanian intelligence services are unconvincing, completely unprofessional and disqualifying for the author.

In this regard, we point out that, even since the NATO pre-accession period, within the offer of forces, Romania made available to NATO/PfP military facilities of the type indicated in the graphics appended to the Report (Appendix 2 AS/Jur /2007)36), in the view of carrying out joint activities with partners. We mention in this respect the Military Base Mihail Kogalniceanu (MK Airfield) and the Babadag Training Area. According to the general rules of safety in this field, securing those objectives during the deployment of military-type activities is absolutely common. The actions to secure have as object both the protection of civilian population against dangers of military activities and the protection of troops against eventual terrorist attacks. All joint training activities deployed in this area have been publicly notified. The limitation of public access in those locations is an internationally recognized custom, being in accordance not only with the military necessity, but also with the generally recognized principles of law.

5.   Therefore, in accordance with the legal provisions regarding the Romanian national security institutional framework, the activities of the kind described by Mr. Dick Marty, according to which members of the Supreme Council of National Defence, of the Presidency, Government or other politico-military decision-makers would have been involved in concealing supposed CIA activities on the territory of Romania were not possible and did not happen in any circumstance, having in view that the organisational and operational laws of the above-mentioned bodies do not afford reaching or making decisions of this type.

We are fully convinced that the Parliamentary Assembly of the Council of Europe will be consequent in following its principles and values, through the firm rejection of these groundless accusations. Irrespective of the result of the vote on 27 June 2007, Romania will continue to be fully opened to the cooperation with any European of international body, of private or public law, with a view to clarifying the allegations regarding the Romanian state, and will firmly act towards the consolidation of democracy and the efficient protection of Human Rights."

*Signed:*

Gyorgy FRUNDA
Chairman of the Romanian delegation