# EXHIBIT U

**All Party Parliamentary Group on Extraordinary Rendition
House of Commons**

25th September 2007

Dear Colleague,

I welcome the opportunity to introduce the APPG's proposal to improve the UK's mechanisms for dealing with rendition requests. This makes a practical contribution to the debate about how governments should deal with the US policy of rendition. This is an issue on which there is great deal of concern right across the House of Commons. I hope that the UK government will consider our proposal carefully.

We have been fortunate to have received helpful advice and comments from a number of experts and organisations. I would particularly like to thank Stuart Wheeler, whose generous support has enabled the production of these measures and the progress of the APPG to date, and Mark Pallis, Senior Adviser to the APPG who has coordinated the development of these measures. I would also like to thank: Nicholas Blake QC, Matrix Chambers; Professor James Crawford SC, University of Cambridge; Andrew Lydiard QC, Brick Court Chambers; G. Brent

1

Mickum IV, Spriggs & Hollingsworth; Professor Manfred Nowak, UN Special Rapporteur on Torture; Sarah Przybylska, APPG Research Associate; Sir Clive Stafford Smith, Reprieve; Elizabeth Wilmshurst, Chatham House. I would also like to thank the following organisations: Amnesty International; Human Rights Watch; London School of Economics, Centre for Human Rights; Liberty; Justice; New York University School of Law, Centre for Human Rights and Global Justice; Redress.  The views expressed in this paper are the views of the APPG alone.

Yours sincerely

**ANDREW TYRIE**

Chairman, All Party Parliamentary Group on Extraordinary Rendition



**All Party Parliamentary Group on Extraordinary Rendition
House of Commons**

A MEASURE TO SAFEGUARD THE RIGHTS OF INDIVIDUALS SUBJECT TO
RENDITIONS

Summary

It is the express policy of the US government to transfer people from the country where they were captured to third countries for the purposes of interrogation or detention. The countries to which people are transferred include those known to practice torture, cruel, inhuman or degrading treatment. Knowingly assisting the US in this practice is morally questionable and also risks placing the UK in breach of domestic and international obligations.

*What is Extraordinary Rendition and why should it be opposed?*

A rendition that involves a risk of torture or other ill treatment for the transferred person is known as an extraordinary rendition. Both US Secretary of State Condoleezza Rice and President Bush have acknowledged the policy, and vigorously defended it as a vital component in the US' counterterrorism strategy. Extraordinary Rendition should not be permitted because:

- Subjecting people to torture, cruel, inhuman or degrading treatment is morally wrong and cannot be countenanced as an instrument of policy.
- Operationally, evidence obtained under such circumstances is likely to be unreliable. Such information cannot be used in court to obtain convictions, therefore the practice is not only undermines the rule of law, it also makes the application of law more difficult.
- Politically, the policy of extraordinary rendition is also likely to be counter productive. The US, and the countries that assist it, are seen to be undermining the values that they are seeking to export. Furthermore, as the UK found when it used unacceptable methods in Northern Ireland in the 1970s, the policy acts as a recruiting sergeant, creating more extremists that it stops.

*Why are the UK's current arrangements inadequate?*

- The UK's position on cooperating with a rendition is that it will only grant permission for a rendition if it would accord with the UK's domestic and international obligations. This is unsatisfactory.
- The government's records on rendition are wholly inadequate – as evidenced by the statement of the Former Foreign Secretary Jack Straw on 12 December 2005. They are incomplete and rely on personal recollections. This means that the government cannot adequately be held to account for the decisions they have taken.

3

- Questions have been raised about 73 – 170 possible CIA rendition flights through the UK. The government does not appear to have independent records to indicate whether these were or were not rendition flights.
- The refusal by the government, fully and openly, to address the issue of rendition and the poor quality of records kept create a climate of confusion.  This lack of clarity hampers effective counterterrorism policy.

*What is the APPG's proposed measure?*

The measure would begin with a statement of the duty of member states to prevent their territory from being used to facilitate the transfer of detained persons to places where there is a real risk of torture, inhuman or degrading treatment or other flagrant denial of their human rights.

The measure itself comprises four elements:
- It would apply whenever a state sought to transport a detained person through the territory or airspace of another state.
- Every such transfer would require prior written permission
- The state requesting permission must provide:
  o Information as to the state of destination
  o The purpose of the transfer and the applicable legal regime
  o Information as to legal safeguards in the destination state for the benefit of the detained person
  o Information about the procedures to which the individual being transferred had access to challenge his or her transfer prior to removal on the basis of a fear of torture, ill-treatment, enforced disappearance, or other reason
  o Such information as the transit state may require when considering the request
- The state through which the transfer would take place would not grant permission unless the transfer was consistent with its legal obligations, including in the field of human rights.

What will the APPG's proposed measure do?

- Ensure that the UK maintains adequate records of requests for permission to conduct renditions through UK territory or airspace;
- Ensure that the UK no longer simply relies on the recollections of officials;
- Safeguard the rights of persons being transferred;
- Ensure that the UK acts in a manner that is consistent with its international and domestic obligations.

Contact: Andrew Tyrie MP, Chairman, APPG on Extraordinary Rendition; 0207 219 6371; marsha@parliament.uk or Mark Pallis, pallism@parliament.uk

*Improving the UK's existing mechanisms for dealing with rendition requests*

## 1. There is no debate, rendition is a fact

The US has a longstanding policy of using 'renditions' as part of their campaign against terrorism.  US Secretary of State Condoleezza Rice set out the policy as follows:

> 'For decades, the United States and other countries have used "renditions" to transport terrorist suspects from the country where they were captured to their home country or to *other countries* where they can be *questioned, held,* or brought to justice.'[1](Emphasis added).

She went on to state: 'Where appropriate, the United States seeks assurances that transferred persons will not be tortured.'  This confirms that people are indeed sent to countries where the risk of torture is sufficiently great to necessitate the seeking of assurances. The effectiveness of such assurances in preventing maltreatment is questionable. An illustrative case is that of Maher Arar, a Canadian citizen, rendered to Syria by the US in 2002. The US had apparently sought assurances from Syria with respect to Mr Arar's treatment,[2] yet a Canadian Commission of Inquiry[3] held that during his

---

[1] http://www.state.gov/secretary/rm/2005/57602.htm
[2] http://www.ccr-ny.org/v2/newsroom/headlines/headline.asp?ObjID=X8priPbFkY&Content=844
[3] www.ararcommission.ca

5

10 month detention, Mr Arar had been beaten repeatedly with heavy cable and held in a cell barely larger than a coffin. Mr Arar was awarded £4.5 million in compensation by Canada.

## 2. Secret detention is a fact

The US has also detained individuals at secret facilities, outside the US. Details of this program were made public by President Bush in September 2006.[4] He said:

> 'In addition to the terrorists held at Guantanamo, a small number of suspected terrorist leaders and operatives captured during the war have been held and questioned outside the United States, in a separate program operated by the Central Intelligence Agency. ... Many specifics of this program, including where these detainees have been held and the details of their confinement, cannot be divulged.
> ....
> Within months of September the 11th, 2001, we captured a man known as Abu Zubaydah. ... We knew that Zubaydah had more information that could save innocent lives, but he stopped talking. As his questioning proceeded, it became clear that he had received training on how to resist interrogation. And so the CIA used an alternative set of procedures. ...
>
> But as more high-ranking terrorists are captured, the need to obtain intelligence from them will remain critical -- and having a CIA program for questioning terrorists will continue to be crucial to getting life-saving information.'

---

[4] http://www.whitehouse.gov/news/releases/2006/09/20060906-3.html

6

From a procedural perspective, rendition and secret detention are notable because:

- The individual transferred for interrogation has not been formally charged with any offence;

- The individual transferred for detention has not been convicted of any offence;

- The individual transferred is not given an opportunity to challenge their transfer, detention or treatment in court;

- No time limits are set for the duration of the interrogation or the detention.[5]

The US has not rescinded either the renditions programme or the secret detention program.  The fact that in the future more transfers may take place means that the UK and other countries must be ready to deal with US requests for assistance.

### 3. UK's role

The UK's acknowledged past involvement in the US renditions program is as follows:

- There have been a total of five occasions since 1997 when the United States have sought permission from the United Kingdom for permission to render someone through United Kingdom territory or airspace.

---

[5] For example, President Bush stated that terror suspect Abu Zubayda was captured 'within months of September 11th 2001' and held in a secret CIA run facility for 5 years without any opportunity to challenge his detention.  He was transferred to Guantanamo Bay in September 2006.

- o On two occasions in 1998, permission was granted for the rendition of suspects to trial in the United States.

- o On a further two occasions in 1998, permission was refused.

- o In 2004, an approach was made by the United States for permission to conduct a rendition, but the United Kingdom indicated that permission would be refused if they were asked to give it.

In addition, questions have been raised about between 73 - 170 flights through the UK or its overseas territories since 2001 by planes which have been linked to renditions.[6]   The investigation presently being undertaken by the Intelligence and Security Committee must shed light on these flights, and specifically whether they were rendition flights, and whether the UK has broken domestic or international law by allowing them to overfly the UK.

4. UK's measures for dealing with rendition requests

The government have described the measures applicable to the granting of permission to rendition flights in the following terms:

'We would expect the US authorities to seek permission to render detainees via UK territory and airspace, including overseas territories, and we will grant permission only

---

[6] See for example, the 73 flights referred to in House of Commons written answer from the Secretary of State for Transport, Mr Darling. 17 March 2006, Col. 2508W http://www.publications.parliament.uk/pa/cm200506/cmhansrd/cm060317/text/60317w02.htm#60317 w02.html_sbhd2 . In addition, the Temporary Committee of the European Parliament, which investigated rendition, referred to '170 stopovers made by CIA-operated aircraft at UK airports, which on many occasions came from or were bound for countries linked with extraordinary rendition circuits and the transfer of detainees'. http://www.europarl.europa.eu/comparl/tempcom/tdip/default_en.htm

8

if we are satisfied that the rendition would accord with UK law and our international obligations.'[7]

This system has proved to be inadequate and must be strengthened.

## 5. Failures of the existing measures

The existing measures have not generated adequate records. The former Foreign Secretary, Jack Straw, in his answer to a parliamentary question on 12 December 2005, highlighted the wholly inadequate state of the Foreign Office records on rendition - some records were incomplete, others were based on personal recollections:

> Additional research covering the remainder of the period of office of this Government (i.e. back to May 1997) has been undertaken. This shows there were some renditions via the UK during that period. Specifically, we have identified two definite occasions in 1998 when requests were made by the US. These occasions, for which records have been identified, were for transfer to the US for the person concerned to stand trial there. As the then Home Secretary I agreed these requests.

> Although confirmatory records have yet to be identified, we believe that there may have been one or two other possible cases, also in 1998, which concerned requests by the US but for transfer to a third country. We have information on one such case which is incomplete and does not tell us whether the request was refused. We also have information on a case based on the recollection of officials involved in such matters, without any confirmatory records. The officials' recollection is that the case

---

[7] Tyrie WPQ 20 March 2006 [59974]. The government have confirmed that this is a legal requirement and that it derives from 'an aspect of the principle of State sovereignty over territory.' Tyrie WPQ 18 April 2006 [61538]. Further, the government have not described other states as being 'required' to seek permission. The reference is consistently to other states being 'expected' to seek permission.

was refused. It is likely, but not certain, that the two cases are in fact one and the same. I have some recollection of such a case, but, given the passage of time, I cannot be certain. The search for records continues.[8]

Further, questions have been raised in the House of Commons, and by a temporary Committee of the European Parliament, about approximately 73 – 170 CIA flights which have travelled through UK airspace. The government have not responded adequately to these concerns, and have not made the relevant records available, if they exist.

It is highly unsatisfactory for such inadequate records to be kept. Given the government's repeated assertions that it would not assist in a rendition if it was contrary to UK law, it is important for the government to be able to demonstrate that they have put this commitment into practice.  Reliance on incomplete records and personal recollections and a situation where the government are not able to know for sure whether a request was granted or declined means that the government cannot adequately be held responsible for its decisions.

Further, as is demonstrated by the legal section below, the present records do not appear to be rigorous enough, or detailed enough, to demonstrably show that the UK has met the standards required by its legal obligations.

6. The UK's legal obligations

---
[8]

http://www.fco.gov.uk/servlet/Front?pagename=OpenMarket/Xcelerate/ShowPage&c=Page&cid=1063632562982&a=KArticle&aid=1136903381639

The UK is obliged to ensure that three legal principles are adhered to in relation to rendition.

The first is state sovereignty. This principle dictates that the UK has control over the passage of aircraft through its territory or airspace, can refuse permission and can require permission to be sought for such overflight.

The second is the obligation of *'non refoulement'*. This obligation 'precludes any measure, regardless of form, which would have the effect of putting an individual at risk by removing them from a place of safety to a place of threat'.[9] If the UK's assistance in a *refoulement* by another country is such as to make that act also attributable to the UK, the UK would commit an internationally wrongful act.

The third principle is that the UK must ensure that the human rights of the person transferred are respected, including their right not to be subjected to cruel inhuman or degrading treatment. In an Opinion prepared for the All Party Parliamentary Group, Professor James Crawford set out the law as follows:

**'The United Kingdom's independent obligations in light of the allegations made**

---

[9] Lauterpacht and Bethlehem, The Scope and Content of the Principle of Non-Refoulement, Opinion prepared for UNHCR 2001 para 251
http://www.refugeelawreader.org/71/The_Scope_and_Content_of_the_Principle_of_Non-refoulement.pdf

11

Regardless of the United States' position, the United Kingdom has an independent obligation to ensure that its territory is not used to send any person to a country where there is a real risk that he may be tortured.

International law requires torture to be guarded against by active measures.

Applied to rendition, it must be right that 'active measures' should include a credible and rigorous system for ensuring that the transferred person's fundamental rights are not abridged.

The Council of Europe has also been highly critical of states' mechanisms for dealing with rendition in a manner that ensures respect for human rights standards. The Secretary General of the Council of Europe, Terry Davis, produced a report on rendition and secret detention[10] based on the replies to letters which he had written to Member States. The executive summary states:

> The replies confirm that the current controls and procedures for civil air traffic lack adequate safeguards against human rights violations. Requests for further information regarding passengers or search of a civil aircraft presupposes the existence of serious grounds for suspicion. Moreover, most States do not appear to exercise effective controls in order to verify whether State aircraft in transit are used for purposes incompatible with the ECHR. States concerned do not indicate that they have resorted to possibilities of granting overflight permissions for State aircraft subject to a waiver of immunity or on conditions. Existing bilateral and multilateral

---

[10] "Secretary General's report under Article 52 ECHR on the question of secret detention and transport of detainees suspected of terrorist acts, notably by or at the instigation of foreign agencies", SG/Inf (2006) 5, 28 February 2006. Available online at https://wcd.coe.int/ViewDoc.jsp?Ref=SG/Inf(2006)5&Sector=secPrivateOffice&Language=lanEnglish

agreements providing for blanket or automatic overflight rights for State aircraft do not appear to allow for any meaningful controls in order to ensure respect for human rights.

The report also made substantive recommendations:

**Safeguards and controls over air traffic [...]**

a.    The existing international legal framework already permits States to introduce certain safeguards and controls which should be used by member States to the maximum extent possible.  Council of Europe member States should require effective guarantees of respect for human rights in relation to overflight and transit through their airspace.

b.    The appropriate fora to reconsider the international regulatory framework for civil aviation are the International Civil Aviation Organization (ICAO) or the European Organisation for the Safety of Air Navigation ("Eurocontrol").  With a view to deterring repetition of abuse, any violations of civil aviation regulations in relation to irregular transport of prisoners should be denounced and brought to the attention of the competent authorities and, in due course, to the public. The use of civil aircraft for rendition purposes constitutes a violation of the Convention on International and Civil Aviation of 7 December 1944 ("Chicago Convention"). Council of Europe member States should use the existing procedures for the settlement of disputes and bring possible breaches of the Convention before the ICAO Council pursuant to Article 54 of the Chicago Convention.

c.    As regards State aircraft, there are several measures which member States can already take. Under international law, State aircraft enjoy immunity, but no overflight rights. It follows that the consent for overflight could and should be made conditional upon guarantees and control procedures concerning respect for human

13

rights. In addition, international law allows for action in case of abuse. If a State aircraft has been presented as if it were a civil aircraft, that is to say without the required authorisation pursuant to Article 3 c) of the Chicago Convention, the territorial State may require landing. The airplane for which State functions have not been declared will not be entitled to immunity and can be searched.

## 7. Conclusion

The UK must improve the way in which it deals with rendition requests. It should increase the rigour of its requirements and increase transparency. Appendix I sets out the detail of the measure which the APPG is proposing be considered and adopted by the UK and other European states.

14

APPENDIX 1

## Proposal

The APPG's suggested measure to address rendition is as follows – of course, the final drafting will vary according to the legislative vehicle selected.

The measure would be predicated by a statement of the duty of member states to prevent their territory from being used to facilitate the transfer of detained persons to places where there is a real risk of torture, inhuman or degrading treatment or other flagrant denial of their human rights. The measure itself would comprise four elements.

    i.    The measure itself shall apply whenever another state seeks to transport a detained person in transit over the territory of another state;

    ii.    every such transit shall be the subject of advance declaration that a person is being detained and an advance request for written permission for the transit;

    iii.    the transit state shall not grant such permission unless satisfied that the transit is not contrary to the state's international obligations, including in the field of human rights;

    iv.    the requesting state shall therefore provide when seeking permissions:-

        a.    information as the state of destination;

        b.    the purpose of the transfer and the applicable legal regime;

15

c.    information as to legal safeguards in the destination state for the benefit of the detained person;

d.    Information about the procedures to which the individual being transferred had access to challenge his or her transfer prior to removal on the basis of a fear of torture, ill-treatment, enforced disappearance, or other reason;

e.    such information as the transit state may require when considering the request.

*4. Possible vehicles*

The measures could be given effect at a UK level, or at a European level.

UK

There are two possible avenues to propose the measures in the UK: via primary or via secondary legislation.

The most appropriate piece of primary legislation is likely to be the Counter Terrorism Bill.  This bill has yet to be published, but is expected to be brought before parliament in 2008.

The most appropriate avenue for secondary legislation would be a revision of the Air Navigation Order 2005. Such a revision would be created by an Order

16

in Council under the powers of the Civil Aviation Act 1982, s.60(3). This matter could be pursued by writing to the Secretary of State for Transport and encouraging the Secretary of State to make the amendment. It would then be subject to the negative resolution procedure in Parliament.

Council of Europe

The Council of Europe are currently charged with drafting common measures on rendition. The report by Terry Davis explains the matter as follows:[11]

> d. The necessary individual action by each member State must be supported and backed up by collective action. With its recognised expertise in human rights, the Council of Europe could make an important contribution towards the development of effective guarantees and mechanisms as far as the transit of State aircraft is concerned. This transit is based either on bilateral and multilateral agreements or, in the absence of such agreements, on the individual practice of States. The Council of Europe provides an ideal forum to develop a common European approach to transit rights and overflight clearances based on a shared understanding of human rights. A series of model clauses which could be inserted in agreements between member countries and with third countries or used when unilaterally granting overflight clearances or rights could be drawn up to assist member States in this matter. Such clauses would provide for effective guarantees for the protection of human rights of all passengers and safeguards against abuse ("human rights clauses"), thus ensuring compliance with the Convention. In addition, it may be necessary to develop clauses providing for search and seizure in appropriate cases as a condition for diplomatic clearances. In any event, the procedures for obtaining such clearances should be

---

[11] "Secretary General's report under Article 52 ECHR on the question of secret detention and transport of detainees suspected of terrorist acts, notably by or at the instigation of foreign agencies", SG/Inf (2006) 5, 28 February 2006. Available online at https://wcd.coe.int/ViewDoc.jsp?Ref=SG/Inf(2006)5&Sector=secPrivateOffice&Language=lanEnglish

17

reconsidered. Requests for overflight authorisations should provide sufficient information as to allow effective monitoring regarding the identities and status of all persons on board, the purpose of the flight and its final destination as well as the final destination of each passenger.

e.    Relying on collectively agreed clauses would at the same time strengthen the negotiating position of our member States in international fora and vis-à-vis third countries. If necessary, existing treaty arrangements should be reviewed within the relevant organisations in order to ensure effective respect for human rights. [...]

This proposal has been formalised in Council of Europe in Recommendation 1754[12] where the Parliamentary Assembly of the Council of Europe called on the Committee of Ministers to draft a recommendation to Council of Europe member states:

**Alleged secret detentions and unlawful inter-state transfers of detainees involving Council of Europe member states**

---

[12] The Government's view on the Council of Europe's proposal was set out in a reply to a question from Andrew Tyrie MP on 23 Nov 2006. The government's response does not adequately address the shortcomings in the UK's existing measures.

Andrew Tyrie (Chichester, Conservative)

To ask the Secretary of State for Foreign and Commonwealth Affairs what the Government's significant reservations are about the proposals by the Secretary-General of the Council of Europe for (a) the regulation of the security services, (b) civil and state aircraft and (c) state immunity.

Kim Howells (Minister of State (Middle East), Foreign & Commonwealth Office)

The Government believe that domestic legislation and international legal instruments already exist to deal satisfactorily with the concerns raised by the Secretary-General of the Council of Europe. The activities of the British security and intelligence agencies are governed by domestic legislation. Civil and state aircraft and state immunity are governed by customary international law and by treaties, including the Chicago Convention and the 2004 UN Convention on the Jurisdictional Immunities of States and their Property. We see no need to create new mechanisms.

1. The Parliamentary Assembly refers to its Resolution 1507 (2006) on alleged secret detentions and unlawful inter-state transfers of detainees involving Council of Europe member states.

2. The Assembly also recalls its Resolution 1433 (2005) and its Recommendation 1699 (2005) on the lawfulness of detentions by the United States in Guantánamo Bay.

3. The Assembly urges the Committee of Ministers to draft a recommendation to Council of Europe member states containing:

   3.1. common measures to guarantee more effectively the human rights of persons suspected of terrorist offences who are captured from, detained in or transported through Council of Europe member states; and

   3.2. a set of minimum requirements for "human rights protection clauses", for inclusion in bilateral and multilateral agreements with third parties, especially those concerning the use of military installations on the territory of Council of Europe member states.

It appears that, to date, such measures have not yet been drafted.  In light of this, the Council may wish to adopt the measures suggested in this proposal, or use them as the starting point for further development.

19

*5. Rationale for APPG's approach*

The objectives in drafting measures to address rendition have been to ensure the rule of law, and the respect for fundamental human rights.  The approach which has been taken is not novel and is drawn from the rules that apply to transits in extradition and to convicted prisoner transfers. It is appropriate that permission for transit through territory of a rendition flight should be subject to similar rules.

Renditions, based on the definition of Secretary of State Rice, involve the transfer of a detained person from one country to another country for the purposes of questioning, detention, or trial.  Such transfers may involve transit through the territory or airspace of third countries.

As such, they have similarities to the transits that take place in cases of extradition, and those that take place when convicted prisoners are transferred from one state to another, via a third country.

In cases of rendition it must be recalled that no hearing has taken place and the individual has not had an opportunity to challenge their transfer. Therefore, it is even more important for the state through which the transfer takes place to have the right to decide whether to permit the transfer.

20

*1. Extradition*

A fundamental distinction between extradition and rendition is that, in cases of extradition, safeguards are provided by the holding of an extradition hearing prior to the individual's transfer. An additional layer of protection also applies: the express right of the state through which the transfer is taking place to know about the details of the transfer and to give their consent to it.

Under the European Convention on Extradition, 1954, the following rules apply:

**'Article 21 – Transit**

1      Transit through the territory of one of the Contracting Parties shall be granted on submission of a request by the means mentioned in Article 12, paragraph 1, provided that the offence concerned is not considered by the Party requested to grant transit as an offence of a political or purely military character having regard to Articles 3 and 4 of this Convention.

2      Transit of a national, within the meaning of Article 6, of a country requested to grant transit may be refused.

3      Subject to the provisions of paragraph 4 of this article, it shall be necessary to produce the documents mentioned in Article 12, paragraph 2.

4      If air transport is used, the following provisions shall apply:

a    when it is not intended to land, the requesting Party shall notify the

Party over whose territory the flight is to be made and shall certify that

one of the documents mentioned in Article 12, paragraph 2.a exists.[13]

In the case of an unscheduled landing, such notification shall have the

effect of a request for provisional arrest as provided for in Article 16,

and the requesting Party shall submit a formal request for transit;

b    when it is intended to land, the requesting Party shall submit a formal

request for transit.

5    A Party may, however, at the time of signature or of the deposit of its

instrument of ratification of, or accession to, this Convention, declare that it will

only grant transit of a person on some or all of the conditions on which it grants

extradition. In that event, reciprocity may be applied.

6    The transit of the extradited person shall not be carried out through any territory

where there is reason to believe that his life or his freedom may be threatened

by reason of his race, religion, nationality or political opinion.'

---

[13] **Article 12 – The request and supporting documents**
1    The request shall be in writing and shall be communicated through the diplomatic channel.
Other means of communication may be arranged by direct agreement between two or more
Parties.
2    The request shall be supported by:
   a    the original or an authenticated copy of the conviction and sentence or detention order
        immediately enforceable or of the warrant of arrest or other order having the same effect
        and issued in accordance with the procedure laid down in the law of the requesting Party;
   b    a statement of the offences for which extradition is requested. The time and place of their
        commission, their legal descriptions and a reference to the relevant legal provisions shall
        be set out as accurately as possible; and
   c    a copy of the relevant enactments or, where this is not possible, a statement of the
        relevant law and as accurate a description as possible of the person claimed, together with
        any other information which will help to establish his identity and nationality.

*2. Transfer of Sentenced persons*

Under the European Convention on the Transfer of Sentenced Persons 1983, transit can be refused in certain circumstances. Signatories are also provided with the right to be notified in cases of overflight – in practice, several countries have availed themselves of this option.

A reason why notification is not expressly required is that unlike cases of extradition, where the individual has not yet been convicted, under the Convention on Sentenced Prisoners scheme, the individual has already been subject to judicial proceedings and convicted.  The fact of conviction means that the state through which the transit is taking place does not face the same degree of legal obligations, and consequently can opt on whether to be notified of the transfer or not.

The relevant part of the European Convention on the Transfer of Sentenced Persons provides:

**'Article 16 – Transit**

1    A Party shall, in accordance with its law, grant a request for transit of a sentenced person through its territory if such a request is made by another Party and that State has agreed with another Party or with a third State to the transfer of that person to or from its territory.

2    A Party may refuse to grant transit:

23

a     if the sentenced person is one of its nationals, or

b     if the offence for which the sentence was imposed is not an offence under its own law.

3     Requests for transit and replies shall be communicated through the channels referred to in the provisions of Article 5.2 and 3.

4     A Party may grant a request for transit of a sentenced person through its territory made by a third State if that State has agreed with another Party to the transfer to or from its territory.

5     The Party requested to grant transit may hold the sentenced person in custody only for such time as transit through its territory requires.

6     The Party requested to grant transit may be asked to give an assurance that the sentenced person will not be prosecuted, or, except as provided in the preceding paragraph, detained, or otherwise subjected to any restriction on his liberty in the territory of the transit State for any offence committed or sentence imposed prior to his departure from the territory of the sentencing State.

7     No request for transit shall be required if transport is by air over the territory of a Party and no landing there is scheduled. However, each State may, by a declaration addressed to the Secretary General of the Council of Europe at the time of signature or of deposit of its instrument of ratification, acceptance, approval or accession, require that it be notified of any such transit over its territory.'

From the foregoing, a number of conclusions can be drawn:

- Flights which transfer individuals in detention from one country to another, via a third country, are already subject to control in certain circumstances.

- The greater the risk that the individuals rights may be breached, the more stringent the rules that apply.

Accordingly, it is both logical and appropriate to approach control of rendition flights in the manner suggested by the APPG.

25