# EXHIBIT W



# Intelligence and Security Committee

# Rendition

Chairman:
The Rt. Hon. Paul Murphy, MP

Cm 7171 £18.00



# Intelligence and Security Committee

# Rendition

Chairman:
The Rt. Hon. Paul Murphy, MP

Presented to Parliament by the Prime Minister
by Command of Her Majesty
JULY 2007

Cm 7171 £18.00

© Crown Copyright 2007

The text in this document (excluding the Royal Arms and departmental logos) may be reproduced free of charge in any format or medium providing that it is reproduced accurately and not used in a misleading context. The material must be acknowledged as Crown copyright and the title of the document specified.

Any enquiries relating to the copyright in this document should be addressed to The Licensing Division, HMSO, St Clements House, 2–16 Colegate, Norwich NR3 1BQ.
Fax: 01603 723000 or e-mail: licensing@cabinet-office.x.gsi.gov.uk

*From: The Chairman, The Rt Hon Paul Murphy MP*

## INTELLIGENCE AND SECURITY COMMITTEE
70 Whitehall, London SW1A 2AS

ISC 160/2007                                                                                     28 June 2007

The Rt Hon Gordon Brown MP
Prime Minister
10 Downing Street
London SW1A 2AA

Dear Gordon,

I enclose the Intelligence and Security Committee's Report on *Rendition*. Our inquiry has considered whether the UK intelligence and security Agencies had any knowledge of, and/or involvement in, rendition operations, and also the Agencies' overall policy for intelligence sharing with foreign liaison services.

The Committee would be grateful if you would lay this Report before Parliament as soon as possible.

Yours ever,

**PAUL MURPHY**

# THE INTELLIGENCE AND SECURITY COMMITTEE

The Rt. Hon. Paul Murphy, MP (Chair)

| | |
|---|---|
| The Rt. Hon. Michael Ancram QC, MP | The Rt. Hon. Alan Beith, MP |
| Mr Ben Chapman, MP | The Rt. Hon. Lord Foulkes of Cumnock *(from 7 February 2007)* |
| The Rt. Hon. George Howarth, MP | The Rt. Hon. Michael Mates, MP |
| Mr Richard Ottaway, MP | Baroness Ramsay of Cartvale *(until 6 February 2007)* |
| Ms Dari Taylor, MP | |

The Intelligence and Security Committee (ISC) was established by the Intelligence Services Act 1994 to examine the policy, administration and expenditure of the Security Service, Secret Intelligence Service (SIS) and Government Communications Headquarters (GCHQ). The Committee has developed its oversight remit, with the Government's agreement, to include examination of the work of the Joint Intelligence Committee (JIC) and the Intelligence and Security Secretariat, which includes the Assessments Staff in the Cabinet Office. The Committee also takes evidence from the Defence Intelligence Staff (DIS), part of the Ministry of Defence (MoD), which assists the Committee in respect of work within the Committee's remit.

The Prime Minister, in consultation with the leaders of the two main opposition parties, appoints the ISC members. The Committee reports directly to the Prime Minister and through him to Parliament, by the publication of the Committee's reports.

The members are subject to Section 1(b) of the Official Secrets Act 1989 and have access to highly classified material in carrying out their duties. The Committee takes evidence from Cabinet Ministers and senior officials – all of which is used to formulate its reports.

The Committee is required by the Intelligence Services Act to produce an Annual Report on the discharge of its functions, which the Prime Minister is required to lay before Parliament. The Committee can produce other reports on specific topics. When laying a report before Parliament, the Prime Minister, in consultation with the Committee, excludes any parts of the report (indicated by the *** in the text) that would be prejudicial to the continuing discharge of the functions of the three intelligence and security Agencies. To date, no material has been excluded without the Committee's consent.

# CONTENTS

| | |
|---|---|
| **The Intelligence and Security Committee** | **Page iv** |
| **Contents** | **Page 1** |
| **List of Abbreviations** | **Page 3** |
| **Introduction** | **Page 5** |
|     Background | Page 5 |
|     Terms of Reference | Page 5 |
|     Definitions | Page 6 |
| **Legal Framework** | **Page 7** |
|     UK Domestic Law | Page 7 |
|     International Law | Page 7 |
|     U.S. Interpretations of International Law | Page 9 |
| **The Nature of Intelligence Sharing** | **Page 11** |
|     Value of Shared Intelligence | Page 11 |
|     Problems | Page 12 |
| **Pre-9/11 Events** | **Page 14** |
|     UK Agencies' Actions | Page 14 |
|     UK Government Involvement | Page 16 |
|     Conclusions | Page 17 |
| **Post-9/11 Events** | **Page 19** |
|     Gradual Awareness of a Change in U.S. Policy | Page 19 |
|     A More Cautious Approach | Page 25 |
|     Public Acknowledgement | Page 27 |
|     Conclusions and Recommendations | Page 29 |
| **Specific Cases** | **Page 31** |
|   **Martin Mubanga** | **Page 31** |
|     Background | Page 31 |
|     Outcome of Investigation | Page 32 |
|     Conclusion | Page 32 |
|   **Binyam Mohamed al-Habashi** | **Page 33** |
|     Background | Page 33 |
|     Allegations | Page 33 |
|     Outcome of Investigation | Page 33 |
|     Conclusions | Page 34 |

| | |
|---|---|
| **A Deportation Without Safeguards** | **Page 35** |
|     Conclusion | Page 35 |
| **Bisher al-Rawi and Jamil el-Banna** | **Page 36** |
|     Introduction | Page 36 |
|     Events in the UK | Page 36 |
|     Arrest in The Gambia | Page 40 |
|     "Rendition to Detention" | Page 43 |
|     Other Allegations | Page 43 |
| **Ethical Dilemmas** | **Page 47** |
|     Implications for the Special Relationship | Page 48 |
| **The UK Agencies** | **Page 50** |
|     Security Service | Page 50 |
|     Secret Intelligence Service | Page 51 |
|     Safeguards in SIS and the Security Service | Page 53 |
|     Conclusions and Recommendations | Page 54 |
|     Government Communications Headquarters | Page 55 |
|     Conclusion | Page 56 |
| **"Ghost Flights"** | **Page 57** |
|     Introduction | Page 57 |
|     Rules Governing Flights Through UK Airspace | Page 58 |
|     Investigation of Allegations | Page 60 |
|     Police Action | Page 62 |
|     Conclusions and Recommendations | Page 62 |
| **Summary of Conclusions and Recommendations** | **Page 64** |
| **ANNEX A: Other Inquiries** | **Page 70** |
| **ANNEX B: List of Witnesses** | **Page 74** |

# LIST OF ABBREVIATIONS

| | |
|---|---|
| **APPG** | All-Party Parliamentary Group |
| **AQ** | Al-Qaeda |
| **CIA** | Central Intelligence Agency |
| **CIDT** | Cruel, inhuman or degrading treatment |
| **CSRT** | Combatant Status Review Tribunal |
| **ECHR** | European Convention on Human Rights |
| **EU** | European Union |
| **FCO** | Foreign and Commonwealth Office |
| **GAR** | General Aviation Report |
| **GCHQ** | Government Communications Headquarters |
| **HMG** | Her Majesty's Government |
| **HMRC** | Her Majesty's Revenue and Customs |
| **HUMINT** | Human-sourced intelligence |
| **ICCPR** | International Covenant on Civil and Political Rights |
| **IED** | Improvised explosive device |
| **JIC** | Joint Intelligence Committee |
| **MI5** | Commonly used name for the Security Service |
| **MI6** | Commonly used name for the Secret Intelligence Service |
| **MPSB** | Metropolitan Police Special Branch |
| **NSA** | U.S. National Security Agency |
| **PMO** | U.S. Presidential Military Order |
| **SIGINT** | Signals intelligence |
| **SIS** | Secret Intelligence Service |
| **UN** | United Nations |
| **UNCAT** | United Nations Convention Against Torture |

# INTRODUCTION

## *Background*

1.   The practice of rendition is not new. Prior to 9/11, rendition operations were carried out to bring individuals subject to arrest warrants to justice – typically in the United States. In recent years, however, it has been alleged that rendition operations have been conducted with the intention of detaining and interrogating individuals outside the normal criminal justice system.[1] It has also been alleged that such operations might involve mistreatment or torture.

2.   Within a few months of 9/11, allegations of "Extraordinary Rendition" operations by the United States began to surface in the media. There have since been allegations that the UK Government has not done enough to ensure that the UK is not involved in such operations, and, furthermore, that it has not sufficiently investigated these allegations, which might be counter to its obligations under UK and international law. (The legal aspects of UK knowledge of, and/or involvement in, rendition are covered in paragraphs 9 to 23.) There have also been allegations of direct involvement in these operations by the UK intelligence and security Agencies and by Her Majesty's Government (HMG) more widely. Given the seriousness of these allegations, the Intelligence and Security Committee considered that an inquiry was necessary.

## *Terms of Reference*

3.   This inquiry has considered whether the UK intelligence and security Agencies had any knowledge of, and/or involvement in, rendition operations (including specific cases), and their overall policy for intelligence sharing with foreign liaison services (principally the United States) in this context.

4.   As necessary background, the Committee has also considered wider issues such as Ministers' knowledge of, and/or involvement in, rendition, the duties of the Government under UK domestic law and international obligations, and the nature of statements and assurances from the United States Administration.

5.   It is not the purpose of this inquiry to reach conclusions on the legality of the actions of any United States agencies under U.S. law.

---

[1] *There have been a number of inquiries and reports related to the UK which the Committee has considered in the course of its inquiry. These are summarised at Annex A.*

## *Definitions*

6. The term "rendition" is used to mean different things by different people.[2] It encompasses numerous variations of extra-judicial transfer such as: to countries where the person is wanted for trial; to countries where the individual can be adequately interrogated; transfer for the purposes of prolonged detention; and military transfer of battlefield detainees.

7. In order to provide clarity, the Committee has used the following terms throughout this Report:[3]

> **"Rendition"**: Encompasses any extra-judicial transfer of persons from one jurisdiction or State to another.
>
> **"Rendition to Justice"**: The extra-judicial transfer of persons from one jurisdiction or State to another, for the purposes of standing trial within an established and recognised legal and judicial system.
>
> **"Military Rendition"**: The extra-judicial transfer of persons (detained in, or related to, a theatre of military operations) from one State to another, for the purposes of military detention in a military facility.
>
> **"Rendition to Detention"**: The extra-judicial transfer of persons from one jurisdiction or State to another, for the purposes of detention and interrogation outside the normal legal system.
>
> **"Extraordinary Rendition"**: The extra-judicial transfer of persons from one jurisdiction or State to another, for the purposes of detention and interrogation outside the normal legal system, where there is a real risk of torture or cruel, inhuman or degrading treatment (CIDT).

8. For example, the transfer of battlefield detainees from Afghanistan to Guantánamo Bay would fall into the category of "Military Renditions". The transfer of a detainee unconnected to the conflict in Afghanistan to Guantánamo Bay would be a "Rendition to Detention". A transfer to a secret facility constitutes cruel and inhuman treatment because there is no access to legal or other representation and, on that basis, we would describe this as an "Extraordinary Rendition".

---

[2] *The Committee has taken the term "Rendition" as not applying to transfers of individuals by methods such as extradition, deportation, removal or exclusion, although others do include such transfers in their definitions of the term.*

[3] *Quotations from third parties may not necessarily conform to these definitions.*

# LEGAL FRAMEWORK

9.   We set out below the legal aspects surrounding rendition.[4]

## *UK Domestic Law*

10.   The case of Nicholas Mullen (often referred to as Peter Mullen) provides the basis of the UK's position on renditions. In 1989, the Secret Intelligence Service (SIS) facilitated the transfer of Mr Mullen from Zimbabwe to the UK in order for him to stand trial on charges related to Irish republican terrorism. His transfer falls into the category of what we now call "Rendition to Justice". Mr Mullen's conviction was overturned by the Court of Appeal in February 1999 on the grounds that his deportation represented a *"blatant and extremely serious failure to adhere to the rule of law"* and involved a clear abuse of process.[5]

11.   This judgment set a legal precedent which meant that the Security Service and SIS did not look to conduct any further renditions to the UK. The Chief of SIS told the Committee: *"This outcome made it clear to SIS that rendition for trial in the UK was not viable."*[6]

12.   As regards torture, or CIDT, under section 6 of the Human Rights Act 1998 it is unlawful for a public authority to commit torture or to inflict inhuman or degrading treatment within UK territorial jurisdiction.

## *International Law*

13.   Under Article 3 of the United Nations Convention Against Torture (UNCAT):

> *No State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.*

The UK therefore has an obligation to ensure that it does not knowingly assist in sending a person to another country, including by any form of rendition operation, where there is a real risk that he may be tortured.[7]

---

[4] *It is worth noting that the Human Rights Act, European Convention on Human Rights and other international conventions were framed without rendition operations in mind and therefore do not address such transfers explicitly.*

[5] *R. v. Nicholas Mullen [1999].*

[6] *Oral evidence – SIS, 7 November 2006.*

[7] *"… the risk of torture must be assessed on grounds that go beyond mere theory or suspicion. However, the risk does not have to meet the test of being highly probable." UN Committee Against Torture, General Comment No. 01 to UNCAT.*

14. Article 3 of the European Convention on Human Rights (ECHR) – incorporated into UK domestic law by the Human Rights Act 1998 – provides that:

> *No one shall be subjected to torture or to inhuman or degrading treatment or punishment.*[8]

Article 7 of the 1966 International Covenant on Civil and Political Rights (ICCPR) goes further than this, adding a prohibition on cruel treatment or punishment:

> *No one shall be subjected to torture or cruel, inhuman or degrading treatment or punishment.*

15. The UK interpretation of what constitutes CIDT is based upon definitions outlined by the European Court of Human Rights. Referring to inhuman and degrading treatment, the Court has said:

> *The acts complained of were such as to arouse in the applicant feelings of fear, anguish and inferiority capable of humiliating and debasing him and possibly breaking his physical and moral resistance.*[9]

16. In a 2005 House of Lords ruling, Lord Bingham of Cornhill argued that *"the prohibition of torture requires Member States to do more than eschew the practice of torture"*.[10] He cited the International Criminal Tribunal for the former Yugoslavia as saying:

> *... States must immediately set in motion all those procedures and measures that may make it possible, within their municipal legal system, to forestall any act of torture or expeditiously put an end to any torture that is occurring.*[11]

17. The rules governing consular access are laid down in Article 36 of the Vienna Convention on Consular Relations (1963), which is generally accepted as being customary international law. Under the Convention, the UK Government cannot offer consular protection to non-British nationals. In 2005, the then Foreign Secretary said:

> *... in international law we only have the standing to take up consular matters in respect of British citizens... It means that we cannot make representations on behalf of people, however long they have been resident in the UK, who are not our nationals. More to the point, the U.S. Government, consistent with their obligations under international law, would not accept such representations.*[12]

---

[8] *European Convention on Human Rights (Convention for the Protection of Human Rights and Fundamental Freedoms), 1950.*
[9] *Selmouni v. France [1999].*
[10] *A (FC) and Others v. Secretary of State for the Home Department [2005].*
[11] *Ibid., Prosecutor v. Furundzija [1998].*
[12] *Statement by the Foreign Secretary, The Rt. Hon. Jack Straw, MP, 11 January 2005, Hansard Columns 179–180.*

The UK Government may make representations on behalf of non-British nationals in exceptional humanitarian cases, although it is under no obligation to do so. Furthermore, it may make informal non-consular representations in specific cases where it believes there are sufficient grounds, and we have seen that the U.S. may accept such representations in certain circumstances.

18. The legal aspects of the alleged use of UK airspace and airports in relation to possible Central Intelligence Agency (CIA) rendition flights are addressed separately in the "Ghost Flights" section of the Report (pages 57 to 63).

### U.S. Interpretations of International Law

19. It is important to highlight the different legal framework under which U.S. agencies such as the CIA operate. UK domestic law and European law, including the ECHR, do not apply to U.S. operations conducted outside the UK/Council of Europe. The ECHR does not impose obligations directly on the United States; however, U.S. nationals acting in the UK are bound by UK law, which conforms to the ECHR.

20. The U.S. has said that it considers itself in a state of war against global terrorism. This has led to a number of executive and military orders authorising actions to counter the threat from terrorism. President Bush said on 29 November 2001:

> ... *non-U.S. citizens who plan and/or commit mass murder are more than criminal suspects. They are unlawful combatants who seek to destroy our country and our way of life...*
>
> *We're an open society. But we're at war. The enemy has declared war on us. And we must not let foreign enemies use the forums of liberty to destroy liberty itself. Foreign terrorists and agents must never again be allowed to use our freedoms against us.*[13]

21. In ratifying UNCAT, the U.S. entered an understanding as to their interpretation of *"where there are substantial grounds for believing that he would be in danger of being subjected to torture"*. The U.S. interprets this to mean *"if it is more likely than not that he would be tortured"*.[14,15]

---

[13] *Remarks by President Bush to the U.S. Attorneys Conference, 29 November 2001.*

[14] *United States Understanding II. (2) – www.ohchr.org/english/countries/ratification/9.htm#reservations*

[15] *The United States ratification of the ICCPR also includes a reservation: "That the United States considers itself bound by article 7 to the extent that 'cruel, inhuman or degrading treatment or punishment' means the cruel and unusual treatment or punishment prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the Constitution of the United States."*

22. This "more likely than not" approach differs significantly from that of the UK, which uses the lower "real risk" threshold. Theoretically, this means that an operation could be legal for U.S. agencies under U.S. law (because there is less than a 50% probability of torture or CIDT) but illegal for the UK Agencies to be involved with under UK law (because there is nevertheless still a real risk of torture or CIDT).

23. On 7 December 2005, an official in the Foreign Secretary's Private Office sent a memorandum to the Prime Minister's Office which discussed the limited circumstances in which assistance to other countries' rendition operations might be legal. This document was leaked in the *New Statesman* in January 2006:

> *In certain circumstances, [rendition] could be legal, if the process complied with the domestic law of both countries involved, and their international obligations. Normally, these international obligations, eg under... ICCPR would prevent an individual from being arbitrarily detained or expelled outside the normal legal process. Council of Europe countries would also be bound by the ECHR, which has similar obligations in this sense. Against this background, even a Rendition that does not involve the possibility of torture [or CIDT] would be difficult, and likely to be confined to those countries not signed up to eg the ICCPR.*[16]

---

[16] *Memorandum entitled "Detainees", sent from the Foreign and Commonwealth Office to the Prime Minister's Office, 7 December 2005.*

# THE NATURE OF INTELLIGENCE SHARING

## *Value of Shared Intelligence*

24. The importance of international cooperation between intelligence and security services was emphasised after 9/11 by UN Security Council Resolution 1373, which called on all States to work ever closer in the fight to combat terrorism. In particular, it called for States to *"find ways of intensifying and accelerating the exchange of operational information, especially regarding actions or movements of terrorist persons or networks"* and to cooperate more generally to *"prevent and suppress terrorist attacks and take action against perpetrators of such acts"*.[17]

25. We have been told by all three Agency Heads that their intelligence-sharing relationships with foreign liaison services are vital to counter the threat from international terrorism. The U.S. link is the most important, not least because of the resources the U.S. agencies command. The Chief of SIS told the Committee:

> *The global resources of CIA, FBI and NSA [National Security Agency] are vast… The UK Agencies' long-developed relationships with U.S. intelligence agencies give them vital access to U.S. intelligence and resources. It is neither practical, desirable, nor is it in the national interest, for UK Agencies to carry out [counter-terrorism] work independently of the U.S. effort.*[18]

The Director of the Government Communications Headquarters (GCHQ) reiterated the value of the relationship to the UK, saying *"Overall the benefit to the UK from this arrangement is enormous"*,[19] and the Director General of the Security Service said *"It is unimaginable that we could [cease sharing intelligence with the U.S.] because of the degree of importance of SIGINT and HUMINT and the intelligence they give us"*.[20,21]

26. The Director General of the Security Service made a further important point about the UK/U.S. relationship – that the two countries are inextricably linked: *"As [the summer 2006 UK/U.S. airliner plot] showed, their security is absolutely bound up with ours."*[22]

27. The value of intelligence obtained from individuals in the CIA's secret detention programme is covered in this Committee's March 2005 report, *The*

---

[17] *UN Security Council Resolution 1373 (2001), adopted 28 September 2001.*

[18] *Oral evidence – SIS, 7 November 2006.*

[19] *Oral evidence – GCHQ, 29 October 2006.*

[20] *Oral evidence – Security Service, 23 November 2006.*

[21] *Throughout this Report "Director General of the Security Service" refers to Dame Eliza Manningham-Buller, who held this position for the majority of this investigation.*

[22] *Oral evidence – Security Service, 23 November 2006.*

*Handling of Detainees by UK Intelligence Personnel in Afghanistan, Guantánamo Bay and Iraq*. The Security Service is quoted in that report as saying:

> *We have however received intelligence of the highest value from detainees, to whom we have not had access and whose location is unknown to us, some of which has led to the frustration of terrorist attacks in the UK or against UK interests.*[23]

SIS stressed the importance and value of intelligence received from detainees in similar terms.

28. In addition, the Committee has been told of a number of cases where individuals detained by foreign liaison services have provided, directly or indirectly, important intelligence that has helped to prevent attacks on the UK. The Director General of the Security Service told the Committee of the case of Khaled Sheikh Mohammed, an individual closely linked to a number of Al-Qaeda (AQ) terrorist attacks and plots, including 9/11 and earlier plots to destroy U.S. airliners. She said:

> *When he was in detention in 2003, place unknown, he provided [the pseudonyms of] six individuals… who were involved in AQ activities in or against the UK. The Americans gave us this information… These included high-profile terrorists – an illustration of the huge amount of significant information that came from one man in detention in an unknown place.*[24]

**A.  Our intelligence-sharing relationships, particularly with the United States, are critical to providing the breadth and depth of intelligence coverage required to counter the threat to the UK posed by global terrorism. These relationships have saved lives and must continue.**

*Problems*

29. Despite the value that intelligence sharing can bring, working with a foreign intelligence service is not always straightforward for the UK Agencies. Other countries have different legal systems and different standards of behaviour to the UK, and their intelligence and security services have varying levels of capability, capacity and professional standards. These factors must be taken into account when working with foreign liaison services.

30. The UK/U.S. relationship has a long history based upon shared goals, common values and complementary intelligence capabilities. This is not to say that the UK and U.S. Governments necessarily see eye to eye on all subjects – there are certain areas of foreign policy and strategy where the two countries have quite

---

[23] *Cm 6469, paragraphs 77–78.*
[24] *Oral evidence – Security Service, 23 November 2006.*

different approaches. There are also certain aspects that complicate the relationship between the respective intelligence and security agencies – for example, the possibility that UK assistance to a U.S. operation might result in a trial leading to capital punishment.

31.   The UK Agencies have always been mindful of human rights issues, particularly when engaging with countries that do not pay the same attention to civil liberties and human rights as the UK. Speaking about the potential for ethical dilemmas to arise, the Director General of the Security Service told the Committee:

> *It gives rise to some significant ethical issues. [My staff] are concerned about the abuse of prisoners in custody… about transmission of information or questions which might lead to abuse, and they are concerned about things done outside a legal framework and the precepts of international law.*[25]

32.   These issues are not easily resolved. Intelligence and security services, here and abroad, rarely divulge information on their sources when sharing intelligence with foreign liaison services. The location, circumstances or treatment of a detainee (or even the fact that the source is a detainee) would therefore not usually be shared.

33.   Where there are concerns, the Agencies seek credible assurances that any action taken on the basis of intelligence provided by the UK Agencies would be humane and lawful. Where credible assurances cannot be obtained, the Chief of SIS explained *"… then we cannot provide the information. Therefore you have the dilemma [of perhaps not being able to prevent attacks] that flows from that."*[26]

34.   What the U.S. rendition programme has shown is that these ethical dilemmas are not confined to countries with poor track records on human rights – the UK now has some ethical dilemmas with our closest ally. As part of this inquiry the Committee has considered the implications for the "special relationship" (pages 48 and 49).

---

[25] *Ibid.*

[26] *Oral evidence – SIS, 7 November 2006.*

# PRE-9/11 EVENTS

35. On 21 June 1995, President Clinton issued a Presidential Decision Directive that stated:

> ... where we do not receive adequate cooperation from a State that harbors a terrorist whose extradition we are seeking, we shall take appropriate measures to induce cooperation. Return of suspects by force may be effected without the cooperation of the host government.[27]

According to a Joint Intelligence Committee (JIC) paper issued in 1998, this Directive led to a more than ten-fold increase in U.S. "Rendition to Justice" operations. It stated that whilst there were only three renditions in the decade preceding the Directive, there were around 40 renditions in the three years following it.

36. In 1997, the Security Service and SIS were formally briefed by the Americans on their strategy of rendering terrorists to justice.[28] This aimed to bring wanted terrorists to stand trial in the U.S. or friendly countries.

37. The 1998 JIC paper shows the collective view of the UK intelligence community as to the consequences of rendition:

> While rendition can be effective in bringing terrorist suspects to justice, it can also have adverse consequences. Egyptian Islamic extremist terrorists mounted a bomb attack in Croatia in 1995 in revenge for a colleague's extradition... A likely product of sustained U.S. renditions is that the U.S. will hold an increasing number of international terrorists in prison. In the case of other countries, this has led to terrorist hostage-taking or hijacking, with a view to bargaining for the prisoner's release.[29]

## *UK Agencies' Actions*

38. The Government, at this time, had no reason to believe that assisting the U.S. to render individuals to the United States to face trial might carry the risk of torture or CIDT. The Security Service, SIS and Ministers were concerned, however, that there was a possibility that the U.S. might seek to carry out a lethal operation against terrorist targets that they could not capture, or seek to impose the death penalty on those they could. They therefore took measures to minimise the risk that they might

---

[27] *Presidential Decision Directive 39, "Counterterrorism Policy", 21 June 1995.*

[28] *SIS subsequently informed policy departments across Whitehall of the existence of the programme.*

[29] *JIC paper, dated 21 October 1998, on the threat from terrorism in the aftermath of U.S. cruise missile strikes on Khartoum and Afghanistan (launched in retaliation for the 7 August 1998 bombings of U.S. embassies in East Africa).*

contribute intelligence which could lead to either outcome. These measures included seeking assurances from the U.S. where necessary.

39. After 1997, the CIA began to request the assistance of SIS in this "Rendition to Justice" programme, in terms of providing the location of targets. In some of these cases SIS cooperated, having first sought approval from the Foreign Secretary on a case-by-case basis.

40. In 1998, SIS believed that it might be able to obtain actionable intelligence that might enable the CIA to capture Osama Bin Laden. Given that this might have resulted in him being rendered from Afghanistan to the U.S., SIS sought Ministerial approval. This was given, provided that the CIA gave assurances regarding humane treatment.[30] In the event, insufficient intelligence was obtained and therefore the operation could not proceed.

41. A similar submission was made to Ministers in October 1999 and was again approved, subject to assurances of humane treatment.[31] Again, the necessary intelligence could not be obtained and the operation did not proceed.

42. The only remaining case of Agency involvement in renditions conducted by foreign liaison services prior to 9/11 is the provision of intelligence by SIS to a foreign liaison service to facilitate the arrest and trial of a terrorist cell. \*\*\*
\*\*\*
\*\*\*
\*\*\*. SIS has told the Committee that they \*\*\* and had not anticipated that a "Rendition to Justice" might result from their sharing intelligence with the foreign liaison service.

43. During 1998, SIS sought Ministerial approval to conduct a "Rendition to Justice" operation themselves – the intention was to transfer a Balkan war criminal to a third country for arrest and subsequent transfer to The Hague to stand trial at the International Criminal Tribunal for the former Yugoslavia *"where it was felt the opposition of the UK Courts to rendition might not apply"*.[32,33] SIS decided, however, that such an operation would undermine the chances of a successful conviction (based on another Tribunal case) and the operation was dropped.

---

[30] *The Committee understands that, at that time, "humane treatment" was presumed to include the right to a fair trial.*

[31] *Ministerial approval given in 1998 would have lapsed by this time.*

[32] *Oral evidence – SIS, 7 November 2006.*

[33] *Ministerial authorisation was given subject to further consideration of the likely impact of the rendition operation on the outcome of the trial.*