## UK Government Involvement

44.    In terms of wider involvement in the U.S. rendition programme prior to 9/11, the Foreign and Commonwealth Office (FCO), Home Office and Ministry of Defence conducted a trawl of their records (in late 2005/early 2006) to identify U.S. requests for approval to use UK airspace to transport detainees. They discovered two cases in 1998 where Ministerial approval was granted because the detainees were en route to stand trial in the U.S. The Home Office has told us:

> There were two approved cases, which would now be called "Renditions to Justice". In June 1998, a flight carrying Mohammed Rashid landed at Prestwick en route from Egypt to the United States. He was charged in connection with the bombing of a Pan Am aircraft in August 1982. He [stood trial and] was sentenced on 24 March 2006…

> In August 1998, a flight carrying Mohammed Rashed Al-Owhali landed at Stansted en route to the United States. He was charged for his part in the 1998 attack on the U.S. embassy in Nairobi. He was convicted in June 2001 and sentenced to life imprisonment.[34]

45.    Also in 1998, there were two further requests to render detainees through UK-controlled airspace. These requests were refused:

> In May–June, the U.S. requested the use of Akrotiri Air Base to refuel a flight which would carry two unnamed Hizballah members from Lebanon to the U.S. This request was considered by the Foreign Secretary and the Defence Secretary [and]… was refused…

> In October 1998, the U.S. requested permission to refuel at Prestwick an aircraft which would be carrying… Muhammed Ibid al-Ibid from Ecuador to Egypt, for whose arrest the Egyptians had issued a warrant (on charges including GIA [Groupe Islamique Armé] membership). There is no record of whether this request was agreed or refused… the recollection of some of those present at the time is that the request was refused.[35]

46.    The Permanent Secretary, Intelligence, Security and Resilience, Sir Richard Mottram, has detailed the extent of the investigation the Government had conducted on this matter and, in response to questions raised in the Committee's letter to the Prime Minister on rendition, has said:[36, 37]

---

[34] Letter from the Home Office, 8 March 2007.

[35] Ibid.

[36] Letter on "Rendition and Torture" from the Committee to the Prime Minister, 11 January 2006.

[37] Prior to 1 August 2006 this post was known as the Security and Intelligence Coordinator.

*British intelligence personnel neither assist nor are involved in rendition where there are grounds to believe that the person being rendered would face a real risk of torture or cruel, inhuman or degrading treatment. The Agencies have researched their records dating back to 1995, and SIS and the Security Service (including JTAC [the Joint Terrorism Analysis Centre]) have circulated a questionnaire to all staff. This research has not revealed any cases which breach this principle...*

*[Additional checks] of Foreign and Commonwealth Office, Home Office, Ministry of Defence, SIS, Security Service and GCHQ files dating back to 1995... have found no evidence of rendition through the UK or Overseas Territories where there were grounds to believe an individual faced a real risk of torture, cruel, inhuman or degrading treatment.[38]*

47.    The Committee has been told that searching for records relating to transfers that we today call "rendition" has proven difficult for Government:

*I agree there is a fault in the record taking... I think part of the problem is that issues like this can go in different directions: it could go to the MoD, it could go to the Home Office, it could come to the Foreign Office, it could go to one of the Agencies, at least initially, and therefore the way in which it is dealt [with] might be different in different departments... I do not think there would be a file marked "Rendition", not in 1998...[39]*

48.    On the basis of what we have been told, and acknowledging the difficulties related to record keeping, the Committee has found no evidence of renditions through UK airspace prior to 9/11, other than the two "Rendition to Justice" cases in 1998 which were approved by Ministers. (The issue of CIA flights through UK airspace is examined in detail in paragraphs 184 to 202.)

49.    In all cases that the Committee is aware of prior to 9/11, Security Service, SIS and departmental concerns over the legality of any assistance to the U.S. "Rendition to Justice" programme meant that Ministerial approval was sought in each instance. Where approval was given, this was subject to appropriate and credible assurances being sought from our liaison partners on subsequent humane treatment of the detainees.

## Conclusions

**B.    We are concerned that Government departments have had such difficulty in establishing the facts from their own records in relation to requests to conduct**

---

[38] *Letter from Sir Richard Mottram, 2 May 2006.*

[39] *Oral evidence – FCO, 5 December 2006.*

renditions through UK airspace. These are matters of fundamental liberties and the Government should ensure that proper searchable records are kept.

C.    Prior to 9/11, assistance to the U.S. "Rendition to Justice" programme – whether through the provision of intelligence or approval to use UK airspace – was agreed on the basis that the Americans gave assurances regarding humane treatment and that detainees would be afforded a fair trial. These actions were appropriate and appear to us to have complied with our domestic law and the UK's international obligations.

# POST-9/11 EVENTS

50.   The UK Agencies have told us that, after the attacks in the U.S. on 11 September 2001, they diverted resources and attention to countering the immediate terrorist threat and preventing further attacks. It appears to us that in a fast-moving environment with limited resources, the focus was, of necessity, on the day-to-day issues rather than the bigger picture. We have been told that:

> *There was indeed an enormous amount going on at the time. The atmosphere was very frenetic back then in September and October, only a month after 9/11… and the resources available to… get results in what was a very pressing situation… were very limited. We had operational objectives… We did not even begin to have the resources to deal with it.*[40]

We were similarly told by the Director General of the Security Service that *"we were struggling very hard. It felt like trench warfare."*[41]

51.   This is not intended to show mitigating circumstances, but to set the context for the following events.

### *Gradual Awareness of a Change in U.S. Policy*

52.   In the immediate aftermath of the 9/11 attacks, and in the context of the conflict in Afghanistan, SIS requested Ministerial authorisation to assist the CIA in capturing Al-Qaeda terrorist suspects and to hand them over to the Americans for "Renditions to Justice". Authorisation was provided, subject to assurances from the Americans that the detainees would be treated humanely and tried in the U.S. In the event, SIS was unable to obtain sufficiently timely intelligence for the operations to proceed. The nature of these Ministerial submissions and authorisations reflects that, at the time, the UK Agencies believed that the U.S. was still conducting "Rendition to Justice" operations of a nature similar to those conducted prior to 9/11 and there was not thought to be any real risk that detainees might be mistreated.

53.   On 13 November 2001, the U.S. announced, by Presidential Military Order (PMO), a change in policy that aimed to:

> *… identify terrorists and those who support them, to disrupt their activities, and to eliminate their ability to conduct or support [terrorist] attacks [and for suspects] to be detained and, when tried, tried… by military tribunals.*[42]

---

[40] *Oral evidence – SIS, 19 March 2007.*

[41] *Oral evidence – Security Service, 20 March 2007.*

[42] *U.S. PMO entitled "Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism", White House Press Release, 13 November 2001.*

The PMO applies to individuals who are non-U.S. citizens and who:

- are or have been, or have knowingly harboured, a member of Al-Qaeda; or

- have engaged in, aided, abetted or conspired to commit acts of international terrorism prejudicial to the interests of the U.S.

The PMO authorised the detention of suspects at any designated location worldwide with no guarantee of trial. It prescribed that suspects, if tried, would be tried by a military commission (with lower standards of evidence than applies in U.S. District Courts and with the possibility of capital punishment).

54.    SIS was given notice of new counter-terrorism powers for the U.S. agencies some time prior to the PMO being issued. SIS has told the Committee that it was sceptical about these new powers – in part because there was a great deal of "tough talk" following 9/11. They did not therefore report this information to Ministers. These powers were then partially reflected in the PMO in November 2001. Later the same month, SIS learnt that the U.S. intended to use military tribunals set up under the PMO to try terrorist suspects captured outside Afghanistan. This information was outlined in a report sent by SIS across Whitehall, including to the Private Offices of the Prime Minister and Foreign Secretary.

55.    The Security Service told the Committee that they considered this material in the context of the conflict in Afghanistan, and that British citizens could potentially be subject to these military tribunals:

> *Insofar as we can establish what happened at that stage, this was not, we thought, about what came to be "Extraordinary Rendition" and was largely about military tribunals in Afghanistan… Given that prisoners picked up in Afghanistan and put into camps were likely to include foreign prisoners, including potentially British citizens, we did seek legal advice within the Government legal service on whether we could provide intelligence or not to the tribunals. That was where we sort of rested.*[43]

56.    The Defence Intelligence Staff confirmed that they received the report but said that there is no record of any action having been taken by them, nor would they expect to have taken any, as a result of what was *"essentially a description of U.S. operational intent"*.[44]

57.    In January 2002, the U.S. began its programme of "Military Renditions" (see definitions in paragraph 7).[45] This was the first sign that the PMO was being

---

[43] *Oral evidence – Security Service, 20 March 2007.*

[44] *Letter from the Defence Intelligence Staff to the Committee, 19 March 2007.*

[45] *Cm 6469, page 35.*

implemented. Those captured as part of military operations in Afghanistan were defined as "unlawful combatants" and transferred to the U.S. military prison facility at Guantánamo Bay, Cuba.[46] The treatment of these military detainees was the subject of the Committee's report *The Handling of Detainees by UK Intelligence Personnel in Afghanistan, Guantánamo Bay and Iraq,* published in March 2005.[47]

58.    The Government indicated publicly, at the time of the first transfers, its sense of unhappiness at the process and sought assurances that detainees transferred to Guantánamo Bay would be treated appropriately. In the Committee's report into the handling of detainees, we noted:

> *The Foreign Secretary had raised the circumstances of the UK nationals being held in Guantánamo Bay with the then U.S. Secretary of State… [and was] satisfied with the U.S. authorities' assurances that the detainees were being treated humanely and consistently with the principles of the Geneva Conventions.*[48]

59.    Signs began to emerge that the U.S. rendition programme was not limited to the conflict in Afghanistan. The Committee has been told of a case in early 2002, when SIS became aware that *** had been transferred to a *** country of which he was not a national in a "Rendition to Detention" operation. Given that the suspect was not transferred into U.S. military custody, or to his home country, this action would appear to be inconsistent with the PMO (as it had been briefed to SIS). SIS questioned the appropriateness of the transfer with the U.S. authorities, but concluded that this was an isolated incident and Ministers were therefore not informed.

60.    Between January and March 2002, intelligence officers in Afghanistan witnessed, or were told of, two occasions of mistreatment by the U.S. military of detainees in U.S. military custody. As the Committee said in its Detainees report, these were, at the time, regarded as isolated incidents.[49]

61.    In March 2002, Martin Mubanga, a dual British-Zambian national travelling on a Zambian passport and a suspected "unlawful combatant" fleeing from the fighting in Afghanistan, was detained by the local authorities in Zambia and subsequently transferred to Guantánamo Bay (in April 2002). This case is considered in detail in paragraphs 90 to 97. This appears to represent the first case

---

[46] *Whilst we use phrases such as "conflict in Afghanistan" and "Afghanistan battlefield" in this Report, it should be recognised that the theatre of operations is not neatly defined in terms of national borders.*

[47] *Cm 6469.*

[48] *Ibid.*

[49] *Ibid.*

of the PMO being implemented for a suspected associate of Al-Qaeda captured outside Afghanistan. Following Mubanga's arrest, the Security Service was informed by the U.S. and it notified SIS and Ministers. This case was an indication that the U.S. had widened their net to other areas where it was believed Al-Qaeda members and "unlawful combatants" had fled after the war had started.

62.   This was reinforced in the early summer of 2002 when SIS was informed *** that *** whom they had previously been jointly investigating *** had been captured *** with the assistance of a third country. ***
***
***. SIS was not involved in this rendition; they were informed of the transfer after it had occurred.

63.   The next such incident came in July 2002 when Binyam Mohamed al-Habashi was allegedly subjected to an "Extraordinary Rendition" from Pakistan to Morocco. (This case is considered in greater detail in paragraphs 98 to 106.) At the time, the Agencies believed that al-Habashi would be transferred from Pakistan to Bagram Air Base and had no knowledge that he was the subject of further transfers.[50] In this case, the Security Service *** had no knowledge of where he was being detained:

> ... *** we did not know where he was... [This] is a case where, with hindsight, we would regret not seeking proper full assurances, but I can understand how it happened [given the Service's knowledge at the time].[51]

64.   A fifth case occurred in mid-2002, which, like the first, appeared inconsistent with what SIS and the Security Service believed to be U.S. policy on Al-Qaeda detainees, including that laid out in the November 2001 PMO. ***.

65.   A step change – and crucial to the Agencies' growing knowledge of U.S. actions – came in November 2002 when U.S. authorities conducted the "Rendition to Detention" of Bisher al-Rawi and Jamil el-Banna from The Gambia to Afghanistan and subsequently to Guantánamo Bay. This case is considered in greater detail in paragraphs 111 to 147. This case showed that the U.S. rendition programme had now extended its boundaries beyond individuals connected to the conflict in Afghanistan. Although the action taken by the U.S. in this case was consistent with the November 2001 PMO, this demonstrated conclusively that the U.S. was willing to exercise these powers on individuals unconnected to the conflict in Afghanistan.

---

[50] The Committee has been told that the Security Service first learnt of the allegation that al-Habashi had been transferred to Morocco in 2005. Again, the Agencies believed, at the time, that the transfer was to U.S. military custody in accordance with the November 2001 PMO.

[51] Oral evidence – Security Service, 23 November 2006.

66.   The case of al-Rawi and el-Banna also represents the first incident where the Agencies had seen that passing intelligence to the U.S. about individuals not directly involved in the Afghanistan conflict could lead to a rendition, despite the use of caveats and despite their protesting once they learnt of U.S. plans. This raises significant issues in relation to the intelligence-sharing relationship with the Americans.[52] The Security Service has told the Committee:

> *This is the first time when suddenly we found that people were… being taken by the Americans. I think it is the first time we experienced that, completely in a different part of the world [from Afghanistan].*[53]

67.   In late 2002, SIS and the Security Service became aware of another case involving the transfer of an individual to a third country. The Security Service and SIS were made aware because the individual was thought to be planning attacks in the UK. The Director General of the Security Service told the Committee: *"Again, with hindsight we realise that [they] intended to render him without due process. We did not fully understand that at the time."*[54] The Security Service was allowed to put questions to the detainee, but it is not clear whether any assurances to prevent torture or CIDT were sought.

68.   The Committee has been told that, from 2003 onwards, SIS was involved in a number of joint operational discussions which developed to the point where they began to become concerned about the legality of their assisting what foreign liaison services, including the U.S., were proposing. We have been told that *" *** ***"*.[55] In a small number of cases, where high-value targets were involved and there was a real risk of a rendition occurring, SIS requested approval from Ministers to continue. The Committee has been told that, by this stage, the nature of these submissions drew heavily on the Service's knowledge of the cases in 2002, where they had seen the results of the U.S. implementing their new powers:

> *… the fact that [they] had the authority to conduct rendition operations to detention had been demonstrated by the well-known cases in 2002, and the submissions therefore focused on the implications for SIS of attempting to carry out joint operations where this was a possibility.*[56]

In the end, these joint operations either did not proceed or ***.

---

[52] *UK/U.S. cooperation is covered in pages 47 to 49.*

[53] *Oral evidence – Security Service, 20 March 2007.*

[54] *Oral evidence – Security Service, 23 November 2006.*

[55] *Oral evidence – SIS, 7 November 2006.*

[56] *Letter from SIS to the Committee, 28 February 2007.*

69.    The Director General of the Security Service confirmed that they had also been involved in some of these operational discussions:

> \*\*\*
> \*\*\*
> \*\*\* [57]

70.    These discussions, together with the six individual incidents over the course of 2002, added to the Agencies' growing awareness that there had been a real shift in the U.S. approach, and in the nature of the rendition programme.

71.    A separate aspect of the rendition programme is the existence, and use, of "black facilities".[58] The Agencies first suspected the possible existence of these secret CIA-directed detention facilities in March 2003, with the arrest of Khaled Sheikh Mohammed. The Chief of SIS told the Committee:

> *Now, the point where it becomes clearer is with the arrest of Khaled Sheikh Mohammed in 2003 and, as I have said, information came through, for example, on terrorist planning against Heathrow... We realised at that point that this was coming from a detention facility which was outside and away from Guantánamo... So, if you like, the issue is on the table at that point.*[59]

72.    Despite suspicions about the existence of "black facilities", the Agencies did not fully appreciate, at the time, that this might mean an increased risk of torture or CIDT:

> *... it never crossed my mind that [the intelligence] was coming from torture [or CIDT]. We are talking about the Americans, our closest ally. This now, with hindsight, may look naive, but all I can say is that is what we thought at the time.*[60]

73.    The case of Khaled Sheikh Mohammed was a watershed in terms of the Security Service's and SIS's knowledge of the potential destinations for those detained as part of U.S. rendition operations. This incident raised new questions for the Security Service and SIS, both when assisting operations to detain suspects and when asking follow-up questions from those already in U.S. custody.

---

[57] *Oral evidence – Security Service, 23 November 2006.*

[58] *For the purposes of this Report, the Committee has defined "black facility" or "black site" as "an extra-judicial detention and interrogation facility secretly operated by the U.S. Central Intelligence Agency outside the normal legal system". This therefore does not include detention facilities at Guantánamo Bay or Bagram Air Base.*

[59] *Oral evidence – SIS, 7 November 2006.*

[60] *Ibid.*

74.    The U.S. authorities would not divulge details of the secret facilities to SIS or the Security Service when asked: *"This has just been an impenetrable subject... There was no give at the edges, almost uniquely."*[61] As a result, greater use was made of assurances with the Americans:

> *As time went on... we began to get more aware of black facilities, and... so we became more aware of the conditions [in which detainees might be held or interrogated]. At that point we began to consider [that] we need assurances that when we go back to the Americans with a follow-up question to [unsolicited intelligence] that they may have given us, that... [torture or CIDT] are not going to be used to seek and get answers to our questions.*[62]

75.    In early 2003, two other cases reinforced the concerns of the Agencies. SIS had provided "building-block" intelligence to a foreign liaison service that may have contributed to the subsequent arrest of terrorist suspects. *** to render the suspects. SIS suggested alternative courses of action (such as deportation to the individual's country of origin) and has told the Committee that no renditions occurred in these cases.

76.    These cases showed SIS that even passing intelligence to a third country could lead to them being implicated in a rendition, if individuals are detained as a result of SIS intelligence and then subsequently handed over to the U.S. authorities.

### A More Cautious Approach

77.    The Chief of SIS told the Committee that this increased awareness led to a change in approach, with a greater number of Ministerial submissions:

> *SIS therefore submitted to the Foreign Office, in a number of cases from 2003 onwards, where they considered there was a real risk [of rendition of] an individual whom SIS had assisted a third country to detain.*[63]

78.    In mid-2003, SIS learnt that an operation they were already conducting ***. They informed officials in the FCO. By the autumn of 2003 the operation had developed further and ***. Given the Service's concern about such circumstances possibly leading to torture or CIDT, SIS informed the Foreign Secretary. The Foreign Secretary's response was that any further involvement by SIS must lead to the lawful arrest of the target. In the event, the operation did not proceed.

---

[61] *Oral evidence – SIS, 19 March 2007.*

[62] *Oral evidence – SIS, 7 November 2006.*

[63] *Ibid.*

25

79.   In cases in which SIS was involved in early 2004, this more cautious approach to assisting rendition operations is confirmed. Where SIS shared intelligence with foreign liaison services to assist "Renditions to Justice" *** they sought Ministerial approval, which was obtained subject to assurances on the treatment of the individuals. The Chief of SIS confirmed that assurances were obtained and shown to have been kept:

> ***
> ***
> ***
>
> ***
> ***
> ***

> *We do not consider that the Service's involvement in… these cases was in breach of the relevant international law obligations governing assistance by one State in the expulsion of an individual by another State. Nor was there a risk of torture or cruel, inhumane or degrading treatment as SIS had, in accordance with the policy set out in Richard Mottram's letter [to the Committee], obtained case-by-case assurances [regarding] treatment.*[64]

80.   In late April 2004, reports emerged of the mistreatment of detainees by soldiers at the U.S.-run Abu Ghraib prison in Iraq. In light of those reports, SIS wrote to the Foreign Secretary explaining that any operations that may lead to U.S. custody of detainees were considered on a case-by-case basis.

81.   In mid-2004, SIS asked Ministers for approval to assist with an operation that, whilst it was intended to bring about arrests by local authorities, could have led to "Renditions to Detention", possibly to secret facilities. They received approval to proceed, dependent on any rendered detainees being treated in accordance with the relevant international conventions. In the event, the U.S. did not attempt to conduct any renditions as a result of this operation.

82.   From 2004 it became clear to SIS and the Security Service that their existing guidance to staff on dealing with foreign liaison services was insufficiently detailed given the increasing requirement to cooperate with foreign services in counter-terrorism operations. They therefore began to expand their guidance, and as elements were finalised they were formally issued to staff.[65]

---

[64] *Ibid.*

[65] *Advice on participation in detention operations and interviews was formally issued to SIS and Security Service staff in 2005. In 2006, all three Agencies formally issued updated guidance to staff on the exchange of intelligence with foreign liaison services (in GCHQ's case it was issued to operational staff only). This expanded guidance better equipped staff to understand their responsibilities and, for operational staff, at what point in any given operation to involve Agency legal advisers, policy departments or Ministers.*

83.    In November 2004, Ministerial awareness of the U.S. rendition programme was evident when the then Foreign Secretary gave evidence to the Committee's inquiry into the handling of detainees. He described to the Committee the nature of the U.S. rendition programme and bluntly made it clear that the UK does not conduct such operations itself.

84.    In early 2005, SIS developed an operation that might have provided high-value intelligence on a target. The circumstances were such that the only viable option *** *** and they therefore sought Ministerial authorisation to proceed. Approval was given on condition that appropriate assurances on humane treatment and a limit on the duration of detention were obtained ***. In the end, *** and the operational proposal was dropped because SIS was not able to satisfy itself as to the likely treatment of the target.[66]

## Public Acknowledgement

85.    On 2 November 2005, the *Washington Post* published an article on "black facilities". The article reported the existence of a network of CIA secret detention facilities in numerous countries, including in Eastern Europe, in which the highest value terrorist suspects were held. This article prompted the Foreign Secretary to write, on 29 November 2005, in his role as President of the EU, to the U.S. Government requesting a response to allegations of renditions involving EU Member States.[67] In response, the U.S. Secretary of State, Condoleezza Rice, issued a statement on 5 December 2005, which said:

> *It is the policy of the United States… to comply with its laws and comply with its treaty obligations, including those under the Convention Against Torture.*
>
> *In accordance with the policy of this Administration:*

- *The United States has respected – and will continue to respect – the sovereignty of other countries.*

- *The United States does not transport, and has not transported, detainees from one country to another for the purpose of interrogation using torture.*

- *The United States does not use the airspace or the airports of any country for the purpose of transporting a detainee to a country where he or she will be tortured.*

---

[66] *Letter from SIS to the Committee, 21 February 2007.*

[67] *Letter from the Foreign Secretary (on behalf of the EU) to the U.S. Secretary of State, 29 November 2005 – www.fco.gov.uk/Files/kfile/Straw_EU_CondiRice_Letter.0.pdf*

- *The United States has not transported anyone, and will not transport anyone, to a country where we believe he will be tortured. Where appropriate, the United States seeks assurances that transferred persons will not be tortured.*[68]

86.    On 30 December 2005, the Detainee Treatment Act of 2005 (also known as the McCain Amendment) was passed into U.S. law. This set out the procedures for the detention, interrogation, treatment and "status reviews" of detainees. It states:

> *No individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location, shall be subject to cruel, inhuman, or degrading treatment or punishment.*

87.    In 2006, the existence of secret detention facilities was finally acknowledged.[69] In April, the U.S. Director of National Intelligence admitted during an interview with *TIME* magazine to the existence of "black facilities". He said that three dozen or so high-value terrorist suspects were being held in secret CIA detention facilities and:

> *… they're bad actors. And as long as this… war on terror continues, I'm not sure I can tell you what the ultimate disposition of those detainees will be.*[70]

88.    President Bush formally acknowledged for the first time the existence of the CIA rendition programme and the use of secret CIA-run overseas detention facilities on 6 September 2006. In a speech in which the President sought to convince Congress of the urgent need to establish a legal basis for the questioning of terrorist suspects, he said:

> *In [cases where detainees pose a significant threat], it has been necessary to move these individuals to an environment where they can be held secretly, questioned by experts, and – when appropriate – prosecuted for terrorist acts…*

> *In addition to the terrorists held at Guantánamo, a small number of suspected terrorist leaders and operatives… have been held and questioned outside the United States, in a separate program operated by the Central Intelligence Agency…*

> *The current transfers [of CIA detainees to Guantánamo Bay] mean that there are now no terrorists in the CIA program. But as more high-ranking terrorists are captured, the need to obtain intelligence from them [via the CIA programme] will remain critical.*[71]

---

[68] *Remarks by the U.S. Secretary of State, Condoleezza Rice, on her departure for Europe, 5 December 2005.*

[69] *The Committee has been told that, in December 2005, the Foreign Secretary discussed with the Chief of SIS the limits of SIS's knowledge of "black facilities".*

[70] *"Spy Chief: CIA Detainees Will Be Held Indefinitely", TIME magazine, 12 April 2006.*

[71] *"President Discusses Creation of Military Commissions to Try Suspected Terrorists", White House Press Release, 6 September 2006.*

## *Conclusions and Recommendations*

**D.**    Those operations detailed above, involving UK Agencies' knowledge or involvement, are "Renditions to Justice", "Military Renditions" and "Renditions to Detention". They are not "Extraordinary Renditions", which we define as *"the extra-judicial transfer of persons from one jurisdiction or State to another, for the purposes of detention and interrogation outside the normal legal system, where there is a real risk of torture or cruel, inhuman or degrading treatment"*. We note that in some of the cases we refer to, there are allegations of mistreatment, including whilst individuals were detained at Guantánamo Bay, although we have not found evidence that such mistreatment was foreseen by the Agencies. The Committee has therefore found no evidence that the UK Agencies were complicit in any "Extraordinary Rendition" operations.

**E.**    In the immediate aftermath of the 9/11 attacks, the UK Agencies were authorised to assist U.S. "Rendition to Justice" operations in Afghanistan. This involved assistance to the CIA to capture "unlawful combatants" in Afghanistan. These operations were approved on the basis that detainees would be treated humanely and be afforded a fair trial. In the event, the intelligence necessary to put these authorisations into effect could not be obtained and the operations did not proceed. The Committee has concluded that the Agencies acted properly.

**F.**    SIS was subsequently briefed on new powers which would enable U.S. authorities to arrest and detain suspected terrorists worldwide. In November 2001, these powers were confirmed by the Presidential Military Order. We understand that SIS was sceptical about the supposed new powers, since at the time there was a great deal of "tough talk" being used at many levels of the U.S. Administration, and it was difficult to reach a definitive conclusion regarding the direction of U.S. policy in this area. Nonetheless, the Committee concludes that SIS should have appreciated the significance of these events and reported them to Ministers.

**G.**    The Security Service and SIS were also slow to detect the emerging pattern of "Renditions to Detention" that occurred during 2002. The UK Agencies, when sharing intelligence with the U.S. which might have resulted in the detention of an individual subject to the Presidential Military Order, should always have sought assurances on detainee treatment.

**H.**    The cases of Bisher al-Rawi and Jamil el-Banna and others during 2002 demonstrated that the U.S. was willing to conduct "Rendition to Detention" operations anywhere in the world, including against those unconnected with the conflict in Afghanistan. We note that the Agencies used greater caution in working with the U.S., including withdrawing from some planned operations, following these cases.

I.    By mid-2003, following the case of Khaled Sheikh Mohammed and suspicions that the U.S. authorities were operating "black sites", the Agencies had appreciated the potential risk of renditions and possible mistreatment of detainees. From this point, the Agencies correctly sought Ministerial approval and assurances from foreign liaison services whenever there were real risks of rendition operations resulting from their actions.

J.    After April 2004 – following the revelations of mistreatment at the U.S. military-operated prison at Abu Ghraib – the UK intelligence and security Agencies and the Government were fully aware of the risk of mistreatment associated with any operations that may result in U.S. custody of detainees. Assurances on humane treatment were properly and routinely sought in operations that involved any risk of rendition and/or U.S. custody.

K.    The Committee has strong concerns, however, about a potential operation in early 2005 which, had it gone ahead, might have resulted in the ***. The operation was conditionally approved by Ministers, subject to assurances on humane treatment and a time limit on detention. These were not obtained and so the operation was dropped. *** *** ***.

## SPECIFIC CASES

89.    There have been a number of rendition cases in which it is alleged that UK Agencies were involved, or complicit, and the Committee has looked at all of these. We have detailed below four of them – these are from 2002 and illustrate key developments in the awareness of the changing nature of the U.S. rendition programme. The Committee notes, however, that any complaints about any alleged conduct by or on behalf of the UK intelligence and security Agencies are a matter for those concerned to raise with the Investigatory Powers Tribunal established under the Regulation of Investigatory Powers Act 2000.[72]

## MARTIN MUBANGA

### *Background*

90.    Martin Mubanga (a dual British-Zambian national who had fled the fighting in Afghanistan) was arrested by the local authorities in Zambia in March 2002 whilst travelling on a Zambian passport.[73] The Zambian authorities handed him over to the Americans in Lusaka.

91.    Mubanga alleges that he was interviewed by U.S. and UK officials (including an SIS officer) in Zambia. He alleges that the SIS officer had his UK passport, which he claims that he lost in Afghanistan, which is why he had travelled to Zambia using his Zambian passport.[74]

92.    Mubanga was "Rendered to Detention" to Guantánamo Bay on 20 April 2002. He alleges that he was subjected to CIDT whilst detained there. On 25 January 2005 he was released from Guantánamo Bay, along with other UK nationals, following negotiations between the U.S. and the UK through diplomatic channels.

93.    The Government has acknowledged publicly that an intelligence officer did interview Mubanga in Zambia, and has also stated that HMG played no role in his capture or rendition.

---

[72] *The Tribunal can be contacted via their website at www.ipt-uk.coml or by post: The Investigatory Powers Tribunal, PO Box 33220, London SW1H 9ZQ.*

[73] *The exact reason for his arrest is not known.*

[74] *The Committee has been told that Mubanga was interviewed by a member of the Security Service and not SIS as has been alleged.*

### *Outcome of Investigation*

94.   We have taken evidence from SIS, the Security Service and the Foreign Secretary on this case. The Chief of SIS told the Committee that *"SIS and the Security Service were not involved in his capture or rendition, but [the Security Service] were allowed to interview him [in Zambia]".*[75]

95.   The Director General of the Security Service said that a Security Service officer had interviewed Mubanga on two occasions over a two-day period, adding that there was *"... no indication that he had been abused, no complaint about his treatment. [The Service was] not responsible for his detention and subsequent transfer to Guantánamo."*[76]

96.   The Security Service was informed while Mubanga was in Zambia that the American authorities were considering rendering him to Guantánamo Bay and notified the FCO, Home Office, Prime Minister's Office and the JIC Chairman on 20 March 2002.

97.   The Foreign Secretary told the Committee that since Mubanga was a dual British-Zambian national detained in Zambia, UK Government policy (which reflects international law and conventions) meant that the Zambians were responsible for providing him with consular protection and making diplomatic representations on his behalf.[77] Consequently, the FCO made no representations to the U.S. in this case, nor was there any subsequent Ministerial direction to the intelligence Agencies.

### *Conclusion*

**L.   We are satisfied that the UK intelligence and security Agencies had no involvement in the capture or subsequent "Rendition to Detention" of Martin Mubanga and that they acted properly.**

---

[75] *Oral evidence – SIS, 7 November 2006.*

[76] *Oral evidence – Security Service, 23 November 2006.*

[77] *"If you are a dual British national in the State of your other nationality, we would not normally offer you support or get involved in dealings between you and the authorities of that State. We may make an exception to this rule if, having looked at the circumstances of the case, we consider that there is a special humanitarian reason to do so... However, the help we can provide will depend on the circumstances and the State of your other nationality must agree."* Support for British Nationals: A Guide, available at www.fco.gov.uk/

# BINYAM MOHAMED AL-HABASHI

## *Background*

98.   Binyam Mohamed al-Habashi, an Ethiopian national, sought political asylum in the UK in March 1994 and was given indefinite leave to remain whilst his asylum application was considered (his application was refused in May 2000). In June 2001 he travelled to Pakistan, planning to return in April 2002. On 10 April 2002 the Pakistani authorities arrested him at Karachi airport (having fled Afghanistan where he had reportedly been fighting with the Taliban) for travelling on a false passport.

## *Allegations*

99.   Al-Habashi alleges that he was held by the Pakistani authorities for a period of three months, during which time he was mistreated. He says that he was interrogated by British officials and that *"one of them did tell me I was going to get tortured by the [Arabs]"*.[78]

100.   Al-Habashi alleges that, in July 2002, he was the subject of an American "Extraordinary Rendition" operation, from Pakistan to Morocco.[79] He claims he was subjected to torture and CIDT whilst detained by the Moroccan authorities. He says that the Moroccans told him that they were working with the British Security Service and that he was asked questions containing details about his life that could only have come from UK sources.

101.   After 18 months' detention in Morocco, al-Habashi alleges that he was rendered to Kabul in January 2004 where he suffered further mistreatment. In September 2004, al-Habashi was transferred to Guantánamo Bay, where he is still being held.

## *Outcome of Investigation*

102.   The Committee has taken evidence about this case. We have been told that SIS never had any contact with al-Habashi. A member of the Security Service did interview al-Habashi once, for a period of approximately three hours, whilst he was detained in Karachi in 2002. The interview was conducted by an experienced officer and was in line with the Service's guidance to staff on contact with detainees.

---

[78] *Statement by al-Habashi to his lawyer (Clive Stafford Smith) whilst in Guantánamo Bay, taken from Reprieve written submission to the Committee, 4 December 2006.*

[79] *The Committee has been told that the Security Service first learnt of the allegation that he had been transferred to Morocco in 2005.*

103. The Security Service denies that the officer told al-Habashi he would be tortured, as he alleges. Furthermore, the officer reported that he did not observe any abuse and that no instances of abuse were mentioned by al-Habashi.

104. The Security Service had no further contact with al-Habashi since this one interview in 2002. However, they were aware of the U.S. plan to transfer him, because:

> ... at the beginning it was thought [al-Habashi] was [a British national], we were told by [the U.S.] that they were going to move him to Afghanistan and we know that he was moved to Guantánamo. He has claimed that on the route there he was held in Morocco and that while in Morocco he was tortured... We do not know whether that happened...[80]

105. ***
***. In giving evidence to the Committee in 2006, the Director General of the Security Service told us:

> ... when we knew he was in custody, because he had information we believed relevant to the UK from having lived here, ***
> ***
> ***
> ***. That is a case where, with hindsight, we would regret not seeking proper full assurances at the time...[81]

106. Whilst no assurances were sought, this is understandable given the lack of knowledge, at the time, of any possible consequences of U.S. custody of detainees. Indeed, the Director General of the Security Service said to us:

> I do not think we would know today if Congress and the Supreme Court had not pressed the American Government to move the way it did.[82]

## Conclusions

**M.    There is a reasonable probability that intelligence passed to the Americans was used in al-Habashi's subsequent interrogation. We cannot confirm any part of al-Habashi's account of his detention or mistreatment after his transfer from Pakistan.**

**N.    We agree with the Director General of the Security Service that, with hindsight, it is regrettable that assurances regarding proper treatment of detainees were not sought from the Americans in this case.**

---

[80] Oral evidence – Security Service, 23 November 2006.

[81] Ibid.

[82] Ibid.

# A DEPORTATION WITHOUT SAFEGUARDS

107. The Committee was told about this case as part of the Agencies' full account of their knowledge of rendition policy. This was not itself a rendition operation, but we believe the circumstances of the deportation need to be mentioned here ***. The countries involved are not named, however, for reasons of national security.

108. In 2002, SIS and the Security Service were informed that a national of one country had been detained in a second country ***. As the individual had UK connections, the Security Service was allowed to put questions to the detainee indirectly, and obtained some important intelligence as a result. There is no record that SIS or the Security Service asked for assurances to ensure that the detainee did not suffer torture or CIDT.

109. After some months, the detaining country decided to deport the detainee to his home country, and requested a contribution from SIS and the Security Service towards the cost of the deportation. We have been told by the Chief of SIS that the two Agencies:

> ... provided the sum asked for, although we both considered it a contribution to our counter-terrorism relationship with the country concerned, and the Security Service specified that it should not be considered a contribution to the deportation... with hindsight both Services feel that they should not have made this payment, even though they tried to decouple it from the deportation.[83]

The Director General of the Security Service also commented: *"He was... in a third country and we were not in a strong position to set conditions on how his deportation was conducted. What we certainly should not have done in my opinion was pay for it."*[84]

110. There is no evidence as to the eventual treatment of the detainee once he was returned to his home country.

## Conclusion

**O.    Whilst this was not a rendition but a deportation, and the Security Service and SIS were not in a strong position to impose conditions on it, we accept their view that they should nevertheless have sought greater assurances that the individual would be treated humanely.**

---

[83] *Oral evidence – SIS, 7 November 2006.*

[84] *Oral evidence – Security Service, 23 November 2006.*