# BISHER AL-RAWI AND JAMIL EL-BANNA

## Introduction

111. Bisher al-Rawi is an Iraqi national who arrived in the UK in 1984. He was granted exceptional leave to remain, but did not apply for British citizenship. Jamil el-Banna is a Jordanian-Palestinian who has refugee status in the UK, but does not have UK citizenship. Both were "Rendered to Detention" by the U.S. in December 2002, possibly first to Afghanistan and then to Guantánamo Bay in February 2003. The Committee has investigated allegations of Security Service involvement in the case. It has been alleged (by lawyers representing the men) that the Security Service asked for the men to be arrested and rendered; that they provided out-of-date and inaccurate information which may have led to their rendition; and that al-Rawi worked for the Security Service, who reneged on the assurances they had given him.

112. In late March 2007, al-Rawi was released from Guantánamo Bay and returned to the UK following a year of FCO discussions with the U.S. authorities. At the time of writing, el-Banna remains in Guantánamo Bay.

113. The events surrounding this case should be viewed in the context of Security Service procedures, and taking account of what the UK Agencies knew about the U.S. rendition programme in 2002.

114. The Committee has not investigated the general issue of FCO support to non-British nationals, which has been addressed by the Foreign Affairs Committee's recent report on Guantánamo Bay.[85]

## Events in the UK

115. The Security Service had knowledge of both al-Rawi and el-Banna prior to the events of November 2002:

> Mr al-Rawi and Mr el-Banna were known to the Service prior to their detention in The Gambia. Whilst in the United Kingdom, both were in contact with a number of individuals considered by the Service to be Islamist extremists, including Abu Qatada, the radical cleric...[86]

---

[85] HC 44, 21 January 2007.

[86] Open statement of Security Service Witness "A", dated 14 March 2006, R. (Al-Rawi & Others) v. Secretary of State for Foreign and Commonwealth Affairs & Another [2006].

El-Banna was described by the Security Service as:

> ... *a Jordanian Palestinian veteran of the Afghan-Soviet war and... assessed to be Abu Qatada's financier. [He] is in close contact with members of [two North African terrorist groups].*[87]

The Service described al-Rawi as:

> ... *an Iraqi Islamist extremist who is a member of Abu Qatada's close circle of associates. He has previously come to our attention for his financial activities...*[88]

116. On 31 October 2002, a member of the Security Service and an officer from the Metropolitan Police Special Branch (MPSB) visited el-Banna at his home in London. They discussed his association with members of the extremist community and suggested that if he chose to help them by providing details of all his activities and contacts, they would assist him to create a new life for himself and his family. The Security Service reported that he gave no indication that he would be willing to cooperate with them.

117. On 1 November 2002, al-Rawi, el-Banna and Abdallah el-Janoudi (a British national) arrived at Gatwick airport intending to fly to The Gambia. They stated that the trip was for business purposes. A covert search of the men's baggage was made at the airport.[89] A number of suspicious items were discovered in al-Rawi's luggage, leading the police to arrest all three men under anti-terrorism laws.[90]

**P.    Given el-Banna's and al-Rawi's backgrounds and associations, it was reasonable to undertake a properly authorised covert search of the men's luggage. The decision to arrest the men was taken by the police on the basis of the suspicious items they found and was not instigated by the Security Service.**

118. The same day, the Security Service sent a telegram to the U.S. authorities notifying them of the arrests and giving their current assessment of the men. Exchanges of information such as this are routine, and a fundamental part of the

---

[87] *Ibid., exhibit A1.*

[88] *Ibid.*

[89] *The search was authorised by a warrant signed by the Home Secretary.*

[90] *The items discovered included: 20 copies of the Quran, 300 copies of a pamphlet entitled* Three Letters on 1) The Description of the Prophet's Gusi, 2) The Description of the Prophet's Wudu, 3) The Description of the Prophet's Prayer, *a bundle of electrical wires wrapped around a set of tweezers, a "folding plotter", three manuals for VHM FM hand-held transceivers, an air pump manual, drill bits, a gas cylinder, a voltage inverter, and various bits of electronic equipment. There was also an item described as "a quantity of masking tape wrapped around an unidentified object [with] a metal sheet stuck to it, and wires leading from it to a battery pack (without batteries). Also connected to this were a series of clips on the ends of several other wires." (Security Service internal Loose Minute, dated 6 November 2002.) This was later discovered to be a modified battery charger.*

work of the Security Service.[91] The telegram described all three as *"Islamists"*, al-Rawi as an *"Iraqi Islamist extremist"* and el-Banna as *"formerly assessed to be Abu Qatada's financier"*. This telegram also mentions that the men were in possession of a *"home-made electronic device"* and indicated that it *"may be a timing device [or] part of a car-based IED [improvised explosive device]"*. The caveat on this telegram made it clear that the information was for *"research and analysis purposes only and may not be used as the basis for overt, covert or executive action"*.[92,93]

**Q.    The sharing of intelligence with foreign liaison services on suspected extremists is routine. There was nothing exceptional in the Security Service notifying the U.S. of the men's arrest and setting out its assessment of them. The telegram was correctly covered by a caveat prohibiting the U.S. authorities from taking action on the basis of the information it contained.**

119.    Police questioning of the men between 1 and 4 November focused on the suspicious items found in their luggage, including what appeared to them to be a modified battery charger.[94] While the men were being questioned, authorised searches of their UK addresses were conducted, and documents relating to a rocket-propelled grenade launcher, circuit boards and watches (in various states of repair) were discovered in al-Rawi's workshop.

120.    The police assessment, in consultation with the Crown Prosecution Service, was that there was insufficient evidence on which to charge the men and they were therefore released on 4 November 2002. On the day of their release, the Security Service sent a telegram to the U.S. that included the Service's assessment of the men and the fact that they were due to travel to The Gambia in the near future.

121.    The telegram asked the U.S. authorities to pass the information to the Gambian security services and said:

> ...[we] would be grateful for feedback on the reaction of the Gambians to this intelligence. In particular, we would be interested to learn if they are able to cover these individuals whilst they are in Gambia.

This telegram was also covered by a caveat prohibiting *"... overt, covert or executive action"*.

---

[91] *The need for increased international intelligence cooperation had been reinforced by UN Security Council Resolution 1373 (see paragraph 24).*

[92] *Caveats on shared intelligence were used predominantly as a means to protect intelligence sources. For example, if intelligence was shared with a foreign liaison service and that service subsequently took action (such as arresting someone), that could reveal the source of the information and endanger that person or other operations. Protection of sources is paramount and the use of caveats is one of the methods by which this is achieved. Caveats are therefore honoured by other agencies.*

[93] *"Executive action" means the exercise of powers by those branches of government responsible for implementing laws and may include actions such as detention, deportation, refusal of a visa, refusal of entry, etc.*

[94] *Al-Rawi claims that he modified a standard battery charger in order to make it waterproof. It is unclear why this was considered necessary.*

122. It is usual practice for such information to be shared with liaison services. The Security Service has a clear duty to warn another country if an individual under investigation is travelling to that country to enable them to take such action as may be necessary to safeguard their national security interests.[95] In addition, they would hope that the country would be able to monitor the individual's activities while there – thereby both ensuring that they do not lose sight of them and also building up the overall intelligence picture of the suspect. Whilst such information *** ***. This again was standard practice.

123. Whenever the Security Service deals with foreign liaison services, they seek to determine whether the country in question has the capability, resources, legal basis and willingness to undertake activity on behalf of the Service. In this case, we consider that this was the purpose of asking whether the Gambians *"are able to cover these individuals whilst they are in Gambia"*. The Committee has been told that the Security Service did not obtain a response to this question.

124. When passing information between liaison services, it is routine procedure that caveats are passed on as well. This case involves information passed to the Gambians via the U.S. authorities – it would be expected that caveats on this information would also have been communicated to the Gambians. The Security Service told us:

> *I cannot reconstruct what was going on in the particular officer's mind six years afterwards, but I think the expectation of the officer would be that this is part of an ongoing investigation by our Service, that we did not want any executive action taken because we did not want somebody arrested… There was not the basis for that.*

> *We therefore [used] a caveat on [the telegrams], and then one is pursuing the investigation through the next stages. It happened that the individual had gone to Gambia. We wanted to know what he was going to do. We did not expect anybody to arrest him or do anything. We just needed to understand what the course of events was.*

> *As it happens, the Americans disregarded the caveat on the operation and decided to step in and do something, but that from our point of view was not the way in*

---

[95] *"… it is a matter of routine inter-governmental cooperation that an intelligence agency in a particular country will notify foreign agencies if a suspected terrorist, or someone suspected of being involved or associated with those engaged in terrorist-related activities, is intending to leave that country and travel abroad. The Service participates in this form of cooperation between governments, and this participation helps to ensure that foreign agencies will, in return, inform the Service whenever they are aware that a suspected terrorist or associate may be travelling to the United Kingdom." Open statement of Security Service Witness "A", dated 14 March 2006, R. (Al-Rawi & Others) v. Secretary of State for Foreign and Commonwealth Affairs & Another [2006].*

*which we would have expected the Americans to operate, given that we have had a long track record of cooperation with them over counter-terrorist matters in regard to Al-Qaeda for some time…*

*It certainly was a surprise that the Americans were operating in this way.*[96]

**R.   In adding the caveat prohibiting action, the Security Service explicitly required that no action (such as arrests) should be taken on the basis of the intelligence contained in the telegrams. We have been told that the Security Service would fully expect such a caveat to be honoured by the U.S. agencies – this is fundamental to their intelligence-sharing relationship. We accept that the Security Service did not intend the men to be arrested.**

125.  On 8 November 2002, the three men travelled to The Gambia. They were not searched at Gatwick on this occasion – it was judged that a second search would have been unlikely to produce any additional relevant material. (Security Service options at this stage would have been to keep an eye on the men to determine if their earlier arrest had given them a scare and disrupted any potential plans, or to monitor them further either to obtain further evidence or to rule them out of the Service's investigation.)

126.  On the day of their departure, a third telegram was sent from the Security Service to the U.S. authorities confirming that the men had departed and including the relevant flight information. Because this telegram contained flight details only – as opposed to intelligence – it was covered by a caveat prohibiting further distribution to other governments, which is the standard caveat used across Government in communiqués with foreign governments. (Whilst this caveat does not include the prohibition on taking action, this had already been established by the caveats on the earlier telegrams.)

*Arrest in The Gambia*

127.  Up to this point, the actions taken by the Security Service were the regular work of investigative officers who monitor suspected extremists – such work is *"routine business"* for the Service.[97]

128.  When the men arrived at Banjul airport, they were met by Omar Omari (a Gambian national) and Bisher's brother Wahab al-Rawi (a British national). The

---

[96] *Oral evidence – Security Service, 20 March 2007.*

[97] *Ibid.*

Gambian authorities searched the men's baggage and discovered *"a suspicious collection of items"*.[98] They arrested all five men.[99] The Security Service assessment was that *"these items may well have formed the basis for their detention"*.[100]

129.  It seems to us that there are a number of possible reasons why the men were initially arrested. It is possible that the Gambian police or border authorities at Banjul airport decided to search the men based on a "hunch" – something that happens routinely at customs and immigration points around the world. It is also possible that the Gambians broke the caveats on the intelligence shared with them and chose to take executive action. Another possibility is that the U.S. authorities neglected to pass on the caveats or instigated the men's arrest themselves. Whatever the reason for the men's arrest, it is clear that it was not at the instigation of the Security Service.

130.  The Security Service was informed of the arrests on 10 November and, the following day, sent a telegram to notify SIS and the FCO of this and to provide background to the case. On 14 November, the Deputy Director General of the Security Service wrote to the Home Office and MPSB in similar terms.

131.  Initially, the remaining men were detained by the Gambian authorities but they were subsequently transferred into American custody.[101] During the men's detention, the Security Service received information about the progress of the investigation into the men's intended activities, although they were not told where the men were being held.[102]

132.  In late November, the Security Service was informed by the U.S. authorities that they intended to conduct what we have defined as a "Rendition to Detention" operation, to transfer the four men from The Gambia to Bagram Air Base in Afghanistan. The Service registered strong concerns, both orally and in writing, at this suggestion and alerted the FCO.

---

[98] *"... the items included a solar panel for a satellite phone, several thousand dollars worth of outdoor equipment, a repair kit for wetsuits, mountain-climbing gear and a large plastic bag full of hand-soldered electrical components." Open statement of Security Service Witness "A", R. (Al-Rawi & Others) v. Secretary of State for Foreign and Commonwealth Affairs & Another [2006].*

[99] *We understand that Omar Omari was released on 9 November, the day after the men's arrest at Banjul airport.*

[100] *Open statement of Security Service Witness "A", dated 14 March 2006, R. (Al-Rawi & Others) v. Secretary of State for Foreign and Commonwealth Affairs & Another [2006].*

[101] *It is unclear precisely at what stage the men were transferred into U.S. custody.*

[102] *Open statement of Security Service Witness "A", dated 14 March 2006, R. (Al-Rawi & Others) v. Secretary of State for Foreign and Commonwealth Affairs & Another [2006].*

133. The Deputy High Commissioner and the High Commissioner to The Gambia made representations to the U.S. Ambassador in Banjul from 27 November.[103] In Washington, the Deputy Head of Mission made representations to the U.S. Department of State and the National Security Council.[104] They registered strong objections to the transfer of the men and sought clarification of their whereabouts and U.S. intentions. The Committee was told:

> *In response to our representations, the U.S. confirmed the detention of the individuals in question, but declined to give their precise location in Gambia. The U.S. also stated that they believed there were good grounds for the individuals' detention and told us they were being well treated.*[105]

134. The FCO sought consular access to the two British nationals (el-Janoudi and Wahab al-Rawi), but this was refused despite repeated requests.[106] Eventually, the two British nationals were released and returned to the UK on 4 and 5 December 2002.

**S.    The Security Service and Foreign Office acted properly in seeking access to the detained British nationals, asking questions as to their treatment and, when they learnt of a possible rendition operation, protesting strongly.**

**T.    We note that eventually the British nationals were released, but are concerned that, contrary to the Vienna Convention on Consular Relations, access to the men was initially denied.**

135. On 6 December 2002, the Security Service sent a telegram to the U.S. authorities which stated that HMG *"would not seek to extend consular protection to non-British nationals"*. We have been told that under international law the FCO could not provide consular protection to Bisher al-Rawi and el-Banna. In a number of the cases we have reviewed, there is an issue related to consular protection afforded to British residents or those with dual nationality.[107] This is a matter beyond the remit of the Committee. We note, however, the report of the Foreign Affairs Committee on their visit to Guantánamo Bay which concludes that the established policy of not accepting consular responsibility for non-British nationals is correct.

---

[103] *The High Commissioner visited the U.S. Ambassador in person, on at least two occasions.*

[104] *The Deputy Head of Mission in Washington spoke directly to senior officials at the State Department and the National Security Council.*

[105] *Letter from the Foreign Secretary to the Committee, 12 January 2007.*

[106] *Consular access was sought from 27 November by way of a formal written request to the Gambian authorities and as part of representations made to the U.S. Ambassador in Banjul.*

[107] *The legal aspects of consular access are described in paragraph 17.*

## *"Rendition to Detention"*

136. Bisher al-Rawi and el-Banna were allegedly "Rendered to Detention" to Bagram Air Base in Afghanistan by the U.S. authorities on 8 December 2002. They were then allegedly transferred and detained in Kabul before again being "Rendered to Detention" to Guantánamo Bay in February 2003.

137. We have considered whether the Security Service should have been more aware of the risk that the men would be rendered. Renditions up until this point had, in effect, been "Military Renditions" (i.e. those connected to the conflict in Afghanistan). We have been told that this was the first time after 9/11 that the Service became aware of a rendition of individuals unrelated to the Afghanistan battlefield (or surrounding area of operations), and it was not therefore expected.

**U.    This is the first case in which the U.S. agencies conducted a "Rendition to Detention" of individuals entirely unrelated to the conflict in Afghanistan. Given that there had been a gradual expansion of the rendition programme during 2002, it could reasonably have been expected that the net would widen still further and that greater care could have been taken. We do, however, note that Agency priorities at the time were – rightly – focused on disrupting attacks rather than scrutinising American policy. We also accept that the Agencies could not have foreseen that the U.S. authorities would disregard the caveats placed on the intelligence, given that they had honoured the caveat system for the past 20 years.**

**V.    This case shows a lack of regard, on the part of the U.S., for UK concerns. Despite the Security Service prohibiting any action being taken as a result of its intelligence, the U.S. nonetheless planned to render the men to Guantánamo Bay. They then ignored the subsequent protests of both the Security Service and the Government. This has serious implications for the working of the relationship between the U.S. and UK intelligence and security agencies.**

## *Other Allegations*

138. Among the allegations surrounding this case, it is claimed that the Security Service provided out-of-date and inaccurate information which may have led to the rendition by the U.S. agencies, and that Bisher al-Rawi worked for the Security Service, who reneged on the assurances they had given him.

## *The Suspicious Device*

139. On the question of the accuracy of the information provided to the Americans, the Security Service telegrams provided their current assessment of the men. The 1 November telegram also referred in passing to a *"home-made electronic device"*

found during the search of the men's baggage, possibly *"as some part of a car-based IED"*, but gave no final assessment of what the device might be. The main focus of the telegram was the men's links to Islamist extremism. The Committee has not seen any evidence that the Security Service told the U.S. of the final assessment of the device.

140. We consider it likely that the men were "Rendered to Detention" due to their links with Islamic extremism, rather than suspicions related to the home-made electronic device and, therefore, even had the final assessment of the device been provided, we do not believe that it would have had any bearing on U.S. decisions in this case.

141. El-Banna's and Bisher al-Rawi's Combatant Status Review Tribunals (CSRTs) concluded that they were properly classified as enemy combatants and should therefore remain detained at Guantánamo Bay to face Military Tribunals.[108,109] El-Banna's CSRT included a number of allegations, including that he *"was arrested in Gambia while attempting to board an airplane with equipment that resembled a home-made electronic device"*.[110] This would appear to refer to the item discovered in the men's baggage at Gatwick airport on 1 November 2002 and is therefore incorrect.

**W.    Whilst we note that Bisher al-Rawi has now been released from Guantánamo Bay and that el-Banna has been cleared for release, we nevertheless recommend that the UK Government ensures that the details of suspicious items found during the Gatwick luggage search (including the police's final assessment of these items) are clarified with the U.S. authorities.**

*Bisher al-Rawi's Relationship with the Security Service*

142. The Committee has also investigated claims made by Bisher al-Rawi regarding his relationship with the Security Service. He claimed in his CSRT that he worked – unpaid – for the Security Service as a go-between with Abu Qatada. In this capacity, he claims to have helped the Service find Abu Qatada, and was given assurances that, should his work for the Service get him into trouble with the authorities, he could ask for their assistance. He also claimed that the Service tried to recruit him when he was in Guantánamo Bay.

---

[108] *The CSRT aims to determine whether those detained at Guantánamo Bay are properly classified as "enemy combatants" and to provide detainees with the opportunity to challenge this designation.*

[109] *Bisher al-Rawi was released from Guantánamo Bay in March 2007 following intervention by the FCO. At the time of writing, el-Banna remains at Guantánamo Bay, although the U.S. authorities have cleared him for release.*

[110] *This would appear to refer to the suspicious device discovered during the search of the men's baggage at Gatwick airport. CSRT, ISN #905, Enclosure (3), page 3.*

143. The issue of whether or not individuals cooperate with the intelligence and security agencies is extremely sensitive. Disclosing information about this sort of cooperation, or whether individuals are sources, would jeopardise existing relationships and dissuade others from helping the services in their future efforts to tackle the terrorist threat. We cannot therefore confirm or deny any of the allegations that have been made. We can confirm, however, that we have looked into the issue in detail, questioned a number of witnesses to assure ourselves of the facts of the case and have seen the relevant excerpts from Security Service files. We have included here as much of the detail as we can put in the public domain without seriously damaging the Agencies' ability to do their job.

144. In March 2006, the Treasury Solicitors, acting for the Foreign Secretary, informed Bisher al-Rawi's legal representatives of the decision to approach the U.S. on al-Rawi's behalf:

> The latest evidence filed on behalf of Mr Al Rawi... [includes] a suggestion that Mr Al Rawi may have agreed to assist the Security Service if released from Guantanamo Bay. Together [with other allegations and assertions], these are the basis of what has been called the "fact specific" claim of Mr Al Rawi... The reason why the Foreign Secretary has decided that an approach should be made to the U.S. Government to ask for Mr Al Rawi's release is related to this fact specific claim...[111]

The Treasury Solicitors did, however, point out that parts of Bisher al-Rawi's claims were *"inaccurate in very many respects"*, and that the Foreign Secretary was under no legal obligation to make these representations.[112]

145. We have questioned the Foreign Secretary on the background to this letter. We have been told that:

> ... the previous Foreign Secretary made an exception, in the case of Mr al-Rawi, somewhat late in the day, because he was informed, rather late in the day, of information ***
> ***
> ***, it was decided that a different policy would be adopted towards al-Rawi compared with the other British residents...
>
> We have not changed our position on consular responsibility in relation to British residents.[113]

---

[111] *Letter from the Treasury Solicitors to Bisher al-Rawi's legal representatives, 22 March 2006. Provided by Mr Andrew Tyrie, MP in response to the Committee's request for any evidence that may be relevant to its inquiry.*

[112] *Ibid.*

[113] *Oral evidence – FCO, 5 December 2006.*

146.  We were told that the information in question came to light following a review of Security Service files in connection with the developing nature of claims brought by Bisher al-Rawi in a court case (al-Rawi and Others) and that this led to the Foreign Secretary being made aware of \*\*\*. The Foreign Secretary has told the Committee:

> It was on the basis of this particular information that Jack Straw decided there were matters... which would enable him to approach the U.S. authorities on Mr al-Rawi's behalf.[114]

147. We can confirm that we have taken evidence from the Security Service on what these "matters" were, have seen the relevant excerpts from their files, and know the full facts of the case.

**X.    We recognise the contribution of the Foreign and Commonwealth Office in securing Bisher al-Rawi's release. However, having seen the full facts of the case – and leaving aside the exact nature of al-Rawi's relationship with the Security Service – we consider that the Security Service should have informed Ministers about the case at the time, and are concerned that it took \*\*\* years, and a court case, to bring it to their attention.**

---

[114] *Letter from the Foreign Secretary, 22 May 2007.*

# ETHICAL DILEMMAS

148.  We have described how the UK's relationship with the U.S. is of fundamental importance in the effort to counter terrorism in paragraphs 24 to 34. We have also outlined the issues our Agencies face when dealing with foreign intelligence services and the ethical, moral and legal dilemmas they encounter.

149.  The Security Service and SIS have, certainly since 1998, where they considered it necessary, sought assurances from foreign intelligence services that individuals facing detention as a result of any action or intelligence shared with them would be treated humanely. This was originally more concerned with the need to ensure a fair trial and avoid capital punishment as CIDT was not thought to be a likely risk.

150.  It was only when news surfaced of the mistreatment of detainees at the U.S.-run Abu Ghraib prison in Iraq in 2004 that the UK Government realised that there were real risks of CIDT:

> *Back in 2003 we were concerned about secret facilities but we did not at that stage, I think, make an automatic connection between secret facilities and mistreatment. That sort of connection grew later as more allegations came to light or… things like Abu Ghraib came to light, which led you to believe, just a minute, if that is happening there, what might be happening in secret facilities.*[115]

151.  The Committee has been told that, as concerns have grown, there has been a corresponding growth in terms of the assurances sought from foreign liaison services: *"the level of assurances that we seek and the conditionality that Ministers have been imposing, that has gradually evolved on an upward curve"*.[116]

152.  After 2004, assurances regarding humane treatment were sought for the specific purpose of ensuring that individuals would not be subject to torture or CIDT. The Director General of the Security Service told the Committee that when passing questions to foreign liaison services to be put to detainees the Service has been much more careful over the last few years:

> *We certainly now have inhibitions… greater inhibitions than we once did. We would now absolutely say, Where is this man? What are you going to do with the information? Where is he being held? What assurances can you give us before you put the questions to him?*[117]

---

[115] *Oral evidence – FCO, 5 December 2006.*

[116] *Ibid.*

[117] *Oral evidence – Security Service, 23 November 2006.*

153. For the most part, the Agencies are able to balance the need to cooperate with foreign liaison services with the need to ensure that individuals are being humanely treated, but there is a further dilemma when it is believed that a serious threat to UK lives can only be disrupted by seeking intelligence which may be obtained by torture or CIDT. The Foreign Secretary told the Committee:

> ... my reaction is that first of all you have to discuss it, particularly at a Ministerial level, that you then have to come to a judgment... I mean, you would be crazy not to consider asking further questions. However, what you would have to consider is do you ask those questions against a background of seeking very clear assurances as to how this person is being and will be treated and, if you do, could you believe those assurances. I think that is the dilemma that would be before Ministers on a case-by-case basis, depending on, for example, if you had any idea where this person was.[118]

154. The Agencies have produced guidance to their staff that addresses the use of intelligence or cooperation with foreign liaison services where there are risks of torture or CIDT – this would include "Extraordinary Rendition" and, depending on the countries involved, may include "Rendition to Detention" and "Rendition to Justice". The guidance was developed jointly by the Security Service, SIS and GCHQ, and so all three are broadly similar.

155. The guidance on sharing intelligence, together with the safeguards employed by the three Agencies, is discussed further on pages 53 to 56.

### Implications for the Special Relationship

156. The rendition programme has revealed aspects of the usually close UK/U.S. relationship that are surprising and concerning. It has highlighted that the UK and U.S. work under very different legal guidelines and ethical approaches. The Director General of the Security Service said that the Americans are aware of the concerns of the UK Agencies in relation to rendition and detainee treatment – she said: "*** ***."[119] UK concerns regarding Guantánamo Bay, detainee treatment and "Extraordinary Rendition" have been raised between the FCO and the U.S. State Department, ***:

> I have certainly had discussions about the broader issue of rendition and detainees with colleagues in the State Department because of various concerns, concerns about the impact this is having in this country on our Parliamentary, press and

---

[118] Oral evidence – FCO, 5 December 2006.

[119] Oral evidence – Security Service, 23 November 2006.

*public opinion, but also concerns that we have, that this can be counter-productive in terms of our concern about terrorism and radicalisation and so on.*

*[Black facilities] have also come up [in] the discussions… that I have had with senior State Department officials, where we simply made clear our opposition really to black facilities, and we feel they are wrong in themselves but also counter-productive for the reasons I described earlier. The State Department has taken note. They have not gone beyond that.*[120]

157. The U.S. rendition programme has required that the Security Service and SIS modify their relationship with their American counterparts to ensure that, in sharing intelligence, the differing legal frameworks of both countries are honoured. The Director General of the Security Service told us:

*We do a lot of exchange of highly sensitive intelligence in a very trusting way, but we now all of us, including the Americans, have a clear understanding of the legal constraints on that exchange… So when you are talking about sharing secret intelligence, we still trust them, but we have a better recognition that their standards, their laws, their approaches are different, and therefore we still have to work with them, but we work with them in a rather different fashion.*[121]

**Y.    What the rendition programme has shown is that in what it refers to as "the war on terror" the U.S. will take whatever action it deems necessary, within U.S. law, to protect its national security from those it considers to pose a serious threat. Although the U.S. may take note of UK protests and concerns, this does not appear materially to affect its strategy on rendition.**

**Z.    It is to the credit of our Agencies that they have now managed to adapt their procedures to work round these problems and maintain the exchange of intelligence that is so critical to UK security.**

---

[120] *Oral evidence – FCO, 5 December 2006.*

[121] *Oral evidence – Security Service, 20 March 2007.*

# THE UK AGENCIES

## *Security Service*

### *Knowledge and Involvement*

158.  Security Service knowledge of, and involvement in, rendition has been in cases where there is a link to the UK. In some cases the detainees have been (or were thought to have been) British nationals or had resided in the UK. In other cases, the foreign liaison services involved may have had cause to believe that detainees were involved in terrorist attack planning against the UK or UK interests:

> *We were aware of people being moved from places: Afghanistan, Pakistan, Zambia and Gambia, usually to Guantánamo. But we are not party to the decision to do so, nor were we aware of routes or how it was done… \*\*\**
> *\*\*\*. We gained this knowledge because these subjects were UK nationals or lived in the UK or were believed to possess intelligence about terrorist activity in or relating to the UK. Some of these renditions were dropped by the Americans after the Service had expressed concern at the proposal.*[122]

159.  In general terms, this means that the Security Service has become involved in cases where the rendition operation has already taken place. Their involvement then becomes a matter of how to deal with foreign liaison services regarding detainees to whom the Service does not have access. In some cases the Service may have very little information regarding the source from which unsolicited intelligence may have come.

160.  The Security Service has never sought to conduct a rendition operation of its own and has said:

> *We have never used rendition, either extraordinary or ordinary… and have not provided assistance to any cases through UK territory… We were not complicit in any cases where it was advocated or implied that someone would be subject to mistreatment.*[123]

## *Sharing Intelligence*

161.  We have discussed the importance of intelligence sharing, particularly with the Americans, and how this has undoubtedly assisted the disruption of attacks against the UK.

---

[122] *Oral evidence – Security Service, 23 November 2006.*

[123] *Ibid.*

162. The problems associated with sharing intelligence with foreign liaison services are not new and the Service has always had to deal with countries that have different legal frameworks and different approaches to human rights. We were told:

> We have had to engage with countries which do not remotely – and I am not actually thinking of the United States – reach our standards of how we do things... The whole issue... of exchanging intelligence with foreign services with different standards and different laws is not new. It has become more acute and more difficult with our closest ally, but the principles apply across the board.[124]

163. The safeguards used by the Security Service to manage this problem when dealing with foreign liaison services are described on pages 53 and 54.

### Secret Intelligence Service

### Knowledge and Involvement

164. SIS's knowledge of, and involvement in, rendition operations has been limited to passing intelligence to, or otherwise assisting, foreign liaison services – ***. Its involvement, unlike the Security Service, has been both prior to and subsequent to renditions taking place.

165. The Chief of SIS summarised his Service's involvement in rendition operations, telling the Committee:

> With one exception, SIS has never conducted a rendition operation. That exception was an operation in 1989. It concerned Peter Mullen, an Irish Republican...

We discussed the implications of that case in paragraph 10. The Chief continued:

> SIS has never given formal permission or otherwise facilitated U.S. rendition operations via UK airspace or territory...

> SIS has never assisted any... renditions into so-called "black facilities"...

> SIS has not assisted any... renditions to third countries, i.e. renditions to countries other than the USA or the detainee's country of origin...

> SIS has not assisted any renditions... to the detainee's country of origin where there was a real risk of cruel, inhumane and degrading treatment or torture, or which would breach the UK's international obligations...

---

[124] Ibid.

> *We have assisted a very small number of renditions where we were certain that*
> *there was no risk of torture or CIDT, and where the circumstances would permit*
> *this assistance without the breach of our country's international obligations.*[125]

166. There have been a number of occasions in which SIS considered taking action
such as assisting renditions to countries other than a detainee's country of origin –
although these cases never developed to the point where Ministers needed to approve
operations.

167. On one occasion consideration was given to assisting ***. This operational
proposal was dropped, however, because SIS was not able to satisfy itself as to the
likely treatment of the target.

*Sharing Intelligence*

168. The Chief of SIS told the Committee of the immense value to the UK of his
Service's relationship with U.S. intelligence agencies.

169. The knowledge of the U.S. rendition programme, as it evolved over time, has
altered the manner in which intelligence is shared with the U.S. whenever the Service
considers that there is a risk of a rendition occurring:

> *So we find ourselves in a position where we share with *** key [counter-*
> *terrorism] interests, objectives and many techniques, but where we have some*
> *different methods and a quite different legal framework, specifically but not only*
> *on the issue of rendition.*
>
> *Now, this does not and cannot be allowed to inhibit the exchange of what we call*
> *"building-block intelligence", by which I mean material which over time*
> *contributes to a picture of a terrorist or a terrorist group, or much other vital*
> *operational collaboration...*
>
> *But it does mean that we have for a long time been aware that sharing what I*
> *would call "actionable intelligence", leading to a possible rendition, would require*
> *very careful internal consideration and Ministerial approval.*[126]

170. SIS applies the same control mechanisms to its intelligence exchange with
foreign liaison services as the other two UK Agencies. These are based upon the use
of caveats, assurances and Ministerial authorisations and are described below.

---

[125] *Oral evidence – SIS, 7 November 2006.*

[126] *Ibid.*

### Safeguards in SIS and the Security Service

171. The Security Service and SIS use a system of safeguards to ensure that their intelligence does not result in torture or mistreatment. These safeguards take the form of conditions which restrict the use that a liaison partner may make of UK intelligence. We have been told that such conditions are understood by intelligence and security services globally, as they all use similar conditions to ensure that one agency does not endanger another agency's sources through their incautious use of intelligence. Intelligence and security agencies accept and respect these conditions because failure to do so would mean that they might not be trusted to receive intelligence in the future.

172. Agency staff are briefed on the system of safeguards as part of their induction training. This was supplemented, prior to 2004, by informal advice from line managers, to whom all staff were advised to refer any concerns. Since 2004, SIS and the Security Service have revised their guidance to staff on the use of these safeguards to ensure that no mistreatment to individuals arises from the sharing of intelligence, and joint guidance, approved by Ministers, was issued to all SIS and Security Service staff in 2006. This guidance is entitled *Guidance on dealing with liaison services: Agency policy on liaison with overseas security and intelligence services in relation to detainees who may be subject to mistreatment*. There is separate guidance for staff involved in questioning detainees in the custody of foreign liaison services, which was the topic of the Committee's March 2005 report into the handling of detainees.[127]

173. The Director General of the Security Service told the Committee: *"[The guidance] is designed to give clear steerage to staff about levels of authorisation and deciding what you can pass and what you cannot pass."*[128] The document is extremely detailed. At the outset the guidance makes it clear that, whilst it is necessary for the UK Agencies to work with foreign liaison services to counter terrorism, the UK Agencies will not condone the use of torture or mistreatment. When a risk of mistreatment is foreseen, then caveats and assurances are used to minimise the risks. Finally, where, despite the use of caveats and assurances, there is still considered to be a risk of mistreatment, senior managerial or Ministerial approval is required.

174. The guidance includes a comprehensive legal briefing, covering the responsibilities of Agency staff under UK law, and the responsibilities of the UK in international law. The overall policy on possible mistreatment related to liaison activities is described as follows:

---

[127] *Cm 6469.*

[128] *Oral evidence – Security Service, 23 November 2006.*

> *The Security and Intelligence Agencies do not participate in, solicit, encourage or condone the use of torture or inhuman or degrading treatment. For reasons both ethical and legal, their policy is not to carry out any action which they know would result in torture or inhuman or degrading treatment. Where there is considered to be a risk that the Agencies' actions will be unlawful, the actions may not be taken without authority at a senior level. In some cases, Ministers may need to be consulted.*

In practical terms, this means there is a range of options available to staff when they share intelligence with foreign liaison services, dependent on the likelihood and risk of torture or CIDT being foreseen. We have examined the guidance documents setting out these options and we believe that they are in line with the objectives set out above.

175. This guidance is designed to ensure that the Agencies' actions, where the possibility of torture or CIDT is foreseen, comply with their, and the UK's, legal obligations. The Agencies' knowledge of the workings of foreign liaison services is critical in assessing the risks involved in cooperation with them.

### Conclusions and Recommendations

**AA. The Committee notes that the UK Agencies now have a policy in place to minimise the risk of their actions inadvertently leading to renditions, torture or cruel, inhuman or degrading treatment (CIDT). Where it is known that the consequences of dealing with a foreign liaison service will include torture or CIDT, the operation will not be authorised.**

**BB.  In the cases we have reviewed, the Agencies have taken action consistent with the policy of minimising the risks of torture or CIDT (and therefore "Extraordinary Rendition") based upon their knowledge and awareness of the CIA rendition programme at that time.**

**CC.  Where, despite the use of caveats and assurances, there remains a real possibility that the actions of the Agencies will result in torture or mistreatment, we note that the current procedure requires that approval is sought from senior management or Ministers. We recommend that Ministerial approval should be sought in all such cases.**

**DD. The Committee considers that "secret detention", without legal or other representation, is of itself mistreatment. Where there is a real possibility of "Rendition to Detention" to a secret facility, even if it would be for a limited time, then approval must never be given.**

### *Government Communications Headquarters*

#### *Knowledge and Involvement*

176. There have been no allegations relating to the involvement of GCHQ in any rendition operations. GCHQ's Director, Sir David Pepper, told the Committee that GCHQ had *"never knowingly provided support to a U.S. rendition operation and we would not authorise the use of intelligence for that purpose... and we have never been asked to do so"*.[129] As mentioned earlier in this Report, GCHQ has checked its records back to 1995 as part of the Government's investigation into possible involvement in rendition/CIDT and, like other Government departments, found no evidence of involvement.

177. Sir David told the Committee that GCHQ's knowledge of the U.S. rendition programme built up over time, as SIS passed on information and shared its growing suspicions with the other Agencies. He also explained that GCHQ's principal partner in the U.S. is the National Security Agency (NSA). Sir David told the Committee:

> *Our knowledge of the rendition programme has essentially flowed from what SIS have learnt and told the other Agencies...*

> *I think it was 1997... that SIS first understood about rendition. It would have been telling the rest of the community at that point, and their knowledge gradually grew, and so our knowledge gradually grew. Then in the years since 2001... we have followed SIS's growing understanding of what the U.S. was doing. We have had no independent source of information ourselves.*[130]

#### *Safeguards*

178. GCHQ shares SIGINT collection data and intelligence reporting with the U.S. under a 60-year-old agreement.

179. As mentioned earlier in the Report, GCHQ applies the same guiding principles as the Security Service and SIS. In addition, GCHQ applies controls and safeguards tailored to its SIGINT function, to ensure that its actions are lawful and for the protection of sensitivities.

180. All SIGINT targeting is recorded and subject to regular external checks by independent commissioners. Furthermore, all end-product reporting is subjected to

---

[129] *Oral evidence – GCHQ, 29 November 2006.*

[130] *Ibid.*

a sensitivity-checking process (known as "***") whenever there are concerns over legal, political or operational sensitivities. This process also ensures that the intelligence is accurate and its distribution is consistent with policy and legislative constraints.

181. GCHQ's long-established "***" process is the prime control mechanism by which GCHQ regulates the use of its intelligence by recipients. It requires all customers of GCHQ intelligence reports (***) to request authorisation from GCHQ to undertake executive action based upon the information they contain. The "***" process ensures that any use made of GCHQ reporting does not compromise sensitive SIGINT sources or relationships, and that it complies with UK policy and law.

182. GCHQ has provided to the Committee extracts from its guidance for "reporters" covering "***" and "***".[131] This advises relevant staff of the steps they should take if they foresee a real possibility that unlawful behaviour might result from supplying intelligence to a foreign partner. It also sets out the safeguards for senior management to follow (such as the use of caveats) in such circumstances, including potential upward referral, ultimately to Ministerial level.

183. Sir David said:

> When we talk about use of intelligence, that would include passing it to liaison services. So if anybody wants to do anything other than read the report and put it on a database, they have to come to us for permission.[132]

He said that he is completely confident that this process is working appropriately.

## Conclusion

**EE. GCHQ has played no role in any U.S. renditions, whether "ordinary" or "extraordinary". Theoretically, given the close working relationship between GCHQ and the National Security Agency (NSA), GCHQ intelligence could have been passed from the NSA to the CIA and could have been used in a U.S. rendition operation. However, GCHQ's legal safeguards and the requirement for explicit permission to take action based on their intelligence provide a high level of confidence that their material has not been used for such operations.**

---

[131] "Reporters" are analysts who create "end-product" intelligence reports as opposed to those involved in the collection of intercept material.

[132] Oral evidence – GCHQ, 29 November 2006.

# "GHOST FLIGHTS"

## *Introduction*

184. One of the allegations concerning the U.S. rendition programme is that CIA planes conducting rendition operations used UK airspace and airports. This is not linked to the intelligence and security Agencies, and does not therefore fall within the Committee's remit. We did, however, look in part at the allegations as part of our background investigations and think it helpful to report our findings.

185. An article in the *Guardian* on 12 September 2005 reported that it had compiled a database of flight records from the U.S. Federal Aviation Administration which demonstrated British logistical and refuelling support for CIA rendition operations.[133,134] In particular, the article referred to the case of Mohammed Saad Iqbal Madni, where it is alleged that the CIA rendered him from Indonesia to Egypt, then flew on to Prestwick airport in Scotland to refuel before returning to Washington. Since September 2005 a number of other reports have referred to the use of UK airspace by CIA-operated aircraft and their possible use in rendition.[135]

186. Varying figures have been reported – from around 200 to 400 – for the number of CIA flights that have used UK airspace. There are, however, only four flights where it is alleged that a plane involved in a rendition operation has subsequently used a UK airport.

187. In each of these four cases the plane has allegedly been returning from a rendition operation overseas, and the detainee(s) in question has not been on the plane.[136] The four alleged cases are listed by Stephen Grey in his book *Ghost Plane* and on his website of flight logs:

---

[133] *"Destination Cairo: Human rights fears over CIA flights", Ian Cobain, Stephen Grey and Richard Norton-Taylor, 12 September 2005 – www.guardian.co.uk/print/0,,5283268-105744,00.html*

[134] *Their investigation focused on the comparison of registration numbers of civilian flights operated by companies with ties to the CIA, flight plans and allegations of rendition.*

[135] *The Guardian: Alleged more than 210 CIA flights through the UK, although none of these flights are alleged to have been rendition operations. "Britain's role in war on terror revealed", 6 December 2005.*

*Amnesty International: Alleged more than 200 CIA flights through the UK, including three flights stopping over in the UK having been involved in rendition operations abroad. Human rights: A broken promise, 23 February 2006.*

*Council of Europe: Highlighted the extent of CIA flights across Europe, including through the UK (although none of these flights are alleged to be directly involved in rendition), 12 June 2006.*

*European Parliament Temporary Committee: Alleged 170 CIA flights through the UK, including one stopping over in the UK having been involved in rendition operations abroad, 16 November 2006.*

[136] *The only known renditions through UK airspace were Nicholas Mullen's 1989 "Rendition to Justice" conducted by SIS (see paragraph 10) and the two 1998 U.S. "Renditions to Justice" (outlined by Ministers in statements to the House in 2005 and 2006).*