- 24 October 2001 – N379P refuelled at Prestwick airport, returning from the rendition of Jamil Qasim Saeed Mohammed from Pakistan to Jordan on 23 October.

- 20 December 2001 – N379P refuelled at Prestwick airport, returning from the transfer of Ahmed Agiza and Mohammed al-Zery from Sweden to Egypt on 18 December.

- 15 January 2002 – N379P refuelled at Prestwick airport, returning from the rendition of Mohammed Saad Iqbal Madni from Indonesia to Egypt on 11 January.

- 24 July 2003 – N379P refuelled at Prestwick airport, returning from the rendition of Saifulla Paracha from Thailand to Afghanistan on 22 July.[137]

### Rules Governing Flights Through UK Airspace

#### Permission to Land

188. The aircraft that have been linked with these four suspected CIA flights are civilian aircraft. These are not required to submit for prior permission to land in the UK (as would be the case for official State Aircraft).[138] The Secretary of State for Transport has told the Committee:

> The UK grants a block approval to many countries and, in the case of the U.S., arrangements for a standing block approval [for State Aircraft] to land in the UK have been in place since at least 1949…
>
> … Non-commercial, non-state flights do not require permission to overfly or land in the UK.[139]

#### Flight Plans

189. All flights, whatever their nature, must submit flight plans for air traffic control purposes and seek prior permission from the relevant airfield:

> The Rules of the Air established in Annex 2 to the Chicago Convention require flight plans to be filed for all flights that cross international borders. This is implemented in the UK by the Rules of the Air 1996 (SI 1996/1393). For flights operating in European controlled airspace, flight plans are filed with the Central

---

[137] Ghost Plane: The Inside Story of the CIA's Secret Rendition Programme, Stephen Grey – www.ghostplane.net

[138] The Chicago Convention on International Civil Aviation (1944), Article 3c and Article 5.

[139] Letter from the Secretary of State for Transport, received 14 December 2006.

*Flow Management Unit (CFMU) at Eurocontrol and passed on to the relevant air traffic control service (in the UK's case, NATS plc)... Flight plan data is limited to information about the respective aircraft's type, registration number, date and time of flight, point of origin and destination and recorded user's name. It does not contain (nor is it legally required to contain) information about any passengers on board aircraft or the purposes of the flight.[140]*

## General Aviation Reports

190.  In addition to flight plans, there is also a statutory requirement for a General Aviation Report (GAR) to be submitted by pilots/operators for all non-scheduled flights departing from or entering the UK.[141] The GAR form requires the following information:

- aircraft details (including registration, type, base and owner/operator);

- flight details (departure and arrival ports); and

- crew and passenger details (names, dates of birth, passport numbers, nationalities and home addresses).

191.  HM Revenue and Customs (HMRC) told the Committee:

*All GARs should be submitted to the HMRC National Co-ordination Unit (NCU) who co-ordinate any necessary HMRC activity and forward a copy to local Immigration. The Police require GARs to be sent by fax to the relevant constabulary, as detailed on the form.[142]*

192.  The Committee has been told that there is poor compliance in the submission of GARs and that completion is not rigorously enforced.[143] In addition, the forms are not held in a readily searchable format.

---

[140] Ibid.

[141] GARs are submitted to HMRC. For flights within the Common Travel Area (consisting of the UK, Republic of Ireland, Isle of Man and the Channel Islands) GARs are then sent to the police by HMRC. However, GARs for flights entering or leaving the Common Travel Area are not copied to the police. (GARs are not required for domestic flights.)

[142] Letter from Paul Gray CB, Acting Chairman, HMRC, 10 January 2007.

[143] Ibid. HMRC told the Committee that approximately 20% of GARs are properly completed.

### *Investigation of Allegations*

193. The Committee has asked the intelligence and security Agencies if they had any knowledge of the use of UK airspace and airports by the CIA flights alleged to have been involved in renditions. The Director General of the Security Service told us:

> We have no knowledge of any detainees being subject to rendition through British territory since 9/11; nor have we helped any "Extraordinary Renditions" via UK airspace or territory; nor have the U.S. sought our assistance or permission to use UK airspace or facilities… Unless you say you are going to search every aircraft to check the truth of what you are told, it is a difficult issue… As you know… we are prioritising ruthlessly and I could not possibly justify diverting people to check whether aircraft are CIA-sponsored and what they contain, and frankly I doubt the police have the resources to do this.[144]

194. On 29 November 2005, the human rights organisation Liberty wrote to ten Chief Constables with jurisdiction over airports which it was alleged may have been involved in rendition operations and asked them to investigate the allegations.[145] Liberty subsequently met the Chief Constable of Greater Manchester Police, Mike Todd, on 19 December 2005 and he offered to examine the allegations on behalf of the Association of Chief Police Officers.

195. Mr Todd told the Committee that he had examined the evidence to see whether domestic law had been breached by the alleged use of UK airports in any rendition. He has concluded that no such evidential basis exists on which a criminal inquiry could be launched. He wrote to Liberty on 5 June 2007 to inform them of his conclusion.

196. A number of rendition flights are alleged to have made use of Scottish airspace and, specifically, Glasgow Prestwick airport after having conducted rendition operations overseas. Strathclyde Police has told the Committee that in relation to the investigation of criminal acts occurring in Scotland:

> For any investigation to get under way… there should exist evidence (even prima facie) of a sufficiently compelling nature; in general, mere speculation, by itself, will not be satisfactory.

> Having fully assessed all available information, I have concluded that there is no evidential basis to support the allegation that crimes or offences [relating to rendition] have taken place within Strathclyde.[146]

---

[144] *Oral evidence – Security Service, 23 November 2006.*

[145] *www.liberty-human-rights.org.uk/issues/1-torture/pdfs/er-letter-to-police.pdf*

[146] *Letter from Ian Learmonth, Assistant Chief Constable, Strathclyde Police, 21 December 2006.*

197. There has been a further allegation that a suspected rendition flight may have transited Diego Garcia in September 2002 (letters from Amnesty International to the Foreign Secretary – 20 February 2007 and 8 June 2007). The Committee was previously told by the Prime Minister that no detainees have transited Diego Garcia (there was a request, in early 2004, to refuel a flight carrying a U.S.-held detainee, but in the event this did not take place). We have confirmed that this remains the case. The Prime Minister has told the Committee:

> ... the U.S. has given firm assurances that at no time have there been any detainees on Diego Garcia. Neither have they transited through the territorial seas or airspace surrounding Diego Garcia. These assurances were last given during talks between U.S. and UK officials in October 2006.[147]

198. The Prime Minister also told the Committee that the Government has not sought to establish whether aircraft that may have previously or subsequently been involved in rendition operations have transited UK territory (including Overseas Territories) or airspace.

199. The Government has carried out detailed checks of its records to determine if there have been any "Extraordinary Renditions" through UK territory or airspace. As we state earlier in this Report, we have been told that:

> [The Government has] carried out checks of Foreign and Commonwealth Office, Home Office, Ministry of Defence, SIS, Security Service and GCHQ files dating back to 1995... [We] have found no evidence of rendition through the UK or Overseas Territories where there were grounds to believe an individual faced a real risk of torture, cruel, inhuman or degrading treatment.[148]

200. In addition, HMRC has told the Committee that:

> HMRC are not, and have never been, aware of extraordinary rendition flights. We have not been told officially or unofficially that such flights have ever taken place, and what the nature of these flights are.[149]

We have also confirmed that record checks were completed within the Department for Transport and included a review of the relevant UK flight plan data supplied to the Council of Europe by Eurocontrol. The Secretary of State for Transport has told the Committee that *"the data provided no evidence that the flights identified were involved in the rendition of prisoners"*.[150]

---

[147] Letter from the Prime Minister, 26 March 2007.

[148] Letter from Sir Richard Mottram, 2 May 2006.

[149] Letter from HMRC, 10 January 2007.

[150] Letter from the Secretary of State for Transport, received 14 December 2006.

*Police Action*

201.  The Committee asked Mr Todd whether he felt greater powers were needed to prevent individuals being rendered through the UK. He responded that he did not think police or immigration services were in any way restricted in their powers to search aircraft:[151]

> *If there was any intelligence, any suggestion a flight was involved in… kidnapping a person from one country to another, we are going to go on to the flight and nobody is going to stop us…*[152]

202.  He did, however, tell the Committee that because of the scale of civilian flights through UK airspace (approximately 1.3 million flights a year covered by the GAR system) there are insufficient resources to undertake spot checks of aircraft. Investigative work therefore has to be intelligence-led and based on specific information.

## *Conclusions and Recommendations*

**FF.   The use of UK airspace and airports by CIA-operated aircraft is not in doubt. There have been many allegations related to these flights but there have been no allegations, and we have seen no evidence, that suggest that any of these CIA flights have transferred detainees through UK airspace (other than two "Rendition to Justice" cases in 1998 which were approved by the UK Government following U.S. requests).**

**GG.  It is alleged that, on up to four occasions since 9/11, aircraft that had previously conducted a rendition operation overseas transited UK airspace during their return journeys (without detainees on board). The Committee has not seen any evidence that might contradict the police assessment that there is no evidential basis on which a criminal inquiry into these flights could be launched.**

**HH. We consider that it would be unreasonable and impractical to check whether every aircraft transiting UK airspace might have been, at some point in the past, and without UK knowledge, involved in a possibly unlawful operation. We are satisfied that, where there is sufficient evidence of unlawful activity on board an aircraft in UK airspace, be it a rendition operation or otherwise, this would be investigated by the UK authorities.**

---

[151] *Article 16 of the Chicago Convention on International Civil Aviation (1944) confirms this assertion: "The appropriate authorities of each of the contracting States shall have the right, without unreasonable delay, to search aircraft of the other contracting States on landing or departure…"*

[152] *Oral evidence – Chief Constable Mike Todd, 23 November 2006.*

II.    The system of flight plans and General Aviation Reports is outside the remit of this inquiry, although we are concerned that it appears to be systemically flawed. The Home Secretary has assured the Committee that the e-Borders and Border Management Programme (being introduced from 2008) will address our concerns relating to general aviation documentation and security risks. This would, however, be a matter for the Transport and Home Affairs Select Committees to review in greater depth, if they felt it merited it.

JJ.    The alleged use of military airfields in the UK by rendition flights has been investigated in response to our questions to the Prime Minister. We are satisfied that there is no evidence that U.S. rendition flights have used UK airspace (except the two cases in 1998 referred to earlier in this Report) and that there is no evidence of them having landed at UK military airfields.

# SUMMARY OF CONCLUSIONS AND RECOMMENDATIONS

A.   Our intelligence-sharing relationships, particularly with the United States, are critical to providing the breadth and depth of intelligence coverage required to counter the threat to the UK posed by global terrorism. These relationships have saved lives and must continue.

B.   We are concerned that Government departments have had such difficulty in establishing the facts from their own records in relation to requests to conduct renditions through UK airspace. These are matters of fundamental liberties and the Government should ensure that proper searchable records are kept.

C.   Prior to 9/11, assistance to the U.S. "Rendition to Justice" programme – whether through the provision of intelligence or approval to use UK airspace – was agreed on the basis that the Americans gave assurances regarding humane treatment and that detainees would be afforded a fair trial. These actions were appropriate and appear to us to have complied with our domestic law and the UK's international obligations.

D.   Those operations detailed above, involving UK Agencies' knowledge or involvement, are "Renditions to Justice", "Military Renditions" and "Renditions to Detention". They are not "Extraordinary Renditions", which we define as *"the extra-judicial transfer of persons from one jurisdiction or State to another, for the purposes of detention and interrogation outside the normal legal system, where there is a real risk of torture or cruel, inhuman or degrading treatment"*. We note that in some of the cases we refer to, there are allegations of mistreatment, including whilst individuals were detained at Guantánamo Bay, although we have not found evidence that such mistreatment was foreseen by the Agencies. The Committee has therefore found no evidence that the UK Agencies were complicit in any "Extraordinary Rendition" operations.

E.   In the immediate aftermath of the 9/11 attacks, the UK Agencies were authorised to assist U.S. "Rendition to Justice" operations in Afghanistan. This involved assistance to the CIA to capture "unlawful combatants" in Afghanistan. These operations were approved on the basis that detainees would be treated humanely and be afforded a fair trial. In the event, the intelligence necessary to put these authorisations into effect could not be obtained and the operations did not proceed. The Committee has concluded that the Agencies acted properly.

F.   SIS was subsequently briefed on new powers which would enable U.S. authorities to arrest and detain suspected terrorists worldwide. In November 2001, these powers were confirmed by the Presidential Military Order. We understand that

SIS was sceptical about the supposed new powers, since at the time there was a great deal of "tough talk" being used at many levels of the U.S. Administration, and it was difficult to reach a definitive conclusion regarding the direction of U.S. policy in this area. Nonetheless, the Committee concludes that SIS should have appreciated the significance of these events and reported them to Ministers.

G.   The Security Service and SIS were also slow to detect the emerging pattern of "Renditions to Detention" that occurred during 2002. The UK Agencies, when sharing intelligence with the U.S. which might have resulted in the detention of an individual subject to the Presidential Military Order, should always have sought assurances on detainee treatment.

H.   The cases of Bisher al-Rawi and Jamil el-Banna and others during 2002 demonstrated that the U.S. was willing to conduct "Rendition to Detention" operations anywhere in the world, including against those unconnected with the conflict in Afghanistan. We note that the Agencies used greater caution in working with the U.S., including withdrawing from some planned operations, following these cases.

I.   By mid-2003, following the case of Khaled Sheikh Mohammed and suspicions that the U.S. authorities were operating "black sites", the Agencies had appreciated the potential risk of renditions and possible mistreatment of detainees. From this point, the Agencies correctly sought Ministerial approval and assurances from foreign liaison services whenever there were real risks of rendition operations resulting from their actions.

J.   After April 2004 – following the revelations of mistreatment at the U.S. military-operated prison at Abu Ghraib – the UK intelligence and security Agencies and the Government were fully aware of the risk of mistreatment associated with any operations that may result in U.S. custody of detainees. Assurances on humane treatment were properly and routinely sought in operations that involved any risk of rendition and/or U.S. custody.

K.   The Committee has strong concerns, however, about a potential operation in early 2005 which, had it gone ahead, might have resulted in the ***. The operation was conditionally approved by Ministers, subject to assurances on humane treatment and a time limit on detention. These were not obtained and so the operation was dropped. ***
***
***.

L.   We are satisfied that the UK intelligence and security Agencies had no involvement in the capture or subsequent "Rendition to Detention" of Martin Mubanga and that they acted properly.

M.    There is a reasonable probability that intelligence passed to the Americans was used in al-Habashi's subsequent interrogation. We cannot confirm any part of al-Habashi's account of his detention or mistreatment after his transfer from Pakistan.

N.    We agree with the Director General of the Security Service that, with hindsight, it is regrettable that assurances regarding proper treatment of detainees were not sought from the Americans in this case.

O.    Whilst this was not a rendition but a deportation, and the Security Service and SIS were not in a strong position to impose conditions on it, we accept their view that they should nevertheless have sought greater assurances that the individual would be treated humanely.

P.    Given el-Banna's and al-Rawi's backgrounds and associations, it was reasonable to undertake a properly authorised covert search of the men's luggage. The decision to arrest the men was taken by the police on the basis of the suspicious items they found and was not instigated by the Security Service.

Q.    The sharing of intelligence with foreign liaison services on suspected extremists is routine. There was nothing exceptional in the Security Service notifying the U.S. of the men's arrest and setting out its assessment of them. The telegram was correctly covered by a caveat prohibiting the U.S. authorities from taking action on the basis of the information it contained.

R.    In adding the caveat prohibiting action, the Security Service explicitly required that no action (such as arrests) should be taken on the basis of the intelligence contained in the telegrams. We have been told that the Security Service would fully expect such a caveat to be honoured by the U.S. agencies – this is fundamental to their intelligence-sharing relationship. We accept that the Security Service did not intend the men to be arrested.

S.    The Security Service and Foreign Office acted properly in seeking access to the detained British nationals, asking questions as to their treatment and, when they learnt of a possible rendition operation, protesting strongly.

T.    We note that eventually the British nationals were released, but are concerned that, contrary to the Vienna Convention on Consular Relations, access to the men was initially denied.

U.    This is the first case in which the U.S. agencies conducted a "Rendition to Detention" of individuals entirely unrelated to the conflict in Afghanistan. Given that there had been a gradual expansion of the rendition programme during 2002, it could reasonably have been expected that the net would widen still further and that

greater care could have been taken. We do, however, note that Agency priorities at the time were – rightly – focused on disrupting attacks rather than scrutinising American policy. We also accept that the Agencies could not have foreseen that the U.S. authorities would disregard the caveats placed on the intelligence, given that they had honoured the caveat system for the past 20 years.

V.    This case shows a lack of regard, on the part of the U.S., for UK concerns. Despite the Security Service prohibiting any action being taken as a result of its intelligence, the U.S. nonetheless planned to render the men to Guantánamo Bay. They then ignored the subsequent protests of both the Security Service and the Government. This has serious implications for the working of the relationship between the U.S. and UK intelligence and security agencies.

W.    Whilst we note that Bisher al-Rawi has now been released from Guantánamo Bay and that el-Banna has been cleared for release, we nevertheless recommend that the UK Government ensures that the details of suspicious items found during the Gatwick luggage search (including the police's final assessment of these items) are clarified with the U.S. authorities.

X.    We recognise the contribution of the Foreign and Commonwealth Office in securing Bisher al-Rawi's release. However, having seen the full facts of the case – and leaving aside the exact nature of al-Rawi's relationship with the Security Service – we consider that the Security Service should have informed Ministers about the case at the time, and are concerned that it took *** years, and a court case, to bring it to their attention.

Y.    What the rendition programme has shown is that in what it refers to as "the war on terror" the U.S. will take whatever action it deems necessary, within U.S. law, to protect its national security from those it considers to pose a serious threat. Although the U.S. may take note of UK protests and concerns, this does not appear materially to affect its strategy on rendition.

Z.    It is to the credit of our Agencies that they have now managed to adapt their procedures to work round these problems and maintain the exchange of intelligence that is so critical to UK security.

AA.  The Committee notes that the UK Agencies now have a policy in place to minimise the risk of their actions inadvertently leading to renditions, torture or cruel, inhuman or degrading treatment (CIDT). Where it is known that the consequences of dealing with a foreign liaison service will include torture or CIDT, the operation will not be authorised.

BB.  In the cases we have reviewed, the Agencies have taken action consistent with the policy of minimising the risks of torture or CIDT (and therefore "Extraordinary

Rendition") based upon their knowledge and awareness of the CIA rendition programme at that time.

CC. Where, despite the use of caveats and assurances, there remains a real possibility that the actions of the Agencies will result in torture or mistreatment, we note that the current procedure requires that approval is sought from senior management or Ministers. We recommend that Ministerial approval should be sought in all such cases.

DD. The Committee considers that "secret detention", without legal or other representation, is of itself mistreatment. Where there is a real possibility of "Rendition to Detention" to a secret facility, even if it would be for a limited time, then approval must never be given.

EE. GCHQ has played no role in any U.S. renditions, whether "ordinary" or "extraordinary". Theoretically, given the close working relationship between GCHQ and the National Security Agency (NSA), GCHQ intelligence could have been passed from the NSA to the CIA and could have been used in a U.S. rendition operation. However, GCHQ's legal safeguards and the requirement for explicit permission to take action based on their intelligence provide a high level of confidence that their material has not been used for such operations.

FF. The use of UK airspace and airports by CIA-operated aircraft is not in doubt. There have been many allegations related to these flights but there have been no allegations, and we have seen no evidence, that suggest that any of these CIA flights have transferred detainees through UK airspace (other than two "Rendition to Justice" cases in 1998 which were approved by the UK Government following U.S. requests).

GG. It is alleged that, on up to four occasions since 9/11, aircraft that had previously conducted a rendition operation overseas transited UK airspace during their return journeys (without detainees on board). The Committee has not seen any evidence that might contradict the police assessment that there is no evidential basis on which a criminal inquiry into these flights could be launched.

HH. We consider that it would be unreasonable and impractical to check whether every aircraft transiting UK airspace might have been, at some point in the past, and without UK knowledge, involved in a possibly unlawful operation. We are satisfied that, where there is sufficient evidence of unlawful activity on board an aircraft in UK airspace, be it a rendition operation or otherwise, this would be investigated by the UK authorities.

II.    The system of flight plans and General Aviation Reports is outside the remit of this inquiry, although we are concerned that it appears to be systemically flawed. The Home Secretary has assured the Committee that the e-Borders and Border Management Programme (being introduced from 2008) will address our concerns relating to general aviation documentation and security risks. This would, however, be a matter for the Transport and Home Affairs Select Committees to review in greater depth, if they felt it merited it.

JJ.    The alleged use of military airfields in the UK by rendition flights has been investigated in response to our questions to the Prime Minister. We are satisfied that there is no evidence that U.S. rendition flights have used UK airspace (except the two cases in 1998 referred to earlier in this Report) and that there is no evidence of them having landed at UK military airfields.

# ANNEX A: OTHER INQUIRIES

203.  The Committee has considered reports already published, and we have spoken to a number of those involved in producing them. The Committee would like to thank these organisations for their contributions to our inquiry. We have addressed their concerns and questions in this Report, insofar as they fall within our remit.

### *All-Party Parliamentary Group on Extraordinary Rendition*[153]

204.  The UK All-Party Parliamentary Group (APPG) on Extraordinary Rendition was established by Andrew Tyrie, MP in December 2005.[154]

205.  The APPG has considered the issue of "Extraordinary Rendition", particularly involving the UK, and has concluded that the Government has not *"put in place a mechanism for ensuring that renditions do not take place in the future through UK airspace or territory"*.[155] In May 2007, the APPG recommended a number of measures which they argue will: safeguard the rights of persons being transferred; ensure that the UK acts in accordance with its domestic and international obligations; and ensure that there are adequate records of requests for permission to conduct renditions. They have suggested that these measures be implemented through legislative means. Mr Tyrie has also suggested that the UK Government should condemn the practice of "Extraordinary Rendition", as it has condemned the existence of the military detention facility at Guantánamo Bay.

206.  The APPG has taken a particular interest in the cases of Bisher al-Rawi, Jamil el-Banna and Binyam Mohamed al-Habashi, and has held information sessions with the families and lawyers of these men.

207.  On 27 April 2006, Mr Tyrie wrote to the Committee, setting out a number of questions that he felt the Committee should consider during the course of our inquiry. Whilst a number of these were outside the remit of this Report, others have been useful in framing some of our evidence sessions and are addressed in the body of our Report.

---

[153] *http://extraordinaryrendition.org/*

[154] *Mr Tyrie gave evidence to the Committee on 26 October 2006 and subsequently wrote to the Committee on 7 November 2006 summarising the findings of the APPG to date.*

[155] *Note to the Committee, available at http://extraordinaryrendition.org/*

### *Council of Europe*[156]

208. The Parliamentary Assembly of the Council of Europe's Committee on Legal Affairs and Human Rights has been looking into allegations of "Extraordinary Rendition" since November 2005. It has described a global "spider's web" of alleged CIA flights. The Council of Europe concluded in its 12 June 2006 report that the *"intentional or grossly negligent collusion of the European partners"* has allowed the CIA to operate rendition flights in Europe and that Council of Europe Member States had not done enough to investigate this potential breach of fundamental human rights.

209. The report condemns the U.S. for its programmes of rendition and secret detention, reports on ten cases of alleged unlawful rendition flights (17 individual detainees) and makes a number of recommendations to ensure the protection of human rights in the future. Insofar as they relate to the UK, and fall within the Committee's remit, these issues are addressed in this Report.

210. The Council of Europe published a second report on 8 June 2007. In relation to the UK, the report criticises the UK for not *"independently or transparently inquiring into the allegations"* that the U.S. used Diego Garcia in the processing of detainees. This is not the case, and the issue is dealt with in paragraph 197.

### *European Parliament*[157]

211. The European Parliament adopted the final report of the Temporary Committee on the alleged use of European countries by the CIA for the transportation and illegal detention of prisoners in February 2007.

212. The Temporary Committee has gathered evidence from a wide range of sources, including alleged victims of CIA renditions and the former HM Ambassador to Uzbekistan, Craig Murray. They have also analysed flight logs and say that there have been at least 1,245 CIA-operated flights into European airspace or airports, and that, of these, there have been about 170 stopovers by CIA-operated aircraft at UK airports. These are not, however, all alleged to be rendition flights. The Temporary Committee cites only one rendition operation where the aircraft subsequently (without the detainees) flew to a UK airport.[158]

---

[156] *www.coe.int/*

[157] *www.europarl.europa.eu/comparl/tempcom/tdip/default_en.htm*

[158] *The case of Ahmed Agiza and Mohammed al-Zery was one of ten cases of "confirmed" rendition. TDIP Working Document No. 7, 16 November 2006.*

213. We note that there is no suggestion within the report that "Extraordinary Rendition" operations have transited UK territory or airspace with a detainee on board. This is consistent with our conclusion that there is no evidence of unlawful renditions through UK territory or airspace (see pages 57 to 63).

214. The Temporary Committee also condemns the "Extraordinary Rendition" of Bisher al-Rawi and Jamil el-Banna from The Gambia. The report suggests that al-Rawi and el-Banna's transfer *"was facilitated by partly erroneous information supplied by the UK security service"*. In the case of Binyam Mohamed al-Habashi, the report concludes that *"some of the questions put by the Moroccan officials to Binyam Mohamed appear to have been inspired by information supplied by the UK"*. In the case of Martin Mubanga, the Temporary Committee *"regrets the fact that Martin Mubanga was interrogated by British officials in Guantánamo where he was detained and tortured for four years"*. We deal with these allegations in the section of this Report entitled "Specific Cases" (pages 31 to 46).

215. Having considered the Temporary Committee's report, it appears that there is no real evidence to substantiate their allegations.

### *Amnesty International*[159]

216. The human rights organisation Amnesty International has published three reports looking at rendition.[160] They have reported that there have been over 200 CIA flights involving UK airports. Again, it is not alleged that these were all rendition flights. They cite three where the flights are suspected of returning from a rendition operation (without detainees aboard).

217. Amnesty wrote to the Prime Minister in January 2006 to express their concern at the possible use of UK airspace and airports by CIA rendition operations. They have recommended that the UK Government conducts an *"immediate, thorough and independent investigation"* into the allegations of "Extraordinary Rendition" and that the Government *"put in place all necessary measures to prevent any action or omission which may, wittingly or unwittingly, have resulted in [unlawful rendition]"*.

---

[159] www.amnesty.org.uk/

[160] United States of America: Below the radar: Secret flights to torture and 'disappearance';
Partners in crime: Europe's role in US renditions;
United Kingdom: Human rights: A broken promise.

### *Reprieve*[161]

218. Reprieve is a campaigning and investigating charity founded by the human rights lawyer Clive Stafford Smith. It has been involved in cases of individuals subject to the U.S. programme of renditions and those detained in Guantánamo Bay.

219. In particular, Reprieve has represented the interests of Binyam Mohamed al-Habashi, Bisher al-Rawi and Jamil el-Banna. Reprieve has provided a submission of evidence to the Committee on these men, suggesting that we examine possible illegal activity and complicity on the part of the British intelligence and security Agencies. The Committee has noted Reprieve's submission, and the Committee's findings in these cases can be found in pages 33 to 46.

### *Liberty*[162]

220. Liberty is a UK-based human rights and civil liberties organisation. It has taken a particular interest in alleged rendition flights through the UK, and has called for a fully resourced, independent investigation into "Extraordinary Rendition".[163]

221. In November 2005, Liberty asked the police to investigate rendition allegations. They also lobbied Government for amendments to the Civil Aviation Bill and the Police and Justice Bill to ensure that action can be taken when flights transiting the UK are suspected of involvement in "Extraordinary Rendition".

222. The subsequent police examination of evidence and the ability of the UK authorities to investigate flights suspected of involvement in rendition operations are both considered in the main body of this Report (pages 57 to 63), although it should be noted that they would not normally fall within the remit of this Committee.

---

[161] *www.reprieve.org.uk/*

[162] *www.liberty-human-rights.org.uk/*

[163] *Shami Chakrabarti, Director of Liberty, wrote to the Committee on 10 October 2006 and subsequently gave evidence to the Committee on 17 October 2006. A further letter was received on 15 June 2007.*

# ANNEX B: LIST OF WITNESSES

The Committee took evidence from the following witnesses, some of whom gave evidence on more than one occasion, and some of whom gave evidence on matters other than rendition:

## *Ministers*

The Rt. Hon. Margaret Beckett, MP – Foreign Secretary

## *Officials*

CABINET OFFICE
Sir Richard Mottram GCB – Permanent Secretary, Intelligence, Security and Resilience

GOVERNMENT COMMUNICATIONS HEADQUARTERS
Sir David Pepper KCMG – Director, GCHQ
Other officials

SECRET INTELLIGENCE SERVICE
Sir John Scarlett KCMG OBE – Chief, SIS
Other officials

SECURITY SERVICE
Hon. Dame Eliza Manningham-Buller DCB – Director General, Security Service (retired 20 April 2007)
Mr Jonathan Evans – Deputy Director General, Security Service (Director General from 21 April 2007)
Other officials

FOREIGN AND COMMONWEALTH OFFICE
Mr David Richmond CMG – Director General, Defence and Intelligence
Other officials

MINISTRY OF DEFENCE
Air Marshal Stuart Peach CBE – Chief of Defence Intelligence

POLICE
Chief Constable Michael Todd – Greater Manchester Police
Detective Superintendent John Kelly – Greater Manchester Police

## *Non-Government Witnesses*

All-Party Parliamentary Group on Extraordinary Rendition – Mr Andrew Tyrie, MP (Chair)

Amnesty International – Ms Anne Fitzgerald (Senior Adviser), Mr Livio Zilli (Researcher)

Birnberg Peirce (solicitors) – Ms Gareth Peirce

Liberty – Ms Shami Chakrabarti (Director), Mr Jago Russell (Policy Officer)

Journalists – Names withheld at request of witnesses

Printed in the UK for The Stationery Office Limited
on behalf of the Controller of Her Majesty's Stationery Office
5616160   07/07

Printed on paper containing 75% recycled fibre content minimum.



Published by TSO (The Stationery Office) and available from:

**Online**
www.tsoshop.co.uk

**Mail, Telephone, Fax & E-mail**
TSO
PO Box 29, Norwich NR3 1GN
Telephone orders/General enquiries: 0870 600 5522
Order through the Parliamentary Hotline Lo-call: 0845 7 023474
Fax orders: 0870 600 5533
E-mail: customer.services@tso.co.uk
Textphone: 0870 240 3701

**TSO Shops**
16 Arthur Street, Belfast BT1 4GD
028 9023 8451 Fax 028 9023 5401
71 Lothian Road, Edinburgh EH3 9AZ
0870 606 5566 Fax 0870 606 5588

**The Parliamentary Bookshop**
12 Bridge Street, Parliament Square,
London SW1A 2JX

**TSO@Blackwell and other Accredited Agents**



ISBN 978-0-10-171712-0

9 780101 717120