# EXHIBIT DD

1 of 82 DOCUMENTS

# The Washington Post
## washingtonpost.com

The Washington Post

December 26, 2002 Thursday
Final Edition

## U.S. Decries Abuse but Defends Interrogations;
## 'Stress and Duress' Tactics Used on Terrorism Suspects Held in Secret Overseas Facilities

**BYLINE:** Dana Priest and Barton Gellman, Washington Post Staff Writers

**SECTION:** A SECTION; Pg. A01

**LENGTH:** 2838 words

Deep inside the forbidden zone at the U.S.-occupied Bagram air base in Afghanistan, around the corner from the detention center and beyond the segregated clandestine military units, sits a cluster of metal shipping containers protected by a triple layer of concertina wire. The containers hold the most valuable prizes in the war on terrorism -- captured al Qaeda operatives and Taliban commanders.

Those who refuse to cooperate inside this secret CIA interrogation center are sometimes kept standing or kneeling for hours, in black hoods or spray-painted goggles, according to intelligence specialists familiar with CIA interrogation methods. At times they are held in awkward, painful positions and deprived of sleep with a 24-hour bombardment of lights -- subject to what are known as "stress and duress" techniques.

Those who cooperate are rewarded with creature comforts, interrogators whose methods include feigned friendship, respect, cultural sensitivity and, in some cases, money. Some who do not cooperate are turned over -- "rendered," in official parlance -- to foreign intelligence services whose practice of torture has been documented by the U.S. government and human rights organizations.

In the multifaceted global war on terrorism waged by the Bush administration, one of the most opaque -- yet vital -- fronts is the detention and interrogation of terrorism suspects. U.S. officials have said little publicly about the captives' names, numbers or whereabouts, and virtually nothing about interrogation methods. But interviews with several former intelligence officials and 10 current U.S. national security officials -- including several people who witnessed the handling of prisoners -- provide insight into how the U.S. government is prosecuting this part of the war.

The picture that emerges is of a brass-knuckled quest for information, often in concert with allies of dubious human rights reputation, in which the traditional lines between right and wrong, legal and inhumane, are evolving and blurred.

While the U.S. government publicly denounces the use of torture, each of the current national security officials interviewed for this article defended the use of violence against captives as just and necessary. They expressed confidence that the American public would back their view. The CIA, which has primary responsibility for interrogations, declined to comment.

"If you don't violate someone's human rights some of the time, you probably aren't doing your job," said one official who has supervised the capture and transfer of accused terrorists. "I don't think we want to be promoting a view of zero tolerance on this. That was the whole problem for a long time with the CIA.."

The off-limits patch of ground at Bagram is one of a number of secret detention centers overseas where U.S. due process does not apply, according to several U.S. and European national security officials, where the CIA undertakes or manages the interrogation of suspected terrorists. Another is Diego Garcia, a somewhat horseshoe-shaped island in the Indian Ocean that the United States leases from Britain.

U.S. officials oversee most of the interrogations, especially those of the most senior captives. In some cases, highly trained CIA officers question captives through interpreters. In others, the intelligence agency undertakes a "false flag" operation using fake decor and disguises meant to deceive a captive into thinking he is imprisoned in a country with a reputation for brutality, when, in reality, he is still in CIA hands. Sometimes, female officers conduct interrogations, a psychologically jarring experience for men reared in a conservative Muslim culture where women are never in control.

In other cases, usually involving lower-level captives, the CIA hands them to foreign intelligence services -- notably those of Jordan, Egypt and Morocco -- with a list of questions the agency wants answered. These "extraordinary renditions" are done without resort to legal process and usually involve countries with security services known for using brutal means.

According to U.S. officials, nearly 3,000 suspected al Qaeda members and their supporters have been detained worldwide since Sept. 11, 2001. About 625 are at the U.S. military's confinement facility at Guantanamo Bay, Cuba. Some officials estimated that fewer than 100 captives have been rendered to third countries. Thousands have been arrested and held with U.S. assistance in countries known for brutal treatment of prisoners, the officials said.

At a Sept. 26 joint hearing of the House and Senate intelligence committees, Cofer Black, then head of the CIA Counterterrorist Center, spoke cryptically about the agency's new forms of "operational flexibility" in dealing with suspected terrorists. "This is a very highly classified area, but I have to say that all you need to know: There was a before 9/11, and there was an after 9/11," Black said. "After 9/11 the gloves come off."

According to one official who has been directly involved in rendering captives into foreign hands, the understanding is, "We don't kick the [expletive] out of them. We send them to other countries so they can kick the [expletive] out of them." Some countries are known to use mind-altering drugs such as sodium pentathol, said other officials involved in the process.

Abu Zubaida, who is believed to be the most important al Qaeda member in detention, was shot in the groin during his apprehension in Pakistan in March. National security officials suggested that Zubaida's painkillers were used selectively in the beginning of his captivity. He is now said to be cooperating, and his information has led to the apprehension of other al Qaeda members.

U.S. National Security Council spokesman Sean McCormack declined to comment earlier this week on CIA or intelligence-related matters. But, he said: "The United States is treating enemy combatants in U.S. government control, wherever held, humanely and in a manner consistent with the principles of the Third Geneva Convention of 1949."

The convention outlined the standards for treatment of prisoners of war. Suspected terrorists in CIA hands have not been accorded POW status.

Other U.S. government officials, speaking on condition of anonymity, acknowledged that interrogators deprive some captives of sleep, a practice with ambiguous status in international law.

The U.N. High Commissioner for Human Rights, the authoritative interpreter of the international Convention Against Torture, has ruled that lengthy interrogation may incidentally and legitimately cost a prisoner sleep. But when employed for the purpose of breaking a prisoner's will, sleep deprivation "may in some cases constitute torture."

The State Department's annual human rights report routinely denounces sleep deprivation as an interrogation method. In its 2001 report on Turkey, Israel and Jordan, all U.S. allies, the department listed sleep deprivation among often-used alleged torture techniques.

U.S. officials who defend the renditions say the prisoners are sent to these third countries not because of their coercive questioning techniques, but because of their cultural affinity with the captives. Besides being illegal, they said, torture produces unreliable information from people who are desperate to stop the pain. They look to foreign allies more because their intelligence services can develop a culture of intimacy that Americans cannot. They may use interrogators who speak the captive's Arabic dialect and often use the prospects of shame and the reputation of the captive's family to goad the captive into talking.

In a speech on Dec. 11, CIA director George J. Tenet said that interrogations overseas have yielded significant returns recently. He calculated that worldwide efforts to capture or kill terrorists had eliminated about one-third of the al Qaeda leadership. "Almost half of our successes against senior al Qaeda members has come in recent months," he said.

Many of these successes have come as a result of information gained during interrogations. The capture of al Qaeda leaders Ramzi Binalshibh in Pakistan, Omar al-Faruq in Indonesia, Abd al-Rahim al-Nashiri in Kuwait and Muhammad al Darbi in Yemen were all partly the result of information gained during interrogations, according to U.S. intelligence and national security officials. All four remain under CIA control.

Time, rather than technique, has produced the most helpful information, several national security and intelligence officials said. Using its global computer database, the CIA is able to quickly check leads from captives in one country with information divulged by captives in another.

"We know so much more about them now than we did a year ago -- the personalities, how the networks are established, what they think are important targets, how they think we will react," said retired Army general Wayne Downing, the Bush administration's deputy national security adviser for combating terrorism until he resigned in June.

"The interrogations of Abu Zubaida drove me nuts at times," Downing said. "He and some of the others are very clever guys. At times I felt we were in a classic counter-interrogation class: They were telling us what they think we already knew. Then, what they thought we wanted to know. As they did that, they fabricated and weaved in threads that went nowhere. But, even with these ploys, we still get valuable information and they are off the street, unable to plot and coordinate future attacks."

In contrast to the detention center at Guantanamo Bay, where military lawyers, news reporters and the Red Cross received occasional access to monitor prisoner conditions and treatment, the CIA's overseas interrogation facilities are off-limits to outsiders, and often even to other government agencies. In addition to Bagram and Diego Garcia, the CIA has other secret detention centers overseas, and often uses the facilities of foreign intelligence services.

Free from the scrutiny of military lawyers steeped in the international laws of war, the CIA and its intelligence service allies have the leeway to exert physically and psychologically aggressive techniques, said national security officials and U.S. and European intelligence officers.

Although no direct evidence of mistreatment of prisoners in U.S. custody has come to light, the prisoners are denied access to lawyers or organizations, such as the Red Cross, that could independently assess their treatment. Even their names are secret.

This month, the U.S. military announced that it had begun a criminal investigation into the handling of two prisoners who died in U.S. custody at the Bagram base. A base spokesman said autopsies found one of the detainees died of a pulmonary embolism, the other of a heart attack.

Al Qaeda suspects are seldom taken without force, and some suspects have been wounded during their capture. After apprehending suspects, U.S. take-down teams -- a mix of military special forces, FBI agents, CIA case officers and local allies -- aim to disorient and intimidate them on the way to detention facilities.

According to Americans with direct knowledge and others who have witnessed the treatment, captives are often "softened up" by MPs and U.S. Army Special Forces troops who beat them up and confine them in tiny rooms. The alleged terrorists are commonly blindfolded and thrown into walls, bound in painful positions, subjected to loud noises and deprived of sleep. The tone of intimidation and fear is the beginning, they said, of a process of piercing a prisoner's resistance.

The take-down teams often "package" prisoners for transport, fitting them with hoods and gags, and binding them to stretchers with duct tape.

Bush administration appointees and career national security officials acknowledged that, as one of them put it, "our guys may kick them around a little bit in the adrenaline of the immediate aftermath." Another said U.S. personnel are scrupulous in providing medical care to captives, adding in a deadpan voice, that "pain control [in wounded patients] is a very subjective thing."

The CIA's participation in the interrogation of rendered terrorist suspects varies from country to country.

"In some cases [involving interrogations in Saudi Arabia], we're able to observe through one-way mirrors the live investigations," said a senior U.S. official involved in Middle East security issues. "In others, we usually get summaries. We will feed questions to their investigators. They're still very much in control."

The official added: "We're not aware of any torture or even physical abuse."

Tenet acknowledged the Saudis' role in his Dec. 11 speech. "The Saudis are proving increasingly important support to our counterterrorism efforts -- from making arrests to sharing debriefing results," he said.

But Saudi Arabia is also said to withhold information that might lead the U.S. government to conclusions or policies that the Saudi royal family fears. U.S. teams, for that reason, have sometimes sent Saudi nationals to Egypt instead.

Jordan is a favored country for renditions, several U.S. officials said. The Jordanians are considered "highly professional" interrogators, which some officials said meant that they do not use torture. But the State Department's 2001 human rights report criticized Jordan and its General Intelligence Directorate for arbitrary and unlawful detentions and abuse.

"The most frequently alleged methods of torture include sleep deprivation, beatings on the soles of the feet, prolonged suspension with ropes in contorted positions and extended solitary confinement," the 2001 report noted. Jordan also is known to use prisoners' family members to induce suspects to talk.

Another significant destination for rendered suspects is Morocco, whose general intelligence service has sharply stepped up cooperation with the United States. Morocco has a documented history of torture, as well as longstanding ties to the CIA..

The State Department's human rights report says Moroccan law "prohibits torture, and the government claims that the use of torture has been discontinued; however, some members of the security forces still tortured or otherwise abused detainees."

In at least one case, U.S. operatives led the capture and transfer of an al Qaeda suspect to Syria, which for years has been near the top of U.S. lists of human rights violators and sponsors of terrorism. The German government strongly protested the move. The suspect, Mohammed Haydar Zammar, holds joint German and Syrian citizenship. It could not be learned how much of Zammar's interrogation record Syria has provided the CIA.

The Bush administration maintains a legal distance from any mistreatment that occurs overseas, officials said, by denying that torture is the intended result of its rendition policy. American teams, officials said, do no more than assist in the transfer of suspects who are wanted on criminal charges by friendly countries. But five officials acknowledged, as one of them put it, "that sometimes a friendly country can be invited to 'want' someone we grab." Then, other officials said, the foreign government will charge him with a crime of some sort.

One official who has had direct involvement in renditions said he knew they were likely to be tortured. "I . . . do it with my eyes open," he said.

According to present and former officials with firsthand knowledge, the CIA's authoritative Directorate of Operations instructions, drafted in cooperation with the general counsel, tells case officers in the field that they may not engage in, provide advice about or encourage the use of torture by cooperating intelligence services from other countries.

"Based largely on the Central American human rights experience," said Fred Hitz, former CIA inspector general, "we don't do torture, and we can't countenance torture in terms of we can't know of it." But if a country offers information gleaned from interrogations, "we can use the fruits of it."

Bush administration officials said the CIA, in practice, is using a narrow definition of what counts as "knowing" that a suspect has been tortured. "If we're not there in the room, who is to say?" said one official conversant with recent reports of renditions.

The Clinton administration pioneered the use of extraordinary rendition after the bombings of U.S. embassies in Kenya and Tanzania in 1998. But it also pressed allied intelligence services to respect lawful boundaries in interrogations.

After years of fruitless talks in Egypt, President Bill Clinton cut off funding and cooperation with the directorate of Egypt's general intelligence service, whose torture of suspects has been a perennial theme in State Department human rights reports.

"You can be sure," one Bush administration official said, "that we are not spending a lot of time on that now."

Staff writers Bob Woodward, Susan Schmidt and Douglas Farah, and correspondent Peter Finn in Berlin, contributed to this report.

**LOAD-DATE:** December 26, 2002

**LANGUAGE:** ENGLISH

**PUBLICATION-TYPE:** Newspaper

Copyright 2002 The Washington Post