# EXHIBIT C

# United States of America / Yemen
## Secret Detention in CIA "Black Sites"

*"They came to take our father at night, like thieves…"*

Fatima al-Assad, age 12, daughter of Muhammad al-Assad,

who "disappeared" after his arrest in 2003

"Brother, what is your name, what village are you from?" It was distinctive Yemeni Arabic that greeted Muhammad al-Assad as he stumbled, still hooded and shackled, from the plane at Sana'a. For the first time in nearly 18 months he knew what country he was in. He heard the question repeated twice more, as Salah Nasser Salim 'Ali and Muhammad Faraj Ahmed Bashmilah emerged onto the hot tarmac. He still could not see them, and had not known they were on the plane with him, but he could hear one of them shouting over and over again: "I am Bashmilah, I am Bashmilah, I am from Aden".

The three, all Yemeni nationals, had "disappeared" in 2003, and had been kept in complete isolation – even from each other – in a series of secret detention centres apparently run by US agents. Senior Yemeni officials have told Amnesty International that they first heard of the men in May 2005, when the US Embassy in Yemen informed them that the three would be flown to Sana'a and transferred to Yemeni custody the following day. No further information or evidence against the men was provided, but the Yemenis say they were instructed by the US to keep them in custody. All three continue to be held in a kind of extralegal limbo; they have not been charged with any offence, given any sentence, or brought before any court or judge. The only improvement in their situation, they say, is that their families now know that they are alive.

Muhammad al-Assad's odyssey began on the night of 26 December 2003, in Dar-es Salaam, Tanzania, where he had lived since 1985. As he told Amnesty International, he had just sat down to dinner with his Tanzanian wife, Zahra Salloum, and her brother and uncle. An immigration officer and two men from the state security forces came to the door, and ordered Muhammad al-Assad to surrender his passport and mobile phone. As he crossed over to his office to get the passport, he was grabbed from behind, a hood was forced over his head, and his hands were cuffed behind his

back. He was thrown into the back of a car, which sped away. "I was very frightened," he said, "very frightened, and kept asking what was happening to me."

His captors did not reply. They took him to a flat, and questioned him for some four hours about his passport. He was then taken directly to a waiting airplane. Still hooded, he could see nothing, but heard the roar of the engines. As he was pushed up the stairs he asked where he was going. The guard told him: "we don't know, we are just following orders, there are high-ranking ones who are responsible".

Muhammad al-Assad thought it was probably a small plane, his head was pushed down as he went through the door. He told Amnesty International he was too frightened to ask any further questions, instead he prayed to have patience, until the authorities discovered their mistake and let him go home. He is still waiting.

Muhammad al-Assad calculates that he is about 45 years old. He has a short beard, and a perpetually anxious expression. His father described him as a "very gentle man, who is always laughing". When Amnesty International interviewed him, in his cell at the political security prison in al-Ghaydah, in the governate of al-Mahra in eastern Yemen, he was solemn, and so soft-spoken in his replies that he was sometimes hard to hear, but there was never even the ghost of a smile on his face.

Tanzanian immigration authorities initially told Zahra Salloum that her husband had been deported to Yemen because his passport was not valid, and this story was repeated in the local media.[1] When she phoned Muhammad al-Assad's 75-year-old father, Abdullah al-Assad, in Yemen, he traveled the 1,300 km from al-Ghaydah to the capital, Sana'a, to find his son. The Yemeni government gave him written assurances, which Amnesty International has seen, that his son had never entered the country. He carried on to Dar es Salaam, where he filed a *habeas corpus* petition with the Tanzanian courts. He was eventually told by Tanzanian officials that his son had been turned over to US custody, and that no one knew where he was.

Two months earlier, in October 2003, Salah 'Ali Nasser Salim 'Ali and Muhammad Faraj Ahmed Bashmilah had been arrested in Jordan[2], and held there briefly before they too were turned over to US custody. Their cases were first documented by Amnesty International in a report released in August 2005.[3]

---

[1] 'Dar deports 2,367 aliens', Daily News (Tanzania), 30 December 2003; 'Yemeni, Italians expelled', The Guardian (Tanzania), 30 December 2003.
[2] Both were initially detained in Indonesia, see below.
[3] USA/Jordan/Yemen: Torture and secret detention: Testimony of the "disappeared" in the "war on terror", AI Index: AMR 51/108/2005

Garcia, while the USA has been more equivocal. In a Defense Department Briefing in July 2004, Lawrence Di Rita, the Principal Deputy Assistant Secretary of Defense for Public Affairs, was questioned about the existence of US detention centres hidden from the ICRC. Di Rita said categorically that "the ICRC has access "to all detainee operations under our [Department of Defense] control. And beyond that, I'm just not prepared to discuss it." Pressed on whether detainees were held in secret on Diego Garcia by other US agencies, he replied: "I don't know. I simply don't know." The US State Department, the Federal Bureau of Investigation (FBI) and the CIA have all declined to comment on these reports.

As pressures mount on the US Administration to close Guantánamo, reform Abu Ghraib prison in Iraq, and turn detention centres in Afghanistan over to the Afghan government, there is a risk that the pervasive disregard for human rights protections at the heart of current detention policy will lead to more frequent recourse to secret measures, which can only lead to further grave violations of human rights.

The pattern of illegal arrests, covert transfers and secret and incommunicado detention described in this report violates the most fundamental rights of detainees: the right not to be arbitrarily arrested, the right of access to lawyers, families, doctors, the right to have families informed of arrest or place of detention, the right to be promptly brought before a judge or other judicial official, the right to challenge the lawfulness of detention and the right to be free from torture and cruel, inhuman or degrading treatment, as guaranteed by a battery of international human rights standards, as well as the US Constitution.

**Detention by proxy: arrests in Indonesia, Jordan and Tanzania**

The process by which the three men were screened for transfer into secret detention suggests that US agencies are placing considerable reliance on foreign security and intelligence services, most of which have been roundly criticized for their methods in the US State Department's own Country Reports on Human Rights Practices. Each one of the men – Muhammad al-Assad in Tanzania, and Salah 'Ali and Muhammad Bashmilah in Indonesia – was initially detained and questioned by immigration officials. A retired intelligence official has told Amnesty International that this is a common investigative tactic, even within the USA. It is often the case, he said, that foreign nationals have some visa irregularity that can justify questioning, and immigration regulations in most countries are so arcane and confusing that even those with legitimate visas and passports can be made to think there might be some problem with their status. Moreover, he added, "it's a good opportunity to check the passport, both to try and confirm the identity and to give you a chance to see where they've

been. It also helps if you can have a look at their cellphones and see who they've been talking to."[15]

In the case of Muhammad al-Assad, the connection that seems to have led to his long detention was a tenuous link to a blacklisted charity. Muhammad al-Assad ran a small business in Dar es Salaam importing diesel engine parts, and renting out offices in a small building he owned. Some six years before his arrest, he had leased space to the Al-Haramain Islamic Foundation, a Saudi Arabian charity identified by the USA after 9/11 as a possible link in terrorist funding. Muhammad al-Assad also signed a guarantee for the charity's registration in Tanzania, but said that his only contact with them after that was to collect the rent.[16]

In the summer of 2003, he was in Dubai on business when his brother-in-law called to tell him that the authorities had been asking questions about the charity. Muhammad al-Assad returned to Tanzania, but was not contacted by the police. In October, the immigration authorities summoned him to their offices, telling him to bring his Tanzanian passport and mobile phone. They did not question him about his immigration status, only asked him about a man with a red car, who had recently visited the Al-Haramain offices. Muhammad al-Assad said he had not seen him, and they asked him to leave his passport, and return for it the following day. This he did, and heard nothing more until he was arrested in December.

The detentions of Salah 'Ali and Muhammad Bashmilah seem to have been automatically triggered when they admitted to having visited Afghanistan. Salah 'Ali was first taken into custody by Indonesian immigration officials in Jakarta in August 2003, ostensibly for questioning about his visa, although he was initially detained in an intelligence services centre. He remained chained to the wall in a cell there, without food, for three days. His wife Aisha tried three times to visit him, but was refused access. He knew she was trying to call him, he told Amnesty International, because his mobile had been left outside his cell, just out of reach, and it rang incessantly until the batteries went dead.

---

[15] Amnesty International interview, October 2005. The official did not wish to be named.

[16] In January 2004, the Kingdom of Saudi Arabia and the U.S. Department of the Treasury jointly designated four additional Al Haramain branches -- Indonesia, Tanzania, Kenya and Pakistan -- as being supporters of terrorism. http://japan.usembassy.gov/e/p/tp-20040220-04.html, accessed 6 October 2005. CBS news reported in June 2004 that "U.S. officials have privately conceded that only a small percentage of the total [funding] was diverted and that few of those who worked for Al-Haramain knew money was being funneled to Osama bin Laden's terrorist organization.", http://www.cbsnews.com/stories/2004/06/07/terror/main621621.shtml, accessed 7 October 2005.

Salah 'Ali was transferred to a deportation centre, where he was held for three weeks, then given a ticket to Yemen via Thailand and Jordan. Aisha, an Indonesian national, was in her last month of pregnancy and could not travel with him. In Jordan, he was taken off the plane, and questioned by the General Intelligence Department, *Da'irat al-Mukhabarat al-'Ammah* (GID), who asked him right away if he had ever been in Afghanistan. He answered yes (there was already a stamp was in his passport, he told us), and was taken into custody and interrogated for 10 days about "*jihad* in Afghanistan". He told Amnesty International that the questions made no sense to him, because they didn't relate to the same period he had spent there, so "I was tortured horribly. It was very bad."

Salah 'Ali described being suspended from the ceiling and having the soles of his feet beaten so badly that when they took him down from the hooks he had to crawl back to his cell.[17] He was stripped and beaten by a ring of masked soldiers with sticks. "When one got tired of hitting me, they would replace him," he told Amnesty International. "They tried to force me to walk like an animal, on my hands and feet, and I refused, so they stretched me out on the floor and walked on me and put their shoes in my mouth". Another time, he said, a guard noticed he had a bad foot, and forced him to stand on it throughout the night while they interrogated him: sometimes during interrogation they held plates of food near his face while they ate, although he was not fed; sometimes they put cigarettes out on his arm.

After about 10 days the Jordanian guards hooded and shackled him, and stuffed foam into his ears before driving him to an airstrip. He was taken onto a plane and laid out on his back on the floor or a stretcher, his arms chained to the floor. He flew for about three or four hours, he says, and when he arrived, he was taken to see an English-speaking doctor, and then by English-speaking guards to his cell.

Muhammad Bashmilah had first been arrested in Indonesia in August 2003, as he and his wife stepped off a train in Surabaya; in his case too, his captors identified themselves as immigration officials. Zahra, his Indonesian wife, was allowed to go, while Muhammad Bashmilah was moved to Jakarta to be questioned about his passport and identity card, and more extensively about his movements since leaving Yemen in 1999, including his three-month visit to Afghanistan in 2000.

He was released in September, and he and his wife travelled to Jordan to meet his mother, who had gone to Amman to have a heart operation. On arrival in Jordan, his passport was taken and he was told to report to the GID to collect it. He went several times, but did not get his passport back. On his fourth visit, on 19 October 2003, he was asked if he had ever been to Afghanistan; as soon as he said yes, he was handcuffed and taken to the intelligence detention centre.

---

[17] A form of torture known as *falaqa*

Muhammad Bashmilah is a small, vibrant man, about 38 years old, who speaks openly, if caustically, about most aspects of his detention. On both occasions he has been interviewed by Amnesty International, however, he has broken down in tears in the attempt to describe his treatment in the GID's cells in Jordan. A prison official in Yemen told Amnesty International that he believed Muhammad Bashmilah had been tortured even more severely than Salah 'Ali.

After three days in custody, Muhammad Bashmilah said that he was allowed to see his mother for 10 minutes. She later told him that she had returned the following day only to be told "your son is a terrorist", and that he had been removed to Saudi Arabia or Iraq.

In fact, he says, he had been taken in the early hours of the morning from his cell to an airstrip about 30 minutes away. Already hooded, his clothes were cut "very harshly" from his body and replaced with blue clothing, and he was shackled and cuffed. He says he felt completely disoriented, still in shock over his treatment in Jordan, and very frightened for his wife and mother.

Although Muhammad Bashmilah and Salah 'Ali were friends from Aden and Indonesia, they had not been held together in Jordan, and neither knew that the other was in custody.

Amnesty International first raised the case of Muhammad Bashmilah's "disappearance" in a letter to the Jordanian authorities in April of 2005, before he had re-appeared in Yemen. There was no response, and no acknowledgement that he had ever been in Jordanian custody. Following the release of Amnesty International's report in August 2005, which included accounts from both Salah 'Ali and Muhammad Bashmilah of their detention in Jordan, the Jordanian GID claimed: "...the recent allegations on torturing Yemeni citizens (Saleh Naser Salm Ali and Mohammad Faraj Bashmela) highlighted the size of false allegations targeting Jordan, noting that the abovementioned Yemenis were NEVER detained at the GID detention center, however, they were merely deported for exceeding their residence permit, and left to Iraq."[18] As subsequent events make clear, however, neither of the men was deported from Jordan, although both were transferred from Jordanian custody.

---

[18] emails to Amnesty International members, who had written to the GID about the cases of the two men.

**Transferred to US custody**

The men do not know where they were taken. They may well have been transferred out on the same plane, as they left at about the same time, both describe a small plane with US guards, and both say they travelled some three to four hours. From Amman they could have reached Iraq in that time, although they could just as easily have ended up in Sudan, Turkey or parts of Eastern Europe. In any case, it is clear that they arrived in the same place, on or about the same day. In separate interviews with Amnesty International, they both described a windowless, underground facility. Each was kept in isolation, in a cell measuring about 1.5 x 2m, containing a bucket for a toilet, a foam mattress and a Qur'an.

During the six months they spent there, they left their cells only to be interrogated. They were asked over and over again about their activities in Afghanistan and Indonesia, and were shown dozens of photos, including of each other.

If they found anyone they recognised in the photos, they were brought back for more questioning, otherwise, they remained alone in their empty cells. Muhammad Bashmilah says that he was once shown a photo of Taysir Alluni, the al-Jazeera journalist, and told that if he said he knew him, his situation would improve[19]. "I did know him," he told Amnesty International with a grin, "but they found out it was only from the television, and there were no favours for me." Neither one ever saw any other detainee, although both believe that others were held there. Muhammad Bashmilah said there were several interrogators, both men and women: all of them were white, wore Western clothing, and spoke English with US accents. There were also a number of different interpreters, some of them native Arabic speakers. "They were not all there for us", he said.

The third man, Muhammad al Assad, estimates that his initial flight from Dar es Salaam took about two to three hours. He recalls that they landed in a hot place, and he thinks that one of the jailers who took him to the interrogation room spoke Arabic with a Somali or Ethiopian accent, and that the bread he was given was typical of East Africa. But of his arrival, less than 12 hours after being dragged from his home, he remembers only fear and confusion. The guards brought him from the plane, and left him, still hooded and shackled, in what turned out to be his cell. "I was so afraid that I couldn't move," he said, "so I stood very still there for a very long time until finally someone looked in and shouted in Arabic: 'sit down'."

---

[19] Taysir Alluni was arrested at his home in Spain in 2003 on suspicion of having links with al- Qa'ida. In September 2005 he was convicted of acting as financial courier to the al- Qa'ida network, and sentenced to seven years.

When they removed his cuffs and hood, he found he was in a large, dirty room, bare except for a foam mattress and some matting on the floor. He saw two small windows up near the ceiling, about 20cm square, and there was a little hole in the door for his food to be handed through. He would be there for about two weeks. In what was to become a familiar pattern, no one spoke a word to him but his interrogator and translator.

His interrogator at this location was a white, English-speaking woman, her translator a white Western man; both appeared to be in their 30s and were dressed in civilian clothes. Muhammad al-Assad speaks a little English, and thinks both were from the US.

Muhammad al-Assad had three or four interrogation sessions with them, and said the interrogator herself never threatened him, although the translator told him, when he could not respond to a question: "you have to understand that your children will be orphans."  The translator was fluent in Arabic, although it was clearly not his native tongue. Muhammad al-Assad said he once complimented him on his Arabic, and the translator retorted with a familiar Arabic saying: "the one who learns the other's language avoids their tricks".

They quizzed him about al-Haramain and its employees, mostly concentrating on two men, the current and former directors. They wanted to know all about the men's movements, their friends and contacts, and relationship to Muhammad al-Assad. They also asked many questions about al-Haramain's activities. He says he told them everything he knew, which wasn't much, and they said they would be sending him to another country. He took this to mean they would send him back to Tanzania.

After about two weeks, however, he was given a Western-style shirt and trousers in a heavier fabric, and taken back to the airfield. This plane, he felt, was large, and he was made to lie on the floor or a bench. He remained hooded and cuffed, and had something wrapped around his ears. He thinks the plane flew for a long time, perhaps eight hours, then touched down for about an hour, then flew again for about three hours.

When he was taken off the plane, he felt that the weather was much colder. His new cell was a bit larger, although completely windowless and empty, except for matting on the floor. He did not have any blanket and was very cold. There was a toilet outside his cell and he was taken there three times a day.

After about nine days alone in his cell, the interrogation started. This time the interrogator and translator were both white men, perhaps in their 40s, but the questions remained exactly the same. He talked to no one else; the guards, who were also English-speaking, came to bring him food and take him to the toilet, but never spoke to him or answered any of his questions.

He stayed there for about two weeks, and was then taken by car to a place about 20 minutes away. There he was put in a cell that was smaller and older, but otherwise very similar, and he stayed there about three months. He was brought irregularly to the same interrogator who had questioned him at the previous place, otherwise he did not leave the room.

## "Black site" detention

The last of Muhammad al-Assad's secret transfers took place in what he estimates to be late April 2004. The flight lasted some five or six hours; when the plane landed, he was transferred to a helicopter, where he was thrown roughly to the floor. He says he felt the presence of others on the floor with him. It is indeed possible that the others included Salah 'Ali and Muhammad Bashmilah, who were also transferred to their final secret destination at about this time, and who also describe a flight landing followed by transfer in a helicopter. Salah 'Ali now jokes about it, and calls it the last leg of his world tour. Muhammad Bashmilah says this flight took place between 22 and 24 April.

Descriptions of the new facility and its detention regime were given to Amnesty International separately by the three men; Muhammad al-Assad has never met or spoken to Salah 'Ali and Muhammad Bashmilah. Their accounts are cohesive and consistent; whether or not they arrived on the same day, they were clearly held in the same place.

It was no makeshift military camp but a purpose-built facility, or at least one that had been extensively refurbished in an effort to make it as anonymous as possible. There were no pictures or ornaments on the walls, no floor coverings, no windows, no natural light. The only clue to its construction, according to Salah 'Ali, was that it was not Arab-built, as the toilets faced the direction of Mecca. The description of the facility tallies with a Washington Post report of the covert prison system run by the CIA, in which secret detention facilities in some eight countries are referred to as "black sites".[20]

Once again, the men were held in complete isolation, and never spoke a word to anyone except their interrogators. In a bizarre twist, the silent guards were covered in black from head to toe – Muhammad Bashmilah described them as "ninjas" – and communicated only by hand gestures. It is a description that would seem like pure

---

[20] Dana Priest, 'CIA holds terror suspects in secret prisons', Washington Post, 2 November 2005

fantasy if it had not been corroborated by other detainees who have spent time in secret US detention.[21]

Inside their cells, there was a constant low-level hum of white noise from the loudspeakers, which sometimes played western music and, towards the end of their stay, occasional verses from the Qur'an. With artificial light kept on 24 hours a day, morning, noon and night were marked only by the kinds of meals served, or because it was time to pray.

There was nothing haphazard or makeshift about the detention regime, it was carefully designed to induce maximum disorientation, dependence and stress in the detainees. The men were subjected to extreme sensory deprivation; for over a year they did not know what country they were in, whether it was night or day, whether it was raining or sunny. They spoke to no one but their interrogators, through translators, and no one spoke to them. For the first six to eight months, they spent nearly every waking hour staring at the four blank walls of their cells, leaving only to go to interrogation, and once a week, to the showers.

The men were all given a Qur'an, a watch, a prayer mat and prayer schedules, and told the direction of Mecca. Muhammad Bashmilah and Salah 'Ali both said that the watch and schedule were manipulated by a few minutes each month to make sure the times didn't correspond exactly to their actual location.

By the last four to six months of their stay, even the interrogators had run out of questions, and formal interrogation sessions stopped almost completely. There were times when they spoke to no one at all for weeks on end. Muhammad al-Assad says that one of the interrogators visited him in his cell a few times, to ask if he needed anything. He always asked why he was there, and the interrogator always replied: "God brought you here and only God can bring you out".

None of the men ever saw each other, or any other detainee, although Muhammad al-Assad remembers that once the electricity went off, and he heard different voices shouting in Arabic. In any case, the system they describe could not have been maintained solely for the purpose of interrogating three low-level detainees. In their daily routines, the men began to pick up some indications of the capacity of the facility. All three have told Amnesty International that during the final months of their

---

[21] Khaled el-Masri, a German citizen, said that was detained in Macedonia in December 2003, before being transferred to a secret US-run prison in Afghanistan. He described guards wearing black masks and black gloves, and told the Guardian that there were other prisoners there from Pakistan, Tanzania, Yemen and Saudi Arabia. El-Masri said that he was held for five months and interrogated by Americans through an interpreter. Isotope analysis of his hair carried out in Germany in 2004 confirmed that he had been in Afghanistan.

stay, they were given a multi-page list of books, from which they could choose several to keep in their cells. Muhammad al-Assad thinks the list contained some 600 titles, in different languages, including the three he recognizes (Arabic, English and Swahili). It's a generous reading list by any standards. Although videos were not on the list, Salah 'Ali was told that there were some available, so he asked for a film on the life of the prophet, called "The Message". He was taken to a small room to see it a few days later, again suggesting that the facility had the capacity to maintain a significant stock of books and videos.

The men were taken to shower every Friday. Muhammad Bashmilah says they were given two cotton ear swabs each week, and each week he counted the number of swabs left in the bin, eventually concluding that there could be up to 20 others using his shower room. He also said that loud music was played during the 15 minutes or so each detainee spent in the shower room, and that counting the musical interludes also led him to conclude that about 20 people were held in his section. He has no idea, however, whether the facility may have contained more than one section.

During the last four months of his captivity, Muhammad al-Assad says, he was finally allowed to take some exercise. He was given a ball and taken to a small hall to play football on his own for half an hour three times a week. At about the same time, he met the new Prison Director. "He said he had come from the US, for the sake of the prisoners to see who is innocent and who is guilty," Muhammad al-Assad said. "He was quite harsh at our first meeting, but the next time he was kinder, I think he read my file. He said that I was at the top of the list to be released."

Salah 'Ali describes a similar regime, although he was convinced that the prison was underground. He was interrogated only for the first six weeks, and throughout this time, he said, he remained in shackles, day and night. Sometimes, he told Amnesty International, even when he was taking his weekly shower, the guards would cuff one of his arms up over his head, and force him to wash using one hand. He says he went on hunger strike for 29 days to force the authorities "to recognize I was there and to get some improvements". He was eventually taken to another cell, where a tube was put up his nose and he was force fed. Afterwards, he says, he was given a blanket and his leg irons were removed.

### Torture, ill-treatment and "disappearance": violations of international law

None of the men has alleged that they were beaten at this facility, but that does not make the regime they endured benign or humane. Torture and ill-treatment take many forms. Prolonged isolation has been shown to cause depression, paranoia, aggression, hallucinations and suicide. The psychological trauma can last a lifetime.[22] Where the detainee has been "disappeared", the effects of enforced solitude are compounded by a pervasive sense of uncertainty and anxiety about the future, which can be similarly destructive.[23]

Incommunicado detention has been condemned by human rights bodies, and by the United Nations Special Rapporteur on Torture, as a human rights violation that also facilitates other violations such as torture or ill-treatment. Related practices, such as hooding, cuffing and shackling, isolation and "white noise" impair the sight, the hearing and the sense of smell of the individual who is subjected to it, lead to disorientation and an increased sense of vulnerability, and cause mental and physical suffering.

Secret detention is prohibited under international human rights standards. Principle 6 of the UN Principles on the Effective Prevention and Investigation of Extra-legal, Arbitrary and Summary Executions states that "governments shall ensure that persons deprived of their liberty are held in officially recognized places of custody, and that accurate information on their custody and whereabouts, including transfers, is made promptly available to their relatives and lawyers or other persons of confidence."[24]

The Human Rights Committee, in an authoritative statement on the prohibition on torture and cruel, inhuman and degrading treatment, has stated that "to guarantee the effective protection of detained persons, provisions should be made for detainees to be held in places officially recognized as places of detention and for their names and

---

[22] In 2004, a group of psychologists and psychiatrists examined eight people being detained under anti-terrorist legislation in the UK. They found "that serious damage to the health of all the detainees they have examined has occurred and is inevitable under a regime which consists of indefinite detention." All of the detainees "now suffer from significant levels of depression and anxiety. The symptoms are of clinical severity and have shown a deterioration over time." Most of the detainees had suicidal thoughts, some had attempted to hang themselves, and several developed significant psychotic symptoms. The study also concluded that: "Deterioration in mood state is clearly linked to a sense of helplessness and hopelessness which is an integral aspect of indefinite detention." See Professor Ian Robbins, Dr James MacKeith, Professor Michael Kopelman, Dr Clive Meux, Dr Sumi Ratnam, Dr Richard Taylor, Dr Sophie Davison and Dr David Somekh, *The Psychiatric Problems of Detainees under the 2001 Antiterrorism Crime and Security Act*, 13 October 2004, http://www.statewatch.org/news/2004/nov/belmarsh-mh.pdf, accessed 5 January 2005. The report was endorsed by the Royal College of Psychiatrists.
[23] Combating torture: a manual for action, Amnesty International, 2003. See also Human Rights First, Behind the Wire: An Update to *Ending Secret Detentions* , March 2005, p 30. http://www.humanrightsfirst.org/us_law/PDF/behind-the-wire-033005.pdf
[24] Recommended by the UN Economic and Social Council resolution 1989/65 of 24 May 1989.

places of detention… to be kept in registers readily available and accessible to those concerned, including relatives and friends".[25]

The UN Special Rapporteur on torture has also said that "the maintenance of secret places of detention should be abolished under law. It should be a punishable offence for any official to hold a person in a secret and/or unofficial place of detention."[26]

"Disappearances" are crimes under international law, involving multiple human rights violations. In certain circumstances they are crimes against humanity, and can be prosecuted in international criminal proceedings.  The defining characteristic of a "disappearance" is that it puts the victim beyond the protection of the law, while at the same time concealing the violations from outside scrutiny, making them harder to expose and condemn, and allowing governments to avoid accountability. The United Nations General Assembly has said that enforced disappearance "constitutes an offence to human dignity, a grave and flagrant violation of human rights and fundamental freedoms ..."[27] The ICRC has said of "disappearances", that "no one has the right to keep that person's fate or whereabouts secret or to deny that he or she is being detained. This practice runs counter to the basic tenets of international humanitarian law and human rights law."[28]

The UN, "Declaration on the Protection of All Persons from Enforced Disappearances" of 1992 states that "any act of enforced disappearance is an offence to human dignity", which *"places the persons subjected thereto outside the protection of the law and inflicts severe suffering on them and their families. It constitutes a violation of the rules of international law guaranteeing, inter alia, the right to recognition as a person before the law, the right to liberty and security of the person and the right not to be subjected to torture and other cruel, inhuman or degrading treatment or punishment. It also violates or constitutes a grave threat to the right to life"*.

---

[25] Human Rights Committee, General Comment 20, Article 7 (Forty-fourth session, 1992), Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, UN Doc. HRI\GEN\1\Rev.1 at 30 (1994), para. 11. Accurate and detailed registers of detainees are required under international law and standards, including the UN Standard Minimum Rules for the Treatment of Prisoners and the UN Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, the Geneva Convention relative to the Treatment of Prisoners of War of 12 August 1949 (Third Geneva Convention), Articles 122 to 125 and the Geneva Convention relative to the Protection of Civilian Persons in Time of War (Fourth Geneva Convention), Articles 136 to 141.
[26] UN Doc. E/CN.4/2002/76, 27 December 2001, Annex 1.

[27] UN General Assembly, "Question of Enforced or Involuntary Disappearances", New York: United Nations, 1994
[28] 'Enforced disappearance must stop',  ICRC Press Release 03/60, 30 August 2003

The Rome Statute of the International Criminal Court defines the crime against humanity of "enforced disappearance of persons" as *"the arrest, detention or abduction of persons by, or with the authorization, support or acquiescence of, a State or a political organization, followed by a refusal to acknowledge that deprivation of freedom or to give information on the fate or whereabouts of those persons, with the intention of removing them from the protection of the law for a prolonged period of time."* [29]

The UN Committee Against Torture has determined that the uncertainty regarding the circumstances surrounding their loved ones' fate "causes the families of disappeared persons serious and continuous suffering".[30]

This is certainly the case for the families of these three men. They have finally discovered that the men are alive, but are still suffering the emotional and economic impact of their "disappearance" and continued detention. When Muhammad al-Assad was transferred to Yemen, his wife Zahra Salloum and their five children came from their home in Dar es Salaam to the remote and dusty town of al-Ghaydah. He had never seen his youngest daughter, born after his arrest; the family named her Sabra, meaning "patient one". They all live in the house of Muhammad al-Assad's father, with his three wives and 10 of their children. Zahra Salloum speaks no Arabic, and none of the women in the family speak Swahili. She prepares meals for Muhammad al-Assad every day, but is only able to visit him in the prison once or twice a week.

The Indonesian wives of Salah 'Ali and Muhammad Bashmilah are even less fortunate. Salah 'Ali's wife, Aisha, had a baby girl after he was detained, and he has yet to even see her, although he has now been permitted a couple of telephone conversations with his wife. The family does not have enough money to travel to Yemen, and without him, they have no means of support in Indonesia. They are destitute, he says, "sometimes they cannot afford milk for the little girl".

Zahra, Muhammad Bashmilah's wife in Indonesia, has also been unable to travel to Yemen, and he has not seen her for more than two years. His father died in September 2004, without ever finding out what had happened to his son, and his mother remains extremely ill. She did not go ahead with her heart operation because of his arrest and "disappearance" in Jordan, and now also suffers what appears to be a thyroid ailment.

---

[29] The Rome Statute of the International Criminal Court, Art. 7(2)(i). Article 7(1) provides that a crime against humanity under the Statute, means an act listed in that Article (including "enforced disappearances of persons") "when committed as part of a widespread or systematic attack directed against any civilian population, with knowledge of the attack".
[30] Concluding observations of the Committee against Torture: Guatemala, UN Doc. A/56/44, 6 December 2000, para. 73(e).

Despite her frailty, she insists on making the trek to the Central Prison in Aden, nearly every day, in the intense midday heat, to see her son. He has asked her to stop, but she refuses. "She suffers a lot to see me", he admits, and says he is consumed with worries over her health.

**Arbitrary detention in Yemen under US direction**

The three men were sent to Yemen on 5 May 2005. Rajih Hunaish, the Undersecretary of the Central Organ for Political Security, told Amnesty International that the Yemeni government was notified of the return only 24 hours before the plane landed at Sana'a. It is not clear whether the Yemeni government knows the origin of the flight, when asked for a flight plan Rajih Hunaish said it would indeed be normal for a flight plan to be filed, but that they had no information about this specific flight, and his office would have to check into it further. Amnesty International has not yet received any response.

The men were held in the political security prison at Sana'a for about two weeks before Muhammad al-Assad was transferred to al-Ghaydah; he has still never met Salah 'Ali and Muhammad Bashmilah, who were sent to Aden. A number of Yemeni officials, including the Chairman of the Central Organ for Political Security, Ghalib al-Qamish, have told Amnesty International that US officials had given them explicit instructions on the continued detention of the three men, and that they are "awaiting files" from the US, so that they can try them. When asked if the men would be released if the US requested it, Rajih Hunaish said, without hesitation, "yes". He told Amnesty International that notification of the transfer in May, and further instructions on the detention of the three men, came from the US Embassy in Sana'a.

Amnesty International met US Embassy officials in Sana'a, and submitted additional questions to the Embassy in writing. In his reply, the Chief, Political/Economic and Commercial Section noted: "The U.S. Government relinquishes all custody and control over detainees transferred from Guantanamo Bay to the exclusive control of another government. There are no conditions attached." However, when asked if this meant that the US was confirming that the men had been released from Guantánamo, the official replied: "As a matter of policy, I am not permitted to talk about the details of any particular case; I can only share information on general policies."[31]

Amnesty International does not accept the assertion that the men were held in Guantánamo, a claim which continues to be repeated in the Yemeni press and by

---

[31] email correspondence dated 16 October 2005 and 18 October 2005

some Yemeni authorities, and which the US Embassy now appears to be promoting. However, the men could not have come from Guantánamo, the USA did not transfer any Guantánamo detainees to Yemen in May 2005, in fact, there were no detainee transfers at all on record between 28 April and 20 July. There was no ICRC notification of their detention, and they were never given access to ICRC officials. Although the ICRC is mandated to follow up on all cases of detainees transferred from Guantánamo to third countries, they have not contacted these three men since their arrival in Yemen. [32] The men's own description of the facilities, climate, detention regime, and length of their return flight, all indicate they were never in Guantánamo

Amnesty International first spoke to Muhammad Bashmilah and Salah 'Ali on 20 June 2005. In a report issued six weeks later, Amnesty International revealed that Yemeni officials had confirmed that their continued detention in Yemen, and that of a third man, Walid al Qadasi, who was returned from Guantánamo in April 2004, was without legal basis, and at the request of the US authorities.[33] In late July, Muhammad Bashmilah says, they were suddenly moved from the Central Prison in Aden to the Political Security Prison in Sana'a. He was told they were going there to be released, so he gave his few belongings to other prisoners, only to find that they had only been taken to Sana'a for questioning. (Walid al Qadasi, the third case in Amnesty International's August report, was also brought to Sana'a, although Muhammad al-Assad, who had not at that time been interviewed by Amnesty International, was not.) Muhammad Bashmilah and Salah 'Ali were interrogated in Sana'a about the circumstances of their arrest and the reasons for their transfer back to Yemen, then returned to Aden, where Muhammad Bashmilah was put into solitary confinement for five days. Since then, he and Salah 'Ali have been held separately. He believes the sudden trip to Sana'a was aimed at intimidating them, "and if we go on talking to you now", he added dryly, "we might be here for life".

In September 2005, Minister of the Interior Rashad Mohammed al-Alimi announced that the men had been accused of belonging to an international terror group and that their trial would begin "once the United States had sent through their files". Officials of the Political Security have also repeatedly told Amnesty International that they are awaiting files from the US before bringing any charges against the men.

---

[32] See 'US detention related to the events of 11 September 2001 and its aftermath - the role of the ICRC', Operational Update April 2005.
http://www.icrc.org/Web/Eng/siteeng0.nsf/iwpList454/541ACF6DC88315C4C125700B004FF643 (accessed 13 October 2005)
[33] USA/Jordan/Yemen: Torture and secret detention: Testimony of the "disappeared" in the "war on terror", AI Index: AMR 51/108/2005

Muhammad Bashmilah says he finds this all confusing. "If we were guilty," he said simply, "the Americans would never have released us." He says that US officials had given him the choice of being handed over to Yemen or to another country, and he had insisted on Yemen because he was sure that he would be helped and welcomed at home. "More than four months have passed," he said, "and we are still detained, but we hear that others who have been returned to European countries have been released and that things have been done to facilitate their return, and this is the opposite to what we have here."

There have been no investigations into any accusations against the men, no charges have been made, none of the men have seen a lawyer or been brought before a judge. Anxiety and uncertainty over their futures, and the fear that their fate may remain unresolved, continue to torment the men and their families. All of them would welcome the prospect of trial. "If I am guilty of anything, try me and I will spend the rest of my life in jail," said Muhammad al-Assad, "only give me a trial".

"If there really are any charges," said Muhammad Bashmilah, "we are ready to defend ourselves… The Interior Minister says he is waiting for an American decision on our cases. But we are Yemenis in Yemen, why is he waiting for the Americans to decide?"


## RECOMMENDATIONS

### "Disappearance" and secret detentions

The US authorities should:

> Disclose the location and status of the detention centres where Muhammad Abdullah Salah al-Assad, Muhammad Faraj Ahmed Bashmilah and Salah Nasser Salim 'Ali were held; disclose the identities and whereabouts of all others held at these places and their legal status, and invite the ICRC to have full and regular access to those detained;

> End immediately the practices of incommunicado and secret detention wherever it is occurring, and under whatever agency;

> Hold detainees only in officially recognized places of detention with access to family, lawyers and courts;

# EXHIBIT
# D

1 of 1 DOCUMENT

Copyright 2005 The Washington Post

# The Washington Post

# washingtonpost.com

The Washington Post

November 7, 2005 Monday
Final Edition

**SECTION:** A Section; A11

**LENGTH:** 1084 words

**HEADLINE:** Prisoner Accounts Suggest Detention At Secret Facilities;
Rights Group Draws Link to the CIA

**BYLINE:** Josh White, Washington Post Staff Writer

**BODY:**

Three Yemeni nationals who were arrested in late 2003 say they were
transferred to U.S. custody and kept isolated in at least four secret detention
facilities that Amnesty International officials believe could be part of a
covert CIA prison system.

The three detainees have not said they were physically abused while in U.S.
custody, but they describe being whisked away in airplanes to unknown locations
where they were interrogated by Americans in civilian clothes, according to an
Amnesty International report. At one prison, the detainees were guarded by
people in all-black "ninja" suits, who communicated using hand gestures.

During their separate incarcerations, the detainees were never visited by
the International Committee of the Red Cross, never had access to lawyers, were
unable to correspond with their families and had no contact with the outside
world, the report said. Their families believed they were dead or were told that
they had gone to Iraq to fight the United States.

The accounts, taken in independent interviews by Amnesty International
researchers over the past few months, appear to be consistent with reports of a
network of secret CIA detention facilities, according to the report. The
detainees could not determine where they were because they were hooded during
the flights, but because of the travel time they assumed they were in Europe or
the Middle East, according to Amnesty International.

"We've tried working out where they might have been, but it's so
subjective," said Anne FitzGerald, senior adviser on research policy for Amnesty
International, who interviewed the detainees in two Yemeni prisons. "It's clear

Prisoner Accounts Suggest Detention At Secret Facilities; Rights Group Draws
Link to the CIA The Washington Post November 7, 2005 Monday

they were in facilities that were designed to hold many people, not just them.
But they really didn't know where they were."

The CIA declined to comment Friday.

In a telephone interview from London last week, FitzGerald said she believes
the detainees' stories are credible because they were each detained separately
and were unable to communicate with one another before the United States turned
them over to the Yemeni government in May. One of the detainees has never met
the other two and is now kept in a separate facility, yet his story is
consistent, she said.

Muhammad Assad was arrested in his home of Dar es Salaam, Tanzania, on Dec.
26, 2003, for alleged passport problems. A Yemeni native, Assad had lived in
Tanzania for 20 years.

After his arrest and initial questioning, Assad was taken to a waiting
airplane, and his family was told that he was deported to Yemen, according to
Amnesty International. Yemeni authorities denied that Assad had entered the
country, and Tanzania later informed Assad's father that he had been turned over
to U.S. officials.

Assad believes he was arrested because of his connections to a charity that
was "blacklisted" after the Sept. 11, 2001, terrorist attacks for allegedly
funding terrorism. The al Haramain Islamic Foundation, a Saudi Arabian charity,
had rented space in a building Assad owned. It is the only topic Assad was
questioned about in his 15 months of incarceration.

He was first taken on a small airplane that flew for about two to three
hours, and was interrogated for two weeks by Arabic-speaking people, according
to the report. He was then flown elsewhere, a flight that he believes lasted
about 11 hours, with a one-hour stop-over. When he arrived, his surroundings
were much colder, and he was interrogated by white men who spoke what he
believed to be American English.

"There was nothing haphazard or makeshift about the detention regime, it was
carefully designed to induce maximum disorientation, dependence and stress in
the detainees," according to the 20-page report. "The men were subjected to
extreme sensory deprivation; for over a year they did not know what country they
were in, whether it was night or day, whether it was raining or sunny. They
spoke to no one but their interrogators, through translators, and no one spoke
to them."

Salah Ali and Muhammad Bashmilah, who were living in Indonesia, were
arrested in August and October 2003, respectively; Ali in Jakarta and Bashmilah
in Amman, Jordan. They were taken to a Jordanian prison and tortured -- badly
beaten and chained in uncomfortable positions -- by Jordanian authorities
before being transferred to U.S. custody, according to Amnesty International.
Both men had traveled to Afghanistan in 2000 to learn about jihad, but neither
man fought against the United States, according to FitzGerald.

Ali said he was stripped and beaten with sticks by a ring of masked
soldiers. "They tried to force me to walk like an animal, on my hands and feet,
and I refused," Ali told Amnesty, "so they stretched me out on the floor and
walked on me and put their shoes in my mouth."

Prisoner Accounts Suggest Detention At Secret Facilities; Rights Group Draws
Link to the CIA The Washington Post November 7, 2005 Monday

Ali and Bashmilah recount similar stories after their transfer to U.S. custody in a place Amnesty International believes could have been Eastern Europe. They were put into a windowless, underground facility, each was isolated in a tiny cell, and their jailers and interrogators spoke English with American accents. In April 2004, they were moved to a new facility with "no pictures or ornaments on the walls, no floor coverings, no windows, no natural light," according to the report. It was here that the guards dressed in all black.

FitzGerald said that the two Indonesian detainees were barely interrogated after their first few weeks, perhaps an acknowledgment that they did not know much. All three were released to Yemeni authorities in May. Ali and Bashmilah are in the central prison in Aden, and Assad is at a security prison at Al Ghaydah. Their families now know they are alive, FitzGerald said.

"The cases of the three 'disappeared' Yemenis documented in this report . . . suggest that the network of clandestine interrogation centres is not reserved solely for high-value detainees, but may be larger, more comprehensive and better organized than previously suspected," the report says.

Such "incommunicado" detentions are against international standards but are consistent with recent reports of how the CIA operated its detention network.

Manfred Nowak, the U.N. rapporteur on torture, said in an interview last week that secret facilities are a particularly important issue because there is no outside oversight and no ability to know which detainees are in custody or where they are held. He condemned the practice.

"Incommunicado detention forms inhumane treatment in and of itself," Nowak said.

**LOAD-DATE:** November 7, 2005

| Homepage | Latest News | Search | Languages | Contact Us | About Us |

Tuesday,
2007

**IPS Direct to
Your Inbox!**

your email | Go |

- Global Affairs
- Africa
- Asia-Pacific
   Afghanistan
   Iran
- Caribbean
   Haiti
- Europe
   Union in Diversity
- Latin America
- Mideast &
Mediterranean
   Iraq
   Israel/Palestine
- North America
   Neo-Cons
   Bush at War



- Development
   MDGs
   City Voices
   Corruption
- Civil Society
- Globalisation
- Environment
   Energy Crunch
   Climate Change
   Tierramérica
- Human Rights
- Health
   HIV/AIDS
- Indigenous
Peoples
- Economy & Trade
- Labour
- Population
   Reproductive
Rights
   Migration&Refugees
- Arts &
Entertainment
- Education
- ExPress Freedom
- Columns
- In Focus

- Readers' Opinions
- Email News
- What is RSS?

**LANGUAGES**

ENGLISH

ESPAÑOL

FRANÇAIS

ARABIC

DEUTSCH

# HUMAN RIGHTS-US: Exporting Torture

By Tito Drago

  
print   send   share

MADRID, Nov 9 (IPS) - The U.S. government prohibits torture on its own soil, but operates secret prisons in various parts of the world where human rights are regularly violated, maintained political analyst Roberto Montoya and rights activist Miguel Ángel Calderón in interviews with IPS.

In response to a U.S. Department of Defence directive made public Tuesday, which specifically prohibits acts of physical and mental torture and states that "all captured or detained personnel shall be treated humanely," Calderón called for "clear signs that they will comply with the Geneva Conventions (on treatment of prisoners of war) and stop the use of torture."

Calderón, communications director for the Spanish chapter of human rights watchdog Amnesty International, stressed that "all detainees should be tried in accordance with national and international laws or else be released."

Moreover, he said, "the Red Cross should be allowed access to all detention centres, which means that those which are still secret must no longer be so."

On Monday, Amnesty International released a report providing detailed information on three Yemeni nationals who were illegally held in secret detention centres or "black sites" run by the United States.

Muhammad al-Assad, Salah Ali and Muhammad Bashmilah were arrested in Yemen in 2003 and handed over to U.S. custody, at which point they "disappeared" for a year and a half until resurfacing in Yemeni custody this past May.

Through interviews with the three men after they were released, Amnesty International uncovered evidence that during the interim, they had been held in complete isolation in a series of U.S.-run secret detention centres.

While there have been widespread reports recently that the United States is holding two to three dozen "high-value" detainees at secret CIA-run facilities outside the country, the cases of the three "disappeared" Yemenis documented in the new Amnesty International report "suggest that the network of clandestine interrogation centres is not reserved solely for high-value detainees, but may be larger, more comprehensive and better organised than previously suspected," the report maintains.

For his part, Montoya said it was "strange" that the new Department of Defence directives were issued "at the same time that Washington is trying to boycott an amendment introduced by Senator (John) McCain that opposes the government's stance that there should be exceptions made for special intelligence operations abroad."

McCain, a senator from the ruling Republican Party - as well as a Vietnam veteran who was himself tortured as a prisoner of war - is the author of an amendment attached to a revised military spending bill that would ban the use of "cruel, inhuman or degrading treatment or punishment" against anyone in U.S. government custody.

The White House unsuccessfully lobbied McCain to exempt the Central Intelligence Agency (CIA) from the measure, and has threatened to veto the bill if it includes the amendment.

Montoya called the new Pentagon directives hypocritical, and recalled that while U.S. President George W. Bush declared that the United States respects all "relevant" national and international laws, internal documents from the Pentagon itself subsequently demonstrated that defence authorities knew about the abuse of prisoners in places like Abu Ghraib prison in Iraq.

The journalist and international relations specialist has just published a new book, La inmunidad imperial (Imperial Immunity), which documents the illegal activities of U.S. military and intelligence personnel in other countries.

Montoya, who is currently the international news desk director at the Madrid daily El Mundo, is originally from Argentina, where he was imprisoned and tortured during the 1966-1973 military dictatorship.

He went into exile in Paris in 1976, when the Argentine army staged another coup and installed a de facto military regime that ruled until 1983. Montoya later moved to Spain, and began to write for El Mundo in 1992.

His book documents the existence of reports written "in his own hand" by U.S. Defence Secretary Donald Rumsfeld, which "give the green light" for the use of torture. Consequently, noted Montoya, human rights abuses are not "exceptions", but rather have been perpetrated on higher orders in Iraq, Afghanistan and the U.S. military base in Guantánamo, Cuba.

Some of the CIA's illegal activities are carried out by private companies used as "fronts", Montoya added, or

---

Lobelo
IPS-Washi
Jim Lobe'
foreign p
other sto



THE RO
COMM
THE AL
CIVILIS



**SIGN UP for the**
biweekly newsle
Migration & Refu

Around the world,
refugees and migr
the social, econom
dynamics of their
creating dialogue t
civilisations. Migra
become the buildir
bridges between c

your email

Read IPS coverag
migration issues.

more

**LATEST GLOBA**

► BRAZIL: Sanitat
115 Years
► FILM-ARGENTIN
Characters Get All
► KYRGYZSTAN:
Hurdles Leave Sp
► RIGHTS-COLON
Cooperation for P
► RUSSIA: Putin S
'Farcical' Election
► TRADE: Subsidi
a Game of "You Fi
► TRADE-AFRICA
be on Domestic N
Exports"
► ENVIRONMENT-
AFRICA: Radioac
Price of Gold
► CLIMATE CHAN
the Great Green H
► MIDEAST: Olme
Razor's Edge in P


WORLD
WARNING

**Mid**
N
Deve

► BRAZIL: Sanitat
115 Years
► TRADE-AFRICA
Should be on Dom
Not Exports"
► ENVIRONMENT-
AFRICA: Radioac
Price of Gold

ITALIANO
JAPANESE
NEDERLANDS
PORTUGUÊS
SUOMI
SVENSKA
SWAHILI
TÜRKÇE

by former agents no longer officially connected to the agency. There is also evidence of the use of civilian aircraft to transport illegal detainees.

Montoya pointed out that the U.S. military has undergone growing privatisation, and noted that during the administration of George Bush (1989-1993), the current president's father, Dick Cheney requested a study of the potential benefits to be gained by the Armed Forces by contracting out services.

Today, with Cheney as vice president, the U.S. military is backed up by over 20,000 mercenaries in Iraq and Afghanistan alone, he said.

Montoya's book provides detailed accounts of concrete cases like the illegal detention in 2003 of Egyptian Islamic cleric Abu Omar in Milan, Italy. He was kidnapped in broad daylight by 13 men who were eventually identified through a cell phone records check authorised by a court order.

Investigations revealed that all of Abu Omar's abductors were CIA agents who took him to Egypt on a plane that took off from the air base in Aviano, Italy.

He eventually turned up in custody in Egypt, where he told his family that he had been tortured both in Aviano and the Egyptian jail where he was being held.

Despite the fact that all 13 CIA agents were identified, the U.S. government refused to hand them over to stand trial in Italy.

Another case documented in the new book is that of a Lebanese-born German citizen who was arrested in Macedonia near the Serbian border and taken first to Afghanistan and then to Iraq, where he was tortured and released three months later.

The victim in this case declared that the plane on which he was transported made a stopover in Palma de Mallorca, the capital of the Balearic Islands located off Spain's Mediterranean coast.

This information helped Montoya locate and publish a photograph of the three civilian planes used by the CIA, whose licence numbers were registered at the airports in both Palma de Mallorca and the Canary Islands, another Spanish territory, off the northwest coast of Africa.

"I knew from conversations with airline pilots that a lot of them have the hobby of taking pictures of planes and posting them on a website," explained Montoya.

He then began to comb through the pictures on the Internet until he found the three planes that corresponded to the licence numbers in question, and published the photographs in his book.

In addition, he investigated the private companies that collaborate with the CIA and found a number in the United Kingdom, as well as South Africa, in addition to those from the United States.

"I also discovered that racial discrimination extends to this sector as well, where blacks and indigenous people get paid less than white Anglo-Americans," he noted.

Imperial Immunity contains accounts of numerous abductions perpetrated by the CIA, dozens of flights that have passed through Spanish airports, and copious documentation from the Bush administration.

It also includes reports on international investigations carried out in the United States, Pentagon memos and circulars, and responses from legal advisors consulted on how to apply certain "interrogation techniques" or deny detainees protection under the Geneva Conventions without running afoul of the country's own federal courts or the International Criminal Court. (END/2005)

Send your comments to the editor

► CLIMATE CHAN
the Great Green H
► AFRICA: Money
Tradition Complic
Political Aspiratio
► SOUTHERN AFI
Issue of Water Att
Authorities"
► WORLD AIDS D.
Trumping Health,
Say
► WORLD AIDS D.
Many Firms Still I
Bottom Line on H
► WORLD AIDS D.
Action Is Key to P
► WORLD AIDS D.
SALVADOR: More
Positive



Digg T

Share this st

del.icio.
newsvin
reddit
StumbleU
YAHOO!

RSS FEED


News Feeds
RSS/XML

Make IPS News
your
homepage!

Free Email
Newsletters
IPS Mobile
Text Only

**RELATED IPS ARTICLES**

- ► RIGHTS: U.N. Blasts Practice of Outsourcing Torture
- ► RIGHTS-US: Report on Covert Prisons Abroad Spurs UN, EU Probes
- ► HUMAN RIGHTS-US: Dozens of Abu Ghraibs
- ► US: Human Rights End Where Military Prisons Begin

READ IN IPSNEWS.NET >>

**IRAQ: BEYOND THE GREEN ZONE**


► IRAQ: Government
Fragments Further
More >>

**CONFRONTING CLIMATE CHANGE**


► CLIMATE
CHANGE: Forests,
the Great Green
Hope?
More >>

**ECONOMY, TRADE & FINANCE**


► TRADE: Subsidies
Reform Still a Game
of "You First"
More >>

Contact Us | About Us | Subscription | News in RSS | Email News | Mobile | Text Only
Copyright © 2007 IPS-Inter Press Service. All rights reserved.

Seized, held, tortured: six tell same tale | The Guardian | Guardian Unlimited        http://www.guardian.co.uk/international/story/0,,1658934,00.html

Sign in · Register

Go to: Guardian Unlimited home    Go



Read today's paper · Jobs

Search:        Go

⦿ Guardian Unlimited  ○ Web

GuardianUnlimited  The Guardian

**Home**      **UK**      **Business**  **Audio**  **Guardian Weekly**  **The Wrap**  **News blog**  **Talk**  **Search**
**The Guardian**  **World**  **America**  **Arts**  **Special reports**  **Podcasts**  **News guide**  **Help**  **Quiz**



Case studies

# Seized, held, tortured: six tell same tale

**Ian Cobain**
**Tuesday December 6, 2005**
**The Guardian**

Search this site
Go

**In this section**
Riots and hunger feared as demand for grain sends food costs soaring

Lunar shots are real, say China's space chiefs

Africa all in a day's work

Opposition leader Sharif barred from fighting Pakistan election

Brad Pitt unveils plans for New Orleans homes

Romney seeks to allay suspicion over his Mormon beliefs

Nazi rocket scientist's secret papers up for sale

International news in brief

Ousted Belgian premier vows to unite rival parties

Kite Runner's Afghan child stars forced into hiding

**Mamdouh Habib**, 49, an Australian citizen, was caught up in the rendition system after being arrested near the Pakistani-Afghan border shortly after the 9/11 attacks. His lawyers say he was bundled aboard a small jet by men speaking English with American accents and flown to Egypt, the country where he was born. For the next six months, they say, he was held in a Cairo jail, where he was hung from hooks, beaten, given shocks from an electric cattle prod, and told he was to be raped by dogs.

Habib also says that he was shackled and forced into three torture chambers: one filled with water up to his chin, requiring him to stand on tiptoe for hours, a second with a low ceiling and two feet of water, forcing him into a painful stoop, and a third with a few inches of water, and within sight of an electric generator which his captors said would be used to electrocute him. He made statements - which he has since withdrawn - declaring that he had helped train the 9/11 attackers in martial arts. Habib was moved to Afghanistan and then to Guantánamo. Last January he was released without charge and allowed to return to his wife and three children in Sydney.

**Maher Arar**, 34, a Canadian citizen, was seized in September 2002 while travelling through JFK airport in New York, on his way home after a holiday in Tunisia. After being questioned for 13 days about a terrorism suspect - the brother of a work colleague - he was handcuffed, placed in leg irons, and put aboard an executive jet. Hearing the crew describe themselves as members of the "special removals unit", and discovering he was bound for Syria, the country where he was born, he begged them to return to the US. The crew, he says, ignored his pleas and suggested he watch a spy film that was being shown on board. After landing in Jordan, Arar says he was driven to Syria, where he was held in a small underground cell which he likened to a grave. His hands were repeatedly whipped with cables, he says. He added that he would eventually confess to anything put to him. Arar was released a year later after the Canadian government took up his case. The Syrian ambassador in Washington announced that no terrorist links had been found. Arar is suing the US government.

Amnesty International has highlighted the plight of two Yemeni friends, **Salah Nasser Salim 'Ali,** 27, and **Muhammad Faraj Ahmed Bashmilah**, 37, arrested separately in August 2003. Salah was detained in

1 of 3                                                                    12/3/2007 7:49 PM

Indonesia, then flown to Jordan, where Muhammad was already under arrest. They say they were hung upside down and beaten for several days, before being flown to an unknown country about four hours' flying distance.

Neither man knew that the other was under arrest, but both described being detained in solitary confinement in an old underground prison, staffed by masked American guards, where western music was played in their cells 24 hours a day. Both men say they were moved after eight months, spending around three hours in a small aircraft, and then a helicopter, before being taken to another underground prison, this time modern, with air conditioning and surveillance cameras in the cells. This too was run by Americans, they say. The two men were returned to Yemen last May, but remain in custody. Amnesty says Yemeni officials have said they are being held at the request of US authorities. "What we have heard from these two men is just one small part of the much broader picture of US secret detentions around the world," said Sharon Critoph, the Amnesty researcher who interviewed them in Yemen.

**Ahmed Agiza**, 43, a doctor, and **Muhammad Zery**, 36, were abducted in Stockholm in December 2001, with the connivance of the Swedish government. Both were seeking asylum in Sweden, and had been convicted in absentia of membership of a banned Islamist group in their native Egypt. Agiza admits knowing Ayman Zawahiri, Osama bin Laden's second-in-command, but says he severed all links many years ago and insists he has renounced violence.

According to evidence to a Swedish parliamentary inquiry last year, they were taken to Bromma airport, Stockholm, by uniformed Swedish police and Americans wearing suits. They were stripped, searched, sedated and dressed in boiler suits and hoods. They were shackled and bundled on to a Gulfstream 5 executive jet, before being flown to Cairo. This aircraft has flown in and out of the UK at least 60 times since December 2001, most recently with a new tail number. Senior Swedish police officers told the parliamentary inquiry the aircraft was operated by the CIA.

Both men later told relatives and Swedish diplomats that they were subjected to electric shock torture in Egypt. Zery was released from prison almost two years later. Agiza was jailed for 25 years, reduced to 15 on appeal.

**Special report**
United States of America

**World news guide**
North American media

**Media**
New York Times
Washington Post
CNN

**Government**
US government portal
White House
Senate
House of Representatives

Printable version | Send it to a friend | Save story

Daily sections

Weekly sections

Privacy policy  |  Terms & conditions  |  Advertising guide  |  A-Z index  |  About this site
Join our dating site today

Guardian Unlimited © Guardian News and Media Limited 2007

# WE WERE TORTURED

**07/12/2005**

AUSTRALIAN Mamdouh Habib, 49, was arrested near the Pakistan-Afghan border shortly after 9/11 and, according to his lawyers, spent six months in a brutal Cairo jail.

Habib claims he was beaten, hung from hooks, electrocuted with a cattle prod and told he would be raped by dogs.

The father-of-three also says he was placed in three torture chambers.

The first was filled with water up to his chin so he had to stand on his tiptoes for hours.

The second had a low ceiling, forcing him to crouch painfully, and in the third he was forced to stand in water inches from an electric generator.

Maher Arar, 34, from Canada, said he was seized in September 2002 at JFK airport in New York.

He claims he was taken to Syria and kept for almost a year in a small underground cell. Arar is suing the US government, claiming his hands were repeatedly whipped with cables.

Salah Nasser Salim'Ali, 27, and Muhammad Faraj Ahmed Bashmilah, 37, were arrested separately in August 2003 and taken to Jordan.

There, the pair claim they were hung upside down and beaten for several days.

They were allegedly kept in solitary confinement in an old underground prison run by masked American guards. Both are still in custody in Yemen.

Amnesty International has drawn attention to their plight, saying: "What we have heard from these two men is just one small part of the much broader picture of US secret detentions around the world."

Doctor Ahmed Agiza, 43, and Muhammad Zery, 36, were arrested in Sweden in December 2001 where they were seeking asylum.

They had previously been convicted of membership of a banned Islamist group in Egypt and Agiza admitted knowing Osama bin Laden's second in command. Both claim they were stripped, searched, sedated and dressed in boiler suits and hoods at Stockholm Airport.

They say they were then flown to Cairo and subjected to electric shock torture.

A German man is also suing for damages, claiming he was held captive and tortured by US government agents after being mistakenly identified as an associate of the 9/11 hijackers.

Khaled al-Masri, who is represented by a leading US rights group, said he was arrested while trying to enter Macedonia for a holiday trip and flown to Afghanistan. During five months in captivity he was subjected to "torture and other cruel, inhuman or degrading treatment", says a lawsuit he filed in America.

The American Civil Liberties Union said the case is the first to challenge CIA abductions of foreign nationals for interrogation in secret prisons in third countries.

**SHARE THIS STORY**

Email to a friend     Digg this     del.icio.us     Facebook