# EXHIBIT E

# TABLE OF CONTENTS

1. The US rendition programme .................................................................................... 2

    1.1 Renditions ............................................................................................................ 2

    1.2 'Diplomatic assurances' ...................................................................................... 3

    1.3 Establishment of the US rendition programme .................................................. 4

    1.4 Rendition practice since September 2001 .......................................................... 6

    1.5 Pakistan ............................................................................................................... 7

    1.6 Torture, ill-treatment and 'disappearance': violations of international law ........ 8

    1.7 Secret detentions and secret transfers: the case of Muhammad Bashmilah, Salah Qaru and Muhammad al-Assad ............................................................................. 9

    1.8 Transfer to torture: the case of Muhammad Zammar ...................................... 17

    1.9 A practice predating 2001: the case of Abdul Rahman al-Yaf'i ...................... 19

2. Planes and airports – the support network for rendition flights ............................. 22

    2.1 International aviation law and renditions ......................................................... 22

    2.2 CIA-front companies ........................................................................................ 23

    2.3 Other US agencies involved in rendition ......................................................... 24

    2.4 Role of third countries ...................................................................................... 26

    2.5 Flight movements: 2001-2005 .......................................................................... 27

    2.6 Companies and aircraft .................................................................................... 28

3. Amnesty International's recommendations ............................................................ 31

Appendix: Planes monitored .................................................................................... 34

> places of detention… to be kept in registers readily available and accessible to those concerned, including relatives and friends".[19] The UN Special Rapporteur on torture has said: "the maintenance of secret places of detention should be abolished under law. It should be a punishable offence for any official to hold a person in a secret and/or unofficial place of detention."[20]
>
> "Disappearances" are crimes under international law, involving multiple human rights violations. In certain circumstances they are crimes against humanity, and can be prosecuted in international criminal proceedings. The International Convention for the Protection of All Persons from Enforced Disappearance, defines enforced disappearance as the: "arrest, detention, abduction or any other form of deprivation of liberty committed by agents of the State or by persons or groups of persons acting with the authorization, support or acquiescence of the State, followed by a refusal to acknowledge the deprivation of liberty or by concealment of the fate or whereabouts of the disappeared person, which place such a person outside the protection of the law."[21]
>
> The defining characteristic of a "disappearance" is that it puts the victim beyond the protection of the law while concealing the violations from outside scrutiny, making them harder to expose and condemn, and allowing governments to avoid accountability.
>
> The UN Committee against Torture has determined that the uncertainty regarding the circumstances surrounding their loved ones' fate "causes the families of disappeared persons serious and continuous suffering".[22]

## 1.7 Secret detentions and secret transfers: the case of Muhammad Bashmilah, Salah Qaru and Muhammad al-Assad

*"Every day here is another day stolen from my life."*
   Muhammad Bashmilah, who "disappeared" in US custody for 21 months and was then arbitrarily detained in Yemen

Secret detention is the corollary of a secret rendition programme. Without renditions, the US-run "black sites" could not exist. The USA has acknowledged that it is holding a number of "high value" detainees – those who are thought to be leading terrorist suspects or to have intelligence information too sensitive to be entrusted to client states. Rendition provides the means to transport them to the CIA-run system of

---

19 Human Rights Committee, General Comment 20, Article 7, para. 11. Accurate and detailed registers of detainees are required under international law and standards, including the UN Standard Minimum Rules for the Treatment of Prisoners and the UN Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment.

20 UN Doc. E/CN.4/2002/76, 27 December 2001, Annex 1.

21 The Convention has not been adopted, although text was finalized in September 2005: E/CN.4/2005/WG.22/WP.1/REV.4, 23 September 2005.

22 Concluding observations of the Committee against Torture: Guatemala, UN Doc. A/56/44, 6 December 2000, para. 73(e).

covert prisons that has reportedly operated at various times in at least eight countries. According to reports, these facilities tend to be used in rotation, with detainees transferred from site to site together, rather than being scattered in different locations. Although the existence of secret CIA detention facilities has been acknowledged since early 2002, the term "black sites" was first reported by the *Washington Post* in November 2005.

The only public testimony from those who have held in "black sites" comes from three Yemeni men who "disappeared" in US custody and were then held in secret detention for more than 18 months, before being returned to Yemen in May 2005. Muhammad Faraj Bashmilah and Salah Nasir Salim 'Ali Qaru[23], had been arrested in Jordan before being transferred to US custody in October 2003. The third man, Muhammad Abdullah Salah al-Assad, was arrested in Tanzania, also in 2003, and turned over to US custody a few hours later. Amnesty International first reported on their cases in 2005, and returned to Yemen to follow up in February and March 2006; Muhammad al-Assad was released on 14 March. Muhammad Bashmilah and Salah Qaru were conditionally released from the political security prison in Aden at around midnight on 27/28 March.

During their "disappearance", the three men were kept in at least four different secret facilities, likely to have been in at least three different countries, judging by the length of their transfer flights and other information they have been able to provide. Although not conclusive, the evidence suggests that they were held at various times in Djibouti, Afghanistan and Eastern Europe.

Muhammad Bashmilah and Salah Qaru were apparently taken from Jordan to Afghanistan in October 2003; other prisoners there managed to get word to them that they were in Afghanistan. The two men have separately described a transfer flight of about four hours from Jordan, which is consistent with a flight to Afghanistan.

It is not clear where in Afghanistan they were held, but it does not appear to be the same Afghan-run prison in Kabul in which Khaled el-Masri was detained at roughly the same time. Khaled el-Masri, a German citizen, had been arrested in Macedonia in December 2003 and rendered to Afghanistan, where he spent some four months in a prison he said was run by Afghans but controlled by US officials. In May 2004, apparently realizing that they had the wrong man, the USA flew him to Albania and dropped him off on a mountain road to make his own way back to Germany. Khaled el-Masri has drawn a detailed floor map of his Afghan prison; the map was immediately recognizable to Walid al-Qadasi, a Yemeni national who had been detained in Kabul in 2002.[24] Muhammad Bashmilah and Salah Qaru, however, did not recognize the drawing and insisted that there were no Afghan guards or staff at their prison. Both men believe that all of their guards and interrogators were from the USA,

---

23 In previous Amnesty International documents, he has been referred to as Salah 'Ali, or as Salah Nasser Salim 'Ali.

24 Amnesty International showed him the map in March 2006, days after he was finally released and returned to his home in Yemen. Walid al Qadasi had been transferred to Guantánamo Bay from Afghanistan in 2002, and spent nearly two years there before being returned to Yemen in April 2004. He was arbitrarily detained in Yemen for almost two years, before being released on 3 March. He has never been charged with any offence, nor given any explanation for the more than four years he has spent in detention.

although the translators included native Arabic speakers with Lebanese and Moroccan accents.

The men told Amnesty International that they were held with a group of "important, high ranking" prisoners, who were watched over very closely. One such detainee managed to tell them that he had not been held permanently in any one location, but had been transported with the group from place to place.

The security measures practiced in the facility were far stricter and more methodical than those described by other detainees who have been held in Afghanistan. Muhammad Bashmilah and Salah Qaru describe a regime in which each detainee was constantly and individually monitored. The men were held in complete isolation, in cells measuring about 2m x 3m. There was one camera above the door and another on the wall on the other side of the cell. The inmates were permanently shackled to a ring fixed in the floor; the chain was not quite long enough to allow them to reach the door.

If a guard needed to enter their room to take them to shower or for interrogation, for instance, they followed a set routine. When the guard opened the door, the inmate had to face the wall with his back to the door and his hands on the wall. The guard would hood them and handcuff them behind their backs before removing the shackles. The hood had a kind of noose that could be tightened around the neck if the detainee did not move fast enough or in the right direction. The guards were always covered, and wore masks and gloves, but the men said that none of them were Arabs or Afghans. When asked how they knew this, they replied that the guards "had a different kind of physique".

They were allowed outside for 20 minutes once a week, when they were brought into a courtyard with very high walls and made to sit in a chair facing the wall. Once seated, their hood was removed. They were not allowed to look to the left or the right, and a guard stood behind them to "enforce the rules".

Muhammad al-Assad was arrested in Dar es Salaam, Tanzania, on 26 December 2003 and flown out sometime before dawn the next day. Sources in Tanzania have said that he was flown to Djibouti on a small US plane. According to press reports, about 800 US personnel, part of a counter-terrorism task force, had been located in Djibouti in late 2002, and the site was known to be a base for the CIA's unmanned predator planes.[25] Speaking before the US Senate Armed Services Committee in March 2005, General John Abizaid noted: "Djibouti has given extraordinary support for US military basing, training, and counter-terrorism operations".[26]

Muhammad al-Assad says that he was questioned there by US officials, one man and one woman, who told him they were from the USA's Federal Bureau of Investigation (FBI); a picture of the President of Djibouti hung on the wall of the interrogation room. Muhammad al-Assad spent about two weeks there before being processed for

---

25 *San Francisco Chronicle*, 12 January 2003.
26 Statement of General John P. Abizaid, United States Army Commander, United States Central Command, before the Senate Armed Services Committee on the 2005 posture of the United States Central Command, 1 March 2005.

another transfer. This time he thinks he was in a larger plane as he entered it without having his head pushed down or bending. He believes he was strapped down to a bench and that the plane had a row of benches along the side. He knows the flight was long and that it touched down once before flying on to a place that was "cold and muddy". At this location, he was held in two different detention centres, about 20-40 minutes apart by car, over unpaved roads. The first room was large and dirty, with a rug and a high narrow window; the second was smaller and darker, and the walls were covered in graffiti. The bread he was given there, he said, was from Pakistan or Afghanistan. Muhammad al-Assad is diabetic and says that he was not given proper medication during this period, so was often dizzy or ill. It is not certain that he was held with Muhammad Bashmilah and Salah Qaru, although all three men were transferred to the same final secret destination at about the same time.

At the end of April 2004, probably around the 24th, the men were brought, one at a time, to be prepared for transfer. They were stripped naked before being given absorbent plastic underpants, a pair of knee length cotton trousers to wear over them, a cotton shirt, and a pair of blue overalls. They were handcuffed and their hands were strapped to a belt around the waist, their legs were shackled together and to the belt. Foam earplugs were inserted in their ears. They were blindfolded and had their mouths covered with a surgical facemask, presumably to prevent them from talking. They were then hooded, and tape or a bandage was wrapped around the hood to prevent movement. Finally, a pair of heavy, sound-deadening headphones were placed over the hood. A similar process was described by Swedish police officers who witnessed a US-led renditions team preparing two men for transfer in December 2001; the renditions team told them that the procedures had become policy for transporting terrorist suspects "post 9/11".

"You lose most of your senses", said Muhammad Bashmilah, "but you can still feel a bit, and on this flight I felt the presence of a number of other bodies swaying back and forth." The preparations are done very quickly and professionally, he added, by a team of black masked "ninjas" who carried out the whole operation in about 20 minutes. After he was prepared, he was taken to a waiting room for a couple of hours, so he believes there must have been a number of others undergoing the same treatment.

Muhammad Bashmilah and Salah Qaru said that this flight lasted three to four hours, Muhammad al-Assad thought the flight was longer. Whether or not they were on the same plane for the first leg of their journey, all three describe landing and waiting for an hour or so before being thrown roughly into a helicopter with a number of other prisoners. All three noted separately that they felt that there were a number of prisoners being transported at the same time, perhaps a dozen or more. All three agree that the helicopter flew for about two and a half or three hours, and that once it had landed they were taken to the new detention centre by car.

The size and location of the final secret facility, where they spent 13 months, remains unconfirmed. Two of the men told Amnesty International in October 2005 that they believed this detention centre was in Europe. Other information they have since provided, some of it confirmed or augmented by media reports, indicates a strong possibility that the men were indeed held in an Eastern European "black site".

As Amnesty International has reported, the facility was new or refurbished, and carefully designed and operated to ensure maximum security and secrecy, as well as disorientation, dependence and stress for the detainees.[27] Well-staffed and resourced, and highly organized, the system in operation there could not have been maintained solely for the purpose of interrogating low-level suspects like Muhammad Bashmilah, Salah Qaru and Muhammad al-Assad.[28] One of the men calculated that at least 20 people were being taken to the shower room in his section each week, although he does not know whether the facility contained more than one section.

The men were initially examined by a doctor or medic, who had access to the medical records that had been kept on the men throughout their detention. At each transfer, the men said, they were stripped and photographed, front and back, and any wounds or marks on their bodies were noted on a medical record, which followed them from place to place. Salah Qaru explained that the doctor used a template drawing, and that he has two scars that the doctors always recorded. The scales used at their checkups, he noted, measured weight only in pounds, the unit used in the USA.[29]

According to one of the men, "all of the guards and officials were Americans. One doctor we saw was an American and one spoke English with a European accent. Of the translators, some were native Arabic speakers, and some spoke Arabic with an American accent." The director of the prison was one of the few people they ever saw unmasked. When he arrived in late 2004, he told Muhammad al-Assad that he had been sent from Washington DC in order to decide who they should keep and who they should send home. "You are at the top of the list to be returned," he told Muhammad al-Assad.

Although the men were never allowed outside, or even to look through a window, they were given prayer schedules throughout the year. The schedules were not made up by the prison officials, but were downloaded from an Internet site (islamicfinder.org) which the men could see at the bottom of the printouts. On these schedules, they said that the time of sundown prayer over the course of the year changed by over three hours, from about 4.30pm to about 8.45pm (including an additional hour for daylight saving time). Such a degree of variation indicates a location north of the 41st parallel, well above the Middle East, and very likely to be within one of the member states of the Council of Europe (CoE). Countries that would fit the time range include Turkey, Azerbaijan, Georgia, Romania, Bulgaria, Albania and Macedonia. They were also in a location that observed daylight saving time, which is observed in all CoE member states, but not, for instance, in Afghanistan, Jordan or Pakistan.

---

27 *United States of America/Yemen: Secret Detention in CIA "Black Sites"*, Amnesty International, November 2005, AI Index: AMR 51/177/2005.

28 The fact that the men were released, that no terrorism-related charges have ever been brought against them, and that the Yemeni government has openly said that no such evidence exists all suggest that they were among the "erroneous renditions" reportedly being investigated by the CIA.

29 Even countries that still use imperial measures, like the UK or Australia, generally measure weight in stone, rather than pounds.

Moreover, the men said that there was significant variation in the temperature. In particular, they noted the extreme cold during the winter. By December 2004, they said, it was so cold that they had to pray wearing their blankets. Even though they were issued new sets of extra warm blankets, they say the temperatures were colder than any they had ever known.

The detention centre had an on-site inventory of some 600 books, again suggesting that many more than three detainees were held there. Most of the books listed were in Arabic, but there were also titles in English, Farsi, Pashto, Russian and Indonesian. The men said that the Arabic books usually had a white and gold sticker, with Arabic and English writing, naming a bookshop in Washington DC and another in Chicago.[30] The detainees were given the book list one morning a week, and ticked off their choices; the book or books were delivered with their evening meal.

The men said that much of the food they were served seemed "European", once including pizza which they had never eaten before. Their description of the meals also echoes the account provided in an *ABC* news report on a "black site" facility allegedly located in Poland.[31] For breakfast, they were served two slices of bread with two triangles of cheese with the wrappers already removed, and yoghurt in a cup. Lunch was usually rice with tinned salty meat, sometimes fish or chicken, and olives or tomatoes. Dinner was more of the same, sometimes with some salad. For a short time in late 2004, they said, there was a dish of "normal" food, a spicy hot chicken with onions, but that stopped after Ramadan.

On Fridays they got two fingers of a "Kit Kat" chocolate bar, again with the wrappers removed (although the name was on the bar itself); *ABC* news reported that Kit Kats were a favourite of Abu Zubaydah, a "high value" detainee allegedly held in Poland in 2005.[32] Labels were usually removed from their clothes and their bottles of water. They had some blankets and t-shirts made in Mexico, while their water cups, although made in China, had the name and telephone number of a US company embossed on the bottom.

The detention facility was about 10-15 minutes by car via a bumpy, possibly unpaved, road from the airstrip. When they got out of the car, they said, they walked up a flight of steps to get into the building, then once inside the building they walked down a ramp or slope of some kind. Their cells were new or refurbished – the walls were freshly painted and bare of any graffiti or identifying marks. The toilet facilities were modern -- the men noted that the toilets were Western-style and faced in the direction of Mecca (which they had been given for prayers), which they thought meant they were unlikely to be in a Muslim country. There was artificial light in the cells, which was usually on 24 hours a day. On the few occasions when the electricity failed, the men said, the cells were absolutely pitch black, leading them to believe that they may have been in the basement of the building. "We don't have daylight here," one of the

---

30 Amnesty International has confirmed the existence of both bookshops.
31 Brian Ross and Richard Esposito, Sources Tell ABC News Top Al Qaeda Figures Held in Secret CIA Prisons, 5 December 2005.
32 ibid.

interrogators told them, "we have capsules". The men assumed that these capsules, which they were given every morning, contained vitamin C or D.

Although they were brought by helicopter, the facility was located within a 10-minute drive of an airbase or airstrip that is probably not a commercial airport, as it only receives light traffic. From their cells, Muhammad al-Assad said, they could hear planes taking off and landing. "Sometimes there were two or three a day," added Muhammad Bashmilah, "but some days there were none. A week wouldn't go by without planes and the most movement was on Wednesdays."

The information that the men provided about the duration of their flights provides general indications of where they might have been. However, without knowing the size, speed and route of the aircraft, as well as the exact duration of the flights, the locations cannot be pinpointed.

The flight that returned the men to Yemen in May 2005 was separately described by all three as a non-stop journey of approximately seven hours. The plane seems to have been a small jet. The men agree that there were about six steps from the ground to the door of the plane, and they think there were probably two seats on the aisle, at least on one side. They believe that they left in the early afternoon and arrived at about 10pm. An airport official said they might have arrived in Yemen in a military plane, although the Yemeni government has thus far refused to comment. Given that cruise speeds for likely aircraft vary from about 250 to more than 500 knots, the final flight could have been between 1,400-2,800 nautical miles (around 2,600-5,200 kilometres).[33]

The triangulation between this flight and the shorter journeys the men had apparently made from Afghanistan to their final secret destination rule out locations in Western Europe and the Middle East. If the flight times given by the men are accurate, the initial flight from Afghanistan could have reached Azerbaijan, Armenia, Turkey or Georgia or coastal Bulgaria or Romania; an additional helicopter flight of 150-180 minutes from such locations would have been unlikely to have gone more than 500 nautical miles (around 925km). Aviation experts note that it is not common for helicopter flights to cross international borders, although technically possible. Assuming that the flight from Afghanistan had reached Turkey, eastern Bulgaria or Romania, possible sites for the final detention centre could have included Turkey, Bulgaria, Romania, Albania, Bosnia-Herzegovina and the Slovak Republic.

Senior Yemeni officials told Amnesty International that they had first heard of the men on 4 May 2005, when the US Embassy in Yemen informed them that the three would be flown to Sana'a and transferred to Yemeni custody the following day. The USA provided no further information about what the men might have done, or any evidence or charges against the men, but Yemeni officials say they were instructed by

---

33 A Beech B300 has a maximum cruise speed of 311 knots, while certain models of the Gulfstream V can cruise up to 585 knots. There are also turboprop planes with the capacity to fly seven hours non-stop; the CASA CN 235, for instance, has a cruising speed of about 246 knots. The men said they did not hear propellers, or sense the rhythm, but cannot be certain because of the headphones and ear plugs.

the US Embassy to keep the men in custody until their case files were transferred from Washington DC. No files or evidence were ever received.

On 13 February 2006, after more than nine months in arbitrary detention in Yemen, and some two and a half years since they were first arrested, the three men were brought to trial in Sana'a. On the basis of statements they made during their interview with the prosecutor of the Special Penal Court,[34] each was charged with forgery in connection with obtaining a false travel document for personal use. None of the alleged forgeries was presented in evidence. None of the men was charged with any terrorism-related offence; the Chief of Special Prosecutions told Amnesty International that they were not suspected of any such offences. The men all pleaded guilty and the judge had it written into the trial record that they had been detained in an unknown place by US agents. On 27 February the judge sentenced the men each to two years in prison, adding the instructions: "to count the period that the accused spent in prisons outside the country as part of the sentence". He calculated that, in addition to their nine months in prison in Yemen, their time in secret US detention had been at least 18 months, and ordered their release.

Muhammad al-Assad was released from custody in Sana'a on 14 March. Muhammad Bashmilah and Salah Qaru were transferred to Aden, where they were released at around midnight on 27/28 March. They were given instructions to report to political security every month and not to leave Aden without permission.

The human cost of rendition and secret detention is too often ignored. Muhammad al-Assad told Amnesty International on his release that "for me now, it has to be a new life, because I will never recover the old one". His business is in ruins, he is in debt, and he does not yet know if he will even be allowed to return to Tanzania, where he had lived since 1985, to try and rebuild the life he had made there.

The prospects are also bleak for Muhammad Bashmilah and Salah Qaru. The men do not know if they will be reunited with their wives in Indonesia, who have been thrown into destitution by their absence. Even if they manage to raise the money, they may not get permission to travel to Indonesia. Nor will it be easy for them to support themselves in Yemen. Even though they were never charged with a terrorist offence, they believe that they will remain stigmatized because they were detained by the USA. Under suspicion by any potential employers, and harassed by the security and intelligence service, they fear they will never be able to lead normal lives or take care of their families. All three men have suffered emotional and physical trauma – Salah Qaru and Muhammad Bashmilah have described severe torture during their detention in Jordan and are in urgent need of medical attention for problems caused or exacerbated by the long months in isolation and secret detention.

---

34 Al-mahkama al-jaza'iyya al-mukhtassa.

## 2. Planes and airports – the support network for rendition flights

*"Yes. It's very convenient. It's finding someone else to do your dirty work."*
Michael Scheuer, who as a senior counter-terrorism official with the CIA, helped establish the rendition programme

### 2.1 International aviation law and renditions

The Convention on International Civil Aviation, also known as the Chicago Convention, establishes the rules of airspace, plane registration and safety, and sets out the rights of the signatory states in relation to air travel. It establishes a system under which all transit and landing rights for airlines and their aircraft require the explicit or tacit approval of the national governments in or above whose territory they operate. The current version of the Convention was adopted in 2000 and it has 189 contracting states.[44]

Of particular importance for rendition cases is the clause that allows private, non-commercial flights to fly over a country, or make technical stops there, without prior authorization or notification. The CIA planes identified to date have been chartered from private companies, real or fictional. "State aircraft" – defined by the Convention as those "used in military, customs and police services" – do require specific agreement or authorization to fly over the territory of another state or to use its airports. Experts on rendition believe that this is one of the main reasons why privately contracted aircraft are used in rendition operations, rather than military or other official aircraft.

The intelligence and military community of the USA has long used private air carriers for secret operations. Some of the covert carriers identified by past US congressional inquiries and other investigations[45] are still in business. In November 2003, for example, carriers such as Southern Air, Kalitta Air, Evergreen International Airways, and Tepper Aviation – all known for their connections to covert intelligence and military operations – received a "US Transportation Command Certificate of Appreciation" for their support of Operations Enduring Freedom and Iraqi Freedom, in the "Global War on Terrorism".[46]

The use of planes able operating as private aircraft, without the restrictions placed on official or military flights, has been a key component of the rendition programme since the mid-1990s. According to Michael Scheuer, when the outlines of the current

---

44 Further information: 'Enabling Torture: International Law Applicable to State Participation in the Unlawful Activities of other States', Briefing Paper by The Center for Human Rights and Global Justice, New York University School of Law, February 2006

45 TransArms, Ariadne's Thread, report to the MacArthur Foundation, 2003; J Peleman, The logistics of sanction busting: the airborne component, in Angola's War Economy, Pretoria, ISS, 2000; Netherlands Institute for War Documentation, http://213.222.3.5/srebrenica/ Appendix II.

46 USTRANSCOM News Service, Release Number: 031113-1, 13 November 2003.

system were established in 1995, the CIA needed the means to locate, detain and remove terror suspects.[47] A small fleet of private jets able to land discreetly at both commercial airports and US military bases worldwide was the essential ingredient for making the system work.

## 2.2 CIA-front companies

The CIA rendition programme has relied on private planes contracted from companies listed as private air charter services. In some cases, these are CIA front companies that exist only on paper. Premier Executive Transport, for instance, first appeared as a Delaware company in 1994, and was then re-registered in Massachusetts in 1996 as a "Foreign Corporation".[48] It listed a President and Treasurer whose only known addresses were post office boxes outside Washington DC, who appeared to have no credit or personal history, and who both had Social Security numbers issued in the mid-1990s.[49]

Premier was the listed owner of only two planes: the Gulfstream jet most frequently identified with rendition operations, originally registered as N379P; and a Boeing 737, initially N313P, which appeared regularly in locations such as Afghanistan, Libya, Jordan, Baghdad, Germany and the UK, and which Amnesty International believes was used to render Khaled el-Masri from Macedonia to Afghanistan in January 2004. Flight records show that the plane flew from Skopje to Kabul, touching down in Baghdad, on 24 January 2004, the day Khaled el-Masri was transferred from Macedonia to Afghanistan. Both planes had previously been registered by Stevens Express Leasing and Amnesty International has landing declarations showing that both continued to identify Stevens Express as their operator in 2003 and 2004. Stevens Express has an office address in Tennessee, but no actual premises, although it currently appears in US Federal Aviation Administration (FAA) records as the operator of four planes.[50] Stevens Express was in turn incorporated by the same lawyer listed as the official representative of Devon Holding, another company identified with rendition flights. Premier Executive Transport ceased operations in late 2004; the Boeing's ownership was transferred in November 2004 to Keeler and Tate Management, another non-existent front company with no other planes, no website and no premises. A few days later, the Gulfstream was transferred to Bayard Foreign Marketing, a company whose named corporate officer, Leonard Bayard, cannot be found in any public record.

Other transport contractors have actual premises and staff, but appear to be largely controlled by the CIA. Aero Contractors, for instance, was described by the *New York*

---

47 Jane Mayer, "Outsourcing Torture", *New Yorker*, February 2005.
48 Massachusetts registration certificate 521857292, can be viewed at:
http://corp.sec.state.ma.us/corp/corpsearch/CorpSearchSummary.asp?ReadFromDB=True&UpdateAllowed=&FEIN=521857292.
49 All US citizens are now required to have a Social Security number before their first birthday. The US Social Security Administration told the Boston Globe that those who receive their numbers in adulthood are either recent immigrants or people being given a new identity. Farah Stockman, Terror suspects' torture claims have Massachusetts Link, 29 November 2004.
50 FAA Registry Inquiry, 22 March 2006, see: http://registry.faa.gov/aircraftinquiry.

*Times* newspaper as "a major domestic hub of the Central Intelligence Agency's secret air service". The *New York Times* went on to say that the CIA owns at least 26 planes, and "concealed its ownership behind a web of seven shell corporations that appear to have no employees and no function apart from owning the aircraft. The planes, regularly supplemented by private charters, are operated by real companies controlled by or tied to the agency, including Aero Contractors and two Florida companies, Pegasus Technologies and Tepper Aviation."[51]

In other cases, the CIA leases their planes from ordinary charter agents, such as Richmor Aviation, which the *Boston Globe* newspaper identified as "one of the nation's oldest aircraft chartering and management companies". The CIA has made frequent use of Richmor's Gulfstream IV, N85VM, later N227SV, which has made over 100 trips to Guantánamo Bay, and which appears to have carried out the rendition of Abu Omar from Ramstein to Cairo in 2003.[52] The plane's owner confirmed to the *Boston Globe* in March 2005 that he charters his plane through Richmor to the CIA, as well as to other clients. The plane is currently advertised for charter at a rate of US$5,365 per hour.

Individual aircraft may change their registration numbers, but they remain largely traceable. Given the concentrated attention now being devoted to tracking rendition flights, it seems that the intelligence services have now decided that the notorious Gulfstream V, variously registered as N379P, N8068V and N44982, has become too conspicuous. It was put up for sale in November 2005; the advertisement on www.usaircraftsales.com emphasized its "16 pax capacity, dual DVD players, mid and aft seating in Brown leather, and Walnut matte finish woodwork", but the plane had to be "priced below market" due to its heavy usage.[53] Premier Executive Transport itself seems to have vanished as well; there are no planes registered with the company and its landing contracts expired in 2005 and have not been renewed. It is likely that other companies have been created to take Premier's place, and that other, less well-known planes are now being used for CIA rendition activities.

It is likewise the case that the number of flights carried out by the planes identified for monitoring in this report have fallen over the last year. This does not necessarily indicate that renditions are not being carried out, but that companies and aircraft previously involved in the programme are being replaced, making the rendition programme increasingly difficult to monitor.

## 2.3 Other US agencies involved in rendition

Although renditions have largely been carried out under the auspices of the CIA, other US agencies have apparently been involved in both flight leasing and operations. Contracts for identified rendition planes have been issued through an obscure US Navy office, rather than the CIA, according to US Department of Defense (DoD)

---

51 Scott Shane, Stephen Grey and Margot Williams, *CIA Expanding Terror Battle Under Guise of Charter Flights*, New York Times, 31 May 2005.
52 Abu Omar, an Egyptian cleric, was kidnapped in Italy and then flown on this jet from Germany to Egypt.
53 http://www.usaircraftsales.com/Forsale/SPECS%20GV%20581%20%202.pdf.

Flight lists are useful, but they cannot tell whether or not any particular plane has carried out a rendition. The information they contain is indicative rather than conclusive; Amnesty International has constructed a database of flights in order to check it against case information as it becomes available. It remains the case that raw data on the flights themselves is of limited use without specific details of cases; case details are hard to come by precisely because the secret nature of the practice is aimed at avoiding scrutiny and oversight. Where cases become known, and the details and dates of the abduction or transfer can be pinpointed, it has often been able to match a rendition with a flight record. Amnesty International cannot, however, infer possible cases or even make estimates of the extent of the rendition programme solely from the flight information.

## 2.6 Companies and aircraft

Amnesty International and TransArms have compiled a list of companies likely to have had some level of involvement in renditions and other covert operations. This includes the owners or operators of aircraft that have been detected in known cases of rendition or in other CIA operations, as well as some of the companies – believed to be intelligence-linked – that are mentioned in both the US Army Aeronautical Service Agency's worldwide landing permits and in US DoD fuelling contracts.

The tentative list of companies involved in covert activities has in turn formed the basis for the list of aircraft whose flights Amnesty International has tracked over the 2001-2006 period. Once the flight logs were analysed, some of these companies and aircraft were dropped from the list, because flight logs indicated that they had only flown in and out of locations unlikely to have been connected to either the rendition programme or to covert CIA activities. In a number of cases, there was mixed activity – a plane which has made repeated flights in and out of bases in Afghanistan and Egypt, for instance, has also appeared in holiday resorts or business centres in the USA – suggesting that the agency may be trying to vary its use of planes, so that individual aircraft cannot be so closely linked to covert activity.

The other indication of a shifting landscape in the world of front companies is the current list of companies with a Civil Aircraft Landing Permit (CALP) that authorizes them to land on US military bases worldwide. The 10 companies that currently hold such certificates are listed below, but equally important are those that are no longer listed. Notably absent from the 2006 list are some of the companies with the most widely and frequently reported rendition links: Aeromet, Inc; Devon Holding and Leasing, Inc; Premier Executive Transport Services, Inc; Rapid Air Trans; Raython Aircraft Company; Richmor Aviation, Inc; Stevens Express Leasing, Inc; and Tepper Aviation, Inc. The permits of all of these companies expired in 2005 and none has been renewed.

**PRIVATE COMPANIES WITH CURRENT PERMITS TO LAND IN US MILITARY BASES WORLDWIDE[62]**

| NAME | CALP | EXPIRATION |
|---|---|---|
| CENTURION AVIATION SERVICES, INC. * | 01-04-121<br>01-05-132 | 1 OCTOBER 2005<br>1 OCTOBER 2006 |
| EVERGREEN INTERNATIONAL AIRLINES, INC. * | 01-04-179<br>01-05-059 | 1 APRIL 2005<br>1 APRIL 2006 |
| FALCON AIR EXPRESS* | 01-04-021<br>01-05-163 | 8 NOVEMBER 2004<br>16 JULY 2006 |
| GEMINI AIR CARGO, INC. * | 01-04-124<br>01-05-117 | 22 JULY 2005<br>1 AUGUST 2006 |
| OMNI AIR INTERNATIONAL, INC. | 01-04-141<br>01-05-130 | 1 AUGUST 2005<br>1 AUGUST 2006 |
| ORBITAL SCIENCES CORPORATION * | 01-04-020<br>01-04-117<br>01-05-118 | 1 JULY 2004<br>1 JULY 2005<br>1 JULY 2006 |
| PHOENIX AIR GROUP | 01-05-113 | 1 AUGUST 2006 |
| POLAR AIR CARGO, INC * | 01-05-037 | 31 DECEMBER 2006 |
| RYAN INTERNATIONAL AIRLINES | 01-05-152 | 15 MAY 2006 |
| SOUTHERN AIR, INC. | 01-04-161<br>01-05-166* | 13 NOVEMBER 2005<br>13 NOVEMBER 2006 |

(*) EXCEPT THE BUCHOLZ US ARMY AIRFIELD, KWAJALEIN ATOLL, KIRIBATI, MARSHALL ISLANDS

**COMPANIES AND AIRCRAFT LINKED TO RENDITION FLIGHTS IN PRESS AND PARLIAMENTARY REPORTS**

| OWNER/OPERATOR | REGISTRATION NUMBER | MANUFACTURER'S NUMBER | AIRCRAFT TYPE |
|---|---|---|---|
| AERO CONTRACTORS | | | |
| APACHE AVIATION | N404AC | 1384 | G-IV |
| AVIATION SPECIALTIES | N5139A | BL-144 | BEECH B200C |
| AVIATION SPECIALTIES | N4489A | BL-145 | BEECH B200C |
| BAYARD FOREIGN MARKETING LLC | N44982 | 581 | G-V |
| BRAXTON MNG/CENTURION AVIATION SERVICES | N478GS | 1478 | G-IV |
| DEVON HOLDING/AEROCONTRACTORS | N168D | C-135 | CASA CN-235-300 |
| DEVON HOLDING/AEROCONTRACTORS | N196D | C-139 | CASA CN-235 |
| DEVON HOLDING/AEROCONTRACTORS | N187D | C-143 | CASA CN-235 |
| GEMINI LEASING INC. | N600GC | 46965 | DC-10-30F |

---

62 www.usaasa.belvoir.army.mil, various period 2004-2006.

*30     USA: Below the radar - Secret flights to torture and 'disappearance'*

| OWNER/OPERATOR | REGISTRATION NUMBER | MANUFACTURER'S NUMBER | AIRCRAFT TYPE |
|---|---|---|---|
| IMPERIAL AIR LTD (BENNET REALTY INC) | N331P** | 1139 | G-IV |
| KEELER & TATE MGM | N4476S | 33010 | B-737-7ET BBJ |
| MARK J. GORDON | N829MG | 327 | G-III |
| PEGASUS TECHNOLOGIES | | | |
| PHOENIX AVIATION GROUP | N547PA | 012 | LEARJET 36 |
| PHOENIX AVIATION GROUP | N541PA | 053 | LEARJET 35 |
| PHOENIX AVIATION GROUP/CFF AIR INC | N549PA | 119 | LEARJET 35A |
| PREMIER EXECUTIVE TRANSPORT SERVICES | N313P | 33010 | B-737-7ET BBJ |
| PREMIER EXECUTIVE TRANSPORT SERVICES, INC | N379P | 581 | G-V |
| PREMIER EXECUTIVE TRANSPORT SERVICES, INC | N8068V | 581 | G-V |
| RAPID AIR TRANS INC./TEPPER AVIATION | N2189M | 4582 | L-382G-44K-30 |
| RAPID AIR TRANS INC./TEPPER AVIATION | N8183J | 4796 | L-382G-44K-30 |
| RICHMOR AVIATION-ASSEMBLY POINT AV | N85VM | 1172 | G-IV |
| RICHMOR AVIATION-ASSEMBLY POINT AV. | N227SV | 1172 | G-IV |
| S&K AVIATION LLC | N259SK | 327 | G-III |
| STEVENS EXPRESS LEASING | N4009L | B300C | Raytheon |

(**) FORMERLY N325RC, THIS PLANE WAS RE-REGISTERED AS N331P, 13 DECEMBER 2001. IT WAS RE-REGISTERED AGAIN ON 14 OCTOBER 2004 AS N134BR BY GSCP (NJ) INC.

*36    USA: Below the radar - Secret flights to torture and 'disappearance'*

## 2. N379P-N8068V-N44982

The Gulfstream V executive jet, variously registered as N379P, N8068V and N44982 has been the plane most often identified with known cases of rendition. AI has records of 590 landings and take offs between February 2001 and September 2005.

**Registration**: registered in February 2000 by Premier Executive Transport Services; it was re-registered as N8068V at the beginning of 2004; and again re-registered as N44982 in December 2004 by Bayard Foreign Marketing, a phantom company registered in Oregon State since August 2003. No other aircraft were registered by Bayard Foreign Marketing. The aircraft was put up for sale in late 2005, and is now the property of a company based in Miami, Florida.[63]

**Landing rights:** Premier Executive Transport Services aircraft were permitted to land in the US bases worldwide (expiration 15 October 2005).

**Range and capacity:** average range of 5,800 nautical miles at 459/585 knots (non-stop Washington Dulles-Kabul in 12 hours, for example). The aircraft can transport up to 18 passengers, but it is usually configured for 8 passengers.



N8068V plane used in rendition flights. Earlier registered as N379P and later re-registered as N44982.
© Jean Luc Altherr

---

[63] See an advertisement for the sale of this Gulfstream V executive jet at US Aircraft Sales: http://www.usaircraftsales.com/Forsale/SPECS%20GV%20581%20%202.pdf.

**Destinations**: movements of N379P-N8068V-N44982 include landings and take offs from the following airports:

| COUNTRY | CITY / AIRPORT | PASSAGES THROUGH THE AIRPORT |
|---|---|---|
| AFGHANISTAN | KHWAJA RAWASH (KABUL) | 5 |
| ALGERIA | ALGIERS | 1 |
| AZERBAIJAN | BAKU | 1 |
| BAHRAIN | MUHARRAQ MILITARY AIRPORT | 1 |
| CYPRUS | LARNACA | 10 |
| CYPRUS | PAPHOS | 2 |
| CZECH REPUBLIC | PRAGUE | 11 |
| DJIBOUTI | DJIBOUTI | 2 |
| EGYPT | CAIRO | 14 |
| GAMBIA | BANJUL | 2 |
| GERMANY | FRANKFURT | 70 |
| GERMANY | MUNICH | 2 |
| GERMANY | RAMSTEIN | 2 |
| GERMANY | STUTTGART | 2 |
| GREECE | ATHENS | 7 |
| IRAQ | BAGHDAD | 6 |
| IRELAND | SHANNON | 22 |
| ITALY | ROME | 4 |
| ISRAEL | TEL AVIV | 4 |
| JORDAN | AMMAN | 18 |
| KUWAIT | KUWAIT | 3 |
| LIBYA | MITIGA | 2 |
| MALAYSIA | KUALA LUMPUR | 1 |
| MOROCCO | MARRAKECH | 2 |
| MOROCCO | RABAT | 7 |
| NETHERLANDS | AMSTERDAM | 1 |
| PAKISTAN | KARACHI | 2 |
| POLAND | WARSAW | 2 |
| PORTUGAL | LISBON | 1 |
| PORTUGAL | PORTO (OPORTO) | 15 |
| QATAR | DOHA | 2 |
| SAUDI ARABIA | RIYADH | 2 |
| SPAIN | PALMA DE MALLORCA | 3 |
| SPAIN | SANTA CRUZ DE TENERIFE (CANARY ISLANDS) | 3 |
| SWITZERLAND | GENEVA | 3 |
| THAILAND | BANGKOK | 1 |
| TURKEY | DIYARBAKIR | 2 |
| UNITED ARAB EMIRATES | ABU DHABI | 1 |
| UNITED ARAB EMIRATES | DUBAI | 4 |
| UNITED KINGDOM | GLASGOW | 20 |
| UNITED KINGDOM | LUTON | 4 |
| UNITED KINGDOM | OXFORD BRIZE NORTON | 2 |
| UNITED KINGDOM | PRESTWICK | 36 |
| UNITED KINGDOM | PROVIDENCIALES (TURKS AND CAICOS) | 6 |
| UNITED STATES OF AMERICA | GUANTÁNAMO BAY US NAVAL AIR STATION, CUBA | 20 |
| UZBEKISTAN | KARSHI AIRBASE | 1 |
| UZBEKISTAN | TASHKENT | 13 |