# EXHIBIT

# F

Case 5:07-cv-02798-JW    Document 55-5    Filed 12/14/2007    Page 2 of 38



*The New York Times*

# Middle East

○ World ○ All NYT    [Search]

## Yemenis Freed After Transfer From Secret Prisons, Report Says

By SCOTT SHANE and MARGOT WILLIAMS
Published: April 5, 2006

WASHINGTON, April 4 — Three Yemeni men who were held for well over a year in secret American prisons overseas were quietly released last month after being transferred to their home country, where a court concluded they had no terrorist ties, according to a report released Tuesday by Amnesty International.

SIGN IN TO E-MAIL THIS

PRINT

SAVE

ARTICLE TOOLS SPONSORED BY



**The Reach of War**

Go to Complete Coverage »

The report says evidence promised by the United States was apparently never transferred to Yemeni authorities. It also adds other new details to accounts of the Central Intelligence Agency's program of holding terrorist suspects in secret detention centers or transferring them to other countries, where some said they were tortured.

**Readers' Opinions**

Forum: The Transition in Iraq

The Yemenis said their American jailers, whom they do not accuse of abusing them, took great care to keep them from surmising the detention centers' location, keeping windows covered and removing wrappers and labels from food, clothing and water bottles, the report says.

In the report — which includes information on the web of companies the C.I.A. uses to own and operate its fleet of aircraft for moving the suspects — Amnesty International officials call for an end to the C.I.A.'s practice of rendition, in which suspects are seized and transported without judicial process.

"The bottom line is that secretly sending individuals to unknown locations where they are likely to be tortured or treated inhumanly is unlawful, and the C.I.A. must stop," said William F. Schulz, executive director of Amnesty International U.S.A.

A C.I.A. spokesman declined to comment on the report.

The report came one day after the Pentagon released 2,700 pages of documents from hearings for detainees held by the United States military at Guantánamo Bay, Cuba. The new documents, the second major installment released since last month in response to a lawsuit filed by The Associated Press, are a window on the frustration of both prisoners who claim they are innocent and the American military officers who must judge whether they are lying.

"Your story sounds like about 500 others," an unidentified colonel declared while questioning a Guantánamo detainee arrested in Pakistan in December 2001. "Everybody has their passport stolen; everybody is in Afghanistan and Pakistan doing charity work."

MOST POPULAR

E-MAILED | BLOGGED | SEARCHED

1. Op-Ed Contributor: A Vote for Latin
2. Frank Rich: Who's Afraid of Barack Obama
3. Paul Krugman: Innovating Our Way to Fina Crisis
4. Buenos Aires Journal: In Macho Argentina, Beacon for Gay Tourists
5. Brad Pitt Commissions Designs for New Or
6. Everybody's Business: The Long and Short Goldman Sachs
7. Thomas L. Friedman: The People We Have Waiting For
8. Official Leaves Post as Texas Prepares to D Science Education Standards
9. Kill the Cat That Kills the Bird?
10. Ending Famine, Simply by Ignoring the Exp

Go to Complete List »

ADVERTISEMENTS

All the news that's fit to personalize.





NYTIMES.COM/TMAGAZINE
THE ONLY ADDRESS TO KNOW. ENTER

American and Afghan soldiers are dying, but according to the detainees' stories, "nobody is killing them," the exasperated officer said. He told the detainee, "Your story doesn't ring true. Help us help you."

Amnesty International first described the cases of the Yemeni prisoners — Muhammad Bashmilah, Salah Ali Qaru and Muhammad al-Assad — late last year.

Mr. Bashmilah and Mr. Qaru were arrested in Jordan and transferred to American custody in October 2003, while Mr. Assad was arrested in Tanzania and turned over to American officials in December 2003, Amnesty International said.

They were kept in at least four secret facilities that likely are situated in at least three countries, probably including Djibouti, Afghanistan, and somewhere in Eastern Europe, Amnesty International concluded after studying the men's descriptions of transfer flights and other data.

After months of interrogation by Americans, they were flown to Yemen in May 2005. "The U.S. authorities effectively instructed the Yemeni officials to detain the men, apparently promising to transfer their case files," the report says.

But it says the files never arrived. In February, Yemeni authorities finally charged the men with forging travel documents, sentenced them to two years and ruled that they had served their time, the report says.

Mr. Assad was freed March 14, and Mr. Bashmilah and Mr. Qaru on March 27, the report says.

If American authorities appear to have struggled over whether the three Yemenis posed a threat, the voluminous transcripts released by the Pentagon suggest similar difficulties assessing some prisoners held at Guantánamo.

One detainee, Abdul Majid Mohammadi, described himself as an Iranian Christian — an anomaly in a counterterrorism campaign usually described as focusing on Islamist extremism. Swearing by "Jesus and God," he admitted to having been a drug dealer and having obtained papers to cross the Iran-Afghanistan border from an Afghan with ties to a pro-Taliban group.

Several detainees from Afghanistan are described as having worked for the Afghan government under Hamid Karzai, the pro-American politician who led the interim administration after American-led forces toppled the Taliban and who was elected president in 2004.

Muhammad Aman, for example, said he was a clerk for the military under the pro-Soviet Communist government, under the Taliban and finally under Mr. Karzai. Like other prisoners, he said the Taliban had forced him to work for them.

"All the workers that you see in the current government of Afghanistan worked for the Taliban too," Mr. Aman told the review board.

*Scott Shane reported from Washington for this article, and Margot Williams from New York.*

More Articles in International »

Donate to the Neediest Cases today!

**Related Articles**
    Spain Looks Into C.I.A.'s Handling of Detainees (November 14, 2005)

National Briefing | South: Texas: Judge Bars Deportation Of Exile (September 28, 2005)

Experts Doubt Accused C.I.A. Operatives Will Stand Trial in Italy (June 27, 2005)

Cuban Exile Is Charged With Illegal Entry (May 20, 2005)

**Related Searches**

Central Intelligence Agency
Extradition
Freedom and Human Rights
Yemen

**INSIDE NYTIMES.COM**

| OPINION » | BUSINESS » | MAGAZINE » | ARTS » | OPINION » | THEATER » |
|---|---|---|---|---|---|
|  | **Spam's End? Maybe, if Time Allows** |  |  | **Monkey Business** Stanley Fish on a clash between the imperatives of religion and the rule of law. |  |
| Letters: Hospice Care | When the Dying Live On | | Kill the Cat That Kills the Bird? | Brad Pitt Commissions Designs for New Orleans | | Love, War and 'Cymbeline' |

Home | World | U.S. | N.Y. / Region | Business | Technology | Science | Health | Sports | Opinion | Arts | Style | Travel | Jobs | Real Estate | Autos | Ba

Copyright 2006 The New York Times Company | Privacy Policy | Search | Corrections | XML | Help | Contact Us | Work for Us | Site Map

2 of 8 DOCUMENTS

Copyright 2006 The Washington Post

# The Washington Post

# washingtonpost.com

The Washington Post

April 6, 2006 Thursday
Final Edition

**SECTION:** A Section; A11

**LENGTH:** 511 words

**HEADLINE:** 3 U.S.-Detained Yemenis Freed, Rights Group Says

**BYLINE:** Josh White, Washington Post Staff Writer

**BODY:**

Three Yemeni nationals who say they were held captive for more than two years in secret U.S. detention facilities have been released in Yemen without facing charges related to terrorism, according to Amnesty International officials who have been working with the former detainees.

In a report released yesterday in London and in previous statements, Amnesty International cites the three detainees' cases as a window on what the organization believes is part of the covert CIA system designed to hide prisoners. Amnesty officials say they cannot be certain exactly where the detainees were held, but they contend, based on the captives' accounts, that the prisons were probably in Afghanistan, Djibouti and somewhere in Eastern Europe.

Muhammad Bashmilah, 38, and Salah Ali Qaru, 29 -- who were living in Indonesia when they were arrested in 2003 -- were released last week after a Yemeni judge convicted them of forging personal travel documents and sentenced them to time served in the U.S. facilities. Both men claimed they were tortured in a Jordanian prison before being transferred into U.S. custody.

Muhammad al-Assad, 43, was arrested in his longtime home of Dar es Salaam, Tanzania, in December 2003 and ended up in what Amnesty International officials believe was a CIA "black site" prison. He was released from a Yemeni prison on March 14.

Anne FitzGerald, senior adviser on research policy for Amnesty International, said the men have never been given information about why they were arrested or why they were being held secretly.

The men do not allege that their American captors abused or tortured them,

3 U.S.-Detained Yemenis Freed, Rights Group Says The Washington Post April 6,
2006 Thursday

but if they were held incommunicado after being shifted to different countries,
as they claim, that practice could violate international laws regarding
detentions. The men were not allowed contact with the International Committee of
the Red Cross and did not have access to lawyers, and their families thought
they had disappeared.

A CIA spokeswoman declined to comment. Mohammed Albasha, press officer for
the Yemeni Embassy in Washington, said Tuesday that he was not able to confirm
the specific cases identified by Amnesty International. In general, Albasha
said, "the Yemeni government will not release any convicts unless they are found
to be . . . not directly or indirectly involved with a terrorist organization."

Amnesty International is calling on the United States to stop shifting
detainees to other countries outside of judicial norms and to cease holding
detainees in secret facilities where human rights organizations are unable to
have contact with them. In its 37-page report, the organization asks governments
worldwide to ensure they are not parties to secret detention and to prevent
their airspace from being used for such activity.

The American Civil Liberties Union last week urged the United Nations human
rights investigative body to open an inquiry into the U.S. program, saying what
the CIA calls "rendition" is in violation of federal and international law.

Staff writer Dan Eggen contributed to this report.

LOAD-DATE: April 6, 2006

Sign in · Register

Go to: Guardian Unlimited home   Go

**Guardian** Unlimited

Capture every moment with a
FREE Camera Phone
from Verizon Wireless

Read today's paper · Jobs

Search:    Go
◉ Guardian Unlimited  ○ Web

**Guardian**Unlimited  **Special reports**

Home        UK        Business    Audio    Guardian Weekly    The Wrap    News blog    Talk    Search
The Guardian    World    America    Arts    Special reports    Podcasts    News guide    Help    Quiz



Special
report
Human
rights in the
UK

**Search this site**

    Go

**Go to...**

Special report: human
rights in the UK

Archived articles on
human rights in the UK

**In this section**
Nick Cohen: In the
public interest

Letters: Setting the
boundaries on freedom
of speech

Leader: Gillian Gibbons
and her school
intended no disrespect
to the prophet

Julie Bindel: The refuge
lottery

Data protection minister
was unaware of missing
discs

Air firm accused of
rendition flights role

Irving and Griffin spark
fury at Oxford Union
debate

'Awful, abhorrent' - but
Oxford insists the
debate must go on

Max Hastings: Students
need to know what sort
of dangerous people
are out there

# Amnesty demands public inquiry on rendition flights

**Richard Norton-Taylor**
**Wednesday April 5, 2006**
**The Guardian**

Amnesty International today calls for an independent public inquiry into all aspects of British involvement in secret CIA "extraordinary rendition" flights. The call comes as it reports details of more than 200 CIA flights passing through British airports.

It also reveals US efforts to ensure conditions and locations where detainees were held were kept secret. Four of the CIA's 26 planes have landed and taken off more than 200 times from British airports over the past five years, Amnesty says. They include Stansted, Gatwick, Luton, Glasgow, Prestwick, Edinburgh, Londonderry and Belfast. Others used are RAF Brize Norton in Oxfordshire, Biggin Hill in Kent, and RAF Leuchars in Scotland, as well as the Turks and Caicos islands, a British overseas territory in the Caribbean.

Amnesty's report - Below the Radar: Secret Flights to Torture and "Disappearance" - shows a pattern of nearly 1,000 flights directly linked to the CIA through "front" companies, most of which, it says, have used European airspace. A further 600 CIA flights were made by planes hired from US aviation companies.

Amnesty says detainees were abducted or handed over to US guards by other law enforcement agencies before being "disappeared". In what it says is the only detailed information to emerge from an Eastern European or Central Asian "black site" prison, detainees had described being prepared for transportation by black-masked "ninjas".

It describes the case of three Yemeni men - Muhammad al-Assad, Muhammad Bashmilah and Sala Qaru - held for more than a year at a suspected "black site". After cross-referencing prayer schedule data and the position of the sun and flight times, Amnesty believes the likely location of the prison is Romania, Bulgaria, Turkey, Macedonia, Albania, Georgia or Azerbaijan.

Information on the numbers and whereabouts of all terror suspects rendered should be publicly available, detainees should be brought before a judicial authority within 24 hours of being held, and any plane carrying detainees, or suspected of doing so, should be identified to the aviation authorities of the country where it lands, Amnesty says.

Jack Straw, the foreign secretary, has said the US would not render a detainee through Britain without the government's permission. He says the Clinton administration asked four times and the UK twice declined

Demonstrators gather
as Irving refuses to
back out of debate

Protesters force their
way into Oxford Union

Henry Porter: A mass
movement is needed to
tackle the state's
snoopers

Hundreds of databases
with personal details at
risk - report

Jenni Russell: Even if
you've got nothing to
hide, there's plenty to
fear

How Lord West said
'Aye, aye' to the PM

its request; there is no evidence the Bush administration
had asked.

**Full coverage**
CIA rendition flights

**Case studies**
06.12.2005: Seized, held, tortured: six tell same tale

**Special reports**
United States
Guantánamo Bay
Terrorism threat to UK

Printable version | Send it to a friend | Save story

▲

 

Privacy policy | Terms & conditions | Advertising guide | A-Z index | About this site
Join our dating site today

Guardian Unlimited © Guardian News and Media Limited 2007



3 December 2007 20:07

- Home
  - > News
    - > World
      - > Americas

# Revealed: the plight of prisoners caught up in US rendition

**By Andrew Buncombe in Washington**

**Published: 05 April 2006**

Three Yemeni prisoners who were apparently seized and held in secret jails by the CIA for 18 months have spoken for the first time about their detention - providing important new details about the systematic "rendition" of prisoners.

The three men, none of whom was ever charged with any terrorism-related offence, were seized in 2003 and then held in four secret locations by "black-masked ninja" US operatives who made considerable efforts to ensure the prisoners did not know where they were being held. They were eventually released about a month ago.

While it remains unclear where exactly the men were held, human rights campaigners who interviewed them believe they were held in Djibouti, Afghanistan and somewhere in eastern Europe. It was alleged last year that the CIA had been operating covert "black site" prisons in Romania and Poland.

The three men - Muhammad Bashmilah, Salah Qaru and Muhammad al-Assad - are now struggling to rebuild their lives. Mr Assad told Amnesty International, which today publishes the men's testimony in a new report: "For me now, it has to be a new life, because I will never recover the old one."

Mr Bashmilah and Mr Qaru were arrested in Jordan in October 2003 and handed over to the US authorities. Mr Assad was arrested in Tanzania the same year. They were returned in May 2005 to the Yemeni authorities, who charged them with obtaining false travel documents. The men pleaded guilty but were released after the judge decided their time held by the US was sufficient time served.

The Amnesty report details how the men's US guards removed all labels from the food and clothing they were given to make it difficult for them to know where they were. Campaigners narrowed down the likely location of their internment based on the length of their rendition flights, the changing position of the sun when the men were allowed outside to pray, and the winter temperature.

"Labels were usually removed from their clothes and their bottles of water. They had some blankets and T-shirts made in Mexico, while their water cups, although made in China, had the name and telephone number of a US company embossed on the bottom," says the report.

Controversy over the rendition of suspects has been growing since it emerged last year that the CIA has been regularly seizing prisoners and flying them to third countries for interrogation. Sometimes the interrogations are carried out by foreign security personnel, sometimes by US operatives. Suspects' families cannot find out what is going on. Some prisoners said they were tortured while in custody.

Britain and other European countries have been accused of complicity in rendition by allowing the CIA to use their airports to refuel and land. Human Rights Watch claimed last year that since the 11 September attacks, planes operated by the CIA for the transfer of prisoners had made at least 300 stops in European countries. Amnesty says the planes have made at least 185 landings at UK airports, including British facilities in the Caribbean. Where the US holds its prisoners, especially those considered "high value" targets, is unknown though a number of possible locations have been identified by campaigners, including Afghanistan, Iraq and Morocco. The British government has persistently denied reports that prisoners have been held on the Indian Ocean islands of Diego Garcia, home to a US air base.

Kate Allen, director of Amnesty International UK, said: "With mounting evidence of illegal CIA rendition flights through European airspace - and multiple landings and take-offs of CIA planes at UK airports - there must be an independent inquiry into all aspects of UK involvement in these sinister practices."

A spokeswoman for the CIA yesterday refused to comment.

**Interesting? Click here to explore further**

© 2007 Independent News and Media Limited





IN DEPTH

FT Home > In depth > Iraq in crisis

IRAQ IN CRISIS

# Amnesty links rendition flights with torture

By Daniel Dombey in Brussels and Demetri Sevastopulo in Washington
Published: April 5 2006 00:34 | Last updated: April 5 2006 00:34

Three Yemeni men abducted and mistreated by the US were probably held in eastern Europe, Amnesty International said in a new report.

A study by Amnesty, based on interviews with the former captives, is intended to cast light on Washington?s practice of **rendition**, or extra-legal abduction, which the human rights group says often paves the way to torture or maltreatment.

**EDITOR'S CHOICE**

Full text: Rendition report - Jun-07

In depth: Rendition flights - Nov-20

Europe's dilemma - Jun-07

US seeks EU backing on rendition flights - May-04

Washington to defend record on torture before UN - May-04

US employs 'gangster' methods, says report - Jan-24

Washington insists it never sends detainees to places where they would be at risk of torture - but it also defines torture much more narrowly than do other governments.

The study said Muhammad Bashmilah, Salah Ali Qaru and Muhammad al-Assad were held in at least four secret US-run facilities...from the information subsequently provided by the men [about the climate, food and prayer schedules] it is likely they were held in Djibouti, Afghanistan and somewhere in eastern Europe.

Both Poland and Romania, named last year as likely centres of CIA "secret prisons" by Human Rights Watch, another campaigning organisation, have denied hosting any such facilities.

Wednesday's report adds that after being arrested and transferred to US custody in 2003, the men were brought back to Yemen in 2005 and released in February this year. Although all were sentenced for forgery in connection with false travel documents, none was charged with any terrorism-related offences. The report also says they had been shackled, kept unaware of their location and not allowed to see daylight for months.

While CIA renditions have stirred controversy in Europe, criticism in the US has been relatively muted, particularly on Capitol Hill. John McCain, the Republican senator who was tortured in Vietnam, pushed through legislation banning torture, but other senior Republicans have avoided the renditions debate.

Patrick Leahy, the senior Democrat on the Senate judiciary committee, and Edward Markey, a Democratic congressman, have introduced legislation that would compel the secretary of state to assure Congress that the administration would only transfer prisoners to countries where it believes they would not be tortured, but the legislation stands little chance of approval.

Jennifer Daskal, advocacy director at Human Rights Watch, says Democrats have been unwilling to push the issue because of the lack of Republican support and concerns they could be painted as soft on national security.

Copyright The Financial Times Limited 2007

Print article    Email article    Order reprints

**MORE IN THIS SECTION**

**US public opinion shifts on Iraq 'surge'**

### RELATED SERVICES

UK annual reports
Market research
Growth companies
Free Technology white papers and trials

FT Fine Wine
FT Diaries
FT Bookshop
FT Conference
FT Syndication

Security claim as 800 Iraqis go home
US paves way for long-term stay in Iraq
Ba'ath reform bill rejected by Sadrists
Kurdistan dispute hits Iraqi oil exports
US reports 'phenomenal' drop in Iraq violence
Troop surge and Iraq factors curb bloodshed
Turkish generals discuss rebels with US
Iran still under fire for 'arming militias'
US House sets troop withdrawal timetable

FT Home                                                                                                     Site map    Co

Advertise with the FT    Media centre    Student offers    FT Conferences    FT Research Centre    FT Syndication    Corporate subscriptions    FT Group
Partner sites: Chinese FT.com    Les Echos    FT Deutschland    Expansion    Investors Chronicle    Exec-Appointments.com
© Copyright The Financial Times Ltd 2007. "FT" and "Financial Times" are trademarks of The Financial Times Ltd. Privacy policy    Terms

Copyright 2006 PR Newswire Association LLC
All Rights Reserved

# PR Newswire

## Public Interest Services

### Delivering the most policy, issue & advocacy news

U.S. Newswire

April 4, 2006 Tuesday 7:01 PM EST

**SECTION:** NATIONAL AND INTERNATIONAL DESKS, DAYBOOK EDITOR

**LENGTH:** 852 words

**HEADLINE:** CIA Exploited Aviation Practices to Unlawfully Transfer Detainees to Countriesthat Torture, According to New Amnesty Int'l. Report

**DATELINE:** WASHINGTON,  April 4

**BODY:**

   Amnesty International today released a new report documenting how the Central Intelligence Agency (CIA) used private aircraft operators and front companies to preserve the secrecy of rendition flights and "black site" detention.

   The report, Below the Radar: Secret flights to Torture and 'Disappearance', reveals how the CIA exploited aviation practices to hide behind the identity of private plane operators and circumvent authorities. Countries that allow CIA planes to cross their airspace and use their airports often cite the Convention on International Civil Aviation, also known as the Chicago Convention. These states claim that they do not have the authority to question the reasons for the flight because there is a clause in the Convention that allows private, non-commercial flights to fly over a country, or make technical stops there, without prior authorization or notification. However, the Convention makes clear that every nation has the right to require inspection if there are "reasonable grounds to conclude that it (the aircraft) is being used for any purpose inconsistent with the aims of the convention." Given that rendition violates international law, and there are many credible reports of such practices, countries have the right -- and duty -- to stop any aircraft on "reasonable grounds" of suspicion.

   The report also details dozens of destinations around the world where planes associated with rendition flights landed and took off. In addition, the report lists the private airlines with permission to land at U.S. military bases worldwide.

   "Are there any laws that the U.S. government will not break to continue its practice of denying people their human rights in the name of national security?"

CIA Exploited Aviation Practices to Unlawfully Transfer Detainees to
Countriesthat Torture, According to New Amnesty Int'l. Report U.S. Newswire
April 4, 2006 Tuesday 7:01 PM EST

said Dr. William F. Schulz, Amnesty International USA's Executive Director. "The
covert nature of the rendition operation has made it impossible to know how many
persons have been abducted, transferred across borders, held in secret detention
or tortured in the 'war on terror.' The bottom line is that secretly sending
individuals to unknown locations where they are likely to be tortured or treated
inhumanly is unlawful, and the CIA must stop."

The transfer of any detainee to another country must take place with proper
safeguards, including judicial oversight, and the use of official aircrafts.

Three Yemeni men recently released after a two-year rendition ordeal have
provided Amnesty International with new information about "black site"
detention, which raises the possibility that they were held somewhere in eastern
Europe or Central Asia. Their ordeal is outlined in an earlier Amnesty
International report, Secret Detention in CIA 'Black Sites', November 2005.

Muhammad Al-Assad, Muhammad Bashmilah and Salah 'Ali Qaru spent 13 months in
one secret facility before being flown to Yemen in May 2005 and eventually
released in late March 2006.

"The men's captors worked very hard to conceal every aspect of detention but
our research assessing information about climate, prayer schedules and flight
times suggests that these men may have been held in Eastern Europe or Central
Asia," said Schulz.

Rendition is the extralegal transfer of people from one country to another in
ways that bypass all judicial and administrative oversight. Since September 11,
2001, Amnesty International believes that the United States government has
rendered perhaps hundreds of individuals for the purposes of interrogation and
detention to countries with dubious human rights records. Mounting evidence
suggests that rendition is part of an elaborate clandestine detention regime
that includes the use of "black sites" and "disappearances," as well as torture
and inhuman treatment.

Amnesty International is calling on the aviation sector to immediately stop
secret rendition flights and governments to stop facilitating the practice of
rendition and receiving rendition victims.

"Rendering people to countries with a proven record of torture -- as
documented by the U.S. State Department -- violates U.S. and international law
as well as core principles of justice. Amnesty International is urging Congress
to create an independent commission to investigate all aspects of U.S. detention
and interrogation practices," added Schulz.

For a copy of Below the Radar: Secret flights to Torture and 'Disappearance',
please contact the AIUSA media office at 202-544-0200, ext. 302.

---

EDITOR'S NOTE:

1. Estimated numbers of rendition victims: The Egyptian prime minister noted
in 2005 that the United States has transferred some 60-70 detainees to Egypt
alone, and a former CIA agent with experience in the region believes that
"hundreds" of detainees may have been sent by the U.S. to prisons in Middle
Eastern countries. The United States has acknowledged the capture of about 30

CIA Exploited Aviation Practices to Unlawfully Transfer Detainees to
Countriesthat Torture, According to New Amnesty Int'l. Report U.S. Newswire
April 4, 2006 Tuesday 7:01 PM EST

"high value" detainees whose whereabouts remain unknown, and the CIA is
reportedly investigating some three dozen additional cases of "erroneous
rendition," in which people were detained based on flawed evidence or confusion
over names

http://www.usnewswire.com/

Contact: Sharon Singh of Amnesty International, 202-544-0200, ext. 289

**LOAD-DATE:** April 5, 2006

1 of 1 DOCUMENT

Copyright 2006 U.P.I.
All Rights Reserved



UPI

April 5, 2006 Wednesday 5:50 AM EST

**LENGTH:** 326 words

**HEADLINE:** U.K.: Rendition report prompts probe calls

**DATELINE:** LONDON, April 5

**BODY:**

An Amnesty International report claiming over 200 CIA rendition flights passed through Britain prompted calls for a public inquiry Wednesday.

The report -- 'Below the Radar: Secret Flights to Torture and "Disappearance"' -- says that four of the CIA's 26 planes have landed and taken off from British airports more than 200 times in the past five years.

It also details almost 1,000 flights directly linked to the U.S. intelligence agency through civilian front companies, most of which, it claims, passed through European airspace. A further 600 flights were made using planes hired from U.S. aviation companies, Amnesty says.

The human rights group claims that detainees were either abducted or handed over to CIA agents by other law enforcement agencies, before being transported to prisons elsewhere. Former prisoners described how they were transported wearing blindfolds, earplugs, hoods, masks and headphones.

The report includes testimony from three Yemeni men who claim they were held for over a year at a secret prison or "black site," likely located in Eastern Europe or Central Asia. Muhammad al-Assad, Muhammad Bashmilah and Sala Qaru said staff were either American, English speakers with European accents or native Arabic speakers. Most wore masks at all times.

British ministers have consistently denied that any U.S. rendition flights have passed through the country since 2001.

But Amnesty International U.K. Director Kate Allen said: "With mounting evidence of illegal CIA rendition flights through European airspace -- and multiple landings and take-offs of CIA planes at U.K. airports -- there must be

U.K.: Rendition report prompts probe calls UPI April 5, 2006 Wednesday 5:50 AM
EST

an independent inquiry into all aspects of U.K. involvement in these sinister
practices."

Conservative Parliamentarian Andrew Tyrie, chairman of Britain's all-party
parliamentary group on rendition, echoed Amnesty's call, adding: "The British
government has been walking along the side of the street, looking the other way,
for far too long."

**LOAD-DATE:** April 6, 2006

**Agence France Presse -- English**
**Amnesty asks if CIA held Yemenis in Djibouti, Afghanistan, and east Europe**
**April 5, 2006**

Amnesty International said Wednesday it had indications that jails in Djibouti, Afghanistan and eastern Europe were part of a secret US-run prison system for suspected terrorists.

The London-based human rights organization said the signs came from three Yemeni men who "disappeared" in US custody and were held in secret for more than 18 months before being returned to Yemen in May 2005.

Muhammad Abdullah Salah al-Assad, Muhammad Bashmilah and Salah Nasir Salim 'Ali Qaru, all Yemenis, are the only terror suspects to have spoken publicly about being held in illegal "black sites," Amnesty said in a report.

It said Bashmilah and 'Ali Qaru had been arrested in Jordan before being sent to US custody in October 2003, while Assad was arrested in Tanzania and immediately turned over to US custody the same year.

Amnesty said it first reported on their cases last year and returned to Yemen to follow up in February and March, with the three of them released last month.

They "were kept in at least four different secret facilities, likely to have been in at least three different countries, judging by the length of their transfer flights and other information they have been able to provide," it said.

"Although not conclusive, the evidence suggests that they were held at various times in Djibouti, Afghanistan and eastern Europe," it added.

Amnesty said it needed further information from the US and European authorities to verify the locations.

Bashmilah and Salah Qaru were "apparently taken from Jordan to Afghanistan in October 2003; other prisoners there managed to get word to them that they were in Afghanistan," it said.

"The two men have separately described a transfer flight of about four hours from Jordan, which is consistent with a flight to Afghanistan," it added.

Circumstantial evidence such as climate and prayer schedules also "suggest that they may have been held in eastern Europe or Central Asia," said Amnesty senior advisor Anne FitzGerald.

The Yemenis' cases were part of an Amnesty report accusing the US Central Intelligence Agency (CIA) of using private aircraft firms and front companies to secretly transfer terror suspects in violation of international law.

*Amnesty asks if CIA held Yemenis in Djibouti, Afghanistan, and east Europe*, AGENCE FRANCE PRESSE, April 5, 2006

1 of 1 DOCUMENT

Copyright 2006 The Irish Times
All Rights Reserved
The Irish Times

April 5, 2006 Wednesday

**SECTION:** WORLD; Other World Stories; Pg. 12

**LENGTH:** 435 words

**HEADLINE:** 'Rendition' aircraft used Irish airports - Amnesty

**BYLINE:** Ruadhán Mac Cormaic

**BODY:**

IRELAND: Four aircraft believed to have been chartered by the CIA landed and took off on 81 separate occasions from Shannon and Dublin airports in the past five years, Amnesty International has claimed.

In a report to be published today, the organisation claims the four aircraft passed through Shannon 78 times and Dublin on three occasions since 2001. The same aircraft used Belfast's international and Derry airports five times in the same period.

One of the aircraft, which has passed through all four Irish airports - a Gulfstream jet that can carry up to 19 people - has made over 100 trips to Guantánamo Bay in the same period, according to the report.

All four aircraft "are known to have rendered prisoners to illegal detention and torture," an Amnesty spokesman said.

"With renditions shrouded in secrecy, it is extremely difficult to gauge the true extent of its operation, though is likely to involve hundreds of detainees, dozens of planes and thousands of flights," he added.

Tracing the worldwide movements of the four aircraft over a five-year period, the report lists almost 1,000 flights it alleges are "directly linked" to the CIA through "front" companies, as well as 600 CIA flights by aircraft leased from US aviation companies.

The report, Below the Radar: Secret Flights to Torture and "Disappearance", cites a number of individual cases where detainees were abducted or handed over to US officials before being "disappeared". The cited testimony of three Yemeni men - Muhammad al-Assad, Muhammad Bashmilah and Sala Qaru - describes their detention for more than a year at a suspected "black site".

After cross-referencing prayer-schedule data, daylight-saving time practice, the position of the sun and flight times, Amnesty believes the likely location of the prison to be Romania, Bulgaria, Turkey, Macedonia, Albania, Georgia or Azerbaijan.

'Rendition' aircraft used Irish airports - Amnesty The Irish Times April 5, 2006
Wednesday

The men were held in isolation, constantly monitored and permanently shackled to a ring fixed in the floor of their cells, according to the report.

The authors call for information on the numbers and whereabouts of all terror suspects rendered to be made publicly available, while detainees should be brought before a judicial authority within 24 hours of being held. Any aircraft carrying detainees, or suspected of doing so, should be identified to the aviation authorities of the country where it lands, they say.

A Department of Transport spokeswoman last night reiterated that the Government has raised this issue with the US authorities, "and the Government has been assured that Irish airports are not being used for the purposes of rendition".

**LOAD-DATE:** April 5, 2006

Chron.com | News, search and shopping from the Houston Chronicle    http://www.chron.com/CDA/archives/archive.mpl?id=2006_4092264



ADVERTISING

chron.com    Keep close with all the news from the
HOUSTON CHRONICLE

| HOME | NEWS | SPORTS | BUSINESS | ENTERTAINMENT | LIFE | TRAVEL | COMICS | JOBS | REAL ESTATE | CARS | SHOPPING |

SEARCH [ ]  IN  [ Chron.com ▼ ]  [ Go! ]

## HOUSTON CHRONICLE ARCHIVES

**Paper:** Houston Chronicle
**Date:** Wed 04/05/2006
**Section:** A
**Page:** 16
**Edition:** 3 STAR

**`Black site' prisons may have been in Eastern Europe / Yemeni detainees detail accounts of journeys that may have been secret CIA flights**

By JENNIFER QUINN
Associated Press

LONDON - In its most detailed report yet on alleged secret rendition flights of terror suspects, Amnesty International said three former detainees have lent support to the idea that eastern European countries may have been involved in secret CIA flights to so-called "black site" prisons.

The report provides detailed accounts of the experiences of three Yemeni men - Muhammad Bashmilah, Muhammad al-Assad and Salah Nasser Salim Ali - who believe they were taken by U.S. authorities to secret prisons following lengthy journeys through different climates and time zones.

Bashmilah said he was detained in Jordan in October 2003 while on a trip to visit his mother. Ali said he was detained in Indonesia in August 2003 and then flown to Jordan, where he was taken into custody. Al-Assad said he was detained in Tanzania in 2003. None of the three could say with confidence where they were taken next.

In statements from February and March, they described travel times, changing climates, temperatures and daylight hours in detailed descriptions Amnesty says indicates they may have been held in Eastern Europe.

The men were allegedly held for 13 months at a so-called "black site," a clandestine facility believed to be run by the CIA, before they were returned to Yemen, where they were charged with forging travel documents, Amnesty said.

"Their captors went to great lengths to conceal their location from the men, but circumstantial evidence such as climate, prayer schedules and flight times to and from the site suggest that they may have been held in Eastern Europe or central Asia," Anne FitzGerald, a senior adviser with Amnesty, said in the statement. "But without further information from the U.S. government and European authorities, it's impossible to verify exactly where."

The CIA declined to comment on the report.

...

RULES QUESTIONED

At Guantanamo Bay Naval Base: Courtroom rules in military trials of terrorist suspects came into question Tuesday during a pretrial hearing for a suspected al-Qaida member charged in a March 2002 grenade attack that wounded three journalists in Afghanistan. Abdul Zahir did not enter a plea, but his U.S. military defense counsel almost immediately began asking the judge, Marine Col. Robert Chester, what laws he would follow in presiding over the trial. The Guantanamo Bay trials - held inside a cinderblock building perched on a hill on this naval base - are the first U.S. military tribunals since the World War II era. Chester refused to be pinned down by the defense on the rules for the trial.

Associated Press



0% APR
for 60 months

for well-qualified
buyers on all 2007
models[1].

VUE Compact SUV

OUTLOOK Crossover

AURA Sport Sedan

12/3/2007 8:11 PM

**Copyright notice:** All materials in this archive are copyrighted by Houston Chronicle Publishing Company Division, Hearst Newspapers Partnership, L.P., or its news and feature syndicates and wire services. No materials may be directly or indirectly published, posted to Internet and intranet distribution channels, broadcast, rewritten for broadcast or publication or redistributed in any medium. Neither these materials nor any portion thereof may be stored in a computer except for personal and non-commercial use.



★ chron.com   Copyright Notice & Privacy Policy | Help | Report a Problem | Site Map | Advertise | Place an ad | Fraudulent Ads

12/3/2007 8:11 PM

1 of 3 DOCUMENTS

Copyright 2006 Belfast Telegraph Newspapers Ltd.
All Rights Reserved
Belfast Telegraph

April 5, 2006 Wednesday

**LENGTH:** 624  words

**HEADLINE:** Yemeni rendition prisoners shed light on secret CIA incarceration

**BODY:**

Three Yemeni prisoners who were apparently seized and held in secret jails by the CIA for 18 months have spoken for the first time about their detention - providing important new details about the systematic "rendition" of prisoners.

The three men, none of whom was ever charged with any terrorism-related offence, were seized in 2003 and then held in four secret locations by "black-masked ninja" US operatives who made considerable efforts to ensure the prisoners did not know where they were being held. They were eventually released about a month ago.

While it remains unclear where exactly the men were held, human rights campaigners who interviewed them believe they were held in Djibouti, Afghanistan and somewhere in eastern Europe. It was alleged last year that the CIA had been operating covert "black site" prisons in Romania and Poland.

The three men - Muhammad Bashmilah, Salah Qaru and Muhammad al-Assad - are now struggling to rebuild their lives. Mr Assad told Amnesty International, which today publishes the men's testimony in a new report: "For me now, it has to be a new life, because I will never recover the old one."

Mr Bashmilah and Mr Qaru were arrested in Jordan in October 2003 and handed over to the US authorities. Mr Assad was arrested in Tanzania the same year. They were returned in May 2005 to the Yemeni authorities, who charged them with obtaining false travel documents. The men pleaded guilty but were released after the judge decided their time held by the US was sufficient time served.

The Amnesty report details how the men's US guards removed all labels from the food and clothing they were given to make it difficult for them to know where they were. Campaigners narrowed down the likely location of their internment based on the length of their rendition flights, the changing position of the sun when the men were allowed outside to pray, and the winter temperature.

"Labels were usually removed from their clothes and their bottles of water. They had some blankets and T-shirts made in Mexico, while their water cups, although made in China, had the name and telephone number of a US company embossed on the bottom," says the report.

Controversy over the rendition of suspects has been growing since it emerged

Yemeni rendition prisoners shed light on secret CIA incarceration Belfast
Telegraph April 5, 2006 Wednesday

last year that the CIA has been regularly seizing prisoners and flying them to
third countries for interrogation. Sometimes the interrogations are carried out
by foreign security personnel, sometimes by US operatives. Suspects' families
cannot find out what is going on. Some prisoners said they were tortured while
in custody.

   Britain and other European countries have been accused of complicity in
rendition by allowing the CIA to use their airports to refuel and land. Human
Rights Watch claimed last year that since the 11 September attacks, planes
operated by the CIA for the transfer of prisoners had made at least 300 stops in
European countries. Amnesty says the planes have made at least 185 landings at
UK airports, including British facilities in the Caribbean. Where the US holds
its prisoners, especially those considered "high value" targets, is unknown
though a number of possible locations have been identified by campaigners,
including Afghanistan, Iraq and Morocco. The British government has persistently
denied reports that prisoners have been held on the Indian Ocean islands of
Diego Garcia, home to a US air base.

   Kate Allen, director of Amnesty International UK, said: "With mounting
evidence of illegal CIA rendition flights through European airspace - and
multiple landings and take-offs of CIA planes at UK airports - there must be an
independent inquiry into all aspects of UK involvement in these sinister
practices."

   A spokeswoman for the CIA yesterday refused to comment.

LOAD-DATE: April 5, 2006



ALJAZEERA.NET

**UPDATED ON:**
**THURSDAY, APRIL 06, 2006**
**19:57 MECCA TIME, 16:57 GMT**


Tenders

WATCH NOW
FRONT PAGE

AFRICA
AMERICAS
ASIA-PACIFIC
CENTRAL/S. ASIA
EUROPE
MIDDLE EAST

FOCUS
BUSINESS
SPORT
PROGRAMMES
WEATHER
YOUR VIEWS

SEARCH
ABOUT US
ARABIC
DOCUMENTARY

LOG IN

## NEWS  GLOBALNEWS

## Amnesty report probes CIA jails

Human rights group Amnesty International says it has further evidence that eastern European countries may have been involved in secret CIA flights to transport terror suspects to clandestine prisons.

The report, released on Wednesday, provides detailed accounts of the experiences of three Yemeni men who believe they were taken by US authorities to secret prisons following lengthy journeys through different climates and time zones.

The 15,000-word report includes testimony taken in February and March from Muhammad Bashmilah, Muhammad al-Assad and Salah Nasser Salim Ali, also known as Salah Qaru.




**Amnesty says eastern European military bases are used**

Bashmilah said he was detained in Jordan in October 2003 while on a trip to visit his mother. Ali was detained in Indonesia in August 2003 and then flown to Jordan where he was taken into custody. Al-Assad claimed he was detained in Tanzania in 2003. However, none of the three could say with confidence where they were taken next.

In their statements, they described travel times, changing climates, temperatures, and daylight hours in detailed descriptions Amnesty says indicates that they may have been held in eastern Europe.

The men were allegedly held for 13 months at a so-called black site, a clandestine facility believed to be run by the CIA, before they were returned to Yemen where they were charged with forging travel documents, Amnesty said.

### Location concealed

In a statement released with the report, Amnesty International said new information from the men raised "the possibility that they were held somewhere in Eastern Europe or Central Asia".

"Their captors went to great lengths to conceal their location from the men; but circumstantial evidence such as climate, prayer schedules, and flight times to and from the site suggest that they may have been held in Eastern Europe or Central Asia," Anne FitzGerald, a senior adviser with Amnesty, said in the statement.

"But without further information from the US government and European authorities, it's impossible to verify exactly where."

The CIA declined to comment on the report.

The US government has said that the transfer of terror suspects is carried out according to US and international law.

The Council of Europe, the continent's top human rights watchdog, is investigating US operated flights sometimes referred to as "renditions" where terror suspects are allegedly transferred to third countries for interrogation.

Amnesty said in its report that the CIA is exploiting

**"Their captors went to great lengths to conceal their location from the men; but circumstantial evidence such as climate, prayer schedules, and flight times to and from the site suggest that they may have been held in Eastern Europe or Central Asia"**

Ann FitzGerald,
Senior Adviser,

**Related:**
- Growing concern over CIA flights (16 Nov 2005)
- Amnesty asks UK to probe CIA flights (15 Dec 2005)

**Tools:**
- Email article
- Print article
- Send your feedback

**Top news**
- US: Iran nuclear work ended in 2003
- Chavez undeterred by vote defeat
- Sharif and Bhutto issue ultimatum
- Russian election heavily criticised
- Qatar: Gulf faces 'serious threats'

a loophole that allows private aircraft to land at        Amnesty International
foreign airports without having to inform local
authorities - unlike government or military planes - and called for inspections
of planes suspected of being involved.

**Twenty landings**

Amnesty's branch in the Czech Republic said three planes made a total of 20
landings in the capital Prague as part of the rendition programme.

"We asked the Czech government to make sure that airports in the Czech
Republic will not be misused for illegal transfers of people that is in breach of
international law," said Martin Kryl, Amnesty's chair of the board in the Czech
Republic.

"This practice does not ensure justice nor safety but makes torture possible."

Discussing the Amnesty International report on
Wednesday, Fawaz Gerges, a professor at Sarah
Lawrence College in New York, told Al Jazeera:
"The report has exposed the the US
administration's conduct and put pressure on it to
reveal the truth."

However, he said "it is more a moral crisis than a
political one".

**The US says the transfer of
terror suspects is legal**

Gerges pointed out that the US secretary of state,
in the past, had declared that no secret prisons
existed outside of the US.

He said he believes the American people will punish their government for
such acts and European publics too will question their governments to
ascertain whether or not they were aware of these activities.

Gerges said the report would have a negative impact on the European
governments concerned as well as on their relations with the US
administration.

Source: Aljazeera + Agencies

© Aljazeera.net 2003-2007 - Powered by PJBHorizons

12/3/2007 9:10 PM

village voice > news > Nat Hentoff: CIA Secret Prisons Exposed by Nat Hent...    http://www.villagevoice.com/news/0619,hentoff,73121,6.html

Case 1:07-cv-02798-JM Document 55-5    Filed 12/14/2007    Page 27 of 38



keyword [search]

| News | NYC Life | Eats | Music | Film | Arts | People | Classifieds |

**Daily Voice «**

Sound of the City
Weekday Bender:
Monday, December 3
and Tuesday,
December 4 «
🕔 5:00 pm

Status Ain't Hood
Why Do Rappers Keep
Quitting? «
🕔 3:54 pm

Eat for Victory
New Dumplings at
TKettle, BBQ Chicken
Soft Opening «
🕔 2:18 pm

Runnin' Scared
Giving Credit Where
It's Due «
🕔 11:29 am

Threadster
Project Runway:
Asians are Fierce! «
🕔 Thursday

» more blogs

**Podcasts «**

🎙 La Dolce Musto
Heroes Star Under
House Arrest

🎙 Status Ain't
Hood
Eating More Drugs

🎙 Cover Story
On the Taco Trail

**Gallery «**



Banksy in NY
by Sam Horine
» more galleries

**NYC Guide «**



Promising New
Moroccan comes to
Astoria
by Robert Sietsema

• best of nyc
• eats
• drinks

## News

write to the editor | email a friend | email alerts | print article | comment

Nat Hentoff

# CIA Secret Prisons Exposed

**The disappeared: Are they dead? Are they alive? Ask Congress. Ask the president.**

by Nat Hentoff

May 7th, 2006 7:59 PM

*CIA officers soon learned one thing for sure—prisoners sent to Bright Light and [other CIA secret prisons] . . . were probably never going to be released. "The word is that once you get sent to Bright Light, you never come back," said the CIA's Counterterrorism Center veteran.*
**James Risen, *State of War: The Secret History of the CIA and the Bush Administration***



Illustration: Matthew Leake

May is the month that the United States has been summoned to Geneva by the United Nations Committee Against Torture to, as Reuters reported on April 18, "provide information about secret detention facilities and specifically whether the United States assumed responsibility for alleged acts of torture in them."

The committee also wants a list of all these secret prisons. So do I—along with every major human rights organization and some members of Congress on both sides of the aisle. However, Kansas Republican Pat Roberts, chairman of the Senate Intelligence Committee, rigidly keeps refusing to authorize an investigation into these "black sites," as they are called in CIA internal communications. (The United States is a faithless signatory to the UN Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and is now being called to account.)

Meanwhile, Director of National Intelligence John Negroponte said the prisoners in these hidden gulags will be there as long as "the war on terror continues." He added, in an April 12 *Time* interview: "I'm not sure I can tell you what the ultimate disposition of those detainees will be."As far as their rights are concerned, these "detainees" have vanished from the face of the earth.

*Time* says that Negroponte's comments "appear to be the first open acknowledgement of the secret U.S. detention system" (authorized


**AD INDEX**
The Village Voice Ad Index.
Everything in print, now online.


**VOICE New Year's**
Advance Tickets
Hottest Parties

**wrapping** **Holiday Gift Guide**
Wrapping 2007
» click here to see

| classifieds | backpage.com | Post ads for |
| --- | --- | --- |
| real estate | 32,346 | adult |
| employment | 10,704 | perso |
| buy, sell, trade | 5,630 | music |

Last Updated: D

[ more news ] [ most popular ] [ most commented ]

Bill O'Reilly's Very Useful Advice For Young People
**This Modern World** by Tom Tomorrow

Modern-day Cotton Club Faces Some Unsettling Developments
by Erik Shilling

Yankee Stadium Gets a Walkway, a Bronx Pol Gets a Big Donation, You Get a Fat Bill
**Runnin' Scared** by Graham Rayman

Not That the A-Rod Signing Solves Anything, But We Told You So
**Runnin' Scared** by Allen Barra

A Brooklyn Community Mourns Yet Another Police Shooting Victim
by Tom Robbins

Thanksgiving Burlesque: Pilgrims, Balloons, and Plenty of White-Meat Breasts
by Mollye Chudacoff

Rudy's Ties to a Terror Sheikh
by Wayne Barrett

Bill O'Reilly's Very Useful Advice For Young People
**This Modern World** by Tom Tomorrow

November in Photos

Can A Penis Atrophy From Lack of Use?
**Savage Love** by Dan Savage

Savage Love: When Every Girl You See is Hotter Than Your Wife, What Do You Do? (11)
**Savage Love** by Dan Savage

Rudy's Ties to a Terror Sheikh (6)
Wayne Barrett

Nat Hentoff: Will Congress and the Presidential

**Village Voice E-mail Sign Up «**

• the weekly villagevoice.com
• the weekly freebies and special
• the daily "what to do in NYC" e-
• information on the performing a

- shopping
- film
- music
- events
- home

Promotions «

Juno
Enter To Win Passes To
An Advanced
Screening Of The Film!

Lime Thai Bistro
Enter To Win Dinner
For Two At Lime Thai
Bistro!

Harry Potter -
Hogwarts
Challenge
Enter To Win the New
Harry Potter
Interactive DVD Game
â€" Hogwarts
Challenge!

moe.
Win tickets to see moe
at Radio City on New
Year's Eve!

Home Ec.
Enter to win one
introduction and one
intermediate sewing
class at Home Ec!

by the president soon after 9-11).

Actually, when the CIA recently fired senior official Mary O. McCarthy—for allegedly providing classified information about CIA secret prisons in Eastern Europe to *The Washington Post*'s Dana Priest—that public accusation also ultimately revealed the existence of the "black sites." (McCarthy denies that she was a source for Priest.)

The cover has long ago been blown on these dungeons by Amnesty International, Human Rights Watch, Human Rights First, and the ceaseless researchers at NYU law school's Center for Human Rights and Global Justice. And in the *Voice*, I've been writing on what I can find out about them since the end of 2002.

But the CIA, the president, Alberto Gonzales, Condoleezza Rice, and Donald Rumsfeld have nothing to say about these gulags, which are wholly removed from American law and the international treaties we have signed.

Now, however, in an explosive, documented April 5 Amnesty International report—"Below the Radar: Secret Flights to Torture and 'Disappearance' "—there is direct testimony, for the first time, from three men who have been salted away in these secret CIA prisons.

This 41-page report, currently reverberating throughout Europe, also includes a wide range of detailed information about the CIA's kidnapping and "renditions" of suspects to countries known for torturing prisoners. But most revealing are Amnesty International's interviews with the three men from Yemen who were "held in at least four secret US-run facilities . . . probably in Djibouti, Afghanistan, and somewhere in Eastern Europe."

In their last "black site," where they were disappeared for 13 months, Muhammad Bashmilah, Salah Ali Qaru, and Muhammad al-Assad were imprisoned—they believe it was in Eastern Europe—where "they were never allowed to look outside. . . . And for month after month, the men had no idea whether it was day or night . . . or whether their torment of spending endless days staring at blank walls, or being interrogated, would ever end."

Why they were finally returned to Yemen is unknown; but there—where they were first arrested two and a half years ago before falling into CIA crevasses—they were charged on February 13, 2006, with having forged a travel document. Amnesty International emphasizes:

"None was charged with any terrorism-related offense; [and] the Chief of Special Prosecution in Yemen told Amnesty International that they were not suspected of any such involvement."

On the old forgery charge, the judge in Yemen sentenced them to time served, the trial record notes, "in an unknown place by the USA."

They were then released. But, AI adds, "All continue to suffer the dire mental and physical health consequences of torture and ill-treatment, including the prolonged periods in isolation."

As Eric Olson, acting director of government relations at Amnesty International USA, says, their long-term solitary imprisonment can, by international standards, "be considered cruel and inhuman treatment," and two "were in a facility where they were chained to a ring on the floor permanently."

But what of the others who have been disappeared in the CIA's secret prisons? In the *Voice* nearly two years ago, I quoted Jack Cloonan, a 27-year veteran of the FBI who, in New York, as senior agent on the FBI's bin Laden squad, headed the investigation of the master Al Qaeda strategist Khalid Shaikh Mohammed. Cloonan had been directing the interrogation of Mohammed in a once secret CIA

Candidates Ever Address CIA Renditions? (6)
Nat Hentoff: Nat Hentoff

Reviews: Alicia Keys: Getting Closer to Her
Masterpiece (5)
Reviews: Gregory Stephen Tate

Nat Hentoff: Has Anyone Heard Darfur Mentioned
in the Presidential Debates? Or in Congress? (4)
Nat Hentoff: Nat Hentoff

"Most Popular" tools brought to you by:

BOOKMARK





BLENDER
THEATER AT GRAMERCY

DEC 13
THE CLARKS
WITH
THE ALTERNATE ROUTES,
MICHAEL TOLCHER

DEC 16
DILLINGER
ESCAPE PLAN
WITH
A LIFE ONCE LOST,
GENGHIS TRON, SHAT

DEC 18
DEATH BY DECIBELS TOUR FEATURING
VADER
MALEVOLENT CREATION,
CATTLE DECAPITATION,
LIGHT THIS CITY, ABIGAIL
WILLIAMS, VEIL OF MAYA

MELISSA FERRICK



AD Index

SERVICES

Health & Beauty

KRAV MAGA
View Ad | View Site

SPA FUMERIE
View Ad | View Site

GRAND SPA
View Ad | View Site

CONTEMPORARY DENTAL
IMPLANT CENTRE
View Ad | View Site

More »

VOICE

advertise with

interrogation center at Bagram Air Force Base in Afghanistan (which Dana Priest exposed in *The Washington Post*).

Concerned at the time about the network of still hidden CIA interrogation centers around the world, Cloonan asked: "What are we going to do with these people when we're finished . . . with them? Are they going to disappear? Are they stateless? . . . What are we going to explain to people when they start asking questions about where they are? Are they dead? Are they alive? What oversight does Congress have?"

Will the elite Washington press finally ask this question of presidential press secretary Tony Snow—and Senate Intelligence Committee chairman Pat Roberts? And especially George W. Bush at his next press conference? What are these American values, Mr. President, we stand for against the terrorists?

---

**More Nat Hentoff**

It's Only Black Muslims
Has anyone heard Darfur mentioned in the presidential debates? Or in Congress?

Congress and the Disappeared
Still waiting for our representatives—and presidential candidates—to address criminal U.S. kidnappings

How We Delight Our Enemies
A former light unto the world, We, the People, have been darkened by this administration

Bush's Man Mukasey
Will the Supreme Court also bow low to the president?

When Judges Attack!
The war president is finding a less pliant judiciary

---

write a comment

Understand Voice Over IP
Free 96 page Voice Over IP eBook. 11 Chapters: Decision to Deployment
ShoreTel.com

Voice Lessons - Manhattan
Develop Vocal Range and Flexibility Learn Key Performance Techniques
www.yourvocalperformance.com

Ads by Google

home | news | nyc life | music | film | arts | people | l.i. voice | about | contact | store | rss

other VVM publications

Copyright © 2007 Village Voice LLC, 36 Cooper Square, New York, NY 10003 The Village Voice and Voice are registered trademarks of Village Voice Media Holdings, LLC. All rights reserved. View our privacy policy.



VOICE
DIGITAL
JUKEBOX

STAY ON TOP OF BREAKING ARTISTS & NEW RELEASES

BE. HEAR. NOW.

VILLAGEVOICE.COM/JUKEBOX




Best Of NYC 2007
Places & Spaces
Hip Neighborhoods
Developments, Gre
» click here to see


Fall Guide 2007
Village Voice 2007
Bites
» click here to see


The Village Voice
Education Supple
Rookie Teacher Nig
The Hardest Lesso
Our Course Catalog
» click here to see


The Village Voice
Festival
Your guide to New
Indie Rock Music F
» click here to see

# EXHIBIT G



Parliamentary **Assembly**
**Assemblée** parlementaire

**Doc. 10957**
12 June 2006

# Alleged secret detentions and unlawful inter-state transfers of detainees involving Council of Europe member states

Report
Committee on Legal Affairs and Human Rights
Rapporteur: Mr Dick Marty, Switzerland, Alliance of Liberals and Democrats for Europe

*Summary*

Our analysis of the CIA 'rendition' programme has revealed a network that resembles a 'spider's web' spun across the globe. The analysis is based on official information provided by national and international air traffic control authorities, as well as on other information. This 'web' is composed of several landing points, which we have subdivided into different categories, and which are linked up among themselves by civilian planes used by the CIA or military aircraft.

Analysis of the network's functioning and of ten individual cases allows us to make a number of conclusions both about human rights violations – some of which continue – and about the responsibilities of some Council of Europe Member states, which are bound by the European Convention on Human Rights and the European Convention for the Prevention of Torture.

The United States, an observer state of our Organisation, actually created this reprehensible network, which we criticise in light of the values shared on both sides of the Atlantic. But we also believe having established that it is only through the intentional or grossly negligent collusion of the European partners that this "web" was able to spread also over Europe.

Whilst hard evidence, at least according to the strict meaning of the word, is still not forthcoming, a number of coherent and converging elements indicate that secret detention centres have indeed existed and unlawful inter-state transfers have taken place in Europe. It is not intended to pronounce that the authorities of these countries are 'guilty' for having tolerated secret detention sites, but rather it is to hold them 'responsible' for failing to comply with the positive obligation to diligently investigate any serious allegation of fundamental rights violations.

The draft resolution and recommendation propose different measures so that terrorism can be fought effectively whilst respecting human rights at the same time.

*Doc. 10957*

## A.     Draft resolution

1.     The Council of Europe is both the point of reference and the guardian for human rights, democracy and respect for the rule of law in Europe. It draws its legal and moral authority from, *inter alia*, the common standards of human rights protection embodied in the European Convention on Human Rights (ECHR) and the European Convention on the Prevention of Torture (ECPT), to which all of its 46 member States subscribe.

2.     The Parliamentary Assembly of the Council of Europe places human rights at the heart of its work. The Assembly must raise the alarm internationally whenever human rights are set aside, or when established standards of their application are undermined.

3.     The Assembly reaffirms its absolute commitment to overcoming the threat of terrorism; but it must equally speak out in the strongest possible terms against the numerous and systematic human rights abuses committed in the pursuit of the so-called "war on terrorism". It considers that such violations play into the hands of the terrorists and ultimately serve to strengthen those who aim to destroy the established political, legal and social order.

4.     The United States of America finds that neither the classic instruments of criminal law and procedure nor the framework of the laws of war (including respect for the Geneva Conventions) have been apt to address the terrorist threat.  As a result, it has introduced new legal concepts, such as "enemy combatant" and "rendition", which were previously unheard of in international law and stand contrary to the basic legal principles that prevail on our continent.

5.     Thus, across the world, the United States has progressively woven a clandestine "spider's web" of disappearances, secret detentions and unlawful inter-state transfers, often encompassing countries notorious for their use of torture.  Hundreds of persons have become entrapped in this web, in some cases merely suspected of sympathising with a presumed terrorist organisation.

6.     The "spider's web" has been spun out with the collaboration or tolerance of many countries, including several Council of Europe member States.  This co-operation, which took place in secret and without any democratic legitimacy, has spawned a system that is utterly incompatible with the fundamental principles of the Council of Europe.

7.     The facts and information gathered to date, along with new factual patterns in the process of being uncovered, indicate that the key elements of this "spider's web" have notably included : a world-wide network of secret detentions on CIA "black sites" and in military or naval installations; the CIA's programme of "renditions", under which terrorist suspects are flown between States on civilian aircraft, outside of the scope of any legal protections, often to be handed over to States who customarily resort to degrading treatment and torture; and the use of military airbases and aircraft to transport detainees as human cargo to Guantanamo Bay in Cuba or to other detention centres.

8.     The Assembly condemns the systematic exclusion of all forms of judicial protection and regrets that, by depriving hundreds of suspects of their basic rights, including the right to a fair trial, the United States has done a disservice to the cause of justice and has tarnished its own hard-won reputation as a beacon of the defence of civil liberties and human rights.

9.     Some Council of Europe member States have knowingly colluded with the United States to carry out these unlawful operations; some others have tolerated them or simply turned a blind eye.  They have also gone to great lengths to ensure that such operations remain secret and protected from effective national or international scrutiny.

10.     This collusion with the United States of America by some Council of Europe member States has taken several different forms.  Having carried out legal and factual analysis on a range of cases of alleged secret detentions and unlawful inter-state transfers, the Assembly has identified instances in which Council of Europe member States have acted in one or several of the following ways, wilfully or at least recklessly in violation of their international human rights obligations, as explained in the explanatory memorandum[1]:

10.1.   secretly detaining a person on European territory for an indefinite period of time, whilst denying that person's basic human rights and failing to ensure procedural legal guarantees such as *habeas corpus*;

---

[1] See Doc ...

Doc. 10957

10.2.    capturing a person and handing the person over to the United States, in the knowledge that such a person would be unlawfully transferred into a US-administered detention facility;

10.3.    permitting the unlawful transportation of detainees on civilian aircraft carrying out "renditions" operations, travelling through European airspace or across European territory;

10.4.    passing on information or intelligence to the United States where it was foreseeable that such material would be relied upon directly to carry out a "rendition" operation or to hold a person in secret detention;

10.5.    participating directly in interrogations of persons subjected to "rendition", or held in secret detention;

10.6.    accepting or making use of information gathered in the course of detainee interrogations, before, during or after which the detainee in question was threatened or subjected to torture or other forms of human rights abuse;

10.7.    making available civilian airports or military airfields as "staging points" or platforms for rendition or other unlawful detainee transfer operations, whereby an aircraft prepares for and takes off on its operation from such a point; and

10.8.    making available civilian airports or military airfields as "stopover points" for rendition operations, whereby an aircraft lands briefly at such a point on the outward or homeward flight, for example to refuel.

11.    Attempts to expose the true nature and extent of these unlawful operations have invariably faced obstruction or dismissal, from the United States and its European partners alike. The authorities of most Council of Europe member States have denied their participation, in many cases without actually having carried out any inquiries or serious investigations.

12.    In other instances such attempts have been thwarted on the grounds of national security or state secrecy. The Assembly takes the view that neither national security nor state secrecy can be invoked in such a sweeping, systematic fashion as to shield these unlawful operations from robust parliamentary and judicial scrutiny.

13.    The Assembly highlights the widespread breach of the positive obligations of all Council of Europe member States to investigate such allegations in a full and thorough manner. It has now been demonstrated incontestably, by numerous well-documented and convergent facts, that secret detentions and unlawful inter-state transfers involving European countries have taken place, such as to require in-depth inquiries and urgent responses by the executive and legislative branches of all the countries concerned.

14.    While the Assembly has been seized in this instance with looking into allegations concerning very specific facts, it cannot ignore other allegations surrounding the existence of other secret detention centres in Europe, apparently also set up in the context of the "war on terrorism". In particular, the Assembly expresses its deep concern at the continued reports of secret detentions in the North Caucasus. The European Committee for the Prevention of Torture issued a Public Statement on this subject in 2003, which was recently supplemented by new, detailed victim testimony and credible allegations from non-governmental organisations. Further serious investigation and analysis of secret detentions in the North Caucasus is clearly required.

15.    The Assembly also regrets that detention centres in Kosovo were not accessible, until very recently, to the European Committee for the Prevention of Torture.  The lack of access seems all the more unacceptable in light of the fact that the international community intervened in that region with the declared aim of restoring order, peace and the respect for human rights.

16.    The Assembly's central objective is to prevent violations of the sort described in this resolution from occurring in the future.

17.    The Assembly therefore commends the Secretary General of the Council of Europe for the swift and thorough use of his power of inquiry under Article 52 ECHR.

18.    The Assembly calls upon the member States of the Council of Europe to:

18.1.    undertake a critical review of the legal framework that regulates the intelligence services, with the dual objective of enhancing their efficiency and strengthening accountability mechanisms against abuse; clear regulations must also govern co-operation with foreign services and the activities of foreign services on national territory;

*Doc. 10957*

18.2.    ensure that the laws governing state secrecy protect persons who disclose illegal activities of state organs (so-called "whistle-blowers") from disciplinary or criminal sanctions;

18.3.    undertake a review of bilateral agreements signed between Council of Europe member States and the United States, particularly those on the status of US forces stationed in Europe and on the use of military and other infrastructures, to ensure that these agreements conform fully to applicable international human rights norms;

18.4.    urge the United States to dismantle its system of secret detentions and unlawful inter-state transfers and to co-operate more closely with the Council of Europe in establishing common means of overcoming the threat of terrorism in line with international human rights standards and respect for the rule of law.

19.    The Assembly also calls on the United States of America, which is an Observer State to the Council of Europe and Europe's long-standing ally in resisting tyranny and defending human rights and the rule of law, to:

19.1.    send a strong message to the world by demonstrating that terrorism can be vanquished by lawful means, thereby proving the superiority of the democratic model founded on respect of human dignity;

19.2.    co-operate more closely in identifying and employing the most effective means with which to prevent and suppress the terrorist threat in conformity with international human rights norms and the rule of law;

19.3.    align its definitions of torture and other cruel, inhuman or degrading treatment with the definition used by the UN Committee Against Torture;

19.4.    prohibit the transfer of persons suspected of involvement in terrorism to countries that practise torture and that fail to guarantee the right to a fair trial;

19.5.    issue official apologies and award compensation to the victims of illegal detentions against whom no formal accusations, nor any court proceedings, have ever been brought; and

19.6.    refrain from prosecuting any officials, former officials or journalists who, by providing testimony or other information, have helped to bring to light the system of unlawful detentions and mistreatment.

20.    The Assembly calls upon its Committee on Legal Affairs and Human Rights urgently to establish an ad hoc Sub-Committee to continue this inquiry into alleged secret detentions and unlawful inter-state transfers involving Council of Europe member States, in view of new facts that are still in the process of being uncovered.

21.    The Assembly further urges its members to call for rigorous inquiries in their respective national parliaments, especially in those States from which no or insufficient information has been forthcoming.

22.    The Assembly recognises, in the context of the present inquiry into secret detentions, that it lacks appropriate investigative powers akin to those provided to parliamentary inquiries in member States, including the powers to subpoena witnesses and compel disclosure of documents, and calls for consideration of this issue.

23.    Finally, the Assembly expresses its appreciation to the relevant European Union institutions (European Commission, European Parliament and EU Satellite Centre), as well as to Eurocontrol, for their invaluable contributions to this inquiry, whilst reiterating the Council of Europe's role as the guardian of human rights throughout Europe.

*Doc. 10957*

**B.    Draft recommendation**

1.    The Parliamentary Assembly refers to its Resolution ... (2006) on alleged secret detentions and unlawful inter-state transfers involving Council of Europe member states.

2.    The Assembly also recalls its Resolution 1433 (2005) and its recommendation on the legality of the detention of persons by the United States in Guantanamo Bay.

3.    The Assembly urges the Committee of Ministers to draft a recommendation to Council of Europe member States containing:

3.1.    common measures to guarantee more effectively the human rights of persons suspected of terrorist offences who are captured from, detained in or transported through Council of Europe member States; and

3.2.    a set of minimum requirements for "human rights protection clauses", for inclusion in bilateral and multilateral agreements with third parties, especially those concerning the use of military installations on the territory of Council of Europe member States.

4.    The Assembly urgently requests that:

4.1.    an initiative be launched on an international level, expressly involving the United States, an Observer to the Council of Europe, to develop a common, truly global strategy to address the terrorist threat. The strategy should conform in all its elements with the fundamental principles of our common heritage in terms of democracy, human rights and respect for the rule of law;

4.2.    a proposal be considered, in instances where States are unable or unwilling to prosecute persons accused of terrorist acts, to bring these persons within the jurisdiction of an international court that is competent to try them.  One possibility worth considering would be to vest such a competence in the International Criminal Court, whilst renewing invitations to join the Court to the United States and other countries that have not yet done so.

5.    The Assembly finally recommends that the Committee of Ministers should consider means of improving the Council of Europe's ability to react rapidly and effectively to allegations of systematic human rights abuse involving several member States.

*Doc. 10957*

## C.    Explanatory memorandum
by Mr Dick Marty, Rapporteur

<u>Table of Contents:</u>

| | | |
|---|---|---|
| 1. | Are human rights little more than a fairweather option? ............................................. | 8 |
| | 1.1.    11 September 2001 ........................................................................................ | 8 |
| | 1.2.    Guantanamo Bay ............................................................................................. | 8 |
| | 1.3.    Secret CIA prisons in Europe? ....................................................................... | 9 |
| | 1.4.    The Council of Europe's response .................................................................. | 10 |
| | 1.5.    The European Parliament ................................................................................ | 10 |
| | 1.6.    Rapporteur or investigator? ........................................................................... | 11 |
| | 1.7.    Is this an Anti-American exercise? ................................................................. | 12 |
| | 1.8.    Is there any evidence? .................................................................................... | 12 |
| 2. | The global "spider's web"........................................................................................... | 13 |
| | 2.1.    The evolution of the rendition programme ..................................................... | 13 |
| | 2.2.    Components of the spider's web ..................................................................... | 15 |
| | 2.3.    Compiling a database of aircraft movements ................................................ | 17 |
| | 2.4.    Operations of the spider's web ...................................................................... | 17 |
| | 2.5.    Successive rendition operations and secret detentions................................. | 18 |
| | 2.6.    Detention facilities in Romania and Poland.................................................... | 18 |
| |      2.6.1    The case of Romania ............................................................... | 19 |
| |      2.6.2.    The case of Poland .................................................................. | 20 |
| | 2.7.    The human impact of rendition and secret detention ..................................... | 21 |
| |      2.7.1.    CIA methodology – how a detainee is treated during a rendition ........... | 22 |
| |      2.7.2.    The effects of rendition and secret detention on individuals and families .............................................. | 24 |
| 3. | Individual case studies .............................................................................................. | 25 |
| | 3.1.    Khaled El-Masri ............................................................................................... | 25 |
| |      3.1.1.    The individual account of Khaled El-Masri ............................... | 25 |
| |      3.1.2.    Elements of corroboration for Mr. El-Masri's account .............. | 26 |
| |      3.1.3.    The role of "the former Yugoslav Republic of Macedonia" ...... | 27 |
| |         3.1.3.1.    The "official line" of the authorities............................. | 27 |
| |         3.1.3.2.    Further elements ........................................................ | 29 |
| | 3.2.    "The Algerian Six"............................................................................................ | 32 |
| | 3.3.    Ahmed Agiza and Mohammed Alzery (El Zari) ............................................. | 35 |
| | 3.4.    Abu Omar ........................................................................................................ | 37 |
| | 3.5.    Bisher Al-Rawi and Jamil El-Banna................................................................ | 38 |
| | 3.6.    Maher Arar ...................................................................................................... | 40 |
| | 3.7.    Messrs Bashmila and Ali Qaru ....................................................................... | 41 |
| | 3.8.    Mohammed Zammar ........................................................................................ | 41 |
| | 3.9.    Binyam Mohamed al Habashi .......................................................................... | 42 |
| 4. | Secret places of detention.......................................................................................... | 45 |
| | 4.1.    Satellite photographs....................................................................................... | 45 |
| | 4.2.    Documented aircraft movements ..................................................................... | 45 |
| | 4.3.    Witness accounts ............................................................................................ | 45 |
| | 4.4.    Evaluation........................................................................................................ | 46 |
| 5. | Secret detentions in the Chechen Republic ................................................................ | 46 |
| | 5.1.    The work of the European Committee for the Prevention of Torture (CPT).......... | 46 |
| | 5.2.    Damning recent accounts by witnesses .......................................................... | 46 |
| 6. | The attitude of governments ....................................................................................... | 47 |
| 7. | Individual cases: judicial proceedings in progress ..................................................... | 49 |
| | 7.1.    A positive example: the Milan public prosecutor's office (Abu Omar case) .......... | 49 |
| | 7.2.    A matter requiring further attention: the Munich (El-Masri case) and Zweibrücken (Abu Omar case) public prosecutors' offices ................... | 49 |
| | 7.3.    Another matter requiring further attention: the Al Rawi and El Banna case ......... | 49 |
| | 7.4.    Sweden: what next in the Agiza and Alzery case? ........................................ | 49 |
| | 7.5.    Spain ............................................................................................................... | 50 |
| | 7.6.    Mr El-Masri's complaint in the United States .................................................. | 50 |
| 8. | Parliamentary investigations ...................................................................................... | 50 |
| | 8.1.    Germany........................................................................................................... | 50 |
| | 8.2    The United Kingdom......................................................................................... | 51 |
| | 8.3.    Poland: a parliamentary inquiry, carried out in secret..................................... | 51 |

*Doc. 10957*

8.4.   Romania and "the former Yugoslav Republic of Macedonia": no parliamentary inquiries ........................................................................................... 51

9.  Commitment to combating terrorism ................................................................. 52

    9.1.   Fight against terrorism: an absolute necessity ......................................... 52

    9.2.   The strength of unity and of the law ........................................................ 52

10.  Legal perspectives ........................................................................................... 54

    10.1.  The United States' legal position ............................................................. 54

    10.2.  The point of view of the Council of Europe .............................................. 56

          10.2.1.    The European Commission for Democracy through Law ....................

                    (Venice Commission) ................................................................... 56

          10.2.2    The Secretary General of the Council of Europe (Article 52 ECHR) .... 58

11.  Conclusion ......................................................................................................... 59

183.    The working methods of this commission, a genuine commission of inquiry with real powers of investigation, empowered to take cognisance of classified information, strike me as very interesting. However, Mr Paul Cavalluzo, principal lawyer to the Commissioner, the Honourable Dennis O'Connor, has reportedly deplored the tendency of the Canadian authorities to use national security confidentiality; Mr Arar's lawyers, Lorne Waldman et Marlys Edwardh, have accused the Government to "hide behind" official secrecy considerations.

### 3.7.    Muhammad Bashmila and Salah Ali Qaru

184.    The cases of Mr Bashmila and Mr Ali Qaru are described in an Amnesty International report[167] based on inquiries made on the spot and intensive discussions with the victims. It is likely that they owe their recent release to Amnesty's commitment. The two men, who have never been accused of the slightest terrorist crimes, were arrested in Jordan and disappeared, as far as their families were concerned, into the American "spider's web" in October 2003[168]. According to AI's investigations, they were held in at least four secret American detention centres, probably in three different countries. The former detainees themselves say that they spent time in Djibouti, Afghanistan and - of particular interest to us - "*somewhere in eastern Europe*". The exact location of the place where they spent the final 13 months from the end of April 2004 onwards remains unknown. The men gave a precise description of their place of detention, which has not yet been published in full[169], and of the route along which they were taken. Particularly intriguing is their return flight to Yemen on 5 May 2005, reportedly a non-stop flight lasting approximately seven hours. I wrote to the Yemeni authorities and asked where the plane had come from, and the arrival of the aircraft on that date with the two men on board was officially confirmed to me. Unfortunately, although I wrote again, I have not yet received the specific information requested. Since the aircraft concerned was probably a military one, the information obtained from Eurocontrol has also been unable to clarify this matter. We have been unable to locate a site corresponding to the description provided.

### 3.8.    Mohammed Zammar

185.    Mr Zammar, a German of Syrian origin, was suspected of having been involved in the "Hamburg cell" of Al Qaeda and had been under police surveillance for several years in Germany. After 11 September 2001, he had been the subject of a criminal investigation for "support for a terrorist organisation", but there was insufficient evidence to keep him in prison.

186.    On 27 October 2001, he is reported to have left Germany for Morocco, where he spent several weeks. When he attempted to return to Germany, he was allegedly arrested by Moroccan officials at Casablanca airport early in December, and to have been questioned by Moroccan and American officials for over two weeks. Towards the end of December 2001, he is said to have been flown to Damascus, Syria, on a CIA-linked aircraft[170].

187.    The case has received extensive press coverage[171], and there have been allegations that Mr Zammar's arrest in Morocco was facilitated through the provision of information by German services, that he was tortured by Syrian services and that he was questioned in Syria by German officials.

188.    A detailed German government report to the *Bundestag*, a copy of which I have obtained[172], gives a balanced version of this affair.

---

describes in detail the procedures followed where the government invokes CLSN, disputes on the matter being settled in the last resort by the federal court.
[166] See the "summaries of hearings in camera" (note 163 above), in particular para. 12 pp and 33. Given the provisional and incomplete nature of these summaries, I prefer not to comment in greater detail.
[167] Below the radar: secret flights to torture and "disappearance", 5 April 2006, AI Index: AMR 51/051/2006. My particular thanks go to Mrs Anne Fitzgerald for her co-operation with our committee's secretariat on this subject.
[168] AI's report (pp 9-16) gives a precise description of the sufferings of the victims and their families.
[169] Cf AI report (pp 13 and 14). One particularly interesting piece of information is a geographical deduction based on the prayer times provided, which were taken from an Internet site (islamicfinder.org). The time of the sunset prayer ranged from 4.30 to 8.45 pm (allowing for the change to summer time, which the whole of Europe uses, but not Afghanistan, Jordan or Pakistan). This corresponds to a location north of the 41st parallel, so well to the north of the Middle East, and very probably within a Council of Europe member state.
[170] The Eurocontrol data available to us does not enable us to confirm this flight, which took place between two non-European airports.
[171] Examples are the items published in the Washington Post on 12 and 19 June 2002 and 31 January 2003, in *Der Spiegel* in July 2002 and November 2005, and in Focus of 20 September 2002, and shown on *Kalla Fakta* (the fourth Swedish TV channel) on 22 November 2004.