# EXHIBIT

# J

**AMNESTY INTERNATIONAL**
**PRESS RELEASE**

AI Index: EUR 18/003/2007 (Public)
News Service No: 203
23 October 2007

**Denmark: Authorities must come clean about renditions**

European governments must initiate independent and thorough investigations into their involvement in the US-led programme of renditions and secret detention, Amnesty International said today.

"The public have a right to know if European airspace and airports were used to facilitate the transfer of people to places where they faced secret detention and torture", said Nicola Duckworth, Europe and Central Asia Programme Director at Amnesty International.

"Under international law, states that facilitate transfers to countries where they know or should know that there is a risk of serious human rights abuses are complicit in these abuses, and individuals complicit in abductions, torture or 'disappearances' should be held criminally responsible. Those who have been subject to rendition, disappeared and secretly detained must receive reparation."

The renewed call came in the wake of further allegations about the rendition and secret detention activities of the US Central Intelligence Agency (CIA) in Europe. On 21 October 2007 the Danish newspaper *Politiken* reported that one of the planes known to have been used for CIA rendition flights was given permission to cross Danish airspace on 25 October 2003. It is suspected that this plane, which was on route from Washington to Jordan, picked up Yemeni national Muhammad Bashmilah from illegal detention in Jordan, and from there rendered him to secret US custody. According to the statement he later gave to Amnesty International, Muhammad Bashmilah was then held by the US in undisclosed locations for over a year and a half. He was kept in solitary confinement, frequently shackled and in handcuffs.

The *Politiken* article also contains information about the rendition in 1995 of an Egyptian man who had been recognized as a refugee in Denmark. Talat Fouad Qassem, also known as Abu Talal, was rendered by the CIA and Egyptian authorities from Croatia to Egypt in 1995. The *Politiken* article quotes former officials from the CIA and the US State Department who believe that, although Danish officials were not the source of their information about Abu Talal's travel from Denmark to Croatia, the Danish national security service -- the PET -- would have been informed of his subsequent rendition.

The *Politiken* article quotes senior US officials who claim to have given their European partners information that came from interrogations of individuals detained in the rendition and secret detention programme. In particular it quotes a speech reportedly delivered in private in March 2007 by Michael Hayden, director of the CIA, to ambassadors of European Union (EU) member states in Washington in which he said:

*"CIA detainees have been a key source for our understanding of al-Qa'ida in the past 5 years, and we have shared this knowledge with our European partners. Thousands of raw intelligence reports from CIA detainees have been passed to EU liaison partners and member countries. In addition, my Agency has provided hundreds of responses to the specific questions your services have posed to the detainees in our custody. Finally, CIA has passed you, our EU partners, hundreds of analytical assessments based, at least in part, on information provided by al-Qa'ida detainees."*

"These statements raise the question of what the European intelligence services knew about the US renditions programme", Nicola Duckworth said.

"European governments must disclose whether their intelligence agencies have asked questions through the CIA to prisoners in the rendition programme, as Michael Hayden claims."

Europe's governments have repeatedly denied their complicity in the US programme of renditions. Nonetheless, evidence suggesting their involvement continues to emerge. As revealed by journalists, by Amnesty International's report *Partners in Crime,* by the reports of other non-governmental organizations and by the reports of the inquiries of the Parliamentary Assembly of the Council of Europe and the European Parliament, European airports and airspace have been used by CIA planes for flights that have repeatedly been

linked to renditions. Agents of a few European countries have participated in the apprehension of people destined for rendition, or in the interrogation of such detainees once they have been transferred to countries where torture is known to be routine. European states may, as the reported remarks of Michael Hayden suggest, have received information resulting from the torture and other ill-treatment of individuals who had been subject to rendition and illegal detention, without asking where that information had come from, or under what circumstances it was obtained.

Allegations of European complicity in this programme have to date been met with silence from the decision-making bodies of the two most powerful European institutions -- the Committee of Ministers of the Council of Europe, and the Council of the EU -- despite the good work done by bodies of both those institutions in exposing the involvement of European states in renditions and secret detention. A crucial step that could, and must, be taken by the Council of Europe, as Europe's collective human rights body, is to establish a framework for the democratic oversight and accountability of national and foreign security and intelligence services, with the aim of ensuring that the actions they take to secure our safety fully respect human rights and the rule of law.

"Steps must be taken to ensure that the abductions, disappearances, secret detention and torture and other ill-treatment that have occurred in the course of the renditions programme, both outside and within Europe, are stopped, and are never repeated."

**Background**
In a letter to the European Parliament's *Temporary Committee on the alleged use of European countries by the CIA for the transportation and illegal detention of prisoners* (TDIP), the Danish government reported over 100 flights through Danish airspace and 45 stopovers in Danish airports by planes allegedly used by the CIA, including those used for renditions. In April 2007 Amnesty International expressed concern, in a briefing to the UN Committee Against Torture, at the failure of the Danish authorities to initiate an independent investigation, in line with the recommendations of the TDIP, into this alleged use of Danish airspace and Danish airports during the renditions program.

In May 2007 representatives of the Danish government reportedly told the UN Committee against Torture that Denmark "had always been strongly opposed to any measures that violated the human rights of detained persons, including terrorists", that Denmark "had a clear stance against the illegal transfer of detainees", and that "it was not possible to confirm that illegal CIA activities had taken place in Danish airspace, on Danish soil, or that any Danish official had been involved in such activities".

**See also:** *Partners in Crime* http://web.amnesty.org/library/index/engeur010082006
*Denmark: A Briefing for the Committee against Torture*
http://web.amnesty.org/library/index/engeur180012007

Public Document
****************************************
For more information please call Amnesty International's press office in London, UK, on +44 20 7413 5566
Amnesty International, 1 Easton St., London WC1X 0DW. web:http://www.amnesty.org

For latest human rights news view http://news.amnesty.org

# EXHIBIT
# K

MALAYSIA SUN
MalaysiaSun.com Tuesday 4th December 2007 Issue 1321

More Breaking International News

- British navy can't fight a war - report
- Hospital strike could have lead to child deaths
- Bhutto says she will be involved in elections
- Congolese army in fight with rebels
- Negative vote ruins chances for Chavez
- U.S wary of Putin's new Russia
- King steps in to political stalemate in Belgium
- British teacher pardoned and flown home
- Bush welcomes Palestinian minister to Washington
- Iran stopped building nukes years ago, says U.S.
- Monitors say Russian elections unfair
- Relief in Britain at release of 'teddy bear' teacher

Get Malaysia Sun headlines emailed to you daily.

Add Email

XML RSS RSS Directory

# Denmark latest European government to duck rendition probe

Malaysia Sun
Wednesday 31st October, 2007



European governments must initiate independent and thorough investigations into their involvement in the US-led programme of renditions and secret detention, says Amnesty International.

"The public have a right to know if European airspace and airports were used to facilitate the transfer of people to places where they faced secret detention and torture", said Nicola Duckworth, Europe and Central Asia Programme Director at Amnesty International.

"Under international law, states that facilitate transfers to countries where they know or should know that there is a risk of serious human rights abuses are complicit in these abuses, and individuals complicit in abductions, torture or 'disappearances' should be held criminally responsible. Those who have been subject to rendition, disappeared and secretly detained must receive reparation.'

The renewed call came in the wake of further allegations about the rendition and secret detention activities of the US Central Intelligence Agency (CIA) in Europe. On 21 October 2007 the Danish newspaper Politiken reported that one of the planes known to have been used for CIA rendition flights was given permission to cross Danish airspace on 25 October 2003. It is suspected that this plane, which was en-route from Washington to Jordan, picked up Yemeni national Muhammad Bashmilah from illegal detention in Jordan, and from there rendered him to secret US custody. According to the statement he later gave to Amnesty International, Muhammad Bashmilah was then held by the US in undisclosed locations for over a year and a half. He was kept in solitary confinement, frequently shackled and in handcuffs.

The Politiken article also contains information about the rendition in 1995 of an Egyptian man who had been recognized as a refugee in Denmark. Talat Fouad Qassem, also known as Abu Talal, was rendered by the CIA and Egyptian authorities from Croatia to Egypt in 1995. The Politiken article quotes former officials from the CIA and the US State Department who believe that, although Danish officials were not the source of their information about Abu Talal's travel from Denmark to Croatia, the Danish national security service -- the PET -- would have been informed of his subsequent rendition.

The Politiken article quotes senior US officials who claim to have given their European partners information that came from interrogations of individuals detained in the rendition and secret detention programme. In particular it quotes a speech reportedly delivered in private in March 2007 by Michael Hayden, director of the CIA, to ambassadors of European Union (EU) member states in Washington in which he said:

"CIA detainees have been a key source for our understanding of al-Qa'ida in the past 5 years, and we have shared this knowledge with our European partners. Thousands of raw intelligence reports from CIA detainees have been passed to EU liaison partners and member

Save Our Global Heritage
Help Save Endagered Sites in the Developing World. Change Lives!
www.globalheritagefund.o

The Geneva IO-MBA
A unique MBA focused on IOs & NGOs Come find out more for yourself!
www.iomba.ch

Goddard College
Socially Responsible Business Low Residency Programs at Goddard
www.goddard.edu

Test Your Vocabulary
50 levels of difficulty. 100% free. Takes just 10 seconds to try it!
www.FreeRice.com

countries. In addition, my Agency has provided hundreds of responses to the specific questions your services have posed to the detainees in our custody. Finally, CIA has passed you, our EU partners, hundreds of analytical assessments based, at least in part, on information provided by al-Qa'ida detainees.'

"These statements raise the question of what the European intelligence services knew about the US renditions programme", Nicola Duckworth said.

'European governments must disclose whether their intelligence agencies have asked questions through the CIA to prisoners in the rendition programme, as Michael Hayden claims.'

Europe's governments have repeatedly denied their complicity in the US programme of renditions. Nonetheless, evidence suggesting their involvement continues to emerge. As revealed by journalists, by Amnesty International's report Partners in Crime, by the reports of other non-governmental organizations and by the reports of the inquiries of the Parliamentary Assembly of the Council of Europe and the European Parliament, European airports and airspace have been used by CIA planes for flights that have repeatedly been linked to renditions. Agents of a few European countries have participated in the apprehension of people destined for rendition, or in the interrogation of such detainees once they have been transferred to countries where torture is known to be routine. European states may, as the reported remarks of Michael Hayden suggest, have received information resulting from the torture and other ill-treatment of individuals who had been subject to rendition and illegal detention, without asking where that information had come from, or under what circumstances it was obtained.

Allegations of European complicity in this programme have to date been met with silence from the decision-making bodies of the two most powerful European institutions, the Committee of Ministers of the Council of Europe, and the Council of the EU, despite the good work done by bodies of both those institutions in exposing the involvement of European states in renditions and secret detention. A crucial step that could, and must, be taken by the Council of Europe, as Europe's collective human rights body, is to establish a framework for the democratic oversight and accountability of national and foreign security and intelligence services, with the aim of ensuring that the actions they take to secure our safety fully respect human rights and the rule of law.

'Steps must be taken to ensure that the abductions, disappearances, secret detention and torture and other ill-treatment that have occurred in the course of the renditions programme, both outside and within Europe, are stopped, and are never repeated."

In a letter to the European Parliament's Temporary Committee on the alleged use of European countries by the CIA for the transportation and illegal detention of prisoners (TDIP), the Danish government reported over 100 flights through Danish airspace and 45 stopovers in Danish airports by planes allegedly used by the CIA, including those used for renditions. In April 2007 Amnesty International expressed concern, in a briefing to the UN Committee Against Torture, at the failure of the Danish authorities to initiate an independent investigation, in line with the recommendations of the TDIP, into this alleged use of Danish airspace and Danish airports during the renditions program.

In May 2007 representatives of the Danish government reportedly told the UN Committee against Torture that Denmark "had always been strongly opposed to any measures that violated the human rights of detained persons, including terrorists", that Denmark "had a clear stance against the illegal transfer of detainees", and that "it was not possible to confirm that illegal CIA activities had taken place in Danish airspace, on Danish soil, or that any Danish official had been involved in such activities".




**Sustainable Development**
Involved in land development? See this free online and print magazine
www.SLDTonline.com

**EHS Metrics Software**
Manage company-wide EH&S metrics on web-based platform.
www.processmap.com

**Environmental Masters**
Sciences, Policy and Management Scholarships available
www.mespom.eu

**Online Classes**
Find Hundeds of Online Colleges! AA, BA & Graduate Degree Programs.
WashingtonPost.com

# EXHIBIT

# L

NEWSTATESMAN

POLITICS

# Missing presumed tortured

Stephen Grey

Published 20 November 2006

Print version | Listen RSS

## More than 7,000 prisoners have been captured in America's war on terror. Just 700 ended up in Guantanamo Bay. Between extraordinary rendition to foreign jails and disappearance into the CIA's "black sites", what happened to the rest?

Sana'a, Yemen. By the gates of the Old City, Muhammad Bashmilah was walking, talking, and laughing in the crowd - behaving like a man without a care in the world. Bargaining with the spice traders and joking with passers-by; at last he was free.

A 33-year-old businessman, Bashmilah has an impish sense of humour; his eyes sparkled as he chatted about his country and the *khat* leaves that all the young men were chewing. But when I began my interview by asking for the story of his past three years, his mood shifted. His face narrowed, his eyes calmed, and he stared beyond me - as if looking directly into the nether world from which he had so recently emerged.

For 11 months, Bashmilah was held in one of the CIA's most secret prisons - its so-called "black sites" - so secret that he had no idea in which country, or even on which continent, he was being held. He was flown there, in chains and wearing a blindfold, from another jail in Afghanistan; his guards wore masks; and he was held in a 10ft by 13ft cell with two video cameras that watched his every move. He was shackled to the floor with a chain of 110 links.

From the times of evening prayer given to him by the guards, the cold winter temperatures, and the number of hours spent flying to this secret jail, he suspected that he was held somewhere in eastern Europe - but he could not be sure.

When he arrived at the prison, said Bashmilah, he was greeted by an interrogator with the words: "Welcome to your new home." He implied that Bashmilah would never be released. "I had gone there without any reason, without any proof, without any accusation," he said. His mental state collapsed and he went on hunger strike for ten days - until he was force-fed food through his nostrils. Finally released after months in detention without being charged with any crime, Bashmilah was one of the first prisoners to provide an inside account of the most secret part of the CIA's detention system.

On 6 September, President George W Bush finally confirmed the existence of secret CIA jails such as the one that held Bashmilah. He added something chilling - a declaration that there were now "no terrorists in the CIA programme", that the many prisoners held with Bashmilah were all gone. It was a statement that hinted at something very dark - that the United States has "disappeared" hundreds of prisoners to an uncertain fate.

Let's examine the arithmetic of this systematic disappearance. In the first years after the attacks of 11 September, thousands of Taliban or suspected terrorist suspects were captured. Just in Afghanistan, the US admitted processing more than 6,000 prisoners. Pakistan has said it handed over around 500 captives to the US; Iran said it sent 1,000 across the border to Afghanistan. Of all these, some were released and just over 700 ended up in Guantanamo, Cuba. But the simple act of subtraction shows that thousands are missing. More than five years after 9/11, where are they all? We know that many were rendered to foreign jails, both by the CIA and directly by the US military. But how many precisely? The answer is still classified. No audit of the fate of all these souls has ever been published.

### Bush's next big scandal

Since the publications of photographs from Abu Ghraib, the Bush administration has faced a string of scandals concerning its conduct of the war on terror: from abuses of prisoners by the US military, to the rendition of terrorist suspects to jails in places such as Egypt and Syria, where torture is routine, a process first described in the *New Statesman* in May 2004. International outrage, inquiries launched against CIA activities by prosecutors in Europe, as well as clear instructions from the US Supreme Court that, in its reaction to 9/11, Congress had not issued the president with a "blank cheque", have all challenged the

administration's venture into what vice-president Dick Cheney called "the dark side" of warfare.

But if Bush hoped to appease his critics with his public acknowledgement of the CIA's secret programmes, and his promise to bring some of America's most important captives to an open military trial at Guantanamo, then he will be disappointed. After last week's midterm elections, the administration will face legislators more emboldened to probe its conduct. And the issue of disappearances - of the fate of the missing prisoners held by the CIA and the Pentagon - threatens to become the next big scandal.

It was in early 2002, when the camp at Guantanamo Bay was opening up, that I heard from a source close to the CIA that most of the media were missing the point. As cameras showed images of chained prisoners being wheeled across the base on trolleys, there was predictable outrage. But the source described these images as "the press release".

This was what Washington wanted the world to see. Beyond Cuba was a concealed network of prisons around the globe that were becoming home to thousands more prisoners. The CIA had its own secret facilities, but many more were held in jails run by foreign allies. There are some good operational reasons for keeping the arrest of suspected terrorists secret. Sometimes, in the short term, deception makes good tactical sense; staying quiet about an arrest may keep the enemy guessing. Sometimes it can be for diplomatic reasons: secrecy may help to persuade countries such as Egypt to accept a prisoner.

But why is it so sensitive to confirm what happened to these prisoners, to detail how many were transferred where and when? Why should a country receiving prisoners be so embarrassed? And why - when countries such as Egypt have come clean and said "yes, we received 70 to 80 prisoners rendered by the United States" - will the United States itself not confirm what it did? Despite admitting, in general, that the CIA carries out renditions, the US has yet to own up to a single specific case of transferring a prisoner to foreign custody.

The explanation for the secrecy is one that most of the CIA officers involved in rendition will quite freely admit - a transfer to places such as Egypt or Uzbekistan (a country known for boiling prisoners alive) will inevitably involve torture. And knowingly sending a prisoner to face torture is, under both US and international law, an illegal act. Revealing the fate of the missing prisoners may be just too politically embarrassing.

**Justifying war with torture**

One of those "disappeared", for example, is the former al- Qaeda camp commander Ibn-al Shaykh al-Libi, who was captured in late 2001. Al-Libi was first interrogated by the FBI but, according to those involved, he was then snatched by the CIA and rendered to Cairo. It was while he was under Egyptian interrogation that al-Libi provided an important piece of "testimony": that Saddam Hussein had an operational relationship with al-Qaeda. It was an erroneous claim, since formally withdrawn by the CIA, but was used as part of the justification for the war in Iraq. Al-Libi's anonymous testimony was cited by Colin Powell before the United Nations. But no one mentioned where the intelligence came from.

After his interrogation in Egypt, al-Libi was sent back to US custody in Afghanistan. But now he has disappeared. Perhaps he has been sent to Libya? He is certainly a more important prisoner than the vast majority at Guantanamo. Yet sending al-Libi to the Cuban camp, put ting him on public trial and allowing him to tell his story would be a political disaster. So he remains hidden.

Other key prisoners are missing too - others whose stories would shock the public conscience. The US, for example, has never acknowledged what it did with German citizen Mohammed Haydar Zammar. He was captured in December 2001, one of the first in custody who was connected to the Hamburg cell that carried out the 9/11 attacks. And, again, instead of being held in US hands, he was rendered in secret to Damascus. He has never been brought to a public trial or had any chance to reveal how he was treated.

The cases of al-Libi and Zammar, who according to fellow prisoners in Syria was brutally tortured, illustrate the corrosive effect of the policy of disappearance. While the secrecy may protect the US from legal jeopardy and from political embarrassment, it also makes the threat of torture self-fulfilling. If you send a prisoner to Damascus, Tripoli or Tashkent, how can you hope to protect that prisoner - to ensure a fair trial or see that he stays alive - if you keep that rendition quiet? Secrecy protects the torturer; and it denies those innocent, those wrongly accused of crimes of terrorism and caught up in these renditions, any chance of justice.

Last month, Bush signed into law his new Military Commissions Act, which provides for the trial at Guantanamo of top al-Qaeda leaders. The act grants fewer rights to defendants than the Nazis got at Nuremberg. And yet, in this strange world, the rights now granted to men such as Khalid Sheikh Mohammed, the man who devised the 9/11 attack and who will now be brought to trial, still rank far higher than the rights of the small fry, those much less significant players behind bars in foreign jails. In this new justice, the big terrorists are granted privileges, and the other missing prisoners, subtracted from the public record, are

disappeared off the face of the earth. That's the mathematics of torture.

*Stephen Grey is the author of "Ghost Plane: the inside story of the CIA's secret rendition programme" published by C Hurst & Co (£16.95)*

**14** European countries admit allowing the CIA to run secret prisons or carry out renditions on their territory

**7,000+** prisoners have been captured in America's war on terror

**450** prisoners are thought to be held at Guantanamo

**10** prisoners at Guantanamo have been convicted

**40** countries have citizens held in Guantanamo

**$18,000** was spent by two alleged CIA agents at the Milan-Savoy hotel during an illegal rendition operation in Italy

*Research by Maria Stella*

**Post this article to**

Digg del.icio.us newsvine NowPublic Shoutwire Reddit

We want to encourage people to comment on our content and to exchange views with other readers and hope this will be done on a courteous basis. However, if you encounter posts which are offensive please let us know by using the 'report this comment' facility or by emailing comments@newstatesman.co.uk and we will take swift action where necessary.

Redesign consultant: Sheila Sang, PowWow Interactive



UNLIMITED CALLING TO ANY 5 PEOPLE.
ANY NUMBER, EVEN LANDLINES.
+300 WHENEVER MINUTES®

Comment

# Pinochet is gone, but his methods are still with us

A new report collating first-hand accounts gives us the clearest view yet of the torture going on in the US's secret prisons

**Adnan Siddiqui and Victoria Brittain**
**Wednesday December 13, 2006**

**Guardian**

Torture, secret prisons and disappearances: all feature prominently in the legacy of Augusto Pinochet. It is a matter of great regret that the former Chilean dictator - brought to power in a CIA-backed coup on September 11 1973 - avoided trial for gross abuses of human rights in his ravenous pursuit of power. But it is a matter of even greater regret that the same tools and the same sponsors are back in action today, with the same impunity, as part of the "war on terror" launched after September 11 2001.

When the Bush administration brought 14 of its most highly valued terrorism suspects to Guantánamo Bay from secret prisons in various countries in September, the US president himself acknowledged for the first time the existence of a network of CIA prisons. This was intended to close a chapter that had become embarrassing to Washington. The US practice of illegal kidnapping known as "extraordinary rendition", and the secret detention and torture that was part of it, had - after more than four years - finally become a scandal condemned by many European politicians, UN officials and international lawyers, as well as US-based human-rights groups.

But, as a new report from the British monitoring group Cageprisoners reveals, the men held in Guantánamo Bay are only the tip of the iceberg: thousands more are hidden elsewhere, outside the law. The "war on terror" is taking a terrible toll on Muslim families and societies through a vast programme of secret detention and torture.

Since January 2002, when the first Muslim men were flown from Afghanistan to Guantánamo, an estimated 14,000 men have been held. They have been hidden in prisons, army barracks, holes in the ground, private houses, hotels and schools. Those responsible for them have been in overlapping chains of command, including the US department of defence, the CIA and the national intelligence services of many countries, such as Britain.

The Cageprisoners report is a meticulous record of information cross-correlated from the testimony of numerous released prisoners in many countries and of lawyers such as Clive Stafford Smith and his team at Reprieve, who represent some of the men in Guantánamo and have been able to talk to them. But Stafford Smith's own statement that as many as three-quarters of the men in Guantánamo have never seen a lawyer, and that the Guantánamo men represent only 4% of all those imprisoned in the war on terror, is a chilling reminder of just how little outsiders have been able to penetrate this dark, illegal world.

None the less, we now have a mass of detail, much of it new, that has never been collated before. The foreign secretary, Margaret Beckett, should publicly dissociate Britain from the wholesale violations of human-rights law and the Geneva conventions that have taken place in the last five years.

The countries listed as being used by the US include Thailand, Germany, Greece, Dubai, Jordan, Egypt and Syria, while some men have been held on US navy vessels. Different prisons and other detention centres are listed for each country, and in many cases the names of prisoners who were held there. But in some cases the prisoners giving the testimony had no idea where they had been held, and could only describe the temperature, the accents of the guards, and other clues. Muhammad al-Assad, for instance, was flown about three hours from Tanzania to somewhere very hot where the accents of the guards in Arabic seemed to be Somali or Ethiopian, as was the bread. He was interrogated by a white western man who spoke good Arabic.

Two women prisoners rendered from Pakistan are reported to have been held in Syria's Far'Falastin prison in Damascus. Canadians who were rendered there by the US, including Mahar Arar and Abdullah al-Maliki, have described this and other Syrian prisons and the appalling conditions, including torture, under which they were held. Syria and Yemen use only their own nationals in their prisons. But in Afghanistan, Indonesia, Jordan, Pakistan, Egypt, Malawi, Mauritania, Morocco, Bosnia and Dubai, CIA and other US or UK personnel are heavily involved in the prisons. One thread running through the report is the presence of British intelligence personnel in many of the interrogations. The experiences of prisoners such as Muhammad al-Assad, Muhammad Faraj Ahmed Bashmilah and Salah Nasir Salim Ali Qaru, who suffered extreme sensory deprivation during months in a "black site", are also described. All the guards covered their faces and said nothing, so there was no way to even guess their nationality.

Innocent men such as Mahar Arar, from Canada, and Khaled el-Masri, from Germany, were lucky to be released from this archipelago of secret prisons, but have had no apology or compensation, nor seen any hint of charges being brought against those responsible for their kidnapping and torture. But, like Pinochet's victims, they will not give up the fight for justice.

Few tears were shed at news of Pinochet's death, which came, aptly enough, on International Human Rights Day. But the near unanimous condemnation of his US-sponsored crimes loses its moral weight if not accompanied by an equally vociferous denunciation of the similar abuses being perpetrated today.

· Dr Adnan Siddiqui is a London-based GP and trustee of Cageprisoners.
adnan.siddiqui@cageprisoners.com

Case 5:07-cv-02798-JW Document 55-7 Filed 12/14/2007 Page 13 of 36

· Victoria Brittain was the co-author of Moazzam Begg's book Enemy Combatant.
victoriacbrittain@hotmail.com

Guardian Unlimited © Guardian News and Media Limited 2007

# EXHIBIT

# M

UNITED
NATIONS





**Economic and Social Council**

Distr.
GENERAL

E/CN.4/2006/98/Add.1
23 December 2005

Original: ENGLISH/FRENCH

COMMISSION ON HUMAN RIGHTS
Sixty-second session
Item 17 of the provisional agenda

# PROMOTION AND PROTECTION OF HUMAN RIGHTS

## Report of the Special Rapporteur on the promotion and protection of human rights and fundamental freedoms while countering terrorism, Martin Scheinin

## Addendum

## Communications with Governments*

---

* The present report is being circulated in the languages of submission only.

GE.05-16830 (E) 050106

**CONTENTS**


| | *Paragraphs* | *Page* |
|---|---|---|
| SUMMARIES OF COMMUNICATIONS TRANSMITTED AND REPLIES RECEIVED | 1 - 30 | 3 |
| Egypt | 1 - 2 | 3 |
| Indonesia | 3 - 4 | 3 |
| Jordan | 5 - 8 | 4 |
| Malaysia | 9 - 10 | 4 |
| Philippines | 11 - 12 | 5 |
| Tajikistan | 13 - 14 | 5 |
| Tunisia | 15 - 16 | 6 |
| United Kingdom of Great Britain and Northern Ireland | 17 - 20 | 6 |
| United States of America | 21 - 25 | 8 |
| Uzbekistan | 26 - 27 | 9 |
| Yemen | 28 - 30 | 10 |

## SUMMARIES OF COMMUNICATIONS TRANSMITTED AND REPLIES RECEIVED

### Egypt

1. On 21 September 2005 the Special Rapporteur sent a letter to the Government of Egypt, in which he referred to the state of emergency in force since 1981, extended in February 2003 for three years, and Act No. 97 of 1992. He pointed to allegations to the effect that Emergency Law No. 162 of 1958, upon which the current state of emergency is based, includes provisions allowing for detention without charge of persons suspected of being a threat to national security (some of whom, according to reports, have been held in detention for up to 15 years). Under the same law, State Security Courts have been established, creating a parallel court system, with no right of appeal, whose judges are often military officers and therefore not independent. Under Presidential Decree No. 1 of 1981, civilians are regularly referred to such courts. According to information received, the list of crimes to be tried before these courts is long and vaguely formulated, and has often been used to limit freedom of expression and freedom of association. Act No. 97 of 1992 is said to contain a very broad and general definition of terrorism, which seems to allow it to be used against dissidents and members of the opposition and which has led to an increase in crimes punishable by the death penalty. The Special Rapporteur requested more information on plans announced in the speech delivered by President Mubarak on 28 July 2005, in which he announced that a new anti-terrorism law would be adopted, with the current state of emergency regime replaced by counter-terrorism legislation.

2. As at 15 December 2005, there had been no response to the Special Rapporteur's correspondence.

### Indonesia

3. By letter dated 18 November the Special Rapporteur, together with the Special Rapporteur on the question of torture, drew the attention of the Government of Indonesia to information they had received regarding **Mr. Salah Nasser Salim 'Ali**, a 27-year-old Yemeni citizen who lived in Jakarta. According to the information received, Salah Nasser Salim 'Ali was detained in Jakarta by Indonesian police on 19 August 2003 and taken to the main immigration centre in the Kuningan area of Jakarta. It was alleged that after four days of incommunicado detention, during which he was handcuffed, blindfolded and without food, Salah Nasser Salim 'Ali was told that he would be deported to Yemen, via Thailand and Jordan. Upon arrival at the airport in Amman, however, it is said that he was taken to a detention facility of the Jordanian intelligence service, where he was interrogated about a past stay in Afghanistan and routinely beaten, spat on, verbally abused, threatened with sexual abuse and electric shocks by Jordanian officials and subjected to other forms of ill-treatment. From detention in Jordan Salah Nasser Salim 'Ali was allegedly transferred to a detention centre under United States control, where he was kept in United States custody for 20 months. Information received also alleged that, at the beginning of May 2005, **Muhammad Farah Ahmed Bashmilah** was transferred to Yemen. The Special Rapporteurs asked specific questions concerning the legal basis for the detention procedures to ensure that the detainees had recourse to judicial review of the lawfulness of their detention and the applicable legal basis for measures referring to "terrorism".

4. A response to the Special Rapporteur's correspondence was requested by 14 January 2006.

**Jordan**

5. By letter dated 17 November 2005 the Special Rapporteur, together with the Special Rapporteur on the question of torture, drew the attention of the Government of Jordan to information they had received regarding **Mr. Salah Nasser Salim 'Ali**, a 27-year-old Yemeni citizen who lived in Jakarta, Indonesia, and **Mr. Muhammad Faraj Ahmed Bashmilah**, aged 37, a Yemeni citizen, who also lived in Indonesia (see paragraph 3 above).

6. Information received also alleged that Muhammad Farah Ahmed Bashmilah travelled to Jordan with his wife in October 2003 where, on arrival at Amman airport, Jordanian immigration authorities took his passport. Three days later, on 19 October 2003, he was apparently arrested by the Jordanian Da'irat al-Mukhabarat al-'Amah (General Intelligence Department), which kept him in custody for four days. It is alleged that he was repeatedly tortured during this period.

7. From detention in Jordan Salah Nasser Salim 'Ali and Muhammad Farah Ahmed Bashmilah are said to have been transferred to a detention centre under United States control. The two men were allegedly kept in United States custody for 20 and 18 months, respectively. At the beginning of May 2005 the two men were transferred to Yemen, where they are still in detention. The Special Rapporteurs asked specific questions concerning the legislation in Jordan, e.g. on the legal basis for the detention procedures to ensure that detainees have recourse to judicial review of the lawfulness of their detention, and the applicable legal basis for measures referring to "terrorism".

8. A response to the Special Rapporteur's correspondence was requested by 14 January 2006.

**Malaysia**

9. On 3 October 2005, the Special Rapporteur sent a letter to the Government of Malaysia concerning the Internal Security Act (ISA) 1960, which has been in force for 45 years, although during this time no state of emergency has been declared. According to the reports received, detainees can be held for a period of two years without charge which, upon expiry, can be renewed by the Internal Security Minister. There are reports of 112 detainees currently held under ISA, some of whom have been in custody for more than four years. Whereas ISA was originally enacted to counter a rebellion, it is said to be currently used against persons alleged to be associated with militant Islamist groups. In this respect, the Special Rapporteur expressed concern that a number of opposition leaders and human rights activists have also been detained under ISA and that there is no provision in the legislation for detainees to challenge their detention because the law prevents the courts from reviewing the merits of ISA detention. According to information received, the lawfulness of these detentions is usually never examined by the courts as a vast majority of ISA detainees are never prosecuted. This practice is said to result in the often lengthy detention of a person, who is thereby denied the right to the presumption of innocence and is held without charge and trial. Taking note of the fact

**United States of America**

21. By letter dated 1 September 2005, the Special Rapporteur sent a letter to the Government of the United States of America, in which he indicated that he was aware of the fact that other special rapporteurs had addressed counter-terrorism measures taken by the Government through letters of allegation, urgent appeals and requests for a country visit, and that a group of special procedures mandate holders had launched a joint study regarding the situation of the detainees in Guantánamo Bay. He also indicated that he was closely following reports from various sources relating to the human rights impact of counter-terrorism measures taken by the United States within its territory and elsewhere. As at 15 December 2005, there had been no written response to the Special Rapporteur's correspondence of 1 September 2005.

22. By letter dated 17 November 2005 the Special Rapporteur, together with the Special Rapporteur on the question of torture, drew the attention of the Government of the United States to information they had received regarding **Mr. Salah Nasser Salim 'Ali**, a 27-year-old Yemeni citizen who lived in Jakarta, Indonesia (see paragraph 3), and **Mr. Muhammad Faraj Ahmed Bashmilah**, aged 37, a Yemeni citizen, who also lived in Indonesia (see paragraph 6).

23. From detention in Jordan, it is said that Salah Nasser Salim 'Ali and Muhammad Farah Ahmed Bashmilah were transferred to a detention centre under United States control. Information received alleged that the cells in which the men were held in solitary confinement for between six and eight months were approximately 1.5 m x 2 m and had buckets instead of toilets. The men were apparently subsequently transferred, by plane and helicopter, to a second detention centre under United States control, again blindfolded, so that they were not able to identify the location of the facility. In both places, Salah Nasser Salim 'Ali and Muhammad Farah Ahmed Bashmilah were interrogated about their activities in Afghanistan and Indonesia, and about their knowledge of other persons suspected of terrorist activities. The two men were said to have been kept in United States custody for 20 and 18 months, respectively. It is alleged that, during this period, they were held underground, in solitary, incommunicado confinement, with no contact but the prison guards, interrogators and interpreters. Noise was apparently piped into their cells without interruption, 24 hours a day. A response to the Special Rapporteur's correspondence of 17 November 2005 was requested by 14 January 2006.

24. On 18 November 2005 the Special Rapporteur, together with the Special Rapporteur on the question of torture, sent a letter regarding secret detention centres under United States authority in various parts of the world, in which an unknown number of persons are allegedly detained. According to the allegations received, the Central Intelligence Agency (CIA) has established a covert prison system in several countries in Eastern Europe, Thailand and Afghanistan to hide and interrogate some of its captives in its fight against terrorism. About 100 terrorism suspects are said to have been held in these places of detention. In most cases it has not been acknowledged that they are being held. The detainees are said to have had no access to the International Committee of the Red Cross, nor have their families been notified of their whereabouts. There is no information about the procedures in place to decide about their detention and its duration. There appears to be no oversight of the conditions of detention and the treatment of the detainees, which is of particular concern since 20 October 2005 when

Vice-President Cheney and CIA Director Goss asked members of Congress to exclude counter-terrorism operations conducted abroad and operations conducted by an element of the United States Government other than the Defense Department, in particular the CIA, from legislation under consideration that would bar inhumane treatment. The Special Rapporteur asked about the legislative amendments and the exclusions requested by the Vice-President and the CIA Director, for an indication of which interrogation techniques have been authorized in respect of counter-terrorism detainees abroad, and for a complete list of all places of detention throughout the world where terrorism suspects are detained under United States authority (including within United States territory).

25. As at 15 December 2005, there had been no response to the Special Rapporteur's communications.

**Uzbekistan**

26. On 21 October 2005 the Special Rapporteur, together with the Special Rapporteur on extrajudicial, summary or arbitrary executions, the Special Rapporteur on the independence of judges and lawyers and the Special Rapporteur on the question of torture, sent an urgent appeal to the Government of Uzbekistan concerning the [trial of] **15 men, including 3 Kyrgyz citizens,** [accused of being the main organizers of the "Andijan events" of May 2005], before the Criminal Chamber of the Supreme Court of Uzbekistan in Tashkent, and concerning **106 other people** still in detention and expected to face trial on similar charges. According to reliable sources, the trial of 15 persons was based on charges of premeditated murder and terrorism, punishable by the death penalty. Furthermore, reports indicated that, on the first day of the trial, all 15 defendants confessed their guilt and did so in terms which tracked the prosecution statement practically word by word. In addition, rather than seeking to defend their clients' interests, the defendants' attorneys are said to have posed questions which were not significant in terms of the charges, or were formulated in such a way as to assist the prosecution's case. Since, apart from the confessions, little evidence was presented during the trial, and since the defendants were not cross-examined by any independent lawyers to verify their testimonies, the Special Rapporteurs expressed their concern that applying the charge of "terrorism" in this matter could be used as a tool by the executive to punish the defendants for their religious or political beliefs and convictions. A number of precise questions were asked of the Government of Uzbekistan concerning legislation that dealt with terrorism, in particular those articles that defined terrorist acts and their punishments, concerning the criteria used to characterize organizations as terrorist, and whether any appeal procedures were in place.

27. The Permanent Mission of the Republic of Uzbekistan to the United Nations Office at Geneva responded on 28 October 2005 to the public statement made on 26 October 2005 by the Special Rapporteurs on the question of torture, the independence of judges and lawyers, extrajudicial, summary or arbitrary executions, and counter-terrorism. The Permanent Mission criticized the Special Rapporteurs for making a public statement before the Republic of Uzbekistan had had an opportunity to formally respond to the correspondence of the Special Rapporteurs of 21 October 2005. The Permanent Mission described the statement as a gross violation of the mandates of the Special Rapporteurs and expressed concern that they had prejudged the matter by doubting the competence of the investigative and judicial bodies of the sovereign State of Uzbekistan. It emphasized that the subject matter of the case concerned grave

crimes punishable under criminal law and recognized worldwide. The Permanent Mission denied that a prosecutor had demanded the death penalty, stating that imprisonment from 15 to 20 years had instead been requested. On the question of the alleged torture of suspects, the Permanent Mission stated that proceedings were being conducted openly and in full conformity with national and international law, and that there had been no complaint by the defendants, their lawyers or their families of the use of torture. The Permanent Mission stated that, in combating terrorism, Uzbekistan was devoted to the norms of international law, including human rights, and resolutions of the Security Council.

**Yemen**

28. By letter dated 17 November 2005 the Special Rapporteur, together with the Special Rapporteur on the question of torture, drew the attention of the Government of Yemen to information they had received regarding **Mr. Salah Nasser Salim 'Ali**, a 27-year-old Yemeni citizen who lived in Jakarta, Indonesia (see paragraph 3), and **Mr. Muhammad Faraj Ahmed Bashmilah**, aged 37, a Yemeni citizen, who also lived in Indonesia (see paragraph 6).

29. The two men were allegedly kept in United States custody for 20 and 18 months, respectively (see paragraph 23) until they were transferred to Yemen, where they were detained in the central prison of Aden and subsequently briefly taken to Sana'a. It is alleged that the men are currently detained at the Fateh political security facility in Aden, where they have received visits by their family. Neither of the two men has been charged with or tried for any offence, and neither has been informed of the reason for his continued detention. Reportedly, the reason for their detention is that their transfer from detention by United States forces was conditional upon their being held in Yemen. The Special Rapporteurs asked specific questions concerning the legislation in Yemen referring to "terrorism", and about the legal basis for the detention procedures to ensure that detainees had recourse to judicial review of the lawfulness of their detention.

30. A response to the Special Rapporteur's correspondence was requested by 14 January 2006.

-----

# EXHIBIT N

UNITED NATIONS





**Economic and Social Council**

Distr.
GENERAL

E/CN.4/2006/6/Add.1
21 March 2006

ENGLISH/FRENCH/SPANISH

COMMISSION ON HUMAN RIGHTS
Sixty-second session
Agenda item 11 (a)

**CIVIL AND POLITICAL RIGHTS, INCLUDING THE QUESTIONS OF TORTURE AND DETENTION**

**Torture and other cruel, inhuman or degrading treatment or punishment**

**Report of the Special Rapporteur, Manfred Nowak**

**Addendum**

**Summary of information, including individual cases, transmitted to Governments and replies received***

* The present document is being circulated as received, in the languages of submission only, as it greatly exceeds the word limitations currently imposed by the relevant General Assembly resolutions.

## Contents


| | Paragraphs | Page |
|---|---|---|
| Introduction | | 4 |
| Mandate abbreviations | | 6 |
| Summary of allegations transmitted and replies received | | 7 |
| Afghanistan | 1 | 7 |
| Algeria | 2 | 8 |
| Australia | 3 | 9 |
| Azerbaijan | 4-6 | 10 |
| Bahrain | 7 | 12 |
| Bangladesh | 8-11 | 14 |
| Belarus | 12 | 16 |
| Brazil | 13-17 | 25 |
| Canada | 18 | 29 |
| Chile | 19 | 29 |
| China | 20-35 | 30 |
| Colombia | 36-45 | 45 |
| Cuba | 46-49 | 56 |
| Democratic Republic of the Congo | 50-57 | 59 |
| Djibouti | 58 | 69 |
| Egypt | 59-62 | 70 |
| Equatorial Guinea | 63 | 73 |
| Eritrea | 64-69 | 74 |
| Ethiopia | 70-75 | 77 |
| Germany | 76 | 82 |
| Guatemala | 77-79 | 85 |
| Guinea | 80 | 88 |
| Haiti | 81 | 89 |
| Honduras | 82-83 | 90 |
| India | 84-89 | 93 |
| Indonesia | 90-95 | 95 |
| Iran (Islamic Republic of) | 96-115 | 99 |
| Iraq | 116-121 | 109 |
| Israel | 122-125 | 113 |
| Jordan | 126 | 114 |
| Kazakhstan | 127-128 | 114 |
| Kenya | 129 | 115 |
| Kuwait | 130 | 116 |
| Kyrgyzstan | 131-136 | 116 |
| Lebanon | 137-138 | 120 |
| Libyan Arab Jamahiriya | 139-140 | 121 |
| Malaysia | 141 | 122 |

| | *Paragraphs* | *Page* |
|---|---|---|
| Mauritania | 142-144 | 122 |
| Mexico | 145-152 | 126 |
| Mongolia | 153 | 143 |
| Morocco | 154-156 | 144 |
| Myanmar | 157-174 | 148 |
| Nepal | 175-347 | 157 |
| Nigeria | 348-349 | 199 |
| Pakistan | 350-359 | 200 |
| Peru | 360 | 204 |
| Philippines | 361-371 | 205 |
| Republic of Moldova | 372-373 | 208 |
| Romania | 374-379 | 210 |
| Russian Federation | 380-395 | 216 |
| Saudi Arabia | 396-398 | 239 |
| Senegal | 399 | 240 |
| Serbia and Montenegro | 400-409 | 240 |
| Sierra Leone | 410 | 244 |
| Slovakia | 411 | 244 |
| Spain | 412-413 | 244 |
| Sri Lanka | 414-442 | 248 |
| Sudan | 443-466 | 260 |
| Sweden | 467 | 277 |
| Syrian Arab Republic | 468-478 | 277 |
| Tajikistan | 479-481 | 281 |
| Thailand | 482-486 | 283 |
| The former Yugoslav Republic of Macedonia | 487-490 | 285 |
| Togo | 491-492 | 287 |
| Tunisia | 493-503 | 289 |
| Turkey | 504-513 | 303 |
| Turkmenistan | 514 | 308 |
| United Arab Emirates | 515-516 | 309 |
| United Kingdom of Great Britain and Northern Ireland | 517-519 | 310 |
| United States of America | 520-527 | 313 |
| Uzbekistan | 528-540 | 319 |
| Venezuela | 541 | 335 |
| Viet Nam | 542-544 | 337 |
| Yemen | 545-550 | 339 |
| Zambia | 551 | 341 |
| Zimbabwe | 552 | 341 |

Annex – Model questionnaire for submission of cases 343

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | beaten, along with her father and her mother by members of the Satuan Gabungan Intelijen (SGI), Sungai Raya town. The officers, led by a captain, whose name is know the the Special Rapporteurs, raided the house in of a GAM member. They ransacked the house and destroyed the furniture and other belongings. Nurlaili M. Amin and her daughter were then taken to the SGI headquarters. There she was stripped naked, had her arms and legs tied to an X-shaped wooden frame, was beaten, and raped by at least three soldiers. Upon being raped for the third time, she lost consciousness. She and her daughter were both released the next day at 10am. | compensation until and after the facts of the case were verified, brought before a court of law and until a verdict was passed. |
| 93 | | 17/11/05 | JAL | Terrorism; TOR; | **Salah Nasser Salim 'Ali**, aged 27, and **Muhammad Faraj Ahmed Bashmilah**, aged 37, both Yemeni citizens. On 19 August 2003, Salah Nasser Salim 'Ali was detained in Jakarta by police and taken to the main immigration centre in the Kuningan area. After four days of incommunicado detention, during which he was handcuffed, blindfolded and denied food, Salah Nasser Salim 'Ali was told that he would be deported to Yemen, via Thailand and Jordan. Upon arrival at the airport in Amman, he was taken to a detention facility of the Jordanian intelligence service, and held there for four days. He was interrogated about a past stay in Afghanistan and was beaten, spat on, verbally abused, and threatened with sexual abuse and electric shocks by Jordanian officials. On one occasion they tried to force him to sit on a bottle so that it would penetrate his anus. He was suspended upside down, hands and feet tied, and beaten with sticks on the soles of the feet. On a later occasion he was surrounded by 15 guards in a circle, who made him run around in the circle to | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | the point of exhaustion. The guards then forced him to lie down in the centre and took turns beating him. Muhammad Farah Ahmed Bashmilah travelled to Jordan with his wife in October 2003. On arrival at Amman airport, Jordanian immigration authorities took his passport. Three days later, on 19 October 2003, he was arrested by the Jordanian Da'irat Al-Mukhabarat Al-'Amah (General Intelligence Department (GID)), who kept him in custody for four days. During this period he was repeatedly tortured. From detention in Jordan, Salah Nasser Salim 'Ali and Muhammad Farah Ahmed Bashmilah were transferred to a detention centre under United States control. Blindfolded, they were brought here by plane follwoing a flight that lasted several hours, and were subsequently detained below ground. Therefore they are not able to identify the location of the detention centre. Both the forces in charge of transferring them and those in charge of the detention centre were from the United States. The solitary confinement cells in which they were held in for six to eight months were approximately 1.5 x 2m, and had buckets instead of toilets. They were later transferred to a second detention centre under United States control, again blindfolded, flown by plane and helicopter, and are not able to identify the location of the facility. In both places, Salah Nasser Salim 'Ali and Muhammad Farah Ahmed Bashmilah were interrogated about their activities in Afghanistan and Indonesia, and about their knowledge of other persons suspected of terrorist activities. The two men were kept in US custody for 20 and 18 months, respectively. Throughout this period they were held incommunicado in underground solitary | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | confinement cells with no contact with others except for the prison guards, interrogators and interpreters. Noise was piped into their cells without interruption, 24 hours a day. At the beginning of May 2005 Muhammad Farah Ahmed Bashmilah and Salah Nasser Salim 'Ali were transferred to Yemen, where they were detained in the central prison of Aden. On one occasion they were taken to Sana'a. They are currently detained at the Fateh political security facility in Aden, where they have received visits by their family. Neither of the two men has been charged or tried with any offence and neither has been informed of the reason for their continued detention. It is reported that the reason for their detention is that their transfer by United States forces was conditional upon them being held in Yemen. | |
| 94 | | 24/11/05 | UA | TOR; | **Elfrianus** (**Alfred**) **Ulu**, aged 23, a student at the Maritime Academy of Kupang, East Nusa, Tenggara Province. On 23 February 2005, he was arrested and detained by members of the Kupang Police Force. On 5 March 2005, he was transferred to Penfui Correctional Institute. During the period from 5 March to 8 March 2005, he was beaten, kicked and hit with various objects including blocks of wood, chairs and a door handle. The acts were carried out by five prison officers (whose names are known to the Special Rapporteur). As a result he suffered from swelling in his face, feet and hands, a bloody nose and bruising. He also lost his eyesight. | |
| 95 | | 6/12/05 | AL | TOR; | **Fitriyanto** (**Sanep**), aged 28, a taxi driver. On 12 September 2005, he was arrested at Manggar Belitung Bus Terminal by a police officer at approximately 11am. He was taken to the Resort Police Station Belitung Timor (Mapolres Belitung | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 547 | | 27/06/05 | JUA | WGAD; TOR; | **I. S.**, a 14 year-old member of the Zaidi community. On 8 May 2005, he was arrested after security forces stormed his family home in Sana'a. Since then, he has been detained incommunicado, possibly in the Political Security (Al-Amn Al-Seyasi) prison in Sana'. Ibrahim Al-Saiani was injured by shrapnel during clashes in Sa'da between government forces and followers of Hussain Badr Al-Din Al-Huthi, a cleric from the Zaidi community. Ibrahim Al-Saiani's right arm is said to have been amputated, a piece of shrapnel is lodged in his skull, and he has an injury to his right leg. | By letter dated 23/09/05, the Government informed that he had participated in acts of sabotage in Saada Province and had been injured during the clashes with the security forces. He subsequently joined a terrorist cell in Sana'a, which perpetrated some acts of sabotage and explosions targeted against the security forces, governmental facilities and foreign embassies. He has been arrested along with a group of 37 persons and the courts are dealing with the case. |
| 548 | | 27/10/05 | JUA | FRDX; IJL; RINT; SUMX; TOR; | **Yahya Al-Daylami**, a religious leader of the Shiite Zaidi community. On 9 September 2004, he was taken into custody in Sa'da by agents of the Political Security Force and held incommunicado at the intelligence detention centre in Sana'a. On 29 May 2005, a special criminal court sentenced Mr. Al-Daylami to death. He is currently awaiting execution, as the death sentence requires the approval of the President, which is still pending. He was detained for more than eight months without access to a lawyer or anybody else. | By letter dated, 14/12/05, the Government informed that his arrest had been carried out in accordance with procedural norms, under the supervision of the Attorney General. No complaint had been submitted a complaint of ill-treatment and he was able to receive visitors. It informed that the specialized court would have taken instant measures in the event that mistreatment had been confirmed. |
| 549 | | 10/11/05 | JAL | FRDX; TOR; | **Moujib Soueileh**, a camera operator working for Al-Arabiya, an Arabic-language satellite TV news station. On 20 October 2005, in Sanaa, police officers beat him, insulted him and detained him for questioning for several hours at a police station in the Habra neighbourhood of Sana'a, for filming a demonstration staged by textile factory workers demanding payment for wage arrears. Mr. Soueileh suffered from internal bleeding, three broken ribs and bruises on one leg. | |
| 550 | | 17/11/05 | JAL | Terrorism; TOR; | **Salah Nasser Salim 'Ali**, aged 27, and **Muhammad Faraj Ahmed Bashmilah**, aged 37, both Yemeni citizens. (See Indonesia above). | By letter dated 20/12/05, the Government informed that both of the men stated, when questioned, that they had not been tortured by |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | the authorities. The two men were not arrested but rather were handed over to them by the United States authorities after having been accused of being members of Al-Qaeda. The Yemeni authorities detained them under the Code of Criminal Procedures with a view to questioning them and verifying the allegations made by the US authorities. The Yemeni authorities received the files on the two men from the US authorities on 10 November 2005, and the legal procedures are being completed pending their arraignment before the courts. Under the Prisons Act, detainees awaiting trial are legally entitled to access to medical treatment and rehabilitation programmes. |
| 551 | Zambia | Follow-up to previously transmitted communication | | | **Martinho Ngola** (E/CN.4/2005/62/Add.1, para. 1973). | By letter dated 8/02/05, the Government informed that the Zambian Police Service does not have any record of the arrest or detention of Mr. Ngola at Lusaka Police Headquarters. There is also no record of him on the Arrested Prisoners Property Book. The Government requested further information to enable it to respond appropriately. |
| 552 | Zimbabwe | 28/06/05 | JUA | FRDX; HRD; TOR; VAW; | **29 members of the Women of Zimbabwe Arise** (WOZA). On 20 June 2005 at around 11am, 100 women carrying placards and banners started a peaceful demonstration in Bulawayo, against alleged forced evictions of thousands of people in the context of Operation Murambatsvina (Drive out the Rubbish). Police officers blocked their way and the women sat down in protest. Twenty-nine women were arrested. They were all detained for 48 hours before appearing in court to face charges of blocking the traffic in violation of the Miscellaneous Offences Act. They were all released on bail. The first trial hearing before the Provincial Magistrate's Court is scheduled for 11 | By letter dated 31/08/05, the Government informed that the incident took place on 18 June 2005 rather than 20 June 2005. The women concerned were blocking traffic, they were detained, charged under the Miscellaneous Offences Act, and were released on bail. No complaint had been filed by Siphiwe Maseko concerning the alleged abuse she suffered. The Government expressed its commitment to investigating the case if a claim was filed. |

# EXHIBIT O

UNITED
NATIONS





# General Assembly

Distr.
GENERAL

A/HRC/4/26/Add.1
15 March 2007

ENGLISH/FRENCH/SPANISH

HUMAN RIGHTS COUNCIL
Fourth session
Agenda item 2

## IMPLEMENTATION OF GENERAL ASSEMBLY RESOLUTION 60/251 OF 15 MARCH 2006 ENTITLED "HUMAN RIGHTS COUNCIL"

### Report of the Special Rapporteur on the promotion and protection of human rights and fundamental freedoms while countering terrorism

**Addendum**

**Communications with Governments***

* The present report is being circulated as received, in the languages of submission only, as it greatly exceeds the word limitation currently used by the relevant General Assembly resolution.

## CONTENTS


| | *Paragraphs* | *Pages* |
|---|---|---|
| **Introduction** | **1-5** | **3** |
| **Summaries of communications transmitted, replies received and press releases issued** | **6-75** | **4** |
| **Afghanistan** | **6-7** | **4** |
| **Algeria** | **8-11** | **4** |
| **Australia** | **12-13** | **6** |
| **Bahrain** | **14-17** | **7** |
| **Chile** | **18-19** | **10** |
| **China** | **20-21** | **12** |
| **France** | **22-23** | **13** |
| **Germany** | **24-25** | **13** |
| **Indonesia** | **26-27** | **14** |
| **Israel** | **28-32** | **15** |
| **Jordan** | **33-36** | **18** |
| **Kenya** | **37-38** | **21** |
| **Kyrgyzstan** | **39-40** | **22** |
| **Malaysia** | **41** | **22** |
| **Maldives** | **42-43** | **23** |
| **Mauritius** | **44-45** | **24** |
| **Morocco** | **46-47** | **25** |
| **Pakistan** | **48-50** | **27** |
| **South Africa** | **51-52** | **28** |
| **Tajikistan** | **53** | **29** |
| **Thailand** | **54-55** | **31** |
| **Turkey** | **56-60** | **32** |
| **Uganda** | **61-62** | **34** |
| **United Kingdom of Great Britain and Northern Ireland** | **63-66** | **35** |

………………...

**United States of America ……………………………………..………...** **67-71** **37**

**Uzbekistan …………………………………………………………….....** **72-74** **41**

**Yemen ………………………………………………………….........** **75** **41**

country visit, the Special Rapporteur would like to discuss these and other issues with relevant authorities, and he hopes that the Government will extend him an invitation in the very near future".

*Uzbekistan*

(a) *Communications sent to the Government by the Special Rapporteur*

72. On 10 August 2006 the Special Rapporteur, together with the Special Rapporteur on freedom of religion or belief, drew the attention of the Government of Uzbekistan to information received concerning **legal amendments restricting the right to promote the bible outside prayer houses**. According to the information received, following a meeting of the heads of the main confessions organised by the Religious Affairs Department held on 28 July 2006, a number of changes to the criminal and administrative Codes were announced. In particular these changes provide that persons who promote the bible outside prayer houses should be fined, and, in case of repeated attempts, imprisoned. Also the "pastor" of the church to which the person belongs can be fined respectively punished. These punishments also apply if a person carries more than one bible since it is assumed that only one is needed for private use.

73. On 1 September 2006 the Special Rapporteur, jointly with the Special Rapporteur on extrajudicial, summary or arbitrary executions and the Special Rapporteur on freedom of religion and belief, drew the Government of Uzbekistan's attention to the case of Mr. **Mohammadrafiq Kamoluddin**, imam of a mosque in the city of Kara-Suu, Mr. Ayubkhodja Shahobidinov and Mr. Fathullo Rahimo (see paragraph 39). According to the information received, on 6 August 2006, the above-mentioned individuals were killed in the city of Osh as the result of an alleged counter terrorism operation, led by the National Security Service of Kyrgyzstan, in cooperation with the security forces of Uzbekistan. Reports indicated that these individuals were suspected members of the Islamic Movement of Uzbekistan and were planning to carry out a terrorist attack on the territory of the State of Uzbekistan. Other reports highlighted that it was not alleged that Mr. Mohammadrafiq Kamoluddin was a member of the Islamic Movement of Uzbekistan or that he was involved in the commission of terrorist acts. The Special Rapporteur requested the Government particularly on what basis it was decided to kill, rather than capture, these three individuals and to indicate legal basis for qualifying an individual or an entity as "terrorist" under the law of Uzbekistan.

(b) *Communication from the Government*

74. As at 31 January 2007, there had been no response to the Special Rapporteur's correspondence.

*Yemen*

(a) *Communication from the Government*

75. By letter of 20 December 2005, the Government of Yemen replied to the Special Rapporteur's letter sent on 17 November 2005 (see paras. 28-30, E/CN.4/2006/98/Add.1). The Government informed that Mr. Salah Nasser Salim 'Ali and Mr. Muhammad Faraj Ahmed

Bashmilah stated, when questioned, that they had not been tortured by the Indonesian, Jordanian or United States of America authorities. Furthermore, the Government advised that the two men had not been arrested but rather handed over to the Yemeni authorities by the United States authorities after having been accused of being members of the organisation know as Al-Quaida. The Yemeni authorities detained the two individuals under the Code of Criminal Procedures No. 13 of 1994, with a view to questioning them and verifying the allegations made by the United States authorities. The Government indicated that steps were being taken to verify that the Department of Public Prosecutions had followed the proper legal procedures. Moreover, the Yemeni authorities received the files on the two individuals from the United States authorities on 10 November 2005. The Government stated that the legal procedures were being completed pending the arraignment against the two men before the courts. Finally, the Government indicated that, under the Prisons Act, detainees awaiting trial are legally entitled to access to medical treatment and rehabilitation programmes, whether at a detention centre or, if they have been convicted and sentenced to imprisonment, at a prison. Internal rules regulating and establishing the parameters for such treatments are being applied, the implementation of which is overseen by the Department of Public Prosecutions.

- - - - -