# EXHIBIT
# P

**UNITED
NATIONS**



**A**



**General Assembly**

Distr.
GENERAL

A/HRC/4/33/Add.3
5 January 2007

Original: ENGLISH

HUMAN RIGHTS COUNCIL
Fourth session
Item 2 of the provisional agenda

### IMPLEMENTATION OF GENERAL ASSEMBLY RESOLUTION 60/251 OF 15 MARCH 2006 ENTITLED "HUMAN RIGHTS COUNCIL"

**Report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, Manfred Nowak**

**Addendum**

**MISSION TO JORDAN∗**

---

∗ The summary of this mission report is being circulated in all official languages. The report itself is contained in the annex to the summary and is being circulated in the language of submission and in Arabic. The appendix is available in English only.

GE.07-10107 (E) 190107

A/HRC/4/33/Add.3
page 2

**Summary**

The Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment undertook a visit to Jordan from 25 to 29 June 2006.  He expresses his appreciation to the Government for the full cooperation it extended to him.  The report contains a study of the legal and factual aspects regarding the situation of torture or ill-treatment in Jordan.

Many consistent and credible allegations of torture and ill-treatment were brought to the attention of the Special Rapporteur.  In particular, it was alleged that torture was practised by General Intelligence Directorate (GID) to extract confessions and obtain intelligence in pursuit of counter-terrorism and national security objectives, and within the Criminal Investigations Department (CID), to extract confessions in the course of routine criminal investigations.  Given that these two facilities were the ones most often cited as the two most notorious torture centres in Jordan, on the basis of all the evidence gathered, the denial of the possibility of assessing these allegations by means of private interviews with detainees in GID, and taking into account the deliberate attempts by the officials to obstruct his work, the Special Rapporteur confirms that the practice of torture is routine in GID and CID.

With respect to conditions of detention in prisons and pretrial detention centres, the Special Rapporteur found that the Al-Jafr Correction and Rehabilitation Centre was in fact a punishment centre, where detainees were routinely beaten and subjected to corporal punishment amounting to torture.  The conditions in both the Siwaqa and the Juweidah (Male) Correction and Rehabilitation Centres were found to be more humane, although he continued to receive credible reports of regular beatings and other forms of corporal punishment by prison officials there.  No allegations of ill-treatment were received in the Juweidah (Female) Correction and Rehabilitation Centre, though he remains critical of the policy of holding females in "protective" detention, under the provisions of the 1954 Crime Prevention Law, because they are at risk of becoming victims of honour crimes.

The Special Rapporteur concludes that the practise of torture persists in Jordan because of a lack of awareness of the problem, and because of institutionalized impunity.  The heads of the security forces and of all the detention facilities he visited denied any knowledge of torture, despite having been presented with substantiated allegations.  Moreover, in practice the provisions and safeguards laid out in Jordanian law to combat torture and ill-treatment are meaningless because the security services are effectively shielded from independent criminal prosecution and judicial scrutiny as abuses by officials of those services are dealt with by special police courts, intelligence courts and military courts, which lack guarantees of independence and impartiality.  The fact that no official has ever been prosecuted for torture under article 208 of the Penal Code underlines this conclusion.  Accordingly, he recommends a number of measures to be adopted by the Government in order to comply with its commitment to prevent and suppress acts of torture and other forms of ill-treatment.  In view of the clear commitment of the Government to human rights, the Special Rapporteur is sure that every effort will be taken to implement his recommendations.

A/HRC/4/33/Add.3
page 3

**Annex**

**REPORT OF THE SPECIAL RAPPORTEUR ON TORTURE AND OTHER
CRUEL, INHUMAN OR DEGRADING TREATMENT OR PUNISHMENT,
MANFRED NOWAK, ON HIS MISSION TO JORDAN
(25 to 29 June 2006)**

**CONTENTS**

|  |  | *Paragraphs* | *Page* |
|---|---|---|---|
| Introduction | | 1 - 8 | 5 |
| I. | LEGAL FRAMEWORK | 9 - 24 | 6 |
| | A. International level | 9 | 6 |
| | B. Domestic level | 10 - 24 | 6 |
| | 1. Constitutional protection of human rights, including the prohibition of torture and other cruel, inhuman or degrading treatment or punishment | 10 | 6 |
| | 2. Provisions of the Penal Code criminalizing torture | 11 - 15 | 6 |
| | 3. Safeguards against torture and ill-treatment during arrest and detention | 16 - 21 | 7 |
| | 4. Investigation of acts of torture | 22 - 24 | 9 |
| II. | THE SITUATION OF TORTURE AND ILL-TREATMENT | 25 - 39 | 10 |
| III. | REASONS FOR THE WIDESPREAD PRACTICE OF TORTURE IN JORDAN | 40 - 63 | 13 |
| | A. State response to terrorism and threats to national security | 40 - 47 | 13 |
| | B. Lack of awareness | 48 - 51 | 16 |
| | C. Impunity | 52 - 63 | 17 |
| IV. | CONCLUSIONS AND RECOMMENDATIONS | 64 - 73 | 20 |

A/HRC/4/33/Add.3
page 4

## CONTENTS (*continued*)

|  |  | *Paragraphs* | *Page* |
|---|---|---|---|

### Appendix

| | | *Paragraphs* | *Page* |
|---|---|---|---|
| | Places of detention - individual cases ........................................................ | 1 - 55 | 25 |
| I. | GENERAL INTELLIGENCE DIRECTORATE, AMMAN ...... | 4 - 5 | 25 |
| II. | AL-JAFR CORRECTION AND REHABILITATION CENTRE, AL-JAFR ..................................................... | 6 - 17 | 26 |
| III. | SIWAQA CORRECTION AND REHABILITATION CENTRE, SIWAQA ..................................................... | 18 - 22 | 29 |
| IV. | JUWEIDAH CORRECTION AND REHABILITATION CENTRE, AMMAN ..................................................... | 23 - 38 | 30 |
| V. | JUWEIDAH WOMEN'S CORRECTION AND REHABILITATION CENTRE, AMMAN ................................ | 39 - 43 | 33 |
| VI. | PUBLIC SECURITY DIRECTORATE, CRIMINAL INVESTIGATION DEPARTMENT, AMMAN ........................ | 44 - 55 | 34 |

A/HRC/4/33/Add.3
page 5

## Introduction

1.     The Special Rapporteur of the United Nations Commission on Human Rights on torture and other cruel, inhuman or degrading treatment or punishment, Mr. Manfred Nowak, undertook a visit to Jordan from 25 to 29 June 2006, at the invitation of the Government.

2.     The request for a visit was made only in December 2005, and the Government responded promptly with an invitation by April 2006.  According to the Special Rapporteur, the invitation is by itself a statement of Jordan's willingness to open up to independent and objective scrutiny and a testament to its cooperation with the international community in the area of human rights.

3.     On the basis of a thorough analysis of the legal system, his visits to detention facilities, interviews with detainees, the support of forensic medical evidence, and interviews with government officials, lawyers and representatives of non-governmental organizations (NGOs), the Special Rapporteur concludes that the practice of torture is widespread in Jordan, that a general awareness of the seriousness of torture is lacking, and that there is total impunity for torture and ill-treatment in the country.

4.     Over the course of the visit, he met with officials, including:  the Minister for Foreign Affairs, the Director of the Human Rights Department of the Ministry for Foreign Affairs, Assistant Director and Head of the Counter-Terrorism Unit of the General Intelligence Directorate, Minister of Interior, Minister of Justice, Commander of the Military Police, Chief of Military Security, Director of the Public Security Directorate, Chief of the Judicial Council, Speaker of the House of Representatives, as well as the Director of the National Institute of Forensic Medicine.

5.     The Special Rapporteur also met with the President and staff of the National Centre for Human Rights (NCHR), representatives of NGOs, lawyers, the diplomatic corps in Jordan, as well as the International Committee of the Red Cross (ICRC).

6.     The Special Rapporteur wishes to thank the Ministry for Foreign Affairs and other authorities for their full cooperation.  In particular, he visited a number of detention facilities where he could carry out unrestricted inspections and private interviews with all the detainees he requested to see.  There are however two notable and regrettable exceptions, which constituted clear breaches of the Terms of Reference for the visit accepted by the Government:  he was denied the right to speak to detainees in private during his visit to the General Intelligence Directorate (GID); and at the Public Security Directorate Criminal Investigation Department (CID) in Abdali, central Amman, the authorities attempted to obstruct the Special Rapporteur and hide evidence.[1]

7.     On 6 September 2006, a preliminary version of this report was sent to the Government. On 10 October 2006 the Government provided detailed comments, which have been carefully studied and taken into account.

---

[1]  For a description of the incidents, see the appendix below.

A/HRC/4/33/Add.3
page 6

8.      The Special Rapporteur wishes to acknowledge with appreciation the support provided to him by the United Nations Resident Coordinator, Ms. Christine McNab, and her staff at the United Nations Development Programme (UNDP); the Office of the High Commissioner for Human Rights (OHCHR); interpreters from the United Nations Office in Geneva; the drivers and the security officer provided to him; Dr. Derrick Pounder, forensic doctor of the University of Dundee; and Ms. Julia Kozma, of the Ludwig Boltzmann Institute of Human Rights.

## I.  LEGAL FRAMEWORK

### A.  International level

9.      The Special Rapporteur notes that Jordan is a State party to the major United Nations human rights treaties prohibiting torture and ill-treatment, including the International Covenant on Civil and Political Rights (ICCPR); the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and the Convention on the Rights of the Child (CRC). Jordan is also party to the Geneva Conventions of 12 August 1949, and the Rome Statute of the International Criminal Court.  Jordan is not a party to the Optional Protocols to the ICCPR, concerning the right of individual petition and the abolition of the death penalty, nor has it recognized the competence of the Committee against Torture (CAT) to consider complaints from individuals by making the declaration under article 22 of the Convention against Torture.  Jordan is also not a party to the Optional Protocol to the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (OPCAT) providing for a system of preventive visits to all places of detention.

### B.  Domestic level

#### 1.  Constitutional protection of human rights, including the prohibition of torture and other cruel, inhuman or degrading treatment or punishment

10.     Chapter 2 of the Constitution of the Hashemite Kingdom of Jordan provides for "Rights and Duties of Jordanians".  Articles 5 to 23 deal with nationality, equality and non-discrimination, right to work and education, personal freedom, freedom of movement and residence, inviolability of dwelling, right to property, prohibition of compulsory labour, freedom of religion, freedom of opinion and media, freedom of assembly, right to petition, freedom of communication, right of congregational schools, right to education, rights of refugees, right to public offices, and workers' rights.  No specific provision relates to the prohibition of torture, or cruel, inhuman or degrading treatment.

#### 2.  Provisions of the Penal Code criminalizing torture

11.     The Convention against Torture, acceded to by Jordan on 13 November 1991, became a binding part of the country's domestic law upon promulgation by publication in the Official Gazette on 15 June 2006.  Prior to this, the Convention's provisions could be referred to by courts to the extent that they were not inconsistent with existing domestic law.

12.     The relevant provision in domestic law which criminalizes torture (art. 208 of the Jordanian Penal Code) stipulates:

"(1)    Anyone who inflicts on a person any form of unlawful violence or harsh treatment with a view to obtaining a confession to an offence or information thereon shall be punished by imprisonment for a period of three months to three years.

(2)    If such acts of violence or harsh treatment lead to illness or injury, the penalty shall be imprisonment for a period of six months to three years unless the said acts warrant a more severe penalty."

13.    However, the definition contained in article 208 is not consistent with article 1 of the Convention against Torture, and this has been noted with concern by the CAT in its concluding observations of 26 July 1995.[2] The definition in article 208, among other things, does not differentiate between private actors and public officials; it does not, or only partly, cover the infliction of mental pain or suffering; and does not impose sanctions that reflect the gravity of the crime, which is regarded a misdemeanour.

14.    Corporal punishment of prisoners is no longer practised.[3] Moreover, the Government informed the Special Rapporteur that a prisoner who breaches prison regulations is subject only to such penalties as are prescribed by law, such as denial of visits, solitary confinement, loss of one quarter of time off for good behaviour, a caution, or a warning. These penalties cannot be imposed in combination.

15.    Disciplinary action against security officers, according to article 37 of the Public Security Law of 1965, may result in lowering of rank for those under a certain rank, confiscation of salary for up to two months and prison or detention for up to two months. In case a public official is convicted for having committed a felony he or she also faces dismissal from service. However, a public official sentenced for a misdemeanour is not automatically dismissed.

### 3. Safeguards against torture and ill-treatment during arrest and detention

16.    Article 7 of the Constitution provides "Personal freedom shall be guaranteed", and article 8 stipulates that "No person may be detained or imprisoned except in accordance with the provisions of law".[4]

17.    Article 100 of the Code of Criminal Procedure, concerned with the phase following arrest, stipulates that the police officer who is not satisfied with the testimony shall send the person concerned to the Public Prosecutor within 24 hours, who in turn should question him/her

---

[2]  See the State party report (CAT/C/16/Add.5) and the concluding observations thereon (*Official Records of the General Assembly, Fiftieth session, Supplement No. 44*, (A/50/44), para. 166.

[3]  See CAT/C/SR.219, para. 15.

[4]  One far-reaching example is the Law on Crime Prevention, 1954, which allows provincial governors to administratively detain, without charge or trial, anyone suspected of committing a crime or deemed to be a danger to society for a period of one year, indefinitely renewable. Also women at risk of being a victim of an honour crime can be detained on basis of this law.

A/HRC/4/33/Add.3
page 8

within 24 hours. An individual may bring an action for deprivation of liberty against an official who keeps him or her in custody for over 24 hours without questioning. During the period between arrest and being presented to the Public Prosecutor, legal counsel may not be sought. Article 114 gives the Public Prosecutor the right to detain the person concerned for a renewable period of 15 days before charging him/her. A detainee may challenge a detention order before the competent court, and may also challenge any extension of a detention order.

18.    Article 63 of the Code of Criminal Procedure states that the Public Prosecutor must caution the defendant that he/she has the right to remain silent except in the presence of a lawyer. The Public Prosecutor has a right to ban any contact between the defendant and others, with the exception of a lawyer, for a renewable period of 10 days, according to article 66, paragraph 1. However, paragraph 2 of that article and article 64 allow prosecutors exceptionally to interrogate detainees without lawyers in cases of urgency.

19.    A court can accept a confession as the only evidence in a case if it is convinced that the confession was made voluntarily and willingly (art. 159 of the Code of Criminal Procedure). Jordanian law makes confessions obtained under torture inadmissible in court.

20.    The Government informed the Special Rapporteur of additional safeguards:

   −   If a public prosecutor decides to place a person in detention, it must be done in a correction and rehabilitation centre which is subject to judicial supervision and inspection in accordance with the Correction and Rehabilitation Centres Act No. 9 of 2004. Prisoners can inform their relatives of their whereabouts within 24 hours of arrival at the centre;

   −   The law permits individuals to pay a bond, rather than be placed in detention, in order to ensure that they turn up for trial. Detention cannot be used with respect to offences carrying a penalty of less than two years' imprisonment;

   −   Correction and rehabilitation centres operate on a system based on separation of convicted persons from persons awaiting trial. Persons convicted of serious crimes are held in separate quarters from other convicted persons. This system is also used in security centres;

   −   For every person placed in a correction and rehabilitation centre, whether as a detainee or a convicted person, a file is created, detailing the individual's state of health on arrival, his/her personal details, the reason for detention, the authority which issued the arrest warrant or verdict, and the date and time of arrival. The file is then used to record all details relating to the person's time at the centre. As soon as a prisoner arrives at a centre, he/she has a medical check-up and the police doctor prepares a medical report on his/her state of health, indicating whether or not he has been beaten or physically tortured. A prisoner exhibiting signs of beating and torture cannot be admitted until the forensic doctor has produced a report on his condition and placed it in his file, and until the judicial authorities have been notified of his condition and his statement has been recorded in the file.

21.     Concerning visits to places of detention, article 106 of the Code of Criminal Procedure obliges the head of Public Prosecution and the heads of courts to inspect prisons in order to determine that nobody is held there illegally, and they are entitled to contact any prisoner or detainee. Prisoners are entitled to three visits per week, which constitutes a safeguard against torture. The Government informed the Special Rapporteur that the Correction and Rehabilitation Centres Act makes provision for oversight of correction and rehabilitation centres by government institutions and civil society organizations. For example, the warden must submit regular three-monthly reports on conditions at the centre, the inmates, and the services that they receive; and article 8 of the Act allows court presidents, the Prosecutor-General and members of the Department of Public Prosecutions, each within his respective area of competence, to visit correction and rehabilitation centres and follow up on any prisoner's complaints about ill-treatment or torture. The Government informed that in 2005, 158 visits were conducted by the Department of Public Prosecutions, the Ministry of Health and other organizations, such as the NCHR, the ICRC, Prisoner Welfare Association, Committee of Public Freedoms for Human Rights, religious leaders, trade unions, student delegates, as well as diplomatic and consular officers. Up until 21 June 2006, the number of visits was 101.

### 4. Investigation of acts of torture

**Complaints**

22.     According to article 107 of the Code of Criminal Procedure, every prisoner has the right to present either a written or a verbal complaint to the prison authorities and ask them to forward the complaint to the Public Prosecutor. If a person makes an allegation of torture against a member of the police, the Department of Public Prosecutions must register the complaint in an investigation report and, if necessary, refer the person to a forensic doctor. A Complaints and Human Rights Office has been established within the Public Security Directorate for the receipt of complaints against its personnel. According to the Government, a human rights directorate was recently created at the Ministry of Interior to follow up on general human rights issues and complaints. The NCHR, established by a law, has among its functions to address human rights issues through a monitoring mechanism that examines complaints related to government institutions. Moreover, the Government informed that prisoners are entitled to complain to domestic or foreign organizations about prison staff.

**Investigations**

23.     Article 108 of the Code of Criminal Procedure stipulates that anyone who knows of a person who is imprisoned or detained illegally is obliged to inform the Public Prosecution office, which in turn should investigate the matter and order release. If they fail to do so they are considered an accomplice in the crime of unlawful deprivation of liberty (arts. 178 and 182 of the Penal Code). Article 25 of the Code of Criminal Procedure determines that every authority or its employees carrying out official duties that gain knowledge of a felony or misdemeanour taking place is obliged to inform the prosecutor.

**Compensation**

24.     The Constitution, while not containing provisions on compensation for human rights violations, grants every resident the right to seek legal redress, and therefore victims of torture

A/HRC/4/33/Add.3
page 10

may pursue private claims following a court decision in their favour. According to article 256 of the Civil Code, the party responsible for damage of any kind, even if he lacks capacity, must make restitution for the damage caused.[5]

## II. THE SITUATION OF TORTURE AND ILL-TREATMENT

25.    The Special Rapporteur observes that the preceding discussion on legislation merely lays out the normative framework for addressing matters related to torture and ill-treatment in Jordan. As has been stressed on numerous occasions, the ratification of treaties and the adoption of laws are only initial steps. By themselves they do not guarantee that torture does not take place, nor does their existence reflect current practice.

26.    Over the years the Special Rapporteur has received few allegations of torture and ill-treatment in Jordan. However, as he has stated on previous occasions, the number of allegations received are not necessarily indicative of the prevailing situation of torture in a country.

27.    On the contrary, this may be an indicator for the level of awareness of individuals, lawyers and civil society of the prohibition of torture and ill-treatment. In Jordan, the Special Rapporteur found an implicit societal tolerance for a degree of violence against alleged criminal suspects and convicts. Though unspoken, there was a widespread awareness that abuse of suspects and detainees occurs and resignation that little can be done about it. According to the Special Rapporteur, save a few active voices, such as the NCHR, and some NGOs, there is little public discourse about the situation of torture in Jordan.[6]

---

[5] For example, in the case for compensation of a wrongful shooting death by a Public Security Department officer, the Court of Cassation (Ruling No. 4433 of 2003) held in favour of the victim's heirs against the officer and the Public Security Department.

[6] In this regard, it was a telling observation that despite his press conference of 29 June 2006 being well-attended by representatives of the major domestic Arab-language media there was little critical exposure of the visit. Exceptions being the English-language, *The Jordan Times*, "UN special investigator urges Jordan to criminalize torture, close special courts", 30 June 2006; editorial entitled, "Damning comments", 3 July 2006; see also the letter to the editor in rebuttal, "Inaccuracies", 9 July 2006; *Al-Ghad*, "Monitoring cases of torture in Jordanian jails, Nowak says they are not supported by Government", 30 June 2006; and *Al Arab Al Yawm*, "Jordanian detention centres and lessons learnt from the mission of the UN Special Rapporteur against torture", 2 July 2006. In large part the official Arabic-language media, including the State-run Jordan News Agency (Petra), either ignored any criticism of the situation, or deliberately misrepresented the preliminary findings of the Special Rapporteur (e.g. Jordan News Agency - Petra, "UN Special Rapporteur Hails Jordan's Openness and Cooperation", 29 June 2006; *Al-Dastour*, "Jordan's first state in the region to respond positively to the international organization to visit detention centres, affirming the non-existence of American secret places of detention on its soil", 30 June 2006; and *Al-Rai*, "OHCHR report praises the situation of human rights in Jordan", 30 June 2006).

28.     During the mission the Special Rapporteur visited the detention facility of the General Intelligence Directorate, Al-Jafr Correction and Rehabilitation Centre, Siwaqa Correction and Rehabilitation Centre, Juweidah Correction and Rehabilitation Centre, Juweidah (Female) Correction and Rehabilitation Centre, and the detention facility of the Public Security Directorate's Criminal Investigation Department.  Save the GID, where he was denied the right to speak to detainees in private, the Special Rapporteur conducted private interviews with detainees, and met with prison officials.  He also held meetings with government officials, the NCHR, NGOs, as well as lawyers.

29.     Over the course of the visit to Jordan, many consistent and credible allegations of torture and ill-treatment were brought to the attention of the Special Rapporteur.  It was alleged that torture was largely practised to extract confessions or obtain intelligence between the time of arrest and transfer to pretrial detention.  In particular, it was alleged that torture was practised by GID at their headquarters in Amman to extract confessions and obtain intelligence in pursuit of counter-terrorism and national security objectives, and at CID in Amman to extract confessions in the course of routine criminal investigations.  He also received many allegations of torture in various local police stations.

30.     In addition, the Special Rapporteur received a high number of consistent and credible allegations that once persons were transferred from GID and CID to the Correction and Rehabilitation Centres for either pretrial detention - virtually all suspects are held in remand without being subject to alternatives to custody - or to serve out their sentences, they were subjected to cruel, inhuman, or degrading treatment or punishment.  The purpose for this treatment was alleged to be the intimidation of prisoners, and arbitrary corporal punishment, amounting to torture in some instances.

31.     Disregard for basic safeguards for detainees, such as notification for reasons of arrest, prompt access to lawyers and families, let alone any serious medical examinations, is reportedly common.  The methods of torture described in the cases that the Special Rapporteur came across included, inter alia:  beatings with fists, truncheons, batons, plastic pipes, tree branches, electrical cables, broom handles, kicking, use of electroshock batons, burning with cigarette butts; suspension in a *strappado*-type position, or being hung from the top of a cell door with a rope tied to hands that are tied behind the back, with variations including being suspended until the toes barely touch the floor, yanked from the legs or feet while being suspended, and beaten on the soles of the feet; the ghost position, where a person is suspended by a rope or pole beneath their shoulders and beaten on their soles and body; the *farruj* ("grilled chicken") position, where the detainee is handcuffed behind the knees and hung upside-down from a pole passed behind the knees and subjected to beatings; *falaqa*, i.e. beatings on the soles of the feet - in some variations, the person is made to walk upon a salt-covered floor afterwards; being hung from the ankles and dropped onto the floor; handcuffed for prolonged periods; restrained to a wall with hands outstretched in the hot sun; sleep deprivation for five consecutive days and nights; and prolonged periods of incommunicado detention.  Prisoners reported the deployment of "special brigades" of up to 30 police personnel that carry out beatings in sleeping quarters with the pretext of looking for drugs or illegal weapons.

32.     Prisoners also reported humiliating treatment, including:  forcible shaving of heads; threats of sexual violence; being subjected to strong sexual insults against female family

A/HRC/4/33/Add.3
page 12

members; being forced to kiss objects, such as furniture, boots of guards or eat food from boots of guards; forced to shout insults at oneself; and forced to mime out various acts in front of an audience of guards or prisoners.

33.     Furthermore, the Special Rapporteur heard a number of allegations of excessive use of force during the prison riots in March and April 2006.

34.     The Special Rapporteur bases his findings on a wide array of sources, including written information, interviews with over 40 detainees (some of whose cases are included in the appendix), forensic medical evidence gathered, and meetings he held with prison officials, the NCHR, NGOs and lawyers.

35.     The Special Rapporteur confirms that the practice of torture is routine in GID and CID. Given that these two facilities were the ones most often cited by various sources of information as the two most notorious torture centres in Jordan, on the basis of the consistency and credibility of evidence gathered, including forensic evidence corroborating beyond any reasonable doubt, and taking into account the deliberate attempts by the officials there to obstruct his work,[7] including the denial of the possibility to assess allegations by interviewing detainees in private in GID and the attempts by the CID officials to hide evidence, he cannot come to a different conclusion.

36.     Within the Correction and Rehabilitation Centres, with the exception of the Juweidah (Female) Centre, the Special Rapporteur concludes that cruel, inhuman or degrading treatment is widespread.  Contrary to statements by officials that such incidents were isolated, the Special Rapporteur found a certain level of organization, for example, specific cells were unofficially designated and well known within a facility as places of punishment; and senior prison staff condoned, or acquiesced the ill-treatment meted out to detainees, for example, by  permitting the organization of "reception" parties for incoming detainees.

37.     It was regularly pointed out by officials that the philosophy of humanity and rehabilitation of prisoners was a hallmark of the Jordanian penal system.  Upon visiting the Al-Jafr Correction and Rehabilitation Centre in the south-east of the country, it was apparent that this notion was stretched to the extreme.  In fact the centre could only be described as a punishment centre, where detainees are routinely beaten and subjected to corporal punishment amounting to torture.  The isolation and harshness of the desert environment compounds the already severe conditions of the prisoners.  The Special Rapporteur found the conditions in both Siwaqa and Juweidah Men's Correction and Rehabilitation Centre to be more humane than in Al-Jafr.  However, he still received reports of regular beatings by prison officials at those two centres.

38.     The Special Rapporteur observes that the prison service is managed by the Public Security Department, and run by former security officers that are subject to regular rotation. According to the Special Rapporteur, the lack of a professional prison service with staff in stable posts, who are specialized in prison management, contributes to the culture of abuse and impunity that characterizes the existing prison system.

---

[7]  For a description of the incidents, see the appendix below.

39.     The only prison where the Special Rapporteur did not receive allegations of ill-treatment is Juweidah (Female) Correction and Rehabilitation Centre, where he was satisfied with the commitment of the prison management to the well-being of the inmates.  Nevertheless, the Special Rapporteur, after talking to women concerned, is highly critical of the current policy of taking females under the provisions of Crime Prevention Law into "protective" detention because they are at risk of becoming victims of an honour crime.  According to the Special Rapporteur, depriving innocent women and girls of their liberty for as long as 14 years can only be qualified as inhuman treatment, and is highly discriminatory.

## III.    REASONS FOR THE WIDESPREAD PRACTICE OF TORTURE IN JORDAN

### A.  State response to terrorism and threats to national security

40.     The Special Rapporteur recognizes the significant challenges faced by the country given its strategic location in the Middle East region, and not least the prevailing sensitive security situation and the continued threat of terrorism.  Notably, Jordan is a party to several international counter-terrorism conventions, which is a demonstration of its commitment to cooperate globally in the fight against terrorism.  He fully recognizes the obligation of the Government to ensure the security of its people.  However, he emphasizes that such measures must respect international human rights norms, in particular the absolute prohibition of torture, as contained in the Convention against Torture that Jordan has ratified.

41.     The Special Rapporteur notes that GID is the pre-eminent institution entrusted with counter-terrorism activities in Jordan.  Before and in the course of his mission he received a number of serious, consistent and credible allegations of torture by GID officials, in particular regarding suspected terrorists.[8]

42.     On 25 June 2006, the Special Rapporteur visited the premises of the General Intelligence Directorate and was received by the Assistant Director, Brigadier Ziyad Sharidah, the Head of the Counter-Terrorism Unit, Mr. Ali Birjak, and the Legal Counsel, Mr. Yousef Masarwa.  The Assistant Director presented him with information about the Department and the detention centre.  The Special Rapporteur asked questions and requested several clarifications, and the deputy director and officers answered all his queries.  The Special Rapporteur was provided, at his request, with a list of the names of all the prisoners being held at the Department's detention centre, together with details of the charges against them and the date on which each person had been taken into detention.  When he sought to visit the GID detention centre on 26 June 2006, in order to investigate allegations for himself, he was denied private interviews with detainees.[9]

43.     The Special Rapporteur further notes that Jordan has repeatedly been mentioned in relation to the practice by the United States of America of "extraordinary renditions".  One case concerns two Yemeni nationals, Saleh Nasser Salim Ali and Muhammad Faraj Ahmed

---

[8]  See notes 10 and 13, below.

[9]  For a description of the incident, see the appendix below.

Bashmilah (see E/CN.4/2006/6/Add.1, paragraph 126), who provided credible evidence that they had been held by United States forces in secret places of detention in Jordan.[10] Another case, which the Special Rapporteur discussed with GID representatives, concerns Mr. Maher Arar.[11]

---

[10] See Amnesty International, USA/Jordan/Yemen. Torture and secret detention: Testimony of the "disappeared" in the "war on terror", AI Index: AMR 51/108/2005. By letter dated 18 January 2006, the Government informed that the allegations are false as there is no record showing that the two men had been arrested for the violations of either the penal, disciplinary or administrative codes. They do not have documented files indicating they pose a security concern, eliminating the possibility of their arrest for what may be described as "terrorism". In a letter dated 10 October 2006, the Government informed that there was "no truth to the allegations that they were tortured in secret prisons run by United States forces in Jordan. [Salah Nasser Salim Ali] was arrested on 4 September 2005 for being a member of al-Qaeda and for entering the country on a forged passport bearing the name of his brother (Salah). He was deported on 8 September 2005. [Muhammad Faraj Ahmed Bashmilah] was brought in to the Department for questioning on 21 October 2003. He was then told to leave the country, which he did on 26 October 2003".

[11] On 26 September 2002, Mr. Maher Arar, a citizen of both Canada and Syria, arrived at John F. Kennedy International Airport in New York on a flight from Zurich, Switzerland. He had started his trip in Tunisia and was connecting through New York on his way to Montreal. Upon his arrival at the airport in New York, he was detained by American authorities. On 7 October 2002, the Regional Director of the United States Immigration and Naturalization Service (INS) issued an order finding Mr. Arar to be a member of al-Qaeda and directing his removal from the United States (United States Immigration and Naturalization Service, "Final Notice of Inadmissibility", 7 October 2002, signed by Deputy Attorney-General Larry Thompson, concerning Mr. Arar's imminent removal). On 8 October 2002, Mr. Arar was awakened at 3 o'clock in the morning at the Metropolitan Detention Centre in New York, and told that it was decided by the United States that he was to be removed to Syria (see letter dated 18 January 2005 from the United States Department of Justice, asserting the State's secret privilege in relation to, inter alia, Mr. Arar's removal to Syria; CBS News, *60 Minutes II*, transcript of "His year in hell", 21 January 2004: "… Imad Moustapha, Syria's highest-ranking diplomat in Washington, says … Syrian intelligence had never heard of Arar before the United States Government asked Syria to take him."; the *Globe and Mail*, "US trusted Syria's assurances on Arar: Ashcroft", 21 November 2003; *Washington Post*, "Man was deported after Syrian assurances", 20 November 2003; and the Syrian Deputy Foreign Minister Mouallem has explained that the United States decision to remove Mr. Arar to Syria via Jordan had taken his Government by surprise; the Syrian authorities had not asked for him; they had expected him to be sent to Canada; but because of the international campaign against terrorism, Syria had had no choice but to take Mr. Arar and question him on his alleged affiliation with al-Qaeda). Mr. Arar was taken to New Jersey, put on a corporate jet, and flown to Amman, Jordan, with brief stops in Washington, D.C., Portland, Maine, and Rome, Italy (*New York Times*, "Suit by detainee on transfer to Syria finds support in jet's log", 30 March 2005; *Human Rights Watch*, US/Canada: Transfer of Maher Arar to Torture; and in response to a request under the 1985 *Access to Information Act*, the Canadian Government has indicated that the Department for Foreign Affairs and International Trade learned that Mr. Arar was transferred from the United States to Jordan

44.    The Assistant Director of GID, Brigadier Ziyad Sharidah, and the Head of the Counter-Terrorism Unit, Colonel Ali Birjak, explained to the Special Rapporteur that Mr. Arar arrived in Amman as a normal passenger on a Royal Jordanian Airlines flight. Upon his arrival, a border control officer alerted GID that Mr. Arar's name was on a list of wanted terrorists. GID officials stated that he was not arrested but was asked to leave the country, and was given a choice of any destination to go to. However, because there were no flights to any of the countries Mr. Arar had selected, he ultimately asked GID to bring him to Syria by car, which GID did. Brigadier Sharidah and Colonel Birjak repeatedly insisted on this account to the Special Rapporteur that Mr. Arar had not been arrested but was voluntarily brought, by his own request, to Syria with the assistance of GID. This account was reaffirmed in the Government's comments to the draft report of 10 October 2006.

45.    In the view of the Special Rapporteur, it is astonishing that high-level intelligence officials provided him an account which is clearly contradicted by the well-substantiated and partly proven allegations, as well as the evidence obtained so far and made public in this well-known case. Moreover, he is surprised that the Government reaffirmed this same account to him.

46.    Based on the many consistent and credible allegations and the consistency of the testimonies of former detainees in relation to the torture methods used, as well as descriptions of the interrogation cells he inspected at GID, the denial of private interviews by GID officials, and the lack of credibility of the GID officials he met, the Special Rapporteur concludes that the allegations that torture is routinely practised by GID have to be taken as accurate.

47.    Moreover, despite Jordan's obligation to prohibit non-refoulement under article 3 of the Convention against Torture, GID has participated in activities that attempt to circumvent this

---

by private plane, cited in the September 2006 Commission of Inquiry report, below). Throughout the journey, he was chained and shackled in the back of the plane. The shackles were removed only at the end of the trip, when he was given the opportunity to have a meal with his guards. On 9 October, in the middle of the night, he arrived in Amman and was transported blindfolded to a detention centre. He was then taken into a room, where the blindfold was removed. He was asked routine questions and then blindfolded again before being led to a cell. The next morning, he was told that he was going to Syria. Later that day, he was blindfolded and put into a vehicle. Around 5 o'clock in the afternoon, Mr. Arar was in Syria, in the Far Falestin detention centre, also called the Palestine Branch, which was run by the Syrian Military Intelligence (SMI). He was held incommunicado until 21 October. See *Report of Professor S. Toope*, Government of Canada, Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar, 14 October 2005; Government of Canada, Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar, *Report of the Events Relating to Maher Arar: Analysis and Recommendations*, 18 September 2006. See also the Report of the Special Rapporteur on Torture to the General Assembly (A/60/316) of 30 August 2005, paragraphs 33, 48-50.

A/HRC/4/33/Add.3
page 16

prohibition in the context of global cooperation in counter-terrorism activities. The Special Rapporteur reiterates that counter-terrorism measures employed by the Government must respect international human rights norms, in particular the absolute prohibition of torture.[12]

## B. Lack of awareness

48.    The Special Rapporteur notes information provided by the Government that it promotes human rights concepts through awareness-raising programmes disseminated by the media and it recently incorporated these concepts into the academic curricula:

> Security institutions spare no effort to train and educate security staff and staff of correction and rehabilitation centres about human rights, so as to enable them to better perform their duties in conformity with the regulations and laws in force and in a manner that reflects Jordan's adherence to international human rights treaties, particularly the Convention against Torture. Some courses are delivered locally, at the police academy, and others are delivered abroad, with officers and men being sent to other countries to learn from the experiences of prisons elsewhere. The National Centre for Human Rights has run training courses for administrators of correction and rehabilitation centres, criminal investigators, and general intelligence officers. Several courses on management of correction and rehabilitation centres have been run, in conjunction with Penal Reform International, to train participants about prisoners' welfare and the Standard Minimum Rules for the Treatment of Prisoners. Other courses have been run, in cooperation with UNDP, on the subject of guaranteeing a fair trial according to international standards. Public Security and General Intelligence officers have also taken part in courses on crime prevention, human rights, and the Convention against Torture.

49.    However, despite these activities, in various meetings with government officials the Special Rapporteur found a lack of awareness of the seriousness of torture. An illustration of this is that most directors of Correction and Rehabilitation Centres, heads of security forces and even members of Government were satisfied that disciplinary sanctions, such as reductions of salary or delayed promotions, constituted appropriate penalties for this practice. This consensus might not be completely surprising, especially given that in the Penal Code torture is classified only as a misdemeanour, subject to a maximum penalty of three years' imprisonment.

50.    More surprising, however, was the finding that none of the directors of prisons, pretrial or police detention centres had allegedly been aware of any allegations of torture. This is in sharp contrast to the considerable number of well-founded allegations which the Special Rapporteur

---

[12]    See, for example, reports of the Special Rapporteur on torture to the General Assembly (A/60/316) and (A/61/259); and the report to the Commission on Human Rights (E/CN.4/2006/6).

received from detainees within only a one-week visit.  In addition, it is well-documented that the practice of torture in Jordan has been alleged by various credible NGOs and other sources.[13]

51.    The Special Rapporteur recalls that the practice of torture constitutes one of the most severe violations of human rights and human dignity, and States parties to the Convention against Torture therefore have an obligation to carefully investigate every allegation of torture with the aim of bringing the perpetrators to justice.

## C. Impunity

52.    Notwithstanding the provisions and safeguards laid out in Jordanian law to combat torture described above, in practice they are totally meaningless because the security services are effectively shielded from independent criminal prosecution and accountability.

53.    A torture victim in Jordan who seeks redress, especially one who is a criminal suspect still in detention, faces an impenetrable wall of conflicting interests.  In simple terms, the person whom a suspect is accusing of committing torture is the same person who is guarding him or her, and the same person who is appointed to investigate and prosecute the allegations of torture being made against him.

54.    The Public Security Directorate under the Ministry of the Interior is the authority charged with the investigation of crime and the interrogation of suspects, as well as the administration of detention of suspects throughout all stages of the criminal proceedings (i.e. upon arrest, in pretrial detention, and upon conviction).[14]  The same authority, through its system of internal special prosecutors and police courts, is also the sole authority tasked with investigating and prosecuting violations committed by its own officials.[15]  Similarly, according to article 7 of the 1964 General Intelligence Directorate Law, GID officers are tried by an intelligence court comprising of GID officials.  The same is true for military personnel who are tried and sentenced by military courts.  In other words, it is only the special police, intelligence and military courts and not the ordinary prosecutors and criminal courts which have the competence to bring to justice any security official accused of torture, as defined in article 208 of the Penal Code.

---

[13]  *Amnesty International*, "Middle East and North Africa:  Jordan, Report 2006", and "Your confessions are ready for you to sign", July 2006; and *Human Rights Watch*, "Summit should address torture problem", 7 February 2006, and "Suspicious sweeps:  The General Intelligence Department and Jordan's rule of law problem", September 2006; and *United States Department of State*, Country Reports on Human Rights Practices 2005, Jordan.

[14]  1965 Public Security Law.  Note that criminal suspects detained by GID remain in its facility up until the time they have received their final sentence by the State Security Court.  Convicted military personnel serve their time in military facilities.

[15]  The 1965 Public Security Law provides that security officers must be tried by a "police court" where the judges and the prosecutor are security officers themselves.

55.     Typically, for a victim to bring charges of torture against a security officer, his or her lawyer must file a claim with the public prosecutor who then transfers the file to the Public Security Director's special prosecutor, a security officer with legal training, appointed by the Public Security Director. The Director also appoints the panel of officers that comprises the special police court, which decides on cases of abuses by officers. Moreover, the Director is empowered to annul the decisions of the special police court. In such a system, the presumption weighs heavily against transparency, independence and impartiality.

56.     Evidence in support of impartial scrutiny by these institutions would include the existence of functioning complaints mechanisms for reporting allegations of torture, a record of investigations into the allegations, and examples of successful prosecutions of security officers. From the heads of all the detention facilities - criminal investigation, pretrial, prison, and intelligence - he visited, the Special Rapporteur heard a chorus of denials of any knowledge of torture allegations received from criminal suspects or detainees. These denials were surprising, despite the officials being confronted with clear and credible allegations of torture by security officials, which were substantiated by forensic medical evidence.

57.     The Special Rapporteur reports that no ex officio investigations are undertaken even in the face of serious injuries sustained by a criminal suspect; not one official could demonstrate to the Special Rapporteur serious steps taken to investigate allegations, including at the very least the prompt and timely medical documentation of injuries sustained by detainees.[16] Given that throughout the world, the use of torture to extract confessions almost invariably takes place within the initial period following arrest and prior to being transferred to pretrial detention, a striking illustration of the indifference to the situation of criminal suspects was the response by the director of the Juweidah Correction and Rehabilitation Centre (the country's principal pretrial detention facility) that investigating such allegations was not his responsibility.

58.     While categorical in maintaining that torture does not exist, security officials routinely cited to the Special Rapporteur examples of disciplinary sanctions as evidence against impunity for those isolated acts of ill-treatment not amounting to torture. Examples of sanctions included loss of salary imposed on officers, or dismissals from service. The Special Rapporteur emphasizes that administrative sanctions on their own are insufficient to prevent and deter acts of cruel, inhuman or degrading treatment or punishment.

59.     No official has ever been prosecuted for torture under article 208 of the Penal Code.[17] A stark example of impunity for torture under article 208 of the Penal Code is illustrated by the

---

[16]  Recourse to forensic medical expertise at the State-run National Institute of Forensic Medicine is made only upon the request of the prosecutor; victims of torture cannot privately approach the institute for an independent examination. Moreover, the process of securing an examination is fraught with significant delays, which has obvious implications for documenting injuries.

[17]  The Government cited data from the Public Security Department that complaints against the police which the Police Prosecution Department or police courts dealt with were investigated in a completely impartial and objective manner. For offences of wounding and ill-treatment committed by general security officers in 2005-2006, there were 14 convictions, and

case of Zaher Abed Al-Jalil Abu Al-Reesh (see appendix, paragraph 46), where the Special
Rapporteur established beyond any reasonable doubt a serious case of torture which had
happened during the week of his fact-finding mission, and for which the evidence was
corroborated by witness testimony, his own forensic doctor, and by two forensic doctors from
the National Institute of Forensic Medicine. Concerning investigations and prosecutions into
these allegations, the Government responded, by letter dated 10 October 2006, "that when
questioned, [Zaher Abed Al-Jalil Abu Al-Reesh] asked for no charges to be brought against the
two culprits. The commission of inquiry decided to refer the two culprits to the police court to
be tried for: conspiracy to wound, in violation of article 334 of the Penal Code and pursuant to
article 76 of the same Code; and disobeying orders and instructions, in violation of article 37,
paragraph 4, of the Public Security Act". According to the Penal Code, article 334 carries a
maximum penalty of one year imprisonment and a fine of 25 Jordanian dinars, and article 37 (4)
of the Public Security Law, concerning disciplinary sanctions, carries a maximum of two
months' imprisonment, loss of two months salary, and a lowering of his rank.

60.     Paradoxically, while law enforcement officials maintain that torture allegations are
unheard of within their institutions, the Court of Cassation has overturned a number of
convictions on the grounds that security officials had obtained confessions from defendants
under torture.[18] Regrettably even these findings do not spur any official investigations into
wrongdoings by officials and none of the security officials involved in these cases have ever
been brought to justice.

61.     What is more, the decisions and rulings of the Court of Cassation related to cases where
criminal suspects are prosecuted under special courts are at the same time cited by government
officials to defend the system, pointing to the existence of independent oversight in the form of
appeals of special court decisions to the Court.

---

14 complaints were dismissed. From 1 January to 21 June 2006, there were three convictions,
two complaints were dismissed and three complaints remain under investigation. Despite
requests no information was provided in relation to the nature of the allegations, the decisions of
the convictions and dismissal, and the nature of the sentences handed down.

[18] See for example, Court of Cassation Decision No. 450/2004 of 17 March 2004: "If the court
concludes that a confession which an accused person gave to the police was obtained in
circumstances that cast doubt on its validity and as the result of beating and physical torture, the
court is entitled to disregard the confession"; and Decision No. 1513/2003 of 4 May 2006:
"Statements obtained as a result of violence and coercion cannot be relied upon to convict a
defendant." Examples of Court of Cassation rulings invalidating special court judgements:
Ruling No. 271/91 of 1 October 1992; Ruling No. 327/94 of 22 August 1994; Ruling No. 746/98
of 20 January 1998; Ruling No. 51/98 of 23 March 1998, which states that if irrefutable evidence
is found that the appellant's statements were obtained under duress and torture and without his
consent, then the statements must be struck from the record, because they are null and void;
Ruling No. 256/98 of 19 May 1998; Ruling No. 552/99 of 23 August 1999; and Ruling
No. 820/2003 of 22 November 2003.

A/HRC/4/33/Add.3
page 20

62.     However, with respect to the question of *impunity* and the *prosecution by special courts of police or intelligence officers for torture or ill-treatment*, no evidence has been produced to indicate examples of where special court acquittals of police officers have been successfully appealed to the Court of Cassation, if appealed at all.

63.     This leads to the conclusion that impunity is total.  The special court system does not work effectively at all.  The absence of a crime of torture in accordance with article 1 of the Convention against Torture is only part of the problem.  At the heart of it lies a system where the presumption of innocence is illusory, primacy is placed on obtaining confessions, public officials essentially demonstrate no sense of duty, and assume no responsibility to investigate human rights violations against suspected criminals, and the system of internal special courts serves only to shield security officials from justice.

## IV.  CONCLUSIONS AND RECOMMENDATIONS

64.     **The Special Rapporteur concludes that the practice of torture is widespread in Jordan, and in some places routine, namely the General Intelligence Directorate, the Public Security Directorate's Criminal Investigation Department, as well as Al-Jafr Correction and Rehabilitation Centre.**

65.     **The total denial of knowledge of torture allegations is astonishing, and points to a lack of awareness and recognition by officials of the nature of the prohibition of torture and ill-treatment, and of its gravity and severity.**

66.     **The Special Rapporteur notes that article 208 of the Penal Code is not in line with the definition of torture contained in article 1 of the Convention against Torture, is not treated as a significant crime but rather as a misdemeanour, and is not subject to penalties appropriate to its gravity.  Indeed, in the opinion of officials, minor disciplinary sanctions seem to be adequate and sufficient sanctions for acts amounting to torture. Notwithstanding the shortcomings of this provision and despite the assertions by the Government that the Convention is a binding part of domestic law, it has never been applied because ordinary courts have no competence to invoke it against military, intelligence or public security officers.**

67.     **Taken together, the lack of awareness and recognition, and the absence of any effective legislation to prohibit and criminalize torture creates a system of total impunity that allows torture to be practised in Jordan unchecked.**

68.     **In view of Jordan's position as a Vice-Chair of the United Nations Human Rights Council; the stated political commitment, at the highest levels, to the promotion of a human rights culture in the country and the dissemination of information about these issues at the governmental and public levels; the reaffirmation of the Government's commitment to the Convention against Torture and the human rights treaties to which it is a party; its condemnation of all practices of torture and ill-treatment and its intention to impose the highest penalties on any public official found guilty of torture and ill-treatment; its willingness to continue to cooperate with the Special Rapporteur and with the**

United Nations human rights mechanisms because of its commitment to developing and promoting human rights; the Special Rapporteur is assured that every effort will be made to implement his recommendations.

69.     The Special Rapporteur expresses the sincere hope that as a first step, the Government will demonstrate its commitment by holding accountable security officials who practise, order or condone torture (e.g. the head of counter-terrorism operations of GID, the Director of the Al-Jafr Correction and Rehabilitation Centre, the Deputy-Director of CID, the Directors of Criminal Investigation Section North/South/ Central Jordan and Amman Centre, the two interrogators from Marqa police station identified in the appendix, and the prison official from Juweidah Correction and Rehabilitation Centre identified in the appendix).

70.     In its letter of 10 October 2006, the Government informed the Special Rapporteur of a number of developments since his visit:

     (1)     The Government has tasked the competent institutions with exploring the possibility of amending article 208 of the Penal Code to increase the penalties to be imposed on public servants, including by ruling out any statute of limitations on, or general amnesty for, acts of torture, and to verify that the article meets the requirements of the definition of torture set out in article 1 of the Convention against Torture.

     (2)     The Public Security Department is investigating a number of the cases of alleged torture mentioned in the report and those responsible for these acts will be punished if found guilty.

     (3)     The Government will look into the possibility of granting everyone who is arrested the right to ask for a lawyer at the time of arrest.

     (4)     The Government is contemplating closing Al-Jafr Correction and Rehabilitation Centre, and transferring the inmates elsewhere.  The number of prisoners has already been reduced; there are currently not more than 50 inmates at the centre [The Special Rapporteur welcomes recent information that the Government has in fact closed Al-Jafr as of December 2006].  The Public Security Department has drawn up a comprehensive plan for the development and modernization of correction and rehabilitation centres and training of staff.  Furthermore, the Government is in the process of creating a special refuge for women held in protective custody.

71.     The Special Rapporteur welcomes this information, some of which relates to recommendations made in his preliminary observations following the visit.  These developments are evidence of the Government's cooperation to this end.  He stands ready to offer his full cooperation and assistance.

72.     The Special Rapporteur recommends to the Government that:

Impunity

     (a)     The absolute prohibition of torture be considered for incorporation into the Constitution;

A/HRC/4/33/Add.3
page 22

(b)     The highest authorities, particularly those responsible for law enforcement activities, declare unambiguously that the culture of impunity must end and that torture and ill-treatment by public officials will not be tolerated and will be prosecuted. The message should be spread that torture is an extremely serious crime which will be punished with severe (long-term) prison sentences;

(c)     The crime of torture be defined as a matter of priority in accordance with article 1 of the Convention against Torture, with penalties commensurate with the gravity of torture;

(d)     The special court system within the security services - above all, police and intelligence courts - be abolished, and their jurisdiction be transferred to the ordinary independent public prosecutors and criminal courts;

(e)     An effective and independent complaints system for torture and abuse leading to criminal investigations be established;

Safeguards

(f)     The right to legal counsel be legally guaranteed from the moment of arrest;

(g)     The power to order or approve arrest and supervision of the police and detention facilities of the prosecutors be transferred to independent courts;

(h)     All detainees be effectively guaranteed the ability to challenge the lawfulness of the detention before an independent court, e.g. through habeas corpus proceedings;

(i)     Judges and prosecutors routinely ask persons brought from police custody how they have been treated and, even in the absence of a formal complaint from the defendant, order an independent medical examination in accordance with the Istanbul Protocol;

(j)     Those legally arrested should not be held in facilities under the control of their interrogators or investigators for more than the time required by law to obtain a judicial warrant of pretrial detention, which should not exceed 48 hours. After this period they should be transferred to a pretrial facility under a different authority, where no further unsupervised contact with the interrogators or investigators should be permitted;

(k)     The maintenance of custody registers be scrupulously ensured, including recording of the time and place of arrest, the identity of the personnel, the actual place of detention, the state of health upon arrival of the person at the detention centre, the time at which the family and a lawyer were contacted and visited the detainee, and information on compulsory medical examinations upon being brought to a detention centre and upon transfer;

(l)     Confessions made by persons in custody without the presence of a lawyer and that are not confirmed before a judge shall not be admissible as evidence against the persons who made the confession. Serious consideration should be given to video and audio taping of interrogations, including of all persons present;

(m)      All allegations of torture and ill-treatment be promptly and thoroughly investigated by an independent authority with no connection to the authority investigating or prosecuting the case against the alleged victim;

(n)      Any public official found responsible for abuse or torture in this report, including the present management of CID and GID, certain police or prison officials involved in torture or ill-treatment, as well as prosecutors and judges implicated in colluding in torture or ignoring evidence, be immediately suspended from duty, and prosecuted; on the basis of his own (very limited and short-time investigations) the Special Rapporteur urges the Government to thoroughly investigate all allegations contained in the appendix with a view to bringing the perpetrators to justice;

(o)      Victims of torture and ill-treatment receive substantial compensation proportionate to the gravity of the physical and mental harm suffered, as well as adequate medical treatment and rehabilitation;

(p)      The declaration be made with respect to article 22 of the Convention against Torture recognizing the competence of the Committee against Torture to receive and consider communications from individuals who claim to be victims of a violation of the provisions of the Convention;

Conditions of detention

(q)      Non-violent offenders be removed from confinement in pretrial detention facilities, subject to non-custodial measures (i.e. guarantees to appear for trial, at any other stage of the judicial proceeding and, should occasion arise, for execution of the judgement);

(r)      Pretrial and convicted prisoners be strictly separated;

(s)      The Criminal Procedure Code be amended to ensure that the automatic recourse to pretrial detention, which is the current de facto general practice, be authorized by a judge strictly only as a measure of last resort, and the use of non-custodial measures, such as bail and recognizance, are increased for non-violent, minor or less serious offences;

(t)      Due to extremely harsh prison conditions and routine practice of torture, the Al-Jafr Correction and Rehabilitation Centre be closed without delay;

(u)      Females not sentenced for a crime but detained under the Crime Prevention Law for being at risk of becoming victims of honour crimes be housed in specific victim shelters where they are at liberty but still enjoy safe conditions.

Prevention

(v)      Security personnel shall undergo extensive and thorough training using a curriculum that incorporates human rights education throughout and that includes training in effective interrogation techniques and the proper use of policing equipment, and that existing personnel receive continuing education;

A/HRC/4/33/Add.3
page 24

      (w)     Security personnel recommended for United Nations peacekeeping operations be scrupulously vetted for their suitability to serve;

      (x)     The Optional Protocol to the Convention against Torture be ratified, and a truly independent monitoring mechanism be established - where the members of the visiting commissions would be appointed for a fixed period of time and not subject to dismissal - to visit all places where persons are deprived of their liberty throughout the country;

      (y)     Systematic training programmes and awareness-raising campaigns be carried out on the principles of the Convention against Torture for the public at large, security personnel, legal professionals and the judiciary.

**International cooperation**

73.    The Special Rapporteur recommends that relevant international organizations, including the OHCHR and UNDP, be requested to provide, in a coordinated manner, assistance in the follow-up to the above recommendations.

A/HRC/4/33/Add.3
page 25

## Appendix

## PLACES OF DETENTION - INDIVIDUAL CASES

1.     The following accounts are based on allegations by detainees while being interviewed by the Special Rapporteur.  If detainees requested confidentiality, their allegations are not contained in this annex.

2.     By letter dated 10 October 2006, the Government replied to some of the observations and the allegations transmitted by the Special Rapporteur.  While the Special Rapporteur appreciates information, including annexes, provided by the Government, he regrets that in most instances it related to the reasons of arrest, and not to the steps taken to investigate the allegations of torture and ill-treatment.  The Special Rapporteur appreciates that investigations may be ongoing and requests that relevant information be forwarded to him as it becomes available.

3.     The Government informed [apart from the information provided by the Government to the specific cases, below]:

> that allegations about torture by criminal investigators or prison staff … in the Special Rapporteur's report are untrue and come from persons with previous criminal records. The individuals in question were detained in correction centres pursuant to court orders issued by public prosecutors of regular courts and after the Department of Public Prosecutions had interviewed them.  None of them made any allegations about police torture.  The public prosecutor refers anyone who makes an allegation about police torture to a doctor for a medical examination, since Jordanian law prohibits acceptance of a confession obtained under duress.  In addition, correction centres do not admit anyone who shows signs of having been tortured, until the victim has been examined by a forensic doctor.  It is common for prisoners to make false allegations about torture in a pathetic attempt to evade punishment and to influence the court.  Correction centres only admit inmates detained pursuant to an order issued by a competent judicial body, or in implementation of the powers vested in administrative governors under the Crime Prevention Act.

## I. GENERAL INTELLIGENCE DIRECTORATE, AMMAN
### (Visited on 26 June 2006)

4.     The Special Rapporteur visited the detention facility of GID unannounced on the evening of 26 June, at approximately 6 p.m.  He was permitted to freely inspect the facility but was denied private interviews by the official on duty, and then by Mr. Ali Birjak, the head of the GID's Counter-Terrorism Unit, who arrived shortly thereafter.  Mr. Birjak did however permit interviews on condition that a soldier be present in the cell, reportedly for the protection of the Special Rapporteur and his delegation.  Moreover, he clearly stated that this condition was similarly imposed on visits by ICRC delegations.  The Special Rapporteur declined the protection, accepting responsibility for any consequences that might arise, explained the rationale for speaking with detainees without a soldier present, and disputed the claim in relation to ICRC.  From the detention wing, he strongly protested this clear violation of the terms of reference for the mission by phone to the Assistant Director of GID, Brigadier Ziyad Sharidah, and the Ministry for Foreign Affairs.  After considerable discussion, and as there was no

A/HRC/4/33/Add.3
page 26

acceptance of private interviews, the Special Rapporteur ended his visit to the facility, at around 8 p.m. after he had inspected the facilities, including various interrogation rooms. From the responses and behaviour of the GID officials, it was apparent to the Special Rapporteur that GID had a strong interest in preventing the detainees from talking to him in private. During the course of the evening up until the next afternoon, on 27 June (approximately 2 p.m.), officials from the Ministry for Foreign Affairs did contact the Special Rapporteur only to reiterate the position of GID (i.e. the concerns for the safety of the Special Rapporteur), saying that they were informed that the Special Rapporteur would not compromise on private interviews, and indicating that the Ministry would continue to seek a solution.

5.      **The Special Rapporteur recommends that since the head of the anti-terrorism unit, Colonel Ali Birjak, has been clearly identified by a number of former detainees as personally being involved in torture practices, criminal investigations should be initiated against him.**

## II. AL-JAFR CORRECTION AND REHABILITATION CENTRE, AL-JAFR
(Visited on 27 June 2006)

6.      On 27 June 2006, the Special Rapporteur undertook a visit to Al-Jafr Correction and Rehabilitation Centre. Located approximately 256 km from Amman in Ma'an Governorate, in south central Jordan, the prison, apart from an adjacent military base, is isolated in desert surroundings. Originally built in 1953, it is reported to initially have held political detainees. The prison underwent a number of closures over its history, and according to the prison director, it was most recently closed in November 1999 and its prisoners were transferred to other facilities. Al-Jafr received a fresh intake of inmates in March 2005. The facility covers about 70,400 m$^2$. There are seven dormitory-style quarters holding about 35 to 48 prisoners, each situated in a walled courtyard. In addition, there are about 20 solitary cells. The centre has a capacity of 320 prisoners, and at the time of the visit 204 persons were being held there. According to the prison director, 84 per cent of the prisoners were administrative detainees under the 1954 Crime Prevention Law, and the remainder as spillover from overcrowded prisons. The Special Rapporteur interviewed 16 persons detained in Al-Jafr.

7.      **General conditions and treatment in detention.** In terms of conditions in detention, complaints related primarily to exposure to the harsh desert temperatures and vermin, lack of adequate medical treatment, and isolation. While prisoners are permitted monthly visits, the location makes it difficult for families or even lawyers to visit.

8.      With the exception of the four members of Parliament mentioned below, virtually every detainee described the treatment meted out by prison staff in Al-Jafr as humiliating and brutal, and the accounts were consistent throughout. Beatings were reported to be carried out regularly, in plain view of other detainees and staff and in solitary confinement cells as well. Beatings could occur for behavioural infractions, including even for not standing up when an officer came into a cell, or otherwise without provocation. Collective punishments were common if one prisoner had been found to have done something wrong, and there was constant fear of reprisals. The treatment described included, among other things, beatings carried out using electrical cables, tree branches, and water pipes; *falaqa*; *strappado*-style hanging, being hung upside down with a stick under the knees in a position called *farruj* ("grilled chicken"); being hung for extended periods of time outdoors from the wrists tied to metal rings fixed to a wall; being

forced to repeatedly stand and squat; and having cigarettes stubbed out against the skin. Officers were reported to draw faucets or ladders on walls or on the ground, which inmates would have to pretend to drink or climb up. Prisoners described being forced to kiss walls, furniture or the shoes of officers, eat food from a guard's shoes, shout slogans, and forced to call themselves insulting names.

9.      The detainees described how newly arrived detainees would be met by a "welcoming committee" of up to 20 officers. In the courtyard outside their assigned barracks, the new arrivals would be forced to strip to their underwear and be subjected to beatings by the officers with electrical cables and batons while still handcuffed. The beatings would last for long periods at a time. The detainees would be revived with cold water and beaten again, and this treatment would last for days. No medical treatment was provided for the injuries. Additionally, they would be placed in solitary confinement cells, where they would be subjected to further beatings.

10.     In one cell block several detainees alleged similar beatings with cabling. The medical examination of the forensic expert revealed that one detainee showed yellowing red "rail-track" bruising with associated abrasions together with circular bruising and central abrasion over the upper half of the back, strongly corroborative of an allegation of beating with cabling. A second detainee showed similar "rail-track" scabbed abrasions horizontally to the lumbar area of the back and both shoulders where there were also irregular areas of fresh scarring strongly corroborative of the allegation of a routine beating. A third detainee who had arrived three days previously from another facility had an area of discontinuous scabbed abrasions down the outer aspect of the right forearm and onto the back of the right hand and adjacent little finger, a pattern of injury consistent with the allegation that they were sustained while warding off blows (defensive-type injuries). The right hand was swollen and there were minimal wrist and finger movements. A prominent area of scabbing overlay the first knuckle of the right ring finger which was extremely tender, displaced and likely fractured. A fourth detainee displayed a scattering of fresh healing "rail-track" abrasions to the upper back and left outer arm again strongly corroborative of the allegation of a beating. A fifth detainee showed similar healing "rail-track" abrasions with associated yellowing pink bruising and irregular areas of abrasion to the upper back. A sixth detainee who alleged that he had been beaten four months previously displayed hyper-pigmented "rail-track" scarring to the back of the right shoulder and circular areas of hyper-pigmented scarring to both shoulders consistent with the time frame of the allegation. He also displayed on his right upper arm a horizontal area of discontinuous "rail-track" fresh pink bruising supportive of his allegation of a very recent assault. A seventh detainee who alleged he was beaten using cabling had irregular areas of young scarring and healing abrasions over the upper back and outer aspect of the left upper arm together with more recent linear scabbed abrasions to the inner aspect of the right thigh consistent with the allegation of two episodes of beatings.

11.     Taken together the character, distribution and age of the injuries to these seven detainees provided compelling corroboration of their allegations of routine beatings as an institutional procedure. Many of the detainees also had multiple parallel linear scars, typical of self-inflicted cut wounds, to predominantly the arms and legs. They freely admitted, without prompting, that these scars were from injuries which they had inflicted upon themselves out of a sense of frustration.

A/HRC/4/33/Add.3
page 28

12.      **Unidentified prisoner in solitary confinement**, approximately aged 25 years. The man, who was obviously extremely frightened, recounted that he had been beaten one week prior to the visit at his reception by prison officials with metal bars, cables and pipes. He complained that he was given dirty food and that he could not leave his cell.

13.      A medical examination, which was necessarily brief because of the expressed fear of the detainee, provided compelling corroborative evidence of the allegations. Large areas of ageing yellow-purple confluent bruising involved the buttocks, both upper arms, mid back and shoulders. Over the mid back and shoulders were classical "rail-track" bruises and scabbed abrasions diagnostic of blows from a linear weapon with a circular cross-sectional shape, such as the cables and pipes alleged. Over the lateral aspects of both upper arms the "rail-tracks" were predominantly scabbed abrasions consistent with the use of metal cabling. Overall the pattern of injuries suggested a severe, sustained, routine beating consistent with the time frame and the weapons alleged.

14.      **Ali Abu Sukkar, Muhammed Abu Fares, Ibrahim Mashoukhi, Jaafar Hourani**, members of Parliament, belonging to the Islamic Action Front. On the evening of 7 June 2005, the four men were arrested after they conveyed their condolences to the family of the Al-Qaeda terrorist, Abu Musab Al Zarqawi. No warrant was shown to them at any time and they were not informed of the reasons for their arrest. They were held overnight at the Criminal Investigation Department, and brought the next day to the civil public prosecutor, who decided after 15 minutes that he was not competent in their case. They were then referred to the State Security Court's prosecutor, who undertook the interrogation. The men complained that they were not given water or food for the entire day. After the interrogation they were taken by van to Al-Jafr. They only learned about the reasons for their arrest from newspapers, which they were allowed to receive. The four MPs felt mentally tortured by their imprisonment but indicated to the Special Rapporteur that they were treated as "first-class detainees" in comparison to the other prisoners in Al-Jafr. They reported that they were unable to make telephone calls, only very limited visits by their families had been allowed, and received one visit from their lawyer. They reported that visits by the Parliament's Freedom Committee, of which they were members, as well as a delegation of MPs, was denied, and they were not seen by the ICRC. That their detention was extended for another 15 days for interrogation was conveyed to them by television. However, the MPs informed the Special Rapporteur that apart from their initial questioning they had not been interrogated further.

15.      Based upon the interviews he conducted with the detainees, the medical examinations carried out, and an inspection of the facility, the Special Rapporteur concludes that Al-Jafr Correction and Rehabilitation Centre exists essentially as a place of punishment for detainees who allegedly did not behave well in other prisons. Moreover, it is apparent that Al-Jafr, as illustrated by the case of the four members of Parliament, continues to be a place where the authorities can arbitrarily detain and isolate individuals at will under the guise of administrative detention provided for under the 1954 Crime Prevention Law.

16.      The Government informed that the four MPs were all released.

17.    **The Special Rapporteur strongly recommends the closure of the Al-Jafr Correction and Rehabilitation Centre [he welcomes recent information that the Government has closed down Al-Jafr as of December 2006]. Furthermore, criminal charges should be brought against the director of the facility and other officers responsible for torture in Al-Jafr.**

### III.  SIWAQA CORRECTION AND REHABILITATION CENTRE, SIWAQA
(Visited on 27 June 2006)

18.    Located approximately 75 km outside of Amman, along the Desert Highway, Siwaqa is a sprawling facility with a capacity for about 2,400 inmates. It is comprised of 13 wings with several support buildings, which include a supermarket, handicraft workshops, a mosque, theatre, sports field, and even an olive grove and farm. According to the director, at the time of the Special Rapporteur's visit, there were just over 2,000 inmates in Siwaqa, 90 per cent of whom were serving their sentences and the remaining prisoners were on remand. In Jordan executions are carried out at Siwaqa, and around 28 prisoners were awaiting death sentences at the time of the visit. The Special Rapporteur interviewed detainees in the solitary confinement wing, on death row, the section for new arrivals, as well as the so-called *Tanzeemat*, or Islamic extremist, wing. About 10 prisoners were interviewed at Siwaqa, but only the following persons agreed to make their allegations public.

(a)    **Solitary confinement cells**

19.    **Mahmud Walid A.**, aged 24, a journalism student. He reported that five years ago he was taken by narcotics officers to the CID, where he was interrogated in connection with a murder investigation. He was kept in an office and forced to sign a statement. When he asked what he was signing, he was smacked, his hands were tied behind his back, and was beaten until he agreed to sign. The prosecutor that came the next morning, insulted him, and beat and kicked him in the stomach. He was taken to the crime scene and was forced to pose for photos. Although the real murderer confessed, according to his lawyer, he nevertheless was convicted, sentenced to death, and remains on death row. When he first arrived at Siwaqa, he was abused and attempted suicide. The guards said that if he complained, they would expedite his execution date. Upon complaining to the director, he was reportedly told by him to forgive and forget. He has been detained for two years in Siwaqa, and was previously held for three years on remand in Juweidah. The Special Rapporteur subsequently discussed this case with the Prison Director.

20.    The Government informed that Mr. Walid did not appear to have been held in the correction centre. The name transmitted by the Special Rapporteur may not be correct and this is required in order to follow up.

(b)    **Tanzeemat wing**

21.    **Munzir Mahmud Khalil Sa'ad Abu Zahr**, aged 25, a graphic design student. On 21 July 2005, his home was raided by masked men security officers. He was handcuffed, blindfolded, and taken away to GID for 11 months. He was held in a 12 m x 10 m cell, and was brought from time to time to the "yard" where he was interrogated. He recalled that the interrogators inquired, "What mistakes did you make in life? Either you confess, or you must

A/HRC/4/33/Add.3
page 30

stand on the edge of the light switch." Those who beat him were usually different from the interrogators, and wore army uniforms. Sitting in the interrogation office, the interrogator would press a button, and a soldier would take him away to be beaten. He was subjected to *falaqa*; forced to lie down on the floor with his feet tied together and beaten on the soles. Later, he would be given salty water to soak his feet in before the next beating, presumably to reduce the swelling. The soldiers would also periodically bang on the cell doors to induce sleep deprivation. His beatings lasted nine days, and he finally confessed to terrorism-related charges. Following questioning by the State Security prosecutor in GID he was transferred to Juweidah. It is there that he lost sight in his left eye. On 28 February 2006, when security personnel fired teargas into a cell of 54 persons, his head was skewered with a metal rod inserted by an officer when he went to the door grating for air. Mr. Abu Zahr was eventually sentenced to four years, and was brought to Siwaqa on 10 March 2006. On arrival he reported that he was subjected to a reception ceremony where the new arrivals were beaten, including with electroshock batons, videotaped undressed, before being fingerprinted. From his arrival until 9 June, he was held in a solitary confinement cell where the window was covered with a black steel plate with holes drilled into it for light. He reports that he is allowed outside of his cell for one hour per week, and is permitted family visits every two weeks for 15 minutes. His requests for antibiotics, and sunglasses have not been granted. The Special Rapporteur subsequently discussed this case with the Prison Director.

22.     The Government informed that the allegations that he was detained and tortured by GID are pure fabrication, since he has never been in detention there.

## IV. JUWEIDAH CORRECTION AND REHABILITATION CENTRE, AMMAN
### (Visited on 28 June 2006)

23.     The facility is the main pretrial detention facility in Jordan, and is located within Amman. Established in 1986, the prison has a capacity for 1,200 inmates but at the time of the visit, had a population of about 1,700, according to the director. The facility is divided into six wings, categorized according to the type of crime, and a *Tanzeemat* Islamic extremists wing. According to the director, pretrial detention can last up to a maximum of two years. The Special Rapporteur interviewed more than one dozen prisoners. Those who agreed to have their interviews made public appear below.

(a)     **Section D - new arrivals**

24.     **Marwan Ali Hameed**, aged 40, Amman. He was held in CID from 22 to 27 June 2006. He described the layout of CID detention facility, the number of cells, and of the location of the interrogation cell. He described how he was suspended *strappado*-style to the top rung of a cell door. For 15 minutes he was suspended and beaten on the soles of his feet until he confessed. He was brought to Juweidah on 27 June 2006. There was no doctor who examined him at CID.

25.     The Government informed that Mr. Hameed has 72 previous convictions for forgery and fraud.

26.     **Khalid Sabah Ya`Qub**, aged 40. On 27 May 2006, he was arrested on suspicion of theft and brought to Elghuwarieh Police Station, Zerka. He was kept there for 15 days. He alleges

that every night at around 10 p.m. the torture started.  He described in detail the detention, torture and interrogation facilities in the basement of the police station.  He described how a number of detainees were suspended *strappado*-style, in a way that all detainees could actually see them and hear their screams.  He never knew when he would be subjected to torture.  Usually he was suspended every second night for at least 10 to 15 minutes.  In addition, he was subjected to beatings with an electroshock baton.  He had to wear two trousers in order to avoid scarring.  The interrogation and the beatings took place in a small room close to the cells.  After 15 days he was brought before the prosecutor, whom he told that he had been tortured.  The prosecutor allegedly replied, "What can I do?"  He was detained for a further two weeks in Bireen Police Station, before being brought to Juweidah on 22 June.

27.     This detainee vividly described the immediate after affects of *strappado* recounting that he lost the use of both hands and arms for three days, was unable to raise his arms above shoulder level and had no grip or sensation in his hands.  Recovery from these effects was gradual so that by the time of the medical examination he had completely recovered the use of his hands and arms.  This case was discussed by the Special Rapporteur with the Prison Director.

28.     The Government informed that Mr. Ya`qub did not appear to have been held in the correction centre.  The name transmitted by the Special Rapporteur may not be correct and this is required in order to follow up.

29.     **Ali Mohammed Hamdan Al-Hineity**, aged 30.  On 20 June 2006, he was arrested by criminal investigation officers at his home and brought to the El-Gueisma police station, on suspicion of theft.  He was handcuffed behind his back for three days.  Every two hours the interrogators poured water on him.  One officer lifted him by the handcuffs and suspended him from a hook on the wall, *strappado*-style.  On another occasion, an officer tied a belt around his ankles and lifted him upside down, releasing him head first to the floor from a height of 30 cm.  He was beaten and kicked all over his body, particularly his head, legs and loins.  After three days he was brought to the prosecutor, whom he informed about his torture.  On 25 June, he arrived at Juweidah in poor condition.  He again complained about his torture and asked for medical treatment because of severe pain in his head and his whole body.  Lieutenant Al-Khateeb, a prison officer, at Juweidah, told him that a torture complaint would make his situation only worse.  He forced Mr. Al-Hineity to sign a false statement, which he himself also signed, stating that his injuries were sustained not at the police station but prior to his arrest, by a masked man who had beaten him with electric cables in front of a petrol station.  The same officer recounted a markedly different story when confronted by the Special Rapporteur.  When the Special Rapporteur raised this case, including the medical evidence and the obvious attempt of the officer to cover up any torture allegations, the director of Juweidah, who denied any knowledge of this or similar torture complaints, promised to investigate these allegations.

30.     This detainee described the after affects of suspension recounting that when he arrived at the prison he had no strength in his hands and arms, was unable to raise his arms above his head and could not hold his food.  By the time of examination he had recovered the use of his hands and arms but still retained, on testing, a change of sensation (parasthesia) in a partial distribution of the right radial nerve involving the thumb and adjacent side of the forefinger.  He had confluent extensive yellowing purple bruising approximately 25 x 20 cm over the left buttock,

three similar areas of bruising up to 10 cm in diameter over the right buttock and a further 10 cm bruise on the inner aspect of the left lower leg, together with two areas of markedly yellowing bruise to the upper mid-abdomen and left side of the abdomen. There were no defensive type injuries to the hands and arms and this together with the extent of the bruising to the buttocks was supportive of his allegation that he had been repeatedly beaten whilst restrained. The colouration of the bruising was consistent with the time interval between the alleged assault and the examination.

**(b)     Cell 13 - Special Brigade incident of 22 June 2006**

31.     **The prisoners in Cell 13**:  On 22 June 2006, between 11.30 p.m. and 12.30 a.m., some 25 to 30 officers known as the Special Brigade (who normally guard prisoners on the way to court) entered Cell 13 in search of drugs and illegal weapons, on the orders of the director. The officers insulted the prisoners, who were watching television, and demanded them to remove their clothes. The prisoners were slapped and struck with cables and broom handles. They were forced to stand facing a wall, and hold up their feet. They were hit on the heels, and beaten on their backs with cables and pipes. A preventive security officer did not intervene and did not prevent the beatings. One senior prison official encouraged the Special Brigade. He ordered the prisoners to be shaved. Following complaints of the incident, the prisoners were examined for injuries. During their medical examination they were blindfolded, handcuffed, and shackled. The prisoners waited in a van and were called one-by-one to an examination room. The examinations were cursory, lasting about two minutes each, involving examinations of the back only, and the prisoners were not asked to explain the circumstances of the injuries.

32.     **Sami Ramahi**, aged 32, a United States national. He reported that during this incident he was struck with a plastic pipe across his waist.

33.     On examination this man had a large D-shaped yellowing purple bruise with central sparring immediately to the left of the umbilicus measuring approximately 15 x 8 cm and consistent with the alleged time (6 days previously) and method of infliction. Other detainees who alleged having been beaten in the same incident six days previously included an unnamed individual who alleged he was struck with a broom handle across the nipple. He had a markedly yellowing purple bruise approximately 12 cm in diameter surrounding the nipple with a linear scabbed abrasion above the nipple consistent with the alleged timing and method of infliction. Another detainee from the same group displayed a 15 cm scabbed "rail-track" abrasion with central 1 cm sparing to the right anterior chest and a similar 8 cm scabbed abrasion with bruising to the left shoulder. Yet another detainee from the same group showed multiple yellowing purple "rail-track" bruises to both shoulder areas, bruising to the outer aspect of the right thigh 15 x 10 cm and to the right hip 10 x 8 cm. Taken together the injuries are strongly corroborative of the allegation that the group of prisoners was beaten using cables and plastic pipes six days previously.

34.     The Government informed that Mr. Ramahi was convicted for issuing cheques without funds to cover them, and has a previous criminal record.

35.     **Rami Mohammed Karaki**, aged 29, Kerak.  In addition to the above incident, Mr. Karaki reported that on 27 June, he was struck on the the right shoulder, upper arm, and back by an officer, when he went to complain about an incident concerning the distributing of visit receipts.

36.     On examination this detainee had a fresh pink linear bruise 20 x 1.5 cm with minor associated abrasion running vertically the length of his right upper arm from shoulder to elbow consistent with the alleged assault the previous day.  He also had a 4 x 1 cm healing abrasion to the right side of the abdomen, a fading yellowing 10 x 3 cm bruise to the back of the right shoulder and four faint areas of healing abrasion to the top of the left shoulder consistent with the allegation of being beaten along with other detainees six days previously.

37.     The Government informed that he was detained by the Amman public prosecutor on a robbery charge and has a criminal record (25 previous convictions), and the police public prosecutor investigated his complaint.

38.     **Investigations of allegations of torture and ill-treatment of incoming prisoners, as well as of those already detained, are the responsibility of the prison administration.  The Special Rapporteur expresses his concern at the lack of any investigations carried out in this regard.  Further, he expresses deep concern with regard to personnel in Juweidah, who seek to deny victims of torture a means to have their allegations addressed and investigated.  The Special Rapporteur strongly recommends that criminal investigations against Lieutenant Al-Khateeb be initiated promptly (see the case of Ali Mohammed Hamdan Al-Hineity, above).**

### V.  JUWEIDAH WOMEN'S CORRECTION AND REHABILITATION CENTRE, AMMAN (Visited on 28 June 2006)

39.     The Special Rapporteur did not receive allegations of ill-treatment in Juweidah (Female) Correction and Rehabilitation Centre, where he was satisfied with the commitment of the prison management to the well-being of the inmates.

**(a)     Protective custody**

40.     **Maysun Shobaki**, aged 32.  She has been detained since 1996, when she was 22.  She was raped by her brother and nephew.  Unaware that she had become pregnant as a result, and being unmarried, the doctor who subsequently examined her called the police.  Eventually, her nephew received seven, and she received three and a half years' imprisonment for unlawful sex.  Even after serving her time, the Governor, on the basis of the 1954 Crime Prevention Law, insisted that she remain in the facility for her own protection, until she obtains a sponsor, or gets married.  She has considered suicide because she is not permitted to leave and would like to recover her freedom.

41.     The Government informed that with respect to women held in protective custody, the aim is to protect these women's lives, since they face death threats from their families.

**(b)     High security**

42.     **Sajida Mubarak Atrous**, aged 37, an Iraqi national.  Following the suicide bombings at
hotels in Amman on 9 November 2005, she was arrested a few days later at her apartment by
GID officers on suspicion of being a bomber.  Her common law husband was among those who
had participated and died in the attacks.  She was brought to GID Headquarters, where she was
detained for 3 months and 20 days incommunicado.  During the first month of her detention, she
reported that she was subjected to severe torture by the head of GID's counter-terrorism unit
together with other members of the unit.  She clearly identified Colonel Ali Birjak, the head of
the counter-terrorism unit, in a photo and testified that he had personally participated in the
torture.  She was beaten on her head and body with a wooden stick covered by a black plastic
tape, every day for about one month.  She was also threatened with rape.  Her body had been
covered with black bruises as a result of the beatings.  During that period she reports that she was
visited by ICRC.  She identified the ICRC officers who had seen her injuries.  She was finally
brought by a female officer to the prison infirmary where she received some treatment.  After her
detention at GID, she was transferred to Juweidah (Female) Prison, where she described the
treatment as good, however, due to her designation as a high-security detainee, she is isolated
from other inmates, and therefore expressed loneliness.  The Special Rapporteur has
subsequently learned that she was sentenced to death in September 2006 (*BBC News*, "Failed
Amman hotel bomber to hang", 21 September 2006).

43.     The Government informed that:

> ... [she] was a member of a terrorist group that blew itself up at hotels in Amman
> on 9 November 2005, killing over 60 people and injuring hundreds of others.  She was
> arrested after information was received that she was staying with a person in the town of
> Salt and that she had an explosive belt in her possession.  The public prosecutor notified
> the State Security Court, which ordered the seizure of the explosive belt and the woman's
> arrest.  From the very outset, the case was overseen by the public prosecutor, who
> conducted the investigation himself.  It was at his request that she was placed in the
> detention centre of the General Intelligence Department.  Her claims that she was
> tortured and threatened with rape are nothing but an attempt to obtain a lenient sentence
> from the Court.  On 12 December 2005, a delegation from the National Centre for
> Human Rights met with her and was satisfied with her treatment.  This meeting is
> mentioned in the 2005 report on the human rights situation in the Kingdom [National
> Centre for Human Rights, *Status Report of Human Rights 2005*, p. 11].

## VI.  PUBLIC SECURITY DIRECTORATE, CRIMINAL INVESTIGATION
## DEPARTMENT, AMMAN (Visited on 28 and 29 June 2006)

44.     The Special Rapporteur visited CID on the evening of 28 June.  Upon his arrival the
officers attempted to prevent and delay his entry to the detention facilities for the purposes of
concealing evidence.  The facility has approximately 80 solitary cells, of which all were empty
except 3 that he was finally able to enter.  In addition, there were 3 common cells, of which 2
were empty.  Members of his team, including the forensic doctor, returned there on the morning
of 29 June to follow up on the cases he intervened in.

45.    The Government informed that the Special Rapporteur and his entourage was provided with every facility to enable them to perform their tasks to the best of their ability. As soon as the officers in charge knew that the Special Rapporteur was at the Criminal Investigation Department, he and his entourage were immediately admitted and provided with every facility, including access to the Department's custody wing. The Special Rapporteur met with all prisoners on their own and without any interference from the security officers present.

46.    **Zaher Abed Al-Jalil Abu Al-Reesh**, aged 30. He had been arrested in connection with a theft investigation and held in Marqa Police Station from 24 to 26 June 2006. On 26 June he had been transferred to CID detention facility; administratively detained on the authority of the Governor for five days. He had not been presented to the public prosecutor. The investigators of his case were Lieutenant Ala'a and Lieutenant Ghaleb from Marqa Police Station who came to CID to interrogate him. He was interrogated in a specially-designated cell adjacent to the cells of other detainees. He told the Special Rapporteur that the torture lasted from about 10.30 p.m. until midnight on 26 June. He was forced to strip to his underwear and his feet were bound with his trousers. The investigators forced him to sit on his feet and handcuffed him behind his back. One of the interrogators sat on his knees while the other one pulled at his arms behind his back for a period of 30 minutes. He was then suspended for almost two hours from the cell door with his feet about one metre above the ground, and subjected to *falaqa*, and beaten on his head, arms and legs with a belt and buckle. Throughout this period he fainted from time to time, and was revived by cold water that was thrown on him. Whenever he regained consciousness the perpetrators would jerk his feet down and continue beating him. As a result of the treatment his shoulder was dislocated. He recalled to the Special Rapporteur that there had been 17 persons in solitary confinement who were transferred or released in days just prior to his visit.

47.    Around midnight, when the Special Rapporteur confronted the Deputy Director of CID, Colonel Atef Al Saudi, the Director of Criminal Investigation Section North/South/Central Jordan, Lieutenant Colonel Issa Kakish, and the Director of Criminal Investigation Section Central Amman, Lieutenant Colonel Assad Bali, with these allegations as well as the clear medical evidence, they flatly denied any knowledge of torture in their premises two nights before. Finally, the officers agreed to a joint medical examination together with Jordanian forensic experts the next day. The Special Rapporteur strongly recommended that none of the detainees should be interrogated or released in the meantime. However, when the Special Rapporteur went downstairs to the cell block again he discovered that Mr. Al-Reesh had been removed during the conversation with the officials. An inquiry revealed that Lieutenant Colonel Assad Bali had ordered his removal, allegedly on request of the Marqa police station. The Special Rapporteur made it clear that he expected Mr. Al-Reesh to be brought back to CID for the medical examination agreed on and expressed strong protest at this obvious attempt to hide evidence.

48.    The next day, 29 June, Mr. Al-Reesh said that after the Special Rapporteur had left the cell block around 11.30 p.m., he was questioned by guards as to what he had said. He was then taken by three police officers to a car parked in an alley behind the police station. About 30 minutes later, the officers were instructed by phone to transfer him quickly to the Marqa police station. He was held there overnight and returned unharmed to CID in the morning before the Special Rapporteur's return.

A/HRC/4/33/Add.3
page 36

49.     This detainee underwent a cursory medical examination when he was first interviewed on 28 June and later a thorough medical examination conducted by two forensic doctors from the National Institute of Forensic Medicine in Amman. His feet were prominently swollen and there was fresh red-purple bruising to the upper surfaces of both feet but not to the soles. Both wrists, but most prominently the right, showed scattered areas of bruising and abrasion typical of pressure from handcuffs, repeated with the cuffs in different positions. Immediately above and below the crooks of both elbows was an unusual pattern of repeated fresh pink horizontal linear bruises. Taken together these injuries with their unusual pattern are strongly corroborative of the allegation of suspension with the arms looped through the bars so that the horizontal rectangular element of the bar structure pressed against the crooks of the elbows. When he was first interviewed in his cell the detainee illustrated how his arms had been looped through the bars in this manner during suspension. On the left side of the abdomen were discontinuous linear red bruises consistent with the allegation of repeated blows. Bruising was also present on the right side of the neck and the outer aspect of the left lower thigh. It is difficult, if not impossible, to conceive of how the injuries to this man could have been inflicted other than in the very specific manner alleged.

50.     The Special Rapporteur established beyond any reasonable doubt a serious case of torture, which had happened during the week of his fact-finding mission. The evidence was corroborated by a witness (see below), his own forensic doctor, and by two forensic doctors from the National Institute of Forensic Medicine in Amman.

51.     The Government informed that:

        ... He was arrested on 24 June 2006 on suspicion of having robbed the Hijazi and Gawsha food company in the Marqa area and having stolen 100,000 dinars from the company's iron safe. (It should be mentioned that he had a previous record for robbery and other offences.) He was detained so that further questioning could be carried out. While he was being processed, two criminal investigators beat him, in breach of the strict instructions issued to all general security officers that they must not use coercion during questioning and must stick to lawful investigation methods when dealing with any kind of case. Zahir was sent for a medical examination and the initial medical report concluded that his general health was good and that he had not sustained any fractures or serious injuries. When questioned, he asked for no charges to be brought against the two culprits. The commission of inquiry decided to refer the two culprits to the police court to be tried for: conspiracy to wound, in violation of article 334 of the Penal Code and pursuant to article 76 of the same Code; and disobeying orders and instructions, in violation of article 37, paragraph 4, of the General Security Act.

52.     **Hikmat Adnan Ibrahim Sarih**, aged 34. On 27 June 2006, he was arrested and brought to CID. He reports that he had only been interrogated on the day of the Special Rapporteur's visit for only five to seven minutes, and was not ill-treated. He reported that he was detained at CID at the time Mr. Al-Reesh was interrogated. While he had not witnessed the torture on 26 June, he heard him screaming from the interrogation cell. Following the beatings, which he estimated lasted about two hours, he and another prisoner were instructed to assist Mr. Al-Reesh back to his cell. He reported that Mr. Al-Reesh was "completely broken"; his face was swollen and bloody, he could not move his arms, and he could not walk because his feet were badly swollen.

53.    The Government informed that Hikmat Adnan Ibrahim Sarih is being held in detention on a robbery charge.

54.    **Ali Ahmad Sayed Arahman Al-Ashaeka**, aged 26.  He was detained in CID for about a week in connection with a murder investigation.  He reported that he had been handcuffed to the grill of his cell door (about a metre and a half above the floor) for five consecutive days and nights, and the cuffs were only removed when he was brought to the toilet.  He complained of being unable to sleep in this position.  He was often awoken at night and interrogated until the early morning hours in an office above the cell block.  While he was interrogated he had to stand for up to two hours.  He stated that an officer had pulled his hair and a guard had beaten him once.  He further reported hearing screams from a cell two nights previously.

55.    On examination in the presence of two forensic doctors of the National Institute of Forensic Medicine in Amman, this detainee displayed swelling of the feet without bruising.  On the inner front of the upper third of both shins, but more marked on the left, was a prominent area of body hair loss associated with pinpoint areas of scabbed abrasion on the left side only. The detainee explained that the prolonged standing with its associated swelling of his feet and lower legs had caused his feet to itch so that he rubbed his heels against his shins.  This highly unusual combination of physical findings is strongly corroborative of the allegation of positional abuse as recounted by the detainee.  In face of the clear evidence of severe torture and the obstruction of his investigations the Special Rapporteur cannot but conclude that torture is routinely practised in CID.  In accordance with article 208 of the Penal Code, he recommends the initiation of criminal investigations against the Deputy Director of CID, Colonel Atef Al Saudi, the Director of Criminal Investigation Section North/South/Central Jordan, Lieutenant Colonel Issa Kakish, and the Director of Criminal Investigation Section Central Amman, Lieutenant Colonel Assad Bali, as well as against Lieutenant Ala'a and Lieutenant Ghaleb from Marqa police station.

-----

# EXHIBIT Q

**UNITED
NATIONS**

**A**



**General Assembly**

Distr.
GENERAL

A/HRC/4/26/Add.1
15 March 2007

ENGLISH/FRENCH/SPANISH

HUMAN RIGHTS COUNCIL
Fourth session
Agenda item 2

## IMPLEMENTATION OF GENERAL ASSEMBLY RESOLUTION 60/251 OF 15 MARCH 2006 ENTITLED "HUMAN RIGHTS COUNCIL"

**Report of the Special Rapporteur on the promotion and protection of human rights and fundamental freedoms while countering terrorism**

**Addendum**

**Communications with Governments**[*]

---

[*] The present report is being circulated as received, in the languages of submission only, as it greatly exceeds the word limitation currently used by the relevant General Assembly resolution.

GE.07-11941

A/HRC/4/26/Add.1
page 2

## CONTENTS

|  | *Paragraphs* | *Pages* |
|---|---|---|
| Introduction................................................................ | 1-5 | 3 |
| Summaries of communications transmitted, replies received and press releases issued ....................................... | 6-75 | 4 |
| Afghanistan............................................................... | 6-7 | 4 |
| Algeria....................................................................... | 8-11 | 4 |
| Australia.................................................................... | 12-13 | 6 |
| Bahrain...................................................................... | 14-17 | 7 |
| Chile.......................................................................... | 18-19 | 10 |
| China ........................................................................ | 20-21 | 12 |
| France........................................................................ | 22-23 | 13 |
| Germany .................................................................... | 24-25 | 13 |
| Indonesia.................................................................... | 26-27 | 14 |
| Israel ......................................................................... | 28-32 | 15 |
| Jordan........................................................................ . | 33-36 | 18 |
| Kenya......................................................................... | 37-38 | 21 |
| Kyrgyzstan ................................................................ | 39-40 | 22 |
| Malaysia..................................................................... | 41 | 22 |
| Maldives.................................................................... | 42-43 | 23 |
| Mauritius.................................................................... | 44-45 | 24 |
| Morocco..................................................................... | 46-47 | 25 |
| Pakistan..................................................................... . | 48-50 | 27 |
| South Africa........................................................... | 51-52 | 28 |
| Tajikistan ................................................................... | 53 | 29 |
| Thailand .................................................................... . | 54-55 | 31 |
| Turkey........................................................................ | 56-60 | 32 |
| Uganda....................................................................... ... | 61-62 | 34 |
| United Kingdom of Great Britain and Northern Ireland | 63-66 | 35 |

A/HRC/4/26/Add.1
page 3

......................

United States of America                                             67-71        37
...................................................................

Uzbekistan ...............................................................     72-74        41

Yemen ......................................................................     75          41

A/HRC/4/26/Add.1
page 19

detainees suspected of security offences. The Special Rapporteur noted some positive changes in the final text but stated that the law does not appear to provide all necessary procedural safeguards for those detained for security reasons. For example, individuals can be detained up to 96 hours before being brought before a judge, they are not necessarily present in court when detention may be extended, and there are restrictions on access to counsel during detention. These aspects of the law are, in my view, incompatible with international human rights law.

"I am mindful that States have a duty to protect their population and to take effective measures to combat terrorism. However, sustainable results can only be achieved by promoting and protecting human rights while countering terrorism. Otherwise there is no real security for the civilian population".

The Special Rapporteur was in Israel to attend the Minerva Biennial Conference on Human Rights where he gave the keynote address on Terrorism and Human Rights.

*Jordan*

(a)      *Communication sent to the Government by the Special Rapporteur*

33. On 10 July 2006 the Special Rapporteur wrote to the Government of Jordan with regard to the **legislation applicable to crimes of terrorism**, in particular that resulting from the Jordanian Penal Code No. 16 of 1960, as amended pursuant to the Provisional Act No. 54 which entered into force on 8 October 2001, and the **Draft Terror Prevention Law**. The Special Rapporteur drew the Government's attention to several substantive areas of concern. First, the Special Rapporteur pointed to the overly broad and vague definition of terrorism as contained in Article 147 paragraph 1 of the Jordanian Penal Code. In particular, its sweeping nature is revealed by the fact that an act may be qualified as terrorist regardless of the motives or purposes for carrying out the act as well as the references to damage, even partial, carried out against public or private property and facilities and the obstruction of the application of the constitution and laws. The Jordanian definition suffers from the absence of two of these cumulative conditions for classifying a crime as a terrorist crime: there is no requirement of a specific aim to further an underlying political or ideological cause and some acts are qualified as terrorist without the intention of causing death or serious bodily injury. Second, Article 5 of the draft terror prevention law provides that security services have the right to arrest and hold any suspect for a period of two weeks, which can be extended by the public prosecutor for a similar period, for justifiable reasons. Lastly, under Article 4 of the draft terror prevention law, the public prosecutor may take several freedom-limiting measures against individuals who are suspected of being involved in terrorist activities. In particular, the Public Prosecutor of the State Security Court may order surveillance of the home, the movements and communications of the suspected individual; ban from travel; and search the residence and impound any item relevant to terrorist activities and appropriate any money. These orders are valid for 3 months and may be renewed for another 3 months by the State Security Court. While the individual against whom these decisions are taken has the right to obtain the review of the measure, this can only be done before the Attorney General of the State Security Court, whose decisions are final. Due to the wide ranging consequences of the measures that may be taken vis-à-vis suspected terrorists in respect of several human right, these measures should in the Special Rapporteur's view be subject to review by a court of law. The Special Rapporteur also urged the Government of Jordan to review

A/HRC/4/26/Add.1
page 20

the definition of terrorism contained in the draft law, significantly amend the draft terror prevention law before it is adopted by Parliament and qualify what constitutes "justifiable reasons" for keeping an individual in detention.

(b)     *Communications from the Government*

34. By letter of 18 January 2006, the Government of Jordan replied to the communication sent on 17 November 2005 (see paras. 5-8, E/CN.4/2006/98/Add.1). The Government informed that the allegations submitted concerning Mr. Salah Nasser Salim 'Ali and Mr. Muhammad Faraj Ahmed Bashmilah were false, as there was no record showing that the two had been arrested for violations of penal, disciplinary or administrative codes. Furthermore, the Government indicated that there had been no files on the two Yemeni citizens indicating that they pose a security concern, eliminating the possibility of their arrest for what may be described as "terrorism".

35. By letter of 22 September 2006, the Government of Jordan replied to the communication sent on 10 July 2006. In its reply, the Government states that the definition contained in Article 147 paragraph 1 of the Jordanian Penal Code is consistent with the Arab Convention for the Suppression of Terrorism, which defines terrorism as any act or threat of violence, whatever its motive or purpose, which is carried out for the purpose of advancing an individual or collective criminal agenda, alarming and frightening people by doing them harm and endangering their lives, liberty or security, damaging the environment, damaging, occupying or seizing public or private installations, or endangering national resources. The definition contained in Article 147, paragraph 1, of the Criminal Code refers to the aims of the act as the basis for defining it as a terrorist offence. As stated in that article, the aim must be "to disrupt public order or endanger the safety and security of society". These aims are linked to a specific outcome, namely alarming and frightening people, endangering their lives and security, damaging the environment, damaging, occupying or seizing public or private installations or property, State installations or diplomatic missions, endangering national resources or impeding the application of the Constitution and the law. The presence of intent (criminal intent), the Government informs, is a key component of terrorist offences. These offences are subject to the general provisions of the Criminal Code. According to article 63 of the Criminal Code, intent is the desire to commit an offence as defined by law. It follows that criminal intent to commit a terrorist offence necessarily entails the desire to commit a criminal act and to achieve a criminal result.

With respect to Article 5 of the Draft Terror Prevention Law, the Government informs that it was designed to take account of the gravity of such offences. The purpose of the article is to give the security services enough time to gather evidence and conduct investigations into these kinds of offences. The article places a number of restrictions on this measure ensuring its correct implementation when and only when specific conditions are met. Thus, recourse to the period of time mentioned in the article can only be had in accordance with the prevention of terrorism law. The defendant must have committed a legally designated offence under that law. The time period cannot be extended unless by order of the public prosecutor and it can only be extended once, for the same period of time. Extension orders must be justified (i.e. they must be based on grounds that justify the extension). Two weeks is the maximum period of detention. If this period of time is not required for the purposes of the investigation and collection of evidence, the individual will be brought before the court as soon as these procedures are completed.

Referring to Article 7 of the International Covenant on Civil and Political Rights, the Government informs that according to article 159 of the Code of Criminal Proceedings, any confession made by a defendant, a suspect or an accused person without a public prosecutor being present shall be ruled inadmissible, unless the prosecution presents clear evidence of the circumstances in which the confession was made and the court is convinced that the confession was given voluntarily and of the person's own free will. If the court concludes that the defendant's confession was obtained as the result of any form of physical or mental coercion, it shall rule the confession to be null and void. Furthermore, Article 208 of the Criminal Code punishes anyone who uses violence or force to extract a confession. Accordingly, anyone who breaches this article must be brought before the competent court.

With respect to incommunicado detention, the Government reports that according to Article 66 of the Code of Criminal Proceedings, the public prosecutor is entitled to prevent a defendant in detention from communicating with the outside world for a period of up to 20 days, which may be extended. This does not apply to the defendant's counsel, who can see his client at any time and without a guard being present. Anyone deprived of his or her liberty by means of detention is entitled to apply to the competent judicial authorities for release and to appeal to the competent court against any rejection of his application.

As regards Article 4 of the Draft Terror Prevention Law, the Government letter informs that the Cabinet recently introduced a number of amendments to this draft law, of which the most important concern the defendant's right to appeal to the court (the State Security Court) against a decision handed down by the public prosecutor, and an increase in the number of safeguards provided. The Court must hear the appeal within one week of being seized of the matter. If the appeal is rejected, it can be sent before the Court of Cassation (the highest court in the land), which must issue a ruling within one week of being seized of the matter.

The Government further informs that there are three types of courts in Jordan, namely civil courts, religious courts and special courts. The types, levels, divisions and administration of the courts are determined by a special law. Special courts conduct proceedings in accordance with the relevant laws and the Constitution. The State Security Court was established by the State Security Act No. 17 of 1959 (as amended). It is an independent and impartial public court established by law. It applies the procedures and rules laid down in the Act and the Code of Criminal Proceedings, which are further explained in the Government's letter.

(c)    *Press release*

36. The Special Rapporteur made the following statement on 7 September 2006:

"Before Jordan's Anti-Terrorism law enters into force I call for further debate and amendments as the implementation of this law as it currently stands could negatively impact on a number of human rights.

"I regret that Parliament passed this law, on 29 August, during a period of intense deliberation by a number of independent Members of Parliament, opposition party leaders and human rights activists who claim it infringes on certain public freedoms and peaceful political activities.

A/HRC/4/26/Add.1
page 22

"The Special Rapporteur wrote to the Government in July 2006 when the draft law was before Parliament and identified a number of areas of concern.

"One of the primary concerns is the overly broad definition of terrorism since it is vague regarding the elements of intent and aim and can be seen to be at variance with the principle of legality. There are also a number of procedural safeguards that appear to have been compromised which can negatively impact on the right to a fair trial and due process. For example, the law currently allows suspects to be detained for up to 30 days without access to a lawyer and without judicial review. Further, the law gives considerable powers to law enforcement, security forces and the Public Prosecutor with regard to detention, search and arrest that effectively negate the right to privacy, freedom and movement and the presumption of innocence. Finally, the law designates military courts as having sole jurisdiction of terrorism cases which may lack judicial independence and deny a number of procedural guarantees.

"This law awaits ratification; and while I am fully conscious of the fact that States' obligation to protect and promote human rights requires them to take effective measures to combat terrorism, I wish to recall that States have a duty to ensure that any such measures comply with their obligations under international law, in particular Articles 7, 9, 10, 14 and 15 of the International Covenant on Civil and Political Rights (ICCPR), to which Jordan is a party".

### *Kenya*

(a)     *Communication sent to the Government by the Special Rapporteur*

37. On 21 June 2006 the Special Rapporteur sent a letter to the Government of Kenya with regard to the **draft Anti-terrorism Bill 2006**, which was under consideration by the Parliament. The Special Rapporteur brought several substantive areas of concern to the attention of the Government. First, the Special Rapporteur pointed to the overly broad definition of terrorism as contained Article 3 of the draft bill. Furthermore, he highlighted the vague reference to "any specified person" in Article 21 (1b) and (2c). Second, the Special Rapporteur underlined that Articles 6 and 7 of the draft bill are vaguely phrased and do not require any proof of intent on the person of the alleged perpetrator to support/commit a terrorist offence. Given the very broad and vague definition of "terrorism" and the lack of any intent requirement, articles 8 and 9 on incitement and aiding and abetting also carry the danger of being misused. Third, Part III of the draft bill confers large powers on the Minister to declare that an organization is "terrorist", if he "believes that it is engaged in terrorism" (art. 11 (4)), based on an assessment of vaguely formulated criteria, such as "promotes and encourages terrorism or is otherwise involved in terrorism" (art. 11 (5 c and d)). Consequently, the Special Rapporteur underlined the need for revising the definition of terrorism contained in the draft bill by introducing clear and precisely formulated provisions, limiting its scope to acts that are genuinely terrorist in nature, and the need for clear and precise provisions with regard to the proscription of allegedly terrorist organizations and appropriate judicial oversight. Furthermore, the Special Rapporteur requested the Government to provide more detailed information on the creation of a victim's fund and its operation.

(b)     *Communication from the Government*