# EXHIBIT R

**UNITED
NATIONS**

**A**

 **General Assembly**

Distr.
GENERAL

A/HRC/4/G/17
30 March 2007

ENGLISH
Original: ARABIC/ENGLISH

HUMAN RIGHTS COUNCIL
Fourth session
Agenda item 2

### IMPLEMENTATION OF GENERAL ASSEMBLY RESOLUTION 60/251
### OF 15 MARCH 2006 ENTITLED "HUMAN RIGHTS COUNCIL"

**Note verbale dated 22 March 2007 from the Permanent Mission of
Jordan to the United Nations Office at Geneva addressed to the
Office of the High Commissioner for Human Rights**

The Permanent Mission of the Hashemite Kingdom of Jordan presents its compliments to the Office of the High Commissioner for Human Rights and the secretariat of the Human Rights Council, and has the honour to attach herewith a copy in Arabic* of the Government's comments on the addendum to the report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, Mr. Manfred Nowak (A/HRC/4/33/Add.3) of 5 January 2007 on his mission to Jordan.

The Permanent Mission of the Hashemite Kingdom of Jordan would be grateful to the Office of the High Commissioner if the above comments were made available on the website of the Council as an official document, together with its annex.

---

\* Reproduced in the annex in the language of submission and in English only.

GE.07-12446 (E)   100507   110507

**Annex**

**Government's reply to the report by Mr. Manfred Nowak, Special Rapporteur on the
question of torture and other cruel, inhuman or degrading treatment or punishment**

**15 March 2007**

**Introduction**

The Government immediately replied to the request from Mr. Manfred Nowak, the Special
Rapporteur on the question of torture and other cruel, inhuman or degrading treatment or
punishment* to visit Jordan, because it is convinced of the importance of human rights issues
and of the need to strengthen cooperation with the United Nations and different international
human rights institutions in order to protect and promote human rights.

All the necessary facilities were provided to the Special Rapporteur, all the difficulties that
he faced were overcome, at his request, and he was able to interview the government officials
that he had asked to meet.

The Special Rapporteur and his delegation had access to all correction and rehabilitation
centres and to detention and custody centres.

The Government read the report by the Special Rapporteur on torture as issued on
5 January 2007, it recalls the Special Rapporteur's previous report and its own response thereto,
submitted on 10 October 2006, setting out its replies to his requests for clarification and drawing
his attention to the new legal and practical arrangements put in place to guarantee detainees in
detention, reform and rehabilitation centres the right not to be subjected to ill-treatment and
torture, and it should like to make the following comments:

In his final report, the Special Rapporteur refers to what he describes as widespread torture
in Jordan, which he attributes to "lack of awareness" and "impunity". In addition, he concludes
that torture is practised routinely in detention centres run by the General Intelligence Directorate
and the Criminal Investigations Department.

It is noteworthy that the Special Rapporteur's final report modifies his earlier conclusion
concerning the systematic practice of torture in detention centres run by the General Intelligence
Directorate and the Criminal Investigations Department. The new conclusion states that torture is
"routinely" practised in these centres. In addition, the Special Rapporteur has retained his
previous conclusions, particularly those indicating that "torture is widespread in Jordan" owing
to "lack of awareness" and "impunity". These are conclusions that the Government considers to
be unjust and unfair and completely at odds with government policies, prohibit torture and
ill-treatment.

---

\* The Special Rapporteur on the question of torture and other cruel, inhuman or degrading
treatment or punishment shall be referred to hereinafter as the "Special Rapporteur".

The Government is aware of the legal and humanitarian dimensions of the crime of torture, constituting, as it does, an immoral offence that is an affront to the human, civilized and religious values which the Government guarantees, upholds and defends both in Jordan and in all international forums. The Government is aware that breaches of these values may be committed from time to time by individuals in our country (and which, naturally, do not reflect Jordan's official position). In this, Jordan is like any other State in this great wide world. The Government again affirms its commitment to the noble humanitarian values that spring from our Islamic civilization, our authentic Arab values, and our absolute faith in the nobility of human rights, which is a fundamental principle from which the Government shall not resile.

Jordan's compliance with the international laws and treaties (including the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, and the Convention against Torture) to which it is a party is also one of the main fixtures of its judicial and legal systems. The Government, contrary to the assertion in the report, is very well aware of the gravity of torture offences and the danger of ignoring or tolerating them. It is also aware that any wrongs that may be committed are individual acts and limited in scale; in no circumstances can generalizations be made about them such as to stigmatize an entire society or justify allegations of failings in the judicial system. This would be unfair to our society and judicial and legal systems. Neither our society nor our judiciary can accept or tolerate violence against detainees or accused persons, whether it is used to extract a confession or as a means of punishment.

The Government, while disagreeing with a number of the Special Rapporteur's conclusions, particularly those referring to widespread torture, lack of awareness among officials, "impunity", and routine torture in the General Intelligence Directorate and the Criminal Investigations Department (mostly based on allegations from individuals), reaffirms that there is a clear and sincere political will to continue with the plans for reform of detention, correctional and rehabilitation centres, a process that began some years ago and is still in effect.

The Government recognizes how important awareness of human rights in general and of the dangers of the offences of torture and ill-treatment in particular is in creating cultural awareness among society at large about the gravity of the offences of torture and ill-treatment.

The Government shall spare no efforts to develop legislation prescribing stiffer penalties for perpetrators of torture and ill-treatment, thereby providing further guarantees to deter the perpetrators of these offences.

**Here, the Government should like to make the following points:**

- Most of the conclusions of the Special Rapporteur on torture claiming that torture is practised widely in Jordan are untrue and baseless;

- The cases which the Special Rapporteur cites to support his conclusions are isolated cases, while the information on which he draws to substantiate his claims mostly comes from civil society organizations and individual allegations by a number of detainees and convicted persons, which cannot lead to the conclusion that torture is widespread in Jordan and routine in some cases.

A/HRC/4/G/17
page 4

**With regard to the Special Rapporteur's claim about lack of awareness among officials of torture:**

The Special Rapporteur describes a lack of awareness of torture as a reason for the widespread practice of torture in Jordan. He interprets lack of awareness as acceptance on the part of Jordanian officials of light penalties for perpetrators of torture offences. Here, he confuses the issue with impunity, even though all the officials that he interviewed condemned torture and affirmed Jordan's compliance with the Convention against Torture. These officials did not deny that individual wrongdoing occurs - as mentioned in the Special Rapporteur's report - the thrust of their comments was that there is no policy supporting and encouraging the practice of torture or ill-treatment.

**The Government should like to draw attention below to the main measures taken to create a culture of awareness of, and increase the penalties for the offences of torture and ill-treatment:**

— The Government, through the relevant security agencies, has issued instructions for the circulation of the Convention against Torture among all members of the security services, cautioning security services officials to comply with the Convention and explaining the gravity of all acts of ill-treatment and torture;

— The Convention against Torture has been incorporated into training curricula for members of the security services;

— In the legislative context, the Government has amended the laws criminalizing the practice of torture, in particular article 208 of the Jordanian Criminal Code, in order to increase the penalties for perpetrators of these kinds of offences. In addition, it has amended the definition in that article to bring it into line with the definition in the Convention against Torture. The Convention became part of Jordanian law upon ratification;

— The laws on the application of the death penalty were amended so as to confine the use of the penalty for the most serious offences; the Criminal Code, Drugs Act and Firearms, Ammunition and Explosives Act were all amended. These texts were approved and published in the Official Gazette in 2006, pursuant to recommendations from civil society organizations operating in the human rights domain;

— In the same connection, the draft ombudsman's law was prepared, and hopefully will complete the constitutional stages soon, in order to strengthen the machinery for monitoring humans rights violations;

— The Government set up a committee to review the Crime Prevention Act and amendments thereto in accordance with human rights concepts. The committee has already begun its work with a view to producing a text guaranteeing better implementation, and preventing misapplication, of the Act;

– The Government issued a circular to administrative judges on the need to avoid using administrative detention too widely; a large number of persons in administrative detention were released.

In Jordan, there are a number of human rights centres that receive citizens' complaints and follow-up on them with government bodies. One example is the National Centre for Human Rights, which was established pursuant to a law that guarantees its independence and ability to deal with human rights matters. The Centre has a monitoring mechanism to follow-up on citizens' complaints with government bodies and to conduct unannounced visits to all correction centres and detention centres in the Kingdom.

The Ombudsman's and Human Rights Office was set up within the General Security Department to deal with citizens' complaints against members of the police. In addition, a human rights directorate was recently created within the Ministry of the Interior to follow-up on human rights issues and complaints in general.

The Government endeavours to disseminate human rights concepts through awareness programmes delivered via the different media. In addition, human rights concepts were recently incorporated into the Kingdom's academic curricula.

Underpinning all this is the political will, existing at the highest level, to strengthen the human rights culture in the Kingdom and increase awareness among government bodies and the public.

**With regard to the subject of impunity:**

The conclusion that Jordanian laws do not apply to perpetrators of ill-treatment is a false one; many members of the police and security services have been tried for abuse of authority, as we shall show below. In addition, the General Security Directorate is investigating a number of the cases of alleged torture mentioned in the report and the perpetrators of these acts will be punished, if found guilty.

Moreover, in practice and in law, the applicable Jordanian laws, especially article 208 of the Jordanian Criminal Code, criminalize the practice of torture. Article 159 of the Code of Criminal Procedures furthermore states that any evidence or statement obtained by means of any form of physical or mental coercion shall be null and void and legally unreliable. Moreover, a complainant is entitled to claim, before a public prosecutor and court, that a police statement was taken from him under pressure or physical or mental coercion.

**Counter-terrorism and its characterization as one of the reasons for the widespread practice of torture in Jordan:**

The Special Rapporteur provides us with no clear evidence as to how he arrived at this conclusion. He confines himself to saying that he has heard from several detainees and civil society organizations about allegations of torture at the General Intelligence Directorate. Furthermore, his attempt to invoke the Kingdom's cooperation with the United States of America in the fight against terrorism as a reason for accusing the Jordanian security services of practising torture is surprising. How can the Special Rapporteur arrive at such a conclusion

A/HRC/4/G/17
page 6

without convincing material proof, knowing that Jordan is a party to international counter-terrorism conventions which place it under an international obligation to cooperate in countering terror with the States parties to those conventions? In spite of the terrorist challenges and threats with which Jordan is confronted, it does not neglect respect for human rights and freedoms.

**With regard to the claim in the Special Rapporteur's report that some Jordanian newspapers and agencies ignored the press conference which the Special Rapporteur held in Amman on 29 June 2006:**

We should like to explain that the media in Jordan are free and impartial and are not subject to government censorship. The Jordanian media dealt with the Special Rapporteur's press conference completely impartially and therefore the charge that he has made about them deliberately ignoring the press conference is untrue. Jordan does not have an official press and the newspapers which the Special Rapporteur mentioned in his most recent report are privately owned and managed. In any case, the Special Rapporteur can write to these newspapers directly to express his opinion on their coverage of his press conference. Furthermore, the Special Rapporteur's press conference was itself a breach of the terms of reference of his visit and an attempt on the Special Rapporteur's part to prejudge the outcome before hearing the Government's explanations.

**The Constitution and provisions against torture:**

Human rights have a special place in the Jordanian Constitution. The Jordanian Constitution regulates human rights and freedoms in accordance with international human rights instruments. Indeed, some of these rights were given constitutional status years before the adoption of universal declarations and international human rights treaties.

The fact that the Jordanian Constitution makes no reference to the crime of torture in no way implies that torture is officially sanctioned. From a legal point of view, the absence of such a clause in the Constitution cannot be construed as a violation of the legal obligations embodied in the Convention against Torture, nor as a failing in the Constitution, for several reasons, including the following:

1.     The Constitution contains general rules that provide a general framework for individual rights and freedoms, while leaving it to other laws to spell out the details of these rights. Like most of the world's constitutions, it makes no sense for the Constitution to criminalize torture. Moreover, the Convention against Torture does not require the States parties to include provisions in their constitutions criminalizing torture.

2.     Domestic laws do criminalize torture.

3.     The Convention against Torture was ratified by the Kingdom and thus became part of Jordan's domestic law.

4.     The Constitution guarantees everyone the right to legal redress, which is a general and absolute right. Article 256 of the Civil Code recognizes the right of an injured party to claim compensation for damage suffered.

The Jordanian Criminal Code defines torture as an offence which is punishable by law, pursuant to article 208 of the Criminal Code and article 49 of the Military Criminal Code.

**With regard to the absence of a specific definition of torture in Jordanian law:**

As soon as the Convention against Torture was ratified by the National Assembly, it became part of Jordanian law and acquired the force of law. Therefore, if a case of this kind is brought before a domestic court, the Jordanian court must refer to the definition set out in article 2 of the Convention against Torture.

The Government has asked the competent institutions to explore whether article 208 of the Criminal Code can be amended to increase the penalties for public servants, including by ruling out any statute of limitations on, or general amnesty for, acts of torture, and to verify that the article satisfies the requirements of the definition under article 1 of the Convention against Torture.

**With regard to legal assistance for persons in detention:**

This type of assistance is available from the time that a person appears before a public prosecutor who is empowered to conduct a judicial investigation. According to article 63 of the Code of Criminal Procedures, accused persons have the right to have a defence lawyer present. Article 66, paragraph 2, of the same Code states that a public prosecutor may not prevent a lawyer from communicating with an accused person.

The Government will examine the possibility of granting everyone who is arrested the right to ask for a lawyer at the time of arrest.

**With regard to the role of members of the Department of Public Prosecutions:**

If a person accuses a policeman of torture, the Department of Public Prosecutions must register the complaint in an investigation report and, if necessary, refer the complainant to a police doctor.

A detainee may challenge a detention order before a competent court and may also challenge any extension of a detention order.

Persons held in custody for the legally prescribed period of time, namely, 24 hours, are detained in custody centres that are situated in known locations and subject to judicial inspection. According to article 112 of the Code of Criminal Procedures, interviews must be conducted within 24 hours. If a public prosecutor decides to place a person in detention, the place of detention must be a correction and rehabilitation centre which is subject to judicial supervision and inspection under the Correction and Rehabilitation Centres Act No. 9 of 2004. The Act states that the Minister or his representative may inspect centres in order to ensure compliance with the Act. The warden must submit regular quarterly reports on conditions at the centre, the inmates, and the services provided to them.

A/HRC/4/G/17
page 8

Under article 8 of the Act, court presidents, the Prosecutor-General and members of the Department of Public Prosecutions, each within his respective area of competence, may visit correction and rehabilitation centres and follow up on any prisoner's complaints about ill-treatment or torture.

Article 113 refers to the right of an individual to bring an action for deprivation of liberty, as defined in the Criminal Code, against an official who keeps him in custody for over 24 hours without questioning him.

**With regard to the Special Rapporteur's recommendation on the abolition of special courts;**

These courts were established in accordance with the Constitution and are monitored by the Court of Cassation in the same way as any other ordinary court. The Court of Cassation has issued a number of rulings quashing verdicts handed down by these courts on the grounds that defendants had been subjected to physical and psychological coercion during questioning. The following are some of these rulings:

1.    Court of Cassation ruling No. 450/2004 of 17 March 2004, which states: "If the court concludes that the confession which the accused person gave to the police was obtained in circumstances that cast doubt on its veracity, and as the result of battery and physical torture, the court is entitled to disregard the confession."

2.    Court of Cassation ruling No. 1513/2003 of 4 May 2006: "Statements obtained as a result of violence and coercion cannot be relied upon to convict a defendant."

3.    Reference may also be made to a number of rulings of the Court of Cassation overturning special court judgements; some of these rulings are listed here below:

(a)    Ruling No. 820/2003 of 22 November 2003;

(b)    Ruling No. 552/99 of 23 August 1999;

(c)    Ruling No. 256/98 of 19 May 1998;

(d)    Ruling No. 51/98 of 23 March 1998, which states that if there is irrefutable evidence that a defendant's statements were obtained under duress and torture and without his consent, the statements must be struck from the record, because they are invalid;

(e)    Ruling No. 746/98 of 20 January 1998;

(f)    Ruling No. 327/94 of 22 August 1994;

(g)    Ruling No. 271/91 of 1 October 1992.

These rulings of the Court of Cassation clearly show that the special courts' verdicts are not final verdicts and may be appealed.

**With regard to the submission of complaints of torture from aggrieved parties or victims:**

The Special Rapporteur views the legal procedures for filing complaints as inadequate and ineffectual - in his words - because the institution receiving these complaints is the police prosecution department or the police court. In his view, this means that investigation procedures are not impartial, since the prosecutors are appointed by the director of general security, and the police courts are made up of military judges who are also appointed by the director of general security. This is not how things actually stand; the police courts have delivered a number of verdicts against members of the general security forces, and these courts are monitored by the Court of Cassation (see the Court's rulings above).

Figures from the General Security Directorate show that a number of complaints against the police have been received by the police prosecution department or police courts and have been investigated with complete impartiality and objectivity.

The figures below refer to offences of wounding and ill-treatment committed by general security officers in 2005-2006:

Total cases: 28

    Convictions: 14

    Case discontinued: 14

Offences from 1 January to 21 June 2006:

Total cases: 8

    Convictions: 3

    Case discontinued: 2

    Under investigation: 3

**With regard to the victim's right to compensation:**

Jordanian law recognizes the right to claim compensation for damage, regardless of who caused the damage, even if the guilty party lacks legal capacity.

Under article 256 of the Civil Code, anyone, even someone lacking capacity, who is responsible for inflicting damage of any kind must make restitution for the damage caused.

The Jordanian Constitution furthermore grants every resident of the Kingdom the right to seek legal redress and to bring an action to claim rights of any kind.

The Jordanian courts have issued several verdicts awarding compensation to victims of ill-treatment, as exemplified, inter alia, by Court of Cassation ruling No. 4433 of 2003.

**With regard to prisoners' records:**

For every person placed in a correction and rehabilitation centre, whether as a detainee or a convicted person, a file is created, detailing the individual's state of health on arrival, his personal details, the reason for his detention, the authority which issued the arrest warrant or verdict, and the date and time of arrival. The file is then used to record all details relating to the person's time at the centre.

**With regard to the categorization of prisoners:**

Correction and rehabilitation centres in Jordan have a system for categorizing inmates based on the separation of convicted persons from persons awaiting trial. Persons convicted of serious crimes are held in separate quarters from other convicted prisoners. This system is also used in security centres. The law permits individuals to pay a surety, in lieu of detention, to ensure that they turn up for trial. Detention cannot be imposed for offences carrying a penalty of less than two years' imprisonment.

**With regard to improving conditions in other correction and rehabilitation centres:**

The Government, through the relevant agencies, pays special attention to, and consistently shows concern for, correction and rehabilitation centres and detention centres, in keeping with the penal policy which Jordan has adopted on prisoner reform and rehabilitation and with a view to eliminating social stigmatization and isolation, as well as cruel, degrading and inhuman treatment. Every effort is made and resources are fully deployed in order to achieve this noble goal and lofty aim. Although exceptional instances of individual wrongdoing do occur, those responsible are brought to book in the majority of cases.

In order to clarify the situation and provide a complete picture of how things stand in this regard, reference must be made to the following achievements:

– In some correction and rehabilitation centres, craft, agricultural and vocational workshops have been installed, subject to availability of resources, to train inmates, occupy them in useful work, increase the volume of paid work that they do, issue them with certificates of achievement from the vocational training institute, and thus preserve their dignity with a view to integrating them into society and helping them to forget prison life and its social stigma and psychological effects;

– Recreational, sports and cultural facilities such as games rooms, libraries and lectures, are provided and efforts are made to boost the spiritual and religious side of prisoners' lives, through the delivery of religious lectures, the establishment of mosques and encouragement of worship in the different centres;

– Legal assistance has been made available through the creation of lawyers' rooms in every correction and rehabilitation centre to enable inmates to meet with their lawyers on their own as a legal guarantee during different stages of proceedings;

– The doors of all correction and rehabilitation centres are open to anyone with the legal authority to conduct inspections and searches, including the Prosecutor-General and his deputies, court presidents and public prosecutors, and to receive complaints, listen to comments, monitor efficiency, address areas of weakness, and ensure that inmates' rights are not violated and the laws regulating their status are upheld;

– All civil society institutions, including the National Centre for Human Rights, human rights organizations, political parties, associations, and the International Committee of the Red Cross (ICRC), are allowed to visit correction and rehabilitation centres, to meet with inmates on their own, to register comments and to receive objective criticisms and reasonable observations. All necessary facilities and suitable arrangements are offered to these bodies. Over 400 visits were carried out in 2006;

– Al-Jafr Prison was closed down by order of His Majesty the King on 17 December 2006 and was turned into a vocational training school, while work is being completed on new correction and rehabilitation centres, which are being constructed according to international standards to accommodate over 1,000 prisoners. One of these centres, in Al-Muwaqqar, is expected to be ready to receive prisoners in the next month, while another one will be in Al-Mafraq. This will finally resolve the problem of overcrowding in some centres, making it possible to categorize prisoners by age group, type of offence committed, and seriousness of the offence;

– Conditions in correction and rehabilitation centres and custody centres are monitored by judicial inspectors, who check that staff comply with instructions on treatment of prisoners and who inspect the facilities. They use their legal authority to deal with anyone who constitutes a danger to prisoners and to their safety and well-being in a centre;

– Inspections of correction and rehabilitation centres and checks on staff performance are carried out by senior managers, the Office of the Inspector-General, the Department of Preventive Security, the Department of Correction and Rehabilitation Centres, and the Ombudsman's and Human Rights Office. Appropriate legal steps are taken against anyone found guilty of ill-treating a prisoner; this is clear from the official figures issued by the General Security Directorate;

– Complaints boxes have been installed in all correction and rehabilitation centres, under the supervision of the Ombudsman's and Human Rights Office. Complaints are processed according to the law. An operations room has been set up at the Department of Correction and Rehabilitation Centres to keep track of court sittings, petitions and attendance;

– Inmates of correctional facilities are covered by social insurance, if they so wish. This remedies a legal shortcoming as far as prisoners are concerned. Literacy classes are held and coordination is effected with all relevant agencies to provide prisoners with health, social and psychological services. The General Security Directorate has signed an agreement with the Ministry of Labour on offering work opportunities in accredited factories in industrial zones for released prisoners or family members of convicted prisoners;

A/HRC/4/G/17
page 12

— Staff of correction and rehabilitation centres are trained and taught how to deal with prisoners according to legal principles and professional ethics, and financial incentives are offered to make sure that they comply with this approach. Staff are selected on the basis of qualifications and according to well-defined criteria in order to achieve the desired goals;

— A model future strategy has been put in place to deal with all failings that may come to light in correction and rehabilitation centres and turn them into model centres which safeguard rights, respect prisoners and uphold the law, in accordance with model international standards for these centres.

**With regard to the women being held in custody in connection with honour crimes:**

These women are being held in order to protect the lives of these women, because they have received death threats from their families. The Government is in the process of creating a special refuge for these women, and the speed of completion will depend on availability of funding.

**With regard to training of prison staff and enhancing awareness among security officials of human rights, ill-treatment and torture:**

We can confirm that security institutions spare no effort to train security staff about human rights so that they are better able to perform their duties in conformity with the applicable regulations and laws and with Jordan's accession to international human rights treaties, particularly the Convention against Torture.

The staff of correction and rehabilitation centres receive most of the attention in this domain, through the delivery of correction and rehabilitation training programmes. Some courses are delivered locally, at the Kingdom's police academy, and others are delivered abroad, with officers and men being sent to other countries to learn from the experiences of prisons elsewhere.

The National Centre for Human Rights has run training courses for administrators of correction and rehabilitation centres, criminal investigators, and general intelligence officers. Several courses on management of correction and rehabilitation centres have been run, in conjunction with Penal Reform International, to teach participants about prisoners' welfare and the standard minimum rules for the treatment of prisoners.

Other courses have been run, in cooperation with the United Nations Development Programme, on guaranteeing a fair trial according to international standards. General security and general intelligence officers have also taken part in courses on crime prevention, human rights, the Convention against Torture, and so on.

The Government has implemented a plan to raise awareness among the security services about human rights issues. The plan envisages the following:

— Creation of a media office within the General Security Directorate and establishment of a security radio station (Security FM) as a concrete expression of media openness and transparency vis-à-vis the processing and receiving of constructive criticism and

comments. Replies are given openly, by means of press releases and on-air radio interviews, in order to serve the nation and the citizen, who is spared the trouble of having to make a journey in order to lodge a complaint or register a comment;

−  The Ombudsman's and Human Rights Office, set up within the General Security Directorate and directly linked to the director of general security, receives complaints from citizens who have suffered an injustice or indignity and brings to book anyone found guilty of abuse of authority or arbitrary use of the law. It verifies compliance with international human rights standards in correction centres, detention facilities and all general security units which can affect human rights;

−  Community police sections have been created and the concepts that they use are being promoted through a media awareness campaign in order to build trust with, solicit support from, and involve, the public in maintaining security in Jordan;

−  Field units of the General Security Directorate have been restructured as a result of the creation of regional security commands and the establishment within them of several police directorates linked to security centres. This makes it easier for citizens and implements the General Security Directorate's strategy for strengthening security and serving citizens, with a view, in the future, to having one security centre for every 50,000 citizens;

−  Promotion of the role of the Department of Family Protection in dealing with cases of domestic violence, sexual abuse and violations of women's and children's rights in complete confidentiality and using modern techniques;

−  Strengthening of the general security apparatus and of the security services through recruitment of well-educated personnel, improvement of staff's education and cultural background by offering them the chance to complete their studies. Masters programmes have been established at the Royal Police Academy, one on criminal justice and the other on administrative and security strategies for senior general security officers, in order to produce modern security officers equipped with knowledge and know-how. The General Security Directorate has recruited large numbers of policewomen to perform security functions and police duties such as security searches of women and supervision of female detention facilities;

−  Development of the work of the security services and creation of an environmental police force, an investment protection unit, tribal affairs offices, a centre for security strategy studies, the tourism police, a department of judicial enforcement, and security kiosks.

−  Introduction of the Convention against Torture into general security training courses and circulation of the text to all general security ranks; cautioning chiefs and commanders to instruct their men to comply with the Convention and explain the seriousness of committing any act of torture under this Convention, which has become part of Jordanian law; inclusion of the Convention in the training curricula for all members of the general security services;

A/HRC/4/G/17
page 14

— Last year, the General Security Directorate signed a cooperation agreement with a Danish organization devoted to combating torture and violence (the Danish Centre for Rehabilitation of Torture Victims) on eliminating torture and ill-treatment in detention centres. Several workshops were held with this organization, with the participation of local and international human rights organizations. It was agreed that these organizations would provide technical and training assistance to members of the general security service and develop their skills in the realization and promotion of human rights with regard to the handling of investigation proceedings. This is a two-year project;

— A police code of conduct was published and distributed to all general security ranks with a view to securing compliance with its rules on professional ethics and proper conduct. It has also been incorporated into the curricula of training courses and promotions procedures;

— Staff in all general security units, correction and rehabilitation centres, security centres and field administrative offices have received human rights training and education about international human rights standards. Human rights subjects have been included in training curricula, courses and promotions procedures and advanced human rights training courses have been held to guarantee the implementation of, and monitoring of compliance with, these standards via monitoring mechanisms, including the Ombudsman's and Human Rights Office. In addition, the capacity of staff to use modern scientific methods of investigation, without resorting to illegal methods, has been strengthened.

**With regard to oversight of correction and rehabilitation centres by government institutions and civil society organizations:**

The figures below refer to visits to correction and rehabilitation centres by state and local organizations, human rights committees, and public prosecutors between 1 January and 21 June 2006:

1. ICRC - 22 visits;

2. Prisoners' Welfare Association and other associations - 4 visits;

3. Public Freedoms and Human Rights Committee of the House of Representatives - 1 visit;

4. National Centre for Human Rights - 5 visits;

5. Members of the Department of Public Prosecutions - 14 visits;

6. Diplomatic bodies and embassies - 20 visits;

7. Religious representatives - 10 visits;

8. Trade unions - 3 visits;

9. Others by student delegations, the Ministry of Health, and so on - 22 visits:

Total number of visits in 2006: 101;
Total number of visits in 2005: 158.

**Measures taken to prevent torture of prisoners:**

1.    As soon as a prisoner arrives at a centre, he has a medical check-up and the police doctor draws up a medical report on his state of health, indicating whether or not he has been beaten or physically tortured.

2.    A prisoner showing signs of having been beaten and tortured cannot be admitted until the police doctor has written a forensic report about him and placed it in his file, the judicial authorities have been notified of his condition, and his statement has been recorded in the file. If he brings an action against any governmental or private institution, the case shall be referred to the public prosecutor, the competent police prosecutor, or the courts, depending on who the defendant is.

3.    A prisoner who breaches prison regulations is subject only to such penalties as are prescribed by law and may not be punished in any other way. The prescribed penalties consist solely of denial of visits, solitary confinement, loss of one quarter of time off for good behaviour, a caution, or a warning. These penalties cannot be imposed in combination.

4.    Prisoners can inform their relatives of their whereabouts within 24 hours of arrival at a centre.

5.    Prisoners are entitled to three visits per week; this is a safeguard against the use of any form of torture.

6.    International organizations such as ICRC and human rights centres are entitled to visit the centres, without preconditions, to check up on prisoners.

7.    Prisoners are entitled to complain to domestic or foreign organizations about prison staff.

8.    Any officer or individual who tortures a prisoner for any reason whatever shall be brought before the police court pursuant to the applicable criminal laws.

These measures are applied in all correction and rehabilitation centres and are necessary to guarantee that detainees are not subjected to ill-treatment or torture.

**With regard to the Special Rapporteur's visits to the General Intelligence Directorate and the Criminal Investigations Department:**

In his report, the Special Rapporteur affirms that the Government breached the terms of reference of the mission during these visits. As for the visit to the General Intelligence Directorate, we should like to point out that the Special Rapporteur was received by the deputy director and a number of the Directorate's senior officers. The deputy director gave him an overview of the Directorate and the detention centre, the Special Rapporteur asked questions and asked for several clarifications, and the deputy director and officers answered all his queries. The Special Rapporteur was provided, at his request, with a list of the names of all the prisoners being held at the Directorate's detention centre, together with details of the charges against them and the date on which each person had been taken into detention.

The Special Rapporteur and his entourage returned to the Directorate for a surprise visit and asked to be admitted to the detention centre. This request was granted and the Special Rapporteur went in, accompanied by a police doctor and a number of other interpreters. He carried out a tour of inspection and saw all the prisoners in the presence of some staff members. He was provided with every facility that he needed for his visit. However, he took, and persisted in taking, photographs of places that had nothing to do with the detention centre. When he asked to talk to the prisoners on their own and to sit down with them without any guards, he was told that the prisoners were dangerous and that it would be better for his own protection, if a guard were present. However, this he refused and he left the detention centre. The Ministry of Foreign Affairs called the Special Rapporteur and his entourage several times to explain the situation and give him permission to complete his visit to the detention centre and meet with the detainees on their own, at his request, and at a time convenient to him. However, the Special Rapporteur and members of his entourage had switched off their mobile telephones and did not reply to the repeated calls that were made to them throughout that day.

It is strange, therefore, that the Special Rapporteur should conclude that torture is carried out at the detention centre run by the Directorate, even though he did not complete his visit. This gives the impression that the Special Rapporteur had already made up his mind that torture was being carried out at the General Intelligence Directorate. He does not provide any compelling evidence to support this contention and his conclusions are based on individual allegations.

**We should like to make the following clarification:**

The detention centre of the General Intelligence Directorate is a known facility that is regulated by the Correction and Rehabilitation Centres Act. It is open to international and domestic human rights organizations, including ICRC and the National Centre for Human Rights, which visit the prisoners regularly. ICRC has been paying regular visits to the detention centres since 1978 and there is a good relationship and level of cooperation between its representatives and intelligence officials. The Directorate does not hesitate to address any comments made by ICRC and provides the organization's representatives, at the beginning of each visit, with lists of prisoners' names. It also allows the organization's doctor to talk to the prisoners. The National Centre for Human Rights paid three visits to the detention centre, which left a positive impression on the visiting team in terms of the reception and cooperation given and the treatment of, and welfare and services provided to, prisoners. The centre is subject to judicial scrutiny and inspection, just like any other detention centre, and everyone detained there is being held pursuant to a court order.

**With regard to the Special Rapporteur's visits to the Criminal Investigations Department in Abdali on 28 June 2006:**

We should like to explain that, as the Special Rapporteur himself acknowledges, the Government provided him and his entourage with every facility to enable them to perform their tasks in the best possible manner. They were allowed to visit all correction and rehabilitation centres and detention centres, which opened their doors to them. As for the Special Rapporteur's visit to the Criminal Investigations Department in Abdali, in particular his claim that his admission to the Department was delayed by an attempt to conceal evidence, we should like to affirm that, as soon as the officers in charge knew that the Special Rapporteur was at the Criminal Investigations Department, he and his entourage were immediately admitted and

provided with every facility, including access to the Department's custody wing. The Special Rapporteur met with all prisoners on their own and without any interference by the security officers present. The Special Rapporteur's claims about torture at the Department's custody centre are all being investigated and those responsible will be punished, if found guilty.

**The Special Rapporteur refers to allegations about persons being held and tortured in secret prisons run by United States forces in Jordan:**

In this regard, we note that the Special Rapporteur had already made up his mind that there were secret prisons in Jordan being run by United States forces and that, as far as he was concerned, this was a certainty. Therefore, he treated the replies of security officials to his requests for clarification with contempt and incredulity, even though the officials assured him that there are no such centres in Jordan and that these are just allegations. As for the allegations concerning the persons whom the Special Rapporteur mentions as being held in Jordanian prisons, we should like to state the following:

- Salah Naser Salim Ali and Mohammed Faraj Ahmad Bashmila, both Yemeni nationals: their claims about being tortured in secret prisons run by United States forces in Jordan are baseless. The first-mentioned person (Salah) was arrested on 4 September 2005 because of his connection to Al-Qaeda and for entering the country on a forged passport bearing the name of his brother (Wadah Nasir Salim Ali). He was deported on 8 September 2005. The second-mentioned person (Mohammed) was brought back to the Department for questioning on 21 October 2003. He was then told to leave the country, which he did on 26 October 2003;

- Maher Irar, a Syrian national who also has Canadian nationality: there is nothing new to add to the information contained in the previous report on this subject;

- Sajidah Mubarak Atrus al-Rishawi, an Iraqi national: she was a member of a terrorist group that carried out suicide bombings at hotels in Amman on 9 November 2005, killing over 60 people and injuring hundreds of others. She was arrested based on information indicating that she was staying with a person in the town of Salt and had an explosive belt in her possession. The public prosecutor notified the State Security Court, which ordered the seizure of the explosive belt and the woman's arrest. From the very outset, the case was conducted under the authority and supervision of the Prosecutor-General, who conducted the questioning himself. It was at his request that she was placed in the detention centre of the General Intelligence Directorate. Her claims that she was tortured and threatened with rape are nothing but an attempt to obtain a lenient sentence from the court. On 12 December 2005, a delegation from the National Centre for Human Rights met with her. This meeting is mentioned in the 2005 report on the human rights situation in the Kingdom;

- Mundhir Abu Zahir and Marwan Ali Hamid: their allegations about being detained and tortured at the General Intelligence Directorate are false, since they have never been detained by the Directorate.

In this connection, we should like to affirm that the security forces at all levels investigate complaints of this kind in order to ensure respect for human rights and to punish anyone who takes it upon himself to infringe these rights. The following are just some examples of cases in which individuals were investigated and tried for committing acts amounting to torture or ill-treatment:

— Case of Zahir Abd al-Jalil Abu al-Rish: this man was arrested on 24 June 2006 on suspicion of having robbed the Hijazi and Gawsha food company in the Marka area and having stolen 100,000 dinars from the company's iron safe. (It should be mentioned that he had a previous record for robbery and other offences.) He was detained for further questioning. While he was being processed, two criminal investigators beat him, in breach of the strict instructions issued to all general security officers that they must not use coercion during questioning and must stick to lawful investigation methods when dealing with any kind of case. Zahir was sent for a medical examination and the initial medical report concluded that his general health was good and that he had not sustained any fractures or serious injuries. When questioned, he asked for no charges to be brought against the two culprits.

The commission of inquiry decided to refer the two culprits to the police court to be tried for:

— Conspiracy to wound, in violation of article 334 of the Criminal Code and pursuant to article 76 of the same Code;

— Disobeying orders and instructions, in violation of article 37, paragraph 4, of the General Security Act;

— With regard to prisoner Ramey Mohammed Najib al-Kirki: he was detained by the Amman public prosecutor on a robbery charge and has a criminal record (25 previous convictions). The police public prosecutor investigated his complaint;

— Prisoner Sami Abd al-Ra'uf Ahmad al-Ramhi was convicted of issuing bad cheques, and has a previous criminal record;

— Prisoner Hikmat Adnan Ibrahim Sarih is in detention on a robbery charge;

— Prisoner Marwan Ali Hamid has 72 previous convictions for forgery and deception;

— Khalid Sabah Ya`qub, Mahmud Walid and Ali Ahmad Abd al-Rahman al-Shawbki do not appear to have been held in correction centres; their names may not be correct (we need the prisoners' correct names).

As for the case of the deputies to which the report refers, it is worth noting that they were all released.

With regard to the allegations in the report that some inmates of detention, correction and rehabilitation centres have been tortured during interrogation, a serious and transparent investigation was conducted into these claims and allegations. It showed that most of the complaints were misleading and groundless and were the result either of fighting between the inmates concerned and other prisoners or of the security forces being constrained to use force to control certain prisoners resisting or assaulting them while attempting to make an arrest. These measures are consistent with the police's legal powers pursuant to article 9 of the General Security Act. In other cases, evidence was found of an attempt by complainants to plea in court that they had been tortured or ill-treated in order to avoid a conviction. In other cases again, after in-depth investigations had been carried out and evidence gathered from medical tests, the complaints were shown to be true and the security officers involved were referred to the courts for the infliction of appropriate and exemplary penalties. Members of the security services do not enjoy any form of immunity against criminal prosecution in respect of any offence, particularly torture and ill-treatment.

## Conclusion

The Government takes a positive interest in the reports produced by most international and domestic human rights organizations. It views the opening of channels for dialogue and debate with these organizations as an important and necessary means of supporting the reform process on which the State has embarked with a view to the promotion and protection of human rights.

The Government should like to reassure the Special Rapporteur of its willingness to continue cooperation with him in full transparency and objectivity in order to promote, protect and develop human rights in Jordan. While the Government does not agree with most of the conclusions reached by the Special Rapporteur, it will give serious consideration to the recommendations in his final report - some recommendations have already been implemented - and will examine and decide on the other recommendations.

The Government should like to reaffirm its condemnation of all practices of torture and ill-treatment and its intention of imposing the highest penalties on any public official found guilty of torture and ill-treatment. The Government should also like to affirm its commitment to the Convention against Torture and all the human rights treaties to which Jordan is a party.

-----

# EXHIBIT
# S

**UNITED
NATIONS**



**A**

 **General Assembly**

Distr.
GENERAL

A/HRC/4/40/Add.1
2 February 2007

ENGLISH
Original:  ENGLISH/FRENCH/
SPANISH

HUMAN RIGHTS COUNCIL
Fourth regular session
Item 2 of the provisional agenda

### IMPLEMENTATION OF GENERAL ASSEMBLY RESOLUTION 60/251 OF 15 MARCH 2006 ENTITLED "HUMAN RIGHTS COUNCIL"

**Opinions adopted by the Working Group on Arbitrary Detention**

The present document contains the Opinions adopted by the Working Group on Arbitrary Detention at its forty-fourth, forty-fifth and forty-sixth sessions, held in November 2005, May 2006 and August 2006, respectively.  A table listing all the opinions adopted by the Working Group and statistical data concerning these opinions is included in the report of the Working Group to the Human Rights Council at its fourth regular session (A/HRC/4/40).

GE.07-10604  (E)    090307    160307

A/HRC/4/40/Add.1
page 2

# CONTENTS

*Opinion*                                               *Page*

No. 38/2005 (China) ....................................................................................... 4

No. 39/2005 (Cambodia) ................................................................................ 6

No. 40/2005 (France) ...................................................................................... 10

No. 41/2005 (Tunisia) ..................................................................................... 14

No. 42/2005 (Colombia) ................................................................................. 19

No. 43/2005 (China) ....................................................................................... 20

No. 44/2005 (Iraq and United States of America) ........................................ 24

No. 45/2005 (Iraq and United States of America) ........................................ 27

No. 46/2005 (Iraq and United States of America) ........................................ 34

No. 47/2005 (Yemen) ..................................................................................... 41

No. 48/2005 (Namibia) ................................................................................... 45

No. 1/2006 (Uzbekistan) ................................................................................ 48

No. 2/2006 (Egypt) ......................................................................................... 49

No. 3/2006 (United Kingdom of Great Britain and Northern Ireland) .......... 49

No. 4/2006 (Myanmar) ................................................................................... 50

No. 5/2006 (Iraq and United States of America) ........................................... 52

No. 6/2006 (Japan) ......................................................................................... 52

No. 7/2006 (Yemen) ....................................................................................... 53

No. 8/2006 (Libyan Arab Jamahiriya) ........................................................... 53

No. 9/2006 (Saudi Arabia) ............................................................................. 54

No. 10/2006 (Algeria) ..................................................................................... 55

No. 11/2006 (China) ....................................................................................... 59

No. 12/2006 (Saudi Arabia) ........................................................................... 63

A/HRC/4/40/Add.1
page 3

## CONTENTS (*continued*)

*Opinion*                                                                                                    *Page*

No. 13/2006 (United Kingdom of Great Britain and Northern Ireland) ...........................    65

No. 14/2006 (Islamic Republic of Iran) .............................................................    70

No. 15/2006 (Syrian Arab Republic) ................................................................    74

No. 16/2006 (Syrian Arab Republic) ................................................................    76

No. 17/2006 (Lebanon) .................................................................................    82

No. 18/2006 (Libyan Arab Jamahiriya) .............................................................    87

No. 19/2006 (Islamic Republic of Iran) ............................................................    88

No. 20/2006 (Gabon) ...................................................................................    90

No. 21/2006 (Syrian Arab Republic) ................................................................    90

No. 22/2006 (Cameroon) ..............................................................................    91

No. 23/2006 (Qatar) ....................................................................................    94

No. 24/2006 (Colombia) ...............................................................................    94

No. 25/2006 (Romania) ................................................................................    95

No. 26/2006 (Islamic Republic of Iran) ............................................................    95

No. 27/2006 (China) ...................................................................................    98

No. 28/2006 (Uruguay) ................................................................................   102

No. 29/2006 (United States of America) ...........................................................   103

No. 30/2006 (Colombia) ...............................................................................   111

No. 31/2006 (Iraq and United States of America) ................................................   114

and redressed, if necessary by putting the perpetrators to justice. Yet, any procedure aiming to put right gross human rights violations, as such welcomed by the Working Group, shall scrupulously respect the rules and standards drawn up and accepted by the international community to respect the rights of any person charged of a criminal offence. The violation of the rights of the person charged may easily backfire. This is particularly true in the present case; any lack of respect for the rights of the leaders of the former regime in the criminal proceedings against them may undermine the credibility of the justice system of the newly emerging democratic Iraq.

39.     The Working Group believes that under the circumstances the proper way to ensure that the detention of Saddam Hussein does not amount to arbitrary deprivation of liberty would be to see to it that his trial is conducted by an independent and impartial tribunal in strict conformity with international human rights standards.

40.     On the basis of what precedes, the Opinion of the Working Group is that:

            (a)     It will not take a position on the alleged arbitrariness of the deprivation of liberty of Mr. Saddam Hussein during the period of international armed conflict;

            (b)     It will follow the development of the process and will request more information from both concerned Governments and from the source. In the meantime and referring to paragraph 17 (c) of its methods of work, it decides to keep the case pending until further information is received.

Adopted on 30 November 2005.

## OPINION No. 47/2005 (YEMEN)

**Communication:  addressed to the Government on 9 August 2005.**

**Concerning:  Messrs. Walid Muhammad Shahir Muhammad al-Qadasi;
Salah Nasser Salim`Ali and Muhammad Faraj Ahmed Bashmilah.**

**The State is a party to the International Covenant on Civil and Political Rights.**

1.     (Same text as paragraph 1 of Opinion No. 38/2005.)

2     The Working Group conveys its appreciation to the Government for having forwarded the requisite information in good time.

3.     (Same text as paragraph 3 of Opinion No. 38/2005.)

4.     In the light of the allegations made, the Working Group welcomes the cooperation of the Government. The Working Group transmitted to the source the reply provided by the Government. The Working Group believes that it is in a position to render an Opinion on the facts and circumstances of the cases, in the context of the allegations made and the response of the Government thereto, as well as the observations by the source.

A/HRC/4/40/Add.1
page 42

5.    The source reports that Mr. Walid Muhammad Shahir Muhammad al-Qadasi, a citizen of Yemen, was arrested in the Islamic Republic of Iran in late 2001. He was held there for about three months before being handed over, with other detained foreign nationals, to the authorities in Afghanistan, who in turn handed them over to the custody of the United States of America. He was held in a prison in Kabul, where he was blindfolded, interrogated, threatened with death and accused of belonging to Al-Qaida. Walid Muhammad Shahir Muhammad al-Qadasi and his fellow detainees were kept in underground cells, 10 of them in a cell measuring approximately two by three metres, and constantly exposed to loud music. After three months in detention in Kabul, he was transferred to a detention centre of the United States military forces at Baghram Air Base, outside Kabul. After a month there, Walid Muhammad Shahir Muhammad al-Qadasi was taken to the United States military base at Guantánamo Bay, Cuba.

6.    Walid Muhammad Shahir Muhammad al-Qadasi was transferred from Guantánamo Bay to Yemen at the beginning of April 2004. On his arrival, he was detained in the Political Security Prison in Sana'a. He was denied access to a lawyer and not brought before a court. Walid Muhammad Shahir Muhammad al-Qadasi was visited in detention by representatives of the source in mid-April 2004. The prison staff informed the source that Walid Muhammad Shahir Muhammad al-Qadasi was under investigation and would be released as soon as the investigation was completed. Subsequently, he was transferred to Ta'iz prison, where a lawyer from the United States non-governmental organization Centre for Constitutional Rights met with him on 21 June 2005. He currently remains in detention there. He has not been charged with a criminal offence, nor been given the opportunity to challenge the legality of his detention. The Head of the Political Security Department in Sana'a informed the source that Walid Muhammad Shahir Muhammad al-Qadasi and other detainees who returned from Guantánamo Bay were being held at the request of the United States authorities and would remain detained in Yemen pending receipt of their files from these authorities for investigation.

7.    With regard to Mr. Salah Nasser Salim 'Ali, the source reports that he is a 27-year-old Yemeni citizen who lived in Jakarta until 19 August 2003. On that day he was detained in Jakarta by agents of the Indonesian police and taken to an immigration centre. After four days of detention, during which his passport expired, Salah Nasser Salim 'Ali was told that he would be deported to Yemen, via Jordan. Upon arrival at the airport in Amman, however, he was taken to a detention facility of the Jordanian intelligence service, where he was interrogated about a past stay in Afghanistan and tortured repeatedly for four days.

8.    As to Mr. Muhammad Faraj Ahmed Bashmilah, aged 37, the source reports that he is a Yemeni citizen, who also lived in Indonesia. In October 2003, he travelled to Jordan with his wife. On arrival at Amman airport, Jordanian immigration authorities took his passport. Three days later, on 19 October 2003, he was arrested by the Jordanian Da'irat al-Mukhabarat al-'Amah (General Intelligence Department, who kept him in custody for four days. During this period he was allegedly repeatedly tortured.

9.    The source further states that from detention in Jordan, Messrs. Salah Nasser Salim 'Ali and Muhammad Farah Ahmed Bashmilah were transferred to a detention centre under United States control. They were taken blindfolded to this detention centre by a several hours' long plane flight and detained underground, and are therefore not able to identify the location

A/HRC/4/40/Add.1
page 43

of the detention centre. Both the forces in charge of transferring them thereto and those in charge of the detention centre were, however, from the United States. They were subsequently transferred, again blindfolded, by plane and helicopter, to a second detention centre under United States control. They are therefore not able to identify the location of the facility. In both places, the two men were interrogated about their activities in Afghanistan and Indonesia, and about their knowledge of other persons suspected of terrorist activities.

10.      According to the source, Messrs. Salah Nasser Salim 'Ali and Muhammad Farah Ahmed Bashmilah were kept in United States custody for 20 and 18 months, respectively. During this period, they were held in solitary confinement and incommunicado, without contact with anyone other than the prison guards, interrogators and interpreters. Western music was piped into their cells uninterruptedly, 24 hours a day. In the second facility they were given books, including the Koran, and videos, and had an opportunity to exercise. Salah Nasser Salim 'Ali was visited by a doctor twice a month.

11.      On or around 5 May 2005, without explanation, Muhammad Farah Ahmed Bashmilah and Salah Nasser Salim 'Ali were transferred to Yemen, where they were detained in the central prison of Aden. They were subsequently briefly taken to Sana'a and back to Aden. They are currently detained at the Fateh political security facility in Aden, where they have received visits by their family.

12.      The source states that neither Muhammad Farah Ahmed Bashmilah nor Salah Nasser Salim 'Ali have been charged or tried with any offence, nor have they been informed of the reason for their continued detention. Representatives of the Yemeni authorities have told the source that the reason for their detention is that their transfer from United States detention was conditional upon them being held in Yemen.

13.      According to the source, the detention of Walid Muhammad Shahir Muhammad al-Qadasi, Muhammad Farah Ahmed Bashmilah and Salah Nasser Salim 'Ali is devoid of any legal basis and thus arbitrary. In particular, the three above-mentioned persons were released from United States custody without charges and were never charged with any criminal offence in Yemen, where they have been detained for 18 months (Walid Muhammad Shahir Muhammad al-Qadasi) and three months (Muhammad Farah Ahmed Bashmilah and Salah Nasser Salim 'Ali), respectively. No decision concerning their detention and or statement setting forth the grounds therefor has been issued by any Yemeni authority. They have not been informed of any charges against them, have not been provided with legal assistance, have not had the right to challenge the lawfulness of their detention, and have not had a single hearing in their case.

14.      The source adds that the detention of Walid Muhammad Shahir Muhammad al-Qadasi, Muhammad Farah Ahmed Bashmilah and Salah Nasser Salim'Ali is in violation of Yemeni domestic law, as well, because, according to it, suspects have the right to see a judge or prosecutor within 24 hours of being detained, the right to challenge the legal basis of their detention and the right to seek prompt legal assistance. Furthermore, Yemeni law provides that detention is not permitted except for acts punishable by law.

A/HRC/4/40/Add.1
page 44

15.      In its reply to these allegations, the Government confirms that Messrs. Walid Muhammad Shahir Muhammad al-Qadasi, Muhammad Farah Ahmed Bashmilah and Salah Nasser Salim 'Ali were handed over to Yemen by the United States. They are held in a security police facility because of their alleged involvement in terrorist activities related to Al-Qaida. The Government of Yemen adds that the "competent authorities are still dealing with the case pending receipt of their [the persons'] files from the United States of America authorities in order to transfer them to the Prosecutor".

16.      In replying to the Government's observations, the source informs that, as of 8 November 2005, the three men remain in detention, while the Government continues to state that it is awaiting the files concerning their cases from the United States authorities.

17.      The Working Group, based on the above information provided by the source and the Government, which coincide, is in the position to render an Opinion.

18.      The Government states that Messrs. Al-Qadasi, Bashmila and Salim were handed over to Yemen by the United States. It is waiting for the files from the American authorities so as to transfer them to the prosecutor. This clearly shows that the Yemen authorities do not currently have any files on them.

19.      The Working Group notes with concern that the transfers that the three persons experienced before being detained in Yemen occurred outside the confines of any legal procedure, such as extradition, and do not allow the individuals access to counsel or to any judicial body to contest the transfers.

20.      No charges have been made by the Government of Yemen against these three men. They have not been informed of any accusation against them, nor have been brought before any judicial authority. No legal procedure has been followed to accuse them. Their deprivation of liberty is, as such, devoid of any legal basis.

21.      In the light of the foregoing, the Working Group renders the following Opinion:

     The deprivation of liberty of Messrs. Walid Muhammad Shahir Muhammad al-Qadasi, Muhammad Farah Ahmed Bashmilah and Salah Nasser Salim'Ali, is arbitrary, being in contravention of article 9 of the Universal Declaration of Human Rights, and article 9 of the International Covenant on Civil and Political Rights, and falls within category I of the categories applicable to the consideration of the cases submitted to the Working Group.

22.      Consequent upon the Opinion rendered, the Working Group requests the Government:

     To release the three above-mentioned persons, or otherwise subject them to a competent judicial authority, bringing these cases in conformity with the standards and principles set forth in the International Covenant on Civil and Political Rights.

Adopted on 30 November 2005.