1  STEVEN M. WATT* swatt@aclu.org
   BEN WIZNER (SBN 215724) bwizner@aclu.org
2  JAMEEL JAFFER* jjaffer@aclu.org
   STEVEN R. SHAPIRO* sshapiro@aclu.org
3  AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
4  125 Broad Street, 18th Floor
   New York, NY 10014
5  Tel. 212.549-2500 / Fax 212.549.2651

6  ANN BRICK (SBN 65296) abrick@aclunc.org
   ACLU FOUNDATION OF
7  NORTHERN CALIFORNIA
   39 Drumm Street
8  San Francisco, CA 94111
   Tel. 415.621.2493 / Fax 415.255.1478

10 Additional Counsel Listed on Next Page

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISON

BINYAM MOHAMED;
ABOU ELKASSIM BRITEL;
AHMED AGIZA;
MOHAMED FARAG AHMAD BASHMILAH;
BISHER AL-RAWI,

   Plaintiffs,

v.

JEPPESEN DATAPLAN, INC.,

   Defendant.

Civil Action No. 5:07-cv-02798 (JW)

DECLARATION OF BISHER AL-RAWI IN SUPPORT OF PLAINTIFFS' OPPOSITION TO THE UNITED STATES' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

CLIVE STAFFORD SMITH*† clivess@mac.com
ZACHARY KATZNELSON† (SBN 209489) zachary@reprieve.org.uk
REPRIEVE
PO Box 52742
London EC4P 4WS
England
Tel. +44 (0)207 353 4640 / Fax +44 (0)207 353 4641

PAUL HOFFMAN (SBN 71244) hoffpaul@aol.com
SCHONBRUN DESIMONE SEPLOW
HARRIS & HOFFMAN LLP
732 Ocean Front Walk, Suite 100
Venice, CA 90291
Tel 310.999.7040, ext. 4 / Fax 310.999.7040

HOPE METCALF* hope.metcalf@yale.edu
NATIONAL LITIGATION PROJECT
ALLARD K. LOWENSTEIN INTERNATIONAL
HUMAN RIGHTS CLINIC
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06520
Tel. 203.432.9404 / Fax 203.432.9128

MARGARET L. SATTERTHWAITE*++ satterth@juris.law.nyu.edu
INTERNATIONAL HUMAN RIGHTS CLINIC
WASHINGTON SQUARE LEGAL SERVICES, INC.
NEW YORK UNIVERSITY SCHOOL OF LAW
245 Sullivan Street
New York, NY 10012
Tel. 212-998-6657 / Fax 212-995-4031

**Attorneys for Plaintiffs BINYAM MOHAMED, ABOU ELKASSIM BRITEL, AHMED AGIZA, MOHAMED FARAG AHMAD BASHMILAH, and BISHER AL-RAWI**
* Admitted Pro Hac Vice
† Attorneys for and on behalf of Plaintiff BINYAM MOHAMED only
++ Attorney for and on behalf of Plaintiff MOHAMED FARAG AHMAD BASHMILAH only

Declaration of Bisher Al-Rawi- C 07-2798-JW

# DECLARATION OF BISHER AL-RAWI IN SUPPORT OF PLAINTIFFS' OPPOSITION TO THE UNITED STATES' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGEMENT

I, **BISHER AL-RAWI**, of Surrey, England under penalty of perjury under the laws of the United States of America, declare as follows, pursuant to 28 U.S.C. § 1746:

1. I am a thirty-nine year-old citizen of Iraq. In the early 1980s, my father was detained and tortured by Saddam Hussein's secret police. In 1984, I left Iraq for the United Kingdom where my brother Wahab al-Rawi already lived. The following year my parents and sister joined Wahab and me, and we all obtained legal residency. I am a permanent British resident with Indefinite Leave to Remain in the United Kingdom and reside presently with my family in Surrey, England.

2. From February 7, 2003, until March 30, 2007, I was held prisoner at the U.S. Naval Base in Guantánamo Bay, Cuba. I was held there for over four years before being released without charge.

3. After arriving in the U.K., I completed my secondary education and then went on to study Material Science and Engineering at Queen Mary and West Field College in London. I never completed my degree, however. In the early nineties, I started a small engineering company specializing in metal fabrication, gradually expanding the business to include the sale of computers and related products. I wound up this company in around about 2000.

4. In the mid-nineties, I began to form a number of friendships with people in the Muslim community in England, including one Muslim cleric, Abu Qatada. Around

1996, Mr. Qatada called and asked if I would come over to assist him with "something important." Upon arrival, I was introduced to some British officials. I think they may have been members of the police force or perhaps MI5, the British intelligence agency, but I can't quite recall now. I was asked to interpret, which I did willingly.

5. Over the next few years, I was called upon to act as a translator on a number of other occasions on a very informal basis.

6. At this time, I was aware that British intelligence had a close interest in a number of individuals in the Muslim community as well as the Muslim community generally, and as I had nothing to hide, I was happy to assist by acting as a translator on an ad hoc basis.

7. A few weeks after the September 11th terrorist attacks on the United States, two MI5 agents arrived at my home to talk with me. The men identified themselves as "Alex" and "Matt." They asked me numerous questions, all of which I answered truthfully. From the nature of their questions, I surmised their visit to have been an effort to "recruit" me as part of a wider effort by British intelligence at the time to recruit individuals from London's Muslim community to collect reconnaissance and combat potential terrorist attacks.

8. At the end of the meeting, the two men asked if I would speak with them again and I readily agreed.

9. I think two more meetings took place at my home, and then, at their suggestion, we started meeting elsewhere, the first at a coffee shop in Victoria Station, London and

others at restaurants or hotel rooms at various locations around the city. Following this series of meetings, "Alex" and "Matt" asked if I would work for them on a more formal basis. As these meetings progressed, Abu Qatada's name was brought up. Abu Qatada is an outspoken Muslim cleric who MI5 suspected was involved with Al Qaeda. For several months, I conveyed questions from MI5 to Abu Qatada and passed his answers back to them. I hoped that by establishing a channel of communication between MI5 and Abu Qatada, and the broader Muslim community, that this would serve to alleviate the extreme tension then existing between the Muslim community and the British authorities.

10. "Alex" and "Matt" were present at all the meetings where the exchange of information happened. These meetings took place mainly in hotel rooms at various locations in and around London.

11. During some of these meetings, the agents pressured me to accept payment for my services. I refused, however. The only thing I ever accepted from them was a cell phone and I took it only because they insisted that I should be easier to contact. Apart from one occasion, I only ever used the cell phone to call or receive calls from MI5.

12. As my work progressed, I recall becoming increasingly concerned that my assistance to MI5 might land me in trouble somehow. To ease my concerns I asked Alex and Matt to meet with me and a lawyer that I knew of, Gareth Peirce. They refused and instead, to convince me to continue to work for them, introduced me to an MI5 lawyer called "Simon."

13. Simon assured me that my services were valuable, necessary and appreciated. Simon

also assured me that there was no risk in my working for the agency and that MI5 and Simon, himself, would come to my aid if I ever found myself compromised as a result of my work with MI5 or my interaction with Abu Qatada. He even gave me an undertaking to act as a witness in court, if matters ever came down to this.

14. As time went on, my relationship with MI5 became increasingly strained. The MI5 agents placed unreasonable demands on me and began using me exclusively as the point of contact between them and Abu Qatada. They seemed to become increasingly frustrated by my inability to broker the meeting with Abu Qatada that they so desperately wanted.

15. My relationship with MI5 terminated a few months before British authorities arrested Abu Qatada in October 2002.

16. After the demise of my ten-month involvement with MI5, I turned my energies towards my brother Wahab's long-planned business venture in the Republic of the Gambia, Africa.

17. Together with Wahab, and three mutual friends, Jamil el-Banna, Abdullah El Janoudi, and Omar Omeri, I entered into a joint-venture to start a mobile peanut-oil processing factory.

18. Omar Omeri originally conceived of the idea for such a business in 2001, and, in early 2002, Wahab, drew up the business plan and began to secure funding, purchase equipment, and secure the necessary permits for the business. In addition, Omar Omeri's sister-in-law, who worked for a government development agency in the Gambia, agreed to be our bookkeeper and her friend, the First Secretary of the

Gambia's Ministry of Agriculture, agreed to act as an advisor. The business was vetted and approved by the Gambian Embassy in the United Kingdom. We also registered the company in the Gambia and obtained all necessary permits and licenses required under Gambian law before any of us traveled to the country.

19. On October 26, 2002, Wahab flew to the Gambia to retrieve the equipment that we had purchased. Before boarding the aircraft at London City Airport, he was stopped by the police and questioned for about one hour. He was asked questions about the business we were starting in the Gambia, the purpose of his trip, and about Abu Qatada. Wahab answered all their questions truthfully and was then permitted to board the plane.

20. On November 1, 2002 I traveled to Gatwick Airport, London with Jamil el-Banna and Abdullah El Janoudi. Before boarding the aircraft, however, we were arrested by airport police, because they claimed I had a "suspect electronic device" in my luggage. In fact, my luggage only contained sundry travel items and some bits and pieces necessary to get our business up and running, including a store-bought battery charger, which it subsequently transpired was the "suspect electronic device."

21. All of us were taken to Paddington Police Station where we were detained and questioned for approximately four days. Our homes were also searched at this time. We were released on or about November 4, 2002, and the battery charger – the "suspect electronic device" - was returned to me.

22. Through documents released by the British government to the Council of Europe, I have learned that on the very same day I was arrested at Gatwick Airport, MI5 sent a

telegram, dated November 1, 2002, to the U.S. Central Intelligence Agency ("CIA") falsely stating that I was an "Islamic extremist" and that a search of my luggage "revealed some form of home-made electronic device. Preliminary inquiries including X-ray suggest that it may be a timing device or could possibly be used as some part of a car-based Improvised Electronic Device (IED)." Attached hereto as Exhibit A is a true and correct copy of the telegram dated November 1, 2002.

23. MI5 sent a second telegram, dated November 11, 2002, to the British Ministry of Foreign Affairs confirming that the device in question was actually a harmless battery charger. Attached hereto as Exhibit B is a true and correct copy of the telegram dated November 11, 2002.

24. According to a 2006 Council of Europe Report on Alleged Secret Detentions and Unlawful Inter-State Transfers Involving Council of Europe Member States, this exculpatory information was never relayed to the CIA. Attached hereto as Exhibit C is a true and correct copy of the relevant paragraphs of the Council of Europe report.

25. I have also learned through publicly available documents, that although I had never been arrested or charged with any wrongdoing as a result of my relationship with Abu Qatada, MI5 sent several telegrams to the CIA between November 4 and November 8, 2002 concerning my association with Abu Qatada. Attached hereto as Exhibit D are true and correct copies of these telegrams one dated November 4, 2002 and the second, dated November 8, 2002.

26. I later learned from the findings of a United Kingdom Parliamentary Intelligence and Security Committee investigation into my rendition and the rendition of other U.K.

residents that U.S. authorities passed on the information they had received from MI5 to the Gambian security services. According to the Committee report, in relevant part, the telegram read: "[we] would be grateful for feedback on the reaction of the Gambians to this intelligence. In particular, we would be interested to learn if they are able to cover these individuals whilst they are in Gambia." Attached hereto as Exhibit E is a true and correct copy of the Committee report, published on July 25, 2007, and setting forth the text of the telegram.

27. On November 8, 2002, accompanied by Jamil el-Banna and Abdullah El Janoudi I flew to Banjul, the Gambia without incident. My brother Wahab's friend, Ibrahim Yousif, was also with us and planned to fly to the Gambia too. Yousif also intended to participate in our planned business venture. However, before boarding the aircraft he was approached by a British official and taken aside. Following his conversation with this British official, Ibrahim became very distressed and, after boarding, requested permission to de-plane, which he was ultimately permitted to do. Ibrahim never rejoined our group.

28. That same day, MI5 forwarded my flight details to the CIA by telegram. According to the aforementioned Council of Europe report, unlike all the previous telegrams between MI5 and the CIA about me, this telegram failed to specify that the information contained therein "must not be used as the basis of overt, covert or executive action." Attached hereto as Exhibit D is a true and correct copy of the telegram dated November 8, 2002 cited in the Council of Europe report.

29. Upon arrival in Banjul, the Gambia, I was arrested, together with Jamil, Abdullah, and my brother Wahab and Omar Omeri, who had come to the airport to meet us. Following our arrest, we were taken by these Gambian officials to the Gambian National Intelligence Agency ("GNIA") headquarters.

30. For approximately two hours we were questioned separately by Gambian officials about our reasons for traveling to the country. I was asked fairly routine questions such as my name, address and parent's names. The following morning two American men arrived. Sitting along side the Gambian officials, these men conducted our interrogation. One of the Americans introduced himself as "Mr. Lee." Mr. Lee had all of us photographed. He appeared to be in charge and was present at all interrogations throughout our detention in the Gambia.

31. I was initially held in the reception area of the GNIA, where I slept on foam mattresses on the floor for approximately two days. The others were held inside the GNIA building. We were then transferred to what our captors called a "safe house." Following this transfer we were separated. Abdullah and I were returned to the GNIA building, and Wahab and Jamil were kept at the "safe house." Soon thereafter we were all brought to a second "safe house" where we were kept apart in special holding cells. These cells were very small, hot, and windowless. We were not permitted to meet or speak with one another throughout this time. It was an extremely difficult time for me.

32. At the second "safe house" the interrogations were controlled by the Americans. In fact the Americans had absolute control over us from the day we first met them. The

interrogations were sporadic during this time and mostly informal. During one of the interrogations, Mr. Lee told me that he knew one of us had worked with MI5, but I did not reveal to Mr. Lee that it was me. During one of my interrogation sessions I was questioned rigorously by Mr. Lee, another American, and two Gambian intelligence agents about my relationship with Abu Qatada. They also asked if I would be willing to work for the CIA in Britain. I told them I would not.

33. During our detention the others made numerous requests for British consular assistance. I didn't, however, as I thought it futile as I was not a citizen of the United Kingdom, only a legal resident and, in any event, bearing in mind the lawless nature of our detention and interrogation up to that point, I thought it highly unlikely that they would extend me this right anyway. The numerous requests for British consular assistance made by the others were all refused and indeed, mocked by our American captors.

34. Concerned by our sudden disappearance, my mother instructed lawyers in the Gambia to file a writ of habeas corpus in the Gambian courts.

35. Omar Omeri was released shortly after our initial arrest; Abdullah was released after about twenty-six days, and my brother, Wahab al-Rawi, after twenty-seven days. Jamil and I, however, continued to be held.

36. Two days after my brother and Abduallah were released Jamil and I were driven to the airport in Banjul. At the airport we were taken into a dark room where Americans placed hoods over our heads, cuffed our hands behind our backs, and shackled our feet.

37. I was placed on a seat between two Gambian officials and I could hear the sound of jet engines as we neared the airport. The position I was placed in was very uncomfortable, because my hands were cuffed behind my back. I attempted to reposition myself to get more comfortable. As I did so, one of the Gambian officials next to me must have noticed my efforts, because he tried to assist me find a less painful way to sit. Then, without speaking, one of my escorts began to gently rub my feet. The kindness of the gesture took me by surprise and seemed to be almost apologetic in nature. At this point I became convinced that something awful was about to happen.

38. Moments later, my Gambian escorts stood me up and began to walk forward. They let go of me briefly, but I was immediately grabbed from behind by two other men and dragged into a small, dark room located somewhere on the airport perimeter.

39. In this room there were several men and women present. All of them wore hoods. Using flashlights to guide them in the darkness and in complete silence, they quickly removed my handcuffs and shackles, cut off my clothes, and dressed me in what I later leaned to be a diaper and a different set of clothing. They cuffed my hands and shackled my legs again and thereafter placed me in some sort of restraining harness. I then had something placed in and around my ears that impaired my hearing and both a blindfold and goggles were placed over my eyes.

40. I was then roughly manhandled onboard an awaiting aircraft and placed on a stretcher-like platform and restrained. For the entire flight I was unable to move. I was also denied access to food, water, or even a toilet.

41. The aircraft landed once before reaching its final destination. I was restrained the whole time. In total, with the stopover, I believe, the flight took approximately nine hours.

42. From public flight records, I have learned that on December 8, 2002 a Gulfstream V aircraft, registered with the FAA as N379P, departed Banjul airport at 9:45 p.m. and landed in Cairo, Egypt at 3:45 a.m. the next morning. This aircraft then left Cairo an hour later at 4:45 a.m. and arrived in Kabul, Afghanistan at 9:04 a.m. that morning. Attached hereto as Exhibit F is a true and correct copy of the relevant flight plan as noted by the European Parliament and the Council of Europe.

43. I have also learned that Jeppesen's involvement in arranging the logistics for this flight is substantiated through reference to the 'local data string' for this flight plan. The 'originator code' on the local data string, i.e. the organization responsible for filing the flight plan, is identified by the code number "KSFOXLDI." I understand that in the aviation logistics industry, this code is specific to Jeppesen Dataplan, Inc. Attached hereto as Exhibit G is a true and correct copy of the local data string relevant to my rendition flight.

44. I subsequently learned, from the report published by the United Kingdom Intelligence and Security Committee on July 25, 2007, that the British Security Service "was informed by the U.S. authorities that they intended to conduct what [the Committee] have defined as a 'Rendition to Detention' operation, to transfer the four men from The Gambia to Bagram Air Base in Afghanistan. The Service registered strong concerns, both orally and in writing, at this suggestion and alerted the FCO (U.K.

Home, Foreign and Commonwealth Office)." Attached hereto as Exhibit H is a true and correct copy of the relevant section of the Committee Report.

45. I also learned from the same report that the FCO Deputy High Commissioner and High Commissioner to the Gambia met with the U.S. Ambassador in Banjul, the Gambia. In addition, the Deputy Head of mission to the U.S. met with high level representatives from the U.S. Department of State and the National Security Council and "registered strong objections to the transfer of the men and sought clarification of their whereabouts and U.S. intentions." The Intelligence and Security Committee was told that, "in response to our representations, the U.S. confirmed the detention of the individuals in question, but declined to give their precise location in Gambia. The U.S. also stated that they believed there were good grounds for the individuals' detention and told us they were being well treated." Attached hereto as Exhibit I is a true and correct copy of the relevant section of the Report dated July 25, 2007.

46. After landing in Afghanistan, I was removed from the aircraft and thrown into the back of a van-like vehicle. Jamil was also in the vehicle, and we were driven along a bumpy road to the prison commonly known as the "Dark Prison," in Kabul, Afghanistan. When the vehicle stopped, Jamil and I were dragged to the prison and placed in separate cells, still blindfolded, shackled, and handcuffed.

47. From the outset, I was held in complete darkness and isolation and kept in leg shackles twenty-four hours a day. I was given very little water and fed only once every one or two days. My toilet was a very small bucket, which was difficult to use, especially in the continuous darkness. Despite the extreme cold, I was not provided

Declaration of Bisher Al-Rawi- C 07-2798-JW

with adequate clothing or blankets. Strange music and loud man-made sounds were played around the clock, which—in addition to the constant screams of the other prisoners around me—made sleeping extremely difficult and very disturbed. When I did manage to fall asleep I often had nightmares.

48. During the entire time at the "Dark Prison," the noise would stop only briefly, for a few seconds, each time the tape reached its end. In these brief moments of silence, I could just barely make out the sound of Jamil calling my name. Fearing retaliation I did not respond. This happened on several occasions, but eventually Jamil stopped calling out to me.

49. After approximately two weeks, I was again hooded, shackled, and handcuffed and thrown into the back of a truck. Despite being fully restrained and unable to resist, I was punched and badly beaten while waiting to be transported. In the truck, other prisoners were thrown on top of me, suffocating me under their weight. My injuries were so extensive— I had cuts and bruises all over my body and was unable to see properly for some time—that they were later photographed by U.S. soldiers, who told me: "We want to know what we've done and what the Afghans have done."

50. I was then driven to a U.S. military helicopter and transferred to the U.S. Bagram Air Base in Afghanistan. Fearing that I was going to be thrown to my death from the helicopter, terror gripped me during the entire flight.

51. On my first day at Bagram, I was forced to stand for a few hours before a military officer at the base. Upon viewing the extent of my injuries, the officer took pity on me

Declaration of Bisher Al-Rawi- C 07-2798-JW

and permitted me to sit down. I later learned that it was customary for every new prisoner at Bagram to be forced to stand for twenty-four hours upon arrival.

52. Conditions worsened the very next day. For more than two months, I was subjected to humiliation, degradation, and physical and psychological torture by U.S. officials at Bagram. I was kicked and dragged along the floor, deprived of access to a toilet, shower, or clean clothes, held in a squalid cell, and forced to undergo prolonged periods of isolation and sleep deprivation. I was threatened with death or with transfer to another country to be tortured. I was frequently interrogated about Abu Qatada, but this time — unlike at the "Dark Prison" — my captors no longer wore hoods.

53. On February 7, 2003, I was transferred to Guantánamo. Before transfer, together with a number of other prisoners also scheduled for transfer there, I was isolated from the rest of the prisoners at the base. My food was restricted and my hair and beard were cut. For around eight hours before the flight, I was left shackled and handcuffed in excruciating pain. I was then moved to a vehicle and driven to a waiting aircraft.

54. Forced to wear darkened goggles, a facemask, and earphones, I was tied — still shackled and handcuffed very painfully with my legs and hands in front — to a seat on the aircraft. I was forced to maintain this position for the duration of the approximately twenty-four hour flight.

55. Unlike my previous flights to the "Dark Prison" and Bagram, the flight to Guantánamo was marked by small acts of kindness on the part of my captors. Some hours into the journey, we were all offered a tablet that we were told would help us

Declaration of Bisher Al-Rawi- C 07-2798-JW

"get through" the flight. Though I did not feel like I could refuse, I still appreciated the gesture. Some time thereafter I was offered a tiny amount of water and a sandwich. Not knowing what to expect, I asked for an additional sandwich and was given one.

56. Documentation from the International Committee for the Red Cross ("ICRC") confirms that I was held in U.S. custody at Bagram, and that I was visited there by ICRC delegates on January 4, 2003. ICRC documentation also confirms that I was transferred from Bagram to Guantánamo on February 7, 2003. Attached hereto as Exhibit J is a true and correct copy of this ICRC documentation.

57. The four years I was a prisoner at Guantánamo ranks as the most challenging of my entire life. I lived through events and experiences I never could have imagined. A letter which I wrote to one of my lawyers while I was detained encapsulates how I was feeling throughout my time there: "It has made me live in the shadows, where one can't feel quite alive, but one does not die." Attached hereto as Exhibit K is a true and correct copy of my letter.

58. On March 30, 2007, almost four and one half years after I was seized and detained in the Gambia, I was released from Guantánamo. No charges were ever filed against me. I was flown from Guantánamo to Britain, accompanied by a number of high ranking British MI6, Home Office, and Special Branch officials, on a luxury Lear jet. Upon arrival at Luton Airport outside London, I underwent just over an hour-long interview conducted by British police officers. I briefly went over my whole experience with

them and, once they had finished questioning me, they drove me to my family home in London.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 10th day of December, 2007.

*[signature]*

Bisher Al-Rawi

Declaration of Bisher Al-Rawi- C 07-2798-JW