# EXHIBIT A



## OUT-TELEGRAM

**Date:** 1 November 2002

**SUBJECT:** Detention of Islamists at Gatwick Airport

THIS INFORMATION HAS BEEN COMMUNICATED IN CONFIDENCE TO THE RECIPIENT GOVERNMENT AND SHOULD NOT BE RELEASED WITHOUT THE AGREEMENT OF THE BRITISH GOVERNMENT. IT IS FOR RESEARCH AND ANALYSIS PURPOSES ONLY AND MAY NOT BE USED AS THE BASIS FOR OVERT, COVERT OR EXECUTIVE ACTION.

1.    Three individuals associated with the prominent spiritual cleric Omar OTHMAN@ Abu QATADA were detained by members of the Anti-Terrorist branch at Gatwick airport on the 1 November 2002 under the Terrorism Act 2000. A search of their baggage revealed some form of home-made electronic device. Preliminary inquiries including X-ray suggest that it may be a timing device or could possibly be used as some part of a car-based IED. All three individuals were due to fly to Banjul, Gambia. At this time, this is for your information only. We intend to do further analysis of the recovered items and will revert in due course.

2.    The three individuals were Bishr AL RAWI (23/12/67) , an Iraqi Islamic extremist who is a member of Abu QATADA's close circle of associates, Abu ANAS@ Jamil Abdulatif Iylayan EL-BANNA@ Mohammed AL-QURAYSHI (28/5/62), formerly assessed to be Abu QATADA's financier and Abdallah ELJANOUDI (18/9/62) ▮▮▮▮▮ ELJANOUDI ▮ has been based in the UK for twelve years and was travelling on a UK passport. Secret and reliable intelligence indicated that these individuals were travelling to Gambia to invest in a peanut oil factory.

3.    Kind regards.

8

# EXHIBIT B



## OUT-TELEGRAM

Date:    11 November 2002

SUBJECT:    Individuals Detained in Gambia

1.    Three individuals associated with the prominent spiritual cleric Omar OTHMAN @ Abu QATADA were detained in Banjul by the Gambian authorities on 8 November. Secret and reliable reporting had indicated that Jamil EL-BANNA @ Abu ANAS, Bishr AL RAWI and Wahab AL RAWI were travelling to Gambia to set up a groundnut oil factory.

2.    Abu ANAS (28/5/62) is a Jordanian Palestinian veteran of the Afghan-Soviet war and is assessed to be Abu QATADA's financier. Abu ANAS is in close contact with members of the GSPC and FIT and his home is reported to have been used by these groups as a meeting place.

3.    Bishr AL RAWI (23/12/67) is an Iraqi Islamist extremist who is a member of Abu QATADA's close circle of associates. He has previously come to our attention for his financial activities in connection with Abu ANAS. Bishr's enthusiasm for extreme sports has often brought him to the attention of the police. For example, he was seen driving away from the M4 flyover at Brentford in March 2001, which he and two other individuals had been seen climbing. He is also a qualified diver, a keen dinghy sailor and parachutist.

4.    Wahab AL RAWI, Bishr's brother, is a close associate of Abu ANAS. Secret and reliable reporting has indicated that Wahab was taking the lead in the plans for setting up the peanut oil factory. Further reporting has revealed that he travelled to Gambia on 28 October, in advance of Bishr and Abu ANAS.

5.    Bishr AL RAWI, Abu ANAS and a further individual Abdallah Ghazi EL JANOUDI attempted to travel to Gambia on 1 November. However, they were detained by members of the

██████████████

Anti-Terrorist Branch at Gatwick Airport under the Terrorism Act 2000. A search of their baggage revealed that they were carrying some form of suspicious home made electronic device. All three individuals were released on 4 November after it was assessed that the device was a commercially available battery charger that had been modified by Bishr AL RAWI in order to make it more powerful.

6.     ████████████████ EL JANOUDI (18/9/62), ██████████████████████████ ████████████████████████████. He was born in Beirut and is now a naturalised British Citizen. Secret and reliable reporting has indicated that EL JANOUDI is a close associate of Bishr AL RAWI.

7.     Bishr AL RAWI, Abu ANAS and EL JANOUDI returned to Gatwick on 8 November and departed for Gambia. Special Branch enquiries on the day revealed that a forth individual, Ibrahim YOUSIF, had the same booking reference as the other three, indicating that he was travelling with them. YOUSIF removed himself from the aircraft before the gate closed, claiming that he was too ill to travel. Special Branch were notified and he was detained under the Terrorism Act 2000. During a police interview YOUSIF admitted that he was carrying a bag for the other three (a subsequent search of this bag had revealed numerous Qu'rans). YOUSIF was later released ████████████████

8.     On arrival in Gambia on the evening of 8 November Bishr AL RAWI, Abu ANAS and EL JANOUDI were detained by the local authorities for questioning. Wahab AL RAWI and an individual called Omar OMARI ███████████████████████████████████ were also detained when they came to meet the other three at Banjul airport.

9.     We are receiving updates from ████████████ regarding these detainees. We will forward any further relevant information in due course.

10.    Regards,

██████████████

██████████████

# EXHIBIT C



Parliamentary **Assembly**
**Assemblée** parlementaire

COUNCIL    CONSEIL
OF EUROPE   DE L'EUROPE

**restricted**
**AS/Jur (2006) 16 Part II**
7 June 2006
ajdoc16 2006 Part II

## Committee on Legal Affairs and Human Rights

# Alleged secret detentions and unlawful inter-state transfers involving Council of Europe member states

## Draft report – Part II (Explanatory memorandum)
Rapporteur: Mr Dick Marty, Switzerland, ALDE

C.    **Explanatory memorandum**
      by Mr Dick Marty, Rapporteur

Table of Contents:

1. Are human rights little more than a fairweather option? ………………………………    3
    1.1. 11 September 2001 …………………………………………………………………    3
    1.2. Guantanamo Bay …………………………………………………………………    4
    1.3. Secret CIA prisons in Europe?……………………………………………………    4
    1.4. The Council of Europe's response …………………………………………….    5
    1.5. European Parliament …………………………………………………………….    6
    1.6. Rapporteur or investigator? ……………………………………………………    6
    1.7. Is this an Anti-American exercise? …………………………………………….    7
    1.8. Is there any evidence?...................................................................................    8
2. The global "spider's web"…………………………………………………………….    9
    2.1. The evolution of the rendition programme …………………………………….    9
    2.2. Components of the spider's web ……………………………………………….    12
    2.3. Compiling a database of aircraft movements ………………………………….    14
    2.4. Operations of the spider's web ………………………………………………….    15
    2.5. Successive rendition operations and secret detentions ……………………….    16
    2.6. Detention facilities in Romania and Poland …………………………..    16
        2.6.1    The case of Romania …………………………………………………….    16
        2.6.2.   The case of Poland …………………………………………….    17
    2.7. The human impact of rendition and secret detention ………………………….    19
        2.7.1.   CIA methodology – how a detainee is treated during a rendition …………    20
        2.7.2.   The effects of rendition and secret detention on individuals ………………
                and families ……………………………………………………………    23

Milan prosecuting authorities, however: an agent belonging to an elite *Carabinieri* unit has admitted taking part in Abu Omar's abduction as part of an operation co-ordinated by the SISMI, the military intelligence services[145]. The head of SISMI had formally denied any participation of his service in the abduction; he even affirmed that he had only been informed of this episode after the abduction itself[146].

### 3.5.    Bisher Al-Rawi and Jamil El-Banna

163.    This case, which concerns two British permanent residents arrested in Gambia in November 2002 and transferred first to Afghanistan and from there to Guantanamo (where they still are) is an example of (ill-conceived) cooperation between the services of a European country (the British MI5) and the CIA in abducting persons against whom there is no evidence enabling them to be kept in prison lawfully, and whose principal crime is to be on social terms with a leading Islamist against whom the authorities have no evidence either – namely Abu Qatada.

164.    The information made public to date[147] shows that the abduction of Messrs Al-Rawi and El-Banna was indeed motivated by information – partly erroneous – supplied by MI5.

165.    Bisher Al-Rawi and Jamil El-Banna were arrested in Gambia on 8 November 2002. They intended to join Mr Al-Rawi's brother Wahab, a British citizen, and help him set up a mobile peanut processing plant. The British authorities were well aware of this business trip[148]. On 1 November, Messrs Al-Rawi and El-Banna left on their trip, but did not get very far. At Gatwick airport they were arrested by reason of a suspect item in Mr Al-Rawi's hand luggage.

166.    On the same day, a first telegram from MI5 informed the CIA that the two men had been arrested under the 2000 anti-terrorist act. That telegram contained false information, including the statement that Mr Al-Rawi was an Islamist extremist, and that the search of his luggage had revealed that he was carrying a sort of improvised electronic device which could be used, according to preliminary investigations, as a component of a home-made bomb[149].

167.    The two men spent 48 hours in police custody, until the police decided that the "suspicious device" was nothing other than a battery charger on sale in several electronic goods shops (Dixons, Argos, Maplins). Mr Al-Rawi explained this when he was arrested, but it had to be checked. The conclusion to the charger episode – that it was indeed a 'harmless device' – was communicated to the Ministry of Foreign Affairs by MI5 in a telegram of 11 November 2002. Unfortunately, there is no evidence that this information was ever conveyed to the CIA. The allegations concerning this 'device' reappeared in their 'trial' before the CSRT (Combatant Status Review Tribunal)[150] as 'evidence' that they were 'enemy combatants'.

---

[145] See *Corriere della Sera* and *La Repubblica* of 11 May 2006.

[146] Statement of General Pollari at the meeting of the TDIP on 6 March 2006

[147] I wish to thank in particular my British colleague Andrew Tyrie, chairman of the House of Commons All-Party Parliamentary Group (APPG) on renditions, who helped to arrange for two members of our committee secretariat to attend an APPG hearing of the brother, wife and lawyers of Mr Al-Rawi and Mr El-Banna;  I also thank the two men's American and British lawyers, Mr Brent Mickum and Ms Gareth Peirce, along with Clive Stafford-Smith, the legal director of REPRIEVE, for the detailed information they provided for my inquiries.

[148] Mr El-Banna informed his lawyer that two MI5 agents had come to his home and told him that they knew all about his planned trip. In reply to his question as to whether everything was in order, they said yes and wished him good luck. Mr El-Banna's wife confirmed this visit at the APPG hearing on 28 March 2006.

[149] Telegram of 1 November 2002, made public on 27 March 2006, with other telegrams dated 4, 8 and 11 November and 6 December 2002 ; these documents are normally classified secret, but came into the public domain after being cited on 22 and 23 March 2006 at a public hearing in the Queens Bench Division of the High Court in London, before Lord Justice Latham and Mr Justice Tugendhat. The telegrams were also the subject of the APPG hearing on 27 March 2006. It is clear to the lawyers that not everything is said in the telegrams, which moreover refer to other communications, including telephone calls.

[150] See US Department of Defense, unclassified Combatant Status Review Tribunal (CSRT) transcripts disclosed in the matter of *El-Banna et al v. Bush*, in the US District Court of Columbia (copies of all transcripts on file with the Rapporteur), October 2004.

# EXHIBIT D



## OUT-TELEGRAM



Date:        4 November 2002

---

**SUBJECT:        Travellers to Gambia**

THIS INFORMATION HAS BEEN COMMUNICATED IN CONFIDENCE TO THE RECIPIENT GOVERNMENT AND SHOULD NOT BE RELEASED WITHOUT THE AGREEMENT OF THE BRITISH GOVERNMENT. IT IS FOR RESEARCH AND ANALYSIS PURPOSES ONLY AND MAY NOT BE USED AS THE BASIS FOR OVERT, COVERT OR EXECUTIVE ACTION.

1.        The following form of words can be passed to Gambian liaison:

BEGINS

1.        Three individuals associated with the prominent spiritual cleric Omar OTHMAN@ Abu QATADA are due to travel to Gambia in the near future with the intention of opening a peanut oil factory. The three individuals are Bishr AL RAWI (23/12/67), an Iraqi Islamic extremist who is a member of Abu QATADA's close circle of associates, Abu ANAS@ Jamil Abdulatif Iylayan EL-BANNA@ Mohammed AL-QURAYSHI (28/5/62), formerly assessed to be Abu QATADA's financier and Abdallah ELJANOUDI (18/9/62). Little is known about ELJANOUDI but he has been based in the UK for twelve years and is travelling on a UK passport.

2.        Abu QATADA is one of the leading Islamist spiritual advisors in Europe with extensive links to a wide range of terrorist groups, including Usama Bin LADEN's Al Qaida network. In 1995 he issued a fatwa justifying the killing of women and children who were relatives of the security forces in Algeria. Abu QATADA lends spiritual advice to and raises funds for terrorist groups. AL RAWI and Abu ANAS are part of Abu QATADA's inner circle of associates.

ENDS

3.      We would be grateful for feedback on the reaction of the Gambians to this intelligence. In particular, we would be interested to learn if they are able to cover these individuals whilst they are in Gambia.  We believe that the three individuals plan to reside in Gambia for around three months.

4.      Kind regards.



**OUT-TELEGRAM**

Date:        8 November 2002

SUBJECT:    Individuals Travelling to Gambia

THIS INFORMATION HAS BEEN COMMUNICATED TO THE RECIPIENT GOVERNMENT IN CONFIDENCE AND SHALL NOT BE RELEASED WITHOUT THE AGREEMENT OF THE BRITISH GOVERNMENT.

1.    Further to [redacted] dated 1 November and our telephone conversation today.

2.    We are able to confirm that the three individuals associated with the prominent spiritual cleric Omar OTHMAN@ Abu QATADA who were arrested at Gatwick on 1 November have today boarded Sierra National Airlines Flight LJ054 to Banjul, Gambia. The flight was due to depart from the UK at 1230 but the departure was delayed until 1310.

3.    The three individuals checked-in at the airport using the following variations of their names:

    JAMIL ABDUL LATIF IYLAN (28/5/62)
    BISHR QALID (23/12/67)
    ABDALLAH GHAZI (18/9/62)

4.    Regards.

**15**

# EXHIBIT E



# Intelligence and Security Committee

# Rendition

Chairman:

The Rt. Hon. Paul Murphy, MP

Cm 7171

£18.00



# Intelligence and Security Committee

# Rendition

Chairman:
The Rt. Hon. Paul Murphy, MP

Presented to Parliament by the Prime Minister
by Command of Her Majesty
JULY 2007

Cm 7171                                        £18.00

© Crown Copyright 2007

The text in this document (excluding the Royal Arms and departmental logos) may be reproduced free of charge in any format or medium providing that it is reproduced accurately and not used in a misleading context. The material must be acknowledged as Crown copyright and the title of the document specified.

Any enquiries relating to the copyright in this document should be addressed to The Licensing Division, HMSO, St Clements House, 2–16 Colegate, Norwich NR3 1BQ.
Fax: 01603 723000 or e-mail: licensing@cabinet-office.x.gsi.gov.uk

## INTELLIGENCE AND SECURITY COMMITTEE
**70 Whitehall, London SW1A 2AS**

ISC 160/2007                                                      28 June 2007

The Rt Hon Gordon Brown MP
Prime Minister
10 Downing Street
London SW1A 2AA

*Dear Gordon,*

I enclose the Intelligence and Security Committee's Report on *Rendition*. Our inquiry has considered whether the UK intelligence and security Agencies had any knowledge of, and/or involvement in, rendition operations, and also the Agencies' overall policy for intelligence sharing with foreign liaison services.

The Committee would be grateful if you would lay this Report before Parliament as soon as possible.

*Yours ever,*

*Paul*

**PAUL MURPHY**

# THE INTELLIGENCE AND SECURITY COMMITTEE

The Rt. Hon. Paul Murphy, MP (Chair)

| | |
|---|---|
| The Rt. Hon. Michael Ancram QC, MP | The Rt. Hon. Alan Beith, MP |
| Mr Ben Chapman, MP | The Rt. Hon. Lord Foulkes of Cumnock *(from 7 February 2007)* |
| The Rt. Hon. George Howarth, MP | The Rt. Hon. Michael Mates, MP |
| Mr Richard Ottaway, MP | Baroness Ramsay of Cartvale *(until 6 February 2007)* |
| Ms Dari Taylor, MP | |

The Intelligence and Security Committee (ISC) was established by the Intelligence Services Act 1994 to examine the policy, administration and expenditure of the Security Service, Secret Intelligence Service (SIS) and Government Communications Headquarters (GCHQ). The Committee has developed its oversight remit, with the Government's agreement, to include examination of the work of the Joint Intelligence Committee (JIC) and the Intelligence and Security Secretariat, which includes the Assessments Staff in the Cabinet Office. The Committee also takes evidence from the Defence Intelligence Staff (DIS), part of the Ministry of Defence (MoD), which assists the Committee in respect of work within the Committee's remit.

The Prime Minister, in consultation with the leaders of the two main opposition parties, appoints the ISC members. The Committee reports directly to the Prime Minister and through him to Parliament, by the publication of the Committee's reports.

The members are subject to Section 1(b) of the Official Secrets Act 1989 and have access to highly classified material in carrying out their duties. The Committee takes evidence from Cabinet Ministers and senior officials – all of which is used to formulate its reports.

The Committee is required by the Intelligence Services Act to produce an Annual Report on the discharge of its functions, which the Prime Minister is required to lay before Parliament. The Committee can produce other reports on specific topics. When laying a report before Parliament, the Prime Minister, in consultation with the Committee, excludes any parts of the report (indicated by the *** in the text) that would be prejudicial to the continuing discharge of the functions of the three intelligence and security Agencies. To date, no material has been excluded without the Committee's consent.

# CONTENTS

**The Intelligence and Security Committee**     **Page iv**

**Contents**     **Page 1**

**List of Abbreviations**     **Page 3**

**Introduction**     **Page 5**
- Background     Page 5
- Terms of Reference     Page 5
- Definitions     Page 6

**Legal Framework**     **Page 7**
- UK Domestic Law     Page 7
- International Law     Page 7
- U.S. Interpretations of International Law     Page 9

**The Nature of Intelligence Sharing**     **Page 11**
- Value of Shared Intelligence     Page 11
- Problems     Page 12

**Pre-9/11 Events**     **Page 14**
- UK Agencies' Actions     Page 14
- UK Government Involvement     Page 16
- Conclusions     Page 17

**Post-9/11 Events**     **Page 19**
- Gradual Awareness of a Change in U.S. Policy     Page 19
- A More Cautious Approach     Page 25
- Public Acknowledgement     Page 27
- Conclusions and Recommendations     Page 29

**Specific Cases**     **Page 31**

  **Martin Mubanga**     **Page 31**
- Background     Page 31
- Outcome of Investigation     Page 32
- Conclusion     Page 32

  **Binyam Mohamed al-Habashi**     **Page 33**
- Background     Page 33
- Allegations     Page 33
- Outcome of Investigation     Page 33
- Conclusions     Page 34

**A Deportation Without Safeguards**   **Page 35**
 Conclusion   Page 35

**Bisher al-Rawi and Jamil el-Banna**   **Page 36**
 Introduction   Page 36
 Events in the UK   Page 36
 Arrest in The Gambia   Page 40
 "Rendition to Detention"   Page 43
 Other Allegations   Page 43

**Ethical Dilemmas**   **Page 47**
 Implications for the Special Relationship   Page 48

**The UK Agencies**   **Page 50**
 Security Service   Page 50
 Secret Intelligence Service   Page 51
 Safeguards in SIS and the Security Service   Page 53
 Conclusions and Recommendations   Page 54
 Government Communications Headquarters   Page 55
 Conclusion   Page 56

**"Ghost Flights"**   **Page 57**
 Introduction   Page 57
 Rules Governing Flights Through UK Airspace   Page 58
 Investigation of Allegations   Page 60
 Police Action   Page 62
 Conclusions and Recommendations   Page 62

**Summary of Conclusions and Recommendations**   **Page 64**

**ANNEX A: Other Inquiries**   **Page 70**

**ANNEX B: List of Witnesses**   **Page 74**

# LIST OF ABBREVIATIONS

| | |
|---|---|
| **APPG** | All-Party Parliamentary Group |
| **AQ** | Al-Qaeda |
| **CIA** | Central Intelligence Agency |
| **CIDT** | Cruel, inhuman or degrading treatment |
| **CSRT** | Combatant Status Review Tribunal |
| **ECHR** | European Convention on Human Rights |
| **EU** | European Union |
| **FCO** | Foreign and Commonwealth Office |
| **GAR** | General Aviation Report |
| **GCHQ** | Government Communications Headquarters |
| **HMG** | Her Majesty's Government |
| **HMRC** | Her Majesty's Revenue and Customs |
| **HUMINT** | Human-sourced intelligence |
| **ICCPR** | International Covenant on Civil and Political Rights |
| **IED** | Improvised explosive device |
| **JIC** | Joint Intelligence Committee |
| **MI5** | Commonly used name for the Security Service |
| **MI6** | Commonly used name for the Secret Intelligence Service |
| **MPSB** | Metropolitan Police Special Branch |
| **NSA** | U.S. National Security Agency |
| **PMO** | U.S. Presidential Military Order |
| **SIGINT** | Signals intelligence |
| **SIS** | Secret Intelligence Service |
| **UN** | United Nations |
| **UNCAT** | United Nations Convention Against Torture |

# INTRODUCTION

## Background

1.    The practice of rendition is not new. Prior to 9/11, rendition operations were carried out to bring individuals subject to arrest warrants to justice – typically in the United States. In recent years, however, it has been alleged that rendition operations have been conducted with the intention of detaining and interrogating individuals outside the normal criminal justice system.[1] It has also been alleged that such operations might involve mistreatment or torture.

2.    Within a few months of 9/11, allegations of "Extraordinary Rendition" operations by the United States began to surface in the media. There have since been allegations that the UK Government has not done enough to ensure that the UK is not involved in such operations, and, furthermore, that it has not sufficiently investigated these allegations, which might be counter to its obligations under UK and international law. (The legal aspects of UK knowledge of, and/or involvement in, rendition are covered in paragraphs 9 to 23.) There have also been allegations of direct involvement in these operations by the UK intelligence and security Agencies and by Her Majesty's Government (HMG) more widely. Given the seriousness of these allegations, the Intelligence and Security Committee considered that an inquiry was necessary.

## Terms of Reference

3.    This inquiry has considered whether the UK intelligence and security Agencies had any knowledge of, and/or involvement in, rendition operations (including specific cases), and their overall policy for intelligence sharing with foreign liaison services (principally the United States) in this context.

4.    As necessary background, the Committee has also considered wider issues such as Ministers' knowledge of, and/or involvement in, rendition, the duties of the Government under UK domestic law and international obligations, and the nature of statements and assurances from the United States Administration.

5.    It is not the purpose of this inquiry to reach conclusions on the legality of the actions of any United States agencies under U.S. law.

---

[1] *There have been a number of inquiries and reports related to the UK which the Committee has considered in the course of its inquiry. These are summarised at Annex A.*

## Definitions

6.     The term "rendition" is used to mean different things by different people.[2] It encompasses numerous variations of extra-judicial transfer such as: to countries where the person is wanted for trial; to countries where the individual can be adequately interrogated; transfer for the purposes of prolonged detention; and military transfer of battlefield detainees.

7.     In order to provide clarity, the Committee has used the following terms throughout this Report:[3]

> **"Rendition":** Encompasses any extra-judicial transfer of persons from one jurisdiction or State to another.

> **"Rendition to Justice":** The extra-judicial transfer of persons from one jurisdiction or State to another, for the purposes of standing trial within an established and recognised legal and judicial system.

> **"Military Rendition":** The extra-judicial transfer of persons (detained in, or related to, a theatre of military operations) from one State to another, for the purposes of military detention in a military facility.

> **"Rendition to Detention":** The extra-judicial transfer of persons from one jurisdiction or State to another, for the purposes of detention and interrogation outside the normal legal system.

> **"Extraordinary Rendition":** The extra-judicial transfer of persons from one jurisdiction or State to another, for the purposes of detention and interrogation outside the normal legal system, where there is a real risk of torture or cruel, inhuman or degrading treatment (CIDT).

8.     For example, the transfer of battlefield detainees from Afghanistan to Guantánamo Bay would fall into the category of "Military Renditions". The transfer of a detainee unconnected to the conflict in Afghanistan to Guantánamo Bay would be a "Rendition to Detention". A transfer to a secret facility constitutes cruel and inhuman treatment because there is no access to legal or other representation and, on that basis, we would describe this as an "Extraordinary Rendition".

---

[2] *The Committee has taken the term "Rendition" as not applying to transfers of individuals by methods such as extradition, deportation, removal or exclusion, although others do include such transfers in their definitions of the term.*

[3] *Quotations from third parties may not necessarily conform to these definitions.*

# LEGAL FRAMEWORK

9.     We set out below the legal aspects surrounding rendition.[4]

## UK Domestic Law

10.    The case of Nicholas Mullen (often referred to as Peter Mullen) provides the basis of the UK's position on renditions. In 1989, the Secret Intelligence Service (SIS) facilitated the transfer of Mr Mullen from Zimbabwe to the UK in order for him to stand trial on charges related to Irish republican terrorism. His transfer falls into the category of what we now call "Rendition to Justice". Mr Mullen's conviction was overturned by the Court of Appeal in February 1999 on the grounds that his deportation represented a *"blatant and extremely serious failure to adhere to the rule of law"* and involved a clear abuse of process.[5]

11.    This judgment set a legal precedent which meant that the Security Service and SIS did not look to conduct any further renditions to the UK. The Chief of SIS told the Committee: *"This outcome made it clear to SIS that rendition for trial in the UK was not viable."*[6]

12.    As regards torture, or CIDT, under section 6 of the Human Rights Act 1998 it is unlawful for a public authority to commit torture or to inflict inhuman or degrading treatment within UK territorial jurisdiction.

## International Law

13.    Under Article 3 of the United Nations Convention Against Torture (UNCAT):

> *No State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.*

The UK therefore has an obligation to ensure that it does not knowingly assist in sending a person to another country, including by any form of rendition operation, where there is a real risk that he may be tortured.[7]

---

[4] *It is worth noting that the Human Rights Act, European Convention on Human Rights and other international conventions were framed without rendition operations in mind and therefore do not address such transfers explicitly.*

[5] *R. v. Nicholas Mullen [1999].*

[6] *Oral evidence – SIS, 7 November 2006.*

[7] *"… the risk of torture must be assessed on grounds that go beyond mere theory or suspicion. However, the risk does not have to meet the test of being highly probable." UN Committee Against Torture, General Comment No. 01 to UNCAT.*

14. Article 3 of the European Convention on Human Rights (ECHR) – incorporated into UK domestic law by the Human Rights Act 1998 – provides that:

> *No one shall be subjected to torture or to inhuman or degrading treatment or punishment.*[8]

Article 7 of the 1966 International Covenant on Civil and Political Rights (ICCPR) goes further than this, adding a prohibition on cruel treatment or punishment:

> *No one shall be subjected to torture or cruel, inhuman or degrading treatment or punishment.*

15. The UK interpretation of what constitutes CIDT is based upon definitions outlined by the European Court of Human Rights. Referring to inhuman and degrading treatment, the Court has said:

> *The acts complained of were such as to arouse in the applicant feelings of fear, anguish and inferiority capable of humiliating and debasing him and possibly breaking his physical and moral resistance.*[9]

16. In a 2005 House of Lords ruling, Lord Bingham of Cornhill argued that *"the prohibition of torture requires Member States to do more than eschew the practice of torture"*.[10] He cited the International Criminal Tribunal for the former Yugoslavia as saying:

> *... States must immediately set in motion all those procedures and measures that may make it possible, within their municipal legal system, to forestall any act of torture or expeditiously put an end to any torture that is occurring.*[11]

17. The rules governing consular access are laid down in Article 36 of the Vienna Convention on Consular Relations (1963), which is generally accepted as being customary international law. Under the Convention, the UK Government cannot offer consular protection to non-British nationals. In 2005, the then Foreign Secretary said:

> *… in international law we only have the standing to take up consular matters in respect of British citizens… It means that we cannot make representations on behalf of people, however long they have been resident in the UK, who are not our nationals. More to the point, the U.S. Government, consistent with their obligations under international law, would not accept such representations.*[12]

---

[8] *European Convention on Human Rights (Convention for the Protection of Human Rights and Fundamental Freedoms), 1950.*

[9] *Selmouni v. France [1999].*

[10] *A (FC) and Others v. Secretary of State for the Home Department [2005].*

[11] *Ibid., Prosecutor v. Furundzija [1998].*

[12] *Statement by the Foreign Secretary, The Rt. Hon. Jack Straw, MP, 11 January 2005, Hansard Columns 179–180.*

The UK Government may make representations on behalf of non-British nationals in exceptional humanitarian cases, although it is under no obligation to do so. Furthermore, it may make informal non-consular representations in specific cases where it believes there are sufficient grounds, and we have seen that the U.S. may accept such representations in certain circumstances.

18. The legal aspects of the alleged use of UK airspace and airports in relation to possible Central Intelligence Agency (CIA) rendition flights are addressed separately in the "Ghost Flights" section of the Report (pages 57 to 63).

## U.S. Interpretations of International Law

19. It is important to highlight the different legal framework under which U.S. agencies such as the CIA operate. UK domestic law and European law, including the ECHR, do not apply to U.S. operations conducted outside the UK/Council of Europe. The ECHR does not impose obligations directly on the United States; however, U.S. nationals acting in the UK are bound by UK law, which conforms to the ECHR.

20. The U.S. has said that it considers itself in a state of war against global terrorism. This has led to a number of executive and military orders authorising actions to counter the threat from terrorism. President Bush said on 29 November 2001:

> … non-U.S. citizens who plan and/or commit mass murder are more than criminal suspects. They are unlawful combatants who seek to destroy our country and our way of life…

> We're an open society. But we're at war. The enemy has declared war on us. And we must not let foreign enemies use the forums of liberty to destroy liberty itself. Foreign terrorists and agents must never again be allowed to use our freedoms against us.[13]

21. In ratifying UNCAT, the U.S. entered an understanding as to their interpretation of *"where there are substantial grounds for believing that he would be in danger of being subjected to torture"*. The U.S. interprets this to mean *"if it is more likely than not that he would be tortured"*.[14, 15]

---

[13] *Remarks by President Bush to the U.S. Attorneys Conference, 29 November 2001.*

[14] *United States Understanding II.(2) – www.ohchr.org/english/countries/ratification/9.htm#reservations*

[15] *The United States ratification of the ICCPR also includes a reservation: "That the United States considers itself bound by article 7 to the extent that 'cruel, inhuman or degrading treatment or punishment' means the cruel and unusual treatment or punishment prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the Constitution of the United States."*

22.    This "more likely than not" approach differs significantly from that of the UK, which uses the lower "real risk" threshold. Theoretically, this means that an operation could be legal for U.S. agencies under U.S. law (because there is less than a 50% probability of torture or CIDT) but illegal for the UK Agencies to be involved with under UK law (because there is nevertheless still a real risk of torture or CIDT).

23.    On 7 December 2005, an official in the Foreign Secretary's Private Office sent a memorandum to the Prime Minister's Office which discussed the limited circumstances in which assistance to other countries' rendition operations might be legal. This document was leaked in the *New Statesman* in January 2006:

> *In certain circumstances, [rendition] could be legal, if the process complied with the domestic law of both countries involved, and their international obligations. Normally, these international obligations, eg under… ICCPR would prevent an individual from being arbitrarily detained or expelled outside the normal legal process. Council of Europe countries would also be bound by the ECHR, which has similar obligations in this sense. Against this background, even a Rendition that does not involve the possibility of torture [or CIDT] would be difficult, and likely to be confined to those countries not signed up to eg the ICCPR.*[16]

---

[16] *Memorandum entitled "Detainees", sent from the Foreign and Commonwealth Office to the Prime Minister's Office, 7 December 2005.*

# THE NATURE OF INTELLIGENCE SHARING

## *Value of Shared Intelligence*

24.    The importance of international cooperation between intelligence and security services was emphasised after 9/11 by UN Security Council Resolution 1373, which called on all States to work ever closer in the fight to combat terrorism. In particular, it called for States to *"find ways of intensifying and accelerating the exchange of operational information, especially regarding actions or movements of terrorist persons or networks"* and to cooperate more generally to *"prevent and suppress terrorist attacks and take action against perpetrators of such acts"*.[17]

25.    We have been told by all three Agency Heads that their intelligence-sharing relationships with foreign liaison services are vital to counter the threat from international terrorism. The U.S. link is the most important, not least because of the resources the U.S. agencies command. The Chief of SIS told the Committee:

> *The global resources of CIA, FBI and NSA [National Security Agency] are vast… The UK Agencies' long-developed relationships with U.S. intelligence agencies give them vital access to U.S. intelligence and resources. It is neither practical, desirable, nor is it in the national interest, for UK Agencies to carry out [counter-terrorism] work independently of the U.S. effort.*[18]

The Director of the Government Communications Headquarters (GCHQ) reiterated the value of the relationship to the UK, saying *"Overall the benefit to the UK from this arrangement is enormous"*,[19] and the Director General of the Security Service said *"It is unimaginable that we could [cease sharing intelligence with the U.S.] because of the degree of importance of SIGINT and HUMINT and the intelligence they give us"*.[20, 21]

26.    The Director General of the Security Service made a further important point about the UK/U.S. relationship – that the two countries are inextricably linked: *"As [the summer 2006 UK/U.S. airliner plot] showed, their security is absolutely bound up with ours."*[22]

27.    The value of intelligence obtained from individuals in the CIA's secret detention programme is covered in this Committee's March 2005 report, *The*

---

[17] *UN Security Council Resolution 1373 (2001), adopted 28 September 2001.*

[18] *Oral evidence – SIS, 7 November 2006.*

[19] *Oral evidence – GCHQ, 29 October 2006.*

[20] *Oral evidence – Security Service, 23 November 2006.*

[21] *Throughout this Report "Director General of the Security Service" refers to Dame Eliza Manningham-Buller, who held this position for the majority of this investigation.*

[22] *Oral evidence – Security Service, 23 November 2006.*

*Handling of Detainees by UK Intelligence Personnel in Afghanistan, Guantánamo Bay and Iraq*. The Security Service is quoted in that report as saying:

> *We have however received intelligence of the highest value from detainees, to whom we have not had access and whose location is unknown to us, some of which has led to the frustration of terrorist attacks in the UK or against UK interests.*[23]

SIS stressed the importance and value of intelligence received from detainees in similar terms.

28.   In addition, the Committee has been told of a number of cases where individuals detained by foreign liaison services have provided, directly or indirectly, important intelligence that has helped to prevent attacks on the UK. The Director General of the Security Service told the Committee of the case of Khaled Sheikh Mohammed, an individual closely linked to a number of Al-Qaeda (AQ) terrorist attacks and plots, including 9/11 and earlier plots to destroy U.S. airliners. She said:

> *When he was in detention in 2003, place unknown, he provided [the pseudonyms of] six individuals… who were involved in AQ activities in or against the UK. The Americans gave us this information… These included high-profile terrorists – an illustration of the huge amount of significant information that came from one man in detention in an unknown place.*[24]

**A.   Our intelligence-sharing relationships, particularly with the United States, are critical to providing the breadth and depth of intelligence coverage required to counter the threat to the UK posed by global terrorism. These relationships have saved lives and must continue.**

## *Problems*

29.   Despite the value that intelligence sharing can bring, working with a foreign intelligence service is not always straightforward for the UK Agencies. Other countries have different legal systems and different standards of behaviour to the UK, and their intelligence and security services have varying levels of capability, capacity and professional standards. These factors must be taken into account when working with foreign liaison services.

30.   The UK/U.S. relationship has a long history based upon shared goals, common values and complementary intelligence capabilities. This is not to say that the UK and U.S. Governments necessarily see eye to eye on all subjects – there are certain areas of foreign policy and strategy where the two countries have quite

---

[23] *Cm 6469, paragraphs 77–78.*

[24] *Oral evidence – Security Service, 23 November 2006.*

different approaches. There are also certain aspects that complicate the relationship between the respective intelligence and security agencies – for example, the possibility that UK assistance to a U.S. operation might result in a trial leading to capital punishment.

31. The UK Agencies have always been mindful of human rights issues, particularly when engaging with countries that do not pay the same attention to civil liberties and human rights as the UK. Speaking about the potential for ethical dilemmas to arise, the Director General of the Security Service told the Committee:

> *It gives rise to some significant ethical issues. [My staff] are concerned about the abuse of prisoners in custody… about transmission of information or questions which might lead to abuse, and they are concerned about things done outside a legal framework and the precepts of international law.*[25]

32. These issues are not easily resolved. Intelligence and security services, here and abroad, rarely divulge information on their sources when sharing intelligence with foreign liaison services. The location, circumstances or treatment of a detainee (or even the fact that the source is a detainee) would therefore not usually be shared.

33. Where there are concerns, the Agencies seek credible assurances that any action taken on the basis of intelligence provided by the UK Agencies would be humane and lawful. Where credible assurances cannot be obtained, the Chief of SIS explained *"… then we cannot provide the information. Therefore you have the dilemma [of perhaps not being able to prevent attacks] that flows from that."*[26]

34. What the U.S. rendition programme has shown is that these ethical dilemmas are not confined to countries with poor track records on human rights – the UK now has some ethical dilemmas with our closest ally. As part of this inquiry the Committee has considered the implications for the "special relationship" (pages 48 and 49).

[25] *Ibid.*

[26] *Oral evidence – SIS, 7 November 2006.*

# PRE-9/11 EVENTS

35.    On 21 June 1995, President Clinton issued a Presidential Decision Directive that stated:

> … where we do not receive adequate cooperation from a State that harbors a terrorist whose extradition we are seeking, we shall take appropriate measures to induce cooperation. Return of suspects by force may be effected without the cooperation of the host government.[27]

According to a Joint Intelligence Committee (JIC) paper issued in 1998, this Directive led to a more than ten-fold increase in U.S. "Rendition to Justice" operations. It stated that whilst there were only three renditions in the decade preceding the Directive, there were around 40 renditions in the three years following it.

36.    In 1997, the Security Service and SIS were formally briefed by the Americans on their strategy of rendering terrorists to justice.[28] This aimed to bring wanted terrorists to stand trial in the U.S. or friendly countries.

37.    The 1998 JIC paper shows the collective view of the UK intelligence community as to the consequences of rendition:

> While rendition can be effective in bringing terrorist suspects to justice, it can also have adverse consequences. Egyptian Islamic extremist terrorists mounted a bomb attack in Croatia in 1995 in revenge for a colleague's extradition… A likely product of sustained U.S. renditions is that the U.S. will hold an increasing number of international terrorists in prison. In the case of other countries, this has led to terrorist hostage-taking or hijacking, with a view to bargaining for the prisoner's release.[29]

## UK Agencies' Actions

38.    The Government, at this time, had no reason to believe that assisting the U.S. to render individuals to the United States to face trial might carry the risk of torture or CIDT. The Security Service, SIS and Ministers were concerned, however, that there was a possibility that the U.S. might seek to carry out a lethal operation against terrorist targets that they could not capture, or seek to impose the death penalty on those they could. They therefore took measures to minimise the risk that they might

---

[27] *Presidential Decision Directive 39, "Counterterrorism Policy", 21 June 1995.*

[28] *SIS subsequently informed policy departments across Whitehall of the existence of the programme.*

[29] *JIC paper, dated 21 October 1998, on the threat from terrorism in the aftermath of U.S. cruise missile strikes on Khartoum and Afghanistan (launched in retaliation for the 7 August 1998 bombings of U.S. embassies in East Africa).*

contribute intelligence which could lead to either outcome. These measures included seeking assurances from the U.S. where necessary.

39.   After 1997, the CIA began to request the assistance of SIS in this "Rendition to Justice" programme, in terms of providing the location of targets. In some of these cases SIS cooperated, having first sought approval from the Foreign Secretary on a case-by-case basis.

40.   In 1998, SIS believed that it might be able to obtain actionable intelligence that might enable the CIA to capture Osama Bin Laden. Given that this might have resulted in him being rendered from Afghanistan to the U.S., SIS sought Ministerial approval. This was given, provided that the CIA gave assurances regarding humane treatment.[30] In the event, insufficient intelligence was obtained and therefore the operation could not proceed.

41.   A similar submission was made to Ministers in October 1999 and was again approved, subject to assurances of humane treatment.[31] Again, the necessary intelligence could not be obtained and the operation did not proceed.

42.   The only remaining case of Agency involvement in renditions conducted by foreign liaison services prior to 9/11 is the provision of intelligence by SIS to a foreign liaison service to facilitate the arrest and trial of a terrorist cell. \*\*\* \*\*\* \*\*\*

\*\*\*. SIS has told the Committee that they \*\*\* and had not anticipated that a "Rendition to Justice" might result from their sharing intelligence with the foreign liaison service.

43.   During 1998, SIS sought Ministerial approval to conduct a "Rendition to Justice" operation themselves – the intention was to transfer a Balkan war criminal to a third country for arrest and subsequent transfer to The Hague to stand trial at the International Criminal Tribunal for the former Yugoslavia *"where it was felt the opposition of the UK Courts to rendition might not apply".*[32,33] SIS decided, however, that such an operation would undermine the chances of a successful conviction (based on another Tribunal case) and the operation was dropped.

---

[30] *The Committee understands that, at that time, "humane treatment" was presumed to include the right to a fair trial.*

[31] *Ministerial approval given in 1998 would have lapsed by this time.*

[32] *Oral evidence – SIS, 7 November 2006.*

[33] *Ministerial authorisation was given subject to further consideration of the likely impact of the rendition operation on the outcome of the trial.*

### UK Government Involvement

44. In terms of wider involvement in the U.S. rendition programme prior to 9/11, the Foreign and Commonwealth Office (FCO), Home Office and Ministry of Defence conducted a trawl of their records (in late 2005/early 2006) to identify U.S. requests for approval to use UK airspace to transport detainees. They discovered two cases in 1998 where Ministerial approval was granted because the detainees were en route to stand trial in the U.S. The Home Office has told us:

> There were two approved cases, which would now be called "Renditions to Justice". In June 1998, a flight carrying Mohammed Rashid landed at Prestwick en route from Egypt to the United States. He was charged in connection with the bombing of a Pan Am aircraft in August 1982. He [stood trial and] was sentenced on 24 March 2006…
>
> In August 1998, a flight carrying Mohammed Rashed Al-Owhali landed at Stansted en route to the United States. He was charged for his part in the 1998 attack on the U.S. embassy in Nairobi. He was convicted in June 2001 and sentenced to life imprisonment.[34]

45. Also in 1998, there were two further requests to render detainees through UK-controlled airspace. These requests were refused:

> In May–June, the U.S. requested the use of Akrotiri Air Base to refuel a flight which would carry two unnamed Hizballah members from Lebanon to the U.S. This request was considered by the Foreign Secretary and the Defence Secretary [and]… was refused…
>
> In October 1998, the U.S. requested permission to refuel at Prestwick an aircraft which would be carrying… Muhammed Ibid al-Ibid from Ecuador to Egypt, for whose arrest the Egyptians had issued a warrant (on charges including GIA [Groupe Islamique Armé] membership). There is no record of whether this request was agreed or refused… the recollection of some of those present at the time is that the request was refused.[35]

46. The Permanent Secretary, Intelligence, Security and Resilience, Sir Richard Mottram, has detailed the extent of the investigation the Government had conducted on this matter and, in response to questions raised in the Committee's letter to the Prime Minister on rendition, has said:[36, 37]

---

[34] Letter from the Home Office, 8 March 2007.

[35] Ibid.

[36] Letter on "Rendition and Torture" from the Committee to the Prime Minister, 11 January 2006.

[37] Prior to 1 August 2006 this post was known as the Security and Intelligence Coordinator.

*British intelligence personnel neither assist nor are involved in rendition where there are grounds to believe that the person being rendered would face a real risk of torture or cruel, inhuman or degrading treatment. The Agencies have researched their records dating back to 1995, and SIS and the Security Service (including JTAC [the Joint Terrorism Analysis Centre]) have circulated a questionnaire to all staff. This research has not revealed any cases which breach this principle…*

*[Additional checks] of Foreign and Commonwealth Office, Home Office, Ministry of Defence, SIS, Security Service and GCHQ files dating back to 1995… have found no evidence of rendition through the UK or Overseas Territories where there were grounds to believe an individual faced a real risk of torture, cruel, inhuman or degrading treatment.*[38]

47.   The Committee has been told that searching for records relating to transfers that we today call "rendition" has proven difficult for Government:

*I agree there is a fault in the record taking… I think part of the problem is that issues like this can go in different directions: it could go to the MoD, it could go to the Home Office, it could come to the Foreign Office, it could go to one of the Agencies, at least initially, and therefore the way in which it is dealt [with] might be different in different departments… I do not think there would be a file marked "Rendition", not in 1998…*[39]

48.   On the basis of what we have been told, and acknowledging the difficulties related to record keeping, the Committee has found no evidence of renditions through UK airspace prior to 9/11, other than the two "Rendition to Justice" cases in 1998 which were approved by Ministers. (The issue of CIA flights through UK airspace is examined in detail in paragraphs 184 to 202.)

49.   In all cases that the Committee is aware of prior to 9/11, Security Service, SIS and departmental concerns over the legality of any assistance to the U.S. "Rendition to Justice" programme meant that Ministerial approval was sought in each instance. Where approval was given, this was subject to appropriate and credible assurances being sought from our liaison partners on subsequent humane treatment of the detainees.

## Conclusions

**B.    We are concerned that Government departments have had such difficulty in establishing the facts from their own records in relation to requests to conduct**

---

[38] *Letter from Sir Richard Mottram, 2 May 2006.*

[39] *Oral evidence – FCO, 5 December 2006.*

renditions through UK airspace. These are matters of fundamental liberties and the Government should ensure that proper searchable records are kept.

C.     Prior to 9/11, assistance to the U.S. "Rendition to Justice" programme – whether through the provision of intelligence or approval to use UK airspace – was agreed on the basis that the Americans gave assurances regarding humane treatment and that detainees would be afforded a fair trial. These actions were appropriate and appear to us to have complied with our domestic law and the UK's international obligations.

# POST-9/11 EVENTS

50.    The UK Agencies have told us that, after the attacks in the U.S. on 11 September 2001, they diverted resources and attention to countering the immediate terrorist threat and preventing further attacks. It appears to us that in a fast-moving environment with limited resources, the focus was, of necessity, on the day-to-day issues rather than the bigger picture. We have been told that:

> There was indeed an enormous amount going on at the time. The atmosphere was very frenetic back then in September and October, only a month after 9/11… and the resources available to… get results in what was a very pressing situation… were very limited. We had operational objectives… We did not even begin to have the resources to deal with it.[40]

We were similarly told by the Director General of the Security Service that *"we were struggling very hard. It felt like trench warfare."*[41]

51.    This is not intended to show mitigating circumstances, but to set the context for the following events.

### *Gradual Awareness of a Change in U.S. Policy*

52.    In the immediate aftermath of the 9/11 attacks, and in the context of the conflict in Afghanistan, SIS requested Ministerial authorisation to assist the CIA in capturing Al-Qaeda terrorist suspects and to hand them over to the Americans for "Renditions to Justice". Authorisation was provided, subject to assurances from the Americans that the detainees would be treated humanely and tried in the U.S. In the event, SIS was unable to obtain sufficiently timely intelligence for the operations to proceed. The nature of these Ministerial submissions and authorisations reflects that, at the time, the UK Agencies believed that the U.S. was still conducting "Rendition to Justice" operations of a nature similar to those conducted prior to 9/11 and there was not thought to be any real risk that detainees might be mistreated.

53.    On 13 November 2001, the U.S. announced, by Presidential Military Order (PMO), a change in policy that aimed to:

> … identify terrorists and those who support them, to disrupt their activities, and to eliminate their ability to conduct or support [terrorist] attacks [and for suspects] to be detained and, when tried, tried… by military tribunals.[42]

---

[40] *Oral evidence – SIS, 19 March 2007.*

[41] *Oral evidence – Security Service, 20 March 2007.*

[42] *U.S. PMO entitled "Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism", White House Press Release, 13 November 2001.*

The PMO applies to individuals who are non-U.S. citizens and who:

- are or have been, or have knowingly harboured, a member of Al-Qaeda; or

- have engaged in, aided, abetted or conspired to commit acts of international terrorism prejudicial to the interests of the U.S.

The PMO authorised the detention of suspects at any designated location worldwide with no guarantee of trial. It prescribed that suspects, if tried, would be tried by a military commission (with lower standards of evidence than applies in U.S. District Courts and with the possibility of capital punishment).

54.   SIS was given notice of new counter-terrorism powers for the U.S. agencies some time prior to the PMO being issued. SIS has told the Committee that it was sceptical about these new powers – in part because there was a great deal of "tough talk" following 9/11. They did not therefore report this information to Ministers. These powers were then partially reflected in the PMO in November 2001. Later the same month, SIS learnt that the U.S. intended to use military tribunals set up under the PMO to try terrorist suspects captured outside Afghanistan. This information was outlined in a report sent by SIS across Whitehall, including to the Private Offices of the Prime Minister and Foreign Secretary.

55.   The Security Service told the Committee that they considered this material in the context of the conflict in Afghanistan, and that British citizens could potentially be subject to these military tribunals:

> *Insofar as we can establish what happened at that stage, this was not, we thought, about what came to be "Extraordinary Rendition" and was largely about military tribunals in Afghanistan… Given that prisoners picked up in Afghanistan and put into camps were likely to include foreign prisoners, including potentially British citizens, we did seek legal advice within the Government legal service on whether we could provide intelligence or not to the tribunals. That was where we sort of rested.*[43]

56.   The Defence Intelligence Staff confirmed that they received the report but said that there is no record of any action having been taken by them, nor would they expect to have taken any, as a result of what was *"essentially a description of U.S. operational intent".*[44]

57.   In January 2002, the U.S. began its programme of "Military Renditions" (see definitions in paragraph 7).[45] This was the first sign that the PMO was being

[43] *Oral evidence – Security Service, 20 March 2007.*

[44] *Letter from the Defence Intelligence Staff to the Committee, 19 March 2007.*

[45] *Cm 6469, page 35.*

implemented. Those captured as part of military operations in Afghanistan were defined as "unlawful combatants" and transferred to the U.S. military prison facility at Guantánamo Bay, Cuba.[46] The treatment of these military detainees was the subject of the Committee's report *The Handling of Detainees by UK Intelligence Personnel in Afghanistan, Guantánamo Bay and Iraq,* published in March 2005.[47]

58.    The Government indicated publicly, at the time of the first transfers, its sense of unhappiness at the process and sought assurances that detainees transferred to Guantánamo Bay would be treated appropriately. In the Committee's report into the handling of detainees, we noted:

> *The Foreign Secretary had raised the circumstances of the UK nationals being held in Guantánamo Bay with the then U.S. Secretary of State… [and was] satisfied with the U.S. authorities' assurances that the detainees were being treated humanely and consistently with the principles of the Geneva Conventions.*[48]

59.    Signs began to emerge that the U.S. rendition programme was not limited to the conflict in Afghanistan. The Committee has been told of a case in early 2002, when SIS became aware that *** had been transferred to a *** country of which he was not a national in a "Rendition to Detention" operation. Given that the suspect was not transferred into U.S. military custody, or to his home country, this action would appear to be inconsistent with the PMO (as it had been briefed to SIS). SIS questioned the appropriateness of the transfer with the U.S. authorities, but concluded that this was an isolated incident and Ministers were therefore not informed.

60.    Between January and March 2002, intelligence officers in Afghanistan witnessed, or were told of, two occasions of mistreatment by the U.S. military of detainees in U.S. military custody. As the Committee said in its Detainees report, these were, at the time, regarded as isolated incidents.[49]

61.    In March 2002, Martin Mubanga, a dual British-Zambian national travelling on a Zambian passport and a suspected "unlawful combatant" fleeing from the fighting in Afghanistan, was detained by the local authorities in Zambia and subsequently transferred to Guantánamo Bay (in April 2002). This case is considered in detail in paragraphs 90 to 97. This appears to represent the first case

---

[46] *Whilst we use phrases such as "conflict in Afghanistan" and "Afghanistan battlefield" in this Report, it should be recognised that the theatre of operations is not neatly defined in terms of national borders.*

[47] *Cm 6469.*

[48] *Ibid.*

[49] *Ibid.*

of the PMO being implemented for a suspected associate of Al-Qaeda captured outside Afghanistan. Following Mubanga's arrest, the Security Service was informed by the U.S. and it notified SIS and Ministers. This case was an indication that the U.S. had widened their net to other areas where it was believed Al-Qaeda members and "unlawful combatants" had fled after the war had started.

62.   This was reinforced in the early summer of 2002 when SIS was informed *** that *** whom they had previously been jointly investigating *** had been captured *** with the assistance of a third country. ***
***
***. SIS was not involved in this rendition; they were informed of the transfer after it had occurred.

63.   The next such incident came in July 2002 when Binyam Mohamed al-Habashi was allegedly subjected to an "Extraordinary Rendition" from Pakistan to Morocco. (This case is considered in greater detail in paragraphs 98 to 106.) At the time, the Agencies believed that al-Habashi would be transferred from Pakistan to Bagram Air Base and had no knowledge that he was the subject of further transfers.[50] In this case, the Security Service *** had no knowledge of where he was being detained:

> … *** *we did not know where he was… [This] is a case where, with hindsight, we would regret not seeking proper full assurances, but I can understand how it happened [given the Service's knowledge at the time].*[51]

64.   A fifth case occurred in mid-2002, which, like the first, appeared inconsistent with what SIS and the Security Service believed to be U.S. policy on Al-Qaeda detainees, including that laid out in the November 2001 PMO. ***.

65.   A step change – and crucial to the Agencies' growing knowledge of U.S. actions – came in November 2002 when U.S. authorities conducted the "Rendition to Detention" of Bisher al-Rawi and Jamil el-Banna from The Gambia to Afghanistan and subsequently to Guantánamo Bay. This case is considered in greater detail in paragraphs 111 to 147. This case showed that the U.S. rendition programme had now extended its boundaries beyond individuals connected to the conflict in Afghanistan. Although the action taken by the U.S. in this case was consistent with the November 2001 PMO, this demonstrated conclusively that the U.S. was willing to exercise these powers on individuals unconnected to the conflict in Afghanistan.

---

[50] *The Committee has been told that the Security Service first learnt of the allegation that al-Habashi had been transferred to Morocco in 2005. Again, the Agencies believed, at the time, that the transfer was to U.S. military custody in accordance with the November 2001 PMO.*

[51] *Oral evidence – Security Service, 23 November 2006.*

66.    The case of al-Rawi and el-Banna also represents the first incident where the Agencies had seen that passing intelligence to the U.S. about individuals not directly involved in the Afghanistan conflict could lead to a rendition, despite the use of caveats and despite their protesting once they learnt of U.S. plans. This raises significant issues in relation to the intelligence-sharing relationship with the Americans.[52] The Security Service has told the Committee:

> *This is the first time when suddenly we found that people were… being taken by the Americans. I think it is the first time we experienced that, completely in a different part of the world [from Afghanistan].*[53]

67.    In late 2002, SIS and the Security Service became aware of another case involving the transfer of an individual to a third country. The Security Service and SIS were made aware because the individual was thought to be planning attacks in the UK. The Director General of the Security Service told the Committee: *"Again, with hindsight we realise that [they] intended to render him without due process. We did not fully understand that at the time."*[54] The Security Service was allowed to put questions to the detainee, but it is not clear whether any assurances to prevent torture or CIDT were sought.

68.    The Committee has been told that, from 2003 onwards, SIS was involved in a number of joint operational discussions which developed to the point where they began to become concerned about the legality of their assisting what foreign liaison services, including the U.S., were proposing. We have been told that *"\*\*\* \*\*\*"*.[55] In a small number of cases, where high-value targets were involved and there was a real risk of a rendition occurring, SIS requested approval from Ministers to continue. The Committee has been told that, by this stage, the nature of these submissions drew heavily on the Service's knowledge of the cases in 2002, where they had seen the results of the U.S. implementing their new powers:

> *… the fact that [they] had the authority to conduct rendition operations to detention had been demonstrated by the well-known cases in 2002, and the submissions therefore focused on the implications for SIS of attempting to carry out joint operations where this was a possibility.*[56]

In the end, these joint operations either did not proceed or \*\*\*.

---

[52] *UK/U.S. cooperation is covered in pages 47 to 49.*

[53] *Oral evidence – Security Service, 20 March 2007.*

[54] *Oral evidence – Security Service, 23 November 2006.*

[55] *Oral evidence – SIS, 7 November 2006.*

[56] *Letter from SIS to the Committee, 28 February 2007.*

69.   The Director General of the Security Service confirmed that they had also been involved in some of these operational discussions:

> \*\*\*
> \*\*\*
> \*\*\*.[57]

70.   These discussions, together with the six individual incidents over the course of 2002, added to the Agencies' growing awareness that there had been a real shift in the U.S. approach, and in the nature of the rendition programme.

71.   A separate aspect of the rendition programme is the existence, and use, of "black facilities".[58] The Agencies first suspected the possible existence of these secret CIA-directed detention facilities in March 2003, with the arrest of Khaled Sheikh Mohammed. The Chief of SIS told the Committee:

> *Now, the point where it becomes clearer is with the arrest of Khaled Sheikh Mohammed in 2003 and, as I have said, information came through, for example, on terrorist planning against Heathrow… We realised at that point that this was coming from a detention facility which was outside and away from Guantánamo… So, if you like, the issue is on the table at that point.*[59]

72.   Despite suspicions about the existence of "black facilities", the Agencies did not fully appreciate, at the time, that this might mean an increased risk of torture or CIDT:

> *… it never crossed my mind that [the intelligence] was coming from torture [or CIDT]. We are talking about the Americans, our closest ally. This now, with hindsight, may look naive, but all I can say is that is what we thought at the time.*[60]

73.   The case of Khaled Sheikh Mohammed was a watershed in terms of the Security Service's and SIS's knowledge of the potential destinations for those detained as part of U.S. rendition operations. This incident raised new questions for the Security Service and SIS, both when assisting operations to detain suspects and when asking follow-up questions from those already in U.S. custody.

---

[57] *Oral evidence – Security Service, 23 November 2006.*

[58] *For the purposes of this Report, the Committee has defined "black facility" or "black site" as "an extra-judicial detention and interrogation facility secretly operated by the U.S. Central Intelligence Agency outside the normal legal system". This therefore does not include detention facilities at Guantánamo Bay or Bagram Air Base.*

[59] *Oral evidence – SIS, 7 November 2006.*

[60] *Ibid.*

74.    The U.S. authorities would not divulge details of the secret facilities to SIS or the Security Service when asked: *"This has just been an impenetrable subject… There was no give at the edges, almost uniquely."*[61] As a result, greater use was made of assurances with the Americans:

> *As time went on… we began to get more aware of black facilities, and… so we became more aware of the conditions [in which detainees might be held or interrogated]. At that point we began to consider [that] we need assurances that when we go back to the Americans with a follow-up question to [unsolicited intelligence] that they may have given us, that… [torture or CIDT] are not going to be used to seek and get answers to our questions.*[62]

75.    In early 2003, two other cases reinforced the concerns of the Agencies. SIS had provided "building-block" intelligence to a foreign liaison service that may have contributed to the subsequent arrest of terrorist suspects. *** to render the suspects. SIS suggested alternative courses of action (such as deportation to the individual's country of origin) and has told the Committee that no renditions occurred in these cases.

76.    These cases showed SIS that even passing intelligence to a third country could lead to them being implicated in a rendition, if individuals are detained as a result of SIS intelligence and then subsequently handed over to the U.S. authorities.

### *A More Cautious Approach*

77.    The Chief of SIS told the Committee that this increased awareness led to a change in approach, with a greater number of Ministerial submissions:

> *SIS therefore submitted to the Foreign Office, in a number of cases from 2003 onwards, where they considered there was a real risk [of rendition of] an individual whom SIS had assisted a third country to detain.*[63]

78.    In mid-2003, SIS learnt that an operation they were already conducting ***. They informed officials in the FCO. By the autumn of 2003 the operation had developed further and ***. Given the Service's concern about such circumstances possibly leading to torture or CIDT, SIS informed the Foreign Secretary. The Foreign Secretary's response was that any further involvement by SIS must lead to the lawful arrest of the target. In the event, the operation did not proceed.

---

[61] *Oral evidence – SIS, 19 March 2007.*

[62] *Oral evidence – SIS, 7 November 2006.*

[63] *Ibid.*

79.    In cases in which SIS was involved in early 2004, this more cautious approach to assisting rendition operations is confirmed. Where SIS shared intelligence with foreign liaison services to assist "Renditions to Justice" *** they sought Ministerial approval, which was obtained subject to assurances on the treatment of the individuals. The Chief of SIS confirmed that assurances were obtained and shown to have been kept:

> ***
> ***
> ***
>
> ***
> ***
> ***

> *We do not consider that the Service's involvement in… these cases was in breach of the relevant international law obligations governing assistance by one State in the expulsion of an individual by another State. Nor was there a risk of torture or cruel, inhumane or degrading treatment as SIS had, in accordance with the policy set out in Richard Mottram's letter [to the Committee], obtained case-by-case assurances [regarding] treatment.*[64]

80.    In late April 2004, reports emerged of the mistreatment of detainees by soldiers at the U.S.-run Abu Ghraib prison in Iraq. In light of those reports, SIS wrote to the Foreign Secretary explaining that any operations that may lead to U.S. custody of detainees were considered on a case-by-case basis.

81.    In mid-2004, SIS asked Ministers for approval to assist with an operation that, whilst it was intended to bring about arrests by local authorities, could have led to "Renditions to Detention", possibly to secret facilities. They received approval to proceed, dependent on any rendered detainees being treated in accordance with the relevant international conventions. In the event, the U.S. did not attempt to conduct any renditions as a result of this operation.

82.    From 2004 it became clear to SIS and the Security Service that their existing guidance to staff on dealing with foreign liaison services was insufficiently detailed given the increasing requirement to cooperate with foreign services in counter-terrorism operations. They therefore began to expand their guidance, and as elements were finalised they were formally issued to staff.[65]

---

[64] *Ibid.*

[65] *Advice on participation in detention operations and interviews was formally issued to SIS and Security Service staff in 2005. In 2006, all three Agencies formally issued updated guidance to staff on the exchange of intelligence with foreign liaison services (in GCHQ's case it was issued to operational staff only). This expanded guidance better equipped staff to understand their responsibilities and, for operational staff, at what point in any given operation to involve Agency legal advisers, policy departments or Ministers.*

83.   In November 2004, Ministerial awareness of the U.S. rendition programme was evident when the then Foreign Secretary gave evidence to the Committee's inquiry into the handling of detainees. He described to the Committee the nature of the U.S. rendition programme and bluntly made it clear that the UK does not conduct such operations itself.

84.   In early 2005, SIS developed an operation that might have provided high-value intelligence on a target. The circumstances were such that the only viable option *** *** and they therefore sought Ministerial authorisation to proceed. Approval was given on condition that appropriate assurances on humane treatment and a limit on the duration of detention were obtained ***. In the end, *** and the operational proposal was dropped because SIS was not able to satisfy itself as to the likely treatment of the target.[66]

## Public Acknowledgement

85.   On 2 November 2005, the *Washington Post* published an article on "black facilities". The article reported the existence of a network of CIA secret detention facilities in numerous countries, including in Eastern Europe, in which the highest value terrorist suspects were held. This article prompted the Foreign Secretary to write, on 29 November 2005, in his role as President of the EU, to the U.S. Government requesting a response to allegations of renditions involving EU Member States.[67] In response, the U.S. Secretary of State, Condoleezza Rice, issued a statement on 5 December 2005, which said:

> *It is the policy of the United States… to comply with its laws and comply with its treaty obligations, including those under the Convention Against Torture.*
>
> *In accordance with the policy of this Administration:*
>
> - *The United States has respected – and will continue to respect – the sovereignty of other countries.*
>
> - *The United States does not transport, and has not transported, detainees from one country to another for the purpose of interrogation using torture.*
>
> - *The United States does not use the airspace or the airports of any country for the purpose of transporting a detainee to a country where he or she will be tortured.*

---

[66] *Letter from SIS to the Committee, 21 February 2007.*

[67] *Letter from the Foreign Secretary (on behalf of the EU) to the U.S. Secretary of State, 29 November 2005 – www.fco.gov.uk/Files/kfile/Straw_EU_CondiRice_Letter,0.pdf*

- *The United States has not transported anyone, and will not transport anyone, to a country where we believe he will be tortured. Where appropriate, the United States seeks assurances that transferred persons will not be tortured.*[68]

86.    On 30 December 2005, the Detainee Treatment Act of 2005 (also known as the McCain Amendment) was passed into U.S. law. This set out the procedures for the detention, interrogation, treatment and "status reviews" of detainees. It states:

> *No individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location, shall be subject to cruel, inhuman, or degrading treatment or punishment.*

87.    In 2006, the existence of secret detention facilities was finally acknowledged.[69] In April, the U.S. Director of National Intelligence admitted during an interview with *TIME* magazine to the existence of "black facilities". He said that three dozen or so high-value terrorist suspects were being held in secret CIA detention facilities and:

> *… they're bad actors. And as long as this… war on terror continues, I'm not sure I can tell you what the ultimate disposition of those detainees will be.*[70]

88.    President Bush formally acknowledged for the first time the existence of the CIA rendition programme and the use of secret CIA-run overseas detention facilities on 6 September 2006. In a speech in which the President sought to convince Congress of the urgent need to establish a legal basis for the questioning of terrorist suspects, he said:

> *In [cases where detainees pose a significant threat], it has been necessary to move these individuals to an environment where they can be held secretly, questioned by experts, and – when appropriate – prosecuted for terrorist acts…*

> *In addition to the terrorists held at Guantánamo, a small number of suspected terrorist leaders and operatives… have been held and questioned outside the United States, in a separate program operated by the Central Intelligence Agency…*

> *The current transfers [of CIA detainees to Guantánamo Bay] mean that there are now no terrorists in the CIA program. But as more high-ranking terrorists are captured, the need to obtain intelligence from them [via the CIA programme] will remain critical.*[71]

---

[68] *Remarks by the U.S. Secretary of State, Condoleezza Rice, on her departure for Europe, 5 December 2005.*

[69] *The Committee has been told that, in December 2005, the Foreign Secretary discussed with the Chief of SIS the limits of SIS's knowledge of "black facilities".*

[70] *"Spy Chief: CIA Detainees Will Be Held Indefinitely", TIME magazine, 12 April 2006.*

[71] *"President Discusses Creation of Military Commissions to Try Suspected Terrorists", White House Press Release, 6 September 2006.*

*Conclusions and Recommendations*

**D.**     Those operations detailed above, involving UK Agencies' knowledge or involvement, are "Renditions to Justice", "Military Renditions" and "Renditions to Detention". They are not "Extraordinary Renditions", which we define as *"the extra-judicial transfer of persons from one jurisdiction or State to another, for the purposes of detention and interrogation outside the normal legal system, where there is a real risk of torture or cruel, inhuman or degrading treatment"*. We note that in some of the cases we refer to, there are allegations of mistreatment, including whilst individuals were detained at Guantánamo Bay, although we have not found evidence that such mistreatment was foreseen by the Agencies. The Committee has therefore found no evidence that the UK Agencies were complicit in any "Extraordinary Rendition" operations.

**E.**     In the immediate aftermath of the 9/11 attacks, the UK Agencies were authorised to assist U.S. "Rendition to Justice" operations in Afghanistan. This involved assistance to the CIA to capture "unlawful combatants" in Afghanistan. These operations were approved on the basis that detainees would be treated humanely and be afforded a fair trial. In the event, the intelligence necessary to put these authorisations into effect could not be obtained and the operations did not proceed. The Committee has concluded that the Agencies acted properly.

**F.**     SIS was subsequently briefed on new powers which would enable U.S. authorities to arrest and detain suspected terrorists worldwide. In November 2001, these powers were confirmed by the Presidential Military Order. We understand that SIS was sceptical about the supposed new powers, since at the time there was a great deal of "tough talk" being used at many levels of the U.S. Administration, and it was difficult to reach a definitive conclusion regarding the direction of U.S. policy in this area. Nonetheless, the Committee concludes that SIS should have appreciated the significance of these events and reported them to Ministers.

**G.**     The Security Service and SIS were also slow to detect the emerging pattern of "Renditions to Detention" that occurred during 2002. The UK Agencies, when sharing intelligence with the U.S. which might have resulted in the detention of an individual subject to the Presidential Military Order, should always have sought assurances on detainee treatment.

**H.**     The cases of Bisher al-Rawi and Jamil el-Banna and others during 2002 demonstrated that the U.S. was willing to conduct "Rendition to Detention" operations anywhere in the world, including against those unconnected with the conflict in Afghanistan. We note that the Agencies used greater caution in working with the U.S., including withdrawing from some planned operations, following these cases.

**I.**     By mid-2003, following the case of Khaled Sheikh Mohammed and suspicions that the U.S. authorities were operating "black sites", the Agencies had appreciated the potential risk of renditions and possible mistreatment of detainees. From this point, the Agencies correctly sought Ministerial approval and assurances from foreign liaison services whenever there were real risks of rendition operations resulting from their actions.

**J.**     After April 2004 – following the revelations of mistreatment at the U.S. military-operated prison at Abu Ghraib – the UK intelligence and security Agencies and the Government were fully aware of the risk of mistreatment associated with any operations that may result in U.S. custody of detainees. Assurances on humane treatment were properly and routinely sought in operations that involved any risk of rendition and/or U.S. custody.

**K.**     The Committee has strong concerns, however, about a potential operation in early 2005 which, had it gone ahead, might have resulted in the \*\*\*. The operation was conditionally approved by Ministers, subject to assurances on humane treatment and a time limit on detention. These were not obtained and so the operation was dropped. \*\*\* \*\*\* \*\*\*.

# SPECIFIC CASES

89.    There have been a number of rendition cases in which it is alleged that UK Agencies were involved, or complicit, and the Committee has looked at all of these. We have detailed below four of them – these are from 2002 and illustrate key developments in the awareness of the changing nature of the U.S. rendition programme. The Committee notes, however, that any complaints about any alleged conduct by or on behalf of the UK intelligence and security Agencies are a matter for those concerned to raise with the Investigatory Powers Tribunal established under the Regulation of Investigatory Powers Act 2000.[72]

# MARTIN MUBANGA

## *Background*

90.    Martin Mubanga (a dual British-Zambian national who had fled the fighting in Afghanistan) was arrested by the local authorities in Zambia in March 2002 whilst travelling on a Zambian passport.[73] The Zambian authorities handed him over to the Americans in Lusaka.

91.    Mubanga alleges that he was interviewed by U.S. and UK officials (including an SIS officer) in Zambia. He alleges that the SIS officer had his UK passport, which he claims that he lost in Afghanistan, which is why he had travelled to Zambia using his Zambian passport.[74]

92.    Mubanga was "Rendered to Detention" to Guantánamo Bay on 20 April 2002. He alleges that he was subjected to CIDT whilst detained there. On 25 January 2005 he was released from Guantánamo Bay, along with other UK nationals, following negotiations between the U.S. and the UK through diplomatic channels.

93.    The Government has acknowledged publicly that an intelligence officer did interview Mubanga in Zambia, and has also stated that HMG played no role in his capture or rendition.

---

[72] *The Tribunal can be contacted via their website at www.ipt-uk.coml or by post: The Investigatory Powers Tribunal, PO Box 33220, London SW1H 9ZQ.*

[73] *The exact reason for his arrest is not known.*

[74] *The Committee has been told that Mubanga was interviewed by a member of the Security Service and not SIS as has been alleged.*

## Outcome of Investigation

94.   We have taken evidence from SIS, the Security Service and the Foreign Secretary on this case. The Chief of SIS told the Committee that *"SIS and the Security Service were not involved in his capture or rendition, but [the Security Service] were allowed to interview him [in Zambia]"*.[75]

95.   The Director General of the Security Service said that a Security Service officer had interviewed Mubanga on two occasions over a two-day period, adding that there was *"… no indication that he had been abused, no complaint about his treatment. [The Service was] not responsible for his detention and subsequent transfer to Guantánamo."*[76]

96.   The Security Service was informed while Mubanga was in Zambia that the American authorities were considering rendering him to Guantánamo Bay and notified the FCO, Home Office, Prime Minister's Office and the JIC Chairman on 20 March 2002.

97.   The Foreign Secretary told the Committee that since Mubanga was a dual British-Zambian national detained in Zambia, UK Government policy (which reflects international law and conventions) meant that the Zambians were responsible for providing him with consular protection and making diplomatic representations on his behalf.[77] Consequently, the FCO made no representations to the U.S. in this case, nor was there any subsequent Ministerial direction to the intelligence Agencies.

## Conclusion

**L.   We are satisfied that the UK intelligence and security Agencies had no involvement in the capture or subsequent "Rendition to Detention" of Martin Mubanga and that they acted properly.**

---

[75] *Oral evidence – SIS, 7 November 2006.*

[76] *Oral evidence – Security Service, 23 November 2006.*

[77] *"If you are a dual British national in the State of your other nationality, we would not normally offer you support or get involved in dealings between you and the authorities of that State. We may make an exception to this rule if, having looked at the circumstances of the case, we consider that there is a special humanitarian reason to do so… However, the help we can provide will depend on the circumstances and the State of your other nationality must agree."* Support for British Nationals: A Guide, *available at www.fco.gov.uk]*

# BINYAM MOHAMED AL-HABASHI

## Background

98. Binyam Mohamed al-Habashi, an Ethiopian national, sought political asylum in the UK in March 1994 and was given indefinite leave to remain whilst his asylum application was considered (his application was refused in May 2000). In June 2001 he travelled to Pakistan, planning to return in April 2002. On 10 April 2002 the Pakistani authorities arrested him at Karachi airport (having fled Afghanistan where he had reportedly been fighting with the Taliban) for travelling on a false passport.

## Allegations

99. Al-Habashi alleges that he was held by the Pakistani authorities for a period of three months, during which time he was mistreated. He says that he was interrogated by British officials and that *"one of them did tell me I was going to get tortured by the [Arabs]"*.[78]

100. Al-Habashi alleges that, in July 2002, he was the subject of an American "Extraordinary Rendition" operation, from Pakistan to Morocco.[79] He claims he was subjected to torture and CIDT whilst detained by the Moroccan authorities. He says that the Moroccans told him that they were working with the British Security Service and that he was asked questions containing details about his life that could only have come from UK sources.

101. After 18 months' detention in Morocco, al-Habashi alleges that he was rendered to Kabul in January 2004 where he suffered further mistreatment. In September 2004, al-Habashi was transferred to Guantánamo Bay, where he is still being held.

## Outcome of Investigation

102. The Committee has taken evidence about this case. We have been told that SIS never had any contact with al-Habashi. A member of the Security Service did interview al-Habashi once, for a period of approximately three hours, whilst he was detained in Karachi in 2002. The interview was conducted by an experienced officer and was in line with the Service's guidance to staff on contact with detainees.

---

[78] *Statement by al-Habashi to his lawyer (Clive Stafford Smith) whilst in Guantánamo Bay, taken from Reprieve written submission to the Committee, 4 December 2006.*

[79] *The Committee has been told that the Security Service first learnt of the allegation that he had been transferred to Morocco in 2005.*

103. The Security Service denies that the officer told al-Habashi he would be tortured, as he alleges. Furthermore, the officer reported that he did not observe any abuse and that no instances of abuse were mentioned by al-Habashi.

104. The Security Service had no further contact with al-Habashi since this one interview in 2002. However, they were aware of the U.S. plan to transfer him, because:

> … *at the beginning it was thought [al-Habashi] was [a British national], we were told by [the U.S.] that they were going to move him to Afghanistan and we know that he was moved to Guantánamo. He has claimed that on the route there he was held in Morocco and that while in Morocco he was tortured… We do not know whether that happened…*[80]

105. \*\*\*

\*\*\*. In giving evidence to the Committee in 2006, the Director General of the Security Service told us:

> … *when we knew he was in custody, because he had information we believed relevant to the UK from having lived here,* \*\*\*
> \*\*\*
> \*\*\*
> \*\*\*. *That is a case where, with hindsight, we would regret not seeking proper full assurances at the time…*[81]

106. Whilst no assurances were sought, this is understandable given the lack of knowledge, at the time, of any possible consequences of U.S. custody of detainees. Indeed, the Director General of the Security Service said to us:

> *I do not think we would know today if Congress and the Supreme Court had not pressed the American Government to move the way it did.*[82]

## Conclusions

**M.   There is a reasonable probability that intelligence passed to the Americans was used in al-Habashi's subsequent interrogation. We cannot confirm any part of al-Habashi's account of his detention or mistreatment after his transfer from Pakistan.**

**N.   We agree with the Director General of the Security Service that, with hindsight, it is regrettable that assurances regarding proper treatment of detainees were not sought from the Americans in this case.**

---

[80] *Oral evidence – Security Service, 23 November 2006.*

[81] *Ibid.*

[82] *Ibid.*

# A DEPORTATION WITHOUT SAFEGUARDS

107. The Committee was told about this case as part of the Agencies' full account of their knowledge of rendition policy. This was not itself a rendition operation, but we believe the circumstances of the deportation need to be mentioned here \*\*\*. The countries involved are not named, however, for reasons of national security.

108. In 2002, SIS and the Security Service were informed that a national of one country had been detained in a second country \*\*\*. As the individual had UK connections, the Security Service was allowed to put questions to the detainee indirectly, and obtained some important intelligence as a result. There is no record that SIS or the Security Service asked for assurances to ensure that the detainee did not suffer torture or CIDT.

109. After some months, the detaining country decided to deport the detainee to his home country, and requested a contribution from SIS and the Security Service towards the cost of the deportation. We have been told by the Chief of SIS that the two Agencies:

> *… provided the sum asked for, although we both considered it a contribution to our counter-terrorism relationship with the country concerned, and the Security Service specified that it should not be considered a contribution to the deportation… with hindsight both Services feel that they should not have made this payment, even though they tried to decouple it from the deportation.*[83]

The Director General of the Security Service also commented: *"He was… in a third country and we were not in a strong position to set conditions on how his deportation was conducted. What we certainly should not have done in my opinion was pay for it."*[84]

110. There is no evidence as to the eventual treatment of the detainee once he was returned to his home country.

## Conclusion

**O.    Whilst this was not a rendition but a deportation, and the Security Service and SIS were not in a strong position to impose conditions on it, we accept their view that they should nevertheless have sought greater assurances that the individual would be treated humanely.**

---

[83] *Oral evidence – SIS, 7 November 2006.*

[84] *Oral evidence – Security Service, 23 November 2006.*

# BISHER AL-RAWI AND JAMIL EL-BANNA

## Introduction

111. Bisher al-Rawi is an Iraqi national who arrived in the UK in 1984. He was granted exceptional leave to remain, but did not apply for British citizenship. Jamil el-Banna is a Jordanian-Palestinian who has refugee status in the UK, but does not have UK citizenship. Both were "Rendered to Detention" by the U.S. in December 2002, possibly first to Afghanistan and then to Guantánamo Bay in February 2003. The Committee has investigated allegations of Security Service involvement in the case. It has been alleged (by lawyers representing the men) that the Security Service asked for the men to be arrested and rendered; that they provided out-of-date and inaccurate information which may have led to their rendition; and that al-Rawi worked for the Security Service, who reneged on the assurances they had given him.

112. In late March 2007, al-Rawi was released from Guantánamo Bay and returned to the UK following a year of FCO discussions with the U.S. authorities. At the time of writing, el-Banna remains in Guantánamo Bay.

113. The events surrounding this case should be viewed in the context of Security Service procedures, and taking account of what the UK Agencies knew about the U.S. rendition programme in 2002.

114. The Committee has not investigated the general issue of FCO support to non-British nationals, which has been addressed by the Foreign Affairs Committee's recent report on Guantánamo Bay.[85]

## Events in the UK

115. The Security Service had knowledge of both al-Rawi and el-Banna prior to the events of November 2002:

> *Mr al-Rawi and Mr el-Banna were known to the Service prior to their detention in The Gambia. Whilst in the United Kingdom, both were in contact with a number of individuals considered by the Service to be Islamist extremists, including Abu Qatada, the radical cleric…*[86]

[85] *HC 44, 21 January 2007.*

[86] *Open statement of Security Service Witness "A", dated 14 March 2006, R. (Al-Rawi & Others) v. Secretary of State for Foreign and Commonwealth Affairs & Another [2006].*

El-Banna was described by the Security Service as:

> ... a Jordanian Palestinian veteran of the Afghan-Soviet war and… assessed to be Abu Qatada's financier. [He] is in close contact with members of [two North African terrorist groups].[87]

The Service described al-Rawi as:

> ... an Iraqi Islamist extremist who is a member of Abu Qatada's close circle of associates. He has previously come to our attention for his financial activities…[88]

116. On 31 October 2002, a member of the Security Service and an officer from the Metropolitan Police Special Branch (MPSB) visited el-Banna at his home in London. They discussed his association with members of the extremist community and suggested that if he chose to help them by providing details of all his activities and contacts, they would assist him to create a new life for himself and his family. The Security Service reported that he gave no indication that he would be willing to cooperate with them.

117. On 1 November 2002, al-Rawi, el-Banna and Abdallah el-Janoudi (a British national) arrived at Gatwick airport intending to fly to The Gambia. They stated that the trip was for business purposes. A covert search of the men's baggage was made at the airport.[89] A number of suspicious items were discovered in al-Rawi's luggage, leading the police to arrest all three men under anti-terrorism laws.[90]

**P. Given el-Banna's and al-Rawi's backgrounds and associations, it was reasonable to undertake a properly authorised covert search of the men's luggage. The decision to arrest the men was taken by the police on the basis of the suspicious items they found and was not instigated by the Security Service.**

118. The same day, the Security Service sent a telegram to the U.S. authorities notifying them of the arrests and giving their current assessment of the men. Exchanges of information such as this are routine, and a fundamental part of the

---

[87] *Ibid., exhibit A1.*

[88] *Ibid.*

[89] *The search was authorised by a warrant signed by the Home Secretary.*

[90] *The items discovered included: 20 copies of the Quran, 300 copies of a pamphlet entitled* Three Letters on 1) The Description of the Prophet's Gusi, 2) The Description of the Prophet's Wudu, 3) The Description of the Prophet's Prayer, *a bundle of electrical wires wrapped around a set of tweezers, a "folding plotter", three manuals for VHM FM hand-held transceivers, an air pump manual, drill bits, a gas cylinder, a voltage inverter, and various bits of electronic equipment. There was also an item described as "a quantity of masking tape wrapped around an unidentified object [with] a metal sheet stuck to it, and wires leading from it to a battery pack (without batteries). Also connected to this were a series of clips on the ends of several other wires." (Security Service internal Loose Minute, dated 6 November 2002.) This was later discovered to be a modified battery charger.*

work of the Security Service.[91] The telegram described all three as *"Islamists"*, al-Rawi as an *"Iraqi Islamist extremist"* and el-Banna as *"formerly assessed to be Abu Qatada's financier"*. This telegram also mentions that the men were in possession of a *"home-made electronic device"* and indicated that it *"may be a timing device [or] part of a car-based IED [improvised explosive device]"*. The caveat on this telegram made it clear that the information was for *"research and analysis purposes only and may not be used as the basis for overt, covert or executive action".*[92,93]

**Q. The sharing of intelligence with foreign liaison services on suspected extremists is routine. There was nothing exceptional in the Security Service notifying the U.S. of the men's arrest and setting out its assessment of them. The telegram was correctly covered by a caveat prohibiting the U.S. authorities from taking action on the basis of the information it contained.**

119. Police questioning of the men between 1 and 4 November focused on the suspicious items found in their luggage, including what appeared to them to be a modified battery charger.[94] While the men were being questioned, authorised searches of their UK addresses were conducted, and documents relating to a rocket-propelled grenade launcher, circuit boards and watches (in various states of repair) were discovered in al-Rawi's workshop.

120. The police assessment, in consultation with the Crown Prosecution Service, was that there was insufficient evidence on which to charge the men and they were therefore released on 4 November 2002. On the day of their release, the Security Service sent a telegram to the U.S. that included the Service's assessment of the men and the fact that they were due to travel to The Gambia in the near future.

121. The telegram asked the U.S. authorities to pass the information to the Gambian security services and said:

> *…[we] would be grateful for feedback on the reaction of the Gambians to this intelligence. In particular, we would be interested to learn if they are able to cover these individuals whilst they are in Gambia.*

This telegram was also covered by a caveat prohibiting *"… overt, covert or executive action".*

---

[91] *The need for increased international intelligence cooperation had been reinforced by UN Security Council Resolution 1373 (see paragraph 24).*

[92] *Caveats on shared intelligence were used predominantly as a means to protect intelligence sources. For example, if intelligence was shared with a foreign liaison service and that service subsequently took action (such as arresting someone), that could reveal the source of the information and endanger that person or other operations. Protection of sources is paramount and the use of caveats is one of the methods by which this is achieved. Caveats are therefore honoured by other agencies.*

[93] *"Executive action" means the exercise of powers by those branches of government responsible for implementing laws and may include actions such as detention, deportation, refusal of a visa, refusal of entry, etc.*

[94] *Al-Rawi claims that he modified a standard battery charger in order to make it waterproof. It is unclear why this was considered necessary.*

122.  It is usual practice for such information to be shared with liaison services. The Security Service has a clear duty to warn another country if an individual under investigation is travelling to that country to enable them to take such action as may be necessary to safeguard their national security interests.[95] In addition, they would hope that the country would be able to monitor the individual's activities while there – thereby both ensuring that they do not lose sight of them and also building up the overall intelligence picture of the suspect. Whilst such information \*\*\* \*\*\*. This again was standard practice.

123.  Whenever the Security Service deals with foreign liaison services, they seek to determine whether the country in question has the capability, resources, legal basis and willingness to undertake activity on behalf of the Service. In this case, we consider that this was the purpose of asking whether the Gambians *"are able to cover these individuals whilst they are in Gambia"*. The Committee has been told that the Security Service did not obtain a response to this question.

124.  When passing information between liaison services, it is routine procedure that caveats are passed on as well. This case involves information passed to the Gambians via the U.S. authorities – it would be expected that caveats on this information would also have been communicated to the Gambians. The Security Service told us:

> *I cannot reconstruct what was going on in the particular officer's mind six years afterwards, but I think the expectation of the officer would be that this is part of an ongoing investigation by our Service, that we did not want any executive action taken because we did not want somebody arrested… There was not the basis for that.*

> *We therefore [used] a caveat on [the telegrams], and then one is pursuing the investigation through the next stages. It happened that the individual had gone to Gambia. We wanted to know what he was going to do. We did not expect anybody to arrest him or do anything. We just needed to understand what the course of events was.*

> *As it happens, the Americans disregarded the caveat on the operation and decided to step in and do something, but that from our point of view was not the way in*

[95] *"… it is a matter of routine inter-governmental cooperation that an intelligence agency in a particular country will notify foreign agencies if a suspected terrorist, or someone suspected of being involved or associated with those engaged in terrorist-related activities, is intending to leave that country and travel abroad. The Service participates in this form of cooperation between governments, and this participation helps to ensure that foreign agencies will, in return, inform the Service whenever they are aware that a suspected terrorist or associate may be travelling to the United Kingdom."* Open statement of Security Service Witness "A", dated 14 March 2006, R. (Al-Rawi & Others) v. Secretary of State for Foreign and Commonwealth Affairs & Another [2006].

*which we would have expected the Americans to operate, given that we have had a long track record of cooperation with them over counter-terrorist matters in regard to Al-Qaeda for some time…*

*It certainly was a surprise that the Americans were operating in this way.*[96]

**R.   In adding the caveat prohibiting action, the Security Service explicitly required that no action (such as arrests) should be taken on the basis of the intelligence contained in the telegrams. We have been told that the Security Service would fully expect such a caveat to be honoured by the U.S. agencies – this is fundamental to their intelligence-sharing relationship. We accept that the Security Service did not intend the men to be arrested.**

125.  On 8 November 2002, the three men travelled to The Gambia. They were not searched at Gatwick on this occasion – it was judged that a second search would have been unlikely to produce any additional relevant material. (Security Service options at this stage would have been to keep an eye on the men to determine if their earlier arrest had given them a scare and disrupted any potential plans, or to monitor them further either to obtain further evidence or to rule them out of the Service's investigation.)

126.  On the day of their departure, a third telegram was sent from the Security Service to the U.S. authorities confirming that the men had departed and including the relevant flight information. Because this telegram contained flight details only – as opposed to intelligence – it was covered by a caveat prohibiting further distribution to other governments, which is the standard caveat used across Government in communiqués with foreign governments. (Whilst this caveat does not include the prohibition on taking action, this had already been established by the caveats on the earlier telegrams.)

### Arrest in The Gambia

127.  Up to this point, the actions taken by the Security Service were the regular work of investigative officers who monitor suspected extremists – such work is *"routine business"* for the Service.[97]

128.  When the men arrived at Banjul airport, they were met by Omar Omari (a Gambian national) and Bisher's brother Wahab al-Rawi (a British national). The

---

[96] *Oral evidence – Security Service, 20 March 2007.*

[97] *Ibid.*

Gambian authorities searched the men's baggage and discovered *"a suspicious collection of items"*.[98] They arrested all five men.[99] The Security Service assessment was that *"these items may well have formed the basis for their detention"*.[100]

129. It seems to us that there are a number of possible reasons why the men were initially arrested. It is possible that the Gambian police or border authorities at Banjul airport decided to search the men based on a "hunch" – something that happens routinely at customs and immigration points around the world. It is also possible that the Gambians broke the caveats on the intelligence shared with them and chose to take executive action. Another possibility is that the U.S. authorities neglected to pass on the caveats or instigated the men's arrest themselves. Whatever the reason for the men's arrest, it is clear that it was not at the instigation of the Security Service.

130. The Security Service was informed of the arrests on 10 November and, the following day, sent a telegram to notify SIS and the FCO of this and to provide background to the case. On 14 November, the Deputy Director General of the Security Service wrote to the Home Office and MPSB in similar terms.

131. Initially, the remaining men were detained by the Gambian authorities but they were subsequently transferred into American custody.[101] During the men's detention, the Security Service received information about the progress of the investigation into the men's intended activities, although they were not told where the men were being held.[102]

132. In late November, the Security Service was informed by the U.S. authorities that they intended to conduct what we have defined as a "Rendition to Detention" operation, to transfer the four men from The Gambia to Bagram Air Base in Afghanistan. The Service registered strong concerns, both orally and in writing, at this suggestion and alerted the FCO.

---

[98] *"… the items included a solar panel for a satellite phone, several thousand dollars worth of outdoor equipment, a repair kit for wetsuits, mountain-climbing gear and a large plastic bag full of hand-soldered electrical components." Open statement of Security Service Witness "A", R. (Al-Rawi & Others) v. Secretary of State for Foreign and Commonwealth Affairs & Another [2006].*

[99] *We understand that Omar Omari was released on 9 November, the day after the men's arrest at Banjul airport.*

[100] *Open statement of Security Service Witness "A", dated 14 March 2006, R. (Al-Rawi & Others) v. Secretary of State for Foreign and Commonwealth Affairs & Another [2006].*

[101] *It is unclear precisely at what stage the men were transferred into U.S. custody.*

[102] *Open statement of Security Service Witness "A", dated 14 March 2006, R. (Al-Rawi & Others) v. Secretary of State for Foreign and Commonwealth Affairs & Another [2006].*

133. The Deputy High Commissioner and the High Commissioner to The Gambia made representations to the U.S. Ambassador in Banjul from 27 November.[103] In Washington, the Deputy Head of Mission made representations to the U.S. Department of State and the National Security Council.[104] They registered strong objections to the transfer of the men and sought clarification of their whereabouts and U.S. intentions. The Committee was told:

> *In response to our representations, the U.S. confirmed the detention of the individuals in question, but declined to give their precise location in Gambia. The U.S. also stated that they believed there were good grounds for the individuals' detention and told us they were being well treated.*[105]

134. The FCO sought consular access to the two British nationals (el-Janoudi and Wahab al-Rawi), but this was refused despite repeated requests.[106] Eventually, the two British nationals were released and returned to the UK on 4 and 5 December 2002.

**S. The Security Service and Foreign Office acted properly in seeking access to the detained British nationals, asking questions as to their treatment and, when they learnt of a possible rendition operation, protesting strongly.**

**T. We note that eventually the British nationals were released, but are concerned that, contrary to the Vienna Convention on Consular Relations, access to the men was initially denied.**

135. On 6 December 2002, the Security Service sent a telegram to the U.S. authorities which stated that HMG *"would not seek to extend consular protection to non-British nationals"*. We have been told that under international law the FCO could not provide consular protection to Bisher al-Rawi and el-Banna. In a number of the cases we have reviewed, there is an issue related to consular protection afforded to British residents or those with dual nationality.[107] This is a matter beyond the remit of the Committee. We note, however, the report of the Foreign Affairs Committee on their visit to Guantánamo Bay which concludes that the established policy of not accepting consular responsibility for non-British nationals is correct.

---

[103] *The High Commissioner visited the U.S. Ambassador in person, on at least two occasions.*

[104] *The Deputy Head of Mission in Washington spoke directly to senior officials at the State Department and the National Security Council.*

[105] *Letter from the Foreign Secretary to the Committee, 12 January 2007.*

[106] *Consular access was sought from 27 November by way of a formal written request to the Gambian authorities and as part of representations made to the U.S. Ambassador in Banjul.*

[107] *The legal aspects of consular access are described in paragraph 17.*

### *"Rendition to Detention"*

136. Bisher al-Rawi and el-Banna were allegedly "Rendered to Detention" to Bagram Air Base in Afghanistan by the U.S. authorities on 8 December 2002. They were then allegedly transferred and detained in Kabul before again being "Rendered to Detention" to Guantánamo Bay in February 2003.

137. We have considered whether the Security Service should have been more aware of the risk that the men would be rendered. Renditions up until this point had, in effect, been "Military Renditions" (i.e. those connected to the conflict in Afghanistan). We have been told that this was the first time after 9/11 that the Service became aware of a rendition of individuals unrelated to the Afghanistan battlefield (or surrounding area of operations), and it was not therefore expected.

**U.     This is the first case in which the U.S. agencies conducted a "Rendition to Detention" of individuals entirely unrelated to the conflict in Afghanistan. Given that there had been a gradual expansion of the rendition programme during 2002, it could reasonably have been expected that the net would widen still further and that greater care could have been taken. We do, however, note that Agency priorities at the time were – rightly – focused on disrupting attacks rather than scrutinising American policy. We also accept that the Agencies could not have foreseen that the U.S. authorities would disregard the caveats placed on the intelligence, given that they had honoured the caveat system for the past 20 years.**

**V.     This case shows a lack of regard, on the part of the U.S., for UK concerns. Despite the Security Service prohibiting any action being taken as a result of its intelligence, the U.S. nonetheless planned to render the men to Guantánamo Bay. They then ignored the subsequent protests of both the Security Service and the Government. This has serious implications for the working of the relationship between the U.S. and UK intelligence and security agencies.**

### *Other Allegations*

138. Among the allegations surrounding this case, it is claimed that the Security Service provided out-of-date and inaccurate information which may have led to the rendition by the U.S. agencies, and that Bisher al-Rawi worked for the Security Service, who reneged on the assurances they had given him.

### *The Suspicious Device*

139. On the question of the accuracy of the information provided to the Americans, the Security Service telegrams provided their current assessment of the men. The 1 November telegram also referred in passing to a *"home-made electronic device"*

found during the search of the men's baggage, possibly *"as some part of a car-based IED"*, but gave no final assessment of what the device might be. The main focus of the telegram was the men's links to Islamist extremism. The Committee has not seen any evidence that the Security Service told the U.S. of the final assessment of the device.

140. We consider it likely that the men were "Rendered to Detention" due to their links with Islamic extremism, rather than suspicions related to the home-made electronic device and, therefore, even had the final assessment of the device been provided, we do not believe that it would have had any bearing on U.S. decisions in this case.

141. El-Banna's and Bisher al-Rawi's Combatant Status Review Tribunals (CSRTs) concluded that they were properly classified as enemy combatants and should therefore remain detained at Guantánamo Bay to face Military Tribunals.[108,109] El-Banna's CSRT included a number of allegations, including that he *"was arrested in Gambia while attempting to board an airplane with equipment that resembled a home-made electronic device"*.[110] This would appear to refer to the item discovered in the men's baggage at Gatwick airport on 1 November 2002 and is therefore incorrect.

**W.    Whilst we note that Bisher al-Rawi has now been released from Guantánamo Bay and that el-Banna has been cleared for release, we nevertheless recommend that the UK Government ensures that the details of suspicious items found during the Gatwick luggage search (including the police's final assessment of these items) are clarified with the U.S. authorities.**

### Bisher al-Rawi's Relationship with the Security Service

142. The Committee has also investigated claims made by Bisher al-Rawi regarding his relationship with the Security Service. He claimed in his CSRT that he worked – unpaid – for the Security Service as a go-between with Abu Qatada. In this capacity, he claims to have helped the Service find Abu Qatada, and was given assurances that, should his work for the Service get him into trouble with the authorities, he could ask for their assistance. He also claimed that the Service tried to recruit him when he was in Guantánamo Bay.

---

[108] *The CSRT aims to determine whether those detained at Guantánamo Bay are properly classified as "enemy combatants" and to provide detainees with the opportunity to challenge this designation.*

[109] *Bisher al-Rawi was released from Guantánamo Bay in March 2007 following intervention by the FCO. At the time of writing, el-Banna remains at Guantánamo Bay, although the U.S. authorities have cleared him for release.*

[110] *This would appear to refer to the suspicious device discovered during the search of the men's baggage at Gatwick airport. CSRT, ISN #905, Enclosure (3), page 3.*

143. The issue of whether or not individuals cooperate with the intelligence and security agencies is extremely sensitive. Disclosing information about this sort of cooperation, or whether individuals are sources, would jeopardise existing relationships and dissuade others from helping the services in their future efforts to tackle the terrorist threat. We cannot therefore confirm or deny any of the allegations that have been made. We can confirm, however, that we have looked into the issue in detail, questioned a number of witnesses to assure ourselves of the facts of the case and have seen the relevant excerpts from Security Service files. We have included here as much of the detail as we can put in the public domain without seriously damaging the Agencies' ability to do their job.

144. In March 2006, the Treasury Solicitors, acting for the Foreign Secretary, informed Bisher al-Rawi's legal representatives of the decision to approach the U.S. on al-Rawi's behalf:

> *The latest evidence filed on behalf of Mr Al Rawi… [includes] a suggestion that Mr Al Rawi may have agreed to assist the Security Service if released from Guantanamo Bay. Together [with other allegations and assertions], these are the basis of what has been called the "fact specific" claim of Mr Al Rawi… The reason why the Foreign Secretary has decided that an approach should be made to the U.S. Government to ask for Mr Al Rawi's release is related to this fact specific claim…*[111]

The Treasury Solicitors did, however, point out that parts of Bisher al-Rawi's claims were *"inaccurate in very many respects"*, and that the Foreign Secretary was under no legal obligation to make these representations.[112]

145. We have questioned the Foreign Secretary on the background to this letter. We have been told that:

> *… the previous Foreign Secretary made an exception, in the case of Mr al-Rawi, somewhat late in the day, because he was informed, rather late in the day, of information ****
> ****
> ****, it was decided that a different policy would be adopted towards al-Rawi compared with the other British residents…*
>
> *We have not changed our position on consular responsibility in relation to British residents.*[113]

[111] *Letter from the Treasury Solicitors to Bisher al-Rawi's legal representatives, 22 March 2006. Provided by Mr Andrew Tyrie, MP in response to the Committee's request for any evidence that may be relevant to its inquiry.*

[112] *Ibid.*

[113] *Oral evidence – FCO, 5 December 2006.*

146. We were told that the information in question came to light following a review of Security Service files in connection with the developing nature of claims brought by Bisher al-Rawi in a court case (al-Rawi and Others) and that this led to the Foreign Secretary being made aware of ***. The Foreign Secretary has told the Committee:

> *It was on the basis of this particular information that Jack Straw decided there were matters… which would enable him to approach the U.S. authorities on Mr al-Rawi's behalf.*[114]

147. We can confirm that we have taken evidence from the Security Service on what these "matters" were, have seen the relevant excerpts from their files, and know the full facts of the case.

**X.     We recognise the contribution of the Foreign and Commonwealth Office in securing Bisher al-Rawi's release. However, having seen the full facts of the case – and leaving aside the exact nature of al-Rawi's relationship with the Security Service – we consider that the Security Service should have informed Ministers about the case at the time, and are concerned that it took *** years, and a court case, to bring it to their attention.**

---

[114] *Letter from the Foreign Secretary, 22 May 2007.*

# ETHICAL DILEMMAS

148. We have described how the UK's relationship with the U.S. is of fundamental importance in the effort to counter terrorism in paragraphs 24 to 34. We have also outlined the issues our Agencies face when dealing with foreign intelligence services and the ethical, moral and legal dilemmas they encounter.

149. The Security Service and SIS have, certainly since 1998, where they considered it necessary, sought assurances from foreign intelligence services that individuals facing detention as a result of any action or intelligence shared with them would be treated humanely. This was originally more concerned with the need to ensure a fair trial and avoid capital punishment as CIDT was not thought to be a likely risk.

150. It was only when news surfaced of the mistreatment of detainees at the U.S.-run Abu Ghraib prison in Iraq in 2004 that the UK Government realised that there were real risks of CIDT:

> *Back in 2003 we were concerned about secret facilities but we did not at that stage, I think, make an automatic connection between secret facilities and mistreatment. That sort of connection grew later as more allegations came to light or… things like Abu Ghraib came to light, which led you to believe, just a minute, if that is happening there, what might be happening in secret facilities.*[115]

151. The Committee has been told that, as concerns have grown, there has been a corresponding growth in terms of the assurances sought from foreign liaison services: *"the level of assurances that we seek and the conditionality that Ministers have been imposing, that has gradually evolved on an upward curve"*.[116]

152. After 2004, assurances regarding humane treatment were sought for the specific purpose of ensuring that individuals would not be subject to torture or CIDT. The Director General of the Security Service told the Committee that when passing questions to foreign liaison services to be put to detainees the Service has been much more careful over the last few years:

> *We certainly now have inhibitions… greater inhibitions than we once did. We would now absolutely say, Where is this man? What are you going to do with the information? Where is he being held? What assurances can you give us before you put the questions to him?*[117]

---

[115] *Oral evidence – FCO, 5 December 2006.*

[116] *Ibid.*

[117] *Oral evidence – Security Service, 23 November 2006.*

153. For the most part, the Agencies are able to balance the need to cooperate with foreign liaison services with the need to ensure that individuals are being humanely treated, but there is a further dilemma when it is believed that a serious threat to UK lives can only be disrupted by seeking intelligence which may be obtained by torture or CIDT. The Foreign Secretary told the Committee:

> *… my reaction is that first of all you have to discuss it, particularly at a Ministerial level, that you then have to come to a judgment… I mean, you would be crazy not to consider asking further questions. However, what you would have to consider is do you ask those questions against a background of seeking very clear assurances as to how this person is being and will be treated and, if you do, could you believe those assurances. I think that is the dilemma that would be before Ministers on a case-by-case basis, depending on, for example, if you had any idea where this person was.*[118]

154. The Agencies have produced guidance to their staff that addresses the use of intelligence or cooperation with foreign liaison services where there are risks of torture or CIDT – this would include "Extraordinary Rendition" and, depending on the countries involved, may include "Rendition to Detention" and "Rendition to Justice". The guidance was developed jointly by the Security Service, SIS and GCHQ, and so all three are broadly similar.

155. The guidance on sharing intelligence, together with the safeguards employed by the three Agencies, is discussed further on pages 53 to 56.

### *Implications for the Special Relationship*

156. The rendition programme has revealed aspects of the usually close UK/U.S. relationship that are surprising and concerning. It has highlighted that the UK and U.S. work under very different legal guidelines and ethical approaches. The Director General of the Security Service said that the Americans are aware of the concerns of the UK Agencies in relation to rendition and detainee treatment – she said: *" *** *** ."*[119] UK concerns regarding Guantánamo Bay, detainee treatment and "Extraordinary Rendition" have been raised between the FCO and the U.S. State Department, ***:

> *I have certainly had discussions about the broader issue of rendition and detainees with colleagues in the State Department because of various concerns, concerns about the impact this is having in this country on our Parliamentary, press and*

---

[118] *Oral evidence – FCO, 5 December 2006.*

[119] *Oral evidence – Security Service, 23 November 2006.*

*public opinion, but also concerns that we have, that this can be counter-productive in terms of our concern about terrorism and radicalisation and so on.*

*[Black facilities] have also come up [in] the discussions… that I have had with senior State Department officials, where we simply made clear our opposition really to black facilities, and we feel they are wrong in themselves but also counter-productive for the reasons I described earlier. The State Department has taken note. They have not gone beyond that.*[120]

157. The U.S. rendition programme has required that the Security Service and SIS modify their relationship with their American counterparts to ensure that, in sharing intelligence, the differing legal frameworks of both countries are honoured. The Director General of the Security Service told us:

*We do a lot of exchange of highly sensitive intelligence in a very trusting way, but we now all of us, including the Americans, have a clear understanding of the legal constraints on that exchange… So when you are talking about sharing secret intelligence, we still trust them, but we have a better recognition that their standards, their laws, their approaches are different, and therefore we still have to work with them, but we work with them in a rather different fashion.*[121]

**Y.    What the rendition programme has shown is that in what it refers to as "the war on terror" the U.S. will take whatever action it deems necessary, within U.S. law, to protect its national security from those it considers to pose a serious threat. Although the U.S. may take note of UK protests and concerns, this does not appear materially to affect its strategy on rendition.**

**Z.    It is to the credit of our Agencies that they have now managed to adapt their procedures to work round these problems and maintain the exchange of intelligence that is so critical to UK security.**

---

[120] *Oral evidence – FCO, 5 December 2006.*

[121] *Oral evidence – Security Service, 20 March 2007.*

# THE UK AGENCIES

## *Security Service*

### *Knowledge and Involvement*

158. Security Service knowledge of, and involvement in, rendition has been in cases where there is a link to the UK. In some cases the detainees have been (or were thought to have been) British nationals or had resided in the UK. In other cases, the foreign liaison services involved may have had cause to believe that detainees were involved in terrorist attack planning against the UK or UK interests:

> *We were aware of people being moved from places: Afghanistan, Pakistan, Zambia and Gambia, usually to Guantánamo. But we are not party to the decision to do so, nor were we aware of routes or how it was done…\*\*\**
>
> *\*\*\*. We gained this knowledge because these subjects were UK nationals or lived in the UK or were believed to possess intelligence about terrorist activity in or relating to the UK. Some of these renditions were dropped by the Americans after the Service had expressed concern at the proposal.*[122]

159. In general terms, this means that the Security Service has become involved in cases where the rendition operation has already taken place. Their involvement then becomes a matter of how to deal with foreign liaison services regarding detainees to whom the Service does not have access. In some cases the Service may have very little information regarding the source from which unsolicited intelligence may have come.

160. The Security Service has never sought to conduct a rendition operation of its own and has said:

> *We have never used rendition, either extraordinary or ordinary… and have not provided assistance to any cases through UK territory… We were not complicit in any cases where it was advocated or implied that someone would be subject to mistreatment.*[123]

### *Sharing Intelligence*

161. We have discussed the importance of intelligence sharing, particularly with the Americans, and how this has undoubtedly assisted the disruption of attacks against the UK.

---

[122] *Oral evidence – Security Service, 23 November 2006.*

[123] *Ibid.*

162. The problems associated with sharing intelligence with foreign liaison services are not new and the Service has always had to deal with countries that have different legal frameworks and different approaches to human rights. We were told:

> *We have had to engage with countries which do not remotely – and I am not actually thinking of the United States – reach our standards of how we do things… The whole issue… of exchanging intelligence with foreign services with different standards and different laws is not new. It has become more acute and more difficult with our closest ally, but the principles apply across the board.*[124]

163. The safeguards used by the Security Service to manage this problem when dealing with foreign liaison services are described on pages 53 and 54.

## Secret Intelligence Service

### Knowledge and Involvement

164. SIS's knowledge of, and involvement in, rendition operations has been limited to passing intelligence to, or otherwise assisting, foreign liaison services – \*\*\*. Its involvement, unlike the Security Service, has been both prior to and subsequent to renditions taking place.

165. The Chief of SIS summarised his Service's involvement in rendition operations, telling the Committee:

> *With one exception, SIS has never conducted a rendition operation. That exception was an operation in 1989. It concerned Peter Mullen, an Irish Republican…*

We discussed the implications of that case in paragraph 10. The Chief continued:

> *SIS has never given formal permission or otherwise facilitated U.S. rendition operations via UK airspace or territory…*

> *SIS has never assisted any… renditions into so-called "black facilities"…*

> *SIS has not assisted any… renditions to third countries, i.e. renditions to countries other than the USA or the detainee's country of origin…*

> *SIS has not assisted any renditions… to the detainee's country of origin where there was a real risk of cruel, inhumane and degrading treatment or torture, or which would breach the UK's international obligations…*

---

[124] *Ibid.*

*We have assisted a very small number of renditions where we were certain that there was no risk of torture or CIDT, and where the circumstances would permit this assistance without the breach of our country's international obligations.*[125]

166. There have been a number of occasions in which SIS considered taking action such as assisting renditions to countries other than a detainee's country of origin – although these cases never developed to the point where Ministers needed to approve operations.

167. On one occasion consideration was given to assisting ***. This operational proposal was dropped, however, because SIS was not able to satisfy itself as to the likely treatment of the target.

## Sharing Intelligence

168. The Chief of SIS told the Committee of the immense value to the UK of his Service's relationship with U.S. intelligence agencies.

169. The knowledge of the U.S. rendition programme, as it evolved over time, has altered the manner in which intelligence is shared with the U.S. whenever the Service considers that there is a risk of a rendition occurring:

*So we find ourselves in a position where we share with *** key [counter-terrorism] interests, objectives and many techniques, but where we have some different methods and a quite different legal framework, specifically but not only on the issue of rendition.*

*Now, this does not and cannot be allowed to inhibit the exchange of what we call "building-block intelligence", by which I mean material which over time contributes to a picture of a terrorist or a terrorist group, or much other vital operational collaboration…*

*But it does mean that we have for a long time been aware that sharing what I would call "actionable intelligence", leading to a possible rendition, would require very careful internal consideration and Ministerial approval.*[126]

170. SIS applies the same control mechanisms to its intelligence exchange with foreign liaison services as the other two UK Agencies. These are based upon the use of caveats, assurances and Ministerial authorisations and are described below.

---

[125] *Oral evidence – SIS, 7 November 2006.*

[126] *Ibid.*

### Safeguards in SIS and the Security Service

171. The Security Service and SIS use a system of safeguards to ensure that their intelligence does not result in torture or mistreatment. These safeguards take the form of conditions which restrict the use that a liaison partner may make of UK intelligence. We have been told that such conditions are understood by intelligence and security services globally, as they all use similar conditions to ensure that one agency does not endanger another agency's sources through their incautious use of intelligence. Intelligence and security agencies accept and respect these conditions because failure to do so would mean that they might not be trusted to receive intelligence in the future.

172. Agency staff are briefed on the system of safeguards as part of their induction training. This was supplemented, prior to 2004, by informal advice from line managers, to whom all staff were advised to refer any concerns. Since 2004, SIS and the Security Service have revised their guidance to staff on the use of these safeguards to ensure that no mistreatment to individuals arises from the sharing of intelligence, and joint guidance, approved by Ministers, was issued to all SIS and Security Service staff in 2006. This guidance is entitled *Guidance on dealing with liaison services: Agency policy on liaison with overseas security and intelligence services in relation to detainees who may be subject to mistreatment*. There is separate guidance for staff involved in questioning detainees in the custody of foreign liaison services, which was the topic of the Committee's March 2005 report into the handling of detainees.[127]

173. The Director General of the Security Service told the Committee: *"[The guidance] is designed to give clear steerage to staff about levels of authorisation and deciding what you can pass and what you cannot pass."*[128] The document is extremely detailed. At the outset the guidance makes it clear that, whilst it is necessary for the UK Agencies to work with foreign liaison services to counter terrorism, the UK Agencies will not condone the use of torture or mistreatment. When a risk of mistreatment is foreseen, then caveats and assurances are used to minimise the risks. Finally, where, despite the use of caveats and assurances, there is still considered to be a risk of mistreatment, senior managerial or Ministerial approval is required.

174. The guidance includes a comprehensive legal briefing, covering the responsibilities of Agency staff under UK law, and the responsibilities of the UK in international law. The overall policy on possible mistreatment related to liaison activities is described as follows:

---

[127] *Cm 6469.*

[128] *Oral evidence – Security Service, 23 November 2006.*

*The Security and Intelligence Agencies do not participate in, solicit, encourage or condone the use of torture or inhuman or degrading treatment. For reasons both ethical and legal, their policy is not to carry out any action which they know would result in torture or inhuman or degrading treatment. Where there is considered to be a risk that the Agencies' actions will be unlawful, the actions may not be taken without authority at a senior level. In some cases, Ministers may need to be consulted.*

In practical terms, this means there is a range of options available to staff when they share intelligence with foreign liaison services, dependent on the likelihood and risk of torture or CIDT being foreseen. We have examined the guidance documents setting out these options and we believe that they are in line with the objectives set out above.

175. This guidance is designed to ensure that the Agencies' actions, where the possibility of torture or CIDT is foreseen, comply with their, and the UK's, legal obligations. The Agencies' knowledge of the workings of foreign liaison services is critical in assessing the risks involved in cooperation with them.

## Conclusions and Recommendations

**AA. The Committee notes that the UK Agencies now have a policy in place to minimise the risk of their actions inadvertently leading to renditions, torture or cruel, inhuman or degrading treatment (CIDT). Where it is known that the consequences of dealing with a foreign liaison service will include torture or CIDT, the operation will not be authorised.**

**BB.  In the cases we have reviewed, the Agencies have taken action consistent with the policy of minimising the risks of torture or CIDT (and therefore "Extraordinary Rendition") based upon their knowledge and awareness of the CIA rendition programme at that time.**

**CC.  Where, despite the use of caveats and assurances, there remains a real possibility that the actions of the Agencies will result in torture or mistreatment, we note that the current procedure requires that approval is sought from senior management or Ministers. We recommend that Ministerial approval should be sought in all such cases.**

**DD. The Committee considers that "secret detention", without legal or other representation, is of itself mistreatment. Where there is a real possibility of "Rendition to Detention" to a secret facility, even if it would be for a limited time, then approval must never be given.**

## Government Communications Headquarters

### Knowledge and Involvement

176. There have been no allegations relating to the involvement of GCHQ in any rendition operations. GCHQ's Director, Sir David Pepper, told the Committee that GCHQ had *"never knowingly provided support to a U.S. rendition operation and we would not authorise the use of intelligence for that purpose… and we have never been asked to do so"*.[129] As mentioned earlier in this Report, GCHQ has checked its records back to 1995 as part of the Government's investigation into possible involvement in rendition/CIDT and, like other Government departments, found no evidence of involvement.

177. Sir David told the Committee that GCHQ's knowledge of the U.S. rendition programme built up over time, as SIS passed on information and shared its growing suspicions with the other Agencies. He also explained that GCHQ's principal partner in the U.S. is the National Security Agency (NSA). Sir David told the Committee:

> *Our knowledge of the rendition programme has essentially flowed from what SIS have learnt and told the other Agencies…*
>
> *I think it was 1997… that SIS first understood about rendition. It would have been telling the rest of the community at that point, and their knowledge gradually grew, and so our knowledge gradually grew. Then in the years since 2001… we have followed SIS's growing understanding of what the U.S. was doing. We have had no independent source of information ourselves.*[130]

### Safeguards

178. GCHQ shares SIGINT collection data and intelligence reporting with the U.S. under a 60-year-old agreement.

179. As mentioned earlier in the Report, GCHQ applies the same guiding principles as the Security Service and SIS. In addition, GCHQ applies controls and safeguards tailored to its SIGINT function, to ensure that its actions are lawful and for the protection of sensitivities.

180. All SIGINT targeting is recorded and subject to regular external checks by independent commissioners. Furthermore, all end-product reporting is subjected to

---

[129] *Oral evidence – GCHQ, 29 November 2006.*

[130] *Ibid.*

a sensitivity-checking process (known as "***") whenever there are concerns over legal, political or operational sensitivities. This process also ensures that the intelligence is accurate and its distribution is consistent with policy and legislative constraints.

181. GCHQ's long-established "***" process is the prime control mechanism by which GCHQ regulates the use of its intelligence by recipients. It requires all customers of GCHQ intelligence reports (***) to request authorisation from GCHQ to undertake executive action based upon the information they contain. The "***" process ensures that any use made of GCHQ reporting does not compromise sensitive SIGINT sources or relationships, and that it complies with UK policy and law.

182. GCHQ has provided to the Committee extracts from its guidance for "reporters" covering "***" and "***".[131] This advises relevant staff of the steps they should take if they foresee a real possibility that unlawful behaviour might result from supplying intelligence to a foreign partner. It also sets out the safeguards for senior management to follow (such as the use of caveats) in such circumstances, including potential upward referral, ultimately to Ministerial level.

183. Sir David said:

> When we talk about use of intelligence, that would include passing it to liaison services. So if anybody wants to do anything other than read the report and put it on a database, they have to come to us for permission.[132]

He said that he is completely confident that this process is working appropriately.

## Conclusion

**EE. GCHQ has played no role in any U.S. renditions, whether "ordinary" or "extraordinary". Theoretically, given the close working relationship between GCHQ and the National Security Agency (NSA), GCHQ intelligence could have been passed from the NSA to the CIA and could have been used in a U.S. rendition operation. However, GCHQ's legal safeguards and the requirement for explicit permission to take action based on their intelligence provide a high level of confidence that their material has not been used for such operations.**

---

[131] *"Reporters" are analysts who create "end-product" intelligence reports as opposed to those involved in the collection of intercept material.*

[132] *Oral evidence – GCHQ, 29 November 2006.*

# "GHOST FLIGHTS"

## *Introduction*

184. One of the allegations concerning the U.S. rendition programme is that CIA planes conducting rendition operations used UK airspace and airports. This is not linked to the intelligence and security Agencies, and does not therefore fall within the Committee's remit. We did, however, look in part at the allegations as part of our background investigations and think it helpful to report our findings.

185. An article in the *Guardian* on 12 September 2005 reported that it had compiled a database of flight records from the U.S. Federal Aviation Administration which demonstrated British logistical and refuelling support for CIA rendition operations.[133,134] In particular, the article referred to the case of Mohammed Saad Iqbal Madni, where it is alleged that the CIA rendered him from Indonesia to Egypt, then flew on to Prestwick airport in Scotland to refuel before returning to Washington. Since September 2005 a number of other reports have referred to the use of UK airspace by CIA-operated aircraft and their possible use in rendition.[135]

186. Varying figures have been reported – from around 200 to 400 – for the number of CIA flights that have used UK airspace. There are, however, only four flights where it is alleged that a plane involved in a rendition operation has subsequently used a UK airport.

187. In each of these four cases the plane has allegedly been returning from a rendition operation overseas, and the detainee(s) in question has not been on the plane.[136] The four alleged cases are listed by Stephen Grey in his book *Ghost Plane* and on his website of flight logs:

---

[133] *"Destination Cairo: Human rights fears over CIA flights", Ian Cobain, Stephen Grey and Richard Norton-Taylor, 12 September 2005 – www.guardian.co.uk/print/0,,5283268-105744,00.html*

[134] *Their investigation focused on the comparison of registration numbers of civilian flights operated by companies with ties to the CIA, flight plans and allegations of rendition.*

[135] *The* Guardian*: Alleged more than 210 CIA flights through the UK, although none of these flights are alleged to have been rendition operations. "Britain's role in war on terror revealed", 6 December 2005.*

   *Amnesty International: Alleged more than 200 CIA flights through the UK, including three flights stopping over in the UK having been involved in rendition operations abroad.* Human rights: A broken promise*, 23 February 2006.*

   *Council of Europe: Highlighted the extent of CIA flights across Europe, including through the UK (although none of these flights are alleged to be directly involved in rendition), 12 June 2006.*

   *European Parliament Temporary Committee: Alleged 170 CIA flights through the UK, including one stopping over in the UK having been involved in rendition operations abroad, 16 November 2006.*

[136] *The only known renditions through UK airspace were Nicholas Mullen's 1989 "Rendition to Justice" conducted by SIS (see paragraph 10) and the two 1998 U.S. "Renditions to Justice" (outlined by Ministers in statements to the House in 2005 and 2006).*

- 24 October 2001 – N379P refuelled at Prestwick airport, returning from the rendition of Jamil Qasim Saeed Mohammed from Pakistan to Jordan on 23 October.

- 20 December 2001 – N379P refuelled at Prestwick airport, returning from the transfer of Ahmed Agiza and Mohammed al-Zery from Sweden to Egypt on 18 December.

- 15 January 2002 – N379P refuelled at Prestwick airport, returning from the rendition of Mohammed Saad Iqbal Madni from Indonesia to Egypt on 11 January.

- 24 July 2003 – N379P refuelled at Prestwick airport, returning from the rendition of Saifulla Paracha from Thailand to Afghanistan on 22 July.[137]

## *Rules Governing Flights Through UK Airspace*

### *Permission to Land*

188. The aircraft that have been linked with these four suspected CIA flights are civilian aircraft. These are not required to submit for prior permission to land in the UK (as would be the case for official State Aircraft).[138] The Secretary of State for Transport has told the Committee:

> *The UK grants a block approval to many countries and, in the case of the U.S., arrangements for a standing block approval [for State Aircraft] to land in the UK have been in place since at least 1949…*

> *… Non-commercial, non-state flights do not require permission to overfly or land in the UK.*[139]

### *Flight Plans*

189. All flights, whatever their nature, must submit flight plans for air traffic control purposes and seek prior permission from the relevant airfield:

> *The Rules of the Air established in Annex 2 to the Chicago Convention require flight plans to be filed for all flights that cross international borders. This is implemented in the UK by the Rules of the Air 1996 (SI 1996/1393). For flights operating in European controlled airspace, flight plans are filed with the Central*

---

[137] Ghost Plane: The Inside Story of the CIA's Secret Rendition Programme, *Stephen Grey – www.ghostplane.net*

[138] *The Chicago Convention on International Civil Aviation (1944), Article 3c and Article 5.*

[139] *Letter from the Secretary of State for Transport, received 14 December 2006.*

*Flow Management Unit (CFMU) at Eurocontrol and passed on to the relevant air traffic control service (in the UK's case, NATS plc)… Flight plan data is limited to information about the respective aircraft's type, registration number, date and time of flight, point of origin and destination and recorded user's name. It does not contain (nor is it legally required to contain) information about any passengers on board aircraft or the purposes of the flight.*[140]

## General Aviation Reports

190. In addition to flight plans, there is also a statutory requirement for a General Aviation Report (GAR) to be submitted by pilots/operators for all non-scheduled flights departing from or entering the UK.[141] The GAR form requires the following information:

- aircraft details (including registration, type, base and owner/operator);

- flight details (departure and arrival ports); and

- crew and passenger details (names, dates of birth, passport numbers, nationalities and home addresses).

191. HM Revenue and Customs (HMRC) told the Committee:

*All GARs should be submitted to the HMRC National Co-ordination Unit (NCU) who co-ordinate any necessary HMRC activity and forward a copy to local Immigration. The Police require GARs to be sent by fax to the relevant constabulary, as detailed on the form.*[142]

192. The Committee has been told that there is poor compliance in the submission of GARs and that completion is not rigorously enforced.[143] In addition, the forms are not held in a readily searchable format.

---

[140] *Ibid.*

[141] *GARs are submitted to HMRC. For flights within the Common Travel Area (consisting of the UK, Republic of Ireland, Isle of Man and the Channel Islands) GARs are then sent to the police by HMRC. However, GARs for flights entering or leaving the Common Travel Area are not copied to the police. (GARs are not required for domestic flights.)*

[142] *Letter from Paul Gray CB, Acting Chairman, HMRC, 10 January 2007.*

[143] *Ibid. HMRC told the Committee that approximately 20% of GARs are properly completed.*

## *Investigation of Allegations*

193.  The Committee has asked the intelligence and security Agencies if they had any knowledge of the use of UK airspace and airports by the CIA flights alleged to have been involved in renditions. The Director General of the Security Service told us:

> *We have no knowledge of any detainees being subject to rendition through British territory since 9/11; nor have we helped any "Extraordinary Renditions" via UK airspace or territory; nor have the U.S. sought our assistance or permission to use UK airspace or facilities… Unless you say you are going to search every aircraft to check the truth of what you are told, it is a difficult issue… As you know… we are prioritising ruthlessly and I could not possibly justify diverting people to check whether aircraft are CIA-sponsored and what they contain, and frankly I doubt the police have the resources to do this.*[144]

194.  On 29 November 2005, the human rights organisation Liberty wrote to ten Chief Constables with jurisdiction over airports which it was alleged may have been involved in rendition operations and asked them to investigate the allegations.[145] Liberty subsequently met the Chief Constable of Greater Manchester Police, Mike Todd, on 19 December 2005 and he offered to examine the allegations on behalf of the Association of Chief Police Officers.

195.  Mr Todd told the Committee that he had examined the evidence to see whether domestic law had been breached by the alleged use of UK airports in any rendition. He has concluded that no such evidential basis exists on which a criminal inquiry could be launched. He wrote to Liberty on 5 June 2007 to inform them of his conclusion.

196.  A number of rendition flights are alleged to have made use of Scottish airspace and, specifically, Glasgow Prestwick airport after having conducted rendition operations overseas. Strathclyde Police has told the Committee that in relation to the investigation of criminal acts occurring in Scotland:

> *For any investigation to get under way… there should exist evidence (even prima facie) of a sufficiently compelling nature; in general, mere speculation, by itself, will not be satisfactory.*

> *Having fully assessed all available information, I have concluded that there is no evidential basis to support the allegation that crimes or offences [relating to rendition] have taken place within Strathclyde.*[146]

---

[144] *Oral evidence – Security Service, 23 November 2006.*

[145] *www.liberty-human-rights.org.uk/issues/1-torture/pdfs/er-letter-to-police.pdf*

[146] *Letter from Ian Learmonth, Assistant Chief Constable, Strathclyde Police, 21 December 2006.*

197. There has been a further allegation that a suspected rendition flight may have transited Diego Garcia in September 2002 (letters from Amnesty International to the Foreign Secretary – 20 February 2007 and 8 June 2007). The Committee was previously told by the Prime Minister that no detainees have transited Diego Garcia (there was a request, in early 2004, to refuel a flight carrying a U.S.-held detainee, but in the event this did not take place). We have confirmed that this remains the case. The Prime Minister has told the Committee:

> … the U.S. has given firm assurances that at no time have there been any detainees on Diego Garcia. Neither have they transited through the territorial seas or airspace surrounding Diego Garcia. These assurances were last given during talks between U.S. and UK officials in October 2006.[147]

198. The Prime Minister also told the Committee that the Government has not sought to establish whether aircraft that may have previously or subsequently been involved in rendition operations have transited UK territory (including Overseas Territories) or airspace.

199. The Government has carried out detailed checks of its records to determine if there have been any "Extraordinary Renditions" through UK territory or airspace. As we state earlier in this Report, we have been told that:

> [The Government has] carried out checks of Foreign and Commonwealth Office, Home Office, Ministry of Defence, SIS, Security Service and GCHQ files dating back to 1995… [We] have found no evidence of rendition through the UK or Overseas Territories where there were grounds to believe an individual faced a real risk of torture, cruel, inhuman or degrading treatment.[148]

200. In addition, HMRC has told the Committee that:

> HMRC are not, and have never been, aware of extraordinary rendition flights. We have not been told officially or unofficially that such flights have ever taken place, and what the nature of these flights are.[149]

We have also confirmed that record checks were completed within the Department for Transport and included a review of the relevant UK flight plan data supplied to the Council of Europe by Eurocontrol. The Secretary of State for Transport has told the Committee that "the data provided no evidence that the flights identified were involved in the rendition of prisoners".[150]

---

[147] Letter from the Prime Minister, 26 March 2007.

[148] Letter from Sir Richard Mottram, 2 May 2006.

[149] Letter from HMRC, 10 January 2007.

[150] Letter from the Secretary of State for Transport, received 14 December 2006.

### Police Action

201.  The Committee asked Mr Todd whether he felt greater powers were needed to prevent individuals being rendered through the UK. He responded that he did not think police or immigration services were in any way restricted in their powers to search aircraft:[151]

> *If there was any intelligence, any suggestion a flight was involved in… kidnapping a person from one country to another, we are going to go on to the flight and nobody is going to stop us…*[152]

202.  He did, however, tell the Committee that because of the scale of civilian flights through UK airspace (approximately 1.3 million flights a year covered by the GAR system) there are insufficient resources to undertake spot checks of aircraft. Investigative work therefore has to be intelligence-led and based on specific information.

### Conclusions and Recommendations

**FF.  The use of UK airspace and airports by CIA-operated aircraft is not in doubt. There have been many allegations related to these flights but there have been no allegations, and we have seen no evidence, that suggest that any of these CIA flights have transferred detainees through UK airspace (other than two "Rendition to Justice" cases in 1998 which were approved by the UK Government following U.S. requests).**

**GG.  It is alleged that, on up to four occasions since 9/11, aircraft that had previously conducted a rendition operation overseas transited UK airspace during their return journeys (without detainees on board). The Committee has not seen any evidence that might contradict the police assessment that there is no evidential basis on which a criminal inquiry into these flights could be launched.**

**HH. We consider that it would be unreasonable and impractical to check whether every aircraft transiting UK airspace might have been, at some point in the past, and without UK knowledge, involved in a possibly unlawful operation. We are satisfied that, where there is sufficient evidence of unlawful activity on board an aircraft in UK airspace, be it a rendition operation or otherwise, this would be investigated by the UK authorities.**

---

[151] *Article 16 of the Chicago Convention on International Civil Aviation (1944) confirms this assertion: "The appropriate authorities of each of the contracting States shall have the right, without unreasonable delay, to search aircraft of the other contracting States on landing or departure…"*

[152] *Oral evidence – Chief Constable Mike Todd, 23 November 2006.*

**II.   The system of flight plans and General Aviation Reports is outside the remit of this inquiry, although we are concerned that it appears to be systemically flawed. The Home Secretary has assured the Committee that the e-Borders and Border Management Programme (being introduced from 2008) will address our concerns relating to general aviation documentation and security risks. This would, however, be a matter for the Transport and Home Affairs Select Committees to review in greater depth, if they felt it merited it.**

**JJ.   The alleged use of military airfields in the UK by rendition flights has been investigated in response to our questions to the Prime Minister. We are satisfied that there is no evidence that U.S. rendition flights have used UK airspace (except the two cases in 1998 referred to earlier in this Report) and that there is no evidence of them having landed at UK military airfields.**

# SUMMARY OF CONCLUSIONS AND RECOMMENDATIONS

A.    Our intelligence-sharing relationships, particularly with the United States, are critical to providing the breadth and depth of intelligence coverage required to counter the threat to the UK posed by global terrorism. These relationships have saved lives and must continue.

B.    We are concerned that Government departments have had such difficulty in establishing the facts from their own records in relation to requests to conduct renditions through UK airspace. These are matters of fundamental liberties and the Government should ensure that proper searchable records are kept.

C.    Prior to 9/11, assistance to the U.S. "Rendition to Justice" programme – whether through the provision of intelligence or approval to use UK airspace – was agreed on the basis that the Americans gave assurances regarding humane treatment and that detainees would be afforded a fair trial. These actions were appropriate and appear to us to have complied with our domestic law and the UK's international obligations.

D.    Those operations detailed above, involving UK Agencies' knowledge or involvement, are "Renditions to Justice", "Military Renditions" and "Renditions to Detention". They are not "Extraordinary Renditions", which we define as *"the extra-judicial transfer of persons from one jurisdiction or State to another, for the purposes of detention and interrogation outside the normal legal system, where there is a real risk of torture or cruel, inhuman or degrading treatment"*. We note that in some of the cases we refer to, there are allegations of mistreatment, including whilst individuals were detained at Guantánamo Bay, although we have not found evidence that such mistreatment was foreseen by the Agencies. The Committee has therefore found no evidence that the UK Agencies were complicit in any "Extraordinary Rendition" operations.

E.    In the immediate aftermath of the 9/11 attacks, the UK Agencies were authorised to assist U.S. "Rendition to Justice" operations in Afghanistan. This involved assistance to the CIA to capture "unlawful combatants" in Afghanistan. These operations were approved on the basis that detainees would be treated humanely and be afforded a fair trial. In the event, the intelligence necessary to put these authorisations into effect could not be obtained and the operations did not proceed. The Committee has concluded that the Agencies acted properly.

F.    SIS was subsequently briefed on new powers which would enable U.S. authorities to arrest and detain suspected terrorists worldwide. In November 2001, these powers were confirmed by the Presidential Military Order. We understand that

SIS was sceptical about the supposed new powers, since at the time there was a great deal of "tough talk" being used at many levels of the U.S. Administration, and it was difficult to reach a definitive conclusion regarding the direction of U.S. policy in this area. Nonetheless, the Committee concludes that SIS should have appreciated the significance of these events and reported them to Ministers.

G.  The Security Service and SIS were also slow to detect the emerging pattern of "Renditions to Detention" that occurred during 2002. The UK Agencies, when sharing intelligence with the U.S. which might have resulted in the detention of an individual subject to the Presidential Military Order, should always have sought assurances on detainee treatment.

H.  The cases of Bisher al-Rawi and Jamil el-Banna and others during 2002 demonstrated that the U.S. was willing to conduct "Rendition to Detention" operations anywhere in the world, including against those unconnected with the conflict in Afghanistan. We note that the Agencies used greater caution in working with the U.S., including withdrawing from some planned operations, following these cases.

I.  By mid-2003, following the case of Khaled Sheikh Mohammed and suspicions that the U.S. authorities were operating "black sites", the Agencies had appreciated the potential risk of renditions and possible mistreatment of detainees. From this point, the Agencies correctly sought Ministerial approval and assurances from foreign liaison services whenever there were real risks of rendition operations resulting from their actions.

J.  After April 2004 – following the revelations of mistreatment at the U.S. military-operated prison at Abu Ghraib – the UK intelligence and security Agencies and the Government were fully aware of the risk of mistreatment associated with any operations that may result in U.S. custody of detainees. Assurances on humane treatment were properly and routinely sought in operations that involved any risk of rendition and/or U.S. custody.

K.  The Committee has strong concerns, however, about a potential operation in early 2005 which, had it gone ahead, might have resulted in the ***. The operation was conditionally approved by Ministers, subject to assurances on humane treatment and a time limit on detention. These were not obtained and so the operation was dropped. ***
***
***.

L.  We are satisfied that the UK intelligence and security Agencies had no involvement in the capture or subsequent "Rendition to Detention" of Martin Mubanga and that they acted properly.

M.   There is a reasonable probability that intelligence passed to the Americans was used in al-Habashi's subsequent interrogation. We cannot confirm any part of al-Habashi's account of his detention or mistreatment after his transfer from Pakistan.

N.   We agree with the Director General of the Security Service that, with hindsight, it is regrettable that assurances regarding proper treatment of detainees were not sought from the Americans in this case.

O.   Whilst this was not a rendition but a deportation, and the Security Service and SIS were not in a strong position to impose conditions on it, we accept their view that they should nevertheless have sought greater assurances that the individual would be treated humanely.

P.   Given el-Banna's and al-Rawi's backgrounds and associations, it was reasonable to undertake a properly authorised covert search of the men's luggage. The decision to arrest the men was taken by the police on the basis of the suspicious items they found and was not instigated by the Security Service.

Q.   The sharing of intelligence with foreign liaison services on suspected extremists is routine. There was nothing exceptional in the Security Service notifying the U.S. of the men's arrest and setting out its assessment of them. The telegram was correctly covered by a caveat prohibiting the U.S. authorities from taking action on the basis of the information it contained.

R.   In adding the caveat prohibiting action, the Security Service explicitly required that no action (such as arrests) should be taken on the basis of the intelligence contained in the telegrams. We have been told that the Security Service would fully expect such a caveat to be honoured by the U.S. agencies – this is fundamental to their intelligence-sharing relationship. We accept that the Security Service did not intend the men to be arrested.

S.   The Security Service and Foreign Office acted properly in seeking access to the detained British nationals, asking questions as to their treatment and, when they learnt of a possible rendition operation, protesting strongly.

T.   We note that eventually the British nationals were released, but are concerned that, contrary to the Vienna Convention on Consular Relations, access to the men was initially denied.

U.   This is the first case in which the U.S. agencies conducted a "Rendition to Detention" of individuals entirely unrelated to the conflict in Afghanistan. Given that there had been a gradual expansion of the rendition programme during 2002, it could reasonably have been expected that the net would widen still further and that

greater care could have been taken. We do, however, note that Agency priorities at the time were – rightly – focused on disrupting attacks rather than scrutinising American policy. We also accept that the Agencies could not have foreseen that the U.S. authorities would disregard the caveats placed on the intelligence, given that they had honoured the caveat system for the past 20 years.

V.     This case shows a lack of regard, on the part of the U.S., for UK concerns. Despite the Security Service prohibiting any action being taken as a result of its intelligence, the U.S. nonetheless planned to render the men to Guantánamo Bay. They then ignored the subsequent protests of both the Security Service and the Government. This has serious implications for the working of the relationship between the U.S. and UK intelligence and security agencies.

W.     Whilst we note that Bisher al-Rawi has now been released from Guantánamo Bay and that el-Banna has been cleared for release, we nevertheless recommend that the UK Government ensures that the details of suspicious items found during the Gatwick luggage search (including the police's final assessment of these items) are clarified with the U.S. authorities.

X.     We recognise the contribution of the Foreign and Commonwealth Office in securing Bisher al-Rawi's release. However, having seen the full facts of the case – and leaving aside the exact nature of al-Rawi's relationship with the Security Service – we consider that the Security Service should have informed Ministers about the case at the time, and are concerned that it took \*\*\* years, and a court case, to bring it to their attention.

Y.     What the rendition programme has shown is that in what it refers to as "the war on terror" the U.S. will take whatever action it deems necessary, within U.S. law, to protect its national security from those it considers to pose a serious threat. Although the U.S. may take note of UK protests and concerns, this does not appear materially to affect its strategy on rendition.

Z.     It is to the credit of our Agencies that they have now managed to adapt their procedures to work round these problems and maintain the exchange of intelligence that is so critical to UK security.

AA. The Committee notes that the UK Agencies now have a policy in place to minimise the risk of their actions inadvertently leading to renditions, torture or cruel, inhuman or degrading treatment (CIDT). Where it is known that the consequences of dealing with a foreign liaison service will include torture or CIDT, the operation will not be authorised.

BB. In the cases we have reviewed, the Agencies have taken action consistent with the policy of minimising the risks of torture or CIDT (and therefore "Extraordinary

Rendition") based upon their knowledge and awareness of the CIA rendition programme at that time.

CC. Where, despite the use of caveats and assurances, there remains a real possibility that the actions of the Agencies will result in torture or mistreatment, we note that the current procedure requires that approval is sought from senior management or Ministers. We recommend that Ministerial approval should be sought in all such cases.

DD. The Committee considers that "secret detention", without legal or other representation, is of itself mistreatment. Where there is a real possibility of "Rendition to Detention" to a secret facility, even if it would be for a limited time, then approval must never be given.

EE. GCHQ has played no role in any U.S. renditions, whether "ordinary" or "extraordinary". Theoretically, given the close working relationship between GCHQ and the National Security Agency (NSA), GCHQ intelligence could have been passed from the NSA to the CIA and could have been used in a U.S. rendition operation. However, GCHQ's legal safeguards and the requirement for explicit permission to take action based on their intelligence provide a high level of confidence that their material has not been used for such operations.

FF. The use of UK airspace and airports by CIA-operated aircraft is not in doubt. There have been many allegations related to these flights but there have been no allegations, and we have seen no evidence, that suggest that any of these CIA flights have transferred detainees through UK airspace (other than two "Rendition to Justice" cases in 1998 which were approved by the UK Government following U.S. requests).

GG. It is alleged that, on up to four occasions since 9/11, aircraft that had previously conducted a rendition operation overseas transited UK airspace during their return journeys (without detainees on board). The Committee has not seen any evidence that might contradict the police assessment that there is no evidential basis on which a criminal inquiry into these flights could be launched.

HH. We consider that it would be unreasonable and impractical to check whether every aircraft transiting UK airspace might have been, at some point in the past, and without UK knowledge, involved in a possibly unlawful operation. We are satisfied that, where there is sufficient evidence of unlawful activity on board an aircraft in UK airspace, be it a rendition operation or otherwise, this would be investigated by the UK authorities.

II.    The system of flight plans and General Aviation Reports is outside the remit of this inquiry, although we are concerned that it appears to be systemically flawed. The Home Secretary has assured the Committee that the e-Borders and Border Management Programme (being introduced from 2008) will address our concerns relating to general aviation documentation and security risks. This would, however, be a matter for the Transport and Home Affairs Select Committees to review in greater depth, if they felt it merited it.

JJ.    The alleged use of military airfields in the UK by rendition flights has been investigated in response to our questions to the Prime Minister. We are satisfied that there is no evidence that U.S. rendition flights have used UK airspace (except the two cases in 1998 referred to earlier in this Report) and that there is no evidence of them having landed at UK military airfields.

# ANNEX A: OTHER INQUIRIES

203.  The Committee has considered reports already published, and we have spoken to a number of those involved in producing them. The Committee would like to thank these organisations for their contributions to our inquiry. We have addressed their concerns and questions in this Report, insofar as they fall within our remit.

### *All-Party Parliamentary Group on Extraordinary Rendition*[153]

204.  The UK All-Party Parliamentary Group (APPG) on Extraordinary Rendition was established by Andrew Tyrie, MP in December 2005.[154]

205.  The APPG has considered the issue of "Extraordinary Rendition", particularly involving the UK, and has concluded that the Government has not *"put in place a mechanism for ensuring that renditions do not take place in the future through UK airspace or territory"*.[155] In May 2007, the APPG recommended a number of measures which they argue will: safeguard the rights of persons being transferred; ensure that the UK acts in accordance with its domestic and international obligations; and ensure that there are adequate records of requests for permission to conduct renditions. They have suggested that these measures be implemented through legislative means. Mr Tyrie has also suggested that the UK Government should condemn the practice of "Extraordinary Rendition", as it has condemned the existence of the military detention facility at Guantánamo Bay.

206.  The APPG has taken a particular interest in the cases of Bisher al-Rawi, Jamil el-Banna and Binyam Mohamed al-Habashi, and has held information sessions with the families and lawyers of these men.

207.  On 27 April 2006, Mr Tyrie wrote to the Committee, setting out a number of questions that he felt the Committee should consider during the course of our inquiry. Whilst a number of these were outside the remit of this Report, others have been useful in framing some of our evidence sessions and are addressed in the body of our Report.

---

[153] *http://extraordinaryrendition.org/*

[154] *Mr Tyrie gave evidence to the Committee on 26 October 2006 and subsequently wrote to the Committee on 7 November 2006 summarising the findings of the APPG to date.*

[155] *Note to the Committee, available at http://extraordinaryrendition.org/*

## *Council of Europe*[156]

208.  The Parliamentary Assembly of the Council of Europe's Committee on Legal Affairs and Human Rights has been looking into allegations of "Extraordinary Rendition" since November 2005. It has described a global "spider's web" of alleged CIA flights. The Council of Europe concluded in its 12 June 2006 report that the *"intentional or grossly negligent collusion of the European partners"* has allowed the CIA to operate rendition flights in Europe and that Council of Europe Member States had not done enough to investigate this potential breach of fundamental human rights.

209.  The report condemns the U.S. for its programmes of rendition and secret detention, reports on ten cases of alleged unlawful rendition flights (17 individual detainees) and makes a number of recommendations to ensure the protection of human rights in the future. Insofar as they relate to the UK, and fall within the Committee's remit, these issues are addressed in this Report.

210.  The Council of Europe published a second report on 8 June 2007. In relation to the UK, the report criticises the UK for not *"independently or transparently inquiring into the allegations"* that the U.S. used Diego Garcia in the processing of detainees. This is not the case, and the issue is dealt with in paragraph 197.

## *European Parliament*[157]

211.  The European Parliament adopted the final report of the Temporary Committee on the alleged use of European countries by the CIA for the transportation and illegal detention of prisoners in February 2007.

212.  The Temporary Committee has gathered evidence from a wide range of sources, including alleged victims of CIA renditions and the former HM Ambassador to Uzbekistan, Craig Murray. They have also analysed flight logs and say that there have been at least 1,245 CIA-operated flights into European airspace or airports, and that, of these, there have been about 170 stopovers by CIA-operated aircraft at UK airports. These are not, however, all alleged to be rendition flights. The Temporary Committee cites only one rendition operation where the aircraft subsequently (without the detainees) flew to a UK airport.[158]

---

[156] *www.coe.int/*

[157] *www.europarl.europa.eu/comparl/tempcom/tdip/default_en.htm*

[158] *The case of Ahmed Agiza and Mohammed al-Zery was one of ten cases of "confirmed" rendition. TDIP Working Document No. 7, 16 November 2006.*

213. We note that there is no suggestion within the report that "Extraordinary Rendition" operations have transited UK territory or airspace with a detainee on board. This is consistent with our conclusion that there is no evidence of unlawful renditions through UK territory or airspace (see pages 57 to 63).

214. The Temporary Committee also condemns the "Extraordinary Rendition" of Bisher al-Rawi and Jamil el-Banna from The Gambia. The report suggests that al-Rawi and el-Banna's transfer *"was facilitated by partly erroneous information supplied by the UK security service"*. In the case of Binyam Mohamed al-Habashi, the report concludes that *"some of the questions put by the Moroccan officials to Binyam Mohamed appear to have been inspired by information supplied by the UK"*. In the case of Martin Mubanga, the Temporary Committee *"regrets the fact that Martin Mubanga was interrogated by British officials in Guantánamo where he was detained and tortured for four years"*. We deal with these allegations in the section of this Report entitled "Specific Cases" (pages 31 to 46).

215. Having considered the Temporary Committee's report, it appears that there is no real evidence to substantiate their allegations.

### Amnesty International[159]

216. The human rights organisation Amnesty International has published three reports looking at rendition.[160] They have reported that there have been over 200 CIA flights involving UK airports. Again, it is not alleged that these were all rendition flights. They cite three where the flights are suspected of returning from a rendition operation (without detainees aboard).

217. Amnesty wrote to the Prime Minister in January 2006 to express their concern at the possible use of UK airspace and airports by CIA rendition operations. They have recommended that the UK Government conducts an *"immediate, thorough and independent investigation"* into the allegations of "Extraordinary Rendition" and that the Government *"put in place all necessary measures to prevent any action or omission which may, wittingly or unwittingly, have resulted in [unlawful rendition]"*.

---

[159] *www.amnesty.org.uk/*

[160] United States of America: Below the radar: Secret flights to torture and 'disappearance';
Partners in crime: Europe's role in US renditions;
United Kingdom: Human rights: A broken promise.

### *Reprieve*[161]

218. Reprieve is a campaigning and investigating charity founded by the human rights lawyer Clive Stafford Smith. It has been involved in cases of individuals subject to the U.S. programme of renditions and those detained in Guantánamo Bay.

219. In particular, Reprieve has represented the interests of Binyam Mohamed al-Habashi, Bisher al-Rawi and Jamil el-Banna. Reprieve has provided a submission of evidence to the Committee on these men, suggesting that we examine possible illegal activity and complicity on the part of the British intelligence and security Agencies. The Committee has noted Reprieve's submission, and the Committee's findings in these cases can be found in pages 33 to 46.

### *Liberty*[162]

220. Liberty is a UK-based human rights and civil liberties organisation. It has taken a particular interest in alleged rendition flights through the UK, and has called for a fully resourced, independent investigation into "Extraordinary Rendition".[163]

221. In November 2005, Liberty asked the police to investigate rendition allegations. They also lobbied Government for amendments to the Civil Aviation Bill and the Police and Justice Bill to ensure that action can be taken when flights transiting the UK are suspected of involvement in "Extraordinary Rendition".

222. The subsequent police examination of evidence and the ability of the UK authorities to investigate flights suspected of involvement in rendition operations are both considered in the main body of this Report (pages 57 to 63), although it should be noted that they would not normally fall within the remit of this Committee.

---

[161] *www.reprieve.org.uk/*

[162] *www.liberty-human-rights.org.uk/*

[163] *Shami Chakrabarti, Director of Liberty, wrote to the Committee on 10 October 2006 and subsequently gave evidence to the Committee on 17 October 2006. A further letter was received on 15 June 2007.*

# ANNEX B: LIST OF WITNESSES

The Committee took evidence from the following witnesses, some of whom gave evidence on more than one occasion, and some of whom gave evidence on matters other than rendition:

## *Ministers*

The Rt. Hon. Margaret Beckett, MP – Foreign Secretary

## *Officials*

CABINET OFFICE
Sir Richard Mottram GCB – Permanent Secretary, Intelligence, Security and Resilience

GOVERNMENT COMMUNICATIONS HEADQUARTERS
Sir David Pepper KCMG – Director, GCHQ
Other officials

SECRET INTELLIGENCE SERVICE
Sir John Scarlett KCMG OBE – Chief, SIS
Other officials

SECURITY SERVICE
Hon. Dame Eliza Manningham-Buller DCB – Director General, Security Service (retired 20 April 2007)
Mr Jonathan Evans – Deputy Director General, Security Service (Director General from 21 April 2007)
Other officials

FOREIGN AND COMMONWEALTH OFFICE
Mr David Richmond CMG – Director General, Defence and Intelligence
Other officials

MINISTRY OF DEFENCE
Air Marshal Stuart Peach CBE – Chief of Defence Intelligence

POLICE
Chief Constable Michael Todd – Greater Manchester Police
Detective Superintendent John Kelly – Greater Manchester Police

## Non-Government Witnesses

All-Party Parliamentary Group on Extraordinary Rendition – Mr Andrew Tyrie, MP (Chair)

Amnesty International – Ms Anne Fitzgerald (Senior Adviser), Mr Livio Zilli (Researcher)

Birnberg Peirce (solicitors) – Ms Gareth Peirce

Liberty – Ms Shami Chakrabarti (Director), Mr Jago Russell (Policy Officer)

Journalists – Names withheld at request of witnesses

Printed in the UK for The Stationery Office Limited
on behalf of the Controller of Her Majesty's Stationery Office
5616160   07/07

Printed on paper containing 75% recycled fibre content minimum.



Published by TSO (The Stationery Office) and available from:

**Online**
www.tsoshop.co.uk

**Mail, Telephone, Fax & E-mail**
TSO
PO Box 29, Norwich NR3 1GN
Telephone orders/General enquiries: 0870 600 5522
Order through the Parliamentary Hotline Lo-call: 0845 7 023474
Fax orders: 0870 600 5533
E-mail: customer.services@tso.co.uk
Textphone: 0870 240 3701

**TSO Shops**
16 Arthur Street, Belfast BT1 4GD
028 9023 8451 Fax 028 9023 5401
71 Lothian Road, Edinburgh EH3 9AZ
0870 606 5566 Fax 0870 606 5588

**The Parliamentary Bookshop**
12 Bridge Street, Parliament Square,
London SW1A 2JX

**TSO@Blackwell and other Accredited Agents**



ISBN 978-0-10-171712-0

9 780101 717120

# EXHIBIT F

**Flight logs related to the rendition of BISHER AL-RAWI and JAMIL EL-BANNA**

| Registration Identifier or Call sign (N_Number) | Airport of Departure (ADEP) | ADEP Name | Airport of Destination (ADES) | ADES Name | Date | Take-off Time (ATOT) DD,HH:MI | Arrival Time (ATA) | Aircraft Type | Registered User or Operator Name |
|---|---|---|---|---|---|---|---|---|---|
| N379P | KIAD | WASHINGTON | GBYD | BANJUL | 08/12/2002 | 08, 13:15 | 20:19 | GLF5 | PREMIER EXECUTIVE TR |
| N379P | GBYD | BANJUL | HECA | CAIRO | 09/12/2002 | 08, 21:45 | 03:45 | GLF5 | PREMIER EXECUTIVE TR |
| N379P | HECA | CAIRO | OAKB | KABUL / KHWADJA RAWASH | 09/12/2002 | 09, 04:45 | 09:04 | GLF5 | PREMIER EXECUTIVE TR |
| N379P | OAKB | KABUL / KHWADJA RAWASH | UTTT | TASHKENT | > no data available < | > no data available < | > no data available < | GLF5 | PREMIER EXECUTIVE TR |
| N379P | UTTT | TASHKENT | EDDF | FRANKFURT MAIN | 10/12/2002 | 10, 06:52 | 13:01 | GLF5 | PREMIER EXECUTIVE TR |
| N379P | EDDF | FRANKFURT MAIN | GMME | RABAT/SALE | 11/12/2002 | 11, 23:09 | 01:55 | GLF5 | PREMIER EXECUTIVE TR |
| N379P | GMME | RABAT/SALE | OAKB | KABUL / KHWADJA RAWASH | 12/12/2002 | 12, 03:56 | 11:03 | GLF5 | PREMIER EXECUTIVE TR |
| N379P | | > no data available < | | > no data available < | | | | | |
| N379P | KIAD | WASHINGTON | EDDF | FRANKFURT MAIN | 21/12/2002 | 21, 01:49 | 08:47 | GLF5 | PREMIER EXECUTIVE TR |

# EUROPEAN PARLIAMENT



*2004*                                    *2009*

*Temporary Committee on the alleged use of European countries by the CIA for the transport and illegal detention of prisoners*

16.11.2006

# WORKING DOCUMENT No 7

on 'extraordinary renditions'

Temporary Committee on the alleged use of European countries by the CIA for the transport and illegal detention of prisoners

Rapporteur: Giovanni Claudio Fava

**EN**                                                              **EN**

## 6) BISHER AL-RAWI AND JAMIL EL-BANNA

Bisher Al-Rawi is an Iraqi citizen residing legally in the United Kingdom, and Jamil El-Banna is a Jordanian citizen who was granted asylum and a residence permit by the British authorities in 1997.

On 1 November 2002 Al-Rawi and El-Banna were preparing to travel to the Gambia when they were arrested by the police at Gatwick Airport because their luggage contained a battery charger, which later turned out to be harmless. They were released on 4 November 2002. On 8 November El-Banna and Al-Rawi arrived at Banjul Airport; they were with Bisher's brother Wahab El-Rawi and Abdullah El Janoudi when they were all arrested by the Gambian authorities. They were interrogated for a month by American agents. Bisher Al-Rawi and El-Banna were then taken by the CIA to Afghanistan, first to the infamous 'Dark Prison' in Kabul, then to Bagram Air Base, and were ultimately moved to Guantanamo in January 2003. Over this whole period they were interrogated by American agents, who told them that the British authorities were behind the actions that had led to their arrest. The temporary committee has had access to telegrams sent by the British intelligence services to unspecified foreign agencies giving very precise details of these two victims of 'extraordinary rendition'.

An official delegation from the temporary committee met with Bisher Al-Rawi's brother Wahab Al-Rawi and the two victims' lawyers, Clive Stafford Smith, Gareth Peirce and Brent Mickum, on 4 October 2006 in London.

According to the testimonies of Al-Rawi and El-Banna's lawyers, Clive Stafford Smith, Gareth Peirce and Brent Mickum, and to other sources, Al-Rawi and El-Banna were taken from Banjul (in the Gambia) to Kabul on 9 December 2002.

Eurocontrol documents contain matching flight plan and/or CRCO data regarding the Gulfstream V with the registration number N379P (the plane used to take El-Zari and Agiza from Stockholm to Cairo, Elkassim Britel from Pakistan to Morocco and Binyam Mohammed from Pakistan to Morocco) for the following flights:

- from Washington to Banjul on 8 December 2002 (departure: 13h15, arrival: 20h19);
- **from Banjul to Cairo on 8 December 2002 (departure: 21h45, arrival: 03h45 on 9 December 2002);**
- **from Cairo to Kabul on 9 December 2002 (departure: 04h45, arrival: 09h04);**
- from Tashkent (Uzbekistan) to Frankfurt am Main on 10 December 2002 (departure: 06h52, arrival: 13h01);
- from Frankfurt am Main to Rabat on 11 December 2002 (departure: 23h09, arrival: 01h55 on 2 December);
- from Rabat to Kabul on 12 December 2002 (departure: 03h56, arrival: 11h05).

**EN**

The airline referred to is: PREMIER EXECUTIVE TRANSPORT SERVICE.[13]

No reference to a flight (or flights) between Kabul and Tashkent on 9 or 10 December 2002 was found in the documents provided by Eurocontrol, since Eurocontrol's remit does not cover flights outside Europe. Similarly, there is no record of the aircraft after it landed at Kabul. The same plane left Washington for Frankfurt am Main on 21 December 2002.

---

[13] See working document No. 8. PE 380.984.

**EN**

# EXHIBIT G

```
=========================================================

>>> From file : 021208.an1_input_manager.log.pif2op2.wri

=========================================================

Date is            : 021208075227

Originat. Network : AFTN

Originat. Address : KSFOXLDI

Net Message Numbr :  6175

Time Stamp         :     080752

Addresses          :

LFPYIFPU

Message is         :

(FPL-N379P-IG

-GLF5/M-SXDGHRWY/S

-KIAD1300

-N0483F370 DCT OTT J42 OOD/N0485F410 J42 RBV J62 ACK DCT

 DOVEY/M085F410 DCT 39N060W 37N050W 33N040W/M085F450

 25N030W/N0481F450 DCT CVS UR976 LUMPO UR976F YF UB600 ND DCT

-GBYD0704 GOOY

-EET/KZNY0021 KZBW0028 KZNY0054 KZNY0100 60W0138 50W0230 LPPO0331

 30W0456 GVSC0518 GOOO0629

REG/N379P SEL/BCPR

RMK/STS/AFTMEXEMPTAPPROVED

US DEPARTMENT OF STATE

CAPE VERDE PMT 070744/SENEGAL PMT 070746

GAMBIA PMT GCN 075/02

E/1019 P/10 R/UV S/M J/L D/2 26 C ORANGE

A/WHT

C/DINEEN)

--------------------------------------------------
```

```
--------------------------------------------------

Date is            : 021208194235

Originat. Network : AFTN

Originat. Address : KSFOXLDI

Net Message Numbr :  19725

Time Stamp         :      081942

Addresses          :

LFPYIFPU

Message is         :

(FPL-N379P-IG

-GLF5/M-SDGHRWY/S

-GBYD2130

-N0484F410 DCT YF UM725 TIO UG864 ZIRAR/N0484F450 UG864

 TBS/N0486F450 UV783 MON UP868 OLIKI UM728 SALUN/N0484F450 A145

 BRN W725 NANVO/N0480F430 W725 DBA W727 FYM A411 CVO DCT

-HECA0600 HEAX

-EET/DAAA0154 DTTC0327 DAAA0329 DTTC0332 LMMM0349 LGGG0450

 HECC0458

 REG/N379P SEL/BCPR

 RMK/SENEGAL REF070746 / MAURITANIA NOTIF

 MALI NOTIF / ALGERIA 4364/DACM/SDTA/BS/02

 TUNISIA REF081236 / EGYPT EJA12314

 STS/ATFMEXEMPTAPPROVED / STS/STATE

 E/0916 P/10 R/UV S/M J/L D/2 26 C ORANGE

 A/WHT

 C/DINEEN)

--------------------------------------------------
```

```
--------------------------------------------------
Date is          : 021208224545
Originat. Network : AFTN
Originat. Address : KSFOXLDI
Net Message Numbr : 22256
Time Stamp       :    082245
Addresses        :

LFPYIFPU

Message is       :

(FPL-N379P-IG

-GLF5/M-SDGHRWY/S

-HECA0430

-N0488F390 A16 MILAD W11 LAKTO/N0489F390 UW11 VELOX UR18

 ALSUS/N0489F410 UM978 NIKAS/N0489F410 R785 BAN/N0487F450 W6

 ALE/N0488F430 B544 TUSYR/N0488F430 VB36 GAZ/N0488F450 UVW701 ERZ

 UB374 INDUR/N0488F450 UB374 KEDAB B111 LUSAL UB449

 DUKAN/K0900S1210 B449 RJ A240 MAMED/K0895S1410 A240 AFGAN L750

 RANAH/N0480F450 DCT VELDT DCT CC V338

-OAKB0419 OPRN

-EET/LCCC0025 OSTT0052 LTAA0107 UGEE0149 UBBB0201 UTAK0228

 UTAA0249 OAKX0336

 REG/N379P SEL/BCPR

 RMK/CYPRUS APVD / SYRIA DGCA7442

 TURKEY E/2082 / AZERBAIJAN APVD

 TURKMENISTAN GC/94/2661/071202

 STS/ATFMEXEMPTAPPROVED / STS/STATE

 E/0746 P/10 R/UV S/M J/L D/2 26 C ORANGE

 A/WHT

 C/DINEEN)

--------------------------------------------------
```

# EXHIBIT H



# Intelligence and Security Committee

## Rendition

Chairman:
The Rt. Hon. Paul Murphy, MP

Cm 7171

£18.00



# Intelligence and Security Committee

# Rendition

Chairman:
The Rt. Hon. Paul Murphy, MP

Presented to Parliament by the Prime Minister
by Command of Her Majesty
JULY 2007

Cm 7171     £18.00

Gambian authorities searched the men's baggage and discovered *"a suspicious collection of items"*.[98] They arrested all five men.[99] The Security Service assessment was that *"these items may well have formed the basis for their detention"*.[100]

129. It seems to us that there are a number of possible reasons why the men were initially arrested. It is possible that the Gambian police or border authorities at Banjul airport decided to search the men based on a "hunch" – something that happens routinely at customs and immigration points around the world. It is also possible that the Gambians broke the caveats on the intelligence shared with them and chose to take executive action. Another possibility is that the U.S. authorities neglected to pass on the caveats or instigated the men's arrest themselves. Whatever the reason for the men's arrest, it is clear that it was not at the instigation of the Security Service.

130. The Security Service was informed of the arrests on 10 November and, the following day, sent a telegram to notify SIS and the FCO of this and to provide background to the case. On 14 November, the Deputy Director General of the Security Service wrote to the Home Office and MPSB in similar terms.

131. Initially, the remaining men were detained by the Gambian authorities but they were subsequently transferred into American custody.[101] During the men's detention, the Security Service received information about the progress of the investigation into the men's intended activities, although they were not told where the men were being held.[102]

132. In late November, the Security Service was informed by the U.S. authorities that they intended to conduct what we have defined as a "Rendition to Detention" operation, to transfer the four men from The Gambia to Bagram Air Base in Afghanistan. The Service registered strong concerns, both orally and in writing, at this suggestion and alerted the FCO.

---

[98] *"… the items included a solar panel for a satellite phone, several thousand dollars worth of outdoor equipment, a repair kit for wetsuits, mountain-climbing gear and a large plastic bag full of hand-soldered electrical components." Open statement of Security Service Witness "A", R. (Al-Rawi & Others) v. Secretary of State for Foreign and Commonwealth Affairs & Another [2006].*

[99] *We understand that Omar Omari was released on 9 November, the day after the men's arrest at Banjul airport.*

[100] *Open statement of Security Service Witness "A", dated 14 March 2006, R. (Al-Rawi & Others) v. Secretary of State for Foreign and Commonwealth Affairs & Another [2006].*

[101] *It is unclear precisely at what stage the men were transferred into U.S. custody.*

[102] *Open statement of Security Service Witness "A", dated 14 March 2006, R. (Al-Rawi & Others) v. Secretary of State for Foreign and Commonwealth Affairs & Another [2006].*

# EXHIBIT I



# Intelligence and Security Committee

## Rendition

Chairman:

The Rt. Hon. Paul Murphy, MP

Cm 7171

£18.00



# Intelligence and Security Committee

# Rendition

Chairman:
The Rt. Hon. Paul Murphy, MP

Presented to Parliament by the Prime Minister
by Command of Her Majesty
JULY 2007

Cm 7171

£18.00

133. The Deputy High Commissioner and the High Commissioner to The Gambia made representations to the U.S. Ambassador in Banjul from 27 November.[103] In Washington, the Deputy Head of Mission made representations to the U.S. Department of State and the National Security Council.[104] They registered strong objections to the transfer of the men and sought clarification of their whereabouts and U.S. intentions. The Committee was told:

> *In response to our representations, the U.S. confirmed the detention of the individuals in question, but declined to give their precise location in Gambia. The U.S. also stated that they believed there were good grounds for the individuals' detention and told us they were being well treated.*[105]

134. The FCO sought consular access to the two British nationals (el-Janoudi and Wahab al-Rawi), but this was refused despite repeated requests.[106] Eventually, the two British nationals were released and returned to the UK on 4 and 5 December 2002.

**S. The Security Service and Foreign Office acted properly in seeking access to the detained British nationals, asking questions as to their treatment and, when they learnt of a possible rendition operation, protesting strongly.**

**T. We note that eventually the British nationals were released, but are concerned that, contrary to the Vienna Convention on Consular Relations, access to the men was initially denied.**

135. On 6 December 2002, the Security Service sent a telegram to the U.S. authorities which stated that HMG *"would not seek to extend consular protection to non-British nationals"*. We have been told that under international law the FCO could not provide consular protection to Bisher al-Rawi and el-Banna. In a number of the cases we have reviewed, there is an issue related to consular protection afforded to British residents or those with dual nationality.[107] This is a matter beyond the remit of the Committee. We note, however, the report of the Foreign Affairs Committee on their visit to Guantánamo Bay which concludes that the established policy of not accepting consular responsibility for non-British nationals is correct.

---

[103] *The High Commissioner visited the U.S. Ambassador in person, on at least two occasions.*

[104] *The Deputy Head of Mission in Washington spoke directly to senior officials at the State Department and the National Security Council.*

[105] *Letter from the Foreign Secretary to the Committee, 12 January 2007.*

[106] *Consular access was sought from 27 November by way of a formal written request to the Gambian authorities and as part of representations made to the U.S. Ambassador in Banjul.*

[107] *The legal aspects of consular access are described in paragraph 17.*

# EXHIBIT J



INTERNATIONAL COMMITTEE OF THE RED CROSS
REGIONAL DELEGATION FOR
UNITED STATES AND CANADA

# ICRC

## ATTESTATION

## CONFIRMING THAT

| | |
|---|---|
| Mr | : BISHER AL RAWI |
| ICRC nr | : ABZ-001469 |
| Father | : AMIN |
| Born in | : 1967 |
| Nationality | : Iraqi |

Has been visited and registered by ICRC delegates at the Military Camp, Bagram, Afghanistan on 04 January 2003.

He was transferred on 07 February 2003 by the US detaining authorities in the Military Camp, Guantanamo Bay, Cuba.

Starting from 12 March 2003, ICRC delegates have regularly visited him in Guantanamo Bay, Cuba, under US custody.

He was repatriated to United Kingdom on 30 March 2007.

Ma........ QED
Protection Coordinator
ICRC Washington

Washington, 04 June 2007

1100 Connecticut Ave, N.W., Suite 500, Washington, DC 20036
Tel: (202) 587-4600 • Fax: (202) 587-4696

# EXHIBIT K

THIS DOCUMENT IS ATTORNEY-CLIENT PRIVILEGED.  IF IT IS RECEIVED IN ERROR BY SOMEONE OTHER THAN THE INTENDED RECIPIENT, IT SHOULD BE IMMEDIATELY DESTROYED AND NOTICE GIVEN TO THE SENDER.

"I am taking this opportunity, whenever I can, to write to you.  These are very difficult times, and my emotions are shifting and changing rapidly. I am thinking about anything and everything. The evenings and nights are no longer times for sleep for me. I am always wide awake going through memories, some happy, some sad. It all flows back to this dismal and depressing reality. (I really don't wish to sound so down, I am sorry.) This new reality, this new existence, is the food strike. It has made me live in the shadows, where one can't feel quite alive, but one does not die. A very strange existence.

"I think it is only now that I can claim that I've moved a step closer to understanding the feelings and emotions of the poor and millions of human beings who are starving through the world. Pictures in my mind of the starving men, women and children, which I have seen through the years, now all make sense. Now I understand what deprivation really means, why people fight and kill each other over food. Despite my weakness and the helplessness that I feel during the days, I am determined to survive this and think this is my biggest struggle in this jail. I hope I'll further discover myself. Just like this whole experience has been a self-discovery full of pain and sadness, full of desperation and hope. I pray to God that this last episode will not break me, but will help me be the best I can both here and when I get out. It'll be a valid and precious asset that will always be at my side."