STEVEN M. WATT* swatt@aclu.org
BEN WIZNER (SBN 215724) bwizner@aclu.org
JAMEEL JAFFER* jjaffer@aclu.org
STEVEN R. SHAPIRO* sshapiro@aclu.org
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10014
Tel. 212.549-2500 / Fax 212.549.2651

ANN BRICK (SBN 65296) abrick@aclunc.org
ACLU FOUNDATION OF
NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Tel. 415.621.2493 / Fax 415.255.1478

Additional Counsel Listed on Next Page

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| **BINYAM MOHAMED;<br>ABOU ELKASSIM BRITEL;<br>AHMED AGIZA;<br>MOHAMED FARAG AHMAD BASHMILAH;<br>BISHER AL-RAWI,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**JEPPESEN DATAPLAN, INC.,**<br><br>**Defendant.** | **Civil Action No. 5:07-cv-02798 (JW)**<br><br>**DECLARATION OF ABOU ELKASSIM BRITEL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO THE UNITED STATES' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT** |

CLIVE STAFFORD SMITH*† clivess@mac.com
ZACHARY KATZNELSON† (SBN 209489) zachary@reprieve.org.uk
REPRIEVE
PO Box 52742
London EC4P 4WS
England
Tel. +44 (0)207 353 4640 / Fax +44 (0)207 353 4641

PAUL HOFFMAN (SBN 71244) hoffpaul@aol.com
SCHONBRUN DESIMONE SEPLOW
HARRIS & HOFFMAN LLP
732 Ocean Front Walk, Suite 100
Venice, CA 90291
Tel 310.999.7040, ext. 4 / Fax 310.999.7040

HOPE METCALF* hope.metcalf@yale.edu
NATIONAL LITIGATION PROJECT
ALLARD K. LOWENSTEIN INTERNATIONAL
HUMAN RIGHTS CLINIC
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06520
Tel. 203.432.9404 / Fax 203.432.9128

MARGARET L. SATTERTHWAITE*++ satterth@juris.law.nyu.edu
INTERNATIONAL HUMAN RIGHTS CLINIC
WASHINGTON SQUARE LEGAL SERVICES, INC.
NEW YORK UNIVERSITY SCHOOL OF LAW
245 Sullivan Street
New York, NY 10012
Tel. 212-998-6657 / Fax 212-995-4031

**Attorneys for Plaintiffs BINYAM MOHAMED, ABOU ELKASSIM BRITEL, AHMED AGIZA, MOHAMED FARAG AHMAD BASHMILAH, and BISHER AL-RAWI**
*** Admitted Pro Hac Vice**
**† Attorneys for and on behalf of Plaintiff BINYAM MOHAMED only**
**++ Attorney for and on behalf of Plaintiff MOHAMED FARAG AHMAD BASHMILAH only**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTHERN CALIFORNIA
DIVISION OF SAN JOSE**

| | |
|---|---|
| **BINYAM MOHAMED**<br>**ABOU ELKASSIM BRITEL**<br>**AHMED AGIZA**<br>**MOHAMED FARAG AHMAD BASHMILAH**<br>**BISHER AL-RAWI**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**JEPPESEN DATAPLAN, Inc.**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) **Civil Action No. 5:07-cv-02798 (JW)**<br>)<br>)<br>)<br>)<br>)<br>) |

**DECLARATION OF ABOU ELKASSIM BRITEL IN SUPPORT OF PLAINTIFFS OPPOSITION TO THE UNITED STATES' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGEMENT**

I, **ABOU ELKASSIM BRITEL**, of Bergamo, Italy under penalty of perjury under the laws of the United States of America, declare as follows, pursuant to 28 U.S.C. § 1746:

1. I was born in Casablanca, Morocco on April 18, 1967. I immigrated to Italy from Morocco in 1989. I married my wife, an Italian citizen, in 1995. In 1999 I became a naturalized Italian Citizen.
2. Upon my arrival in Italy I worked at a poultry shop and in January 1996 qualified as an electrician. In 2000 my wife and I began translating Islamic books and texts from Arabic into Italian. We set up a webpage "Islamiqra" where we published these translations as well as topical commentaries aimed at supporting the understanding and spread of Islam.
3. I traveled to Iran on June 17, 2001 to seek financing to support our translation work and to conduct further research on Islamic issues. From there I traveled around the Middle East and Pakistan for the same professional reasons.

4. On March 10, 2002 I was apprehended by agents of the Pakistani police on immigration charges and was detained and interrogated by them at a facility in Lahore, Pakistan. I repeatedly asserted my Italian citizenship and asked to be afforded legal representation and assistance from the Italian Embassy. I was denied those most basic requests.

5. Throughout my time in Pakistani custody I was physically and psychologically tortured. They accused me of being a "terrorist fighter." I was beaten severely, sometimes with a cricket bat, deprived of sleep, my hands and feet were bound and I was hung from the walls or ceiling of my cell for extensive periods of time. I was denied access to a toilet, my interrogators told me they would harm my family, and I was told that worse torture and death were to come.

6. By April, 2002, following weeks of torture, I gave in to my interrogators and falsely confessed that I was a terrorist. I hoped this would end my pain.

7. Soon after my "confession" I was brought before U.S. officials who fingerprinted and photographed me. I was told that if I did not cooperate my Pakistani interrogators would kill me.

8. May 5, 2002 I was transferred from Lahore to the Pakistani intelligence services headquarters in Islamabad. I was, on four separate occasions, blindfolded and taken from this facility to a house where I was interrogated by U.S. intelligence agents. These agents continually asked me about my alleged association with Osama Bin Laden and promised me money if I would give them information about Osama Bin Laden. I again asked to contact the Italian Embassy and was again denied this request

9. At my final interrogation in Pakistan I was questioned by a U.S. official named "David Morgan." Mr. Morgan told me that he was charged with writing a profile of me for "Washington." Mr. Morgan asked me a number of questions about my life. I asked Mr. Morgan if I could speak with the Italian Embassy, again I was denied this request. Mr. Morgan did tell me, however, that I could meet with the Moroccan ambassador, but this meeting never occurred.

10. Shortly after this last interrogation I was told by one of my captors that I would soon be released and returned to Italy.

11. Instead, on the night of May 24, 2002, I was handcuffed, blindfolded, and taken by car to an airport. About one half hour thereafter, I was grabbed around the neck from behind so tightly I thought I would suffocate. I was forced into what seemed to me to be a small bathroom where my clothes were sliced off me. My blindfold was then removed and I saw four or five men dressed in black from head to toe, with only their eyes showing. I was photographed, had a diaper put on me, and was dressed in a torn t-shirt. I was again blindfolded and placed in a metallic slip and chained to the shackles that bound my hands and feet.

12. I was then dragged on board a small aircraft and forced onto my back. Shortly thereafter, I heard a second prisoner being brought on board. I could tell by his accent that he was not Moroccan. I believe that he was a prisoner because he sounded wounded or ill and expressed pain and discomfort throughout the duration of the flight. I was instructed not to move, and when I did I was hit or kicked. My back began to hurt during the flight and I asked for permission to change positions. My request was refused and instead I had my mouth taped shut. I was also denied use of the bathroom for the duration of the nine hour flight. Upon landing, my handcuffs were removed and were replaced with tight plastic bands.

13. Although, when in Pakistan, I had been told by my captors that I would soon be released and returned to Italy, the aircraft I was on landed in Rabat, Morocco. After my arrival here, U.S. officials transferred me to the custody of the Moroccan intelligence services and I was taken by them to the notorious Témara prison.

14. Flight records show that on May 23, 2002 a Gulfstream V aircraft, registered with the FAA as N379P, departed Washington, D.C. at 12:45 a.m. and arrived at Frankfort, Germany at 7:39 a.m. before taking off at 10:08 a.m. that same morning for Dubai, United Arab Emirates, arriving there at 4:10 p.m. At 9.05 a.m. the next day, May 24, the same aircraft departed from Islamabad at 9.05 p.m. and arrived in Rabat, Morocco at 7.03 a.m. the following day, May 25. Less than an hour later, at 7.58 a.m. the aircraft departed Rabat for Porto, Portugal, where it remained overnight before departing Porto at 8 a.m. the next morning for Washington D.C., arriving back there

at 3.09 p.m. on May 26, 2002. Attached hereto as Exhibit A is a true and correct copy of the relevant flight records.

15. The originator code on the flight plans for this itinerary and submitted to Eurocontrol, the inter-governmental organization responsible for air traffic control through European airspace, is noted as KSFOXLDI, a code specific to Jeppesen Dataplan. Attached hereto as Exhibit B is a true and correct copy of the local "data string" for the relevant flight plan.

16. I would spend the next eight and one half months at Témara completely cut off from the outside world. I was denied access to my family, friends, counsel, and the Italian consulate, and not once did I leave the four walls of the prison. I was held in complete isolation and deprived of sleep and adequate food. I was interrogated about my private life, the people I associated with in Italy, and pressured to act an informant for Moroccan intelligence.

17. During these interrogations I was handcuffed, blindfolded, and severely beaten on all parts of my body. I was threatened with worse torture, including having my genitals cut off and "bottle torture" (a torture technique whereby a bottle is forced into the victim's anus). Additionally, my interrogators threatened to harm my wife and my sisters who lived in Morocco.

18. On February 11, 2003, I was released from Témara, without explanation or charges having been brought against me.

19. On February 26, 2003 my wife flew to Morocco and I met with her for the first time in twenty months. As a result of the torture I had been subjected to, I was suffering from dizziness, chronic diarrhea. My left eye and ear had also been permanently damaged. Large portions of my skin had turned black and blue and no hair grew in these areas.

20. After my release I was continually harassed and threatened by agents of the Moroccan intelligence service. They insisted that I tell nobody about my time at Témara. Additionally, an officer visited me at least once a week and pressure me to cooperate with Moroccan intelligence upon my eventual return to Italy and to act as an informant for them.

21. Fearing for my own safety and that of my family I immediately attempted to return home to Italy. However, I was unable to do so at first because my passport had been confiscated in Pakistan.

22. On May 12, 2003 I finally received travel documentation from the Italian embassy in Rabat which permitted me to return home to Italy. I did not want to fly home without an escort, so I decided instead to travel over-land through Melilla, a town on the border between Morocco and Spain. My wife had already purchased her plane ticket home to Italy so we decided that she would begin her flight home only once she had heard that I had safely made it out of Morocco.

23. On May 16, 2003, at approximately10.00pm, bombs exploded in Casablanca. Moroccan authorities blamed "terrorists" for the attack. Earlier that same day at around 1.30 p.m. before the bombings occurred, I was arrested and detained at the Moroccan border for six hours without any explanation. I was handcuffed, forced into a car, and returned once more to the secret prison, Témara.

24. In Témara I was again held incommunicado, this time for four months. I was held under atrocious conditions and was forced to sign a confession I was never permitted to read.

25. On September 16, 2003, I was transferred to the Salè prison.

26. On October 3, 2003, after a hastily convened trial, I stood trial on the charge of "gathering an armed band aimed at planning and carrying our terrorist acts" in Morocco. I was convicted and sentenced to 15 years imprisonment for this offense. My conviction was based in part on the confession I had signed while being tortured at Témara. On appeal, my sentence was subsequently reduced to 9 years. An observer from the Italian embassy who attended my trial reported that the procedures followed were fundamentally flawed and failed to comport with universally accepted fair trial standards.

27. On September 29, 2006, following a six-year investigation in Italy into my alleged involvement in terrorist activities, the examining judge there dismissed my case. He cited a complete lack of evidence linking me with *any* criminal, let alone terrorist-

related, activity. Attached hereto as Exhibit C is a true and correct copy of relevant paragraphs of a resolution passed by the European Parliament noting this fact.

28. In January 2007, 62 members of the Italian Parliament, 25 Italian Senators and 12 Members of the European Parliament supported a request calling on Moroccan authorities to pardon me, and, in addition Italy petitioned the King of Morocco to have me pardoned, released from prison, and returned to my home, Italy. Despite this, I remain incarcerated in Ain Bourja prison in Casablanca.

I hereby declare under penalty of perjury that the foregoing is true and correct. Executed this 02 day of 11 2007.

[signature]

Abou Elkassim Britel