# EXHIBIT A



Reprieve
PO Box 52742
London
EC4P 4WS

Tel: 020 7353 4640
Fax: 020 7353 4641
Email: info@reprieve.org.uk
Website: www.reprieve.org.uk

Memo re:    **FBI involvement in the abuse of Binyam Mohammed (al Habashi)**
Date:    August 24th, 2005
From:    Clive A. Stafford Smith

Below is a memo about Binyam Mohammed. He has authorized me to reveal this information, as he wants a complete investigation to prevent this kind of thing happening again to someone else.

The FBI involvement allegedly began in Pakistan as set out in the memo. The media has got the flight logs proving that Binyam was flown from Pakistan to Morocco and back to Afghanistan on the days he had previously identified. We have no specific evidence to date that the FBI was directly involved in Morocco, although the evidence from the U.S. end demonstrates that they were involved in the U.S. investigation while the torture was happening in Morocco.

In terms of physical evidence, presumably the photographs of his abuse exist somewhere, although I would have no idea where these might still be stored.

You will obviously be familiar with the Jose Padilla case. The fact that evidence was being tortured out of Binyam for use in the Padilla investigation raises moral and ethical problems, in addition to everything else.

The named FBI agent also actively misled the family about where their kid brother was (it would arguably have been reasonable to refuse to disclose information, but the active falsehoods caused the family great trauma).

Reprieve is a UK registered charity (1080147)
Patrons: Alan Bennett, Sir John Mortimer, Marina Warner, Charles Wheeler
Founder: Clive Stafford Smith

*Note: This memo is preliminary since I have not had nearly
enough time to complete going through Binyam's experiences.
This is derived directly from materials that have been deemed
unclassified, and contains no classified information.*

Binyam Mohammed was born on July 24, 1978, in Ethiopia. His father is Ahmed
Mohammed Bushra, who was a supervisor with Ethiopian Airlines. His mother is originally
from Yemen. In 1992, the government changed and the military took over. They began
arresting people who had been associated with the old government. Binyam went to Britain
on March 9, 1994. He sought political asylum and was given leave to remain while this was
resolved. He was there for 7 years.

1. Binyam's seizure

Binyam went to the Karachi Airport on April 10, 2002, with a ticket to Zurich and on to
London.

"I was seized in Karachi. I was by myself. I refused to talk in Karachi until they gave me a
lawyer. I said it was my right to have a lawyer. The FBI said, 'The law has been changed.
There are no lawyers. You can cooperate with us -- the easy way, or the hard way.'"

2. Torture for the Americans by the Pakistanis

Binyam was taken to Landi Prison from April 13-20, 2002. He was not interrogated there at
all. Indeed, while he was later abused by Pakistanis, he was never interrogated by the
Pakistanis at all.

From April 20-27, 2002, he was taken to the I.C.I. Unit, an interrogation center in Karachi.
This is where he met the FBI. He asked for an attorney and refused to speak with them,
since he said the Americans had nothing to do with him.

There were 4 small cells, each 2m x 2.5m. While there, he was hung up for a week by a
leather strap around the wrists. He could only just stand. He was only allowed down to go
to the toilet twice a day. He was given food, normally rice and beans, once every second
day. "It was the first thing that happened to me. I just thought it would end. There were
threats of beating, though."

The FBI would come in for morning interrogations. There were four of them:

1. 'Chuck'. White male, about 40, 5'9" or 5'10", brown hair, blue eyes, 70kg. "If I see
him I'll know him."

2. 'Terry'. White male, about 50, 5'11 or 6', brown hair, blue eyes, clean shaven but with a
mustache, 90kg. "If I see him I'll know him."

3. FNU. Black male (light skinned), 35, 5'10, bald, spoke Swahili. "If I see him I'll know
him."

4. 'Jenny'. White female, 40-ish, 5'9", skinny, brown shoulder-length hair. "If I see her I'll
know her."

Reprieve is a UK registered charity (1080147)
Patrons: Alan Bennett, Sir John Mortimer, Marina Warner, Charles Wheeler
Founder: Clive Stafford Smith

The FBI seemed to think that because he had lived in the US for a short while he had plans to do something there. "But I'm going to the UK," Binyam would say.

The FBI also seemed to think that he was some kind of top Al Qaida person.

"How? It's been less than six months since I converted to Islam! Before that, I was into using drugs," Binyam would say. Indeed, he had traveled in part to help try to kick the habit.

On the first day of the interrogations, 'Chuck' said, "If you don't talk to me, you're going to Jordan. We can't do what we want here, the Pakistanis can't do exactly what we want them to. The Arabs will deal with you."

It was at this point that Binyam told them his name and address. Chuck checked with the British and this was true.

'Terry' asked the same questions. "I'm going to send you to Jordan or Israel," he said. Then he threatened to send him to the British. "The SAS know how to deal with people like you."

It was after Terry's visit that they started the torture.

The Pakistanis could not speak English, and Binyam could not understand them. They would just come in and beat him with a leather strap. It had a handle, and then leather with a joint making the rounded end part whip back on him.

One Pakistani pointed some kind of gun at Binyam's chest. It was a semi-automatic, and he loaded it in front of Binyam. "He pressed it against my chest. He just stood there. I knew I was going to die. He stood like that for five minutes. I looked into his eyes, and I saw my own fear reflected there. I had time to think about it. Maybe he will pull the trigger and I will *not* die, but be paralyzed. There was enough time to think the possibilities through."

'Chuck' came in after that. He said nothing. He stared at me and left.

Two MI6 officers came after that. The torture stopped when the British came.

1. 'John'. He was a white male, 30, short black (?) hair, a goatee, 5'10" and stocky. ("I might recognize him.")

2. FNU. White male, 45, 5'10", stocky, full short black (?) beard. ("I would recognize him.")

"They gave me a cup of tea with a lot of sugar in it. I initially only took one. 'No, you need a lot more. Where you're going you need a lot of sugar.' I didn't know exactly what he meant by this, but I figured he meant some poor country in Arabia." One of them did tell me that I was going to get tortured by the Arabs.

'John' questioned Binyam. Binyam said he wanted a lawyer.

"How can I help you?" he asked.

"I don't know," said Binyam.

Reprieve is a UK registered charity (1080147)
Patrons: Alan Bennett, Sir John Mortimer, Marina Warner, Charles Wheeler
Founder: Clive Stafford Smith

"I'll see what we can do with the Americans," he said, promising to tell Binyam what would happen to him. He did not see them again.

A month later, Binyam was refusing to talk until he got a lawyer. The Americans left. The FIA came with the money he had had. They had him sign a paper for his release from Pakistan.

On July 19th, 2002 (he thinks it was a Friday), Binyam was taken from Karachi to Islamabad on a PIA flight with two officers, but not even in cuffs. He was in row 35 or 36. When he arrived, he was taken in a bus to a pickup truck. He was handcuffed, and taken to the Special branch office, where he was left in a room with a Pakistani prisoner until the Sunday night at about 10pm.

## MOROCCO

### 1. Arriving in Morocco

On July 21st, 2002 (+/-), Binyam was taken to a military airport in Islamabad. There were two others with him. He was blindfolded, but it was very quiet. He was held there for about two hours.

#### a. Into U.S. Custody for Rendition

Once there, he was turned over to the Americans. The U.S. soldiers were dressed in black, with masks, wearing what looked like Timberland boots. They stripped him naked, took photos, put fingers up his anus, and dressed him in a tracksuit. He was shackled, with earphones, and blindfolded.

He was put into a U.S. plane – he cannot say the size, but is sure it was some kind of official or military plane, rather than anything civilian, since it was so quiet on board before take off that there were not many others on it.

#### b. The location of the Moroccan airport

He was tied to the seat for the roughly 8 to 10 hour flight. He was flown to an airport in Morocco where he arrived on July 22nd. While he was blindfolded, he is sure there were two other prisoners on the flight.

He believes it may have been near Rabat.

Binyam believes that there was a U.S. military base near it.

### 2. The Torture Prison in Morocco – In Binyam's own words

*This is the first, very rough preliminary edition of Binyam's diary of his torture at the hand of the torturers in Morocco.*

It was when I got to Morocco that they said that some big people in Al Qaida were talking about me. They told me that the U.S. had a story they wanted from me, and it was their job to get it. They talked about Jose Padilla, and they said I was going to testify against him and big people. They named Khalid Sheik Mohammed, Abu Zubaydah and Ibn Sheikh Al Libi. I was meant to be working with these people, giving them ideas like the dirty bomb.

Reprieve is a UK registered charity (1080147)
Patrons: Alan Bennett, Sir John Mortimer, Marina Warner, Charles Wheeler
Founder: Clive Stafford Smith

It is hard to pin down the exact story, because what they wanted changed from Morocco to when I was in the Dark Prison, to Bagram and again in Guantanamo Bay.

But one thing is sure. I've never met anyone like Khalid Sheik Mohammed, Abu Zubaydah or Ibn Sheikh Al Libi. How would I? I spoke no Arabic at all when I was in Pakistan. And I didn't know Jose Padilla either. I never heard his name till they told me.

A. The Torture Prison itself

At the airport, I was put in what I believe to be a Reynolds van. I was told to lie down. My cuffs were changed to plastic ones, and they drove for half an hour or 45 minutes. I heard Arabic being spoken at this time.

Where I was first held, from July 23rd, 2002, to about August 15th, there was a series of houses which were dug down, almost underground. There were six rooms per house, and at least five houses in a group, with more further away. Three of the rooms were for the prisoners, one for interrogation, one for the guards and one empty. When I arrived, there were already two other prisoners in the other rooms.

From July 23rd to about August 15th, I was in the middle room of three. The wall was whitewashed. There was a large window, but it was shuttered.

I was then moved from the 15th to about the 22nd to the end room, which was next to the toilet. This was the dark, 'torture' room with wood paneling.

There was a metal fence all around. The trees outside were about ten metres high.

1. The Torture Team

*Some of the torture team were masked, and some were not. Below is the best that Binyam could do in my initial discussions with him, but we will work on improving the descriptions so we can make an identification of them.*

a. 'Mohamed'

Mohamed was about six feet tall, well built, blue eyes, brown hair, white skin, perhaps 28-30 years old. He was Moroccan.

b. 'Sarah' the 'Canadian'

Sarah was about 30-35 years old, white, blue eyes, blond hair, about 5'6", average weight. She said she was Canadian and was meant to play the role of 'third party' between him and his adversary, the Americans (and Moroccans). Binyam had refused to speak with the Americans and the Moroccans, so they thought they would try something else. He was told that she had come in specially to act as intermediary and they had to delay his interrogation for four days to do this. But he believes that she was probably just an American, or a Canadian involved with the U.S. military, and this was just part of the interrogation process.

**"If you don't talk to me, the Americans are getting ready to carry out the torture. They're going to electrocute you, beat you and rape you." She seemed blasé about this,**

Reprieve is a UK registered charity (1080147)
Patrons: Alan Bennett, Sir John Mortimer, Marina Warner, Charles Wheeler
Founder: Clive Stafford Smith

**as if this were something normal. I listened but said I would not talk today. (August 2nd, 2002)**

    c.  'Smoke-too-much'

The one who smoked too much was Moroccan, about 5'10", brown skin, black hair, brown eyes.

    d.  'Marwan'

My lead tormentor was Marwan. He was the one who was in charge of much the actual abuse. He was 6'2", said he weighed 90kg, brown skin, brown eyes, and clean shaven. He slapped me a few times during the interrogations, smoked Marlboro lights, and had a Motorola Wing telephone.

    e.  'Scarface'

Scarface was the one with no name, scary looking, about 5'10", face like 'Scarface' (though he was masked), brown skin, brown eyes, deep voice, he did much of the questioning and the beating.

    f.  The Boss

The most senior one was about six feet tall, very white and brown eyes, hair that was black but flecking to grey, a trimmed beard, well built. It is said that he has been to Guantanamo to interrogate the Moroccans there.

    2.  American Plans for the Torture

*According to the unclassified materials that Binyam wrote:* "they want me to testify in court as they have no witnesses and they have told me they are preparing me and others for their use and giving us information on the accused which we know nothing of."

    3.  The initial softening up process in Morocco

I was placed in a room with three guards, and the cuffs were cut off, replaced with metal cuffs "Made in Spain." I was cuffed to the chair. The sun was already up, and I asked to be allowed to pray. They let me wash at the shower, and told me the direction to Mecca. I went to sleep in a 3.5 x 3.5 room with a bed and table. The large window was shuttered so I could not see out of it.

I was not of this world. I did not believe this was real, that this was happening to me. It never, never crossed my mind that I'd end up being hauled half way across the world by the Americans to face torture in a place I had never been, Morocco.

The first shift of guards spoke English – "How are you?" – and were white with Arab features.

The second shift were very Moroccan. They told me, "If you cooperate with them, they won't torture you." I knew I was going to be tortured. I was pissed off that the U.S. interrogated me, then took me across the world.

Reprieve is a UK registered charity (1080147)
Patrons: Alan Bennett, Sir John Mortimer, Marina Warner, Charles Wheeler
Founder: Clive Stafford Smith

For the first few days it seemed that they were just observing me. They would just ask me a few questions, and I would talk with the guards.

"What kind of torture do they do in this place?" I asked one of the guards.

"They'll come in wearing masks and beat you up. They'll beat you with sticks. They'll rape you first, then they'll take a glass bottle, they break the top off and make you sit on it."

When I looked in the eyes of the people who said they'd make me sit on a broken glass bottle, all I saw was nothing but determination, certainty deep in them that they *were* going to do it. I hoped it was just a threat, but some Moroccan friends back home had told me about this happening in Morocco, they were known for it. I just didn't think they were going to do it to someone who was not Moroccan, who had nothing at all to do with Morocco.

### a. Friday, July 26

An interrogator came into the room. "This is just a welcome."

I demanded who he was. I made sure I looked pissed off. We did not talk about anything. Nothing happened. I went back to my room. All I did was ask what kinds of tortures were available.

### b. Sunday, July 28 (+/-)

Two interrogators came in today. In the interrogation room there was some kind of international swimming on television.

"This is just talk. If you want interrogation, we'll interrogate you."

They asked about a Heritage Centre (a Mosque) in N. Kensington, about five minutes from where I lived, where I worked from October 2000 to about May 2001. They showed me pictures and asked about people who had been there.

I told them I refused to talk. "I'm not Moroccan, it has nothing to do with you." I said this politely. "And if the Brits have questions, they should ask themselves, not you."

The guy who was smoking smiled at me. "Why do you think the Brits sold you out to us so cheaply? Why do you think they sent you here?"

They asked me about Moroccan groups in Afghanistan. I told them I knew nothing. The first interrogator was smoking impatiently, and told me that I had better speak to them at once, or he would get up and smack me about.

"I know I'm here to be tortured, so you may as well get on with it," I said with bravado. "I have nothing to do with you, or your Moroccan groups, as I'm not Moroccan."

They left me alone all that night. At one point a guard – I remember he was the one who was 22 years old – came in to tell me something. "If you don't speak to them now, you're just going to see people coming in with masks and they're going to beat the hell out of you."

They left me all day Monday to think about it. Nothing happened.

Reprieve is a UK registered charity (1080147)
Patrons: Alan Bennett, Sir John Mortimer, Marina Warner, Charles Wheeler
Founder: Clive Stafford Smith

c.  Tuesday, July 30 (+/-)

Today I was questioned about my links with Britain. The interrogator told me that we have been working with the British, and we have photos of people given to us by MI5. 'Do you know these?' I realized that the British were sending questions to the Moroccans. I was at first surprised that the Brits were siding with the Americans. I sought asylum in Britain rather than America because it's known as the one country that has laws that it follows. To say that I was disappointed at this moment would be an understatement.

The guards started talking about torture again. They talked more about the beating and the rape. I tried not to show them the fear that I had.

They left me for a while to dwell on it. I was thinking they were promising to torture me, so I asked for a Quran. They eventually brought me one on August 1st. It had been dipped in something like diesel, I have to leave it to evaporate before I could read it. This was a difficult moment, because it was a clear indication of the hypocrisy going on there. These people were not real Muslims. I was just learning Arabic then, but just reading the Quran gave me tranquility.

d.  August 2 (+/-)

The "Canadian" called "Sarah" came today. She said she was supposedly a "third party" only interested in talking to me, because I had refused to talk to the Moroccans and the Americans, so maybe I would want to talk to a Canadian.

"If you don't talk to me, then the Americans are getting ready to carry out the torture. They're going to electrocute you, beat you, and rape you." She seemed blasé about this, as if this was something normal. I listened to her, but I said I would not talk today.

e.  August 3 (+/-)

Today I told "Sarah" that I never asked for a "third party." She got angry.

"You don't know what's good for you." She had me taken back to my room.

A guard told me that they had waited all this time while she had been brought from Canada.

"How can I talk to them?" I pleaded. "I know nothing about what they want."

"Ask them for pictures," he replied. "You're the one who should ask them questions, how you can help them."

f.  August 4 (+/-)

Today 'Sarah' came in with Mohammed, a Moroccan.

They had brought pictures, all of British people. "This is the British file," they said. "Sarah" picked up the pictures of two British people – Yusuf Jamaici and Amin Mohammed – and told their whole story, about how they were suspected of being al Qaida and other stuff.

Reprieve is a UK registered charity (1080147)
Patrons: Alan Bennett, Sir John Mortimer, Marina Warner, Charles Wheeler
Founder: Clive Stafford Smith

They also brought pictures of about 25 of the "most wanted" Al Qaida people. "I don't know these people."

I was interested in my own case.

"I'm giving you a last chance to think about cooperating with the U.S.," said 'Sarah.'

They left me alone for a day to think about it, with no interrogation.

g.   August 6 (+/-)

It was "Sarah" and "Mohammed" again today. They came on all sympathetic, and brought in breakfast. I said I was not talking. They talked about politics and wars of the past. "I want you to answer the Americans' questions." "Sarah" talked on and on, all about snitching on people. Mohammed said they would send me back to the UK, where they were expecting me.

That night I thought I was going to be transferred out of there. They came in and cuffed my hands behind my back. But then three men came in with black masks, some kind of ski masks that only showed their eyes. They had military trousers and different coloured shirts.

When they came in my head stopped. I ceased really knowing I was alive. One stood on each of my shoulders, and the third punched me in the stomach. The first punch, I didn't expect it. I didn't know where it would be. I'd have tensed my muscles but I didn't have time. It turned everything in me upside down. I felt I was going to vomit.

Within ten minutes I was almost gone. It seemed to go on for hours. I had prayed the sunset prayer, but I don't know what time it went on to. I was meant to stand, but I was in so much pain I'd fall to my knees. They'd pull me back up and hit me again. They'd kick me in my thighs as I got up. I vomited within the first few punches. I really didn't speak at all though. I didn't have the energy or will to say anything. I just wanted for it to end.

I could see the hands that were hitting me. They looked like the hands of someone who had worked as a mechanic or chopped with an axe. They were heavy hands. There was dark black hair on the back of the hands and the fingers. I don't remember any rings. The wrists were thick, with shirtsleeves buttoned down all the way.

I looked in his eyes. I saw no sympathy. I never looked at the eyes of the other two. They never said a word. They just beat me up that night and left me.

I collapsed and they left. I heard the key lock. I stayed on the ground a long time before I lapsed into unconsciousness. My legs were dead. I could not move. I awoke still on the floor. I'd vomited, pissed on myself.

h.   August 7 (+/-)

There was to be no more first class treatment. No bathroom. No food for a while. The door opened. I thought they were back. They were not. I was taken for interrogation.

"Are you going to cooperate or not?" asked the man, the seventh who had questioned me so far. I said nothing. They took me back to the room. But it was a different room now, next door to the other one, the dark room. It was lined with wood paneling.

They left me there, depressed. I lost it at this point. I was numb. I was full of pain. I still have a permanent stomach problem, and my ribs hurt if I sit for long. Something is broken inside. But back then I was just numb.

i.   August 7 (+/-) Night: The Circle of Torture

It was then that the circle of torture began. They'd ask me a question. I'd say one thing. They'd say it was a lie. I'd say another. They'd say it was a lie. I could not work out what they wanted to hear.

They'd say there's this guy who says you're the big man in Al Qaida. I'd say it's a lie. They'd torture me. I'd say, okay it's true. They'd say, okay, tell us more. I'd say, I don't know more. They're torture me again.

That night the same people came back. The same guy punched me till I couldn't stand. I was making noises, groaning, I couldn't breathe, I begged them to stop. They didn't care.

Then, after a while, they acted like they were sympathetic. One would say, as best I could understand in Arabic, "Let's leave him." One would say, "We've got to finish the job."

They left me on the floor for, I don't know, maybe fifteen minutes, half and hour. A guard came in and uncuffed me, and gave me food. "It's all over. You don't have to worry any more." I wanted to believe him. I just couldn't.

j.   The phoney war

But this time they left me for a week. I got regular meals. I was in pain, I could not get up for prayer. But they left me alone.

One week later one of them came in. "Faraj," he said. That means freedom. "You're going to leave." I thought I was going to Cuba then. To be honest, I was relieved. I thought it would be public there, so some of this would not happen.

Half an hour later I was taken blindfolded in a vehicle. I was take up some steps, along a hallway, into another room. Was it the waiting room at the airport? When I could see again, it was about three metres square, white, with a window, opaque, high up. But there were hooks in there for hanging people.

But for two or three days, I was treated okay. Again, I thought it was over. That's what they kept on telling me.

Then one night they tied me with a rope, back to the wall. They put shackles on my ankles. My feet were just on the ground again. They left me for about half an hour. I thought maybe I'd be left there, or maybe they'd start beating me with sticks again. I just didn't know.

It was Marwan who came in. "Give me the whole story all over again." I did what I could. "If this is the best you can come up with, you haven't seen any of the tortures yet." He called the three goons in. He stood behind them watching while they beat me. He was just standing there, watching, smoking cigarettes like the Godfather in the film. He just gave an order. Idrabo, in Arabic, which means beat him. And he stood back while they did it.

Reprieve is a UK registered charity (1080147)
Patrons: Alan Bennett, Sir John Mortimer, Marina Warner, Charles Wheeler
Founder: Clive Stafford Smith

I guess this went on for a couple of his cigarettes, I don't know exactly how long.

"Is this what God has promised you?" he asked.

"God has promised me heaven," I answered.

At that point, he cursed the Quran. I smiled, as I know I had got through to him. It was a mistake. He came and backhanded me across my right cheek. In a strange way, though, I felt victory over him again for a moment. I'd got under his skin.

He left with his people, left me hanging. I thought they'd just leave me there, but an hour or so later they came back in and started beating me up again. When they were doing it, it was only like a sting by then. I was semi-conscious. I wasn't really there. I had memorized some verses of the Quran, just the first chapter, and I was trying to think of them. The pain would come later.

They hit me in the chest, the stomach, the legs. They'd knock my feet out from under me. I have a shoulder pain to this day from the wrenching as my arms were almost pulled out of their sockets.

I was left again, maybe a couple of hours. I was almost asleep standing up when they came back. They came back in, with their masks on again. They were not wearing masks to prevent themselves being identified. It was to create fear. I'm sure of that. In their eyes, they were just doing a job. They were just getting paid for doing this.

This time it seemed to go on all night. They came in four times that night. Towards the end they seemed to get really pissed off. I called them hypocrites I think. I think I must have recited a verse about hypocrites or something. I don't really remember. But the one who was punching, he hit me on the jaw and knocked me out. I think I reached heaven then, but I came back. That was the problem. I came back. I think I came back after only a few seconds, and he was just there waiting for me. I didn't really know what was happening, but he must have knocked me out again. The next thing I remember, I was seeing guards come in. They took me down and left me on the floor all day. I was happy. I could just sleep now.

I remember a guard telling me that it was not being a good Muslim to get tortured. They'd bring me tea and sweets, but I couldn't take much of it.

They'd tell me, there's worse to come. I could hear people screaming across the hall and next door all that night. There were two things crossing my mind. Either one, that these people are getting raped, or they are getting electrocuted. I just didn't know what to feel or think. At that point, I was just wishing I was dead.

But nothing happened. They left me for a week, maybe two. I'm just guessing. One day was like a week, and sometimes a week would be like a day. I'd sleep. But I'd wake at night because of the screams. The guards running up and down. They'd open the door to wake you every half an hour or so.

The guards would say, "America's really pissed off at what happened, and they've said to the World, either you're with us or you're against us. We Moroccans say we're with you. So we'll do whatever they want. They want revenge for everyone who died on 9/11."

Reprieve is a UK registered charity (1080147)
Patrons: Alan Bennett, Sir John Mortimer, Marina Warner, Charles Wheeler
Founder: Clive Stafford Smith

It was Marwan who came in next.

"How are you?" he asked me.

I was thinking if I said I was alright they'd beat me again. I thought they'd left me to heal so they could start all over again. "I'm in pain."

He started speaking about my case. "You're doing good. But we need to prepare you for other stuff. Someone in Al Qaida has said you're a big man in Al Qaida, so we figure it must be true."

I had been through so much, I said, "I've got no problem saying whatever you want me to say."

"That's good. When I say something, you say yes."

But then it would get to me. He thought he was something, doing all this. He thought he was something smart.

"Why do you think the Americans brought you to us?" he'd ask.

I made a mistake. "You're not intelligence, you're Moroccan. The British have intelligence. You don't."

He swore at me.

That night he came back. He had me tied to the wall again.

### 4. Torture heavy in Morocco

#### a. The scalpel

Marwan brought in the three thugs.

"Strip him."

They cut off my clothes with some kind of doctor's scalpel. I was totally naked. I was afraid to ask Marwan what would happen, because it would show fear. I tried to put on a brave face. But maybe I was going to be raped. Maybe they'd electrocute me. Maybe castrate me.

"You don't think I'm a man, not with Intelligence. Show him who's a man."

They took the scalpel to my right chest. It was only a small cut. Maybe an inch. At first I just screamed because the pain was just. . . . I was just shocked, I wasn't expecting. . . .

Then they cut my left chest. This time I didn't want to scream because I knew it was coming.

Marwan got agitated at this. "Just go ahead with the plan."

Reprieve is a UK registered charity (1080147)
Patrons: Alan Bennett, Sir John Mortimer, Marina Warner, Charles Wheeler
Founder: Clive Stafford Smith

One of them took my penis in his hand and began to make cuts. He did it once, and they stood still for maybe a minute, watching my reaction. I was in agony, crying, trying desperately to suppress myself, but I was screaming. I remember Marwan seemed to smoke half a cigarette, throw it down, and start another.

They must have done this 20 to 30 times, in maybe two hours. There was blood all over.

"I told you I was going to teach you who's the man," Marwan eventually said.

They cut all over my private parts. One of them said, it would be better just to cut it off, as I would only breed terrorists.

I asked for a doctor. "The doctor's off," I was told. But in the end there would be two doctors.

Doctor #1 was 45, almost totally white, 5'9", stocky, carried a briefcase. "You're alright,

aren't you? But I'm going to say a prayer for you."

Doctor #2 was 40-45, 6', stocky, goatee and mustache, brown hair, wore white overalls. He would advise me to do anything I could to avoid torture. He gave me an alkaseltzer for the pain. I told him about my penis.

"I need to see it. How did this happen?" I told him. He looked like it was just another patient. "Put this cream on it two times a day. Morning and night." He gave me some kind of antibiotic.

I was in Morocco for a total of 18 months. Once they began this, they would do it to me about once a month.

One time I asked a guard. "What's the point of this? I've got nothing I can say to them. I've told them everything I possibly could. What's the point?"

"As far as I know, it's just to degrade you. So when you leave here, you'll have these scars and you'll never forget. So you'll always fear doing anything but what the US wants."

Later, when the US picked me up, a female MP took pictures. They treated me and took more photos when I was in Kabul. Someone told me this was "to show Washington it's healing."

> b.  More

"There were even worse things. Too horrible to remember, let alone talk about." Three days later Marwan came in again and the thugs tied me up. I did not curse or say anything. Last time, look what happened.

> 5.  18 months in Morocco

>> a.  Trying to Get his Script Right

Reprieve is a UK registered charity (1080147)
Patrons: Alan Bennett, Sir John Mortimer, Marina Warner, Charles Wheeler
Founder: Clive Stafford Smith

About once a week or even once every two weeks I would be taken for interrogation, where they would tell me what to say. They said if you say this story as we read it, you will just go to court as a witness and all this torture will stop. I could not take any more of this torture, and I eventually repeated what was read out to me.

They told me to say that I had been with Bin Laden five or six times. Of course that was false.

They told me to say that I had told Bin Laden about places that should be attacked. Of course, that was false too.

They told me to say that I had sat with UBL's top people. That was a lie too. There were about 25 of them. They told me all their names.

They told me that I must plead guilty. I'd have to say I was an Al Qaida operations man,

an ideas man. I kept insisting that I had only been in Afghanistan a short while. "We

don't care," was all they'd say.

This lessened some of the torture, but it wasn't over. They began the brainwashing system.

### b. The abuse continues

During September-October 2002, I was taken in a car to another place. The room was bigger, maybe 2.5 metres by 4. It had its own toilet and a window which was opaque. There was a metal door with a flap. The walls were painted white and there was a pinkish-white mattress was on the floor that was made in either the UK or France, I forget which. I had two blankets, one dark brown and red, the other dark and light brown. There was no pillow. They gave me a toothbrush and Colgate toothpaste. There was a bar or soap for washing clothes with a peacock on it. It was French, with the name Laus or Laos, or something like that. It was dark yellow or brown.

I was allowed to recover from the scalpel for about two weeks, and the guards said nothing about it.

### i. The noise

Then they cuffed me and put earphones on my head. They played hip-hop and rock music, very loud. I remember they played Meatloaf and Aerosmith over and over. I hated that. They also played Tupac, "All Eyes Only" all night and all day.

A couple of days later they did the same thing. Same music. When I became a Muslim, I had tried to get away from this. I'd canceled all the music out of my head and now they were forcing it back again.

I could not take the headphones off as I was cuffed. I had to sleep with the music on and even pray with it.

Reprieve is a UK registered charity (1080147)
Patrons: Alan Bennett, Sir John Mortimer, Marina Warner, Charles Wheeler
Founder: Clive Stafford Smith

For eighteen months, there was not one night when I could sleep well. Sometimes I would go 48 hours without sleep. At night, they would bang the metal doors, bang the flap on the door, or just come right in.

### ii. The stench

Two times, for a month each, they took me to a room that smelled of piss twenty-four hours a day. The walls were moldy and damp. It was cold in there. It would give me headaches and a runny nose all the time. There were holes in the toilet so the toilet would leak out into the room.

### iii. The drugs

Maybe a week later, they started the stuff in the food. I found myself laughing my head off, drunk, or something wrong with me after eating. I did not know what to do. I had no choice but to eat. This went on for two weeks and it got so bad I decided I had to go on a hungerstrike.

This was all mental torture, meant to break me. "It's best for you to go back to your old ways. You need to be a Muslim only in name," said one of the guards.

I went four days without food or water. Then they came in again, and strapped me to a mattress. They put an IV in my arm. First one, then a second. There was some kind of yellow liquid. This I think must have been heroin, though I've never tried it, so I don't know for sure. I was out of this world. I didn't exist. They alternated. They'd do a plain IV, then the heroin IV, then the plain one, then the heroin one. My body started reaching. I started shivering. It was like going cold turkey on drugs. This went on maybe ten or 14 days, but I lost track of time. By then, my body needed the drug and if I didn't have it, I'd go nuts, shaking, paranoid. I wasn't hungry. I didn't eat at all.

In the end I agreed to eat, and they stopped. The food that came still seemed to have something like hash in it. Bad though that was, it was better than having the other drug injected straight into my blood.

### iv. The porn

When they knew it was the time I should be praying, they would turn up the volume on their sex films they were watching.

They brought in women. This happened over six months. They were naked, or part naked. I was high or drunk. One woman was beautiful, with brown hair. They were just enticing me.

### v. Binyam is broken

This mental torture was a lot worse then the physical torture. For they were now working on my brain. I think I came to several emotional breakdowns in this time, but who was there to turn to?

### vi. Scripting it

Reprieve is a UK registered charity (1080147)
Patrons: Alan Bennett, Sir John Mortimer, Marina Warner, Charles Wheeler
Founder: Clive Stafford Smith

They continued with two or three interrogations a month. They weren't really interrogations, more like trainings, training me what to say.

Scarface, the interrogator, told me what was going on. "We're going to change your brain," he said.

### c.   The Routine

I suffered the razor treatment about once a month for the remaining time I was in Morocco. About once a month they would do other things to me that I just cannot talk about. I would be "interrogated" perhaps once every ten days or so, though this was mostly about how I could be a witness. This happened even after I'd agreed to confess to whatever they wanted to hear. If this torture is for information, why are we tortured even though the real interrogation had been over for a year or so?

The last time they cut me, they tied me up and slashed me twelve times or so with the razor. I had lost hope that I could even talk to them. It became like a routine. They'd come in, tie me up, spend maybe an hour doing it – they used to be very slow, deliberately slow. One would cut me, they'd take a rest. They'd have a cigarette, talk in some Moroccan dialect that I couldn't catch. Then another would take his turn. They never spoke to me, not a word. Then they'd tip some kind of liquid on me – the burning, the stinging, was like grasping a hot coal . . . but not with my hands, even. The cutting, that was one kind of pain. The burning, that was another.

In all the 18 months I was there, I never went outside. I never saw the Sun, not even once. I never saw any human being except the guards and my tormentors, unless you count the pictures they showed me.

When the Americans told me in Karachi, "Our friends the Arabs know how to deal with you" I didn't really know what they were talking about. Now I understand why the Americans call the Moroccans "Our Arab Friends."

What kept me going was the stories of Stephen and Jesus and Mohammed and thinking that nobody goes through torture except that he is in the right. And I always thought that the Truth shall prevail.

> *Note: Binyam did learn from people there about others who might be there. Details to follow.*

### 6.   Binyam is taken to Afghanistan

"Farich – you're going home." By now I would not believe it. I thought there was something special coming along. The first time they said "farich" was the first time I went to the torture chamber and they hung me up.

It was a cold night. I was cuffed, blindfolded, put in a van and driven for about half an hour. Then they took me into a room, still blindfolded. It was dark.

It was January 21st or 22nd, 2004, at about 10pm. After waiting about two hours, I heard a plane. I knew I was going to go. I heard an American accent. I knew then I was being transferred back to the Americans. It was me and two other prisoners.

Reprieve is a UK registered charity (1080147)
Patrons: Alan Bennett, Sir John Mortimer, Marina Warner, Charles Wheeler
Founder: Clive Stafford Smith

There were five U.S. soldiers in black and grey, with face masks, and again with Timberland type boots. They did not talk to me. They cut off my clothes.

There was a white female with glasses. She took the pictures. One of the soldiers held my penis and she took digital pictures. This took a while, maybe half an hour.

She was one of the few Americans who ever showed me any sympathy. She was about 5'6", short, blue eyes. When she saw the injuries I had she gasped. She said, "Oh, my God, look at that!" Then all her mates looked at what she was pointing at and I could see the shock and horror in her eyes.

Later, when I was in Afghanistan they took more pictures. They were treating me, and one of them explained that the photos were "to show Washington it's healing."

## AFGHANISTAN

1. Kabul

It was about ten hours before we reached Kabul. I was put in a truck. I was only in shorts and it was very cold. It seemed like we were driving along a dirt track.

I was put in a prison called "The Prison of Darkness." I was in Kabul for about five months from January 22, 2004, until late May.

The US military told us, "Bin Ladin had his laugh on 9/11 so it is now our time to have our laugh."

There was a hall with rooms apart from each other. I am guessing there were about 20 rooms. I was told special people were housed in it, and I was "special" which is why I was being taken there. I later found out that these special people were people like Abdulsalam Hiera, the Yemeni businessman from Sana'a, and the former Ambassador of Afghanistan.

They knocked my head against a wall a few times until I could feel blood, then I was thrown into a cell. It was cell number 16 or 17, the second or third to last room from the shower room. The room was about 2m by 2.5m. The cell had heavy metal door, all solid, then a second door with bars. There were speakers near the ceilings at both ends of the room. There was a watching hole low down on one wall. There was a hanging pole for people left there in a kneeling position. There was a bucket in the corner for a toilet.

I was put in shorts and a top, and chained to the floor with little or no room to manoeuvre.

The mat was thin as a blanket, and the blanket was thin as a sheet. It was hard to use the toilet in the dark. All the shit and piss in the bucket got on my blanket, but when they let me lie down I had to use it, as it was all I had.

Showers were either weekly or monthly, as they wished.

It was pitch black, and no lights on in the rooms for most of the time. They used to turn the light on for a few hours, but that only made it worse when they turned it back off.

They hung me up. I was allowed a few hours of sleep on the second day, then hung up again, this time for two days. My legs had swollen. My wrists and hands had gone numb. I

got food only once all this time. After a while I felt pretty much dead. I didn't feel I existed at all.

Then I was taken off the wall and left in the dark. There was loud music, Slim Shady and Dr. Dre for 20 days. I heard this non-stop over and over, I memorized the music, all of it, when they changed the sounds to horrible ghost laughter and Halloween sounds. It got really spooky in this black hole. The only light I saw came from the guards using flashlights to bring inedible food, mainly raw rice and beans for lunch, and bread and beans for dinner. Just the sauce, not the beans themselves. I lost 20 kg in the weeks of my stay. They used to come and weigh us every other day, it seemed like they were making sure we were losing weight.

Then there was a misunderstanding in interrogation that lead to my being chained to the rails for a fortnight, all cause I said the truth about what I had and hadn't done, thinking the CIA interrogators looked understanding.

Interrogation was right from the start, and went on until the day I left there. The CIA worked on people, including me, day and night for the months before I left. Plenty lost their minds. I could hear people knocking their heads against the walls and the doors, screaming their heads off. Well, what a time to believe in God. Without hope I would certainly have been dead.

Throughout my time I had all kinds of music, and irritating sounds, mentally disturbing. I call it brain washing.

In the Dark Prison, they had separate cells, where the guards could walk all around them. There was a door, and another grill down by the floor, and a small window at the top of the cell. But it was dark anyway. To begin with the cell was dark 23 hours straight. The guards had flashlights, and it was eerie when they would come around. Then they had it dark for 21 hours, and they gradually increased it until it was only dark for about 12 hours.

It was bad in the Dark Prison in Kabul. For 20 days, 24 hours a day, they played some album by Slim Shady and Dr. Dre. I don't know the name of the album, and I've tried to block it out. But it has some song about "America I love you" on it. There is talking on it by a girl, and it's about her. They used this music to torture us. It was blasting loud all around. There were speakers in every cell."

Then they used horror sounds, like they were from the movies. 24 hours a day, for maybe two weeks. There was hardly any way to sleep. It was like a perpetual nightmare.

After that, they came with other sounds, irritating things -- thunder, planes taking off, cackling laughter, the screams of women and kids, that kind of thing. It was meant to drive you nuts. There's a prisoner here in Guantanamo who was there who had totally lost his head.

There was not meant to be any sleeping anyway. The guards would come around to keep you awake. They wore masks, they said no words. They just made noise to keep you awake.

To begin with there were no showers, but later it was once a week. They had you chained by one hand and you had to undress with the other. The water seemed very salty, and left something on your body. Sometimes they would give you clean clothes, sometimes not.

Reprieve is a UK registered charity (1080147)
Patrons: Alan Bennett, Sir John Mortimer, Marina Warner, Charles Wheeler
Founder: Clive Stafford Smith

But you weren't allowed to wash the ones you were in.

To begin with they gave me food every 36 hours. After a couple of weeks, I got two meals in 36 hours. It was all rice and beans. Made the Guantanamo food look like gourmet, no matter how bad it is here. In March 2004 they added tea and bread for breakfast. I lost about 30 kg in my time there.

I had interrogation most days. He started with pictures. I would say, "I don't know them." He would say, "You do know them." I'd said, "Okay, I do know them." I would describe the people and what they did. I was just making stuff up, but it made the interrogator very happy. But then he went off and did his homework. He came back angry. "If you make up stories again, we're going to torture you." I asked him to tell me what he wanted, cos I didn't know what to say. "Just say what we want. Don't make things up." From then on they would give me the name and the story behind each picture. Most of them were Afghanis and Pakistanis. I was surprised at that, since I rarely had much of an interaction with an Afghani while I was there, because I did not speak the language.

In the Dark Prison, American soldiers, dressed all in black, came to me with a story. They said, "This is the story that Washington wants." It was about a dirty bomb. I was meant to steal the parts and build it with Padilla in New York. I did not even know what a dirty bomb was. At first, they talked about an atomic bomb, but then they talked about a dirty bomb. It was meant to be half A-bomb, half something else to make it explode. The story went round and round for the four months I spent in the Dark Prison. I could not understand what they were talking about, and got it wrong. They hung me up for ten days, almost non-stop. They had me in a sitting position on the floor, where I could not lie down. My hands were suspended above my head. There was a bucket next to me, but it was hard to maneuver to use it. I kept knocking over the bucket when I tried.

A psych came to see me two times while I was in the Dark Prison. He asked weird questions. It was like they were studying us.

It was May 2004 before I got to go outside. I got five minutes that week. I sat in the Sun for the full five minutes. For a person who had not seen the sun for two years it was like being given chocolate. I got to go out once a week. It was fresh air for the first time.

### 2. Bagram

In May, we were transferred to Bagram Air Base by helicopter, tied like hens going for slaughter. We were thrown into the helicopter. After a flight of 20 – 30 minutes we landed in Bagram. We were tied for hours. We were blindfolded, with headphones.

There was processing that went on till the morning hours, with no right to pray or use the bathrooms. I had no blanket or mat for two days, then they gave me just a blanket.

Men of 75 or even 90 years old were body cuffed and made to stay in a sitting position for six hours in a row with no right to toilet or food or water because they were praying when it was body count time.

We were forced to take showers all naked with 8 or 10 of us, while soldiers looked on talking about which PUAC is worth penetrating. A PUAC is a Prisoner Under American Custody.

Reprieve is a UK registered charity (1080147)
Patrons: Alan Bennett, Sir John Mortimer, Marina Warner, Charles Wheeler
Founder: Clive Stafford Smith

I was allowed to see the ICRC for the first time in my life some time in late May or June, I don't remember the actual date. The ICRC said they can't publicize anything, 'cause they have an agreement with the US government to keep everything on the hush hush.

I was in Bagram from the end of May until I was taken to Guantanamo in September 2004.

They said that there were ten of us meant to go to court. Some had to write statements. Some just had to sign statements that had been written by the U.S. interrogators. They said we were meant to go to court right on arrival in Cuba.

They made me write something out for them in Bagram. It was long - about twenty pages - but the first fifteen pages were just an autobiography. The actual story was only a couple of pages. By then, the story was something like this. First, Jose Padilla and I were meant to have good connections, because we both spoke English. We were meant to have been hanging out together. The FBI showed me Jose Padilla's picture as early as April 2002 when I was in Pakistan. When I was in Morocco I was shown a news clip of him. The truth is that I do not know Jose Padilla, I did not recognize him in the photograph.

Second, I was meant to have come from Afghanistan with him. The truth is that I have no idea whether I did. I was in a group of people for two or three days coming out of Afghanistan. I have no idea whether he was in it, or even whether he had been in Afghanistan. I did not know him, and kept to myself, and I can say that I have certainly never spoken with him. But, of course, by the time I was in Bagram I was telling them whatever they wanted to hear.

Third, I was meant to say that Jose Padilla and I were going to go to the U.S. to explode a dirty bomb.

I don't really remember, because by then I just did what they told me. But I think that was about the total of it by then.

Reprieve is a UK registered charity (1080147)
Patrons: Alan Bennett, Sir John Mortimer, Marina Warner, Charles Wheeler
Founder: Clive Stafford Smith

## Binyam & Those Who Have Treated Him Decently

Binyam is remarkably without bitterness. My impression is that he is suffering from Torture Victim Syndrome / PTSD or some related sequelae:

> What I am saying may not be exciting enough for you. But when I think about it, I am counting my rewards from God, and I cannot express what I felt. I'm sorry I have no emotion when talking about the past, 'cause I have closed. You have to figure out all the emotion part, I'm kind of dead in the head. Perhaps I can work this out later.

### a.  In Morocco

The woman who took the photographs in Morocco was a white female with glasses. She was 5'6" (at a guess, Binyam thinks she was 'short' but thought that 5'6" was short), blue eyes. She took the pictures. One of the soldiers held my penis and she took digital pictures. This took a while, maybe half an hour.

She was one of the few Americans who ever showed me any sympathy. She was about 5'6", short, blue eyes. When she saw the injuries I had she gasped. She said, "Oh, my God, look at that!" Then all her mates looked at what she was pointing at and I could see the shock and horror in her eyes.

### b.  In Afghanistan

The general in Kabul seemed a decent person. He changed a lot of rules while Binyam was there. He met with some of the prisoners and acceded to their requests after they explained what had happened to them. He showed some respect, but said "I can only do so much without getting fired."

Reprieve is a UK registered charity (1080147)
Patrons: Alan Bennett, Sir John Mortimer, Marina Warner, Charles Wheeler
Founder: Clive Stafford Smith

## The FBI Makes An Appearance

**Benhur Mohammed, Binyam's brother:** Benhur said that two FBI agents visited him at his apartment at 10am some time in May or June 2002. Benhur found the card left by one of the agents:

James R. Sobchack,
Special Agent,
Washington Metropolitan Field office.
Washington, DC 20535.
Phone 202-278-4352

Benhur has given a depiction of the visit:

Agent No. 1 was 5'11", skinny, clean shaved.

Agent No. 2 was 5'10", clean shaved.

> It was around 10am, in the morning when a bang on the door woke me up. I opened the door and two Caucasian males were standing at the door. Agent No. 1 said, "Can we speak with you for a moment?" I let them in.
>
> Agent No. 2: We are from the FBI, this is in regards to your brother.
>
> Agent No. 2 then took out a picture from yellow envelope and showed it to me, the picture was of medium size, black and white of an Arab looking person with small Islamic hat [skullcap], and said, do you know this person. I said, no, I do not know him.
>
> Agent No. 2 asked: Have you ever seen this person. I said no.
>
> Agent No. 1 said: Do you know where your brother is right now.
>
> I said: I do not know. I am looking for him. I know he is in London, but I have not heard from him for over a year now.
>
> Agent No. 2 said, "Your brother was seen with a bad person in Pakistan, a person that we want, this guy in the picture."
>
> Then I asked was he involved in anything?
>
> Agent No. 2 said: "No, he was seen with a person that we want, and picked up the picture from the table, the same picture he showed me earlier and said he was seen with this guy. And he added, "this is a bad guy, he has done a lot of bad things, we are looking for him, we do not need your brother."
>
> Agent No. 1 said: "When was the last time you saw him? I said in August of 1998, I went to visit him.
>
> Agent No. 1 said: "What was the purpose of your visit?"
>
> I said, I just went to see what he was going. If he was still in school or not.

Agent No. 2, said: " like big brother, little brother."

I said yes.

Agent No. 1 asked me full name, date of birth, passport, driving license, date of entry in the United States, social security number, date and place issued. Places I have lived, school I have attended. Do I pray or not. How religious I was, etc.

Agent No. 1 said: "Do you belong to any Islamic religious group?"

I said no.

Agent No. 1 said: "Anyone approached you to join their group?"

I said no.

Agent No. 1, looked at my passport, wrote my SS number, my email, my driving license number and passport number. And asked if I have another passport,

I said no.

Agent No. 2 said: "Have you travelled anywhere with another passport?"

I said no.

Agent No. 2, asked about where my father works, where he lives, about my sisters and my mother, their phone numbers and their addresses, etc.

Agent No. 1 said: "When was the last time you talked to your brother?"

I said sometime in June of 2001.

Agent No. 1 said: "Did you noticed anything unusual?"

I said no.

Agent No. 1 said: "Did he mention to you anything about the United States?" and he added, "Was he against the United States government?"

I said no, I have never heard him say anything bad about the U.S. government.

Agent No. 1 said: "How do you communicate?"

I said over the phone.

Agent No. 1 said: "Do you write letters to each other?"

I said no.

Agent No. 1 said: "Why did you stop calling?"

I said someone kept saying I am dialing the wrong number. Then I asked her where did she get this [mobile] phone, she said she bought it from someone.

Agent No. 1 said: "Who has a close contact with him?" I said my older sister.

Agent No. 1 said: "Where does she work?"

I said, At the CVS pharmacy.

Agent No. 2 said: "Is she at work right now?"

I said yes, and told them where she works.

Agent No. 2 said: "I will leave my business card, and give me a call if you want to tell us anything more."

I said OK and took the card.

Agent No. 2 said: "Do you have any questions?"

I said yes, and said, "Where is he right now?"

Agent No. 2 said: "We do not want him. He is in the custody of the Pakistani government."

I asked how can we contact him.

Agent No. 2 said: "He is not in our custody any more, maybe you need to contact the Pakistani consulate in New York."

**Zuhra Mohammed, Binyam's sister:** In June or July of 2002, two FBI agents came to visit Zuhra at the CVS pharmacy she worked at at the time, which is located at: 5001 Duke Street, Alexandria, VA 22304.

Zuhra described the agents as follows:

Agent 1: white male, short, dark hair, did most of the talking. He gave Zuhra his card. His first name is Jim and his last name started with an "S". (Zuhra said the spelling of his last name was very complicated and hard for her to pronounce. This is presumably James R. Sobchack.)

Agent 2: white male, tall, lighter colored hair, quiet during the interaction.

Zuhra said she was standing in the middle of an aisle when the agents came in. She saw them enter. They both immediately walked up to her and asked to speak with her. Zuhra said it seemed like they didn't know who she was. She asked her boss for permission to speak with them, and then took them both to the break room in the back.

Jim asked, "So who's Binyam?" Zuhra explained that he was her brother and asked where he was.

Jim told her Binyam had gone to Pakistan to learn religion.

Reprieve is a UK registered charity (1080147)
Patrons: Alan Bennett, Sir John Mortimer, Marina Warner, Charles Wheeler
Founder: Clive Stafford Smith

Zuhra asked Jim what the FBI needed Binyam for. Jim said, "We don't need Binyam," and continued: "He's fallen in with a bad crew." Jim showed Zuhra a photograph and asked her if she "knew this guy." Zuhra said the photo was of a Hispanic male with close cropped hair and a chubby face. Zuhra asked, "Who's that?" and Jim replied that it was Jose Padilla. Zuhra said she didn't know Jose Padilla. Zuhra then asked Jim what Jose Padilla had to do with Binyam. Jim told her that Binyam had fallen in with him and that Jose Padilla was a "bad guy."

Zuhra then asked where her brother was. Jim told her he didn't know. He said the US wouldn't have him since they "didn't need him" and that he might be in the custody of the Pakistanis, but he didn't know for sure.

Jim gave Zuhra his card and he and agent #2 left the pharmacy. Jim told Zuhra to call him if she heard anything about Binyam. He asked for her number. Zuhra gave him her cell phone, work number, and home number and told Jim to contact her if he found out anything about Binyam. She said that if he did find Binyam, to give him her number so that he could get in touch with her.

Zuhra estimated the interaction lasted approximately 30 minutes.

### Looking for their kid brother

**Zuhra**: Zuhra called Jim a while after their meeting looking for Binyam. Jim suggested that she try the Pakistani embassy or the Pakistani consulate in NYC. She did this, and was asked to send the embassy a photograph of Binyam. She didn't hear anything back. She called again and was told they hadn't found Binyam in any of their prisons.

Zuhra called Jim again, who told her to keep trying the embassy. She contacted the embassy a third time – they could give her no information about Binyam.

Zuhra said she called Jim fairly often between the time of their meeting and December 2003. Each time they talked, Jim would basically tell her that he didn't know what was happening with Binyam. He didn't know why he would still be in captivity since the FBI "didn't need him," and kept telling Zuhra to try the Pakistanis.

During one conversation, Zuhra asked Jim if he could put her in touch with Jose Padilla, so she could ask him if he knew where her brother was. Jim said she couldn't. Zuhra asked him why and he replied, "Padilla won't talk to you. He hasn't been answering any questions, so he won't talk to you." Zuhra asked Jim if she should hire a lawyer to talk to Padilla or to Padilla's lawyers to try to get information about Binyam. Jim told her no. Zuhra said this is why she didn't seek legal representation earlier.

Zuhra is very angry about this: "I should've hired a lawyer from the beginning, but I didn't because of what Jim told me."

In December 2003, Zuhra called Jim's number and a woman answered. She told Zuhra to call Jim back. She did, and Jim told her there was nothing he could do and to stop calling him, since he "didn't know anything." Jim again suggested she try the Pakistani consulate in New York.

Reprieve is a UK registered charity (1080147)
Patrons: Alan Bennett, Sir John Mortimer, Marina Warner, Charles Wheeler
Founder: Clive Stafford Smith

Zuhra estimates that she called the Pakistani consulate about 10 times but was only able to reach someone working there perhaps 5 times. She spoke to a female there once and the same male the other 4 times. The male at the consulate eventually told her they weren't able to track Binyam down.

Zuhra did not know of Binyam's whereabouts until early 2005, when she was contacted by the Red Cross and told that Binyam was in Guantanamo Bay.

**Benhur**: Benhur and Zuhra did most of the work looking for Binyam. They sent the Pakistani consulate Binyam's photo upon request. They heard nothing back. They sent another photo. Finally, someone at the consulate told them they were unable to find Binyam, and that they would need to be more specific.

In December 2003, Benhur went to the UK to look for Binyam. He was in London for a week searching.

### The emotional toll

**Zuhra:** Zuhra says that she feels hurt more than anything. She resents the fact the FBI knew where Binyam was all along but didn't tell her. Zuhra said she cries about Binyam often and that she's felt a great emptiness ever since she realized he was missing. It gave her some relief to know Binyam was in Guantanamo, she said, because at least she knew he hadn't been killed.

Zuhra said she is frustrated at the FBI's handling of the situation. She resents being made to look for her brother by herself, particularly when she has been actively misled as to where he is.

Zuhra felt guilt during the search: "I was really nervous. I didn't even know what to look for. I was worried that I was failing Binyam, but I wasn't sure what to do."

She is very distrusting of the FBI. She spoke about how she felt comfortable, initially, when she and Jim spoke at the pharmacy – she thought that the FBI (i.e. Jim) would help her find her brother. It made her feel very helpless and insecure when she realized Jim wouldn't help her. It was much later (after she had wasted a great deal of energy looking for her kid brother) that she learned that Jim had actually misled her.

**ENDS**

Reprieve is a UK registered charity (1080147)
Patrons: Alan Bennett, Sir John Mortimer, Marina Warner, Charles Wheeler
Founder: Clive Stafford Smith

# EXHIBIT B

# EUROPEAN PARLIAMENT

*2004*                                    *2009*

*Session document*

FINAL
**A6-0020/2007**

30.1.2007

# REPORT

on the alleged use of European countries by the CIA for the transportation and illegal detention of prisoners
(2006/2200(INI))

Temporary Committee on the alleged use of European countries by the CIA for the transportation and illegal detention of prisoners

Rapporteur: Giovanni Claudio Fava

without any charges being brought;

63. Regrets that, according to the documentation provided to the Temporary Committee by Abou Elkassim Britel's lawyer, the Italian Ministry of Internal Affairs was at the time in 'constant cooperation' with foreign secret services concerning the case of Abou Elkassim Britel following his arrest in Pakistan;

64. Urges the Italian Government to take concrete steps in order to obtain the immediate release of Abou Elkassim Britel and Abu Omar so that proceedings against the latter can be prosecuted in the Court of Milan;

65. Deeply regrets that Italian territory was used by the CIA to make a stopover during the flight that was used to carry out the extraordinary rendition of Maher Arar, who gave testimony to the Temporary Committee, from the United States to Syria, via Rome;

66. Notes the 46 stopovers made by CIA-operated aircraft at Italian airports and expresses serious concern about the purpose of those flights which came from or were bound for countries linked with extraordinary rendition circuits and the transfer of detainees; deplores the stopovers at Italian airports of aircraft which have been shown to have been used by the CIA on other occasions for the extraordinary rendition of , Bisher Al-Rawi, Jamil El-Banna, Abou Elkassim Britel, Khaled El-Masri, Binyam Mohammed, Abu Omar and Maher Arar and for the expulsion of Ahmed Agiza and Mohammed El Zari;

THE UNITED KINGDOM

67. Deplores the manner in which the UK Government, as represented by its Minister for Europe, cooperated with the Temporary Committee; is extremely surprised at the letter of the Minister sent to Parliament's President,

68. Thanks the All-Party Parliamentary Group on Extraordinary Renditions (APPG), comprising members of the House of Commons and the House of Lords, for its work and for providing the Temporary Committee delegation to London with a number of highly valuable documents;

69. Condemns the extraordinary rendition of Bisher Al-Rawi, an Iraqi citizen and resident of the United Kingdom, and Jamil El-Banna, a Jordanian citizen and resident of the United Kingdom, who were arrested by Gambian authorities in Gambia in November 2002, turned over to US agents, and flown to Afghanistan and then to Guantánamo, where they remain detained without trial or any form of judicial assistance;

70. Points out that the telegrams from the UK security service MI5 to an unspecified foreign government which were released to the Chairman of the APPG, Andrew Tyrie, suggest that the abduction of Bisher Al-Rawi and Jamil El-Banna was facilitated by partly erroneous information supplied by the UK security service;

71. Criticises the unwillingness of the UK Government to provide consular assistance to Bisher Al-Rawi and Jamil El-Banna on the grounds that they are not UK citizens;

72. Condemns the multiple extraordinary rendition of Binyam Mohammed, Ethiopian citizen and resident of the United Kingdom; points out that Binyam Mohammed has been held in at least two secret detention facilities, in addition to military prisons;

**EN**

73. Is deeply disturbed by the testimony of Binyam Mohammed's lawyer, who gave an account of the most horrific torture endured by his client to the official delegation of the Temporary Committee to the United Kingdom;

74. Emphasises that the former UK Secretary of State for Foreign and Commonwealth Affairs, Jack Straw, conceded in December 2005 that UK intelligence officials met Binyam Mohammed when he was arrested in Pakistan; points out in this respect that some of the questions put by the Moroccan officials to Binyam Mohammed appear to have been inspired by information supplied by the UK;

75. Condemns the extraordinary rendition of UK citizen Martin Mubanga, who met the official delegation of the Temporary Committee to the United Kingdom, and who was arrested in Zambia in March 2002 and subsequently flown to Guantánamo; regrets the fact that Martin Mubanga was interrogated by British officials at Guantánamo, where he was detained and tortured for four years without trial or any form of judicial assistance and then released without charge;

76. Thanks Craig Murray, former UK Ambassador to Uzbekistan, for his very valuable testimony to the Temporary Committee on the exchange of intelligence obtained under torture and for providing a copy of the legal opinion of Michael Wood, former legal advisor to the UK Foreign and Commonwealth Office;

77. Is outraged by Michael Wood's legal opinion, according to which 'receiving or possessing' information extracted under torture, in so far as there is no direct participation in the torture, is not per se prohibited by the UN Convention against Torture and other Cruel, Inhumane or Degrading Treatment or Punishment; expresses its outrage at any attempt to obtain information by means of torture, regardless of who is involved;

78. Expresses serious concern about the 170 stopovers made by CIA-operated aircraft at UK airports, which on many occasions came from or were bound for countries linked with extraordinary rendition circuits and the transfer of detainees; deplores the stopovers at UK airports of aircraft which have been shown to have been used by the CIA, on other occasions, for the extraordinary rendition of Bisher Al-Rawi, Jamil El-Banna, Abou Elkassim Britel, Khaled El-Masri, Binyam Mohammed, Abu Omar and Maher Arar and for the expulsion of Ahmed Agiza and Mohammed El Zari;

GERMANY

79. Acknowledges the good cooperation on the part of the German Government by providing restricted documents to the Chairman and the rapporteur of the Temporary Committee; regrets, on the other hand, that no representative of the German Government was able to appear before the Temporary Committee;

80. Welcomes the excellent work of the German Parliament inquiry committee and expresses its full support for the continuation of that committee's work;

81. Thanks Munich Public Prosecutor Martin Hofmann for his testimony to the Temporary Committee and applauds all ongoing judicial inquiries in Germany;

82. Deplores the fact that German authorities at least had knowledge of the illegal abduction

**EN**

of German citizen Khaled El-Masri, who gave testimony to the Temporary Committee, and requests the German Parliament inquiry committee to examine further and clarify the role of German agents in this case;

83. Condemns the extraordinary rendition of Turkish citizen and resident of Germany Murat Kurnaz, who gave testimony to the Temporary Committee and who was arrested in Pakistan in November 2001, transferred to the US units across the border in Afghanistan by the Pakistani police on no legal basis and with no judicial assistance, and finally flown to Guantánamo at the end of January 2002, from where he was released on 24 August 2006 without charge, having been tortured in all the locations where he had been held;

84  Points out that, according to confidential institutional information, the German Government did not accept the US offer, made in 2002, to release Murat Kurnaz from Guantánamo; notes that on many occasions since 2002, Murat Kurnaz's lawyer was told by the German Government that it was impossible to open negotiations with the US Government on his release because Murat Kurnaz was a Turkish citizen; notes that all investigations concluded, as early as the end of October 2002, that Murat Kurnaz posed no terrorist threat;

85. Regrets the fact that Murat Kurnaz was interrogated twice, in 2002 and in 2004, by German officials at Guantánamo, where he detained subject to neither formal charge nor trial and without judicial assistance; regrets the fact that German officials denied him any assistance and were only interested in questioning him;

86. Fully supports the investigation launched by the public prosecutor in Potsdam, transferred to the Public Prosecutor in Tübingen/Karlsruhe on 25 October 2006, into unknown perpetrators in order to establish whether Murat Kurnaz was ill-treated in Afghanistan by German soldiers belonging to the Kommando Spezialkräfte (KSK), the German army's special operational forces, before being sent to Guantánamo;

87. Notes that during his interrogations Murat Kurnaz was confronted with details from his personal life; notes that this gives rise to the suspicion that even before he left the country Murat Kurnaz was the subject of surveillance of a closeness which can normally only be provided by domestic intelligence services;

88. Appreciates the German Government's initiative in January 2006 which led to the release of Murat Kurnaz;

89. Condemns the extraordinary rendition of the German citizen Mohammed Zammar, arrested without formal charge on 8 December 2001 at Casablanca airport in Morocco and detained and tortured in Morocco and Syria;

90. Notes that, according to a confidential institutional source, on 26 November 2001 the German Federal Criminal Police Office provided details of Mohammed Zammar's whereabouts to the US Federal Bureau of Investigation (FBI), and that this facilitated Mohammed Zammar's arrest;

91. Points out that, subsequently to a meeting between the officials of the German Federal Chancellery and Syrian intelligence officials in July 2002, German prosecutors dropped charges against several Syrian citizens in Germany while the Syrian authorities allowed

**EN**

German officials to meet Mohammed Zammar in the Syrian prison Far' Falastin, as also confirmed by a confidential institutional source; regrets that Mohammed Zammar was interrogated by German agents in that prison;

92. Calls on the German Bundestag's First Committee of Inquiry, in the context of the forthcoming expansion of its remit, to investigate the case which recently came to light involving the illegal rendition of the Egyptian national Abdel-Halim Khafagy, who had long been resident in Germany; Abdel-Halim Khafagy was probably arrested in Bosnia and Herzegovina in September 2001 on suspicion of being a terrorist and abducted to a prison on the US 'Eagle Base' military base in Tuzla, where he was severely mistreated and detained under inhumane conditions;

93. Is deeply concerned at information contained in an unclassified document made available to the Temporary Committee which shows that the illegal rendition of at least six Algerians from Tuzla via Incirlik to Guantánamo was planned at the US European Command (USEUCOM) military base near Stuttgart; calls on the German Bundestag to investigate without delay whether those alleged renditions involved breaches of the Forces Status Agreement or other agreements or treaties concluded with US military forces on German territory, whether further illegal renditions were planned by USEUCOM and whether German liaison officers were involved in any way;

94. Expresses serious concern about the 336 stopovers made by CIA-operated aircraft at German airports that on many occasions came from or were bound for countries linked with extraordinary rendition circuits and the transfer of detainees; deplores the stopovers in Germany of aircraft which have been shown to have been used by the CIA, on other occasions, for the extraordinary renditions of Bisher Al-Rawi, Jamil El-Banna, Abou Elkassim Britel, Khaled El-Masri, Binyam Mohammed, Abu Omar and Maher Arar and for the expulsionof Ahmed Agiza and Mohammed El Zari; is particularly concerned that one of the flights referred to was destined for Guantánamo; strongly encourages the German authorities further to investigate that flight;

95. Notes the allegations concerning the temporary detention and mistreatment of suspected terrorists at the US military prison in Mannheim-Blumenau, welcomes the investigations opened by the Federal Public Prosecutor's Office and hopes that the German Bundestag and/or the competent committee of inquiry will investigate this case more closely;

SWEDEN

96. Takes note of the position of the Swedish Government expressed in the letter transmitted to the Temporary Committee by its Foreign Minister Carl Bildt; regrets that no representative of the government was able to appear before the Temporary Committee in order to hold an exchange of views on its position;

97. Condemns the fact that Sweden's expulsion in December 2001 of Mohammed El-Zari and Ahmed Agiza, Egyptian nationals who were seeking asylum in Sweden, was based solely on diplomatic assurances from the Egyptian Government, which did not provide effective safeguards against torture; also acknowledges that the Swedish government hindered them from exercising their rights in accordance with the European convention, by not informing their lawyers until before they had arrived in Cairo; deplores the fact that the Swedish authorities accepted an US offer to place at their disposal an aircraft

**EN**

which benefited from special overflight authorisation in order to transport the two men to Egypt;

98. Deplores the fact that the Swedish security police lost control over the enforcement of the expulsion of Ahmed Agiza and Mohammed El-Zari to Egypt, outside the rule of law, by remaining passive during the degrading treatment of the men by US agents at Bromma airport;

99. Underlines that the decision of the expulsion was taken at the highest executive level, from which no appeal was possible;

100. Fully endorses the UN Human Rights Committee's decision of 6 November 2006 in which it found that Sweden had breached the absolute ban on torture; similarly endorses a separate ruling by the UN Committee against Torture of 20 May 2005, which concluded that Sweden had violated the UN Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment and stated that "procurement of diplomatic assurances (from Egypt), which, moreover, provided no mechanism for their enforcement, did not suffice to protect against this manifest risk";

101. Thanks the Swedish Chief Parliamentary Ombudsman, Mats Melin, for his testimony to the Temporary Committee and applauds his investigation which concluded that the Swedish security service and airport police "were remarkably submissive to the American officials" and "lost control of the enforcement", resulting in the ill-treatment of Ahmed Agiza and Mohammed El-Zari, including physical abuse and other humiliation, at the airport immediately before they were transported to Cairo;

AUSTRIA

102. Notes the written explanations given on behalf of the Austrian Government but regrets that the Austrian Government did not consider it appropriate to appear before the Temporary Committee in order to hold an exchange of views about its position;

103. Notes that the persons referred to in the following paragraphs, Masaad Omer Behari and Gamal Menshawi, are individuals who did not and still do not have Austrian citizenship, whose freedom of movement was unrestricted; notes that the two men left Austria voluntarily and without undergoing checks by the Austrian authorities, and that they were arrested by foreign agencies, outside Austrian territory and outside the area of influence of the Austrian authorities, with no Austrian involvement; notes that, accordingly, these are clearly not cases of rendition of persons to foreign authorities;

104. Condemns the fact that Masaad Omer Behari, a Sudanese citizen and resident of Austria since 1989 who gave testimony to the Temporary Committee, was abducted at Amman airport on 12 January 2003 on his way back to Vienna from Sudan;

105. Deplores the fact that Masaad Omer Behari was later illegally secretly detained in a prison close to Amman run by the Jordan General Intelligence Department, without trial or legal assistance, and that he was tortured and ill-treated there until 8 April 2003, when he was released without charge; recalls that a judicial procedure was started by the Austrian authorities against Masaad Omer Behari in September 2001, which was subsequently closed in August 2002, without charge;

106. Deplores the fact that, according to Masaad Omer Behari's statement to the Temporary Committee, there may have been cooperation between the US, Austrian and Jordanian authorities in respect of his case;

107. Condemns the abduction of Egyptian citizen and resident of Austria, Gamal Menshawi, who was arrested on his way to Mecca at Amman airport in February 2003, and later brought to Egypt where he was secretly detained until 2005 without trial or legal rights; recalls that no allegations have ever been made against Gamal Menshawi in Austria;

108. Regrets that, having considered the above paragraphs, neither a special nor a parliamentary inquiry was carried out in Austria into the possible involvement of the Austrian authorities in the two cases referred to; urges the Austrian Parliament to start appropriate inquiries as soon as possible;

SPAIN

109. Welcomes the declaration of good cooperation with the Temporary Committee of the Spanish Government, in particular, the testimony given to the Temporary Committee by its Minister for Foreign Affairs; regrets, nevertheless, that the Spanish Government ultimately did not authorise the Director of the Spanish Intelligence Services to appear before the Temporary Committee, several months after having been requested to do so;

110. Thanks the Chief Prosecutor Javier Zaragoza and Prosecutor Vicente González Mota of the *Audiencia Nacional* for their testimony to the Temporary Committee and applauds their investigations into the use of Spanish airports for the transit of CIA aircraft within the context of the programme of extraordinary rendition; encourages the prosecutors to investigate further the stopovers of the aircraft involved in the extraordinary rendition of Khaled El-Masri;

111. Applauds the investigative journalism of Diario de Mallorca, which played an important role in revealing the transit of CIA aircrafts through the Balearic Island airports and the identification of their crews;

112. Recalls the words of Chief Prosecutor Zaragoza that "there was no obstacle, objection or trouble from the Spanish Government side in the investigations by the *Audiencia Nacional*";

113. Calls on the Spanish authorities to take all necessary steps to allow Spanish citizen Mustafa Setmariam Nasarwho, abducted in Syria in October 2005 and rendered to US agents, to face a fair trial before competent judicial authorities;

114. Expresses serious concern about the 68 stopovers made by CIA-operated aircraft at Spanish airports that on many occasions came from or were bound for countries linked with extraordinary rendition circuits and the transfer of detainees; deplores the stopovers in Spain of aircraft which have been shown to have been used by the CIA in other countries for the extraordinary rendition of Ahmed Agiza, Mohammed El-Zari, Bisher Al-Rawi, Jamil El-Banna, Abou Elkassim Britel, Khaled El-Masri, Binyam Mohammed, Abu Omar and Maher Arar, according to the legal investigations under way in Spain and Italy; is particularly concerned that, of the above flights, three originated from or were destined for Guantánamo; strongly encourages the Spanish Prosecutors further to investigate those flights;

**EN**

PORTUGAL

115. Welcomes the meeting in Lisbon with the Portuguese Minister of Foreign Affairs and the fact that the Portuguese Government supplied documents and explanations; regrets that the Portuguese authorities were unable or reluctant to answer all the questions raised by the Temporary Committee delegation in Portugal;

116. Asks the Portuguese authorities to investigate the case of Abdurahman Khadr, allegedly carried on board the Gulfstream IV N85VM from Guantánamo to Tuzla in Bosnia and Herzegovina on 6 November 2003, with a stopover in Santa Maria on the Azores Islands on 7 November 2003; calls on the Portuguese authorities to examine this case and those of other possible victims transported via Portugal with a view to determining whether there should be compensation for violations of human rights;

117. Welcomes the establishment of the inter-ministerial working group on 26 September 2006 and the entry into force, on 13 October 2006, of a regulation stipulating that lists of the names of crew members and passengers on private flights must be submitted to the Portuguese frontier authorities;

118. Deplores the fact that the former Minister of Defence, Paulo Portas, and the former Minister of the Interior, António Figueiredo Lopes, declined invitations to meet the delegation of the Temporary Committee;

119. Notes that some of the 91 stopovers made in Portugal enabled the CIA and US military bodies to carry out the extraordinary rendition of Bisher Al-Rawi, Jamil El-Banna, Khaled El-Masri, Binyam Mohammed and Abu Omar and for the expulsion of Ahmed Agiza and Mohammed El Zari; is particularly concerned that of those flights, at least three originated from or were destined for Guantánamo; notes that the aircraft involved in the rendition of Maher Arar and Abou Elkassim Britel made stopovers in Portugal on their return flights;

120. Expresses deep concern at an additional list that the Temporary Committee has obtained, the authenticity of which the Portuguese Government has not denied, which indicates that, in addition to the 91 stopovers made, aircraft from a number of countries, travelling to or from Guantánamo, made 17 stopovers (including three contained in Eurocontrol lists) at the Portuguese airports of Lajes and Santa Maria between 11 January 2002 and 24 June 2006;

IRELAND

121. Welcomes the testimony given to the Temporary Committee by the Irish Minister for Foreign Affairs on behalf of the Irish Government as well as his unequivocal criticism of the process of extraordinary rendition; notes the fact, however, that he failed to answer all the questions in relation to the concerns that Irish airports may have been used by CIA aircraft travelling to or from extraordinary rendition missions (as in the case of Abu Omar);

122. Thanks the Irish Human Rights Commission (IHRC) for its testimony to the Temporary Committee and endorses its view which considers that acceptance by the Irish government of diplomatic assurances do not fulfil Ireland's human rights obligations, which oblige the government actively to seek to prevent any actions that could in any

**EN**

way facilitate torture or ill-treatment in Ireland or abroad; regrets the decision of the Irish Government not to follow the IHRC's advice on this matter to date; notes that there is continuing dialogue between the IHRC and the Irish Government;

123. Expresses serious concern about the 147 stopovers made by CIA-operated aircraft at Irish airports that on many occasions came from or were bound for countries linked with extraordinary rendition circuits and the transfer of detainees; deplores the stopovers in Ireland of aircraft which have been shown to have been used by the CIA, on other occasions, for the extraordinary rendition of Bisher Al-Rawi, Jamil El-Banna, Abou Elkassim Britel, Khaled El-Masri, Binyam Mohammed, Abu Omar and Maher Arar and for the expulsion of Ahmed Agiza and Mohammed El Zari;

124. Notes the absence of Irish parliamentary scrutiny of either Irish or foreign intelligence services and the potential that this creates for abuse;

125. Considers, that, in the absence of a system of random searches, a ban should be imposed on all CIA-operated aircraft landing in Ireland;

126. Urges the Irish Government, in view of the findings of the Temporary Committee, to agree to launch a parliamentary inquiry into the use of Irish territory as part of the CIA rendition circuit;

GREECE

127. Expresses serious concern about the 64 stopovers made by CIA-operated aircraft at Greek airports that on many occasions came from or were bound for countries linked with extraordinary rendition circuits and the transfer of detainees; deplores the stopovers in Greece of aircraft which have been shown to have been used by the CIA, on other occasions, for the extraordinary rendition of Ahmed Agiza, Mohammed El-Zari, Bisher Al-Rawi, Jamil El-Banna, Abou Elkassim Britel, Khaled El-Masri, Binyam Mohammed and Maher Arar;

CYPRUS

128. Expresses serious concern about the 57 stopovers made by CIA-operated aircraft at Cypriot airports that on many occasions came from or were bound for countries linked with extraordinary rendition circuits and the transfer of detainees; deplores the stopovers in Cyprus of aircraft which have been shown to have been used by the CIA, on other occasions, for the extraordinary rendition of Ahmed Agiza, Mohammed El-Zari, Bisher Al-Rawi, Jamil El-Banna, Abou Elkassim Britel, Khaled El-Masri, Binyam Mohammed and Abu Omar;

DENMARK

129. Welcomes the cooperation received from the Danish authorities, while regretting that no representative of the government considered it appropriate to appear before the Temporary Committee;

BELGIUM

130. Calls on the Belgian Government to disclose the results of all investigations that have

**EN**

taken place and deplores the fact that Belgium did not conduct a thorough investigation concerning the use of Belgian airports and the Belgian airspace by aircraft clearly involved in the extraordinary rendition programme or the transport of detainees;

131. Notes the statements of the President of the Belgian Senate Anne-Marie Lizin and refers to the conclusions of the report of the Belgian Senate which deplore the lack of cooperation by the Belgian intelligent services and the Belgian authorities;

TURKEY

132. Expresses its serious concern about the failure of the Turkish authorities to extend diplomatic protection to their national Murat Kurnaz and about the absence of any step to secure his release from the prison at Guantánamo;

133. Regrets that, on the contrary, the same authorities used the illegal detention of their national to interrogate him at Guantánamo;

134. Deplores the silence of the Turkish authorities concerning the use of their territory for the stopover of an aircraft which had taken to Guantánamo the six nationals of or residents in Bosnia and Herzogovina, of Algerian origin, who were illegally arrested in Bosnia and Herzegovina;

FORMER YUGOSLAV REPUBLIC OF MACEDONIA

135. Emphasises that a delegation of the Temporary Committee was received in Skopje in April 2006 by the President of the Republic, members of the government and several officials and thanks them for the welcome given to the delegation; notes, however, a lack of thorough investigation into the Khaled El-Masri case by the authorities of the Former Yugoslav Republic of Macedonia;

136. Condemns the extraordinary rendition of the German citizen Khaled El-Masri, abducted at the border-crossing Tabanovce in the Former Yugoslav Republic of Macedonia on 31 December 2003, illegally held in Skopje from 31 December 2003 to 23 January 2004 and then transported to Afghanistan on 23-24 January 2004, where he was held until May 2004 and subjected to degrading and inhuman treatment;

137. Urges the Council and its High Representative for the CFSP to shed full light on the fact that the EU police mission (PROXIMA) was incorporated into the Ministry of Interior of the Former Yugoslav Republic of Macedonia and was involved in the work of the Macedonian Security and Counter-Espionage Service (DBK) at the time when Khaled El-Masri was handed over to the CIA; would like to know if it is true that the Council questioned the EU staff involved in the PROXIMA mission so as to evaluate the level of information in their possession regarding the case of Khaled el Masri; if appropriate, asks the Council to provide Parliament with a full account of the investigation;

138. Fully endorses the preliminary findings of Munich Public Prosecutor Martin Hofmann that there is no evidence on the basis of which to refute Khaled El-Masri's version of events;

139. Deeply regrets the fact that the authorities of the Former Yugoslav Republic of Macedonia failed to follow up the recommendations made by the Temporary

**EN**

Committee in its interim report of 6 July 2006;

140. Points out again that the Former Yugoslav Republic of Macedonia authorities are expected to carry out investigations; urges the newly elected national parliament of the Former Yugoslav Republic of Macedonia to set up a committee of inquiry as soon as possible to deal with the case of Khaled El-Masri and to cooperate fully with the ongoing inquiry of the German Parliament;

BOSNIA AND HERZEGOVINA

141. Welcomes the fact that the Government of Bosnia and Herzegovina is the only European government that does not deny its participation in the extraordinary rendition of four citizens of and two residents in Bosnia and Herzegovina, all of Algerian origin, and stresses that the Government of Bosnia and Herzegovina is the only European government to have accepted formal responsibility for its illegal actions; regrets, however, that the steps undertaken by the Government of Bosnia and Herzegovina have not yet resulted in the release of the six men from Guantánamo;

142. Condemns the extraordinary rendition of those six men, who were abducted in Sarajevo on 17 January 2002, turned over to US soldiers and then flown to Guantánamo, where they remain detained without trial or legal guarantees;

143. Takes note of the testimony given to the Temporary Committee by Wolfgang Petritsch, former High Representative of the international community in Bosnia and Herzegovina, and by Michèle Picard, former President of the Human Rights Chamber of Bosnia and Herzegovina, which stated that representatives of the international community in Bosnia and Herzegovina were given adequate notice of the imminent handing-over of the men referred to the US forces before events unfolded; condemns in this respect the Member States for their lack of action;

144. Regrets the fact that the international community as represented in Bosnia and Herzegovina turned a blind eye when the decisions of the Supreme Court and the Human Rights Chamber of Bosnia and Herzegovina ordering the release of the men from custody were not implemented;

145. Points out that, according to the information that the Temporary Committee received from the lawyers of the six men, the authorities of Bosnia and Herzegovina were subject to unprecedented pressure from the US Government, which threatened to close its embassy, withdraw all staff and cease diplomatic relations with Bosnia and Herzegovina unless the Government of Bosnia and Herzegovina immediately arrested the six men on terrorism charges;

146. Notes that Wolfgang Petritsch confirmed that the United States put considerable pressure on the authorities of Bosnia and Herzegovina and the international community not to interfere in the renditions and that the commander of the international NATO-led Stabilisation Force in particular rejected any questioning of his activities since he acted in his capacity as US military officer;

OTHER EUROPEAN COUNTRIES

147. Is concerned about the stopovers made by CIA-operated aircraft in other European

countries' airports and expresses serious concern about the purpose of those flights which came from or were bound for countries linked with extraordinary rendition circuits and the transfer of detainees; encourages the authorities of those European countries to launch adequate investigations into this matter;

*Secret detention facilities*

148. Welcomes the investigations carried out into the existence of secret detention facilities in Europe by Human Rights Watch, the Washington Post and American Broadcasting Company News (ABC News);

149. Recalls that some journalists at the Washington Post and ABC News, as they confirmed to the Temporary Committee, were put under pressure not to name the eastern European countries, namely Poland and Romania, where there were said to have been secret detention facilities;

150. Emphasises that the concept of "secret detention facility" includes not only prisons, but also all places where somebody is held *incommunicado*, such as private apartments, police stations or hotel rooms, as in the case of Khaled El-Masri in Skopje;

151. Is deeply concerned that, in some cases, temporary secret detention facilities in European countries may have been located at US military bases;

152. Calls for the appropriate implementation of bilateral agreements, Status of Forces Agreements and military base agreements (between Member States and third countries) to ensure the monitoring of respect for human rights and, where appropriate, for a review and renegotiation of those agreements to this effect; stresses that, according to the Venice Commission, the legal framework of foreign military bases on the territory of Council of Europe's Member States must enable them to exercise sufficient powers to fulfil their human rights obligations;

153. Points out in this regard the allegations concerning the US Coleman Barracks in Mannheim, Germany, and calls on both the judiciary and the German Bundestag's inquiry Committee to investigate this case further;

154. Regrets that there may have been a lack of control over US military bases by host European countries; recalls, however, that the ECHR provides that all State parties are bound to exercise jurisdiction over their whole territory, including foreign military bases;

155. Recalls that the ECHR also provides that every case of detention must be lawful and must be the result of proceedings prescribed by law, whether national or international;

156. Recalls that imposing or executing or allowing directly or indirectly secret and illegal detentions, which are instruments resulting in people's 'disappearance', per se constitute serious violations of human rights and that the active or passive involvement in such secret and illegal detentions by a European country renders that county responsible under the ECHR;

ROMANIA

**EN**

157. Welcomes the excellent hospitality and good cooperation extended by the Romanian authorities to the Temporary Committee, including meetings with members of the Romanian Government, as well as the establishment of an ad hoc inquiry committee of the Romanian Senate;

158. Notes, however, the reluctance on the part of the Romanian authorities to investigate thoroughly the existence of secret detention facilities on its territory;

159. Regrets that the report issued by the Romanian inquiry committee was entirely secret except for its conclusions, included in Chapter 7, categorically denying the possibility that secret detention facilities could be hosted on Romanian soil; regrets that the Romanian inquiry committee heard no testimony from journalists, NGOs, or officials working in airports, and has not yet provided the Temporary Committee with the report contrary to its commitment to do so; regrets that taking these elements into consideration, the conclusions drawn in the Romanian inquiry committee's report appear premature and superficial; takes note, however, of the intention expressed by the Chairwoman of the inquiry committee to the Temporary Committee delegation to consider the conclusions provisional;

160. Regrets the lack of control of the Gulfstream aircraft with Registration Number N478GS that suffered an accident on 6 December 2004 when landing in Bucharest; recalls that the aircraft took off from Bagram Air Base in Afghanistan, and that its seven passengers disappeared following the accident; appreciates, however, the good cooperation of the Romanian authorities in handing over the report on the accident to the Temporary Committee;

161. Is deeply concerned to see that Romanian authorities  did not initiate an official investigation process, as any democratic country should have done, into the case of a passenger on the aircraft Gulfstream N478GS , who was found carrying a Beretta 9 mm Parabellum pistol with ammunition;

162. Expresses serious concern about the 21 stopovers made by CIA-operated aircraft at Romanian airports, which on many occasions came from or were bound for countries linked with extraordinary rendition circuits and the transfer of detainees; deplores the stopovers in Romania of aircraft which have been shown to have been used by the CIA, on other occasions, for the extraordinary rendition of Bisher Al-Rawi, Jamil El-Banna, Abou Elkassim Britel, Khaled El-Masri, Binyam Mohammed and Abu Omar and for the expulsion of Ahmed Agiza and Mohammed El Zari; is particularly concerned that, of the flights referred to, two originated from or were destined for Guantánamo; strongly encourages the Romanian authorities further to investigate those flights;

163. Is extremely concerned that the Romanian authorities may have lacked control over US activities in the military base at Kogalniceanu airport;

164. Cannot exclude, based only on the statements made by Romanian authorities to the Temporary Committee delegation to Romania, the possibility that US secret services operated in Romania on a clandestine basis and that no definitive evidence has been provided to contradict any of the allegations concerning the running of a secret detention facility on Romanian soil;

POLAND

**EN**

165. Deplores the glaring lack of cooperation by the Polish Government with the Temporary Committee, in particular when receiving the Temporary Committee delegation at an inappropriate level; deeply regrets that all those representatives of the Polish Government and Parliament who were invited to do so, declined to meet the Temporary Committee;

166. Believes that this attitude reflected an overall rejection on the part of the Polish Government of the Temporary Committee and its objective to examine allegations and establish facts;

167. Regrets that no special inquiry committee has been established and that the Polish Parliament has not conducted an independent investigation;

168. Recalls that on 21 December 2005, the Special Services Committee held a private meeting with the Minister Coordinator of Special Services and the heads of both intelligence services; emphasises that the meeting was conducted speedily and in secret, in the absence of any hearing or testimony and subject to no scrutiny; stresses that such an investigation cannot be defined as independent and regrets that the committee released no documentation, save for a single final statement in this regard;

169. Expresses serious concern about the 11 stopovers made by CIA-operated aircraft at Polish airports that on many occasions came from or were bound for countries linked with extraordinary rendition circuits and the transfer of detainees; deplores the stopovers in Poland of aircraft which have been shown to have been used by the CIA, on other occasions, for the extraordinary rendition of Bisher Al-Rawi, Jamil El-Banna, Abou Elkassim Britel, Khaled El-Masri and Binyam Mohammed and for the expulsion of Ahmed Agiza and Mohammed El Zar;

170. Regrets that following the hearings carried out by the Temporary Committee delegation in Poland, there was confusion and contradictory statements were made about the flight logs for those CIA flights, which were first said not to have been retained and then said to have probably been archived at the airport and finally claimed to have been sent by the Polish Government to the Council of Europe; acknowledges that in November 2006, the Szymany Airport's management provided the Temporary Committee with partial information on flight logs;

171. Thanks the former manager of the Szymany airport, for the valuable testimony given before the Temporary Committee; notes the fact that during 2006 he or she was questioned in the framework of a late enquiry concerning the CIA flights, immediately after his or her testimony was made public;

172. Takes note that, according to different sources, several high-value detainees who had been held secretly in Afghanistan in 2003 were transferred out of the country in September and October 2003; underlines with concern that a Boeing 737 with Registration Number N313P, used by the CIA for ascertained renditions, flew from Kabul to Szymany airport on 22 September 2003 and was then directed to Guantánamo;

173. Recalls that, concerning the landing of the aircraft referred to at Szymany airport, seven staff on board were joined by five passengers and that no customs control was carried out on those passengers;

**EN**

| DATE | | LOCATION | DESCRIPTION | |
|---|---|---|---|---|
| 04 October 2006-Wednesday (morning) 06 October 2006 - Friday (evening) | ••• | London (United Kingdom) | **Delegation TDIP 4: London (UNITED KINGDOM)** Sarah LUDFORD, [acting chair], Giovanni Claudio FAVA, Jas GAWRONSKI, Wolfgang KREISSL-DÖRFLER, , Jean LAMBERT, Giusto CATANIA, Miroslaw PIOTROWSKI | Wahab El-Rawi, brother of Bisher al-Rawi; Clive Stafford Smith, lawyer for Bisher al-Rawi, Jamil El-Banna and Binyam Mohamed; Gareth Peirce, lawyer for Bisher al-Rawi and Jamil El-Banna; Brent Mickum , US lawyer of Bisher al Rawi and Jamil El-Banna; Rt Hon Michael Ancram MP, Member of the Intelligence and Security Committee; Martin Mubanga; Louise Christian, lawyer of Martin Mubanga; Eric Metcalfe, representative from Justice; Gareth Crossman, representative from Liberty; Anne Fitzgerald, representative from Amnesty International; Ian Cobain and Richard Norton-Taylor, journalists from "The Guardian"; Stephen GREY, free-lance journalist; Mike Gapes MP, Chairman of the Foreign Affairs Committee (House of Commons); Rt Hon Geoff Hoon MP, Minister for Europe, Foreign and Commonwealth Office; Andrew Tyrie MP, Chairman of the All-Party Parliamentary Group on extraordinary rendition, comprising members of the House of Commons and House of Lords |
| 06 October 2006 - Friday | 11h00 - 12h00 | Commission Delegation London (United Kingdom) | Press conference 9: | Sarah LUDFORD, acting chair and Giovanni Claudio FAVA, rapporteur: Outcome of the delegation to London |
| 09 October 2006 - Monday | 15h00 - 18h30 | EP - BXL | TDIP Committee 22: | Armando SPATARO, Prosecutor (Milano) |
| 10 October 2006 - Tuesday | 09h00 - 12h30 | | | Otmar LAHODINSKY, Journalist and European editor of Austria's weekly magazine "Profil"; Massad Omer BEHARI, Alleged victim of Sudanese origin, living in Vienna |

| | | | | | |
|---|---|---|---|---|---|
| 9 | **CHRISTIAN Louise** | Lawyer of Martin MUBANGA | United Kingdom | 04 October 2006 | London | Delegation |
| 10 | **MICKUM Brent** | US lawyer of Bisher AL-RAWI and Jamil EL-BANNA | United Kingdom | 04 October 2006 | London | Delegation |
| 11 | **PEIRCE Gareth** | Lawyer for Bisher AL-RAWI and Jamil EL-BANNA | United Kingdom | 04 October 2006 | London | Delegation |
| 12 | **STAFFORD SMITH Clive** | Lawyer for Bisher AL-RAWI, Jamil EL-BANNA and Mohamed BINYAM | United Kingdom | 04 October 2006 | London | Delegation |
| 1 | **FITZGERALD Anne** | Senior Research Policy Adviser | Amnesty International | 23 February 2006 | Brussels | Hearing |
| | | | | 04 October 2006 | London | Delegation |
| 2 | **DIZDAREVIC Srdjan** | President of the Helsinki Committee for Human Rights | Bosnia & Herzegovina | 25 April 2006 | Brussels | Hearing |
| 3 | **NAJCEVSKA Mirjana** | President of the Macedonian Helsinki Committee | FYROM | 28 April 2006 | Skopje | Delegation |
| 4 | **BAUMANN Susanne** | Amnesty International Germany | Germany | 19 September 2006 | Berlin | Delegation |
| 5 | **MUGGENTHALER Ferdinand** | Amnesty International Germany | Germany | 19 September 2006 | Berlin | Delegation |
| 6 | **DASKAL Jennifer** | US Advocacy Director | Human Rights Watch | 10 May 2006 | Washington | Delegation |
| 7 | **MARINER Joanne** | Director of Terrorism and Counterterrorism Program | Human Rights Watch | 23 February 2006 | Brussels | Hearing |
| 8 | **SIFTON John** | Counterterrorism Researcher | Human Rights Watch | 10 May 2006 | Washington | Delegation |

**EN**

# EXHIBIT C



Parliamentary **Assembly**
**Assemblée** parlementaire

**Doc. 10957**
12 June 2006

# Alleged secret detentions and unlawful inter-state transfers of detainees involving Council of Europe member states

Report
Committee on Legal Affairs and Human Rights
Rapporteur: Mr Dick Marty, Switzerland, Alliance of Liberals and Democrats for Europe

*Summary*

Our analysis of the CIA 'rendition' programme has revealed a network that resembles a 'spider's web' spun across the globe. The analysis is based on official information provided by national and international air traffic control authorities, as well as on other information. This 'web' is composed of several landing points, which we have subdivided into different categories, and which are linked up among themselves by civilian planes used by the CIA or military aircraft.

Analysis of the network's functioning and of ten individual cases allows us to make a number of conclusions both about human rights violations – some of which continue – and about the responsibilities of some Council of Europe Member states, which are bound by the European Convention on Human Rights and the European Convention for the Prevention of Torture.

The United States, an observer state of our Organisation, actually created this reprehensible network, which we criticise in light of the values shared on both sides of the Atlantic. But we also believe having established that it is only through the intentional or grossly negligent collusion of the European partners that this "web" was able to spread also over Europe.

Whilst hard evidence, at least according to the strict meaning of the word, is still not forthcoming, a number of coherent and converging elements indicate that secret detention centres have indeed existed and unlawful inter-state transfers have taken place in Europe. It is not intended to pronounce that the authorities of these countries are 'guilty' for having tolerated secret detention sites, but rather it is to hold them 'responsible' for failing to comply with the positive obligation to diligently investigate any serious allegation of fundamental rights violations.

The draft resolution and recommendation propose different measures so that terrorism can be fought effectively whilst respecting human rights at the same time.

F – 67075 Strasbourg Cedex, tel: +33 3 88 41 20 00, fax: +33 3 88 41 27 02, http://assembly.coe.int, e-mail: assembly@coe.int

*Doc. 10957*

189.    Mr Zammar's arrest in Morocco was objectively facilitated by exchanges of information between the German services and their Dutch, Moroccan and also American counterparts. These exchanges of information about the travel plans of a person suspected of terrorist activities (the German government's report contains detailed information which seem to justify such suspicion) are part of normal international co-operation in the fight against terrorism. It cannot be deduced from the fact that the German services informed their colleagues of the dates on which Mr Zammar had flight reservations that it was their intention - or even that they suspected - that he would be arrested and held in violation of normal procedures. The facts date back to December 2001, well before the public revelations about the illegal practice of "rendition flights".

190.    The German Ministry for Foreign Affairs and the Damascus and Rabat Embassies intervened several times, firstly to establish Mr Zammar's whereabouts, then to give him consular assistance during his detention in Syria. Syria refused any kind of consular intervention, on the basis of its non-recognition of his renunciation of Syrian nationality when he underwent naturalisation in Germany, a policy applied generally by Syria.

191.    German officials did indeed question Mr Zammar in Syria. While Mr Zammar is said to have told his German interrogators that he had been beaten both in Morocco and in the early stages of his detention in Syria, but nothing supports the conclusion that this mistreatment related to the presence and intervention of the German agents. The German officials are reported to have found him in a good physical and psychological condition, although he had lost a considerable amount of weight. Relations between Mr Zammar and his Syrian guards did not seem tense, although the German visitors did note a somewhat authoritarian relationship.

192.    As indicated above, a *Bundestag* committee of inquiry is looking into the matter, and it is appropriate to await its results.

### 3.9.    Binyam Mohamed al Habashi

193.    Binyam Mohamed al Habashi is an Ethiopian citizen who has held resident status in the United Kingdom since 1994. While many of his family members emigrated to the United States and became naturalised citizens there, Binyam moved to the UK as a teenager and claimed asylum. He spent seven years pursuing his education in London while his asylum application was considered in a protracted, ultimately unresolved process. He had problems with drugs and converted to Islam at the age of twenty.

194.    Binyam is now detained at Guantanamo Bay and has been selected as one of the first group of ten prisoners to appear before a special United States Military Commission, probably later in 2006. We were able to view Binyam's diary, an account of the last five years of his life, and a series of letters he has written from Guantanamo. A member of my team was also able to hear first-hand testimony from members of his family and his legal representatives in the United Kingdom.

195.    In treating Binyam's case in my report I shall avoid any reference to the charges he is likely to face before the Military Commission. Suffice to say that I regard such commissions generally as a flawed basis on which to prosecute allegations of the most serious nature, since the defendant's due process rights are severely impaired[173]. I do not consider these commissions to be fair hearings and I reiterate my position that the global effort to bring terrorist suspects to justice should depend primarily upon judicial remedies.

196.    Of greatest concern in Binyam's case are the accounts of torture and other serious human rights violations which he says he has suffered. He speaks of being wounded all over his body with a scalpel and a razor blade, beaten unconscious and hung from the walls in shackles. He suffered gross physical injuries, including broken bones. He was constantly threatened with death, rape and electrocution.

---

[172] Following my request to the Chair of the *Bundestag* committee responsible for monitoring the special services, I received a copy of the public version of this report. I also received from an anonymous source a version classified "confidential/for official use only", of which I made responsible use, in the spirit of the decision taken by the Legal Affairs Committee at its meeting of 13 March 2006 on the receipt of confidential information. I was also offered a copy of an even more detailed version classified "secret", which I opted not to accept for ethical reasons. I place my trust in the members of the *Bundestag* to whom this document was addressed to take the necessary action on the basis thereof, including appropriate action to alert me to any fact reported in this version directly related to my terms of reference as rapporteur.

[173] Reference to the Executive Order that established Military Commissions for Guantanamo detainees, signed by President Bush in Oct / Nov 2001.

*Doc. 10957*

197.   It is difficult to say whether this account actually reflects reality. Let us just recall that some of these acts are included in what has been called "enhanced interrogation techniques", which have been developed by the United States in the "war on terror"[174]. Furthermore many of the abuses described by Binyam bear striking similarities to the allegations of other detainees who have been held in the same detention facilities at various points over the last few years[175].

198.   Binyam's case is an example for the very numerous detainees – most of whose names and whereabouts we do not know – who have become trapped in the United States' spider's web during the course of the "war on terror". Binyam has been subjected to two CIA renditions, a US military transfer to Guantanamo Bay and several other clandestine transfers by plane and helicopter. He has been held in at least two secret detention facilities, in addition to military prisons. During his illegal interrogations, he has been confronted with allegations that could only have arisen from intelligence provided by the United Kingdom.

199.   Binyam's family told my representative that he disappeared in the summer of 2001. His close-knit family subsequently endured several years of desperate uncertainty about his whereabouts and well-being, only partially clarified by their first visit from FBI agents three years later, in 2004. Although they have received a handful of letters from him in Guantanamo, none of the family has been able to see or speak to Binyam for five years.

200.   According to his testimony, Binyam travelled voluntarily to Afghanistan in 2001[176] and spent some time there, probably several months, before crossing into Pakistan and seeking to return to the UK. He was arrested by Pakistani officials at Karachi Airport on 10 April 2002 for attempting to travel on a false passport. Within ten days of his arrest, he was interrogated by American officials. Upon asserting his right to a lawyer, and later upon refusing to answer questions, American officers are alleged to have told him: "*The law has been changed. There are no lawyers. You can co-operate with us the easy way, or the hard way. If you don't talk to us, you're going to Jordan. We can't do what we want here, the Pakistanis can't do exactly what we want them to do. The Arabs will deal with you.*"

201.   The initial interrogations in Karachi involved Pakistani, American and British agents. Binyam was never accused of a particular crime and was told by MI6 agents that "*they checked out my story and said they knew I was a nobody*". When he was discharged from Pakistani custody, however, he was not released. Instead, the Pakistani security services took him to a military airport in Islamabad and handed him over to the United States.

202.   Binyam testifies that he underwent his first rendition on 21 July 2002. He was set upon by unidentified people "*dressed in black, with masks, wearing what looked like Timberland boots*". He describes how they "*stripped [him] naked, took photos, put fingers up [his] anus and dressed [him] in a tracksuit. [He] was shackled, with earphones, and blindfolded*", before being forced onto an aircraft and flown to Morocco. Official flight records obtained by this inquiry show that the known rendition plane, N379P, took off from Islamabad on 21 July 2002 and flew to Rabat, Morocco.

203.   Binyam has described various secret detention facilities in which he was held in Morocco, including one prison that was submerged "*almost underground*" and one more sanitary place in which he was apparently placed to recover from injuries sustained from his torture. Between July 2002 and January 2004 Binyam was tortured on numerous occasions by a team of interrogators and other officials, most of whom were Moroccan. Some of the officials wore masks, while others did not; at least one interrogator, who identified herself as a Canadian, is thought to have been an American CIA agent.

204.   It appears that the object of the torture was to break Binyam's resistance, or to destroy him physically and psychologically, in order to extract confessions from him as to his involvement in terrorist activities. In addition to the sustained abuse and threats, the torturers used information, apparently obtained from intelligence sources, to indicate to Binyam that they knew a lot about him. Much of the personal information – including details of his education, his friendships in London and even his kickboxing trainer – could only have originated from collusion in this interrogation process by UK intelligence services.

---

[174] Reference to some of the many documents on interrogation techniques obtained by the ACLU in its series of applications under the Freedom of Information Act.
[175] In this regard, see the Human Rights Watch reports on Temara in Morocco, plus a range of NGO and detainee accounts from the Dark Prison in Kabul.
[176] Binyam told his lawyer that he wanted to travel to Afghanistan to see the Taliban with his own eyes and decide "*whether it was a good Islamic country or not*". He also wanted to get away from a social life in London that revolved around drug use.

*Doc. 10957*

205.   Binyam has described his ill-treatment in Morocco to his lawyer in several phases: an initial "softening up"; a routine "circle of torture"; and eventually a "heavy" abuse involving mental torment and the infliction of physical injury. In the first few weeks of his detention he was repeatedly suspended from the walls or ceilings, or otherwise shackled, and brutally beaten: "*They came in and cuffed my hands behind my back. Then three men came in with black ski masks that only showed their eyes... One stood on each of my shoulders and the third punched me in the stomach. The first punch... turned everything inside me upside down. I felt I was going to vomit. I was meant to stand, but I was in so much pain I'd fall to my knees. They'd pull me back up and hit me again. They'd kick me in the thighs as I got up. They just beat me up that night... I collapsed and they left. I stayed on the ground for a long time before I lapsed into unconsciousness. My legs were dead. I could not move. I'd vomited and pissed on myself.*"

206.   At its worst, the torture involved stripping Binyam naked and using a doctor's scalpel to make incisions all over his chest and other parts of his body: "*One of them took my penis in his hand and began to make cuts. He did it once and they stood for a minute, watching my reaction. I was in agony, crying, trying desperately to suppress myself, but I was screaming. They must have done this 20 to 30 times, in maybe two hours. There was blood all over. They cut all over my private parts. One of them said it would be better just to cut it off, as I would only breed terrorists.*"

207.   Eventually Binyam began to co-operate in his interrogation sessions in an effort to prevent being tortured: "*They said if you say this story as we read it, you will just go to court as a witness and all this torture will stop. I could not take any more... and I eventually repeated what they read out to me. They told me to say I was with bin Laden five or six times. Of course that was false. They continued with two or three interrogations a month. They weren't really interrogations – more like trainings, training me what to say.*"

208.   Binyam says he was subjected to a second rendition on the night from 21 to 22 January 2004. After being cuffed, blindfolded and driven for about 30 minutes in a van, he was offloaded at what he believes was an airport. Again, Binyam's description matches the "methodology" of rendition described earlier in this report: "*They did not talk to me. They cut off my clothes. There was a white female with glasses – she took the pictures. One of them held my penis and she took digital pictures. When she saw the injuries I had, she gasped. She said: 'Oh my God, look at that'.*"

209.   The second rendition of Binyam Mohamed took place within the "rendition circuit" that I have identified in this inquiry. The aircraft N313P, operated on behalf of the CIA, is shown in my official data to have flown from Rabat to Kabul in the early hours of 22 January 2004. Two days later, as part of the same circuit, the same plane flew back to Europe and was used in the rendition of Khaled El-Masri[177].

210.   Binyam Mohamed's ordeal continued in Kabul, Afghanistan, where he was held in the facility he refers to as "The Prison of Darkness"[178] for four months. Detention conditions in this prison amount to inhuman and degrading treatment. In addition, forcing prisoners to remain in painful positions, sleep alteration, sensory deprivation and other recognised "enhanced interrogation techniques"[179] are known to be deployed there routinely by the United States military and its partners. At various times, Binyam was chained to the floor with his arms suspended above his head, had his head knocked against the wall and describes "*torture by music*", involving the sounds of loud rap and heavy metal, thunder, planes taking off, cackling laughter and horror sounds that amounted to a *"perpetual nightmare"*.

211.   Up until his transfer by helicopter to Bagram at the end of May 2004, Binyam was not allowed to see daylight. He was persistently interrogated and told about terrorist plots and activities in which he was accused of involvement. He was subjected to irregular eating patterns and "*weird*" sessions with psychiatrists.

212.   In a detention facility at Bagram Air Base, Afghanistan, Binyam was forced to write out a lengthy statement prepared by the Americans. The content of the statement is unknown to us. Binyam has told his lawyers that he wrote and signed this document in a state of complete mental disarray: "*I don't really remember [what I wrote], because by then I just did what they told me. Of course, by the time I was in Bagram I was telling them whatever they wanted to hear.*"

---

[177] References to the sections on rendition circuits and the individual case of El-Masri.
[178] Many other accounts in the file of the Rapporteur refer to this facility as the "Dark Prison" or the "Disco Prison".
[179] These so-called "enhanced interrogation techniques", which are considered acceptable in the context of some interrogations by the Americans, were exposed by the ACLU in its application under the *Freedom of Information Act*. In particular, these techniques are enumerated in a document from the FBI, available at www.aclu.org.

*Doc. 10957*

213.    The case of Binyam Mohamed is sufficient grounds for an urgent and decisive change of course in the international effort to overcome terrorism. The Council of Europe is duty-bound to ensure that secret detentions, unlawful inter-state transfers and the use of torture are absolutely prohibited and never resorted to again.

214.    It remains to be seen whether a Military Commission process will decide for or against Binyam Mohamed. The only certain legacy of this case is the deeply disturbing recognition that a human being has, in his own words, been completely dehumanised: *"I'm sorry I have no emotion when talking about the past, 'cause I have closed. You have to figure out all the emotional part; I'm kind of dead in the head."*

## 4.    Secret places of detention

215.    After the publication of allegations by the Washington Post and Human Rights Watch[180], we centred our search on certain sites in Poland and Romania.

### 4.1.    Satellite photographs

216.    We obtained from the European Union Satellite Centre (EUSC) in Torrejón a number of satellite photographs of the sites concerned[181], some taken at different times. We studied these with the assistance of an independent expert.

217.    These photographs do not constitute conclusive evidence. With the expert's help, we were able to identify several specific locations at a civil airport and a secret services base (in Poland) and at military airfields (in Romania) which would be very suitable for the secret detention of persons flown in from abroad. There are however hundreds of equally favourable locations throughout Europe. As the EUSC did not have available, for most of the places concerned, sequences of photographs which would have shown whether physical structures (huts, fences, watchtowers, and so on) had been altered (added or dismantled) at certain relevant times, the satellite photographs do not enable us to reach any conclusions with a high degree of certainty.

218.    On the other hand, they did enable us to request certain clarifications from the Polish and Romanian delegations. All the replies we received, in my opinion, show a lack of transparency and genuine willingness to co-operate in the authorities concerned[182].

### 4.2.    Documented aircraft movements

219.    As we showed above, the information received from Eurocontrol and certain national air traffic control authorities, confirmed by witnesses' accounts, makes it possible to be sure that certain flights were made between known detention centres and the suspected places in Poland and Romania. The geographical position of these places making them unlikely to be used for refuelling, the period spent on the ground in these places by these aircraft, and in particular the fact that the landings in question belong to well-established "rendition circuits"[183], allow us to suspect that they are or were places of detention which form part of the "spider's web" referred to above.

### 4.3.    Witnesses' accounts

220.    Accounts given by witnesses to Amnesty International[184] make it look very likely that a relatively large place of detention had to be located in a European country, without any more detail.

221.    A journalist working for German television[185] interviewed a young Afghan in Kabul who said that he had been held in Romania. This witness, very frightened and unwilling to give direct evidence to a member

---

[180] See para. 7 above.

[181] The following sites were captured in the satellite photographs: Cataloi, Fetesti and Mihail Kogalniceanu in Romania; and Szczytno / Szymany in Poland.

[182] In Poland's case, we detected, at an airfield said not to have been used for military purposes since the end of World War II, a very well-maintained double fence around a structure identified as containing munitions bunkers. Our question as to the reason for keeping this double fence in perfect condition did not receive a convincing reply. Where Romania is concerned, the authorities first stated that the construction works at the airbases concerned were merely being carried out to maintain existing infrastructure; only when the question was raised again, backed up by the only single-site photo sequence available to us, clearly showing the building of a new hangar and an extension of the aircraft parking area, did the Romanian authorities confirm that some new building had also been done.

[183] See para. 52 above.

[184] See para. 184 above, the case of Mr Bashmila and Mr Ali Qaru.

# EXHIBIT D

**** BUFFED by Mallorcair, S.L. Wed Mar 30 05:20:01 2005 ****
RCVD 01/01/25 03:57:33

E3G3D7X
PHIZJXR
MADFPCR
E3G3D7X

MALLORCAIR (THRU U.A.S. LEMD)
JEPPESEN DATAPLAN - U.S.A.
TIME SENSITIVE    TIME SENSITIVE

CONFIRM THIS REQUEST FOR GROUND HANDLING SERVICES ON BEHALF OF
EXPRESS LEASING INC FOR THIS PRIVATE NON-COMMERCIAL FLIGHT.

RATION NBR: N313P / CALL SIGN: N313P
AND AIRCRAFT TYPE: BOEING 737-700, MTOW: 171000 LB.
NT JAMES R FAIRING
OF 3 CREW AND 7 PAX IN / 7 PAX OUT

LE AS FOLLOWS
ATD 25 JAN 2004 2350Z
EPA 26 JAN 2004 0200Z
EPA 27 JAN 2004 0900Z
TAD 27 JAN 2004 1800Z

BED ON THE ABOVE SCHEDULE, PLEASE ADVISE OF ANY RESTRICTIONS
RPORT CURFEWS THAT MAY EXIST.

CES REQUIRED
OUND HANDLING   PLEASE INVOICE HANDLING AND AIRPORT FEES TO:
EN DATAPLAN
EST SANTA CLARA ST, SUITE 1200
JOSE, CA 95113-1773

ANY SERVICE IS REQUIRED TO BE PAID WITH CASH, PLEASE ADVISE ESTIMATE OF CO
MTOW OF ACFT IS LISTED ABOVE.

# EXHIBIT E

**nu**

Home

it the

ews

uss

t

rence

a

the

act

# A CIA rendition - and a Boeing firm called Jeppesen .... in documents

**I CONFIRM THIS REQUEST FOR GROUND HANDLING SERVICES ON BEHALF OF S. EXPRESS LEASING INC FOR THIS PRIVATE NON-COMMERCIAL FLIGHT.**

**Khaled el Masri,** the German citizen (pictured below), rendered from Skopje, Macedonia, to a jail in Afghanistan, described how he was handcuffed and blindfolded and placed in a jet to Ka Afghanistan, on **January 24, 2004.** The plane reached Kabul after making one stop, he said.



Confirmation of el Masri's account came from the **flight logs the CIA jet,** registered in 2004 under the tail number **N313** later N4476S, a Boeing Business Jet (BBJ).

The plane was operated by **Aero Contractors Ltd** from Nor Carolina, although generally travelled under the identity of **"Stevens Express",** a company registered in Tennessee.

As described in Ghost Plane (chapter 4), evidence for the involvement of the N313P and the identity of its pilots, crew the rendition team emerged from an inquiry by Spanish polic the island of **Mallorca,** from where the plane began its journ pick up el Masri in Macedonia, and where the plane returned for two nights after the rendition.

The same plane had arrived in Mallorca after also rendering the Londoner, **Binyam Mohamed** Morroco to Afghanistan.

**JEPPESEN DATAPLAN — U.S.A.**

The Spanish report suggested the plane was handled in Majorca by a local company, Mallorcair which arranged immigration procedures, refuelling, local permissions, and organised hotel accomodation, as well as restocking the plane with food and wine. The New Yorker - in a piece Jane Mayer called **'The CIA's Travel Agent'** - has reported the Jeppersen Data Plan connectiv noted it was a subsidiary of Boeing. Mayer reported:

> "A former Jeppesen employee, who asked not to be identified, said recently that he had been startled to learn, during an internal corporate meeting, about the company's involvement with the rendition flights. At the meeting, he recalled, Bob Overby, the managing director of Jeppesen International Trip Planning, said, "We do all of the extraordinary rendition flights—you know, the torture flights. Let's face it, some of these flights end up that way." The former employee said that another executive told him, "We do the spook flights." He was told that two of the company's trip planners were specially designated to handle renditions. He was deeply troubled by the rendition program, he said, and eventually quit his job. He recalled Overby saying, "It certainly pays well. They"—the C.I.A.—"spare no expense. They have absolutely no worry about costs. What they have to get done, they get done."
>
> Overby, who was travelling last week, did not return several phone calls. Mike Pound, the head of corporate communications for Jeppesen, said that he would have no comment, and he added, "Bob Overby will have no comment as well." Tim Neale, the director of media relations for Boeing's corporate office in Chicago, said, "The flight-planning services we provide our customers are confidential, and we do not comment publicly on any work done for any customer without their consent." The C.I.A. had no comment."

The visit of the N313P for el Masri's rendition was just one many visits to Mallorca by the BBJ as the plane's sister jet, a Gulfstream V (registered as N379P and then N8068V) that was used great many renditions, as detailed in the book.

Here are the flight logs of the N313P during its visits to Majorca in January 2004:

17-January-2004 SHANNON to LARNACA
21-January-2004 LARNACA to RABAT/SALE
21-January-2004 RABAT-SALE to KABUL **Rendition of Binyam Mohamed**
22-January-2004 KABUL to ALGIERS
22-January-2004 ALGIERS to PALMA DE MALLORCA **First night in Mallorca (Marriott hotel)**
23-January-2004 PALMA DE MALLORCA to SKOPJE
24-January-2004 SKOPJE to BAGHDAD **Rendition of Khaled el Masri**
24-January-2004 BAGHDAD to KABUL **Rendition of Khaled el Masri**
25-January-2004 KABUL to TIMISOARA (Romania)
26-January-2004 BUCUREST (Romania) to PALMA DE MALLORCA **2nd / 3rd night in Mallorca (Gran Me Hotel)**
28-January-2004 PALMA DE MALLORCA DULLES WASHINGTON

In almost all visits by the alleged CIA planes, according to the Spanish report, instructions wer received by Mallorcair from Jeppesen Data Plan. Although the documents here are sometimes difficult to read, instructions can be seen in the form of a telex to Mallorcair from named indivi

at Jeppesen for handling of the jet.

Below are instructions received for the BBJ's return to Palma after the el Masri rendition. The p
is identified as a "private non-commercial flight" and the captain identified as "Capt James R
Fairing", believed to be a cover name.



In a statement to Spanish police, the boss of Mallorcair confirms he received instructions from
Jeppesen:

> MIGUEL MUDOY RODRÍGUEZ, propietario y delegado de la empresa
> MALLORCAIR S.L. SER. AVIATION.
>
> El señor MUDOY fue reseñando las siete ocasiones que su empresa prestó
> servicio a las aeronaves citadas con anterioridad
>
> Todos los servicios prestados se realizaron previa solicitud de JEPPESEN
> DATAPLAN, 225 West Santa Clara ST Suite 1600, San José, California, U.S.A.,
> (empresa dedicada a gestionar servicios de handling, derechos aeroportuarios, permisos
> de sobre vuelos, etc.)
>
> En la documentación aportada a las presentes por el señor MUDOY se aprecia
> que todas las aeronaves eran operadas por la compañía STEVENS EXPRESS
> LEASING (USA). — una de las firmas del NJT

An un-certified translation of the above is:

> **"Miguel Moduy Rodriguez**, proprietor and delegate of the business, Mallorcair S.L. Ser
> Aviation.
>
> The gentleman, Mudoy, recorded six occasions that his business rendered services to the

previously cited airplanes.

All of the services rendered were made before the solicitation of **JEPPESEN DATAPLAN**, 225 West Santa Clara ST Suite 1600, San Jose, California, U.S.A., (a business dedicated to the handling, airport rights, and flight welfare, etc)

In the presented documentation by Mudoy, it shows that all airplanes were operated by the company **Stevens Express Leasing (U.S.A.)**."

Click to download:

- the full telex from Jeppesen on return trip of BBJ to Mallorcair after el Masri rendition

- telex on visit of N313P on 9 March 2004

- telex on visit of N4476S on 17 January 2005

- telex on visit of N8068V on 15 September 2004

- telex on visit of N8068V on 6 September 2004

## Visibility and openness is

Submitted by Anonymous (not verified) on Fri, 2006-12-08 22:05.
Visibility and openness is our new city vision. Let's continue it with who shall be the sponsors downtown holiday ice rink. I would recommend that we do more overtly instead covertly as to advertising the Jeppesen international trip planning people, who are also involved with sponsc torture. Is this what San Jose should also be known for? I hope not because I am very proud city.
» reply

## What do you mean by "overtly

Submitted by San Jose protester (not verified) on Tue, 2006-12-12 03:27.
What do you mean by "overtly and not covertly"? We are doing our best to publicize the fa that this company here in San Jose is implicated in torture. If you have more ideas about to do it, please let me know!
» reply

## Here in San Jose, we read

Submitted by San Jose protester (not verified) on Thu, 2006-12-07 02:32.

Here in San Jose, we read the article by Jane Mayer in the New Yorker and organized a protes
11/17 in front of the building at 225 W. Santa Clara St. that houses the Jeppesen offices. It g
some good coverage in the media, including TV news coverage and coverage by a San Jose
Mercury News columnist. http://cbs5.com/local/local_story_321002154.html Reporters contac
Jeppesen, who of course had "no comment". Starting Dec. 1 there is an ongoing "San Jose Sa
to Torture" vigil in front of that office every Friday from 4:30 to 5:30 until further notice. Jepp
is a sponsor of the downtown Holiday Ice Rink so on December 5, we held a rally in front of C
Hall and went in to the City Council meeting to speak out and demand that the city council rei
the Jeppesen banner from the ice rink. These protests are sponsored by South Bay Mobilizatic
(www.sbm4peace.org), Act Against Torture (www.ActAgainstTorture.org) and Amnesty
International Group 35 and the Friday Peace Vigil (http://www.sanjoseinterfaithpeaceaction.o
» reply

## Post new comment

### Math Question: What is 9 + 6?: *

Please solve the math problem above and type in the result. e.g. for 1+1, type 2

### Your name:

Anonymous

### E-mail:

The content of this field is kept private and will not be shown publicly.

### Homepage:

### Comment: *

- Lines and paragraphs break automatically.
- Allowed HTML tags: <em> <strong> <cite> <code> <ul> <ol> <li> <dl> <dt> <dd>

More information about formatting options    [ Preview comment ]    [ Post comment ]

# EXHIBIT F



# Intelligence and Security Committee

## Rendition

Chairman:

The Rt. Hon. Paul Murphy, MP

Presented to Parliament by the Prime Minister
by Command of Her Majesty
JULY 2007

Cm 7171

£18.00

# BINYAM MOHAMED AL-HABASHI

## Background

98.    Binyam Mohamed al-Habashi, an Ethiopian national, sought political asylum in the UK in March 1994 and was given indefinite leave to remain whilst his asylum application was considered (his application was refused in May 2000). In June 2001 he travelled to Pakistan, planning to return in April 2002. On 10 April 2002 the Pakistani authorities arrested him at Karachi airport (having fled Afghanistan where he had reportedly been fighting with the Taliban) for travelling on a false passport.

## Allegations

99.    Al-Habashi alleges that he was held by the Pakistani authorities for a period of three months, during which time he was mistreated. He says that he was interrogated by British officials and that *"one of them did tell me I was going to get tortured by the [Arabs]"*.[78]

100.    Al-Habashi alleges that, in July 2002, he was the subject of an American "Extraordinary Rendition" operation, from Pakistan to Morocco.[79] He claims he was subjected to torture and CIDT whilst detained by the Moroccan authorities. He says that the Moroccans told him that they were working with the British Security Service and that he was asked questions containing details about his life that could only have come from UK sources.

101.    After 18 months' detention in Morocco, al-Habashi alleges that he was rendered to Kabul in January 2004 where he suffered further mistreatment. In September 2004, al-Habashi was transferred to Guantánamo Bay, where he is still being held.

## Outcome of Investigation

102.    The Committee has taken evidence about this case. We have been told that SIS never had any contact with al-Habashi. A member of the Security Service did interview al-Habashi once, for a period of approximately three hours, whilst he was detained in Karachi in 2002. The interview was conducted by an experienced officer and was in line with the Service's guidance to staff on contact with detainees.

---

[78] *Statement by al-Habashi to his lawyer (Clive Stafford Smith) whilst in Guantánamo Bay, taken from Reprieve written submission to the Committee, 4 December 2006.*

[79] *The Committee has been told that the Security Service first learnt of the allegation that he had been transferred to Morocco in 2005.*

33

103. The Security Service denies that the officer told al-Habashi he would be tortured, as he alleges. Furthermore, the officer reported that he did not observe any abuse and that no instances of abuse were mentioned by al-Habashi.

104. The Security Service had no further contact with al-Habashi since this one interview in 2002. However, they were aware of the U.S. plan to transfer him, because:

> … at the beginning it was thought [al-Habashi] was [a British national], we were told by [the U.S.] that they were going to move him to Afghanistan and we know that he was moved to Guantánamo. He has claimed that on the route there he was held in Morocco and that while in Morocco he was tortured… We do not know whether that happened…[80]

105. ***

***. In giving evidence to the Committee in 2006, the Director General of the Security Service told us:

> … when we knew he was in custody, because he had information we believed relevant to the UK from having lived here, ***
>
> ***
>
> ***
>
> ***. That is a case where, with hindsight, we would regret not seeking proper full assurances at the time…[81]

106. Whilst no assurances were sought, this is understandable given the lack of knowledge, at the time, of any possible consequences of U.S. custody of detainees. Indeed, the Director General of the Security Service said to us:

> I do not think we would know today if Congress and the Supreme Court had not pressed the American Government to move the way it did.[82]

## Conclusions

**M.    There is a reasonable probability that intelligence passed to the Americans was used in al-Habashi's subsequent interrogation. We cannot confirm any part of al-Habashi's account of his detention or mistreatment after his transfer from Pakistan.**

**N.    We agree with the Director General of the Security Service that, with hindsight, it is regrettable that assurances regarding proper treatment of detainees were not sought from the Americans in this case.**

---

[80] *Oral evidence – Security Service, 23 November 2006.*

[81] *Ibid.*

[82] *Ibid.*