IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Binyam Mohamed, et al., | NO. C 07-02798 JW |
| Plaintiffs, | **ORDER GRANTING THE UNITED STATES' MOTION TO INTERVENE AND GRANTING THE UNITED STATES' MOTION TO DISMISS WITH PREJUDICE** |
| v. | |
| Jeppesen Dataplan, Inc., | |
| Defendant. | |

## I. INTRODUCTION

This lawsuit was filed by Plaintiffs, who are foreign nationals, for damages inflicted upon them in a so-called "rendition" program operated under the auspices of the United States Government. Plaintiffs allege that under the program they were unlawfully apprehended, transported, imprisoned, interrogated and in some instances tortured—all under the direction of the United States. Defendant, Jeppesen Dataplan, Inc., is a domestic corporation with its headquarters in San Jose, California. Defendant is being sued for its alleged participation in the program. Plaintiffs are proceeding under the Alien Tort Statute, 28 U.S.C. § 1350, which gives the District Courts original jurisdiction to hear actions that allege tortious conduct committed against aliens in violation of the law of nations or a treaty of the United States. The United States seeks to intervene in the action, to assert the "state secrets" privilege, and on that basis, to move the Court for dismissal of the action or alternatively for summary judgment.

1   The Court conducted a hearing on February 5, 2008. The Court finds good cause to allow
2 the United States to intervene. Having reviewed the allegations of the Complaint and the showing
3 made by the United States, including a classified declaration, the Motion to Dismiss is GRANTED.

## II. BACKGROUND

In a First Amended Complaint filed on August 1, 2007, Plaintiffs[1] make the following allegations against Defendant Jeppesen:

> Plaintiffs Mohamed, Britel, Agiza, Bashmilah, and al-Rawi were victims of an unlawful program devised and developed by the Central Intelligence Agency. Commonly known as "extraordinary rendition," the program involves the clandestine apprehension and transfer of persons suspected of involvement in terrorist activities to secret detention and interrogation facilities in countries outside the United States, utilizing methods impermissible under United States and international law. (First Amended Complaint ¶ 13, hereafter, "FAC," Docket Item No. 27.) Each Plaintiff's experience is as follows:

> Binyam Mohamed is an Ethiopian citizen. At the time of his unlawful rendition, Mohamed was a legal resident of the United Kingdom. (FAC ¶ 22.) On April 10, 2002, Mohamed was arrested in Karachi, Pakistan and turned over to agents of the U.S. Federal Bureau of Investigation and the CIA. After four months of interrogation, during which time he was refused access to a lawyer, CIA agents blindfolded him, strapped him to the seat of a plane, and flew him to Rabat, Morocco. (FAC ¶ 3.) For the next eighteen months, Mohamed was secretly detained, interrogated, and tortured by agents of the Moroccan intelligence services. On January 21, 2004, he was taken by agents of the CIA and flown to the secret U.S. detention facility known as the "Dark Prison," in Kabul, Afghanistan. There, Mohamed was subjected to several more months of detention, interrogation, and torture by U.S. intelligence agents before being transferred to Bagram Air Base outside Kabul. In September 2004, Mohamed was transferred to the Naval Station at Guantánamo Bay, Cuba where he remains. (FAC ¶ 4.)

> Abou Elkassim Britel is an Italian citizen. At the time of his unlawful rendition, he was an Italian citizen working in Pakistan. (FAC ¶ 23.) On March 10, 2002, Bristel was apprehended by Pakistani police in Lahore, Pakistan. After two months of interrogation, during which time his repeated requests to speak with the Italian consulate were denied, he was turned over to CIA agents who blindfolded him, strapped him to the seat of a plane, and flew him to Rabat, Morocco. (FAC ¶ 5.) For more than eight months, Britel was secretly detained, interrogated, and tortured by agents of the Moroccan intelligence services until he was released without charges in February 2003. In May 2003, he was arrested by Moroccan authorities while attempting to return to Italy. In the same month, Britel was sentenced to fifteen years in prison for his alleged involvement in terrorist-related activities. His sentence was subsequently reduced to nine years on appeal. (FAC ¶ 6.) Britel is currently imprisoned at the Ain Bourja prison in Morocco. (FAC ¶ 23.)

---

[1] Plaintiffs are Binyam Mohamed, Abou Elkassim Britel, Ahmed Agiza, Mohamed Farag Ahmad Bashmilah, and Bisher al-Rawi.

Ahmed Agiza is an Egyptian citizen. At the time of his unlawful rendition, Agiza, together with his wife and five young children, was living in Sweden, where the family had applied for political asylum and permanent residence. (FAC ¶ 24.) On December 18, 2001, Agiza was secretly apprehended by Swedish security police, handed over to agents of the CIA who blindfolded him, strapped him to the seat of a plane, and flew him to Cairo. There, he was turned over to agents of the Egyptian intelligence services who detained, interrogated, and tortured him. (FAC ¶ 7.) For the first five weeks after his arrival in Egypt, Agiza was detained incommunicado. During this time and for about ten weeks, he was repeatedly and severely tortured and denied meaningful access to consular officials, family members, and lawyers. In April 2004, following trial before a military tribunal, Agiza was convicted and sentenced to twenty-five years in prison for membership in an organization banned under Egyptian law. The sentence has since been reduced to fifteen years. (FAC ¶ 8.) Agiza is currently imprisoned in the Tora prison complex in Egypt. (FAC ¶ 24.)

Mohamed Farag Ahmad Bashmilah is a Yemeni citizen. At the time of his unlawful rendition, Bashmilah, together with his wife, was visiting Jordan to assist his mother in obtaining medical care. (FAC ¶ 25.) On or about October 21, 2003, Bashmilah was taken into custody by the Jordanian General Intelligence Department while he was visiting Jordan. After being interrogated under torture for many days, Bashmilah was handed over, by the Jordanian government, to CIA agents who blindfolded him, strapped him to the seat of a plane, and flew him to Kabul, Afghanistan. (FAC ¶ 9.) For the next nineteen months, Bashmilah was held incommunicado by the U.S. government. For about six months, Bashmilah was secretly detained, interrogated, and tortured by U.S. intelligence agents at Bagram Air Base in Afghanistan. Toward the end of April 2004, Bashmilah was again transferred to another detention facility in an unknown country. In this CIA "black site," Bashmilah was subjected to more than a year of interrogation, torture, and detention. On May 5, 2005, he was again "prepared" for flight by a CIA team. This time he was returned to Yemen, where he was detained for about nine months before being released. (FAC ¶ 10.) Bashmilah currently resides in Yemen. (FAC ¶ 25.)

Bisher al-Rawi is an Iraqi citizen and a British permanent resident. At the time of his unlawful rendition, al-Rawi, together with his elder brother and his business associates, was traveling to the Republic of the Gambia, Africa, to establish a peanut processing business. (FAC ¶ 26.) On November 8, 2002, al-Rawi was apprehended by Gambian intelligence agents at the Banjul airport in the Republic of The Gambia. He was detained and questioned for two weeks by Gambian officials and agents of the CIA. CIA agents then blindfolded him, strapped him to the seat of a plane, and flew him to Kabul, Afghanistan. (FAC ¶ 11.) In Afghanistan, al-Rawi was detained for two weeks at the secret U.S.–run detention facility known as the "Dark Prison" before being transferred to the Bagram Air Base for two more months of detention and interrogation. While in U.S. custody, al-Rawi was physically and psychologically tortured and otherwise abused before he was flown to Guantánamo on February 7, 2003. On March 30, 2007, al-Rawi was released from Guantánamo and returned to his home in England, were he currently resides. No charges have ever been brought against him. (FAC ¶ 12.)

The program described above has been carried out by the CIA, with the assistance of U.S.-based corporations, such as Jeppesen, who have provided the aircraft, flight crews, and the flight and logistical support necessary for hundreds of international flights. (FAC ¶ 13.)

Jeppesen is a corporation with headquarters in San Jose, California. Jeppesen provides an aviation and logistical and travel service operating under the trade name Jeppesen International Trip Planning. Jeppesen is a wholly owned subsidiary of Jeppesen

3

Sanderson, a corporation with headquarters in Englewood, Colorado. Jeppesen Sanderson, in turn, is a wholly owned subsidiary of Boeing Company. (FAC ¶ 27.)

Jeppesen has provided direct and substantial services to the United States for its "extraordinary rendition." (FAC ¶ 2.) In providing its services to the CIA, Jeppesen knew or reasonably should have known that Plaintiffs would be subjected to forced disappearance, detention, and torture in countries where such practices are routine. According to published reports, Jeppesen had actual knowledge of the consequences of its activities. A former Jeppesen employee informed The New Yorker magazine that at an internal company meeting, a senior Jeppesen official stated: "We do all of the extraordinary rendition flights - you know, the torture flights. Let's face it, some of these flights end up that way." Jane Mayer, *Outsourced: The CIA's Travel Agent,* The New Yorker, Oct. 30, 2006. (FAC ¶ 16.)

On the basis of the allegations outlined above, Plaintiffs allege two causes of action: (1) Alien Tort Statute: Forced Disappearance; and (2) Alien Tort Statute: Torture and Other Cruel, Inhuman, or Degrading Treatment.

Presently before the Court are the United States' Motion to Intervene[2] and the United States' Motion to Dismiss, or in the Alternative, for Summary Judgment.[3]

## III. DISCUSSION

The United States seeks to intervene in this case and to assert state secrets privilege on behalf of itself and Jeppesen, filing separate motions as to each issue. In support of its motions, the United States filed a public declaration of General Michael V. Hayden, USAF, who is currently serving as director of the CIA.[4] The Court has also reviewed, *in camera* and *ex parte*, a classified declaration of General Hayden. Upon review of the public and classified declarations, the Court proceeds to address each of the United States' motions in turn.[5]

---

[2] (hereafter, "Motion to Intervene," Docket Item No. 42.)

[3] (hereafter, "Motion Re State Secrets," Docket Item No. 43.)

[4] (Motion Re State Secrets, Formal Claim of State Secrets and Statutory Privileges by General Michael V. Hayden, USAF, Director of the Central Intelligence Agency, hereafter, "Public Hayden Decl.")

[5] In this Order, the Court refers only to the contents of General Hayden's publicly filed declaration.

4

**A.    The United States' Motion to Intervene**

The United States moves to intervene as a matter of right pursuant to Federal Rule of Civil Procedure 24(a).  (Motion to Intervene at 3.)

Rule 24(a) provides:

On timely motion, the court must permit anyone to intervene who:

> (1) is given an unconditional right to intervene by a federal statute; or (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

To intervene as a matter of right, a non-party must satisfy four requirements: "(1) the application for intervention must be timely; (2) the applicant must have a 'significantly protectable' interest relating to the property or transaction that is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest must not be adequately represented by the existing parties in the lawsuit." Southwest Center for Biological Diversity v. Berg, 268 F.3d 810, 817 (9th Cir. 2001).  The Ninth Circuit has liberally construed Rule 24(a) in favor of potential intervenors.  Id. at 818.

The United States has satisfied all of the requirements for intervention.  First, the motion by the United States is timely.  Second, the motion was filed early in the litigation, and was earlier preceded by a Statement of Interest, informing the Court that the United States was considering whether to intervene.  (See Docket Item No. 34.)  Third, the United States has an important interest in this action because it involves activities allegedly overseen by the CIA; it is the nature and extent of these activities over which the United States seeks to assert state secrets privilege.  (See Motion Re State Secrets.)  If the United States were not allowed to intervene, its interest in maintaining state secrets could be harmed.  Finally, the United States is not adequately represented by Jeppesen because Jeppesen cannot assert state secrets privilege on behalf of the government.  The privilege belongs to the government alone and cannot be asserted by private citizens.  United States v. Reynolds, 345 U.S. 1, 7-8 (1953).

5

In addition, neither party opposes the intervention of the United States in this action. (See Docket Item Nos. 48, 51.) Accordingly, the Court GRANTS the United States' Motion to Intervene.

**B.    The United States' Invocation of State Secrets Privilege and Motion to Dismiss**

The United States has interposed a claim of state secrets privilege and moves to dismiss the lawsuit on that ground. (Motion Re State Secrets at 6, 9, 16.)

State secrets privilege is a common law evidentiary privilege of constitutional significance that the government may assert when "there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged." Reynolds, 345 U.S. at 10. Invocation of state secrets privilege requires a court to undertake a three-step analysis:[6] (1) the court must "ascertain that the procedural requirements for invoking the state secrets privilege have been satisfied," El-Masri v. U.S., 479 F.3d 296, 304 (4th Cir. 2007); see also Reynolds, 345 U.S. at 7-8; (2) the court must make an independent determination of whether the information is privileged, El-Masri, 479 F.3d at 304; and (3) the court must consider whether or how the case should proceed in light of the privilege claim. Id. The Court proceeds to conduct the above analysis in this case.

**1.    The Government has complied with the procedures for invoking the privilege.**

To assert state secrets privilege, the government must make "a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." Reynolds, 345 U.S. at 7-8.

General Hayden is the head of the CIA, which is the department that Plaintiffs allege has control over the "extraordinary rendition" program. (Public Hayden Decl. ¶ 1; FAC ¶¶ 3-13.) In his public declaration, General Hayden states, "The purpose of this declaration is to formally assert, in my capacity as the Director of the Central Intelligence Agency, the military and state secrets

---

[6] The Ninth Circuit's recent decision in Al-Haramain Islamic Foundation, Inc. v. Bush, 507 F.3d 1190, 1202 (9th Cir. 2007), adopted this three-step analysis, which was first articulated in El-Masri, 479 F.3d at 304.

6

privilege." (Public Hayden Decl. ¶ 3.) The Court finds that the public declaration satisfies all of the procedural requirements for invocation of the state secrets privilege.

### 2. State secrets privilege applies to the information which the government seeks to protect from disclosure.

After state secrets privilege has been properly asserted, a court must determine whether the privilege applies to the information the government seeks to prevent from being disclosed. See Reynolds, 345 U.S. at 7-8.

Without reaching the merits of Plaintiffs' allegations, in the First Amended Complaint, Plaintiffs make allegations against Defendant concerning the operations of the CIA overseas. (FAC ¶¶ 1-13.) Litigation over "allegations" about the operations of the CIA overseas implicates national security interests of the United States, entitling the United States to invoke state secrets privilege. The court defers "to the Executive [Branch] on matters of foreign policy and national security." Al-Haramain, 507 F.3d at 1203. Moreover, the Court has read the classified Declaration of General Hayden. In light of the Supreme Court's warning not to disclose "the very thing the privilege is designed to protect," the Court does not give an analysis of the classified document. Reynolds, 345 U.S. at 7-8. The Court finds that inasmuch as the case involves "allegations" about the conduct by the CIA, the privilege is invoked to protect information which is properly the subject of state secrets privilege.

### 3. Whether this case may proceed in the face of the invocation of state secrets privilege.

Once state secrets privilege is invoked, the Court should consider whether the case may proceed under that circumstance. The invocation of states secret privilege is a categorical bar to a lawsuit under the following circumstances: (1) if the very subject matter of the action is a state secret; (2) if the invocation of the privilege deprives a plaintiff of evidence necessary to prove a *prima facie* case; and (3) if the invocation of the privilege deprives a defendant of information necessary to raise a valid defense. Since the Court finds that the very subject matter of this case is a state secret, the Court does not reach the other circumstances.

7

The issue of whether "subject matter" of a case is a state secret is a threshold determination. Al-Haramain, 507 F.3d at 1201. If the "very subject matter of the action" is a state secret, then the action is non-justiciable and "the court should dismiss the plaintiff's action based solely on the invocation of state secrets privilege." Kasza v. Browner, 133 F.3d 1159, 1166 (9th Cir. 1998); Al-Haramain, 507 F.3d at 1200.

The "subject matter" of an action is not the same as the "facts necessary to litigate the case." Al-Haramain, 507 F.3d at 1201; but see El-Masri, 479 F.3d at 308. Courts have found the "very subject matter" of a case to be a state secret when the case involved classified weapons or other devices, or when the case involved covert operations by agencies of the United States in foreign countries. See Hepting v. AT & T Corp., 439 F. Supp. 2d 974, 993 (N.D. Cal. 2006) (citing exemplary cases). For example, in Kasza, the Ninth Circuit found that the "subject matter" of a case was a state secret because the information was at the core of the plaintiff's claim such that any further proceeding in the case jeopardized national security. The court reasoned:

> Not only does the state secrets privilege bar Frost from establishing her prima facie case on any of her eleven claims, but any further proceeding in this matter would jeopardize national security. No protective procedure can salvage Frost's suit. Therefore, as the very subject matter of Frost's action is a state secret, we agree with the district court that her action must be dismissed.

Kasza, 133 F.3d at 1170.

The government contends that the very "subject matter" of this case is a state secret because the disclosure of the information covered by its privilege assertions reasonably could be expected to cause serious damage to the national security and foreign relations of this country. (Motion Re State Secrets at 16.) For example, in his publicly filed declaration, General Hayden states:

> First, this lawsuit puts at issue whether or not Jeppesen assisted the CIA with any of the alleged detention and interrogation . . . . Disclosure of information that would tend to confirm or deny whether or not Jeppesen provided such assistance – even if such confirmations or denial come from a private party alleged to have cooperated with the United States and not the United States itself – would cause exponentially grave damage to the national security by disclosing whether or not the CIA utilizes particular sources and methods and, thus, revealing to foreign adversaries information about the CIA's intelligence capabilities or lack thereof.
> . . .

8

> Second, this lawsuit puts at issues whether or not the CIA cooperated with particular foreign governments in the conduct of alleged clandestine intelligence activities. Adducing evidence that would tend to confirm or deny such allegations would result in extremely grave damage to the foreign relations and foreign activities of the United States.

(Public Hayden Decl. ¶¶ 22, 23.) The Court's review of General Hayden's public and classified declarations confirm that proceeding with this case would jeopardize national security and foreign relations and that no protective procedure can salvage this case. Thus, the Court finds that the issues involved in this case are non-justiciable because the very subject matter of the case is a state secret.

Plaintiffs contend that the very "subject matter" of this case is not a state secret because publically made statements about the United States' detention and interrogation program show an intention to engage in a public discourse about the program. (Plaintiffs' Opposition to the United States' Motion to Dismiss at 25, 28.) Plaintiffs further contend that these public statements mean the program is not a "black box" program, the very existence of which is secret. (Id.) Plaintiffs rely on Al-Haramain,[7] where the Ninth Circuit found that the "subject matter" of a case involving a National Security Agency wiretapping program was not a state secret because elements of the program had been disclosed to the public. 507 F.3d at 1201. Al-Haramain is distinguishable from the facts alleged in this case. The Court's review of General Hayden's public and classified declarations cause it to have concern that any further proceedings in this case would elicit facts which might tend to confirm or refute as of yet undisclosed state secrets.

In sum, at the core of Plaintiffs' case against Defendant Jeppesen are "allegations" of covert U.S. military or CIA operations in foreign countries against foreign nationals—clearly a subject matter which is a state secret. Accordingly, pursuant to 28 U.S.C. § 1331 and Federal Rule of Civil Procedure 12(b)(1), the United States' Motion to Dismiss is GRANTED with prejudice on the ground that the Court lacks subject matter jurisdiction.

---

[7] Plaintiffs also rely on Hepting, 439 F. Supp. 2d 974. In Hepting, the Court conducted an analysis as to whether an asserted state secret was actually "secret" in the sense that it had not been publically disclosed by any reliable source. Id. at 990. However, this approach is not fully supported by the Ninth Circuit's later decision in Al-Haramain, where the Court focused on disclosures made by the holder of the privilege, which is the government, as opposed disclosures made by any reliable source. See 507 F.3d at 1197-1200.

9

## IV. CONCLUSION

This non-justiciable dismissal is limited to the legal effect of the United States' invocation of state secrets privilege; it is not an indication as to whether Plaintiffs have standing or whether they are entitled to recover under the Alien Tort Statute.

The Court GRANTS the United States' Motion to Intervene and GRANTS the United States' Motion to Dismiss on the ground that the very subject matter of the case is a state secret. The Court DISMISSES this case with prejudice.

Dated: February 13, 2008

JAMES WARE
United States District Judge

**United States District Court**
For the Northern District of California

1 **THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Ann Brick, abrick@aclunc.org
Benjamin Elihu Wizner, bwizner@aclu.org
Daniel Paul Collins, Daniel.Collins@mto.com
Jameel Jaffer, jjaffer@aclu.org
Joseph Scott Klapach, joseph.klapach@mto.com
Margaret Lockwood Satterthwaite, satterth@juris.law.nyu.edu
Michael Patrick Abate, michael.abate@usdoj.gov
Steven M. Watt, swatt@aclu.org

**Dated: February 13, 2008**              **Richard W. Wieking, Clerk**

                                          **By:   /s/ JW Chambers**
                                              **Elizabeth Garcia**
                                              **Courtroom Deputy**